**BLANK ROME LLP**
*A Pennsylvania LLP*
David C. Kistler
(New Jersey Resident Partner)
Anthony B. Haller, Esquire
Janet O. Lee, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ  08540
Telephone: (609) 750-2643
Facsimile: (609) 897-7291
Kistler@BlankRome.com
Haller@BlankRome.com
JLee@BlankRome.com
*Attorneys for Defendant*
*Bordentown Driver Training School, LLC*
*d/b/a Smith & Solomon*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH FRILANDO, | Civil Action No. 2:15-cv-02917 |
| Plaintiff, | ***Electronically Filed*** |
| v. | |
| BORDENTOWN DRIVER TRAINING SCHOOL, LLC d/b/a SMITH & SOLOMON, | Motion Date: February 21, 2017 |
| Defendants. | Oral Argument Requested |

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   SUMMARY OF UNDISPUTED MATERIAL FACTS...................................... 3

      A.    The Unique and Significant Dangers of Commercial Motor Vehicles.................. 3

      B.    The FMCSA and its Comprehensive CMV Safety Regulations........................... 3

            1.    The FMCSR Physical Qualification Requirements. ................................. 3

            2.    The Decision to Allow a Hearing Test Waiver........................................... 4

            3.    The CDL Examination. ................................................................... 5

      C.    Bordentown and its Linden, New Jersey Facility ..................................... 6

      D.    Bordentown's CDL Training Program. ................................................ 7

            1.    Classroom Training................................................................... 7

            2.    Yard Training.......................................................................... 8

            3.    Road Training. ........................................................................ 9

      E.    Bordentown's Significant Efforts to Obtain Guidance Regarding the Hearing
            Test Waiver. .......................................................................... 11

      F.    Plaintiff Kenneth Frilando. ........................................................... 11

            1.    Background Facts Regarding Plaintiff and His Disability...................... 11

            2.    Plaintiff's Failure to Obtain a Valid Medical Certificate...................... 11

                  a.    Plaintiff's Attempt to Obtain a Medical Certificate from Dr.
                        Lawrence Marino. .........................................................11

                  b.    Plaintiff's Attempt to Obtain a Medical Certificate from Dr. Kwi
                        Yu..........................................................................12

      G.    Plaintiff's Correspondence with Bordentown...................................... 13

      H.    Bordentown's Significant Efforts to Determine if it Could Reasonably
            Accommodate Plaintiff's Disability. ............................................... 13

III.  Plaintiff's Key Statements and Admissions......................................... 15

IV.   Standard of Review..................................................................... 18

V.    LEGAL argument ........................................................................ 19

      A.    Bordentown Cannot Accommodate Plaintiff Without Undue Financial Burden.  19

      B.    Bordentown Cannot Accommodate Plaintiff Without Fundamentally Altering its
            Training Program. .................................................................... 20

  C.  Bordentown Cannot Accommodate Plaintiff Without Directly Threatening the Health and Safety of Others. .............................................................................. 23

  D.  There is No Reasonable Accommodation for Plaintiff's Disability. .................... 26

  E.  Plaintiff Was Not Qualified to Participate in the CDL Training Program. .......... 28

  F.  Plaintiff Cannot Avoid Summary Judgment Based on the Testimony of a Different Student at a Different CDL Training Program. ..................................... 29

VI.  Conclusion ...................................................................................................................... 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................18

*Bates v. UPS*,
    No. 99-2216, 2004 U.S. Dist. LEXIS 21062 (N.D. Cal. Oct. 21, 2004) ................................27

*Breece v. Alliance Tractor-Trailer Training II, Inc.*,
    824 F. Supp. 576 (E.D. Va. 1993) ...............................................23, 24, 26

*Caruso v. Blockbuster-Sony Music Ent. Centre*,
    193 F.3d 730 (3d Cir. 1999)........................................................................21

*Daily v. Martin Transp. Sys.*,
    No. 12-115, 2013 U.S. Dist. LEXIS 139994 (W.D. Mich. Sept. 30, 2013) ..........................28

*Lawrence v. Nat'l Westminster Bank*,
    98 F.3d 61 (3d Cir. 1996) ...........................................................................18

*Matthews v. Pa. Dep't of Corr.*,
    613 Fed. Appx. 163 (3d Cir. 2015).............................................................21

*Ridley Sch. Dist. v. M.R.*,
    680 F.3d 260 (3d Cir. 2012)........................................................................21

*Robertson v. Allied Signal, Inc.*,
    914 F.2d 360 (3d Cir. 1990)........................................................................18

*Sch. Bd. v. Arline*,
    480 U.S. 273 (1987)....................................................................................19

*Southeastern Cmty. Coll. v. Davis*,
    442 U.S. 397 (1979)........................................................21, 22, 23, 26

*Staron v. McDonald's Corp.*,
    51 F.3d 353 (2d Cir. 1995)..........................................................................19

**Statutes**

42 U.S.C. § 12182(b)(2)(A)(ii)-(iii)...............................................................21

42 U.S.C. § 12182(b)(2)(A)(iii).......................................................................19

42 U.S.C. § 12182(b)(3) .................................................................................23

ADA ................................................................................................................ *passim*

**Other Authorities**

28 C.F.R. § 36.104 ................................................................................................... 19

28 C.F.R. § 36.104(a)-(b) & (d) ............................................................................. 20

28 C.F.R. § 36.208(b) ............................................................................................. 25

49 C.F.R. § 391.41(b)(11) ........................................................................................ 4

49 C.F.R. § 391.43(a) .............................................................................................. 28

Fed. R. Civ. P. 26(a)(2) ........................................................................................... 29

Fed. R. Civ. P. 56(a) ............................................................................................... 18

N.J.A.C. § 13:13-4.11(a) ......................................................................................... 19

N.J.A.C. § 13:13-4.11(b)(1)-(3) ............................................................................. 21

## I.      PRELIMINARY STATEMENT

Plaintiff Kenneth Frilando is completely deaf, cannot read lips, requires an American Sign Language ("ASL") interpreter to communicate, and has no experience operating a commercial motor vehicle ("CMV").  Plaintiff alleges that the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("LAD") require Defendant Bordentown Driver Training School, LLC ("Bordentown") to enroll him in the Commercial Driver's License ("CDL") training program at its Linden, New Jersey facility.  Plaintiff admits that, as an accommodation, he would need the assistance of ASL interpreters for the duration of the training program and ASL interpreters were necessary for his participation in the program.

Bordentown is an interstate motor carrier regulated by the Federal Motor Carrier Safety Administration ("FMCSA").  Bordentown is therefore subject to, and must comply with, the FMCSA's Federal Motor Carrier Safety Regulations ("FMCSR").  Bordentown's training program is designed based on the CDL examination standards developed by the American Association of American Motor Vehicle Administrators ("AAMVA").  The FMCSR, the AAMVA examination standards, and the relevant state CDL examination guidelines strictly prohibit the use of ASL interpreters.

The undisputed evidence establishes that Bordentown is entitled to summary judgment for *five* independent reasons:

- *First*, accommodating Plaintiff would impose an undue financial burden on Bordentown.  It would cost Bordentown between $60,000 and $150,000 – an amount that could exceed the Linden facility's annual operating profit and that is up to thirty-seven times the $4,000 tuition for the CDL training program – to provide Plaintiff with his required ASL interpreters.  Bordentown would also lose significant tuition revenue due to the need to modify its program and provide seats for the ASL interpreters in Plaintiff's training vehicle.  The ADA

1

and LAD do not require Bordentown to should such an extraordinary and disproportionate cost to accommodate Plaintiff;

- *Second*, Bordentown would need to fundamentally alter its training program to accommodate Plaintiff.  Because the FMCSR and AAMVA standards prohibit ASL interpreters, Bordentown could not train Plaintiff (or his fellow students) under "test conditions" using ASL interpreters.

- *Third*, Bordentown could not accommodate Plaintiff without creating a direct threat to public safety.  Plaintiff cannot understand verbal commands and cannot engage in instantaneous communication with an instructor while operating a CMV.  Bordentown's experience and numerous driver safety studies confirm that delayed communication between Plaintiff and his instructor, or any accommodation that would require Plaintiff to divert his attention from the road, while learning to drive a CMV would present an unacceptable risk of death or injury to other students, instructors, and the driving public

- *Fourth*, there is no reasonable accommodation for Plaintiff's disability.  Plaintiff admits that it is "dangerous and unsafe" to use an ASL interpreter while driving any vehicle.  The only other accommodation proposed by Plaintiff, informal hand gestures and written notes, has never been evaluated by the FMCSA or AAMVA, has never been developed in the context of CDL training, and could not be used without violating the FMCSR and AAMVA standards;

- *Fifth*, even if Plaintiff's disability could be reasonably accommodated, Plaintiff has never obtained the valid medical certificate required by the FMCSR to obtain a Commercial Learner's Permit ("CLP") that is prerequisite to enrollment in Bordentown's training program. Accordingly, Plaintiff is not even qualified to participate in the training program.

For each of these reasons, this Court should grant summary judgment to Bordentown.

II.     **SUMMARY OF UNDISPUTED MATERIAL FACTS**

A.     **The Unique and Significant Dangers of Commercial Motor Vehicles.**

Due to their size, weight, and complexity of operation, CMVs present significantly greater safety risks to their operators and the travelling public than regular passenger cars.  Defs.' Stmt. Undisp. Mat. Facts ("SOF") ¶¶ 4-16.  The Federal Motor Carrier Safety Administration ("FMCSA") has warned that crashes involving CMVs create a "grievous toll in human life and survivor suffering" and "the economic cost of these crashes is exceedingly high."  SOF ¶ 11.  A multi-year study by the FMCSA and the National Highway Safety Administration confirmed that more than 23% of CMV crashes result in at least one fatality and an additional 28% of CMV crashes result in an incapacitating injury.  SOF ¶ 12.

A simple example highlights this risk: according to AAMVA, a 60-foot tractor-trailer traveling at 50 miles per hour requires at least seven seconds and more than 500 feet of distance to come to a complete stop.  SOF ¶ 8.  Thus, immediate communication and reaction is essential to the safe operation of a CMV.  SOF ¶¶ 103-08.  The risk of a crash *doubles* if a driver's reactions are delayed by even one-half of one second.  SOF ¶ 14.

B.     **The FMCSA and its Comprehensive CMV Safety Regulations.**

The FMCSA's mission is to "reduce crashes, injuries, and fatalities involving large trucks and buses."  SOF ¶ 18.  In furtherance of this mission, the FMCSA has promulgated the FMCSR to protect the public from the inherent dangers of CMVs.  SOF ¶¶ 17-20.  The FMCSR establish baseline standards for state CDL examinations and establish strict safety requirements intended to reduce the risk of commercial motor vehicle ("CMV") accidents and the impact of injuries sustained from those accidents.  SOF ¶¶ 17-28.

1.     **The FMCSR Physical Qualification Requirements.**

The FMCSR require prospective CMV operators to pass a comprehensive medical

examination and obtain a medical certificate from a registered medical examiner prior to applying for or obtaining a CDL. SOF ¶¶ 21-28. The medical examiner must "establish whether a driver has a disease or disorder than interferes with the ability to safely operate a CMV, increases the risk for sudden death, or increases the risk for the onset of gradual or sudden incapacitation, thus endangering public safety." SOF ¶ 24.

The medical fitness examination includes a hearing test. SOF ¶ 26. With respect to hearing, the FMCSR provide that:

> A person is physically qualified to drive a commercial motor vehicle if that person . . . perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5 – 1951.

SOF ¶ 28.

Until 2013, an individual who failed the hearing test was categorically ineligible to obtain a medical certificate. SOF ¶ 29. As the Federal Highway Administration (the predecessor to the FMCSA) explained, "hearing is important when a driver must act on emergency sounds or improper mechanical sounds and when a driver needs to communicate." SOF ¶ 27. *See also* SOF ¶ 35. Therefore, "persons who are deaf or who suffer from moderate to extreme hearing loss cannot be licensed to operate CMVs in interstate commerce." SOF ¶ 27.

### 2.      The Decision to Allow a Hearing Test Waiver.

Due to pressure from interest groups (including the National Association for the Deaf), the FMCSA began to issue limited exemptions from the hearing test requirement in 2013. SOF ¶ 30. These exemptions are expressly limited to the hearing test requirement and do not exempt recipients from any of the other requirements of the FMCSR. SOF ¶ 31.

Because CDL applicants are not required to attend a CDL training program, the FMCSA

did not consider, did not address, and did not provide any contemporaneous guidance regarding how the CDL training industry could accommodate deaf individuals.  SOF ¶¶ 32-33.  To the present day, the FMCSA has not published any guidance regarding how (if at all) the CDL training industry may safely train an individual who is completely deaf or how such an individual may take the CDL examination.  SOF ¶ 34.

### 3.   The CDL Examination.

The FMCSR require that "[a]ll drivers of CMVs must have the knowledge and skills necessary to operate a CMV safely."  SOF ¶ 42.  The FMCSR therefore prescribe that state CDL examinations must include a "knowledge test" and "skills tests" that cover specific, defined subject areas.  *Id*.  The knowledge test must contain a "set number of questions" selected from a "FMCSA pre-approved pool of test questions" designed to "ensure that driver applicants possess the knowledge" required by the FMCSR.  SOF ¶ 43.  The skills tests must include separate sequential examinations on "pre-trip vehicle inspection skills," "basic vehicle control skills," and "safe on-road driving skills."  SOF ¶ 44.  To obtain a CDL, an applicant must successfully complete, in order, the knowledge test and all of the skills tests.  SOF ¶ 45.[1]

The FMCSR specifically prohibit the use of interpreters, including ASL interpreters, during the knowledge and skills tests.  SOF ¶¶ 46-48.  The FMCSR also specifically require that a CDL applicant and examiner must communicate only through spoken English during the skills tests:

> ***Interpreters are prohibited during the administration of skills tests***.  Applicants must be able to understand and respond to verbal commands and instructions in English by a skills test examiner.  ***Neither the applicant nor the examiner may communicate in a language other than English during the skills test.***

---

[1] Upon passing the knowledge test, an applicant is eligible for a Commercial Learner's Permit ("CLP"), which permits the applicant to operate a CMV under the instruction of a licensed CDL operator.  SOF ¶¶ 50, 75.

SOF ¶ 48.  The FMCSR further require that a CDL applicant must be able to "read and speak the English language sufficiently to converse with the general public" to be "qualified to drive a commercial motor vehicle."  SOF ¶ 49.

The FMCSR delegate the development of CDL examination questions and protocols to AAMVA.   SOF ¶¶ 52-53.  Consistent with the FMCSR, AAMVA's Model Commercial Driver Manual requires direct and immediate verbal communication between CDL applicants and examiners and prohibits the use of interpreters during CDL testing.  SOF ¶ 55.  The New Jersey and New York state motor vehicle administrators use CDL manuals that follow the AAMVA model manuals.  SOF ¶ 57.  At all times relevant to this litigation, neither state had amended its CDL manuals to permit the use of interpreters during CDL testing or to otherwise permit the accommodation of deaf CDL applicants.  *Id*.

### C.     Bordentown and its Linden, New Jersey Facility

Bordentown an interstate motor carrier that offers comprehensive CDL training programs at nine locations in New Jersey, Delaware, and Pennsylvania.   SOF ¶¶ 3, 58.   Because Bordentown is an interstate motor carrier, it must comply with the FMCSR in all aspects of its CDL training programs.  SOF ¶¶ 3, 36, 69.  If Bordentown failed to comply with the FMCSR, it could lose its operating license, lose its insurance, and face significant legal liability for any crash involving its students.  SOF ¶¶ 36-37.

The Linden, New Jersey location is Bordentown's largest facility and is located on a tract of land sandwiched between U.S. Route 1 and Interstate 95.  SOF ¶ 59.  The Linden facility contains a classroom that can accommodate up to fifty students and a three-acre private lot used to train basic vehicle skills exercises, such as inspections, backing, turning, and docking ( "yard training").  SOF ¶ 60.  The facility does not have a road training course; all on-the-road training is performed on public streets and highways in a densely-populated urban area.  SOF ¶ 61.

6

### D.      Bordentown's CDL Training Program.

Bordentown's CDL training program is specifically designed to teach students the knowledge and skills required to pass each part of the Class A CDL examination.[2]   SOF ¶ 62. As required by the FMCSR, prospective students must (among other things) obtain a medical certificate prior to enrolling in the program.  SOF ¶¶ 65-66.

Although Bordentown's most common CDL training program follows a 160-hour curriculum, students typically require significantly more than 160 hours of instruction to prepare for the CDL examination.  SOF ¶ 67.  The average student receives between 50 and 125 days of instruction, but there is no limit on how long a student may remain in the program.  *Id*.

The CDL training industry is a low margin industry and Bordentown realizes only a small profit from its training program.  SOF ¶¶ 112-15.  The student tuition for the 160-hour training program is $4,000 and Bordentown's average profit per student is only $200.  SOF ¶¶ 113-14. At the Linden facility, Bordentown's annual profit (prior to taxes and capital expenditures, such as the purchase of a new cab or trailer for training) is only approximately $140,000 on $3 million in annual revenue.  SOF ¶ 114.  Bordentown's company-wide profit (again, prior to taxes and capital expenditures) is only $400,000 on $10 million in revenue.  SOF ¶ 115.

Bordentown trains its students using "test conditions" *i.e.* using the same steps, standards, and procedures used during the actual CDL examination.  SOF ¶¶ 69-70.  Following the structure of the CDL examination, Bordentown divides its training program into three sequential phases – classroom training, yard training, and road training.  SOF ¶ 68.

### 1.      Classroom Training.

The classroom training is a week-long program, taught using videos, computer

---

[2] A "Class A" CDL is required to operate any vehicle weighing more than 26,001 pounds or any combination of vehicles (i.e. a tractor and trailer) weighing more than 26,001 aggregate pounds when the trailer weighs more than 10,000 pounds.  SOF ¶ 63.

presentations, and lectures, that focuses on the subjects covered by the CDL knowledge test. SOF ¶¶ 72-74.  Students take the knowledge test at the state Department of Motor Vehicles at the end of the classroom training and, assuming they pass, obtain a CLP.  SOF ¶ 75.  Bordentown requires students to obtain a CLP before progressing to yard training.  SOF ¶ 76.

### 2.      Yard Training.

The yard training teaches students the knowledge and skills necessary to pass the "pre-trip vehicle inspection" and "basic vehicle control" parts of the CDL skills test.   SOF ¶ 77. Accordingly, the yard training focuses on skills such as cab and trailer inspections, air brake tests, and basic driving skills, including, coupling (and uncoupling) trailers, backing, turning, and docking.  SOF ¶¶ 79-84.  For the yard training (and the subsequent road training), Bordentown maintains a fleet of conventional tractor trailers that have been modified for training – for example, each cab contains three additional seats in back of the driver and front passenger seats, thus permitting the vehicle to carry five people.  SOF ¶ 78.

The yard training at the Linden facility is performed on the facility's lot, with each instructor overseeing up to three vehicles and an average of fifteen students.  SOF ¶ 85.  Up to twenty trucks and 150 students (including students not in vehicles) may participate in the yard training at any time.  SOF ¶ 86.  Vehicles and students are positioned at various skill stations, where students would on specific continuous motion skills.  SOF ¶ 87.  Instructors do not sit in the vehicles, but instead rotate through the yard and the skill stations, observing, instructing, and moving between their assigned vehicles and students.  SOF ¶¶ 87-88.

Safe and successful yard training depends heavily on instantaneous verbal communication between students and instructors.  SOF ¶¶ 88-93.  The instructors do not (and cannot) maintain consistent visual contact with each student, but instead depend on the students'

(and their own) ability to respond to verbal commands and directions.  SOF ¶¶ 88-89.  If a student needs specific instruction, an instructor may move over to the student's vehicle, climb on the cab's running board, and provide instruction through the driver's window while the student continues to operate the vehicle.  SOF ¶ 88.  Given the number of students and vehicles operating on yard during the yard training, each student must maintain constant visual focus on his vehicle and its surroundings on the yard, and not on his instructor.  SOF ¶¶ 89-93.

### 3.  Road Training.

The road training teaches students the knowledge and skills necessary to pass the "safe on-road driving" part of the CDL skills test.  SOF ¶ 94.  The road training therefore focuses on teaching students to safely operate a tractor trailer on public roads and includes instruction on topics such as the vehicle's transmission, how to get a truck into the proper gear and recover from a missed gear, using side mirrors to locate potential hazards, speed, braking, merging and lane changes, signaling, reacting to changing road conditions, and identifying mechanical issues before they lead to a potential mechanical failure.  SOF ¶¶ 95-98.  Students typically start their road training on side streets and then proceed to major streets and highways as they become more familiar with driving a CMV in road conditions.  SOF ¶ 102.

As with the yard training, instantaneous verbal communication is essential to safe and successful road training.  SOF ¶¶ 95-99, 103-09.  An instructor will typically take up to four students out on the road and each student (including the non-driving students) must be able to hear and understand the instructor's verbal commands.  SOF ¶ 101.  The FMCSR require that the instructor must "at all times by physically present in the front seat of the vehicle" next to the student driver.  SOF ¶ 50.

Because the truck is operating on public roads – at speed and in traffic – the student

driver cannot take his eyes off of the road to observe the instructor sitting next to him (or an ASL interpreter sitting behind him).  SOF ¶¶ 104, 108-10.  Given the difficulty of learning to drive a CMV, Bordentown's Chief Operating Officer, John Diab explained that a "catastrophic accident" could occur if a student was unable to immediately respond to verbal instruction during road training:

> It is done with the instructor being able to verbally communicate to the student.  If they cannot verbally communicate with the student, then you are leading up to a catastrophic accident, because even our students, our average student, half the time cannot get the truck in gear.  Think about it.  It is ten speeds.  You have to flip the switch, you gotta – so now I am looking, trying to merge, trying to keep an eye on everything, accelerate, where is the car coming from.  Then what happen is they cannot get it in gear.  Now, could they feel that it is not in gear, yes, they could, but they don't know how to correct it. . . . *If I cannot verbally communicate with that student*, as I said, to me, what would happen is, it is not in gear, the truck literally goes to a coast or a roll, *I am looking for a catastrophic accident*.

SOF ¶ 105.

Furthermore, students – like CDL-licensed drivers – must also be able to listen for signs of potential mechanical failures that may not be identified by the vehicle's instruments, such as leaking tires (which could lead to a tire failure), leaking air brakes (which could lead to a brake failure), or a faulty engine belt (which could lead to an engine failure):

> [A student] has got to be able to recognize audible alerts.  He has to be able to hear the tire in the back if it starts to leak before it blows out.  He has to be able to know that the belts are squealing and that sooner or later it is going to break and cause a problem mechanically.  He has to hear a siren. . . . Your air brakes are shooting pressure out the side all the time.  Now, they can pump down and at some point, your gauge will start to come down.  You need to be able to hear that beforehand.

SOF ¶ 106.  Any delay in understanding or responding to an instructor's road training commands, or in identifying a possible mechanical issue, would threaten the safety of the truck's occupants and others driving on the same public roads.  SOF ¶¶ 95-99, 103-09.

### E.   Bordentown's Significant Efforts to Obtain Guidance Regarding the Hearing Test Waiver.

Upon learning that the FMCSA was granting hearing test, Bordentown preemptively contacted the FMCSA and AAMVA for guidance regarding the potential training and testing of deaf CDL applicants.  SOF ¶¶ 38-41.  At that time, FMCSA and AAMVA informed Bordentown that there was "no test and no acceptable training program" for deaf CDL applicants.  SOF ¶¶ 39-41.  AAMVA further informed Bordentown that, in its view, "it is not safe" to administer the CDL examination to deaf applicants.  SOF ¶ 41.

### F.   Plaintiff Kenneth Frilando.

#### 1.   Background Facts Regarding Plaintiff and His Disability.

Plaintiff Frilando was born completely deaf.  SOF ¶ 116.  Plaintiff testified that he can sometimes identify s low frequency noises (such as "when the subway rumbles underneath" or a "siren from an ambulance or a police car"), but he is not able to detect the source of those sounds.  *Id*.

Plaintiff requires an ASL interpreter to communicate with hearing individuals.  SOF ¶ 118.  He cannot read lips.  SOF ¶ 117.   In Plaintiff's own words, without an ASL interpreter, "typically all communication is misunderstood and unsatisfactory."  SOF ¶ 118.

Plaintiff has no prior experience driving a CMV.  SOF ¶ 119.

#### 2.   Plaintiff's Failure to Obtain a Valid Medical Certificate.

Plaintiff has twice sought to obtain the medical certificate required by the FMCSR.  SOF ¶¶ 120-37.  He has never obtained a valid certificate.  *Id*.

##### a.   Plaintiff's Attempt to Obtain a Medical Certificate from Dr. Lawrence Marino.

In December 2012, Dr. Lawrence J. Marino diagnosed Plaintiff with atrial fibrillation ("A-Fib") and sleep apnea.  SOF ¶ 121.  Dr. Marino referred Plaintiff to a sleep apnea clinic, but

Plaintiff "never went" for further treatment or diagnosis.  SOF ¶ 122.  In June 2013, Plaintiff

asked Dr. Marino for a medical certificate.  SOF ¶ 123.  Dr. Marino advised that he could not

provide the certificate until Plaintiff visited an audiologist (due to his deafness) and was "cleared

by a cardiologist" (due to his A-Fib).  *Id.*

Plaintiff again asked Dr. Marino to provide a medical certificate on September 2013.

SOF ¶ 123.  At this time, Dr. Marino did not address Plaintiff's sleep apnea, A-Fib, or deafness.

*Id.*[3]  Nevertheless, Dr. Marino provided Plaintiff with a medical certificate.  *Id.*  This medical

certificate was not valid because Dr. Marino was not a FMCSA-registered medical examiner at

the time he provided the certificate to Plaintiff.  SOF ¶¶ 125-27.

### b.   Plaintiff's Attempt to Obtain a Medical Certificate from Dr. Kwi Yu.

In July 2015 – three months ***after*** he filed this litigation – Plaintiff visited another doctor,

Dr. Kwi Y. Yu, in another effort to obtain a medical certificate.  SOF ¶ 128.  Plaintiff failed to

disclose to Dr. Yu his prior diagnoses of sleep apnea and A-Fib – the medical self-report that he

provided attested that he had "no" history of  "heart disease [or] other cardiovascular condition"

or any "sleep disorders [or] pauses in breathing while sleeping."  SOF ¶¶ 129-30.  Nevertheless,

Plaintiff certified that this self-report was "complete and accurate" and acknowledged that any

"inaccurate, false, or missing information" on the medical examination report "may invalidate

the examination and my Medical Examiner's Certificate."  SOF ¶ 131.

Relying on Plaintiff's misrepresentations, Dr. Yu provided Plaintiff with a medical

certificate.  SOF ¶ 132  Dr. Yu subsequently testified under oath that he would not have granted

the certification if Plaintiff had properly disclosed his sleep apnea and A-Fib diagnoses.  SOF ¶

133.   As Dr. Yu confirmed, it is an open question whether Plaintiff could ***ever*** be medically

---

[3] Plaintiff did not receive a waiver of the FMCSR hearing requirement from the FMCSA until 16 months later, on January 13, 2015.  SOF ¶¶ 138-40.

cleared under the FMCSR due to his sleep apnea.  SOF ¶¶ 134-37 ("Usually, I don't qualify them. I have one or two patient come like that, I said bye-bye, get out.").

### G.    Plaintiff's Correspondence with Bordentown.

Plaintiff has never communicated directly with Bordentown and has never sought admission into the CDL training program.  SOF ¶ 141.  In February 2015, Plaintiff's brother, Joseph Frilando, called Bordentown and scheduled a visit to the Linden facility on February 20, 2015.  SOF ¶ 142.  Plaintiff and his brother did not appear that appointment.  SOF ¶ 144.

Joseph Frilando next contacted Bordentown on March 17, 2015 and spoke with Dale Wessendorf, Bordentown's Director of Safety and Program Training.  SOF ¶ 145.  Later that same day, Joseph Frilando e-mailed Wessendorf a copy of Plaintiff's hearing test waiver.  *Id*. Wessendorf responded to Joseph Frilando's e-mail (and to subsequent e-mails that he sent on March 23 and March 29) on March 30, 2015 and indicated that:

> We are seeking guidance from the Federal DOT and the local MVCs [Motor Vehicle Commissions] regarding how to safely and effectively accommodate the specific needs of this community.  As of yet we do not have a clear direction in the matter.   As we receive additional communication we will keep you advised.

SOF ¶¶ 146-48.

### H.    Bordentown's Significant Efforts to Determine if it Could Reasonably Accommodate Plaintiff's Disability.

Bordentown addresses disability accommodations on a case-by-case basis and thoroughly analyzes each accommodation request to determine whether it may reasonably accommodate a disability.  SOF ¶ 150.[4]  Consistent with this policy – and in addition to its efforts to obtain

---

[4] For example, Bordentown has accommodated deaf students in its separate one-day forklift training program.  SOF ¶¶ 151-54.  Unlike the CDL training program, the one-day forklift training is not regulated by FMCSA or any other agency, does not require a license or any other specific certification, and is done entirely on a closed, private course.  SOF ¶¶ 152-53. Bordentown therefore determined that it could accommodate deaf students (and, if needed,

guidance regarding the potential training and testing of deaf CDL applicants when the FMCSA first began to issue hearing test waivers – Bordentown took significant additional efforts upon receiving Joseph Frilando's correspondence to determine if it could reasonably accommodate Plaintiff in its CDL training program:

- Bordentown contacted representatives of FMCSA and AAMVA and asked "is there an acceptable training program and is there a test" for deaf CDL applicants. SOF ¶¶ 157-58.  Both organizations told Bordentown that "**there is no test and there is no acceptable training program**." *Id.*;

- AAMVA reiterated to Bordentown that it "had been requested by [FMCSA] to produce a test for the hearing impaired [but] **they have refused to produce a test because they say it is not safe to do so**." SOF ¶ 158;

- Blain Stein, the head CDL examiner for the State of New Jersey, told Bordentown that "our position currently is that we will not test because it is not safe." *Id.* at 78:19-23.  SOF ¶¶ 159-60;

- Henry Elmy from the Pennsylvania DMV told Bordentown that Pennsylvania would not test deaf CDL applicants because it is not safe and we have no way of doing it.  We have no way of communicating." SOF ¶ 161;

- Bordentown also contacted the New York DMV, but did not receive any response regarding New York's position on testing deaf CDL applicants.  SOF ¶ 162;

- Bordentown also conducted its own internal analysis to determine whether it could safely and legally accommodate Plaintiffs' disability in its training program.  SOF ¶ 163.

Bordentown ultimately determined that it was not "qualified or capable at this time" to accommodate Plaintiff in its training program.  SOF ¶ 164.

Accordingly, on April 6, 2015, Wessendorf e-mailed Joseph Frilando and stated:

> After considerable discussion at both the State and Federal level and having received little or no guidance on how to effectively train and safely protect the motoring public, the student and our personnel, we have determined that Smith & Solomon is not capable or qualified at this time to render the services requested." *Id.*

provide ASL interpreters) without an undue financial burden, without fundamentally altering the program, and without threatening public safety.  SOF ¶¶ 152-54.

14

*Id*.  Joseph Frilando did not respond to the April 6 e-mail with any guidance on how Plaintiff could be reasonably accommodated in the CDL training program.  *Id*.  Eighteen days later, Plaintiff filed this litigation.  SOF ¶ 165.

## III.   PLAINTIFF'S KEY STATEMENTS AND ADMISSIONS

Plaintiff has made several key admissions confirming that it would be unduly burdensome for Bordentown to accommodate his disability, that any attempt to accommodate his disability would require Bordentown to fundamentally alter the nature of its training program, that any accommodation would impose a direct threat to the health and safety of others, and that there is no reasonable accommodation that complies with the FMCSR and AAMVA standards:

- <u>Plaintiff's would require an ASL interpreter to participate in the CDL training program</u>: Plaintiff testified that the specific accommodation that he needs to "go through the course" at Bordentown is a "sign language interpreter," including "on site inside the trailer as we're going on the road":

> Q:  And what specifically are you saying that a court should require Smith & Solomon to do, I mean, Bordentown to do in order to enable you to go through the course?
>
> A:  *A sign language interpreter*. Any films and videos that they utilize in the training room to be closed captioned.  Also, ***to be allowed to have an interpreter come on site inside the trailer as we're going on the road*** and there's other things that I haven't mentioned that I can't think of at the moment, but there are other situations, but it all pertains to an interpreter and closed captioning.

Ex. 3, K. Frilando Dep. at 200:20-201:10 (emphases added).  *See also id.* at 170:5-12 ("Yes, that's all I would have needed was an interpreter."); *id.* at 164:19-21 ("Q: And is that an accurate statement of what you would need?; A: It is.").

- <u>Any accommodation other than an ASL interpreter would be "unsatisfactory"</u>: Plaintiff testified that "typically all communication is misunderstood and unsatisfactory" unless

15

he has an ASL interpreter.  Ex. 3, K. Frilando Dep. at 37:2-4.  *See also id.* at 37:21-38:2 ("If the

interpreters were not present, I would not be able to have a conversation with you . . . [i]t would

cause miscommunication and misunderstandings.  Having the interpreter provides clarity and if I

did not have the interpreters I would probably get frustrated.").

- It is not safe to use an ASL interpreter while operating any vehicle: Plaintiff

admitted that when he learned to operate a passenger vehicle "safety factor[s]" foreclosed the use

of ASL interpretation "while we were driving":

> Q:  And why, why was there no sign language interpretation going on
> while you were driving?
>
> A:  Well, *it was a safety factor*. Therefore, the instructor made sure there
> was no talking going on with the interpreter and stuff like that while
> we were driving. *As we were driving, we were instructed to keep our
> eyes on the road*. I was under observation. It was a safety factor why
> we didn't have any communication taking place until we were in a safe
> area where we were at a complete stop.

Ex. 3, K. Frilando Dep. at 71:22-72:10 (emphases added).  Plaintiff further admitted that it is

"even more dangerous and unsafe" to communicate through an ASL interpreter while operating a

CMV:

> Q:  So, Mr. Frilando, can we agree on the record that *given the scale and
> size of a tractor-trailer, that it would be even more dangerous and
> unsafe for sign language interpretation to be occurring while you
> are actually driving the vehicle*?
>
> A:  *Yes*.

*Id.* at 189:13-20 (emphases added).

- There is no place to safely and effectively locate an ASL interpreter in a CMV:

Plaintiff admitted that an ASL interpreter must "in [his] line of sight" and would not be effective

if "sitting to [his] right," the only place (i.e. the front passenger seat) that an ASL interpreter

could sit if Plaintiff was driving a CMV during training:

> Q: As I understand it, ***to have the sign language interpreters sitting to your right would not be effective because they are not in your line of sigh***t, is that correct?
>
> A: ***I do agree. It is not appropriate***. In fact, where they're sitting right now is the best line of travel where I can see them visually, because every time I would have to look at them to see what they're saying I have to turn to the right and, therefore, my face is off the camera and off of your attention.

Ex. 3, K. Frilando Dep. at 11:3-17 (emphases added). Plaintiff's own expert witness, Daniel Cox, similarly admitted that "[s]ign language interpreters in the back seat would be dangerous." Ex. 6, Cox Dep. at 107:22-24.  *See also id.* at 178:19-21 ("[H]aving them sit in the back seat and having the student talk to them, that would be dangerous.").

- Plaintiff would need at least two ASL interpreters at all times during the training program: Plaintiff testified that ASL interpreters "need to work as a team because of fatigue" and "for processing and accuracy . . . they need about 20 to 30 minutes per person and then they switch, and they support each other."  Ex. 24, K. Frilando Dep. (Dutchess) at 18:21-19:9.  *See also id.* ("[I]f it is for two or three hours, a team of two is needed.").

- ASL interpretation is consecutive, not instantaneous.  Plaintiff's own attorney explained at Plaintiff's deposition that ASL interpretation "will not be simultaneous translation. It will be consecutive.  There will be some delay."  Ex. 3, K. Frilando Dep. at 9:12-14.

- Plaintiff is does not know of the cost of ASL interpretation: Plaintiff testified that he had "no idea" as to "what the cost of having a sign language interpreter is."  Ex. 3, K. Frilando Dep. at 164:22-25.

- Plaintiff never offered any information as to how Bordentown could accommodate his disability: Plaintiff admitted that he did not provide "any suggest[ions] as to how [Bordentown] might be able to accommodate a deaf student in training" before he filed this

17

litigation:

> Q: Before you sued them, did you or did anyone on your behalf go back to them in light of their statement that they had no experience in teaching a deaf student to give them any suggests[ions] as to how they might be able to accommodate a deaf student in the training?

> A: No, I did not.

Ex. 3, K. Frilando Dep. at 167:14-21.

- Plaintiff has not suffered any damages from Bordentown's alleged denial of ASL interpretation: Plaintiff testified that the only remedy he seeks in this litigation is "to be allowed to go to school." Ex. 3, K. Frilando Dep. at 200:15-19. Plaintiff has not suffered any "financial damages," has not "sought any kind of treatment or counseling for mental or emotional issues," and has not suffered any "illnesses" as a result of Bordentown's decision that it could not reasonably accommodate his disability. *Id.* at 204:14-20, 204:23-205:1. *See also* Ex. 24, K. Frilando Dep. (Dutchess) at 50:15-21.

## IV.    STANDARD OF REVIEW

Summary judgment is proper where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To obtain summary judgment, a defendant need only show that there is an absence of evidence to support the plaintiff's case or, alternatively, offer affirmative evidence demonstrating that the plaintiff cannot prove his case. *Lawrence v. Nat'l Westminster Bank*, 98 F.3d 61, 69 (3d Cir. 1996). A plaintiff cannot avoid summary judgment by presenting evidence that "is merely colorable, or is not significantly probative," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986), and it is well-established that a plaintiff's mere speculation, conclusory allegations, and bare denials are insufficient to raise a genuine issue of material fact. *See, e.g.*, *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## V.      LEGAL ARGUMENT

As explained below, Bordentown is entitled to summary judgment for each of five independent reasons.

### A.      Bordentown Cannot Accommodate Plaintiff Without Undue Financial Burden.

Summary judgment is appropriate because the undisputed evidence shows that Bordentown cannot accommodate Plaintiff's disability without incurring an undue financial burden.  The ADA and LAD do not require any accommodation that "would result in an undue burden" to Bordentown.  42 U.S.C. § 12182(b)(2)(A)(iii).  *See also* N.J.A.C. § 13:13-4.11(a) (LAD does not require accommodations that "would impose an undue burden").  An undue burden includes a "significant difficulty *or expense*" in providing an accommodation.  28 C.F.R. § 36.104 (emphasis added).  *See also*, *e.g.*, *Sch. Bd. v. Arline*, 480 U.S. 273, 288 n.17 (1987) (federal law does not require accommodations that impose "undue financial or administrative burdens"); *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (ADA reasonable accommodation inquiry must consider "the cost to the organization that would implement it").

Plaintiff has admitted that he requires ASL interpreters to participate in the CDL training program and that he would need at least two interpreters at all times during the training.  *See supra* at 17.  The undisputed evidence shows that it would cost between $60,000 and $150,000 – *fifteen to thirty-seven times* the $4,000 tuition for Bordentown's standard 160-hour CDL training program – to provide Plaintiff with the necessary interpreters.  SOF ¶ 112.  This expense alone would consume between *40%* and *107%* of the Linden facility's annual operating profit, *15% to 37.5%* of Bordentown's company-wide operating profit, and would cost between *300* and *750* times Bordentown's average $200 per student profit from the CDL training program.  SOF ¶¶ 112-15.  Bordentown's (and the Linden facility's) revenues and profits would be further

19

reduced because Plaintiff's ASL interpreters would need to occupy vehicle seats otherwise used by paying students during yard and road training.  SOF ¶ 111.  Those revenues and profits would decline even further because of restrictions that Bordentown would need to place on other training programs to ensure the safety of all its students and instructions while Plaintiff was being trained – including, but not limited to, closing down large portions of the Linden facility's yard during Plaintiff's yard training.  SOF ¶ 91.

This is unquestionably an undue financial burden for *any* company and even more so for a low margin business like Bordentown.  *See* 28 C.F.R. § 36.104(a)-(b) & (d) (undue burden analysis focuses on "nature and cost" of accommodation, "financial resources" of defendant, and "effect" of accommodation on the defendant's "expenses and resources").   In *Roberts v. KinderCare Learning Centers, Inc.*, a Minnesota district court found (and the Eighth Circuit affirmed) an undue burden where the cost of a similar accommodation – providing one-on-one specialized care to a disabled child – was only *twice* the cost of the child's tuition and would have equaled just *10%* of the facility's monthly operating income.  *Roberts*, 896 F. Supp. 921, 927 (D. Minn. 1995) (comparing $200 per week cost of accommodation to $105 weekly tuition), *aff'd* 86 F.3d 844, 846 (8th Cir. 1996) (comparing $200 weekly cost to $9,600 monthly operating income).  Here, the magnitude of cost of the accommodation to Bordentown is substantially greater, both in comparison to Plaintiff's own tuition and to the Linden facility's overall revenues and income.  *See supra* at 19-20.  Accordingly, because the undisputed evidence confirms that accommodating Plaintiff's disability would create an undue financial burden, this Court should grant summary judgment to Bordentown.

**B.    Bordentown Cannot Accommodate Plaintiff Without Fundamentally Altering its Training Program.**

Summary judgment is also appropriate because the undisputed evidence shows that

Bordentown cannot not accommodate Plaintiff without fundamentally altering its training program.  The ADA and LAD do not require Bordentown to provide any accommodation that "would fundamentally alter the nature of the . . . service" that it offers to its students.  42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).  *See also* N.J.A.C. § 13:13-4.11(b)(1)-(3); *Caruso v. Blockbuster-Sony Music Ent. Centre*, 193 F.3d 730, 739 n.9 (3d Cir. 1999) ("Title III [of the ADA] specifically provides that facilities can refrain from making modifications that "would fundamentally alter the nature of such . . . facilities.").

Interpreting the fundamental alteration standard under the Rehabilitation Act (which follows the same legal standards as the ADA), the Supreme Court has held that an education program is not required to "dispense with the need for effective oral communication" to accommodate a hearing-impaired applicant.  *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 407-11 (1979).[5]  In *Davis*, the defendant refused to enroll a deaf applicant in its nurse training program on the grounds that the plaintiff's hearing impairment made it impossible to safely participate in clinical training and care for patients and that any accommodation would fundamentally alter the program.  *See id.* at 401-02 ("To adjust patient learning experiences in keeping with [plaintiff's] hearing limitations could, in fact, be the same as denying her full learning to meet the objectives of [the] nursing program.").  To accommodate plaintiff, the defendant would have been required to provide "close supervision" and, as found by the district court, would have needed to make significant adjustments to its standard clinical practice:

> [In] many situations such as an operation room intensive care unit, or post-natal care unit, all doctors and nurses wear surgical masks which would

---

[5] *See also*, *e.g.*, *Matthews v. Pa. Dep't of Corr.*, 613 Fed. Appx. 163, 166-67 (3d Cir. 2015) ("The ADA and the Rehabilitation Act have the same standard for liability and are to be interpreted consistently."); *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282-83 (3d Cir. 2012) ("[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same.").

> make lipreading impossible.  Additionally, in many situations a Registered Nurse would be required to instantly follow the physicians' instructions concerning procurement of various types of instruments and drugs where the physician would be unable to get the nurse's attention by other than vocal means.

*Id.* at 403 (quotation omitted).  The Supreme Court agreed, holding that the Rehabilitation Act "does not encompass the kind of curricular changes that would be necessary to accommodate [plaintiff] in the nursing program." *Id.* at 409.

As in *Davis*, the undisputed evidence in this case confirms that Bordentown would need to fundamentally alter its training program to accommodate Plaintiff.  Bordentown teaches using "test conditions" – replicating the experience and requirements of the actual CDL examination – as a fundamental aspect of its training program.  SOF ¶¶ 69-70.  Because the FMCSR specifically prohibit the use of interpreters during the entire CDL test and require the use of verbal communication during the skills tests, it would be impossible for Bordentown to train Plaintiff using an ASL interpreter and maintain the test conditions for Plaintiff and the other students in Plaintiff's training class.  SOF ¶¶ 46-49, 82, 99-100, 107.

The undisputed evidence also shows that Bordentown could not accommodate Plaintiff without foregoing the essential elements of its training program.  *See* SOF ¶¶ 90-91 (Diab Dep. at 227:23-228:1: "Could it be done?  Potentially it could be done, ***but not without is dramatically changing the way we operate***, particularly at that location.").  For example, Bordentown could not train Plaintiff to respond to the audible alerts (*i.e.*, leaking tires, squealing belts, brake pressure indications, emergency sirens, and warnings from other drivers) necessary to safely operate a CMV.  SOF ¶ 106.  Similarly, Bordentown could not provide Plaintiff with the real-time verbal instruction necessary to teaching the operation of a CMV on public roads and highways.  SOF ¶¶ 104-05, 107-09.  Indeed, AAMVA informed Bordentown that there was "no acceptable training program" to teach deaf individuals to drive a CMV and state motor

vehicle administrators indicated to Bordentown that they would not test a deaf applicant for a CDL. SOF ¶¶ 39, 157.

For these reasons, one district court has specifically applied *Davis* to hold, under facts mirroring the undisputed evidence in this case, that a deaf applicant cannot be accommodated without fundamentally altering a CDL training program. *Breece v. Alliance Tractor-Trailer Training II, Inc.*, 824 F. Supp. 576 (E.D. Va. 1993). As with Bordentown's program, a "major pedagogical benefit" of the *Breece* training program was "public road driving" using "personal interaction and instruction with the in-cab trainer making quick commands." *Id.* at 578. The *Breece* court accordingly found that that the plaintiff's "hearing impairment cannot be accommodated without fundamentally altering the nature of [defendant's] intensive training program of driving tractor-trailers on the road accompanied by an instructor." *Id.* at 579.

Plaintiff's claim is indistinguishable from those rejected in *Davis* and *Breece*. Bordentown's training program requires effective oral communication and immediate responses to audible indications to teach students to safely operate a CMV. SOF ¶¶ 71, 77-109. The undisputed evidence confirms that Plaintiff cannot communicate orally or respond to verbal commands and that those requirements cannot be accommodated through an ASL interpreter. SOF ¶¶ 116-18. Accordingly, this Court should grant summary judgment for the additional reason that Bordentown cannot accommodate Plaintiff's disability without fundamentally altering its training program.

### C. Bordentown Cannot Accommodate Plaintiff Without Directly Threatening the Health and Safety of Others.

Summary judgment is further appropriate because the undisputed shows that Bordentown cannot accommodate Plaintiff's disability without creating a direct threat to the health and safety of its other students, its instructors, and the driving public. Bordentown is not required to

provide any accommodation that "poses a direct threat to the health and safety of others."  42 U.S.C. § 12182(b)(3).  The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services."  *Id.  See also*, *e.g.*, *Breece*, 824 F. Supp. at 579-80 (discussing "direct threat" standard).

The undisputed evidence confirms that Plaintiff's disability would present a direct threat to health and safety if he were to participate in Bordentown's training program or operate a CMV.  Because Plaintiff cannot hear or respond verbal commands, he would not be able to respond to the instructions necessary to avoid a serious accident during yard training or while driving on a public road.  SOF ¶¶ 77-109, 116-18.  As John Diab explained, Bordentown "would have to clear the yard" to avoid the accident risk presented by Plaintiff's yard training:

> Under the circumstances, in our opinion, we would have to clear the yard. Because we have so many students there and such going on and I cannot risk something happening to those other students or our instructors. . . . We cannot take the chance or run the risk of all my other students getting hurt, we don't know what [Plaintiff's] reaction is going to be.  As I said, we have people, like I said, who have accidents in the yard and we can quickly and effectively communicate with them. . . . [T]he impaired student, cannot hear what is going on, he can pick it up visually, but in order to do it safely we would have to remove the other people.

SOF ¶ 91.

The undisputed evidence also confirms that the safety threat would be even greater (and even more unavoidable) when training Plaintiff to operate a CMV on a public highway.  SOF ¶¶ 4-16, 94-109.   For example, Diab explained further that an "average student, half the time cannot get the truck in gear" when training on a public road and that this could cause "a catastrophic accident" without immediate verbal communication:

> [I]magine that you are on a service road on Staten Island and you were going to enter the Staten Island Expressway and you have an 86,000 pound truck. As you are corning on and you have only driven this 86,000

> pound truck with a ten speed transmission a few times, you may have never driven a stick shift before, ever. Now you are getting ready to get on, you have to accelerate, you have to look in this mirror and you have to look in that mirror. You have to shift up, you have to know that the RPMs are correct then you have to merge into traffic.  So you are doing all of these things.  It is done with the instructor being able to verbally communicate to the student.  ***If they cannot verbally communicate with the student, then you are leading up to a catastrophic accident***[.]

SOF ¶ 105.   Furthermore, because Plaintiff cannot hear audible alerts, he cannot identify potentially serious mechanical failures in his vehicle or identify accident warnings from other drivers.  SOF ¶¶ 81, 106.  *See also* SOF ¶ 106 (Diab Dep. at 121:15-23: "You see the big pieces of rubber on the highway, that is because it started as a leak and ended up as a blowout or started as a blowout, whatever the case is.  I cannot speak for a deaf person . . . but if that tire starts to leak, they are not going to hear it.").[6]

The undisputed evidence similarly confirms that Bordentown reasonably determined that any attempt to accommodate Plaintiff's disability would only exacerbate these direct safety threats.  *See* 28 C.F.R. § 36.208(b).  Plaintiff himself has admitted that it is "dangerous and unsafe" to communicate through an ASL interpreter while driving because drivers "must keep our eyes on the road."  SOF ¶ 197.  Diab explained that using an ASL interpreter in training would create unsafe "delayed reaction time" and "distracted driving" because a deaf student would need to "look at the interpreter with five or six other things going on at the same time."

---

[6] AAMVA has specifically cautioned that "the inability of the driver to respond to audible commands may result in injury to the examiner or other persons/vehicles in the immediate area. [T]he applicant's inability to hear mechanical buzzers, warning/engine sounds, leaks, surrounding sounds within the cab, warnings from other highway users (*i.e.*, horns, sirens/emergency vehicles) could result in a potentially dangerous malfunction of the vehicle or result in a crash."  AAMVA, CDL Testing for Hearing Impaired Applicants, *available at* https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/CDL%20Testing%20for%20Hearing%20Impaired%20Applicants%20-%20FINAL.pdf (last checked Dec. 9, 2016).

Ex. 2, Diab Dep. at 130:14-20.[7]  And AAMVA has stated that any accommodation that would "require the driver to take his/her eyes and attention off of the driving task to focus on the instruction . . . could result in a crash."  AAMVA, CDL Testing for Hearing Impaired Applicants, *supra* at 25 n.6.

Based on identical undisputed evidence, the *Breece* court held that the CDL training school in that case "made a reasonable judgment" that "any accommodation . . . would pose a direct threat to the safety of [plaintiff], his instructor, and the public at large on the public highway system."  *Breece*, 824 F. Supp. at 580.  The court explained:

> [Plaintiff] could not possibly keep his eyes on the road, gauges, and mirrors and simultaneously watch a sign-language interpreter translating his teacher's instructions. . . . Because [plaintiff] would be unable to communicate with his instructor in the cab, his presence on the road would constitute a direct threat to public safety.

*Id.  See also*, *e.g.*, *Davis*, 442 U.S. at 403 (affirming district court finding that "[respondent's] handicap actually prevents her from safely performing in both her training program and her proposed profession").  For the same reasons, this Court should grant summary judgment to Bordentown on the further basis that any accommodation of Plaintiff's disability would pose a direct threat to public safety.

### D.    There is No Reasonable Accommodation for Plaintiff's Disability.

Summary judgment is also further appropriate because there is no reasonable accommodation for Plaintiff's disability.  As explained above, the undisputed evidence shows that Bordentown could not reasonably accommodate Plaintiff using ASL interpreters.  *See supra* at 19-26.  The undisputed evidence also shows that Bordentown took significant efforts to determine if Plaintiff could be reasonably accommodated in its CDL training program.  *See*

---

[7] *See also* Ex. 2, Diab Dep. at 128:7-12 ("How is that interpreter, wherever you put them, how is that interpreter communicating with me and how am I dealing with the interpreter?  How can I do that?  I am looking here and looking there.")

*supra* at 11, 13-14.   The undisputed evidence further shows that, in stark contrast to Bordentown's considerable (and legally sufficient) efforts, Plaintiff has not made any effort to identify any other accommodation that is not unduly burdensome, does not require a fundamental alteration to the CDL training program, and would allow Plaintiff to safely participate in the training program.  SOF ¶¶ 32-41, 141-65.

The ***only*** other accommodation offered by Plaintiff (which Plaintiff only presented in the context of this litigation) is an undefined system of basic hand gestures and written notes proposed by Plaintiff's putative expert, Daniel Cox.  SOF ¶ 170-71.  Cox concedes, however, that he has absolutely no idea how (or even if) this proposed accommodation could work in the contect of CDL training.  SOF ¶¶ 170-80.  Cox admitted at his deposition that he had developed this proposed accommodation only for passenger vehicles, that he had no familiarity with CMVs or CDL training, and that he "did not consider, did not review, and did not apply any of the specifics of what must going into training for a CMV."  SOF ¶¶ 172-73.  Another federal court has rejected Cox's proposal as "unworkable" in the context of smaller "Class B") commercial vehicles (parcel delivery trucks) and emphasized that Cox has "never tried to train a deaf individual how to drive a commercial vehicle."  *Bates v. UPS*, No. 99-2216, 2004 U.S. Dist. LEXIS 21062, at *111-13 (N.D. Cal. Oct. 21, 2004).

Not surprisingly, Plaintiff has not adduced any evidence to support any finding that Cox's proposal is a reasonable accommodation for an FMCSA-regulated CDL training program.  To the contrary, the undisputed evidence shows that Cox's proposal does not permit simultaneous communication, would require a student to divert attention from safe driving tasks, and fails entirely to consider the unique characteristics of CMVs (including, but not limited to, the much different layouts of CMV cabs and passenger vehicles and the significant additional complexity

in operating a CMV as compared to a standard car).  SOF ¶¶ 181-84.[8]  Therefore, Bordentown is entitled to summary judgment for the further reason that the undisputed evidence does suggest or support any reasonable accommodation for Plaintiff's disability.

      **E.**    **Plaintiff Was Not Qualified to Participate in the CDL Training Program.**

Even if Plaintiff's disability could be reasonably accommodated (and notwithstanding the undisputed evidence confirming that it cannot be), Bordentown would still be entitled to summary judgment because the undisputed evidence shows that Plaintiff did not have a valid medical certificate when he sought admission to the CDL training program.  SOF ¶¶ 121-27.

Because the FMCSR require a medical certificate as a precondition to obtaining a CLP and operating a CMV, Bordentown requires its applicants to obtain a valid medical certificate prior to admission into the CDL training program.  SOF ¶¶ 65-66.  There is no dispute, however, that Plaintiff did not have a valid certificate when he sought admission in early 2015 – the FMCSA expressly informed Plaintiff that Dr. Marino was not a certified FMCSA medical examiner and that the medical certificate issued by Dr. Marino in 2013 was not valid.  SOF ¶¶ 125-27.  *See also* 49 C.F.R. § 391.43(a) ("[T]he medical examination must be performed by a medical examiner listed on the National Registry of Certified Medical Examiners.").  Accordingly, Plaintiff was not even eligible for admission for reasons unrelated to his disability and, for this additional reason, cannot bring any claim against Bordentown under the ADA or LAD.[9]

---

[8] *See also Bates*, 2004 U.S. Dist. LEXIS 21062 at *112-13 ("This distinction is relevant because the trainer sits much closer to the trainee in a passenger car than in a commercial vehicle . . . and a commercial driving trainee might therefore not be able to see the same hand signals in his peripheral vision.  In addition . . . there is no evidence to support a finding that it would be possible to develop signals that could be seen in a trainee's peripheral vision for all of the necessary communication.").

[9] Plaintiff did not obtain his second medical certificate, from Dr. Kwi Yu, until July 2015 – three months after Plaintiff brought this litigation against Bordentown.  SOF ¶ 128.  Regardless, this

**F.** **Plaintiff Cannot Avoid Summary Judgment Based on the Testimony of a Different Student at a Different CDL Training Program.**

Bordentown anticipates that Plaintiff will attempt to avoid summary judgment by asserting that another deaf individual has been trained at another CDL training program in another parts of the country. SOF ¶ 185. Any such effort fails because the undisputed evidence does not support any claim that any similarly-situated CDL training program has accommodated any similarly-situated deaf individual. SOF ¶¶ 187-92.

The only evidence in the record suggesting that a deaf individual has been trained for a CDL is the testimony of Plaintiff's putative expert John Huey, a deaf CDL operator.[10] SOF ¶¶ 185-93. However, the undisputed evidence shows that Huey's experience is wholly inapposite to Plaintiff's claim against Bordentown:

- Unlike Bordentown, Huey received his CDL training at community colleges in Arizona and Texas that received public funding to provide him with ASL interpreters and did not have to bear the significant financial burden of providing Huey with ASL interpreters. SOF ¶ 187;

- Unlike Bordentown, the community colleges where Huey took his CDL training had large campuses, had very few CDL students, and had private courses where Huey could practice road training before using public roads. SOF ¶ 188. Accordingly, Huey's CDL training did not present the same risk to public safety that would exist at Bordentown's Linden facility, where all road training occurs on public roads. SOF ¶ 102;

- Unlike Bordentown, the community colleges where Huey took his CDL training were not FMCSA-regulated interstate motor carriers and were not subject to the legal requirements of the FMCSR. SOF ¶ 189;

---

certificate was also invalid because (although required to do so) Plaintiff failed to disclose his prior diagnoses of A-Fib and sleep apnea to Dr. Yu and Dr. Yu has testified that he would not have issued the certificate had Plaintiff informed him of these diagnoses. SOF ¶¶ 129-37. *See also Daily v. Martin Transp. Sys.*, No. 12-115, 2013 U.S. Dist. LEXIS 139994 (W.D. Mich. Sept. 30, 2013) (granting summary judgment on ADA claim by CMV driver: "Defendant argues that by twice falsifying her medical history, Plaintiff rendered invalid the medical examiner's certificates that she received. The Court agrees.")

[10] Bordentown's reference to Huey's testimony is without prejudice to the position that Huey is not qualified to be an expert witness (and, moreover, did not comply with the disclosure requirements of Fed. R. Civ. P. 26(a)(2)).

- Unlike Bordentown, the community colleges did not have CDL training programs that were designed based on test conditions and adherence to the AAMVA examination standards.  SOF ¶ 190;

- Unlike Bordentown, Huey passed the CDL examination in Texas, which (in contrast to the AAMVA standards) permitted him to use an ASL interpreter for part of the examination and permitted communication through hand gestures for the rest of the examination.  SOF ¶ 191.  Huey was not able to pass the CDL examination in Arizona, which (consistent with the AAMVA standards) did not permit an ASL interpreter or other non-verbal communication.  SOF ¶ 192.

The undisputed evidence also shows that Huey has never visited the Linden facility and has no knowledge of Bordentown's CDL training program or how Plaintiff could be reasonably accommodated into the training program.  SOF ¶ 192.

Accordingly, Huey's experiences do not provide any basis for Plaintiff to avoid summary judgment on his ADA and LAD claims.

## VI.   CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to Bordentown and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted:

**BLANK ROME LLP**

/s/ Janet O. Lee
DAVID C. KISTLER
New Jersey Resident Partner
ANTHONY B. HALLER
(*pro hac vice*)
JANET O. LEE
301 Carnegie Center, 3rd Floor
Princeton, NJ  08540
Telephone: (609) 750-2643
Facsimile: (609) 897-7291
Kistler@BlankRome.com
Haller@BlankRome.com
JLee@BlankRome.com

Dated: December 9, 2016
*Attorneys for Defendants Smith & Solomon*
*School of Tractor Trailer Driving, Inc.*