**BLANK ROME LLP**
*A Pennsylvania LLP*
David C. Kistler
(New Jersey Resident Partner)
Anthony B. Haller, Esquire
Janet O. Lee, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-2643
Facsimile: (609) 897-7291
Kistler@BlankRome.com
Haller@BlankRome.com
JLee@BlankRome.com
*Attorneys for Defendant*
*Bordentown Driver Training School, LLC*
*d/b/a Smith & Solomon*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH FRILANDO,<br><br>                              Plaintiff,<br><br>                    v.<br><br>BORDENTOWN DRIVER TRAINING<br>SCHOOL, LLC d/b/a SMITH & SOLOMON,<br><br>                              Defendants. | Civil Action No. 2:15-cv-02917<br><br>***Electronically Filed***<br><br><br>Motion Date: February 21, 2017<br><br>Oral Argument Requested |

**APPENDIX OF EXHIBITS TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

1.  Declaration of John Diab

2.  Deposition of John Diab

3.  Deposition of Kenneth Frilando

4.  Deposition of Joseph Frilando

5.  Deposition of Dr. Yu Kyi

6.  Deposition of Daniel Cox

7.  Deposition of John Huey

8.  AAMVA Model Commercial Driver License Manual – 2005 CDL Testing Manual (July 2010)

9.  Bordentown's Expert Report of Daniel McGee

10. Bordentown's Rebuttal Expert Report of Daniel McGee

11. Bordentown's Expert Report of William Adams

12. Bordentown's Rebuttal Expert Report of William Adams

13. Plaintiff's Expert Report of Daniel Cox

14. FMCSA Medical Examiner Handbook (Excerpts)

15. New Jersey CDL Manual

16. New York CDL Manual

17. Bordentown CDL Training Lesson Plan

18. Bordentown CDL Training Enrollment Materials

19. Medical Certificate Issued by Dr. Lawrence Marino

20. Medical Certificate Issued by Dr. Yu Kyi

21. Plaintiff's Correspondence with the FMCSA re Hearing Test Waiver

22. Bordentown's Correspondence with Joseph Frilando re Plaintiff

23. Internal Bordentown Correspondence re Plaintiff

24. Excerpts from Kenneth Frilando Deposition in *Frilando v. Dutchess School of Driving, Inc.*, No. 15-3972 (S.D.N.Y.)

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH FRILANDO, | Civil Action No. 2:15-cv-02917 |
| Plaintiff, | |
| v. | |
| BORDENTOWN DRIVER TRAINING SCHOOL, LLC d/b/a SMITH & SOLOMON, | |
| Defendants. | |

### DECLARATION OF JOHN DIAB, SR.

I, John Diab, Sr., declare as follows:

1. I have been the Chief Operating Officer of Bordentown Driver Training School, LLC since 1999. I regularly visit and am familiar with each of Bordentown's nine school locations.

2. Bordentown's schools are located in New Castle, Delaware, Bordentown, New Jersey, Linde, New Jersey, Hammonton, New Jersey, Lakewood, New Jersey, Bellmawr, New Jersey, Dupont, Pennsylvania, Norristown, Pennsylvania, and Philadelphia, Pennsylvania.

3. Our Linden, NJ location is the largest of the nine locations. The facility is rented, not owned. It has a classroom that can accommodate up to fifty students. The facility also has a large, private lot that is used to train and perform basic vehicle skills (referred to as "yard" exercises). The Linden facility is located in an urban area in New Jersey, sandwiched between Route 9 and the New Jersey Turnpike (Interstate 95).

4. Because Bordentown operates tractor-trailers as part of the CDL training program, Bordentown is an interstate motor carrier under the Federal Motor Carrier Safety Regulations ("FMCSR") and is required to adhere to the safety requirements contained in those regulations. We cannot adopt any process into our training program that would otherwise violate the FMCSR, as we could lose our operating license and be put out of business as an interstate motor carrier. Furthermore, if a crash occurred during our training program and we were found not to be in compliance with the requirements of the FMCSR, we could be held legally liable for the crash. In addition, the terms of our insurance policies require compliance with the requirements of the FMCSR.

5. In my experience, commercial motor vehicles present significantly greater safety risks than regular passenger vehicles. For example, a commercial motor vehicle is substantially heavier than a standard passenger vehicle – a semi-loaded tractor trailer can weigh up to 80,000 pounds, while a passenger vehicle typically weighs around 4,000 pounds. This added weight requires a substantially longer stopping distance (and stopping time) for a

1

commercial motor vehicle and presents a much greater risk of harm to the travelling public if an operator loses control of a commercial motor vehicle. Commercial motor vehicles are also typically much longer than the average passenger vehicle and have much more powerful engines than the average passenger vehicle.

6. Other significant dangers presented by a commercial motor vehicle include, without limitation, the risk of the tractor-trailer jackknifing (which may be caused by a brake failure or the driver downshifting and turning too quickly) or rolling over (which may be caused by the driver turning too sharply at speed).

7. Because of the significant public safety risks presented by commercial motor vehicles, the FMCSR impose strict safety and physical fitness requirements that are intended to reduce the risk of commercial motor vehicle accidents and the impact of injuries sustained therefrom. As part of the regulations, the Federal Motor Carrier Safety Administration ("FMCSA") requires that drivers undergo a medical fitness for duty examination. Through this examination, a certified Medical Examiner determines if a CDL applicant presents any physical, mental, or organic conditions that would affect the applicant's ability to safely operate a tractor trailer. According to the Medical Examiner's Handbook, which is published by the FMCSA, the Medical Examiner's role is to "establish whether a driver has a disease or disorder that interferes with the ability to safely operate a CMV, increases the risk for sudden death, or increases the risk for the onset of gradual or sudden incapacitation, thus endangering public safety."

8. One element of the medical fitness for duty examination is a hearing test. To pass the hearing test, a driver must be able to perceive a forced whispered voice in one ear at a distance of 5 feet, with or without the use of a hearing aid. If an audiometric devised is used, the driver must not have an average hearing loss in his better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz, with or without a hearing aid

9. My personal understanding is that this hearing standard was adopted into the federal regulations in the 1970s because, according to the Federal Highway Administration (the predecessor to the FMCSA), "persons who are deaf or who suffer from moderate to extreme hearing loss cannot be licensed to operate commercial motor vehicles in interstate commerce" and that "hearing is important when a driver must act on emergency sounds or improper mechanical sounds and when a driver needs to communicate."

10. My personal understanding is that from the adoption of the hearing standard until 2013, the FMCSA and its predecessor agencies did not grant any individual exemptions from the hearing requirement of the medical fitness examination. I also understand that the FMCSA began to grant limited exemption to the hearing standard in 2013. Based upon what I was told by FMCSA, I understand that the impetus for these exemptions was to accommodate individuals who could hear in the past, but had lost their hearing over the course of their career as a truck driver.

11. I also understand that FMCSA has granted hearing standard waivers to at least some individuals who did not have prior experience operating a CMV. However, to the best of my knowledge, the FMCSA has not published any guidance regarding how (if at all) the

2

CDL training industry may safely train an individual who is completely deaf or how such an individual may take the CDL examination. Upon learning that the FMCSA was granting waivers of the hearing test requirement for the medical certificate, we preemptively contacted FMCSA and AAMVA for guidance on the potential training and testing of deaf CDL applicants. They uniformly informed us that there was no test and there is no acceptable training program for deaf CDL applicants.

12. The FMCSR also set forth the requirements for the CDL examination. To obtain the CDL, an individual must do three things: (1) obtain the Medical Examiner's Certification, (2) pass a written knowledge test and obtain a Commercial Learner's Permit ("CLP"), and (3) pass a skills test (road examination). The skills test in turn contains three parts: the vehicle inspection test; the basic controls test; and the road test. The FMCSR do not require applicants attend a CDL training program. Enrollment in a CDL training program is voluntary and is not a prerequisite to obtaining a CDL.

13. Bordentown's CDL training program is structured to assist students to take and pass the written examination, obtain the CLP, and take and pass the skills test. The training starts with classroom instruction that addresses the written exam and the CLP. The Yard Training and Road Training portions of the training then address the requirements for the skills test. The training program is specifically designed for individuals without prior experience operating a commercial motor vehicle. In each phase of the training program, we place a primary emphasis on the safety of our students, instructors, and the travelling public.

14. The first phase of our CDL training program is Classroom Training. This is a week-long advanced training program designed to prepare students for the written CDL examination. Students are taught in a classroom at the facility, which can accommodate up to 50 students at a time. Students are taught using a combination of videos, power point presentations, and lecture. The instruction covers general knowledge (accident control, backing, braking, cargo, emergencies, fires, inspections, mirror use, night driving, parking, shifting, and skid control); the fundamentals of the air brake test; stopping distance, how to avoid rollovers, using trailer brakes, fifth wheel, coupling, air leakage rates, hose couplers, and trailer air supply; rules related to hazardous materials and waste; and tanker analysis.

15. At the end of the Classroom Training, students take the written CDL examination (at their state DMV) that is required to obtain the CLP.

16. The CLP is required to begin driving the CMV.

17. After the Classroom Training, assuming the student successfully passes the written test and obtains a CLP, the student can proceed to the Yard Training phase. During Yard Training, students are taught the knowledge and skills necessary to pass the CDL practical road test portion of the skills test. The practical road test includes the pre-trip inspection, in-cab inspection, air brake test, and backing and turning skills.

18. During Yard Training and Road Training, Bordentown trains its students under test conditions. The use of "test conditions" is a fundamental and essential element of the training program because it ensures that students are best prepared to take and pass each

3

phase of the CDL examination. Because interpreters are not permitted during the skills test, we do not allow interpreters in the vehicle during Yard Training or Road Training.

19. For Yard Training and Road Training, Bordentown maintains a fleet of conventional Freightliner tractor-trailers that have been modified for training purposes. Each has a forty-eight foot van trailer. The inside of the cab has been modified so that the rear bed is replaced with three seats for students. This enables the instructor to bring four students out on the road for every ride. Each truck has traditional "West Coast Mirrors," which are located on the outside of the driver and passenger doors. There is no interior (i.e. rear-view) mirror in the truck because there is no rear window in our cabs (and there is a trailer behind the cab). This means that the student's attention must be on the road ahead and the West Coast side-view mirrors.

20. The "pre-trip inspection" part of the practical road test requires the student to learn to perform a complete vehicle inspection. Specifically the student must learn to verbally identify and describe the inspection of the tractor trailer. Under the regulations and the standard American Association of Motor Vehicle Administrators ("AAMVA") examination requirements, this test must be administered in English only. The use of interpreters is strictly prohibited. It is therefore not possible to train the student to perform this inspection using an interpreter, since the interpreter is not permitted during the skills test.

21. During the "in-cab inspection," the student is taught to identify and check the interior components of the tractor trailer, including anti-lock brakes, air brake check, air compressor, electric lines, doors and mirrors, brake hoses, horn, lights, and warning signals. As with the pre-trip inspection, the use of interpreters is strictly prohibited by the regulations and the standard AAMVA examination requirements. Therefore, there is no way to reasonably accommodate a deaf student without completely changing how we do our business and teaching the student using an interpreter in contravention of the examination requirements.

22. During Yard Training, students also learn to operate the tractor trailer's complicated manual transmission. Specifically, they will be taught to use the double clutch mechanism, which is significantly more complicated than a manual transmission in a passenger vehicle.

23. Students are also taught basic vehicle control maneuvers during Yard Training. In the yard, one instructor will oversee fifteen students at a time. Three students will be in each tractor trailer. The tractor trailers are in different "skill stations," and each student is performing continuous motion skills. The instructor is located outside of the cab in a safe position providing verbal instruction and guidance as the student operates the tractor trailer. It is imperative that the student's vision is on the vehicle, and not looking toward the instructor when moving the truck and receiving instruction. Because of the number of vehicles in the yard and the number of students present, it is a safety risk for the student to take his or her vision off of the truck and risk injury to another student or property. It would therefore be impossible to communicate with the student in real-time with a sign language interpreter, since the student would have to look at the interpreter and not at the truck or the yard. Even assuming that the instruction could be communicated to a deaf student in a meaningful

4

way, we would likely need to close at least a portion, if not the entire yard, when training a deaf student. We simply could not risk accident and injury to our other students. As a result, we would need to reduce the number of students at the Linden facility (where we typically have up to 150 students at a time) and thus lose significant revenue and profit.

24. The final phase of the training program is Road Training, during which students operate the tractor trailer on public roads and prepare for the "safe on-road driving" portion of the CDL skills test. During Road Training, the instructor provides constant verbal instruction to a student as he or she operates the tractor trailer. The types of instructions the instructor provides relate to topics including the use of the transmission, what to do if a gear is missed, using the mirrors, speed, braking, location, heights, intersections, lane changes, merging, signaling, reacting to changing road conditions, and other maneuvers. The regulations and the standard AAMVA examination requirements require that the "safe on-road driving" test must be administered in English only. The use of interpreters is strictly prohibited. It is therefore not possible to train the student to perform the "safe on-road driving" test through an interpreter consistent with test conditions.

25. There are no abandoned or private roads or estates near the Linden, New Jersey facility to which our company has access to use to develop the student's proficiency before proceeding to public roads. We also do not have an on-site road training simulator. Students therefore start their road training on side streets and then proceed to major streets and highways as they become more familiar with driving a commercial motor vehicle in road conditions.

26. The dangers involved in the Road Training phase can be serious, especially if a student is not able to immediately receive and react to information from the instructor. If the student cannot receive instruction while moving the vehicle, dangers like freewheeling and off-tracking can occur leading to catastrophic accidents.

27. Based on my experience, there no way to provide Plaintiff with an interpreter during the Road Training. A sign language interpreter would prevent instantaneous communication between the instructor and student. The examination also requires that the student relate information to the examiner, such as traffic, signs, construction, pedestrians, railroad grade crossings, and overpasses. Without constant interactive communication between the instructor and student, Bordentown could not offer the Road Training in true test conditions.

28. During the Road Training, an instructor will typically take up to four students out on the road and each student (including the driver and the students sitting behind the instructor) must be able to hear and understand the instructor's verbal commands. Even if we could train the Plaintiff, we would need to replace two students in the rear seat with sign language interpreters. This would reduce the number of students we could train in Plaintiff's vehicle by 50% -- from four students to two.

29. It is Bordentown's policy to assess applicants with disabilities, and whether and how we can accommodate such an applicant, on a case-by-case basis. We instruct employees to contact senior management when any request for accommodation is made. We will then

5

review, analyze, and determine whether Bordentown can reasonably accommodate such the disability.

30. Consistent with this case-by-case analysis, we reviewed Plaintiff's disability to determine whether we could safely accommodate him in our CDL training program. Without any guidance from federal or state agencies, and based on our own thorough research, we were unable to determine how to safely provide such an accommodation.

31. Before responding to Plaintiff's brother's inquiry regarding our training program, I and other representatives of Bordentown spoke with the FMCSA, AAMVA, the State of New Jersey, and the State of New York about whether there were published guidelines on how to train a deaf student and whether we should test a deaf student.

32. The FMCSA and AAMVA confirmed that there are no guidelines or requirements to train a deaf student. I spoke with Larry Minor of the FMCSA and Kevin Lewis with AAMVA. They also confirmed that it is illegal for a deaf applicant to use an interpreter during the skills test.

33. Individuals from the New Jersey and Pennsylvania state agencies that handle the CDL examination both confirmed that a deaf student would not be permitted to use an interpreter during the skills examination. In March 2015, I spoke with Blain Stein of the State of New Jersey, who confirmed the state would not test the hearing impaired because it is not safe to do so. I am also ware that Henry Elmy of the Commonwealth of Pennsylvania provided the same response to my son, John Diab, Jr.

34. To the best of my knowledge, receipt of a hearing exemption from the FMCSA only allows the student to skip the forced whisper test of the medical examination.

35. The hearing exemption does not have any impact or bearing on the individual's ability to participate in a CDL training program offered by a private institution. It also does not waive the requirement that the student take the skills test without the assistance of an interpreter.

36. Plaintiff and his brother never provided Bordentown with any information about how we could reasonably accommodate Plaintiff's hearing impairment. Even after explaining to the Plaintiff's brother that we were without guidance or direction, no information was provided.

37. Providing Plaintiff with sign language interpreter for the full duration of our 160-hour training program would result in a considerable financial burden to our company. Based on our use of sign language interpreters in a separate forklift training program (that is not subject to the FMCSR), the cost of having two sign language interpreters for one day is around $1,200. Because the average student is in the program for between 50 and 125 days, the estimated cost of providing the sign language interpreter is between $60,000 and $150,000. This is approximately fifteen to thirty-seven times greater than the $4,000 tuition for the 160-hour training program.

6

38. Each year, approximately 700 students attend CDL training classes at the Linden facility. Across the entire company, approximately 2,500 students participate in our CDL training programs each year.

39. Across all nine locations, our annual revenue is approximately $10 million. At the Linden facility, our annual revenue is approximately $3 million.

40. This is a very low margin industry. Our company-wide net profit at the end of the year is only $400,000 (prior to taxes and capital expenditures, such as the cost of purchasing a new cab or trailer for training), which is reinvested into the company. At the Linden facility, our annual profit is only $140,000 (also prior to taxes and capital expenditures).

41. None of the individuals Plaintiff disclosed during discovery as experts ever visited our facilities – either in Linden, New Jersey or any of the other eight locations. They did not observe how we perform our training, they never observed our trucks, and they have not seen the layout of the facility.


I certify under penalty of perjury that the foregoing is true and correct.


John Diab, Sr.

Executed on: December 9, 2016

7

145806.00601/104221585v.4

# EXHIBIT 2

1

1

2      UNITED STATES DISTRICT COURT
       DISTRICT OF NEW JERSEY
3      ----------------------------------------X
       KENNETH FRILANDO,
4
                                 PLAINTIFF,
5
                   -against-     Index No.:
6                                CV-02917-KM-JBC

7      BORDENTOWN DRIVER TRAINING SCHOOL LLC,

8                                DEFENDANT.
       ----------------------------------------X
9

10                          DATE: January 6, 2016

11                          TIME: 10:25 A.M.

12

13            EXAMINATION BEFORE TRIAL of the

14     Defendant, BORDENTOWN DRIVER TRAINING

15     SCHOOL LLC, by a witness, JOHN DIAB, taken

16     by the respective parties, pursuant to a

17     Court Order, held at the offices of

18     Eisenberg & Baum, LLP, 24 Union Square

19     East, New York, New York 10003, before

20     Jenifer Pennline, a Notary Public of the

21     State of New York.

22

23

24

25

2

```
1

2     A P P E A R A N C E S:

3

4     EISENBERG & BAUM, LLP
        Attorneys for the Plaintiff
5       24 Union Square East
        New York, New York 10003
6       BY: SETH A. NADLER, ESQ.

7

8

9     BLANK ROME, LLP
        Attorneys for the Defendant
10      130 North 18th Street
        Philadelphia, Pennsylvania 19103
11      BY: ANTHONY B. HALLER, ESQ.

12

13    ALSO PRESENT: Philip M. Black
                     John Connelly

14

15              *          *          *

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2        F E D E R A L   S T I P U L A T I O N S

 3

 4

 5        IT IS HEREBY STIPULATED AND AGREED by and

 6    between the counsel for the respective

 7    parties herein that the sealing, filing and

 8    certification of the within deposition be

 9    waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20        IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *       *       *       *

25
```

4

```
 1                    DIAB
 2   J O H N   D I A B, called as a witness,
 3   having been first duly sworn by a Notary
 4   Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY.
 7   MR. NADLER:
 8        Q.    Please state your name for the
 9   record.
10        A.    John Diab.
11        Q.    What is your address?
12        A.    402 Rising Sun Road,
13   Bordentown, New Jersey 08505.
14        Q.    Hello.  My name is Seth Nadler.
15   I represent the Plaintiff in this matter,
16   Ken Frilando.  I asked you to come here
17   today because I had a few questions about
18   your interaction about Mr. Frilando.
19             Before we start, have you ever
20   attended a deposition before?
21        A.    I have in the past.
22        Q.    When was that?
23        A.    Years ago.  It was on a
24   construction issue.
25        Q.    Do you remember if it was for a
```

```
 1                        DIAB
 2    contract case or personal injury?
 3          A.    It was contract.
 4          Q.    Contract?
 5          A.    Yes.
 6          Q.    Do you understand that you are
 7    under oath?
 8          A.    Yes, I do.
 9          Q.    Do you understand that even
10    though we are in the informal setting of a
11    conference room you must answer all
12    questions truthfully and honestly as if we
13    were in a courtroom?
14          A.    Yes, I understand.
15          Q.    Is there anything that would
16    prevent you from providing honest and
17    truthful answers to my questions today?
18          A.    No.
19                MR. HALLER:  Before you proceed
20          with any further substantive
21          questions, there are a couple of
22          things I would like to say on the
23          record.
24                MR. NADLER:  Okay.
25                MR. HALLER:  I would like to
```

```
 1                         DIAB
 2          make sure that we are proceeding
 3          today on the understanding that
 4          objections are reserved for trial in
 5          accordance with the Federal rules
 6          except as to the form of the
 7          question, what we call, at least in
 8          the Eastern District, the usual
 9          stipulations; is that agreeable?
10               MR. NADLER:  That is fine.
11               MR. HALLER:  Secondly, I do
12          want to make clear that Mr. Diab is
13          here in response to a specific notice
14          submitted under Rule 30B6 of the
15          Federal Rules of Civil Procedure,
16          which is a corporate designee notice
17          with respect to the specified
18          subjects in that notice, and that we
19          have, as I think you know, submitted
20          objections and responses to that
21          notice, so he is here to respond to
22          questions with respect to the 30B6
23          Notice subject to the objections that
24          have been provided.
25               MR. NADLER:  Okay.  It has been
```

```
 1                      DIAB
 2           noted for the record.
 3           Q.    Are you taking any medications
 4      right now?
 5           A.    No.
 6           Q.    Are you under the influence of
 7      alcohol or have you been in the past 24
 8      hours?
 9           A.    No.
10           Q.    If you do not understand my
11      questions, will you let me know?
12           A.    Yes, I will.
13           Q.    When answering a question in
14      full, I just ask that you state the answer
15      affirmatively, do not nod or shake your
16      head, is that okay?
17           A.    Yes.
18           Q.    If you need a break please let
19      me know and we will take one.
20           A.    Okay.
21           Q.    I ask that if we take a break,
22      you do not do it in the middle of the
23      question, you do it after the question has
24      been asked.
25           A.    I understand.
```

```
 1                         DIAB
 2          Q.     I am going to ask you a couple
 3   of questions and I would just like to
 4   preface it by saying any communications
 5   that you have had with your lawyer are
 6   privileged and should not be told to me
 7   specifically what those communications
 8   were, I am just going to put that on the
 9   record and just ask you a few questions
10   after that.
11          A.     Okay.
12          Q.     Have you met with your lawyer
13   in preparation for this deposition?
14          A.     Yes.
15          Q.     Did you review documents?
16          A.     I did.
17          Q.     Did you prepare in any other
18   way?
19          A.     Only other than for the
20   attorneys just compiling the information
21   that I needed that had been requested by
22   you first.
23          Q.     So did you communicate with
24   anyone aside from your lawyer or just your
25   attorneys?
```

```
 1                     DIAB
 2          A.    It was my attorneys and my son
 3    who works for us and only that he gathered
 4    the information that I requested.
 5          Q.    Okay.
 6                Do you understand that you have
 7    been presented here pursuant to a 30B6
 8    Notice?
 9          A.    Yes.
10          Q.    Has your lawyer explained what
11    a 30B6 Notice is?
12          A.    Yes.
13          Q.    So you understand that are you
14    here as a corporate representative of
15    Bordentown driver's school?  I will refer
16    to it as Bordentown throughout the
17    deposition in shorthand.
18          A.    Yes, I understand that.
19          Q.    And you have been presented to
20    answer questions on behalf of this driving
21    school, Bordentown?
22          A.    I understand that.
23          Q.    I would like to go through a
24    couple of the issues that were in the 30B6
25    Notice so that we are on the same page and
```

```
 1                         DIAB
 2    we both know what you are here to answer to
 3    today.
 4         A.     Okay.
 5         Q.     Communications between Mr.
 6    Joseph Frilando and Defendant from March
 7    17th to April 26, 2015, roughly?
 8         A.     Okay.
 9         Q.     Communications between Mr.
10    Frilando and Mr. Wessendorf?
11         A.     Yes.
12         Q.     Defendant's current policy and
13    procedures in accommodating deaf and hard
14    of hearing individuals?
15         A.     Yes.
16         Q.     Defendant's current policies
17    and procedures in accommodating deaf and
18    hard of hearing individuals in its forklift
19    driver training program?
20         A.     Yes.
21         Q.     Defendant's policies and
22    practices for the scheduling of American
23    sign language interpreters?
24         A.     As it pertains to the forklift?
25         Q.     Just in general.  Just your
```

```
 1                    DIAB
 2   policies if somebody requests an
 3   interpreter how you contact the interpreter
 4   agency or what policies that you have in
 5   place for that.
 6        A.    Yes, I believe.
 7        Q.    Okay.
 8              Defendant's contact without
 9   outside entities regarding its obligation
10   to provide a qualified interpreter to deaf
11   and hard of hearing driver students?
12        A.    Yes.
13              MR. HALLER:  I want to be very
14        clear with respect to that there was
15        a specific objection with respect to
16        that topic, just so you know.
17              MR. NADLER:  Are we talking
18        about the Defendant's contact outside
19        entities regarding it's obligation to
20        provide a qualified interpreter to
21        deaf and hard of hearing students, is
22        that where you had a specific
23        objection?
24              MR. HALLER:  We presented the
25        objection and with respect to that
```

1                          DIAB

2          the witness is here and he is

3          prepared to testify about contact

4          with outside agencies with regard to

5          the waiver issues generally, but as

6          you know, we do not think with

7          respect to CTL training that there is

8          an obligation to provide qualified

9          interpreters, so we depose an

10         objection in that regard, but he

11         certainly can talk about what was

12         discussed with the outside agency

13         about the subject matter in a broad

14         sense.

15              MR. NADLER:  Okay.  When we get

16         to that topic if you have further

17         objections, you can make them when I

18         ask the questions.

19         Q.    Any non-privileged research

20    done in investigating whether a deaf driver

21    can safely be trained to operate a large

22    truck?

23         A.    Yes.

24         Q.    That is the last of the areas

25    that you have been presented here to answer

```
 1                        DIAB
 2    any questions for.
 3         A.    Yes.
 4         Q.    With that, I would just like to
 5    get started with the questions.
 6               Can you state your title?
 7         A.    Yes.  I am chief operating
 8    officer.
 9         Q.    Chief operating officer?
10         A.    Yes.
11         Q.    What company do you work for?
12         A.    Bordentown Drivers Training
13    School LLC, d/b/a Smith and Solomon.
14         Q.    What is the address of the
15    location that you work at?
16         A.    402 Rising Sun Road,
17    Bordentown, New Jersey 08505.
18         Q.    How long have you had this
19    position at Bordentown?
20         A.    Since the school was started in
21    1999, so 16 years.
22         Q.    So when the school was started,
23    were you given this position and you
24    retained it ever since?
25         A.    That's correct.
```

```
 1                    DIAB
 2        Q.    Okay.
 3              Is this the only position that
 4   you have ever had at Bordentown?
 5        A.    That's correct.
 6        Q.    Who owns the school?
 7        A.    I do and I have several
 8   partners.
 9        Q.    Is the school incorporated?
10        A.    It is an LLC.
11        Q.    How many locations are there in
12   the Bordentown school?
13        A.    Nine.
14        Q.    Nine?
15        A.    Yes.
16        Q.    Where are the other locations?
17        A.    Other than?
18        Q.    Other than the one specifically
19   where Mr. Frilando contacted, where are --
20   I assume it is one entity, the Bordentown
21   driving school with separate other schools,
22   so where are the other schools?
23        A.    The one entity with nine
24   locations.
25        Q.    Are the locations primarily in
```

15

```
 1                    DIAB
 2    New Jersey?
 3         A.    New Jersey, Pennsylvania and
 4    Delaware.
 5         Q.    You are the chief operating
 6    officer for all of those schools?
 7         A.    That's correct.
 8         Q.    How large would you say the
 9    staff of your specific location is?
10              MR. HALLER:  Objection to form.
11              Which location?
12         A.    I don't understand the
13    question.
14         Q.    The Bordentown location.
15         A.    Bordentown itself?
16         Q.    The specific location where Mr.
17    Frilando --
18         A.    I need you to reference the
19    location if you would.  So that I am sure
20    that I am addressing the proper location.
21    I believe you are addressing our Linden
22    location?
23         Q.    Yes.
24         A.    That has probably 25 or 30
25    staff, some of which are part-time.
```

```
 1                        DIAB
 2         Q.     Okay.
 3                Do staff members at one
 4    location interact with staff members at
 5    other locations?
 6         A.     Yes, they do.
 7         Q.     How do they interact?
 8         A.     By phone.  They could -- they
 9    have meetings with the entire other
10    locations and the other staff.  Sometimes
11    instructors come and go.  We pick an
12    instructor from one location to another.
13    That is generally how they would interact.
14         Q.     Okay.
15                Do all of the locations offer
16    the same courses?
17                MR. HALLER:  Objection to form.
18                You may answer.
19         A.     The answer to that is no.  They
20    all offer basic CDL training.  There -- we
21    have some corporate business that is only
22    done in certain locations.  And we do
23    forklift only in certain locations.
24         Q.     Okay.
25                Is the CDL program itself
```

```
 1                    DIAB
 2   identical in all of the nine locations or
 3   does it vary in locations?
 4        A.    The CDL program is identical,
 5   other than the fact that although there is
 6   an outline, there is 160 hour program.  We
 7   are performance based.
 8             So our programs tend to exceed
 9   the 160 hours, and depending on the
10   location, how many students are in the
11   location, how many are there at a certain
12   time, it can actually be longer or shorter.
13   How long it takes us to get folks tested.
14             If you want to know
15   specifically about the Linden location, the
16   average there for a student is about ten
17   weeks.
18        Q.    You mentioned above the average
19   160 hours.
20             Can you explain what that
21   means?
22        A.    Our course is designated as 160
23   hour course.
24             It truly has never been 160
25   hours.  It has always been more than that,
```

```
 1                        DIAB
 2   because we are performance based.
 3              If someone needs more time, we
 4   put more time into it.
 5              We also count the time that
 6   they are with us while they are waiting to
 7   test with the state, sometimes -- in
 8   general, I mean the first time pass rate is
 9   about 45 or 50 percent, first time somebody
10   goes to take the test, they pass it 45, 50
11   percent.
12              That means they have to come
13   back.
14              So really a program could go
15   indefinitely but we outline our programs as
16   160 hour course.
17        Q.    What is the management
18   structure of the school?
19        A.    You are talking about the
20   entire --
21        Q.    The entire Bordentown
22   organization?
23        A.    I am chief operating officer,
24   my son is director of operation.  He
25   answers to me and he has certain truckers
```

```
 1                        DIAB
 2      that answer to him.  That would be
 3      marketing fleet and safety.  In the state
 4      of Pennsylvania we are an approved state
 5      examiner, so they would answer to him.  And
 6      placement of our students, so those
 7      departments, which really are all of the
 8      departments that answer to him.
 9           Q.    Okay.
10                 So you are the senior most
11      person on management?
12           A.    I am.
13           Q.    Are you familiar with the
14      title, Director of Safety and Program
15      Training?
16           A.    I believe that that title was
17      Dale Wessendorf's title.
18           Q.    Is that only a title that he
19      had while he was employed in that position
20      that no longer exists?
21           A.    That title was specific to Dale
22      because he had certain talents.  When Dale
23      passed away his replacement then became
24      Director of Fleet and Safety.  Dale had the
25      ability to write programs and so really
```

```
 1                      DIAB
 2    that position and that title was done away
 3    with.
 4         Q.    You mentioned that Dale had
 5    this title because he had special talents.
 6    Can you --
 7         A.    When Dale came to us, it was
 8    probably well over ten years ago, ten or 12
 9    years ago.  He'd been in the Air Force for
10    probably ten or 12 years, and he worked in
11    the fire department in the Air Force on the
12    runways and he wrote policies and
13    procedures for the Air Force.  So Dale
14    could -- when he came to us, he had the
15    ability to do, if we needed, a Hazmat
16    program, Dale could write it.  There were
17    certain things that he could do that other
18    people could not.  In addition to that,
19    Dale had a truck stop background.  That
20    qualified him for the fleet and maintenance
21    of the fleet and upkeep of the fleet.
22         Q.    Can you elaborate what a truck
23    stop background is?
24         A.    A truck stop is a place where
25    trucks go and they are provided services
```

```
 1                    DIAB
 2    while the drivers and trucks are on the
 3    road.
 4              They generally have maintenance
 5    shops, truck washers, fuel, there's a
 6    restaurant.  It is an entire facility.
 7         Q.    Aside from Mr. Wessendorf's
 8    special talents that allowed him to have
 9    this title, did he have any advanced
10    education, for example, a master's or
11    another degree in driver safety training?
12              MR. HALLER:  Objection to form.
13         A.    There are some ongoing courses
14    that I am sure that he took, but I am not
15    familiar what they were.
16         Q.    Did he have any special license
17    in this safety training?
18         A.    Not to the best of my
19    knowledge.
20              MR. NADLER:  Off the record.
21              (Whereupon, an off-the-record
22           discussion was held.)
23              MR. NADLER:  Back on the
24           record.
25         Q.    As the Director of Safety
```

```
 1                    DIAB
 2   Training, what determination did Mr.
 3   Wessendorf make?
 4             MR. HALLER:  Objection to form.
 5             You may answer.
 6        A.   Well, I am not sure I
 7   understand.  Would you ask it again?
 8        Q.   I will rephrase it.
 9             As the Director of Safety
10   Training, what was Mr. Wessendorf's role?
11        A.   Well, he provided training,
12   specific training programs for us.  He
13   worked on our curriculum, he handled
14   insurance and insurance claims.  And
15   anything out of the ordinary, in terms of
16   whether it was help or students, he would
17   be involved from a safety aspect.  He would
18   evaluate from the standpoint of whatever
19   specifically it was that he was looking at,
20   was it safe, was it safe for the
21   individual, safe for the public, was it
22   safe for the company.  If he had questions,
23   then he would generally bring them to me or
24   my son.
25        Q.   What types of training did he
```

```
 1                    DIAB
 2   work on?
 3          A.    Types of training?
 4          Q.    Yes.
 5          A.    He did a lot of outside classes
 6   for us, Hazmat, tanker training, roll over,
 7   mountain driving.
 8                The general safety of
 9   everything that we did, Dale was out in the
10   field, so he was constantly looking at the
11   condition of our trucks and were they safe
12   and the condition of our facilities and
13   were they safe.
14                He generally looked at all the
15   aspects of safety related to the operation.
16          Q.    Mr. Wessendorf had this
17   position, he was in charge of safety for
18   all nine locations?
19          A.    Yes.
20          Q.    Did he report directly to you
21   or did he report to your son who then
22   reported to you?
23          A.    Dale reported directly to my
24   son but really had a dotted line to me as
25   well.  Dale actually worked for me before
```

```
 1                    DIAB
 2   he worked for my son.  So we pretty much
 3   maintained a relationship.
 4        Q.    What do you mean he worked for
 5   you before he worked for your son?
 6        A.    Well, we were in the truck stop
 7   business.  When we were in the truck stop
 8   business, I operated a company that
 9   operated a large truck stop and Dale was
10   one of the managers and I was the person
11   that was in charge of the truck stop so he
12   answered to me.
13        Q.    How long did Mr. Wessendorf
14   have this position at Bordentown?
15        A.    I believe he started with us in
16   the driving school in 2006, so it was about
17   ten years.  Less because of his passing.
18        Q.    Was there anybody who had a
19   position similar to his before he came on
20   board in 2006?
21        A.    No.
22        Q.    No, so the position was created
23   for him in 2006?
24        A.    Well, the position was created
25   because we needed it and it wasn't created
```

```
 1                        DIAB
 2    for him, it was created with him because we
 3    had a need because we were growing.
 4         Q.    So from the time that the
 5    school was created until 2006, there was
 6    nobody in charge of safety training?
 7         A.    It was about five years and we
 8    had an operation's person that basically
 9    handled it.  Someone that had been in the
10    business since we started and he kind of
11    handled everything.
12              We didn't have any of the
13    equipment that we had, we did not have the
14    number of locations that we had, and so we
15    didn't need a specific person.
16              As we grew, it was then that we
17    realized that we needed somebody.
18         Q.    Since Mr. Wessendorf passed
19    away, who has been in his position now?
20              MR. HALLER:  Objection to form.
21              You may answer.
22         A.    We hired a person to deal with
23    the fleet, fleet safety, the general
24    safety, but he does not do the program
25    related development that Dale did.
```

```
 1                    DIAB
 2        Q.   Was it typical that the
 3   director of student and safety training for
 4   purposes of our lawsuit handled disability
 5   accommodations?
 6             MR. HALLER:  Objection to form.
 7        A.   I am not sure that I actually
 8   -- you said the director of student safety.
 9   That was never his title.  I don't recall
10   anywhere anybody ever saying that his title
11   was director of student safety.  He was the
12   fleet and safety director.
13        Q.   Mr. Wessendorf?
14        A.   Mr. Wessendorf, but not
15   specifically -- I don't believe the student
16   safety director.  It was part of his role,
17   but I don't believe that that was his
18   title.
19             MR. NADLER:  BDTS 0007.  Let's
20        have this marked as Exhibit 1.
21             (Whereupon, the aforementioned
22        document Bate stamped BDTS 0007 was
23        marked as Diab(s)' Exhibit 1 for
24        identification as of this date by the
25        Reporter.)
```

```
 1                    DIAB
 2        Q.    Would you turn to BDTS 0010?
 3        A.    Okay.
 4        Q.    Under Mr. Dale G. Wessendorf,
 5   this is an e-mail communication from him.
 6   It says Smith and Solomon Commercial Driver
 7   Training, Director of Safety and Program
 8   Training.
 9        A.    That's correct.  That is
10   exactly what I said.
11        Q.    So he is in charge of director
12   of safety and program training, but not
13   student safety?
14        A.    It was all encompassed but it
15   wasn't specifically student.  You referred
16   to it as director of student safety and I
17   am saying that that is part of the safety.
18   The other part of the safety had to do with
19   the trucks.  The other part had to do with
20   physical properties.  It was much more
21   encompassing than just the student safety.
22        Q.    Okay.
23              We can agree that he was the
24   director of safety of program training?
25        A.    Absolutely.
```

```
 1                    DIAB
 2       Q.     Thank you.
 3              I will go back to an earlier
 4   question.
 5              Was it typical if a potential
 6   student e-mailed the school looking for
 7   disability accommodations that Mr.
 8   Wessendorf is the person in your
 9   organization that would have been in
10   contact with him?
11       A.     That's correct.
12              MR. HALLER:  I will object to
13          the form, because I don't think there
14          is any basis to establish that
15          anything was typical in this area,
16          but he answered the question.
17       Q.     Was it unusual in this regard
18   that Mr. Wessendorf responded back to Mr.
19   Frilando or somebody else would have done
20   that in his position?
21              MR. HALLER:  Objection to form.
22              You may answer.
23       A.     No, it is not unusual that Mr.
24   Wessendorf would have answered or
25   responded.
```

```
1                        DIAB
2         Q.    Did he handle disability
3    accommodations for all students enrolled in
4    the school?
5         A.    Yes, but the -- we probably
6    have not gotten two requests for disability
7    accommodations.  So it is not something
8    that he would do regularly.
9         Q.    So is it your testimony that in
10   the history of the Bordentown school you
11   have never received more than two requests?
12        A.    Well, it's been more than two
13   requests.  I mean, there have been several
14   requests over I guess ten years.
15        Q.    Do you remember exactly how
16   many requests that you have received over
17   ten years?
18        A.    I do not.
19        Q.    There have been requests?
20        A.    Yes, there have.
21        Q.    Has Mr. Wessendorf always been
22   the person who answered these requests?
23        A.    Generally, he has and sometimes
24   he was assisted by a Mr. Todd Highland and
25   Highland to do with -- he was a fill-in,
```

```
1                      DIAB
2    his primarily function was placement, but
3    if Dale were unavailable or had to be in a
4    specific location then Mr. Highland may
5    have filled in.
6            Q.     What was Mr. Highland's title
7    at the school?
8            A.     Director of Placement.
9            Q.     Director of Placement?
10           A.     Yes.
11           Q.     How long has he been at
12   Bordentown?
13           A.     He was with us about five
14   years.  He is no longer with us.
15           Q.     What were his exact duties at
16   the school?
17           A.     Primarily to place students and
18   some other involvement with the counties
19   that we do business with and -- we are a
20   small organization so there is a lot of
21   overlap in responsibilities.
22           Q.     When you say place students,
23   what do you mean?
24           A.     Well, a signature part of what
25   we do is we get our students jobs.
```

```
 1                    DIAB
 2       Q.    So he was in charge --
 3       A.    Of getting the students jobs.
 4       Q.    How many students on average
 5  would you say, let's say, per week, called
 6  the school inquiring about enrolling?
 7       A.    Are you talking about all of
 8  the schools or are you talking about one
 9  location?
10       Q.    Let's say for the entire
11  Bordentown, is it one central call line
12  where they are calling in and saying I
13  would like to take this driver program and
14  from there they would see which location
15  that you would be in or do you have to call
16  every location individually?
17            MR. HALLER:  Objection to the
18         form.
19            You may answer.
20       A.    You would call in to a central
21  operator but generally, that operator is in
22  Linden and everything falls through there.
23            I think you asked me how many?
24       Q.    Yes.
25       A.    I would tell you on average, we
```

```
1                    DIAB
2     probably receive for the entire group,
3     1,500 calls a month.
4          Q.    A month?
5          A.    Yes.
6          Q.    They all go through the Linden
7     location?
8          A.    They go through primarily
9     operator.  We have the ability to switch it
10    from one location to the other with our
11    phones, but most of the time it would go
12    through Linden.
13         Q.    Do you also get this volume of
14    e-mail inquiries?
15         A.    We get -- that is all our
16    inquiries.  That is just not --
17         Q.    The 1500 is --
18         A.    That is all our inquiries, that
19    is our website.  It is phone, it is all the
20    inquiries we are getting.
21         Q.    Okay.
22               How long does it usually take
23    between the time a student will inquire
24    with the school about enrolling and when he
25    or she actually becomes enrolled?
```

```
 1                      DIAB
 2        A.     Typically it is six to eight
 3   weeks.
 4        Q.     Why would it take six to eight
 5   weeks?
 6        A.     Just to process.  Someone calls
 7   in, set up an appointment, we give some
 8   information over the phone.  They come in,
 9   have a preliminary interview, we do not
10   take everybody that calls.  They have to be
11   in any number of ways DOT qualified and so
12   as they come in for interviews, we would
13   have those conversations and then the
14   process is, you know, how are they going to
15   pay for it, when do they want to go to
16   school, they go away, they come back.  When
17   all is said and done, six to eight weeks.
18        Q.     How often are there semesters?
19        A.     There are not semesters, we are
20   an open enrollment.  We go every week.
21        Q.     Every week?
22        A.     Generally every week.  In our
23   Linden location, we go every week.  That is
24   our largest location.  We have other
25   smaller schools that go every other week,
```

```
 1                       DIAB
 2    every third week.  It's open and we try to
 3    get somebody into the next possible class
 4    once they are determined that they want to
 5    do this.
 6         Q.    You mentioned that during the
 7    six to eight week period between when a
 8    student inquires and when they enroll there
 9    are certain steps involved.
10              One of these steps is receiving
11    documents from the DOT, can you explain
12    what documents you need to receive?
13         A.    We have to know that the
14    individual has a COP, which is Commercial
15    Owner's Permit, and a valid medical
16    certificate.
17         Q.    How does a student obtain a
18    valid medical certificate?
19         A.    They have to either, A, if they
20    do it on their own, determine who is
21    certified by the Federal Motor Carrier, a
22    medical examiner, or if they choose to, we
23    have a medical examiner that goes from
24    location to location, and on certain days
25    they can come back and take the physical
```

```
 1                      DIAB
 2    right at one of our locations.
 3         Q.    This examiner would check to
 4    see if this person was qualified to enroll
 5    in a CDL program?
 6         A.    He wouldn't check.  He has
 7    specific requirement that he has to follow.
 8    I can elaborate if you would like me to.
 9         Q.    What are these requirements
10    that he or she has to follow?
11         A.    They have to be -- they do a
12    standard physical blood pressure, they have
13    to pass a urine analysis, it has to be
14    determined whether they have any heart
15    conditions, anything related to sleep
16    apnea, any, I think the regulation states
17    loss of limb.  Any sight problems.
18              They have to go through a
19    series of events, depending what it is, and
20    the medical exam by a certified examiner
21    has tightened up and -- particularly with
22    sleep apnea, we lose significantly more
23    people to sleep apnea than we do anything
24    else.
25              In the event -- let's use sleep
```

                        DIAB
apnea for example.

              In the event that the person
has sleep apnea, it has gotten to the point
the Federal Motor Carrier has basically
said if somebody comes in and -- actually I
hold a CDL, so I have to get my physical
every two years and honestly I have a 17
inch neck.  And if a person comes in, and
it looks like they have a 17 inch neck,
they almost automatically qualify for sleep
apnea testing.

              So then that person is required
by that medical examiner to go out on their
own and go to a clinic and have sleep apnea
testing done and then come back with a
report and give it to the medical examiner
before the medical examiner can actually
sign off on the medical card.

              In the case of sleep apnea, and
in the case of cardiology issues, you can
only issue a medical card for one year.  It
cannot be for two years.

              So they go through the series
of events and they will -- you know, a

```
 1                    DIAB
 2   medical examiner that is on the Federal
 3   register, unless he wants to lose his
 4   certification from the Federal government,
 5   needs to be following those guidelines and
 6   directions.
 7              But, as I said, in this day and
 8   age, sleep apnea has become our greatest
 9   nemesis.
10        Q.    Aside from sleep apnea, which
11   you said is your greatest nemesis, are
12   there any medical conditions that would
13   automatically disqualify one from being
14   able to obtain this license?
15        A.    Yes.
16        Q.    What are some of these
17   conditions?
18        A.    Loss of limb.  Hearing
19   impaired, vision impaired.  I believe that
20   diabetes, that is to a certain degree
21   diabetes, and uncontrollable or hard to
22   control, we will basically eliminate
23   someone.
24        Q.    You mentioned hearing impaired.
25              So if somebody was hearing
```

```
 1                         DIAB
 2    impaired they automatically could not get
 3    to pass the medical exam, is that what you
 4    are saying?
 5         A.    If they are hearing impaired,
 6    there is a force whisper test that is
 7    given.  If they either say -- if they come
 8    in and say I can't hear and I can't speak,
 9    then it is up to the medical doctor to say,
10    okay, we can try the force whisper test,
11    but today, in this day and age, the medical
12    examiner is going to say then you need to
13    get a waiver from the Federal government
14    before you go any further.
15         Q.    Okay.
16               I would like to step back.
17    Still in the six to eight week time lapse
18    between a student inquiring the school and
19    enrolling, there is the medical exam, there
20    is the COP permit.
21               You also mentioned there was an
22    interview that the student would have to go
23    through.
24               Can you explain the interview
25    process and what that entails?
```

```
 1                    DIAB
 2         A.    Well, there are several things.
 3    One is that a driver's license abstract has
 4    got to be run and we have to see that, you
 5    know, they have a valid driver's license,
 6    that there is not an outrageous number of
 7    points on it.  That there has been no
 8    drunken driving.  Those kind of things
 9    would disqualify that person, not from
10    getting a license necessarily, but from us
11    being able to get them a job.  So we alert
12    the person to that.  Look in this case, you
13    can get a license, but we are going to be
14    hard pressed to find you a job.
15         Q.    I see.  If somebody has this in
16    their background, DUI, for example, you
17    tell them that it would be very difficult
18    for us to place you and that is the reason
19    that you would not want to take them into
20    the school?
21         A.    Well, it's not that -- we want
22    to get -- our ultimate goal is to get
23    someone a job and if we cannot get them a
24    job, it is our obligation at the very least
25    to let them know that it is going to be
```

1                        DIAB

2      very hard for us to do that.  If somebody

3      came to us and said I have already got a

4      job, somebody is going to hire me.  They do

5      not care about the points or DWI, or that I

6      was arrested for drugs.  So in that case,

7      we would ask them to get a letter from the

8      person that said they were going to employ

9      them and at their own risk basically we

10     would then go ahead and proceed and train

11     them.

12          Q.    So for example, if somebody had

13     a record of DUI and they came to your

14     school but they were able to get a job

15     after, they had a letter, a company was

16     going to hire them, that background of

17     theirs would not be relevant for your

18     purposes, you would still train them in the

19     school, because they would still be getting

20     a job after the training?

21          A.    Yes.  There are some things

22     that will appear on a motor vehicle record

23     or abstract that will I believe people from

24     getting a CDL.

25               Those could be anything that is

```
  1                    DIAB
  2    worse than a DWI, somebody that was in
  3    prison for a motor vehicle accident.  There
  4    are certain requirements that the Federal
  5    Motor Carrier can prevent people from
  6    getting a CDL.
  7         Q.    For the purposes of your
  8    school, what you are focussed on is job
  9    placement, so as long as that person would
 10    be able to get a job after he graduates,
 11    then that's what primarily is what matters
 12    to you?
 13              MR. HALLER:  Objection to the
 14         form.  Mischaracterization of the
 15         testimony.
 16              You may answer.
 17         A.    Could you repeat the question?
 18         Q.    Sure.
 19              You stated before that career
 20    placement was the ultimate goal.
 21         A.    Um-hum.
 22         Q.    I would just like to clarify
 23    that what your school is primarily
 24    concerned with is getting somebody placed
 25    after the program, that is your primary
```

```
1                    DIAB
2    focus, making sure that somebody goes
3    through the program and gets a job
4    afterwards?
5         A.    We are primarily focussed, our
6    primary focus is to get somebody a CDL.
7    That is our primary focus.  That is what we
8    do.  We get people CDL.  Once they have
9    gotten the CDL, successfully gotten the
10   CDL, then our next focus is to get that
11   person a job.
12        Q.    Can we agree that being able to
13   place a person and get them a job is
14   something that is a big part of the
15   interview, that you look at when
16   interviewing somebody before they enroll in
17   the school?
18             MR. HALLER:  Objection to form.
19             You may answer.
20        A.    It is part of what we look at.
21   It is certainly part of what we look at.
22   There is no question about that.
23        Q.    I would like to switch gears
24   here a little bit.
25             Have you heard of the name
```

```
 1                    DIAB
 2    Kenneth Frilando?
 3         A.    Yes.
 4         Q.    When did you first hear this
 5    name?
 6         A.    I heard it in I believe
 7    sometime in March of 2015.
 8              MR. HALLER:  Are we now on
 9         topic one and two, communication?
10              MR. NADLER:  I guess so.  I
11         wasn't going specifically through the
12         list.  I had my own outline that
13         covers these topics.  But I guess
14         referring to the 30B6, it would be
15         number one, communication between
16         Joseph Frilando on behalf of
17         Plaintiff and Defendant from March
18         until April 2015.
19              MR. HALLER:  So I am not
20         objecting to the manner in which you
21         are conducting, although it sounds
22         like we are in topic one and two.
23              To that degree, as I think you
24         would recognize, Mr. Diab is here as
25         the corporate designee and much of
```

```
 1              DIAB
 2       what occurred subject to topics one
 3       and two were not within his personal
 4       knowledge.
 5           So we have prepared, as we have
 6       for a couple of other topics, a
 7       summary of the communications that
 8       were subject to one and two.
 9           So to the extent that that
10       would help him since it is not in his
11       personal knowledge, we will ask you
12       to allow him to refer to it.
13           MR. NADLER:  Just to clarify,
14       you mentioned that the communication
15       between Mr. Frilando and Mr.
16       Wessendorf is not Mr. Diad's personal
17       knowledge, but he has been CC'd on
18       almost every e-mail between them.
19           How would that not be in his
20       personal knowledge?  He was receiving
21       all these e-mails at the time.
22           MR. HALLER:  Because there is
23       direct communication that was
24       occurring between Mr. Wessendorf and
25       Mr. Frilando that he wasn't privy to
```

45

```
 1                    DIAB
 2         at the time.
 3              I am not saying that he had no
 4         personal knowledge, I am just saying
 5         that he doesn't have complete
 6         personal knowledge.
 7              MR. NADLER:  I can just ask him
 8         and see what he can answer and what
 9         he cannot answer, but he is --
10              MR. HALLER:  I think some of
11         the CC's may have been to his son as
12         opposed -- Mr. Diad's son as opposed
13         to him.
14              MR. NADLER:  I can introduce
15         these and clarify.
16              MR. HALLER:  We are just trying
17         to be helpful.  This is a summary of
18         the communications that occurred that
19         are the subject of topics one and
20         two.
21              MR. NADLER:  Well, I wasn't
22         presented with this before the
23         deposition to fully go over it.  So I
24         am going to just leave it here for
25         now then just proceed with the
```

```
 1              DIAB
 2    questioning that I have.
 3         MR. HALLER:  That is fine.  All
 4    I am asking, and I am insisting, is
 5    that you allow the witness to refer
 6    to it, to the extent that it helps
 7    him answer a question that goes
 8    beyond his personal knowledge.
 9         That is what a 30B6 deposition
10    is about.  I don't think there is
11    anything controversial here, by the
12    way.
13         MR. NADLER:  No, but you know I
14    have to take a look at it.
15         I am conducting a deposition.
16    I can't just get a document sent to
17    me and then just to let the witness
18    rely on it if I have not gone over
19    it.
20         I am going to introduce the
21    e-mails that I have.  I will present
22    a copy to Mr. Diab and yourself and
23    then you can object how you like, but
24    that is how I will proceed regarding
25    the communications, number one.
```

1              DIAB

2              I have already presented Diab 1

3         is a series of -- that has already

4         been introduced as an exhibit of

5         e-mail communications.

6              The top says, Re: 90 day

7         waiver, 4/1/2015, document Bate

8         stamped BDTS007 until 0010.

9              I would like to introduce a

10        second part of e-mail communications

11        between Mr. Frilando and Mr.

12        Wessendorf Bate stamped BDTS 0002

13        until 0006.  I will present a copy to

14        the court reporter and please ask

15        that we mark this as Diab Exhibit 2.

16             (Whereupon, the aforementioned

17        document Bate stamped BDTS 0002 until

18        0006 was marked as Diab(s)' Exhibit 2

19        for identification as of this date by

20        the Reporter.)

21             MR. HALLER:  For the record,

22        the fact that are you marking them

23        Diab 1 and 2 should not down the road

24        be taken as any inference that this

25        is a personal deposition.  It

```
 1                    DIAB
 2          probably would have been appropriate
 3          to call it Bordentown 1 and 2.  As
 4          long as we understand.  This is the
 5          corporation that is here today.
 6                    MR. NADLER:  He is here as a
 7          30B6 representative on behalf of
 8          Bordentown.  Okay.
 9          Q.    I would like to go back to my
10   earlier question.
11                    When did you first come across
12   the name Ken Frilando?
13          A.    I believe it was in mid March
14   of 2015.  Sorry.
15                    Are you asking me that
16   personally?  When did I, not the company,
17   but when did I come across the name Kenneth
18   Frilando and my answer would be sometime in
19   March.
20          Q.    I can ask both questions then.
21                    When did Bordentown driving
22   school first come across the name --
23          A.    Bordentown came across the name
24   of Kenneth Frilando in mid March, probably
25   between the 15th and the 18th -- sorry,
```

```
 1                    DIAB
 2    February.
 3              MR. NADLER:  I will ask
 4         opposing counsel not to instruct or
 5         coach the witness while I am asking
 6         him questions.
 7              MR. HALLER:  Well, that is why
 8         I did what I did.  We are now very
 9         confused with his personal knowledge
10         and the corporation knowledge.
11              THE WITNESS:  That is why I
12         asked the question --
13              MR. NADLER:  I clarified my
14         question.  I was asking about
15         Bordentown.
16              MR. HALLER:  Just so we are
17         clear, he is asking about Bordentown.
18         A.    Bordentown was in early
19    February.
20         Q.    Of what year?
21         A.    2015.
22         Q.    That was when Bordentown
23    driving school first became aware of
24    Kenneth Frilando?
25         A.    That's correct.  His brother
```

```
 1                     DIAB
 2    called in to our phone bank and shortly
 3    thereafter he was given an appointment date
 4    to come in and speak with our people and
 5    they never showed.
 6         Q.    When did you personally, you,
 7    as Mr. Diab, yourself, become aware of Mr.
 8    Frilando?
 9         A.    I believe --
10              MR. HALLER:  I will object to
11         that question.  He is not here for
12         his personal knowledge.  He is only
13         here as the corporate witness.
14              MR. NADLER:  He has been CC'd
15         on all the e-mails.  I have a right
16         to ask him about it.  He has to have
17         known personally.
18              MR. HALLER:  That is fine.  I
19         mean, I will allow it, but I mean at
20         some point you are going to have to
21         distinguish.
22              MR. NADLER:  That is what I
23         have been doing.  That is why I asked
24         before about the school.
25              MR. HALLER:  We are here -- we
```

```
 1                    DIAB
 2          are only here on a 30B6 Notice on
 3          very specific topics.  Nothing else.
 4          So this deposition is limited, it is
 5          a limited purpose deposition.
 6               MR. NADLER:  Okay.
 7               MR. HALLER:  So I don't mind in
 8          this context if you want to do this,
 9          but outside this limited context, I
10          may have significant problems if you
11          are straying into personal knowledge
12          or --
13               MR. NADLER:  I will continue
14          with the questioning and can you see
15          where it is going --
16               MR. HALLER:  That is fine.
17               MR. NADLER:  -- and can you
18          object if you need to.
19               MR. HALLER:  Okay.
20          Q.   I would like to look at
21    BDTS 0002, Plaintiff's Exhibit 2, if you
22    can.
23          A.   Okay.
24          Q.   The top of the document, I
25    would like to clarify for myself, who is
```

```
1                       DIAB
2    the third line of e-mail names?  The first
3    e-mail says, joseph.frilando@gmail.com, do
4    you see that?
5         A.    Yes.
6         Q.    Underneath that
7    dwessendorf@smithsolomon.com?
8         A.    Yes.
9         Q.    Underneath that I would like to
10   clarify, who is that first e-mail,
11   jsdiab@smithsolomon.com?
12        A.    That is my son.
13        Q.    Who is johndiabpetro14@aol.com?
14        A.    That is me.
15        Q.    Who is
16   johndiab@smithsolomon.com?
17        A.    Me.
18        Q.    The two e-mails that you have
19   are johndiabpetro14@aol and
20   johndiab@smithsolomon.com, those are your
21   e-mails?
22        A.    Yes.
23        Q.    The first e-mail, is that the
24   petro14@aol, is that your personal e-mail,
25   do you use that only for work?
```

```
 1                    DIAB
 2        A.    That is my primary account for
 3   work.
 4        Q.    So you use that for work?
 5        A.    I use that primarily for work,
 6   yes.
 7        Q.    The second one,
 8   johndiab@smithsolomon, that's your work
 9   e-mail?
10        A.    That's the work e-mail, but, as
11   my son would say, you can't teach an old
12   dog new tricks, and I primarily use the aol
13   account.
14        Q.    Primarily?
15        A.    Yes.
16        Q.    Okay.
17              I just wanted to clear for the
18   record, because there are several e-mails
19   with your name on it.
20        A.    Okay.
21        Q.    Do you know why Mr. Frilando
22   contacted Bordentown?
23              MR. HALLER:  Objection to the
24         form.  Calls for speculation.
25        A.    I believe I was told from Dale
```

```
 1                    DIAB
 2    that they had contacted other schools and
 3    the other schools, for whatever reason,
 4    weren't taking them or weren't addressing
 5    them or whatever and so they contacted us.
 6         Q.    I am a little confused.
 7               Your testimony is that Mr.
 8    Frilando contacted your school because
 9    other schools wouldn't take him?
10         A.    That is basically my testimony,
11    yes.
12         Q.    You got that testimony from Mr.
13    Wessendorf?
14         A.    I did.
15         Q.    Do you know how Mr. Wessendorf
16    came to that conclusion?
17         A.    He came to that conclusion, I
18    think that Mr. Frilando told him that.
19    That is how it was explained to me.
20         Q.    Are you familiar with the name
21    Joseph Frilando?
22         A.    Yes.
23         Q.    Who is Joseph Frilando?
24         A.    Joseph Frilando is Ken
25    Frilando's brother.
```

```
1                         DIAB
2          Q.    How is Bordentown familiar with
3     Joseph Frilando?
4          A.    I believe the only
5     communication that Bordentown ever had with
6     the Frilando's or at least the most
7     significant amount of communication was
8     with Joseph and not Kenneth.
9          Q.    What happened after Mr. Joseph
10    Frilando e-mailed Bordentown the first
11    time?  Was he asked for any documents or
12    what was he told?
13              MR. HALLER:  Objection to the
14          form of the question.
15              It presumes the first time was
16          an e-mail.  I don't think that is the
17          testimony.  Would you rephrase that?
18          Q.    The first time that Joseph
19    Frilando contacted Bordentown inquiring
20    about the school, what was the response
21    given to him by your school?
22          A.    It was a phone call early in
23    February.  I have been told that he
24    explained that his brother wanted to come
25    to school and his brother was deaf.
```

```
 1                     DIAB
 2           Subsequently, we set up an
 3   appointment for him and his brother to come
 4   to school on February 20th and they never
 5   came and never called.
 6        Q.   Do you remember if you, as in
 7   the school, if it was one time that Mr.
 8   Frilando called or more than one time?
 9        A.   That he called?  I believe Mr.
10   Wessendorf may have had several
11   conversations with Mr. Frilando, but Dale
12   is not here and I can only go based on my
13   memory of him saying that he had some
14   communication with Mr. Frilando.  It was
15   always Joseph and never Kenneth.
16        Q.   Was Mr. Frilando ever asked to
17   provide any documents?
18        A.   He was asked what document his
19   brother had, if any, and they said that he
20   had a valid COP, which is Commercial
21   Learner's Permit, and he had a valid
22   medical card and that he had a 90 day
23   hearing waiver.
24        Q.   Was Mr. Frilando just asked if
25   he had these documents or was he asked by
```

```
 1                          DIAB
 2      the school to actually provide them?
 3              A.     First time he was asked if he
 4      had them.   Then the second time he was
 5      asked to show proof of the hearing waiver.
 6              Q.     Did Mr. Frilando provide you
 7      proof with the hearing waiver?
 8              A.     Yes, he did.   It was a 90 day
 9      hearing waiver.
10              Q.     Did he provide anything else?
11              A.     No, he did not, at that time.
12      Subsequently he provided a two year hearing
13      waiver.
14              MR. NADLER:   I have a document
15              before me Bate stamped BDTS 0104
16              until BDTS 012006.   I am now giving a
17              copy to the court reporter to mark as
18              Diab Exhibit 3.
19              (Whereupon, the aforementioned
20              document Bate stamped BDTS 0104 until
21              BDTS 012006 was marked as Diab(s)'
22              Exhibit 3 for identification as of
23              this date by the Reporter.)
24              Q.     Have you reviewed the
25      documents?
```

```
 1                         DIAB
 2         A.    I am reading them.
 3         Q.    Take your time.
 4         A.    Okay.
 5         Q.    When Mr. Frilando contacted
 6   your school, did you know that he was deaf?
 7         A.    Yes, his brother told us that.
 8   That was the only way that we would know.
 9         Q.    Can you repeat that?
10         A.    That was the only way that we
11   would know.  We didn't know Mr. Frilando,
12   but when his brother called he said my
13   brother is deaf and he would like to come
14   to school.
15              MR. NADLER:  I would like to
16         introduce BDTS 0107 to be marked
17         Plaintiff's Exhibit 4, Diab 4.
18              (Whereupon, the aforementioned
19         document Bate stamped BDTS 0107 was
20         marked as Diab(s)' Exhibit 4 for
21         identification as of this date by the
22         Reporter.)
23         Q.    Take your time and take a look
24   at that.
25         A.    Okay.
```

```
 1                    DIAB
 2        Q.    Have you looked it over?
 3        A.    Yes.
 4        Q.    Okay.
 5              Have you ever seen this e-mail
 6   before?
 7        A.    Yes.
 8        Q.    When did you see it?
 9        A.    I am assuming on the day I
10   wrote it, which was March 30, 2015.
11        Q.    What was the context in which
12   you wrote it?
13        A.    Dale had said prior to this
14   that he was letting me know that we had --
15   Mr. Frilando wanted to come to school and
16   that he really didn't know how to address
17   it because he had absolute no idea how Mr.
18   Frilando would be trained or tested.  And
19   he said I really do not know what to do.
20   What do you recommend we do.  I said we
21   need to continue, because we had had some
22   ongoing conversations with Federal Motor
23   Carrier and the State and what have you
24   regarding hearing impaired.  I said you
25   need to explain to him that we are trying
```

```
 1                         DIAB
 2     to get guidance from the Federal Motor
 3     Carrier and to find out about the skills
 4     exam and if there was a specific skills
 5     exam for hearing impaired, because what we
 6     do, train somebody for the skills exam, so
 7     if we do not know what the skills exam is,
 8     then we don't know how to train them.  So
 9     we are contacting these people and
10     simultaneously Mr. Joseph Frilando is
11     literally, if you're following the trail,
12     hammering us every couple days, did you get
13     an answer, did you get an answer, hi, did
14     you get an answer.  I said to Dale, please
15     explain to Mr. Frilando, as I put it here
16     in writing, that we are seeking guidance,
17     we must get help from the DOT and from
18     motor vehicle that we can safely and
19     effectively do this.  We cannot do it
20     without violating Federal regulations.  We
21     are a school second in an interstate motor
22     carrier first.  But because we are an
23     interstate motor carrier, we have to abide
24     by all the Federal guidelines.  Everything
25     that was accessible to us said that no
```

```
 1                    DIAB
 2   matter what we do here, we are going to
 3   violate Federal regulations, so we have got
 4   to get clarity, and we have to find out
 5   what the state is going to do the various
 6   things, about testing these folks, because
 7   I can't train if I don't know what I am
 8   training for.  So this is what we sent to
 9   Mr. Frilando.
10        Q.    At the time Mr. Frilando was
11   contacting your school, waiver was set to
12   expire; is that correct?
13        A.    To the best of my knowledge,
14   yes, he had a 90 day waiver, and it was
15   going to expire.
16        Q.    We can agree that he was
17   seeking an answer pretty quickly --
18        A.    He was trying to get an answer
19   from the Federal Motor Carrier on a two
20   year waiver, but I guess that we learned,
21   which we already know, was the Federal
22   government doesn't move quickly.
23        Q.    You mentioned that one of the
24   reasons that you were drafting this e-mail
25   is because you did not want to violate
```

```
1                         DIAB
2    Federal regulations.
3                   Were you nervous about or
4    hesitant because you did not want to
5    violate a host of Federal regulations?
6                   MR. HALLER:  Objection to the
7             form.
8                   You may answer.
9         Q.    What Federal regulations
10   specifically were you hesitant that you
11   thought would become violated if you just
12   accepted Mr. Frilando point blank?
13        A.    And I would like to clarify
14   that our first concern was safety and
15   additionally our concern were the
16   violations of the Federal Motor Carrier.
17   Those violations would be as stated in the
18   Federal Motor Carrier handbook, you must be
19   able to verbally communicate.  Must.
20                  You must be able to recognize
21   audible alerts.  If we were stopped with a
22   person such as Mr. Frilando in the truck
23   driving the truck and we were stopped by
24   the police, it would be very easy for the
25   police to say, hey, you are in violation,
```

```
 1                    DIAB
 2    we are shutting you down.  Over the course
 3    of time we have had many conversations with
 4    the Federal Motor Carrier.  They said that
 5    to us.  They said, yes, we gave hearing
 6    waivers, but we didn't think it through and
 7    there are inherent conflicts with other
 8    regulations.
 9         Q.    So is it your testimony that
10    you have had discussion with the Federal
11    Motor Carrier?  We can abbreviate it to the
12    FMCSA, so it is easier to say.
13         A.    Absolutely.
14         Q.    So it your testimony that in
15    the guidance that you tried to seek from
16    the FMCSA, they said, yes, we did this
17    waiver but there is no way to comply with
18    it?
19               Is that what you are --
20         A.    They said that they never took
21    into consideration that these folks would
22    have to be trained.
23               They said that the original
24    thought was to take someone who already had
25    a CDL, lost their hearing and by giving
```

```
 1                      DIAB
 2    them a waiver, would be able to continue to
 3    drive, but they never considered how
 4    somebody would be trained.
 5         Q.    Do you have any documentation
 6    to support this?  Any e-mails from anyone
 7    --
 8         A.    I don't, but I have met with
 9    Larry Minor, I am sure that is a name you
10    are familiar with, and several other people
11    there and quite frankly, better than that,
12    our association had a conference that Larry
13    Minor spoke at and did a presentation and
14    publically said that.  He said we didn't
15    think this through he said and something
16    has got to change.  Either we have to stop
17    issuing the hearing exemptions or we have
18    to modify how we are giving them.
19                 That was at a public forum.
20                 I also met with Larry Minor and
21    Chuck Horan, Sharon Watson in their offices
22    and the same thing was said there.
23                 Then subsequently they came out
24    to our conference and they said the same
25    thing again.  They said this to them was a
```

```
 1                    DIAB
 2      place where they tried to make
 3      accommodations that clashed with reality.
 4                    They cannot tell us how to do
 5      this.  They cannot tell us how to do it.
 6      There is no test.  There is no test, they
 7      cannot tell us how to do it.
 8                    Would you like me to go on
 9      further?  Because I am happy to.
10           Q.     Please continue.
11           A.     If you are familiar with AAMVA.
12      They are --
13                    MR. HALLER:  The American
14               Association of Motor Vehicle
15               Administrators.
16           A.     What AAMVA does is they have
17      historically produced the skills test that
18      is utilized by all the states to do the CDL
19      testing.  I went to AAMVA and I said to
20      AAMVA, is there a test now or coming for
21      hearing impaired.  I was told that by Kevin
22      Lewis, I was told by Kevin Lewis --
23           Q.     Is it L-E-W-I-S?
24           A.     Yes, L-E-W-I-S.
25                    I was told by him, who was one
```

```
 1                        DIAB
 2      of the director of AAMVA, that he had been
 3      requested by the Federal Motor Carrier to
 4      produce a test for the hearing impaired.
 5      And to this date, they have not produced a
 6      test.  And they have refused to produce a
 7      test because they say it is not safe to do.
 8      I have nowhere to go.
 9          Q.     When you said that you spoke
10      with Kevin Lewis, was this a phone call and
11      e-mail?
12          A.     In person.
13          Q.     In person?
14          A.     Yes, in person.  He spoke at
15      our conferences.  I don't believe that I
16      have any e-mails.  I met him in the Federal
17      Motor Carrier in the early part of 2015,
18      had a negotiated rule making in process in
19      Washington D.C. that I attended, Kevin
20      Lewis was there, he was a participant, the
21      CVTA was there, I was there.
22               I had the opportunity to talk
23      with Larry Minor from the Federal Motor
24      Carrier and with Kevin Lewis and
25      continuously asked the same question every
```

```
 1                    DIAB
 2    time I saw them, is there an acceptable
 3    training program and is there a test, and
 4    in every case they said there is no test
 5    and there is no acceptable training
 6    program.
 7         Q.    Did you speak to Mr. Lewis,
 8    just so I am clear, after you spoke to Mr.
 9    Frilando, is this part of the research that
10    you did after or when did you speak to him?
11         A.    It was -- I contacted and
12    continue to contact Mr. Lewis almost
13    weekly.  I did that in the two-week period
14    at the end of March, from middle to the end
15    of March when we were doing our research
16    for Mr. Frilando, but I had spoken to all
17    of them prior to that.  I had spoken to
18    them in 2014.  Then I spoke to them early
19    in February and March even before this
20    litigation came.  I said what is going on,
21    what are we supposed to do.
22              MR. HALLER:  I would like to
23         interject at this point.  We have now
24         veered into topic number 10, which is
25         fine.  We have another of these aids
```

```
 1                    DIAB
 2          to the 30B6 testimony which is
 3          responsive to topic ten, which is a
 4          listing of the contract about the
 5          outside agency, which is the subject
 6          of that topic.  I thought that would
 7          be helpful to you.  It is a summary
 8          of things that Mr. Diab is currently
 9          referring to.
10                    MR. NADLER:  Okay.
11          Q.    When Mr. Frilando contacted
12   Bordentown with the request asking to
13   enroll in the school, and Bordentown never
14   had a situation like this before; is that
15   correct?
16                    MR. HALLER:  Objection to form.
17          Q.    Where --
18          A.    As it relates to CDL, that is
19   correct.
20          Q.    Okay.
21                    So there was never a request
22   like this before with a deaf person wanting
23   to enroll in the CDL program?
24          A.    I believe this was the first
25   one.
```

```
 1                    DIAB
 2         Q.    So all of the guidance or
 3   research that Bordentown was doing as per
 4   this e-mail, Plaintiff's Exhibit 4, was
 5   after Mr. Frilando contacted the school,
 6   that was when you decided to reach out to
 7   Federal and local agency?
 8         A.    No.  I had said this.  We
 9   started in 2014.  We started in 2014
10   because we knew that the exemptions were
11   being given.  And I believe they began in
12   2013 and we have not received any calls or
13   anything, but when I saw the individuals
14   from the Federal Motor Carrier and when I
15   saw the individuals from AAMVA, we began to
16   talk to them and say, what, when this comes
17   up, how are we supposed to treat this.
18              Again, it was the same
19   questions, how do we do the training, how
20   do we do the test.
21              So we started way back in 2014.
22   We accelerated and really accelerated is
23   the incorrect word.  What we did was we
24   intensified, went back and asked the same
25   questions pretty much all over again with a
```

```
 1                    DIAB
 2    few exceptions when Mr. Frilando came in.
 3                    The exceptions were that in
 4    addition to the analysis that we conducted
 5    on our own, the extensive analysis of in
 6    the truck with instructors and examiners
 7    and how are we going to get this done and
 8    tried every possible scenario, we also
 9    called states.
10                    We called the State of New
11    Jersey, and said, will you test the hearing
12    impaired.  They said, no, we will not.  Why
13    not, because it is not safe.
14                    We called the State of
15    Pennsylvania and we said, will you test a
16    hearing impaired.  No, we will not.  Why
17    not, because it is not safe.
18                    We called the State of New York
19    and said, will you test the hearing
20    impaired, and they said, we don't know, we
21    will get back to you, leave us your name
22    and number and they never called me back.
23        Q.    Did you ever call any other
24    driving schools or did you only contact
25    Federal and State agencies to ask if these
```

```
 1                    DIAB
 2   other schools have had a similar request
 3   like the one that you received to see if
 4   they came across anything similar?
 5        A.    I was the past chairman of the
 6   Commercial Vehicle Training Association and
 7   there had been other requests to schools in
 8   other parts of the country and for the
 9   association, so I was aware that they had
10   that on request.  Had anybody trained
11   anybody, no.  To this day, I don't believe
12   that anybody, to the best of my knowledge,
13   has trained anybody.  What we attempted to
14   do at that point was, again, even from the
15   association standpoint, was get something
16   from Federal Motor Carrier and AAMVA that
17   said this is how you can do this.
18        Q.    I am just a little confused.
19              My question specifically was
20   after Mr. Frilando e-mailed your school
21   saying I have this request, I would like to
22   accommodate, you reached out to Federal
23   agencies; is that correct?
24        A.    That's correct.
25        Q.    You reached out to State
```

1                          DIAB

2     agencies; is that correct?

3          A.     That's correct.

4          Q.     My question is, if you called

5     any other driving schools that you know of

6     to say we have a student, he is deaf, he is

7     trying to enroll in our CDL program, have

8     you gotten any requests like this, is this

9     something that you have come across?

10         A.     The answer to your question is

11    no, but what I tried to explain to you was

12    that I was aware, because of my position

13    with CVTA that other schools had been

14    contacted prior to.  They had not trained

15    anybody, because they did not know how to

16    train anybody.  I had and awareness, but I

17    did not call anyone.

18         Q.     For the record, what does CVTA

19    stand for?

20         A.     Commercial Vehicle Training

21    Association.

22         Q.     You mentioned your position,

23    what is that?

24         A.     Today?

25         Q.     Then.

```
 1                      DIAB
 2        A.    I was the chairman.
 3        Q.    For how long?
 4        A.    Two years.
 5        Q.    What years?
 6        A.    2013 through 2015.  My term
 7   ended in October of 2015.
 8        Q.    You mentioned before speaking
 9   with Mr. Lewis of the AAMVA?
10        A.    Yes.
11        Q.    He expressed that there was a
12   waiver in place but the regulations were
13   not clear and they were not done directly
14   because driving schools do not know how to
15   accommodate, was that your testimony?
16        A.    No.
17        Q.    Okay.
18              Can you clarify that?
19        A.    Mr. Lewis and AAMVA produced
20   the test for -- they produced the skills
21   test that is given by each of the State's
22   motor vehicle.  That is what they do.  I
23   asked Mr. Lewis if there was specifically a
24   test that can be administered to the
25   hearing impaired.  He said no, there isn't.
```

```
 1                    DIAB
 2    We have been asked by the Federal Motor
 3    Carrier to create a test and we have
 4    refused to do that because it is not safe.
 5    Now, first time I asked him that was
 6    probably in 2014.  Today, still there is no
 7    testing.
 8         Q.    Well, do you know if there is
 9    any research he had done himself to say why
10    it was unsafe or did he just categorically
11    say it is unsafe to do this exam therefore
12    we refuse to do it?
13         A.    AAMVA is very highly regarded
14    in the industry.  I can't tell you what
15    their research is or what they do or don't
16    do.  Typically it has to do with scientific
17    data.  The ATA, which is the American
18    Trucking Association, anything that they
19    produce, AAMVA, any of these folks do a lot
20    of scientific research and data.
21              And how he concluded, it wasn't
22    he that concluded, it wasn't he that
23    concluded.  It was AAMVA that concluded.
24    He was the messenger and the message was,
25    it was not safe.
```

```
 1                    DIAB
 2        Q.    What I have that has been
 3   produced by opposing counsel is a document,
 4   topic ten, contact with outside agencies.
 5        A.    Yes.
 6        Q.    I would like to go through that
 7   document and just flush out, since you have
 8   provided who you have spoken to on Federal
 9   and State level, what those communications
10   were.
11        A.    Okay.
12        Q.    August 14, 2014, there is an
13   e-mail from Cindy Maugeri, M-A-U-G-E-R-I,
14   of Federal Motor Carrier Safety
15   Administration?
16        A.    That's correct.
17        Q.    Can you go into why there was
18   an e-mail from her at that time?
19        A.    To the best of my knowledge, on
20   that specific e-mail, Dale Wessendorf had
21   requested guidance and her response was, we
22   know that there is an issue, we know that
23   there are testing problems, we know that he
24   people do not know to do this correctly, we
25   are working on it, addressing it and we
```

```
 1                    DIAB
 2    will get back to you.  He never got back to
 3    us.
 4         Q.    What prompted  him to inquire
 5    because it was many months before --
 6         A.    That was in 2014.  That is what
 7    I said.  I said --
 8         Q.    My question is, what prompted
 9    him, in August of 2014, Mr. Wessendorf to
10    e-mail Mrs. Maugeri asking her this?
11         A.    Because I asked him to do that.
12    I said we need clarification from the
13    Federal Motor Carrier in the events that
14    someone contacts us as to how we are going
15    to handle it and to let her know or them,
16    the Federal Motor Carrier, that there are
17    issues with the training and testing and
18    what have they done, the Federal Motor
19    Carrier to clarify things.
20         Q.    You just took an issue where
21    your school took the initiative to contact
22    for guidance because you knew the
23    regulations came out and you know that a
24    deaf person might try to enroll in the
25    school, is that --
```

```
 1                        DIAB
 2           A.    That's exactly correct and, as
 3      I said to you before, as being chairman of
 4      the association, I knew that other schools
 5      throughout the country had been contacted.
 6      So I figured sooner or later someone was
 7      going to contact us, so we better get our
 8      ducks in a row and understand how we are
 9      going to do this.
10           Q.    Okay.
11                 So we can agree that you
12      preemptively thought that it was possible
13      that a deaf person might contact your
14      school to enroll in a CDL program and you
15      wanted to have the correct guidance when
16      that time came?
17           A.    That's correct.
18           Q.    In the last couple of weeks of
19      March of 2015, who did you speak with in
20      New Jersey?
21           A.    Blain Stein, that is the head
22      examiner.
23           Q.    Do you know what you asked him
24      specifically when you are in contact with
25      him?
```

```
 1                      DIAB
 2        A.    Yes, I did it myself and I
 3   specifically asked him if he would test a
 4   deaf student.
 5        Q.    How were you in contact with
 6   him?
 7        A.    I called him.
 8        Q.    You called him?
 9        A.    Yes.
10        Q.    There are no e-mails?
11        A.    No.
12        Q.    There are no documents that he
13   sent you?
14        A.    No.
15        Q.    It was just a phone call where
16   you said we have a student, he wants to
17   enroll, what do I do?
18        A.    No.  I didn't do any of that.
19   Sorry.  I basically called and said what is
20   the State's position on examining a deaf
21   student.  They said our position currently
22   is that we will not test because it is not
23   safe.  I did not tell him I had a student.
24   I did not give him any of that information.
25   I said I am inquiring because I would like
```

```
 1                          DIAB
 2      to know where the State stands on this
 3      matter.
 4           Q.    Who did you call in
 5      Pennsylvania?
 6           A.    Henry Elmy.  I did not speak to
 7      him myself.
 8           Q.    Who spoke to him?
 9           A.    My son, John.
10           Q.    Do you know what your son asked
11      him?
12           A.    Exact same question, will the
13      State test a deaf person.  We basically got
14      the exact same answer.  We are not going to
15      do it because it is not safe and we have no
16      way of doing it.  We have no way of
17      communicating.
18           Q.    Are there any e-mails to this
19      effect or was it a phone call?
20           A.    Verbal.
21           Q.    So is it your testimony that in
22      both of these cases, Mr. Stein and Mr.
23      Elmy, you called them and asked is it safe
24      to test the deaf driver and they said it
25      was unsafe and would not comply --
```

```
 1                    DIAB
 2        A.    No, sir, I did not say that.  I
 3   said I called them and said will you test a
 4   deaf driver.  I didn't say anything about
 5   is it safe or not safe.  I said will you
 6   test a deaf driver.  The answer in both
 7   cases was they said, A, it is not safe and,
 8   B, we have no way to do it.  We do not know
 9   how to do it.  Why don't you know how to do
10   it, because signers are not allowed.  So if
11   you cannot use a signer and you cannot use
12   an interpreter, how do you do this.
13        Q.    Did you ever in either of those
14   phone calls discuss the Federal exemption?
15        A.    What?
16        Q.    The hearing waiver?
17        A.    No.  There was no reason to do
18   that.  The hearing waiver provides a person
19   with the ability to skip the forced
20   whispered test.  Nothing else.  That is all
21   it does.
22             MR. NADLER:  Off the record.
23             (Whereupon, an off-the-record
24        discussion was held.)
25             MR. NADLER:  Back on the
```

```
 1                    DIAB

 2       record.

 3           Q.    I would like to clarify, from

 4       the time Mr. Frilando contacted your

 5       school, what were the exact agencies that

 6       you were in contact with on the Federal and

 7       State level?

 8           A.    We were in contact with the

 9       Federal Motor Carrier, AAMVA, State of New

10       Jersey Motor Vehicle, State of Pennsylvania

11       Motor Vehicle, State of New York Motor

12       Vehicle.

13               MR. NADLER:  BDTS 0132.  Let's

14           have this marked as Plaintiff's

15           Exhibit 5 for identification.

16               (Whereupon, the aforementioned

17           document Bate stamped BDTS 0132 was

18           marked as Plaintiff(s)' Exhibit 5 for

19           identification as of this date by the

20           Reporter.)

21           Q.    Let me know when you have had a

22       chance to look at this.

23           A.    Okay.

24           Q.    Have you seen this e-mail

25       before?
```

```
 1                    DIAB
 2       A.    Yes.
 3       Q.    When did you see it?
 4       A.    I am assuming I saw it on 3/20
 5  of 2015.
 6       Q.    What was the context for this
 7  e-mail?
 8       A.    The context?
 9       Q.    The context, why did this
10  exchange take place?
11       A.    This had to do with Cindy
12  Atwood from the association.  She has her
13  contacts and accessibility at the Federal
14  Motor Carrier because the association is in
15  D.C., she can get quicker access than most
16  people can.
17            I believe that I asked her to
18  find out specifically about any Federal
19  rule making on the hearing impaired.  She
20  called Chuck Horan or e-mailed him and said
21  there has been no final rule making.  And
22  further said, just to be clear, you must
23  pass the DOT exam, the Federal Motor
24  Carrier exemption in order to be trained
25  and I believe my interpretation of that was
```

```
 1                    DIAB
 2    in order to be considered for training.
 3             That is the starting point.
 4    That doesn't mean you have to train them
 5    because they have these things.
 6         Q.    Have you ever been in contact
 7    with Cindy Atwood before this point?
 8         A.    Cindy Atwood is the security
 9    and vice-president of the association.  I
10    talk to her every day.
11             Then, not now.
12         Q.    So it is your position that
13    when she replied back to you and she was
14    saying that they have the DOT exam, they
15    must pass the DOT exam and have an FMCSA
16    exception in order to be trained, that
17    doesn't necessarily mean they had to have
18    been taken in the school?
19         A.    Absolutely not.  Federal Motor
20    Carrier has no jurisdiction over schools.
21    They have jurisdiction over us as an
22    Interstate Commerce Carrier.
23             Jurisdiction of schools,
24    depending on the State, generally lie with
25    the Department of Labor.
```

```
 1                    DIAB
 2              So the motor vehicle or
 3      Federal Motor Carrier cannot dictate to a
 4      school what you can or cannot do.
 5         Q.    Is there anything in this
 6      e-mail that gives you the impression that
 7      you would not have to have accepted Mr.
 8      Frilando into your school for any reason?
 9         A.    I'm not sure I understand this
10      question.
11         Q.    I will repeat it.
12              Is there anything in the e-mail
13      from Mrs. Atwood that gave you the
14      impression that you did not have to train
15      Mr. Frilando?
16         A.    I never even considered it
17      because, again, the Federal Motor Carrier
18      has no direction, no jurisdiction over the
19      school, or jurisdiction over us as a motor
20      carrier.
21         Q.    So if they have no jurisdiction
22      over your school, then would it have really
23      mattered what guidance they provided as to
24      your final determination whether you had to
25      train Mr. Frilando or not?
```

```
 1                    DIAB
 2        A.    Because they gave the hearing
 3   waiver without any thought.  And having
 4   done that, we needed them to tell us,
 5   because they did it without thought, how we
 6   were supposed to accomplish what they
 7   wanted us to accomplish.
 8             More importantly, they and
 9   AAMVA have the skills test and provide the
10   skills test.
11             So it gets very complex because
12   you have Interstate Motor Carrier rules
13   with some school regulations, but, in fact,
14   what happened here is it is the ultimate
15   thing is the skills test, so the Federal
16   Motor Carrier needed to say to us in order
17   to get that person through the skills test,
18   this is how you have to do it.
19             You do realize that a person
20   does not have to go to school at all to get
21   a CDL?  They do not have to do that at all.
22   So you go get a permit, get medical exam,
23   you go take the test.
24        Q.    So if you do not need to go
25   through the school, what is the benefit
```

```
 1                    DIAB
 2   that would make somebody want to go through
 3   the school and pay tuition and have to go
 4   through that process?
 5       A.    We do a better job at it then
 6   if you have to do it the other way.  And
 7   particularly in this day and age, I never
 8   went to school and I am not a professional
 9   truck driver nor was I ever, but I got my
10   CDL because I was in the trucking related
11   business.
12             I had no one teach me.  It was
13   not an easy chore to get my license.  We
14   help the process along, but there is
15   absolutely no requirement that anybody has
16   to go to school.
17             MR. NADLER:  Let's take a lunch
18        break.
19             (Whereupon, a lunch recess was
20        taken.)
21       Q.    I would like to ask you a few
22   questions relating back to Mr. Wessendorf's
23   correspondence with Mr. Frilando.
24       A.    Okay.
25       Q.    When Mr. Frilando, Joseph
```

```
 1                    DIAB
 2    Frilando called Bordentown Driver Training
 3    School, do you know who answered the phone?
 4         A.    No, I do not.
 5         Q.    When somebody calls with an
 6    inquiry, is there a receptionist who would
 7    take the call, then give it to Mr.
 8    Wessendorf or somebody else?
 9         A.    It can go into an operator
10    bank, then the operator bank forwards it to
11    our girls, and then our girls would forward
12    it onto Dale.
13         Q.    What do you mean other girls?
14         A.    Well, we also use an outside
15    service to take the initial call.
16         Q.    So the calls go through an
17    outside service, then they would get sent
18    to somebody in your school?
19         A.    Unless in Frilando's case, he
20    dialed the number directly into Linden.
21    Then the receptionist or girls that are
22    answering the phones change, rotate.  There
23    is not just one person that is ever there.
24         Q.    How often do they rotate, once
25    a month?
```

```
 1                    DIAB
 2        A.    Twice a day.
 3        Q.    Twice a day?
 4        A.    Three times a day.
 5        Q.    Do you know if these girls are
 6   ever recorded?
 7        A.    No.
 8        Q.    No, as in you don't know?
 9        A.    No, we do not record any calls.
10        Q.    Have you ever received any
11   calls from any students seeking to enroll
12   who were disabled in any capacity?
13        A.    Yes, but not for CDL.
14        Q.    When did you get these calls?
15        A.    Several years ago we had
16   requests for hearing impaired for forklift
17   training.
18        Q.    Do you know about how many
19   years ago it was?
20        A.    I believe it was 2012 or 2013.
21              MR. NADLER:  I would like to
22         introduce Exhibit 6, Bate stamped
23         BDTS 0112 through 0015 and attached
24         to that BDTS 0126, BDTS 0127, BDTS
25         0128, BDTS 0134 and BDTS 0135 to be
```

```
 1                      DIAB
 2          marked as Exhibit 6.
 3                  (Whereupon, the aforementioned
 4          document Bate stamped BDTS 0112
 5          through 0015 and attached to that
 6          BDTS 0126, BDTS 0127, BDTS 0128, BDTS
 7          0134 and BDTS 0135 was marked as
 8          Plaintiff(s)' Exhibit 6 for
 9          identification as of this date by the
10          Reporter.)
11          Q.    I am on Page BDTS 0112.
12          A.    Okay.
13          Q.    Have you ever seen the top
14   portion of this document before?
15          A.    Yes, I have.
16          Q.    When have you seen it?
17          A.    Over the last several months
18   and I have reviewed it also with my
19   attorneys.
20          Q.    Do you recall the context of
21   when this exchange took place?
22          A.    I'm not sure I understand the
23   question.
24          Q.    Okay.
25                  Do you recall the context when
```

```
 1                    DIAB
 2    Mr. John Diab, junior, Director of
 3    Operations, said we have to accommodate and
 4    pay for the interpreter, Dale, let us know
 5    when it is all scheduled, but someone from
 6    upper management should be around the day
 7    of training.
 8                 Do you know what those two
 9    lines refer to?
10         A.    Yes, I do.  They refer to the
11    training of a hearing impaired person on
12    the forklift training.
13         Q.    Prior to 2014, have you ever
14    received or your school ever received any
15    requests for accommodations from any
16    students with a disability?
17         A.    Prior to 2014?
18         Q.    Prior to this exchange in
19    February of 2014.
20         A.    Yes, I believe there were
21    several before on the forklift as well.
22         Q.    On the forklift?
23         A.    Yes.
24         Q.    Do you recall how many people?
25         A.    I think we trained three or
```

```
 1                    DIAB
 2   four.
 3        Q.    Three or four?
 4        A.    Yes.
 5        Q.    Do you know about how long ago
 6   the first one took place?
 7        A.    As I said, I thought that was
 8   in 2012 or 2013.
 9        Q.    Okay.
10              Your school has received
11   requests from four disabled students
12   seeking to enroll in the forklift driver
13   training program?
14              MR. HALLER:  Objection to form
15          and characterization of his
16          testimony.
17              You may answer.
18        A.    To the best of my knowledge,
19   yes.
20        Q.    Who is Todd Olsen?
21        A.    I don't know who Todd Olsen is.
22   I would -- Todd Olsen may have been with --
23   he is with the Division of Hard of Hearing
24   I believe in the State of New Jersey.  I
25   believe that we were communicating with him
```

```
 1                    DIAB
 2    in terms of the interpreter.
 3         Q.    When this student, Livonia
 4    Avate contacted your school, do you know
 5    how many times she would have contacted
 6    your school?
 7         A.    I don't.
 8         Q.    Do you have any correspondence
 9    from her about her inquiry?
10         A.    I do not.
11         Q.    Is the acceptance into the
12    forklift driver training program when a
13    student wants to enroll, is it a similar
14    process to when a student wants to enroll
15    in the CDL program?
16         A.    The process is somewhat
17    similar.  I mean they would come in, we
18    would talk to them.  They do not have to
19    take any drug test or any DOT physical,
20    there is no license required.  It's a much
21    simpler process.
22              We try to get, you know, those
23    folks jobs as well, but because there is no
24    driver's license required, is just a much
25    simpler process.
```

1                    DIAB

2          Q.    Is it a main goal in the

3     forklift training program to get students

4     placed after they complete the program?

5          A.    Is it a main goal, no, it is

6     not.  The majority of the forklift programs

7     that we do are like add-ons to our CDL, we

8     would do CDL plus forklift.  When we would

9     be doing a class for our forklifts or CDL

10    students, if somebody came in that was hard

11    of hearing, asked us to do the training, if

12    we can get him into that class in time, we

13    would.  Basically, though, we have two

14    classes a year of hard of hearing.  The

15    reason that we do that is because we may do

16    a class in a different location, we may set

17    it up on three day's notice and you cannot

18    put it all together with getting a signer

19    and all of the things that we need to do,

20    so we set it up so that it is done in two

21    classes a year.

22         Q.    So there are two classes a year

23    where deaf and hard of hearing students can

24    complete the forklift training program?

25         A.    That's correct.

```
 1                    DIAB
 2         Q.    Are those classes on an
 3    as-needed basis depending if a deaf student
 4    calls?
 5         A.    No.  We would do those dates,
 6    but when somebody came in -- in other
 7    words, we do other students as well, but if
 8    somebody came in that was hard of hearing,
 9    we would give them those dates so they had
10    time, we had time, to put the whole program
11    together for them.
12         Q.    Would you say that job
13    placement plays a bigger role in the CDL
14    program than it does in the forklift
15    program?
16         A.    Yes, probably.
17         Q.    So there is more of an
18    incentive to take students into the CDL
19    program that you know can get a job
20    afterwards with a trucking company?
21         A.    It is not -- that is not the
22    way that we go about it.  In other words,
23    we address it -- we address it to get the
24    person their CDL.  We strive to get them a
25    job.  Particularly with someone that comes
```

```
 1                        DIAB

 2    to us from unemployment.  But our primarily

 3    concern is let's get them a CDL.

 4         Q.     Does the school get any ratings

 5    on any State or Federal agency based on

 6    your placement statistics?

 7         A.     Yes.

 8         Q.     How does that rating system

 9    work?

10         A.     You are rated based on how many

11    jobs are provided in relationship to the

12    number of students that an individual

13    county sent you.  So it has nothing to do

14    with somebody that comes in and pass us off

15    the street.  It is directly limited to

16    those students that came through

17    unemployment.

18         Q.     How would your rating be

19    affected either way if it was not enough

20    placement?

21         A.     If there is not enough

22    placement then the rating goes down.

23         Q.     What is the consequence for

24    your rating, do people enrolling in the

25    school get to see --
```

```
 1                    DIAB
 2        A.    No, there are -- in other
 3   words, someone from unemployment is told
 4   have you to go out and talk to three
 5   different schools.  You chose which school
 6   you want.  And truthfully in the past,
 7   because we strive to do it, our placement
 8   rate is very good.  We have been in
 9   counties where we had the highest placement
10   rate, yet the county would send people to
11   the other schools with the lowest placement
12   rate.  Does it have a bearing, it is
13   supposed to, but ultimately it is the
14   school that the student picks.
15        Q.    Would you say that a student
16   with a disability might have a harder time
17   getting placement than a student without a
18   disability?
19             MR. HALLER:  Objection to form.
20             You may answer if you know.
21        A.    I don't know the answerer to
22   that, because I don't know -- I have -- it
23   has not happened.  I don't know anybody
24   that -- we certainly not had anybody that
25   we had to place and I have not heard of
```

```
1                      DIAB
2   anybody that needed to be placed.  I am not
3   familiar with any deaf drivers in the
4   country.  So I don't know.
5        Q.    When a student with a
6   disability, any disability, deafness or
7   not, applies to your school, and goes to
8   the interview, is placement something worth
9   thinking about during that interview
10  process?
11       A.    We want them to get a job, so
12  yes, it is.
13       Q.    If there was a deaf student who
14  applied to your school, who had a job lined
15  up after the program, like some other
16  students do when they go through, would
17  that affect your willingness to take the
18  student or no?
19       A.    Absolutely not.  Absolutely
20  not.  I wouldn't take the student.
21             This has nothing to do with job
22  placement.  It has to do with safety.
23  Whether he gets a job or doesn't get a job
24  has nothing to do with safety and putting
25  somebody on the road that is not safe.
```

```
 1                    DIAB
 2        Q.    If a deaf student came to you
 3   and said, I would like to go through the
 4   program upon graduation, I have a signed
 5   letter from named trucking company saying
 6   they will hire me on the condition that I
 7   complete the school, your school would
 8   still categorically not take that student?
 9        A.    That's correct.  Not until such
10   time as the Federal Motor Carrier tells me
11   how to do it safely and what the test is.
12   If I know those two things, is a different
13   story.  I don't know the answer to either
14   of those two things.  Particularly I don't
15   know how to do it safely.
16        Q.    With the forklift driver
17   training program, when a deaf student goes
18   to the program, do you provide them with an
19   interpreter?
20        A.    We have, and others have
21   provided interpreters themselves.
22        Q.    I am assuming that it is
23   probably less than ten students who have
24   gone through the forklift driver training
25   program who are deaf.
```

```
 1                    DIAB
 2           Do you know off the top of your
 3   head how many have provided their own
 4   interpreters versus how many the school has
 5   provided?
 6       A.    I don't know.  I believe that
 7   we have only provided maybe two, to the
 8   best of my knowledge.  I could be mistaken.
 9       Q.    When you provided these
10   interpreters, where did you get them from?
11       A.    I got them through -- by
12   recommendations of the ADA, they gave us a
13   list of interpreters, we contacted them and
14   they were provided by various companies.
15       Q.    Can you describe in brief the
16   forklift driver's training program, how
17   many weeks it is, what it involves, in
18   other words, to pass the program?
19       A.    Sure.  There is no license, no
20   certification, I think you have to be 16
21   years old, we give you a sheet of paper
22   that says you are OSHA certified.  We have
23   three different types of equipment.  We
24   train each on the types of equipment, each
25   piece of equipment.  It is eight hours one
```

```
 1                   DIAB
 2    day and done.
 3         Q.    What do you mean different
 4    equipment, are there different types --
 5         A.    There are different types of
 6    forklift.
 7         Q.    In order to pass the program,
 8    you have to be able to adequately use each
 9    piece of equipment?
10         A.    The forklifts are pretty
11    similar to each other, yes, and the maximum
12    speed on one is approximately two miles an
13    hour.
14         Q.    How many weeks is the program?
15         A.    Forklift?
16         Q.    Yes.
17         A.    One day.
18         Q.    One day?
19         A.    Yes.
20         Q.    Okay.
21               So there are no -- just so I
22    understand, you come in, then you are
23    trained one day, then you are certified to
24    use the forklift?
25         A.    That's correct.
```

1                          DIAB

2          Q.     There is no written examination

3      or in-class component?

4          A.     There is, when you say,

5      in-class, we do the first portion of it in

6      class.   Then the second portion of it is on

7      the equipment.

8          Q.     So if it is one day, the

9      student comes int in the morning, they are

10     in a classroom?

11         A.     That's correct.

12         Q.     By the afternoon, they are

13     driving the forklift?

14         A.     That's correct.

15         Q.     Then the next day they are --

16         A.     There is no next day.

17         Q.     The next day they are able to

18     go work in a warehouse?

19         A.     They can, if the warehouse says

20     that was enough training or it wasn't

21     enough training or, you know, that is up to

22     the warehouse to decide.   When they get to

23     the warehouse, the warehouse, not only like

24     a trucking company, is going do with the

25     CDL, they are going to say show me your

```
 1                    DIAB
 2    skills.  Go run the forklift.  If they
 3    cannot run the forklift they are not going
 4    to do it.  We have not had any issues in
 5    terms of somebody coming back saying we
 6    were not adequately trained.
 7         Q.    Okay.
 8               When a student who is deaf went
 9    through this program, there was the
10    in-class component and then there was the
11    actual driving component, were they
12    provided an interpreter for that entire
13    day?
14         A.    Yes, they were and I know on
15    the last one, we were told that they needed
16    two interpreters because it was too much
17    work for one in a day.
18         Q.    They were provided two
19    interpreters for that day of training?
20         A.    That's correct.
21         Q.    How did the interpreter
22    interact with the student on the in-class
23    component for the first half of the day?
24         A.    I wasn't there, I could not
25    tell you.
```

```
 1                          DIAB
 2          Q.    Do you have any knowledge as a
 3    corporate representative, how the student
 4    is trained with an interpreter when they
 5    are going through the forklift training?
 6          A.    My knowledge is limited, but as
 7    I said, the vehicle has a maximum speed of
 8    about two miles per hour.  The interpreter
 9    can be on the ground with the instructor.
10    There is nobody around because you can move
11    -- if there are other students, you have to
12    move them out of the way, it's on a closed
13    course.  There is no liability.  You cannot
14    run away with a forklift as if you can run
15    away with a truck.
16          Q.    Would you say a forklift is a
17    dangerous piece of machine to operate?
18          A.    I think virtually any piece of
19    equipment that is that big can be dangerous
20    to operate.
21          Q.    Why do you think that it is
22    safe for a deaf person to operate a
23    forklift?
24          A.    Why do I think it is safe?
25          Q.    Yes.
```

1                    DIAB

2          A.    Because they are not on the

3     road.   There is no license needed.   I have

4     not heard of any serious or even

5     non-serious forklift accident.   And all our

6     research tells us that we can adequately

7     train this person and not violate any laws

8     and not put the other students, instructor

9     or the general public in any safety

10    concern, because it is closed quarters.

11    They are not on the road.

12              What I have to be concerned

13    about is getting through the training.

14    What happens when they got out there, if

15    they decide to drive into somebody,

16    whatever the case is, that's not my

17    concern, my concern is I have to get them

18    through the course.   It is the same thing

19    with the CDL.   I have to get them through

20    the course and to pass the test and they

21    have to go out and get a job and do what

22    they do.

23          Q.    Are you aware of any deaf truck

24    drivers?

25          A.    I am not aware.   I have heard

```
 1                         DIAB
 2    that there are deaf drivers, but the ones
 3    that I have heard about have not been
 4    trained, but have lost their hearing after
 5    they had their CDL and have continued
 6    driving although he had to get a waiver as
 7    well.
 8         Q.    The only deaf truck drivers you
 9    have heard of are people that just became
10    deaf through their life but were not born
11    deaf?
12         A.    I didn't say that.
13         Q.    I am trying to clarify.
14         A.    I said that the driver, for
15    whatever reason, had his CDL and was not
16    deaf.  Something happened to him after he
17    had his CDL, he became deaf or hearing
18    impaired.  Every two years you have to
19    recertify your medical.  So if that driver
20    became deaf and he went to take his
21    medical, he could not pass it and his job
22    would be gone unless he had a waiver.
23              As I said, that is what I
24    understand the original waivers were meant
25    to do.
```

```
 1                      DIAB
 2              I am personally unfamiliar with
 3       anybody that has gone through a driving --
 4       a tractor trailer driving school and then
 5       became a truck driver.
 6          Q.    Have you heard of any
 7       fatalities involving deaf truck drivers?
 8              MR. HALLER:  Objection to form.
 9          A.    No, but I could not tell you --
10       I mean I know that there are truck driving
11       accidents every day, I don't know which are
12       deaf and which aren't.
13          Q.    So we agree that driving a
14       truck is dangerous?
15          A.    Driving a truck is extremely
16       dangerous.
17          Q.    We can agree that it is
18       dangerous whether you are deaf or not?
19              MR. HALLER:  Objection to form.
20          A.    Okay.
21          Q.    I would like to go back to this
22       Plaintiff's Exhibit 6, the top part of the
23       e-mail, John Diab, junior to Dale
24       Wessendorf.  We have to accommodate and pay
25       for the interpreter.
```

```
 1                        DIAB
 2         A.    Yes.
 3         Q.    Your school pays for an
 4   interpreter for deaf students in its
 5   forklift driving training program?
 6         A.    I said in some cases we pay and
 7   other cases they come in with an
 8   interpreter.
 9         Q.    Your school has paid for --
10         A.    We have paid, that's correct.
11         Q.    Why have you paid?
12         A.    Why have we paid?
13         Q.    Yes.
14         A.    Because the person has said I
15   cannot provide an interpreter and I need an
16   interpreter, so we paid.
17         Q.    So if a deaf student would make
18   a request seeking an interpreter for one of
19   your programs, the school would pay for it?
20              MR. HALLER:  Objection to the
21         form.
22         A.    No.  That's not true at all.
23   We would do it for forklift.  We would not
24   do it for CDL, because an interpreter or
25   signer is not legal to use in the training
```

```
 1                    DIAB
 2   and skills test.  So we wouldn't say okay,
 3   we are going to pay for an interpreter or
 4   signer, you cannot take the test with them,
 5   so then what happens.
 6        Q.    Where is your assertion coming
 7   from that it is not legal to use an
 8   interpreter --
 9        A.    In all the Federal Motor
10   Carrier regulations.  It is in Federal
11   Motor Carrier regulations.  I have spoken
12   to Federal Motor Carrier personally, every
13   one of them, Larry Minor and Chuck Horan.
14            I have spoken to Kevin Lewis
15   from AAMVA.  I spoke to all the motor
16   vehicle departments, and, as I said, in the
17   Federal Motor Carrier handbook and in the
18   CDL manual for examiners, it says, no
19   signers -- it says no interpreters.
20   Interpreters I have been told includes
21   signers.
22        Q.    That is in the handbook or
23   regulations?
24        A.    In the Federal handbook, that
25   is in the regulations, it is in the
```

1                    DIAB

2     original regulations from 1970 and at their

3     discretion, the Federal Motor Carrier gave

4     a waiver for hearing.  They did not give

5     one for speaking, but they did give one for

6     hearing.

7          Q.    In Exhibit 6, was there any

8     research that your company did in order to

9     seek guidance as to whether you had to

10    accommodate a deaf forklift driver, were

11    there any agencies that you called or any

12    other organizations?

13         A.    That we have to accommodate?

14         Q.    Yes.  I am sure the first time

15    that you received a call from a deaf

16    forklift student, I am sure that you did

17    not know how to accommodate, are there any

18    steps that you took to figure out how to

19    accommodate that?

20         A.    We analyze it to a certain

21    degree without the outside agency the same

22    way we analyzed the CDL and recognized that

23    with we thought one interpreter, that this

24    could be done safely.

25               From that standpoint, we had no

```
 1                          DIAB
 2    concerns, as I said, about the safety of
 3    the driver, instructor or the general
 4    public.
 5         Q.    When a student who is deaf is
 6    driving the forklift and the interpreter is
 7    there with him, is the interpreter
 8    interacting with the student?
 9         A.    Yes, but not to a great degree,
10    because you can give them one set of
11    instructions, because it is a very short --
12    in other words, you can say pull the
13    vehicle forward, raise the vehicle.  Its
14    one thing and it is pretty easy for the
15    interaction between the instructor, the
16    student and the interpreter.
17              They can also, in the case of
18    the forklift, I mean they can be beside it
19    or in front of it or what have you.
20         Q.    So the interpreter would be
21    beside the student that is deaf who is
22    driving the forklift and the student would
23    be able to get instructions?
24         A.    Generally, they would be in
25    front of them, because you can do that.  In
```

```
 1                    DIAB
 2     other words, if you were driving a
 3     forklift, I can be the interpreter, and I
 4     can stand in front of you because that
 5     forklift is not going to run me over, but
 6     if I tried do that with a truck, forget it.
 7               So they are not going to be on
 8     the side because it is going to be a
 9     problem.  So they would do it in the front
10     of them too.
11          Q.   When a student takes the CDL
12     road test part of the training, what does
13     that road examination entail?
14          A.   Training or the test itself,
15     which are you referring to?
16          Q.   The actual test.  They have
17     gone through weeks of in-classroom learning
18     where I assume they are watching videos or
19     reading materials.  Then there is actual
20     driving exam that they have to take on
21     their own; is that correct?
22          A.   No.  They go from classroom out
23     into a yard.  And they learn backing skills
24     and docking skills and turning skills.
25     They learn how to drive a ten speed
```

```
1                      DIAB
2       transmission because all of our trucks are
3       ten speed transmissions.  They learn how to
4       couple and uncouple trailers and tractors
5       and what have you.  They do that for some
6       time.  Then after they have done that they
7       begin to go out on the road.  Then they
8       will go out on the road with an instructor
9       for, then they will come back and go do the
10      yard things and then do the yard and go
11      back and do the road.  It is back and forth
12      until such time we think somebody is
13      competent to take the test.  Sometimes it
14      takes weeks or months.  Whatever it takes
15      we are going to try and get to the point
16      where they can.  Ultimately some people
17      just cannot do it.
18           Q.    What do you mean some people
19      cannot do it?
20           A.    They just cannot grasp it.
21      Think about it this way, imagine -- I don't
22      know where you are from, but imagine that
23      you are on a service road on Staten Island
24      and you were going to enter the Staten
25      Island Expressway and you have an 86,000
```

```
1                    DIAB
2      pound truck.  As you are coming on and you
3      have only driven this 86,000 pound truck
4      with a ten speed transmission a few times,
5      you may have never driven a stick shift
6      before, ever.  Now you are getting ready to
7      get on, you have to accelerate, you have to
8      look in this mirror and you have to look in
9      that mirror.  You have to shift up, you
10     have to know that the RPM'S are correct
11     then you have to merge into traffic.
12                    So you are doing all of these
13     things.  It is done with the instructor
14     being able to verbally communicate to the
15     student.  If they cannot verbally
16     communicate with the student, then you are
17     leading up to a catastrophic accident,
18     because even our students, our average
19     student, half the time cannot get the truck
20     in gear.  Think about it.  It is ten
21     speeds.  You have to flip the switch, you
22     gotta -- so now I am looking, trying to
23     merge, trying to keep an eye on everything,
24     accelerate, where is the car coming from.
25     Then what happens is they cannot get it in
```

```
 1                         DIAB
 2     gear.
 3              Now, could they feel that it is
 4     not in gear, yes, they could, but they
 5     don't know how to correct it.  Now the
 6     instructor has to say you have to raise the
 7     RPM.  If you have driven a stick shift, if
 8     you are familiar with a stick shift, you
 9     have some idea, but whatever you have done,
10     unless it is in a truck, you have no idea
11     what it takes to get this truck into gear.
12     Am I going too far forward, am I going too
13     far back, what am I doing, how do I get it
14     in gear?
15              If I cannot verbally
16     communicate with that student, as I said,
17     to me, what would happen is, it is not in
18     gear, the truck literally goes to a coast
19     or a roll, I am looking for a catastrophic
20     accident.
21        Q.    What is, in your point of view,
22     the central characteristics of a safe
23     driver?
24        A.    I don't think so that I can --
25     you have to be more specific as to the
```

```
 1                    DIAB
 2    characteristics.  What I may think is
 3    essentially to being a safe driver is not
 4    the same as it is to you.  I mean are you
 5    asking me what I think, are you asking me
 6    what Federal Motor Carrier thinks?
 7         Q.    Just you.  What do you think
 8    are some things that a safe driver needs to
 9    have?
10         A.    I think he has to be aware
11    primarily, especially in the truck, of his
12    total surroundings.  He has got to able to
13    recognize audible alerts.  He has to be
14    able to hear the tire in the back if it
15    starts to leak before it blows out.  He has
16    to be able to know that the belts are
17    squealing and that sooner or later it is
18    going to break and cause a problem
19    mechanically.  He has to hear a siren.
20    That is even true in a car.  You have to
21    hear a siren.  If you cannot hear a siren,
22    so what then, especially in a truck, you
23    have to be able to have all of your senses
24    about you or, again, its potentially going
25    to create a major concern.
```

```
 1                    DIAB
 2        Q.    When you are driving in a
 3   truck, is it normally a loud environment or
 4   quiet environment?
 5        A.    Inside or outside the truck?
 6        Q.    Inside the truck.  I am on the
 7   road, I am driving, I am on the highway,
 8   what is the noise level inside the cabin?
 9        A.    If you have a relatively new
10   truck the noise level is going to be
11   moderate.  If you have an old truck, it
12   will be very loud.  When I say very loud,
13   very loud to me it is relative, it is
14   noisy.
15        Q.    That is just noisy in --
16        A.    The seats are going, it can
17   rattle, it can be something wrong with the
18   wheel.  The newer the tractor and trailer,
19   the less you are going to hear those
20   things.
21        Q.    Would you agree that visual
22   alertness is extremely important in driving
23   a truck?
24        A.    Without doubt.
25        Q.    Why would you agree to that?
```

```
 1                      DIAB
 2         A.    You cannot drive when you are
 3    blind.  There is no exemption.  You have to
 4    be able to see and have you to be able to
 5    see everything that is surrounding you.  I
 6    believe that that is pretty important and
 7    if there are individuals with visual
 8    problems, then they still have to pass the
 9    visual test.  To the best of my knowledge,
10    there are no exemptions for vision.  In
11    other words, you put your glasses on and
12    the glasses have to take you to the point
13    where you can be able to see.  If you
14    cannot see there is no vision exemptions,
15    to the best of my knowledge.
16         Q.    How important are the side
17    mirrors when driving a truck?
18         A.    Critical.
19         Q.    Why?
20         A.    Because in a car you have a
21    rearview mirror.  In a truck, you don't.
22    If you drive a small truck, day cab, what
23    have you, there is a rear window, but even
24    if there is a rear window, there is a
25    trailer behind you.  If you look in the
```

1                          DIAB

2      rearview mirror, you just see the trailer.

3      Everything that you did in a track trail is

4      with your side view mirrors.

5           Q.    That is a very, very important

6      part of the truck?

7           A.    Yes.

8           Q.    What are some of the things

9      that you need to see in the side view

10     mirrors?

11          A.    You cannot back up unless you

12     use side view mirrors.  You cannot.  You

13     need them when you turn.  You need your

14     side view mirrors for changing lanes.

15     There is a multitude more.  They are

16     critical.

17          Q.    Would you agree that a deaf

18     person could still see out of the side view

19     mirrors and get the same line of side as a

20     hearing person?

21          A.    I think that is a difficult

22     question for me to answer.  I don't know

23     that I can -- I guess.

24          Q.    So if a deaf person was looking

25     out of a side view mirror, they could see a

```
1                      DIAB
2    siren behind?
3         A.     They can see a siren?  No, you
4    have to hear it.
5         Q.     You can see an ambulance?
6         A.     If they were directly behind
7    them, yes.  If it were coming in a
8    different direction, a different street,
9    they would have no idea where it is coming
10   from.
11        Q.     That is the same as a hearing
12   person, if it was coming in a difficult
13   direction they --
14        A.     I thought you asked me the
15   question about a deaf person.  You are
16   saying somebody that can hear, I need to
17   understand the question.
18        Q.     Sure.
19        A.     You are saying somebody that
20   can hear, in other words, can I hear a
21   siren, and I can tell that the siren is to
22   my right, okay.  But I have heard the
23   siren, which causes me then to slow down,
24   okay, or I know it is to my left or I sense
25   that it is behind me or I sense that it is
```

```
 1                     DIAB
 2    coming in the other direction.  If you
 3    cannot hear that then what is my
 4    alternative?
 5         Q.    You would be able to still see
 6    the emergency vehicle from your side
 7    mirror; is that correct?
 8         A.    No.
 9         Q.    No?
10         A.    The side mirror don't point
11    that way or that way (indicating).  They
12    point backwards.  The only time that you
13    would be able to see it if someone was
14    directly behind you.  If someone were in an
15    ambulance that was ten cars back, you would
16    not see them.  Chances are you would not
17    see them in the mirror.  You might, but you
18    might not.  You are never going to see them
19    peripherally.  Diagonally, you are not
20    going to see them.  A person that can hear,
21    at least you can get a sense a siren is
22    coming from, I don't know where it is
23    coming from, I just better stop.
24         Q.    Out of your side mirror, you
25    would be able to see if other cars are
```

```
 1                        DIAB
 2      coming to merge onto a highway; is that
 3      correct?
 4           A.    Yes.
 5           Q.    You would be able to see if
 6      there were cars in another lane before you
 7      turned?
 8           A.    Yes.
 9           Q.    What are some other things,
10      aside from a siren, would you need to hear
11      driving a truck?
12           A.    You would need to hear a tire
13      that begins to leak.  There is no sensor.
14      There is no sensing device that says, hey,
15      you have a leak in the tire.  You see the
16      big pieces of rubber on the highway, that
17      is because it started out as a leak and
18      ended up as a blowout or started as a
19      blowout, whatever the case is.  I cannot
20      speak for a deaf person.  I don't know what
21      they can hear or cannot or feel or not
22      feel, but if that tire starts to leak, they
23      are not going to hear it.  If a belt starts
24      to squeal and it is potentially going to
25      break and they do not hear it or pull over,
```

1                    DIAB
2    there is nothing that is going to sense
3    that.  Your air brakes are shooting
4    pressure out the side all the time.  Now,
5    they can pump down and at some point, your
6    gauge will start to come down.  You need to
7    be able to hear that beforehand.
8          Q.    Are you aware of PSI tire
9    gauges that have warning lights that air is
10   leaking from the brakes?
11         A.    Adapted to the car?  You are
12   talking about on the car, are you talking
13   about warning lights on a car or a truck
14   that says you have a low tire?
15         Q.    Yes.  A flashing light and
16   something that would alert a driver?
17         A.    I am familiar with that.
18         Q.    Do you agree that a deaf person
19   would be able to see these lights flashing
20   to alert him if the air is leaking?
21         A.    No.
22         Q.    Why do you say that?
23         A.    Because it is only on the truck
24   and not on the trailer.  So there is no
25   device or mechanism that tells you that all

```
 1                    DIAB
 2   of those tires on the trailer, call it 16,
 3   okay, that any one of it is leaking.  On
 4   your truck it will, but not on your
 5   trailer.
 6        Q.    Is it your testimony that there
 7   is no PSI tire gauge with flashing lights
 8   that would be adequate for a deaf person to
 9   alert them if the air was leaking in a
10   truck?
11        A.    I don't know that I am an
12   expert enough to answer that question.
13   What I can tell you is to the best of my
14   knowledge, there is no pressure gauge for a
15   trailer.  There are pressure gauges for the
16   truck, but not for the trailer.
17        Q.    You mentioned before that a
18   siren is something that you would need to
19   hear when you were driving because you
20   cannot see directly in back of the truck if
21   there is an ambulance or a fire engine.
22             Are you aware of trucks that
23   have screens in the driving cabinet that
24   would have a camera to the back of the
25   truck which would allow you to see the rear
```

```
 1                    DIAB
 2    of the truck and what is behind you when
 3    are you driving?
 4         A.    I am not familiar with anything
 5    that would do that with a trailer.  There
 6    are trucks that can do that.  Not Class A.
 7    There are Class B, there are trucks like
 8    UPS that have rear cameras.  I cannot tell
 9    you that the rear camera, though, operates
10    like a dashboard camera.  If you have a
11    dashboard camera, it is rolling all the
12    time.  I have not heard about a camera that
13    roles all the time in the back of the truck
14    and I have never heard of anything that is
15    capable of doing that on a trailer.  A
16    trailer is 53 feet, so you're talking about
17    from the cab to the back of the truck
18    that's 70 feet.
19         Q.    If this existed would you agree
20    that would be an adequate way for a deaf
21    person to be able to notice there was an
22    emergency vehicle behind them while they
23    are driving?
24         A.    Again, technically I am not
25    capable of giving you that answer.  I don't
```

```
 1                      DIAB
 2   know.  Typically what happens in these
 3   situations is that they are scientific
 4   studies done that would say, hey, look,
 5   take it out, try it, see what happens.  I
 6   am not capable to say that would make it
 7   right for somebody to see a siren instead
 8   of hearing a siren.
 9        Q.     Do you think it is safe for a
10   deaf person to drive a car?
11        A.     I think it is safer than a
12   truck because it doesn't have the magnitude
13   that the truck has.  It doesn't have all of
14   that weight.  It doesn't -- a car doesn't
15   react the same way a truck does.
16              If you are driving a truck and
17   I can tell you from experience, if you are
18   driving a truck, and you are going down the
19   hill, a truck is going to respond
20   differently than when it is going up the
21   hill.
22              The characteristics are
23   entirely different than a car.  When you
24   are in a car, it goes up the hill and then
25   it goes down the hill.  It turns left and
```

```
 1                      DIAB
 2      it turns right.
 3                  A truck is different.
 4      Particularly on inclines and declines and
 5      also with turns.  When you are driving a
 6      car you are not articulating and your
 7      trailer has to follow.  If you do not get
 8      it right, you are going to take out a phone
 9      pole.  That can happen to anybody.
10                  I am just answering your
11      question about the comparison between the
12      two.
13          Q.   Are you aware of any deaf
14      people driving cars?
15          A.   I believe Mr. Frilando does
16      because I saw him on WNBC TV.
17          Q.   How big is the inside of the
18      truck when a student goes on the road with
19      the instructor?
20          A.   The truck is capable of holding
21      five people.
22          Q.   Five people?
23          A.   Yes.
24          Q.   Do several students go out at a
25      time?
```

```
 1                      DIAB
 2        A.    Yes.  Several students.  Never
 3   take a truck out by itself.
 4        Q.    Would you say the cabin would
 5   be big enough to accommodate the student,
 6   the instructor and an interpreter?
 7        A.    Yes.
 8        Q.    So an interpreter would
 9   theoretically be allowed to go out with the
10   student in the truck?
11        A.    They can be allowed.  I don't
12   know what they can do or how they would do
13   it.  Where are you going to place them?
14   That is not the question that you are
15   asking.  Would they be allowed, yes.
16        Q.    If there was a mirror like you
17   have in a regular car in which a student
18   was driving, the instructor is here and the
19   interpreter was in back of the student and
20   can see in the mirror, do you think that
21   would be adequate in order to train a deaf
22   student?
23        A.    Absolutely not.
24        Q.    How come?
25        A.    Delayed reaction.  Go back to
```

```
 1                          DIAB
 2       my highway example.  I am looking left, I'm
 3       looking right, trying to accelerate.  Now I
 4       can't even shift this thing.  Now I am
 5       looking at it to try to figure out why I
 6       can't.
 7                    How is that interpreter,
 8       wherever you put them, how is that
 9       interpreter communicating with me and how
10       am I dealing with the interpreter?  How can
11       I do that?  I am looking here and looking
12       there.
13                    I am telling you, what happens
14       is, the average student ends up not being
15       able to get this truck in the gear and he
16       starts looking at it, like that is going to
17       help.
18                    So there is too much going on,
19       forget about the delayed reaction, there is
20       too much going on for a person to even pay
21       attention to the fact that there is a
22       signer in the truck.
23           Q.    Is this point of view, a
24       delayed reaction, something that you came
25       up on research that you have done --
```

1                    DIAB

2         A.    It is research that I have

3    done.  Sorry, finish.

4         Q.    -- based on American Sign

5    Language and how deaf people communicate or

6    based on your own --

7         A.    No, it is based on the Federal

8    Motor Carrier's research, also in their

9    manual and in their regulations it

10   addresses delayed reaction time.  And that

11   delayed reaction time means more to a

12   Spanish speaking or -- it is a language

13   issue when they talk about the

14   interpreters.  That was their first

15   thought.  In other words, you go and

16   instructor, interpreter, the driver and

17   they are saying, look, this is totally not

18   right because of the delayed reaction.

19            Part of my assessment with my

20   people is that that reaction is compounded

21   -- that delayed reaction is compounded.

22   Now, with a hearing impaired person, if I

23   have a person that I cannot communicate

24   with in Spanish, I can scream at him and he

25   is going to know, hey, look, something is

130

```
 1                   DIAB
 2    not right, I have to do something.  If I do
 3    that with a deaf person, that is not going
 4    to make any difference.
 5         Q.    If a deaf person is looking at
 6    an interpreter wouldn't know if an
 7    emergency was happening?
 8         A.    Say that again.
 9         Q.    There is a deaf person on the
10    road, there is an interpreter.  They are
11    driving, if there is an emergency, based on
12    looking at the interpreter he wouldn't know
13    --
14         A.    Based on looking at the
15    interpreter, sure.  But, A, that's
16    distracted driving and, B, it is delayed
17    reaction time and I don't understand that.
18    Let's go back to my example.  Can he look
19    at the interpreter with other five or six
20    things going on at the same time.
21         Q.    When a student is hearing
22    instructions, a hearing student is hearing
23    instructions on the road from the
24    instructor, what type of instructions is he
25    hearing?
```

1                    DIAB

2        A.    Shift up, shift down, your RPM

3    are not high enough.  Are you going to

4    catch this tree, are you going to catch

5    this thing, there is a ball in the street.

6        Q.    The interactions tend to be

7    short sentences of just giving instructions

8    --

9        A.    They are instantaneous.

10        Q.    They are instantaneous?

11        A.    Yes.

12        Q.    So do you agree that a deaf

13    person would be able to make those same

14    movements if he was just going either right

15    or left or pull ahead, listening to the

16    interpreter?

17            MR. HALLER:  Objection to the

18        form of the question.

19            MR. NADLER:  Read it back.

20            (Whereupon, the referred to

21        question was read back by the

22        Reporter.)

23        A.    I am not qualified to give that

24    answer, because I can do it, with an

25    average person and average student.  I have

```
 1                   DIAB
 2    no idea what a deaf person is capable of.
 3         Q.    Is it your testimony that you
 4    have no idea what a deaf person is capable
 5    of when they are driving?
 6         A.    That is true.
 7         Q.    You have made the determination
 8    that you know that it is unsafe?
 9              MR. HALLER:  Objection to the
10         form.
11              That is not what he said.  I
12         have allowed this to get off topic.
13         The topic of general safety which is
14         a whole other issue is not a topic
15         for Todd.  The question is whether
16         the person can be trained safely,
17         which is a different issue.  So I am
18         not going to stop the deposition, but
19         we have been off topic for some time.
20              MR. NADLER:  This fits to
21         whether a student can be trained.  I
22         am trying to ascertain how a student
23         could be trained based on assertion
24         that a deaf student cannot be trained
25         in a CDL program.  I am trying to
```

```
 1                      DIAB
 2         gather how a student can be trained
 3         and method that would allow that to
 4         work.
 5         A.    I can't even consider a signer
 6    because I am required by law not to use a
 7    signer.  So if I cannot use a signer then
 8    it is really an exercise in futility.  I
 9    don't know what the signer or deaf person
10    or anybody is going to do.  Federal
11    government says I cannot use a signer.  Why
12    would I consider taking that person and
13    trying to train them with a signer and
14    getting them to the exam and the examiner
15    says you cannot have a signer.  Now what
16    happens.
17              MR. NADLER:  I am introducing
18         Plaintiff's Exhibit 7, BDTS 0101,
19         0100.
20              (Whereupon, the aforementioned
21         document Bate stamped BDTS 0101, 0100
22         was marked as Plaintiff(s)' Exhibit 7
23         for identification as of this date by
24         the Reporter.)
25         Q.    Have you seen this before?
```

```
 1                      DIAB
 2        A.    I have.
 3        Q.    When have you seen this?
 4        A.    April 30th of 2015.
 5        Q.    Can you let me know what the
 6   handwritten words are on the page are?
 7        A.    Those are my notes that say I
 8   am reminding myself that in addition to
 9   what has been here and the fact that we
10   have to also do -- these were sent out to
11   all CVTA members.  Just because it says
12   Dear John doesn't mean it just came to me.
13   It went to all the CVTA members.  Smith and
14   Solomon was going to file their own comment
15   to the Federal register and I wanted to
16   make sure that I at least remembered the
17   conflicts with all of the Federal
18   regulations which we already spoke about.
19        Q.    Did the CVTA ask you,
20   Bordentown, to file these comments?
21        A.    Yes.  They asked Bordentown and
22   all of their members to file comment.
23        Q.    I am on the next page,
24   BDTS 0100.
25        A.    Right.
```

```
 1                     DIAB
 2        Q.    The second paragraph --
 3        A.    Okay.
 4        Q.    -- that starts, based on
 5   current information?
 6        A.    Right.
 7        Q.    When you wrote these comments,
 8   what current information are you
 9   referencing that you are aware of that
10   would state, based on current information,
11   state what current information you are
12   referencing in this paragraph talking about
13   things that no thought were given to?
14        A.    There was no thought given to.
15   There are no specific training programs
16   that have been developed or released.  That
17   is common knowledge.  The availability of
18   the skills test exam to be utilized by
19   State examiners, there is none.  And we
20   have spoken to AAMVA.  Potentially exposing
21   the training provided to conflicts with
22   current DOT motor carrier regulations, such
23   as equipment or mechanical failure that
24   relies on auditory indicators.  We have
25   addressed that as well.
```

1                    DIAB

2          Q.     The third paragraph, it states,

3     after lengthy discussions with

4     transportation experts, medical

5     professionals and colleagues in our

6     industry, we have determined that, we as

7     training providers along with State motor

8     vehicles examiners currently lack the

9     knowledge and ability to train or test

10    individuals with a hearing exemption waiver

11    until such time as significant guidance and

12    direction is provided for by FMSCA.

13         A.     Yes.

14         Q.     What transportation experts are

15    being referred to here?

16         A.     The several of the large

17    carrier safety directors.  People like

18    Schneider, Warner.  All the large trucking

19    carriers that I had conversations with

20    regarding.

21         Q.     I didn't catch that, Schneider,

22    Warner?

23         A.     Schneider, Warner.  They are

24    trucking companies.  I went to the trucking

25    companies and I asked the trucking

```
 1                    DIAB
 2    companies safety directors and I went to
 3    the ATA, that is American Trucking
 4    Association.  That is where you are going
 5    to get -- they represent 37,000 trucking
 6    companies.  They have filed comments to the
 7    Federal Motor Carrier that this is not
 8    safe.  They are without a doubt the expert
 9    in the trucking industry.  They have all
10    kinds of staff, all kinds of things going
11    on.  They do research and what have you.  I
12    called and spoke to them.  That is the
13    indication that they gave me.
14         Q.    How many discussions did you
15    have with Schneider?
16         A.    In this case, probably at this
17    time one.
18         Q.    And Warner?
19         A.    Probably one.  And one with the
20    ATA, and that to me was the most important
21    one in talking to their safety director
22    because he represented so many trucking
23    companies.
24         Q.    What medical professional did
25    you consult with?
```

1                    DIAB

2        A.    I spoke to the medical examiner

3    that we use to do physicals as well as for

4    our students.  It was his opinion that it

5    just wasn't safe to have a deaf driver on

6    the road.

7        Q.    Was that the only medical --

8        A.    That was the only medical

9    professional.

10       Q.    What did you ask this medical

11   professional specifically, do you recall?

12       A.    I asked him if he had gotten or

13   seen any hearing waivers.  He said that he

14   personally had not, however he was aware of

15   waivers, he was aware of the regulations,

16   and the protocol that had to be followed,

17   but in his opinion, it was not safe for a

18   hearing impaired person for all the reasons

19   that we have already discussed, audible

20   alert and what have you to be driving a

21   truck.

22            MR. HALLER:  Let's take a

23        break.

24            (Whereupon, a brief recess was

25        taken.)

1                    DIAB
2              MR. NADLER:  I would like to
3         introduce documents Bate stamped
4         BDTS 0116 through 0118 titled
5         National Association of the Deaf Law
6         Center.  Let's have this marked as
7         Plaintiff's Exhibit 8 for
8         identification.
9              (Whereupon, the aforementioned
10        documents Bate stamped BDTS 0116
11        through 0118 titled National
12        Association of the Deaf Law Center
13        was marked as Plaintiff(s)' Exhibit 8
14        for identification as of this date by
15        the Reporter.)
16             MR. NADLER:  I have handed the
17        witness a document marked Plaintiff's
18        Exhibit 8.
19             It is entitled, National
20        Association of the Deaf Law Center,
21        on top, obligations of private
22        education agencies to deaf and hard
23        of hearing students.
24        Q.    Have you had time to look this
25   over?

```
1                         DIAB
2         A.     Yes.
3         Q.     Have you ever seen this before?
4         A.     I am not familiar with it.
5         Q.     So this is the first time that
6    you have seen this document?
7         A.     Yes.
8         Q.     Do you still have Plaintiff's
9    Exhibit 6?
10             MR. HALLER:  He can use my
11        Exhibit 6.  It looks like his has
12        come apart.
13             MR. NADLER:  I am referring to
14        specifically BDTS 0114.
15        Q.     If you have that part of it?
16        A.     Okay.
17        Q.     This has been -- Exhibit 8,
18   obligation of private education agency to
19   deaf and hard of hearing students, was sent
20   in an attachment from Dale Wessendorf to
21   John Diab, Monday, April 21, 2014, 257.
22             Is that referring to you or
23   your son as John Diab?
24        A.     I don't know, because I don't
25   know what the e-mail address is.  On the
```

```
 1                    DIAB
 2      top of this one, this is my son
 3      (indicating).  They say John Diab.
 4               This was with regard, I
 5      believe, to the forklift.
 6          Q.   Yes.
 7          A.   If it was, chances are it was
 8      to my son and not to me.
 9          Q.   So you have never seen a
10      Plaintiff's Exhibit 8 before today, this
11      document?
12          A.   Not to the best of my
13      recollection, no.
14          Q.   You are correct, it was
15      produced by your attorney as an attachment
16      in an e-mail sent in regards to
17      accommodations for deaf students who were
18      seeking accommodations for the forklift
19      driving training program back in 2014.
20               And this was sent along in a
21      response, whether or not they had to have
22      been accommodated.
23               Does your school have any
24      policies that are written for accommodating
25      disabled students?
```

```
 1                    DIAB
 2          A.    We have no written policies.
 3    We handle disabled students on a case by
 4    case basis.
 5          Q.    What do you mean on a case by
 6    case basis?
 7          A.    Well, if someone comes to us
 8    and they have a loss of limb or two limbs,
 9    which very much don't happen, if in this
10    case, it was a hearing exemptions, with the
11    forklift training, each one of those we
12    look at and we analyze and we determine
13    whether it is something that we can do or
14    something that we cannot do.
15          Q.    Prior to looking at this
16    document, have you ever heard of National
17    Association of the Deaf abbreviated NAD?
18          A.    I have.
19          Q.    When have you heard of them?
20          A.    Its has really been -- it might
21    have been something at the CVTA or
22    something that I heard through the Federal
23    Motor Carrier I might have heard a
24    reference to them.
25          Q.    Have you ever read any
```

```
 1                    DIAB
 2    materials that they produced, any documents
 3    or any reports?
 4         A.    I have not.
 5         Q.    Did you ever contact them in
 6    any capacity once Mr. Frilando came to you
 7    with a request?
 8         A.    I did not.
 9         Q.    Is there a reason that you did
10    not contact them?
11         A.    I felt that my responsibility
12    was to the Federal Motor Carrier and
13    because they licensed me.  I am licensed by
14    the Federal Motor Carrier, not the ADA and
15    first I have to be able to fulfill the
16    requirements of the Federal Motor Carrier.
17    Having not been able to did that, honestly,
18    I didn't go any further with the ADA.
19         Q.    So you, as per previous e-mails
20    --
21              MR. HALLER:  What do you mean,
22         you mean the NAD?
23              THE WITNESS:  NAD, yes.
24              MR. HALLER:  I think it was a
25         mixture of acronyms.
```

```
 1                    DIAB
 2            THE WITNESS:  Sorry.
 3        Q.     When Mr. Frilando contacted
 4   your school, you reached out to various
 5   Federal and State agencies in order to seek
 6   guidance; is that correct?
 7        A.     That's correct.
 8        Q.     And you did not reach out to
 9   the National Association of the Deaf
10   because for what reason?
11        A.     Because I am not licensed by
12   the NAD.  I am licensed by the Federal
13   Motor Carrier.  I am licensed in the State
14   of New Jersey by the Motor Vehicle.  I have
15   to first comply with their regulations
16   before I talk to anybody else.  I was
17   unable to ascertain that we can comply with
18   their regulations.  I did not talk to the
19   NAD.
20        Q.     Don't you think they could have
21   been a good resource on how to accommodate
22   a deaf driver?
23        A.     I think I have to be able to
24   comply with the Federal Motor Carrier
25   regulations and State regulations and I
```

1                        DIAB

2    have to be able to get them tested.  I

3    don't see or didn't see and didn't think of

4    the NAD in terms of how they would be able

5    to help me with a truck and the Federal

6    Motor Carrier and the State testing.  So I

7    felt my due diligence was done by talking

8    to those agencies that I am licensed by.

9         Q.    Your primarily goal is to train

10   a driver safely; is that correct?

11        A.    Yes.

12        Q.    And when you received an e-mail

13   or contact from Mr. Frilando seeking this

14   accommodation to come into your school as a

15   deaf person, you originally did not know

16   how that would work, is that correct, how

17   you would accommodate a deaf student?

18        A.    We had no idea how to

19   accommodate -- how to perform the training

20   or what the skills exam was.  In my

21   opinion, and I did not talk to the NAD, in

22   my opinion, the NAD wasn't going to be able

23   to give me those answers.

24        Q.    Why do you make that

25   determination that they would not be able

```
1                    DIAB
2      to --
3           A.    They were not involved with
4      motor vehicle.  They are not involved with
5      the Federal Motor Carrier.  The Federal
6      Motor Carrier makes their regulations.
7      They do not make their regulations in
8      conjunction with the NAD.  The test, the
9      skills test, is created by AAMVA, it's not
10     created by AAMVA and the NAD.
11          Q.    Just to be clear, the NAD is
12     not a legal institution that makes laws or
13     has any law making capacity, it is simply
14     an organization that advocates for the deaf
15     and there is a lot of policy and research
16     for deaf persons?
17          A.    Um-hum.
18          Q.    So they put out policy reports
19     on deaf people and different research into
20     deaf culture?
21          A.    Um-hum.
22          Q.    So my question is, did you
23     think that maybe they had any reports or
24     any experience with doing research on
25     whether deaf people have driven trucks or
```

```
 1                    DIAB
 2   driven at all?
 3              MR. HALLER:  Objection to the
 4         form of the question.
 5         A.    No, I did not, because I am
 6   accustomed to getting anything related to
 7   driving trucks from the American Trucking
 8   Association and the Federal Motor Carrier
 9   and AAMVA.
10              I am not accustomed to getting
11   any of that information from the National
12   Association of the Deaf.  Quite frankly I
13   didn't think of it to go with them to say,
14   hey, look, can you help me with the Federal
15   Motor Carrier regulations.  That is
16   something that I did not consider it.
17              It is not something that I
18   wouldn't consider it, it is that I did not
19   consider it.
20         Q.    In hindsight, do you think that
21   you should have consulted them at the time,
22   since they are leading institution of deaf
23   research and deaf studies and they may have
24   some ideas about how to accommodate deaf
25   drivers?
```

```
 1                    DIAB
 2            MR. HALLER:  Objection to the
 3       form.
 4       A.    The only answer I have to that
 5   question is that I have been told by the
 6   Federal Motor Carrier that they have had
 7   conversations with the National Association
 8   of the Deaf and have not jointly come to
 9   any conclusion on how to train or test the
10   deaf.
11            That was shortly after Mr.
12   Frilando, so maybe two or three weeks later
13   I might have thought about doing it, but
14   having spoken to the Federal Motor Carrier
15   and having them telling me that, I did not
16   see any reason for me to personally contact
17   them.
18       Q.    Are you aware of the American
19   Disability Act?
20       A.    Yes.
21       Q.    When have you heard of that
22   term?
23       A.    I have heard of it in
24   restaurants, on sidewalks, on
25   accessibility.
```

```
 1                    DIAB
 2              Can't tell you anymore
 3    specifically about it, I can't.
 4         Q.    Well, you contacted agencies
 5    and looked into accommodating deaf persons
 6    when Mr. Frilando asked you about joining
 7    the school?
 8         A.    Yes.
 9         Q.    So did you ever come across
10    something with the ADA in it while you were
11    looking at agencies or other --
12         A.    No.
13         Q.    No?
14         A.    No.
15         Q.    Are you aware generally, what
16    the ADA purpose is?
17         A.    Yes, to accommodate people with
18    disabilities.
19         Q.    You did not come across it at
20    all when you were reaching out to local and
21    Federal agencies after Mr. Frilando --
22         A.    Not once.
23         Q.    Not once?
24         A.    No.   In all my conversations
25    with Federal Motor Carrier, AAMVA, with the
```

```
 1                    DIAB
 2    States, with everybody that I have spoken
 3    to.  Not one person said anything about the
 4    National Association of the Deaf or the
 5    ADA.  It was never brought up.
 6          Q.    Because the National
 7    Association of the Deaf and ADA were never
 8    brought up after speaking to AAMVA and
 9    Federal Motor Carrier, was that speaking to
10    them the extent of your research, then you
11    just got back to Mr. Frilando?
12                MR. HALLER:  Objection to the
13          form of the question.
14          A.    I don't understand that
15    question.  You will have to --
16                MR. HALLER:  He has described
17          in his deposition the circumstances
18          that were done which included
19          contacting outside agencies and he
20          described international extensive
21          analysis.  So I think that is an
22          unfair question.
23                MR. NADLER:  Which question?
24                MR. HALLER:  The one that you
25          just asked.  It is as if he only did
```

```
 1                      DIAB
 2         something.
 3              MR. NADLER:  That is what I am
 4         trying to get at.
 5              MR. HALLER:  He already
 6         testified at length --
 7              MR. NADLER:  I just want to be
 8         clear --
 9              MR. HALLER:  -- the things that
10         were done.
11              MR. NADLER:  I just want to be
12         clear exactly what guidance he sought
13         from where and that is what I am
14         getting at.
15         Q.    So I was just trying to clarify
16    that what agencies you spoke to and what
17    agencies you didn't speak to?
18         A.    I explained, I thought on
19    several occasions, what agencies that I
20    spoke to.  Federal Motor Carrier, AAMVA, I
21    spoke to the State of New Jersey,
22    Pennsylvania, the State of New York.  Those
23    were the agencies that I spoke to.
24         Q.    Okay.
25              MR. NADLER:  I am presenting
```

```
 1                        DIAB
 2              Exhibit document Bate stamped BDTS
 3              0102 and 0103 as one exhibit.  I
 4              believe we are up to Exhibit 9.
 5              Let's have this marked as Exhibit 9.
 6                   (Whereupon, the aforementioned
 7              document Bate stamped BDTS 0102 and
 8              0103 was marked as Plaintiff(s)'
 9              Exhibit 9 for identification as of
10              this date by the Reporter.)
11              Q.     Let me snow when you have
12       looked it over.  I will only be asking
13       questions from BDTS 0102.  0103 is cut-off.
14              A.     Okay.
15              Q.     Have you seen this e-mail
16       before?
17              A.     Yes.
18              Q.     How have you seen this?
19              A.     First it was sent to me by Dale
20       and then I responded by saying if you read
21       the attached letters, both of them had to
22       do with the two year wait, the way they
23       were written, someone that had a CDL and
24       neither considered or indicated that the
25       recipient of the letter could be trained.
```

```
1                          DIAB
2          Q.    What I am confused about that I
3    would like to backtrack, first of all, what
4    two letters are referred in this e-mail?
5          A.    There were two letters that
6    Dale had sent to me that Mr. Frilando's
7    brother had forwarded to us once they had
8    the two year wait.  So these letters were
9    regarding -- they were not actually the
10   letters, they were actually the waiver and
11   whatever came along.  There was a waiver
12   itself and what came along with the waiver.
13         Q.    Where did you come to the
14   conclusion that the letters addressed
15   somebody who already had a CDL?
16         A.    That was my conclusion.  I drew
17   that conclusion.
18         Q.    If you can elaborate, why did
19   you come to that conclusion?
20         A.    Because there was nothing in
21   there that gave any indication that letters
22   allowed somebody to go through training.
23   Because training had never been given any
24   consideration and my concern was how to
25   properly train someone.
```

```
 1                        DIAB
 2         Q.    So I don't want to misstate
 3    your testimony.  I just want to clarify
 4    that because the exemptions never addressed
 5    the actual training process, the letters
 6    that Mr. Frilando produced only could have
 7    been regarding somebody who had a CDL, not
 8    somebody who was seeking a CDL?
 9         A.    We had been told by the Federal
10    Motor Carrier at the outset in 2014 that
11    these waivers were first given assuming
12    that somebody had a license and lost their
13    hearing.  And that with a waiver, they
14    could continue to drive.  My comment here
15    basically refers to that by saying hi,
16    look, this is what this is saying.  It is
17    saying -- at least my interpretation is --
18    if they have a license and they lost their
19    hearing, then they can continue to drive
20    because they have this waiver.  There is
21    nothing that addresses the training
22    program.  And my focus was on training, not
23    anything after.  It is not my issue.  My
24    issue is get them trained, get them tested.
25         Q.    So this was just based on your
```

```
 1                      DIAB
 2    intuition?  You did not contact anyone else
 3    to double check this?
 4         A.     That's correct.
 5              MR. HALLER:  I have a belated
 6         objection to the form of that
 7         question.
 8              The one intuition I think
 9         doesn't fairly describe what he said,
10         but he said he read the letters.  So
11         he is reading the letter for
12         interpretation.
13              MR. NADLER:  Off the record.
14              (Whereupon, an off-the-record
15         discussion was held.)
16              MR. NADLER:  Back on the
17         record.
18              Let's have this marked as
19         Plaintiff's Exhibit 10 for
20         identification.
21              (Whereupon, the aforementioned
22         document Bate stamped BDTS 0109 0110
23         and 0111 was marked as Plaintiff(s)'
24         Exhibit 10 for identification as of
25         this date by the Reporter.)
```

```
 1                    DIAB
 2            MR. NADLER:   I have presented
 3         to the witness and opposing counsel a
 4         document Bate stamped BDTS 0109 0110
 5         and 0111.
 6         Q.    Have you seen this before?
 7         A.    I don't have those numbers.  I
 8    want to make sure that --
 9         Q.    They would be on top, on the
10    top right?
11         A.    Sorry.  Yes.
12         Q.    Okay.
13         A.    Yes, I have seen this.
14         Q.    When?
15         A.    I've seen it recently is when I
16    went through it with my attorneys and I saw
17    it in March, on the 17th, when I got this
18    from Dale.
19         Q.    There is only you're John Diab
20    and your son is John Diab, there isn't a
21    third one?
22         A.    No.  That is my two e-mails.
23    He has an e-mail and I have two.
24         Q.    Okay.
25               It says here category, what
```

```
 1                    DIAB
 2   does that mean?
 3        A.    I believe that was Dale's way
 4   of saying it was of high importance.
 5        Q.    Okay.
 6        A.    It is not something that we
 7   utilize in the company.
 8        Q.    It doesn't have a specific
 9   designation where you get certain requests?
10        A.    Not at all.
11        Q.    Why do you think Mr. Wessendorf
12   put it as high priority?
13        A.    I'm really not sure that that
14   is what it meant.  I am assuming that that
15   is what it meant, that it was a high
16   priority.  It could have meant something
17   entirely different.  I have not seen it
18   before, anything that was addressed in a
19   different color or category.  And actually
20   somebody told me that.  I am not extremely
21   computer literate, but on Microsoft or Word
22   or something, you can tag it with a color
23   and give it varying degrees of priority.
24             To answer your question, why
25   would I think that that is what it is
```

```
1                        DIAB
2    because Dale thought this was an important
3    issue that we needed to address to try and
4    be able to accommodate Mr. Frilando.
5         Q.    Okay.
6              I have a question about the
7    bottom of the page on BDTS 0109 and that is
8    an e-mail from Joseph Frilando to Mr.
9    Wessendorf sent Tuesday, March 17th.
10        A.    Okay.
11        Q.    When Mr. Frilando contacted the
12   school, Bordentown, he stated that he was
13   deaf; is that correct?
14        A.    Mr. Frilando's brother.
15        Q.    Mr. Frilando's brother?
16        A.    His brother stated that he was
17   deaf.
18        Q.    Why did you ask Mr. Frilando to
19   provide waivers if your school was not
20   equipped to handle a deaf student in its
21   CDL program?
22        A.    We asked him for the waiver
23   first to see that there was in fact a
24   waiver.  Second, the determination had not
25   been made at that point that we could not
```

1                    DIAB

2    handle it.  It was made after we did all

3    our research and determined that if we

4    could not handle it.  It was made -- the

5    determination was made having spoken to the

6    States who said they would not test.  All

7    of which happened after the initial

8    contact, more towards the end of March than

9    the middle of March.

10          Q.    You personally have, correct me

11   if I am wrong, testified earlier that it is

12   unsafe for a deaf person to get trained in

13   a CDL program; is that correct?

14          A.    Under the current conditions

15   without any assistance from the Federal

16   government on how to do it, and without any

17   knowledge of how the test or what the test

18   is that would tell you that, yes, I believe

19   that it is totally unsafe and unsafe or

20   not, you still cannot get him to the test.

21   So that is our current position and that is

22   what we said to Mr. Frilando.  We said we

23   would like to continue this but he kept

24   pressing.  He wanted an answer in a week

25   and a half.  But if those things were to

```
 1                    DIAB
 2     change and we get guidance and somebody
 3     says here is what the test is, then we have
 4     something to work with.
 5          Q.     What specific guidance are you
 6     looking for?
 7          A.     First I would like the Federal
 8     Motor Carrier to say to us, this is how you
 9     do it.  With all our expertise, this is how
10     you would train them, okay, these are the
11     regulations that you will not violate
12     because we have now gone back and corrected
13     everything, and Mr. Diab, here is the test.
14          Q.     So if the Federal Motor Carrier
15     would say an interpreter would be allowed
16     to sit in the back seat while the student
17     and instructor are in the front taking a
18     road test, you would be fine with that and
19     allow a deaf student to enroll in your
20     school and CDL and go through the program?
21          A.     If the Federal Motor Carrier
22     says that, and that causes them to take
23     responsibility for the safety then, yes, I
24     would absolutely do that.
25          Q.     You mentioned that when Mr.
```

1                          DIAB

2     Frilando contacted your school, you had not

3     done research yet to see whether it can

4     accommodate him --

5                 MR. HALLER:   Objection to form.

6          Q.    -- is that correct?

7          A.    When Mr. Frilando -- repeat the

8     question.

9          Q.    When Mr. Frilando contacted

10    your school on behalf of his brother to see

11    if his brother could enroll in the school,

12    you did not yet have the determination yet

13    whether it was safe or not for him to be in

14    the program?

15         A.    We had not made a

16    predetermination, okay.  We needed to

17    continue to do the research that we had

18    done sometime before and I needed more

19    clarification and updates from the States

20    and the testing and from AAMVA.

21         Q.    Now, you have spoken with State

22    agencies, Federal agencies and AAMVA before

23    Mr. Frilando contacted your school; is that

24    correct?

25         A.    We did.

```
 1                    DIAB
 2        Q.    To see if a deaf person could
 3   be accommodated in a CDL program?
 4        A.    We did.  We did not talk to the
 5   State about the test.  We talked about
 6   AAMVA about the test.  We talk to the
 7   Federal Motor Carrier with regard to
 8   training of the deaf and violating and what
 9   have you.
10             We went through this whole
11   litany, even through the time where we put
12   the press on because Mr. Frilando's brother
13   was pressing us so hard to get him an
14   answer.  We still couldn't get answers.
15   And subsequently at a later date, I believe
16   it was in October, I went to Washington in
17   my capacity with the CVTA and met with half
18   a dozen people from the Federal Motor
19   Carrier.  It was as if they had not heard
20   anything that we said prior to that.
21             Now, some light switch went off
22   and they sat there and said, you're right,
23   we should have never done this, we didn't
24   think it through, it is an issue, we have
25   to do something about it, please from the
```

```
 1                     DIAB
 2    association standpoint, they asked the
 3    president who was with me at the
 4    association, full-time employee, please get
 5    us a letter, we need to look at this, we
 6    need to make some changes.  Talk to the
 7    Federal government.  I talked to them, and
 8    talked to them and talked to them and tried
 9    to get an answer was lying pulling teeth.
10              On the other side of that, we
11    he have Mr. Frilando's brother who is
12    calling every other day, get me an answer,
13    get me an answer, get me an answer.  So we
14    tried to be the best we could.  Our
15    position basically came down to at that
16    time and today as well, because nothing has
17    changed, we are still not qualified to
18    train this person safely nor do we know how
19    to train.  We don't know how to train.  We
20    do not know what to train him for.
21              If I took it upon myself to say
22    I am going to train with a signer, then I
23    go to the test and everybody, the Federal
24    Motor Carrier and AAMVA and the people in
25    the State all say you cannot use a signer,
```

```
 1                      DIAB
 2    well, what is the alternative, they do not
 3    have an alternative.
 4          Q.    Who doesn't have an
 5    alternative?
 6          A.    AAMVA, Federal Motor Carrier
 7    and the State.  Now I get to the test and I
 8    am there with a signer.  They go we are not
 9    going to see you.  You cannot use a signer.
10    That is the first thing that it says.  You
11    cannot use a signer.  He has to be able to
12    communicate verbally.  Now the meaningful
13    part of this, which is getting the person
14    his license, that meaningful part is gone,
15    because I could have trained him for six
16    months and I still cannot test him.
17          Q.    What I would like to know, you
18    were mentioning the signer.  Are you
19    talking about a foreign language
20    interpreter not being allowed?  What
21    exactly -- you were mentioning interpreter.
22          A.    The Federal Motor Carrier
23    policy is interpreters.  It included in
24    their description of an interpreter is a
25    signer.  They started with foreign language
```

1                    DIAB
2    interpreter, and then expanded that,
3    simultaneously, to signers.  I knew that
4    the regulations said no interpreter.  I
5    heard that it included no signers.  I
6    pursued that as far as I could, because I
7    wanted to know is it signers, is it not
8    signers and I was told emphatically, no
9    signers.
10        Q.    By who?
11        A.    Federal Motor Carrier, and
12   Larry Minor, in the same meeting with Chuck
13   Horan and the same meeting with Sharon
14   Watson.  I was told by Kevin Lewis from
15   AAMVA.
16             We were told.
17        Q.    Can we go back to your
18   conversation with Larry Minor.
19             Who is he?
20        A.    He is the assistant director of
21   the Federal Motor Carrier.  Assistant
22   something.  He is pretty high up there.
23        Q.    Has he ever sent you any
24   letters or e-mails or any documents at all
25   stating either that there is no guidance on

```
 1                    DIAB
 2    the regulations or schools who would not be
 3    able to comply?
 4          A.    No.  He has not, but I didn't
 5    go to my meeting alone.  There were other
 6    people at the meeting.  Then, as I said,
 7    shortly thereafter, he came to our
 8    conference and he said the exact same thing
 9    at our conference.  We have our own
10    attorneys for the association and they were
11    amazed that Larry Minor said we screwed up.
12    When asked what he was going to do about
13    it, he said he didn't know.
14          Q.    So Larry Minor's position is
15    that they created this regulation and they
16    completely regret it and don't know how to
17    handle it?
18          A.    I am not going to put words in
19    his mouth.  I am not going to tell you they
20    completely regret it, but they know it is
21    creating a problem.  They know it is a
22    problem to get people trained.  It may not
23    be a problem for a deaf person to drive, a
24    deaf person it's a custom to have been in
25    the truck and familiar with truck stops and
```

```
 1                     DIAB
 2    the road and the shifting and -- that is
 3    one thing, but he knows and has clearly
 4    said we did not take into consideration how
 5    these people were going to get trained.  He
 6    clearly said that.
 7               I don't have it in writing, but
 8    there were plenty of other people in the
 9    meeting with me and there was 150 people in
10    the conference that he said it to.  When
11    they asked him what he was going do about
12    it he said I don't know.  He said that it
13    is possible that we put limitations on it,
14    on the waiver.  He said it is possible that
15    we stop issuing waivers.  He said there is
16    -- he said potentially we might need to
17    have a meeting with the National
18    Association of the Deaf.  He said we now
19    recognize that there is a problem, we just
20    do not know what to do with it.
21          Q.    When Mr. Minor was speaking,
22    was he speaking on his behalf personally or
23    was he speaking on behalf of the Federal
24    Motor Carrier?
25          A.    On behalf of the Federal Motor
```

```
 1                    DIAB
 2   Carrier.
 3        Q.    The Federal Motor Carrier has
 4   made this admission --
 5        A.    Listen, he had five or six
 6   people in the room with us.  We met in
 7   their offices in D.C..  If it was in their
 8   offices in D.C. and he had five or six
 9   people in the room, I have to assume that
10   was not his behalf personally, it was on
11   behalf of the Federal Motor Carrier.
12   Subsequently he came out to our conference
13   and he speaks to our conference
14   representing the Federal Motor Carrier and
15   said the exact same things in public that
16   he had said to us in a private meeting.
17        Q.    How often does your conference
18   meet?
19        A.    Twice a year.
20        Q.    Who is a member of this
21   conference?
22        A.    Who is?
23        Q.    How do you become a member?
24        A.    You have to be a truck driving
25   school, you have to submit an application
```

```
 1                    DIAB
 2   and you have to meet certain criteria.
 3        Q.    When were the conferences held
 4   in 2015?
 5        A.    Last one was in October.  The
 6   one before that was in May.
 7        Q.    In the May of 2015 conference,
 8   did you ask any other truck drivers there
 9   if they have come across a deaf student
10   that wanted to drive, seeing how you just
11   got this request, not too long before and
12   thought maybe some other schools might have
13   gotten this request as well?
14        A.    This was -- it was brought to
15   my attention in my capacity as chairman
16   that other schools have been contacted by
17   the deaf.
18        Q.    Are you aware of what these
19   other schools' responses were?
20        A.    Yes.  Their response was very
21   similar to mine, which was this is not
22   safe.  I don't know how we are going to do
23   this.  I don't have any idea, no idea how
24   we are going to do this.  Most of the
25   schools are small schools, they are mom and
```

```
1                    DIAB
2    pop.  They do not have facilities or the
3    trucks or the staff or personnel.  There is
4    a lot of things that they do not have.
5    They do not have the wherewithal to have to
6    take on a fight and they just didn't know
7    what they were going to do.  Ultimately, to
8    the best of my knowledge, not one of them
9    started.  Not one of them started or
10   trained a deaf person, to my knowledge.
11        Q.    If you were made aware of other
12   schools, trucking schools, that have
13   trained deaf students in their CDL program,
14   would you be amendable towards adopting
15   your schools policies?
16        A.    I would only be amenable if the
17   Federal Motor Carrier tells us that we can
18   do it without violating any of the
19   regulations and there is a test out there
20   that is approved for the hard of hearing.
21   Then I would happily do it.
22             I would not do it, I would not
23   do it just because somebody out there said,
24   hey, I am going to train somebody at
25   whatever cost.
```

```
 1                    DIAB
 2          And mostly, I believe if
 3   somebody is doing it it's because they are
 4   afraid of potential litigation.  So they
 5   are going to take the chance and put this
 6   person on the road and it being unsafe.
 7          They don't even know how they
 8   are going to do it.  I mean, well, we are
 9   going to do it.  How are you going to do
10   it?  I don't have any idea.
11          Q.    If we were to provide you a
12   policy of what other schools have done who
13   have possibly put through one or even more
14   deaf students through its CDL program?
15          MR. HALLER:  Do not answer that
16      question.
17          Please leave the room.
18          THE WITNESS:  Okay.
19          (Whereupon, the witness has
20      left the deposition room.)
21          MR. NADLER:  Can we go off the
22      record?
23          MR. HALLER:  No.  I want this
24      on the record.
25          We have asked from the
```

```
 1                    DIAB
 2          beginning of this case for
 3          information related to any other
 4          schools, we have not received any.
 5          So I will not let him answer that
 6          question.  If you have something, it
 7          has to be produced.
 8              MR. NADLER:  It was produced at
 9          the last phone conference.
10              MR. HALLER:  Do you know
11          anything about -- we were given by
12          Andrew the name and some reference
13          from Google.
14              MR. NADLER:  Okay.
15              MR. HALLER:  We have
16          personally, not him, we have looked
17          into it.
18              MR. NADLER:  Okay.
19              MR. HALLER:  They have a
20          simulator.  All right, so you want to
21          ask him about simulators, you want to
22          know what the cost of a simulator,
23          that is fine.  But I don't want to
24          play this game.  I am really not
25          going to allow this witness to be put
```

```
 1                    DIAB
 2       in a position where you are sort of
 3       shocking him with surprise --
 4            MR. NADLER:  You were on notice
 5       of this at the last conference call.
 6       Did you look at the school and what
 7       they have done?
 8            MR. HALLER:  Yes.
 9            MR. NADLER:  Why are you saying
10       that -- did you share it?
11            MR. HALLER:  Do you have a
12       policy?  We do not have a policy.  We
13       have just done due diligence and --
14            MR. NADLER:  We did due
15       diligence by giving you a school that
16       accommodated not even one, but two
17       deaf students, soup to nuts that did
18       the CDL program --
19            MR. HALLER:  Which one?
20            MR. NADLER:  Amarillo Truck
21       Driving School in Texas.  It was
22       provided to you.  I can tell you
23       verbatim what the school does.  I can
24       give you contact people from the
25       school.  I can give you the names of
```

174

```
 1                    DIAB
 2          the students who have gone through
 3          this program and exactly what they
 4          get, close captioning for their
 5          classes and in classroom on the
 6          video, their textbooks have been
 7          highlighted, they had interpreter
 8          with them on the road.
 9              MR. HALLER:  So bear with me.
10          We have been asked for this
11          information from probably the first
12          conversation that I had with Andrew
13          when he brought this up in the
14          initial conference with the
15          Magistrate.
16              MR. NADLER:  Yes.
17              MR. HALLER:  We have been given
18          by you names of three schools, that
19          is what we have today.
20              MR. NADLER:  Yes.
21              MR. HALLER:  The school in
22          Colorado, as I represented to the
23          Magistrate when we had the conference
24          in November, is closed.  The school
25          in Amarillo, the first one, is a
```

```
 1                    DIAB
 2           school that is, first of all, only
 3           available to students in Texas, it is
 4           done in collaboration with a school
 5           for hearing for the deaf and they
 6           have refused directly to give us any
 7           information about what they do and
 8           how they do it and if you have that
 9           information it should have been
10           produced two months ago and I am not
11           going to let you --
12                MR. NADLER:  It was produced at
13           the conference.
14                MR. HALLER:  No.  You are on
15           notice of the Amarillo Truck Driving
16           School, I am not.  Amarillo, that is
17           the latest one --
18                MR. NADLER:  Yes.
19                MR. HALLER:  -- that would we
20           didn't --
21                MR. NADLER:  With the
22           stimulator.
23                MR. HALLER:  That we have done
24           and they have a stimulator.
25                MR. NADLER:  Okay.
```

```
 1                    DIAB
 2            MR. HALLER:  If you want to ask
 3       him questions about if you have a
 4       simulator, do you think you can do
 5       it, I have no objection to that.  If
 6       that is all you are saying, but if
 7       you have something else --
 8            MR. NADLER:  I am not being
 9       difficulty.  I just want to come to
10       an agreeable solution.
11            What my question is is, if
12       there is a school that is effectively
13       doing things to train a deaf student,
14       would he be amendable to saying, oh,
15       look, they do this at other schools,
16       they have closed caption, this is
17       what they do, I will learn from that,
18       maybe we can do it, it wouldn't cost
19       us a lot of money, it is easier than
20       I thought.
21            Why is that objectionable to
22       ask him if he would see other schools
23       doing that --
24            MR. HALLER:  Because you
25       prefaced your question with, if I was
```

```
 1              DIAB
 2      to show you the policy, right, if I
 3      was to show you the policy of these
 4      other schools, which inferred, and
 5      you have now on the record you have
 6      confirmed my concern as suspicion
 7      that you are sitting on information
 8      that you have not produced.
 9          MR. NADLER:  It was produced.
10      You just said it yourself with the
11      stimulator.  Amarillo school.  You
12      just said that.
13          MR. HALLER:  You have given us
14      a name.
15          MR. NADLER:  I gave you a
16      school.
17          MR. HALLER:  You gave us a name
18      of a school.
19          MR. NADLER:  Right.
20          MR. HALLER:  Apparently, you
21      have information related to the
22      contents of the programs, which we
23      have been asking for since day one.
24          MR. NADLER:  I gave you the
25      school and what they do.  Whatever
```

```
 1                    DIAB
 2        else, you can ask Andrew it, because
 3        he was on the phone calling you.
 4            I can only ask based on what I
 5        gave Andrew which was then produced.
 6        I don't have a magic book in front of
 7        me that says deaf driving 101 --
 8            MR. HALLER:  We will show you
 9        what we got.  We have hyperlinks to
10        their website.
11            MR. NADLER:  Did you call the
12        school?  Did you -- once you got the
13        hyperlinks what did you do?
14            MR. HALLER:  Here is the
15        problem.  You think that we lawyers
16        can call a school when they don't
17        know us and they are going to open up
18        and give us all their information.
19        If you have the information --
20            MR. NADLER:  I only have what
21        you have.  I don't have anything
22        else.
23            MR. HALLER:  What we know is
24        that that school has a simulator and
25        that is what they use.
```

```
 1                    DIAB
 2          MR. NADLER:  But they trained
 3     students to go through the program
 4     who now become successful truckers so
 5     what does it matter if the simulator
 6     is something else.  They have gone
 7     through the program, they've become
 8     successful truck drivers.  They have
 9     taken the test and are able to go on
10     the road.
11          MR. HALLER:  Because when Mr.
12     Frilando presents himself to
13     Bordentown, they do not have a
14     simulator and there is nothing in the
15     law that says you guys have to go and
16     spend -- and I don't know how much it
17     is, but it is a lot of money -- to go
18     and buy a simulator.  That is not our
19     program.  So I want to be sure --
20          MR. NADLER:  I have nothing I
21     am going to spring on you.  You were
22     provided with the name of that
23     school.
24          MR. HALLER:  Right.
25          MR. NADLER:  That is what I
```

```
 1                    DIAB
 2        have, that is what I provided to you.
 3             MR. HALLER:  Instead of us
 4        playing hide and seek, let's be up
 5        front.  If you are going to talk
 6        about the school you can ask him
 7        about simulator.  They do not do it
 8        without simulator.  If you do not
 9        have a simulator, everything else is
10        sort of irrelevant, so.
11             MR. NADLER:  Off the record.
12             (Whereupon, an off-the-record
13        discussion was held.)
14             MR. NADLER:  Back on the
15        record.
16             I would like to clarify back on
17        the record the witness left the room
18        and I am speaking with opposing
19        counsel.
20             What was produced before this
21        deposition that you got at the last
22        phone call, the Court conference, was
23        a link to a school, the Amarillo
24        Driving School in Texas.  That is
25        what we have, that is what we sent
```

```
 1                    DIAB
 2      you.  I have no written policies from
 3      the school, I have no paper documents
 4      from the school, I have no e-mails
 5      from the school.  I don't have any
 6      policy I plan on bringing out as a
 7      surprise.  That was a hypothetical if
 8      I had one in my possession.  So I
 9      would like this on the record --
10          MR. HALLER:  That is fine.  I
11      except that.
12          MR. NADLER:  Just to clear the
13      air.
14          MR. HALLER:  I will except
15      that.  That is fine.  Thank you.
16          MR. NADLER:  Off the record.
17          (Whereupon, an off-the-record
18      discussion was held.)
19          MR. NADLER:  Back on the
20      record.
21          Can we have BDTS 0163 and 0164
22      be marked as Plaintiff's Exhibit 11.
23          (Whereupon, the aforementioned
24      document Bate stamped BDTS 0163 and
25      0164 was marked as Plaintiff(s)'
```

```
 1                        DIAB
 2           Exhibit 11 for identification as of
 3               this date by the Reporter.)
 4           Q.    Take a look at this and let me
 5    know when are you finished.
 6           A.    Okay.
 7           Q.    Have you seen this document
 8    before?
 9           A.    I have.
10           Q.    Where have you seen this?
11           A.    I have seen it some time ago in
12    my office because we pulled it off of the
13    Federal register.  It was in our position
14    to a hearing impaired waiver and I have
15    recently reviewed it with my attorneys.
16           Q.    So these were comments
17    submitted when the waiver went into place
18    by a -- the Montana Motor Vehicle Division,
19    Christine Thatcher, Driver License Bureau
20    Chief.
21                 Was this something that you
22    looked at when you were trying to seek
23    guidance on how to accommodate Mr. Frilando
24    that you found online?
25           A.    No.  It is not online it is on
```

```
 1                        DIAB
 2    the Federal register.  So every time it
 3    creates a waiver of any sort requested they
 4    request comments from everyone, anyone that
 5    wants to comment.  This comment was posted
 6    on the Federal register in it appears 2013.
 7    We have seen this in 2014.  Because the
 8    Federal Motor Carrier has periodically
 9    released hearing exemptions or requests for
10    hearing exemptions.  It happened probably
11    three times, to my knowledge.  So on one of
12    the occasions, these were posted.
13         Q.    I would like to draw your
14    attention, under the heading testing at the
15    bottom of the page, about three lines down,
16    the sentence that begins one or two word
17    instructions?
18         A.    Yes.
19         Q.    According to this paragraph, it
20    says, one or two word instructions are
21    placed on a flashcard as positioned for the
22    driver to be with minimal distraction or a
23    threat to safety.  The adjustment does not
24    apply to a driver testing in a CMV, which I
25    assume stands for commercial motor vehicle?
```

```
 1                    DIAB
 2        A.    Yes.
 3        Q.    Can you explain what this
 4   comment, this part of the comment he is
 5   trying to say?
 6        A.    As I read it, it says that it
 7   works with a flashcard in a car, but does
 8   not work in a truck.
 9        Q.    Why would it not work in a
10   truck?
11        A.    As it says here, you are in a
12   closer proximity to each other.  A lot of
13   times in a car when you are testing in the
14   car, you have dual steering wheels and dual
15   brakes.  Those are not in a truck.  The
16   truck's braking distance is far greater
17   than a car.  And reaction time has to be
18   quicker.  There is a greater distance
19   between the driver and the examiner, as far
20   as the seats are concerned.
21              It is just -- there are a
22   number of issues.  I mean, those are the
23   highlights.
24        Q.    I would like to draw your
25   attention to the last sentence under the
```

```
 1                      DIAB
 2    testing paragraph.  It starts, the CMV road
 3    test standard will be fundamentally
 4    compromised.  Again, this does not support
 5    the premise of the exemption's wording, "as
 6    safe or safer".
 7         A.    Okay.
 8         Q.    Can you explain that?
 9         A.    I believe that in the
10    exemptions, waivers that were given out by
11    the Federal Motor Carrier for the hearing
12    impaired there is a caption in there that
13    says the Federal Motor Carrier has found
14    the hearing impaired person to be safe or
15    safer than the average driver.  This
16    contradicts that.
17         Q.    So the Federal Motor Carrier
18    has stated that a deaf or hard of hearing
19    driver is as safe or safer as a hearing
20    driver; is that correct?
21         A.    That is what they said on the
22    waiver.  They have no statistical or
23    scientific information to back that up.
24         Q.    How do you know they have no
25    statistical or scientific data --
```

```
 1                      DIAB
 2        A.    We asked them.  They have been
 3    asked for the information.  They do not
 4    have it.  When I say we, the associations.
 5    The association CTA, ATA, Montana.  They
 6    just do not have the statistical
 7    information.
 8              MR. NADLER:  I am presenting
 9              document Bate stamped BDTS 0155 to
10              0162.
11              Please mark this Plaintiff's
12              Exhibit 12.
13              (Whereupon, the aforementioned
14              document Bate stamped BDTS 0155 to
15              0162 was marked as Plaintiff(s)'
16              Exhibit 12 for identification as of
17              this date by the Reporter.)
18        Q.    Take a look at this document
19    and let me know when you are finished.
20        A.    Okay.
21        Q.    Have you seen this document
22    before?
23        A.    I have.
24        Q.    When have you seen it?
25        A.    I saw it on October 21st and I
```

```
 1                         DIAB
 2      I also saw it as it was being prepared for
 3      CVTA to post to the Federal register on
 4      comments for hearing impaired exemptions.
 5      It was also I believe sent in letter form
 6      to the Federal Motor Carrier, because they
 7      requested that a letter be sent so that
 8      they could reconsider the hearing waivers.
 9           Q.    Does Bordentown driving school
10      take the position put forth in this
11      document and agree with the comments
12      submitted by Don Lafez (p.s.), president
13      and CEO of CVTA?
14           A.    I have scanned through it and I
15      cannot tell you that word for word and line
16      for line that we do or do not.  I think
17      conceptionally we agree, but I can't tell
18      you specifically item by item that we do
19      unless I sit here and really read through
20      the whole thing.
21           Q.    Are there any provisions with
22      CVTA takes regarding the safety of a deaf
23      or hard of hearing person to drive a truck
24      that the Bordentown school differs on?
25           A.    I don't believe so.  I believe
```

```
 1                         DIAB
 2    the premises is that it is unsafe.  They
 3    may have some different reasons.  They may
 4    have used some different terminology, but
 5    the basic premises is that it is unsafe.
 6         Q.    I would like to go to the last
 7    page, Page 8, Bate stamped BDTS 0162.
 8         A.    Okay.
 9         Q.    I would like to draw your
10    attention to the second paragraph that
11    starts as noted above.  And it goes about
12    five lines, six lines down and it ends by
13    foot note 22 near the word crash.
14         A.    Okay.
15         Q.    Are you aware of the evidence,
16    the 2008 evidence report that is cited here
17    that was a part of Federal Motor Carrier
18    decisions to grant hearing exemptions?
19         A.    I am vaguely familiar with it.
20    I'm also familiar with the same time there
21    was, if I can find it -- I believe it is on
22    BDTS 0158.  The last paragraph.
23         Q.    The paragraph starting with
24    such concerns?
25         A.    A member of the Federal Motor
```

```
 1                    DIAB
 2    Carrier --
 3         Q.     Are you reading the language
 4    here?
 5         A.     Yes.  There is a Federal Motor
 6    Carrier representative that specifically
 7    stated --
 8         Q.     Where are you reading from?
 9         A.     This paragraph, it starts with
10    such concerns, go down three lines.
11         Q.     Okay.
12         A.     It says, use of interpreters
13    during skills testing pose a serious safety
14    hazard to the driver, examiner, CMV and
15    general public on the highway.  That was
16    one of their own people that said that.
17         Q.     Right, but that is not related
18    to the question I am asking.  That is just
19    a quote from this report, but I am asking
20    ask you something else.  I am asking you
21    whether you have read this 2008 evidence
22    report --
23         A.     I did not read the entire
24    report.
25         Q.     Have you read some of it?
```

1                           DIAB

2          A.    I have read pretty much what

3     you have here.

4          Q.    You mean as in these eight

5     pages?

6          A.    Yes.

7          Q.    I am just -- to clarify I am

8     talking about the 2008 evidence report that

9     the Federal Motor Carrier use to make their

10    determination to grant the waiver.  The

11    report is not here.  This is just --

12         A.    Which basically concludes that

13    this goes back to if you drive a car and if

14    you are a safe driver in a car then you are

15    a safe driver in a truck.  That is what

16    they are saying.

17         Q.    This report, the 2008 evidence

18    report, included research on the safety of

19    deaf and hard of hearing drivers; is that

20    correct?

21         A.    Yes, it does.

22         Q.    And the report, as a direct

23    quote, observed that -- quotation start --

24    "neither study found evidence to support

25    the contention that individuals with

```
 1                    DIAB
 2    hearing impairment are at an increased risk
 3    for a crash", close quote.
 4               MR. HALLER:  I will object to
 5          the form of the question, because you
 6          missed out the initial clause that
 7          governs the sentence.
 8               MR. NADLER:  I am just quoting
 9          from the 2008 report not cushioned by
10          the filter that Don Lafez put in
11          regarding this memo about the report,
12          because that is Don Lafez's position,
13          I am quoting from the 2008 evidence
14          report executive summary.
15               MR. HALLER:  It's related to
16          private driver research.
17               MR. NADLER:  Okay.  I will
18          rephrase the question.  I am still
19          going to use the exact quote.
20          Q.    The sentence in this is not
21    from the 2008 evidence report, this is part
22    of the comment in Exhibit 12 submitted by
23    Don Lafez, president and CEO of CVTA.  Mr.
24    Lafez say, citing this private driver
25    research, the report observes that neither
```

1                          DIAB
2    study found evidence to support the
3    contention that individuals with hearing
4    impairment are at an increased risk for a
5    crash.  The actual 2008 evidence report
6    executive summary at three says that
7    neither study found evidence to support the
8    contention that individuals with hearing
9    impairment are at an increased risk for a
10   crash.
11             What the 2008 report is saying
12   is that individuals who are deaf or hard of
13   hearing were not at increased risk to get
14   into fatalities.
15             MR. HALLER:  I will object to
16        the form.
17             I don't know if there is a
18        question there.
19        Q.    The question that I am getting
20   at is -- my question would be, what would
21   be your answer to the 2008 study?
22        A.    It is really quite simple.  The
23   2008 study does not address how to train an
24   individual.  How to train an individual.
25   Our concern is how do we train them and how

```
 1                        DIAB
 2    do we get them to pass the test.  This is
 3    not addressing either of those two
 4    questions.  I don't understand that, I
 5    don't know of any hearing impaired drivers,
 6    I don't know where they got this private
 7    study, I don't know where they got their
 8    information.  My concern is how do I train
 9    them and how do I test them.
10         Q.     You testified before, correct
11    me if I am wrong, that you did not read the
12    2008 study in its entirety; is that
13    correct?
14         A.     I did not.
15         Q.     Now you are testifying that you
16    know what the report is about or what the
17    Federal Motor Carrier assertions were when
18    they put the evidence report forward.  I am
19    confused.
20         A.     It's been a discussion that I
21    have had with various people in the
22    industry.  That is where I am getting my
23    information from.
24              This report, I have been told,
25    does not address training or testing.  It
```

194

```
1                    DIAB
2   addresses someone driving a vehicle, but
3   not training and testing.  Two separate
4   issues.
5        Q.    My question is why don't you
6   just read the report, do you plan on
7   reading the report?
8        A.    If it doesn't address testing
9   and it doesn't address training, then I
10  have no reason to read the report.
11       Q.    Because you believe it doesn't
12  address driving or training, you believe
13  that you should not -- I am just trying to
14  be --
15            MR. HALLER:  You said driving
16        or training.  He said testing or
17        training.
18            MR. NADLER:  I will rephrase
19        that.
20       Q.    Because you believe the report
21  does not involve testing or training, you
22  do not need to read it?
23       A.    My business is testing, my
24  business is training and my business is
25  getting people tested.  I am sure there is
```

```
1                        DIAB
2    a hundred reports out there that if they do
3    not address how to safely train and then
4    how to get someone tested, why am I reading
5    the report?
6         Q.    You mentioned there might be
7    hundreds of reports out there, but my
8    question is, are you only going by what
9    other people have told you these reports
10   contain?  And is that your stance on why
11   you wouldn't read the report?  I don't
12   understand -- I don't understand -- I am
13   trying to clarify, is that your position
14   because other people have told you that is
15   what this report is about and you just do
16   not feel like you need to read it?
17        A.    No.  I don't feel that there is
18   a need to read it because it doesn't
19   include anything regarding testing and
20   training.
21        Q.    So any report that you would
22   read that would involve research or medical
23   testimony or expert opinion about whether
24   deaf people can safely drive a truck, you
25   would only read if the report also
```

1                    DIAB

2    contained how to safely train that person?

3         A.    I would probably limit it to

4    training and testing.  The other factors to

5    us are not relevant, because unless

6    somebody can tell us how to train, somebody

7    can tell us how to test, it doesn't matter

8    how they drive on the road.  If they can

9    get that far and how they drive on the road

10   has no bearing on how we would train them

11   and how we would get them tested.

12        Q.    Are there any commercial trucks

13   that don't use air brakes?

14        A.    You are going to have a pickup

15   truck, that is a commercial truck.  You can

16   -- there are variations of commercial

17   trucks, but you can, in fact, have trucks

18   that do not have air brakes, yes.

19        Q.    When a student graduates your

20   school and they get placed, are they only

21   taught how to drive trucks that have air

22   brakes?

23        A.    If you want a CDL, it has air

24   brakes.

25        Q.    Every truck will have air

1                         DIAB
2     brakes?
3          A.     We do not have a truck without
4     air brakes.  You can find -- you can go to
5     Hertz and you can rent a box truck, 16 foot
6     box truck, that would have an automatic
7     transmission and no air brakes.  It would
8     have hydraulic brakes and for that, you did
9     not need a CDL, but can you drive that
10    truck.  Anybody can drive that truck.
11         Q.     Do you think it is unsafe for a
12    deaf person to drive a truck that does not
13    have air brakes?
14                Can I rephrase that?
15                For example, if there is a
16    truck that does not have air brakes, would
17    you think it is a safety issue for a deaf
18    person to drive that truck?
19         A.     I think you can still have many
20    of the same safety issues.  However, it
21    does diminish some of the problems and some
22    of the possibilities.
23         Q.     I asked that because on Page 8
24    of the Exhibit 12, if you go to the top
25    paragraph, those four lines, starting from

```
 1                    DIAB
 2    the second line more toward the right, CVTA
 3    believes that the hearing exemptions should
 4    be limited to hearing impaired individuals
 5    seeking only to operate non-air brake
 6    vehicles.
 7            Do you agree with that?
 8        A.    I do.
 9        Q.    Why do you agree with that?
10        A.    Because if a waiver is going to
11    be issued for somebody to drive a truck
12    that limits the size of the truck, it
13    limits the exposure to the air brakes and
14    reduces the number of possibilities for
15    catastrophic accidents.
16        Q.    Whether you agree or disagree
17    with the conclusion Federal Motor Carrier
18    came to to grant the exemption, can you
19    agree that before they made the exemptions
20    they did do research?
21        A.    They did no research, to the
22    best of my knowledge, they did no research.
23    They -- their research was limited for
24    training purposes.  They never considered
25    training.  Whatever other research they
```

```
 1                    DIAB
 2   may have done was irrelevant to us and they
 3   have said it because they never took into
 4   consideration the training and how to get
 5   the person through the test.
 6        Q.    The question wasn't whether you
 7   believe they did good research or bad
 8   research or could have done more, I want to
 9   see if we can agree they did research.
10        A.    They may have done research,
11   but they didn't follow their own procedures
12   and protocol.  They did not follow it.
13              The way that the Federal Motor
14   Carrier historically has given waivers is
15   on an individual basis.  They just recently
16   got -- not just with hearing, there are
17   others.  They want to give people that have
18   epileptic seizures the right to drive
19   trucks.  People that have narcolepsy.
20              The Federal Motor Carrier has a
21   problem with sleep apnea, but it is okay to
22   give someone a license that has narcolepsy.
23              Just in general, they have gone
24   to this let's give ten or twelve at a time.
25   Historically the way they have done it is
```

```
 1                    DIAB
 2    that an individual applies for a waiver.
 3    Then someone from the Federal Motor
 4    Carrier, an agent from the Federal Motor
 5    Carrier, comes out and meets with that
 6    person and makes a determination whether
 7    that person, in their opinion, is capable
 8    or incapable of going on and getting a
 9    license.
10              Federal Motor Carrier did not
11    do that in this case.  They just
12    arbitrarily decided that they were going to
13    give these waivers.
14              To answer your question, did
15    they do research, yes.  Did they have
16    scientific research as it relates to truck
17    drivers, I don't believe that I have ever
18    seen any.
19         Q.    Can you repeat the last
20    sentence that you said?
21         A.    As it relates to truck drivers.
22         Q.    Earlier today we talked about
23    going through medical testing in order to
24    be admitted into the Bordentown Driving
25    Training School there has to be a medical
```

1                        DIAB

2      exam and they look at certain factors, your

3      hearing, vision.  You mentioned sleep

4      apnea.

5          A.      Um-hum.

6          Q.      Would your school enroll a

7      student who has sleep apnea?

8          A.      Only if he has been approved

9      and gone through the process of the medical

10     examiner.

11         Q.      So if the medical examiner has

12     said this person has sleep apnea but they

13     are still safe to drive, then you --

14         A.      They have to go through a whole

15     process.  In other words, if they go to a

16     medical examiner and the medical examiner

17     says, did you ever have sleep apnea, do you

18     have problems with sleep apnea, what are

19     the cases, and the individual acknowledges

20     that he does or for some reason the medical

21     examiner thinks he does, then the medical

22     examiner will not approve that person.

23              He will send that person out

24     for testing on the individual.  It is on

25     the person's time, they have to go and they

```
 1                    DIAB
 2    have to go to a sleep apnea clinic and go
 3    through the entire process of a sleep apnea
 4    diagnosis and conclusion and wear the sleep
 5    apnea machine and do all that.  Then come
 6    back to the medical examiner, okay, with a
 7    statement from, and a diagnosis from the
 8    sleep apnea clinic, that says these people
 9    can go ahead and they can, for a limited
10    time, they can get a CDL.
11              There is a whole step by step
12    process that you go through.  They
13    initially start out by granting them a
14    month and then it goes to three months and
15    then it goes beyond that.
16              They can only be issued a one
17    year medical certificate and they have to
18    go back and be retested every year rather
19    than every two years.
20              MR. NADLER:  I would like to
21         mark Plaintiff's Exhibit 13, Bate
22         stamped BDTS 0136 through 0154
23         entitled, Smith and Solomon
24         Commercial Driver Training Private
25         Enrollment Procedure, date revised
```

```
 1                    DIAB
 2        5/13/2015.
 3             (Whereupon, the aforementioned
 4        document Bate stamped BDTS 0136
 5        through 0154 was marked as
 6        Plaintiff(s)' Exhibit 13 for
 7        identification as of this date by the
 8        Reporter.)
 9        Q.    Take a look at this and let me
10   know when you have read it.
11        A.    Okay.
12        Q.    Have you seen this document
13   before today?
14        A.    Yes, I have.
15        Q.    When have you seen it?
16        A.    Recently -- I mean altogether
17   with my attorneys, but prior to that, I
18   have seen these documents through the years
19   to admit students.
20        Q.    When a student becomes
21   admitted, is this the packet of documents
22   that he is given?
23        A.    Yes.
24        Q.    It says that it was date
25   revised 5/13/15?
```

```
 1                    DIAB
 2        A.    Right.
 3        Q.    Do you remember what revisions
 4   were made?
 5        A.    I don't.
 6        Q.    Would you be able to locate a
 7   copy of this before 5/13/15?
 8        A.    I believe so.
 9        Q.    I would like to go to
10   BDTS 0138.
11        A.    Okay.
12        Q.    On the top under the heading
13   admission --
14        A.    Yes.
15        Q.    -- I am just curious.  It
16   starts, student at Smith and Solomon
17   Commercial Driving Training are admitted
18   without regard to race, color, creed, sex,
19   age or national origin.
20        A.    Yes.
21             MR. NADLER:  I would just like
22        to note for the record that Smith and
23        Solomon Commercial Driving Training
24        referred here is Bordentown, for our
25        purposes.
```

```
 1                    DIAB
 2        Q.    I am curious why disability is
 3   not mentioned as one of the categories?
 4        A.    Because we do not have control
 5   over the disability, the Federal Motor
 6   Carrier does.  They dictate what we can do
 7   and what we cannot.  We cannot take someone
 8   that is missing a limb.  We cannot take
 9   someone that can not hear if they do not
10   have a waiver.  We cannot put that into our
11   documents and then have someone say --
12   comes in saying your document saying you
13   can take it.  We can't do that.  We are
14   limited and restricted by the Federal Motor
15   Carrier.
16        Q.    My question is, the statement
17   doesn't say we will automatically admit
18   students without regard to race, color
19   creed, sex, age and national origin.  It is
20   not saying disability is there, you will
21   automatically have to take them.  I am just
22   wondering why it is not listed as something
23   that you would put in there as part of the
24   admission that you -- I was just wondering
25   why it was not listed categorically as
```

```
 1                    DIAB
 2  something that you would not pay notice to?
 3            MR. HALLER:  He answered that
 4       question.  There isn't another
 5       answer.  The regulations are
 6       requiring you not to consider certain
 7       people with certain disabilities.  He
 8       said that.
 9       Q.    You have taken deaf students to
10  your forklift driving program?
11            MR. HALLER:  Yes, because he
12       said he does that on a case by case
13       basis.  He is limited as all carriers
14       are.  I am not testifying.  He's
15       given his answer.
16            MR. NADLER:  Okay.  You made
17       your objection.
18            MR. HALLER:  Are you arguing?
19            MR. NADLER:  You made your
20       objection.
21       Q.    When this was revised, who
22  revised it?
23       A.    Probably a combination of my
24  son and we have an HR person.
25       Q.    Who is the HR person?
```

```
 1                     DIAB
 2          A.     Randy Hamilton.
 3          Q.     Randy Hamilton?
 4          A.     Yes.
 5          Q.     How long has he been at
 6     Bordentown?
 7          A.     Randy Hamilton?
 8          Q.     Yes.  Is that a male or female?
 9          A.     Male.  Eight years.
10          Q.     How often do you revise your
11     private enrollment procedures?
12          A.     Periodically.  It primarily has
13     to do with terms of payment and that is
14     generally why we would revise.  I can't say
15     that is exactly why this one was revised,
16     but it generally has to do with payment
17     terms.  Different student loan programs.
18     Anything new that might come out from the
19     Federal Motor Carrier that causes us to
20     make the change.
21          Q.     Has this person, Mr. Hamilton,
22     ever been involved in any disability
23     accommodation requests?
24          A.     No.
25          Q.     Has this document or this set
```

```
 1                    DIAB
 2   of documents, have they been revised since
 3   5/13/15?
 4        A.    I don't know.  I don't believe
 5   so.  Although there is a possibility.
 6        Q.    Have you ever revised anything
 7   in this policy aside from tuition increases
 8   or changes in regulations?
 9        A.    I don't know.  We revise on an
10   as-needed basis.
11        Q.    I would like to ask some
12   questions putting this exhibit down.
13        A.    Okay.
14        Q.    If a student would ask for a
15   sign language interpreter, would it be an
16   undue financial burden to provide one?
17        A.    For?
18        Q.    If a student asked for a sign
19   language --
20        A.    For CDL.
21        Q.    For CDL, for example.
22        A.    The only information that we
23   have is predicated on the forklift and
24   assuming that the forklift needed two
25   signers --
```

```
 1                          DIAB
 2         Q.    I am not asking about the
 3    forklift.
 4         A.    -- for a day.  I am going to
 5    get there.
 6         Q.    Okay.
 7         A.    Then that is primarily the only
 8    information that I have.  So if you had to
 9    do the mathematical calculation then this
10    is really an indefinite period of time, but
11    if you take the average student who gets
12    out in ten weeks or 50 days and you said,
13    well, this is 50 days at $1200 a day and we
14    are getting $4,000 and that doesn't
15    include, you know, anything else related to
16    how we would change our process or how
17    dramatically we would have to change our
18    process, just the interpreters alone would
19    be in the $60,000 neighborhood.  We have
20    $4,000 a class.
21         Q.    Where did you get that number
22    from, $60,000?
23         A.    Well, if you take the bill that
24    I have of $595 for one interpreter for one
25    day and double it, it is $1200.  If you
```

```
 1                    DIAB
 2     take $1200 and we go five guys a week for
 3     ten weeks, that is 50 days.  50 days times
 4     $1200 is $60,000.
 5          Q.    The bill that you mentioned,
 6     when did your school last higher an
 7     interpreter?
 8          A.    Sometime I believe in 2014.
 9          Q.    Have you checked the prices
10     since then?
11          A.    No.
12          Q.    At the time that Mr. Frilando
13     was contacting you, you did not check what
14     interpreter prices would be?
15          A.    We did not.  We did not look at
16     this from a cost standpoint whatsoever.  We
17     looked at this strictly from a safety
18     standpoint when we responded to Mr.
19     Frilando, to his brothers, it was strictly
20     safety and the test and this cost.  Could
21     cost potentially be an issue, yes, but if
22     we can't get past the safety and the
23     training and the test part.  So we really
24     never put anything together and never did
25     while we were talking to Mr. Frilando.  We
```

```
 1                        DIAB
 2    never considered the cost related to this.
 3    But when we were in Princeton and I sat
 4    through the depositions with Mr. Frilando,
 5    and heard at that point it was 2500 for two
 6    interpreters, I got a little bit concerned.
 7    So obviously I at least tried to, you know,
 8    look at it from an interpreter's standpoint
 9    and did the calculations that day and that
10    day it came out to $90,000.
11         Q.    I'm confused.  If you can just
12    backtrack.  You spoke to Mr. Frilando --
13         A.    No, I didn't speak to him, I
14    sat in on the deposition and as I sit in on
15    the deposition, the interpreters --
16         Q.    Whose deposition?
17         A.    Mr. Frilando.
18         Q.    Joseph or Kenneth?
19         A.    Kenneth, yes.  It was Kenneth
20    because the two interpreters were there at
21    that time and it came out in conversation
22    that it was costing $2500 for that day for
23    those two interpreters.
24         Q.    Are you aware of different
25    interpreter agencies?
```

```
 1                    DIAB
 2        A.    Not personally.  I am certain
 3   there are different agencies out there.
 4   Ultimately this is not just about
 5   interpreters.  There are other portions of
 6   this from a monetary standpoint that would
 7   also add to the cost making it cost
 8   prohibited.
 9        Q.    Okay.
10              Your primarily concern is
11   before even getting to interpreters the
12   fact that according to you, it would just
13   not be safe for a deaf person to drive a
14   CDL; is that correct?
15              MR. HALLER:  Objection to the
16         form of that question.
17              You may answer.
18        A.    My whole issue, Smith and
19   Solomon's whole issue on this, whether it
20   is Mr. Frilando or any hearing impaired, if
21   there were others out there, is safety
22   issue and testing issue.  You have to start
23   there.  If you cannot train or test then I
24   don't worry about the cost.  I don't get to
25   the cost.  I don't look at the cost,
```

1                       DIAB
2     because first I have to have the ability to
3     train and to test.
4          Q.    Correct me if I am wrong but
5     you testified earlier any reports on the
6     safety or how safe it is for a deaf person
7     to drive a CDL, any of those reports, you
8     said that you have not read because they
9     have not involved testing?
10               MR. HALLER:  Objection to the
11          form of the question.
12               I don't believe there are any
13          such reports that he is aware of.
14     A.    And I didn't say that.
15               MR. HALLER:  He didn't say
16          there were reports.  He said there
17          could be a hundred reports out there.
18          Q.    I was asking about the 2008
19     evidence report or even if there are any
20     other reports that would present research
21     and data and medical expert testimony on
22     whether it is safe for a deaf person to
23     drive a CDL, you have not nor plan to read
24     unless those reports mention how to train a
25     deaf driver?

```
 1                       DIAB
 2        A.     My concern is how do I get the
 3   student trained and not violate any other
 4   laws that could potentially put us out of
 5   business.  And how do I test the student
 6   and I need those answers before I do
 7   anything else.
 8        Q.     You believe that if you were to
 9   train a deaf person to go through the CDL
10   program, you would lose your license
11   yourself or your business?
12        A.     I think there is a possibility
13   that that could happen, yes.
14               Currently, I believe that that
15   could happen.
16        Q.     Is that something that you
17   think because intuitively or --
18        A.     No.  I have been told by the
19   Federal Motor Carrier that if you put a
20   person like this in your truck even though
21   we gave them the waiver, you can violate
22   other Federal regulations and we can shut
23   you down.  What else do I have to go on.
24   That is what I have to go on.
25        Q.     Does your school, Bordentown,
```

```
 1                    DIAB
 2   receive money from any Federal agency?
 3        A.    You will have to explain that.
 4   How do we receive it?
 5        Q.    Do you receive money from the
 6   United States Federal government for any
 7   purposes?
 8        A.    Contractural.
 9        Q.    Can you explain that?
10        A.    On a limited basis.  We do CDL
11   training for the FBI and D of Homeland
12   Security.  Maybe we have done one or two
13   and they are a contractural basis.
14        Q.    How often do you get these
15   contracts?
16        A.    To the best of my knowledge, we
17   have gotten one or two.
18        Q.    Can you go into exactly what --
19   you mentioned that you got them --
20        A.    It is a bid process.  It is
21   Department of Homeland Security.  It is a
22   bid process.  You put it out to bid, three
23   or four or a dozen people bid on it and --
24        Q.    What do you mean they put it
25   out to bid?
```

216

```
 1                         DIAB
 2         A.     Yes.
 3         Q.     What out, what --
 4         A.     There is a contract.
 5         Q.     To train drivers --
 6         A.     To train "X" amount of drivers.
 7                MR. NADLER:   Let's take a
 8         break.
 9                (Whereupon, a brief recess was
10         taken.)
11         Q.     Do you believe there are any
12    parties other than Bordentown who are
13    liable?
14         A.     Liable for what?
15         Q.     Liable as in responsible for
16    Mr. Frilando's case, other than Bordentown?
17         A.     I do.
18         Q.     Who?
19         A.     Federal Motor Carrier.
20         Q.     The --
21         A.     Federal Motor Carrier.
22         Q.     Why do you they think are
23    liable?
24         A.     Because I think they
25    arbitrarily handed out these waivers and
```

```
 1                        DIAB
 2    did not think it through and they literally
 3    dumped or unloaded the problem of how to
 4    get the people trained and tested, on not
 5    just the schools, but the State Motor
 6    Vehicle Agencies.  So it has to fall back
 7    on the Federal Motor Carrier.
 8         Q.    What do you think they should
 9    have done that they didn't when they put
10    this regulation out?
11         A.    The Federal Motor Carrier in my
12    opinion, is, and not unlike any other
13    government agency, you know, can be spotty,
14    but they have come around on certain
15    things.  And I think that they should have
16    consulted with the industry, not just the
17    trucking industry, but with the training
18    industry, and said, how are we going to do
19    this.  They should have consulted with
20    AAMVA.  They didn't even consult with them,
21    to say, how are we going to test these
22    folks.  They didn't do that.
23              All they needed to do was sit
24    down, which I firmly believe they are going
25    to but it is after the fact.  I believe
```

```
 1                      DIAB
 2   that they are going to do that.  I believe
 3   that they are going to sit down and say,
 4   okay, let's put a group together, you know,
 5   that is going to figure out the best way of
 6   doing this.
 7        Q.    Do you think there is anything
 8   else they could have done?
 9             MR. HALLER:  Objection to form.
10        Q.    Aside from consulting with
11   other driving schools?
12        A.    As I said before, they didn't
13   follow their own procedures on waivers.
14   And they started doing these blocks of
15   waivers and -- rather than doing them
16   individually.
17        Q.    What do you mean blocks of
18   waivers?
19        A.    They give, I believe and I
20   don't know where Mr. Frilando or when he
21   got his exemption or whatever, but the
22   first pass was 60 waivers.  Then the next
23   pass was 10 waivers, then I believe there
24   was one more pass and it was 20 waivers.
25   But it was not, let's do one on one or --
```

1                           DIAB
2      and, quite frankly, the other thing they
3      said is we never thought that there would
4      be this --
5           Q.     Who is this?
6           A.     Federal Motor Carrier.  Federal
7      Motor Carrier never thought that there
8      would be this many hearing impaired people
9      that would be applying to schools and
10     training.
11          Q.     Who specifically from the
12     Federal Motor Carrier said that to you?
13          A.     Larry Minor.
14          Q.     He said this to you on behalf
15     of the Federal Motor Carrier?
16          A.     Yes, he did.
17          Q.     He said this to you in person?
18          A.     Yes, he did.
19          Q.     Do you think Mr. Frilando
20     should not have been given a hearing
21     waiver?
22          A.     I think that the whole process
23     should have been reviewed and vetted better
24     than it was.
25          Q.     Do you think it's is fair for

```
1                          DIAB
2      somebody who has a hearing waiver to not be
3      allowed to enroll in school?
4                  MR. HALLER:  Objection to the
5             form of the question.
6                  It calls for a speculative
7             opinion from this witness.
8                  I am not going to prohibit you
9             from answering, but I do object.
10            You may answer.
11            A.    Ask me the question one more
12      time.
13                 MR. NADLER:  Read it back.
14                 (Whereupon, the referred to
15            question was read back by the
16            Reporter.)
17            A.    I think that everybody is
18      entitled to whatever opportunities they can
19      avail themselves to.  I think in this case
20      we need more definition and more clarity,
21      and potentially once we have that
22      definition and clarity, we would be able to
23      reevaluate the situation.
24            Q.    We are at the end of the
25      deposition.  Is there anything that you
```

```
 1                    DIAB
 2    would like to clarify at this point?
 3         A.    I think there are some things
 4    that need some clarification.  I would like
 5    --
 6         Q.    I am asking you.
 7         A.    There was --
 8         Q.    You cannot ask your attorney.
 9         A.    Yes.  There are -- there was
10    one that goes back to I believe you asked
11    the question of Federal Motor Carrier said
12    you could have an interpreter or a signer
13    and -- in the truck, would I agree to then
14    do the training.  I think that was the
15    question.  I think my answer was yes, I
16    would.  But if the Federal Motor Carrier
17    comes up with part of a regulation that
18    says you can do this, then we would be
19    expected to do it.  But it wouldn't change
20    my position that it is still not safe to do
21    with a signer in the truck.
22         Q.    So even if the Federal Motor
23    Carrier would take the position that it is
24    safe, you, Bordentown, would still take the
25    position that it wasn't safe?
```

```
1                    DIAB
2        A.    I would take the position that
3   it wasn't safe.  I would do the training if
4   I was told you have to do the training, but
5   I would still take the position that it was
6   not safe, because for the same reasons that
7   it is, and I firmly believe that the
8   Federal Motor Carrier would not do that
9   because they have just over the recent
10  years taken the signers and the
11  interpreters out.  Why would they go back
12  and put them back in, because it deflates
13  their your own purpose.
14       Q.    What do you mean taking them
15  out?  Can you clarify that?
16       A.    It has been three years or so
17  since they have said you cannot use an
18  interpreter.  People were allowed before to
19  take the written test, take the test in
20  different languages.  That is what started
21  the whole thing with the interpreters and
22  signers.
23       Q.    When you say three years ago
24  they were not allowed to use interpreters,
25  are you talking about a, for example,
```

```
 1                    DIAB
 2    Spanish or French or German language
 3    interpreter --
 4         A.    Yes.
 5         Q.    -- or specifically a sign
 6    language interpreter?
 7         A.    I would imagine -- ask the
 8    question again, please.
 9              MR. NADLER:  Read it back.
10              (Whereupon, the referred to
11         question was read back by the
12         Reporter.)
13         A.    It was both.
14         Q.    Where is that conclusion that
15    you put forthcoming from?
16              MR. HALLER:  Objection.
17              Asked and answered.
18              You may answer again.
19         Q.    Where are you coming to your
20    determination that it includes sign
21    language interpreters?
22         A.    Federal Motor Carrier
23    specifically told me that, again, Larry
24    Minor, Chuck Horan, and AAMVA all told me
25    personally that and Larry Minor said it at
```

```
1                    DIAB
2    our conference to the entire group, no
3    signers.
4         Q.    Is there anything else that you
5    would like to clarify?
6         A.    I think -- I don't think so
7    that there is anything else in terms of
8    clarification.  I don't know if we ever
9    covered our classroom portion, road
10   portions.  I don't think so that we ever
11   covered the other portions of the training
12   which is in the yard.  I believe we jumped
13   over that, but we have --
14        Q.    We can discuss it now.
15        A.    We have the same concerns and
16   issues in our yard and that safety and
17   particularly in the Linden location.  The
18   Linden location, which is our biggest
19   location, we have 20 trucks running
20   sometimes at the same time on three acres.
21   We can potentially have 150 or so students
22   there.  There is no way for us to train
23   someone in that environment safety.
24        Q.    Let's back up a little.
25              Can you explain the yard
```

```
 1                    DIAB
 2   training?
 3        A.    Here is the components.  You
 4   got classroom, you got yard, which is you
 5   have not gone out on the road yard.  I
 6   think we touched on it a little bit earlier
 7   this morning, we said it's backing skills,
 8   it's how we docking.
 9        Q.    Is that a restricted course,
10   not on the open road?
11        A.    Yes.
12        Q.    I presume there are cones and
13   difference things like that set up?
14        A.    Exactly.  In a potentially one
15   on one situation, which is not how we
16   train, we have one instructor that is
17   responsible in the yard for 15 students and
18   three trucks.
19        Q.    So just so I am clear, there is
20   one instructor who would be doing the
21   training --
22        A.    We have multiple -- we have 15
23   or 20 trucks going.  There are multiple
24   instructors in the yard, but one instructor
25   may have two, one may have three.
```

1                    DIAB

2        Q.    How is an instructor able to

3    concentrate on more than one truck at a

4    time?

5        A.    Well, he is working the yard.

6    He is working this one, that one, telling

7    them where to go.  That is not just

8    Bordentown.  There are ratios, classroom

9    ratios, it really doesn't matter, you can

10   do 50 to1 in the classroom.  In the yard,

11   the average ratio is 15 to 1.  In the

12   truck, the average ratio is 4 to 1.  It's 4

13   students, 1 instructor.

14       Q.    So for the yard portion, just

15   so I am clear, the instructor is outside

16   and he is directing students inside?

17       A.    Yes.

18       Q.    So why wouldn't an interpreter

19   be able to stand next to him and interpret

20   what he is saying, then let the driver who

21   is deaf in the car, if he is looking at

22   one, he can look at both at the same time?

23       A.    Because it's just not working

24   one.  In other words, they are not working

25   in one direction, he is backing it on an

1                    DIAB

2    angle, turning it, so.  You have to take

3    one instructor and he has to entirely focus

4    with the signer on the one truck and the

5    one driver and therefore cannot do the

6    other ones.

7         Q.   Why would the instructor have

8    to focus on the signer?  It would be the

9    signer's job to have to focus on the

10   instructor.

11        A.   How can the signer tell the

12   student what to do, they are not an

13   instructor.  So the instructor is out

14   there.  He is not following any plans.

15   It's this one is backing up one way, this

16   one is backing up another way, this is

17   doing something else.  You cannot, at lease

18   in my opinion, we have got these guys going

19   and have had accidents in our yard with

20   people not stopping quick enough, doing

21   things and now you are trying to add an

22   interpreter to it as well.  It just

23   compounds the issue.  Could it be done?

24   Potentially it could be done, but not

25   without us dramatically changing the way we

1                    DIAB

2   operate, particularly in that location.

3        Q.    It would dramatically change

4   how you operate to have a sign language

5   interpreter next to this instructor already

6   outside of the car interpreting what the

7   instructor outside of the car is doing for

8   the deaf person who is driving the car?

9        A.    Well, it is not a car, it is a

10  truck.

11       Q.    A truck, I mean.

12       A.    Under the circumstances, in our

13  opinion, we would have to clear the yard.

14  Because we have so many students there and

15  such going on and I cannot risk something

16  happening to those other students or our

17  instructors, so we would have to focus on

18  the one truck with the signer and the

19  instructor.

20            Could we accomplish what we

21  needed to in the yard, yes, basically, but

22  not without dramatically changing the way

23  we operate.

24       Q.    I am a little confused.

25            Why would you need to clear the

```
 1                    DIAB
 2     yard for the sign language interpreter who
 3     is signing only for the deaf student?
 4          A.    Because there is a hundred
 5     things going on at the same time.
 6                We cannot take the chance or
 7     run the risk of all my other students
 8     getting hurt, we don't know what the
 9     reaction is going to be.  As I said, we
10     have people, like I said, who have
11     accidents in the yard and we can quickly
12     effectively communicate with them.
13          Q.    So you think it would create a
14     greater risk to have that interpreter next
15     to the instructor, that extra person would
16     create a much larger risk for the other
17     students in the yard?
18          A.    I don't know the other
19     person -- I think the delayed reaction and
20     I think the -- not the interpreter, but
21     their interpretations of what should be
22     done and how it should be done and the fact
23     that the student, the impaired student,
24     cannot hear what is going on, he can pick
25     it up visually, but in order to do it
```

```
 1                         DIAB
 2     safely we would have to remove the other
 3     people.
 4          Q.   When the hearing students are
 5     all in their trucks and they are looking at
 6     this instructor who is outside the truck,
 7     are they able to hear him or are they
 8     visually looking at where he is telling
 9     them to go in the yard?
10          A.   Are they able to hear him?
11          Q.   Is he just pointing --
12          A.   No.   They can hear him.   A lot
13     of times what happens is if you go to the
14     yard and an instructor may jump on the side
15     rail of the truck.   He is talking to the
16     student as the student is learning how to
17     back up and make the turn and do whatever.
18     He is right there guiding them through.
19     You cannot do that with an interpreter or
20     signer.
21          Q.   He is there with one student at
22     a time, this person outside.   He is not
23     directing several students in the truck at
24     once?
25          A.   There is one student in the
```

```
 1                         DIAB

 2      truck.  Three trucks.  He tells this one go

 3      ahead, back up.  This one is having a

 4      problem.  He gets on the truck with this

 5      one and talks to that person, as you back

 6      up, this is how do you it, you gotta turn

 7      it, you gotta do it, whatever the case is.

 8      I don't know how he would -- never mind the

 9      safety factor, I don't know how we would be

10      able to communicate.

11          Q.    If you had a deaf student, you

12      do not know how he would communicate?

13          A.    I don't know, because, as I

14      said, the instructor literally gets on the

15      running board and is in the window of the

16      truck talking to this person and saying

17      this is what you have to do because you

18      have not gotten it right, this is the way

19      have you to do it.  He does that, gets off

20      of that and maybe he will go to the next

21      one and step back and observe all three.

22      But he is bouncing from one to the other

23      and he has all of these students.  He might

24      take one out and put another one in and

25      start all over again.  So while this is
```

```
 1                    DIAB
 2    being done you also have all these other
 3    students that are in the yard that are
 4    watching what is going on so that when it
 5    is their turn, at least they picked up on
 6    some of it.
 7         Q.    And you believe having a sign
 8    language interpreter communicating with the
 9    deaf driver and interpreting what the
10    instructor in the yard is doing to the deaf
11    student in the truck itself would create a
12    large risk of danger for the other students
13    in the yard?
14         A.    I do and I can go on and on
15    about it.  I think you basically captured
16    it.  I think that is pretty much all I
17    have.
18         Q.    I just have two more questions.
19               Have you ever interacted with a
20    sign language interpreter?
21         A.    Personally, no.
22               MR. HALLER:  Are you asking if
23               one on one with him as opposed to
24               sitting in a deposition?
25               MR. NADLER:  Well, the school.
```

1                          DIAB

2                MR. HALLER:  Okay.

3          A.    I have not.  Some of the other

4    personnel has.  When we did the forklift.

5          Q.    Some of the other employees in

6    the school have been around and interacted

7    with the interpreter?

8          A.    On the forklift.

9          Q.    Okay.

10               Is there anything else that you

11   would like to clarify?

12         A.    I don't believe so.

13         Q.    Is there anything looking back

14   that you would have done differently or

15   regret not having done?

16               MR. HALLER:  Objection to the

17          form of the question.

18         A.    I think that we have done

19   everything that we possibly can and are

20   continuing to do everything that we

21   possibly can.  I think that Mr. Frilando's

22   brother pushed very hard over a two-week

23   period and wanted answers that we could not

24   give him and that we have never denied

25   anybody access to our school, as we said in

```
 1                   DIAB
 2   our communications, I believe that it was
 3   said in the complaint.  We need help doing
 4   it.  We don't have the information and we
 5   don't have the capability to do it.  And
 6   that hasn't changed, we still don't have
 7   it.  I think in the long run the Federal
 8   Motor Carrier is going to ultimately either
 9   change what way they are doing or add some
10   things to what they are doing or put some
11   stipulations on what they are doing, but
12   our concern has always been about safety
13   for everyone and we have a pretty good
14   safety record.  So I think that's what we
15   have done is pretty much the right thing.
16        Q.    In accommodating a deaf student
17   who wants to partake in the CDL program, I
18   am asking you as a representative of
19   Bordentown, do you think it is the job and
20   the perspective of a deaf student to tell
21   the school how the training should occur or
22   do you think it is the job of the school to
23   figure out how the training should occur?
24             MR. HALLER:  Objection to the
25        extent that question calls for a
```

```
 1                      DIAB
 2        legal conclusion.
 3              You may answer.
 4              He is a lay witness.
 5        A.    I don't know and I think as my
 6   counsel said, I don't know if I am
 7   qualified to answer that.  I don't know
 8   that the student is ever going to be able
 9   to say this is how you do it.  I think that
10   the answer has really got to come from a
11   higher power than the student or school,
12   which is either the State or Federal
13   government.  They have to say this is the
14   way that you need to do this.
15              We just cannot skip the part
16   about the test.  We just cannot skip the
17   part about the test.  We just do not have
18   -- we do not know what to train to or for.
19              MR. NADLER:  At this point, I
20         do not have any further questions for
21         today's deposition.
22              MR. HALLER:  Let's take a
23         break.  I may have a few questions.
24              Off the record.
25              (Whereupon, an off-the-record
```

```
 1                    DIAB
 2        discussion was held.)
 3             MR. HALLER:  Back on the
 4        record.
 5   EXAMINATION BY
 6   MR. HALLER:
 7        Q.   Mr. Diab, in the questioning
 8   that happened just towards the end of the
 9   examination, you were talking about the
10   yard and I believe there was assumption in
11   the questions with regard that the
12   instructor would be at all times in the
13   line of sight of the student in the cab.
14             Can you comment on that?
15        A.   Yes.  I thought at some point
16   in there I said that that is not the case.
17   That they are not always in the line of
18   sight.  The instructor is not, because of
19   the angle of the truck and the alley
20   docking and the different parking positions
21   that are needed.  So the instructor could
22   give the direction, then the student
23   generally would go through the process.
24        Q.   I would like you to just pull
25   out if you have it in front of you the
```

```
 1                    DIAB
 2    exhibit that was marked as Diab 12.
 3         A.    Okay.
 4              MR. NADLER:  Hold on a second.
 5         What was the contents of that
 6         document?
 7              MR. HALLER:  That is the CVTA
 8         submission to Federal Motor Carrier.
 9              MR. NADLER:  This is the Don
10         Lafez?
11              MR. HALLER:  Yes.
12              MR. NADLER:  Okay, I have it.
13         Q.    I know that you said on
14    cross-examination that this report is not
15    word for word state the conclusions that
16    Bordentown reached through it's own
17    analysis.  But if we look at Pages 157
18    through 159, the top of 159, under the
19    heading, individual is unable to pass urine
20    test, cannot safely complete on the road
21    training, do you see that?
22         A.    Yes.
23              MR. NADLER:  Can you repeat
24         where you on the page?
25              MR. HALLER:  The bottom of the
```

1                    DIAB

2          Page 157 to the top of Page 159.

3               MR. NADLER:  Okay.

4          Q.    Are you generally familiar with

5     the conclusions that CVTA reached?

6          A.    I am.

7          Q.    And, again, understanding that

8     it is not word for word, the conclusions

9     that Bordentown reached, does it in general

10    terms reflect the substance of the

11    conclusions that you reached, Bordentown

12    reached on it's own analysis?

13         A.    Yes.

14         Q.    If we then go to Page 161 under

15    the heading, additional complications

16    related to waivers.  In this section CVTA

17    discusses the complications in its view

18    relating to the granting of waivers because

19    of the testing issues that you have

20    referred to in the deposition.

21         A.    Yes.

22         Q.    Does this also, I know that you

23    said not word for word, but in general

24    terms reflect the substance of the

25    conclusion that you reached on the issue of

```
 1                        DIAB
 2    the unavailability of testing when you did
 3    your own analysis?
 4          A.    Yes, it does.
 5                MR. HALLER:  I have no further
 6          questions.
 7                MR. NADLER:  The deposition has
 8          concluded.  We are now off the
 9          record.
10                (Whereupon, at 4:35 P.M., the
11          Examination of this Witness was
12          concluded.)
13
14
15                _____
                        JOHN DIAB
16
17    Subscribed and sworn to before me
18    this _____ day of _____ 20___.
19
20    _____
          NOTARY PUBLIC
21
22
23
24
25
```

240

```
 1                       DIAB

 2                 E X H I B I T S

 3

 4    PLAINTIFF'S EXHIBITS

 5

 6    EXHIBIT    EXHIBIT                   PAGE

 7    NUMBER     DESCRIPTION

 8    1          Document Bate stamped     26
                 BDTS 0007
 9
      2          Document Bate stamped     47
10               BDTS 0002 until 0006

11    3          Document Bate stamped     57
                 BDTS 0104 until
12               BDTS 012006

13    4          Document Bate stamped     58
                 BDTS 0107
14
      5          Document Bate stamped     81
15               BDTS 0132

16    6          Document Bate stamped     89
                 BDTS 0112 through 0015
17               and attached to that
                 BDTS 0126, BDTS 0127,
18               BDTS 0128, BDTS 0134 and
                 BDTS 0135
19
      7          Document Bate stamped     133
20               BDTS 0101, 0100

21    8          Document Bate stamped     139
                 BDTS 0116 through 0118
22
      9          Document Bate stamped     152
23               BDTS 0102 and 0103

24    10         Document Bate stamped     155
                 BDTS 0109 0110 and 0111
25
```

```
 1                        DIAB

 2     PLAINTIFF'S EXHIBITS

 3     EXHIBIT     EXHIBIT                    PAGE

 4     NUMBER      DESCRIPTION

 5     11          Document Bate stamped      181
                   BDTS 0163 and 0164
 6
        12         Document Bate stamped      186
 7                 BDTS 0155 to 0162

 8     13          Document Bate stamped      203
                   BDTS 0136 through 0154
 9


10
           (Exhibits retained by Court Reporter.)
11

12
                       I N D E X
13

14     EXAMINATION BY                         PAGE

15
       MR. NADLER                             4
16
       MR. HALLER                             236
17

18

19

20

21

22

23

24

25
```

```
 1                        DIAB
 2              C E R T I F I C A T E
 3
    STATE OF NEW YORK        )
 4                          :  SS.:
    COUNTY OF NEW YORK       )
 5
 6        I, JENIFER PENNLINE, a Notary Public
 7   for and within the State of New York, do
 8   hereby certify:
 9        That the witness whose examination is
10   hereinbefore set forth was duly sworn and
11   that such examination is a true record of
12   the testimony given by that witness.
13        I further certify that I am not
14   related to any of the parties to this
15   action by blood or by marriage and that I
16   am in no way interested in the outcome of
17   this matter.
18        IN WITNESS WHEREOF, I have hereunto
19   set my hand this 6th day of January 2016.
20
21
22        _____
23            JENIFER PENNLINE
24
25
```

**versus** [1] - 99:4
**vetted** [1] - 219:23
**vice** [1] - 83:9
**vice-president** [1] - 83:9
**video** [1] - 174:6
**videos** [1] - 111:18
**view** [9] - 114:21, 118:4, 118:9, 118:12, 118:14, 118:18, 118:25, 128:23, 238:17
**violate** [7] - 61:3, 61:25, 62:5, 104:7, 160:11, 214:3, 214:21
**violated** [1] - 62:11
**violating** [3] - 60:20, 162:8, 170:18
**violation** [1] - 62:25
**violations** [2] - 62:16, 62:17
**virtually** [1] - 103:18
**vision** [4] - 37:19, 117:10, 117:14, 201:3
**visual** [3] - 116:21, 117:7, 117:9
**visually** [2] - 229:25, 230:8
**volume** [1] - 32:13

## W

**wait** [2] - 152:22, 153:8
**waiting** [1] - 18:6
**waived** [1] - 3:9
**waiver** [40] - 12:5, 38:13, 47:7, 56:23, 57:5, 57:7, 57:9, 57:13, 61:11, 61:14, 61:20, 63:17, 64:2, 73:12, 80:16, 80:18, 85:3, 105:6, 105:22, 109:4, 136:10, 153:10, 153:11, 153:12, 154:13, 154:20, 158:22, 158:24, 167:14, 182:14, 182:17, 183:3, 185:22, 190:10, 198:10, 200:2, 205:10, 214:21, 219:21, 220:2
**waivers** [20] - 63:6, 105:24, 138:13, 138:15, 154:11, 158:19, 167:15, 185:10, 187:8, 199:14, 200:13, 216:25, 218:13, 218:15, 218:18, 218:22, 218:23, 218:24, 238:16, 238:18
**wanted** [10] - 53:17, 55:24, 59:15, 77:15, 85:7, 134:15, 159:24, 165:7, 169:10, 233:23

**wanting** [1] - 68:22
**wants** [6] - 37:3, 78:16, 92:13, 92:14, 183:5, 234:17
**warehouse** [5] - 101:18, 101:19, 101:22, 101:23
**Warner** [4] - 136:18, 136:22, 136:23, 137:18
**warning** [2] - 122:9, 122:13
**was he** [4] - 55:11, 56:25, 167:22, 167:23
**was it** [9] - 22:20, 22:21, 26:2, 28:5, 28:17, 74:24, 79:19, 169:14
**was that** [6] - 4:22, 22:19, 72:11, 73:15, 138:7, 150:9
**was there** [5] - 24:18, 66:20, 66:21, 109:7
**washers** [1] - 21:5
**Washington** [2] - 66:19, 162:16
**watching** [2] - 111:18, 232:4
**Watson** [2] - 64:21, 165:14
**ways** [1] - 33:11
**wear** [1] - 202:4
**website** [2] - 32:19, 178:10
**week** [13] - 31:5, 33:20, 33:21, 33:22, 33:23, 33:25, 34:2, 34:7, 38:17, 67:13, 159:24, 210:2, 233:22
**weekly** [1] - 67:13
**weeks** [12] - 17:17, 33:3, 33:5, 33:17, 77:18, 99:17, 100:14, 111:17, 112:14, 148:12, 209:12, 210:3
**weight** [1] - 125:14
**were you** [4] - 13:23, 62:3, 62:10, 78:5
**weren't** [2] - 54:4
**Wessendorf** [25] - 10:10, 22:3, 23:16, 24:13, 25:18, 26:13, 26:14, 27:4, 28:8, 28:18, 28:24, 29:21, 44:16, 44:24, 47:12, 54:13, 54:15, 56:10, 75:20, 76:9, 87:8, 106:24, 140:20, 157:11, 158:9
**Wessendorf's** [4] - 19:17, 21:7, 22:10, 86:22
**what are** [6] - 35:9, 37:16, 67:21, 118:8, 121:9, 201:18

**what did** [2] - 138:10, 178:13
**What is** [15] - 4:11, 13:14, 18:17, 67:20, 72:23, 78:19, 85:25, 95:23, 114:21, 116:8, 120:3, 124:2, 164:2, 229:24, 232:4
**what was** [9] - 12:11, 22:10, 30:6, 55:12, 55:20, 59:11, 82:6, 180:20, 237:5
**what were** [2] - 30:15, 81:5
**whatsoever** [1] - 210:16
**wheel** [1] - 116:18
**wheels** [1] - 184:14
**when are** [2] - 124:2, 182:5
**when did** [11] - 43:4, 48:11, 48:16, 48:17, 48:21, 50:6, 59:8, 67:10, 82:3, 88:14, 210:6
**when were** [1] - 169:3
**when you** [23] - 30:22, 66:9, 69:6, 77:24, 81:21, 99:9, 101:4, 116:2, 117:2, 118:13, 123:19, 125:23, 126:5, 135:7, 145:12, 149:20, 152:11, 182:22, 184:13, 186:19, 203:10, 222:23, 239:2
**where are** [6] - 14:16, 14:19, 14:22, 127:13, 189:8, 223:19
**where is** [3] - 108:6, 113:24, 223:14
**WHEREOF** [1] - 242:18
**Whereupon** [27] - 21:21, 26:21, 47:16, 57:19, 58:18, 80:23, 81:16, 86:19, 89:3, 131:20, 133:20, 138:24, 139:9, 152:6, 155:14, 155:21, 171:19, 180:12, 181:17, 181:23, 186:13, 203:3, 216:9, 220:14, 223:10, 235:25, 239:10
**wherever** [1] - 128:8
**wherewithal** [1] - 170:5
**whisper** [2] - 38:6, 38:10
**whispered** [1] - 80:20
**who are** [3] - 98:25, 192:12, 216:12
**who is** [20] - 34:20, 51:25, 52:10, 52:13, 52:15, 54:23, 91:20, 102:8, 110:5, 110:21, 163:11, 165:19, 168:20,

168:22, 206:25, 219:5, 226:20, 228:8, 229:2, 230:6
**who was** [3] - 65:25, 154:8, 163:3
**who were** [2] - 88:12, 141:17
**willingness** [1] - 97:17
**window** [3] - 117:23, 117:24, 231:15
**witness** [19] - 1:15, 3:10, 3:16, 3:18, 4:2, 12:2, 46:5, 46:17, 49:5, 50:13, 139:17, 156:3, 171:19, 172:25, 180:17, 220:7, 235:4, 242:9, 242:12
**Witness** [1] - 239:11
**WITNESS** [5] - 49:11, 143:23, 144:2, 171:18, 242:18
**WNBC** [1] - 126:16
**wondering** [2] - 205:22, 205:24
**word** [12] - 69:23, 183:16, 183:20, 187:15, 188:13, 237:15, 238:8, 238:23
**Word** [1] - 157:21
**wording** [1] - 185:5
**words** [13] - 94:7, 94:22, 96:3, 99:18, 110:12, 111:2, 117:11, 119:20, 129:15, 134:6, 166:18, 201:15, 226:24
**work** [17] - 13:11, 13:15, 23:2, 52:25, 53:3, 53:4, 53:5, 53:8, 53:10, 95:9, 101:18, 102:17, 133:4, 145:16, 160:4, 184:8, 184:9
**worked** [6] - 20:10, 22:13, 23:25, 24:2, 24:4, 24:5
**working** [6] - 75:25, 226:5, 226:6, 226:23, 226:24
**works** [2] - 9:3, 184:7
**worry** [1] - 212:24
**worse** [1] - 41:2
**worth** [1] - 97:8
**wouldn't** [11] - 35:6, 54:9, 97:20, 108:2, 130:6, 130:12, 147:18, 176:18, 195:11, 221:19, 226:18
**write** [2] - 19:25, 20:16
**writing** [2] - 60:16, 167:7
**written** [6] - 101:2,

DIAB

## $

$1200 [4] - 209:13, 209:25, 210:2, 210:4
$2500 [1] - 211:22
$4,000 [2] - 209:14, 209:20
$595 [1] - 209:24
$60,000 [3] - 209:19, 209:22, 210:4
$90,000 [1] - 211:10

## 0

0002 [4] - 47:12, 47:17, 51:21, 240:10
0006 [3] - 47:13, 47:18, 240:10
0007 [3] - 26:19, 26:22, 240:8
0010 [2] - 27:2, 47:8
0015 [3] - 88:23, 89:5, 240:16
0100 [4] - 133:19, 133:21, 134:24, 240:20
0101 [3] - 133:18, 133:21, 240:20
0102 [4] - 152:3, 152:7, 152:13, 240:23
0103 [4] - 152:3, 152:8, 152:13, 240:23
0104 [3] - 57:15, 57:20, 240:11
0107 [3] - 58:16, 58:19, 240:13
0109 [4] - 155:22, 156:4, 158:7, 240:24
0110 [3] - 155:22, 156:4, 240:24
0111 [3] - 155:23, 156:5, 240:24
0112 [4] - 88:23, 89:4, 89:11, 240:16
0114 [1] - 140:14
0116 [3] - 139:4, 139:10, 240:21
0118 [3] - 139:4, 139:11, 240:21
012006 [3] - 57:16, 57:21, 240:12
0126 [3] - 88:24, 89:6, 240:17
0127 [3] - 88:24, 89:6, 240:17
0128 [3] - 88:25, 89:6, 240:18
0132 [3] - 81:13, 81:17, 240:15
0134 [3] - 88:25, 89:7, 240:18

0135 [3] - 88:25, 89:7, 240:18
0136 [3] - 202:22, 203:4, 241:8
0138 [1] - 204:10
0154 [3] - 202:22, 203:5, 241:8
0155 [3] - 186:9, 186:14, 241:7
0158 [1] - 188:22
0162 [4] - 186:10, 186:15, 188:7, 241:7
0163 [3] - 181:21, 181:24, 241:5
0164 [3] - 181:21, 181:25, 241:5
08505 [2] - 4:13, 13:17

## 1

1 [8] - 3:17, 47:2, 47:23, 48:3, 226:11, 226:12, 226:13, 240:8
1,500 [1] - 32:3
10 [3] - 67:24, 218:23, 240:24
10003 [2] - 1:19, 2:5
101 [1] - 178:7
10:25 [1] - 1:11
11 [1] - 241:5
12 [4] - 20:8, 20:10, 237:2, 241:6
13 [1] - 241:8
130 [1] - 2:10
133 [1] - 240:19
139 [1] - 240:21
14 [1] - 75:12
15 [3] - 225:17, 225:22, 226:11
150 [2] - 167:9, 224:21
1500 [1] - 32:17
152 [1] - 240:22
155 [1] - 240:24
157 [2] - 237:17, 238:2
159 [3] - 237:18, 238:2
15th [1] - 48:25
16 [4] - 13:21, 99:20, 123:2, 197:5
160 [6] - 17:6, 17:9, 17:19, 17:22, 17:24, 18:16
161 [1] - 238:14
17 [2] - 36:8, 36:10
17th [3] - 10:7, 156:17, 158:9
181 [1] - 241:5
186 [1] - 241:6
18th [2] - 2:10, 48:25
19103 [1] - 2:10

1970 [1] - 109:2
1999 [1] - 13:21

## 2

2 [3] - 47:23, 48:3, 240:9
20 [3] - 218:24, 224:19, 225:23
2006 [4] - 24:16, 24:20, 24:23, 25:5
2008 [13] - 188:16, 189:21, 190:8, 190:17, 191:9, 191:13, 191:21, 192:5, 192:11, 192:21, 192:23, 193:12, 213:18
2012 [2] - 88:20, 91:8
2013 [5] - 69:12, 73:6, 88:20, 91:8, 183:6
2014 [16] - 67:18, 69:9, 69:21, 74:6, 75:12, 76:6, 76:9, 90:13, 90:17, 90:19, 140:21, 141:19, 154:10, 183:7, 210:8
2015 [14] - 10:7, 43:7, 43:18, 48:14, 49:21, 59:10, 66:17, 73:6, 73:7, 77:19, 82:5, 134:4, 169:4, 169:7
2016 [2] - 1:10, 242:19
203 [1] - 241:8
20___ [1] - 239:18
20th [1] - 56:4
21 [1] - 140:21
21st [1] - 186:25
22 [1] - 188:13
236 [1] - 241:16
24 [3] - 1:18, 2:5, 7:7
25 [1] - 15:24
2500 [1] - 211:5
257 [1] - 140:21
26 [2] - 10:7, 240:8

## 3

3 [1] - 240:11
3/20 [1] - 82:4
30 [3] - 3:16, 15:24, 59:10
30B6 [10] - 6:14, 6:22, 9:7, 9:11, 9:24, 43:14, 46:9, 48:7, 51:2, 68:2
30th [1] - 134:4
37,000 [1] - 137:5

## 4

4 [5] - 58:17, 226:12, 240:13, 241:15
4/1/2015 [1] - 47:7
402 [2] - 4:12, 13:16

45 [2] - 18:9, 18:10
47 [1] - 240:9
4:35 [1] - 239:10

## 5

5 [1] - 240:14
5/13/15 [3] - 203:25, 204:7, 208:3
5/13/2015 [1] - 203:2
50 [7] - 18:9, 18:10, 209:12, 209:13, 210:3, 226:10
53 [1] - 124:16
57 [1] - 240:11
58 [1] - 240:13

## 6

6 [2] - 1:10, 240:16
60 [1] - 218:22
6th [1] - 242:19

## 7

7 [1] - 240:19
70 [1] - 124:18

## 8

8 [3] - 188:7, 197:23, 240:21
81 [1] - 240:14
86,000 [2] - 112:25, 113:3
89 [1] - 240:16

## 9

9 [1] - 240:22
90 [4] - 47:6, 56:22, 57:8, 61:14

## A

A.M [1] - 1:11
AAMVA [30] - 65:11, 65:16, 65:19, 65:20, 66:2, 69:15, 71:16, 73:9, 73:19, 74:13, 74:19, 74:23, 81:9, 85:9, 108:15, 135:20, 146:9, 146:10, 147:9, 149:25, 150:8, 151:20, 161:20, 161:22, 162:6, 163:24, 164:6, 165:15, 217:20, 223:24
abbreviate [1] - 63:11
abbreviated [1] - 142:17
abide [1] - 60:23
ability [6] - 19:25, 20:15, 32:9, 80:19,

136:9, 213:2
**able** [47] - 37:14, 39:11, 40:14, 41:10, 42:12, 62:19, 62:20, 64:2, 100:8, 101:17, 110:23, 113:14, 115:12, 115:14, 115:16, 115:23, 117:4, 117:13, 120:5, 120:13, 120:25, 121:5, 122:7, 122:19, 124:21, 128:15, 131:13, 143:15, 143:17, 144:23, 145:2, 145:4, 145:22, 145:25, 158:4, 164:11, 166:3, 179:9, 204:6, 220:22, 226:2, 226:19, 230:7, 230:10, 231:10, 235:8
**absolute** [1] - 59:17
**absolutely** [8] - 27:25, 63:13, 83:19, 86:15, 97:19, 127:23, 160:24
**abstract** [2] - 39:3, 40:23
**accelerate** [3] - 113:7, 113:24, 128:3
**accelerated** [2] - 69:22
**acceptable** [2] - 67:2, 67:5
**acceptance** [1] - 92:11
**accepted** [2] - 62:12, 84:7
**access** [2] - 82:15, 233:25
**accessibility** [2] - 82:13, 148:25
**accessible** [1] - 60:25
**accident** [4] - 41:3, 104:5, 113:17, 114:20
**accidents** [4] - 106:11, 198:15, 227:19, 229:11
**accommodate** [17] - 71:22, 73:15, 90:3, 106:24, 109:10, 109:13, 109:17, 109:19, 127:5, 144:21, 145:17, 145:19, 147:24, 149:17, 158:4, 161:4, 182:23
**accommodated** [3] - 141:22, 162:3, 173:16
**accommodating** [5] - 10:13, 10:17, 141:24, 149:5, 234:16
**accommodation** [2] - 145:14, 207:23
**accommodations** [8] - 26:5, 28:7, 29:3, 29:7, 65:3, 90:15, 141:17, 141:18
**accomplish** [3] - 85:6, 85:7, 228:20

**accordance** [1] - 6:5
**according** [2] - 183:19, 212:12
**account** [2] - 53:2, 53:13
**accustomed** [2] - 147:6, 147:10
**acknowledges** [1] - 201:19
**acres** [1] - 224:20
**acronyms** [1] - 143:25
**Act** [1] - 148:19
**action** [1] - 242:15
**actual** [5] - 102:11, 111:16, 111:19, 154:5, 192:5
**ADA** [7] - 99:12, 143:14, 143:18, 149:10, 149:16, 150:5, 150:7
**adapted** [1] - 122:11
**add** [4] - 93:7, 212:7, 227:21, 234:9
**add-ons** [1] - 93:7
**addition** [3] - 20:18, 70:4, 134:8
**additional** [1] - 238:15
**additionally** [1] - 62:15
**address** [13] - 4:11, 13:14, 59:16, 94:23, 140:25, 158:3, 192:23, 193:25, 194:8, 194:9, 194:12, 195:3
**addressed** [4] - 135:25, 153:14, 154:4, 157:18
**addresses** [3] - 129:10, 154:21, 194:2
**addressing** [5] - 15:20, 15:21, 54:4, 75:25, 193:3
**adequate** [3] - 123:8, 124:20, 127:21
**adequately** [3] - 100:8, 102:6, 104:6
**adjustment** [1] - 183:23
**administer** [1] - 3:11
**administered** [1] - 73:24
**Administration** [1] - 75:15
**Administrators** [1] - 65:15
**admission** [3] - 168:4, 204:13, 205:24
**admit** [2] - 203:19, 205:17
**admitted** [3] - 200:24, 203:21, 204:17
**adopting** [1] - 170:14
**advanced** [1] - 21:9
**advocates** [1] - 146:14

**affect** [1] - 97:17
**affected** [1] - 95:19
**affirmatively** [1] - 7:15
**aforementioned** [13] - 26:21, 47:16, 57:19, 58:18, 81:16, 89:3, 133:20, 139:9, 152:6, 155:21, 181:23, 186:13, 203:3
**afraid** [1] - 171:4
**afternoon** [1] - 101:12
**afterwards** [2] - 42:4, 94:20
**age** [5] - 37:8, 38:11, 86:7, 204:19, 205:19
**agencies** [22] - 12:4, 70:25, 71:23, 72:2, 75:4, 81:5, 109:15, 139:22, 144:5, 145:8, 149:4, 149:11, 149:21, 150:19, 151:16, 151:17, 151:19, 151:23, 161:22, 211:25, 212:3
**Agencies** [1] - 217:6
**agency** [9] - 11:4, 12:12, 68:5, 69:7, 95:5, 109:21, 140:18, 215:2, 217:13
**agent** [1] - 200:4
**agree** [20] - 27:23, 42:12, 61:16, 77:11, 106:13, 106:17, 116:21, 116:25, 118:17, 122:18, 124:19, 131:12, 187:11, 187:17, 198:7, 198:9, 198:16, 198:19, 199:9, 221:13
**agreeable** [2] - 6:9, 176:10
**AGREED** [2] - 3:5, 3:20
**aids** [1] - 67:25
**Air** [3] - 20:9, 20:11, 20:13
**air** [16] - 122:3, 122:9, 122:20, 123:9, 181:13, 196:13, 196:18, 196:21, 196:23, 196:25, 197:4, 197:7, 197:13, 197:16, 198:5, 198:13
**alcohol** [1] - 7:7
**alert** [5] - 39:11, 122:16, 122:20, 123:9, 138:20
**alertness** [1] - 116:22
**alerts** [2] - 62:21, 115:13
**alley** [1] - 236:19
**allow** [7] - 44:12, 46:5, 50:19, 123:25, 133:3, 160:19, 172:25
**allowed** [12] - 21:8,

80:10, 127:9, 127:11, 127:15, 132:12, 153:22, 160:15, 164:20, 220:3, 222:18, 224:24
**alone** [2] - 166:5, 209:18
**ALSO** [1] - 2:13
**alternative** [4] - 120:4, 164:2, 164:3, 164:5
**altogether** [1] - 203:16
**amarillo** [3] - 173:20, 175:16, 177:11
**Amarillo** [3] - 174:25, 175:15, 180:23
**amazed** [1] - 166:11
**ambulance** [3] - 119:5, 120:15, 123:21
**amenable** [1] - 170:16
**amendable** [2] - 170:14, 176:14
**American** [7] - 10:22, 65:13, 74:17, 129:4, 137:3, 147:7, 148:18
**amount** [2] - 55:7, 216:6
**analysis** [7] - 35:13, 70:4, 70:5, 150:21, 237:17, 238:12, 239:3
**analyze** [2] - 109:20, 142:12
**analyzed** [1] - 109:22
**AND** [2] - 3:5, 3:20
**Andrew** [4] - 172:12, 174:12, 178:2, 178:5
**angle** [2] - 227:2, 236:19
**answer** [57] - 5:11, 7:14, 9:20, 10:2, 12:25, 16:18, 16:19, 19:2, 19:5, 19:8, 22:5, 25:21, 28:22, 31:19, 41:16, 42:19, 45:8, 45:9, 46:7, 48:18, 60:13, 60:14, 61:17, 61:18, 62:8, 72:10, 79:14, 80:6, 91:17, 96:20, 98:13, 118:22, 123:12, 124:25, 131:24, 148:4, 157:24, 159:24, 162:14, 163:9, 163:12, 163:13, 171:15, 172:5, 192:21, 200:14, 206:5, 206:15, 212:17, 220:10, 221:15, 223:18, 235:3, 235:7, 235:10
**answered** [7] - 24:12, 28:16, 28:24, 29:22, 87:3, 206:3, 223:17
**answerer** [1] - 96:21
**answering** [4] - 7:13, 87:22, 126:10, 220:9
**answers** [6] - 5:17,

18:25, 145:23, 162:14, 214:6, 233:23
**ANTHONY** [1] - 2:11
**anybody** [18] - 24:18, 26:10, 71:10, 71:11, 71:12, 71:13, 72:15, 72:16, 86:15, 96:23, 96:24, 97:2, 106:3, 126:9, 133:10, 144:16, 197:10, 233:25
**anymore** [1] - 149:2
**anywhere** [1] - 26:10
**aol** [1] - 53:12
**apart** [1] - 140:12
**apnea** [20] - 35:16, 35:22, 35:23, 36:2, 36:4, 36:12, 36:15, 36:20, 37:8, 37:10, 199:21, 201:4, 201:7, 201:12, 201:17, 201:18, 202:2, 202:3, 202:5, 202:8
**apparently** [1] - 177:20
**appear** [1] - 40:22
**appears** [1] - 183:6
**application** [1] - 168:25
**applied** [1] - 97:14
**applies** [2] - 97:7, 200:2
**apply** [1] - 183:24
**applying** [1] - 219:9
**appointment** [3] - 33:7, 50:3, 56:3
**appropriate** [1] - 48:2
**approve** [1] - 201:22
**approved** [3] - 19:4, 170:20, 201:8
**approximately** [1] - 100:12
**April** [4] - 10:7, 43:18, 134:4, 140:21
**arbitrarily** [2] - 200:12, 216:25
**are there** [11] - 14:11, 17:11, 33:18, 37:11, 79:18, 100:4, 101:15, 109:17, 187:21, 196:12, 221:9
**area** [1] - 28:15
**areas** [1] - 12:24
**aren't** [1] - 106:12
**arguing** [1] - 206:18
**arrested** [1] - 40:6
**articulating** [1] - 126:6
**as-needed** [2] - 94:3, 208:10
**ascertain** [2] - 132:22, 144:17
**aside** [6] - 8:24, 21:7, 37:10, 121:10, 208:7, 218:10

**asking** [20] - 46:4, 48:15, 49:5, 49:14, 49:17, 68:12, 76:10, 115:5, 127:15, 152:12, 177:23, 189:18, 189:19, 189:20, 209:2, 213:18, 221:6, 232:22, 234:18
**aspect** [1] - 22:17
**aspects** [1] - 23:15
**assertion** [2] - 108:6, 132:23
**assertions** [1] - 193:17
**assessment** [1] - 129:19
**assistance** [1] - 159:15
**assistant** [2] - 165:20, 165:21
**assisted** [1] - 29:24
**association** [11] - 64:12, 71:9, 71:15, 77:4, 82:12, 82:14, 83:9, 163:2, 163:4, 166:10, 186:5
**Association** [16] - 65:14, 71:6, 72:21, 74:18, 137:4, 139:5, 139:12, 139:20, 142:17, 144:9, 147:8, 147:12, 148:7, 150:4, 150:7, 167:18
**associations** [1] - 186:4
**assume** [4] - 14:20, 111:18, 168:9, 183:25
**assuming** [6] - 59:9, 82:4, 98:22, 154:11, 157:14, 208:24
**assumption** [1] - 236:10
**ATA** [4] - 74:17, 137:3, 137:20, 186:5
**attached** [4] - 88:23, 89:5, 152:21, 240:17
**attachment** [2] - 140:20, 141:15
**attempted** [1] - 71:13
**attended** [4] - 4:20, 66:19
**attention** [5] - 128:21, 169:15, 183:14, 184:25, 188:10
**attorney** [2] - 141:15, 221:8
**Attorneys** [2] - 2:4, 2:9
**attorneys** [8] - 8:20, 8:25, 9:2, 89:19, 156:16, 166:10, 182:15, 203:17
**Atwood** [4] - 82:12, 83:7, 83:8, 84:13
**audible** [3] - 62:21, 115:13, 138:19

**auditory** [1] - 135:24
**August** [2] - 75:12, 76:9
**authorized** [1] - 3:11
**automatic** [1] - 197:6
**automatically** [5] - 36:11, 37:13, 38:2, 205:17, 205:21
**avail** [1] - 220:19
**availability** [1] - 135:17
**available** [1] - 175:3
**Avate** [1] - 92:4
**average** [12] - 17:16, 17:18, 31:4, 31:25, 113:18, 128:14, 131:25, 185:15, 209:11, 226:11, 226:12
**aware** [20] - 49:23, 50:7, 71:9, 72:12, 104:23, 104:25, 115:10, 122:8, 123:22, 126:13, 135:9, 138:14, 138:15, 148:18, 149:15, 169:18, 170:11, 188:15, 211:24, 213:13
**awareness** [1] - 72:16

## B

**background** [4] - 20:19, 20:23, 39:16, 40:16
**backing** [5] - 111:23, 225:7, 226:25, 227:15, 227:16
**backtrack** [2] - 153:3, 211:12
**backwards** [1] - 120:12
**ball** [1] - 131:5
**bank** [3] - 50:2, 87:10
**based** [15] - 17:7, 18:2, 56:12, 95:5, 95:10, 129:4, 129:6, 129:7, 130:11, 130:14, 132:23, 135:4, 135:10, 154:25, 178:4
**basic** [2] - 16:20, 188:5
**basically** [13] - 25:8, 36:5, 37:22, 40:9, 54:10, 78:19, 79:13, 93:13, 154:15, 163:15, 190:12, 228:21, 232:15
**basis** [9] - 28:14, 94:3, 142:4, 142:6, 199:15, 206:13, 208:10, 215:10, 215:13
**Bate** [36] - 26:22, 47:7, 47:12, 47:17, 57:15, 57:20, 58:19, 81:17, 88:22, 89:4, 133:21, 139:3, 139:10, 152:2, 152:7, 155:22, 156:4, 181:24, 186:9, 186:14,

188:7, 202:21, 203:4, 240:8, 240:9, 240:11, 240:13, 240:14, 240:16, 240:19, 240:21, 240:22, 240:24, 241:5, 241:6, 241:8
**Baum** [1] - 1:18
**BAUM** [1] - 2:4
**BDTS** [67] - 26:19, 26:22, 27:2, 47:12, 47:17, 51:21, 57:15, 57:16, 57:20, 57:21, 58:16, 58:19, 81:13, 81:17, 88:23, 88:24, 88:25, 89:4, 89:6, 89:7, 89:11, 133:18, 133:21, 134:24, 139:4, 139:10, 140:14, 152:2, 152:7, 152:13, 155:22, 156:4, 158:7, 181:21, 181:24, 186:9, 186:14, 188:7, 188:22, 202:22, 203:4, 204:10, 240:8, 240:10, 240:11, 240:12, 240:13, 240:15, 240:16, 240:17, 240:18, 240:18, 240:20, 240:21, 240:23, 240:24, 241:5, 241:7, 241:8
**BDTS007** [1] - 47:8
**bear** [1] - 174:9
**bearing** [2] - 96:12, 196:10
**becomes** [2] - 32:25, 203:20
**BEFORE** [1] - 1:13
**beforehand** [1] - 122:7
**begins** [2] - 121:13, 183:16
**behalf** [10] - 9:20, 43:16, 48:7, 161:10, 167:22, 167:23, 167:25, 168:10, 168:11, 219:14
**behind** [7] - 117:25, 119:2, 119:6, 119:25, 120:14, 124:2, 124:22
**belated** [1] - 155:5
**believe** [62] - 11:6, 15:21, 19:16, 24:15, 26:15, 26:17, 37:19, 40:23, 43:6, 48:13, 50:9, 53:25, 55:4, 56:9, 66:15, 68:24, 69:11, 71:11, 82:17, 82:25, 88:20, 90:20, 91:24, 91:25, 99:6, 117:6, 126:15, 141:5, 152:4, 157:3, 159:18, 162:15, 171:2, 185:9, 187:5, 187:25, 188:21, 194:11, 194:12, 194:20, 199:7, 200:17,

204:8, 208:4, 210:8, 213:12, 214:8, 214:14, 216:11, 217:24, 217:25, 218:2, 218:19, 218:23, 221:10, 222:7, 224:12, 232:7, 233:12, 234:2, 236:10
**believes** [1] - 198:3
**belt** [1] - 121:23
**belts** [1] - 115:16
**benefit** [1] - 85:25
**beside** [2] - 110:18, 110:21
**bid** [5] - 215:20, 215:22, 215:23, 215:25
**bigger** [1] - 94:13
**biggest** [1] - 224:18
**bill** [2] - 209:23, 210:5
**bit** [3] - 42:24, 211:6, 225:6
**Black** [1] - 2:13
**Blain** [1] - 77:21
**blank** [1] - 62:12
**BLANK** [1] - 2:9
**blind** [1] - 117:3
**blocks** [2] - 218:14, 218:17
**blood** [2] - 35:12, 242:15
**blowout** [2] - 121:18, 121:19
**blows** [1] - 115:15
**board** [2] - 24:20, 231:15
**book** [1] - 178:6
**Bordentown** [52] - 4:13, 9:15, 9:16, 9:21, 13:12, 13:17, 13:19, 14:4, 14:12, 14:20, 15:14, 15:15, 18:21, 24:14, 29:10, 30:12, 31:11, 48:3, 48:8, 48:21, 48:23, 49:15, 49:17, 49:18, 49:22, 53:22, 55:2, 55:5, 55:10, 55:19, 68:12, 68:13, 69:3, 87:2, 134:20, 134:21, 158:12, 179:13, 187:9, 187:24, 200:24, 204:24, 207:6, 214:25, 216:12, 216:16, 221:24, 226:8, 234:19, 237:16, 238:9, 238:11
**BORDENTOWN** [2] - 1:7, 1:14
**born** [1] - 105:10
**bouncing** [1] - 231:22
**box** [2] - 197:5, 197:6
**brake** [1] - 198:5
**brakes** [14] - 122:3, 122:10, 184:15, 196:13,

196:18, 196:22, 196:24, 197:2, 197:4, 197:7, 197:8, 197:13, 197:16, 198:13
**braking** [1] - 184:16
**break** [8] - 7:18, 7:21, 86:18, 115:18, 121:25, 138:23, 216:8, 235:23
**brief** [3] - 99:15, 138:24, 216:9
**bringing** [1] - 181:6
**broad** [1] - 12:13
**brother** [18] - 49:25, 54:25, 55:24, 55:25, 56:3, 56:19, 58:7, 58:12, 58:13, 153:7, 158:14, 158:15, 158:16, 161:10, 161:11, 162:12, 163:11, 233:22
**brothers** [1] - 210:19
**burden** [1] - 208:16
**Bureau** [1] - 182:19
**business** [11] - 16:21, 24:7, 24:8, 25:10, 30:19, 86:11, 194:23, 194:24, 214:5, 214:11
**buy** [1] - 179:18
**BY** [5] - 2:6, 2:11, 4:6, 236:5, 241:14

### C

**cab** [3] - 117:22, 124:17, 236:13
**cabin** [2] - 116:8, 127:4
**cabinet** [1] - 123:23
**calculation** [1] - 209:9
**calculations** [1] - 211:9
**call** [20] - 6:7, 31:11, 31:15, 31:20, 48:3, 55:22, 66:10, 70:23, 72:17, 78:15, 79:4, 79:19, 87:7, 87:15, 109:15, 123:2, 173:5, 178:11, 178:16, 180:22
**calling** [3] - 31:12, 163:12, 178:3
**calls** [14] - 32:3, 33:6, 33:10, 53:24, 69:12, 80:14, 87:5, 87:16, 88:9, 88:11, 88:14, 94:4, 220:6, 234:25
**camera** [5] - 123:24, 124:9, 124:10, 124:11, 124:12
**cameras** [1] - 124:8
**can you** [26] - 13:6, 17:20, 20:6, 20:22, 34:11, 38:24, 51:14, 51:17, 58:9, 73:18,

75:17, 99:15, 114:24, 134:5, 147:14, 184:3, 185:8, 197:9, 198:18, 200:19, 215:9, 215:18, 222:15, 224:25, 236:14, 237:23
**capability** [1] - 234:5
**capable** [7] - 124:15, 124:25, 125:6, 126:20, 132:2, 132:4, 200:7
**capacity** [5] - 88:12, 143:6, 146:13, 162:17, 169:15
**caption** [2] - 176:16, 185:12
**captioning** [1] - 174:4
**captured** [1] - 232:15
**car** [23] - 113:24, 115:20, 117:20, 122:11, 122:12, 122:13, 125:10, 125:14, 125:23, 125:24, 126:6, 127:17, 184:7, 184:13, 184:14, 184:17, 190:13, 190:14, 226:21, 228:6, 228:7, 228:8, 228:9
**card** [3] - 36:19, 36:22, 56:22
**cardiology** [1] - 36:21
**care** [1] - 40:5
**career** [1] - 41:19
**carrier** [5] - 60:22, 60:23, 84:20, 135:22, 136:17
**Carrier** [105] - 34:21, 36:5, 41:5, 59:23, 60:3, 61:19, 62:16, 62:18, 63:4, 63:11, 66:3, 66:17, 66:24, 69:14, 71:16, 74:3, 75:14, 76:13, 76:16, 76:19, 81:9, 82:14, 82:24, 83:20, 83:22, 84:3, 84:17, 85:12, 85:16, 98:10, 108:10, 108:11, 108:12, 108:17, 109:3, 115:6, 137:7, 142:23, 143:12, 143:14, 143:16, 144:13, 144:24, 145:6, 146:5, 146:6, 147:8, 147:15, 148:6, 148:14, 149:25, 150:9, 151:20, 154:10, 160:8, 160:14, 160:21, 162:7, 162:19, 163:24, 164:6, 164:22, 165:11, 165:21, 167:24, 168:2, 168:3, 168:11, 168:14, 170:17, 183:8, 185:11, 185:13, 185:17, 187:6, 188:17, 189:2, 189:6,

190:9, 193:17, 198:17, 199:14, 199:20, 200:4, 200:5, 200:10, 205:6, 205:15, 207:19, 214:19, 216:19, 216:21, 217:7, 217:11, 219:6, 219:7, 219:12, 219:15, 221:11, 221:16, 221:23, 222:8, 223:22, 234:8, 237:8
**Carrier's** [1] - 129:8
**carriers** [2] - 136:19, 206:13
**cars** [4] - 120:15, 120:25, 121:6, 126:14
**case** [24] - 5:2, 36:20, 36:21, 39:12, 40:6, 67:4, 87:19, 104:16, 110:17, 121:19, 137:16, 142:3, 142:4, 142:5, 142:6, 142:10, 172:2, 200:11, 206:12, 216:16, 220:19, 231:7, 236:16
**cases** [5] - 79:22, 80:7, 107:6, 107:7, 201:19
**catastrophic** [3] - 113:17, 114:19, 198:15
**catch** [3] - 131:4, 136:21
**categorically** [3] - 74:10, 98:8, 205:25
**categories** [1] - 205:3
**category** [2] - 156:25, 157:19
**CC'd** [2] - 44:17, 50:14
**CC's** [1] - 45:11
**CDL** [60] - 16:20, 16:25, 17:4, 35:5, 36:7, 40:24, 41:6, 42:6, 42:8, 42:9, 42:10, 63:25, 65:18, 68:18, 68:23, 72:7, 77:14, 85:21, 86:10, 88:13, 92:15, 93:7, 93:8, 93:9, 94:13, 94:18, 94:24, 95:3, 101:25, 104:19, 105:5, 105:15, 105:17, 107:24, 108:18, 109:22, 111:11, 132:25, 152:23, 153:15, 154:7, 154:8, 158:21, 159:13, 160:20, 162:3, 170:13, 171:14, 173:18, 196:23, 197:9, 202:10, 208:20, 208:21, 212:14, 213:7, 213:23, 214:9, 215:10, 234:17
**Center** [3] - 139:6, 139:12, 139:20
**central** [3] - 31:11, 31:20, 114:22
**CEO** [2] - 187:13,

191:23
  **certificate** [3] - 34:16, 34:18, 202:17
  **certification** [3] - 3:8, 37:4, 99:20
  **certified** [4] - 34:21, 35:20, 99:22, 100:23
  **certify** [2] - 242:8, 242:13
  **chairman** [4] - 71:5, 73:2, 77:3, 169:15
  **chance** [3] - 81:22, 171:5, 229:6
  **chances** [2] - 120:16, 141:7
  **change** [9] - 64:16, 87:22, 160:2, 207:20, 209:16, 209:17, 221:19, 228:3, 234:9
  **changed** [2] - 163:17, 234:6
  **changes** [2] - 163:6, 208:8
  **changing** [3] - 118:14, 227:25, 228:22
  **characteristics** [3] - 114:22, 115:2, 125:22
  **characterization** [1] - 91:15
  **charge** [5] - 23:17, 24:11, 25:6, 27:11, 31:2
  **check** [4] - 35:3, 35:6, 155:3, 210:13
  **checked** [1] - 210:9
  **Chief** [1] - 182:20
  **chief** [4] - 13:7, 13:9, 15:5, 18:23
  **choose** [1] - 34:22
  **chore** [1] - 86:13
  **chose** [1] - 96:5
  **Christine** [1] - 182:19
  **Chuck** [5] - 64:21, 82:20, 108:13, 165:12, 223:24
  **Cindy** [4] - 75:13, 82:11, 83:7, 83:8
  **circumstances** [2] - 150:17, 228:12
  **cited** [1] - 188:16
  **citing** [1] - 191:24
  **Civil** [1] - 6:15
  **claims** [1] - 22:14
  **clarification** [4] - 76:12, 161:19, 221:4, 224:8
  **clarified** [1] - 49:13
  **clarify** [19] - 41:22, 44:13, 45:15, 51:25, 52:10, 62:13, 73:18, 76:19, 81:3, 105:13,

151:15, 154:3, 180:16, 190:7, 195:13, 221:2, 222:15, 224:5, 233:11
  **clarity** [3] - 61:4, 220:20, 220:22
  **clashed** [1] - 65:3
  **class** [10] - 34:3, 93:9, 93:12, 93:16, 101:3, 101:5, 101:6, 102:10, 102:22, 209:20
  **Class** [2] - 124:6, 124:7
  **classes** [6] - 23:5, 93:14, 93:21, 93:22, 94:2, 174:5
  **classroom** [8] - 101:10, 111:17, 111:22, 174:5, 224:9, 225:4, 226:8, 226:10
  **clause** [1] - 191:6
  **clear** [15] - 6:12, 11:14, 49:17, 53:17, 67:8, 73:13, 82:22, 146:11, 151:8, 151:12, 181:12, 225:19, 226:15, 228:13, 228:25
  **clinic** [3] - 36:15, 202:2, 202:8
  **closed** [4] - 103:12, 104:10, 174:24, 176:16
  **closer** [1] - 184:12
  **CMV** [3] - 183:24, 185:2, 189:14
  **coach** [1] - 49:5
  **coast** [1] - 114:18
  **collaboration** [1] - 175:4
  **colleagues** [1] - 136:5
  **color** [4] - 157:19, 157:22, 204:18, 205:18
  **Colorado** [1] - 174:22
  **combination** [1] - 206:23
  **coming** [13] - 65:20, 102:5, 108:6, 113:2, 113:24, 119:7, 119:9, 119:12, 120:2, 120:22, 120:23, 121:2, 223:19
  **comment** [9] - 134:14, 134:22, 154:14, 183:5, 184:4, 191:22, 236:14
  **comments** [7] - 134:20, 135:7, 137:6, 182:16, 183:4, 187:4, 187:11
  **Commerce** [1] - 83:22
  **Commercial** [7] - 27:6, 34:14, 56:20, 71:6, 202:24, 204:17, 204:23
  **commercial** [5] - 72:20, 183:25, 196:12, 196:15, 196:16

  **common** [1] - 135:17
  **communicate** [11] - 8:23, 62:19, 113:14, 113:16, 114:16, 129:5, 129:23, 164:12, 229:12, 231:10, 231:12
  **communicating** [4] - 79:17, 91:25, 128:9, 232:8
  **communication** [8] - 27:5, 43:9, 43:15, 44:14, 44:23, 55:5, 55:7, 56:14
  **communications** [11] - 8:4, 8:7, 10:5, 10:9, 44:7, 45:18, 46:25, 47:5, 47:10, 75:9, 234:2
  **companies** [6] - 99:14, 136:24, 136:25, 137:2, 137:6, 137:23
  **company** [10] - 13:11, 22:22, 24:8, 40:15, 48:16, 94:20, 98:5, 101:24, 109:8, 157:7
  **comparison** [1] - 126:11
  **competent** [1] - 112:13
  **compiling** [1] - 8:20
  **complaint** [1] - 234:3
  **complete** [5] - 45:5, 93:4, 93:24, 98:7, 237:20
  **completely** [2] - 166:16, 166:20
  **complex** [1] - 85:11
  **complications** [2] - 238:15, 238:17
  **comply** [6] - 63:17, 79:25, 144:15, 144:17, 144:24, 166:3
  **component** [4] - 101:3, 102:10, 102:11, 102:23
  **components** [1] - 225:3
  **compounded** [2] - 129:20, 129:21
  **compounds** [1] - 227:23
  **compromised** [1] - 185:4
  **computer** [1] - 157:21
  **concentrate** [1] - 226:3
  **conceptionally** [1] - 187:17
  **concern** [14] - 62:14, 62:15, 95:3, 104:10, 104:17, 115:25, 153:24, 177:6, 192:25, 193:8, 212:10, 214:2, 234:12
  **concerned** [4] - 41:24, 104:12, 184:20, 211:6
  **concerns** [4] - 110:2, 188:24, 189:10, 224:15

  **concluded** [6] - 74:21, 74:22, 74:23, 239:8, 239:12
  **concludes** [1] - 190:12
  **conclusion** [12] - 54:16, 54:17, 148:9, 153:14, 153:16, 153:17, 153:19, 198:17, 202:4, 223:14, 235:2, 238:25
  **conclusions** [4] - 237:15, 238:5, 238:8, 238:11
  **condition** [3] - 23:11, 23:12, 98:6
  **conditions** [4] - 35:15, 37:12, 37:17, 159:14
  **conducted** [1] - 70:4
  **conducting** [2] - 43:21, 46:15
  **cones** [1] - 225:12
  **conference** [18] - 5:11, 64:12, 64:24, 166:8, 166:9, 167:10, 168:12, 168:13, 168:17, 168:21, 169:7, 172:9, 173:5, 174:14, 174:23, 175:13, 180:22, 224:2
  **conferences** [2] - 66:15, 169:3
  **confirmed** [1] - 177:6
  **conflicts** [3] - 63:7, 134:17, 135:21
  **confused** [7] - 49:9, 54:6, 71:18, 153:2, 193:19, 211:11, 228:24
  **conjunction** [1] - 146:8
  **Connelly** [1] - 2:13
  **consequence** [1] - 95:23
  **consider** [6] - 133:5, 133:12, 147:16, 147:18, 147:19, 206:6
  **consideration** [4] - 63:21, 153:24, 167:4, 199:4
  **considered** [6] - 64:3, 83:2, 84:16, 152:24, 198:24, 211:2
  **constantly** [1] - 23:10
  **construction** [1] - 4:24
  **consult** [2] - 137:25, 217:20
  **consulted** [3] - 147:21, 217:16, 217:19
  **consulting** [1] - 218:10
  **contact** [23] - 11:3, 11:8, 11:18, 12:3, 28:10, 67:12, 70:24, 75:4, 76:21, 77:7, 77:13, 77:24, 78:5, 81:6, 81:8,

83:6, 143:5, 143:10, 145:13, 148:16, 155:2, 159:8, 173:24
**contacted** [23] - 14:19, 53:22, 54:2, 54:5, 54:8, 55:19, 58:5, 67:11, 68:11, 69:5, 72:14, 77:5, 81:4, 92:4, 92:5, 99:13, 144:3, 149:4, 158:11, 161:2, 161:9, 161:23, 169:16
**contacting** [4] - 60:9, 61:11, 150:19, 210:13
**contacts** [2] - 76:14, 82:13
**contain** [1] - 195:10
**contained** [1] - 196:2
**contention** [3] - 190:25, 192:3, 192:8
**contents** [2] - 177:22, 237:5
**context** [8] - 51:8, 51:9, 59:11, 82:6, 82:8, 82:9, 89:20, 89:25
**continue** [9] - 51:13, 59:21, 64:2, 65:10, 67:12, 154:14, 154:19, 159:23, 161:17
**continued** [1] - 105:5
**continuing** [1] - 233:20
**continuously** [1] - 66:25
**contract** [5] - 5:2, 5:3, 5:4, 68:4, 216:4
**contracts** [1] - 215:15
**contractural** [2] - 215:8, 215:13
**contradicts** [1] - 185:16
**control** [2] - 37:22, 205:4
**controversial** [1] - 46:11
**conversation** [3] - 165:18, 174:12, 211:21
**conversations** [7] - 33:13, 56:11, 59:22, 63:3, 136:19, 148:7, 149:24
**COP** [3] - 34:14, 38:20, 56:20
**copy** [6] - 3:14, 3:17, 46:22, 47:13, 57:17, 204:7
**corporate** [6] - 6:16, 9:14, 16:21, 43:25, 50:13, 103:3
**corporation** [2] - 48:5, 49:10
**corrected** [1] - 160:12
**correctly** [1] - 75:24

**correspondence** [2] - 86:23, 92:8
**cost** [12] - 170:25, 172:22, 176:18, 210:16, 210:20, 210:21, 211:2, 212:7, 212:24, 212:25
**costing** [1] - 211:22
**counsel** [7] - 3:6, 3:17, 49:4, 75:3, 156:3, 180:19, 235:6
**count** [1] - 18:5
**counties** [2] - 30:18, 96:9
**country** [3] - 71:8, 77:5, 97:4
**COUNTY** [1] - 242:4
**county** [2] - 95:13, 96:10
**couple** [7] - 5:21, 8:2, 9:24, 44:6, 60:12, 77:18, 112:4
**course** [8] - 17:22, 17:23, 18:16, 63:2, 103:13, 104:18, 104:20, 225:9
**courses** [2] - 16:16, 21:13
**COURT** [1] - 1:2
**court** [2] - 47:14, 57:17
**Court** [4] - 1:17, 3:13, 180:22, 241:10
**courtroom** [1] - 5:13
**covered** [2] - 224:9, 224:11
**covers** [1] - 43:13
**crash** [4] - 188:13, 191:3, 192:5, 192:10
**create** [5] - 74:3, 115:25, 229:13, 229:16, 232:11
**created** [8] - 24:22, 24:24, 24:25, 25:2, 25:5, 146:9, 146:10, 166:15
**creates** [1] - 183:3
**creating** [1] - 166:21
**creed** [2] - 204:18, 205:19
**criteria** [1] - 169:2
**critical** [2] - 117:18, 118:16
**cross** [1] - 237:14
**cross-examination** [1] - 237:14
**CTA** [1] - 186:5
**CTL** [1] - 12:7
**culture** [1] - 146:20
**curious** [2] - 204:15, 205:2
**current** [9] - 10:12,

10:16, 135:5, 135:8, 135:10, 135:11, 135:22, 159:14, 159:21
**currently** [4] - 68:8, 78:21, 136:8, 214:14
**curriculum** [1] - 22:13
**cushioned** [1] - 191:9
**custom** [1] - 166:24
**cut** [1] - 152:13
**cut-off** [1] - 152:13
**CV-02917-KM-JBC** [1] - 1:6
**CVTA** [16] - 66:21, 72:13, 72:18, 134:11, 134:13, 134:19, 142:21, 162:17, 187:3, 187:13, 187:22, 191:23, 198:2, 237:7, 238:5, 238:16

**D**

**D.C** [3] - 66:19, 82:15, 168:8
**D.C.** [1] - 168:7
**d/b/a** [1] - 13:13
**Dale** [29] - 19:17, 19:21, 19:22, 19:24, 20:4, 20:7, 20:13, 20:16, 20:19, 23:9, 23:23, 23:25, 24:9, 25:25, 27:4, 30:3, 53:25, 56:11, 59:13, 60:14, 75:20, 87:12, 90:4, 106:23, 140:20, 152:19, 153:6, 156:18, 158:2
**Dale's** [1] - 157:3
**danger** [1] - 232:12
**dangerous** [5] - 103:17, 103:19, 106:14, 106:16, 106:18
**dashboard** [2] - 124:10, 124:11
**data** [4] - 74:17, 74:20, 185:25, 213:21
**date** [18] - 26:24, 47:19, 50:3, 57:23, 58:21, 66:5, 81:19, 89:9, 133:23, 139:14, 152:10, 155:25, 162:15, 182:3, 186:17, 202:25, 203:7, 203:24
**DATE** [1] - 1:10
**dates** [2] - 94:5, 94:9
**day** [38] - 37:7, 38:11, 47:6, 56:22, 57:8, 59:9, 61:14, 71:11, 83:10, 86:7, 88:2, 88:3, 88:4, 90:6, 100:2, 100:17, 100:18, 100:23, 101:8, 101:15, 101:16, 101:17, 102:13, 102:17, 102:19, 102:23, 106:11, 117:22,

163:12, 177:23, 209:4, 209:13, 209:25, 211:9, 211:10, 211:22, 239:18, 242:19
**day's** [1] - 93:17
**days** [7] - 3:16, 34:24, 60:12, 209:12, 209:13, 210:3
**deaf** [119] - 10:13, 10:17, 11:10, 11:21, 12:20, 55:25, 58:6, 58:13, 68:22, 72:6, 76:24, 77:13, 78:4, 78:20, 79:13, 79:24, 80:4, 80:6, 93:23, 94:3, 97:3, 97:13, 98:2, 98:17, 98:25, 102:8, 103:22, 104:23, 105:2, 105:8, 105:10, 105:11, 105:16, 105:17, 105:20, 106:7, 106:12, 106:18, 107:4, 107:17, 109:10, 109:15, 110:5, 110:21, 118:17, 118:24, 119:15, 121:20, 122:18, 123:8, 124:20, 125:10, 126:13, 127:21, 129:5, 130:3, 130:5, 130:9, 131:12, 132:2, 132:4, 132:24, 133:9, 138:5, 139:22, 140:19, 141:17, 144:22, 145:15, 145:17, 146:14, 146:16, 146:19, 146:20, 146:25, 147:22, 147:23, 147:24, 148:10, 149:5, 158:13, 158:17, 158:20, 159:12, 158:18, 159:12, 160:19, 162:2, 162:8, 166:23, 166:24, 169:9, 169:17, 170:10, 170:13, 171:14, 173:17, 175:5, 176:13, 178:7, 185:18, 187:22, 190:19, 192:12, 195:24, 197:12, 197:17, 206:9, 212:13, 213:6, 213:22, 213:25, 214:9, 226:21, 228:8, 229:3, 231:11, 232:9, 232:10, 234:16, 234:20
**Deaf** [10] - 139:5, 139:12, 139:20, 142:17, 144:9, 147:12, 148:8, 150:4, 150:7, 167:18
**deafness** [1] - 97:6
**deal** [1] - 25:22
**dealing** [1] - 128:10
**Dear** [1] - 134:12
**decide** [2] - 101:22, 104:15
**decided** [2] - 69:6, 200:12

decisions [1] - 188:18
declines [1] - 126:4
DEFENDANT [1] - 1:8
Defendant [4] - 1:14, 2:9, 10:6, 43:17
defendant's [1] - 10:12
Defendant's [4] - 10:16, 10:21, 11:8, 11:18
definition [2] - 220:20, 220:22
deflates [1] - 222:12
degree [5] - 21:11, 37:20, 43:23, 109:21, 110:9
degrees [1] - 157:23
Delaware [1] - 15:4
delayed [9] - 127:25, 128:19, 128:24, 129:10, 129:11, 129:18, 129:21, 130:16, 229:19
denied [1] - 233:24
Department [2] - 83:25, 215:21
department [1] - 20:11
departments [3] - 19:7, 19:8, 108:16
depending [4] - 17:9, 35:19, 83:24, 94:3
depose [1] - 12:9
deposition [24] - 3:8, 3:9, 3:14, 4:20, 8:13, 9:17, 45:23, 46:9, 46:15, 47:25, 51:4, 51:5, 132:18, 150:17, 171:20, 180:21, 211:14, 211:15, 211:16, 220:25, 232:24, 235:21, 238:20, 239:7
depositions [1] - 211:4
describe [2] - 99:15, 155:9
described [2] - 150:16, 150:20
description [1] - 164:24
DESCRIPTION [2] - 240:7, 241:4
designated [1] - 17:22
designation [1] - 157:9
designee [2] - 6:16, 43:25
determination [10] - 22:2, 84:24, 132:7, 145:25, 158:24, 159:5, 161:12, 190:10, 200:6, 223:20
determine [2] - 34:20, 142:12
determined [4] - 34:4, 35:14, 136:6, 159:3
developed [1] - 135:16

development [1] - 25:25
device [2] - 121:14, 122:25
diab [1] - 43:24
Diab [20] - 4:10, 6:12, 46:22, 47:2, 47:15, 47:23, 50:7, 57:18, 58:17, 68:8, 90:2, 106:23, 140:21, 140:23, 141:3, 156:19, 156:20, 160:13, 236:7, 237:2
DIAB [2] - 1:15, 239:15
Diab(s [4] - 26:23, 47:18, 57:21, 58:20
diabetes [2] - 37:20, 37:21
Diad's [2] - 44:16, 45:12
diagnosis [2] - 202:4, 202:7
diagonally [1] - 120:19
dialed [1] - 87:20
dictate [2] - 84:3, 205:6
did he [8] - 21:9, 21:16, 22:25, 23:20, 23:21, 29:2, 57:10, 74:10
did it [2] - 78:2, 85:5
did they [2] - 200:14, 200:15
did you [29] - 8:15, 8:17, 8:23, 58:6, 60:12, 60:13, 67:7, 70:23, 70:24, 77:19, 79:4, 80:13, 99:10, 137:14, 137:24, 143:5, 146:22, 149:9, 153:13, 153:18, 158:18, 169:8, 173:6, 173:10, 178:11, 178:12, 201:17, 209:21
difference [2] - 130:4, 225:13
differently [2] - 125:20, 233:14
differs [1] - 187:24
difficult [3] - 39:17, 118:21, 119:12
difficulty [1] - 176:9
diligence [3] - 145:7, 173:13, 173:15
diminish [1] - 197:21
direct [2] - 44:23, 190:22
directing [2] - 226:16, 230:23
direction [7] - 84:18, 119:8, 119:13, 120:2, 136:12, 226:25, 236:22
directions [1] - 37:6
director [14] - 18:24, 26:3, 26:8, 26:11, 26:12, 26:16, 27:11, 27:16,

27:24, 30:8, 30:9, 66:2, 137:21, 165:20
Director [6] - 19:14, 19:24, 21:25, 22:9, 27:7, 90:2
directors [2] - 136:17, 137:2
disabilities [2] - 149:18, 206:7
disability [13] - 26:4, 28:7, 29:2, 29:6, 90:16, 96:16, 96:18, 97:6, 205:2, 205:5, 205:20, 207:22
Disability [1] - 148:19
disabled [4] - 88:12, 91:11, 141:25, 142:3
disagree [1] - 198:16
discretion [1] - 109:3
discuss [2] - 80:14, 224:14
discussed [2] - 12:12, 138:19
discusses [1] - 238:17
discussion [8] - 21:22, 63:10, 80:24, 155:15, 180:13, 181:18, 193:20, 236:2
discussions [2] - 136:3, 137:14
disqualify [2] - 37:13, 39:9
distance [2] - 184:16, 184:18
distinguish [1] - 50:21
distracted [1] - 130:16
distraction [1] - 183:22
DISTRICT [2] - 1:2, 1:2
District [1] - 6:8
Division [2] - 91:23, 182:18
do they [3] - 33:15, 87:24, 227:12
do you [74] - 4:25, 5:6, 5:9, 9:6, 13:11, 24:4, 29:15, 30:23, 31:15, 32:13, 52:3, 52:25, 53:21, 54:15, 56:6, 59:20, 64:5, 74:8, 77:23, 79:10, 87:3, 87:13, 88:5, 88:18, 89:20, 89:25, 90:8, 90:24, 91:5, 92:4, 92:8, 98:18, 99:2, 100:3, 103:2, 103:21, 112:18, 115:7, 122:18, 122:22, 125:9, 127:20, 131:12, 138:11, 140:8, 142:5, 143:21, 145:24, 147:20, 157:11, 172:10, 173:11, 176:4, 194:6, 197:11,

198:7, 198:9, 201:17, 204:3, 207:10, 215:5, 215:14, 215:24, 216:11, 216:22, 217:8, 218:7, 218:17, 219:19, 219:25, 222:14, 234:19, 234:22, 237:21
docking [3] - 111:24, 225:8, 236:20
doctor [1] - 38:9
document [35] - 26:22, 46:16, 47:7, 47:17, 51:24, 56:18, 57:14, 57:20, 58:19, 75:3, 75:7, 81:17, 89:4, 89:14, 133:21, 139:17, 140:6, 141:11, 142:16, 152:2, 152:7, 155:22, 156:4, 181:24, 182:7, 186:9, 186:14, 186:18, 186:21, 187:11, 203:4, 203:12, 205:12, 207:25, 237:6
Document [13] - 240:8, 240:9, 240:11, 240:13, 240:14, 240:16, 240:19, 240:21, 240:22, 240:24, 241:5, 241:6, 241:8
documentation [1] - 64:5
documents [17] - 8:15, 34:11, 34:12, 55:11, 56:17, 56:25, 57:25, 78:12, 139:3, 139:10, 143:2, 165:24, 181:3, 203:18, 203:21, 205:11, 208:2
does it [5] - 17:3, 32:22, 96:12, 179:5, 238:9
does that [5] - 95:8, 111:12, 157:2, 206:12, 231:19
does this [1] - 238:22
doesn't [21] - 45:5, 61:22, 83:4, 83:17, 97:23, 125:12, 125:13, 125:14, 134:12, 155:9, 157:8, 164:4, 194:8, 194:9, 194:11, 195:18, 196:7, 205:17, 209:14, 226:9
dog [1] - 53:12
Don [5] - 187:12, 191:10, 191:12, 191:23, 237:9
DOT [8] - 33:11, 34:11, 60:17, 82:23, 83:14, 83:15, 92:19, 135:22
dotted [1] - 23:24
double [2] - 155:3, 209:25

doubt [2] - 116:24, 137:8
dozen [2] - 162:18, 215:23
drafting [1] - 61:24
dramatically [4] - 209:17, 227:25, 228:3, 228:22
draw [3] - 183:13, 184:24, 188:9
drew [1] - 153:16
drive [26] - 64:3, 104:15, 111:25, 117:2, 117:22, 125:10, 154:14, 154:19, 166:23, 169:10, 187:23, 190:13, 195:24, 196:8, 196:9, 196:21, 197:9, 197:10, 197:12, 197:18, 198:11, 199:18, 201:13, 212:13, 213:7, 213:23
driven [5] - 113:3, 113:5, 114:7, 146:25, 147:2
driver [41] - 10:19, 11:11, 12:20, 21:11, 31:13, 79:24, 80:4, 80:6, 86:9, 91:12, 92:12, 98:16, 98:24, 105:14, 105:19, 106:5, 109:10, 110:3, 114:23, 115:3, 115:8, 122:16, 129:16, 138:5, 144:22, 145:10, 183:22, 183:24, 184:19, 185:15, 185:19, 185:20, 189:14, 190:14, 190:15, 191:16, 191:24, 213:25, 226:20, 227:5, 232:9
Driver [4] - 27:6, 87:2, 182:19, 202:24
DRIVER [2] - 1:7, 1:14
driver's [5] - 9:15, 39:3, 39:5, 92:24, 99:16
Drivers [1] - 13:12
drivers [15] - 21:2, 97:3, 104:24, 105:2, 105:8, 106:7, 147:25, 169:8, 179:8, 190:19, 193:5, 200:17, 200:21, 216:5, 216:6
Driving [6] - 173:21, 175:15, 180:24, 200:24, 204:17, 204:23
driving [53] - 9:20, 14:21, 23:7, 24:16, 39:8, 48:21, 49:23, 62:23, 70:24, 72:5, 73:14, 101:13, 102:11, 105:6, 106:3, 106:4, 106:10, 106:13, 106:15, 107:5, 110:6, 110:22, 111:2,

111:20, 116:2, 116:7, 116:22, 117:17, 121:11, 123:19, 123:23, 124:3, 124:23, 125:16, 125:18, 126:5, 126:14, 127:18, 130:11, 130:16, 132:5, 138:20, 141:19, 147:7, 168:24, 178:7, 187:9, 194:2, 194:12, 194:15, 206:10, 218:11, 228:8
drug [1] - 92:19
drugs [1] - 40:6
drunken [1] - 39:8
dual [2] - 184:14
ducks [1] - 77:8
due [3] - 145:7, 173:13, 173:14
DUI [2] - 39:16, 40:13
duly [2] - 4:3, 242:10
dumped [1] - 217:3
duties [1] - 30:15
dwessendorf@ smithsolomon.com [1] - 52:7
DWI [2] - 40:5, 41:2

## E

e-mail [33] - 27:5, 32:14, 44:18, 47:5, 47:10, 52:2, 52:3, 52:10, 52:23, 52:24, 53:9, 53:10, 55:16, 59:5, 61:24, 66:11, 69:4, 75:13, 75:18, 75:20, 76:10, 81:24, 82:7, 84:6, 84:12, 106:23, 140:25, 141:16, 145:12, 152:15, 153:4, 156:23, 158:8
e-mailed [4] - 28:6, 55:10, 71:20, 82:20
e-mails [14] - 44:21, 46:21, 50:15, 52:18, 52:21, 53:18, 64:6, 66:16, 78:10, 79:18, 143:19, 156:22, 165:24, 181:4
early [4] - 49:18, 55:22, 66:17, 67:18
easier [2] - 63:12, 176:19
East [2] - 1:19, 2:5
Eastern [1] - 6:8
easy [3] - 62:24, 86:13, 110:14
education [3] - 21:10, 139:22, 140:18
effect [3] - 3:12, 3:15, 79:19
effectively [3] - 60:19,

176:12, 229:12
eight [8] - 33:2, 33:4, 33:17, 34:7, 38:17, 99:25, 190:4, 207:9
Eisenberg [1] - 1:18
EISENBERG [1] - 2:4
elaborate [3] - 20:22, 35:8, 153:18
eliminate [1] - 37:22
Elmy [2] - 79:6, 79:23
emergency [4] - 120:6, 124:22, 130:7, 130:11
emphatically [1] - 165:8
employ [1] - 40:8
employed [1] - 19:19
employee [1] - 163:4
employees [1] - 235:5
encompassed [1] - 27:14
encompassing [1] - 27:21
end [5] - 67:14, 159:8, 220:24, 236:8
ended [2] - 73:7, 121:18
ends [2] - 128:14, 188:12
engine [1] - 123:21
enroll [17] - 34:8, 35:4, 42:16, 68:13, 68:23, 72:7, 76:24, 77:14, 78:17, 88:11, 91:12, 92:13, 92:14, 160:19, 161:11, 201:6, 220:3
enrolled [2] - 29:3, 32:25
enrolling [4] - 31:6, 32:24, 38:19, 95:24
Enrollment [1] - 202:25
enrollment [2] - 33:20, 207:11
entail [1] - 111:13
entails [1] - 38:25
enter [1] - 112:24
entirety [1] - 193:12
entities [2] - 11:9, 11:19
entitled [3] - 139:19, 202:23, 220:18
entity [2] - 14:20, 14:23
environment [3] - 116:3, 116:4, 224:23
epileptic [1] - 199:18
equipment [9] - 25:13, 99:23, 99:24, 99:25, 100:4, 100:9, 101:7, 103:19, 135:23
equipped [1] - 158:20
ESQ [2] - 2:6, 2:11
essentially [1] - 115:3
establish [1] - 28:14

evaluate [1] - 22:18
event [2] - 35:25, 36:3
events [3] - 35:19, 36:25, 76:13
everybody [4] - 33:10, 150:2, 163:23, 220:17
evidence [13] - 188:15, 188:16, 189:21, 190:8, 190:17, 190:24, 191:13, 191:21, 192:2, 192:5, 192:7, 193:18, 213:19
exact [7] - 30:15, 79:12, 79:14, 81:5, 166:8, 168:15, 191:19
exactly [9] - 27:10, 29:15, 77:2, 151:12, 164:21, 174:3, 207:15, 215:18, 225:14
exam [17] - 35:20, 38:3, 38:19, 60:4, 60:5, 60:6, 60:7, 74:11, 82:23, 83:14, 83:15, 85:22, 111:20, 133:14, 135:18, 145:20, 201:2
Examination [1] - 239:11
examination [6] - 101:2, 111:13, 236:9, 237:14, 242:9, 242:11
EXAMINATION [4] - 1:13, 4:6, 236:5, 241:14
examined [1] - 4:5
examiner [22] - 19:5, 34:22, 34:23, 35:3, 35:20, 36:14, 36:17, 36:18, 37:2, 38:12, 77:22, 133:14, 138:2, 184:19, 189:14, 201:10, 201:11, 201:16, 201:21, 201:22, 202:6
examiners [4] - 70:6, 108:18, 135:19, 136:8
examining [1] - 78:20
example [9] - 21:10, 36:2, 39:16, 40:12, 128:2, 130:18, 197:15, 208:21, 222:25
exceed [1] - 17:8
except [4] - 3:21, 6:6, 181:11, 181:14
exception [1] - 83:16
exceptions [2] - 70:2, 70:3
exchange [3] - 82:10, 89:21, 90:18
executive [2] - 191:14, 192:6
exemption [6] - 80:14, 82:24, 117:3, 136:10, 198:18, 218:21

exemption's [1] - 185:5
exemptions [13] -
64:17, 69:10, 117:10,
117:14, 142:10, 154:4,
183:9, 183:10, 185:10,
187:4, 188:18, 198:3,
198:19
exercise [1] - 133:8
Exhibit [1] - 152:2
exhibit [4] - 47:4, 152:3,
208:12, 237:2
EXHIBIT [4] - 240:6,
241:3
Exhibit 1 [2] - 26:20,
26:23
Exhibit 10 [2] - 155:19,
155:24
Exhibit 11 [2] - 181:22,
182:2
Exhibit 12 [4] - 186:12,
186:16, 191:22, 197:24
Exhibit 13 [2] - 202:21,
203:6
Exhibit 2 [3] - 47:15,
47:18, 51:21
Exhibit 3 [2] - 57:18,
57:22
Exhibit 4 [3] - 58:17,
58:20, 69:4
Exhibit 5 [2] - 81:15,
81:18
Exhibit 6 [7] - 88:22,
89:2, 89:8, 106:22,
109:7, 140:9, 140:11
Exhibit 7 [2] - 133:18,
133:22
Exhibit 8 [5] - 139:7,
139:13, 139:18, 140:17,
141:10
Exhibit 9 [3] - 152:4,
152:5, 152:9
EXHIBITS [2] - 240:4,
241:2
Exhibits [1] - 241:10
existed [1] - 124:19
exists [1] - 19:20
expanded [1] - 165:2
expected [1] - 221:19
experience [2] - 125:17,
146:24
expert [4] - 123:12,
137:8, 195:23, 213:21
expertise [1] - 160:9
experts [2] - 136:4,
136:14
expire [2] - 61:12, 61:15
explain [11] - 17:20,
34:11, 38:24, 59:25,
60:15, 72:11, 184:3,

185:8, 215:3, 215:9,
224:25
explained [4] - 9:10,
54:19, 55:24, 151:18
exposing [1] - 135:20
exposure [1] - 198:13
expressed [1] - 73:11
Expressway [1] -
112:25
extensive [2] - 70:5,
150:20
extent [2] - 44:9, 46:6,
150:10, 234:25
extra [1] - 229:15
extremely [3] - 106:15,
116:22, 157:20
eye [1] - 113:23

F

facilities [2] - 23:12,
170:2
facility [1] - 21:6
fact [10] - 17:5, 47:22,
85:13, 128:21, 134:9,
158:23, 196:17, 212:12,
217:25, 229:22
factor [1] - 231:9
factors [2] - 196:4,
201:2
failure [1] - 135:23
fair [1] - 219:25
fairly [1] - 155:9
fall [1] - 217:6
falls [1] - 31:22
familiar [15] - 19:13,
21:15, 54:20, 55:2,
64:10, 65:11, 97:3,
114:8, 122:17, 124:4,
140:4, 166:25, 188:19,
188:20, 238:4
fatalities [2] - 106:7,
192:14
FBI [1] - 215:11
February [6] - 49:2,
49:19, 55:23, 56:4,
67:19, 90:19
Federal [141] - 6:5, 6:15,
34:21, 36:5, 37:2, 37:4,
38:13, 41:4, 59:22, 60:2,
60:20, 60:24, 61:3,
61:19, 61:21, 62:2, 62:5,
62:9, 62:16, 62:18, 63:4,
63:10, 66:3, 66:16,
66:23, 69:7, 69:14,
70:25, 71:16, 71:22,
74:2, 75:8, 75:14, 76:13,
76:16, 76:18, 80:14,
81:6, 81:9, 82:13, 82:18,
82:23, 83:19, 84:3,

84:17, 85:15, 95:5,
98:10, 108:9, 108:10,
108:12, 108:17, 108:24,
109:3, 115:6, 129:7,
133:10, 134:15, 134:17,
137:7, 142:22, 143:12,
143:14, 143:16, 144:5,
144:12, 144:24, 145:5,
146:5, 147:8, 147:14,
148:6, 148:14, 149:21,
149:25, 150:9, 151:20,
154:9, 159:15, 160:7,
160:14, 160:21, 161:22,
162:7, 162:18, 163:7,
163:23, 164:6, 164:22,
165:11, 165:21, 167:23,
167:25, 168:3, 168:11,
168:14, 170:17, 182:13,
183:2, 183:6, 183:8,
185:11, 185:13, 185:17,
187:3, 187:6, 188:17,
188:25, 189:5, 190:9,
193:17, 198:17, 199:13,
199:20, 200:3, 200:4,
200:10, 205:5, 205:14,
207:19, 214:19, 214:22,
215:2, 215:6, 216:19,
216:21, 217:7, 217:11,
219:6, 219:12, 219:15,
221:11, 221:16, 221:22,
222:8, 223:22, 234:7,
235:12, 237:8
feel [5] - 114:3, 121:21,
121:22, 195:16, 195:17
feet [2] - 124:16, 124:18
felt [2] - 143:11, 145:7
female [1] - 207:8
field [1] - 23:10
fight [1] - 170:6
figure [4] - 109:18,
128:5, 218:5, 234:23
figured [1] - 77:6
file [3] - 134:14, 134:20,
134:22
filed [1] - 137:6
filing [1] - 3:7
fill [1] - 29:25
fill-in [1] - 29:25
filled [1] - 30:5
filter [1] - 191:10
final [2] - 82:21, 84:24
financial [1] - 208:16
find [6] - 39:14, 60:3,
61:4, 82:18, 188:21,
197:4
fine [9] - 6:10, 46:3,
50:18, 51:16, 67:25,
160:18, 172:23, 181:10,
181:15
finish [1] - 129:3

finished [2] - 182:5,
186:19
fire [2] - 20:11, 123:21
firmly [2] - 217:24,
222:7
first [38] - 4:3, 8:22,
18:8, 18:9, 43:4, 48:11,
48:22, 49:23, 52:2,
52:10, 52:23, 55:10,
55:15, 55:18, 57:3,
60:22, 62:14, 68:24,
74:5, 91:6, 101:5,
102:23, 109:14, 129:14,
140:5, 143:15, 144:15,
152:19, 153:3, 154:11,
158:23, 160:7, 164:10,
174:11, 174:25, 175:2,
213:2, 218:22
fits [1] - 132:20
five [9] - 25:7, 30:13,
126:21, 126:22, 130:19,
168:5, 168:8, 188:12,
210:2
flashcard [2] - 183:21,
184:7
flashing [3] - 122:15,
122:19, 123:7
fleet [7] - 19:3, 20:20,
20:21, 25:23, 26:12
Fleet [1] - 19:24
flip [1] - 113:21
flush [1] - 75:7
FMCSA [3] - 63:12,
63:16, 83:15
FMSCA [1] - 136:12
focus [9] - 42:2, 42:6,
42:7, 42:10, 154:22,
227:3, 227:8, 227:9,
228:17
focussed [2] - 41:8,
42:5
folks [6] - 17:13, 61:6,
63:21, 74:19, 92:23,
217:22
follow [6] - 35:7, 35:10,
126:7, 199:11, 199:12,
218:13
followed [1] - 138:16
following [3] - 37:5,
60:11, 227:14
follows [1] - 4:5
foot [2] - 188:13, 197:5
force [3] - 3:15, 38:6,
38:10
Force [3] - 20:9, 20:11,
20:13
forced [1] - 80:19
foreign [2] - 164:19,
164:25
forget [2] - 111:6,

128:19
  **forklift** [46] - 10:18, 10:24, 16:23, 88:16, 90:12, 90:21, 90:22, 91:12, 92:12, 93:3, 93:6, 93:8, 93:24, 94:14, 98:16, 98:24, 99:16, 100:6, 100:15, 100:24, 101:13, 102:2, 102:3, 103:5, 103:14, 103:16, 103:23, 104:5, 107:5, 107:23, 109:10, 109:16, 110:6, 110:18, 110:22, 111:3, 111:5, 141:5, 141:18, 142:11, 206:10, 208:23, 208:24, 209:3, 233:4, 233:8
  **forklifts** [2] - 93:9, 100:10
  **form** [37] - 3:21, 6:6, 15:10, 16:17, 21:12, 22:4, 25:20, 26:6, 28:13, 28:21, 31:18, 41:14, 42:18, 53:24, 55:14, 62:7, 68:16, 91:14, 96:19, 106:8, 106:19, 107:21, 131:18, 132:10, 147:4, 148:3, 150:13, 155:6, 161:5, 187:5, 191:5, 192:16, 212:16, 213:11, 218:9, 220:5, 233:17
  **forth** [3] - 112:11, 187:10, 242:10
  **forthcoming** [1] - 223:15
  **forum** [1] - 64:19
  **forward** [4] - 87:11, 110:13, 114:12, 193:18
  **forwarded** [1] - 153:7
  **forwards** [1] - 87:10
  **found** [5] - 182:24, 185:13, 190:24, 192:2, 192:7
  **four** [5] - 91:2, 91:3, 91:11, 197:25, 215:23
  **frankly** [3] - 64:11, 147:12, 219:2
  **French** [1] - 223:2
  **frilando** [1] - 84:25
  **Frilando** [83] - 4:16, 4:18, 10:6, 10:10, 14:19, 15:17, 28:19, 43:2, 43:16, 44:15, 44:25, 47:11, 48:12, 48:18, 48:24, 49:24, 50:8, 53:21, 54:8, 54:18, 54:21, 54:23, 54:24, 55:3, 55:10, 55:19, 56:8, 56:11, 56:14, 56:16,

56:24, 57:6, 58:5, 58:11, 59:15, 59:18, 60:10, 60:15, 61:9, 61:10, 62:12, 62:22, 67:9, 67:16, 68:11, 69:5, 70:2, 71:20, 81:4, 84:8, 84:15, 86:23, 86:25, 87:2, 126:15, 143:6, 144:3, 145:13, 148:12, 149:6, 149:21, 150:11, 154:6, 158:4, 158:8, 158:11, 158:18, 159:22, 161:2, 161:7, 161:9, 161:23, 179:12, 182:23, 210:12, 210:19, 210:25, 211:4, 211:12, 211:17, 212:20, 218:20, 219:19
  **FRILANDO** [1] - 1:3
  **Frilando's** [10] - 54:25, 55:6, 87:19, 153:6, 158:14, 158:15, 162:12, 163:11, 216:16, 233:21
  **front** [8] - 110:19, 110:25, 111:4, 111:9, 160:17, 178:6, 180:5, 236:25
  **fuel** [1] - 21:5
  **fulfill** [1] - 143:15
  **full** [2] - 7:14, 163:4
  **full-time** [1] - 163:4
  **fully** [1] - 45:23
  **function** [1] - 30:2
  **fundamentally** [1] - 185:3
  **FURTHER** [1] - 3:20
  **futility** [1] - 133:8

**G**

  **game** [1] - 172:24
  **gather** [1] - 133:2
  **gathered** [1] - 9:3
  **gauge** [3] - 122:6, 123:7, 123:14
  **gauges** [2] - 122:9, 123:15
  **gave** [12] - 63:5, 84:13, 85:2, 99:12, 109:3, 137:13, 153:21, 177:15, 177:17, 177:24, 178:5, 214:21
  **gear** [7] - 113:20, 114:2, 114:4, 114:11, 114:14, 114:18, 128:15
  **gears** [1] - 42:23
  **German** [1] - 223:2
  **gets** [7] - 42:3, 85:11, 97:23, 209:11, 231:4, 231:14, 231:19
  **girls** [5] - 87:11, 87:13,

87:21, 88:5
  **give** [23] - 33:7, 36:17, 78:24, 87:7, 94:9, 99:21, 109:4, 109:5, 110:10, 131:23, 145:23, 157:23, 173:24, 173:25, 175:6, 178:18, 199:17, 199:22, 199:24, 200:13, 218:19, 233:24, 236:22
  **given** [19] - 13:23, 38:7, 50:3, 55:21, 69:11, 73:21, 135:13, 135:14, 153:23, 154:11, 172:11, 174:17, 177:13, 185:10, 199:14, 203:22, 206:15, 219:20, 242:12
  **gives** [1] - 84:6
  **giving** [6] - 57:16, 63:25, 64:18, 124:25, 131:7, 173:15
  **glasses** [2] - 117:11, 117:12
  **goal** [5] - 39:22, 41:20, 93:2, 93:5, 145:9
  **goes** [16] - 18:10, 34:23, 42:2, 46:7, 95:22, 97:7, 98:17, 114:18, 125:24, 125:25, 126:18, 188:11, 190:13, 202:14, 202:15, 221:10
  **Google** [1] - 172:13
  **gotta** [3] - 113:22, 231:6, 231:7
  **gotten** [9] - 29:6, 36:4, 42:9, 72:8, 138:12, 169:13, 215:17, 231:18
  **government** [9] - 37:4, 38:13, 61:22, 133:11, 159:16, 163:7, 215:6, 217:13, 235:13
  **governs** [1] - 191:7
  **graduates** [2] - 41:10, 196:19
  **graduation** [1] - 98:4
  **grant** [3] - 188:18, 190:10, 198:18
  **granting** [2] - 202:13, 238:18
  **grasp** [1] - 112:20
  **great** [1] - 110:9
  **greater** [3] - 184:16, 184:18, 229:14
  **greatest** [2] - 37:8, 37:11
  **grew** [1] - 25:16
  **ground** [1] - 103:9
  **group** [3] - 32:2, 218:4, 224:2
  **growing** [1] - 25:3
  **guess** [5] - 29:14,

43:10, 43:13, 61:20, 118:23
  **guidance** [16] - 60:2, 60:16, 63:15, 69:2, 75:21, 76:22, 77:15, 84:23, 109:9, 136:11, 144:6, 151:12, 160:2, 160:5, 165:25, 182:23
  **guidelines** [2] - 37:5, 60:24
  **guiding** [1] - 230:18
  **guys** [3] - 179:15, 210:2, 227:18

**H**

  **half** [4] - 102:23, 113:19, 159:25, 162:17
  **HALLER** [110] - 2:11, 5:19, 5:25, 6:11, 11:13, 11:24, 15:10, 16:17, 21:12, 22:4, 25:20, 26:6, 28:12, 28:21, 31:17, 41:13, 42:18, 43:8, 43:19, 44:22, 45:10, 45:16, 46:3, 47:21, 49:7, 50:6, 50:10, 50:18, 50:25, 51:7, 51:16, 51:19, 53:23, 55:13, 62:6, 65:13, 67:22, 68:16, 91:14, 96:19, 106:8, 106:19, 107:20, 131:17, 132:9, 138:22, 140:10, 143:21, 143:24, 147:3, 148:2, 150:12, 150:16, 150:24, 151:5, 151:9, 155:5, 161:5, 171:15, 171:23, 172:10, 172:15, 172:19, 173:8, 173:11, 173:19, 174:9, 174:17, 174:21, 175:14, 175:19, 175:23, 176:2, 176:24, 177:13, 177:17, 177:20, 178:8, 178:14, 178:23, 179:11, 179:24, 180:3, 181:10, 181:14, 191:4, 191:15, 192:15, 194:15, 206:3, 206:11, 206:18, 212:15, 213:10, 213:15, 218:9, 220:4, 223:16, 232:22, 233:2, 233:16, 234:24, 235:22, 236:3, 236:6, 237:7, 237:11, 237:25, 239:5, 241:16
  **Hamilton** [4] - 207:2, 207:3, 207:7, 207:21
  **hammering** [1] - 60:12
  **hand** [1] - 242:19
  **handbook** [4] - 62:18,

108:17, 108:22, 108:24
**handed** [2] - 139:16, 216:25
**handle** [7] - 29:2, 76:15, 142:3, 158:20, 159:2, 159:4, 166:17
**handled** [4] - 22:13, 25:9, 25:11, 26:4
**handwritten** [1] - 134:6
**happening** [2] - 130:7, 228:16
**happens** [8] - 104:14, 108:5, 113:25, 125:2, 125:5, 128:13, 133:16, 230:13
**happily** [1] - 170:21
**happy** [1] - 65:9
**hard** [20] - 10:13, 10:18, 11:11, 11:21, 37:21, 39:14, 40:2, 93:10, 93:14, 93:23, 94:8, 139:22, 140:19, 162:13, 170:20, 185:18, 187:23, 190:19, 192:12, 233:22
**Hard** [1] - 91:23
**harder** [1] - 96:16
**hasn't** [1] - 234:6
**have you** [48] - 4:19, 7:7, 8:12, 13:18, 42:25, 57:24, 59:2, 59:5, 59:23, 72:7, 81:24, 83:6, 88:10, 89:13, 89:16, 90:13, 96:4, 106:6, 107:11, 110:19, 112:5, 117:4, 117:23, 133:25, 134:3, 137:11, 138:20, 139:24, 140:3, 142:16, 142:19, 142:25, 148:21, 152:15, 152:18, 156:6, 162:9, 182:7, 182:10, 186:21, 186:24, 189:25, 203:12, 203:15, 208:6, 210:9, 231:19, 232:19
**hazard** [1] - 189:14
**Hazmat** [2] - 20:15, 23:6
**he'd** [1] - 20:9
**he's** [1] - 206:14
**head** [3] - 7:16, 77:21, 99:3
**heading** [4] - 183:14, 204:12, 237:19, 238:15
**hear** [25] - 38:8, 43:4, 115:14, 115:19, 115:21, 116:19, 119:4, 119:16, 119:20, 120:3, 120:20, 121:10, 121:12, 121:21, 121:23, 121:25, 122:7, 123:19, 205:9, 229:24, 230:7, 230:10, 230:12
**heard** [20] - 42:25, 43:6,

96:25, 104:4, 104:25, 105:3, 105:9, 106:6, 119:22, 124:12, 124:14, 142:16, 142:19, 142:22, 142:23, 148:21, 148:23, 162:19, 165:5, 211:5
**hearing** [82] - 10:14, 10:18, 11:11, 11:21, 37:18, 37:24, 37:25, 38:5, 56:23, 57:5, 57:7, 57:9, 57:12, 59:24, 60:5, 63:5, 63:25, 64:17, 65:21, 66:4, 70:11, 70:16, 70:19, 73:25, 80:16, 80:18, 82:19, 85:2, 88:16, 90:11, 93:11, 93:14, 93:23, 94:8, 105:4, 105:17, 109:4, 109:6, 118:20, 119:11, 125:8, 129:22, 130:21, 130:22, 130:25, 136:10, 138:13, 138:18, 139:23, 140:19, 142:10, 154:13, 154:19, 170:20, 175:5, 182:14, 183:9, 183:10, 185:11, 185:14, 185:18, 185:19, 187:4, 187:8, 187:23, 188:18, 190:19, 191:2, 192:3, 192:8, 192:13, 193:5, 198:3, 198:4, 199:16, 201:3, 212:20, 219:8, 219:20, 220:2, 230:4
**Hearing** [1] - 91:23
**heart** [1] - 35:14
**held** [8] - 1:17, 21:22, 80:24, 155:15, 169:3, 180:13, 181:18, 236:2
**hello** [1] - 4:14
**help** [8] - 22:16, 44:10, 60:17, 86:14, 128:17, 145:5, 147:14, 234:3
**helpful** [2] - 45:17, 68:7
**helps** [1] - 46:6
**henry** [1] - 79:6
**HEREBY** [1] - 3:5
**hereby** [1] - 242:8
**herein** [1] - 3:7
**hereinbefore** [1] - 242:10
**hereunto** [1] - 242:18
**Hertz** [1] - 197:5
**hesitant** [2] - 62:4, 62:10
**hey** [6] - 62:25, 121:14, 125:4, 129:25, 147:14, 170:24
**hi** [2] - 60:13, 154:15
**hide** [1] - 180:4
**high** [5] - 131:3, 157:4,

157:12, 157:15, 165:22
**higher** [2] - 210:6, 235:11
**highest** [1] - 96:9
**Highland** [3] - 29:24, 29:25, 30:4
**Highland's** [1] - 30:6
**highlighted** [1] - 174:7
**highlights** [1] - 184:23
**highly** [1] - 74:13
**highway** [5] - 116:7, 121:2, 121:16, 128:2, 189:15
**hill** [4] - 125:19, 125:21, 125:24, 125:25
**hindsight** [1] - 147:20
**hire** [3] - 40:4, 40:16, 98:6
**hired** [1] - 25:22
**historically** [3] - 65:17, 199:14, 199:25
**history** [1] - 29:10
**hold** [2] - 36:7, 237:4
**holding** [1] - 126:20
**Homeland** [2] - 215:11, 215:21
**honest** [1] - 5:16
**honestly** [3] - 5:12, 36:8, 143:17
**Horan** [5] - 64:21, 82:20, 108:13, 165:13, 223:24
**host** [1] - 62:5
**hour** [5] - 17:6, 17:23, 18:16, 100:13, 103:8
**hours** [5] - 7:8, 17:9, 17:19, 17:25, 99:25
**how are** [6] - 33:14, 69:17, 70:7, 171:9, 217:18, 217:21
**how did** [1] - 102:21
**how do** [15] - 16:7, 69:19, 80:12, 114:13, 168:23, 185:24, 192:25, 193:8, 193:9, 214:2, 214:5, 215:4, 231:6
**how is** [4] - 55:2, 128:7, 128:8, 226:2
**how many** [15] - 14:11, 17:10, 17:11, 29:15, 31:4, 31:23, 88:18, 90:24, 92:5, 95:10, 99:3, 99:4, 99:16, 100:14, 137:14
**how often** [5] - 33:18, 87:24, 168:17, 207:10, 215:14
**HR** [2] - 206:24, 206:25
**hum** [4] - 41:21, 146:17,

146:21, 201:5
**hundred** [3] - 195:2, 213:17, 229:4
**hundreds** [1] - 195:7
**hurt** [1] - 229:8
**hydraulic** [1] - 197:8
**hyperlinks** [2] - 178:9, 178:13
**hypothetical** [1] - 181:7

---

**I**

**i've** [1] - 156:15
**idea** [10] - 59:17, 114:9, 114:10, 119:9, 132:2, 132:4, 145:18, 169:23, 171:10
**ideas** [1] - 147:24
**identical** [2] - 17:2, 17:4
**identification** [16] - 26:24, 47:19, 57:22, 58:21, 81:15, 81:19, 89:9, 133:23, 139:8, 139:14, 152:9, 155:20, 155:24, 182:2, 186:16, 203:7
**imagine** [3] - 112:21, 112:22, 223:7
**impaired** [28] - 37:19, 37:24, 38:2, 38:5, 59:24, 60:5, 65:21, 66:4, 70:12, 70:16, 70:20, 73:25, 82:19, 88:16, 90:11, 105:18, 129:22, 138:18, 182:14, 185:12, 185:14, 187:4, 193:5, 198:4, 212:20, 219:8, 229:23
**impairment** [1] - 191:2, 192:4, 192:9
**importance** [1] - 157:4
**important** [6] - 116:22, 117:6, 117:16, 118:5, 137:20, 158:2
**importantly** [1] - 85:8
**impression** [2] - 84:6, 84:14
**IN** [1] - 242:18
**in-class** [4] - 101:3, 101:5, 102:10, 102:22
**in-classroom** [1] - 111:17
**incapable** [1] - 200:8
**incentive** [1] - 94:18
**inch** [2] - 36:9, 36:10
**inclines** [1] - 126:4
**include** [2] - 195:19, 209:15
**included** [4] - 150:18, 164:23, 165:5, 190:18
**includes** [2] - 108:20,

DIAB

223:20
  **incorporated** [1] - 14:9
  **incorrect** [1] - 69:23
  **increased** [4] - 191:2,
192:4, 192:9, 192:13
  **increases** [1] - 208:7
  **indefinite** [1] - 209:10
  **indefinitely** [1] - 18:15
  **Index** [1] - 1:5
  **indicated** [1] - 152:24
  **indicating)** [2] - 120:11,
141:3
  **indication** [2] - 137:13,
153:21
  **indicators** [1] - 135:24
  **individual** [10] - 22:21,
34:14, 95:12, 192:24,
199:15, 200:2, 201:19,
201:24, 237:19
  **individually** [2] - 31:16,
218:16
  **individuals** [11] - 10:14,
10:18, 69:13, 69:15,
117:7, 136:10, 190:25,
192:3, 192:8, 192:12,
198:4
  **industry** [7] - 74:14,
136:6, 137:9, 193:22,
217:16, 217:17, 217:18
  **inference** [1] - 47:24
  **inferred** [1] - 177:4
  **influence** [1] - 7:6
  **informal** [1] - 5:10
  **information** [25] - 8:20,
9:4, 33:8, 78:24, 135:5,
135:8, 135:10, 135:11,
147:11, 172:3, 174:11,
175:7, 175:9, 177:7,
177:21, 178:18, 178:19,
185:23, 186:3, 186:7,
193:8, 193:23, 208:22,
209:8, 234:4
  **inherent** [1] - 63:7
  **initial** [4] - 87:15, 159:7,
174:14, 191:6
  **initially** [1] - 202:13
  **initiative** [1] - 76:21
  **injury** [1] - 5:2
  **inquire** [2] - 32:23, 76:4
  **inquires** [1] - 34:8
  **inquiries** [4] - 32:14,
32:16, 32:18, 32:20
  **inquiring** [4] - 31:6,
38:18, 55:19, 78:25
  **inquiry** [2] - 87:6, 92:9
  **inside** [5] - 116:5,
116:6, 116:8, 126:17,
226:16
  **insisting** [1] - 46:4

  **instantaneous** [2] -
131:9, 131:10
  **institution** [2] - 146:12,
147:22
  **instruct** [1] - 49:4
  **instructions** [8] -
110:11, 110:23, 130:22,
130:23, 130:24, 131:7,
183:17, 183:20
  **instructor** [36] - 16:12,
103:9, 104:8, 110:3,
110:15, 112:8, 113:13,
114:6, 126:19, 127:6,
127:18, 129:16, 130:24,
160:17, 225:16, 225:20,
225:24, 226:2, 226:13,
226:15, 227:3, 227:7,
227:10, 227:13, 228:5,
228:7, 228:19, 229:15,
230:6, 230:14, 231:14,
232:10, 236:12, 236:18,
236:21
  **instructors** [4] - 16:11,
70:6, 225:24, 228:17
  **insurance** [2] - 22:14
  **int** [1] - 101:9
  **intensified** [1] - 69:24
  **interact** [4] - 16:4, 16:7,
16:13, 102:22
  **interacted** [2] - 232:19,
233:6
  **interacting** [1] - 110:8
  **interaction** [2] - 4:18,
110:15
  **interactions** [1] - 131:6
  **interested** [1] - 242:16
  **interject** [1] - 67:23
  **international** [1] -
150:20
  **interpret** [1] - 226:19
  **interpretation** [3] -
82:25, 154:17, 155:12
  **interpretations** [1] -
229:21
  **interpreter** [66] - 11:3,
11:10, 11:20, 80:12,
90:4, 92:2, 98:19,
102:12, 102:21, 103:4,
103:8, 106:25, 107:4,
107:8, 107:15, 107:16,
107:18, 107:24, 108:3,
108:8, 109:23, 110:6,
110:7, 110:16, 110:20,
111:3, 127:6, 127:8,
127:19, 128:7, 128:9,
128:10, 129:16, 130:6,
130:10, 130:12, 130:15,
130:19, 131:16, 160:15,
164:20, 164:21, 164:24,
165:2, 165:4, 174:7,

208:15, 209:24, 210:7,
210:14, 211:25, 221:12,
222:18, 223:3, 223:6,
226:18, 227:22, 228:5,
229:2, 229:14, 229:20,
230:19, 232:8, 232:20,
233:7
  **interpreter's** [1] - 211:8
  **interpreters** [24] -
10:23, 12:9, 98:21, 99:4,
99:10, 99:13, 102:16,
102:19, 108:19, 108:20,
129:14, 164:23, 189:12,
209:18, 211:6, 211:15,
211:20, 211:23, 212:5,
212:11, 222:11, 222:21,
222:24, 223:21
  **interpreting** [2] - 228:6,
232:9
  **Interstate** [2] - 83:22,
85:12
  **interstate** [2] - 60:21,
60:23
  **interview** [6] - 33:9,
38:22, 38:24, 42:15,
97:8, 97:9
  **interviewing** [1] - 42:16
  **interviews** [1] - 33:12
  **introduce** [6] - 45:14,
46:20, 47:9, 58:16,
88:22, 139:3
  **introduced** [1] - 47:4
  **introducing** [1] - 133:17
  **intuition** [2] - 155:2,
155:8
  **intuitively** [1] - 214:17
  **investigating** [1] -
12:20
  **involve** [1] - 194:21,
195:22
  **involved** [6] - 22:17,
34:9, 146:3, 146:4,
207:22, 213:9
  **involvement** [1] - 30:18
  **involves** [1] - 99:17
  **involving** [1] - 106:7
  **irrelevant** [2] - 180:10,
199:2
  **IS** [2] - 3:5, 3:20
  **is it your** [5] - 29:9,
63:9, 79:21, 123:6, 132:3
  **is that** [51] - 6:9, 7:16,
11:21, 19:18, 32:17,
38:3, 39:3, 46:4, 52:23,
52:24, 54:7, 61:12,
63:19, 68:14, 71:23,
72:2, 76:25, 78:22,
103:19, 111:21, 120:7,
121:2, 125:3, 129:20,
140:22, 144:6, 145:10,

145:16, 147:18, 148:5,
158:13, 159:13, 159:18,
161:6, 161:23, 166:14,
176:21, 178:23, 185:20,
188:2, 188:5, 190:19,
192:12, 193:12, 195:10,
195:13, 199:25, 207:8,
212:14, 214:16, 225:9
  **is there** [15] - 5:15,
65:20, 67:2, 67:3, 84:5,
84:12, 87:6, 110:6,
143:9, 205:20, 220:25,
224:4, 230:21, 233:10,
233:13
  **is this** [5] - 14:3, 67:9,
72:8, 128:23, 203:21
  **Island** [2] - 112:23,
112:25
  **issue** [19] - 4:24, 36:22,
75:22, 76:20, 129:13,
132:14, 132:17, 154:23,
154:24, 158:3, 162:24,
197:17, 210:21, 212:18,
212:19, 212:22, 227:23,
238:25
  **issued** [2] - 198:11,
202:16
  **issues** [10] - 9:24, 12:5,
36:21, 76:17, 102:4,
184:22, 194:4, 197:20,
224:16, 238:19
  **issuing** [2] - 64:17,
167:15
  **IT** [2] - 3:5, 3:20
  **item** [2] - 187:18

**J**

  **January** [2] - 1:10,
242:19
  **JENIFER** [2] - 242:6,
242:22
  **Jenifer** [1] - 1:20
  **Jersey** [10] - 4:13,
13:17, 15:2, 15:3, 70:11,
77:20, 81:10, 91:24,
144:14, 151:21
  **JERSEY** [1] - 1:2
  **job** [26] - 39:11, 39:14,
39:23, 39:24, 40:4,
40:14, 40:20, 41:8,
41:10, 42:3, 42:11,
42:13, 86:5, 94:12,
94:19, 94:25, 97:11,
97:14, 97:21, 97:23,
104:21, 105:21, 227:9,
234:19, 234:22
  **jobs** [4] - 30:25, 31:3,
92:23, 95:11
  **John** [11] - 2:13, 4:10,

79:9, 90:2, 106:23,
134:12, 140:21, 140:23,
141:3, 156:19, 156:20
  **JOHN** [2] - 1:15, 239:15
  **johndiab@
smithsolomon** [1] - 53:8
  **johndiab@
smithsolomon.com** [2] -
52:16, 52:20
  **johndiabpetro14@aol**
[1] - 52:19
  **johndiabpetro14@aol.
com** [1] - 52:13
  **joining** [1] - 149:6
  **jointly** [1] - 148:8
  **joseph** [1] - 54:24
  **Joseph** [13] - 10:6,
43:16, 54:21, 54:23,
55:3, 55:8, 55:9, 55:18,
56:15, 60:10, 86:25,
158:8, 211:18
  **joseph.frilando@
gmail.com** [1] - 52:3
  **jsdiab@
smithsolomon.com** [1] -
52:11
  **Judge** [1] - 3:13
  **jump** [1] - 230:14
  **jumped** [1] - 224:12
  **junior** [2] - 90:2, 106:23
  **jurisdiction** [6] - 83:20,
83:21, 83:23, 84:18,
84:19, 84:21

## K

  **keep** [1] - 113:23
  **Ken** [3] - 4:16, 48:12,
54:24
  **KENNETH** [1] - 1:3
  **Kenneth** [9] - 43:2,
48:17, 48:24, 49:24,
55:8, 56:15, 211:18,
211:19
  **kept** [1] - 159:23
  **Kevin** [7] - 65:21, 65:22,
66:10, 66:19, 66:24,
108:14, 165:14
  **kinds** [2] - 137:10
  **knowledge** [30] - 21:19,
44:4, 44:11, 44:17,
44:20, 45:4, 45:6, 46:8,
49:9, 49:10, 50:12,
51:11, 61:13, 71:12,
75:19, 91:18, 99:8,
103:2, 103:6, 117:9,
117:15, 123:14, 135:17,
136:9, 159:17, 170:8,
170:10, 183:11, 198:22,
215:16

## L

  **L-E-W-I-S** [1] - 65:24
  **Labor** [1] - 83:25
  **lack** [1] - 136:8
  **Lafez** [5] - 187:12,
191:10, 191:23, 191:24,
237:10
  **Lafez's** [1] - 191:12
  **lane** [1] - 121:6
  **lanes** [1] - 118:14
  **Language** [1] - 129:5
  **language** [14] - 10:23,
129:12, 164:19, 164:25,
189:3, 208:15, 208:19,
223:2, 223:6, 223:21,
228:4, 229:2, 232:8,
232:20
  **languages** [1] - 222:20
  **lapse** [1] - 38:17
  **large** [6] - 12:21, 15:8,
24:9, 136:16, 136:18,
232:12
  **larger** [1] - 229:16
  **largest** [1] - 33:24
  **Larry** [12] - 64:9, 64:12,
64:20, 66:23, 108:13,
165:12, 165:18, 166:11,
166:14, 219:13, 223:23,
223:25
  **last** [13] - 12:24, 77:18,
89:17, 102:15, 169:5,
172:9, 173:5, 180:21,
184:25, 188:6, 188:22,
200:19, 210:6
  **latest** [1] - 175:17
  **Law** [3] - 139:5, 139:12,
139:20
  **law** [3] - 133:6, 146:13,
179:15
  **laws** [3] - 104:7, 146:12,
214:4
  **lawsuit** [1] - 26:4
  **lawyer** [4] - 8:5, 8:12,
8:24, 9:10
  **lawyers** [1] - 178:15
  **lay** [1] - 235:4
  **leading** [2] - 113:17,
147:22
  **leak** [5] - 115:15,
121:13, 121:15, 121:17,
121:22
  **leaking** [4] - 122:10,
122:20, 123:3, 123:9
  **learn** [4] - 111:23,
111:25, 112:3, 176:17
  **learned** [1] - 61:20
  **Learner's** [1] - 56:21
  **learning** [2] - 111:17,
230:16

  **lease** [1] - 227:17
  **leave** [3] - 45:24, 70:21,
171:17
  **legal** [4] - 107:25,
108:7, 146:12, 235:2
  **length** [1] - 151:6
  **lengthy** [1] - 136:3
  **let's** [19] - 26:19, 31:5,
31:10, 35:25, 81:13,
86:17, 95:3, 130:18,
138:22, 139:6, 152:5,
155:18, 180:4, 199:24,
216:7, 218:4, 218:25,
224:24, 235:22
  **letter** [8] - 40:7, 40:15,
98:5, 152:25, 155:11,
163:5, 187:5, 187:7
  **letters** [10] - 152:21,
153:4, 153:5, 153:8,
153:10, 153:14, 153:21,
154:5, 155:10, 165:24
  **letting** [1] - 59:14
  **level** [4] - 75:9, 81:7,
116:8, 116:10
  **Lewis** [12] - 65:22,
66:10, 66:20, 66:24,
67:7, 67:12, 73:9, 73:19,
73:23, 108:14, 165:14
  **LEWIS** [1] - 65:23
  **liability** [1] - 103:13
  **liable** [4] - 216:13,
216:14, 216:15, 216:23
  **license** [17] - 21:16,
37:14, 39:3, 39:5, 39:10,
39:13, 86:13, 92:20,
92:24, 99:19, 104:3,
154:12, 154:18, 164:14,
199:22, 200:9, 214:10
  **License** [1] - 182:19
  **licensed** [6] - 143:13,
144:11, 144:12, 144:13,
145:8
  **lie** [1] - 83:24
  **life** [1] - 105:10
  **light** [2] - 122:15,
162:21
  **lights** [4] - 122:9,
122:13, 122:19, 123:7
  **limb** [4] - 35:17, 37:18,
142:8, 205:8
  **limbs** [1] - 142:8
  **limit** [1] - 196:3
  **limitations** [1] - 167:13
  **limited** [11] - 51:4, 51:5,
51:9, 95:15, 103:6,
198:4, 198:23, 202:9,
205:14, 206:13, 215:10
  **limits** [2] - 198:12,
198:13
  **Linden** [9] - 15:21,

17:15, 31:22, 32:6,
32:12, 33:23, 87:20,
224:17, 224:18
  **line** [9] - 23:24, 31:11,
52:2, 118:19, 187:15,
187:16, 198:2, 236:13,
236:17
  **lined** [1] - 97:14
  **lines** [6] - 90:9, 183:15,
188:12, 189:10, 197:25
  **link** [1] - 180:23
  **list** [2] - 43:12, 99:13
  **listed** [2] - 205:22,
205:25
  **listen** [1] - 168:5
  **listening** [1] - 131:15
  **listing** [1] - 68:4
  **litany** [1] - 162:11
  **literally** [4] - 60:11,
114:18, 217:2, 231:14
  **literate** [1] - 157:21
  **litigation** [2] - 67:20,
171:4
  **Livonia** [1] - 92:3
  **LLC** [4] - 1:7, 1:15,
13:13, 14:10
  **LLP** [3] - 1:18, 2:4, 2:9
  **loan** [1] - 207:17
  **local** [2] - 69:7, 149:20
  **locate** [1] - 204:6
  **location** [28] - 13:15,
15:9, 15:11, 15:14,
15:16, 15:19, 15:20,
15:22, 16:4, 16:12,
17:10, 17:11, 17:15,
30:4, 31:9, 31:14, 31:16,
32:7, 32:10, 33:23,
33:24, 34:24, 93:16,
224:17, 224:18, 224:19,
228:2
  **locations** [14] - 14:11,
14:16, 14:24, 14:25,
16:5, 16:10, 16:15,
16:22, 16:23, 17:2, 17:3,
23:18, 25:14, 35:2
  **looks** [2] - 36:10,
140:11
  **lose** [3] - 35:22, 37:3,
214:10
  **loss** [3] - 35:17, 37:18,
142:8
  **lost** [4] - 63:25, 105:4,
154:12, 154:18
  **lot** [9] - 23:5, 30:20,
74:19, 146:15, 170:4,
176:19, 179:17, 184:12,
230:12
  **loud** [4] - 116:3, 116:12,
116:13
  **low** [1] - 122:14

**lowest** [1] - 96:11
**lunch** [2] - 86:17, 86:19
**lying** [1] - 163:9

**M**

**machine** [2] - 103:17, 202:5
**magic** [1] - 178:6
**Magistrate** [2] - 174:15, 174:23
**magnitude** [1] - 125:12
**mail** [33] - 27:5, 32:14, 44:18, 47:5, 47:10, 52:2, 52:3, 52:10, 52:23, 52:24, 53:9, 53:10, 55:16, 59:5, 61:24, 66:11, 69:4, 75:13, 75:18, 75:20, 76:10, 81:24, 82:7, 84:6, 84:12, 106:23, 140:25, 141:16, 145:12, 152:15, 153:4, 156:23, 158:8
**mailed** [4] - 28:6, 55:10, 71:20, 82:20
**mails** [14] - 44:21, 46:21, 50:15, 52:18, 52:21, 53:18, 64:6, 66:16, 78:10, 79:18, 143:19, 156:22, 165:24, 181:4
**main** [2] - 93:2, 93:5
**maintained** [1] - 24:3
**maintenance** [2] - 20:20, 21:4
**major** [1] - 115:25
**majority** [1] - 93:6
**male** [2] - 207:8, 207:9
**management** [3] - 18:17, 19:11, 90:6
**managers** [1] - 24:10
**manner** [1] - 43:20
**manual** [2] - 108:18, 129:9
**March** [15] - 10:6, 43:7, 43:17, 48:13, 48:19, 48:24, 59:10, 67:14, 67:15, 67:19, 77:19, 156:17, 158:9, 159:8, 159:9
**mark** [4] - 47:15, 57:17, 186:11, 202:21
**marked** [23] - 26:20, 26:23, 47:18, 57:21, 58:16, 58:20, 81:14, 81:18, 89:2, 89:7, 133:22, 139:6, 139:13, 139:17, 152:5, 152:8, 155:18, 155:23, 181:22, 181:25, 186:15, 203:5,

237:2
**marketing** [1] - 19:3
**marking** [1] - 47:22
**marriage** [1] - 242:15
**master's** [1] - 21:10
**materials** [2] - 111:19, 143:2
**mathematical** [1] - 209:9
**matter** [8] - 4:15, 12:13, 61:2, 79:3, 179:5, 196:7, 226:9, 242:17
**mattered** [1] - 84:23
**matters** [1] - 41:11
**Maugeri** [2] - 75:13, 76:10
**MAUGERI** [1] - 75:13
**maximum** [2] - 100:11, 103:7
**mean** [28] - 18:8, 24:4, 29:13, 30:23, 50:19, 83:4, 83:17, 87:13, 92:17, 100:3, 106:10, 110:18, 112:18, 115:4, 134:12, 142:5, 143:21, 143:22, 157:2, 171:8, 184:22, 190:4, 203:16, 215:24, 218:17, 222:14, 228:11
**meaningful** [2] - 164:12, 164:14
**means** [3] - 17:21, 18:12, 129:11
**meant** [4] - 105:24, 157:14, 157:15, 157:16
**mechanical** [1] - 135:23
**mechanically** [1] - 115:19
**mechanism** [1] - 122:25
**medical** [38] - 34:15, 34:18, 34:22, 34:23, 35:20, 36:14, 36:17, 36:18, 36:19, 36:22, 37:2, 37:12, 38:3, 38:9, 38:11, 38:19, 56:22, 85:22, 105:19, 105:21, 136:4, 137:24, 138:2, 138:7, 138:8, 138:10, 195:22, 200:23, 200:25, 201:9, 201:11, 201:16, 201:20, 201:21, 202:6, 202:17, 213:21
**medications** [1] - 7:3
**meet** [2] - 168:18, 169:2
**meeting** [7] - 165:12, 165:13, 166:5, 166:6, 167:9, 167:17, 168:16
**meetings** [1] - 16:9
**meets** [1] - 200:5
**member** [3] - 168:20,

168:23, 188:25
**members** [5] - 16:3, 16:4, 134:11, 134:13, 134:22
**memo** [1] - 191:11
**memory** [1] - 56:13
**mention** [1] - 213:24
**mentioned** [16] - 17:18, 20:4, 34:6, 37:24, 38:21, 44:14, 61:23, 72:22, 73:8, 123:17, 160:25, 195:6, 201:3, 205:3, 210:5, 215:19
**mentioning** [2] - 164:18, 164:21
**merge** [3] - 113:11, 113:23, 121:2
**message** [1] - 74:24
**messenger** [1] - 74:24
**method** [1] - 133:3
**Microsoft** [1] - 157:21
**mid** [2] - 48:13, 48:24
**middle** [3] - 7:22, 67:14, 159:9
**miles** [2] - 100:12, 103:8
**mind** [2] - 51:7, 231:8
**mine** [1] - 169:21
**minimal** [1] - 183:22
**minor** [1] - 167:21
**Minor** [11] - 64:9, 64:13, 64:20, 66:23, 108:13, 165:12, 165:18, 166:11, 219:13, 223:24, 223:25
**Minor's** [1] - 166:14
**mirror** [11] - 113:8, 113:9, 117:21, 118:2, 118:25, 120:7, 120:10, 120:17, 120:24, 127:16, 127:20
**mirrors** [6] - 117:17, 118:4, 118:10, 118:12, 118:14, 118:19
**mischaracterization** [1] - 41:14
**missed** [1] - 191:6
**missing** [1] - 205:8
**misstate** [1] - 154:2
**mistaken** [1] - 99:8
**mixture** [1] - 143:25
**moderate** [1] - 116:11
**modify** [1] - 64:18
**mom** [1] - 169:25
**Monday** [1] - 140:21
**monetary** [1] - 212:6
**money** [4] - 176:19, 179:17, 215:2, 215:5
**Montana** [2] - 182:18, 186:5

**month** [4] - 32:3, 32:4, 87:25, 202:14
**months** [6] - 76:5, 89:17, 112:14, 164:16, 175:10, 202:14
**morning** [1] - 101:9, 225:7
**mostly** [1] - 171:2
**motor** [13] - 40:22, 41:3, 60:18, 60:21, 60:23, 73:22, 84:2, 84:19, 108:15, 135:22, 136:7, 146:4, 183:25
**Motor** [112] - 34:21, 36:5, 41:5, 59:22, 60:2, 61:19, 62:16, 62:18, 63:4, 63:11, 65:14, 66:3, 66:17, 66:23, 69:14, 71:16, 74:2, 75:14, 76:13, 76:16, 76:18, 81:9, 81:10, 81:11, 82:14, 82:23, 83:19, 84:3, 84:17, 85:12, 85:16, 98:10, 108:9, 108:11, 108:12, 108:17, 109:3, 115:6, 129:8, 137:7, 142:23, 143:12, 143:14, 143:16, 144:13, 144:14, 144:24, 145:6, 146:5, 146:6, 147:8, 147:15, 148:6, 148:14, 149:25, 150:9, 151:20, 154:10, 160:8, 160:14, 160:21, 162:7, 162:18, 163:24, 164:6, 164:22, 165:11, 165:21, 167:24, 167:25, 168:3, 168:11, 168:14, 170:17, 182:18, 183:8, 185:11, 185:13, 185:17, 187:6, 188:17, 188:25, 189:5, 190:9, 193:17, 198:17, 199:13, 199:20, 200:3, 200:4, 200:10, 200:5, 205:14, 207:19, 214:19, 216:19, 216:21, 217:5, 217:7, 217:11, 219:6, 219:7, 219:12, 219:15, 221:11, 221:16, 221:22, 222:8, 223:22, 234:8, 237:8
**mountain** [1] - 23:7
**mouth** [1] - 166:19
**move** [3] - 61:22, 103:10, 103:12
**movements** [1] - 131:14
**Mr** [125] - 4:18, 6:12, 10:5, 10:9, 10:10, 14:19, 15:16, 21:7, 22:2, 22:10, 23:16, 24:13, 25:18, 26:13, 26:14, 27:4, 28:7,

28:18, 28:23, 29:21,
29:24, 30:4, 30:6, 43:24,
44:15, 44:16, 44:24,
44:25, 45:12, 46:22,
47:11, 50:7, 53:21, 54:7,
54:12, 54:15, 54:18,
55:9, 56:7, 56:9, 56:11,
56:14, 56:16, 56:24,
57:6, 58:5, 58:11, 59:15,
59:17, 60:10, 60:15,
61:9, 61:10, 62:12,
62:22, 67:7, 67:8, 67:12,
67:16, 68:8, 68:11, 69:5,
70:2, 71:20, 73:9, 73:19,
73:23, 76:9, 79:22, 81:4,
84:7, 84:15, 84:25,
86:22, 86:23, 86:25,
87:7, 90:2, 126:15,
143:6, 144:3, 145:13,
148:11, 149:6, 149:21,
150:11, 153:6, 154:6,
157:11, 158:4, 158:8,
158:11, 158:14, 158:15,
158:18, 159:22, 160:13,
160:25, 161:7, 161:9,
161:23, 162:12, 163:11,
167:21, 179:11, 182:23,
191:23, 207:21, 210:12,
210:18, 210:25, 211:4,
211:12, 211:17, 212:20,
216:16, 218:20, 219:19,
233:21, 236:7
  mR [2] - 49:3, 241:15
  MR [201] - 4:7, 5:19,
5:24, 5:25, 6:10, 6:11,
6:25, 11:13, 11:17,
11:24, 12:15, 15:10,
16:17, 21:12, 21:20,
21:23, 22:4, 25:20, 26:6,
26:19, 28:12, 28:21,
31:17, 41:13, 42:18,
43:8, 43:10, 43:19,
44:13, 44:22, 45:7,
45:10, 45:14, 45:16,
45:21, 46:3, 46:13,
47:21, 48:6, 49:7, 49:13,
49:16, 50:10, 50:14,
50:18, 50:22, 50:25,
51:6, 51:7, 51:13, 51:16,
51:17, 51:19, 53:23,
55:13, 57:14, 58:15,
62:6, 65:13, 67:22,
68:10, 68:16, 80:22,
80:25, 81:13, 86:17,
88:21, 91:14, 96:19,
106:8, 106:19, 107:20,
131:17, 131:19, 132:9,
132:20, 133:17, 138:22,
139:2, 139:16, 140:10,
140:13, 143:21, 143:24,

147:3, 148:2, 150:12,
150:16, 150:23, 150:24,
151:3, 151:5, 151:7,
151:9, 151:11, 151:25,
155:5, 155:13, 155:16,
156:2, 161:5, 171:15,
171:21, 171:23, 172:8,
172:10, 172:14, 172:15,
172:18, 172:19, 173:4,
173:8, 173:9, 173:11,
173:14, 173:19, 173:20,
174:9, 174:16, 174:17,
174:20, 174:21, 175:12,
175:14, 175:18, 175:19,
175:21, 175:23, 175:25,
176:2, 176:8, 176:24,
177:9, 177:13, 177:15,
177:17, 177:19, 177:20,
177:24, 178:8, 178:11,
178:14, 178:20, 178:23,
179:2, 179:11, 179:20,
179:24, 179:25, 180:3,
180:11, 180:14, 181:10,
181:12, 181:14, 181:16,
181:19, 186:8, 191:4,
191:8, 191:15, 191:17,
192:15, 194:15, 194:18,
202:20, 204:21, 206:3,
206:11, 206:16, 206:18,
206:19, 212:15, 213:10,
213:15, 216:7, 218:9,
220:4, 220:13, 223:9,
223:16, 232:22, 232:25,
233:2, 233:16, 234:24,
235:19, 235:22, 236:3,
236:6, 237:4, 237:7,
237:9, 237:11, 237:12,
237:23, 237:25, 238:3,
239:5, 239:7, 241:16
  Mrs [2] - 76:10, 84:13
  multiple [2] - 225:22,
225:23
  multitude [1] - 118:15
  myself [5] - 51:25, 78:2,
79:7, 134:8, 163:21

**N**

  NAD [11] - 142:17,
143:22, 143:23, 144:12,
144:19, 145:4, 145:21,
145:22, 146:8, 146:10,
146:11
  NADLER [95] - 2:6, 4:7,
5:24, 6:10, 6:25, 11:17,
12:15, 21:20, 21:23,
26:19, 43:10, 44:13,
45:7, 45:14, 45:21,
46:13, 48:6, 49:3, 49:13,
50:14, 50:22, 51:6,

51:13, 51:17, 57:14,
58:15, 68:10, 80:22,
80:25, 81:13, 86:17,
88:21, 131:19, 132:20,
133:17, 139:2, 139:16,
140:13, 150:23, 151:3,
151:7, 151:11, 151:25,
155:13, 155:16, 156:2,
171:21, 172:8, 172:14,
172:18, 173:4, 173:9,
173:14, 173:20, 174:16,
174:20, 175:12, 175:18,
175:21, 175:25, 176:8,
177:9, 177:15, 177:19,
177:24, 178:11, 178:20,
179:2, 179:20, 179:25,
180:11, 180:14, 181:12,
181:16, 181:19, 186:8,
191:8, 191:17, 194:18,
202:20, 204:21, 206:16,
206:19, 216:7, 220:13,
223:9, 232:25, 235:19,
237:4, 237:9, 237:12,
237:23, 238:3, 239:7,
241:15
  Nadler [1] - 4:14
  name [16] - 4:8, 4:14,
42:25, 43:5, 48:12,
48:17, 48:22, 48:23,
53:19, 54:20, 64:9,
70:21, 172:12, 177:14,
177:17, 179:22
  named [1] - 98:5
  names [3] - 52:2,
173:25, 174:18
  narcolepsy [2] - 199:19,
199:22
  National [10] - 139:5,
139:11, 139:19, 142:16,
144:9, 147:11, 148:7,
150:4, 150:6, 167:17
  national [2] - 204:19,
205:19
  neck [2] - 36:9, 36:10
  needs [3] - 18:3, 37:5,
115:8
  negotiated [1] - 66:18
  neighborhood [1] -
209:19
  nemesis [2] - 37:9,
37:11
  nervous [1] - 62:3
  NEW [3] - 1:2, 242:3,
242:4
  newer [1] - 116:18
  nine [5] - 14:13, 14:14,
14:23, 17:2, 23:18
  nobody [2] - 25:6,
103:10
  nod [1] - 7:15

  noise [2] - 116:8,
116:10
  noisy [2] - 116:14,
116:15
  non [3] - 12:19, 104:5,
198:5
  non-air [1] - 198:5
  non-privileged [1] -
12:19
  non-serious [1] - 104:5
  normally [1] - 116:3
  North [1] - 2:10
  NOTARY [1] - 239:20
  Notary [1] - 1:20, 4:3,
242:6
  note [2] - 188:13,
204:22
  noted [2] - 7:2, 188:11
  notes [1] - 134:7
  notice [9] - 6:13, 6:16,
6:18, 6:21, 93:17,
124:21, 173:4, 175:15,
206:2
  Notice [5] - 6:23, 9:8,
9:11, 9:25, 51:2
  November [1] - 174:24
  nowhere [1] - 66:8
  number [12] - 25:14,
33:11, 39:6, 43:15,
46:25, 67:24, 70:22,
87:20, 95:12, 184:22,
198:14, 209:21
  NUMBER [2] - 240:7,
241:4
  numbers [1] - 156:7
  nuts [1] - 173:17

**O**

  oath [2] - 3:12, 5:7
  object [7] - 28:12,
46:23, 50:10, 51:18,
191:4, 192:15, 220:9
  objecting [1] - 43:20
  objection [40] - 11:15,
11:23, 11:25, 12:10,
15:10, 16:17, 21:12,
22:4, 25:20, 26:6, 28:21,
31:17, 41:13, 42:18,
53:23, 55:13, 62:6,
68:16, 91:14, 96:19,
106:8, 106:19, 107:20,
131:17, 132:9, 147:3,
148:2, 150:12, 155:6,
161:5, 176:5, 206:17,
206:20, 212:15, 213:10,
218:9, 220:4, 223:16,
233:16, 234:24
  objectionable [1] -
176:21

objections [5] - 3:21, 6:4, 6:20, 6:23, 12:17
obligation [5] - 11:9, 11:19, 12:8, 39:24, 140:18
obligations [1] - 139:21
observe [1] - 231:21
observed [1] - 190:23
observes [1] - 191:25
obtain [2] - 34:17, 37:14
obviously [1] - 211:7
occasions [2] - 151:19, 183:12
occur [2] - 234:21, 234:23
occurred [2] - 44:2, 45:18
occurring [1] - 44:24
October [4] - 73:7, 162:16, 169:5, 186:25
OF [3] - 1:2, 242:3, 242:4
off-the-record [6] - 21:21, 80:23, 155:14, 180:12, 181:17, 235:25
offer [2] - 16:15, 16:20
office [1] - 182:12
officer [4] - 13:8, 13:9, 15:6, 18:23
offices [4] - 1:17, 64:21, 168:7, 168:8
oh [1] - 176:14
Okay [1] - 12:15
okay [81] - 5:24, 6:25, 7:16, 7:20, 8:11, 9:5, 10:4, 10:8, 11:7, 14:2, 16:2, 16:14, 16:24, 19:9, 27:3, 27:22, 32:21, 38:10, 38:15, 48:8, 51:6, 51:19, 51:23, 53:16, 53:20, 58:4, 58:25, 59:4, 68:10, 68:20, 73:17, 75:11, 77:10, 81:23, 86:24, 89:12, 89:24, 91:9, 100:20, 102:7, 106:20, 108:2, 119:22, 119:24, 123:3, 135:3, 140:16, 151:24, 152:14, 156:12, 156:24, 157:5, 158:5, 158:10, 160:10, 161:16, 171:18, 172:14, 172:18, 175:25, 182:6, 185:7, 186:20, 188:8, 188:14, 189:11, 191:17, 199:21, 202:6, 203:11, 204:11, 206:16, 208:13, 209:6, 212:9, 218:4, 233:2, 233:9, 237:3, 237:12, 238:3
old [3] - 53:11, 99:21,

116:11
Olsen [3] - 91:20, 91:21, 91:22
ones [2] - 105:2, 227:6
ongoing [2] - 21:13, 59:22
online [2] - 182:24, 182:25
ons [1] - 93:7
open [4] - 33:20, 34:2, 178:17, 225:10
operate [8] - 12:21, 103:17, 103:20, 103:22, 198:5, 228:2, 228:4, 228:23
operated [2] - 24:8, 24:9
operates [1] - 124:9
operating [4] - 13:7, 13:9, 15:5, 18:23
operation [2] - 18:24, 23:15
operation's [1] - 25:8
Operations [1] - 90:3
operator [5] - 31:21, 32:9, 87:9, 87:10
opinion [10] - 138:4, 138:17, 145:21, 145:22, 195:23, 200:7, 217:12, 220:7, 227:18, 228:13
opportunities [1] - 220:18
opportunity [1] - 66:22
opposed [3] - 45:12, 232:23
opposing [4] - 49:4, 75:3, 156:3, 180:18
Order [1] - 1:17
order [10] - 82:24, 83:2, 83:16, 85:16, 100:7, 109:8, 127:21, 144:5, 200:23, 229:25
ordinary [1] - 22:15
organization [4] - 18:22, 28:9, 30:20, 146:14
organizations [1] - 109:12
origin [2] - 204:19, 205:19
original [5] - 3:9, 3:17, 63:23, 105:24, 109:2
originally [1] - 145:15
OSHA [1] - 99:22
outcome [1] - 242:16
outline [3] - 17:6, 18:15, 43:12
outrageous [1] - 39:6
outset [1] - 154:10

outside [18] - 11:9, 11:18, 12:4, 12:12, 23:5, 51:9, 68:5, 75:4, 87:14, 87:17, 109:21, 116:5, 150:19, 226:15, 228:6, 228:7, 230:6, 230:22
overlap [1] - 30:21
Owner's [1] - 34:15
owns [1] - 14:6

**P**

P.M [1] - 239:10
p.s [1] - 187:12
packet [1] - 203:21
Page [6] - 89:11, 188:7, 197:23, 238:2, 238:14
page [7] - 9:25, 134:6, 134:23, 158:7, 183:15, 188:7, 237:24
PAGE [3] - 240:6, 241:3, 241:14
pages [1] - 190:5
Pages [1] - 237:17
paid [5] - 107:9, 107:10, 107:11, 107:12, 107:16
paper [2] - 99:21, 181:3
paragraph [10] - 135:2, 135:12, 136:2, 183:19, 185:2, 188:10, 188:22, 188:23, 189:9, 197:25
parking [1] - 236:20
part [27] - 15:25, 26:16, 27:17, 27:18, 27:19, 30:24, 42:14, 42:20, 42:21, 47:10, 66:17, 67:9, 106:22, 111:12, 118:6, 129:19, 140:15, 164:13, 164:14, 184:4, 188:17, 191:21, 205:23, 210:23, 221:17, 235:15, 235:17
part-time [1] - 15:25
partake [1] - 234:17
participant [1] - 66:20
parties [4] - 1:16, 3:7, 216:12, 242:14
partners [1] - 14:8
parts [1] - 71:8
pass [17] - 18:8, 18:10, 35:13, 38:3, 82:23, 83:15, 95:14, 99:18, 100:7, 104:20, 105:21, 117:8, 193:2, 218:22, 218:23, 218:24, 237:19
passed [2] - 19:23, 25:18
passing [1] - 24:17
pay [9] - 33:15, 86:3, 90:4, 106:24, 107:6,

107:19, 108:3, 128:20, 206:2
payment [2] - 207:13, 207:16
pays [1] - 107:3
PENNLINE [2] - 242:6, 242:22
Pennline [1] - 1:20
Pennsylvania [7] - 2:10, 15:3, 19:4, 70:15, 79:5, 81:10, 151:22
people [52] - 20:18, 35:23, 40:23, 41:5, 42:8, 50:4, 60:9, 64:10, 75:24, 82:16, 90:24, 95:24, 96:10, 105:9, 112:16, 112:18, 126:14, 126:21, 126:22, 129:5, 129:20, 136:17, 146:19, 146:25, 149:17, 162:18, 163:24, 166:6, 166:22, 167:5, 167:8, 167:9, 168:6, 168:9, 173:24, 189:16, 193:21, 194:25, 195:9, 195:14, 195:24, 199:17, 199:19, 202:8, 206:7, 215:23, 217:4, 219:8, 222:18, 227:20, 229:10, 230:3
percent [2] - 18:9, 18:11
perform [1] - 145:19
performance [2] - 17:7, 18:2
period [4] - 34:7, 67:13, 209:10, 233:23
periodically [2] - 183:8, 207:12
peripherally [1] - 120:19
Permit [2] - 34:15, 56:21
permit [2] - 38:20, 85:22
person [95] - 19:11, 24:10, 25:8, 25:15, 25:22, 28:8, 29:22, 35:4, 36:3, 36:9, 36:13, 39:9, 39:12, 40:8, 41:9, 42:11, 42:13, 62:22, 66:12, 66:13, 66:14, 68:22, 76:24, 77:13, 79:13, 80:18, 85:17, 85:19, 87:23, 90:11, 94:24, 103:22, 104:7, 107:14, 118:18, 118:20, 118:24, 119:12, 119:15, 120:20, 121:20, 122:18, 123:8, 124:21, 125:10, 128:20, 129:22, 129:23, 130:3, 130:5, 130:9, 131:13, 131:25, 132:2, 132:4, 132:16, 133:9, 133:12,

138:18, 145:15, 150:3, 159:12, 162:2, 163:18, 164:13, 166:23, 166:24, 170:10, 171:6, 185:14, 187:23, 196:2, 197:12, 197:18, 199:5, 200:6, 200:7, 201:12, 201:22, 201:23, 206:24, 206:25, 207:21, 212:13, 213:6, 213:22, 214:9, 214:20, 219:17, 228:8, 229:15, 229:19, 230:22, 231:5, 231:16
  **person's** [1] - 201:25
  **personal** [13] - 5:2, 44:3, 44:11, 44:16, 44:20, 45:4, 45:6, 46:8, 47:25, 49:9, 50:12, 51:11, 52:24
  **personally** [14] - 48:16, 50:6, 50:17, 106:2, 108:12, 138:14, 148:16, 159:10, 167:22, 168:10, 172:16, 212:2, 223:25, 232:21
  **personnel** [2] - 170:3, 233:4
  **persons** [2] - 146:16, 149:5
  **perspective** [1] - 234:20
  **pertains** [1] - 10:24
  **petro14@aol** [1] - 52:24
  **Philadelphia** [1] - 2:10
  **philip** [1] - 2:13
  **phone** [14] - 16:8, 32:19, 33:8, 50:2, 55:22, 66:10, 78:15, 79:19, 80:14, 87:3, 126:8, 172:9, 178:3, 180:22
  **phones** [2] - 32:11, 87:22
  **physical** [5] - 27:20, 34:25, 35:12, 36:7, 92:19
  **physicals** [1] - 138:3
  **pick** [2] - 16:11, 229:24
  **picked** [1] - 232:5
  **picks** [1] - 96:14
  **pickup** [1] - 196:14
  **piece** [4] - 99:25, 100:9, 103:17, 103:18
  **pieces** [1] - 121:16
  **place** [14] - 11:5, 20:24, 30:17, 30:22, 39:18, 42:13, 65:2, 73:12, 82:10, 89:21, 91:6, 96:25, 127:13, 182:17
  **placed** [5] - 41:24, 93:4, 97:2, 183:21, 196:20
  **placement** [14] - 19:6, 30:2, 41:9, 41:20, 94:13,

95:6, 95:20, 95:22, 96:7, 96:9, 96:11, 96:17, 97:8, 97:22
  **Placement** [2] - 30:8, 30:9
  **PLAINTIFF** [1] - 1:4
  **Plaintiff** [3] - 2:4, 4:15, 43:17
  **Plaintiff's** [14] - 51:21, 58:17, 69:4, 81:14, 106:22, 133:18, 139:7, 139:17, 140:8, 141:10, 155:19, 181:22, 186:11, 202:21
  **PLAINTIFF'S** [2] - 240:4, 241:2
  **Plaintiff(s** [9] - 81:18, 89:8, 133:22, 139:13, 152:8, 155:23, 181:25, 186:15, 203:6
  **plan** [3] - 181:6, 194:6, 213:23
  **plans** [1] - 227:14
  **play** [1] - 172:24
  **playing** [1] - 180:4
  **plays** [1] - 94:13
  **Please** [2] - 4:8, 186:11
  **please** [8] - 7:18, 47:14, 60:14, 65:10, 162:25, 163:4, 171:17, 223:8
  **plenty** [1] - 167:8
  **plus** [1] - 93:8
  **point** [19] - 36:4, 50:20, 62:12, 67:23, 71:14, 83:3, 83:7, 112:15, 114:21, 117:12, 120:10, 120:12, 122:5, 128:23, 158:25, 211:5, 221:2, 235:19, 236:15
  **pointing** [1] - 230:11
  **points** [2] - 39:7, 40:5
  **pole** [1] - 126:9
  **police** [2] - 62:24, 62:25
  **policies** [9] - 10:16, 10:21, 11:2, 11:4, 20:12, 141:24, 142:2, 170:15, 181:2
  **policy** [11] - 10:12, 146:15, 146:18, 164:23, 171:12, 173:12, 177:2, 177:3, 181:6, 208:7
  **pop** [1] - 170:2
  **portion** [5] - 89:14, 101:5, 101:6, 224:9, 226:14
  **portions** [3] - 212:5, 224:10, 224:11
  **pose** [1] - 189:13
  **position** [30] - 13:19, 13:23, 14:3, 19:19, 20:2,

23:17, 24:14, 24:19, 24:22, 24:24, 25:19, 28:20, 72:12, 72:22, 78:20, 78:21, 83:12, 159:21, 163:15, 166:14, 173:2, 182:13, 187:10, 191:12, 195:13, 221:20, 221:23, 221:25, 222:2, 222:5
  **positioned** [1] - 183:21
  **positions** [1] - 236:20
  **possession** [1] - 181:8
  **possibilities** [2] - 197:22, 198:14
  **possibility** [2] - 208:5, 214:12
  **post** [1] - 187:3
  **posted** [2] - 183:5, 183:12
  **potential** [2] - 28:5, 171:4
  **potentially** [10] - 115:24, 121:24, 135:20, 167:16, 210:21, 214:4, 220:21, 224:21, 225:14, 227:24
  **pound** [2] - 113:2, 113:3
  **power** [1] - 235:11
  **practices** [1] - 10:22
  **predetermination** [1] - 161:16
  **predicated** [1] - 208:23
  **preemptively** [1] - 77:12
  **preface** [1] - 8:4
  **prefaced** [1] - 176:25
  **preliminary** [1] - 33:9
  **premise** [1] - 185:5
  **premises** [2] - 188:2, 188:5
  **preparation** [1] - 8:13
  **prepare** [1] - 8:17
  **prepared** [3] - 12:3, 44:5, 187:2
  **present** [3] - 46:21, 47:13, 213:20
  **PRESENT** [1] - 2:13
  **presentation** [1] - 64:13
  **presented** [7] - 9:7, 9:19, 11:24, 12:25, 45:22, 47:2, 156:2
  **presenting** [2] - 151:25, 186:8
  **presents** [1] - 179:12
  **president** [4] - 83:9, 163:3, 187:12, 191:23
  **press** [1] - 162:12
  **pressed** [1] - 39:14
  **pressing** [2] - 159:24, 162:13

  **pressure** [4] - 35:12, 122:4, 123:14, 123:15
  **presume** [1] - 225:12
  **presumes** [1] - 55:15
  **pretty** [11] - 24:2, 61:17, 69:25, 100:10, 110:14, 117:6, 165:22, 190:2, 232:16, 234:13, 234:15
  **prevent** [2] - 5:16, 41:5
  **previous** [1] - 143:19
  **prices** [2] - 210:9, 210:14
  **primarily** [16] - 14:25, 30:2, 30:17, 32:8, 41:11, 41:23, 42:5, 53:5, 53:12, 53:14, 95:2, 115:11, 145:9, 207:12, 209:7, 212:10
  **primary** [4] - 41:25, 42:6, 42:7, 53:2
  **Princeton** [1] - 211:3
  **prior** [9] - 59:13, 67:17, 72:14, 90:13, 90:17, 90:18, 142:15, 162:20, 203:17
  **priority** [3] - 157:12, 157:16, 157:23
  **prison** [1] - 41:3
  **Private** [1] - 202:24
  **private** [7] - 139:21, 140:18, 168:16, 191:16, 191:24, 193:6, 207:11
  **privileged** [2] - 8:6, 12:19
  **privy** [1] - 44:25
  **problem** [10] - 111:9, 115:18, 166:21, 166:22, 166:23, 167:19, 178:15, 199:21, 217:3, 231:4
  **problems** [6] - 35:17, 51:10, 75:23, 117:8, 197:21, 201:18
  **Procedure** [2] - 6:15, 202:25
  **procedures** [6] - 10:13, 10:17, 20:13, 199:11, 207:11, 218:13
  **proceed** [4] - 5:19, 40:10, 45:25, 46:24
  **proceeding** [1] - 6:2
  **process** [22] - 33:6, 33:14, 38:25, 66:18, 86:4, 86:14, 92:14, 92:16, 92:21, 92:25, 97:10, 154:5, 201:9, 201:15, 202:3, 202:12, 209:16, 209:18, 215:20, 215:22, 219:22, 236:23
  **produce** [3] - 66:4, 66:6, 74:19

260

DIAB

produced [16] - 65:17, 66:5, 73:19, 73:20, 75:3, 141:15, 143:2, 154:6, 172:7, 172:8, 175:10, 175:12, 177:8, 177:9, 178:5, 180:20
professional [4] - 86:8, 137:24, 138:9, 138:11
professionals [1] - 136:5
program [57] - 10:19, 16:25, 17:4, 17:6, 18:14, 20:16, 25:24, 27:12, 27:24, 31:13, 35:5, 41:25, 42:3, 67:3, 67:6, 68:23, 72:7, 77:14, 91:13, 92:12, 92:15, 93:3, 93:4, 93:24, 94:10, 94:14, 94:15, 94:19, 97:15, 98:4, 98:17, 98:18, 98:25, 99:16, 99:18, 100:7, 100:14, 102:9, 107:5, 132:25, 141:19, 154:22, 158:21, 159:13, 160:20, 161:14, 162:3, 170:13, 171:14, 173:18, 174:3, 179:3, 179:7, 179:19, 206:10, 214:10, 234:17
Program [2] - 19:14, 27:7
programs [9] - 17:8, 18:15, 19:25, 22:12, 93:6, 107:19, 135:15, 177:22, 207:17
prohibit [1] - 220:8
prohibited [1] - 212:8
prompted [2] - 76:4, 76:8
proof [2] - 57:5, 57:7
proper [1] - 15:20
properly [1] - 153:25
properties [1] - 27:20
protocol [2] - 138:16, 199:12
provide [13] - 11:10, 11:20, 12:8, 56:17, 57:2, 57:6, 57:10, 85:9, 98:18, 107:15, 158:19, 171:11, 208:16
provided [20] - 6:24, 20:25, 22:11, 57:12, 75:8, 84:23, 95:11, 98:21, 99:3, 99:5, 99:7, 99:9, 99:14, 102:12, 102:18, 135:21, 136:12, 173:22, 179:22, 180:2
providers [1] - 136:7
provides [1] - 80:18
providing [1] - 5:16

provisions [1] - 187:21
proximity [1] - 184:12
PSI [2] - 122:8, 123:7
Public [3] - 1:20, 4:4, 242:6
PUBLIC [1] - 239:20
public [6] - 22:21, 64:19, 104:9, 110:4, 168:15, 189:15
publically [1] - 64:14
pull [4] - 110:12, 121:25, 131:15, 236:24
pulled [1] - 182:12
pulling [1] - 163:9
pump [1] - 122:5
purpose [3] - 51:5, 149:16, 222:13
purposes [6] - 26:4, 40:18, 41:7, 198:24, 204:25, 215:7
pursuant [2] - 1:16, 9:7
pursued [1] - 165:6
pushed [1] - 233:22
putting [2] - 97:24, 208:12

**Q**

qualified [9] - 11:10, 11:20, 12:8, 20:20, 33:11, 35:4, 131:23, 163:17, 235:7
qualify [1] - 36:11
quarters [1] - 104:10
question [70] - 6:7, 7:13, 7:23, 15:13, 28:4, 28:16, 41:17, 42:22, 46:7, 48:10, 49:12, 49:14, 50:11, 55:14, 66:25, 71:19, 72:4, 72:10, 76:8, 79:12, 84:10, 89:23, 118:22, 119:15, 119:17, 123:12, 126:11, 127:14, 131:18, 131:21, 132:15, 146:22, 147:4, 148:5, 150:13, 150:15, 150:22, 150:23, 155:7, 157:24, 158:6, 161:8, 171:16, 172:6, 176:11, 176:25, 189:18, 191:5, 191:18, 192:18, 192:19, 192:20, 194:5, 195:8, 199:6, 200:14, 205:16, 206:4, 212:16, 213:11, 220:5, 220:11, 220:15, 221:11, 221:15, 223:8, 223:11, 233:17, 234:25
questioning [3] - 46:2, 51:14, 236:7

questions [27] - 4:17, 5:12, 5:17, 5:21, 6:22, 7:11, 8:3, 8:9, 9:20, 12:18, 13:2, 13:5, 22:22, 48:20, 49:6, 69:19, 69:25, 86:22, 152:13, 176:3, 193:4, 208:12, 232:18, 235:20, 235:23, 236:11, 239:6
quick [1] - 227:20
quicker [2] - 82:15, 184:18
quickly [3] - 61:17, 61:22, 229:11
quiet [1] - 116:4
quotation [1] - 190:23
quote [4] - 189:19, 190:23, 191:3, 191:19
quoting [2] - 191:8, 191:13

**R**

race [2] - 204:18, 205:18
rail [1] - 230:15
raise [2] - 110:13, 114:6
Randy [3] - 207:2, 207:3, 207:7
rate [4] - 18:8, 96:8, 96:10, 96:12
rated [1] - 95:10
rating [4] - 95:8, 95:18, 95:22, 95:24
ratings [1] - 95:4
ratio [2] - 226:11, 226:12
ratios [2] - 226:8, 226:9
rattle [1] - 116:17
Re [1] - 47:6
reach [2] - 69:6, 144:8
react [1] - 125:15
reaction [12] - 127:25, 128:19, 128:24, 129:10, 129:11, 129:18, 129:20, 129:21, 130:17, 184:17, 229:9, 229:19
read [27] - 131:19, 131:21, 142:25, 152:20, 155:10, 184:6, 187:19, 189:21, 189:23, 189:25, 190:2, 193:11, 194:6, 194:10, 194:22, 195:11, 195:16, 195:18, 195:22, 195:25, 203:10, 213:8, 213:23, 220:13, 220:15, 223:9, 223:11
reading [7] - 58:2, 111:19, 155:11, 189:3, 189:8, 194:7, 195:4

reality [1] - 65:3
realize [1] - 85:19
realized [1] - 25:17
rear [5] - 117:23, 117:24, 123:25, 124:8, 124:9
rearview [2] - 117:21, 118:2
reason [11] - 39:18, 54:3, 80:17, 84:8, 93:15, 105:15, 143:9, 144:10, 148:16, 194:10, 201:20
reasons [4] - 61:24, 138:18, 188:3, 222:6
recall [5] - 26:9, 89:20, 89:25, 90:24, 138:11
receive [5] - 32:2, 34:12, 215:2, 215:4, 215:5
received [11] - 29:11, 29:16, 69:12, 71:3, 88:10, 90:14, 91:10, 109:15, 145:12, 172:4
receiving [2] - 34:10, 44:20
recent [1] - 222:9
recently [4] - 156:15, 182:15, 199:15, 203:16
receptionist [2] - 87:6, 87:21
recertify [1] - 105:19
recess [3] - 86:19, 138:24, 216:9
recipient [1] - 152:25
recognize [4] - 43:24, 62:20, 115:13, 167:19
recognized [1] - 109:22
recollection [1] - 141:13
recommend [1] - 59:20
recommendations [1] - 99:12
reconsider [1] - 187:8
record [37] - 4:9, 5:23, 7:2, 8:9, 21:20, 21:21, 21:24, 40:13, 40:22, 47:21, 53:18, 72:18, 80:22, 80:23, 81:2, 88:9, 155:13, 155:14, 155:17, 171:22, 171:24, 177:5, 180:11, 180:12, 180:15, 180:17, 181:9, 181:16, 181:17, 181:20, 204:22, 234:14, 235:24, 235:25, 236:4, 239:9, 242:11
recorded [1] - 88:6
reduces [1] - 198:14
reevaluate [1] - 220:23
refer [5] - 9:15, 44:12, 46:5, 90:9, 90:10

reference [3] - 15:18, 142:24, 172:12
referencing [2] - 135:9, 135:12
referred [8] - 27:15, 131:20, 136:15, 153:4, 204:24, 220:14, 223:10, 238:20
referring [5] - 43:14, 68:9, 111:15, 140:13, 140:22
refers [1] - 154:15
reflect [2] - 238:10, 238:24
refuse [1] - 74:12
refused [3] - 66:6, 74:4, 175:6
regard [8] - 12:4, 12:10, 28:17, 141:4, 162:7, 204:18, 205:18, 236:11
regarded [1] - 74:13
regarding [10] - 11:9, 11:19, 46:24, 59:24, 136:20, 153:9, 154:7, 187:22, 191:11, 195:19
regards [1] - 141:16
register [6] - 37:3, 134:15, 182:13, 183:2, 183:6, 187:3
regret [3] - 166:16, 166:20, 233:15
regular [1] - 127:17
regularly [1] - 29:8
regulation [4] - 35:16, 166:15, 217:10, 221:17
regulations [32] - 60:20, 61:3, 62:2, 62:5, 62:9, 63:8, 73:12, 76:23, 85:13, 108:10, 108:11, 108:23, 108:25, 109:2, 129:9, 134:18, 135:22, 138:15, 144:15, 144:18, 144:25, 146:6, 146:7, 147:15, 160:11, 165:4, 166:2, 170:19, 206:5, 208:8, 214:22
related [13] - 23:15, 25:25, 35:15, 86:10, 147:6, 172:3, 177:21, 189:17, 191:15, 209:15, 211:2, 238:16, 242:14
relates [3] - 68:18, 200:16, 200:21
relating [2] - 86:22, 238:18
relationship [2] - 24:3, 95:11
relative [1] - 116:13
relatively [1] - 116:9
released [2] - 135:16,

183:9
relevant [2] - 40:17, 196:5
relies [1] - 135:24
rely [1] - 46:18
remember [4] - 4:25, 29:15, 56:6, 204:3
remembered [1] - 134:16
reminding [1] - 134:8
remove [1] - 230:2
rent [1] - 197:5
repeat [6] - 41:17, 58:9, 84:11, 161:7, 200:19, 237:23
rephrase [5] - 22:8, 55:17, 191:18, 194:18, 197:14
replacement [1] - 19:23
replied [1] - 83:13
report [33] - 23:20, 23:21, 36:17, 188:16, 189:19, 189:22, 189:24, 190:8, 190:11, 190:17, 190:18, 190:22, 191:9, 191:11, 191:14, 191:21, 191:25, 192:5, 192:11, 193:16, 193:18, 193:24, 194:6, 194:7, 194:10, 194:20, 195:5, 195:11, 195:15, 195:21, 195:25, 213:19, 237:14
reported [2] - 23:22, 23:23
reporter [2] - 47:14, 57:17
Reporter [17] - 26:25, 47:20, 57:23, 58:22, 81:20, 89:10, 131:22, 133:24, 139:15, 152:10, 155:25, 182:3, 186:17, 203:8, 220:16, 223:12, 241:10
reports [13] - 143:3, 146:18, 146:23, 195:2, 195:7, 195:9, 213:5, 213:7, 213:13, 213:16, 213:17, 213:20, 213:24
represent [2] - 4:15, 137:5
representative [5] - 9:14, 48:7, 103:3, 189:6, 234:18
represented [2] - 137:22, 174:22
representing [1] - 168:14
request [10] - 68:12, 68:21, 71:2, 71:10, 71:21, 107:18, 143:7,

169:11, 169:13, 183:4
requested [6] - 8:21, 9:4, 66:3, 75:21, 183:3, 187:7
requests [16] - 11:2, 29:6, 29:11, 29:13, 29:14, 29:16, 29:19, 29:22, 71:7, 72:8, 88:16, 90:15, 91:11, 157:9, 183:9, 207:23
required [4] - 36:13, 92:20, 92:24, 133:6
requirement [2] - 35:7, 86:15
requirements [3] - 35:9, 41:4, 143:16
requiring [1] - 206:6
research [37] - 12:19, 67:9, 67:15, 69:3, 74:9, 74:15, 74:20, 104:6, 109:8, 128:25, 129:2, 129:8, 137:11, 146:15, 146:19, 146:24, 147:23, 150:10, 159:3, 161:3, 161:17, 190:18, 191:16, 191:25, 195:22, 198:20, 198:21, 198:22, 198:23, 198:25, 199:7, 199:8, 199:9, 199:10, 200:15, 200:16, 213:20
reserved [2] - 3:22, 6:4
resource [1] - 144:21
respect [6] - 6:17, 6:22, 11:14, 11:15, 11:25, 12:7
respective [2] - 1:16, 3:6
respond [2] - 6:21, 125:19
responded [4] - 28:18, 28:25, 152:20, 210:18
response [5] - 6:13, 55:20, 75:21, 141:21, 169:20
responses [2] - 6:20, 169:19
responsibilities [1] - 30:21
responsibility [2] - 143:11, 160:23
responsible [2] - 216:15, 225:17
responsive [1] - 68:3
restaurant [1] - 21:6
restaurants [1] - 148:24
restricted [2] - 205:14, 225:9
retained [2] - 13:24, 241:10
retested [1] - 202:18
review [1] - 8:15

reviewed [4] - 57:24, 89:18, 182:15, 219:23
revise [3] - 207:10, 207:14, 208:9
revised [7] - 202:25, 203:25, 206:21, 206:22, 207:15, 208:2, 208:6
revisions [1] - 204:3
right [26] - 7:4, 35:2, 50:15, 119:22, 125:7, 126:2, 126:8, 128:3, 129:18, 130:2, 131:14, 134:25, 135:6, 156:10, 162:22, 172:20, 177:2, 177:19, 179:24, 189:17, 198:2, 199:18, 204:2, 230:18, 231:18, 234:15
Rising [2] - 4:12, 13:16
risk [10] - 40:9, 191:2, 192:4, 192:9, 192:13, 228:15, 229:7, 229:14, 229:16, 232:12
road [28] - 21:3, 47:23, 97:25, 104:3, 104:11, 111:12, 111:13, 112:7, 112:8, 112:11, 112:23, 116:7, 126:18, 130:10, 130:23, 138:6, 160:18, 167:2, 171:6, 174:8, 179:10, 185:2, 196:8, 196:9, 224:9, 225:5, 225:10, 237:20
Road [2] - 4:12, 13:16
role [3] - 22:10, 26:16, 94:13
roles [1] - 124:13
roll [2] - 23:6, 114:19
rolling [1] - 124:11
ROME [1] - 2:9
room [6] - 5:11, 168:6, 168:9, 171:17, 171:20, 180:17
rotate [2] - 87:22, 87:24
roughly [1] - 10:7
row [1] - 77:8
RPM [2] - 114:7, 131:2
RPM'S [1] - 113:10
rubber [1] - 121:16
Rule [1] - 6:14
rule [3] - 66:18, 82:19, 82:21
rules [2] - 6:5, 85:12
Rules [1] - 6:15
run [8] - 39:4, 102:2, 102:3, 103:14, 111:5, 229:7, 234:7
running [2] - 224:19, 231:15
runways [1] - 20:12

| S | | | |
|---|---|---|---|
| **safe** [43] - 22:20, 22:21, 22:22, 23:11, 23:13, 66:7, 70:13, 70:17, 74:4, 74:25, 78:23, 79:15, 79:23, 80:5, 80:7, 97:25, 103:22, 103:24, 114:22, 115:3, 115:8, 125:9, 137:8, 138:5, 138:17, 161:13, 169:22, 185:6, 185:14, 185:19, 190:14, 190:15, 201:13, 212:13, 213:6, 213:22, 221:20, 221:24, 221:25, 222:3, 222:6 | 136:21, 136:23, 137:15 | **screens** [1] - 123:23 | **shooting** [1] - 122:3 |

**safe** [43] - 22:20, 22:21, 22:22, 23:11, 23:13, 66:7, 70:13, 70:17, 74:4, 74:25, 78:23, 79:15, 79:23, 80:5, 80:7, 97:25, 103:22, 103:24, 114:22, 115:3, 115:8, 125:9, 137:8, 138:5, 138:17, 161:13, 169:22, 185:6, 185:14, 185:19, 190:14, 190:15, 201:13, 212:13, 213:6, 213:22, 221:20, 221:24, 221:25, 222:3, 222:6

**safely** [13] - 12:21, 60:18, 98:11, 98:15, 109:24, 132:16, 145:10, 163:18, 195:3, 195:24, 196:2, 230:2, 237:20

**safer** [3] - 125:11, 185:15, 185:19

**safer"** [1] - 185:6

**safety** [48] - 19:3, 21:11, 21:17, 22:17, 23:8, 23:15, 23:17, 25:6, 25:23, 25:24, 26:3, 26:8, 26:11, 26:12, 26:16, 27:12, 27:13, 27:16, 27:17, 27:18, 27:21, 27:24, 62:14, 97:22, 97:24, 104:9, 110:2, 132:13, 136:17, 137:2, 137:21, 160:23, 183:23, 187:22, 189:13, 190:18, 197:17, 197:20, 210:17, 210:20, 210:22, 212:21, 213:6, 224:16, 224:23, 231:9, 234:12, 234:14

**Safety** [6] - 19:14, 19:24, 21:25, 22:9, 27:7, 75:14

**sat** [3] - 162:22, 211:3, 211:14

**saying** [30] - 8:4, 26:10, 27:17, 31:12, 38:4, 45:3, 45:4, 56:13, 71:21, 83:14, 98:5, 102:5, 119:16, 119:19, 129:17, 152:20, 154:15, 154:16, 154:17, 157:4, 173:9, 176:6, 176:14, 190:16, 192:11, 205:12, 205:20, 226:20, 231:16

**scanned** [1] - 187:14

**scenario** [1] - 70:8

**scheduled** [1] - 90:5

**scheduling** [1] - 10:22

**Schneider** [4] - 136:18,

**school** [124] - 9:15, 9:21, 13:20, 13:22, 14:6, 14:9, 14:12, 14:21, 18:18, 24:16, 25:5, 28:6, 29:4, 29:10, 30:7, 30:16, 31:6, 32:24, 33:16, 38:18, 39:20, 40:14, 40:19, 41:8, 41:23, 42:17, 48:22, 49:23, 50:24, 54:8, 55:20, 55:21, 55:25, 56:4, 56:7, 57:2, 58:6, 58:14, 59:15, 60:21, 61:11, 68:13, 69:5, 71:20, 76:21, 76:25, 77:14, 81:5, 83:18, 84:4, 84:8, 84:19, 84:22, 85:13, 85:20, 85:25, 86:3, 86:8, 86:16, 87:18, 90:14, 91:10, 92:4, 92:6, 95:4, 95:25, 96:5, 96:14, 97:7, 97:14, 98:7, 99:4, 106:4, 107:3, 107:9, 107:19, 141:23, 144:4, 145:14, 149:7, 158:12, 158:19, 160:20, 161:2, 161:10, 161:11, 161:23, 168:25, 173:6, 173:15, 173:23, 173:25, 174:21, 174:24, 175:2, 175:4, 176:12, 177:11, 177:16, 177:18, 177:25, 178:12, 178:16, 178:24, 179:23, 180:6, 180:23, 181:3, 181:4, 181:5, 187:9, 187:24, 196:20, 201:6, 210:6, 214:25, 220:3, 232:25, 233:6, 233:25, 234:21, 234:22, 235:11

**School** [6] - 13:13, 87:3, 173:21, 175:16, 180:24, 200:25

**SCHOOL** [2] - 1:7, 1:15

**schools** [36] - 14:21, 14:22, 15:6, 31:8, 33:25, 54:2, 54:3, 54:9, 70:24, 71:2, 71:7, 72:5, 72:13, 73:14, 77:4, 83:20, 83:23, 96:5, 96:11, 166:2, 169:12, 169:16, 169:25, 170:12, 170:15, 171:12, 172:4, 174:18, 176:15, 176:22, 177:4, 217:5, 218:11, 219:9

**schools'** [1] - 169:19

**scientific** [6] - 74:16, 74:20, 125:3, 185:23, 185:25, 200:16

**scream** [1] - 129:24

**screwed** [1] - 166:11

**sealing** [1] - 3:7

**seat** [1] - 160:16

**seats** [2] - 116:16, 184:20

**second** [10] - 47:10, 53:7, 57:4, 60:21, 101:6, 135:2, 158:24, 188:10, 198:2, 237:4

**secondly** [1] - 6:11

**section** [1] - 238:16

**security** [1] - 83:8

**Security** [2] - 215:12, 215:21

**seek** [5] - 63:15, 109:9, 144:5, 180:4, 182:22

**seeking** [9] - 60:16, 61:17, 88:11, 91:12, 107:18, 141:18, 145:13, 154:8, 198:5

**seizures** [1] - 199:18

**semesters** [2] - 33:18, 33:19

**send** [2] - 96:10, 201:23

**senior** [1] - 19:10

**sense** [5] - 12:14, 119:24, 119:25, 120:21, 122:2

**senses** [1] - 115:23

**sensing** [1] - 121:14

**sensor** [1] - 121:13

**sentence** [5] - 183:16, 184:25, 191:7, 191:20, 200:20

**sentences** [1] - 131:7

**separate** [2] - 14:21, 194:3

**series** [3] - 35:19, 36:24, 47:3

**serious** [3] - 104:4, 104:5, 189:13

**service** [4] - 3:16, 87:15, 87:17, 112:23

**services** [1] - 20:25

**Seth** [1] - 4:14

**SETH** [1] - 2:6

**setting** [1] - 5:10

**sex** [2] - 204:18, 205:19

**shake** [1] - 7:15

**share** [1] - 173:10

**Sharon** [2] - 64:21, 165:13

**sheet** [1] - 99:21

**shift** [7] - 113:5, 113:9, 114:7, 114:8, 128:4, 131:2

**shifting** [1] - 167:2

**shocking** [1] - 173:3

**shops** [1] - 21:5

**shorthand** [1] - 9:17

**show** [5] - 57:5, 101:25, 177:2, 177:3, 178:8

**shut** [1] - 214:22

**shutting** [1] - 63:2

**sidewalks** [1] - 148:24

**sight** [3] - 35:17, 236:13, 236:18

**sign** [10] - 10:23, 36:19, 208:15, 208:18, 223:5, 223:20, 228:4, 229:2, 232:7, 232:20

**Sign** [1] - 129:4

**signature** [1] - 30:24

**signed** [4] - 3:10, 3:12, 3:15, 98:4

**signer** [26] - 80:11, 93:18, 107:25, 108:4, 128:22, 133:5, 133:7, 133:9, 133:11, 133:13, 133:15, 163:22, 163:25, 164:8, 164:9, 164:11, 164:18, 164:25, 221:12, 221:21, 227:4, 227:8, 227:11, 228:18, 230:20

**signer's** [1] - 227:9

**signers** [12] - 80:10, 108:19, 108:21, 165:3, 165:5, 165:7, 165:8, 165:9, 208:25, 222:10, 222:22, 224:3

**significant** [3] - 51:10, 55:7, 136:11

**significantly** [1] - 35:22

**signing** [1] - 229:3

**simple** [1] - 192:22

**simpler** [2] - 92:21, 92:25

**simulator** [10] - 172:20, 172:22, 176:4, 178:24, 179:5, 179:14, 179:18, 180:7, 180:8, 180:9

**simulators** [1] - 172:21

**simultaneously** [2] - 60:10, 165:3

**sir** [1] - 80:2

**siren** [13] - 115:19, 115:21, 119:2, 119:3, 119:21, 119:23, 120:21, 121:10, 123:18, 125:7, 125:8

**sit** [5] - 160:16, 187:19, 211:14, 217:23, 218:3

**sitting** [2] - 177:7, 232:24

**situation** [3] - 68:14, 220:23, 225:15

situations [1] - 125:3
six [10] - 33:2, 33:4, 33:17, 34:7, 38:17, 130:19, 164:15, 168:5, 168:8, 188:12
size [1] - 198:12
skills [20] - 60:3, 60:4, 60:6, 60:7, 65:17, 73:20, 85:9, 85:10, 85:15, 85:17, 102:2, 108:2, 111:23, 111:24, 135:18, 145:20, 146:9, 189:13, 225:7
skip [3] - 80:19, 235:15, 235:16
sleep [20] - 35:15, 35:22, 35:23, 35:25, 36:4, 36:11, 36:15, 36:20, 37:8, 37:10, 199:21, 201:3, 201:7, 201:12, 201:17, 201:18, 202:2, 202:3, 202:4, 202:8
slow [1] - 119:23
smaller [1] - 33:25
Smith [7] - 13:13, 27:6, 134:13, 202:23, 204:16, 204:22, 212:18
snow [1] - 152:11
Solomon [6] - 13:13, 27:6, 134:14, 202:23, 204:16, 204:23
Solomon's [1] - 212:19
solution [1] - 176:10
somebody [47] - 11:2, 18:9, 25:17, 28:19, 34:3, 36:6, 37:25, 39:15, 40:2, 40:4, 40:12, 41:2, 41:24, 42:2, 42:6, 42:16, 60:6, 64:4, 86:2, 87:5, 87:8, 87:18, 93:10, 94:6, 94:8, 95:14, 97:25, 102:5, 104:15, 112:12, 119:16, 119:19, 125:7, 153:15, 153:22, 154:7, 154:8, 154:12, 157:20, 160:2, 170:23, 170:24, 171:3, 196:6, 198:11, 220:2
someone [24] - 18:3, 25:9, 33:6, 37:23, 39:23, 63:24, 76:14, 77:6, 90:5, 94:25, 96:3, 120:13, 120:14, 142:7, 152:23, 153:25, 194:2, 195:4, 199:22, 200:3, 205:7, 205:9, 205:11, 224:23
somewhat [1] - 92:16
son [18] - 9:2, 18:24, 22:24, 23:21, 23:24, 24:2, 24:5, 45:11, 45:12,

52:12, 53:11, 79:9, 79:10, 140:23, 141:2, 141:8, 156:20, 206:24
sooner [2] - 77:6, 115:17
sorry [6] - 48:14, 48:25, 78:19, 129:3, 144:2, 156:11
sort [3] - 173:2, 180:10, 183:3
sought [1] - 151:12
sounds [1] - 43:21
soup [1] - 173:17
Spanish [3] - 129:12, 129:24, 223:2
speak [9] - 38:8, 50:4, 67:7, 67:10, 77:19, 79:6, 121:20, 151:17, 211:13
speaking [9] - 73:8, 109:5, 129:12, 150:8, 150:9, 167:21, 167:22, 167:23, 180:18
speaks [1] - 168:13
special [3] - 20:5, 21:8, 21:16
specific [17] - 6:13, 11:15, 11:22, 15:9, 15:16, 19:21, 22:12, 25:15, 30:4, 35:7, 51:3, 60:4, 75:20, 114:25, 135:15, 157:8, 160:5
specifically [21] - 8:7, 14:18, 17:15, 22:19, 26:15, 27:15, 43:11, 62:10, 71:19, 73:23, 77:24, 78:3, 82:18, 138:11, 140:14, 149:3, 187:18, 189:6, 219:11, 223:5, 223:23
specified [1] - 6:17
speculation [1] - 53:24
speculative [1] - 220:6
speed [5] - 100:12, 103:7, 111:25, 112:3, 113:4
speeds [1] - 113:21
spend [1] - 179:16
spoke [15] - 64:13, 66:9, 66:14, 67:8, 67:18, 79:8, 108:15, 134:18, 137:12, 138:2, 151:16, 151:20, 151:21, 151:23, 211:12
spoken [10] - 67:16, 67:17, 75:8, 108:11, 108:14, 135:20, 148:14, 150:2, 159:5, 161:21
spotty [1] - 217:13
spring [1] - 179:21
Square [2] - 1:18, 2:5
squeal [1] - 121:24

squealing [1] - 115:17
SS [1] - 242:4
staff [7] - 15:9, 15:25, 16:3, 16:4, 16:10, 137:10, 170:3
stamped [36] - 26:22, 47:8, 47:12, 47:17, 57:15, 57:20, 58:19, 81:17, 88:22, 89:4, 133:21, 139:3, 139:10, 152:2, 152:7, 155:22, 156:4, 181:24, 186:9, 186:14, 188:7, 202:22, 203:4, 240:8, 240:9, 240:11, 240:13, 240:14, 240:16, 240:19, 240:21, 240:22, 240:24, 241:5, 241:6, 241:8
stance [1] - 195:10
stand [3] - 72:19, 111:4, 226:19
standard [2] - 35:12, 185:3
standpoint [8] - 22:18, 71:15, 109:25, 163:2, 210:16, 210:18, 211:8, 212:6
stands [2] - 79:2, 183:25
start [6] - 4:19, 122:6, 190:23, 202:13, 212:22, 231:25
started [15] - 13:5, 13:20, 13:22, 24:15, 25:10, 69:9, 69:21, 121:17, 121:18, 164:25, 170:9, 218:14, 222:20
starting [3] - 83:3, 188:23, 197:25
starts [9] - 115:15, 121:22, 121:23, 128:16, 135:4, 185:2, 188:11, 189:9, 204:16
STATE [1] - 242:3
state [10] - 4:8, 7:14, 13:6, 18:7, 19:3, 19:4, 61:5, 135:10, 135:11, 237:15
State [33] - 1:21, 4:4, 59:23, 70:10, 70:14, 70:18, 70:25, 71:25, 75:9, 79:2, 79:13, 81:7, 81:9, 81:10, 81:11, 83:24, 91:24, 95:5, 135:19, 136:7, 144:5, 144:13, 144:25, 145:6, 151:21, 151:22, 161:21, 162:5, 163:25, 164:7, 217:5, 235:12, 242:7
State's [2] - 73:21,

78:20
stated [6] - 41:19, 62:17, 158:12, 158:16, 185:18, 189:7
statement [2] - 202:7, 205:16
Staten [2] - 112:23, 112:24
States [4] - 150:2, 159:6, 161:19, 215:6
states [4] - 35:16, 65:18, 70:9, 136:2
STATES [1] - 1:2
stating [1] - 165:25
statistical [3] - 185:22, 185:25, 186:6
statistics [1] - 95:6
steering [1] - 184:14
Stein [2] - 77:21, 79:22
step [4] - 38:16, 202:11, 231:21
steps [3] - 34:9, 34:10, 109:18
stick [3] - 113:5, 114:7, 114:8
stimulator [3] - 175:22, 175:24, 177:11
STIPULATED [2] - 3:5, 3:20
stipulations [2] - 6:9, 234:11
stop [11] - 20:19, 20:23, 20:24, 24:6, 24:7, 24:9, 24:11, 64:16, 120:23, 132:18, 167:15
stopped [2] - 62:21, 62:23
stopping [1] - 227:20
stops [1] - 166:25
story [1] - 98:13
straying [1] - 51:11
street [3] - 95:15, 119:8, 131:5
Street [1] - 2:10
strictly [2] - 210:17, 210:19
strive [2] - 94:24, 96:7
structure [1] - 18:18
student [96] - 17:16, 26:3, 26:8, 26:11, 26:15, 27:13, 27:15, 27:16, 27:21, 28:6, 32:23, 34:8, 34:17, 38:18, 38:22, 72:6, 78:4, 78:16, 78:21, 78:23, 92:3, 92:13, 92:14, 94:3, 96:14, 96:15, 96:17, 97:5, 97:13, 97:18, 97:20, 98:2, 98:8, 98:17, 101:9,

102:8, 102:22, 103:3, 107:17, 109:16, 110:5, 110:8, 110:16, 110:21, 110:22, 111:11, 113:15, 113:16, 113:19, 114:16, 126:18, 127:5, 127:10, 127:17, 127:19, 127:22, 128:14, 130:21, 130:22, 131:25, 132:21, 132:22, 132:24, 133:2, 145:17, 158:20, 160:16, 160:19, 169:9, 176:13, 196:19, 201:7, 203:20, 204:16, 207:17, 208:14, 208:18, 209:11, 214:3, 214:5, 227:12, 229:3, 229:23, 230:16, 230:21, 230:25, 231:11, 232:11, 234:16, 234:20, 235:8, 235:11, 236:13, 236:22
**students** [57] - 11:11, 11:21, 17:10, 19:6, 22:16, 29:3, 30:17, 30:22, 30:25, 31:3, 31:4, 88:11, 90:16, 91:11, 93:3, 93:10, 93:23, 94:7, 94:18, 95:12, 95:16, 97:16, 98:23, 103:11, 104:8, 107:4, 113:18, 126:24, 127:2, 138:4, 139:23, 140:19, 141:17, 141:25, 142:3, 170:13, 171:14, 173:17, 174:2, 175:3, 179:3, 203:19, 205:18, 206:9, 224:21, 225:17, 226:13, 226:16, 228:14, 228:16, 229:7, 229:17, 230:4, 230:23, 231:23, 232:3, 232:12
**studies** [2] - 125:4, 147:23
**study** [7] - 190:24, 192:2, 192:7, 192:21, 192:23, 193:7, 193:12
**subject** [6] - 6:23, 12:13, 44:2, 44:8, 45:19, 68:5
**subjects** [1] - 6:18
**submission** [1] - 237:8
**submit** [1] - 168:25
**submitted** [5] - 6:14, 6:19, 182:17, 187:12, 191:22
**Subscribed** [1] - 239:17
**subsequently** [5] - 56:2, 57:12, 64:23, 162:15, 168:12
**substance** [2] - 238:10, 238:24
**substantive** [1] - 5:20

**successful** [2] - 179:4, 179:8
**successfully** [1] - 42:9
**summary** [5] - 44:7, 45:17, 68:7, 191:14, 192:6
**Sun** [2] - 4:12, 13:16
**support** [5] - 64:6, 185:4, 190:24, 192:2, 192:7
**supposed** [4] - 67:21, 69:17, 85:6, 96:13
**surprise** [2] - 173:3, 181:7
**surrounding** [1] - 117:5
**surroundings** [1] - 115:12
**suspicion** [1] - 177:6
**switch** [4] - 32:9, 42:23, 113:21, 162:21
**sworn** [4] - 3:10, 4:3, 239:17, 242:10
**system** [1] - 95:8

## T

**tag** [1] - 157:22
**takes** [6] - 17:13, 111:11, 112:14, 114:11, 187:22
**talents** [3] - 19:22, 20:5, 21:8
**talk** [14] - 12:11, 66:22, 69:16, 83:10, 92:18, 96:4, 129:13, 144:16, 144:18, 145:21, 162:4, 162:6, 163:6, 180:5
**talked** [5] - 162:5, 163:7, 163:8, 200:22
**talking** [17] - 11:17, 18:19, 31:7, 31:8, 122:12, 124:16, 135:12, 137:21, 145:7, 164:19, 190:8, 210:25, 222:25, 230:15, 231:16, 236:9
**talks** [1] - 231:5
**tanker** [1] - 23:6
**taught** [1] - 196:21
**teach** [2] - 53:11, 86:12
**technically** [1] - 124:24
**teeth** [1] - 163:9
**telling** [4] - 128:13, 148:15, 226:6, 230:8
**tells** [5] - 98:10, 104:6, 122:25, 170:17, 231:2
**ten** [18] - 17:16, 20:8, 20:10, 24:17, 29:14, 29:17, 68:3, 75:4, 98:23, 111:25, 112:3, 113:4, 113:20, 120:15, 199:24,

209:12, 210:3
**tend** [2] - 17:8, 131:6
**term** [2] - 73:6, 148:22
**terminology** [1] - 188:4
**terms** [9] - 22:15, 92:2, 102:5, 145:4, 207:13, 207:17, 224:7, 238:10, 238:24
**test** [78] - 18:7, 18:10, 38:6, 38:10, 65:6, 65:17, 65:20, 66:4, 66:6, 66:7, 67:3, 67:4, 69:20, 70:11, 70:15, 70:19, 73:20, 73:21, 73:24, 74:3, 78:3, 78:22, 79:13, 79:24, 80:3, 80:6, 80:20, 85:9, 85:10, 85:15, 85:17, 85:23, 92:19, 98:11, 104:20, 108:2, 108:4, 111:12, 111:14, 111:16, 112:13, 117:9, 135:18, 136:9, 146:8, 146:9, 148:9, 159:6, 159:17, 159:20, 160:3, 160:13, 160:18, 162:5, 162:6, 163:23, 164:7, 164:16, 170:19, 179:9, 185:3, 193:2, 193:9, 196:7, 199:5, 210:20, 210:23, 212:23, 213:3, 214:5, 217:21, 222:19, 235:16, 235:17, 237:20
**tested** [8] - 17:13, 59:18, 145:2, 154:24, 194:25, 195:4, 196:11, 217:4
**testified** [5] - 4:5, 151:6, 159:11, 193:10, 213:5
**testify** [1] - 12:3
**testifying** [2] - 193:15, 206:14
**testimony** [18] - 29:9, 41:15, 54:7, 54:10, 54:12, 55:17, 63:9, 63:14, 68:2, 73:15, 79:21, 91:16, 123:6, 132:3, 154:3, 195:23, 213:21, 242:12
**testing** [28] - 36:12, 36:16, 61:6, 65:19, 74:7, 75:23, 76:17, 145:6, 161:20, 183:14, 183:24, 184:13, 185:2, 189:13, 193:25, 194:3, 194:8, 194:16, 194:21, 194:23, 195:19, 196:4, 200:23, 201:24, 212:22, 213:9, 238:19, 239:2
**Texas** [3] - 173:21, 175:3, 180:24

**textbooks** [1] - 174:6
**thank** [2] - 28:2, 181:15
**Thatcher** [1] - 182:19
**THE** [4] - 49:11, 143:23, 144:2, 171:18
**theirs** [1] - 40:17
**theoretically** [1] - 127:9
**there's** [1] - 21:5
**thereafter** [2] - 50:3, 166:7
**they've** [1] - 179:7
**thinking** [1] - 97:9
**third** [4] - 34:2, 52:2, 136:2, 156:21
**threat** [1] - 183:23
**three** [21] - 88:4, 90:25, 91:3, 93:17, 96:4, 99:23, 148:12, 174:18, 183:11, 183:15, 189:10, 192:6, 202:14, 215:22, 222:16, 222:23, 224:20, 225:18, 225:25, 231:2, 231:21
**tightened** [1] - 35:21
**TIME** [1] - 1:11
**times** [8] - 88:4, 92:5, 113:4, 183:11, 184:13, 210:3, 230:13, 236:12
**tire** [7] - 115:14, 121:12, 121:15, 121:22, 122:8, 122:14, 123:7
**tires** [1] - 123:2
**title** [13] - 13:6, 19:14, 19:16, 19:17, 19:18, 19:21, 20:2, 20:5, 21:9, 26:9, 26:10, 26:18, 30:6
**titled** [2] - 139:4, 139:11
**to1** [1] - 226:10
**today's** [1] - 235:21
**Todd** [5] - 29:24, 91:20, 91:21, 91:22, 132:15
**topic** [12] - 11:16, 12:16, 43:9, 43:22, 67:24, 68:3, 68:6, 75:4, 132:12, 132:13, 132:14, 132:19
**topics** [5] - 43:13, 44:2, 44:6, 45:19, 51:3
**total** [1] - 115:12
**totally** [2] - 129:17, 159:19
**touched** [1] - 225:6
**towards** [3] - 159:8, 170:14, 236:8
**track** [1] - 118:3
**tractor** [2] - 106:4, 116:18
**tractors** [1] - 112:4
**traffic** [1] - 113:11
**trail** [2] - 60:11, 118:3
**trailer** [13] - 106:4,

116:18, 117:25, 118:2, 122:24, 123:2, 123:5, 123:15, 123:16, 124:5, 124:15, 124:16, 126:7

**trailers** [1] - 112:4

**train** [42] - 40:10, 40:18, 60:6, 60:8, 61:7, 72:16, 83:4, 84:14, 84:25, 99:24, 104:7, 127:21, 133:13, 136:9, 145:9, 148:9, 153:25, 160:10, 163:18, 163:19, 163:20, 163:22, 170:24, 176:13, 192:23, 192:24, 192:25, 193:8, 195:3, 196:2, 196:6, 196:10, 212:23, 213:3, 213:24, 214:9, 216:5, 216:6, 224:22, 225:16, 235:18

**trained** [30] - 12:21, 59:18, 63:22, 64:4, 71:10, 71:13, 72:14, 82:24, 83:16, 90:25, 100:23, 102:6, 103:4, 105:4, 132:16, 132:21, 132:23, 132:24, 133:2, 152:25, 154:24, 159:12, 164:15, 166:22, 167:5, 170:10, 170:13, 179:2, 214:3, 217:4

**TRAINING** [2] - 1:7, 1:14

**training** [80] - 10:19, 12:7, 16:20, 21:11, 21:17, 22:11, 22:12, 22:25, 23:3, 23:6, 25:6, 26:3, 27:12, 27:24, 40:20, 61:8, 67:3, 67:5, 69:19, 76:17, 83:2, 88:17, 90:7, 90:11, 90:12, 91:13, 92:12, 93:3, 93:11, 93:24, 98:17, 98:24, 99:16, 101:20, 101:21, 102:19, 103:5, 104:13, 107:5, 107:25, 111:12, 111:14, 135:15, 135:21, 136:7, 141:19, 142:11, 145:19, 153:22, 153:23, 154:5, 154:21, 154:22, 162:8, 193:25, 194:3, 194:9, 194:12, 194:16, 194:17, 194:21, 194:24, 195:20, 196:4, 198:24, 198:25, 199:4, 210:23, 215:11, 217:17, 219:10, 221:14, 222:3, 222:4, 224:11, 225:2, 225:21, 234:21, 234:23, 237:21

**Training** [13] - 13:12,

19:15, 22:2, 22:10, 27:7, 27:8, 71:6, 72:20, 87:2, 200:25, 202:24, 204:17, 204:23

**transmission** [3] - 112:2, 113:4, 197:7

**transmissions** [1] - 112:3

**transportation** [2] - 136:4, 136:14

**treat** [1] - 69:17

**tree** [1] - 131:4

**TRIAL** [1] - 1:13

**trial** [2] - 3:22, 6:4

**tricks** [1] - 53:12

**Truck** [2] - 173:20, 175:15

**truck** [109] - 12:22, 20:19, 20:22, 20:24, 21:5, 24:6, 24:7, 24:9, 24:11, 62:22, 62:23, 70:6, 86:9, 103:15, 104:23, 105:8, 106:5, 106:7, 106:10, 106:14, 106:15, 111:6, 113:2, 113:3, 113:19, 114:10, 114:11, 114:18, 115:11, 115:22, 116:3, 116:5, 116:6, 116:10, 116:11, 116:23, 117:17, 117:21, 117:22, 118:6, 121:11, 122:13, 122:23, 123:4, 123:10, 123:16, 123:20, 123:25, 124:2, 124:13, 124:17, 125:12, 125:13, 125:15, 125:16, 125:18, 125:19, 126:3, 126:18, 126:20, 127:3, 127:10, 128:15, 128:22, 138:21, 145:5, 166:25, 168:24, 169:8, 179:8, 184:8, 184:10, 184:15, 187:23, 190:15, 195:24, 196:15, 196:25, 197:3, 197:5, 197:6, 197:10, 197:12, 197:16, 197:18, 198:11, 198:12, 200:16, 200:21, 214:20, 221:13, 221:21, 226:3, 226:12, 227:4, 228:10, 228:11, 228:18, 230:6, 230:15, 230:23, 231:2, 231:4, 231:16, 232:11, 236:19

**truck's** [1] - 184:16

**truckers** [2] - 18:25, 179:4

**trucking** [13] - 86:10, 94:20, 98:5, 101:24, 136:18, 136:24, 136:25, 137:5, 137:9, 137:22,

170:12, 217:17

**Trucking** [3] - 74:18, 137:3, 147:7

**trucks** [21] - 20:25, 21:2, 23:11, 27:19, 112:2, 123:22, 124:6, 124:7, 146:25, 147:7, 170:3, 196:12, 196:17, 196:21, 199:19, 224:19, 225:18, 225:23, 230:5, 231:2

**true** [4] - 107:22, 115:20, 132:6, 242:11

**truly** [1] - 17:24

**truthful** [1] - 5:17

**truthfully** [2] - 5:12, 96:6

**Tuesday** [1] - 158:9

**tuition** [2] - 86:3, 208:7

**turning** [2] - 111:24, 227:2

**turns** [3] - 125:25, 126:2, 126:5

**TV** [1] - 126:16

**twelve** [1] - 199:24

**twice** [3] - 88:2, 88:3, 168:19

**two-week** [1] - 67:13, 233:22

**type** [1] - 130:24

**types** [6] - 22:25, 23:3, 99:23, 99:24, 100:4, 100:5

**typical** [3] - 26:2, 28:5, 28:15

**typically** [3] - 33:2, 74:16, 125:2

## U

**ultimate** [3] - 39:22, 41:20, 85:14

**ultimately** [5] - 96:13, 112:16, 170:7, 212:4, 234:8

**um** [4] - 41:21, 146:17, 146:21, 201:5

**um-hum** [4] - 41:21, 146:17, 146:21, 201:5

**unable** [2] - 144:17, 237:19

**unavailability** [1] - 239:2

**unavailable** [1] - 30:3

**uncontrollable** [1] - 37:21

**uncouple** [1] - 112:4

**underneath** [2] - 52:6, 52:9

**understand** [23] - 5:6,

5:9, 5:14, 7:10, 7:25, 9:6, 9:13, 9:18, 9:22, 15:12, 22:7, 48:4, 77:8, 84:9, 89:22, 100:22, 105:24, 119:17, 130:17, 150:14, 193:4, 195:12

**understanding** [2] - 6:3, 238:7

**undue** [1] - 208:16

**unemployment** [3] - 95:2, 95:17, 96:3

**unfair** [1] - 150:22

**unfamiliar** [1] - 106:2

**Union** [2] - 1:18, 2:5

**United** [1] - 215:6

**UNITED** [1] - 1:2

**unlike** [1] - 217:12

**unloaded** [1] - 217:3

**unsafe** [11] - 74:10, 74:11, 79:25, 132:8, 159:12, 159:19, 171:6, 188:2, 188:5, 197:11

**unsigned** [1] - 3:14

**unusual** [2] - 28:17, 28:23

**updates** [1] - 161:19

**upkeep** [1] - 20:21

**upper** [1] - 90:6

**UPS** [1] - 124:8

**urine** [2] - 35:13, 237:19

**usual** [1] - 6:8

**utilize** [1] - 157:7

**utilized** [2] - 65:18, 135:18

## V

**vaguely** [1] - 188:19

**valid** [5] - 34:15, 34:18, 39:5, 56:20, 56:21

**variations** [1] - 196:16

**vary** [1] - 17:3

**varying** [1] - 157:23

**veered** [1] - 67:24

**Vehicle** [9] - 65:14, 71:6, 72:20, 81:10, 81:11, 81:12, 144:14, 182:18, 217:6

**vehicle** [14] - 40:22, 41:3, 60:18, 73:22, 84:2, 103:7, 108:16, 110:13, 120:6, 124:22, 146:4, 183:25, 194:2

**vehicles** [2] - 136:8, 198:6

**verbal** [1] - 79:20

**verbally** [5] - 62:19, 113:14, 113:15, 114:15, 164:12

**verbatim** [1] - 173:23

DIAB

141:24, 142:2, 152:23,
181:2, 222:19
  **wrong** [4] - 116:17,
159:11, 193:11, 213:4
  **wrote** [4] - 20:12, 59:10,
59:12, 135:7

## Y

  **yard** [25] - 111:23,
112:10, 224:12, 224:16,
224:25, 225:4, 225:5,
225:17, 225:24, 226:5,
226:10, 226:14, 227:19,
228:13, 228:21, 229:2,
229:11, 229:17, 230:9,
230:14, 232:3, 232:10,
232:13, 236:10
  **year** [12] - 36:22, 49:20,
57:12, 61:20, 93:14,
93:21, 93:22, 152:22,
153:8, 168:19, 202:17,
202:18
  **years** [24] - 4:23, 13:21,
20:8, 20:9, 20:10, 24:17,
25:7, 29:14, 29:17,
30:14, 36:8, 36:23, 73:4,
73:5, 88:15, 88:19,
99:21, 105:18, 202:19,
203:18, 207:9, 222:10,
222:16, 222:23
  **York** [10] - 1:19, 1:21,
2:5, 4:4, 70:18, 81:11,
151:22, 242:7
  **YORK** [2] - 242:3, 242:4
  **yourself** [4] - 46:22,
50:7, 177:10, 214:11

# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT                                09:29

FOR THE DISTRICT OF NEW JERSEY                              09:29

CIV. NO. 15-CV-02917-KM-JBC                                 09:29

                                                           09:29

- - - - - - - - - - - - - - - - - - - -x                   09:29

KENNETH FRILANDO,                                           09:29

                    Plaintiff,                              09:29

        - against -                                        09:29

BORDENTOWN DRIVER TRAINING SCHOOL, LLC,                     09:29

                                                           09:29

                 Defendant.                                 09:29

- - - - - - - - - - - - - - - - - - - -x                   09:29

                                                           09:29

                                                           09:29

    VIDEOTAPE DEPOSITION of KENNETH FRILANDO,               09:29

taken pursuant to notice, was held at the Law              09:29

Offices of Blank Rome, LLP, 301 Carnegie Center,           09:29

Princeton, New Jersey 08540, commencing November          09:29

17, 2015, 9:53 a.m., on the above date, before            09:29

Catherine M. Donahue, a Certified Court Reporter          09:29

and Notary Public in the State of New Jersey.             09:29

Job No. 221173                                             09:29

                                                           09:29

            MAGNA LEGAL SERVICES                            09:29

               (866) 624-6221                               09:29

             www.MagnaLS.com                                09:29

                                                           09:29



**Page 2**

```
 1   A P P E A R A N C E S:                      09:29
 2                              09:29
 3   EISENBERG AND BAUM, LLP               09:29
 4   Attorneys for Plaintiff              09:29
 5   24 Union Square East, 4th Floor          09:29
 6   New York, New York  10003              09:29
 7   BY:  ANDREW ROZYNSKI, ESQ.              09:29
 8       SETH A. NADLER, ESQ.              09:29
 9                              09:29
10   BLANK ROME, LLP                   09:29
11   Attorneys for Defendant              09:29
12   130 North 18th Street               09:29
13   One Logan Square, 11th Floor           09:29
14   Philadelphia, Pennsylvania  19103         09:29
15   BY:  ANTHONY B. HALLER, ESQ.          09:29
16       JOHN A. CONNELLY, ESQ.           09:29
17                              09:29
18   ALSO PRESENT:                    09:29
19   Elizabeth Staehle, American Sign Language  09:29
20      Interpreter                  09:29
21   Simon V. Martinez, Jr., American Sign Language  09:29
22      Interpreter                  09:29
23   John Diab                      09:29
24   Matthew Donaghy, Videographer          09:29
25
```

**Page 3**

```
 1            I N D E X               09:29
 2                              09:29
 3   Witness:             Page     09:29
 4   KENNETH FRILANDO                  09:29
 5      Examination by Ms. Haller............... 9    09:29
 6                              09:29
 7                              09:29
 8                              09:29
 9                              09:29
10                              09:29
11                              09:29
12                              09:29
13                              09:29
14                              09:29
15                              09:29
16                              09:29
17                              09:29
18                              09:29
19                              09:29
20                              09:29
21   November 17, 2015               09:29
22   Princeton, New Jersey              09:29
23                              09:29
24                              09:29
25                              09:29
```

**Page 4**

```
 1            E X H I B I T S             09:29
 2   Exhibit Name   Description       Page No.  09:29
 3                              09:29
     Defendant's                      09:29
 4   1      Complaint            30    09:29
                                    09:29
 5   2      Complaint            42    09:29
 6   3      Disclosures          46    09:29
                                    09:29
 7   4      Defendant's First Set of    48    09:29
          Interrogatories to Plaintiff         09:29
 8                              09:29
 9   5      Plaintiff's Objections and   48    09:29
          Answers to Defendant's First        09:29
          Set of Interrogatories              09:29
10                              09:29
11   6      Defendant's First Document   48    09:29
          Requests to Plaintiff              09:29
12   7      Plaintiff's Answers to      88    09:29
          Defendant's Bordentown Driver        09:29
13        Training School LLC's First          09:29
          Request For Documents              09:29
14                              09:29
15   8      Plaintiff's Answers to      88    09:29
          Defendant's Bordentown Driver        09:29
16        Training School LLC's First          09:29
          Request For Documents              09:29
17   9      Plaintiff's Objections and   98    09:29
          Amended Answers to Defendant's      09:29
18        First Set of Interrogatories         09:29
                                    09:29
19   10     Plaintiff's Amended Answers to  99  09:29
          Defendant's First Set of            09:29
20        Interrogatories                09:29
21   11     Copy of New York State     113   09:29
          Driver's License of Kenneth         09:29
22        Frilando                    09:29
23   12     Copy of State of New York   120   09:29
          Department of Motor Vehicles        09:29
24        Abstract of Driver Record            09:29
                                    09:29
25                              09:29
```

**Page 5**

```
 1            E X H I B I T S             09:29
 2   Exhibit Name   Description       Page No.  09:29
 3                              09:29
 4   Defendant's                      09:29
 5   13     Documents which relate to   122   09:29
          communications with the            09:29
 6        Federal Motor Carrier Safety         09:29
          Administration                09:29
 7   14     Original Medical Examiner's  138   09:29
 8        Certificate obtained from Dr.        09:29
          Marino                     09:29
 9   15     Medical Examiner's Certificate  138  09:29
10        obtained by Dr. Yu              09:29
                                    09:29
11   16     Report of HearUSA dated    141   09:29
          2/18/2013                   09:29
12   17     Compilation of documents which  143  09:29
13        includes a letter and subpoena      09:29
          from Blank Rome, LLP            09:29
14   18     Photograph           156   09:29
15                              09:29
16   19     Set of documents produced in  161  09:29
          connection with the Amendment       09:29
17        to Plaintiff's Interrogatory         09:29
          Answers that relate to            09:29
18        correspondence with Jersey          09:29
          Tractor-Trailer Training            09:29
19   20     Correspondence between Joseph  166  09:29
          Frilando and Dutchess School         09:29
20   21     Correspondence between Joseph  171  09:29
          Frilando and Bordentown            09:29
21                              09:29
22                              09:29
23                              09:29
24        (Exhibits attached with transcript.)   09:29
25                              09:29
```



Page 6

```
 1        DEPOSITION SUPPORT INDEX        09:29
 2                                        09:29
 3    Instruction To Witness Not To Answer    09:29
 4        PAGE    LINE                    09:29
 5        None Marked                     09:29
 6    Request for Production of Documents     09:29
 7        PAGE    LINE                    09:29
 8        97     4                        09:29
 9        159    20                       09:29
10        None Marked                     09:29
                                          09:29
11        Marked Text                     09:29
12        PAGE    LINE                    09:29
13        None Marked                     09:29
14                                        09:29
15                                        09:29
16                                        09:29
17                                        09:29
18                                        09:29
19                                        09:29
20                                        09:29
21                                        09:29
22                                        09:29
23                                        09:29
24                                        09:29
25                                        09:29
```

Page 8

```
 1    representing the plaintiff, Kenneth    09:54
 2    Frilando. I'm here with my colleague,  09:54
 3    Seth Nadler from the same firm.        09:54
 4        THE VIDEOGRAPHER: Will the court   09:54
 5    reporter please swear in the witness.  09:54
 6        (The witness is sworn by the       09:54
 7    court reporter.)                       09:54
 8    E L I Z A B E T H   S T A E H L E, called as   09:54
 9    the interpreter in this action, was duly    09:54
10    sworn by the Notary Public (Catherine M.    09:54
11    Donahue) to accurately and faithfully       09:54
12    translate the questions propounded to the   09:54
13    witness from English into American Sign     09:54
14    Language, and the answers given by the      09:54
15    witness from American Sign Language into    09:54
16    English.                                    09:54
17    S I M O N   V.   M A R T I N E Z, JR., called as   09:54
18    the interpreter in this action, was duly    09:54
19    sworn by the Notary Public (Catherine M.    09:54
20    Donahue) to accurately and faithfully       09:54
21    translate the questions propounded to the   09:54
22    witness from English into American Sign     09:54
23    Language, and the answers given by the      09:54
24    witness from American Sign Language into    09:54
25    English.                                    09:54
```

Page 7

```
 1        THE VIDEOGRAPHER: We are now on    09:53
 2    the record. This begins videotape No. 1     09:53
 3    in the deposition of Kenneth Frilando       09:53
 4    versus Bordentown Driving School d/b/a      09:53
 5    Smith & Solomon, for the District of New    09:53
 6    Jersey, Civil Action No.                    09:53
 7    15-CV-02917-KM-JBC. Today is Tuesday,       09:53
 8    November 17, 2015, and the time is 9:53.    09:53
 9    This deposition is being taken at 301       09:53
10    Carnegie Center, Princeton, New Jersey,     09:53
11    at the request of Blank Rome, LLP.          09:53
12        The videographer is Matt Donaghy        09:53
13    of Magna Legal Services and the court       09:53
14    reporter is Catherine Donahue of Magna      09:53
15    Legal Services.                             09:53
16        Will counsel and all parties           09:53
17    present state their appearances and whom    09:53
18    they represent.                             09:54
19        MR. HALLER: Anthony Haller             09:54
20    representing the defendant, Bordentown      09:54
21    Driving Training School, LLC, with the      09:54
22    firm of Blank Rome, and I'm here with my    09:54
23    colleague, John Connelly.                   09:54
24        MR. ROZYNSKI: Andrew Rozynski          09:54
25    with the firm of Eisenberg and Baum,        09:54
```

Page 9

```
 1    K E N N E T H   F R I L A N D O, called as a    09:54
 2    witness by Defendant, having been first     09:54
 3    duly sworn by Catherine M. Donahue, a       09:54
 4    Notary Public within and for the State of   09:54
 5    New Jersey, was examined and testified as   09:54
 6    follows:                                    09:54
 7        THE WITNESS: I do.                      09:55
 8        MR. ROZYNSKI: For the record,          09:55
 9    the sign language interpreters are going    09:55
10    to be interpreters in American Sign         09:55
11    Language into English and vice versa.       09:55
12    This will not be a simultaneous             09:55
13    translation. It will be consecutive.        09:55
14    There will be some delay. Sometimes the     09:55
15    interpreters will need to cooperate with    09:55
16    each other to insure the accuracy of the    09:55
17    interpretation that takes place. The        09:55
18    word choices used are by the                09:55
19    interpreters, because English and           09:55
20    American Sign Language are not the same     09:55
21    and certain concepts are open to            09:55
22    interpretation. I just wanted to notice     09:55
23    that so the deposition runs smoothly and    09:55
24    that we realize that there will be some     09:55
25    delay during the translation.               09:55
```



Page 10

```
 1  EXAMINATION BY MR. HALLER:                09:55
 2      Q.  Okay.                             09:56
 3         Good morning, Mr. Frilando.        09:56
 4      A.  Good morning.                     09:56
 5      Q.  My name is Anthony Haller.  I'm with    09:56
 6  the law firm of Blank Rome, and we represent the   09:56
 7  defendant, Bordentown Driver Training School,    09:56
 8  LLC in this case that you have brought against    09:56
 9  that company.                            09:56
10      A.  Yes.                             09:56
11      Q.  Do you understand that you are here    09:56
12  under oath today?                        09:56
13      A.  Yes.                             09:56
14      Q.  When we started, your counsel read    09:56
15  into the record certain comments concerning the   09:56
16  use of sign language interpreters.       09:57
17         Did you follow those comments?    09:57
18      A.  Yes, I did.                      09:57
19      Q.  Are the sign language interpreters    09:57
20  seated in a position within your line of sight    09:57
21  that makes it possible for you to respond to my    09:57
22  questions as best you can?               09:57
23      A.  Yes.                             09:57
24      Q.  As you know, we are videotaping this    09:57
25  deposition.                             09:57
```

Page 11

```
 1         Do you understand that?           09:57
 2      A.  Yes.                             09:57
 3      Q.  It would have been my preference to    09:57
 4  have the sign language interpreters in the video   09:57
 5  so we would have a full record of what was being   09:57
 6  signed, as well as your responses, but as I    09:57
 7  understand it, to have the sign language    09:58
 8  interpreters sitting to your right would not be    09:58
 9  effective because they are not in your line of    09:58
10  sight, is that correct?                  09:58
11      A.  I do agree.  It is not appropriate.    09:58
12  In fact, where they're sitting right now is the    09:58
13  best line of travel where I can see them    09:58
14  visually, because every time I would have to    09:58
15  look at them to see what they're saying I have    09:58
16  to turn to the right and, therefore, my face is    09:58
17  off the camera and off of your attention.    09:58
18      Q.  I would like to say at the outset,    09:58
19  Mr. Frilando, this is the first time I have    09:58
20  taken a deposition in these circumstances.  So    09:58
21  that I hope that you will recognize that I'm    09:58
22  learning perhaps just as much as you are    09:58
23  learning in this process.                09:58
24      A.  Sure.                           09:58
25      Q.  Okay.                           09:59
```

Page 12

```
 1         And if at any time you feel like I    09:59
 2  am going too fast or that I need to do something    09:59
 3  different to enable you to understand my    09:59
 4  questions and answer them, please will you tell    09:59
 5  me?                                     09:59
 6      A.  Okay.  I will.                   09:59
 7      Q.  Do you understand that the sign    09:59
 8  language interpreters in a deposition of this    09:59
 9  nature are acting as an extension of the court,    09:59
10  that they are responsible to the court to make    09:59
11  sure to the best of their ability what they    09:59
12  interpret is accurate?                   09:59
13      A.  I do.                           09:59
14      Q.  Do you understand that the sign    09:59
15  language interpreters cannot provide    09:59
16  clarification about the questions or your    09:59
17  answers?                                10:00
18      A.  I do.                           10:00
19      Q.  If you do not understand something    10:00
20  that I ask you, please will you tell me?    10:00
21      A.  Okay.  I will.                   10:00
22      Q.  This is a difficult question for me    10:00
23  because I don't -- you know, this is the first    10:00
24  time I'm doing this, but if the sign language    10:00
25  interpreters give me a verbal answer that may    10:00
```

Page 13

```
 1  not be a hundred percent what you mean, is there    10:00
 2  a way of identifying that issue?         10:00
 3      A.  I wouldn't know.                 10:01
 4      Q.  So we would have to rely really on    10:01
 5  the accuracy of the interpretation?     10:01
 6      A.  You have to rely on the interpreters    10:01
 7  because I can't hear the interpreters what    10:01
 8  they're saying.                         10:01
 9         MR. HALLER:  Sorry, can you       10:01
10      repeat the answer?                   10:01
11         THE WITNESS:  I cannot hear, so    10:01
12      therefore, I cannot rely on what they're    10:01
13      saying, because I can't hear.        10:01
14         MR. ROZYNSKI:  Just for the       10:01
15      record, if I notice that something is an    10:01
16      interpretation that is way off, I will    10:01
17      ask the interpreters to reinterpret just    10:01
18      to insure a clear record.            10:01
19  BY MR. HALLER:                          10:01
20      Q.  Could you please state your full    10:01
21  name and home address for the record?   10:01
22      A.  Yes, my name is Kenneth, last name    10:01
23  is Frilando, F-r-i-l-a-n-d-o.  And my full    10:01
24  address is 330 Beach, No. 90th Street, and    10:02
25  that's in Rockaway Beach, New York.  Zip Code    10:02
```



Page 14

```
 1   11693.                              10:02
 2     Q.  Thank you.                    10:02
 3         Have you ever been through a   10:02
 4   deposition process like we're going through  10:02
 5   today?                             10:02
 6     A.  No, I haven't.  This I guess my  10:02
 7   first deposition.                  10:02
 8     Q.  I'm going to establish some ground  10:02
 9   rules for the taking of the deposition, which  10:02
10   I'll say in a minute once that's been  10:02
11   interpreted.  Okay.                10:02
12         First of all, I would ask you to  10:03
13   answer my questions fully and to the best of  10:03
14   your knowledge, is that understood and agreed?  10:03
15     A.  Yes.                         10:03
16     Q.  Because the court reporter is taking  10:03
17   down both my questions and then the verbal  10:03
18   answers after they have been interpreted, please  10:03
19   will you make sure that you wait for me to  10:03
20   finish my questions and for them to be  10:03
21   interpreted until you answer?      10:03
22     A.  Okay.                        10:03
23     Q.  Okay.                        10:03
24         If at any time you feel that I have  10:03
25   interrupted your answer inadvertently and I will  10:03
```

Page 15

```
 1   not do it intentionally, please, will you tell  10:03
 2   me?                                10:04
 3     A.  I will.                       10:04
 4     Q.  If you do not understand the  10:04
 5   question, please will you tell me?  10:04
 6     A.  I will.                       10:04
 7     Q.  If you do not say anything, I will  10:04
 8   assume that you have understood the question.  10:04
 9         Is that fair, understood and agreed?  10:04
10     A.  Yes.                         10:04
11     Q.  Are you currently taking any  10:04
12   medication that would affect your ability  10:04
13   mentally to provide answers to my questions here  10:04
14   today?                             10:04
15     A.  No, I'm not.                  10:04
16     Q.  Have you ever gone by another name?  10:05
17     A.  No, I do not.  I just go by my full  10:05
18   name.  I don't have a nickname or anything,  10:05
19   per se.                            10:05
20     Q.  What is your date of birth?    10:05
21     A.  September 25, 1968.           10:05
22     Q.  And where were you born?      10:05
23     A.  Here in New York.  Actually, Queens.  10:05
24   I just encompass everything as New York.  I was  10:05
25   born in New York State.            10:05
```

Page 16

```
 1     Q.  Could you tell me who your immediate  10:05
 2   family is?  I believe you have a mother and a  10:05
 3   brother, but I'm not sure, so just tell me who  10:05
 4   your immediate family is, please.  10:06
 5     A.  I just have my mother and my  10:06
 6   brother.  That's it.  That's all I have for my  10:06
 7   immediate family.                 10:06
 8     Q.  In this lawsuit you are being  10:06
 9   represented by the law firm of Eisenberg and  10:06
10   Baum, you understand that?         10:06
11     A.  Yes, that's correct.          10:06
12     Q.  Could you please tell me when you  10:06
13   first spoke to anyone at the firm of Eisenberg  10:06
14   and Baum in connection with any legal matter?  10:06
15     A.  I believe the first time that I  10:07
16   encountered the Eisenberg and Baum was in April  10:07
17   of 2015, of this year.  Approximately.  It may  10:07
18   have been March, as well.  So that's why I'm  10:07
19   saying approximately between March and April.  10:07
20     Q.  Do you have any documents,  10:07
21   correspondence or any kind of other information  10:07
22   that might help us identify the first date on  10:07
23   which you spoke to anyone at the firm of  10:07
24   Eisenberg and Baum?                10:07
25     A.  No, I don't.  Actually, I had  10:08
```

Page 17

```
 1   contacted the National Association for the Deaf  10:08
 2   because I was looking for a law firm that can  10:08
 3   basically communicate with my communication  10:08
 4   needs and the National Association of the Deaf  10:08
 5   had given me the name of the law firm.  That's  10:08
 6   how I reached out to them and the name, the name  10:08
 7   that was recommended was Eisenberg and Baum.  10:08
 8     Q.  Thank you for that answer.     10:08
 9         You anticipated my next question,  10:08
10   which was how you knew about Eisenberg and Baum  10:08
11   or got connected with them.  So as I understand  10:08
12   it, you or somebody on your behalf contacted the  10:09
13   National Association for the Deaf, is that  10:09
14   right?                             10:09
15     A.  Actually, it was my mother and I  10:09
16   that contacted the NAD, and then afterwards, I  10:09
17   followed up with my own contact with the law  10:09
18   firm.                              10:09
19     Q.  Was the contact with the NAD by  10:09
20   telephone or was it through written  10:09
21   correspondence?                    10:09
22     A.  I'm not really sure.  My mother was  10:09
23   the one that reached out to them.  I think it  10:09
24   might have been an e-mail or a phone call, but  10:09
25   I'm more likely to say that my mom used an  10:09
```



Page 18

```
 1   e-mail when she contacted somebody from the NAD.   10:10
 2   I believe so.                                      10:10
 3        Q.  Did you personally have any contact       10:10
 4   with anyone at the NAD?                             10:10
 5        A.  No, I did not.          10:10
 6        Q.  So following your mother's initial         10:10
 7   contact with the NAD, was it through that that      10:10
 8   you then got the referral to Eisenberg and Baum?    10:10
 9        A.  That is correct.           10:10
10        Q.  And what was the subject matter of         10:10
11   the advice that you were interested in getting      10:10
12   from a law firm at that time?           10:10
13            MR. ROZYNSKI:  Objection.  Calls      10:11
14       for attorney/client privilege.  To the     10:11
15       extent that you don't disclose any         10:11
16       conversations between you and your         10:11
17       attorneys, you can answer, but I'm just    10:11
18       going to instruct you to be cautious and   10:11
19       not disclose any attorney/client          10:11
20       communications between us and you.         10:11
21       Okay.                                       10:11
22        A.  I'm sorry.  Would you repeat the       10:11
23   question again?                 10:11
24   BY MR. HALLER:                   10:11
25        Q.  Yes, the question was, what was the     10:11
```

Page 19

```
 1   subject matter on which you wanted to get advice   10:11
 2   from a law firm at that time?  I'm not asking      10:11
 3   about the conversations with them.  I'm asking     10:11
 4   why you wanted to go to them and what the          10:12
 5   subject was that you wanted to discuss with        10:12
 6   them?                              10:12
 7        A.  I was -- I sought consultation to        10:12
 8   seek advice about a discrimination case because    10:12
 9   I was denied the opportunity to apply for          10:12
10   driving school.                      10:12
11        Q.  So, is it your testimony that you        10:12
12   sought out that advice after you had been denied   10:12
13   participation in a driving school?              10:12
14        A.  That is correct.          10:12
15        Q.  And by whom at that time did you         10:12
16   believe you had been denied participation in a     10:12
17   driving school when you went to seek that          10:12
18   advice?                  10:12
19        A.  I believe it was one of the         10:12
20   personnel that worked at the driving school by     10:12
21   the name of David.  I don't know David's last      10:13
22   name, but I was corresponding with him through     10:13
23   e-mail and David had sent an e-mail to my          10:13
24   brother, and my brother was the one who brought    10:13
25   it to my attention after he was contacted by       10:13
```

Page 20

```
 1   someone at the driving school, which was David    10:13
 2   saying that my application was denied.           10:13
 3        Q.  All right.                  10:13
 4            So are you referring to the         10:13
 5       defendant in this case that we identified as   10:13
 6   Bordentown Driving Training School?             10:13
 7        A.  What school are you talking about?     10:13
 8   Bordentown Driving School, that's the school I'm   10:13
 9   speaking about.                 10:13
10        Q.  So is it your testimony that you       10:13
11   first went to a lawyer after Bordentown in your    10:13
12   mind had denied you participation in the driving   10:13
13   school?                   10:13
14        A.  That is correct.           10:13
15        Q.  What are the terms of your           10:14
16   engagement with the law firm of Eisenberg and     10:14
17   Baum?  What's your financial arrangement with      10:14
18   them?                  10:14
19            MR. ROZYNSKI:  Objection.  Calls      10:14
20       for attorney/client privilege             10:14
21       communication between the client and the     10:14
22       law firm, and I'm going to object as to      10:14
23       attorney/client privilege and instruct      10:14
24       the witness not to answer.             10:14
25            MR. HALLER:  I don't believe that    10:14
```

Page 21

```
 1       the terms of the engagement are subject     10:14
 2       to the attorney/client privilege and I     10:14
 3       think that the law is clear that there      10:14
 4       is a right to inquire on the fee           10:14
 5       arrangements which are discoverable.  So    10:14
 6       I would ask you to reconsider your          10:15
 7       position.                    10:15
 8            MR. ROZYNSKI:  Do you have any        10:15
 9       authority to support that?            10:15
10            MR. HALLER:  There is a 3rd          10:15
11       Circuit case called Montgomery County      10:15
12       versus Micro Vote Corp., in which the      10:15
13       court held that a fee arrangement was       10:15
14       discoverable and not privileged.  I'm      10:15
15       not going to inquire into the            10:15
16       conversations about it, I just want to     10:15
17       have some understanding of what the        10:15
18       arrangement is.             10:15
19            MR. ROZYNSKI:  Okay.  Mr.           10:15
20       Frilando, to the extent if you would       10:15
21       like to talk about generally what the      10:15
22       arrangement is with the firm, you can      10:15
23       say so.  However, I instruct you not to    10:15
24       talk about conversations that we had had   10:16
25       relating to the agreement in any way,      10:16
```



6 (Pages 18 to 21)

Page 22

```
 1        shape or form.  That you can answer      10:16
 2    generally what the arrangement is.          10:16
 3        A.  I'm not comfortable disclosing.  I   10:16
 4    would like to leave it just as it is.  I don't  10:16
 5    want to discuss it.                          10:16
 6    BY MR. HALLER:                               10:16
 7        Q.  Please, whether you're comfortable   10:16
 8    or not, you're here under oath to answer    10:16
 9    questions.  You have an obligation to do so,  10:16
10    sir.  Subject to the limitations your client has  10:16
11    put on, please, will you answer my question as  10:16
12    to just generally what is the nature of the  10:16
13    terms of engagement that you have with Eisenberg  10:16
14    and Baum?                                    10:16
15        MR. ROZYNSKI:  Mr. Frilando, you         10:16
16        can, you can, you can say generally what  10:16
17        the agreement is between the firm and    10:17
18        perhaps you want to give examples if     10:17
19        he's not clear.                          10:17
20        A.  Is somebody going to give me an      10:17
21    example?                                     10:17
22    BY MR. HALLER:                               10:17
23        Q.  No, I asked, I think, a very simple  10:17
24    question.  What are the terms of the agreement  10:17
25    with the law firm, between you and the law firm?  10:17
```

Page 23

```
 1        A.  Well, I'm not going to disclose the  10:17
 2    amount of money of how much I'm paying for the  10:17
 3    services.  That, I'm not going to do.         10:17
 4        Is that what you want to know?            10:17
 5        Q.  Well, in part, yes.  In part, I do    10:17
 6    want to know.                                 10:17
 7        MR. ROZYNSKI:  I think he might           10:17
 8        be confused.  You know if -- it would be  10:17
 9        helpful I can talk to my client.          10:17
10        MR. HALLER:  Let me see if I can          10:17
11        elicit it.  If not, perhaps we will need  10:17
12        to do that.                               10:17
13    BY MR. HALLER:                                10:18
14        Q.  So, is the arrangement you have with  10:18
15    the law firm of Eisenberg and Baum that you are  10:18
16    paying them on an hourly basis for their      10:18
17    services?                                     10:18
18        A.  Can you elaborate a little bit more   10:18
19    on that question, please?                     10:18
20        Q.  Well, let me try and explain what     10:18
21    I'm trying to understand.  In many cases like  10:18
22    this, the arrangement between the individual and  10:18
23    the law firm is that the individual may pay    10:18
24    certain costs, but not the legal fees, and that  10:18
25    the representation is done on what's called a  10:19
```

Page 24

```
 1    contingency basis.  So depending on the outcome  10:19
 2    and what is obtained in the litigation, that  10:19
 3    that's how legal fees are dealt with.  A more  10:19
 4    traditional way of retaining a lawyer is on a  10:19
 5    straight hourly rate basis where the client like  10:19
 6    you pays as they go along for every hour that  10:19
 7    the lawyers spend handling your case.          10:19
 8        And what I'm trying to find out is        10:19
 9    what is the nature of the understanding,       10:19
10    arrangement that you have with Eisenberg and  10:19
11    Baum.  I don't know what it is, so I can't     10:19
12    elaborate more than that.                      10:19
13        A.  Well, right now, no monies were        10:19
14    discussed right now.  So right now, I'm not   10:19
15    paying out any expenses out of my pocket until  10:19
16    after the case is over.                        10:19
17        Q.  And is there any understanding         10:20
18    between you and the law firm of Eisenberg and  10:20
19    Baum as to how they will get their legal fees in  10:20
20    this case at any point in time?               10:20
21        A.  I want to say no.  It hasn't been     10:20
22    discussed in full.                            10:20
23        Q.  So, as far as you know, you have no   10:20
24    personal financial obligations with respect to  10:20
25    your representation by Eisenberg and Baum?    10:20
```

Page 25

```
 1        A.  Right now I'm not paying any          10:20
 2    expenses at the moment.  I will incur an expense  10:20
 3    at the end, but right now, I'm not paying up   10:20
 4    front.                                        10:20
 5        Q.  And so, I assume that you have not    10:20
 6    received any bills at this point in time?     10:20
 7        A.  No, I haven't.                         10:21
 8        Q.  Are you sure that it was in          10:21
 9    connection with Bordentown Driver Training   10:21
10    School that you first went to see somebody at  10:21
11    Eisenberg and Baum or was it in connection with  10:21
12    the issues you had with the Dutchess School of  10:21
13    Driving?                                      10:21
14        INTERPRETER MARTINEZ:  Dutchess          10:21
15        School?                                   10:21
16        MR. HALLER:  The Dutchess School.         10:21
17        A.  I went to -- I filed a lawsuit        10:21
18    against Bordentown first, prior to the Dutchess  10:21
19    School.                                       10:21
20    BY MR. HALLER:                                10:21
21        Q.  Is it your testimony here under oath  10:21
22    that you did not go to the law firm of Eisenberg  10:21
23    and Baum for advice before Bordentown had made a  10:21
24    decision on whether or not they could allow you  10:22
25    to participate in the driver training?        10:22
```



7 (Pages 22 to 25)

Page 26

1    A.  Well, I didn't fill out any          10:22
2    applications.  I had sent out an e-mail.  Okay.    10:22
3    And then after I was denied, I then contacted    10:22
4    the law firm after I was denied.          10:22
5        Q.  Well, that's exactly my question.  I    10:22
6    want to just make sure I understand that you're    10:22
7    saying here under oath.                  10:22
8        It was only after Bordentown --          10:22
9        A.  That is correct.                10:22
10       Q.  Wait -- Driver Training School had      10:22
11   come to a final conclusion that they would not    10:22
12   be able to have you participate, that you then    10:22
13   went to consult with the law firm of Eisenberg    10:23
14   and Baum?                            10:23
15           MR. ROZYNSKI:  Objection to form.    10:23
16       You can answer.                    10:23
17       A.  Yes, that is correct.            10:23
18   BY MR. HALLER:                          10:23
19       Q.  So you're telling me that you didn't    10:23
20   go and get advice from the law firm of Eisenberg    10:23
21   and Baum actually before you started, your      10:23
22   brother started having communications with      10:23
23   representatives from Bordentown?            10:23
24           MR. ROZYNSKI:  Objection to form.    10:23
25       You can answer.                    10:23

Page 27

1        A.  That is correct.                10:23
2    BY MR. HALLER:                          10:23
3        Q.  Okay.                        10:23
4            And is it your testimony that you    10:23
5    didn't go and consult with Eisenberg and Baum    10:23
6    during the time that your brother was          10:24
7    corresponding with Bordentown, but before they    10:24
8    had made -- before Bordentown had made a final    10:24
9    decision?                            10:24
10           MR. ROZYNSKI:  Objection to form.    10:24
11       You can answer.                    10:24
12       A.  After my brother had contacted them,    10:25
13   there was a letter saying thank you.  It was    10:25
14   official that it was already decided that I was    10:25
15   denied, that I was not going to have an          10:25
16   interpreter there.  I then filed all the        10:25
17   information afterwards, after the fact.          10:25
18   BY MR. HALLER:                          10:25
19       Q.  Other than this case, are you        10:25
20   involved in any other litigation with anyone    10:25
21   concerning CDL driver training?            10:25
22       A.  There are two cases.  Bordentown and    10:25
23   Dutchess.  There are no others besides those    10:26
24   two.  However, my brother is looking for a      10:26
25   school that would, you know, would be willing to    10:26

Page 28

1    provide me with training through the source of    10:26
2    providing an interpreter there, as well.  We    10:26
3    haven't gotten there yet.                10:26
4        Q.  So is it your testimony you do not    10:26
5    have any kind of claim pending against Jersey    10:26
6    Tractor-Trailer Training?                10:26
7        A.  No.                          10:26
8        Q.  Are you intending to sue them?        10:26
9        A.  Yes.                        10:26
10       Q.  And why are you intending to sue      10:26
11   them?                                10:27
12       A.  I feel like I have been            10:27
13   discriminated against as a deaf person for the    10:27
14   reasons that they did not provide an            10:27
15   interpreter.  I would like equal access.        10:27
16       Q.  And is that the same concern that    10:27
17   you had with Dutchess School of Driving that    10:27
18   they would not provide an interpreter?          10:27
19       A.  It is similar, yes.              10:27
20       Q.  Okay.                        10:27
21           Well, I asked if it was the same.    10:27
22   So, I would like to know if it is the same or if    10:27
23   it is not, if there is any difference.          10:27
24       A.  The same.  I experienced            10:27
25   discrimination from both.                10:27

Page 29

1        Q.  Other than this case and the case    10:28
2    that you have brought against Dutchess School of    10:28
3    Driving, have you been involved in any other    10:28
4    lawsuits related to any kind of issue every?    10:28
5        A.  No.                          10:28
6        Q.  Other than meetings you have had    10:28
7    with your counsel, did you do anything else to    10:28
8    prepare for today's deposition?            10:28
9        A.  Just a meeting with my counsel.      10:28
10       Q.  Outside the presence of your        10:29
11   counsel, did you discuss anything to do with the    10:29
12   preparation for today with anyone else, such as    10:29
13   your brother or anybody other than counsel?    10:29
14       A.  No.                          10:29
15       Q.  Mr. Frilando, throughout the        10:29
16   deposition I'm going to be referring at times to    10:29
17   what lawyers call exhibits, and in order to try    10:29
18   to speed things up, I have placed before you    10:29
19   certain exhibits that have been premarked as    10:29
20   Defendant's Exhibits 1 through 10.            10:29
21           MR. CONNELLY:  Through 10.          10:30
22   BY MR. HALLER:                          10:30
23       Q.  They're in front of you and I have    10:30
24   given a copy to your counsel.  So I would ask    10:30
25   you, if you would not mind, to look at the first    10:30



Page 30

1  exhibit, Exhibit 1, which is the top document in   10:30
2  that pile in front of you.                         10:30
3              (Complaint was marked as              10:30
4          Defendant's Exhibit 1 for                 10:30
5          identification, as of this date.)         10:30
6  BY MR. HALLER:                                     10:30
7      Q.  Do you have that?                          10:30
8      A.  It is Exhibit 1.                           10:30
9      Q.  Do you recognize Exhibit 1 to be the      10:30
10  complaint that was filed on your behalf by your   10:30
11  attorneys that started this lawsuit?              10:30
12     A.  It is.                                     10:30
13     Q.  Did you personally read and review        10:30
14  this complaint for accuracy before it was filed   10:31
15  on your behalf?                                   10:31
16     A.  I did before filing.                       10:31
17     Q.  Did you also review the complaint         10:31
18  for completeness so that it fully set out your    10:31
19  claims before it was filed on your behalf?        10:31
20     A.  It has the fullness of my complaint.      10:31
21  I read all nine pages before it was submitted     10:31
22  and it has my approval.                           10:31
23     Q.  I have a few questions on the             10:31
24  document.  I may come back to it later.  So if    10:32
25  you could go to the preliminary statement in      10:32

Page 31

1  paragraph 1, the first sentence.                   10:32
2      A.  One moment.                                10:32
3      Q.  In that --                                 10:32
4      A.  One moment.                                10:32
5      Q.  I'm actually, I think based visually      10:32
6  on what you did, I think you looked at the wrong   10:32
7  thing.  It is the first sentence in paragraph 1    10:32
8  under preliminary statement.                       10:32
9      A.  I just read it.                            10:32
10     Q.  Okay.                                      10:32
11         Since I'm learning here, I would          10:32
12  normally ask this differently, but could you      10:32
13  tell me what it says.  We'll do it that way.      10:33
14     A.  The plaintiff is a deaf individual        10:33
15  who communicates primarily in American Sign       10:33
16  Language, which is his expressed preference and   10:33
17  most efficient means of communication.  And that  10:33
18  the plaintiff had experienced discrimination.     10:33
19     Q.  I'm only asking you --                     10:33
20     A.  Oh, okay.  My apologies.                   10:33
21     Q.  Now, I understand that what you read      10:33
22  that was interpreted generally describes what     10:34
23  was in that sentence, but are you able to         10:34
24  discern if it was exactly correct?                10:34
25     A.  Basically, the sentence is                10:34

Page 32

1  expressing the fact that I was denied access       10:34
2  because of the fact that I'm deaf and use sign     10:34
3  language, and Bordentown had viewed that as I      10:34
4  would be a dangerous candidate because I can't     10:34
5  hear, and that I was denied because I'm            10:34
6  disabled.                                          10:34
7      Q.  I appreciate what you just said, but      10:34
8  that really wasn't my question, nor was it an      10:34
9  answer to my question.  So let me pose my          10:34
10  question again.                                    10:35
11         You read something from the document      10:35
12  which was then interpreted by the interpreters    10:35
13  who are here today, and I wanted to just know     10:35
14  for my own education whether you have any         10:35
15  ability to discern whether that translation was,  10:35
16  in fact, a hundred percent accurate translation   10:35
17  of the words that are on this page, and when I    10:35
18  say on this page, under preliminary statement,    10:35
19  first sentence, paragraph 1 of Exhibit 1?         10:35
20         MR. ROZYNSKI:  Objection to form.          10:35
21     A.  I can't verify that.  My English is       10:35
22  a second language to me, so since ASL is my       10:35
23  first language, it has a different word order     10:35
24  than spoken and written English.  So when I       10:35
25  signed it for the interpreter to speak, I had to  10:35

Page 33

1  choose a different word order in my signing that   10:36
2  matched my signing and not American Sign           10:36
3  Language.                                          10:36
4  BY MR. HALLER:                                     10:36
5      Q.  Thank you.  And just so you know,         10:36
6  this is an education for me too.  So, thanks.     10:36
7          If you go to page 12, paragraph 3,         10:36
8  under the heading, the parties.                    10:36
9          INTERPRETER MARTINEZ:  Excuse me          10:36
10     one second, do you have an extra copy         10:36
11     for the interpreter to follow along?          10:36
12         MR. HALLER:  Sure, we can.  If we         10:36
13     can get it back.                               10:36
14         INTERPRETER MARTINEZ:  Yes, of            10:36
15     course.  What page are you on?                10:36
16         MR. HALLER:  I want to be very            10:36
17     clear --                                       10:36
18         INTERPRETER MARTINEZ:  It is for          10:36
19     directionality to find placement where        10:36
20     you want him to read.                          10:36
21         MR. HALLER:  Right.  I want to            10:36
22     make sure that to the extent what is          10:36
23     said its slightly different that we           10:36
24     understand on the record.                      10:36
25



Page 34

BY MR. HALLER:                                    10:37
1
2    Q.  So, Mr. Frilando, I'll ask you to go      10:37
3  to page 12, paragraph 3, the second sentence,  10:37
4  please.                                         10:37
5    A.  The paragraph that starts with "The       10:37
6  parties"?                                       10:37
7    Q.  Yes.  But I'm under No. 3.  I'm           10:37
8  asking you to focus on the second sentence in   10:37
9  that paragraph.  It begins "Mr. Frilando is     10:37
10 deaf."  That's how it begins.                   10:37
11   A.  Yes, I found it.  I am deaf since          10:37
12 birth.                                          10:37
13   Q.  Have you had a chance to read it?         10:37
14   A.  Yes.  Mr. Frilando is deaf.  I see         10:37
15 that sentence.                                  10:38
16   Q.  Okay.                                     10:38
17     So could you, again, the same drill        10:38
18 as we did the last time.  Could you read it back 10:38
19 to the translators so that I can hear it from    10:38
20 you as opposed to me reading it?                10:38
21       INTERPRETER MARTINEZ:  Sir, just    10:38
22   for clarification for the interpreter,       10:38
23   he's giving it back in a sight              10:38
24   translation.  Do you want him to give it     10:38
25   as a sight translation or do you want        10:38

Page 35

1   him to give it back in his own words on      10:38
2   the back channel?                            10:38
3       MR. HALLER:  As eyesight               10:38
4   translation as if he's reading it.          10:38
5       INTERPRETER MARTINEZ:  Okay.      10:38
6   Thank you.                                   10:38
7    A.  You want me to do exactly as it         10:38
8  says?  You want me to do the first sentence now? 10:38
9    Q.  The second sentence.                    10:38
10   A.  Oh, I'm sorry.  My apologies.           10:38
11     Mr. Frilando, is deaf.  Primarily        10:38
12 communicates in ASL and is substantially limited 10:39
13 in the main life activities of hearing and      10:39
14 speaking within the means of federal and state  10:39
15 against discrimination law --                  10:39
16 anti-discrimination laws --                    10:39
17       MR. HALLER:  Okay.  So that's        10:39
18   exactly what I didn't want you to do.  I    10:39
19   didn't want you to actually give her the    10:39
20   words.                                      10:39
21       INTERPRETER MARTINEZ:  I'm not      10:39
22   giving her the words.  I'm telling her      10:39
23   where he is at.                             10:39
24       MR. HALLER:  You whispered them      10:39
25   and then she repeated them.  It doesn't     10:39

Page 36

1   matter, but I just would ask you to make     10:39
2   sure that you just allow me to do the        10:39
3   questions as I pose them without any         10:39
4   sort of aids.                                10:39
5  BY MR. HALLER:                                 10:39
6    Q.  Could you specifically state for me      10:39
7  what the substantial limitations that you have, 10:40
8  major life activities relating to hearing and   10:40
9  speaking?                                      10:40
10   A.  See, English is a language that         10:40
11 typically is for individuals who can hear.  Now, 10:40
12 I use American Sign Language because I'm deaf.    10:40
13 So there are differences in how those are        10:40
14 communicated.                                  10:40
15   Q.  Is that the answer to my question?      10:40
16   A.  It is.                                  10:40
17   Q.  Could I please ask you, I'm going to    10:40
18 ask the court reporter to read back the         10:40
19 question.                                      10:40
20       (Record read.)                        10:40
21   A.  So I'm completely deaf, so I'm not      10:41
22 able to hear.  I do have hearing aids, but I'm   10:41
23 not able to speak sentences, completely.  I'm    10:41
24 also not able to read lips, and also, with       10:41
25 environmental sounds, as well, I'm not able to   10:41

Page 37

1  hear.  I am able to communicate with the use of  10:41
2  interpreters.  If I don't have interpreters,    10:42
3  typically all communication is misunderstood and 10:42
4  unsatisfactory.                                10:42
5  BY MR. HALLER:                                 10:42
6    Q.  In correspondence that your brother     10:43
7  had with the Dutchess School of Driving, he said 10:43
8  to the Dutchess School that you were completely  10:43
9  deaf, that you would require a sign language     10:43
10 interpreter, and that your hearing aids are of   10:43
11 little use unfortunately, is that a correct      10:43
12 statement?                                     10:43
13   A.  That's correct.                         10:44
14   Q.  Okay.                                   10:44
15     And just, again, and please excuse       10:44
16 me, and I don't want to appear that I'm         10:44
17 offending in any way, but I'm just trying to     10:44
18 understand it, so, with your hearing aids, am I   10:44
19 correct that you could not without an            10:44
20 interpreter have a conversation with me?         10:44
21   A.  If the interpreters were not            10:44
22 present, I would not be able to have a           10:44
23 conversation with you with just my hearing       10:44
24 aids.  It would cause miscommunication and       10:44
25 misunderstandings.  Having the interpreter       10:44



Page 38

```
1    provides clarity and if I did not have the      10:44
2    interpreters I would probably get frustrated.   10:44
3         Q.  Again, it is really awkward and I       10:45
4    don't want to be offensive.  What do the hearing 10:45
5    aids do for you, if anything?  What difference,  10:45
6    if anything, do they make?                       10:45
7              MR. ROZYNSKI:  Objection to form.      10:45
8         You can answer.                             10:45
9         A.  Maybe this will help.  When you         10:45
10   speak, the hearing aids don't allow me to hear   10:45
11   every word you say or understand your speech.    10:45
12   It helps with environmental noises.  I'm able to 10:45
13   hear a fire alarm, a car honk.  A doorbell.  A   10:45
14   phone ring.  So those things I can hear.  They   10:45
15   help me hear.  However, your speech, I'm not     10:45
16   able to hear without the hearing aids.  If I do  10:45
17   not have any hearing aids in, I can't hear any   10:45
18   noise.  Hearing aids don't have voice            10:45
19   recognition abilities.  I can hear tones and     10:46
20   potentially if you were to yell I could hear     10:46
21   that there was a call being made towards me, but 10:46
22   I wouldn't know where.  I was born deaf.  This   10:46
23   is how I was raised.                             10:46
24   BY MR. HALLER:                                   10:46
25        Q.  Do the hearing aids pick up certain     10:46
```

Page 39

```
1    sounds or not?  I would like to understand just 10:46
2    what kind of sounds do the hearing aids pick up. 10:46
3              MR. ROZYNSKI:  Objection to form.      10:46
4         You can answer.                             10:46
5         A.  I wouldn't hear conversations.  I       10:46
6    would hear car noises, music as a general tone.  10:46
7    I can hear engines.  I can hear cars honking.    10:47
8    If I didn't have my hearing aids in, it would    10:47
9    just be a white noise, if you will, completely   10:47
10   quiet.  With the hearing aids, I can hear        10:47
11   certain noises.                                  10:47
12   BY MR. HALLER:                                   10:47
13        Q.  Am I correct, certain noises, but       10:47
14   not all noises, is that right?                   10:47
15        A.  If they're high frequency, high         10:47
16   pitch, I'm able to hear them usually.  If        10:47
17   they're low frequency, low pitch, I don't really 10:47
18   have a chance.  If I don't have any hearing aids 10:47
19   in, I don't have a single chance at all to hear  10:47
20   any low frequency, low noise, but I might on the 10:47
21   off chance find a high pitch high frequency      10:47
22   noise.  So the hearing aid gives me a chance for 10:48
23   both pitches and frequencies.                    10:48
24             MR. HALLER:  Okay.  Thank you.         10:48
25   BY MR. HALLER:                                   10:48
```

Page 40

```
1         Q.  If I could just take you to page 3      10:48
2    of the complaint and also page 4.  There is a    10:48
3    section called Statement of Facts beginning with 10:48
4    paragraph 7 and concluding with paragraph 19.    10:48
5         Do you have that in front of you?           10:48
6         A.  I see the section.                      10:48
7         Q.  Are you familiar with what is stated    10:49
8    in that section or do you need to read it?       10:49
9              MR. ROZYNSKI:  Objection to form.      10:49
10        You can answer.                             10:49
11        A.  I would like to just take a look        10:49
12   over it, if I may.                               10:49
13   BY MR. HALLER:                                   10:49
14        Q.  Yes.  Please do.                        10:49
15        Have you had a chance to read             10:50
16   paragraphs 7 through 19?                          10:50
17        A.  I have.                                 10:51
18        Q.  And does that from your perspective     10:51
19   accurately describe the communications that      10:51
20   occurred on -- by your brother on your behalf    10:51
21   with Bordentown Training School?                 10:51
22             MR. ROZYNSKI:  Objection to form.      10:51
23        You can answer.                             10:51
24        A.  I agree, yes.                           10:51
25   BY MR. HALLER:                                   10:51
```

Page 41

```
1         Q.  Can we agree --                          10:51
2         A.  A hundred percent.                       10:51
3         Q.  Can we agree on the record that you      10:51
4    personally did not have any direct                10:51
5    communications with anyone at Bordentown?         10:51
6              MR. ROZYNSKI:  Objection to the         10:51
7         form.                                        10:51
8         A.  Correct.  My brother was the one who     10:52
9    had contact.  He was hoping to find a driving     10:52
10   school who would be a good fit for me and a       10:52
11   qualified school.  He didn't want me to search    10:52
12   in vein and maybe end up at a school that wasn't  10:52
13   highly qualified, and so, my brother did the      10:52
14   work for me.                                      10:52
15   BY MR. HALLER:                                    10:52
16        Q.  Just for the record, when I say          10:52
17   Bordentown, I'm referring to Bordentown Driving   10:52
18   School.  Just so we don't have any                10:52
19   misunderstanding on the record.                   10:52
20        A.  That's fine.                             10:52
21        Q.  Okay.                                    10:52
22        A.  No problem.                              10:52
23        Q.  I do have some questions about the       10:53
24   statement of facts, but I think I'll come back    10:53
25   to it a little later after we have gone through   10:53
```



MAGNA
LEGAL SERVICES

Page 42

```
 1   some other things.                  10:53
 2        So, I'm now going to ask you to look    10:53
 3   at what is before you Defendant's Exhibit 2.   10:53
 4             (Complaint was marked as      10:53
 5        Defendant's Exhibit 2 for         10:53
 6        identification, as of this date.)    10:53
 7   BY MR. HALLER:                     10:53
 8        Q.  As a suggestion, Mr. Frilando, if   10:53
 9   you take the exhibits, yes, that's perfect.  Put   10:53
10   them upside down.                    10:53
11        Mr. Frilando you have this document,    10:53
12   Exhibit 2, in front of you?           10:53
13        A.  I do.                      10:53
14        Q.  Do you recognize this to be the   10:53
15   complaint which was filed on your behalf by your   10:54
16   attorneys, the law firm of Eisenberg and Baum,   10:54
17   against the Dutchess School of Driving?   10:54
18        A.  Yes.  This is the one where my   10:54
19   brother was having dialogue back and forth by   10:54
20   e-mail with the school.              10:54
21        Q.  In paragraph 70 on page 12, there is   10:55
22   again a statement that plaintiff was deaf and   10:55
23   communicates in American Sign Language, in   10:55
24   parens (ASL) closed parens.            10:55
25        Is that an accurate statement?     10:55
```

Page 43

```
 1        A.  Yes, that's true.           10:55
 2        Q.  And then if you go to page 3,   10:55
 3   paragraphs 14 and 15.  This picks up on what I   10:55
 4   asked you a little bit earlier, there is an   10:55
 5   allegation --                       10:55
 6        INTERPRETER MARTINEZ:  Hold on   10:55
 7        one second, please.  Begin your   10:55
 8        question.                      10:55
 9   BY MR. HALLER:                      10:55
10        Q.  If you go to paragraphs 14 and 15,   10:55
11   and this picks up on a question I had a little   10:55
12   earlier --                          10:56
13        A.  Hold on.  Let me read it.  I didn't   10:56
14   read 14 and 15 in its entirety.        10:56
15        MR. ROZYNSKI:  Just for the        10:56
16        record, he can't look at the       10:56
17        interpreters when he's reading the   10:56
18        paragraph, so you have to read it and   10:56
19        then he looks up and then continue your   10:56
20        statement, because he won't be able to   10:56
21        see the interpreter comments until he's   10:56
22        looking up at the interpreter.     10:56
23   BY MR. HALLER:                      10:56
24        Q.  Mr. Frilando, before I ask my   10:56
25   question, I want to make sure I understand.  So   10:56
```

Page 44

```
 1   if you're reading the document, you're not able   10:56
 2   to visually see the interpreters, and therefore,   10:56
 3   it is difficult to converse until you finish   10:56
 4   reading, is that right?               10:56
 5        A.  That's correct.             10:56
 6        Q.  So if I asked you to look back   10:56
 7   through that door, keep your eyes fixed on   10:57
 8   something behind that door, would you do that   10:57
 9   for me.  Are you able to see the -- are you able   10:57
10   to converse at that point if your eyes are far   10:57
11   away?                              10:57
12        A.  No, I cannot.  How would I be able   10:57
13   to do it if I'm looking at the door and I can't   10:57
14   look at the interpreter who is in the opposite   10:57
15   direction.  It is not like I have, you know,   10:57
16   four sets of eyes, a pair of eyes in the back of   10:57
17   my head, so I can't see the interpreter while   10:57
18   I'm looking at the back of the wall.   10:57
19        Q.  Okay.                      10:57
20        I want to come back to my question,   10:57
21   sir.  Having read 14 and 15, paragraphs 14 and   10:57
22   15.  My question is, as I was eluding to   10:57
23   earlier, do you recall that the representative   10:57
24   of Dutchess School asked by e-mail whether you   10:58
25   were completely deaf, requiring a sign language   10:58
```

Page 45

```
 1   interpreter or do you have any type of hearing   10:58
 2   aid and that your brother responded "He's   10:58
 3   completely deaf, yes, would require sign   10:58
 4   language interpreter.  His hearing aids are of   10:58
 5   little use unfortunately"?             10:58
 6        INTERPRETER MARTINEZ:  And the   10:58
 7        question is, is that true or is that not   10:58
 8        true?                          10:58
 9        Is that your question, sir?        10:58
10        MR. HALLER:  Yes.               10:58
11        A.  Yes, that's true.  My brother   10:58
12   already knows that because he knows about my   10:58
13   deafness and he knows I can't read lips, and he   10:58
14   also knows I can't hear through my hearing aids   10:59
15   to distinguish sounds and speech, I should say,   10:59
16   but that it is only used for environmental   10:59
17   sounds.                            10:59
18   BY MR. HALLER:                      10:59
19        Q.  I'm going to ask you to put that   10:59
20   document down and go to the next document,   10:59
21   Defendant's Exhibit 3.                10:59
22             (Disclosures was marked as    10:59
23        Defendant's Exhibit 3 for         10:59
24        identification, as of this date.)    10:59
25   BY MR. HALLER:                      10:59
```



Page 46

1      Q.  Mr. Frilando, I put before you what      10:59
2  we have marked as Defendant's Exhibit 3, which   10:59
3  are some disclosures that were submitted by your  10:59
4  attorneys on your behalf.                    11:00
5      Do you recognize this document?          11:00
6      A.  I believe so.  I believe I may have    11:00
7  seen this before.  I think.                  11:00
8      Q.  Do you see that it asks on the        11:00
9  second page, it is responding to an obligation   11:00
10  to provide --                               11:00
11      INTERPRETER MARTINEZ:  Hold on          11:00
12      one second, please.  Okay, and your      11:00
13      question?                              11:00
14  BY MR. HALLER:                             11:00
15      Q.  Do you see that there is a response   11:00
16  to a subject of identities of individuals likely  11:00
17  to have knowledge of discoverable facts?     11:01
18      Do you see that?                       11:01
19      A.  I see it.                          11:01
20      Q.  And did you review this response     11:01
21  before it was submitted on your behalf?      11:01
22      A.  Yes.                               11:01
23      Q.  And did you review it for accuracy?   11:01
24      A.  I did.                             11:01
25      Q.  So, am I correct, that at this point  11:01

Page 47

1  you had identified yourself, your brother, and   11:01
2  Mr. Wessendorf as people that you knew had      11:01
3  knowledge related to this case?              11:02
4      A.  Yes, that's correct.                11:02
5      Q.  And then, do you see under           11:02
6  Section B, there is a heading of documents?   11:02
7      A.  I see that.                        11:02
8      Q.  Okay.                             11:02
9      And then you listed various            11:02
10  documents that are relevant to this case, is   11:02
11  that correct?                             11:02
12      A.  Yes, I did.                       11:02
13      Q.  And is that listing accurate?       11:02
14      A.  Yes, it is accurate.  There's       11:02
15  nothing missing.                          11:02
16      Q.  Okay.                            11:02
17      I would then like you to go to the     11:03
18  next two exhibits, Exhibits 4 and 5.         11:03
19      (Defendant's First Set of            11:03
20      Interrogatories to Plaintiff was      11:03
21      marked as Defendant's Exhibit 4 for   11:03
22      identification, as of this date.)    11:03
23      (Plaintiff's Objections and          11:03
24      Answers to Defendant's First Set of  11:03
25      Interrogatories was marked as        11:03

Page 48

1      Defendant's Exhibit 5 for              11:03
2      identification, as of this date.)     11:03
3      INTERPRETER MARTINEZ:  Four and 5     11:03
4  at the same time?                         11:03
5      MR. HALLER:  Yes, 4 and 5 because     11:03
6  they relate to each other, and hopefully     11:03
7  I can move quite quickly through 4 and      11:03
8  actually to try to move things along.  I    11:03
9  think if you can take 6, Exhibit 6,         11:03
10  Defendant's Exhibit 6 out, as well.  We     11:03
11  may be able to get through these fairly     11:03
12  quickly.                                  11:03
13      (Defendant's First Document          11:03
14      Requests to Plaintiff was marked as   11:03
15      Defendant's Exhibit 6 for             11:03
16      identification, as of this date.)    11:03
17  BY MR. HALLER:                             11:03
18      Q.  So, Mr. Frilando, just for the sake  11:04
19  of the completeness of the record, I want to go  11:04
20  through these three things.  They relate to each  11:04
21  other and there's sort of overlap.  So -- I'm   11:04
22  sorry, I made a mistake.  You can put 6 away.   11:04
23  We'll just talk about 4 and 5.  Thanks.       11:04
24      So, do you recall that early on in      11:04
25  this case, the defendants submitted through your  11:04

Page 49

1  counsel something called the First Set of     11:05
2  Interrogatories addressed to you, which are   11:05
3  questions that are posed in the nature of what  11:05
4  we lawyers call interrogatories.             11:05
5      Were you aware that that document      11:05
6  had been presented to your counsel?          11:05
7      A.  Yes, I recall that.               11:05
8      Q.  Okay.                            11:05
9      And then, if you look at Defendant's   11:05
10  Exhibit 5, do you see that I put before you your  11:05
11  objections and answers?                    11:05
12      A.  We're on 5, okay.                 11:06
13      Q.  I put before you your Objections and  11:06
14  Answers to Defendant's First Set of         11:06
15  Interrogatories.  So your responses to the   11:06
16  document that we just identified as Exhibit 4.  11:06
17      Do you see that?                     11:06
18      So, at this point, I'm just asking    11:06
19  if you generally recognize the document?    11:06
20      A.  I do.                            11:06
21      Q.  Okay.                           11:06
22      Do you recognize this as your        11:06
23  Objections and Answers to the Defendant's    11:06
24  Interrogatories?                          11:07
25      A.  Yes.                            11:07



Page 50

```
 1        Q.  Okay.                    11:07
 2        And did you review -- let me        11:07
 3   withdraw that question.           11:07
 4        Did you provide information to your  11:07
 5   counsel in order to enable them to respond to  11:07
 6   Defendant's First Set of Interrogatories?  11:07
 7        A.  When I first received that, when I  11:07
 8   first received that paperwork for me to fill out  11:07
 9   all those answers, I filled out the answers  11:07
10   before I submitted it.  I took it to my attorney  11:07
11   to have him verify it to make sure that we went  11:07
12   over all the forms together.        11:07
13        Q.  I don't want to know what you and  11:07
14   your attorneys discussed.          11:07
15        A.  Okay, I'm sorry.             11:08
16        Q.  Just the process is fine.  Once it  11:08
17   had been put into final form, did you review  11:08
18   these responses for accuracy?       11:08
19        A.  I did.                    11:08
20        Q.  And if you go to the very last page  11:08
21   of the document, very last page of Defendant's  11:08
22   Exhibit 5, do you see that there's a  11:08
23   verification form under which you certified that  11:08
24   the statements in these responses are true and  11:08
25   that you were aware that if any statements made  11:08
```

Page 51

```
 1   by you are false, you're subject to punishment  11:08
 2   for contempt of court?             11:08
 3        A.  Yes, I signed off on it.        11:08
 4        Q.  Okay.                    11:08
 5        And from your perspective, were  11:08
 6   these responses accurate and complete, to the  11:08
 7   best of your knowledge, at the time you signed  11:08
 8   that verification?                 11:09
 9        A.  Yes.                     11:09
10        Q.  If we could go then to the fourth  11:09
11   page of this document, which is where the actual  11:09
12   answers begin following the objections.  I have  11:09
13   a few questions for you.            11:09
14        A.  Well, the pages are not listed by  11:09
15   numbers.  How do I know I'm going to the fourth  11:09
16   page?  Do we go from the cover sheet back,  11:09
17   counting the fourth page back?      11:09
18        Q.  Yes, it is the fourth page back.  11:09
19        A.  Okay.  I have that.          11:09
20        Q.  You see at the top it has Plaintiff,  11:09
21   Kenneth Frilando's Objections and Answers to  11:09
22   those first set of interrogatories, and then it  11:10
23   says Interrogatory No. 1?          11:10
24        A.  I see that.               11:10
25        Q.  So, I'm going to speed things along.  11:10
```

Page 52

```
 1   I'm going to paraphrase some of the    11:10
 2   interrogatory questions just to get to my point.  11:10
 3   I hope that's okay.                11:10
 4        A.  Sure.                    11:10
 5        Q.  All right.               11:10
 6        So the first interrogatory really  11:10
 7   asks for, you know, you to identify potential  11:10
 8   witnesses in the case, and from this document  11:10
 9   you added people to the list from the original  11:10
10   disclosures that you had made.      11:10
11        Do you recall that?           11:10
12        A.  Yes.                     11:10
13        Q.  So one of the people you added was  11:10
14   your mother, Carmen Melendez, correct?  11:10
15        A.  Yes.                     11:10
16        Q.  In it you say that she potentially  11:10
17   has knowledge of the allegations contained in  11:11
18   your complaint?                    11:11
19        A.  Yes.                     11:11
20        Q.  Okay.                    11:11
21        Are you aware of any contact that  11:11
22   she had at any time with Bordentown?  11:11
23        A.  No.                      11:11
24        Q.  So I understand --          11:11
25        A.  I don't think she ever did.  I'm not  11:11
```

Page 53

```
 1   aware of it.                      11:11
 2        Q.  So, would it be fair to say she  11:11
 3   doesn't have any specific knowledge of the  11:11
 4   interactions between your brother and  11:11
 5   Bordentown?                       11:11
 6        A.  No.  My mother became aware of it  11:11
 7   after.  You know, then I filled my mother in and  11:11
 8   I brought her up to date in terms of what  11:12
 9   happened after I filed the complaint.  But prior  11:12
10   to that, my mother did not know about anything.  11:12
11        Q.  Okay.                    11:12
12        Did you show her the e-mails at that  11:12
13   point in time?                    11:12
14        A.  No, I did not.  It was just hearsay,  11:12
15   what my brother and I told my mother.  I don't  11:12
16   think it was necessary for my mother to read the  11:12
17   actual e-mails or the documents and stuff like  11:12
18   that.  Afterwards when I filed the lawsuit, I  11:12
19   shared that information with my mother verbally  11:12
20   and in sign language.             11:12
21        Q.  Another person added is Dr. Lawrence  11:12
22   J. Marino, next page.  Is he a physician that  11:12
23   you see regularly?                 11:12
24        A.  He's my primary physician.  However,  11:13
25   that's not my primary physician, per se.  He was  11:13
```



Page 54

1  not the one who certified my paperwork for, you      11:13
2  know, driving for the school. When I had called      11:13
3  the FCMA, they said I needed to find somebody      11:13
4  who is authorized to be able to document those      11:13
5  certifications for the driving. So I had, I was      11:13
6  then steered to another direction where I found      11:13
7  another doctor instead. This is regular, this      11:13
8  is my regular primary physician. That's all      11:13
9  this doctor is for. Dr. Marino.      11:13
10      Q.  And were you steered to Dr. Yu, Win      11:13
11  Yu.  That's who is listed next?      11:13
12      A.  Yes.  This is the one who is      11:13
13  basically authorized to sign off on the      11:13
14  credentials, who is authorized to sign off on      11:13
15  the credentials after the physicals and the      11:14
16  examinations for any of the candidates that      11:14
17  apply for the FCMA applications, and he was the      11:14
18  one who said everything passed and everything      11:14
19  was submitted to Washington, D.C., and      11:14
20  everything was done copacetically, and they said      11:14
21  this was all going to remain for two years.      11:14
22  This would remain for two years.      11:14
23          THE VIDEOGRAPHER:  Pardon me, may      11:14
24  we break?      11:14
25          MR. HALLER:  Sure.  Why don't we      11:14

Page 55

1  take a short break.      11:14
2          THE VIDEOGRAPHER:  The time is      11:14
3  11:15.  We're off the record.      11:14
4          (Whereupon, at 11:15 o'clock      11:14
5  a.m., a recess was taken until 11:26      11:14
6  o'clock a.m.)      11:14
7          THE VIDEOGRAPHER:  The time is      11:26
8  11:26.  We are back on the record.      11:26
9  BY MR. HALLER:
10      Q.  Mr. Frilando, when we just took a      11:26
11  break, I was asking you about Defendant's      11:26
12  Exhibit 5 and the list of some additional names      11:26
13  under witnesses who might have knowledge about      11:26
14  the case and we just talked about Dr. Marino and      11:26
15  Dr. Yu, and I would like to just move on from      11:26
16  there.      11:26
17          Is that fine?      11:26
18      A.  That will be fine.      11:26
19      Q.  There are two other doctors listed.      11:26
20  Dr. Jacobson and it looks like Dr. Fong and      11:26
21  they're listed as people who have knowledge of      11:26
22  --      11:26
23      A.  One moment.  You may proceed.      11:26
24      Q.  Do you see they're listed as      11:26
25  individuals who have knowledge of vision tests      11:27

Page 56

1  that were done for your medical examination      11:27
2  report.      11:27
3          Is that correct?      11:27
4      A.  I can't remember.  It's been a      11:27
5  while, so I don't recall specifically.      11:27
6      Q.  Are you aware of anyone who      11:27
7  performed a hearing test, an audiology      11:27
8  examination?      11:27
9      A.  I did visit an audiologist.      11:27
10      Q.  Do you know who that was?  Either by      11:27
11  name of doctor or name of the organization?      11:27
12      A.  I don't recall.      11:27
13      Q.  Do you recall when that was?      11:27
14      A.  I don't recall.      11:27
15      Q.  Do you recall anything about the      11:28
16  test itself?      11:28
17      A.  Nothing.      11:28
18      Q.  Do you remember whether the test was      11:28
19  done with or without hearing aids?      11:28
20      A.  I did have my hearing aids off.      11:28
21  They have a special adjustment.  They're not      11:28
22  hearing aids.  They're just like a special      11:28
23  implant that they put in your ear.  Like      11:28
24  headphones of sorts and you just kind of test      11:28
25  out your level of hearing in each ear and that's      11:28

Page 57

1  just how the general test is done.  And they do      11:28
2  that in order to provide you with an accurate      11:28
3  fit for hearing aids.  And so you don't put your      11:28
4  hearing aids in typically for an audiology test      11:28
5  because specifically they need to measure my      11:29
6  levels of hearing to give me the right fit for      11:29
7  hearing aids.  Obviously, I'm not capable of      11:29
8  choosing the best hearing aid fit for me.      11:29
9  That's the doctors ability and choice and they      11:29
10  let me know which is the best match for me.      11:29
11      Q.  What I'm trying to understand is      11:29
12  whether there was a test which measured your      11:29
13  hearing according to the accepted scales with      11:29
14  hearing aids in as opposed to without hearing      11:29
15  aids.  I just don't know.      11:29
16      A.  They don't have a test of how much I      11:29
17  can hear with my hearing aids.  It is just that      11:29
18  I take an audiology test for what my level of      11:30
19  hearing is and then I'm given hearing aids      11:30
20  matching that and that's as far as it goes.      11:30
21      Q.  So, I just many trying to understand      11:30
22  this.  Again, this is largely for educational      11:30
23  purposes on my part.  So, if a physician was      11:30
24  trying to measure whether or not you could with      11:30
25  your hearing aids, hear certain specific sounds,      11:30



Page 58

```
 1  is the only way of doing that actually sort of    11:30
 2  creating the environment where the sound would    11:30
 3  be, would be heard and seeing if you would, if    11:30
 4  you hear it?                                       11:30
 5           MR. ROZYNSKI: Objection to form.         11:31
 6        You can answer.                              11:31
 7        A.  There's no kind of test to see if I     11:31
 8  can hear a doorbell or if I can hear a phone       11:31
 9  ring.  It is just a test of what level of          11:31
10  hearing I have to indicate if there's a need for   11:31
11  hearing aids or not.  Now, since I have a Class    11:31
12  D driver's license, I am required by law to have   11:31
13  hearing aids in and my glasses.  And on that       11:31
14  license has proof of my hearing levels and the     11:31
15  fact that I wear hearing aids, and so, that's in   11:31
16  case of an interaction with the police, I have     11:31
17  this verification.                                 11:31
18  BY MR. HALLER:                                     11:31
19        Q.  Okay.  I appreciate that.  So I         11:32
20  think I understand it.                             11:32
21           So, if we were trying to determine       11:32
22  whether or not you are able with hearing aids to   11:32
23  hear or to discern a specific sound, we would      11:32
24  kind of need to simulate that and then to see if   11:32
25  you hear it or not, right?                         11:32
```

Page 59

```
 1           MR. ROZYNSKI: Objection to form.         11:32
 2        You can answer.                              11:32
 3        A.  Can you elaborate on that question,      11:32
 4  please?  I'm not quite understanding the           11:32
 5  question.                                          11:32
 6  BY MR. HALLER:                                     11:33
 7        Q.  Yes.                                     11:33
 8           I'm trying to understand given what       11:33
 9  you have said and I recognize you told me that     11:33
10  there really isn't a test for other sounds that    11:33
11  you might be able to pick up with your hearing     11:33
12  aids.  So what I want to know is if -- I'm         11:33
13  interested in knowing with hearing aids can you    11:33
14  hear or discern a specific sound, how would I      11:33
15  reach that determination?                          11:33
16           MR. ROZYNSKI: Objection to form.         11:33
17        You can answer.                              11:33
18        A.  Like if I hear a door bell, I can        11:33
19  figure out that it is a doorbell.  If there is a   11:33
20  siren from an ambulance or a police car I          11:33
21  typically can hear that noise.  Sometimes when     11:33
22  the subway rumbles underneath I can identify       11:33
23  that sound.  So I can typically identify what      11:33
24  sound is being produced at those levels, but       11:33
25  conversationally I'm not able to hear those kind   11:33
```

Page 60

```
 1  of noises and distinguish words.  I can hear       11:34
 2  background noise.  Background music.  I can feel   11:34
 3  the base and that can help me figure out what      11:34
 4  kind of genre it is.  So there's a mix of sounds   11:34
 5  that I can hear.  If there is maybe a gun shot I   11:34
 6  can hear that.  If there is an explosion I can     11:34
 7  hear that.                                         11:34
 8        Q.  I appreciate what you just said.         11:34
 9  I'm just coming back to my question, though.  If   11:34
10  I want to be certain whether you can or cannot     11:34
11  hear a specific sound using hearing aids, is       11:34
12  there any way of doing it other than just          11:34
13  testing, you know, in a simulated environment      11:34
14  whether or not you are perceiving the sound?       11:34
15           MR. ROZYNSKI: Objection to form.         11:34
16        You can answer.                              11:34
17        A.  I mean, in an instance where there       11:34
18  is a siren being produced I look around.  I can    11:35
19  identify that it is being produced.  Maybe a       11:35
20  mile away.  I also have eyesight that I utilize    11:35
21  in addition to identifying a sound being           11:35
22  produced and that helps me figure out the source   11:35
23  of it.  If it is one, two miles away, I mean, it   11:35
24  really does depend.                                11:35
25  BY MR. HALLER:                                     11:35
```

Page 61

```
 1        Q.  Are you able to tell which direction     11:35
 2  it is without sight, just from hearing whether     11:35
 3  it is behind, in front, to the side?              11:35
 4           MR. ROZYNSKI: Objection to form.         11:35
 5        You can answer.                              11:35
 6        A.  No.                                      11:35
 7  BY MR. HALLER:                                     11:35
 8        Q.  All right.                               11:35
 9           We went off on a tangent and I'm          11:35
10  sorry.  I'm coming back to the list.  Am I right   11:35
11  that Cindy Gaines and Larry Minor are people       11:35
12  that you interacted with over your 90-day          11:35
13  waiver, is that correct?                           11:35
14        A.  That's correct.                          11:36
15        Q.  And then did Mr. Minor also with respect 11:36
16  to I think your two-year exemption?                11:36
17        A.  That's correct.  That's who I was in     11:36
18  touch with about my exemption and having the       11:36
19  physical being done, I gave that information to    11:36
20  via e-mail.                                        11:36
21        Q.  And then am I also correct that          11:36
22  Elaine Papp is the person that you mentioned not   11:36
23  by name earlier, that you had conversation or      11:36
24  communications with concerning the need for        11:36
25  getting a medical certificate from somebody who    11:36
```



16 (Pages 58 to 61)

Page 62

```
 1    was authorized by the Federal Motor Carrier     11:36
 2    Administration?                                 11:36
 3             MR. ROZYNSKI: Objection to form.       11:36
 4       You can answer.                              11:36
 5       A.  She was the one who provided me the      11:37
 6    medical exam form and she gave it to me via     11:37
 7    e-mail, which I printed out and brought to the  11:37
 8    doctor for the evaluation.                      11:37
 9    BY MR. HALLER:                                  11:37
10       Q.  And was she the one who told you         11:37
11    needed to get a medical certificate from a      11:37
12    medical examiner who was on the national        11:37
13    registry?                                       11:37
14       A.  I received the form and I had the        11:37
15    understanding that I could just see my primary  11:37
16    care doctor, which I did.  I filled out the form 11:37
17    and I submitted it to a representative at FMCA.  11:37
18    It had been about a year before I heard back    11:38
19    from anyone.  And I can't recall the exact form 11:38
20    of contact, I believe it was an e-mail.  Hold   11:38
21    on.  Maybe it was my mother who e-mailed to     11:38
22    follow up and we got a response saying that my  11:38
23    doctor wasn't certified.  And then it was Elaine 11:38
24    who told me I had to find a doctor who was       11:38
25    allowed to do DOT certification.  And she told  11:38
```

Page 63

```
 1    me that I had to find a specific doctor who had  11:38
 2    the medical certification for DOT.  And then     11:38
 3    that's how I found the doctor, Dr. Yu who is DOT 11:38
 4    certified and can verify.                        11:38
 5       Q.  Do you know if your mother still has      11:39
 6    the copies of the e-mails?                       11:39
 7       A.  I mean, I believe she e-mailed from       11:39
 8    work, so I don't have access to that.  I can't   11:39
 9    recall.                                          11:39
10       Q.  Could you go to interrogatory No. 7       11:39
11    and the answer to interrogatory No. 7.  Is here  11:39
12    where you say you had that audiological test     11:39
13    that we were talking about a few minutes ago?    11:40
14       A.  It is.  It is.  I couldn't recall         11:40
15    the specific name.  Seeing it, I do recognize    11:40
16    it.                                              11:40
17       Q.  I'll come and show you a document,        11:40
18    but based on the document, that test occurred in 11:40
19    September of 2013, do you recall that?           11:40
20       A.  Do you mind repeating the date            11:40
21    again?                                           11:40
22       Q.  September of 2013?                        11:40
23       A.  Yes, I believe I have a copy of that      11:41
24    paper, as well.                                  11:41
25       Q.  Okay.                                     11:41
```

Page 64

```
 1             Other than that hearing test in         11:41
 2    September of 2013, did you have any other        11:41
 3    audiological test, hearing tests related in any  11:41
 4    way to your request to get a CDL permit or your  11:41
 5    applications to any driving school?              11:41
 6             MR. ROZYNSKI: Objection to form.        11:41
 7       You can answer.                               11:41
 8       A.  HearUSA was the only visit I had for      11:41
 9    that.                                            11:41
10    BY MR. HALLER:                                   11:41
11       Q.  Interrogatory No. 7 asks you to list      11:41
12    every physician, psychologist, therapist, nurse, 11:41
13    social worker or other health care professional  11:42
14    with whom you have consulted or was examined,    11:42
15    treated or rendered services to you with regard  11:42
16    to your alleged hearing disability or            11:42
17    impairment.                                      11:42
18             Do you see that?                        11:42
19       A.  Just give me a moment.                    11:42
20             I do see that.                          11:42
21       Q.  So, what do we know from the answers      11:42
22    that you provided in these interrogatories is    11:42
23    that you have a primary care physician, Dr.      11:42
24    Marino, is that right?                           11:42
25       A.  That's correct.                           11:43
```

Page 65

```
 1       Q.  That in September of 2013, you had a      11:43
 2    hearing test done by HearUSA, is that right?     11:43
 3       A.  Yes.                                      11:43
 4       Q.  Now, other than Dr. Marino and           11:43
 5    HearUSA, are there any other health care         11:43
 6    providers who have helped you or with whom you   11:43
 7    consulted who have examined you in any way in    11:43
 8    connection with your hearing disability?         11:43
 9             MR. ROZYNSKI: Objection to form.        11:43
10       You can answer.                               11:43
11       A.  No.  Just those two.                      11:43
12    BY MR. HALLER:                                   11:43
13       Q.  Sir, am I correct in understanding        11:44
14    then that you don't have a specialist that you   11:44
15    go and see with respect to your hearing          11:44
16    disability?                                      11:44
17       A.  No.                                       11:44
18       Q.  So, again, I apologize, and I don't       11:44
19    want to appear insensitive, so would sort of     11:44
20    the medical treatment examinations related to    11:44
21    your hearing impairment have occurred            11:44
22    essentially at birth or when you were very young 11:44
23    as opposed to subsequently?                      11:44
24             MR. ROZYNSKI: Objection to form.        11:44
25       You can answer.                               11:44
```



Page 66

1    A.  When I was born, I was identified as    11:45
2    deaf. I'm not physically disabled. I have a    11:45
3    deafness, which is that, and I have ASL as a    11:45
4    communication means.  I'm able to use my brain.    11:45
5    I don't have a cognitive disability.  I use ASL.    11:45
6    And so, I feel like a normal person. I have a    11:45
7    hearing loss since birth.    11:45
8    BY MR. HALLER:    11:45
9        Q.  That's fine, and I respect you, and    11:45
10   that's why I was treading very carefully.  But I    11:45
11   just wanted to know whether there was any kind    11:45
12   of medical course of treatment at any time    11:45
13   related to your hearing loss or deafness?    11:45
14           MR. ROZYNSKI:  Objection to form.    11:45
15   You can answer.    11:45
16       A.  No.  However, though, at the time of    11:46
17   my birth, my parents were concerned that I was    11:46
18   deaf and they had taken me to seven different    11:46
19   hospitals because they wanted to confirm my    11:46
20   deafness, and then finally, they did a test on    11:46
21   me where they realized and they confirmed my    11:46
22   deafness and that was it.  But there was no    11:46
23   surgical procedures that was opted to restore my    11:46
24   hearing, no.    11:46
25           You know, I was, you know, keeping    11:46

Page 67

1    in mind that I was born deaf at birth and my    11:46
2    parents were trying to, you know, establish    11:46
3    communication with me and they were concerned    11:46
4    over the two-year period.  So the first two    11:46
5    years that they did take me for evaluations    11:46
6    because they were concerned to see if I had any    11:46
7    cognitive disabilities that I encountered    11:47
8    besides my deafness, and once it was established    11:47
9    that it wasn't, it was established that only the    11:47
10   hearing loss was the condition.    11:47
11       Q.  Who provides or whom do you go for    11:47
12   your hearing aids?    11:47
13       A.  Typically, it is a battery system    11:47
14   that I use, so it needs to be replaced at times.    11:47
15   So I get new batteries and that's how I work    11:47
16   with my hearing aids.    11:47
17       Q.  Are they prescribed or is there any    11:47
18   sort of health care provider that deals with the    11:47
19   provision of hearing aids and monitoring them?    11:47
20       A.  Well, I do go to HearUSA. I don't    11:47
21   interact with a doctor.  I have a person who can    11:47
22   give those to me.  They give me new hearing    11:48
23   aids.  It is not a prescription.  It is more    11:48
24   that they have a mold to make sure that they fit    11:48
25   in my ear, but if a battery dies, I can    11:48

Page 68

1    typically just go to Rite Aid and get a    11:48
2    replacement battery for that so they work and    11:48
3    then they mold it to fit my ear at HearUSA, and    11:48
4    that's typically how it goes.    11:48
5        Q.  Do you from time to time replace or    11:48
6    upgrade the hearing aids?    11:48
7            MR. ROZYNSKI:  Objection to form.    11:48
8    You can answer.    11:48
9        A.  For me, my hearing aids don't have    11:48
10   any need to upgrade, downgrade.  They have been    11:48
11   pretty much consistent my whole life.    11:48
12   BY MR. HALLER:    11:48
13       Q.  If we go to Interrogatory No. 11, I    11:48
14   have some questions.  As I understand your    11:48
15   answer to Interrogatory No. 11, you learned to    11:49
16   drive at Mill Neck Lutheran School for the Deaf,    11:49
17   is that right?    11:49
18       A.  Yes.  When I was 16 or 17.    11:49
19       Q.  I want to come in a minute to your    11:49
20   educational background and work history.  But    11:49
21   was that a school you were personally attending    11:49
22   or was it a school to whom you went in order to    11:49
23   learn how to drive?    11:50
24       A.  Both.  I had road test driving    11:50
25   practice there, as well, but I also was a    11:50

Page 69

1    full-time student at Mill Neck Lutheran School    11:50
2    for the Deaf, as well.    11:50
3        Q.  Can you describe to me, for me, what    11:50
4    was the set up that they had in order to teach    11:50
5    people who were deaf how to drive a car?    11:50
6        A.  One moment.  I chose Mill Neck    11:50
7    because the driving instructor there didn't    11:50
8    actually know how to sign, but had had an    11:50
9    interpreter, so that he would be able to    11:50
10   instruct via interpreter to the deaf students    11:51
11   who wanted to take the driving test.  And so    11:51
12   when we took the written part of the driving    11:51
13   test, we had that interpreted that, as well.  It    11:51
14   would have been frustrating had I gone to the    11:51
15   DMV directly without an interpreter to    11:51
16   understand the questions.  So we were provided    11:51
17   the aid of an interpreter for the entire    11:51
18   process.    11:51
19       Q.  What I would like to understand is    11:51
20   did they have an area where you could learn how    11:51
21   to drive off road?    11:51
22           MR. ROZYNSKI:  Objection to the    11:51
23   form.  You can answer.    11:51
24       A.  So they had a set up for the school    11:51
25   where once school was done, we had an    11:52



Page 70

```
1   after-school activity.  The driving instructor      11:52
2   would come with his car.  We would get into the     11:52
3   car.  We would drive around for driving practice    11:52
4   and then we would be returned to campus and then    11:52
5   I would head home after that.  Typically,           11:52
6   there's going to be two or three students with      11:52
7   me in the car practicing our driving.               11:52
8   BY MR. HALLER:                                       11:52
9        Q.  And so I was trying to understand,         11:52
10  is that off road or was that on normal roads?       11:52
11       A.  It was a combination of both off           11:52
12  road and on road.                                   11:52
13       Q.  Do you start off road and graduate         11:52
14  over to going on the road?                           11:52
15       A.  Exactly.  We would start off like,         11:52
16  you know, off road, you know, like parking lots     11:53
17  and stuff like that, and then eventually we         11:53
18  would go out onto the streets and make the          11:53
19  actual drives on the real streets.                   11:53
20       Q.  I want to understand perhaps better        11:53
21  how you were communicating with the instructor      11:53
22  during both the off road and on road activity.      11:53
23       A.  We always had the assistance of a          11:53
24  sign language interpreter there in our presence.    11:53
25       Q.  So --                                       11:53
```

Page 71

```
1        A.  I mean you have to have that.             11:53
2   Otherwise, you wouldn't have effective              11:53
3   communication and there would be no                 11:53
4   communication taking place.  So with the            11:53
5   interpreter in place, then basically both           11:53
6   parties have access to each other.                   11:53
7        Q.  So I just want to understand then          11:53
8   how that worked.  When you were driving, you        11:53
9   would be in the driving seat obviously, right?      11:53
10       A.  Yes.                                        11:54
11       Q.  And where was the instructor?              11:54
12       A.  He would be sitting in the                 11:54
13  passenger's seat and the interpreter would be       11:54
14  sitting in the back seat and no interpretation      11:54
15  took place during the actual driving until we       11:54
16  came to a complete stop, and that's when the        11:54
17  interpreter would be utilized.  And then while      11:54
18  we were driving there would be no interpretation    11:54
19  that takes place.  When we came to a stop, then     11:54
20  the interpreter would be interpreting as we were    11:54
21  at a full stop.                                      11:54
22       Q.  And why, why was there no sign             11:54
23  language interpretation going on while you were     11:54
24  driving?                                             11:54
25            MR. ROZYNSKI:  Objection to form.         11:54
```

Page 72

```
1        You can answer.                                11:54
2        A.  Well, it was a safety factor.              11:55
3   Therefore, the instructor made sure there was no    11:55
4   talking going on with the interpreter and stuff     11:55
5   like that while we were driving.  As we were        11:55
6   driving, we were instructed to keep our eyes on     11:55
7   the road.  I was under observation.  It was a       11:55
8   safety factor why we didn't have any                11:55
9   communication taking place until we were in a       11:55
10  safe area where we were at a complete stop.  We     11:55
11  needed the interpreter because of the fact that     11:55
12  as we were going, the instructor would tell me,     11:55
13  you know, guide me as to how my progress was        11:55
14  going, but also in terms of where the instructor    11:55
15  wanted me to go turn left or right, proceeding      11:55
16  straight ahead.  Okay.  Parking.  Do a K-turn,      11:55
17  whatever the case may be.  That information         11:55
18  would not have been disseminated to me              11:55
19  effectively without the use of the interpreter.     11:55
20  That's why we had the interpreter there.            11:55
21  BY MR. HALLER:                                       11:55
22       Q.  Again, so I can visualize and              11:55
23  understand it better, were the instructions         11:55
24  given about where to go and where to turn before    11:55
25  you started actually driving so you knew what he    11:56
```

Page 73

```
1   wanted?                                              11:56
2        A.  Yes, exactly.  I mean, it has been a       11:56
3   long time.  I'm trying to remember the process,     11:56
4   but I was 16 years old.  I remember that's how      11:56
5   it was done, to the best of my recollection.        11:56
6        Q.  Do you recall any situation where          11:56
7   you were given an instruction before the vehicle    11:56
8   started moving, you were driving and then the       11:56
9   instructor wanted to tell you to do something       11:56
10  different?                                           11:56
11       Do you recall that ever coming up?             11:56
12            INTERPRETER MARTINEZ:  This is             11:57
13       the interpreter's question, as he was          11:57
14       driving?                                        11:57
15            MR. ROZYNSKI:  Objection to form.          11:57
16       You can answer.                                 11:57
17            MR. HALLER:  Yes.                          11:57
18       A.  No, that never happened.                    11:57
19  BY MR. HALLER:                                       11:57
20       Q.  Can you just elaborate for me,             11:57
21  please, on the assistance that you received with    11:57
22  the written test?  I'm not sure I understood        11:57
23  your testimony.  I think you said that you had a    11:57
24  sign language interpreter to do the written test    11:57
25  and I would like to understand that better.         11:58
```



Page 74

1    A.  Well, because the test is in          11:58
2  English, which is not my native language,     11:58
3  because I use American Sign Language, English is   11:58
4  a second language, therefore, not native to me.   11:58
5  So the interpreter would basically take that    11:58
6  language of English and put it into my language.   11:58
7  Keeping in mind that no answers are being     11:58
8  provided by the interpreter.  The interpreter is   11:58
9  only interpreting the question.  It was up to me   11:58
10  as the student to formulate the answer based    11:58
11  upon what I knew, based on my knowledge.  So a   11:58
12  lot of times there's misconception that people    11:58
13  think interpreters are there to give you the    11:58
14  answers.  It's not.  The interpreter's job is    11:58
15  just to interpret the questions only.  We as the   11:58
16  student are responsible for providing the     11:58
17  accurate answers.                 11:58
18    Q.  Just again to help me visualize it,    11:59
19  were these questions that were on like paper or   11:59
20  were they on -- when I did it they were like on   11:59
21  a screen and you went through like multiple     11:59
22  choice?                     11:59
23    A.  Well, at the time that I went to     11:59
24  school, remember it was over 30 years ago, that   11:59
25  was all on paper.  Where you had the multiple    11:59

Page 75

1  choices and so forth.  However, you know, things   11:59
2  have changed now.  Now it is probably done on a   11:59
3  monitor and stuff like that.  Basically,     11:59
4  everything was from a driver's manual book and   11:59
5  questionnaire sheets.              11:59
6    Q.  And again, so I understand it, so if    11:59
7  you went to question 1, am I correct that you    11:59
8  would have the sign language interpreter would   11:59
9  read that and relay it to you in sign language   11:59
10  so that you fully understood it?         11:59
11    A.  Yes, that is correct.  So the       12:00
12  interpreter would basically interpret the     12:00
13  question.  Then on the multiple choice he would   12:00
14  sign the multiple choices that were there.  That   12:00
15  was it.  It was up to me to discern which of the   12:00
16  multiple choices I wanted to put in there as an   12:00
17  answer.  If I didn't understand something in    12:00
18  terms of the question, I would ask him to     12:00
19  re-elaborate on the question.  So, you know,    12:00
20  basically, the most I was ever answered was    12:00
21  twice if I ever needed clarification.  But for   12:00
22  the most part, it was done only one time only.   12:00
23    Q.  Again, just to help me, in those     12:00
24  circumstances, do you first read the question to   12:00
25  get a general understanding and then have the   12:00

Page 76

1  interpreter interpret it or do you just let them   12:00
2  do it first?  I'm just not sure how that works.   12:00
3      MR. ROZYNSKI:  Objection to form.     12:00
4    You can answer.              12:00
5    A.  Basically, the interpreter -- we did   12:01
6  it on, you know, basically a standard procedure   12:01
7  where the interpreter would interpret the     12:01
8  question for all the students.  So if question   12:01
9  No. 1 was being interpreted, everybody would    12:01
10  look at the interpreter that was interpreting    12:01
11  and then the answer was given and then we move   12:01
12  on to the next question.              12:01
13    Some people did know the answers      12:01
14  already, you know, and there were some that    12:01
15  didn't understand the question.  They probably   12:01
16  had to reiterate and say what does the question   12:01
17  mean again.  So that was done.  Those who knew   12:01
18  the answer went ahead and gave the answer.    12:01
19  Those who didn't asked for clarifications.  But   12:01
20  never at any time were the answers given.  To   12:01
21  say who got something elaborated and who      12:01
22  understood the first, that's on an individual    12:01
23  basis on what somebody's reading levels were and   12:01
24  what their skills were.             12:01
25  BY MR. HALLER:                 12:01

Page 77

1    Q.  So, then, just asking my question    12:01
2  directed just to you, did you read the question   12:02
3  first or did you go through the process you just   12:02
4  described, which is you hear it from the     12:02
5  interpreter?                  12:02
6      MR. ROZYNSKI:  Objection to the      12:02
7    form.                    12:02
8    A.  I always, my preference was always    12:02
9  to have the interpreter interpret the question   12:02
10  for me before I answered it.          12:02
11  BY MR. HALLER:                 12:02
12    Q.  If we move on to interrogatory     12:02
13  No. 12, there is a question about whether or not   12:02
14  you intend to use sign language interpreted    12:02
15  during the examination if you get trained.    12:02
16    Do you see that question?          12:02
17    A.  Yes, if I was accepted I would have   12:03
18  gotten an interpreter for that.  That was my    12:03
19  expectation because it is within my right.    12:03
20  Being deaf, you know, and having access to this   12:03
21  test and not in my native language, I would have   12:03
22  the right to have accessibility to that      12:03
23  language.                   12:03
24    Q.  So let me try and break this down.    12:03
25  Have you spoken, you personally spoken to anyone   12:03



Page 78

| | |
|---|---|
| 1 | that administers the CDL license examination in   12:03 |
| 2 | New York with respect to what would be permitted   12:03 |
| 3 | or not permitted by way of sign language   12:03 |
| 4 | interpretation during the examination?   12:03 |
| 5 | MR. ROZYNSKI:  Objection to form.   12:03 |
| 6 | A.  I need clarification before filling   12:03 |
| 7 | out the application or after being accepted or   12:03 |
| 8 | what?  That depends on how I interpret that   12:03 |
| 9 | that's why I say that.   12:04 |
| 10 | BY MR. HALLER:   12:04 |
| 11 | Q.  Let me withdraw the question and try   12:04 |
| 12 | to restate it.  On the assumption that you were   12:04 |
| 13 | trained and now need to sit for the examination,   12:04 |
| 14 | have you had any conversation with any, you   12:04 |
| 15 | personally had any conversation with anyone who   12:04 |
| 16 | administers the commercial driving license   12:04 |
| 17 | examination in the State of New York to   12:04 |
| 18 | ascertain whether or not they would permit sign   12:04 |
| 19 | language interpreters to participate in the   12:04 |
| 20 | examination process?   12:04 |
| 21 | MR. ROZYNSKI:  Objection to form.   12:04 |
| 22 | You can answer.   12:04 |
| 23 | A.  I did.   12:04 |
| 24 | BY MR. HALLER:   12:04 |
| 25 | Q.  And who did you speak to?   12:04 |

Page 79

| | |
|---|---|
| 1 | A.  I contacted, I contacted the   12:04 |
| 2 | National Association of the Deaf and they said   12:04 |
| 3 | that you know the CDL classification for going   12:04 |
| 4 | to school would be covered under the law.  So I   12:04 |
| 5 | inquired about that and they said that they   12:05 |
| 6 | should be able to provide you with an   12:05 |
| 7 | interpreter.  Although, some of the schools may   12:05 |
| 8 | be not cooperative, not providing you with an   12:05 |
| 9 | interpreter, but I was told I would be able to   12:05 |
| 10 | get one.   12:05 |
| 11 | Q.  Mr. Frilando, I want to be sure that   12:05 |
| 12 | you understand my question.  Because my question   12:05 |
| 13 | really was not directed specifically at the   12:05 |
| 14 | training schools.  It was directed at the people   12:05 |
| 15 | that give the examinations.  And what I want to   12:05 |
| 16 | know is --   12:05 |
| 17 | A.  I did.  I contacted New York State.   12:05 |
| 18 | I forgot the name of the individual I spoke   12:05 |
| 19 | with.  I said listen, I'm a deaf individual and   12:05 |
| 20 | I was considering taking the test for the CDL.   12:05 |
| 21 | Would they be providing a sign language   12:05 |
| 22 | interpreter and someone did say yes.   12:05 |
| 23 | Q.  But you can't identify the person?   12:06 |
| 24 | A.  No, I'm sorry.  I didn't get a name   12:06 |
| 25 | on that individual.  I don't remember the name   12:06 |

Page 80

| | |
|---|---|
| 1 | of that person.  But, you know, New York State,   12:06 |
| 2 | but I know it was somebody up there because I   12:06 |
| 3 | contacted New York State directly.  I just   12:06 |
| 4 | didn't bother to take their name down though.   12:06 |
| 5 | Q.  And how did you contact them?   12:06 |
| 6 | A.  I'm not sure.  I think I made a   12:06 |
| 7 | phone call with my video phone first and then I   12:06 |
| 8 | followed up with an e-mail, but I don't recall   12:06 |
| 9 | though for sure.   12:06 |
| 10 | Q.  Explain to me how the video phone   12:06 |
| 11 | would have worked with somebody that you're   12:06 |
| 12 | calling from a government agency.   12:06 |
| 13 | A.  All right.  Well, a video phone it   12:07 |
| 14 | is a three-way communication.  I dial in my   12:07 |
| 15 | number.  Okay.  And I'm connected to an   12:07 |
| 16 | interpreter on a screen.  Okay.  Now, the   12:07 |
| 17 | interpreters never identify themselves by name,   12:07 |
| 18 | but they identify themselves by operator number   12:07 |
| 19 | or interpreter number, and then I tell them, I   12:07 |
| 20 | say, hey listen, I'm placing a call to so and   12:07 |
| 21 | so, they would place the call.  Now the   12:07 |
| 22 | interpreter I see on the screen, actually makes   12:07 |
| 23 | the call.  Basically I would place a call on my   12:07 |
| 24 | video phone.  I would see the interpreter come   12:07 |
| 25 | up on the monitor.  I would place my call.  The   12:07 |

Page 81

| | |
|---|---|
| 1 | interpreter would then have the headphone set,   12:07 |
| 2 | make the connection to the call to the party I   12:07 |
| 3 | want to speak with and then begin interpreting.   12:07 |
| 4 | Q.  Do you remember what -- let me   12:07 |
| 5 | withdraw that question.   12:07 |
| 6 | Would you have any record on your   12:07 |
| 7 | phone of when that conversation took place?   12:07 |
| 8 | A.  No, I just used the video phone to   12:08 |
| 9 | place my call.  Now, the number that I call, I   12:08 |
| 10 | would supply the number.  Okay, but then like   12:08 |
| 11 | anything else it is just like a regular phone.   12:08 |
| 12 | You delete your numbers you call.  I don't save   12:08 |
| 13 | those numbers.   12:08 |
| 14 | Q.  I assume you would have a copy of   12:08 |
| 15 | the follow up e-mail?   12:08 |
| 16 | A.  It has been a long time.  It has   12:08 |
| 17 | been over two or three years ago.  I can't   12:08 |
| 18 | remember.  I don't think I would.  I'm not   12:08 |
| 19 | saying I don't have it, I just don't remember.   12:08 |
| 20 | Q.  So it would have been sometime in   12:09 |
| 21 | 2012 or '13 that you had that conversation, if   12:09 |
| 22 | that's two or three years ago?   12:09 |
| 23 | A.  I want to say yes, but if I were to   12:09 |
| 24 | take a guess, I would probably say somewhere   12:09 |
| 25 | around November, the last week of November   12:09 |



21  (Pages 78 to 81)

Page 82

1    perhaps, just before the first week of December.   12:09
2    I'm not sure, but somewhere in that time period   12:09
3    between maybe 2011.  2011.  I'm not sure though.   12:09
4    I'm not sure of the exact year.  You know, I'm   12:09
5    sorry, I can't remember all those dates.   12:09
6         Q.  And would you agree here today that   12:09
7    in order to take the examination that you would   12:09
8    need a sign language interpreter to participate?   12:09
9              MR. ROZYNSKI:  Objection to form.   12:09
10   A.  Yes.   12:10
11   BY MR. HALLER:   12:10
12        Q.  Can you think of any way other than   12:10
13   with the help of a sign language interpreter   12:10
14   that you would be able to take the test?   12:10
15             MR. ROZYNSKI:  Objection to form.   12:10
16        You can answer.   12:10
17   A.  No, anything else would be less than   12:10
18   satisfactory.  I require the use of a sign   12:10
19   language interpreter and it is within the law   12:10
20   and I have my right to have an interpreter.   12:10
21   BY MR. HALLER:   12:10
22        Q.  If you would now go to interrogatory   12:10
23   No. 18.   12:10
24             INTERPRETER STAEHLE:  One moment   12:10
25        while we switch.   12:10

Page 83

1    BY MR. HALLER:   12:11
2         Q.  In this interrogatory we asked if   12:11
3    you could identify any schools of driver   12:11
4    training courses that you know or believe   12:11
5    accommodate people who have a hearing disability   12:11
6    or impairment, and you have listed two places,   12:11
7    Actual Career Training and Peak Technical   12:11
8    Institute.   12:11
9         Do you see that?   12:11
10   A.  Yes, one in Texas and one in   12:11
11   Colorado.  I was told that they provide   12:11
12   interpreters and that deaf students had   12:11
13   enrolled.  So I was wondering about New Jersey   12:11
14   and New York and when I attempted to have   12:11
15   accommodations made, I was denied.  Even though   12:11
16   I had the waiver.  It doesn't seem fair to me.   12:11
17        Q.  So who told you about these two   12:11
18   places?   12:12
19   A.  I just heard hearsay from some of my   12:12
20   friends.  You know, I had heard chatter of those   12:12
21   accommodations being made for deaf people in   12:12
22   those cities, in those states, and so I had   12:12
23   contacted some friends and I said where did you   12:12
24   hear that?  And I said, were these schools in   12:12
25   New York, and they told me one in Texas and one   12:12

Page 84

1    is in Colorado, and so I had heard hearsay   12:12
2    through friends.   12:12
3         Q.  Did you know anything specific about   12:12
4    those schools based on that hearsay, such as the   12:12
5    name of the school?   12:12
6    A.  Well, my friends' friends had given   12:12
7    them the name of the school because my friends   12:12
8    have some friends who have friends who have gone   12:12
9    to driving schools and who are deaf, and so the   12:12
10   name of those schools had been passed along to   12:13
11   me.   12:13
12        Q.  Do you have any information about   12:13
13   what those schools are doing to accommodate   12:13
14   people with hearing disabilities in terms of the   12:13
15   driving courses that they are running?   12:13
16   A.  I was told that those schools are   12:13
17   providing interpreters for deaf students and   12:13
18   that the students are getting interpreters and   12:13
19   able to pass their written test and their road   12:13
20   tests.  And that they're also getting   12:13
21   certificates of approval to insure safety that   12:13
22   they have passed a safety training that requires   12:13
23   60 to 70 hours which interpreters have been   12:14
24   provided for and they have all of this before   12:14
25   taking the road test.  And I heard that there   12:14

Page 85

1    are several states out there where there's a lot   12:14
2    of deaf individuals getting CDL.   12:14
3         Q.  So, again, who told you this, is   12:14
4    that from your friends?   12:14
5    A.  Yes, my friends are telling me about   12:14
6    this.   12:14
7         Q.  All right.   12:14
8         So you personally -- sorry?   12:14
9    A.  Because I have seen some images,   12:14
10   some photos where there are deaf individuals in   12:14
11   these school photos of graduates from CDL   12:14
12   training online, and so I have seen that they're   12:14
13   deaf individuals as graduates of CDL training   12:14
14   online, and so I found out that way that they're   12:14
15   also deaf graduates.   12:14
16        Q.  Okay.   12:14
17        But you personally have not spoken   12:14
18   to anyone at either Action Career Training or   12:15
19   Peak Technical Institute to get from them   12:15
20   specifically what they do?   12:15
21   A.  I have not spoken directly to   12:15
22   anyone.   12:15
23        Q.  Are you aware of the equipment that   12:15
24   they use for their training?   12:15
25   A.  I don't have any knowledge.   12:15



Page 86

1    Q.  Other than what you have now said in        12:15
2  this deposition, do you have any further        12:15
3  information about either Action Career Training     12:15
4  or Peak Technical Institute and how they train     12:15
5  people who are deaf to get CDL license?        12:15
6    A.  Correct.  I have told you everything      12:16
7  I know, because I don't have any specifics        12:16
8  beyond that.  I just have knowledge that they     12:16
9  have provided interpreters.  How they conduct     12:16
10  their training or things beyond that, I don't     12:16
11  have any knowledge of.              12:16
12    Q.  I guess this is the last question on      12:16
13  this document.  Interrogatory No. 19, we asked     12:16
14  you to describe other cases that you have        12:16
15  brought and you named the Dutchess School of     12:16
16  Driving case.                    12:16
17      Do you see that?              12:16
18    A.  I do see that.              12:16
19    Q.  And in the last sentence of that       12:17
20  answer which is on the final page --          12:17
21    A.  One moment while I get there.        12:17
22    Q.  You say that "Plaintiff brought this     12:17
23  action because Dutchess School of Driving would   12:17
24  not provide an American Sign Language          12:17
25  interpreter for its CDL training course."        12:17

Page 87

1      Do you see that?              12:17
2    A.  I do see that.              12:17
3    Q.  And is that the basis of your claim      12:17
4  against Dutchess, as far as you know?          12:17
5      MR. ROZYNSKI:  Objection to form.     12:17
6  You can answer.                  12:17
7    A.  That is.                  12:18
8  BY MR. HALLER:                  12:18
9    Q.  And that's the same basis as your      12:18
10  claim in this case?                12:18
11      MR. ROZYNSKI:  Objection to form.     12:18
12  You can answer.                  12:18
13    A.  Yes, because I was denied to get an    12:18
14  interpreter and then in the search for another     12:18
15  school I was denied again for interpreting        12:18
16  services for yet at another school.          12:18
17  BY MR. HALLER:                  12:18
18    Q.  So I would now like to move on to      12:18
19  some other documents.  So if you could take two   12:18
20  documents, Defendant's Exhibit 6 and 7, because   12:18
21  again, they relate to each other.            12:18
22      (Plaintiff's Answers to           12:18
23      Defendant Bordentown Driver Training    12:18
24      School LLC's First Request For        12:18
25      Documents was marked as Defendant's    12:18

Page 88

1      Exhibit 7 for identification, as of     12:18
2      this date.)                  12:18
3        (Plaintiff's Answers to         12:18
4      Defendant Bordentown Driver Training    12:18
5      School LLC's First Request For        12:18
6      Documents was marked as Defendant's    12:18
7      Exhibit 8 for identification, as of     12:18
8      this date.)                  12:18
9  BY MR. HALLER:                  12:18
10    Q.  And then, also in this case, please     12:19
11  take Exhibit 8, Defendant's Exhibit 8, as well,   12:19
12  because again --                  12:19
13    A.  Let me just make a little room for     12:19
14  all these.  Do you need me to take this binder   12:19
15  clip off?                      12:19
16    Q.  No, you can keep it for now.        12:19
17    A.  Okay.                    12:19
18    Q.  Mr. Frilando, I have put before you     12:19
19  what we have marked as Defendant's Exhibit 8,    12:19
20  which is the first document request addressed to   12:19
21  you from the defendants.  Do you recall        12:19
22  generally receiving through your lawyers this     12:19
23  request for production of documents?  This is    12:19
24  Exhibit 6, which is the first one.          12:20
25    A.  I have seen this before.          12:20

Page 89

1    Q.  And if you look at Defendant's        12:20
2  Exhibit 7, do you see that this is a document    12:20
3  entitled your Answers to Defendant Bordentown    12:20
4  Driver Training School's First Request for        12:20
5  Documents?                    12:20
6    A.  I see that.                12:20
7    Q.  And did you assist your counsel in      12:20
8  the preparation of -- not the objections, but     12:20
9  the substantive written responses to each of the   12:21
10  document questions?                12:21
11    A.  For No. 7?                12:21
12    Q.  No, not No. 7.              12:21
13    A.  When I received this I did type out    12:21
14  some responses, and then I sent it over to my    12:21
15  lawyer to look over just to make sure the        12:21
16  specifics are okay.                12:21
17    Q.  Did you do a search for any         12:21
18  documents that were responsive or might be       12:21
19  responsive to the requests that had been served   12:21
20  upon you through your counsel by virtue of       12:21
21  Defendant's Exhibit 6?                12:21
22    A.  I did look for some documents.       12:22
23    Q.  So what I'm trying to understand is     12:22
24  whether you diligently searched for any        12:22
25  documents that might be responsive to those      12:22



Page 90

1    requests. Did you? I'm not asking about        12:22
2    Exhibit 8 that the point.                      12:22
3            INTERPRETER STAEHLE: Let the           12:22
4    interpreter clarify. Six is asking for         12:22
5    documents that you put into 8, correct?        12:22
6            MR. HALLER: I didn't put               12:22
7    anything into it. Let me try to                12:22
8    clarify.                                       12:22
9            INTERPRETER MARTINEZ: This is          12:22
10   the interpreter, we need clarification         12:22
11   what form you are working off.                 12:23
12           MR. HALLER: There are three            12:23
13   documents.                                     12:23
14   BY MR. HALLER:                                 12:23
15   Q.   The first document, just for the          12:23
16   benefit of the sign language interpreters is the 12:23
17   requests themselves. The second is just a copy  12:23
18   of the responses. And the third is the         12:23
19   responses with the documents.                  12:23
20           INTERPRETER STAEHLE: The               12:23
21   documents are in 8?                            12:23
22           MR. HALLER: They are in 8.             12:23
23   That's the end of a search that occurred       12:23
24   and I'm trying to find out what happened       12:23
25   along the way and whether or not we have       12:23

Page 91

1    everything.                                    12:23
2            INTERPRETER STAEHLE: I                 12:23
3    understand.                                    12:23
4            MR. HALLER: Do you understand?         12:23
5            INTERPRETER STAEHLE: Yes.              12:23
6            MR. HALLER: I'm not saying we          12:23
7    don't. I just need to ascertain that.          12:23
8            INTERPRETER STAEHLE: Okay.             12:23
9            MR. HALLER: Let me rephrase the        12:23
10   question.                                      12:23
11   BY MR. HALLER:                                 12:23
12   Q.   So, Mr. Frilando, we have identified      12:23
13   Exhibit 6 as the requests for production of    12:24
14   documents that was served on you through your  12:24
15   counsel.                                       12:24
16           Do you understand that?                12:24
17   A.   I do.                                      12:24
18   Q.   Okay.                                      12:24
19           And what I'm trying to then            12:24
20   ascertain is whether in response to that, you  12:24
21   did a diligent search for any documents that   12:24
22   might be responsive to those requests.         12:24
23           Did you do that?                       12:24
24   A.   To the best of my ability.                12:24
25   Q.   And in the course of doing that           12:24

Page 92

1    diligent search, did you ask your brother and  12:24
2    mother to provide anything that they may have  12:24
3    through e-mail or in any other form where they 12:24
4    were assisting you in the context of your      12:24
5    applications to various driving schools or to  12:25
6    the government to get waivers, medical         12:25
7    certificates or anything else of that nature?  12:25
8    A.   I did have some documents given to        12:25
9    me by my brother and I handed all those over to 12:25
10   my attorney to make sure that I was diligently 12:25
11   matching those requests.                       12:25
12   Q.   So just so I'm clear, I wanted to         12:25
13   just know as part of the search, you           12:25
14   specifically went to your mother and brother and 12:25
15   said I need anything that's covered by these   12:25
16   requests that you helped deal with on my behalf? 12:25
17           MR. ROZYNSKI: Objection to form.       12:26
18   A.   My brother had some e-mails, so he        12:26
19   forwarded those to me and I sent those over to 12:26
20   my attorney. Beyond that, I looked over the    12:26
21   requests in document 6. I answered the         12:26
22   questions. I found the documents I had that    12:26
23   matched those requests and so, if anything, my 12:26
24   brother gave me some additional e-mails, but I 12:26
25   handled most of the workload myself.           12:26

Page 93

1    BY MR. HALLER:                                 12:26
2    Q.   So I infer from that question, but I      12:26
3    would ask you to answer directly, that you did 12:26
4    not ask your mother to provide you with things 12:26
5    that might be called for by those requests, such 12:26
6    as the e-mail when she was interacting with the 12:26
7    Federal Motor Carrier Administration over the  12:27
8    medical examiner?                              12:27
9    A.   I requested that e-mail from my           12:27
10   mother, I think so in that context.            12:27
11   Q.   In the course of your diligent            12:27
12   search for documents, did you at any time      12:27
13   destroy or get rid of any document?            12:27
14   A.   I'm not sure. I can't remember.           12:27
15   Because most of them were e-mails, so did I have 12:27
16   a piece of paper that I crumbled and threw away, 12:28
17   I mean, I'm not sure. I don't think so.        12:28
18   Q.   In the course of that search, did         12:28
19   you identify any document that you know existed 12:28
20   at one time but that you weren't able to locate 12:28
21   because it may have been deleted from e-mail or 12:28
22   somehow discarded in some other way?           12:28
23   A.   Not to my knowledge.                       12:28
24   Q.   So, if we go to Exhibit 8, do you         12:28
25   recognize this as the answers you gave to the  12:29



24  (Pages 90 to 93)

Page 94

1    first requests for documents from the defendants    12:29
2    with the responsive documents attached?    12:29
3         A.  I'll have a look.  Yes.    12:29
4         Q.  Okay.    12:29
5             And did you review this for accuracy    12:29
6    before it was submitted on your behalf by your    12:29
7    counsel to the defendant?    12:29
8         A.  I did.    12:29
9         Q.  And did you review this set of    12:29
10   answers for completeness after it was    12:29
11   submitted -- before it was submitted on your    12:29
12   behalf by your counsel to defendants?    12:29
13        A.  I did.  It is important for me to    12:30
14   review.  I read it over two or three times to    12:30
15   insure that it was accurate and complete to the    12:30
16   best of my ability, and then I then relinquished    12:30
17   it for my counsel to hand it over.    12:30
18        Q.  Is it your testimony here under oath    12:30
19   that the attachments to your answers to the    12:30
20   first requests for documents from defendants    12:30
21   contains all of the documents that you were able    12:30
22   to identify and find that are responsive to the    12:30
23   requests subject, of course, to all the    12:30
24   objections that were interposed?    12:30
25        A.  To the best of my ability,    12:30

Page 95

1    everything is in here.    12:30
2         Q.  And in that regard, you provided all    12:30
3    of the interaction by e-mail or other forms of    12:31
4    written communication between you and the    12:31
5    Federal Motor Carrier Safety Association?    12:31
6         A.  To the best of my ability, yes.    12:31
7         Q.  So what's puzzling to me a little    12:31
8    bit and why I'm asking these questions, Mr.    12:31
9    Frilando, is that it would seem to me that for    12:31
10   the various letters that you have produced to    12:31
11   have occurred, that there is, intuitively for me    12:31
12   there was likely to be other communication    12:31
13   around that correspondence, such as e-mails or    12:31
14   perhaps phone calls, I'm not sure.    12:32
15        A.  This was to the best of my ability.    12:32
16        Q.  And I guess --    12:32
17        A.  I didn't intentionally leave    12:32
18   anything out.    12:32
19        Q.  I'm not suggesting that.  I'm just    12:32
20   trying to make sure that we have identified    12:32
21   everything.    12:32
22        A.  Okay.    12:32
23        Q.  So the one thing that we have    12:32
24   identified that may not be in this package of    12:32
25   documents, is an e-mail, to the extent it still    12:32

Page 96

1    exists that your mother sent from a work e-mail    12:32
2    address to the Federal Motor Carrier Safety    12:32
3    Administration?    12:32
4         A.  I mean, I never asked for that    12:33
5    e-mail to be forwarded specifically because it    12:33
6    is her work e-mail and I respect that.  I know    12:33
7    it has certain privacy and there is a policy    12:33
8    connected to that, so I don't have access to    12:33
9    that.    12:33
10        Q.  Do you know if she received any    12:33
11   response to her e-mail from the Federal Motor    12:33
12   Carrier Safety Association?    12:33
13        A.  There was a response.    12:33
14        Q.  And was that also to her work e-mail    12:33
15   address?    12:33
16        A.  Yes.  It was her work e-mail.  She    12:33
17   didn't write them from home.    12:33
18            MR. HALLER:  Andrew, I would make    12:33
19        a request to see if we could please get    12:34
20        that correspondence to the extent it    12:34
21        still exists, and I'm sure that she    12:34
22        could get permission from work to    12:34
23        provide it, but we would ask that    12:34
24        efforts be made to obtain those    12:34
25        documents.    12:34

Page 97

1            MR. ROZYNSKI:  I'll take it under    12:34
2        advisement and I'll speak to her.    12:34
3            MR. HALLER:  Okay.  Thank you.    12:34
4            (Transcript marked for    12:34
5        request of production of documents    12:34
6        and/or information.)    12:34
7    BY MR. HALLER:    12:34
8         Q.  Just so --    12:34
9         A.  I have to say she might not have    12:34
10   saved it.  It could potentially be thrown away.    12:34
11   She is not somebody who saves e-mails that long,    12:34
12   so I'm just giving you a heads-up on that.    12:34
13        Q.  That's fine.  So long as we make    12:34
14   diligent efforts.  That's all we can do.    12:34
15            MR. ROZYNSKI:  Can we take a    12:34
16        little break?  I need to use the    12:34
17        restroom.    12:34
18            MR. HALLER:  Can you just give me    12:34
19        two minutes to finish up and we may be    12:34
20        able to break for lunch?    12:34
21            MR. ROZYNSKI:  Sure.    12:34
22            MR. HALLER:  Can I ask you a    12:34
23        question to speed things up?  The    12:34
24        amendments I received them this morning,    12:34
25        is that really to just add the one    12:35



Page 98

```
 1      document or are there other subsequent    12:35
 2  amendments to the interrogatories?            12:35
 3          MR. ROZYNSKI:  No, there are no       12:35
 4  substantive amendments.  Just to add the      12:35
 5  document.                                     12:35
 6          MR. HALLER:  Can I quickly go         12:35
 7  through this and then we'll take a            12:35
 8  break?                                        12:35
 9          MR. ROZYNSKI:  Sure.                  12:35
10  BY MR. HALLER:                                12:35
11      Q.  Mr. Frilando, I'm going to show you   12:35
12  Exhibits 9 and 10.                            12:35
13              (Plaintiff's Objections and       12:35
14          Amended Answers to Defendant's First  12:35
15          Set of Interrogatories was marked as  12:35
16          Defendant's Exhibit 9 for             12:35
17          identification, as of this date.)     12:35
18              (Plaintiff's Amended Answers      12:35
19          to Defendant's First Set of           12:35
20          Interrogatories was marked as         12:35
21          Defendant's Exhibit 10 for            12:35
22          identification, as of this date.)     12:35
23  BY MR. HALLER:                                12:35
24      Q.  You can take them and you can put 8A  12:35
25  way.  Do you have those in front of you?      12:35
```

Page 99

```
 1      A.  I do.                                 12:35
 2  BY MR. HALLER:                                12:35
 3      Q.  We received today an amendment to     12:35
 4  your original set of interrogatories.         12:35
 5          INTERPRETER MARTINEZ:  Hold on a      12:35
 6  second, please.  Okay.  Go ahead.             12:35
 7  BY MR. HALLER:                                12:35
 8      Q.  We received today an amendment to     12:35
 9  your original set of interrogatories, and as I 12:35
10  understand it from reading the amendment and  12:35
11  also as confirmed by your counsel a minute ago 12:36
12  on the record, that the amendment is to provide 12:36
13  the materials that are attached as Exhibit B to 12:36
14  Defendant's Exhibit No. 10, which is the e-mail 12:36
15  correspondence related to you between your     12:36
16  brother and Jersey Tractor-Trailer Training; is 12:36
17  that right?                                   12:36
18      A.  Yes.                                  12:36
19      Q.  And, as far as you know, those are    12:36
20  the only changes or differences between the   12:36
21  amended interrogatories and the original?     12:36
22      A.  That was it, yes.                     12:36
23      Q.  And do you know why given that the    12:36
24  correspondence was around April of this year, 12:36
25  that that information had not been included in 12:36
```

Page 100

```
 1  the original responses?                       12:36
 2      A.  Yes, but I'm looking at the date.     12:37
 3  It says November the 6th.  November 16th.  So I 12:37
 4  was familiar with that one right there.  Yes.  12:37
 5  That was the questionnaire that was given to me. 12:37
 6  What are you referring to?                    12:37
 7      Q.  Exhibit B, the attachment?            12:37
 8      A.  Oh, I'm sorry.  The one they're       12:37
 9  dated from April 30th, correct?               12:38
10      Q.  Yes.                                  12:38
11      A.  I wasn't familiar with that.  My      12:38
12  brother had notified me later because I remember 12:38
13  prior to that it was two that my brother       12:38
14  informed me about.  I became aware of this at a 12:38
15  later date.  I was only aware of the two.  I   12:38
16  didn't even have any knowledge about that third 12:38
17  one until later.                              12:38
18      Q.  The last question and then we'll      12:38
19  break.  When did you first decide that you were 12:38
20  interested in perhaps getting a CDL license and 12:38
21  becoming a CDL driver?                        12:39
22      A.  Well, I had heard very successful     12:39
23  stories of many people who were deaf that had  12:39
24  gone on to get their CDL license and there were 12:39
25  a lot of people that, you know, in graphic     12:39
```

Page 101

```
 1  designs.  I went to school and studied graphic 12:39
 2  design.  I wasn't able to get a job in my field. 12:39
 3  It was a very competitive market, so I figured I 12:39
 4  would have to make a paradigm change and make a 12:39
 5  shift in my career.                           12:39
 6          I started thinking about the          12:39
 7  alternative careers out there.  It became      12:39
 8  motivated and I enjoyed the concept of being on 12:39
 9  the road in a tractor-trailer, because I know a 12:39
10  lot of people who, you know, that have hearing 12:39
11  impairments like graduated from college.  They 12:39
12  can't get jobs because of discrimination.  They 12:39
13  can't get jobs because of the competitive market 12:40
14  field or whatever.  So I figured I would find a 12:40
15  niche that I can get a job where I have access  12:40
16  to a job that I can get into.  I thought that   12:40
17  being a CDL tractor-trailer driver would provide 12:40
18  that for me.  So I became interested in that and 12:40
19  I pursued it.  You know, Ethnic was the company 12:40
20  that I wanted to work for.  So that's why I     12:40
21  pursued it.                                   12:40
22      Q.  And I appreciate that.  My question   12:40
23  was when.  So I just wanted to get a time frame. 12:40
24  When you first started thinking about that as a 12:40
25  career.                                       12:40
```



MAGNA
LEGAL SERVICES

Page 102

```
1        A.  When I started first thought of        12:40
2   that, I probably want to say about two to three    12:40
3   years ago.  Then that was only based upon the    12:40
4   fact that I have heard about the successful    12:40
5   stories of other individuals who are also deaf    12:40
6   that actually were passing their CDL licenses.    12:40
7   I would probably say that's about two to three    12:40
8   years ago.  You know, since that two or three    12:41
9   years have elapsed, many more people with    12:41
10  hearing impairments have become -- I believe    12:41
11  there might possibly be two to 300 CDL drivers    12:41
12  who have a hearing loss.  I figured why not.  I    12:41
13  can join the ranks.                          12:41
14       MR. HALLER:  Shall we take a    12:41
15  lunch break?                 12:41
16       MR. ROZYNSKI:  Sure.       12:41
17       MR. HALLER:  My preference is, I    12:41
18  mean as long as you need, but as short    12:41
19  as possible.                 12:41
20       THE VIDEOGRAPHER:  The time is    12:41
21  now 12:45.  Off the record.      12:41
22       (Whereupon at 12:45 o'clock    13:37
23       p.m., a luncheon recess was taken.)    13:37
24                          13:37
25
```

Page 103

```
1    A F T E R N O O N   S E S S I O N    13:37
2            1:38 o'clock p.m.          13:37
3       THE VIDEOGRAPHER:  The time is    13:38
4   1:38.  We are now back on the record.    13:38
5   BY MR. HALLER:                  13:38
6       Q.  Good afternoon, Mr. Frilando.  The    13:38
7   same ground rules that we discussed at the    13:38
8   beginning of the deposition are still in effect.    13:38
9       Do you understand that?       13:38
10      A.  Sure.              13:38
11      Q.  I'm wondering if at this point it    13:38
12  would be possible for you to just give me a    13:38
13  short summary of your educational background,    13:38
14  including any higher education or vocational    13:38
15  courses that you have done?       13:38
16      A.  I was at St. Francis School for the    13:39
17  Deaf, which is in Brooklyn, and that's where I    13:39
18  first enrolled in school.  And I was there until    13:39
19  I was 13.  And I graduated eighth grade in '93,    13:39
20  and then I went to Mill Neck in Long Island as a    13:39
21  full-time student.  I was there until I    13:39
22  graduated in 1989.  And then I went to another    13:39
23  school in LaGuardia, LaGuardia Community,    13:39
24  LaGuardia Community College.  It is a CUNY.  And    13:39
25  I didn't complete my schooling there.  I    13:39
```

Page 104

```
1   actually left because they didn't have the kind    13:39
2   of classes that I felt were good for deaf    13:39
3   people, and then I joined my father's business    13:39
4   and I worked with him for a year.  And then I    13:39
5   applied to a college, NTID RIT.  I ended up    13:39
6   attending there and graduating with an AAOS for    13:39
7   glasses repair, optometry.  And ultimately, I    13:40
8   wasn't satisfied with my major.  So I decided to    13:40
9   go back to LaGuardia Community College because    13:40
10  they had made improvements to their program and    13:40
11  so I decided to study computer system    13:40
12  programming there, and I graduated in 2003.    13:40
13      And then I went to New York, a    13:40
14  technical college.  I entered a baccalaureate    13:40
15  program for communication design and it is a    13:40
16  four-year program, and I was there full time and    13:40
17  I graduated in 2008.  After that, I started    13:40
18  looking for a job.  The economy wasn't so great.    13:40
19  I had sent out my resume multiple times.    13:40
20      And then, fortunately, I found an    13:41
21  internship and I pursued that internship for    13:41
22  about two years until I was basically dismissed    13:41
23  and I had to then pursue a job search after    13:41
24  that, and that's where we are now as far as    13:41
25  schooling.                   13:41
```

Page 105

```
1       Q.  I think I followed most of that.    13:41
2   I'm not sure I understand, was NTID RIT with the    13:41
3   glasses repair?                13:41
4       A.  It is the National Technical    13:41
5   Institute for the Deaf.          13:41
6       Q.  Okay.               13:41
7       A.  At RIT, which is the Rochester    13:41
8   Institute of Technology.  It is a college under    13:42
9   that university.             13:42
10      Q.  Thank you.            13:42
11      A.  No problem.           13:42
12      Q.  What was your father's business?    13:42
13      A.  In electronics.  I mean, I can't    13:42
14  remember the name of his company.  And at this    13:42
15  point, he's retired and passed away, as well.    13:42
16      Q.  Was it retail electronics or was it    13:42
17  repair or what kind of electronics?    13:42
18      A.  A repair shop.  Typically, if there    13:42
19  was a need for wiring to be installed in    13:42
20  buildings and things like that, he would get    13:42
21  involved.  Typically, it was more contractor    13:42
22  work.  He didn't work in the shop.  He worked on    13:42
23  sites.                       13:42
24      Q.  Could you please just give me a    13:42
25  summary of your actual work experience?    13:42
```



Page 106

```
 1        A.  So when I mentioned that I pursued a    13:43
 2   degree in communication design that was more a   13:43
 3   graphic design.  So I had an internship in that  13:43
 4   field.  I worked for a company, I mean, it was   13:43
 5   an internship.  So maybe in total four to five   13:43
 6   months or so.  I can't recall exactly.  Then I   13:43
 7   had to go back to school and then I pursued a    13:43
 8   job search.  It wasn't very fruitful and then I  13:43
 9   got an internship.  When that was done, I then   13:43
10   proceeded to look for a job in the real world    13:43
11   and I haven't had too much luck.  For actually   13:43
12   been very disappointed and, you know, wondering  13:43
13   about my own self worth when I can't find a job. 13:43
14   It's been frustrating.  Disappointing.  You      13:43
15   know, I doubt myself sometimes.               13:43
16        Q.  I just want to be sure I understand    13:44
17   your employment history as opposed to the       13:44
18   courses which you have done.  And based on what 13:44
19   I have heard, I understand that you have worked  13:44
20   for approximately a year in your father's       13:44
21   electronic repair business and then had an      13:44
22   internship in graphic design for about four to  13:44
23   five months.  And based on what you told me, I  13:44
24   believe that that's the full extent of your     13:44
25   employment history?                          13:44
```

Page 107

```
 1        A.  Yes.  I mean, I have eagerly sent      13:44
 2   out my resume hundreds of times and I haven't   13:44
 3   quite experienced a job offer.  You know, I'm   13:44
 4   not sure if I'm being discriminated against     13:44
 5   typically or if they're even really reading over 13:44
 6   my resume.  I haven't got much followup from all 13:44
 7   the resumes I have sent out.  I also do know    13:44
 8   that the unemployment rate for deaf individuals 13:45
 9   is 75 percent.  It is quite significantly higher 13:45
10   than for individuals who are able to hear.      13:45
11        Q.  Do you have any source of income?     13:45
12        A.  I get SSI income on a monthly basis.   13:45
13        Q.  Are you living in your mother's        13:45
14   house or just tell me if -- what your living    13:45
15   arrangement is?                              13:45
16        A.  I live with my mother and my          13:45
17   brother.  And we provide support for each other 13:45
18   as a family.                                 13:46
19        Q.  Okay.                               13:46
20           So am I right you don't pay rent?      13:46
21        A.  I do contribute to the rent.         13:46
22        Q.  Does your mother rent the house or    13:46
23   does she own it?                             13:46
24        A.  My mother owns the house.            13:46
25        Q.  When you said you contribute to the   13:46
```

Page 108

```
 1   rent, what did you mean by that?             13:46
 2        A.  In a sense I help pay for her        13:46
 3   living.  So if she needs food I contribute.  My 13:46
 4   brother contributes to the mortgage.  I believe 13:46
 5   his share is 20 to 30 percent and then my mother 13:46
 6   takes care of the rest and I pay where there is 13:46
 7   a need.  My mother isn't able to support herself 13:46
 8   alone in that sense, so we all as a family      13:46
 9   contribute to family living.                 13:47
10        Q.  Does your mother work?              13:47
11        A.  Yes.  She works at a hospital called 13:47
12   Gouveneur's Hospital in Manhattan.  She works in 13:47
13   the office and handles eye exams for patients.  13:47
14   She is not a doctor, but she does the office    13:47
15   work for eye exams for patients.  Make sure that 13:47
16   their name and information is put down          13:47
17   correctly.  Handles appointments.           13:47
18        Q.  And does your brother have a job?    13:47
19        A.  He currently works for Con Edison    13:47
20   and his position is more with the phone systems. 13:47
21   He handles phone calls, customer service.    13:47
22   Basically, if a customer calls in about a need 13:47
23   for repair or for bills, something like that, he 13:47
24   works the third shift at the call center.    13:47
25        Q.  Other than the Social Security       13:48
```

Page 109

```
 1   benefits that you receive, you don't have any   13:48
 2   other income, is that right, you personally?    13:48
 3        A.  No.  It is my source of income.      13:48
 4        Q.  Do you own a car?                    13:48
 5        A.  I did in the past, but now I don't.  13:48
 6   At times I borrow my brother's car if I needed  13:48
 7   it.  My name is also on my brother's insurance, 13:48
 8   so I am a recognized driver on his car.       13:48
 9        Q.  How long ago was it that you owned a 13:48
10   car?                                         13:48
11        A.  It must have been when I was 17 or   13:49
12   18.  Eighteen, 19.  Maybe up to 20.  Somewhere 13:49
13   along those years and it was my first car I    13:49
14   owned.  It was nice.  My father had bought me a 13:49
15   car.                                         13:49
16        Q.  Was that the only car you have       13:49
17   owned?                                       13:49
18        A.  That's the only car.  And then due   13:49
19   to some automobile problems, I had to get rid of 13:49
20   it, and then when I had to embark on a new     13:49
21   search for a new car, prices were too expensive, 13:49
22   so I just used my brother's car or my dad's when 13:49
23   he was still alive and I had always planned to  13:49
24   get a job and buy my own car again.          13:49
25        Q.  And how often in the last say five   13:49
```



Page 110

1    years do you actually drive a car?        13:49
2        A.  Maybe two or three times a week.  It     13:50
3    depends on if I have appointments or if I'm     13:50
4    going to the store.  I don't have daily usage of   13:50
5    a car, but weekly.  And like if my mother needs   13:50
6    me to drive, I drive her.  And then when my     13:50
7    father was still alive if he needed me to drive   13:50
8    him, I would drive him.                13:50
9        Q.  When you learned to drive at Mill     13:50
10   Neck Lutheran School for the Deaf, was that an   13:50
11   automatic car?                13:50
12       A.  Automatic.                13:50
13       Q.  Okay.                13:50
14       A.  It was an Oldsmobile, a Cutlas.     13:51
15       Q.  And the car that your father     13:51
16   graciously gave you or provided for you, was     13:51
17   that also an automatic?                13:51
18       A.  It was automatic and then -- so it     13:51
19   was automatic and then I had some issues with   13:51
20   that, so then I switched it over to a stick     13:51
21   shift system and --                13:51
22           INTERPRETER STAEHLE:  Interpreter   13:51
23       error.                13:51
24       A.  I had an issue with the automatic on   13:51
25   the column, so I had it moved to the center     13:51

Page 111

1    console of the car, but it is still automatic.   13:51
2    BY MR. HALLER:                13:51
3        Q.  Still automatic.  Okay.        13:51
4           And then, is your brother's car now   13:51
5    automatic?                13:52
6        A.  It is.                13:52
7        Q.  Have you ever driven a stick shift     13:52
8    car?                13:52
9        A.  I've driven it a little bit.  Not     13:52
10   much.  I do need to learn to become proficient.   13:52
11   So that's part of the reason why I wanted to     13:52
12   attend training.  Most of the cars that I have   13:52
13   driven have been automatic.                13:52
14       Q.  What cars have you driven that     13:52
15   aren't automatic that are stick shift?        13:52
16       A.  I can't remember what type of car.     13:52
17   It was just, I had a friend who had a stick     13:52
18   shift car, but you know, the make and model, I   13:52
19   can't recall.  It was a car.  It might have been   13:52
20   when I was 21 or 25.  Something back then.  It   13:52
21   was a long time ago.                13:52
22       Q.  And you just tried it to see what it   13:52
23   was like?                13:52
24       A.  Yes.  Just to see if I could do it.   13:53
25   My friend actually wanted to teach me and he,   13:53

Page 112

1    you know, explained to me how I have to follow   13:53
2    the gauges and know when to shift into gear and   13:53
3    how to not absolutely, you know, demolish the   13:53
4    transmission.                13:53
5        Q.  Am I correct, though, you didn't,     13:53
6    you didn't drive it with any regularity or very   13:53
7    over any long distances?                13:53
8        A.  No.                13:53
9        Q.  I'm going to show you a document     13:53
10   we'll mark as Exhibit 11.                13:53
11           (Copy of New York State     13:53
12       Driver's License of Kenneth Frilando   13:53
13       was marked as Defendant's Exhibit 11   13:53
14       for identification, as of this     13:53
15       date.)                13:53
16   BY MR. HALLER:                13:54
17       Q.  So I have put before you what we     13:54
18   have marked as Exhibit 11, which are documents   13:54
19   that you produced in this case that are actually   13:54
20   part of the attachments to Exhibit 8, but I have   13:54
21   now separated them out so we can talk about them   13:54
22   individually.                13:54
23       A.  Okay.                13:54
24       Q.  So, if we go to this document before   13:54
25   you that's Exhibit 11 and start really at the   13:54

Page 113

1    end, there are actually little designations,     13:54
2    page numbers, PLA 16 and 17.  So it is the last   13:54
3    two pages.                13:54
4           Am I correct this is a photocopy of   13:54
5    your Class D license, is that right?        13:54
6        A.  My current Class D license, yes.     13:55
7        Q.  Okay.                13:55
8        A.  And then my Class A is professional.   13:55
9    It is up to two years and it is going to expire,   13:55
10   I believe, January 9, 2016 is my final.        13:55
11       Q.  If you look at the last page, there   13:55
12   are on your Class D license, that's that page,   13:55
13   yes, the last page of this document, there's     13:55
14   some restrictions on your Class D license and   13:55
15   I'm not sure, I mean, I can see corrective     13:55
16   lenses is one.  Are there any other restrictions   13:55
17   you are aware of on that license?        13:55
18       A.  It also notes my hearing aids.     13:55
19       Q.  Okay.                13:55
20       A.  My hearing loss.                13:55
21       Q.  And then the first two pages of     13:56
22   Exhibit 11 are your learner permit for     13:56
23   commercial driving Class A from New York State,   13:56
24   is that right?                13:56
25       A.  That's correct.                13:56



Page 114

1     Q.  And this is an accurate copy of that     13:56
2  license?                              13:56
3     A.  It is.                         13:56
4     Q.  Okay.                          13:56
5        So if we just take a look at it, I     13:56
6  guess it has Class A on it and then it has your     13:56
7  name, a picture of you and your home address, is     13:56
8  that right?                           13:56
9     A.  That's correct.                 13:56
10     Q.  And it has date of birth.       13:56
11  9/25/1968.                            13:56
12        Do you see that?                13:56
13     A.  That's correct.                13:56
14     Q.  And then it has expires on 1/09/15.     13:56
15     Do you see that?                   13:56
16     A.  Yes, this is when I initially got it     13:57
17  and then before it expired I had to get a new     13:57
18  one for the final year.               13:57
19     Q.  Okay.                         13:57
20     A.  I am allowed this for two years.     13:57
21     Q.  Well, let's go step by step.  What     13:57
22  has been produced here, what's in front of us,     13:57
23  has an expiration date of January 9, 2015, is     13:57
24  that right?                           13:57
25     A.  Yes.                          13:57

Page 115

1     Q.  Okay.                          13:57
2        So, I don't have any other          13:57
3  documentation of any other license.  So what     13:57
4  documentation, if any, exists with respect to     13:57
5  any permit that extends beyond January 9, 2015?     13:57
6     A.  I have it.                      13:57
7        MR. ROZYNSKI:  Do you want to     13:57
8     make a copy?                       13:57
9     A.  One moment, please.             13:58
10        MR. HALLER:  Let the record     13:58
11     reflect that the witness is showing what     13:58
12     looks to be a learner permit commercial     13:58
13     driver which he has pulled from his     13:58
14     pocket and this has an expiration date     13:58
15     of confirm of January 2, 2016.     13:58
16     A.  It says January 2, 2016 and that's     13:58
17  the final date on it.  I'm not able to renew for     13:58
18  a third time after that, and if I would like to,     13:58
19  I have the knowledge that I have to take the     13:58
20  test all over again.  The policy only permits     13:58
21  for two years.                        13:58
22  BY MR. HALLER:                         13:58
23     Q.  And when did you renew or extend the     13:59
24  license that has been produced on Exhibit 11?     13:59
25     A.  I mean, it is according to this.  So     13:59

Page 116

1  I was there January 2, 2015.  Because I knew I     13:59
2  had to get it before that date.  And I went to,     13:59
3  I went to the DMV and I just asked to renew     13:59
4  this, because I knew that it was going to be     13:59
5  expiring on the 9th, so they allowed me to do     13:59
6  that, and the date was 2016, January 2nd.     13:59
7     Q.  Can I take a look at it?         13:59
8     A.  Do you want to copy it?          13:59
9     Q.  We may.  I just want to see if we     14:00
10  can continue.  Why don't you please keep that     14:00
11  out.  First of all, if we could go to, just go     14:00
12  to the second page, PLA 15 of Exhibit 11.     14:00
13        Do you see that there are some     14:00
14  restrictions on this license?  It says     14:00
15  "Corrective lenses," and then it says "Hearing     14:00
16  and/or full hearing aid or full-view mirror," is     14:00
17  that right?                           14:00
18     A.  Yes, well that was when I was     14:01
19  younger.  It was mandated that you had to have a     14:01
20  full-view mirror.  That's no longer required     14:01
21  anymore.  You can use a regular standard mirror     14:01
22  nowadays.  My eyesight is very good.  I'm not     14:01
23  legally blind or anything like that.  Back at     14:01
24  the earlier times it was required in order to     14:01
25  get acclimated in order to get to drive and     14:01

Page 117

1  develop your skills.  It is no longer required     14:01
2  anymore.  That's a myth that deaf people need to     14:01
3  continue to use a long view mirror.  That's not     14:01
4  the case anymore.                      14:01
5     Q.  So, I'm not looking at whether it is     14:01
6  right or wrong or misperception.  This is a     14:01
7  restriction on your license, right?     14:01
8     A.  Yes, it is.                     14:01
9     Q.  Okay.                          14:01
10     A.  But if I were to be, you know, if I     14:01
11  were confronted by a police officer and stuff     14:01
12  like, it is not an offense when they cite you     14:01
13  with a ticket or anything like that.     14:01
14     Q.  Well, your answer is with respect to     14:01
15  the Class A license, correct?         14:02
16     A.  No, it is necessary for the Class A     14:02
17  license.  Like I said, not everybody needs a     14:02
18  long-view mirror.  If you have a blind spot in     14:02
19  the back where you can't see, that's what     14:02
20  they're basically used for.  Depending if you're     14:02
21  using a wide vehicle or something like that.  It     14:02
22  depends on     14:02
23  what kind of a truck you're driving.  In certain     14:02
24  types of trucks it would be mandatory.  For some     14:02
25  of the vehicles that don't have a back window it     14:02



Page 118

```
 1    is not required.  And it is quite common, it is     14:02
 2    a common practice in tractor-trailer drivers by     14:02
 3    deaf people.                                        14:02
 4        Q.  I'm not sure I'm following any of           14:02
 5    this.  Right now my questions are going to          14:02
 6    what's on the license and I may come to what the    14:02
 7    rules and regulations are, but I'm not yet          14:02
 8    there.                                              14:02
 9        So, can we just agree that there is             14:03
10    a restriction on your license that includes         14:03
11    hearing aid or full-view mirror?                    14:03
12        A.  Yes, it does say that.                      14:03
13        Q.  And then if we go to the renewed            14:03
14    license, am I correct that it says                  14:03
15    "Hearing aid/full-view mirror"?                     14:03
16        A.  It does.                                    14:03
17        Q.  Okay.                                       14:03
18        Now, did you talk to anybody in the            14:03
19    licensing department of New York State to           14:03
20    understand what those restrictions meant?           14:03
21        A.  No, I didn't.                               14:03
22        Q.  Okay.                                       14:03
23        So, when you're describing, as you             14:03
24    did a minute or so ago your understanding of the   14:03
25    need to have or the lack of a need to have a       14:03
```

Page 119

```
 1    full-view mirror, is that just based on what you    14:03
 2    believe or is that based on something specific      14:04
 3    that you have discovered from government            14:04
 4    regulation?                                         14:04
 5        MR. ROZYNSKI:  Objection to form.             14:04
 6        You can answer.                                 14:04
 7        A.  Yes, I know that it was something           14:04
 8    that was enforced in the past back in '85.  It      14:04
 9    is not enforced anymore.  So they don't require     14:04
10    that anymore.  I know that for a fact.  It          14:04
11    hasn't been changed on the books.                   14:04
12    BY MR. HALLER:                                      14:04
13        Q.  Well, do you know why the New York         14:04
14    State DMV is still putting those restrictions on    14:04
15    your license?                                       14:04
16        A.  I have no idea.                             14:04
17        Q.  Okay.                                       14:04
18        MR. HALLER:  I'm going to show               14:05
19        you a document we'll mark as Exhibit 12.     14:05
20        (Copy of State of New York             14:05
21        Department of Motor Vehicles            14:05
22        Abstract of Driver Record was marked    14:05
23        as Defendant's Exhibit 12 for          14:05
24        identification, as of this date.)      14:05
25        MR. ROZYNSKI:  Is there a copy         14:05
```

Page 120

```
 1        for me?                                      14:05
 2        MR. HALLER:  Yes.                          14:05
 3    BY MR. HALLER:                                     14:05
 4        Q.  This is another document that was        14:05
 5    produced by you in response to the document        14:05
 6    requests.  Am I correct this is an abstract of     14:05
 7    your driver records showing conviction for a       14:05
 8    traffic offense, disobeying a traffic, it looks    14:05
 9    like DMV.                                          14:06
10        Do you know what that was about?             14:06
11        A.  Well, it is it was not a driving          14:06
12    it wasn't a speeding ticket or anything.  Not a    14:06
13    moving violation.  What happened, I didn't         14:06
14    realize or notice when we talk about the yellow    14:06
15    lines on the street, I crossed, I had crossed      14:06
16    over there at a stop on a corner.  I was waiting   14:06
17    for the pedestrians to cross.  I was a little      14:06
18    rolled into that little yellow spot there.  And    14:06
19    so, that's a fineable offense when you cross       14:06
20    over into that crosswalk road.  When the officer   14:07
21    came to me, I explained I was hearing impaired.    14:07
22    I asked the officer -- I was trying to explain     14:07
23    to the officer what was the matter.  He was        14:07
24    trying to, you know, gesture to me that he         14:07
25    needed my license and registration and he was     14:07
```

Page 121

```
 1    explaining to me that this is a ticket that you     14:07
 2    can get because you're over the yellow line.  So    14:07
 3    I wasn't aware of it at that time.  So he did       14:07
 4    give me a ticket for that because that yellow       14:07
 5    line is a no crossover zone.  A vehicle can't be    14:07
 6    in that boxed zone when you're at a stop.           14:07
 7        Q.  Have you ever received a citation          14:07
 8    for a moving violation?                             14:07
 9        A.  Never.                                      14:07
10        Q.  Okay.                                       14:07
11        MR. HALLER:  I'm going to show               14:07
12        you a batch of documents that we'll mark    14:07
13        as Exhibit 13.                               14:07
14        (Documents which relate to             14:07
15        communications with the Federal        14:07
16        Motor Carrier Safety Administration    14:07
17        was marked as Defendant's Exhibit 13   14:07
18        for identification, as of this         14:07
19        date.)                                 14:07
20        MR. HALLER:  Defendant's             14:08
21        Exhibit 13.                                  14:08
22    BY MR. HALLER:                                     14:08
23        Q.  Mr. Frilando, this batch of             14:08
24    documents that we have marked as Exhibit 13 are    14:08
25    the documents that you produced, again that are   14:08
```



Page 122

1    contained in Exhibit 8, which relate to          14:08
2    communications with the Federal Motor Carrier      14:08
3    Safety Administration.                              14:08
4         Do you recognize these documents?        14:08
5    A.  I do.  I do.                    14:08
6    Q.  I would like to quickly go through      14:09
7    them if that's acceptable with you?            14:09
8    A.  Sure.                      14:09
9    Q.  So, first of all, we have a first      14:09
10   page which is marked PLA 37.  We have a letter    14:09
11   from Mr. Minor, Associate Administrator for        14:09
12   Policy at the Federal Motor Carrier Safety        14:09
13   Association notifying you of the decision to      14:09
14   grant a limited 90-day waiver from 49 CFR        14:09
15   39.41(b)(11).                    14:09
16        Do you see that?                14:09
17   A.  Yes, I do.                    14:09
18   Q.  And this waiver was valid from      14:09
19   January 14, 2015 until midnight on April 14,      14:09
20   2015, is that right?                14:09
21   A.  That is correct, yes.            14:09
22   Q.  Do you see at the end of the second      14:10
23   paragraph, the last sentence, could you read      14:10
24   that?                      14:10
25        INTERPRETER MARTINEZ:  Do you      14:10

Page 123

1         want him to cite that?  You said you      14:10
2         want him to read it.  Do you want him to      14:10
3         cite it?                  14:10
4    BY MR. HALLER:                    14:10
5    Q.  No, have you read it?              14:10
6    A.  I have read it.              14:10
7    Q.  Could you, as I asked you before,      14:10
8    could you just relay back what you are reading      14:10
9    there?                      14:10
10        INTERPRETER MARTINEZ:  His      14:10
11        interpretation of it or verbatim?      14:10
12        MR. HALLER:  Verbatim.            14:10
13   A.  Yes, it says "You must comply with      14:10
14   all other applicable Federal Safety requirements    14:10
15   and any state laws and regulations that are not    14:11
16   preempted by this federal waiver."          14:11
17   Q.  So did you understand that that      14:11
18   meant that other than the waiver from the      14:11
19   section that's referenced in this document, that    14:11
20   you would have to make sure that you met all the    14:11
21   other requirements that are in the federal      14:11
22   regulations?                    14:11
23   A.  Yes, I do.                14:11
24   Q.  Okay.                    14:11
25        And do you understand that the      14:11

Page 124

1    waiver relates to the Forced Whisper hearing      14:11
2    test that's part of the medical examiner      14:11
3    requirements in normal circumstances for the      14:11
4    granting -- for obtaining a license?          14:11
5         MR. ROZYNSKI:  Objection to form.      14:12
6    A.  I do.                    14:12
7    BY MR. HALLER:                    14:12
8    Q.  And did you understand that other      14:12
9    than this being a waiver of that requirement,      14:12
10   the Forced Whisper test, that in order to be      14:12
11   qualified to drive a commercial motor vehicle      14:12
12   you had to meet all of the other requirements in    14:12
13   the regulation?                  14:12
14        MR. ROZYNSKI:  Objection to form.      14:12
15   A.  Yes.                    14:13
16   BY MR. HALLER:                    14:13
17   Q.  Okay.                    14:13
18        And we're going to get to this      14:13
19   probably in order, but as you later learned, one    14:13
20   of those requirements was that you get a medical    14:13
21   certification from a physician who was on the      14:13
22   national registry at the time, right?        14:13
23   A.  Yes.  I do.                14:13
24   Q.  Okay.                    14:13
25        And if we go to the second page of      14:13

Page 125

1    this document, on PLA 38, this is a document      14:13
2    that sets out the terms of the waiver, is that      14:13
3    correct?                    14:13
4    A.  Yes.                    14:13
5    Q.  And if you look under regulatory      14:13
6    provisions, you would agree, would you not, that    14:14
7    it says "This waiver is limited to the      14:14
8    requirements of 49 CFR 391.41B-11"?          14:14
9    A.  Yes.                    14:14
10        I see that.                14:14
11   Q.  And then it goes on to describe that    14:14
12   section by saying and I'm going to quote which    14:14
13   states "That a person is physically qualified to    14:14
14   drive a commercial motor vehicle if that person    14:14
15   first perceives a Forced Whispered voice in the    14:14
16   better ear not less than five feet with or      14:14
17   without the use of a hearing aid or if tested by    14:14
18   use of an audiometric device does not have an      14:14
19   average hearing loss in the better ear greater      14:14
20   than 40 decibels at 500 hertz, 1,000 hertz, and    14:14
21   2000 hertz with or without a hearing aid when      14:14
22   the audiometric device is calibrated to the      14:14
23   American National Standard."            14:15
24        That's what it says, correct?      14:15
25   A.  Yes, that's what it says.          14:15



32  (Pages 122 to 125)

Page 126

```
 1      Q.  Okay.                      14:15
 2      A.  But mind you, when I had the waiver,   14:15
 3  I went to the doctor.  I showed the doctor this.   14:15
 4  And I gave that document and we proceeded with   14:15
 5  the physical.  And he says no you have to take   14:15
 6  this hearing test, but I couldn't hear.  And I   14:15
 7  explained that, so I did that take that with   14:15
 8  that special apparatus that you were speaking   14:15
 9  about that was used for that test.  So I did   14:15
10  undergo that, but without that, I wouldn't be   14:15
11  able to hear anything.  But the test that they   14:15
12  gave me with the apparatus that they gave me, I   14:15
13  was able to hear it and I did pass it.   14:15
14      MR. ROZYNSKI:  I want to ask the   14:15
15  interpreters to reinterpret Mr.   14:15
16  Frilando's testimony.  I don't believe   14:15
17  it was correct.  So you can ask the   14:15
18  question again, and if you reinterpret,   14:15
19  I don't believe the way Mr. Frilando   14:15
20  said it was interpreted correctly.   14:16
21      MR. HALLER:  I thought my   14:16
22  question --                        14:16
23      INTERPRETER MARTINEZ:  It may not   14:16
24  have been clear for me as the   14:16
25  interpreter.                       14:16
```

Page 127

```
 1      MR. HALLER:  I thought my   14:16
 2  question was that I quoted the language   14:16
 3  and then I asked if that's what it said.   14:16
 4      Could we read it back?  I don't   14:16
 5  know if we have to read the whole quote.   14:16
 6      (Record read.)                  14:16
 7  BY MR. HALLER:                      14:16
 8      Q.  It says "With or without," isn't   14:16
 9  that what it says there?  It says, if you look   14:16
10  on the last sentence, it says "With the -- with   14:16
11  or without a hearing aid."  That's what it says.   14:16
12      A.  Yes, that's what it says.    14:17
13      Q.  Okay.                       14:17
14      MR. ROZYNSKI:  Okay.            14:17
15  BY MR. HALLER:                      14:17
16      Q.  And I was really trying to establish   14:17
17  a point, which is, so, when I asked you in   14:17
18  regard of Mr. Minor's letter, if you understood   14:17
19  that their waiver was limited to the specific   14:17
20  section of the code of regulation related to the   14:17
21  Forced Whisper, that was actually stated in the   14:17
22  terms of the waiver, right?               14:17
23      A.  Yes.                        14:17
24      Q.  If we go to the next document, PLA   14:17
25  39, am I correct that this is a correspondence   14:17
```

Page 128

```
 1  from Mr. Minor again related to an exemption, a   14:18
 2  two-year exemption that you obtained on or   14:18
 3  around March 29, 2015?               14:18
 4      A.  Yes.                        14:18
 5      Q.  Then, am I correct that that   14:18
 6  exemption as it says in the first paragraph of   14:18
 7  the letter, again, is the exemption from the   14:18
 8  hearing regulation of 49 CFR 391.41B-11?   14:18
 9      A.  Yes.                        14:18
10      Q.  Okay.                       14:18
11      And then, in the second section,   14:19
12  sorry, let me withdraw that.         14:19
13      In the second paragraph, No. 2 of   14:19
14  the letter, Mr. Minor instructs that you must   14:19
15  keep the exemption and a copy of the medical   14:19
16  examiner's certificate on your person while   14:19
17  operating a CMV, is that right?      14:19
18      A.  Yes, that is correct.  By law, I'm   14:19
19  required to carry that in my possession, yes.   14:19
20      Q.  And then, if we go to PLA 41.  This   14:19
21  is a copy of the hearing exemption, is that   14:19
22  right?                             14:19
23      A.  Yes, that's correct.         14:20
24      Q.  And then, it actually -- at the top   14:20
25  it has the title Hearing Exemption and   14:20
```

Page 129

```
 1  underneath in brackets it says from the   14:20
 2  requirements 49 CFR 391.41B-11, correct?   14:20
 3      A.  Yes.                        14:20
 4      Q.  Then, if we go to PLA 43, this is   14:20
 5  something we've alluded to earlier, which is   14:20
 6  correspondence from Elaine Papp, Chief of the   14:20
 7  Medical Programs Division of the Federal Motor   14:20
 8  Carrier Safety Administration, advising you that   14:20
 9  the Federal Motor Carrier Safety Association   14:21
10  required a completed medical examination and   14:21
11  certificate?                       14:21
12      Do you agree with that?          14:21
13      A.  Yes, I do.                   14:21
14      Q.  Now, for some reason, this letter or   14:21
15  this copy of the letter is not date stamped.   14:21
16      Do you see that?                 14:21
17      A.  Yes, it was just a letter.  When I   14:21
18  received it, you know, I made sure to have it   14:21
19  filled out after my physical exam and have a   14:21
20  copy made and then sent one of the copies off to   14:21
21  FMCA.  So there wasn't any stamping in that   14:21
22  process.  The waiver did require a date stamp,   14:21
23  but this was a physical examination and once I   14:21
24  had that examination completed, I made a copy of   14:21
25  this and sent it off to the office.   14:21
```



Page 130

```
1       Q.  Well, can we agree that this letter    14:22
2    from Elaine Papp came after the letter that Mr.    14:22
3    Minor sent you some time in the end of March    14:22
4    2015?                          14:22
5       MR. ROZYNSKI:  Objection to form.    14:22
6       You can answer.                 14:22
7       A.  Do you mind just repeating that    14:22
8    again?                         14:22
9    BY MR. HALLER:                    14:22
10      Q.  I mean, it is the way it is    14:22
11   presented chronologically, but I just want to    14:22
12   confirm on the record that the letter from    14:22
13   Elaine Papp was sent after you received the    14:22
14   letter from Mr. Minor enclosing the hearing    14:22
15   exemption that was sent around March 30, 2015?    14:22
16      MR. ROZYNSKI:  Objection to form.    14:22
17      A.  I had received this before the    14:23
18   waiver.  The reason being is that I had to go    14:23
19   through a physical examination first and I was    14:23
20   told that that process would take about one or    14:23
21   two months and then I would receive a new 90-day    14:23
22   waiver.  So this letter was first and then the    14:23
23   letter from Mr. Minor was second.    14:23
24   BY MR. HALLER:                    14:23
25      Q.  Okay.                     14:23
```

Page 131

```
1       Then, did you understand, though,    14:23
2    that in order to complete the process, you    14:23
3    needed to complete the medical from somebody on    14:23
4    the national registry?             14:23
5       A.  Yes.                      14:23
6       Q.  That was necessary to validate the    14:23
7    exemption so that you could move forward with    14:23
8    your training?                   14:23
9       A.  I knew that if I passed a physical    14:24
10   examination I had to make a copy.  I would send    14:24
11   it off.  I would get approved and then I could    14:24
12   get the waiver.  I understood that.  That that    14:24
13   was the order.                   14:24
14      Q.  Okay.                     14:24
15      A.  I knew that there was a physical    14:24
16   examination required first.  I had to be    14:24
17   verified to pass that and then I would receive a    14:24
18   90-day waiver and then get the two year.  So I    14:24
19   knew that the examination was before the waiver.    14:24
20      Q.  I understand, but as you explained    14:24
21   earlier in the deposition, you learned through    14:24
22   Ms. Papp that you needed to get a medical    14:24
23   certification from a medical examiner on the    14:24
24   national registry, right?          14:24
25      A.  I think I follow now.  When I    14:24
```

Page 132

```
1    received this letter I had just went straight to    14:25
2    my primary.  And I didn't realize that I needed    14:25
3    to have a DOT, if you will, approved doctor.    14:25
4    And I knew in order to get the waiver, I needed    14:25
5    to have a physical examination.  So then my    14:25
6    mother called in to clarify and to get a list of    14:25
7    the doctors that were approved.  I realized that    14:25
8    my doctor wasn't on that list and I then made    14:25
9    the decision in order to make sure that I got a    14:25
10   doctor who has medical exemption status, and so,    14:25
11   then I made sure to go to that appointment.  I    14:25
12   got this form filled out.  I had a physical    14:25
13   examination, an eye examination, an audio    14:25
14   examination.                     14:25
15      Hold on, let me backtrack just a    14:25
16   little bit.  When I received the hearing waiver    14:25
17   with the two-year term, I had shown that to my    14:25
18   doctor to get the approval.  I went through the    14:25
19   physical examination.  Passed.  And then the    14:25
20   doctor sent a letter to FMCSA to verify my name    14:25
21   had gone through the process to send it off to    14:26
22   the federal government to have that process    14:26
23   completed, and at the doctor's office they told    14:26
24   me to keep a copy for my own records.  So I made    14:26
25   sure to do that.  So then I sent this off to    14:26
```

Page 133

```
1    FMCSA to have this process completed.    14:26
2       Q.  I'm not sure I fully followed that.    14:26
3    Again, I'm just picking up on what you said    14:26
4    earlier in the deposition.  So, at some point in    14:26
5    this process you learned that you needed a    14:26
6    medical certification from Dr. Yu, not Dr.    14:26
7    Marino, because he wasn't on the approved    14:26
8    registry, right?                 14:26
9       A.  So my primary doctor isn't under    14:27
10   that approved list of the FMCSA and when I had    14:27
11   tried to pursue that process, I then from Elaine    14:27
12   found out that I needed to have a doctor who was    14:27
13   approved.  I went through the search.  Found out    14:27
14   that there was somebody in my area who was    14:27
15   approved.  Called in to make sure they were, in    14:27
16   fact, approved.  They verified that.  So then I    14:27
17   brought in my paperwork.  Showed them the waiver    14:27
18   that I had for the two-year status.  We went    14:27
19   through the physical exam.  I passed.  And then    14:27
20   my information was put into the federal system.    14:27
21   I don't know the official term of that.  Then I    14:27
22   understood that it was sent off to FMCSA, and    14:27
23   admittedly, when I did the first physical    14:27
24   examination, I didn't realize that I had to    14:27
25   start over again and I was told that by the    14:27
```



Page 134

1  doctor, Dr. Yu, that I should have a copy of      14:27
2  these papers in my office because everything      14:28
3  that the doctor touches is going to go straight   14:28
4  to the FMCSA office, and so I held on to this.     14:28
5       Q.  All right.                              14:28
6       So thank you very much, and so, I          14:28
7  think that clarifies.  Where I was really trying  14:28
8  to go with my original question and sort of went  14:28
9  off on a little bit of a tangent, I think we      14:28
10  have come back is, to try and ascertain when in   14:28
11  the process of getting the exemption from FMCSA   14:28
12  that Elaine Papp told you that you needed to get  14:28
13  a proper medical certification from somebody      14:28
14  other than Dr. Marino in order to validate this   14:28
15  entire process.  When did she tell you that?      14:28
16       A.  So I had seen Dr. Marino.  Filled       14:29
17  out the paperwork.  Sent it in.  A year passed.   14:29
18  I didn't hear anything.  I knew I was supposed    14:29
19  to hear within 90 days, and so then I believe it  14:29
20  was an e-mail contact, but I can't verify that a  14:29
21  hundred percent, but I had contacted Elaine       14:29
22  asking for the status.                            14:29
23       I was told she was retired.  And           14:29
24  that I would be referred to this woman Cindy.  I  14:29
25  spoke to Cindy explaining I hadn't heard a        14:29

Page 135

1  response.  I hadn't gotten my waiver.  So then I   14:29
2  contacted NAD in an e-mail and I had their         14:29
3  support in contacting the office to find out       14:30
4  what the status of my waiver.                      14:30
5       I then got a response with my waiver         14:30
6  and I had the two-year extension.  Cindy           14:30
7  informed me that I had to start all over again     14:30
8  to, in fact, see a DOT recognized -- national      14:30
9  registry recognized doctor.  I went through the    14:30
10  evaluation.  I passed.  Showed my two-year         14:30
11  waiver.  Everything was fine.  Then, the           14:30
12  paperwork as I mentioned was sent in.  And Cindy   14:30
13  informed me that I would be getting a two-year     14:30
14  waiver after this waiver that's in this packet,    14:30
15  and so I had to hear back and then eventually      14:30
16  get my two-year waiver.                            14:30
17       Q.  So, you were told that, in fact,        14:30
18  once you did the proper medical, you would get a   14:30
19  new version of the two-year waiver?               14:31
20       A.  I was told that I would receive it      14:31
21  later.  They told me with the expiration of        14:31
22  March 2017, I would get a new two year with the    14:31
23  second doctor, but they told me that that was an   14:31
24  issue that would be on hold.                       14:31
25       Q.  So, the last two pages of this          14:31

Page 136

1  document relate to authorize for release of        14:31
2  information.                                        14:32
3       Do you see that's your signature            14:32
4  dated July 30, 2015?                               14:32
5       A.  Yes, that is my signature, yes.          14:32
6       Q.  Does that date help refresh your        14:32
7  recollection as to when it was that you were in    14:32
8  conversation with the Federal Motor Carrier        14:32
9  Safety Administration about getting the correct    14:32
10  medical to support your waiver?                    14:32
11       A.  If fits my recollection.                14:32
12       Q.  Sorry?                                  14:32
13       A.  It fits my recollection.                14:32
14       Q.  Okay.                                   14:32
15       So that's about the right timing, is       14:32
16  that right?                                        14:32
17       A.  Yes, yes.                               14:32
18       Q.  So why don't we just pursue this for    14:32
19  a minute.  Let me show you two documents we'll     14:32
20  mark as 14 and 15.                                 14:32
21       (Original Medical Examiner's               14:32
22       Certificate obtained from Dr. Marino       14:32
23       was marked as Defendant's Exhibit 14       14:32
24       for identification, as of this             14:32
25       date.)                                     14:32

Page 137

1       (Medical Examiner's                         14:32
2       Certificate obtained by Dr. Yu was         14:32
3       marked as Defendant's Exhibit 15 for       14:32
4       identification, as of this date.)          14:32
5       THE WITNESS:  Thank you.                    14:33
6  BY MR. HALLER:                                      14:33
7       Q.  Mr. Frilando, I put before you what     14:33
8  we have marked as Defendant's Exhibits 14 and      14:33
9  15.  So, can we agree on the record that           14:33
10  Defendant's Exhibit 14 is the Original Medical     14:33
11  Examiner's Certificate that you obtained from      14:34
12  Dr. Marino, is that right?                         14:34
13       A.  Yes, but I didn't realize that he       14:34
14  wasn't DOT certified.                              14:34
15       Q.  Okay.  I understand that.               14:34
16       So, as a result, based on the              14:34
17  conversations you had with the Federal Motor       14:34
18  Carrier Safety Administration, you ended up        14:34
19  trying to correct the problem of not having        14:34
20  somebody who was on the registry by going to Dr.   14:34
21  Yu, and the certificate from Dr. Yu is what is     14:34
22  before you as Defendant's Exhibit 15, is that      14:34
23  correct?                                           14:34
24       A.  Yes.                                    14:34
25       Q.  Okay.                                   14:34



Page 138

```
1        A.  You can see the stamp there for DOT      14:34
2    approval.  Whereas, Dr. Marino's doesn't have    14:34
3    that kind of qualification.  So you can see the  14:35
4    difference in their qualifications in that sense 14:35
5    by the stamp.                                    14:35
6        Q.  The stamp is under Dr. Yu's name on      14:35
7    the right-hand side of the document?             14:35
8        A.  It does, yes, and you can see that       14:35
9    it is absent from Dr. Marino's certification.    14:35
10   So now I see the difference.                     14:35
11       Q.  Right.  Okay.                            14:35
12           And then the designation is at the       14:35
13   bottom, NRCME, which stands for National         14:35
14   Registry --                                      14:35
15           MR. CONNELLY:  National.                 14:35
16   BY MR. HALLER:                                   14:35
17       Q.  -- Certified Medical Examiner, is        14:35
18   that right, if you know?                         14:35
19       A.  I don't know what that signifies.        14:35
20       Q.  Okay.                                    14:35
21       I'll represent to you that that's            14:35
22   the designation.  So, this is the, this is the   14:35
23   certificate you then got from Dr. Yu that we     14:35
24   have been discussing, right?                     14:35
25       A.  Yes.                                     14:36
```

Page 139

```
1        Q.  Okay.                                    14:36
2            And can we agree on the record that      14:36
3    the date that you got the certificate from Dr.   14:36
4    Yu was on July 30, 2015?                         14:36
5        A.  Yes.                                     14:36
6        Q.  Okay.                                    14:36
7            And that corresponds with the date       14:36
8    of the medical authorization form to the FMCSA   14:36
9    that you signed and was on the back of           14:36
10   Exhibit 13?                                      14:36
11       A.  It does.                                 14:36
12       Q.  Okay.  Okay.                             14:36
13       A.  Yes, basically once my exam had          14:36
14   finished, I signed this form and had copies made 14:36
15   for myself, and then sent off to the office.     14:36
16   That way I could insure a speedy process.        14:37
17       Q.  Okay.                                    14:37
18           So as of the date that you got this      14:37
19   signed you were kind of good to go with your     14:37
20   qualifications, right?                           14:37
21           MR. ROZYNSKI:  Objection to form.        14:37
22       You can answer.                              14:37
23       A.  Yes, this is a certification that I      14:37
24   needed in order to go to training school.  So as 14:37
25   far as I understood, I had ready everything.     14:37
```

Page 140

```
1    BY MR. HALLER:                                   14:37
2        Q.  Okay.                                    14:37
3            Could we go to the next document,        14:37
4    which we'll mark as Exhibit 16.                  14:37
5            (Report of HearUSA dated                 14:37
6            2/18/2013 was marked as Defendant's      14:37
7            Exhibit 16 for identification, as of     14:37
8            this date.)                              14:37
9    BY MR. HALLER:                                   14:37
10       Q.  Do you recognize this to be a report     14:38
11   from HearUSA on the audiology examination that   14:38
12   was done sometime in September of 2013?          14:38
13       A.  Yes.                                     14:38
14       Q.  And do you recall this was done at       14:38
15   the request of Dr. Marino as part of what he     14:38
16   believed the process should be for the           14:38
17   certification, medical certification with        14:38
18   respect to your CDL driver permit?               14:38
19           MR. ROZYNSKI:  Objection to form.        14:38
20       You can answer.                              14:38
21       A.  No.                                      14:39
22   BY MR. HALLER:                                   14:39
23       Q.  No, what was this then?                  14:39
24       A.  Well, I took the initiative to go on     14:39
25   my own to get this exam.  I also because my      14:39
```

Page 141

```
1    hearing aids were old and I wanted to check on   14:39
2    them.  I needed them replaced.                   14:39
3        Q.  Okay.                                    14:39
4        A.  And then when I saw Dr. Yu, the one      14:39
5    who was certified, I asked do I need to have an  14:39
6    audiology exam, and Dr. Yu told me I don't need  14:39
7    to have an examination.                          14:39
8        Q.  So you didn't have another test done     14:39
9    after September 2013?                            14:39
10       A.  No, I also had the two-year waiver       14:40
11   and two-year exemption, so I was told that I     14:40
12   don't need that.  So Dr. Yu said there was no    14:40
13   need.                                            14:40
14       Q.  Okay.                                    14:40
15           Just so the record is clear, when I      14:40
16   said another test, I meant audiology test,       14:40
17   hearing test, just to make sure that's           14:40
18   understood?                                      14:40
19           MR. ROZYNSKI:  Object to the             14:40
20       form.                                        14:40
21       A.  Correct.  And I didn't have any.         14:40
22           MR. HALLER:  I'm going to show           14:40
23       you a batch of documents that we'll mark     14:40
24       as Defendant's Exhibit 17.                   14:40
25           (Compilation of documents                14:40
```



Page 142

```
1          which includes a letter and subpoena    14:40
2      from Blank Rome, LLP was marked as          14:40
3      Defendant's Exhibit 17 for            14:40
4      identification, as of this date.)     14:40
5   BY MR. HALLER:                    14:40
6      Q.  Mr. Frilando, I have given you this    14:41
7   batch of documents which we have marked for the    14:41
8   record as Defendant's Exhibit 17.  I'll      14:41
9   represent to you that this set of documents      14:41
10  includes a letter, a subpoena that was sent from    14:41
11  our office.                      14:41
12          INTERPRETER MARTINEZ:  Hold on    14:41
13      one second, please.            14:41
14      A.  Okay.              14:42
15  BY MR. HALLER:                    14:42
16      Q.  So, Mr. Frilando, I'll represent to    14:42
17  you that this batch of documents which we marked    14:42
18  as Defendant's Exhibit 17 represents a letter    14:42
19  from our office, from Mr. Connelly, a subpoena,    14:42
20  and then an authorization from you, and then    14:42
21  records from Dr. Marino and his office related    14:42
22  to your medical consultations with Dr. Marino.    14:42
23  Just so it is clear what this is.        14:42
24      A.  Yes.              14:42
25      Q.  And were you generally aware that    14:42
```

Page 143

```
1   the defendant had requested these records from    14:42
2   Dr. Marino?                     14:42
3      A.  I do.              14:43
4      Q.  Okay.              14:43
5          So I have a few questions about    14:43
6   them.                      14:43
7          Unfortunately, they're not numbered,    14:43
8   so we'll have to just work through.  But I would    14:43
9   like to go to the medical record itself that    14:43
10  appears after.  This is a document that has in    14:43
11  big type at the top, Jamaica Hospital Medical    14:43
12  Center, and then I want to go to the next page.    14:43
13  Okay.                      14:43
14          So if you go to the next page, it    14:43
15  appears that you had a visit with Dr. Marino    14:43
16  based on his electronic signature on this    14:44
17  document appears to be around or about December    14:44
18  12, 2012.                      14:44
19          Do you see that date that's on    14:44
20  various places in this document?          14:44
21      A.  Yes, I do.            14:44
22      Q.  And do you see that there's a    14:44
23  diagnosis of three things, A-Fib, sleep apnea    14:44
24  and BRBPR?                    14:44
25      A.  I do.              14:44
```

Page 144

```
1      Q.  Okay.              14:44
2          And I don't need to at this point    14:44
3   get into the reasons why you went to see him at    14:44
4   this point, but I want to focus on the      14:44
5   diagnosis.  It says under overview "Will refer    14:44
6   to sleep apena clinic."              14:44
7          Do you see that?          14:45
8      A.  No, I never went to a sleep apena    14:45
9   clinic.                      14:45
10     Q.  Understood.            14:45
11         Do you see, though, he says "refer    14:45
12  to"?                      14:45
13     A.  No, I see what it says, but I never    14:45
14  went.                      14:45
15     Q.  If you go to the next page, there's    14:45
16  a block that says "Progress notes," and then    14:45
17  there's a paragraph underneath.  Are you      14:45
18  following me?  Maybe it is two pages.  It is two    14:45
19  pages over, the next page.            14:45
20     A.  I see the progress notes.  Go ahead.    14:45
21     Q.  So, just before I get to the    14:45
22  progress notes, by way of information, when you    14:45
23  went to see Dr. Marino, was your brother with    14:45
24  you to help interpret?              14:46
25     A.  Yes, he was.            14:46
```

Page 145

```
1      Q.  Okay.              14:46
2          And generally when you went to see a    14:46
3   physician, did you need someone to be a sign    14:46
4   language interpreter?              14:46
5      A.  Yes, I do.  My brother guesses a    14:46
6   lot.  He's not a fluent signer/interpreter.  He    14:46
7   guesses a little bit.  I'm able to understand    14:46
8   what he says a little bit.            14:46
9      Q.  If you look under the progress notes    14:46
10  it says that you were diagnosed with A-Fib.    14:46
11  That you had --                  14:46
12     A.  I don't even know what "A-Fib"    14:46
13  means.                      14:46
14     Q.  Okay.              14:46
15         That you had had three bouts of    14:46
16  rectal bleeding with no pain and that you had a    14:46
17  third problem of sleep apnea.          14:46
18         Do you see that?          14:46
19     A.  Yes, I see that.          14:47
20     Q.  Okay.              14:47
21         And do you recall discussing those    14:47
22  three issues with Dr. Marino during this visit?    14:47
23     A.  I do.              14:47
24     Q.  And did he recommend that you visit    14:47
25  a sleep apnea clinic?              14:47
```



Page 146

```
 1        A.  He did, but I wasn't able to make      14:47
 2   that schedule because I wasn't able to get there 14:47
 3   with my brother to make that appointment.  So    14:47
 4   when I went to see a cardiologist about my        14:47
 5   A-Fib, it wasn't necessary.  There was an         14:47
 6   adjustment in my sleeping habits.  We changed my  14:47
 7   pillow at home and that made a difference.        14:47
 8   Because I was sleeping improperly with my head    14:47
 9   up in a certain position under the old system I   14:47
10   was using with a different pillow, so when I      14:48
11   changed that, that corrected that.                14:48
12        Q.  Okay.                                    14:48
13            So I want to then go to the next         14:48
14   visit report, which is on 6/11/2013.  If you can  14:48
15   go forward several pages in the document if you   14:48
16   can find it.  It is okay.  I can help you.  It    14:48
17   might be quicker if I just help you.              14:48
18            INTERPRETER MARTINEZ:  Where are         14:48
19       you at so I can find it?                      14:48
20        A.  It is confusing.                         14:48
21            INTERPRETER MARTINEZ:  Very good.        14:49
22   BY MR. HALLER:                                    14:49
23        Q.  So this is a visit --                    14:49
24        A.  Hold on one second, please.             14:49
25        Q.  Okay.                                    14:49
```

Page 147

```
 1            Do you see under diagnosis it has        14:49
 2   history of A-Fibrillation?                        14:49
 3        A.  I see it.                                14:50
 4        Q.  Then if you go forward two pages,        14:50
 5   see there's progress notes, Lawrence J. Marino,   14:50
 6   M.D. at 6/11/2013, 11:52 a.m. continued.          14:50
 7   Do you see that?                                  14:50
 8        A.  Yes.                                     14:50
 9        Q.  And then I'm going to read what he       14:50
10   wrote in that paragraph that's under the patient  14:50
11   I.D.  "The patient is seeking clearance to be     14:50
12   able to get a CDL license.  He's deaf, but the    14:50
13   DOT now allows deaf drivers to obtain a CDL       14:50
14   license.  They must meet certain criteria from    14:51
15   an audiological standpoint.  The patient will     14:51
16   see the audiologist next week.  Also, the         14:51
17   patient was diagnosed with A-Fibrillation.  I     14:51
18   want the patient to be cleared by a               14:51
19   cardiologist prior to my certifying him."         14:51
20            Do you see that?                         14:51
21        A.  Yes.                                     14:51
22        Q.  So, first thing, Mr. Frilando, does      14:51
23   this note help refresh your recollection that it  14:51
24   was Dr. Marino that sent you to HearUSA to the    14:51
25   audiologist rather than you just doing that of    14:51
```

Page 148

```
 1   your own volition?                                14:51
 2        A.  I don't recall him telling me to go      14:51
 3   see an audiologist or anything like that.  You    14:51
 4   know, because I know if I would have got a        14:51
 5   prescription to go, I would have gone, but the    14:51
 6   doctor never told me about going there.  So I     14:51
 7   decided to go on my own, but I didn't get a       14:51
 8   prescription from him.  I wasn't instructed -- I  14:51
 9   don't recall him instructing me to go there.      14:52
10            After the physical was done, I went      14:52
11   over and showed that I had the audiology test.    14:52
12   I did that on my own accord.  Now, whether he     14:52
13   told me to do that, I don't recall that.  When I  14:52
14   went to have the audiogram, I brought that        14:52
15   paperwork and the results of that back to the     14:52
16   doctor.                                           14:52
17        Q.  And then, if you go to the next          14:52
18   page, there's an entry under plan, it says        14:52
19   "Patient to see audiologist next week for         14:52
20   evaluation and then patient to followup"?         14:52
21            INTERPRETER MARTINEZ:  Hold on           14:52
22       one second, please.  Okay.  Go ahead.         14:52
23   BY MR. HALLER:                                    14:52
24        Q.  "Patient to followup with his           14:52
25   cardiologist for cardiac clearance based on the   14:52
```

Page 149

```
 1   A-Fibrillation.  I will complete the physical     14:52
 2   form once the patient sees the above              14:52
 3   specialist."                                      14:52
 4            Do you see that?                          14:52
 5        A.  Yes, I recall that.                      14:52
 6        Q.  Okay.                                    14:52
 7            So did you go and see a                  14:52
 8   cardiologist?                                      14:52
 9        A.  I did.                                   14:53
10        Q.  All right.                               14:53
11        A.  Do you want anything else?  I'm          14:53
12   saying yes.  Did you need anything else from me   14:53
13   about that?                                       14:53
14        Q.  Yes.  Yes.                               14:53
15        A.  I'm sorry, I let you finish.             14:53
16        Q.  Okay.  Thank you.                        14:53
17            So we have asked a lot of questions      14:53
18   in terms of who -- I mean, one of the questions   14:53
19   in the interrogatories we went through            14:53
20   specifically, With whom you have any consulted    14:53
21   medically, any health care provider, doctor, and  14:53
22   we have other questions that would, I think,      14:53
23   elicit documents related to a cardiologist        14:53
24   visit.  So, yes I would like to know if you went  14:53
25   to a cardiologist, who that cardiologist was,     14:53
```



Page 150

| | |
|---|---|
| 1 | when the cardiologic examination was done and   14:53 |
| 2 | what --   14:53 |
| 3 | A.  Hold on.   14:53 |
| 4 | Q.  Let me finish, and what, if   14:53 |
| 5 | anything, you received from the cardiologist or   14:53 |
| 6 | Dr. Marino received from the cardiologist,   14:54 |
| 7 | because when I look at Dr. Marino's notes   14:54 |
| 8 | there's nothing from a cardiologist.  So could   14:54 |
| 9 | you explain that to me, please?   14:54 |
| 10 | MR. ROZYNSKI:  Objection to form.   14:54 |
| 11 | A.  I know that Dr. Marino asked me to   14:54 |
| 12 | go see the cardiologist.  I had a stress test   14:54 |
| 13 | done.  I walked on a treadmill.  I know they did   14:54 |
| 14 | tests on me.  Now, that doctor is supposed to   14:54 |
| 15 | submit that paperwork to Dr. Marino.  I can   14:54 |
| 16 | honestly say, you know, he did not give me any   14:54 |
| 17 | paperwork to give to Dr. Marino.  Okay.  So I   14:54 |
| 18 | can't account for that.  So, but normally when a   14:54 |
| 19 | specialist does that test and it is ordered by   14:54 |
| 20 | another doctor, he normally would send that.  If   14:54 |
| 21 | he gave me anything I would normally expect him   14:54 |
| 22 | to send that to the doctor and forward that   14:54 |
| 23 | information to him.   14:55 |
| 24 | BY MR. HALLER:   14:55 |
| 25 | Q.  And who was the doctor or what was   14:55 |

Page 151

| | |
|---|---|
| 1 | the office where you did the stress test?   14:55 |
| 2 | A.  I know it was done in Queens, New   14:55 |
| 3 | York.  I want to believe it was done in Howard   14:55 |
| 4 | Beach somewhere, but I'm not sure exactly where.   14:55 |
| 5 | I don't recall the doctor's name per se, but it   14:55 |
| 6 | was done at a facility in Howard Beach.   14:55 |
| 7 | Q.  Do you know when it was done?   14:55 |
| 8 | A.  I can't remember.  If I were to take   14:55 |
| 9 | a guess looking at this document, I would   14:55 |
| 10 | probably say, it was about three years ago.   14:55 |
| 11 | Less than three years ago.  To be honest with   14:55 |
| 12 | you, I really can't give you an exact date.  I   14:55 |
| 13 | really can't.  I really can't.  I'm sorry.   14:55 |
| 14 | Q.  Could you go back to Exhibit 15,   14:55 |
| 15 | please?   14:55 |
| 16 | So --   14:56 |
| 17 | A.  I have 15.   14:56 |
| 18 | Q.  Okay.   14:56 |
| 19 | So you recall you testified this is   14:56 |
| 20 | the certification from Dr. Yu, right?   14:56 |
| 21 | A.  Yes, that's correct.   14:56 |
| 22 | Q.  Okay.   14:56 |
| 23 | And if you go to the second page of   14:56 |
| 24 | that document.   14:56 |
| 25 | A.  Yes, I'm on that second page.   14:56 |

Page 152

| | |
|---|---|
| 1 | Q.  You see there is a health history   14:56 |
| 2 | that you personally completed, is that right?   14:56 |
| 3 | A.  I actually didn't check that off and   14:56 |
| 4 | complete that.  Actually, the doctor did that.   14:56 |
| 5 | I never checked this form off whatsoever.  I was   14:56 |
| 6 | asked questions.  I answered the questions.  And   14:56 |
| 7 | he checked off the forms.  He did the test and   14:56 |
| 8 | he checked off the appropriate blocks.   14:56 |
| 9 | Q.  All right.   14:56 |
| 10 | A.  I never touched it.   14:56 |
| 11 | Q.  So let me just make sure I   14:56 |
| 12 | understand it.  So you were there with Dr. Yu.   14:57 |
| 13 | He was asking you questions related to this   14:57 |
| 14 | health history and you gave him the answers and   14:57 |
| 15 | then he marked the boxes, is that right?   14:57 |
| 16 | MR. ROZYNSKI:  Objection to form.   14:57 |
| 17 | A.  That is correct.   14:57 |
| 18 | BY MR. HALLER:   14:57 |
| 19 | Q.  Okay.   14:57 |
| 20 | And during that examination, did you   14:57 |
| 21 | at any point tell him that you had had this   14:57 |
| 22 | diagnosis of A-Fibrillation?   14:57 |
| 23 | A.  No, I didn't mention it to Dr. Yu,   14:57 |
| 24 | but the doctor gave me some type of a -- there   14:57 |
| 25 | was a high blood pressure test, another type of   14:57 |

Page 153

| | |
|---|---|
| 1 | test that was done for my heart that he did with   14:57 |
| 2 | the stethoscope.  He checked that out.  I can't   14:57 |
| 3 | remember what I told him.  I can't remember the   14:57 |
| 4 | conversation we had, because it was three years   14:57 |
| 5 | ago, but I notified him that I was applying for   14:57 |
| 6 | my license.   14:58 |
| 7 | You know, but whether the fact I   14:58 |
| 8 | stated I have A-Fib or anything like that, I   14:58 |
| 9 | can't remember if I mentioned it to him or not.   14:58 |
| 10 | Like I said, it was a long time ago.  It was   14:58 |
| 11 | over three years ago.  You know, I had gone to a   14:58 |
| 12 | new doctor.  You know, I remember -- I don't   14:58 |
| 13 | remember if I mentioned that or not.   14:58 |
| 14 | Q.  And if you --   14:58 |
| 15 | A.  And if I overlooked it, it was an   14:58 |
| 16 | oversight -- if it was an oversight.   14:58 |
| 17 | Q.  Okay.   14:58 |
| 18 | And if you look at the right-hand   14:58 |
| 19 | box, there's a "yes" and "no" column, and the   14:58 |
| 20 | second entry you see is sleeping disorders,   14:58 |
| 21 | pauses in breathing while at sleep, daytime   14:58 |
| 22 | sleepiness and loud snoring.   14:58 |
| 23 | Do you see that?   14:58 |
| 24 | A.  At that time when I went for this, I   14:58 |
| 25 | think my mother was the interpreter.  Okay.   14:58 |



Page 154

1   Now, my mother had mentioned to the doctor that   14:59
2   she never heard me snore or anything like that.   14:59
3   They asked if I snored.  Me being deaf, I   14:59
4   wouldn't have known.  They asked my mother and   14:59
5   she said no.  Three years I did snore a lot.  I   14:59
6   do recall that.  After that, my mother has told   14:59
7   me I don't snore anymore.   14:59
8        Q.  I'm just asking whether you provided   14:59
9   to Dr. Yu your medical history, which included a   14:59
10   diagnosis of sleep apnea?   14:59
11        A.  No, I did not.   14:59
12        Q.  Okay.   14:59
13             MR. HALLER:  Why don't we take a   14:59
14        break, because the tape is out.  So   14:59
15        let's take a five-minute break.   14:59
16             THE VIDEOGRAPHER:  The time is   14:59
17        2:59.  We are off the record.   14:59
18             (Whereupon, at 2:59 o'clock   14:59
19        p.m., a recess was taken until 3:16   14:59
20        o'clock p.m.)   14:59
21             THE VIDEOGRAPHER:  The time is   14:59
22        3:16.  We are back on the record.   15:16
23   BY MR. HALLER:   15:16
24        Q.  Mr. Frilando, one of the questions   15:16
25   that was asked in the medical examinations was   15:16

Page 155

1   whether you have ever used either habitually or   15:17
2   recreationally illegal drugs, have you?   15:17
3             MR. ROZYNSKI:  Objection to form.   15:17
4        A.  They asked and I responded no.   15:17
5   BY MR. HALLER:   15:17
6        Q.  And was that a true statement?   15:17
7        A.  It is.   15:17
8        Q.  So unlike Mr. Clinton, you didn't   15:17
9   even try marijuana?   15:17
10        A.  Never.   15:17
11        Q.  Okay.   15:17
12        A.  I know the reference you made, but   15:17
13   no.   15:17
14             MR. HALLER:  What number?   15:18
15             MR. CONNELLY:  Eighteen.   15:18
16             MR. HALLER:  Let's mark this as   15:18
17        Defendant's Exhibit 18.   15:18
18             (Photograph was marked as   15:18
19        Defendant's Exhibit 18 for   15:18
20        identification, as of this date.)   15:18
21   BY MR. HALLER:   15:18
22        Q.  Mr. Frilando, in your answers to   15:18
23   interrogatories you had made reference to having   15:18
24   discussed your case with Josh Inicia of Channel   15:18
25   7 ABC News.   15:18

Page 156

1        Do you generally recall that you   15:18
2   spoke to him, that that was actually a segment,   15:18
3   I think, on the late evening news, on late night   15:18
4   news about your story?   15:19
5        A.  That's correct.   15:19
6        Q.  And as part of doing that story, am   15:19
7   I correct that you rented a car from Enterprise   15:19
8   Rent-a-Car?   15:19
9        A.  No, my brother owns this car.   15:19
10        Q.  So your testimony is this is your   15:19
11   brother's car?   15:19
12        A.  Yes, it is my brother's car.   15:19
13        Q.  Do you have any explanation why in   15:19
14   the news reel that when you look at the key that   15:19
15   you put into the ignition that there's an   15:20
16   Enterprise tag on the key?   15:20
17        A.  My brother purchased it from   15:20
18   Enterprise.  So Enterprise rents cars, but they   15:20
19   also have some cars for sale, former rental cars   15:20
20   for sale.  My brother purchased it from them.   15:20
21        Q.  Okay.   15:20
22        So, based on your prior answers, we   15:20
23   can agree, right, on the record that this was an   15:20
24   automatic, not a shift car?   15:20
25        A.  It is automatic, yes.   15:20

Page 157

1        Q.  And there is a shot of you driving   15:20
2   that is in the news clip.  An what I put before   15:21
3   you as Exhibit 18 is a snapshot of that.   15:21
4        Do you recognize that this is what   15:21
5   you have described as your brother's car?   15:21
6        A.  I do recognize it.   15:21
7        Q.  And can you tell me exactly where   15:21
8   this intersection is where they shot you   15:21
9   driving?   15:21
10        A.  This is near the sidewalk and this   15:21
11   is the sidewalk that has a crosswalk.   15:22
12             INTERPRETER MARTINEZ:  Some   15:22
13        interpreter clarification.  Saying the   15:22
14        names of the streets of the   15:22
15        intersection.   15:22
16        A.  I do recall that this is by the A   15:22
17   train.  By the Grant Street station on the A   15:22
18   train, but I can't remember the exact name of   15:22
19   the streets in this intersection.   15:22
20   BY MR. HALLER:   15:22
21        Q.  So you can't name the street that   15:22
22   you were driving on?   15:22
23        A.  I don't remember.   15:22
24        Q.  And you don't know the name of the   15:22
25   cross street?   15:22



MR. ROZYNSKI: Objection to form. 15:22
A. I don't. 15:22
BY MR. HALLER: 15:22
Q. Is there some way we could find out exactly where this is? 15:22
A. This might help. If you know the A line, when you get off, if you cross the street, there's an intersection close by, kind of catty-corner, if you will, diagonally, and it is in that area. 15:23
Q. Is that near where you live? 15:23
A. No, it is in Brooklyn. I live in Rockaway Beach, which is about a 10, 15-minute drive distance. 15:23
Q. Do you or does your brother drive near there on any regular basis? 15:23
A. Well, for this segment, the reporter asked if I could drive around somewhere in a car and I decided that this area was a good area to do that in. The reporter wanted to see what driving in New York would like look like. I had decided that Manhattan wouldn't be best, so I chose this area in Brooklyn. 15:24
Q. Okay. 15:24
So would it be possible for you on 15:24

your own or with your brother to go and just identify exactly where this picture is taken? 15:24
A. Do you mind just rephrasing that? 15:25
Q. Yes. 15:25
Would it be possible for you since it is fairly close to where you live to just go to the location and identify to your counsel and your counsel can tell us exactly what the cross streets are? 15:25
A. I could, yes, yes, I could do that. 15:25
Q. Yes. Thank you. 15:25
A. I remember where it is as far as the station, so I could retrace my steps. I could do that. 15:25
Q. While we go on, I'll see if we can Google map it and maybe we can identify it now, but if not, we'll find a more hands-on way of doing it. 15:26
A. Okay. That would be fine. 15:26
(Transcript marked for request of production of information and/or documents.) 15:26
MR. HALLER: I'm going to show you another document, which we'll mark as Defendant's Exhibit 19. 15:26

(Set of documents produced in connection with the Amendment to Plaintiff's Interrogatory Answers that relate to correspondence with Jersey Tractor-Trailer Training was marked as Defendant's Exhibit 19 for identification, as of this date.) 15:26
THE WITNESS: Are we finished with this? 15:26
MR. HALLER: Yes. You can put all that away. 15:26
BY MR. HALLER: 15:26
Q. I'll show you what we'll mark as Defendant's Exhibit 19. Mr. Frilando, I'll represent to you that this is the set of documents that were produced to us, I think either late last night or this morning in connection with the amendment to your interrogatory answers and they relate to correspondence with Jersey Tractor-Trailer Training. 15:27
Are you generally familiar with this set of documents? 15:28
A. No. The only two incidences that I have any recollection of are the two that we

discussed. My brother didn't give me any kind of knowledge about this situation. 15:28
Q. So recognizing that you were not directly involved in corresponding, I just wanted to ask you a few questions about the documents to see if you agree with some of the things that your brother has said on your behalf. 15:28
A. Okay. 15:29
Q. If you go to the page that's marked PLA 106. Do you want to just take a minute to read that e-mail from Christina Loveall, Admissions Representative at the National Tractor-Trailer School. 15:29
A. One moment, please. I've read it over. 15:30
Q. Do you see that in response to the inquiries from your brother about whether you could participate at this school, they said that they were able to check and Dr. Marino had performed the physical. It is not a DOT certified physician in order for enrollment. They would need to get a DOT certified physician and then send the results. 15:30
Do you see that? 15:30

MAGNA LEGAL SERVICES

Page 162

```
1     A.  I do.                    15:30
2     Q.  Okay.                    15:30
3        And even though you were not      15:30
4  involved in this, you were aware of that issue  15:30
5  at that time because were you trying to resolve  15:30
6  that with getting the certificate from Dr. Yu,  15:30
7  is that correct?                15:30
8        MR. ROZYNSKI:  Objection to form.  15:30
9     A.  I did know at some point that Dr.  15:30
10 Marino wasn't certified and then I went to Dr.  15:30
11 Yu.                          15:30
12 BY MR. HALLER:                  15:30
13    Q.  Right.                  15:30
14       So then, if you go to page PLA 104.  15:31
15 I would like you to look at an e-mail on August  15:31
16 17th to Christina Loveall, Subject re: Physical  15:31
17 from your brother and just if you could read  15:31
18 that.                         15:31
19    A.  I've read it.           15:31
20    Q.  And do you see that he says "Good  15:31
21 afternoon, Ms. Loveall, my name is Joseph  15:31
22 Frilando.  We communicated back in May about the  15:31
23 possibility of my brother, Kenneth Frilando, who  15:31
24 is,"" I think it means deaf, "attending your  15:32
25 school.  You needed my brother to provide a DOT  15:32
```

Page 163

```
1  certified physical, which is attached to this  15:32
2  e-mail.  I apologize for the delay.  Everything  15:32
3  seems to be process.  So please review the  15:32
4  document and I looked forward to your response."  15:32
5        Do you see that?          15:32
6     A.  Yes, this is my brother's contact.  15:32
7     Q.  Okay.                   15:32
8        And were you aware that he was  15:32
9  sending them Dr. Yu's medical certification?  15:32
10    A.  I think that must be the case.  15:33
11    Q.  Okay.  Thank you.        15:33
12    A.  If my brother had sent my forms, I  15:33
13 didn't have any knowledge of that.  15:33
14    Q.  So if we go forward to page 102 to  15:33
15 103, there's an e-mail that starts right at the  15:33
16 bottom of the page from Christina Loveall.  It  15:33
17 starts at the bottom of the page PLA 102 and  15:33
18 goes over to the next page, and I really wanted  15:33
19 to focus on the paragraph on the page PLA 103  15:33
20 where she says --                15:33
21    A.  One moment just while I get my  15:33
22 bearings on what you're speaking about.  15:33
23    Q.  Yes, that's fine.         15:33
24    A.  Okay.                   15:34
25    Q.  All right.              15:34
```

Page 164

```
1        If you could just keep open page PLA  15:34
2  103.  There is a paragraph that starts "I see by  15:34
3  his DOT physical."  Do you see that?  15:34
4        Do you see that she says "I see by  15:34
5  his DOT physical that he does have a hearing  15:34
6  aid.  Does he have one for each ear?  And does  15:34
7  that mean he can understand the instructor  15:34
8  without the help of sign language?"  15:34
9     A.  I'm reading it now.  Okay, yes, I  15:34
10 see that.                     15:34
11    Q.  And if you go back to page 102, you  15:34
12 see that your brother responds also on August  15:35
13 17th and says "Thank you.  No he will need a  15:35
14 sign language interpreter at all times.  Would  15:35
15 rely on the school to provide one for Kenneth."  15:35
16       Do you see that?          15:35
17    A.  I do.  I see it right there.  Yes.  15:35
18    Q.  Okay.                   15:35
19       And is that an accurate statement of  15:35
20 what you would need?             15:35
21    A.  It is.                  15:35
22    Q.  I haven't asked you this yet, since  15:35
23 I don't know maybe you might know, what the cost  15:35
24 of having a sign language interpreter is?  15:35
25    A.  I have no idea.           15:35
```

Page 165

```
1     Q.  But you have personally no  15:36
2  involvement or contact with respect to Jersey  15:36
3  Tractor-Trailer Training?         15:36
4     A.  I have no personal involvement.  15:36
5        MR. HALLER:  I'm going to show  15:37
6     you another exhibit, which we'll mark as  15:37
7     Defendant's Exhibit 20.       15:37
8        (Correspondence between      15:37
9     Joseph Frilando and Dutchess School  15:37
10    was marked as Defendant's Exhibit 20  15:37
11    for identification, as of this  15:37
12    date.)                     15:37
13 BY MR. HALLER:                  15:37
14    Q.  I put before you what we marked as  15:37
15 Exhibit 20, which is the correspondence between  15:38
16 your brother and the Dutchess School.  15:38
17       Are you generally familiar with this  15:38
18 type of document?                15:38
19    A.  Yes.                    15:38
20    Q.  And we had talked about some of  15:38
21 them, some of the things that were said in here  15:38
22 earlier today, so I'm not going to go back  15:38
23 through everything.              15:38
24       On April 30th, if you look at the  15:38
25 first page, PLA 8, the Dutchess School  15:38
```



Page 166

1  ultimately responds to your brother that "We      15:38
2  have never had any deaf students, that we have     15:38
3  no experience in teaching a deaf student how to    15:38
4  drive a tractor-trailer.  My suggestion would be   15:38
5  for you to continue your search for a school       15:38
6  that has such experience."                          15:38
7           Do you see that?                  15:38
8     A.  I do.  That's discrimination.       15:39
9     Q.  Okay.                          15:39
10          And then you send, your brother    15:39
11  sends an e-mail to you saying "Send to your       15:39
12  lawyer."                            15:39
13          Do you see that?               15:39
14    A.  Yes, I do.                      15:39
15    Q.  Okay.                          15:39
16          So, we can agree that by that date,  15:39
17  at least, you had already retained --      15:39
18    A.  I'm sorry, say that again.        15:39
19    Q.  We can agree by that date, you had   15:39
20  already retained a law firm to represent you in   15:39
21  some capacity?                      15:39
22          MR. ROZYNSKI:  Objection to form.   15:39
23    A.  Yes.                          15:39
24  BY MR. HALLER:                       15:39
25    Q.  Was that Eisenberg and Baum?        15:39

Page 167

1     A.  Yes.                          15:40
2     Q.  Following this e-mail from Dutchess  15:40
3  driving school on April 30th, where they say "We   15:40
4  have no experience in teaching deaf students how  15:40
5  to drive a tractor-trailer," did you or your      15:40
6  brother or anyone on your behalf have any         15:40
7  further discussions with anyone representing the   15:40
8  Dutchess School?                     15:40
9     A.  That was the end of the           15:40
10  correspondence right here.  We never pursued it   15:40
11  any further with anybody else on staff.    15:40
12    Q.  And then you sued them, right?      15:40
13    A.  Yes.                          15:40
14    Q.  Before you sued them, did you or did  15:40
15  anyone on your behalf go back to them in light    15:40
16  of their statement that they had no experience   15:41
17  in teaching a deaf student to give them any      15:41
18  suggests as to how they might be able to        15:41
19  accommodate a deaf student in the training?      15:41
20          MR. ROZYNSKI:  Objection to form.   15:41
21    A.  No, I did not.                  15:41
22  BY MR. HALLER:                       15:41
23    Q.  Why not?                      15:41
24    A.  See, I took it when they had no     15:41
25  experience they were afraid to deal with a       15:41

Page 168

1  situation of like this, dealing with someone who   15:41
2  was deaf or hiring an interpreter.  They    15:41
3  probably figured the cost might be involved.  I   15:41
4  don't know.  I figured they took the shortcut    15:41
5  and took the easy way out.  Let's recommend       15:41
6  another school.  That's the approach I took from  15:41
7  that.                               15:41
8           You have to remember something, when  15:41
9  you talk about a training facility such as        15:41
10  tractor-trailer driving, they are afraid about    15:41
11  hiring somebody with a disability.  Because they  15:42
12  don't know any better.  They just try to avoid   15:42
13  it and try to push it off on another school.     15:42
14    Q.  Well, that's exactly why I'm asking   15:42
15  you these questions, Mr. Frilando.  So I'm just  15:42
16  wondering why given that you had the perception   15:42
17  that people, you know, in your view, might be    15:42
18  afraid of you, why you didn't go back with the   15:42
19  help of advice from counsel and explain what you  15:42
20  thought they might be able to do that wouldn't    15:42
21  create a problem for them of extra cost or        15:42
22  safety and explain what you thought might help   15:42
23  to accomplish this.  That was the purpose of my   15:42
24  question.                           15:42
25          So, let me frame it differently.   15:42

Page 169

1  Other than what your brother had conveyed, which   15:42
2  is that you would need a sign language            15:42
3  interpreter all the time, was there anything      15:42
4  else that you feel should have been conveyed to   15:42
5  Dutchess for them to sort of think about whether  15:42
6  or not this was something they could            15:43
7  accommodate?                         15:43
8           MR. ROZYNSKI:  Objection to form.   15:43
9     You can answer.                     15:43
10    A.  You know, I shouldn't really have to  15:43
11  explain anything, because basically the bottom   15:43
12  line is that any of these school facilities are   15:43
13  obligated to provide interpreters under DAG law.  15:43
14  That has been in existence for 25 years and      15:43
15  these businesses know better.  This is why I     15:43
16  contacted the National Association for the Deaf   15:43
17  and they said all these facilities are required   15:43
18  by law to provide an interpreter.  That's what I  15:43
19  was told by the NAD.                 15:43
20    Q.  I think that's what I'm trying to    15:43
21  understand.  So, as we have discussed, in        15:43
22  relation to things that you said to the Jersey   15:43
23  Tractor-Trailer Training that you have said in    15:44
24  connection with Dutchess, and I think with       15:44
25  respect to Bordentown, that what you believed    15:44



43 (Pages 166 to 169)

Page 170

```
 1    was necessary was to have a sign language        15:44
 2    interpreter assigned throughout the entire       15:44
 3    course and that's what you would need?           15:44
 4         A.  Yes.                          15:44
 5         Q.  And is it your position in this case     15:44
 6    that that's all you needed, as long as you had a  15:44
 7    sign language interpreter that would have been    15:44
 8    sufficient from your perspective in terms of an   15:44
 9    accommodation?                         15:44
10              MR. ROZYNSKI:  Objection to form.   15:44
11         A.  Yes, that's all I would have needed   15:44
12    was an interpreter.                     15:44
13    BY MR. HALLER:                         15:44
14         Q.  I'm going to show you what we'll      15:45
15    mark as Exhibit 21.                     15:45
16              (Correspondence between         15:45
17         Joseph Frilando and Bordentown was     15:45
18         marked as Defendant's Exhibit 21 for   15:45
19         identification, as of this date.)     15:45
20    BY MR. HALLER:                         15:45
21         Q.  Are you generally familiar with this   15:45
22    correspondence between your brother and        15:45
23    Bordentown in connection with your expression of  15:45
24    interest about doing CDL driver training with     15:46
25    that school?                          15:46
```

Page 171

```
 1         A.  Yes, I am.                    15:46
 2         Q.  So, if we can go to PLA 6, so, do     15:46
 3    you see that there's correspondence from your     15:46
 4    brother to Mr. Wessendorf at Bordentown under     15:47
 5    Smith Solomon e-mail address, Subject: 90-day     15:47
 6    waiver sent on March 17, 2015 around 5:36 p.m.,   15:47
 7    Tuesday?                              15:47
 8         A.  Yes, I see that.                15:47
 9         Q.  And then, do you see, I believe that   15:47
10    was a Tuesday, you see the following Monday,      15:47
11    there's an e-mail from your brother saying "Hi,   15:47
12    still waiting to hear from you.  Good day."       15:47
13    With two exclamation marks.                 15:47
14         Do you see that?                    15:47
15         A.  Yes, I see that.                15:48
16         Q.  And then, on March 30th, Monday,     15:48
17    March 30th, Mr. Wessendorf -- this is on PLA 4,   15:48
18    writes to your brother saying "We are seeking     15:48
19    guidance from the Federal DOT and the local      15:48
20    MVC's regarding how to safely and effectively     15:48
21    accommodate the specific needs of this          15:48
22    community."                           15:48
23              INTERPRETER MARTINEZ:  I'm sorry,  15:48
24         I just lost you.  Where are you at?   15:48
25              MR. HALLER:  Bottom of PLA 4.    15:48
```

Page 172

```
 1              INTERPRETER MARTINEZ:  I see it.   15:48
 2         Thank you.  We're always going to be a   15:48
 3         few seconds behind you looking at the   15:48
 4         documents as you cite us.            15:48
 5              MR. HALLER:  That's fine.  Just   15:48
 6         let me know.                     15:48
 7         A.  I see that.                    15:49
 8    BY MR. HALLER:                         15:49
 9         Q.  Okay.                         15:49
10         So you understand that as of the        15:49
11    30th of March that Mr. Wessendorf was saying     15:49
12    they were looking for guidance from Federal DOT   15:49
13    and the local MVC's?                    15:49
14         A.  Yes, I see that.                15:49
15         Q.  Okay.                         15:49
16         Did you understand that at that       15:49
17    time?  Is that something your brother          15:49
18    communicated to you?                    15:49
19         A.  Yes, I did, but not only -- also, I   15:49
20    had given all the paperwork where they had the   15:49
21    waiver and everything that was done there.  They   15:49
22    asked for those documents and I provided those   15:49
23    them with those two documents that I had with    15:49
24    the waiver.                           15:49
25         Q.  So do you see that if you go to the   15:49
```

Page 173

```
 1    top of the page that Mr. Wessendorf asks on      15:49
 2    March 30th for a copy of the exemption?          15:49
 3         A.  Yes, I do see that.             15:50
 4         Q.  And your brother responds "We still   15:50
 5    have the 90-day waiver, the two-year waiver will   15:50
 6    be in our possession within a week or two.  I    15:50
 7    will forward it at that time.  Is there anything   15:50
 8    else you will need?"                    15:50
 9         Do you see that?                    15:50
10         A.  Yes, those were the only two        15:50
11    documents that my brother mentioned to me, yes.   15:50
12         Q.  Okay.                         15:50
13         So then you see if you go to page       15:50
14    PLA 3, your brother sent you an e-mail saying    15:50
15    "Forward to your lawyer."                 15:50
16              INTERPRETER MARTINEZ:  Hold on   15:50
17         one second, please.                15:50
18         A.  I see that.                    15:50
19    BY MR. HALLER:                         15:50
20         Q.  So do you know why given in this     15:50
21    e-mail chain at least, that there's still back   15:51
22    and forth between your brother and Mr.          15:51
23    Wessendorf and Mr. Wessendorf is waiting for the  15:51
24    documentation?  Why he would want you to forward   15:51
25    it to your lawyer at that time?             15:51
```



Page 174

1    MR. ROZYNSKI:  Objection to form.    15:51
2  You can answer.                       15:51
3    A.  Well, I think there's an e-mail   15:51
4  missing from this.  Because from this it says   15:51
5  that there was a statement stating that we're   15:51
6  not going to be providing an interpreter for   15:51
7  this training.  Thank you for your interest and   15:51
8  that was the end of it.  So that's missing from   15:51
9  this set of e-mails.                  15:51
10  BY MR. HALLER:                       15:51
11    Q.  Okay.                         15:51
12    Is that what then appears --       15:51
13    A.  I'm noticing what they finally    15:51
14  disclosed everything for us to pursue it   15:51
15  somewhere else that e-mail is missing.   15:51
16    Q.  If you look at PLA 1 and PLA 2, is   15:51
17  that what you're referring to?        15:52
18    A.  I see it right here.  The final one   15:52
19  here.  Up on the top.  So I took that when I   15:52
20  read that that was the final response that they   15:52
21  were going to give.  That they were no longer   15:52
22  interested in helping.                15:52
23    Q.  So let me, let me ask you this.    15:52
24  Following that e-mail from Mr. Wessendorf, in   15:52
25  which he says "After considerable discussion at   15:52

Page 175

1  both the state and federal level and having   15:52
2  received little or no guidance on how to   15:52
3  effectively train and safely protect the   15:52
4  motoring public, the student and our personnel,   15:52
5  we have determined that Smith & Solomon is not   15:52
6  capable or qualified at this time to render the   15:52
7  services requested.  Thank you very much for   15:52
8  your interest in Smith & Solomon."   15:52
9  Do you see that?                     15:52
10    A.  Yes, but I had the waiver there.   15:52
11  When that waiver was there and submitted they   15:53
12  disregarded that waiver that I had.  So I was   15:53
13  wondering why they had terminated the pursuance   15:53
14  of this, because the waiver was already there   15:53
15  saying that I could do this, but they chose not   15:53
16  to accept that waiver.               15:53
17    Q.  So, let me ask similar questions to   15:53
18  the ones I asked with respect to Dutchess.   15:53
19  After your brother received that   15:53
20  response, did you or did anyone on your behalf   15:53
21  seek to reach out to Smith & Solomon or   15:53
22  Bordentown, as it is properly known, and talk to   15:53
23  them about what you thought could be done to   15:53
24  effectively train and safely protect the   15:53
25  motoring public, the student and their   15:53

Page 176

1  personnel?                          15:53
2    A.  No, I did not.                  15:53
3    Q.  Why not, why didn't you want to   15:53
4  engage in at least some discussion about what   15:54
5  you thought might be the right way of   15:54
6  effectively training and safely protecting the   15:54
7  motoring public, student and their personnel to   15:54
8  try and come up with a solution to this issue as   15:54
9  opposed to immediately filing a lawsuit?   15:54
10    MR. ROZYNSKI:  Objection to form.   15:54
11  You can answer.                     15:54
12    A.  Well, because my brother shared all   15:54
13  the correspondence that was taking place and my   15:54
14  brother shared with them all the documents that   15:54
15  we gave them that they wanted, it doesn't matter   15:54
16  whether I approved or disapproved.  We complied   15:54
17  and gave them everything that they asked for and   15:54
18  they should know there are other schools, other   15:54
19  interpreters that are provided at other   15:54
20  institutions.  They should know this.   15:54
21  BY MR. HALLER:                       15:55
22    Q.  Well, Mr. Frilando, in fairness to   15:55
23  Bordentown, you dealt at the same time frame   15:55
24  with two other schools who appear to have the   15:55
25  same concerns and believed this was a challenge,   15:55

Page 177

1  right?                              15:55
2    MR. ROZYNSKI:  Objection to form.   15:55
3    A.  Yes.                          15:55
4  BY MR. HALLER:                       15:55
5    Q.  So were you not aware that given   15:55
6  that these waivers were very new in the   15:55
7  industry, that there might be the need for some   15:55
8  dialogue about what could or could not be done   15:56
9  as opposed to simply resorting to litigation?   15:56
10    MR. ROZYNSKI:  Objection to form.   15:56
11  You can answer.                     15:56
12    A.  I mean, I showed them the waiver.  I   15:56
13  felt an apprehension on their part, a little   15:57
14  push back on that.  I don't think that was the   15:57
15  issue.  I think the issue was that they didn't   15:57
16  want to be involved with the concern of what the   15:57
17  cost would be for hiring an interpreter to   15:57
18  accommodate my accessibility to that.  I think   15:57
19  that's what the issue was.            15:57
20  Now, I understand that -- I did   15:57
21  know that this went through other schools.  I   15:57
22  know there were other schools willing to provide   15:57
23  an interpreter for other people.  I think this   15:57
24  came down to a monetary issue and I think that's   15:57
25  what the bottom line was.  That's just my   15:57



Page 178

1  personal opinion. I think that all schools          15:57
2  should have that fair practice where they can       15:57
3  provide accommodations for everybody. I'm an         15:57
4  individual who wants to learn how to drive a         15:57
5  tractor-trailer and get the credentials. I have      15:57
6  that right. That's within my right and I was         15:57
7  denied that right.                                   15:57
8  BY MR. HALLER:                                       15:57
9      Q.  Mr. Frilando, I understand the way           15:57
10 you feel and your personal views. Right now I'm      15:57
11 just trying to elicit facts, and the question        15:57
12 that I posed was different from the answer that      15:57
13 you gave me, which was not responsive.               15:58
14        My question was, why after they had           15:58
15 told you that they didn't think, they did not        15:58
16 get any guidance from the state or federal           15:58
17 authorities as to how to do this effectively and     15:58
18 safely to protect the motoring public, the           15:58
19 student and the personnel, why didn't you, you       15:58
20 had lawyers that were representing you, engage       15:58
21 in a constructive discussion with them about how     15:58
22 you thought or the people representing you           15:58
23 thought or the National Association for the Deaf     15:58
24 thought that this could be done safely and           15:58
25 effectively, protecting all of those different       15:58

Page 179

1  interests? Why didn't you engage in that             15:58
2  constructive discussion?                             15:58
3        MR. ROZYNSKI: Objection to form.               15:58
4     You can answer.                                   15:58
5     A.  I didn't bother explaining because I          15:59
6  knew they were already determined with their         15:59
7  final answer. They were not going to do this.        15:59
8  I had already come to the guess because of the       15:59
9  fact that I was going -- I think they were just      15:59
10 afraid to take on this type of a case where they     15:59
11 would allow somebody who was deaf to go into         15:59
12 their school. I think they were concerned if I       15:59
13 were to pass, they were afraid if I was in an        15:59
14 accident or something they were going to be          15:59
15 afraid that liability may be on them. I think        15:59
16 that's what it really also came down to, as          15:59
17 well, but the law still states, that these           15:59
18 schools are supposed to allow these people an        15:59
19 opportunity to apply and go to the school and        15:59
20 pass the course like anybody will. They were        15:59
21 aware I contacted the NAD and there were a lot       15:59
22 of schools out there still not in compliance         15:59
23 with this.                                           16:00
24 BY MR. HALLER:                                       16:00
25     Q.  I'm not going to get into an                 16:00

Page 180

1  argument or a debate with you on the law.            16:00
2        Can we establish that you're not a             16:00
3  lawyer and you are not capable of interpreting       16:00
4  the Federal Code of Regulations in this area?        16:00
5        MR. ROZYNSKI: Objection to form.               16:00
6        INTERPRETER MARTINEZ: Your                     16:00
7     question?                                         16:00
8        MR. HALLER: That was the                       16:00
9     question.                                         16:00
10       INTERPRETER MARTINEZ: What's the               16:00
11    question? I just explained you're not a           16:00
12    lawyer. What is the question? Maybe I             16:00
13    missed it, sir.                                   16:00
14       MR. HALLER: We'll read it back.                16:00
15       INTERPRETER MARTINEZ: Thank you.               16:00
16    (Record read.)                                    16:00
17       MR. ROZYNSKI: Objection to form.               16:00
18    A.  No, I'm not a lawyer.                         16:00
19 BY MR. HALLER:                                       16:01
20    Q.  Are you aware of any regulation or            16:01
21 guidance that is directed to training schools in     16:01
22 connection with the implementation of the waiver    16:01
23 of the Forced Whisper test under the                16:01
24 regulations?                                         16:01
25       MR. ROZYNSKI: Objection to form.               16:01

Page 181

1     A.  I don't recall. I don't remember.            16:01
2  BY MR. HALLER:                                       16:01
3     Q.  Do you think --                               16:01
4        INTERPRETER MARTINEZ: Hold on a               16:01
5     second, please. Okay.                             16:01
6  BY MR. HALLER:                                       16:01
7     Q.  Do you think that it would be                 16:01
8  necessary or appropriate for the government when     16:01
9  they're making a change like this to provide        16:02
10 some guidance?                                       16:02
11       MR. ROZYNSKI: Objection to form.              16:02
12       INTERPRETER STAEHLE: For the                  16:02
13    interpreter, you mean establishing the           16:02
14    guidance?                                         16:02
15       MR. HALLER: Yes.                               16:02
16    A.  I believe the federal government             16:02
17 should instruct the CDL schools about how to        16:02
18 work with this waiver.                               16:02
19 BY MR. HALLER:                                       16:02
20    Q.  Okay. Thank you.                              16:02
21       Now, if you look at Exhibit 21, and           16:02
22 I confess to having read it many times, could       16:02
23 you identify in this entire sequence or             16:02
24 correspondence any place where your brother         16:02
25 expresses, identifies or requests a specific        16:02



Page 182

1   accommodation?                        16:02
2       A.  I think so.                   16:03
3       Q.  Show me, please.              16:03
4       A.  Okay.  It says accommodations and   16:03
5   interpreting.  It is on PLA 4.  It says   16:04
6   accommodate.  It says accommodate for a deaf   16:05
7   student.                              16:05
8       Q.  Where are you reading from?  I'm   16:05
9   sorry, I don't see it.                16:05
10      A.  PLA 5, and PLA 4.             16:05
11      Q.  Okay.                        16:06
12          So, let's start with PLA 5.  Where   16:06
13  on PLA 5 does your brother specify any   16:06
14  accommodation?  Not use the word      16:06
15  "accommodation," but specify what he or you   16:06
16  believe is necessary?                 16:06
17      A.  Accommodations include an    16:07
18  interpreter.  So having an interpreter provided   16:07
19  is in that hub of accommodations.     16:07
20      Q.  Yes, Mr. Frilando, I confess to   16:07
21  getting a little bit frustrated.  I understand   16:07
22  your argument and I understand you think   16:07
23  accommodations would include a sign language   16:07
24  interpreter.                          16:07
25          My question is much more direct and   16:07

Page 183

1   I would like you to agree with me on the record   16:07
2   there's nothing in this correspondence where   16:07
3   your brother says what Kenneth Frilando needs is   16:07
4   a sign language interpreter at all times during   16:07
5   the course or specify any other specific   16:07
6   accommodation.  Can we agree on that?   16:07
7           MR. ROZYNSKI:  Objection to form.   16:07
8       A.  We can.                       16:07
9   BY MR. HALLER:                        16:07
10      Q.  Okay.  Thank you.            16:07
11          And can we also agree that had that   16:07
12  conversation taken place, the request that your   16:07
13  brother would have made on your behalf was to   16:08
14  have a sign language interpreter available to   16:08
15  you at all times during his training both with   16:08
16  respect to the course work and with respect to   16:08
17  the yard training and with respect to the   16:08
18  on-road training, is that right?     16:08
19          MR. ROZYNSKI:  Objection to form.   16:08
20          INTERPRETER STAEHLE:  Would you   16:08
21      read back the beginning of that part of   16:08
22      that question?  This is the interpreter.   16:08
23          (Record read.)                16:08
24      A.  It is hard to say, I don't know.   16:09
25

Page 184

1   BY MR. HALLER:                        16:09
2       Q.  Well, other than a sign language   16:09
3   interpreter, are you personally aware of any   16:09
4   other specific accommodation that you believe   16:09
5   would have enabled you to do all of those   16:09
6   aspects of the training, the course work, the   16:09
7   yard, in the yard training and then the   16:09
8   on-road training?                     16:09
9           MR. ROZYNSKI:  Objection to form.   16:09
10      A.  Having an interpreter provided would   16:10
11  be the only kind of accommodation that would be   16:10
12  effective, because I would want to make sure   16:10
13  that I got all the safety information,   16:10
14  especially with the specifics, such as weight.   16:10
15  Things like that.  Without an interpreter,   16:10
16  there's the potential for misunderstanding.   16:10
17  BY MR. HALLER:                        16:10
18      Q.  The two schools that were identified   16:11
19  in your interrogatory answers that you believe   16:11
20  allow for training for people who are deaf, have   16:11
21  you made any attempt to enter those programs?   16:11
22          INTERPRETER STAEHLE:  Interpreter   16:11
23      clarification, in has he applied?    16:11
24          MR. HALLER:  Has he spoken to   16:11
25      them about entering, has he done   16:11

Page 185

1       anything to see if that's an option.   16:11
2       A.  I have not contacted them.     16:11
3   BY MR. HALLER:                        16:11
4       Q.  Have you thought about other similar   16:11
5   occupations that involve driving but not, not   16:11
6   necessarily involve the driving of a   16:11
7   tractor-trailer where there are some acute   16:11
8   safety issues in connection with the size and   16:11
9   nature of the vehicle?                16:11
10          MR. ROZYNSKI:  Objection to form.   16:11
11      A.  I have considered other kinds.   16:12
12  BY MR. HALLER:                        16:12
13      Q.  Have you considered forklift, being   16:12
14  a forklift driver, by way of an example?   16:12
15      A.  I've never considered it.  I would   16:12
16  be willing too.  I would have to learn.   16:12
17      Q.  Are you aware that Bordentown Smith   16:12
18  & Solomon provides sign language interpreters   16:12
19  for forklift and driver training?     16:12
20      A.  I didn't realize.  My preference,   16:13
21  though, is for CDL training, especially because   16:13
22  I have the qualifications ready for that and   16:13
23  also because I have the waiver.       16:13
24      Q.  What familiarity, if any, do you   16:13
25  have with the content of the curriculum that is   16:13



Page 186

1    taught by Bordentown in order for in its view    16:13
2    its students to be properly and safely trained    16:13
3    as CDL drivers?                                    16:13
4            MR. ROZYNSKI: Objection to form.    16:13
5      A.  I don't know.  I know that my            16:14
6    brother had a friend who attended Smith &        16:14
7    Solomon and his friend recommended the school to  16:14
8    my brother and my brother informed me of this,    16:14
9    which is why my brother contacted them.           16:14
10           INTERPRETER MARTINEZ: Excuse me,  16:14
11   I just need to use the restroom for one          16:14
12   minute.                                          16:14
13           MR. HALLER: Let's take a             16:14
14   two-minute break.                                16:14
15           THE VIDEOGRAPHER: The time is        16:14
16   now 4:15.  We're off the record.                 16:14
17           (Whereupon, at 4:15 o'clock         16:25
18   p.m., a recess was taken until 4:25             16:25
19   o'clock p.m.)                                    16:25
20           THE VIDEOGRAPHER: The time is        16:25
21   4:25.  We are back on the record.               16:25
22   BY MR. HALLER:                                   16:25
23     Q.  Back on the record, Mr. Frilando.    16:25
24     A.  Yes.                                       16:26
25     Q.  So following up on my last question,  16:26

Page 187

1    do you personally have any knowledge sitting    16:26
2    here today of the dangers associated with the    16:26
3    driving of a tractor-trailer, which is obviously  16:26
4    a very, very large vehicle?                      16:26
5            MR. ROZYNSKI: Objection to form.    16:26
6      A.  There are weight dangers and with        16:26
7    also carrying a big load.  It is also a big     16:26
8    responsibility.  I am aware that there is danger  16:26
9    involved.                                        16:26
10   BY MR. HALLER:                                   16:26
11     Q.  Are you aware that if you cut         16:26
12   corners too acutely that there's actually a     16:26
13   danger of the whole tractor-trailer unit tipping  16:26
14   over because of its size?                        16:26
15           MR. ROZYNSKI: Objection to form.    16:27
16     A.  I'm aware of that.  I have seen that    16:27
17   in a book.  That move is actually called        16:27
18   jackknifing.  I've seen it in some of the       16:27
19   driving training books.                          16:27
20   BY MR. HALLER:                                   16:27
21     Q.  So in the context of this           16:27
22   litigation, given that your request for        16:27
23   accommodation is the assignment of a sign       16:27
24   language interpreter throughout, what is it that  16:27
25   you're saying that sign language interpreter     16:27

Page 188

1    should be doing during the actual on road       16:27
2    portion of the training?                         16:27
3            MR. ROZYNSKI: Objection to the      16:27
4      form.                                          16:27
5      A.  That's not my level of expertise.    16:28
6    It is not something I know, but I'm sure that    16:28
7    the training school and the interpreter would be  16:28
8    able to figure something out as to what's the    16:28
9    best way to have the interpreter.  It really    16:28
10   depends on what kind of discussion takes place    16:28
11   between the professionals for that part of the    16:28
12   test and training.                               16:28
13   BY MR. HALLER:                                   16:28
14     Q.  That's your answer?                   16:28
15           MR. ROZYNSKI: Objection to form.    16:28
16     A.  Yes.                                   16:28
17   BY MR. HALLER:                                   16:28
18     Q.  Okay.                                  16:28
19     So, when you explained to me how you    16:28
20   were trained to drive a car, you were very      16:28
21   explicit about the fact that you were given     16:28
22   directions when the car was stationery and that  16:28
23   it would be unsafe when you were driving for    16:29
24   there to be any effort at sign language         16:29
25   interpretation.                                  16:29

Page 189

1            Do you recall that testimony?       16:29
2            MR. ROZYNSKI: Objection to form.    16:29
3      A.  Do you mind repeating that again?    16:29
4            MR. HALLER: May I have the          16:29
5      question read back, please.                16:29
6            (Record read.)                      16:29
7      A.  I do, yes.  Yes, before getting on    16:30
8    the road, the instructions were given to me     16:30
9    through an interpreter, yes, and it is not safe  16:30
10   to have an interpretive message delivered to me  16:30
11   while driving.                                   16:30
12   BY MR. HALLER:                                   16:30
13     Q.  So.  Mr. Frilando, can we agree on    16:30
14   the record that given the scale and size of a    16:30
15   tractor-trailer, that it would be even more    16:30
16   dangerous and unsafe for sign language          16:30
17   interpretation to be occurring while you are    16:30
18   actually driving the vehicle?                    16:30
19           MR. ROZYNSKI: Objection to form.    16:30
20     A.  Yes.  But at the same time, if a car    16:31
21   is not in motion, if the tractor-trailer is     16:31
22   stopped, having an interpretive message there,    16:31
23   it is similar.  I would rather be safe than     16:31
24   sorry.                                           16:31
25



BY MR. HALLER:                              16:31
1
2      Q.  Well, that wasn't my question, and I    16:31
3   would really like a direct answer to my        16:31
4   question.                                       16:31
5         Do you agree that in the context of      16:31
6   learning how to drive a tractor-trailer, which   16:31
7   is a much bigger and more dangerous vehicle than   16:31
8   a car, that it would be dangerous and unsafe for   16:31
9   there to be sign language interpretation while    16:31
10  the vehicle is being driven and in motion on      16:31
11  roads?                                           16:31
12        MR. ROZYNSKI:  Objection to form.     16:31
13     A.  I think that the danger would be the    16:32
14  same in both situations in a moving vehicle.     16:32
15  BY MR. HALLER:                              16:32
16     Q.  Mr. Frilando, you're not seriously      16:32
17  sitting here telling me under oath that you      16:32
18  think that driving a car poses the same dangers   16:32
19  as a huge tractor-trailer, are you?            16:32
20        MR. ROZYNSKI:  Objection to form.     16:32
21     A.  I find them to be the same, but I do   16:33
22  see how a tractor-trailer would be more        16:33
23  dangerous.  And I do acknowledge that if there   16:33
24  was an accident while driving a tractor-trailer,   16:33
25  the accident could be more dangerous.  There    16:33

1   would be more of a heavy result.  I could see    16:33
2   how in a car an accident could be less damaging.   16:33
3   I could see how in a tractor-trailer an accident   16:33
4   there would be worse than an accident in a car.   16:33
5   BY MR. HALLER:                              16:33
6      Q.  And I think this is what you're        16:33
7   saying, in both cases it is unsafe to be having   16:33
8   a system of sign language while the car is being   16:33
9   or the vehicle is being driven?               16:33
10        MR. ROZYNSKI:  Objection to form.     16:33
11     A.  Yes.                                 16:34
12  BY MR. HALLER:                              16:34
13     Q.  So, Mr. Frilando, I want you to       16:34
14  imagine that you are in the cab of a          16:34
15  tractor-trailer vehicle where you don't have a   16:34
16  mirror that you can see behind you.  You have to   16:34
17  look out of side mirrors, are you following me?   16:34
18     A.  Yes, I'm following you, yes.         16:34
19     Q.  I want you to imagine that it is      16:34
20  early stage learning.  You're learning how to   16:34
21  use the gears of which there are many, arguably   16:34
22  10.  I want you to imagine that you are being   16:35
23  asked by the instructor to go from a normal road   16:35
24  down a ramp on to a major expressway with at    16:35
25  least three lanes of traffic and no clear lane   16:35

1   to enter into those lanes of traffic.         16:35
2         Are you following me?                 16:35
3         MR. ROZYNSKI:  Objection to form.     16:35
4      A.  Yes, I am.  I'm following you.        16:35
5   BY MR. HALLER:                              16:35
6      Q.  And as you are coming down as a       16:36
7   truck, you need to maneuver the gears to be at   16:36
8   the right speed as you're entering this major   16:36
9   highway with lots of oncoming traffic coming at   16:36
10  high speeds.                                 16:36
11        MR. ROZYNSKI:  Objection to form.     16:36
12  BY MR. HALLER:                              16:36
13     Q.  I want you to image that you have     16:36
14  been instructed that as you are entering that   16:36
15  highway, so the traffic is coming on the major   16:36
16  highway to your left, that you need to be       16:36
17  looking in the left mirror to actually see      16:36
18  whether there is an entry path on to the        16:36
19  highway?                                     16:36
20     A.  Yes.                                 16:36
21     Q.  Okay.                                16:36
22        So now you have your hands on the     16:36
23  wheel, you're looking into the left mirror,     16:36
24  which is away from the instructor who is sitting   16:37
25  to your right.                               16:37

1         Are you following me?                 16:37
2         MR. ROZYNSKI:  Objection to form.     16:37
3   BY MR. HALLER:                              16:37
4      Q.  Now, as you're doing that, the       16:37
5   instructor wants to tell you that you're not    16:37
6   operating the gears properly and you need to go   16:37
7   down a gear in order not to be going too fast,   16:37
8   because otherwise you might have a danger of not   16:37
9   being able to approach in the right speed to    16:37
10  avoid hitting the traffic.                    16:37
11        Are you following me?                 16:37
12        MR. ROZYNSKI:  Objection to form.     16:37
13  BY MR. HALLER:                              16:37
14     Q.  Are you following me?                16:37
15        MR. ROZYNSKI:  Objection to form.     16:37
16  BY MR. HALLER:                              16:37
17     Q.  I just want you to image where the   16:37
18  court reporter is, where her laptop is, in to    16:37
19  the mirror.  Now, how in your view of the world   16:37
20  of sign language interpretation can you tell me   16:37
21  how that communication is going to happen when   16:37
22  you're doing -- that he's over there and        16:38
23  somewhere in the cab apparently there's a sign   16:38
24  language interpreter?                        16:38
25        MR. ROZYNSKI:  Objection to form.     16:38



1    A.  Well, I couldn't really answer that        16:38
2    question because I haven't gone to a school to    16:38
3    encounter that situation.  I think these are     16:38
4    some of the things that we work out logistically   16:38
5    as we're going to school and we talk about these   16:38
6    things before we get on-the-road.  I take your   16:38
7    question quite serious.  I know what you're      16:38
8    trying to say.  I think these are some of the    16:38
9    things that would be discussed and we would      16:38
10   develop these strategies on the logistics with   16:38
11   the interpreter how to handle these situations   16:38
12   prior to going out there on the road.  Okay.     16:38
13       Now you're asking me after the fact         16:38
14   and I haven't experienced that, so I couldn't    16:38
15   say.                                             16:38
16   BY MR. HALLER:                                   16:38
17       Q.  So, Mr. Frilando, how, how can you      16:38
18   in advance have a system that would account for  16:38
19   how the driver is handling the gears, what the   16:39
20   oncoming traffic is, how fast the driver is      16:39
21   going?  How could you account in advance for any   16:39
22   of those contingencies, other than --           16:39
23       MR. ROZYNSKI:  Objection.                   16:39
24   BY MR. HALLER:                                   16:39
25       Q.  -- other than a communication that      16:39

1    is happening as the truck is going along in real   16:39
2    time?                                            16:39
3       MR. ROZYNSKI:  Objection to form.           16:39
4       A.  I understand what you're getting         16:39
5    out.  I think this is something that would       16:39
6    require a little bit of collaboration between    16:39
7    the instructor, the interpreter and myself.  You   16:39
8    know, because you wouldn't just get into a       16:39
9    vehicle and start doing this and then, you know,   16:39
10   decide how you're going to handle this in the    16:39
11   moment.  This would all have to be discussed and   16:40
12   collaborated beforehand before you go out on the   16:40
13   road.  So this would take some early dialogue    16:40
14   between the three of you, between the            16:40
15   interpreter to work the system out, a form of    16:40
16   communication that would be acceptable that      16:40
17   would be considered safe and agreed upon before   16:40
18   all of us would be able to go into that vehicle   16:40
19   to go out on the road.                           16:40
20       I think this is probably something          16:40
21   that would be done beforehand.  This is not      16:40
22   something that would be handled at the last      16:40
23   minute while we were in the vehicle, as you say.   16:40
24       Q.  Okay.                                   16:40
25       So I just want you to image, Mr.            16:40

1    Frilando, you're doing exactly what I have       16:40
2    described, you're looking into that mirror and   16:40
3    it actually happens that you're too close to the   16:40
4    curb, and the instructor needs you to           16:40
5    immediately stop the vehicle.                    16:40
6       MR. ROZYNSKI:  Objection to form.           16:40
7       A.  I would come to a complete stop.  If     16:40
8    something had to be handled, no matter what the   16:40
9    situation that was dangerous, I would come to a   16:40
10   complete stop no matter what.  I would stop the   16:40
11   vehicle.                                         16:41
12   BY MR. HALLER:                                   16:41
13       Q.  My question is not what you would       16:41
14   do.  It is you're looking there and this is a    16:41
15   split-second decision.  The instructor is right   16:41
16   next to you and he needs to communicate to you   16:41
17   what you should be doing.  It could be stop, it   16:41
18   could be going to the right.  It could be        16:41
19   picking up speed.  It could be slowing down.  It   16:41
20   could be a whole range of things that he would   16:41
21   want you to do.  And you're looking over there.   16:41
22   I don't know where the sign interpreter is.      16:41
23       So do you have, sitting here today,         16:41
24   an answer as to how that would work?            16:41
25       MR. ROZYNSKI:  Objection to form.          16:41

1       A.  No, I don't have an answer at this       16:41
2    very minute, no.                                 16:41
3    BY MR. HALLER:                                   16:41
4       Q.  So, in your words, it would take         16:41
5    collaboration.  Why is it that rather than       16:41
6    trying to engage in a dialogue with Smith &      16:41
7    Solomon, Bordentown or Dutchess or the other     16:42
8    schools, the other school you're thinking of     16:42
9    suing, that you would try and have a            16:42
10   collaborative effort to see if there's something   16:42
11   that can be done or not done?                    16:42
12       MR. ROZYNSKI:  Objection to form.          16:42
13       A.  This all stems from the fact that       16:42
14   they're not even comfortable with my deafness    16:42
15   and my situation requiring an interpreter.  I    16:42
16   think this is because this is their first        16:42
17   experience encountering this.  This is what this   16:42
18   is all about.  This is nervous.  They're         16:42
19   paranoid, afraid about this accident that could   16:42
20   happen.  They're worried about lawsuits and so   16:42
21   forth.  The easy way out for the schools to do   16:42
22   is to say we're not providing any training.      16:42
23   We're not offering it to you.                    16:42
24   BY MR. HALLER:                                   16:42
25       Q.  I understand that's your personal       16:42



Page 198

1    view.  How can you say that about Bordentown   16:42
2    where I just told you they have a whole program   16:43
3    for forklift drivers where they're able to do   16:43
4    this in a way that they believe is safe?  How   16:43
5    can you say that about them?   16:43
6             MR. ROZYNSKI:  Objection to form.   16:43
7       A.   The point is, it is what I want to   16:43
8    do.  I don't want to drive a forklift.  I want   16:43
9    to drive a tractor-trailer.  I have a CDL.  I   16:43
10   have a waiver for two years that's good.  I have   16:43
11   a right to utilize that.  I am not less inferior   16:43
12   because I'm deaf.  I have the right to pursue   16:43
13   the kind of career that I want to pursue like   16:43
14   anybody else.   16:43
15      Q.   Do you think you can fly an   16:43
16   airplane?   16:43
17            MR. ROZYNSKI:  Objection to form.   16:43
18      A.   Yes, there are deaf pilots out   16:43
19   there.  I have heard about them.  So they do   16:43
20   exist.  I know pilots that are deaf that fly   16:43
21   helicopters that have a pilot's license.  So,   16:43
22   yes, they do, and I would like to add something   16:43
23   else.  Deaf people can do almost anything.   16:43
24   BY MR. HALLER:   16:44
25      Q.   Are you aware that in flight schools   16:44

Page 199

1    there are things called simulators?   16:44
2             MR. ROZYNSKI:  Objection to form.   16:44
3       A.   Yes.   16:44
4    BY MR. HALLER:   16:44
5       Q.   Are you aware of any simulators that   16:44
6    exist in the CDL trucking industry, training   16:44
7    schools?   16:44
8             MR. ROZYNSKI:  Objection to form.   16:44
9       A.   No, I don't know of any.   16:44
10   BY MR. HALLER:   16:44
11      Q.   Okay.   16:44
12      A.   But I heard of a simulator.  I   16:44
13   believe that there may be some out there, but in   16:44
14   reference to whether that school in Bordentown   16:44
15   has one, I don't know.   16:44
16      Q.   Okay.   16:44
17           Do you agree that having a   16:44
18   simulation of driving that would go through the   16:44
19   type of scenario that we were just discussing   16:44
20   might be a way of training somebody in a way   16:44
21   that is safe and effective?   16:44
22            MR. ROZYNSKI:  Objection to form.   16:44
23      A.   I say yes, but that's an unfair   16:45
24   comparison because this is a practice simulator.   16:45
25   There is nothing like taking a vehicle on the   16:45

Page 200

1    road.  A simulator is almost like a video game.   16:45
2    You know, it does help, but it is not as real as   16:45
3    going out there on the street.  I think hands-on   16:45
4    is the most best training you can get out there   16:45
5    on the streets.   16:45
6    BY MR. HALLER:   16:45
7       Q.   What are the damages that you're   16:45
8    seeking in this case?   16:45
9             MR. ROZYNSKI:  Objection to form.   16:45
10      A.   Well, I'm not going to talk about   16:45
11   monetary because that's not the case.  You two   16:46
12   are lawyers.  Like you said, I'm not a lawyer,   16:46
13   so I won't discuss that.   16:46
14   BY MR. HALLER:   16:46
15      Q.   I asked what you're seeking by way   16:46
16   of damages or maybe any other form of relief in   16:46
17   this case.   16:46
18      A.   I want to be allowed to go to school   16:46
19   and pursue this.   16:46
20      Q.   And what specifically are you saying   16:46
21   that a court should require Smith & Solomon to   16:46
22   do, I mean, Bordentown to do in order to enable   16:46
23   you to go through the course?   16:46
24            MR. ROZYNSKI:  Objection to form.   16:46
25      A.   A sign language interpreter.  Any   16:47

Page 201

1    films and videos that they utilize in the   16:47
2    training room to be closed captioned.  Also, to   16:47
3    be allowed to have an interpreter come on site   16:47
4    inside the trailer as we're going on the road   16:47
5    and there's other things that I haven't   16:47
6    mentioned that I can't think of at the moment,   16:47
7    but there are other situations, but it all   16:47
8    pertains to an interpreter and closed   16:47
9    captioning.   16:47
10   BY MR. HALLER:   16:47
11      Q.   Can we agree on the record that the   16:47
12   major focus of what you're seeking is a   16:47
13   requirement that in this case Bordentown and the   16:47
14   other case Dutchess has a sign language   16:47
15   interpreter that's assigned and available   16:47
16   throughout the --   16:47
17      A.   Yes.   16:48
18      Q.   Hang on, I didn't finish my   16:48
19   question -- throughout the six weeks of the   16:48
20   training?   16:48
21            MR. ROZYNSKI:  Objection to form.   16:48
22      A.   Yes.   16:48
23   BY MR. HALLER:   16:48
24      Q.   Do you know what the fee is for   16:48
25   going through the training?   16:48



Page 202

```
 1        A.  We haven't gotten that far.  I never    16:48
 2   got to the point where I could discuss that with   16:48
 3   the schools yet.                        16:48
 4        Q.  And do you have any, do you          16:49
 5   personally have any sense of the cost of what    16:49
 6   you are saying should be required by the court   16:49
 7   in terms of a sign language interpreter assigned  16:49
 8   throughout the six-week program in relation to   16:49
 9   the amount of money that's charged by individual  16:49
10   to go through the program?                16:49
11        MR. ROZYNSKI:  Objection to form.      16:49
12        A.  I have no idea what that would cost.   16:49
13   BY MR. HALLER:                         16:49
14        Q.  So, you said -- is there anything     16:49
15   else you want to add to what you believe in this  16:49
16   case the court should be requiring of         16:49
17   Bordentown?                          16:49
18        MR. ROZYNSKI:  Objection to form.      16:49
19        A.  No, other than what I mentioned at    16:50
20   the moment.  Something may come up.  My main    16:50
21   primary concern right now is to have the         16:50
22   interpreter to have through the accessibility of   16:50
23   the entire course like everybody else and the   16:50
24   closed captioning videotape.  Not that strict on  16:50
25   certain things.  I do want them there, though,   16:50
```

Page 203

```
 1   and it really depends on the situation of the    16:50
 2   school.  I'm sure there may be something there    16:50
 3   that may not require the interpreter at that      16:50
 4   moment.  It all depends.  I have to find out      16:50
 5   what's entailed in that entire course.         16:50
 6   BY MR. HALLER:                         16:50
 7        Q.  Do you know anything about the air    16:50
 8   brake systems on these trucks?             16:50
 9        MR. ROZYNSKI:  Objection to form.      16:50
10        You can answer.                     16:50
11        A.  Yes, I read an article on that.  I    16:50
12   have done some reading on hydraulic brakes.     16:50
13   BY MR. HALLER:                         16:50
14        Q.  Okay.                         16:50
15        Are you aware that part of the         16:50
16   requirements of training is to be able to       16:50
17   audibly hear the sound of the brakes, the air    16:50
18   pressure?                            16:51
19        MR. ROZYNSKI:  Objection to form.      16:51
20        A.  There's an air pressure gauge on the  16:51
21   panel that most people that are deaf would refer  16:51
22   to that panel.  Although, some people are        16:51
23   hearing could auditorily hear that it is also    16:51
24   available to engage on the panel for you to see  16:51
25   that to engage.                       16:51
```

Page 204

```
 1   BY MR. HALLER:                         16:51
 2        Q.  I understand that.               16:51
 3        So you would say that you could rely    16:51
 4   on the gauge because it would be difficult, if   16:51
 5   not impossible, to hear?                  16:51
 6        A.  That is correct.                 16:51
 7        MR. ROZYNSKI:  Objection to form.      16:51
 8        A.  Because my eyes would substitute for  16:51
 9   what I can't hear.  So if I sense there was a    16:51
10   problem, I would stop the vehicle anyway, if I   16:51
11   sense there was a problem with the hydraulic    16:51
12   brakes.                              16:51
13   BY MR. HALLER:                         16:51
14        Q.  In terms of financial damages, can   16:51
15   we agree at no point since April 6, 2015, have   16:51
16   you sought any kind of treatment or counseling   16:52
17   for mental or emotional issues from any health   16:52
18   care provider?                        16:52
19        MR. ROZYNSKI:  Objection to form.      16:52
20        A.  No, I did not.                  16:52
21   BY MR. HALLER:                         16:52
22        Q.  Okay.                         16:52
23        And you've had no illnesses since      16:52
24   that date, have you?                    16:52
25        MR. ROZYNSKI:  Objection to form.      16:52
```

Page 205

```
 1        A.  No, I was not sick, no.           16:52
 2   BY MR. HALLER:                         16:53
 3        Q.  Do you know the difference between   16:53
 4   air brakes and hydraulic brakes?           16:53
 5        A.  I do.  They're not the same.       16:53
 6        Q.  And which type of brake systems are  16:53
 7   on tractor-trailers, if you know?          16:53
 8        MR. ROZYNSKI:  Objection to form.      16:53
 9        A.  I know that the front and rear      16:53
10   brakes are air brakes on tractor-trailers, if   16:53
11   I'm correct.                         16:53
12   BY MR. HALLER:                         16:54
13        Q.  Are you aware, let me withdraw that.  16:54
14        There are certain -- in addition to     16:54
15   the sounds for the air brakes, there are certain  16:54
16   audible warning signals that are on           16:54
17   tractor-trailers with respect to things like air  16:55
18   pressure, seat belts, if the horn is not        16:55
19   working, if the ignition is on, the key is in so  16:55
20   that the ignition on is on?               16:55
21        Do you know sitting here today         16:55
22   whether you would be able to hear any of those   16:55
23   audible signals or would you be relying on the   16:55
24   gauges?                              16:55
25        MR. ROZYNSKI:  Objection to on        16:55
```



Page 206

1    form.                              16:55
2         A.  No, I don't depend on my hearing.  I   16:55
3    watch the gauges when I'm watching as I turn on.   16:55
4    I look at the oil pressure.  I look at the       16:55
5    panels, every instrument and every gauge that's   16:55
6    on that panel.  If I sense that there's          16:55
7    something wrong, I find out everything is based   16:55
8    on visual with me and what I feel, because I     16:55
9    have to insure that everything is in normal      16:55
10   operating condition.  The other people who have  16:55
11   a hearing impairment also that have gotten their  16:56
12   CDL license, they operate the same way.  It is   16:56
13   all based on visual queues based upon what they  16:56
14   see on the panels.                 16:56
15        MR. HALLER:  I'm just going to go   16:56
16   off the record for a minute and see what   16:56
17   else there is to do.               16:56
18        MR. ROZYNSKI:  Okay.          16:56
19        THE VIDEOGRAPHER:  The time is   16:56
20   4:56.  We're off the record.       16:56
21        (Whereupon, at 4:56 o'clock   16:56
22   p.m., a recess was taken until 4:59   16:56
23   o'clock p.m.)                      16:56
24        THE VIDEOGRAPHER:  The time is   17:00
25   4:59.  We are back on the record.   17:00

Page 207

1         MR. HALLER:  That concludes my   17:00
2    questioning for today.  I'm going to   17:00
3    reserve my right based on the      17:00
4    possibility that maybe some additional   17:00
5    documents that we received to recall the   17:00
6    witness.  I don't think it will be   17:00
7    necessary.  I think it is highly   17:00
8    unlikely, but just in light of the fact   17:00
9    that there are a couple things that we   17:00
10   have identified that might be relevant,   17:00
11   I want to reserve that right.  With   17:00
12   that, I'm finished today.          17:00
13        MR. ROZYNSKI:  So we won't have   17:00
14   him come back tomorrow.            17:00
15        THE WITNESS:  Okay.  We're not   17:00
16   here tomorrow.  Thank goodness.    17:00
17        THE VIDEOGRAPHER:  Off the record   17:00
18   at 5:00 o'clock.                   17:00
19        (Whereupon, at 5:00 o'clock   17:00
20   p.m., the deposition was concluded.)   17:00
21                                      17:00
22
23
24
25

Page 208

1         C E R T I F I C A T E        17:00
2    STATE OF NEW JERSEY)               17:00
3         )SS:                    17:00
4    COUNTY OF MONMOUTH )               17:00
5                                      17:00
6         I, CATHERINE M. DONAHUE, a Certified Court   17:00
7    Reporter and Notary Public within and for the   17:00
8    State of New Jersey, do hereby certify:   17:00
9         That the witness whose deposition is   17:00
10   hereinbefore set forth was duly sworn by me and   17:00
11   that such deposition is a true record of the   17:00
12   testimony given by such witness.   17:00
13        I further certify that I am not related to   17:00
14   any of the parties to this action by blood or   17:00
15   marriage, and that I am in no way interested in   17:00
16   the outcome of this matter.        17:00
17        IN WITNESS WHEREOF, I have hereunto set my   17:00
18   hand this 30th day of November, 2015.   17:00
19                                      17:00
20   _____           17:00
     CATHERINE M. DONAHUE, CCR          17:00
21   License No. 30X100223700           17:00
22
23
24
25



**A**

**AAOS** 104:6
**ABC** 155:25
**abilities** 38:19
**ability** 12:11 15:12
32:15 57:9 91:24
94:16,25 95:6,15
**able** 26:12 31:23
36:22,23,24,25
37:1,22 38:12,16
39:16 43:20 44:1
44:9,9,12 48:11
54:4 58:22 59:11
59:25 61:1 66:4
69:9 79:6,9 82:14
84:19 93:20 94:21
97:20 101:2
107:10 108:7
115:17 126:11,13
145:7 146:1,2
147:12 161:20
167:18 168:20
188:8 193:9
195:18 198:3
203:16 205:22
**absent** 138:9
**absolutely** 112:3
**abstract** 4:24
119:22 120:6
**accept** 175:16
**acceptable** 122:7
195:16
**accepted** 57:13
77:17 78:7
**access** 28:15 32:1
63:8 71:6 77:20
96:8 101:15
**accessibility** 77:22
177:18 202:22
**accident** 179:14
190:24,25 191:2,3
191:4 197:19
**acclimated** 116:25
**accommodate** 83:5
84:13 167:19

169:7 171:21
177:18 182:6,6
**accommodation**
170:9 182:1,14,15
183:6 184:4,11
187:23
**accommodations**
83:15,21 178:3
182:4,17,19,23
**accomplish** 168:23
**accord** 148:12
**account** 150:18
194:18,21
**accuracy** 9:16 13:5
30:14 46:23 50:18
94:5
**accurate** 12:12
32:16 42:25 47:13
47:14 51:6 57:2
74:17 94:15 114:1
164:19
**accurately** 8:11,20
40:19
**acknowledge**
190:23
**acting** 12:9
**action** 7:6 8:9,18
85:18 86:3,23
208:14
**activities** 35:13
36:8
**activity** 70:1,22
**actual** 51:11 53:17
70:19 71:15 83:7
105:25 188:1
**acute** 185:7
**acutely** 187:12
**add** 97:25 98:4
198:22 202:15
**added** 52:9,13
53:21
**addition** 60:21
205:14
**additional** 55:12
92:24 207:4
**address** 13:21,24

96:2,15 114:7
171:5
**addressed** 49:2
88:20
**adjustment** 56:21
146:6
**administers** 78:1
78:16
**Administration** 5:6
62:2 93:7 96:3
121:16 122:3
129:8 136:9
137:18
**Administrator**
122:11
**Admissions** 161:13
**admittedly** 133:23
**advance** 194:18,21
**advice** 18:11 19:1,8
19:12,18 25:23
26:20 168:19
**advisement** 97:2
**advising** 129:8
**affect** 15:12
**afraid** 167:25
168:10,18 179:10
179:13,15 197:19
**afternoon** 103:6
162:21
**after-school** 70:1
**agency** 80:12
**ago** 63:13 74:24
81:17,22 99:11
102:3,8 109:9
111:21 118:24
151:10,11 153:5
153:10,11
**agree** 11:11 40:24
41:1,3 82:6 118:9
125:6 129:12
130:1 137:9 139:2
156:23 161:6
166:16,19 183:1,6
183:11 189:13
190:5 199:17
201:11 204:15

**agreed** 14:14 15:9
195:17
**agreement** 21:25
22:17,24
**ahead** 72:16 76:18
99:6 144:20
148:22
**aid** 39:22 45:2 57:8
68:1 69:17 116:16
118:11 125:17,21
127:11 164:6
**aids** 36:4,22 37:10
37:18,24 38:5,10
38:16,17,18,25
39:2,8,10,18 45:4
45:14 56:19,20,22
57:3,4,7,14,15,17
57:19,25 58:11,13
58:15,22 59:12,13
60:11 67:12,16,19
67:23 68:6,9
113:18 141:1
**aid/full-view**
118:15
**air** 203:7,17,20
205:4,10,15,17
**airplane** 198:16
**alarm** 38:13
**alive** 109:23 110:7
**allegation** 43:5
**allegations** 52:17
**alleged** 64:16
**allow** 25:24 36:2
38:10 179:11,18
184:20
**allowed** 62:25
114:20 116:5
200:18 201:3
**allows** 147:13
**alluded** 129:5
**alternative** 101:7
**ambulance** 59:20
**amended** 4:17,19
98:14,18 99:21
**amendment** 5:16
99:3,8,10,12

160:2,18
**amendments** 97:24
98:2,4
**American** 2:19,21
8:13,15,22,24
9:10,20 31:15
33:2 36:12 42:23
74:3 86:24 125:23
**amount** 23:2 202:9
**Andrew** 2:7 7:24
96:18
**and/or** 97:6 116:16
159:22
**answer** 6:3 12:4,25
13:10 14:13,21,25
17:8 18:17 20:24
22:1,8,11 26:16
26:25 27:11 32:9
36:15 38:8 39:4
40:10,23 58:6
59:2,17 60:16
61:5 62:4 63:11
64:7 65:10,25
66:15 68:8,15
69:23 72:1 73:16
74:10 75:17 76:4
76:11,18,18 78:22
82:16 86:20 87:6
87:12 93:3 117:14
119:6 130:6
139:22 140:20
169:9 174:2
176:11 177:11
178:12 179:4,7
188:14 190:3
194:1 196:24
197:1 203:10
**answered** 75:20
77:10 92:21 152:6
**answers** 4:9,12,14
4:17,19 5:17 8:14
8:23 12:17 14:18
15:13 47:24 49:11
49:14,23 50:9,9
51:12,21 64:21
74:7,14,17 76:13



76:20 87:22 88:3
89:3 93:25 94:10
94:19 98:14,18
152:14 155:22
156:22 160:3,19
184:19
**Anthony** 2:15 7:19
10:5
**anticipated** 17:9
**anti-discriminati...**
35:16
**anybody** 29:13
118:18 167:11
179:20 198:14
**anymore** 116:21
117:2,4 119:9,10
154:7
**anyway** 204:10
**apena** 144:6
**apnea** 143:23 144:8
145:17,25 154:10
**apologies** 31:20
35:10
**apologize** 65:18
163:2
**apparatus** 126:8,12
**apparently** 193:23
**appear** 37:16 65:19
176:24
**appearances** 7:17
**appears** 143:10,15
143:17 174:12
**applicable** 123:14
**application** 20:2
78:7
**applications** 26:2
54:17 64:5 92:5
**applied** 104:5
184:23
**apply** 19:9 54:17
179:19
**applying** 153:5
**appointment**
132:11 146:3
**appointments**
108:17 110:3

**appreciate** 32:7
58:19 60:8 101:22
**apprehension**
177:13
**approach** 168:6
193:9
**appropriate** 11:11
152:8 181:8
**approval** 30:22
84:21 132:18
138:2
**approved** 131:11
132:3,7 133:7,10
133:13,15,16
176:16
**approximately**
16:17,19 106:20
**April** 16:16,19
99:24 100:9
122:19 165:24
167:3 204:15
**area** 69:20 72:10
133:14 158:10,19
158:19,23 180:4
**arguably** 191:21
**argument** 180:1
182:22
**arrangement** 20:17
21:13,18,22 22:2
23:14,22 24:10
107:15
**arrangements** 21:5
**article** 203:11
**ascertain** 78:18
91:7,20 134:10
**asked** 22:23 28:21
43:4 44:6,24
76:19 83:2 86:13
96:4 116:3 120:22
123:7 127:3,17
141:5 149:17
150:11 152:6
154:3,4,25 155:4
158:18 164:22
172:22 175:18
176:17 191:23

200:15
**asking** 19:2,3 31:19
34:8 49:18 55:11
77:1 90:1,4 95:8
134:22 152:13
154:8 168:14
194:13
**asks** 46:8 52:7
64:11 173:1
**ASL** 32:22 35:12
42:24 66:3,5
**aspects** 184:6
**assigned** 170:2
201:15 202:7
**assignment** 187:23
**assist** 89:7
**assistance** 70:23
73:21
**assisting** 92:4
**Associate** 122:11
**associated** 187:2
**Association** 17:1,4
17:13 79:2 95:5
96:12 122:13
129:9 169:16
178:23
**assume** 15:8 25:5
81:14
**assumption** 78:12
**attached** 5:24 94:2
99:13 163:1
**attachment** 100:7
**attachments** 94:19
112:20
**attempt** 184:21
**attempted** 83:14
**attend** 111:12
**attended** 186:6
**attending** 68:21
104:6 162:24
**attention** 11:17
19:25
**attorney** 50:10
92:10,20
**attorneys** 2:4,11
18:17 30:11 42:16

46:4 50:14
**attorney/client**
18:14,19 20:20,23
21:2
**audible** 205:16,23
**audibly** 203:17
**audio** 132:13
**audiogram** 148:14
**audiological** 63:12
64:3 147:15
**audiologist** 56:9
147:16,25 148:3
148:19
**audiology** 56:7
57:4,18 140:11
141:6,16 148:11
**audiometric** 125:18
125:22
**auditorily** 203:23
**August** 162:15
164:12
**authorities** 178:17
**authority** 21:9
**authorization**
139:8 142:20
**authorize** 136:1
**authorized** 54:4,13
54:14 62:1
**automatic** 110:11
110:12,17,18,19
110:24 111:1,3,5
111:13,15 156:24
156:25
**automobile** 109:19
**available** 183:14
201:15 203:24
**average** 125:19
**avoid** 168:12
193:10
**aware** 49:5 50:25
52:21 53:1,6 56:6
85:23 100:14,15
113:17 121:3
142:25 162:4
163:8 177:5
179:21 180:20

184:3 185:17
187:8,11,16
198:25 199:5
203:15 205:13
**awkward** 38:3
**A-Fib** 143:23
145:10,12 146:5
153:8
**A-Fibrillation**
147:2,17 149:1
152:22
**a.m** 1:16 55:5,6
147:6

---

## B

**B** 2:15 4:1 5:1 8:8
47:6 99:13 100:7
**baccalaureate**
104:14
**back** 30:24 33:13
34:18,23 35:1,2
36:18 41:24 42:19
44:6,16,18,20
51:16,17,18 55:8
60:9 61:10 62:18
71:14 103:4 104:9
106:7 111:20
116:23 117:19,25
119:8 123:8 127:4
134:10 135:15
139:9 148:15
151:14 154:22
162:22 164:11
165:22 167:15
168:18 173:21
177:14 180:14
183:21 186:21,23
189:5 206:25
207:14
**background** 60:2,2
68:20 103:13
**backtrack** 132:15
**base** 60:3
**based** 31:5 63:18
74:10,11 84:4
102:3 106:18,23



119:1,2 137:16
143:16 148:25
156:22 206:7,13
206:13 207:3
**basically** 17:3
31:25 54:13 71:5
74:5 75:3,12,20
76:5,6 80:23
104:22 108:22
117:20 139:13
169:11
**basis** 23:16 24:1,5
76:23 87:3,9
107:12 158:16
**batch** 121:12,23
141:23 142:7,17
**batteries** 67:15
**battery** 67:13,25
68:2
**Baum** 2:3 7:25
16:10,14,16,24
17:7,10 18:8
20:17 22:14 23:15
24:11,19,25 25:11
25:23 26:14,21
27:5 42:16 166:25
**Beach** 13:24,25
151:4,6 158:13
**bearings** 163:22
**becoming** 100:21
**beginning** 40:3
103:8 183:21
**begins** 7:2 34:9,10
**behalf** 17:12 30:10
30:15,19 40:20
42:15 46:4,21
92:16 94:6,12
161:8 167:6,15
175:20 183:13
**believe** 16:2,15
18:2 19:16,19
20:25 46:6,6
62:20 63:7,23
83:4 102:10
106:24 108:4
113:10 119:2

126:16,19 134:19
151:3 171:9
181:16 182:16
184:4,19 198:4
199:13 202:15
**believed** 140:16
169:25 176:25
**bell** 59:18
**belts** 205:18
**benefit** 90:16
**benefits** 109:1
**best** 10:22 11:13
12:11 14:13 51:7
57:8,10 73:5
91:24 94:16,25
95:6,15 158:22
188:9 200:4
**better** 70:20 72:23
73:25 125:16,19
168:12 169:15
**beyond** 86:8,10
92:20 115:5
**big** 143:11 187:7,7
**bigger** 190:7
**bills** 25:6 108:23
**binder** 88:14
**birth** 15:20 34:12
65:22 66:7,17
67:1 114:10
**bit** 23:18 43:4 95:8
111:9 132:16
134:9 145:7,8
182:21 195:6
**Blank** 1:14 2:10
5:13 7:11,22 10:6
142:2
**bleeding** 145:16
**blind** 116:23
117:18
**block** 144:16
**blocks** 152:8
**blood** 152:25
208:14
**book** 75:4 187:17
**books** 119:11
187:19

**Bordentown** 1:7
4:12,15 5:21 7:4
7:20 10:7 20:6,8
20:11 25:9,18,23
26:8,23 27:7,8,22
32:3 40:21 41:5
41:17,17 52:22
53:5 87:23 88:4
89:3 169:25
170:17,23 171:4
175:22 176:23
185:17 186:1
197:7 198:1
199:14 200:22
201:13 202:17
**born** 15:22,25
38:22 66:1 67:1
**borrow** 109:6
**bother** 80:4 179:5
**bottom** 138:13
163:16,17 169:11
171:25 177:25
**bought** 109:14
**bouts** 145:15
**box** 153:19
**boxed** 121:6
**boxes** 152:15
**brackets** 129:1
**brain** 66:4
**brake** 203:8 205:6
**brakes** 203:12,17
204:12 205:4,4,10
205:10,15
**BRBPR** 143:24
**break** 54:24 55:1
55:11 77:24 97:16
97:20 98:8 100:19
102:15 154:14,15
186:14
**breathing** 153:21
**Brooklyn** 103:17
158:12,23
**brother** 16:3,6
19:24,24 26:22
27:6,12,24 29:13
37:6 40:20 41:8

41:13 42:19 45:2
45:11 47:1 53:4
53:15 92:1,9,14
92:18,24 99:16
100:12,13 107:17
108:4,18 144:23
145:5 146:3 156:9
156:17,20 158:15
159:1 161:1,7,18
162:17,23,25
163:12 164:12
165:16 166:1,10
167:6 169:1
170:22 171:4,11
171:18 172:17
173:4,11,14,22
175:19 176:12,14
181:24 182:13
183:3,13 186:6,8
186:8,9
**brother's** 109:6,7
109:22 111:4
156:11,12 157:5
163:6
**brought** 10:8 19:24
29:2 53:8 62:7
86:15,22 133:17
148:14
**buildings** 105:20
**business** 104:3
105:12 106:21
**businesses** 169:15
**buy** 109:24

———————————

**C**

**C** 2:1 208:1,1
**cab** 191:14 193:23
**calibrated** 125:22
**call** 17:24 29:17
38:21 49:4 80:7
80:20,21,23,23,25
81:2,9,9,12
108:24
**called** 8:8,17 9:1
21:11 23:25 40:3
49:1 54:2 93:5

108:11 132:6
133:15 187:17
199:1
**calling** 80:12
**calls** 18:13 20:19
95:14 108:21,22
**camera** 11:17
**campus** 70:4
**candidate** 32:4
**candidates** 54:16
**capable** 57:7 175:6
180:3
**capacity** 166:21
**captioned** 201:2
**captioning** 201:9
202:24
**car** 38:13 39:6
59:20 69:5 70:2,3
70:7 109:4,6,8,10
109:13,15,16,18
109:21,22,24
110:1,5,11,15
111:1,4,8,16,18
111:19 156:7,9,11
156:12,24 157:5
158:18 188:20,22
189:20 190:8,18
191:2,4,8
**cardiac** 148:25
**cardiologic** 150:1
**cardiologist** 146:4
147:19 148:25
149:8,23,25,25
150:5,6,8,12
**care** 62:16 64:13,23
65:5 67:18 108:6
149:21 204:18
**career** 83:7 85:18
86:3 101:5,25
198:13
**careers** 101:7
**carefully** 66:10
**Carmen** 52:14
**Carnegie** 1:14 7:10
**Carrier** 5:6 62:1
93:7 95:5 96:2,12



121:16 122:2,12
129:8,9 136:8
137:18
**carry** 128:19
**carrying** 187:7
**cars** 39:7 111:12,14
156:18,19,19
**case** 10:8 19:8 20:5
21:11 24:7,16,20
27:19 29:1,1 47:3
47:10 48:25 52:8
55:14 58:16 72:17
86:16 87:10 88:10
112:19 117:4
155:24 163:10
170:5 179:10
200:8,11,17
201:13,14 202:16
**cases** 23:21 27:22
86:14 191:7
**Catherine** 1:17
7:14 8:10,19 9:3
208:6,20
**catty-corner** 158:9
**cause** 37:24
**cautious** 18:18
**CCR** 208:20
**CDL** 27:21 64:4
78:1 79:3,20 85:2
85:11,13 86:5,25
100:20,21,24
101:17 102:6,11
140:18 147:12,13
170:24 181:17
185:21 186:3
198:9 199:6
206:12
**center** 1:14 7:10
108:24 110:25
143:12
**certain** 9:21 10:15
23:24 29:19 38:25
39:11,13 57:25
60:10 96:7 117:23
146:9 147:14
202:25 205:14,15

**certificate** 5:8,9
61:25 62:11
128:16 129:11
136:22 137:2,11
137:21 138:23
139:3 162:6
**certificates** 84:21
92:7
**certification** 62:25
63:2 124:21
131:23 133:6
134:13 138:9
139:23 140:17,17
151:20 163:9
**certifications** 54:5
**certified** 1:17 50:23
54:1 62:23 63:4
137:14 138:17
141:5 161:22,23
162:10 163:1
208:6
**certify** 208:8,13
**certifying** 147:19
**CFR** 122:14 125:8
128:8 129:2
**chain** 173:21
**challenge** 176:25
**chance** 34:13 39:18
39:19,21,22 40:15
**change** 101:4 181:9
**changed** 75:2
119:11 146:6,11
**changes** 99:20
**channel** 35:2
155:24
**charged** 202:9
**chatter** 83:20
**check** 141:1 152:3
161:20
**checked** 152:5,7,8
153:2
**Chief** 129:6
**choice** 57:9 74:22
75:13
**choices** 9:18 75:1
75:14,16

**choose** 33:1
**choosing** 57:8
**chose** 69:6 158:23
175:15
**Christina** 161:12
162:16 163:16
**chronologically**
130:11
**Cindy** 61:11 134:24
134:25 135:6,12
**Circuit** 21:11
**circumstances**
11:20 75:24 124:3
**citation** 121:7
**cite** 117:12 123:1,3
172:4
**cities** 83:22
**CIV** 1:2
**Civil** 7:6
**claim** 28:5 87:3,10
**claims** 30:19
**clarification** 12:16
34:22 75:21 78:6
90:10 157:13
184:23
**clarifications** 76:19
**clarifies** 134:7
**clarify** 90:4,8 132:6
**clarity** 38:1
**Class** 58:11 113:5,6
113:8,12,14,23
114:6 117:15,16
**classes** 104:2
**classification** 79:3
**clear** 13:18 21:3
22:19 33:17 92:12
126:24 141:15
142:23 191:25
**clearance** 147:11
148:25
**cleared** 147:18
**client** 20:21 22:10
23:9 24:5
**clinic** 144:6,9
145:25
**Clinton** 155:8

**clip** 88:15 157:2
**close** 158:8 159:6
196:3
**closed** 42:24 201:2
201:8 202:24
**CMV** 128:17
**code** 13:25 127:20
180:4
**cognitive** 66:5 67:7
**collaborated**
195:12
**collaboration** 195:6
197:5
**collaborative**
197:10
**colleague** 7:23 8:2
**college** 101:11
103:24 104:5,9,14
105:8
**Colorado** 83:11
84:1
**column** 110:25
153:19
**combination** 70:11
**come** 26:11 30:24
41:24 44:20 63:17
68:19 70:2 80:24
118:6 134:10
176:8 179:8 196:7
196:9 201:3
202:20 207:14
**comfortable** 22:3,7
197:14
**coming** 60:9 61:10
73:11 192:6,9,15
**commencing** 1:15
**comments** 10:15,17
43:21
**commercial** 78:16
113:23 115:12
124:11 125:14
**common** 118:1,2
**communicate** 17:3
37:1 196:16
**communicated**
36:14 162:22

172:18
**communicates**
31:15 35:12 42:23
**communicating**
70:21
**communication**
17:3 20:21 31:17
37:3 66:4 67:3
71:3,4 72:9 80:14
95:4,12 104:15
106:2 193:21
194:25 195:16
**communications**
5:5 18:20 26:22
40:19 41:5 61:24
121:15 122:2
**community** 103:23
103:24 104:9
171:22
**company** 10:9
101:19 105:14
106:4
**comparison** 199:24
**competitive** 101:3
101:13
**Compilation** 5:12
141:25
**complaint** 4:4,5
30:3,10,14,17,20
40:2 42:4,15
52:18 53:9
**complete** 51:6
71:16 72:10 94:15
103:25 131:2,3
149:1 152:4 196:7
196:10
**completed** 129:10
129:24 132:23
133:1 152:2
**completely** 36:21
36:23 37:8 39:9
44:25 45:3
**completeness** 30:18
48:19 94:10
**compliance** 179:22
**complied** 176:16



comply 123:13
computer 104:11
Con 108:19
concept 101:8
concepts 9:21
concern 28:16
    177:16 202:21
concerned 66:17
    67:3,6 179:12
concerning 10:15
    27:21 61:24
concerns 176:25
concluded 207:20
concludes 207:1
concluding 40:4
conclusion 26:11
condition 67:10
    206:10
conduct 86:9
confess 181:22
    182:20
confirm 66:19
    115:15 130:12
confirmed 66:21
    99:11
confronted 117:11
confused 23:8
confusing 146:20
connected 17:11
    80:15 96:8
connection 5:16
    16:14 25:9,11
    65:8 81:2 160:2
    160:18 169:24
    170:23 180:22
    185:8
Connelly 2:16 7:23
    29:21 138:15
    142:19 155:15
consecutive 9:13
considerable
    174:25
considered 185:11
    185:13,15 195:17
considering 79:20
consistent 68:11

console 111:1
constructive
    178:21 179:2
consult 26:13 27:5
consultation 19:7
consultations
    142:22
consulted 64:14
    65:7 149:20
contact 17:17,19
    18:3,7 41:9 52:21
    62:20 80:15 134:20
    163:6 165:2
contacted 17:1,12
    17:16 18:1 19:25
    26:3 27:12 79:1,1
    79:17 80:3 83:23
    134:21 135:2
    169:16 179:21
    185:2 186:9
contacting 135:3
contained 52:17
    122:1
contains 94:21
contempt 51:2
content 185:25
context 92:4 93:10
    187:21 190:5
contingencies
    194:22
contingency 24:1
continue 43:19
    116:10 117:3
    166:5
continued 147:6
contractor 105:21
contribute 107:21
    107:25 108:3,9
contributes 108:4
conversation 37:20
    37:23 61:23 78:14
    78:15 81:7,21
    136:8 153:4
    183:12
conversationally
    59:25

conversations
    18:16 19:3 21:16
    21:24 39:5 137:17
converse 44:3,10
conveyed 169:1,4
conviction 120:7
cooperate 9:15
cooperative 79:8
copacetically 54:20
copies 63:6 129:20
    139:14
copy 4:21,23 29:24
    33:10 63:23 81:14
    90:17 112:11
    114:1 115:8 116:8
    119:20,25 128:15
    128:21 129:15,20
    129:24 131:10
    132:24 134:1
    173:2
corner 120:16
corners 187:12
Corp 21:12
correct 11:10 16:11
    18:9 19:14 20:14
    26:9,17 27:1
    31:24 37:11,13,19
    39:13 41:8 44:5
    46:25 47:4,11
    52:14 56:3 61:13
    61:14,17,21 64:25
    65:13 75:7,11
    86:6 90:5 100:9
    112:5 113:4,25
    114:9,13 117:15
    118:14 120:6
    122:21 125:3,24
    126:17 127:25
    128:5,18,23 129:2
    136:9 137:19,23
    141:21 151:21
    152:17 156:5,7
    162:7 204:6
    205:11
corrected 146:11
corrective 113:15

116:15
correctly 108:17
    126:20
correspondence
    5:17,19,20 16:21
    17:21 37:6 95:13
    96:20 99:15,24
    127:25 129:6
    160:4,20 165:8,15
    167:10 170:16,22
    171:3 176:13
    181:24 183:2
corresponding
    19:22 27:7 161:4
corresponds 139:7
cost 164:23 168:3
    168:21 177:17
    202:5,12
costs 23:24
counsel 7:16 10:14
    29:7,9,11,13,24
    49:1,6 50:5 89:7
    89:20 91:15 94:7
    94:12,17 99:11
    159:7,8 168:19
counseling 204:16
counting 51:17
County 21:11
    208:4
couple 207:9
course 33:15 66:12
    86:25 91:25 93:11
    93:18 94:23 170:3
    179:20 183:5,16
    184:6 200:23
    202:23 203:5
courses 83:4 84:15
    103:15 106:18
court 1:1,17 7:13
    8:4,7 12:9,10
    14:16 21:13 36:18
    51:2 193:18
    200:21 202:6,16
    208:6
cover 51:16
covered 79:4 92:15

create 168:21
creating 58:2
credentials 54:14
    54:15 178:5
criteria 147:14
cross 120:17,19
    157:25 158:7
    159:8
crossed 120:15,15
crossover 121:5
crosswalk 120:20
    157:11
crumbled 93:16
CUNY 103:24
curb 196:4
current 113:6
currently 15:11
    108:19
curriculum 185:25
customer 108:21
    108:22
cut 187:11
Cutlas 110:14

            D
D 3:1 9:1 58:12
    113:5,6,12,14
dad's 109:22
DAG 169:13
daily 110:4
damages 200:7,16
    204:14
damaging 191:2
danger 187:8,13
    190:13 193:8
dangerous 32:4
    189:16 190:7,8,23
    190:25 196:9
dangers 187:2,6
    190:18
date 1:16 15:20
    16:22 30:5 42:6
    45:24 47:22 48:2
    48:16 53:8 63:20
    88:2,8 98:17,22
    100:2,15 112:15



114:10,23 115:14
115:17 116:2,6
119:24 121:19
129:15,22 136:6
136:25 137:4
139:3,7,18 140:8
142:4 143:19
151:12 155:20
160:7 165:12
166:16,19 170:19
204:24
**dated** 5:11 100:9
136:4 140:5
**dates** 82:5
**David** 19:21,23
20:1
**David's** 19:21
**day** 171:12 208:18
**days** 134:19
**daytime** 153:21
**deaf** 17:1,4,13
28:13 31:14 32:2
34:10,11,14 35:11
36:12,21 37:9
38:22 42:22 44:25
45:3 66:2,18 67:1
68:16 69:2,5,10
77:20 79:2,19
83:12,21 84:9,17
85:2,10,13,15
86:5 100:23 102:5
103:17 104:2
105:5 107:8
110:10 117:2
118:3 147:12,13
154:3 162:24
166:2,3 167:4,17
167:19 168:2
169:16 178:23
179:11 182:6
184:20 198:12,18
198:20,23 203:21
**deafness** 45:13 66:3
66:13,20,22 67:8
197:14
**deal** 92:16 167:25

**dealing** 168:1
**deals** 67:18
**dealt** 24:3 176:23
**debate** 180:1
**December** 82:1
143:17
**decibels** 125:20
**decide** 100:19
195:10
**decided** 27:14
104:8,11 148:7
158:19,22
**decision** 25:24 27:9
122:13 132:9
196:15
**defendant** 1:9 2:11
4:12,15 7:20 9:2
10:7 20:5 87:23
88:4 89:3 94:7
143:1
**defendants** 48:25
88:21 94:1,12,20
**Defendant's** 4:3,7,9
4:10,17,19 5:3
29:20 30:4 42:3,5
45:21,23 46:2
47:19,21,24 48:1
48:10,13,15 49:9
49:14,23 50:6,21
55:11 87:20,25
88:6,11,19 89:1
89:21 98:14,16,19
98:21 99:14
112:13 119:23
121:17,20 136:23
137:3,8,10,22
140:6 141:24
142:3,8,18 155:17
155:19 159:25
160:6,14 165:7,10
170:18
**degree** 106:2
**delay** 9:14,25 163:2
**delete** 81:12
**deleted** 93:21
**delivered** 189:10

**demolish** 112:3
**denied** 19:9,12,16
20:2,12 26:3,4
27:15 32:1,5
83:15 87:13,15
178:7
**department** 4:23
118:19 119:21
**depend** 60:24 206:2
**depending** 24:1
117:20
**depends** 78:8 110:3
117:22 188:10
203:1,4
**deposition** 1:12 6:1
7:3,9 9:23 10:25
11:20 12:8 14:4,7
14:9 29:8,16 86:2
103:8 131:21
133:4 207:20
208:9,11
**describe** 40:19 69:3
86:14 125:11
**described** 77:4
157:5 196:2
**describes** 31:22
**describing** 118:23
**Description** 4:2 5:2
**design** 101:2
104:15 106:2,3,22
**designation** 138:12
138:22
**designations** 113:1
**designs** 101:1
**destroy** 93:13
**determination**
59:15
**determine** 58:21
**determined** 175:5
179:6
**develop** 117:1
194:10
**device** 125:18,22
**Diab** 2:23
**diagnosed** 145:10
147:17

**diagnosis** 143:23
144:5 147:1
152:22 154:10
**diagonally** 158:9
**dial** 80:14
**dialogue** 42:19
177:8 195:13
197:6
**dies** 67:25
**difference** 28:23
38:5 138:4,10
146:7 205:3
**differences** 36:13
99:20
**different** 12:3
32:23 33:1,23
66:18 73:10
146:10 178:12,25
**differently** 31:12
168:25
**difficult** 12:22 44:3
204:4
**diligent** 91:21 92:1
93:11 97:14
**diligently** 89:24
92:10
**direct** 41:4 182:25
190:3
**directed** 77:2 79:13
79:14 180:21
**direction** 44:15
54:6 61:1
**directionality**
33:19
**directions** 188:22
**directly** 69:15 80:3
85:21 93:3 161:4
**disabilities** 67:7
84:14
**disability** 64:16
65:8,16 66:5 83:5
168:11
**disabled** 32:6 66:2
**disappointed**
106:12
**Disappointing**

106:14
**disapproved**
176:16
**discarded** 93:22
**discern** 31:24 32:15
58:23 59:14 75:15
**disclose** 18:15,19
23:1
**disclosed** 174:14
**disclosing** 22:3
**disclosures** 4:6
45:22 46:3 52:10
**discoverable** 21:5
21:14 46:17
**discovered** 119:3
**discriminated**
28:13 107:4
**discrimination**
19:8 28:25 31:18
35:15 101:12
166:8
**discuss** 19:5 22:5
29:11 200:13
202:2
**discussed** 24:14,22
50:14 103:7
155:24 161:1
169:21 194:9
195:11
**discussing** 138:24
145:21 199:19
**discussion** 174:25
176:4 178:21
179:2 188:10
**discussions** 167:7
**dismissed** 104:22
**disobeying** 120:8
**disorders** 153:20
**disregarded** 175:12
**disseminated** 72:18
**distance** 158:14
**distances** 112:7
**distinguish** 45:15
60:1
**District** 1:1,2 7:5
**Division** 129:7



**DMV** 69:15 116:3
  119:14 120:9
**doctor** 54:7,9 56:11
  62:8,16,23,24
  63:1,3 67:21
  108:14 126:3,3
  132:3,8,10,18,20
  133:9,12 134:1,3
  135:9,23 148:6,16
  149:21 150:14,20
  150:22,25 152:4
  152:24 153:12
  154:1
**doctors** 55:19 57:9
  132:7
**doctor's** 132:23
  151:5
**document** 4:10
  30:1,24 32:11
  42:11 44:1 45:20
  45:20 46:5 48:13
  49:5,16,19 50:21
  51:11 52:8 54:4
  63:17,18 86:13
  88:20 89:2,10
  90:15 92:21 93:13
  93:19 98:1,5
  112:9,24 113:13
  119:19 120:4,5
  123:19 125:1,1
  126:4 127:24
  136:1 138:7 140:3
  143:10,17,20
  146:15 151:9,24
  159:24 163:4
  165:18
**documentation**
  115:3,4 173:24
**documents** 4:13,16
  5:5,12,15 6:6
  16:20 47:6,10
  53:17 87:19,20,25
  88:6,23 89:5,18
  89:22,25 90:5,13
  90:19,21 91:14,21
  92:8,22 93:12

94:1,2,20,21
  95:25 96:25 97:5
  112:18 121:12,14
  121:24,25 122:4
  136:19 141:23,25
  142:7,9,17 149:23
  159:22 160:1,16
  160:23 161:6
  172:4,22,23
  173:11 176:14
  207:5
**doing** 12:24 58:1
  60:12 84:13 91:25
  147:25 156:6
  159:18 170:24
  188:1 193:4,22
  195:9 196:1,17
**Donaghy** 2:24 7:12
**Donahue** 1:17 7:14
  8:11,20 9:3 208:6
  208:20
**door** 44:7,8,13
  59:18
**doorbell** 38:13 58:8
  59:19
**DOT** 62:25 63:2,3
  132:3 135:8
  137:14 138:1
  147:13 161:21,23
  162:25 164:3,5
  171:19 172:12
**doubt** 106:15
**downgrade** 68:10
**Dr** 5:8,10 53:21
  54:9,10 55:14,15
  55:20,20 63:3
  64:23 65:4 133:6
  133:6 134:1,14,16
  136:22 137:2,12
  137:20,21 138:2,6
  138:9,23 139:3
  140:15 141:4,6,12
  142:21,22 143:2
  143:15 144:23
  145:22 147:24
  150:6,7,11,15,17

151:20 152:12,23
  154:9 161:20
  162:6,9,10 163:9
**drill** 34:17
**drive** 68:16,23 69:5
  69:21 70:3 110:1
  110:6,6,7,8,9
  112:6 116:25
  124:11 125:14
  158:14,15,18
  166:4 167:5 178:4
  188:20 190:6
  198:8,9
**driven** 111:7,9,13
  111:14 190:10
  191:9
**driver** 1:7 4:12,15
  4:24 10:7 25:9,25
  26:10 27:21 83:3
  87:23 88:4 89:4
  100:21 101:17
  109:8 115:13
  119:22 120:7
  140:18 170:24
  185:14,19 194:19
  194:20
**drivers** 102:11
  118:2 147:13
  186:3 198:3
**driver's** 4:21 58:12
  75:4 112:12
**drives** 70:19
**driving** 7:4,21
  19:10,13,17,20
  20:1,6,8,12 25:13
  28:17 29:3 37:7
  41:9,17 42:17
  54:2,5 64:5 68:24
  69:7,11,12 70:1,3
  70:7 71:8,9,15,18
  71:24 72:5,6,25
  73:8,14 78:16
  84:9,15 86:16,23
  92:5 113:23
  117:23 120:11
  157:1,9,22 158:21

167:3 168:10
  185:5,6 187:3,19
  188:23 189:11,18
  190:18,24 199:18
**drugs** 155:2
**due** 109:18
**duly** 8:9,18 9:3
  208:10
**Dutchess** 5:19
  25:12,14,16,18
  27:23 28:17 29:2
  37:7,8 42:17
  44:24 86:15,23
  87:4 165:9,16,25
  167:2,8 169:5,24
  175:18 197:7
  201:14
**D.C** 54:19
**d/b/a** 7:4

—————————————

**E**
**E** 2:1,1 3:1 4:1 5:1
  8:8,8,8,8,17 9:1,1
  103:1,1 208:1,1
**eagerly** 107:1
**ear** 56:23,25 67:25
  68:3 125:16,19
  164:6
**earlier** 43:4,12
  44:23 61:23
  116:24 129:5
  131:21 133:4
  165:22
**early** 48:24 191:20
  195:13
**East** 2:5
**easy** 168:5 197:21
**economy** 104:18
**Edison** 108:19
**education** 32:14
  33:6 103:14
**educational** 57:22
  68:20 103:13
**effect** 103:8
**effective** 11:9 71:2
  184:12 199:21

**effectively** 72:19
  171:20 175:3,24
  176:6 178:17,25
**efficient** 31:17
**effort** 188:24
  197:10
**efforts** 96:24 97:14
**Eighteen** 109:12
  155:15
**eighth** 103:19
**Eisenberg** 2:3 7:25
  16:9,13,16,24
  17:7,10 18:8
  20:16 22:13 23:15
  24:10,18,25 25:11
  25:22 26:13,20
  27:5 42:16 166:25
**either** 56:10 85:18
  86:3 155:1 160:17
**elaborate** 23:18
  24:12 59:3 73:20
**elaborated** 76:21
**Elaine** 61:22 62:23
  129:6 130:2,13
  133:11 134:12,21
**elapsed** 102:9
**electronic** 106:21
  143:16
**electronics** 105:13
  105:16,17
**elicit** 23:11 149:23
  178:11
**Elizabeth** 2:19
**eluding** 44:22
**embark** 109:20
**emotional** 204:17
**employment**
  106:17,25
**enable** 12:3 50:5
  200:22
**enabled** 184:5
**enclosing** 130:14
**encompass** 15:24
**encounter** 194:3
**encountered** 16:16
  67:7



encountering
197:17
ended 104:5 137:18
enforced 119:8,9
engage 176:4
178:20 179:1
197:6 203:24,25
engagement 20:16
21:1 22:13
engines 39:7
English 8:13,16,22
8:25 9:11,19
32:21,24 36:10
74:2,3,6
enjoyed 101:8
enrolled 83:13
103:18
enrollment 161:22
entailed 203:5
enter 184:21 192:1
entered 104:14
entering 184:25
192:8,14
Enterprise 156:7
156:16,18,18
entire 69:17 134:15
170:2 181:23
202:23 203:5
entirety 43:14
entitled 89:3
entry 148:18
153:20 192:18
environment 58:2
60:13
environmental
36:25 38:12 45:16
equal 28:15
equipment 85:23
error 110:23
especially 184:14
185:21
ESQ 2:7,8,15,16
essentially 65:22
establish 14:8 67:2
127:16 180:2
established 67:8,9

establishing 181:13
Ethnic 101:19
evaluation 62:8
135:10 148:20
evaluations 67:5
evening 156:3
eventually 70:17
135:15
everybody 76:9
117:17 178:3
202:23
exact 62:19 82:4
151:12 157:18
exactly 26:5 31:24
35:7,18 70:15
73:2 106:6 151:4
157:7 158:5 159:2
159:8 168:14
196:1
exam 62:6 129:19
133:19 139:13
140:25 141:6
examination 3:5
10:1 56:1,8 77:15
78:1,4,13,17,20
82:7 129:10,23,24
130:19 131:10,16
131:19 132:5,13
132:13,14,19
133:24 140:11
141:7 150:1
152:20
examinations 54:16
65:20 79:15
154:25
examined 9:5 64:14
65:7
examiner 62:12
93:8 124:2 131:23
138:17
examiner's 5:7,9
128:16 136:21
137:1,11
example 22:21
185:14
examples 22:18

exams 108:13,15
exclamation 171:13
excuse 33:9 37:15
186:10
exemption 61:16
61:18 128:1,2,6,7
128:15,21,25
130:15 131:7
132:10 134:11
141:11 173:2
exhibit 4:2 5:2 30:1
30:1,4,8,9 32:19
42:3,5,12 45:21
45:23 46:2 47:21
48:1,9,10,15
49:10,16 50:22
55:12 87:20 88:1
88:7,11,11,19,24
89:2,21 90:2
91:13 93:24 98:16
98:21 99:13,14
100:7 112:10,13
112:18,20,25
113:22 115:24
116:12 119:19,23
121:13,17,21,24
122:1 136:23
137:3,10,22
139:10 140:4,7
141:24 142:3,8,18
151:14 155:17,19
157:3 159:25
160:6,14 165:6,7
165:10,15 170:15
170:18 181:21
exhibits 5:24 29:17
29:19,20 42:9
47:18,18 98:12
137:8
exist 198:20 199:6
existed 93:19
existence 169:14
exists 96:1,21 115:4
expect 150:21
expectation 77:19
expense 25:2

expenses 24:15
25:2
expensive 109:21
experience 105:25
166:3,6 167:4,16
167:25 197:17
experienced 28:24
31:18 107:3
194:14
expertise 188:5
expiration 114:23
115:14 135:21
expire 113:9
expired 114:17
expires 114:14
expiring 116:5
explain 23:20 80:10
120:22 150:9
168:19,22 169:11
explained 112:1
120:21 126:7
131:20 180:11
188:19
explaining 121:1
134:25 179:5
explanation 156:13
explicit 188:21
explosion 60:6
expressed 31:16
expresses 181:25
expressing 32:1
expression 170:23
expressway 191:24
extend 115:23
extends 115:5
extension 12:9
135:6
extent 18:15 21:20
33:22 95:25 96:20
106:24
extra 33:10 168:21
eye 108:13,15
132:13
eyes 44:7,10,16,16
72:6 204:8
eyesight 35:3 60:20

116:22
e-mail 17:24 18:1
19:23,23 26:2
42:20 44:24 61:20
62:7,20 80:8
81:15 92:3 93:6,9
93:21 95:3,25
96:1,5,6,11,14,16
99:14 134:20
135:2 161:12
162:15 163:2,15
166:11 167:2
171:5,11 173:14
173:21 174:3,15
174:24
e-mailed 62:21
63:7
e-mails 53:12,17
63:6 92:18,24
93:15 95:13 97:11
174:9

F

F 9:1 103:1 208:1
face 11:16
facilities 169:12,17
facility 151:6 168:9
fact 11:12 27:17
32:1,2,16 58:15
72:11 102:4
119:10 133:16
135:8,17 153:7
179:9 188:21
194:13 197:13
207:8
factor 72:2,8
facts 40:3 41:24
46:17 178:11
fair 15:9 53:2 83:16
178:2
fairly 48:11 159:6
fairness 176:22
faithfully 8:11,20
false 51:1
familiar 40:7 100:4
100:11 160:22



165:17 170:21
**familiarity** 185:24
**family** 16:2,4,7
    107:18 108:8,9
**far** 24:23 44:10
    57:20 87:4 99:19
    104:24 139:25
    159:12 202:1
**fast** 12:2 193:7
    194:20
**father** 109:14 110:7
    110:15
**father's** 104:3
    105:12 106:20
**FCMA** 54:3,17
**federal** 5:6 35:14
    62:1 93:7 95:5
    96:2,11 121:15
    122:2,12 123:14
    123:16,21 129:7,9
    132:22 133:20
    136:8 137:17
    171:19 172:12
    175:1 178:16
    180:4 181:16
**fee** 21:4,13 201:24
**feel** 12:1 14:24
    28:12 60:2 66:6
    169:4 178:10
    206:8
**fees** 23:24 24:3,19
**feet** 125:16
**felt** 104:2 177:13
**field** 101:2,14 106:4
**figure** 59:19 60:3
    60:22 188:8
**figured** 101:3,14
    102:12 168:3,4
**filed** 25:17 27:16
    30:10,14,19 42:15
    53:9,18
**filing** 30:16 176:9
**fill** 26:1 50:8
**filled** 50:9 53:7
    62:16 129:19
    132:12 134:16

**filling** 78:6
**films** 201:1
**final** 26:11 27:8
    50:17 86:20
    113:10 114:18
    115:17 174:18,20
    179:7
**finally** 66:20
    174:13
**financial** 20:17
    24:24 204:14
**find** 24:8 33:19
    39:21 41:9 54:3
    62:24 63:1 90:24
    94:22 101:14
    106:13 135:3
    146:16,19 158:4
    159:17 190:21
    203:4 206:7
**fine** 41:20 50:16
    55:17,18 66:9
    97:13 135:11
    159:19 163:23
    172:5
**fineable** 120:19
**finish** 14:20 44:3
    97:19 149:15
    150:4 201:18
**finished** 139:14
    160:8 207:12
**fire** 38:13
**firm** 7:22,25 8:3
    10:6 16:9,13,23
    17:2,5,18 18:12
    19:2 20:16,22
    21:22 22:17,25,25
    23:15,23 24:18
    25:22 26:4,13,20
    42:16 166:20
**first** 4:7,9,10,13,15
    4:18,19 9:2 11:19
    12:23 14:7,12
    16:13,15,22 20:11
    25:10,18 29:25
    31:1,7 32:19,23
    35:8 47:19,24

48:13 49:1,14
    50:6,7,8 51:22
    52:6 67:4 75:24
    76:2,22 77:3 80:7
    82:1 87:24 88:5
    88:20,24 89:4
    90:15 94:1,20
    98:14,19 100:19
    101:24 102:1
    103:18 109:13
    113:21 116:11
    122:9,9 125:15
    128:6 130:19,22
    131:16 133:23
    147:22 165:25
    197:16
**fit** 41:10 57:3,6,8
    67:24 68:3
**fits** 136:11,13
**five** 106:5,23
    109:25 125:16
**five-minute** 154:15
**fixed** 44:7
**flight** 198:25
**Floor** 2:5,13
**fluent** 145:6
**fly** 198:15,20
**FMCA** 62:17
    129:21
**FMCSA** 132:20
    133:1,10,22 134:4
    134:11 139:8
**focus** 34:8 144:4
    163:19 201:12
**follow** 10:17 33:11
    62:22 81:15 112:1
    131:25
**followed** 17:17 80:8
    105:1 133:2
**following** 18:6
    51:12 118:4
    144:18 167:2
    171:10 174:24
    186:25 191:17,18
    192:2,4 193:1,11
    193:14

**follows** 9:6
**followup** 107:6
    148:20,24
**Fong** 55:20
**food** 108:3
**Forced** 124:1,10
    125:15 127:21
    180:23
**forgot** 79:18
**forklift** 185:13,14
    185:19 198:3,8
**form** 22:1 26:15,24
    27:10 32:20 38:7
    39:3 40:9,22 41:7
    50:17,23 58:5
    59:1,16 60:15
    61:4 62:3,6,14,16
    62:19 64:6 65:9
    65:24 66:14 68:7
    69:23 71:25 73:15
    76:3 77:7 78:5,21
    82:9,15 87:5,11
    90:11 92:3,17
    119:5 124:5,14
    130:5,16 132:12
    139:8,14,21
    140:19 141:20
    149:2 150:10
    152:5,16 155:3
    158:1 162:8
    166:22 167:20
    169:8 170:10
    174:1 176:10
    177:2,10 179:3
    180:5,17,25
    181:11 183:7,19
    184:9 185:10
    186:4 187:5,15
    188:4,15 189:2,19
    190:12,20 191:10
    192:3,11 193:2,12
    193:15,25 195:3
    195:15 196:6,25
    197:12 198:6,17
    199:2,8,22 200:9
    200:16,24 201:21

202:11,18 203:9
    203:19 204:7,19
    204:25 205:8
    206:1
**former** 156:19
**forms** 50:12 95:3
    152:7 163:12
**formulate** 74:10
**forth** 42:19 75:1
    173:22 197:21
    208:10
**fortunately** 104:20
**forward** 131:7
    146:15 147:4
    150:22 163:4,14
    173:7,15,24
**forwarded** 92:19
    96:5
**found** 34:11 54:6
    63:3 85:14 92:22
    104:20 133:12,13
**four** 44:16 48:3
    106:5,22
**fourth** 51:10,15,17
    51:18
**four-year** 104:16
**frame** 101:23
    168:25 176:23
**Francis** 103:16
**frequencies** 39:23
**frequency** 39:15,17
    39:20,21
**friend** 111:17,25
    186:6,7
**friends** 83:20,23
    84:2,6,6,7,8,8
    85:4,5
**Frilando** 1:4,12 3:4
    4:22 5:19,21 7:3
    8:2 10:3 11:19
    13:23 21:20 22:15
    29:15 34:2,9,14
    35:11 42:8,11
    43:24 46:1 48:18
    55:10 79:11 88:18
    91:12 95:9 98:11



103:6 112:12
121:23 126:19
137:7 142:6,16
147:22 154:24
155:22 160:14
162:22,23 165:9
168:15 170:17
176:22 178:9
182:20 183:3
186:23 189:13
190:16 191:13
194:17 196:1
**Frilando's** 51:21
126:16
**front** 25:4 29:23
30:2 40:5 42:12
61:3 98:25 114:22
205:9
**fruitful** 106:8
**frustrated** 38:2
182:21
**frustrating** 69:14
106:14
**full** 11:5 13:20,23
15:17 24:22 71:21
104:16 106:24
116:16
**fullness** 30:20
**fully** 14:13 30:18
75:10 133:2
**full-time** 69:1
103:21
**full-view** 116:16,20
118:11 119:1
**further** 86:2 167:7
167:11 208:13
**F-r-i-l-a-n-d-o**
13:23

**G**

**Gaines** 61:11
**game** 200:1
**gauge** 203:20 204:4
206:5
**gauges** 112:2
205:24 206:3

**gear** 112:2 193:7
**gears** 191:21 192:7
193:6 194:19
**general** 39:6 57:1
75:25
**generally** 21:21
22:2,12,16 31:22
49:19 88:22
142:25 145:2
156:1 160:22
165:17 170:21
**genre** 60:4
**gesture** 120:24
**getting** 18:11 61:25
84:18,20 85:2
100:20 134:11
135:13 136:9
162:6 182:21
189:7 195:4
**give** 12:25 22:18,20
34:24 35:1,19
57:6 64:19 67:22
67:22 74:13 79:15
97:18 103:12
105:24 121:4
150:16,17 151:12
161:1 167:17
174:21
**given** 8:14,23 17:5
29:24 57:19 59:8
72:24 73:7 76:11
76:20 84:6 92:8
99:23 100:5 142:6
168:16 172:20
173:20 177:5
187:22 188:21
189:8,14 208:12
**gives** 39:22
**giving** 34:23 35:22
97:12
**glasses** 58:13 104:7
105:3
**go** 15:17 19:4 24:6
25:22 26:20 27:5
30:25 33:7 34:2
43:2,10 45:20

47:17 48:19 50:20
51:10,16 63:10
65:15 67:11,20
68:1,13 70:18
72:15,24 77:3
82:22 93:24 98:6
99:6 104:9 106:7
112:24 114:21
116:11,11 118:13
122:6 124:25
127:24 128:20
129:4 130:18
132:11 134:3,8
139:19,24 140:3
140:24 143:9,12
143:14 144:15,20
146:13,15 147:4
148:2,5,7,9,17,22
149:7 150:12
151:14,23 159:1,6
159:15 161:10
162:14 163:14
164:11 165:22
167:15 168:18
171:2 172:25
173:13 179:11,19
191:23 193:6
195:12,18,19
199:18 200:18,23
202:10 206:15
**goes** 57:20 68:4
125:11 163:18
**going** 9:9 12:2 14:4
14:8 18:18 20:22
21:15 22:20 23:1
23:3 27:15 29:16
36:17 42:2 45:19
51:15,25 52:1
54:21 70:6,14
71:23 72:4,12,14
79:3 98:11 110:4
112:9 113:9 116:4
118:5 119:18
121:11 124:18
125:12 134:3
137:20 141:22

147:9 148:6
159:23 165:5,22
170:14 172:2
174:6,21 179:7,9
179:14,25 193:7
193:21 194:5,12
194:21 195:1,10
196:18 200:3,10
201:4,25 206:15
207:2
**good** 10:3,4 41:10
103:6 104:2
116:22 139:19
146:21 158:19
162:20 171:12
198:10
**goodness** 207:16
**Google** 159:16
**gotten** 28:3 77:18
135:1 202:1
206:11
**Gouveneur's**
108:12
**government** 80:12
92:6 119:3 132:22
181:8,16
**graciously** 110:16
**grade** 103:19
**graduate** 70:13
**graduated** 101:11
103:19,22 104:12
104:17
**graduates** 85:11,13
85:15
**graduating** 104:6
**grant** 122:14
157:17
**granting** 124:4
**graphic** 100:25
101:1 106:3,22
**great** 104:18
**greater** 125:19
**ground** 14:8 103:7
**guess** 14:6 81:24
86:12 95:16 114:6
151:9 179:8

**guesses** 145:5,7
**guidance** 171:19
172:12 175:2
178:16 180:21
181:10,14
**guide** 72:13
**gun** 60:5

**H**

**H** 4:1 5:1 8:8,8 9:1
**habits** 146:6
**habitually** 155:1
**Haller** 2:15 3:5
7:19,19 10:1,5
13:9,19 18:24
20:25 21:10 22:6
22:22 23:10,13
25:16,20 26:18
27:2,18 29:22
30:6 33:4,12,16
33:21 34:1 35:3
35:17,24 36:5
37:5 38:24 39:12
39:24,25 40:13,25
41:15 42:7 43:9
43:23 45:10,18,25
46:14 48:5,17
54:25 55:9 58:18
59:6 60:25 61:7
62:9 64:10 65:12
66:8 68:12 70:8
72:21 73:17,19
76:25 77:11 78:10
78:24 82:11,21
83:1 87:8,17 88:9
90:6,12,14,22
91:4,6,9,11 93:1
96:18 97:3,7,18
97:22 98:6,10,23
99:2,7 102:14,17
103:5 111:2
112:16 115:10,22
119:12,18 120:2,3
121:11,20,22
123:4,12 124:7,16
126:21 127:1,7,15



130:9,24 137:6
138:16 140:1,9,22
141:22 142:5,15
146:22 148:23
150:24 152:18
154:13,23 155:5
155:14,16,21
157:20 158:3
159:23 160:10,12
162:12 165:5,13
166:24 167:22
170:13,20 171:25
172:5,8 173:19
174:10 176:21
177:4 178:8
179:24 180:8,14
180:19 181:2,6,15
181:19 183:9
184:1,17,24 185:3
185:12 186:13,22
187:10,20 188:13
188:17 189:4,12
190:1,15 191:5,12
192:5,12 193:3,13
193:16 194:16,24
196:12 197:3,24
198:24 199:4,10
200:6,14 201:10
201:23 202:13
203:6,13 204:1,13
204:21 205:2,12
206:15 207:1
**hand** 94:17 208:18
**handed** 92:9
**handle** 194:11
195:10
**handled** 92:25
195:22 196:8
**handles** 108:13,17
108:21
**handling** 24:7
194:19
**hands** 192:22
**hands-on** 159:17
200:3
**Hang** 201:18

**happen** 193:21
197:20
**happened** 53:9
73:18 90:24
120:13
**happening** 195:1
**happens** 196:3
**hard** 183:24
**head** 44:17 70:5
146:8
**heading** 33:8 47:6
**headphone** 81:1
**headphones** 56:24
**heads-up** 97:12
**health** 64:13 65:5
67:18 149:21
152:1,14 204:17
**hear** 13:7,11,13
32:5 34:19 36:11
36:22 37:1 38:10
38:13,14,15,16,17
38:19,20 39:5,6,7
39:7,10,16,19
45:14 57:17,25
58:4,8,8,23,25
59:14,18,21,25
60:1,5,6,7,11 77:4
83:24 107:10
126:6,11,13
134:18,19 135:15
171:12 203:17,23
204:5,9 205:22
**heard** 58:3 62:18
83:19,20 84:1,25
100:22 102:4
106:19 134:25
154:2 198:19
199:12
**hearing** 35:13 36:8
36:22 37:10,18,23
38:4,10,16,17,18
38:25 39:2,8,10
39:18,22 45:1,4
45:14 56:7,19,20
56:22,25 57:3,4,6
57:7,8,13,14,14

57:17,19,19,25
58:10,11,13,14,15
58:22 59:11,13
60:11 61:2 64:1,3
64:16 65:2,8,15
65:21 66:7,13,24
67:10,12,16,19,22
68:6,9 83:5 84:14
101:10 102:10,12
113:18,20 116:15
116:16 118:11,15
120:21 124:1
125:17,19,21
126:6 127:11
128:8,21,25
130:14 132:16
141:1,17 164:5
203:23 206:2,11
**hearsay** 53:14
83:19 84:1,4
**heart** 153:1
**HearUSA** 5:11
64:8 65:2,5 67:20
68:3 140:5,11
147:24
**heavy** 191:1
**held** 1:13 21:13
134:4
**helicopters** 198:21
**help** 16:22 38:9,15
60:3 74:18 75:23
82:13 108:2 136:6
144:24 146:16,17
147:23 158:6
164:8 168:19,22
200:2
**helped** 65:6 92:16
**helpful** 23:9
**helping** 174:22
**helps** 38:12 60:22
**hereinbefore**
208:10
**hereunto** 208:17
**hertz** 125:20,20,21
**hey** 80:20
**Hi** 171:11

**high** 39:15,15,21,21
152:25 192:10
**higher** 103:14
107:9
**highly** 41:13 207:7
**highway** 192:9,15
192:16,19
**hiring** 168:2,11
177:17
**history** 68:20
106:17,25 147:2
152:1,14 154:9
**hitting** 193:10
**hold** 43:6,13 46:11
62:20 99:5 132:15
135:24 142:12
146:24 148:21
150:3 173:16
181:4
**home** 13:21 70:5
96:17 114:7 146:7
**honest** 151:11
**honestly** 150:16
**honk** 38:13
**honking** 39:7
**hope** 11:21 52:3
**hopefully** 48:6
**hoping** 41:9
**horn** 205:18
**hospital** 108:11,12
143:11
**hospitals** 66:19
**hour** 24:6
**hourly** 23:16 24:5
**hours** 84:23
**house** 107:14,22,24
**Howard** 151:3,6
**hub** 182:19
**huge** 190:19
**hundred** 13:1
32:16 41:2 134:21
**hundreds** 107:2
**hydraulic** 203:12
204:11 205:4

———————
**I**
———————

**idea** 119:16 164:25
202:12
**identification** 30:5
42:6 45:24 47:22
48:2,16 88:1,7
98:17,22 112:14
119:24 121:18
136:24 137:4
140:7 142:4
155:20 160:7
165:11 170:19
**identified** 20:5 47:1
49:16 66:1 91:12
95:20,24 184:18
207:10
**identifies** 181:25
**identify** 16:22 52:7
59:22,23 60:19
79:23 80:17,18
83:3 93:19 94:22
159:2,7,16 181:23
**identifying** 13:2
60:21
**identities** 46:16
**ignition** 156:15
205:19,20
**illegal** 155:2
**illnesses** 204:23
**image** 192:13
193:17 195:25
**images** 85:9
**imagine** 191:14,19
191:22
**immediate** 16:1,4,7
**immediately** 176:9
196:5
**impaired** 120:21
**impairment** 64:17
65:21 83:6 206:11
**impairments**
101:11 102:10
**implant** 56:23
**implementation**
180:22
**important** 94:13
**impossible** 204:5



**improperly** 146:8
**improvements**
    104:10
**inadvertently**
    14:25
**incidences** 160:24
**include** 182:17,23
**included** 99:25
    154:9
**includes** 5:13
    118:10 142:1,10
**including** 103:14
**income** 107:11,12
    109:2,3
**incur** 25:2
**INDEX** 6:1
**indicate** 58:10
**individual** 23:22,23
    31:14 76:22 79:18
    79:19,25 178:4
    202:9
**individually** 112:22
**individuals** 36:11
    46:16 55:25 85:2
    85:10,13 102:5
    107:8,10
**industry** 177:7
    199:6
**infer** 93:2
**inferior** 198:11
**information** 16:21
    27:17 50:4 53:19
    61:19 72:17 84:12
    86:3 97:6 99:25
    108:16 133:20
    136:2 144:22
    150:23 159:21
    184:13
**informed** 100:14
    135:7,13 186:8
**Inicia** 155:24
**initial** 18:6
**initially** 114:16
**initiative** 140:24
**inquire** 21:4,15
**inquired** 79:5

**inquiries** 161:18
**insensitive** 65:19
**inside** 201:4
**installed** 105:19
**instance** 60:17
**Institute** 83:8 85:19
    86:4 105:5,8
**institutions** 176:20
**instruct** 18:18
    20:23 21:23 69:10
    181:17
**instructed** 72:6
    148:8 192:14
**instructing** 148:9
**instruction** 6:3
    73:7
**instructions** 72:23
    189:8
**instructor** 69:7
    70:1,21 71:11
    72:3,12,14 73:9
    164:7 191:23
    192:24 193:5
    195:7 196:4,15
**instructs** 128:14
**instrument** 206:5
**insurance** 109:7
**insure** 9:16 13:18
    84:21 94:15
    139:16 206:9
**intend** 77:14
**intending** 28:8,10
**intentionally** 15:1
    95:17
**interact** 67:21
**interacted** 61:12
**interacting** 93:6
**interaction** 58:16
    95:3
**interactions** 53:4
**interest** 170:24
    174:7 175:8
**interested** 18:11
    59:13 100:20
    101:18 174:22
    208:15

**interests** 179:1
**internship** 104:21
    104:21 106:3,5,9
    106:22
**interposed** 94:24
**interpret** 12:12
    74:15 75:12 76:1
    76:7 77:9 78:8
    144:24
**interpretation** 9:17
    9:22 13:5,16
    71:14,18,23 78:4
    123:11 188:25
    189:17 190:9
    193:20
**interpreted** 14:11
    14:18,21 31:22
    32:12 69:13 76:9
    77:14 126:20
**interpreter** 2:20,22
    8:9,18 25:14
    27:16 28:2,15,18
    32:25 33:9,11,14
    33:18 34:21,22
    35:5,21 37:10,20
    37:25 43:6,21,22
    44:14,17 45:1,4,6
    46:11 48:3 69:9
    69:10,15,17 70:24
    71:5,13,17,20
    72:4,11,19,20
    73:12,24 74:5,8,8
    75:8,12 76:1,5,7
    76:10 77:5,9,18
    79:7,9,22 80:16
    80:19,22,24 81:1
    82:8,13,19,20,24
    86:25 87:14 90:3
    90:4,9,10,20 91:2
    91:5,8 99:5
    110:22,22 122:25
    123:10 126:23,25
    142:12 145:4
    146:18,21 148:21
    153:25 157:12,13
    164:14,24 168:2

169:3,18 170:2,7
    170:12 171:23
    172:1 173:16
    174:6 177:17,23
    180:6,10,15 181:4
    181:12,13 182:18
    182:18,24 183:4
    183:14,20,22
    184:3,10,15,22,22
    186:10 187:24,25
    188:7,9 189:9
    193:24 194:11
    195:7,15 196:22
    197:15 200:25
    201:3,8,15 202:7
    202:22 203:3
**interpreters** 9:9,10
    9:15,19 10:16,19
    11:4,8 12:8,15,25
    13:6,7,17 32:12
    37:2,2,21 38:2
    43:17 44:2 74:13
    78:19 80:17 83:12
    84:17,18,23 86:9
    90:16 126:15
    169:13 176:19
    185:18
**interpreter's** 73:13
    74:14
**interpreting** 71:20
    74:9 76:10 81:3
    87:15 180:3 182:5
**interpretive** 189:10
    189:22
**Interrogator** 68:13
**interrogatories** 4:7
    4:9,18,20 47:20
    47:25 49:2,4,15
    49:24 50:6 51:22
    64:22 98:2,15,20
    99:4,9,21 149:19
    155:23
**interrogatory** 5:16
    51:23 52:2,6
    63:10,11 64:11
    68:15 77:12 82:22

83:2 86:13 160:3
    160:19 184:19
**interrupted** 14:25
**intersection** 157:8
    157:15,19 158:8
**intuitively** 95:11
**involve** 185:5,6
**involved** 27:20 29:3
    105:21 161:4
    162:4 168:3
    177:16 187:9
**involvement** 165:2
    165:4
**Island** 103:20
**issue** 13:2 29:4
    110:24 135:24
    162:4 176:8
    177:15,15,19,24
**issues** 25:12 110:19
    145:22 185:8
    204:17
**I.D** 147:11

---

**J**

**J** 53:22 147:5
**jackknifing** 187:18
**Jacobson** 55:20
**Jamaica** 143:11
**January** 113:10
    114:23 115:5,15
    115:16 116:1,6
    122:19
**Jersey** 1:2,15,18
    3:22 5:17 7:6,10
    9:5 28:5 83:13
    99:16 160:5,20
    165:2 169:22
    208:2,8
**job** 1:19 74:14
    101:2,15,16
    104:18,23 106:8
    106:10,13 107:3
    108:18 109:24
**jobs** 101:12,13
**John** 2:16,23 7:23
**join** 102:13



**joined** 104:3
**Joseph** 5:19,20
  162:21 165:9
  170:17
**Josh** 155:24
**Jr** 2:21 8:17
**July** 136:4 139:4

**K**

**K** 9:1
**keep** 44:7 72:6
  88:16 116:10
  128:15 132:24
  164:1
**keeping** 66:25 74:7
**Kenneth** 1:4,12 3:4
  4:21 7:3 8:1 13:22
  51:21 112:12
  162:23 164:15
  183:3
**key** 156:14,16
  205:19
**kind** 16:21 28:5
  29:4 39:2 56:24
  58:7,24 59:25
  60:4 66:11 104:1
  105:17 117:23
  138:3 139:19
  158:8 161:1
  184:11 188:10
  198:13 204:16
**kinds** 185:11
**knew** 17:10 47:2
  72:25 74:11 76:17
  116:1,4 131:9,15
  131:19 132:4
  134:18 179:6
**know** 10:24 12:23
  13:3 19:21 23:4,6
  23:8 24:11,23
  27:25 28:22 32:13
  33:5 38:22 44:15
  50:13 51:15 52:7
  53:7,10 54:2
  56:10 57:10,15
  59:12 60:13 63:5

64:21 66:11,25,25
67:2 69:8 70:16
70:16 72:13 75:1
75:19 76:6,13,14
77:20 79:3,16
80:1,2 82:4 83:4
83:20 84:3 86:7
87:4 92:13 93:19
96:6,10 99:19,23
100:25 101:9,10
101:19 102:8
106:12,15 107:3,7
111:18 112:1,2,3
117:10 119:7,10
119:13 120:10,24
127:5 129:18
133:21 138:18,19
145:12 148:4,4
149:24 150:11,13
150:16 151:2,7
153:7,11,12
155:12 157:24
158:6 162:9
164:23,23 168:4
168:12,17 169:10
169:15 172:6
173:20 176:18,20
177:21,22 183:24
186:5,5 188:6
194:7 195:8,9
196:22 198:20
199:9,15 200:2
201:24 203:7
205:3,7,9,21
**knowing** 59:13
**knowledge** 14:14
  46:17 47:3 51:7
  52:17 53:3 55:13
  55:21,25 74:11
  85:25 86:8,11
  93:23 100:16
  115:19 161:2
  163:13 187:1
**known** 154:4
  175:22
**knows** 45:12,12,13

45:14
**K-turn** 72:16

**L**

**L** 8:8,8 9:1
**lack** 118:25
**LaGuardia** 103:23
  103:23,24 104:9
**lane** 191:25
**lanes** 191:25 192:1
**language** 2:19,21
  8:14,15,23,24 9:9
  9:11,20 10:16,19
  11:4,7 12:8,15,24
  31:16 32:3,22,23
  33:3 36:10,12
  37:9 42:23 44:25
  45:4 53:20 70:24
  71:23 73:24 74:2
  74:3,4,6,6 75:8,9
  77:14,21,23 78:3
  78:19 79:21 82:8
  82:13,19 86:24
  90:16 127:2 145:4
  164:8,14,24 169:2
  170:1,7 182:23
  183:4,14 184:2
  185:18 187:24,25
  188:24 189:16
  190:9 191:8
  193:20,24 200:25
  201:14 202:7
**laptop** 193:18
**large** 187:4
**largely** 57:22
**Larry** 61:11
**late** 156:3,3 160:17
**law** 1:13 10:6 16:9
  17:2,5,17 18:12
  19:2 20:16,22
  21:3 22:25,25
  23:15,23 24:18
  25:22 26:4,13,20
  35:15 42:16 58:12
  79:4 82:19 128:18
  166:20 169:13,18

179:17 180:1
**Lawrence** 53:21
  147:5
**laws** 35:16 123:15
**lawsuit** 16:8 25:17
  30:11 53:18 176:9
**lawsuits** 29:4
  197:20
**lawyer** 20:11 24:4
  89:15 166:12
  173:15,25 180:3
  180:12,18 200:12
**lawyers** 24:7 29:17
  49:4 88:22 178:20
  200:12
**learn** 68:23 69:20
  111:10 178:4
  185:16
**learned** 68:15
  110:9 124:19
  131:21 133:5
**learner** 113:22
  115:12
**learning** 11:22,23
  31:11 190:6
  191:20,20
**leave** 22:4 95:17
**left** 72:15 104:1
  192:16,17,23
**legal** 1:21 7:13,15
  16:14 23:24 24:3
  24:19
**legally** 116:23
**lenses** 113:16
  116:15
**letter** 5:13 27:13
  122:10 127:18
  128:7,14 129:14
  129:15,17 130:1,2
  130:12,14,22,23
  132:1,20 142:1,10
  142:18
**letters** 95:10
**let's** 114:21 154:15
  155:16 168:5
  182:12 186:13

**level** 56:25 57:18
  58:9 175:1 188:5
**levels** 57:6 58:14
  59:24 76:23
**liability** 179:15
**license** 4:21 58:12
  58:14 78:1,16
  86:5 100:20,24
  112:12 113:5,6,12
  113:14,17 114:2
  115:3,24 116:14
  117:7,15,17 118:6
  118:10,14 119:15
  120:25 124:4
  147:12,14 153:6
  198:21 206:12
  208:21
**licenses** 102:6
**licensing** 118:19
**life** 35:13 36:8
  68:11
**light** 167:15 207:8
**limitations** 22:10
  36:7
**limited** 35:12
  122:14 125:7
  127:19
**line** 6:4,7,12 10:20
  11:9,13 121:2,5
  158:7 169:12
  177:25
**lines** 120:15
**lips** 36:24 45:13
**list** 52:9 55:12
  61:10 64:11 132:6
  132:8 133:10
**listed** 47:9 51:14
  54:11 55:19,21,24
  83:6
**listen** 79:19 80:20
**listing** 47:13
**litigation** 24:2
  27:20 177:9
  187:22
**little** 23:18 37:11
  41:25 43:4,11



45:5 88:13 95:7
97:16 111:9 113:1
120:17,18 132:16
134:9 145:7,8
175:2 177:13
182:21 195:6
**live** 107:16 158:11
158:12 159:6
**living** 107:13,14
108:3,9
**LLC** 1:7 7:21 10:8
**LLC's** 4:13,15
87:24 88:5
**LLP** 1:14 2:3,10
5:13 7:11 142:2
**load** 187:7
**local** 171:19 172:13
**locate** 93:20
**location** 159:7
**Logan** 2:13
**logistically** 194:4
**logistics** 194:10
**long** 73:3 81:16
97:11,13 102:18
103:20 109:9
111:21 112:7
117:3 153:10
170:6
**longer** 116:20
117:1 174:21
**long-view** 117:18
**look** 11:15 29:25
40:11 42:2 43:16
44:6,14 49:9
60:18 76:10 89:1
89:15,22 94:3
106:10 113:11
114:5 116:7 125:5
127:9 145:9 150:7
153:18 156:14
158:21 162:15
165:24 174:16
181:21 191:17
206:4,4
**looked** 31:6 92:20
163:4

**looking** 17:2 27:24
43:22 44:13,18
100:2 104:18
117:5 151:9 172:3
172:12 192:17,23
196:2,14,21
**looks** 43:19 55:20
115:12 120:8
**loss** 66:7,13 67:10
102:12 113:20
125:19
**lost** 171:24
**lot** 74:12 85:1
100:25 101:10
145:6 149:17
154:5 179:21
**lots** 70:16 192:9
**loud** 153:22
**Loveall** 161:12
162:16,21 163:16
**low** 39:17,17,20,20
**luck** 106:11
**lunch** 97:20 102:15
**luncheon** 102:23
**Lutheran** 68:16
69:1 110:10

———————
**M**
**M** 1:17 8:10,17,17
8:19 9:3 208:6,20
**Magna** 1:21 7:13
7:14
**main** 35:13 202:20
**major** 36:8 104:8
191:24 192:8,15
201:12
**making** 181:9
**mandated** 116:19
**mandatory** 117:24
**maneuver** 192:7
**Manhattan** 108:12
158:22
**manual** 75:4
**map** 159:16
**March** 16:18,19
128:3 130:3,15

135:22 171:6,16
171:17 172:11
173:2
**marijuana** 155:9
**Marino** 5:8 53:22
54:9 55:14 64:24
65:4 133:7 134:14
134:16 136:22
137:12 140:15
142:21,22 143:2
143:15 144:23
145:22 147:5,24
150:6,11,15,17
161:20 162:10
**Marino's** 138:2,9
150:7
**mark** 112:10
119:19 121:12
136:20 140:4
141:23 155:16
159:24 160:13
165:6 170:15
**marked** 6:5,10,11
6:13 30:3 42:4
45:22 46:2 47:21
47:25 48:14 87:25
88:6,19 97:4
98:15,20 112:13
112:18 119:22
121:17,24 122:10
136:23 137:3,8
140:6 142:2,7,17
152:15 155:18
159:20 160:6
161:10 165:10,14
170:18
**market** 101:3,13
**marks** 171:13
**marriage** 208:15
**Martinez** 2:21
25:14 33:9,14,18
34:21 35:5,21
43:6 45:6 46:11
48:3 73:12 90:9
99:5 122:25
123:10 126:23

142:12 146:18,21
148:21 157:12
171:23 172:1
173:16 180:6,10
180:15 181:4
186:10
**match** 57:10
**matched** 33:2
92:23
**matching** 57:20
92:11
**materials** 99:13
**Matt** 7:12
**matter** 16:14 18:10
19:1 36:1 120:23
176:15 196:8,10
208:16
**Matthew** 2:24
**mean** 13:1 60:17,23
63:7 71:1 73:2
76:17 93:17 96:4
102:18 105:13
106:4 107:1 108:1
113:15 115:25
130:10 149:18
164:7 177:12
181:13 200:22
**means** 31:17 35:14
66:4 145:13
162:24
**meant** 118:20
123:18 141:16
**measure** 57:5,24
**measured** 57:12
**medical** 5:7,9 56:1
61:25 62:6,11,12
63:2 65:20 66:12
92:6 93:8 124:2
124:20 128:15
129:7,10 131:3,22
131:23 132:10
133:6 134:13
135:18 136:10,21
137:1,10 138:17
139:8 140:17
142:22 143:9,11

154:9,25 163:9
**medically** 149:21
**medication** 15:12
**meet** 124:12 147:14
**meeting** 29:9
**meetings** 29:6
**Melendez** 52:14
**mental** 204:17
**mentally** 15:13
**mention** 152:23
**mentioned** 61:22
106:1 135:12
153:9,13 154:1
173:11 201:6
202:19
**message** 189:10,22
**met** 123:20
**Micro** 21:12
**midnight** 122:19
**mile** 60:20
**miles** 60:23
**Mill** 68:16 69:1,6
103:20 110:9
**mind** 20:12 29:25
63:20 67:1 74:7
126:2 130:7 159:3
189:3
**Minor** 61:11,15
122:11 128:1,14
130:3,14,23
**Minor's** 127:18
**minute** 14:10 68:19
99:11 118:24
136:19 161:11
186:12 195:23
197:2 206:16
**minutes** 63:13
97:19
**mirror** 116:16,20
116:21 117:3,18
118:11,15 119:1
191:16 192:17,23
193:19 196:2
**mirrors** 191:17
**miscommunication**
37:24



**misconception** 74:12
**misperception** 117:6
**missed** 180:13
**missing** 47:15 174:4,8,15
**mistake** 48:22
**misunderstanding** 41:19 184:16
**misunderstandings** 37:25
**misunderstood** 37:3
**mix** 60:4
**model** 111:18
**mold** 67:24 68:3
**mom** 17:25
**moment** 25:2 31:2 31:4 55:23 64:19 69:6 82:24 86:21 115:9 161:15 163:21 195:11 201:6 202:20 203:4
**Monday** 171:10,16
**monetary** 177:24 200:11
**money** 23:2 202:9
**monies** 24:13
**monitor** 75:3 80:25
**monitoring** 67:19
**MONMOUTH** 208:4
**Montgomery** 21:11
**monthly** 107:12
**months** 106:6,23 130:21
**morning** 10:3,4 97:24 160:17
**mortgage** 108:4
**mother** 16:2,5 17:15,22 52:14 53:6,7,10,15,16 53:19 62:21 63:5 92:2,14 93:4,10

96:1 107:16,22,24 108:5,7,10 110:5 132:6 153:25 154:1,4,6
**mother's** 18:6 107:13
**motion** 189:21 190:10
**motivated** 101:8
**motor** 4:23 5:6 62:1 93:7 95:5 96:2,11 119:21 121:16 122:2,12 124:11 125:14 129:7,9 136:8 137:17
**motoring** 175:4,25 176:7 178:18
**move** 48:7,8 55:15 76:11 77:12 87:18 131:7 187:17
**moved** 110:25
**moving** 73:8 120:13 121:8 190:14
**multiple** 74:21,25 75:13,14,16 104:19
**music** 39:6 60:2
**MVC's** 171:20 172:13
**myth** 117:2
**M.D** 147:6

**N**
**N** 2:1 3:1 8:17,17 9:1,1,1 103:1,1,1
**NAD** 17:16,19 18:1 18:4,7 135:2 169:19 179:21
**Nadler** 2:8 8:3
**name** 4:2 5:2 10:5 13:21,22,22 15:16 15:18 17:5,6,6 19:21,22 56:11,11 61:23 63:15 79:18 79:24,25 80:4,17

84:5,7,10 105:14 108:16 109:7 114:7 132:20 138:6 151:5 157:18,21,24 162:21
**named** 86:15
**names** 55:12 157:14
**national** 17:1,4,13 62:12 79:2 105:4 124:22 125:23 131:4,24 135:8 138:13,15 161:13 169:16 178:23
**native** 74:2,4 77:21
**nature** 12:9 22:12 24:9 49:3 92:7 185:9
**near** 157:10 158:11 158:16
**necessarily** 185:6
**necessary** 53:16 117:16 131:6 146:5 170:1 181:8 182:16 207:7
**Neck** 68:16 69:1,6 103:20 110:10
**need** 9:15 12:2 23:11 40:8 57:5 58:10,24 61:24 68:10 78:6,13 82:8 88:14 90:10 91:7 92:15 97:16 102:18 105:19 108:7,22 111:10 117:2 118:25,25 141:5,6,12,13 144:2 145:3 149:12 161:23 164:13,20 169:2 170:3 173:8 177:7 186:11 192:7,16 193:6
**needed** 54:3 62:11 72:11 75:21 109:6

110:7 120:25 131:3,22 132:2,4 133:5,12 134:12 139:24 141:2 162:25 170:6,11
**needs** 17:4 67:14 108:3 110:5 117:17 171:21 183:3 196:4,16
**nervous** 197:18
**never** 73:18 76:20 80:17 96:4 121:9 144:8,13 148:6 152:5,10 154:2 155:10 166:2 167:10 185:15 202:1
**new** 1:2,15,18 2:6,6 3:22 4:21,23 7:5 7:10 9:5 13:25 15:23,24,25 67:15 67:22 78:2,17 79:17 80:1,3 83:13,14,25 104:13 109:20,21 112:11 113:23 114:17 118:19 119:13,20 130:21 135:19,22 151:2 153:12 158:21 177:6 208:2,8
**news** 155:25 156:3 156:4,14 157:2
**nice** 109:14
**niche** 101:15
**nickname** 15:18
**night** 156:3 160:17
**nine** 30:21
**noise** 38:18 39:9,20 39:22 59:21 60:2
**noises** 38:12 39:6 39:11,13,14 60:1
**normal** 66:6 70:10 124:3 191:23 206:9
**normally** 31:12

150:18,20,21
**North** 2:12
**Notary** 1:18 8:10 8:19 9:4 208:7
**note** 147:23
**notes** 113:18 144:16,20,22 145:9 147:5 150:7
**notice** 1:13 9:22 13:15 120:14
**noticing** 174:13
**notified** 100:12 153:5
**notifying** 122:13
**November** 1:15 3:21 7:8 81:25,25 100:3,3 208:10
**nowadays** 116:22
**NRCME** 138:13
**NTID** 104:5 105:2
**number** 80:15,18 80:19 81:9,10 155:14
**numbered** 143:7
**numbers** 51:15 81:12,13 113:2
**nurse** 64:12

**O**
**O** 8:17 9:1 103:1,1 103:1
**oath** 10:12 22:8 25:21 26:7 94:18 190:17
**object** 20:22 141:19
**Objection** 18:13 20:19 26:15,24 27:10 32:20 38:7 39:3 40:9,22 41:6 58:5 59:1,16 60:15 61:4 62:3 64:6 65:9,24 66:14 68:7 69:22 71:25 73:15 76:3 77:6 78:5,21 82:9 82:15 87:5,11



92:17 119:5 124:5
124:14 130:5,16
139:21 140:19
150:10 152:16
155:3 158:1 162:8
166:22 167:20
169:8 170:10
174:1 176:10
177:2,10 179:3
180:5,17,25
181:11 183:7,19
184:9 185:10
186:4 187:5,15
188:3,15 189:2,19
190:12,20 191:10
192:3,11 193:2,12
193:15,25 194:23
195:3 196:6,25
197:12 198:6,17
199:2,8,22 200:9
200:24 201:21
202:11,18 203:9
203:19 204:7,19
204:25 205:8,25
**objections** 4:8,17
47:23 49:11,13,23
51:12,21 89:8
94:24 98:13
**obligated** 169:13
**obligation** 22:9
46:9
**obligations** 24:24
**observation** 72:7
**obtain** 96:24
147:13
**obtained** 5:8,10
24:2 128:2 136:22
137:2,11
**obtaining** 124:4
**obviously** 57:7 71:9
187:3
**occupations** 185:5
**occurred** 40:20
63:18 65:21 90:23
95:11
**occurring** 189:17

**offending** 37:17
**offense** 117:12
120:8,19
**offensive** 38:4
**offer** 107:3
**offering** 197:23
**office** 108:13,14
129:25 132:23
134:2,4 135:3
139:15 142:11,19
142:21 151:1
**officer** 117:11
120:20,22,23
**Offices** 1:14
**official** 27:14
133:21
**Oh** 31:20 35:10
100:8
**oil** 206:4
**okay** 10:2 11:25
12:6,21 14:11,22
14:23 18:21 21:19
26:2 27:3 28:20
31:10,20 34:16
35:5,17 37:14
39:24 41:21 44:19
46:12 47:8,16
49:8,12,21 50:1
50:15 51:4,19
52:3,20 53:11
58:19 63:25 72:16
80:15,16 81:10
85:16 88:17 89:16
91:8,18 94:4
95:22 97:3 99:6
105:6 107:19
110:13 111:3
112:23 113:7,19
114:4,19 115:1
117:9 118:17,22
119:17 121:10
123:24 124:17,24
126:1 127:13,14
128:10 130:25
131:14 136:14
137:15,25 138:11

138:20 139:1,6,12
139:12,17 140:2
141:3,14 142:14
143:4,13 144:1
145:1,14,20
146:12,16,25
148:22 149:6,16
150:17 151:18,22
152:19 153:17,25
154:12 155:11
156:21 158:24
159:19 161:9
162:2 163:7,11,24
164:9,18 166:9,15
172:9,15 173:12
174:11 181:5,20
182:4,11 183:10
188:18 192:21
194:12 195:24
199:11,16 203:14
204:22 206:18
207:15
**old** 73:4 141:1
146:9
**Oldsmobile** 110:14
**once** 14:10 50:16
67:8 69:25 129:23
135:18 139:13
149:2
**oncoming** 192:9
194:20
**ones** 175:18
**online** 85:12,14
**on-road** 183:18
**on-the-road** 184:8
194:6
**open** 9:21 164:1
**operate** 206:12
**operating** 128:17
193:6 206:10
**operator** 80:18
**opinion** 178:1
**opportunity** 19:9
179:19
**opposed** 34:20
57:14 65:23

106:17 176:9
177:9
**opposite** 44:14
**opted** 66:23
**option** 185:1
**optometry** 104:7
**order** 29:17 32:23
33:1 50:5 57:2
68:22 69:4 82:7
116:24,25 124:10
124:19 131:2,13
132:4,9 134:14
139:24 161:22
186:1 193:7
200:22
**ordered** 150:19
**organization** 56:11
**original** 5:7 52:9
99:4,9,21 100:1
134:8 136:21
137:10
**outcome** 24:1
208:16
**outset** 11:18
**Outside** 29:10
**overlap** 48:21
**overlooked** 153:15
**oversight** 153:16
153:16
**overview** 144:5
**owned** 109:9,14,17
**owns** 107:24 156:9
**o'clock** 55:4,6
102:22 103:2
154:18,20 186:17
186:19 206:21,23
207:18,19

---

**P**

**P** 2:1,1
**package** 95:24
**packet** 135:14
**page** 3:3 4:2 5:2 6:4
6:7,12 32:17,18
33:7,15 34:3 40:1
40:2 42:21 43:2

46:9 50:20,21
51:11,16,17,18
53:22 86:20 113:2
113:11,12,13
116:12 122:10
124:25 143:12,14
144:15,19 148:18
151:23,25 161:10
162:14 163:14,16
163:17,18,19
164:1,11 165:25
173:1,13
**pages** 30:21 51:14
113:3,21 135:25
144:18,19 146:15
147:4
**pain** 145:16
**pair** 44:16
**panel** 203:21,22,24
206:6
**panels** 206:5,14
**paper** 63:24 74:19
74:25 93:16
**papers** 134:2
**paperwork** 50:8
54:1 133:17
134:17 135:12
148:15 150:15,17
172:20
**Papp** 61:22 129:6
130:2,13 131:22
134:12
**paradigm** 101:4
**paragraph** 31:1,7
32:19 33:7 34:3,5
34:9 40:4,4 42:21
43:18 122:23
128:6,13 144:17
147:10 163:19
164:2
**paragraphs** 40:16
43:3,10 44:21
**paranoid** 197:19
**paraphrase** 52:1
**Pardon** 54:23
**parens** 42:24,24



**parents** 66:17 67:2
**parking** 70:16
    72:16
**part** 23:5,5 57:23
    69:12 75:22 92:13
    111:11 112:20
    124:2 140:15
    156:6 177:13
    183:21 188:11
    203:15
**participate** 25:25
    26:12 78:19 82:8
    161:19
**participation** 19:13
    19:16 20:12
**parties** 7:16 33:8
    34:6 71:6 208:14
**party** 81:2
**pass** 84:19 126:13
    131:17 179:13,20
**passed** 54:18 84:10
    84:22 105:15
    131:9 132:19
    133:19 134:17
    135:10
**passenger's** 71:13
**passing** 102:6
**path** 192:18
**patient** 147:10,11
    147:15,17,18
    148:19,20,24
    149:2
**patients** 108:13,15
**pauses** 153:21
**pay** 23:23 107:20
    108:2,6
**paying** 23:2,16
    24:15 25:1,3
**pays** 24:6
**Peak** 83:7 85:19
    86:4
**pedestrians** 120:17
**pending** 28:5
**Pennsylvania** 2:14
**people** 47:2 52:9,13
    55:21 61:11 69:5

74:12 76:13 79:14
    83:5,21 84:14
    86:5 100:23,25
    101:10 102:9
    104:3 117:2 118:3
    168:17 177:23
    178:22 179:18
    184:20 198:23
    203:21,22 206:10
**perceives** 125:15
**perceiving** 60:14
**percent** 13:1 32:16
    41:2 107:9 108:5
    134:21
**perception** 168:16
**perfect** 42:9
**performed** 56:7
    161:21
**period** 67:4 82:2
**permission** 96:22
**permit** 64:4 78:18
    113:22 115:5,12
    140:18
**permits** 115:20
**permitted** 78:2,3
**person** 28:13 53:21
    61:22 66:6 67:21
    79:23 80:1 125:13
    125:14 128:16
**personal** 24:24
    165:4 178:1,10
    197:25
**personally** 18:3
    30:13 41:4 68:21
    77:25 78:15 85:8
    85:17 109:2 152:2
    165:1 184:3 187:1
    202:5
**personnel** 19:20
    175:4 176:1,7
    178:19
**perspective** 40:18
    51:5 170:8
**pertains** 201:8
**Philadelphia** 2:14
**phone** 17:24 38:14

58:8 80:7,7,10,13
    80:24 81:7,8,11
    95:14 108:20,21
**photocopy** 113:4
**Photograph** 5:14
    155:18
**photos** 85:10,11
**physical** 61:19
    126:5 129:19,23
    130:19 131:9,15
    132:5,12,19
    133:19,23 148:10
    149:1 161:21
    162:16 163:1
    164:3,5
**physically** 66:2
    125:13
**physicals** 54:15
**physician** 53:22,24
    53:25 54:8 57:23
    64:12,23 124:21
    145:3 161:22,23
**pick** 38:25 39:2
    59:11
**picking** 133:3
    196:19
**picks** 43:3,11
**picture** 114:7 159:2
**piece** 93:16
**pile** 30:2
**pillow** 146:7,10
**pilots** 198:18,20
**pilot's** 198:21
**pitch** 39:16,17,21
**pitches** 39:23
**PLA** 113:2 116:12
    122:10 125:1
    127:24 128:20
    129:4 161:11
    162:14 163:17,19
    164:1 165:25
    171:2,17,25
    173:14 174:16,16
    182:5,10,10,12,13
**place** 9:17 71:4,5
    71:15,19 72:9

80:21,23,25 81:7
    81:9 176:13
    181:24 183:12
    188:10
**placed** 29:18
**placement** 33:19
**places** 83:6,18
    143:20
**placing** 80:20
**plaintiff** 1:5 2:4 4:7
    4:11 8:1 31:14,18
    42:22 47:20 48:14
    51:20 86:22
**Plaintiff's** 4:8,12,14
    4:17,19 5:16
    47:23 87:22 88:3
    98:13,18 160:3
**plan** 148:18
**planned** 109:23
**please** 8:5 12:4,20
    13:20 14:18 15:1
    15:5 16:4,12 22:7
    22:11 23:19 34:4
    36:17 37:15 40:14
    43:7 46:12 59:4
    73:21 88:10 96:19
    99:6 105:24 115:9
    116:10 142:13
    146:24 148:22
    150:9 151:15
    161:15 163:3
    173:17 181:5
    182:3 189:5
**pocket** 24:15
    115:14
**point** 24:20 25:6
    44:10 46:25 49:18
    52:2 53:13 90:2
    103:11 105:15
    127:17 133:4
    144:2,4 152:21
    162:9 198:7 202:2
    204:15
**police** 58:16 59:20
    117:11
**policy** 96:7 115:20

122:12
**portion** 188:2
**pose** 32:9 36:3
**posed** 49:3 178:12
**poses** 190:18
**position** 10:20 21:7
    108:20 146:9
    170:5
**possession** 128:19
    173:6
**possibility** 162:23
    207:4
**possible** 10:21
    102:19 103:12
    158:25 159:5
**possibly** 102:11
**potential** 52:7
    184:16
**potentially** 38:20
    52:16 97:10
**practice** 68:25 70:3
    118:2 178:2
    199:24
**practicing** 70:7
**preempted** 123:16
**preference** 11:3
    31:16 77:8 102:17
    185:20
**preliminary** 30:25
    31:8 32:18
**premarked** 29:19
**preparation** 29:12
    89:8
**prepare** 29:8
**prescribed** 67:17
**prescription** 67:23
    148:5,8
**presence** 29:10
    70:24
**present** 2:18 7:17
    37:22
**presented** 49:6
    130:11
**pressure** 152:25
    203:18,20 205:18
    206:4



**pretty** 68:11
**prices** 109:21
**primarily** 31:15
  35:11
**primary** 53:24,25
  54:8 62:15 64:23
  132:2 133:9
  202:21
**Princeton** 1:15
  3:22 7:10
**printed** 62:7
**prior** 25:18 53:9
  100:13 147:19
  156:22 194:12
**privacy** 96:7
**privilege** 18:14
  20:20,23 21:2
**privileged** 21:14
**probably** 38:2 75:2
  76:15 81:24 102:2
  102:7 124:19
  151:10 168:3
  195:20
**problem** 41:22
  105:11 137:19
  145:17 168:21
  204:10,11
**problems** 109:19
**procedure** 76:6
**procedures** 66:23
**proceed** 55:23
**proceeded** 106:10
  126:4
**proceeding** 72:15
**process** 11:23 14:4
  50:16 69:18 73:3
  77:3 78:20 129:22
  130:20 131:2
  132:21,22 133:1,5
  133:11 134:11,15
  139:16 140:16
  163:3
**produced** 5:15
  59:24 60:18,19,22
  95:10 112:19
  114:22 115:24

120:5 121:25
  160:1,16
**production** 6:6
  88:23 91:13 97:5
  159:21
**professional** 64:13
  113:8
**professionals**
  188:11
**proficient** 111:10
**program** 104:10,15
  104:16 198:2
  202:8,10
**programming**
  104:12
**programs** 129:7
  184:21
**progress** 72:13
  144:16,20,22
  145:9 147:5
**proof** 58:14
**proper** 134:13
  135:18
**properly** 175:22
  186:2 193:6
**propounded** 8:12
  8:21
**protect** 175:3,24
  178:18
**protecting** 176:6
  178:25
**provide** 12:15
  15:13 28:1,14,18
  46:10 50:4 57:2
  79:6 83:11 86:24
  92:2 93:4 96:23
  99:12 101:17
  107:17 162:25
  164:15 169:13,18
  177:22 178:3
  181:9
**provided** 62:5
  64:22 69:16 74:8
  84:24 86:9 95:2
  110:16 154:8
  172:22 176:19

182:18 184:10
**provider** 67:18
  149:21 204:18
**providers** 65:6
**provides** 38:1
  67:11 185:18
**providing** 28:2
  74:16 79:8,21
  84:17 174:6
  197:22
**provision** 67:19
**provisions** 125:6
**psychologist** 64:12
**public** 1:18 8:10,19
  9:4 175:4,25
  176:7 178:18
  208:7
**pulled** 115:13
**punishment** 51:1
**purchased** 156:17
  156:20
**purpose** 168:23
**purposes** 57:23
**pursuance** 175:13
**pursuant** 1:13
**pursue** 104:23
  133:11 136:18
  174:14 198:12,13
  200:19
**pursued** 101:19,21
  104:21 106:1,7
  167:10
**push** 168:13 177:14
**put** 22:11 42:9
  45:19 46:1 48:22
  49:10,13 50:17
  56:23 57:3 74:6
  75:16 88:18 90:5
  90:6 98:24 108:16
  112:17 133:20
  137:7 156:15
  157:2 160:10
  165:14
**putting** 119:14
**puzzling** 95:7
**p.m** 102:23 103:2

154:19,20 171:6
  186:18,19 206:22
  206:23 207:20

---

**Q**

**qualification** 138:3
**qualifications**
  138:4 139:20
  185:22
**qualified** 41:11,13
  124:11 125:13
  175:6
**Queens** 15:23
  151:2
**question** 12:22 15:5
  15:8 17:9 18:23
  18:25 22:11,24
  23:19 26:5 32:8,9
  32:10 36:15,19
  43:8,11,25 44:20
  44:22 45:7,9
  46:13 50:3 59:3,5
  60:9 73:13 74:9
  75:7,13,18,19,24
  76:8,8,12,15,16
  77:1,2,9,13,16
  78:11 79:12,12
  81:5 86:12 91:10
  93:2 97:23 100:18
  101:22 126:18,22
  127:2 134:8
  168:24 178:11,14
  180:7,9,11,12
  182:25 183:22
  186:25 189:5
  190:2,4 194:2,7
  196:13 201:19
**questioning** 207:2
**questionnaire** 75:5
  100:5
**questions** 8:12,21
  10:22 12:4,16
  14:13,17,20 15:13
  22:9 30:23 36:3
  41:23 49:3 51:13
  52:2 68:14 69:16

74:15,19 89:10
  92:22 95:8 118:5
  143:5 149:17,18
  149:22 152:6,6,13
  154:24 161:5
  168:15 175:17
**queues** 206:13
**quicker** 146:17
**quickly** 48:7,12
  98:6 122:6
**quiet** 39:10
**quite** 48:7 59:4
  107:3,9 118:1
  194:7
**quote** 125:12 127:5
**quoted** 127:2

---

**R**

**R** 2:1 8:17 9:1
  103:1 208:1
**raised** 38:23
**ramp** 191:24
**range** 196:20
**ranks** 102:13
**rate** 24:5 107:8
**reach** 59:15 175:21
**reached** 17:6,23
**read** 10:14 30:13
  30:21 31:9,21
  32:11 33:20 34:13
  34:18 36:18,20,24
  40:8,15 43:13,14
  43:18 44:21 45:13
  53:16 75:9,24
  77:2 94:14 122:23
  123:2,5,6 127:4,5
  127:6 147:9
  161:12,15 162:17
  162:19 174:20
  180:14,16 181:22
  183:21,23 189:5,6
  203:11
**reading** 34:20 35:4
  43:17 44:1,4
  76:23 99:10 107:5
  123:8 164:9 182:8



203:12
**ready** 139:25
185:22
**real** 70:19 106:10
195:1 200:2
**realize** 9:24 120:14
132:2 133:24
137:13 185:20
**realized** 66:21
132:7
**really** 13:4 17:22
32:8 38:3 39:17
52:6 59:10 60:24
79:13 97:25 107:5
112:25 127:16
134:7 151:12,13
151:13 163:18
169:10 179:16
188:9 190:3 194:1
203:1
**rear** 205:9
**reason** 111:11
129:14 130:18
**reasons** 28:14
144:3
**recall** 44:23 48:24
49:7 52:11 56:5
56:12,13,14,15
62:19 63:9,14,19
73:6,11 80:8
88:21 106:6
111:19 140:14
145:21 148:2,9,13
149:5 151:5,19
154:6 156:1
157:16 181:1
189:1 207:5
**receive** 109:1
130:21 131:17
135:20
**received** 25:6 50:7
50:8 62:14 73:21
89:13 96:10 97:24
99:3,8 121:7
129:18 130:13,17
132:1,16 150:5,6

**reel** 156:14
**refer** 144:5,11
203:21
**reference** 155:12
155:23 199:14
**referenced** 123:19
**referral** 18:8
**referred** 134:24
**referring** 20:4
29:16 41:17 100:6
174:17
**reflect** 115:11
**refresh** 136:6
147:23
**regard** 64:15 95:2
127:18
**regarding** 171:20
**registration** 120:25
**registry** 62:13
124:22 131:4,24
133:8 135:9
137:20 138:14
**regular** 54:7,8
81:11 116:21
158:16
**regularity** 112:6
**regularly** 53:23
**regulation** 119:4
124:13 127:20
128:8 180:20
**regulations** 118:7
123:15,22 180:4
180:24
**regulatory** 125:5
**reinterpret** 13:17
126:15,18
**reiterate** 76:16
**relate** 5:5,17 48:6
48:20 87:21
121:14 122:1
136:1 160:4,19
**related** 29:4 47:3
64:3 65:20 66:13
99:15 127:20
128:1 142:21
149:23 152:13

175:2,19 207:5
**receiving** 88:22
**recess** 55:5 102:23
154:19 186:18
206:22
**recognition** 38:19
**recognize** 11:21
30:9 42:14 46:5
49:19,22 59:9
63:15 93:25 122:4
140:10 157:4,6
**recognized** 109:8
135:8,9
**recognizing** 161:3
**recollection** 73:5
136:7,11,13
147:23 160:25
**recommend** 145:24
168:5
**recommended** 17:7
186:7
**reconsider** 21:6
**record** 4:24 7:2 9:8
10:15 11:5 13:15
13:18,21 33:24
36:20 41:3,16,19
43:16 48:19 55:3
55:8 81:6 99:12
102:21 103:4
115:10 119:22
127:6 130:12
137:9 139:2
141:15 142:8
143:9 154:17,22
156:23 180:16
183:1,23 186:16
186:21,23 189:6
189:14 201:11
206:16,20,25
207:17 208:11
**records** 120:7
132:24 142:21
143:1
**recreationally**
155:2
**rectal** 145:16

208:13
**relates** 124:1
**relating** 21:25 36:8
**relation** 169:22
202:8
**relay** 75:9 123:8
**release** 136:1
**relevant** 47:10
207:10
**relief** 200:16
**relinquished** 94:16
**rely** 13:4,6,12
164:15 204:3
**relying** 205:23
**remain** 54:21,22
**remember** 56:4,18
73:3,4 74:24
79:25 81:4,18,19
82:5 93:14 100:12
105:14 111:16
151:8 153:3,3,9
153:12,13 157:18
157:23 159:12
168:8 181:1
**render** 175:6
**rendered** 64:15
**renew** 115:17,23
116:3
**renewed** 118:13
**rent** 107:20,21,22
108:1
**rental** 156:19
**rented** 156:7
**rents** 156:18
**Rent-a-Car** 156:8
**repair** 104:7 105:3
105:17,18 106:21
108:23
**repeat** 13:10 18:22
**repeated** 35:25
**repeating** 63:20
130:7 189:3
**rephrase** 91:9
**rephrasing** 159:3
**replace** 68:5
**replaced** 67:14

141:2
**replacement** 68:2
**report** 5:11 56:2
140:5,10 146:14
**reporter** 1:17 7:14
8:5,7 14:16 36:18
158:17,20 193:18
208:7
**represent** 7:18 10:6
138:21 142:9,16
160:15 166:20
**representation**
23:25 24:25
**representative**
44:23 62:17
161:13
**representatives**
26:23
**represented** 16:9
**representing** 7:20
8:1 167:7 178:20
178:22
**represents** 142:18
**request** 4:13,16 6:6
7:11 64:4 87:24
88:5,20,23 89:4
96:19 97:5 140:15
159:21 183:12
187:22
**requested** 93:9
143:1 175:7
**requests** 4:11 48:14
89:19 90:1,17
91:13,22 92:11,16
92:21,23 93:5
94:1,20,23 120:6
181:25
**require** 37:9 45:3
82:18 119:9
129:22 195:6
200:21 203:3
**required** 58:12
116:20,24 117:1
117:22 118:1
128:19 129:10
131:16 169:17



202:6
**requirement** 124:9
 201:13
**requirements**
 123:14,21 124:3
 124:12,20 125:8
 129:2 203:16
**requires** 84:22
**requiring** 44:25
 197:15 202:16
**reserve** 207:3,11
**resolve** 162:5
**resorting** 177:9
**respect** 24:24 61:15
 65:15 66:9 78:2
 96:6 115:4 117:14
 140:18 165:2
 169:25 175:18
 183:16,16,17
 205:17
**respond** 10:21 50:5
**responded** 45:2
 155:4
**responding** 46:9
**responds** 164:12
 166:1 173:4
**response** 46:15,20
 62:22 91:20 96:11
 96:13 120:5 135:1
 135:5 161:17
 163:4 174:20
 175:20
**responses** 11:6
 49:15 50:18,24
 51:6 89:9,14
 90:18,19 100:1
**responsibility**
 187:8
**responsible** 12:10
 74:16
**responsive** 89:18
 89:19,25 91:22
 94:2,22 178:13
**rest** 108:6
**restate** 78:12
**restore** 66:23

**restriction** 117:7
 118:10
**restrictions** 113:14
 113:16 116:14
 118:20 119:14
**restroom** 97:17
 186:11
**result** 137:16 191:1
**results** 148:15
 161:24
**resume** 104:19
 107:2,6
**resumes** 107:7
**retail** 105:16
**retained** 166:17,20
**retaining** 24:4
**retired** 105:15
 134:23
**retrace** 159:13
**returned** 70:4
**review** 30:13,17
 46:20,23 50:2,17
 94:5,9,14 163:3
**re-elaborate** 75:19
**rid** 93:13 109:19
**right** 11:8,12,16
 17:14 20:3 21:4
 24:13,14,14 25:1
 25:3 33:21 39:14
 44:4 52:5 57:6
 58:25 61:8,10
 64:24 65:2 68:17
 71:9 72:15 77:19
 77:22 80:13 82:20
 85:7 99:17 100:4
 107:20 109:2
 113:5,24 114:8,24
 116:17 117:6,7
 118:5 122:20
 124:22 127:22
 128:17,22 131:24
 133:8 134:5
 136:15,16 137:12
 138:11,18,24
 139:20 149:10
 151:20 152:2,9,15

156:23 162:13
 163:15,25 164:17
 167:10,12 174:18
 176:5 177:1 178:6
 178:6,7,10 183:18
 192:8,25 193:9
 196:15,18 198:11
 198:12 202:21
 207:3,11
**right-hand** 138:7
 153:18
**ring** 38:14 58:9
**RIT** 104:5 105:2,7
**Rite** 68:1
**road** 68:24 69:21
 70:10,12,13,14
 70:16,22,22 72:7
 84:19,25 101:9
 120:20 188:1
 189:8 191:23
 194:12 195:13,19
 200:1 201:4
**roads** 70:10 190:11
**Rochester** 105:7
**Rockaway** 13:25
 158:13
**rolled** 120:18
**Rome** 1:14 2:10
 5:13 7:11,22 10:6
 142:2
**room** 88:13 201:2
**Rozynski** 2:7 7:24
 7:24 9:8 13:14
 18:13 20:19 21:8
 21:19 22:15 23:7
 26:15,24 27:10
 32:20 38:7 39:3
 40:9,22 41:6
 43:15 58:5 59:1
 59:16 60:15 61:4
 62:3 64:6 65:9,24
 66:14 68:7 69:22
 71:25 73:15 76:3
 77:6 78:5,21 82:9
 82:15 87:5,11
 92:17 97:1,15,21

98:3,9 102:16
 115:7 119:5,25
 124:5,14 126:14
 127:14 130:5,16
 139:21 140:19
 141:19 150:10
 152:16 155:3
 158:1 162:8
 166:22 167:20
 169:8 170:10
 174:1 176:10
 177:2,10 179:3
 180:5,17,25
 181:11 183:7,19
 184:9 185:10
 186:4 187:5,15
 188:3,15 189:2,19
 190:12,20 191:10
 192:3,11 193:2,12
 193:15,25 194:23
 195:3 196:6,25
 197:12 198:6,17
 199:2,8,22 200:9
 200:24 201:21
 202:11,18 203:9
 203:19 204:7,19
 204:25 205:8,25
 206:18 207:13
**rules** 14:9 103:7
 118:7
**rumbles** 59:22
**running** 84:15
**runs** 9:23

_____
**S**
**S** 2:1 4:1 5:1 8:8,17
 103:1,1,1
**safe** 72:10 189:9,23
 195:17 198:4
 199:21
**safely** 171:20 175:3
 175:24 176:6
 178:18,24 186:2
**safety** 5:6 72:2,8
 84:21,22 95:5
 96:2,12 121:16

122:3,12 123:14
 129:8,9 136:9
 137:18 168:22
 184:13 185:8
**sake** 48:18
**sale** 156:19,20
**satisfactory** 82:18
**satisfied** 104:8
**save** 81:12
**saved** 97:10
**saves** 97:11
**saw** 141:4
**saying** 11:15 13:8
 13:13 16:19 20:2
 26:7 27:13 62:22
 81:19 91:6 125:12
 149:12 157:13
 166:11 171:11,18
 172:11 173:14
 175:15 187:25
 191:7 200:20
 202:6
**says** 31:13 35:8
 51:23 100:3
 115:16 116:14,15
 118:14 123:13
 125:7,24,25 126:5
 127:8,9,9,10,11
 127:12 128:6
 129:1 144:5,11,13
 144:16 145:8,10
 148:18 162:20
 163:20 164:4,13
 174:4,25 182:4,5
 182:6 183:3
**scale** 189:14
**scales** 57:13
**scenario** 199:19
**schedule** 146:2
**school** 1:7 4:13,15
 5:19 7:4,21 10:7
 19:10,13,17,20
 20:1,6,7,8,8,13
 25:10,12,15,16,19
 26:10 27:25 28:17
 29:2 37:7,8 40:21



41:10,11,12,18
42:17,20 44:24
54:2 64:5 68:16
68:21,22 69:1,24
69:25 74:24 79:4
84:5,7 85:11
86:15,23 87:15,16
87:24 88:5 101:1
103:16,18,23
106:7 110:10
139:24 161:14,19
162:25 164:15
165:9,16,25 166:5
167:3,8 168:6,13
169:12 170:25
179:12,19 186:7
188:7 194:2,5
197:8 199:14
200:18 203:2
**schooling** 103:25
104:25
**schools** 79:7,14
83:3,24 84:4,9,10
84:13,16 92:5
176:18,24 177:21
177:22 178:1
179:18,22 180:21
181:17 184:18
197:8,21 198:25
199:7 202:3
**School's** 89:4
**screen** 74:21 80:16
80:22
**se** 15:19 53:25
151:5
**search** 41:11 87:14
89:17 90:23 91:21
92:1,13 93:12,18
104:23 106:8
109:21 133:13
166:5
**searched** 89:24
**seat** 71:9,13,14
205:18
**seated** 10:20
**second** 32:22 33:10

34:3,8 35:9 43:7
46:9,12 74:4
90:17 99:6 116:12
122:22 124:25
128:11,13 130:23
135:23 142:13
146:24 148:22
151:23,25 153:20
173:17 181:5
**seconds** 172:3
**section** 40:3,6,8
47:6 123:19
125:12 127:20
128:11
**Security** 108:25
**see** 11:13,15 23:10
25:10 34:14 36:10
40:6 43:21 44:2,9
44:17 46:8,15,18
46:19 47:5,7
49:10,17 50:22
51:20,24 53:23
55:24 58:7,24
62:15 64:18,20
65:15 67:6 77:16
80:22,24 83:9
86:17,18 87:1,2
89:2,6 96:19
111:22,24 113:15
114:12,15 116:9
116:13 117:19
122:16,22 125:10
129:16 135:8
136:3 138:1,3,8
138:10 143:19,22
144:3,7,11,13,20
144:23 145:2,18
145:19 146:4
147:1,3,5,7,16,20
148:3,19 149:4,7
150:12 152:1
153:20,23 158:20
159:15 161:6,17
161:25 162:20
163:5 164:2,3,4,4
164:10,12,16,17

166:7,13 167:24
171:3,8,9,10,14
171:15 172:1,7,14
172:25 173:3,9,13
173:18 174:18
175:9 182:9 185:1
190:22 191:1,3,16
192:17 197:10
203:24 206:14,16
**seeing** 58:3 63:15
**seek** 19:8,17 175:21
**seeking** 147:11
171:18 200:8,15
201:12
**seen** 46:7 85:9,12
88:25 134:16
187:16,18
**sees** 149:2
**segment** 156:2
158:17
**self** 106:13
**send** 131:10 132:21
150:20,22 161:24
166:10,11
**sending** 163:9
**sends** 166:11
**sense** 108:2,8 138:4
202:5 204:9,11
206:6
**sent** 19:23 26:2
89:14 92:19 96:1
104:19 107:1,7
129:20,25 130:3
130:13,15 132:20
132:25 133:22
134:17 135:12
139:15 142:10
147:24 163:12
171:6 173:14
**sentence** 31:1,7,23
31:25 32:19 34:3
34:8,15 35:8,9
86:19 122:23
127:10
**sentences** 36:23
**separated** 112:21

**September** 15:21
63:19,22 64:2
65:1 140:12 141:9
**sequence** 181:23
**serious** 194:7
**seriously** 190:16
**served** 89:19 91:14
**service** 108:21
**services** 1:21 7:13
7:15 23:3,17
64:15 87:16 175:7
**set** 4:7,9,18,19 5:15
30:18 47:19,24
49:1,14 50:6
51:22 69:4,24
81:1 94:9 98:15
98:19 99:4,9
142:9 160:1,15,23
174:9 208:10,17
**Seth** 2:8 8:3
**sets** 44:16 125:2
**seven** 66:18
**shape** 22:1
**share** 108:5
**shared** 53:19
176:12,14
**sheet** 51:16
**sheets** 75:5
**shift** 101:5 108:24
110:21 111:7,15
111:18 112:2
156:24
**shop** 105:18,22
**short** 55:1 102:18
103:13
**shortcut** 168:4
**shot** 60:5 157:1,8
**show** 53:12 63:17
98:11 112:9
119:18 121:11
136:19 141:22
159:23 160:13
165:5 170:14
182:3
**showed** 126:3
133:17 135:10

148:11 177:12
**showing** 115:11
120:7
**shown** 132:17
**sick** 205:1
**side** 61:3 138:7
191:17
**sidewalk** 157:10,11
**sight** 10:20 11:10
34:23,25 61:2
**sign** 2:19,21 8:13
8:15,22,24 9:9,10
9:20 10:16,19
11:4,7 12:7,14,24
31:15 32:2 33:2
36:12 37:9 42:23
44:25 45:3 53:20
54:13,14 69:8
70:24 71:22 73:24
74:3 75:8,9,14
77:14 78:3,18
79:21 82:8,13,18
86:24 90:16 145:3
164:8,14,24 169:2
170:1,7 182:23
183:4,14 184:2
185:18 187:23,25
188:24 189:16
190:9 191:8
193:20,23 196:22
200:25 201:14
202:7
**signals** 205:16,23
**signature** 136:3,5
143:16
**signed** 11:6 32:25
51:3,7 139:9,14
139:19
**signer/interpreter**
145:6
**significantly** 107:9
**signifies** 138:19
**signing** 33:1,2
**similar** 28:19
175:17 185:4
189:23



**Simon** 2:21
**simple** 22:23
**simply** 177:9
**simulate** 58:24
**simulated** 60:13
**simulation** 199:18
**simulator** 199:12
  199:24 200:1
**simulators** 199:1,5
**simultaneous** 9:12
**single** 39:19
**sir** 22:10 34:21
  44:21 45:9 65:13
  180:13
**siren** 59:20 60:18
**sit** 78:13
**site** 201:3
**sites** 105:23
**sitting** 11:8,12
  71:12,14 187:1
  190:17 192:24
  196:23 205:21
**situation** 73:6
  161:2 168:1 194:3
  196:9 197:15
  203:1
**situations** 190:14
  194:11 201:7
**six** 90:4 201:19
**six-week** 202:8
**size** 185:8 187:14
  189:14
**skills** 76:24 117:1
**sleep** 143:23 144:6
  144:8 145:17,25
  153:21 154:10
**sleepiness** 153:22
**sleeping** 146:6,8
  153:20
**slightly** 33:23
**slowing** 196:19
**Smith** 7:5 171:5
  175:5,8,21 185:17
  186:6 197:6
  200:21
**smoothly** 9:23

**snapshot** 157:3
**snore** 154:2,5,7
**snored** 154:3
**snoring** 153:22
**social** 64:13 108:25
**Solomon** 7:5 171:5
  175:5,8,21 185:18
  186:7 197:7
  200:21
**solution** 176:8
**somebody** 17:12
  18:1 22:20 25:10
  54:3 61:25 80:2
  80:11 97:11 131:3
  133:14 134:13
  137:20 168:11
  179:11 199:20
**somebody's** 76:23
**sorry** 13:9 18:22
  35:10 48:22 50:15
  61:10 79:24 82:5
  85:8 100:8 128:12
  136:12 149:15
  151:13 166:18
  171:23 182:9
  189:24
**sort** 36:4 48:21
  58:1 65:19 67:18
  134:8 169:5
**sorts** 56:24
**sought** 19:7,12
  204:16
**sound** 58:2,23
  59:14,23,24 60:11
  60:14,21 203:17
**sounds** 36:25 39:1
  39:2 45:15,17
  57:25 59:10 60:4
  205:15
**source** 28:1 60:22
  107:11 109:3
**speak** 32:25 36:23
  38:10 78:25 81:3
  97:2
**speaking** 20:9
  35:14 36:9 126:8

  163:22
**special** 56:21,22
  126:8
**specialist** 65:14
  149:3 150:19
**specific** 53:3 57:25
  58:23 59:14 60:11
  63:1,15 84:3
  119:2 127:19
  171:21 181:25
  183:5 184:4
**specifically** 36:6
  56:5 57:5 79:13
  85:20 92:14 96:5
  149:20 200:20
**specifics** 86:7 89:16
  184:14
**specify** 182:13,15
  183:5
**speech** 38:11,15
  45:15
**speed** 29:18 51:25
  97:23 192:8 193:9
  196:19
**speeding** 120:12
**speeds** 192:10
**speedy** 139:16
**spend** 24:7
**split-second** 196:15
**spoke** 16:13,23
  79:18 134:25
  156:2
**spoken** 32:24 77:25
  77:25 85:17,21
  184:24
**spot** 117:18 120:18
**Square** 2:5,13
**SS** 208:3
**SSI** 107:12
**St** 103:16
**Staehle** 2:19 82:24
  90:3,20 91:2,5,8
  110:22 181:12
  183:20 184:22
**staff** 167:11
**stage** 191:20

**stamp** 129:22 138:1
  138:5,6
**stamped** 129:15
**stamping** 129:21
**standard** 76:6
  116:21 125:23
**standpoint** 147:15
**stands** 138:13
**start** 70:13,15
  112:25 133:25
  135:7 182:12
  195:9
**started** 10:14 26:21
  26:22 30:11 72:25
  73:8 101:6,24
  102:1 104:17
**starts** 34:5 163:15
  163:17 164:2
**state** 1:18 4:21,23
  7:17 9:4 13:20
  15:25 35:14 36:6
  78:17 79:17 80:1
  80:3 112:11
  113:23 118:19
  119:14,20 123:15
  175:1 178:16
  208:2,8
**stated** 40:7 127:21
  153:8
**statement** 30:25
  31:8 32:18 37:12
  40:3 41:24 42:22
  42:25 43:20 155:6
  164:19 167:16
  174:5
**statements** 50:24
  50:25
**states** 1:1 83:22
  85:1 125:13
  179:17
**stating** 174:5
**station** 157:17
  159:13
**stationery** 188:22
**status** 132:10
  133:18 134:22

  135:4
**steered** 54:6,10
**stems** 197:13
**step** 114:21,21
**steps** 159:13
**stethoscope** 153:2
**stick** 110:20 111:7
  111:15,17
**stop** 71:16,19,21
  72:10 120:16
  121:6 196:5,7,10
  196:10,17 204:10
**stopped** 189:22
**store** 110:4
**stories** 100:23
  102:5
**story** 156:4,6
**straight** 24:5 72:16
  132:1 134:3
**strategies** 194:10
**street** 2:12 13:24
  120:15 157:17,21
  157:25 158:7
  200:3
**streets** 70:18,19
  157:14,19 159:9
  200:5
**stress** 150:12 151:1
**strict** 202:24
**student** 69:1 74:10
  74:16 103:21
  166:3 167:17,19
  175:4,25 176:7
  178:19 182:7
**students** 69:10 70:6
  76:8 83:12 84:17
  84:18 166:2 167:4
  186:2
**studied** 101:1
**study** 104:11
**stuff** 53:17 70:17
  72:4 75:3 117:11
**subject** 18:10 19:1
  19:5 21:1 22:10
  46:16 51:1 94:23
  162:16 171:5



submit 150:15
submitted 30:21
  46:3,21 48:25
  50:10 54:19 62:17
  94:6,11,11 175:11
subpoena 5:13
  142:1,10,19
subsequent 98:1
subsequently 65:23
substantial 36:7
substantially 35:12
substantive 89:9
  98:4
substitute 204:8
subway 59:22
successful 100:22
  102:4
sue 28:8,10
sued 167:12,14
sufficient 170:8
suggesting 95:19
suggestion 42:8
  166:4
suggests 167:18
suing 197:9
summary 103:13
  105:25
supply 81:10
support 6:1 21:9
  107:17 108:7
  135:3 136:10
supposed 134:18
  150:14 179:18
sure 11:24 12:11
  14:19 16:3 17:22
  25:8 26:6 33:12
  33:22 36:2 43:25
  50:11 52:4 54:25
  67:24 72:3 73:22
  76:2 79:11 80:6,9
  82:2,3,4 89:15
  92:10 93:14,17
  95:14,20 96:21
  97:21 98:9 102:16
  103:10 105:2
  106:16 107:4

108:15 113:15
118:4 122:8
123:20 129:18
132:9,11,25 133:2
133:15 141:17
151:4 152:11
184:12 188:6
203:2
surgical 66:23
swear 8:5
switch 82:25
switched 110:20
sworn 8:6,10,19 9:3
  208:10
system 67:13
  104:11 110:21
  133:20 146:9
  191:8 194:18
  195:15
systems 108:20
  203:8 205:6

———————
       T
———————
T 4:1 5:1 8:8,8,17
  9:1 103:1 208:1,1
tag 156:16
take 40:1,11 42:9
  48:9 55:1 57:18
  67:5 69:11 74:5
  80:4 81:24 82:7
  82:14 87:19 88:11
  88:14 97:1,15
  98:7,24 102:14
  114:5 115:19
  116:7 126:5,7
  130:20 151:8
  154:13,15 161:11
  179:10 186:13
  194:6 195:13
  197:4
taken 1:13 7:9
  11:20 55:5 66:18
  102:23 154:19
  159:2 183:12
  186:18 206:22
takes 9:17 71:19

108:6 188:10
talk 21:21,24 23:9
  48:23 112:21
  118:18 120:14
  168:9 175:22
  194:5 200:10
talked 55:14
  165:20
talking 20:7 63:13
  72:4
tangent 61:9 134:9
tape 154:14
taught 186:1
teach 69:4 111:25
teaching 166:3
  167:4,17
technical 83:7
  85:19 86:4 104:14
  105:4
Technology 105:8
telephone 17:20
tell 12:4,20 15:1,5
  16:1,3,12 31:13
  61:1 72:12 73:9
  80:19 107:14
  134:15 152:21
  157:7 159:8 193:5
  193:20
telling 26:19 35:22
  85:5 148:2 190:17
term 132:17 133:21
terminated 175:13
terms 20:15 21:1
  22:13,24 53:8
  72:14 75:18 84:14
  125:2 127:22
  149:18 170:8
  202:7 204:14
test 56:7,16,18,24
  57:1,4,12,16,18
  58:7,9 59:10
  63:12,18 64:1,3
  65:2 66:20 68:24
  69:11,13 73:22,24
  74:1 77:21 79:20
  82:14 84:19,25

115:20 124:2,10
126:6,9,11 141:8
141:16,16,17
148:11 150:12,19
151:1 152:7,25
153:1 180:23
188:12
tested 125:17
testified 9:5 151:19
testimony 19:11
  20:10 25:21 27:4
  28:4 73:23 94:18
  126:16 156:10
  189:1 208:12
testing 60:13
tests 55:25 64:3
  84:20 150:14
Texas 83:10,25
Text 6:11
thank 14:2 17:8
  27:13 33:5 35:6
  39:24 97:3 105:10
  134:6 137:5
  149:16 159:11
  163:11 164:13
  172:2 174:7 175:7
  180:15 181:20
  183:10 207:16
thanks 33:6 48:23
therapist 64:12
thing 31:7 95:23
  147:22
things 29:18 38:14
  42:1 48:8,20
  51:25 75:1 86:10
  93:4 97:23 105:20
  143:23 161:7
  165:21 169:22
  184:15 194:4,6,9
  196:20 199:1
  201:5 202:25
  205:17 207:9
think 17:23 21:3
  22:23 23:7 31:5,6
  41:24 46:7 48:9
  52:25 53:16 58:20

61:16 73:23 74:13
80:6 81:18 82:12
93:10,17 105:1
131:25 134:7,9
149:22 153:25
156:3 160:16
162:24 163:10
169:5,20,24 174:3
177:14,15,18,23
177:24 178:1,15
179:9,12,15 181:3
181:7 182:2,22
190:13,18 191:6
194:3,8 195:5,20
197:16 198:15
200:3 201:6 207:6
207:7
thinking 101:6,24
  197:8
third 90:18 100:16
  108:24 115:18
  145:17
thought 101:16
  102:1 126:21
  127:1 168:20,22
  175:23 176:5
  178:22,23,24
  185:4
three 48:20 70:6
  81:17,22 90:12
  94:14 102:2,7,8
  110:2 143:23
  145:15,22 151:10
  151:11 153:4,11
  154:5 191:25
  195:14
three-way 80:14
threw 93:16
thrown 97:10
ticket 117:13
  120:12 121:1,4
time 7:8 11:14,19
  12:1,24 14:24
  16:15 18:12 19:2
  19:15 24:20 25:6
  27:6 34:18 48:4


MAGNA ▶
LEGAL SERVICES

51:7 52:22 53:13
55:2,7 66:12,16
68:5,5 73:3 74:23
75:22 76:20 81:16
82:2 93:12,20
101:23 102:20
103:3 104:16
111:21 115:18
121:3 124:22
130:3 153:10,24
154:16,21 162:5
169:3 172:17
173:7,25 175:6
176:23 186:15,20
189:20 195:2
206:19,24
**times** 29:16 67:14
74:12 94:14
104:19 107:2
109:6 110:2
116:24 164:14
181:22 183:4,15
**timing** 136:15
**tipping** 187:13
**title** 128:25
**today** 7:7 10:12
14:5 15:14 29:12
32:13 82:6 99:3,8
165:22 187:2
196:23 205:21
207:2,12
**today's** 29:8
**told** 53:15 59:9
62:10,24,25 79:9
83:11,17,25 84:16
85:3 86:6 106:23
130:20 132:23
133:25 134:12,23
135:17,20,21,23
141:6,11 148:6,13
153:3 154:6
169:19 178:15
198:2
**tomorrow** 207:14
207:16
**tone** 39:6

**tones** 38:19
**top** 30:1 51:20
128:24 143:11
173:1 174:19
**total** 106:5
**touch** 61:18
**touched** 152:10
**touches** 134:3
**tractor-trailer** 5:18
28:6 99:16 101:9
101:17 118:2
160:5,20 161:14
165:3 166:4 167:5
168:10 169:23
178:5 185:7 187:3
187:13 189:15,21
190:6,19,22,24
191:3,15 198:9
**tractor-trailers**
205:7,10,17
**traditional** 24:4
**traffic** 120:8,8
191:25 192:1,9,15
193:10 194:20
**trailer** 201:4
**train** 86:4 157:17
157:18 175:3,24
**trained** 77:15 78:13
186:2 188:20
**training** 1:7 4:13
4:15 5:18 7:21
10:7 20:6 25:9,25
26:10 27:21 28:1
28:6 40:21 79:14
83:4,7 84:22
85:12,13,18,24
86:3,10,25 87:23
88:4 89:4 99:16
111:12 131:8
139:24 160:5,21
165:3 167:19
168:9 169:23
170:24 174:7
176:18 10:21
183:15,17,18
184:6,7,8,20

185:19,21 187:19
188:2,7,12 197:22
199:6,20 200:4
201:2,20,25
203:16
**transcript** 5:24
97:4 159:20
**translate** 8:12,21
**translation** 9:13,25
32:15,16 34:24,25
35:4
**translators** 34:19
**transmission** 112:4
**travel** 11:13
**treading** 66:10
**treadmill** 150:13
**treated** 64:15
**treatment** 65:20
66:12 204:16
**tried** 111:22 133:11
**truck** 117:23 192:7
195:1
**trucking** 199:6
**trucks** 117:24
203:8
**true** 43:1 45:7,8,11
50:24 155:6
208:11
**try** 23:20 29:17
48:8 77:24 78:11
90:7 134:10 155:9
168:12,13 176:8
197:9
**trying** 23:21 24:8
37:17 57:11,21,24
58:21 59:8 67:2
70:9 73:3 89:23
90:24 91:19 95:20
120:22,24 127:16
134:7 137:19
162:5 169:20
178:11 194:8
197:6
**Tuesday** 7:7 171:7
171:10
**turn** 11:16 72:15,24

206:3
**twice** 75:21
**two** 27:22,24 47:18
54:21,22 55:19
60:23 65:11 67:4
70:6 81:17,22
83:6,17 87:19
94:14 97:19
100:13,15 102:2,7
102:8,11 104:22
110:2 113:3,9,21
114:20 115:21
130:21 131:18
135:22,25 136:19
144:18,18 147:4
160:24,25 171:13
172:23 173:6,10
176:24 184:18
198:10 200:11
**two-minute** 186:14
**two-year** 61:16
67:4 128:2 132:17
133:18 135:6,10
135:13,16,19
141:10,11 173:5
**type** 45:1 89:13
111:16 143:11
152:24,25 165:18
179:10 199:19
205:6
**types** 117:24
**typically** 36:11
37:3 57:4 59:21
59:23 67:13 68:1
68:4 70:5 105:18
105:21 107:5

_____

**U**

**ultimately** 104:7
166:1
**undergo** 126:10
**underneath** 59:22
129:1 144:17
**understand** 10:11
11:1,7 12:3,7,14
12:19 15:4 16:10

17:11 23:21 26:6
31:21 33:24 37:18
38:11 39:1 43:25
52:24 57:11,21
58:20 59:8 68:14
69:16,19 70:9,20
71:7 72:23 73:25
75:6,17 76:15
79:12 89:23 91:3
91:4,16 99:10
103:9 105:2
106:16,19 118:20
123:17,25 124:8
131:1,20 137:15
145:7 152:12
164:7 169:21
172:10,16 177:20
178:9 182:21,22
195:4 197:25
204:2
**understanding**
21:17 24:9,17
59:4 62:15 65:13
75:25 118:24
**understood** 14:14
15:8,9 73:22
75:10 76:2
127:18 131:12
133:22 139:25
141:18 144:10
**unemployment**
107:8
**unfair** 199:23
**unfortunately**
37:11 45:5 143:7
**Union** 2:5
**unit** 187:13
**UNITED** 1:1
**university** 105:9
**unsafe** 188:23
189:16 190:8
191:7
**unsatisfactory** 37:4
**upgrade** 68:6,10
**upside** 42:10
**usage** 110:4



**use** 10:16 32:2
36:12 37:1,11
45:5 66:4,5 67:14
72:19 74:3 77:14
82:18 85:24 97:16
116:21 117:3
125:17,18 182:14
186:11 191:21
**usually** 39:16
**utilize** 60:20 198:11
201:1
**utilized** 71:17

## V

**V** 2:21 8:17
**valid** 122:18
**validate** 131:6
134:14
**various** 47:9 92:5
95:10 143:20
**vehicle** 73:7 117:21
121:5 124:11
125:14 185:9
187:4 189:18
190:7,10,14 191:9
191:15 195:9,18
195:23 196:5,11
199:25 204:10
**vehicles** 4:23
117:22,25 119:21
**vein** 41:12
**verbal** 12:25 14:17
**verbally** 53:19
**verbatim** 123:11,12
**verification** 50:23
51:8 58:17
**verified** 131:17
133:16
**verify** 32:21 50:11
63:4 132:20
134:20
**versa** 9:11
**version** 135:19
**versus** 7:4 21:12
**vice** 9:11
**video** 11:4 80:7,10

80:13,24 81:8
200:1
**videographer** 2:24
7:1,12 8:4 54:23
55:2,7 102:20
103:3 154:16,21
186:15,20 206:19
206:24 207:17
**videos** 201:1
**videotape** 1:12 7:2
202:24
**videotaping** 10:24
**view** 117:3 168:17
186:1 193:19
198:1
**viewed** 32:3
**views** 178:10
**violation** 120:13
121:8
**virtue** 89:20
**vision** 55:25
**visit** 56:9 64:8
143:15 145:22,24
146:14,23 149:24
**visual** 206:8,13
**visualize** 72:22
74:18
**visually** 11:14 31:5
44:2
**vocational** 103:14
**voice** 38:18 125:15
**volition** 148:1
**Vote** 21:12

## W

**wait** 14:19 26:10
**waiting** 120:16
171:12 173:23
**waiver** 61:13 83:16
122:14,18 123:16
123:18 124:1,9
125:2,7 126:2
127:19,22 129:22
130:18,22 131:12
131:18,19 132:4
132:16 133:17

135:1,4,5,11,14
135:14,16,19
136:10 141:10
171:6 172:21,24
173:5,5 175:10,11
175:12,14,16
177:12 180:22
181:18 185:23
198:10
**waivers** 92:6 177:6
**walked** 150:13
**wall** 44:18
**want** 21:16 22:5,18
23:4,6 24:21 26:6
33:16,20,21 34:24
34:25 35:7,8,18
35:19 37:16 38:4
41:11 43:25 44:20
48:19 50:13 59:12
60:10 65:19 68:19
70:20 71:7 79:11
79:15 81:3,23
102:2 106:16
115:7 116:8,9
123:1,2,2 126:14
130:11 143:12
144:4 146:13
147:18 149:11
151:3 161:11
173:24 176:3
177:16 184:12
191:13,19,22
192:13 193:17
195:25 196:21
198:7,8,8,13
200:18 202:15,25
207:11
**wanted** 9:22 19:1,4
19:5 32:13 66:11
66:19 69:11 72:15
73:1,9 75:16
92:12 101:20,23
111:11,25 141:1
158:20 161:5
163:18 176:15
**wants** 178:4 193:5

**warning** 205:16
**Washington** 54:19
**wasn't** 32:8 41:12
62:23 67:9 100:11
101:2 104:8,18
106:8 120:12
121:3 129:21
132:8 133:7
137:14 146:1,2,5
148:8 162:10
190:2
**watch** 206:3
**watching** 206:3
**way** 13:2,16 21:25
24:4 31:13 37:17
58:1 60:12 64:4
65:7 78:3 82:12
85:14 90:25 93:22
98:25 126:19
130:10 139:16
144:22 158:4
159:17 168:5
176:5 178:9
185:14 188:9
197:21 198:4
199:20,20 200:15
206:12 208:15
**wear** 58:15
**week** 81:25 82:1
110:2 147:16
148:19 173:6
**weekly** 110:5
**weeks** 201:19
**weight** 184:14
187:6
**went** 19:17 20:11
25:10,17 26:13
50:11 61:9 68:22
74:21,23 75:7
76:18 92:14 101:1
103:20,22 104:13
116:2,3 126:3
132:1,18 133:13
133:18 134:8
135:9 144:3,8,14
144:23 145:2

146:4 148:10,14
149:19,24 153:24
162:10 177:21
**weren't** 93:20
**Wessendorf** 47:2
171:4,17 172:11
173:1,23,23
174:24
**we'll** 31:13 48:23
98:7 100:18
112:10 119:19
121:12 136:19
140:4 141:23
143:8 159:17,24
160:13 165:6
170:14 180:14
**we're** 14:4 49:12
55:3 124:18 172:2
174:5 186:16
194:5 197:22,23
201:4 206:20
207:15
**we've** 129:5
**whatsoever** 152:5
**wheel** 192:23
**WHEREOF**
208:17
**Whisper** 124:1,10
127:21 180:23
**whispered** 35:24
125:15
**white** 39:9
**wide** 117:21
**willing** 27:25
177:22 185:16
**Win** 54:10
**window** 117:25
**wiring** 105:19
**withdraw** 50:3
78:11 81:5 128:12
205:13
**witness** 3:3 6:3 8:5
8:6,13,15,22,24
9:2,7 13:11 20:24
115:11 137:5
160:8 207:6,15



208:9,12,17
**witnesses** 52:8
55:13
**woman** 134:24
**wondering** 83:13
103:11 106:12
168:16 175:13
**word** 9:18 32:23
33:1 38:11 182:14
**words** 32:17 35:1
35:20,22 60:1
197:4
**work** 41:14 63:8
67:15 68:2,20
96:1,6,14,16,22
101:20 105:22,22
105:25 108:10,15
143:8 181:18
183:16 184:6
194:4 195:15
196:24
**worked** 19:20 71:8
80:11 104:4
105:22 106:4,19
**worker** 64:13
**working** 90:11
205:19
**workload** 92:25
**works** 76:2 108:11
108:12,19,24
**world** 106:10
193:19
**worried** 197:20
**worse** 191:4
**worth** 106:13
**wouldn't** 13:3
38:22 39:5 71:2
126:10 154:4
158:22 168:20
195:8
**write** 96:17
**writes** 171:18
**written** 17:20 32:24
69:12 73:22,24
84:19 89:9 95:4
**wrong** 31:6 117:6

206:7
**wrote** 147:10
**www.MagnaLS.c...**
1:22

**X**

**x** 1:3,9 3:1 4:1 5:1

**Y**

**yard** 183:17 184:7
184:7
**year** 16:17 62:18
82:4 99:24 104:4
106:20 114:18
131:18 134:17
135:22
**years** 54:21,22 67:5
73:4 74:24 81:17
81:22 102:3,8,9
104:22 109:13
110:1 113:9
114:20 115:21
151:10,11 153:4
153:11 154:5
169:14 198:10
**yell** 38:20
**yellow** 120:14,18
121:2,4
**York** 2:6,6 4:21,23
13:25 15:23,24,25
78:2,17 79:17
80:1,3 83:14,25
104:13 112:11
113:23 118:19
119:13,20 151:3
158:21
**young** 65:22
**younger** 116:19
**Yu** 5:10 54:10,11
55:15 63:3 133:6
134:1 137:2,21,21
138:23 139:4
141:4,6,12 151:20
152:12,23 154:9
162:6,11
**Yu's** 138:6 163:9

**Z**

**Z** 8:8,17
**Zip** 13:25
**zone** 121:5,6

**0**

**08540** 1:15
**09:29** 1:1,2,2,3,3,4
1:5,6,7,8,9,9,10
1:11,12,13,14,15
1:16,17,18,19,20
1:21,21,22,22 2:1
2:2,3,4,5,6,7,8,9
2:10,11,12,13,14
2:15,16,17,18,19
2:20,21,22,23,24
3:1,2,3,4,5,6,7,8,9
3:10,11,12,13,14
3:15,16,17,18,19
3:20,21,22,23,24
3:25 4:1,2,2,3,4,4
4:5,5,6,6,7,7,8,8,9
4:9,10,10,11,11
4:12,12,13,13,14
4:14,15,15,16,16
4:17,17,18,18,19
4:19,20,20,21,21
4:22,22,23,23,24
4:24,25 5:1,2,2,3
5:4,5,5,6,6,7,7,8,8
5:9,9,10,10,11,11
5:12,12,13,13,14
5:14,15,15,16,16
5:17,17,18,18,19
5:19,20,20,21,22
5:23,24,25 6:1,2,3
6:4,5,6,7,8,9,10
6:10,11,12,13,14
6:15,16,17,18,19
6:20,21,22,23,24
6:25
**09:53** 7:1,2,3,4,5,6
7:7,8,9,10,11,12
7:13,14,15,16,17
**09:54** 7:18,19,20,21
7:22,23,24,25 8:1

8:2,3,4,5,6,7,8,9
8:10,11,12,13,14
8:15,16,17,18,19
8:20,21,22,23,24
8:25 9:1,2,3,4,5,6
**09:55** 9:7,8,9,10,11
9:12,13,14,15,16
9:17,18,19,20,21
9:22,23,24,25
10:1
**09:56** 10:2,3,4,5,6,7
10:8,9,10,11,12
10:13,14,15
**09:57** 10:16,17,18
10:19,20,21,22,23
10:24,25 11:1,2,3
11:4,5,6
**09:58** 11:7,8,9,10
11:11,12,13,14,15
11:16,17,18,19,20
11:21,22,23,24
**09:59** 11:25 12:1,2
12:3,4,5,6,7,8,9
12:10,11,12,13,14
12:15,16

**1**

**1** 4:4 7:2 29:20 30:1
30:4,8,9 31:1,7
32:19,19 51:23
75:7 76:9 174:16
**1,000** 125:20
**1/09/15** 114:14
**1:38** 103:2,4
**10** 4:19 29:20,21
98:12,21 99:14
158:13 191:22
**10:00** 12:17,18,19
12:20,21,22,23,24
12:25 13:1,2
**10:01** 13:3,4,5,6,7,8
13:9,10,11,12,13
13:14,15,16,17,18
13:19,20,21,22,23
**10:02** 13:24,25 14:1
14:2,3,4,5,6,7,8,9

14:10,11
**10:03** 14:12,13,14
14:15,16,17,18,19
14:20,21,22,23,24
14:25 15:1
**10:04** 15:2,3,4,5,6,7
15:8,9,10,11,12
15:13,14,15
**10:05** 15:16,17,18
15:19,20,21,22,23
15:24,25 16:1,2,3
**10:06** 16:4,5,6,7,8,9
16:10,11,12,13,14
**10:07** 16:15,16,17
16:18,19,20,21,22
16:23,24
**10:08** 16:25 17:1,2
17:3,4,5,6,7,8,9
17:10,11
**10:09** 17:12,13,14
17:15,16,17,18,19
17:20,21,22,23,24
17:25
**10:10** 18:1,2,3,4,5,6
18:7,8,9,10,11,12
**10:11** 18:13,14,15
18:16,17,18,19,20
18:21,22,23,24,25
19:1,2,3
**10:12** 19:4,5,6,7,8,9
19:10,11,12,13,14
19:15,16,17,18,19
19:20
**10:13** 19:21,22,23
19:24,25 20:1,2,3
20:4,5,6,7,8,9,10
20:11,12,13,14
**10:14** 20:15,16,17
20:18,19,20,21,22
20:23,24,25 21:1
21:2,3,4,5
**10:15** 21:6,7,8,9,10
21:11,12,13,14,15
21:16,17,18,19,20
21:21,22,23
**10:16** 21:24,25 22:1



22:2,3,4,5,6,7,8,9
22:10,11,12,13,14
22:15,16
**10:17** 22:17,18,19
22:20,21,22,23,24
22:25 23:1,2,3,4,5
23:6,7,8,9,10,11
23:12
**10:18** 23:13,14,15
23:16,17,18,19,20
23:21,22,23,24
**10:19** 23:25 24:1,2
24:3,4,5,6,7,8,9
24:10,11,12,13,14
24:15,16
**10:20** 24:17,18,19
24:20,21,22,23,24
24:25 25:1,2,3,4,5
25:6
**10:21** 25:7,8,9,10
25:11,12,13,14,15
25:16,17,18,19,20
25:21,22,23
**10:22** 25:24,25 26:1
26:2,3,4,5,6,7,8,9
26:10,11,12
**10:23** 26:13,14,15
26:16,17,18,19,20
26:21,22,23,24,25
27:1,2,3,4,5
**10:24** 27:6,7,8,9,10
27:11
**10:25** 27:12,13,14
27:15,16,17,18,19
27:20,21,22
**10:26** 27:23,24,25
28:1,2,3,4,5,6,7,8
28:9,10
**10:27** 28:11,12,13
28:14,15,16,17,18
28:19,20,21,22,23
28:24,25
**10:28** 29:1,2,3,4,5,6
29:7,8,9
**10:29** 29:10,11,12
29:13,14,15,16,17

29:18,19,20
**10:30** 29:21,22,23
29:24,25 30:1,2,3
30:4,5,6,7,8,9,10
30:11,12,13
**10:31** 30:14,15,16
30:17,18,19,20,21
30:22,23
**10:32** 30:24,25 31:1
31:2,3,4,5,6,7,8,9
31:10,11,12
**10:33** 31:13,14,15
31:16,17,18,19,20
31:21
**10:34** 31:22,23,24
31:25 32:1,2,3,4,5
32:6,7,8,9
**10:35** 32:10,11,12
32:13,14,15,16,17
32:18,19,20,21,22
32:23,24,25
**10:36** 33:1,2,3,4,5,6
33:7,8,9,10,11,12
33:13,14,15,16,17
33:18,19,20,21,22
33:23,24
**10:37** 34:1,2,3,4,5,6
34:7,8,9,10,11,12
34:13,14
**10:38** 34:15,16,17
34:18,19,20,21,22
34:23,24,25 35:1
35:2,3,4,5,6,7,8,9
35:10,11
**10:39** 35:12,13,14
35:15,16,17,18,19
35:20,21,22,23,24
35:25 36:1,2,3,4,5
36:6
**10:40** 36:7,8,9,10
36:11,12,13,14,15
36:16,17,18,19,20
**10:41** 36:21,22,23
36:24,25 37:1
**10:42** 37:2,3,4,5
**10:43** 37:6,7,8,9,10

37:11,12
**10:44** 37:13,14,15
37:16,17,18,19,20
37:21,22,23,24,25
38:1,2
**10:45** 38:3,4,5,6,7,8
38:9,10,11,12,13
38:14,15,16,17
**10:46** 38:18,19,20
38:21,22,23,24,25
39:1,2,3,4,5,6
**10:47** 39:7,8,9,10
39:11,12,13,14,15
39:16,17,18,19,20
39:21
**10:48** 39:22,23,24
39:25 40:1,2,3,4,5
40:6
**10:49** 40:7,8,9,10
40:11,12,13,14
**10:50** 40:15,16
**10:51** 40:17,18,19
40:20,21,22,23,24
40:25 41:1,2,3,4,5
41:6,7
**10:52** 41:8,9,10,11
41:12,13,14,15,16
41:17,18,19,20,21
41:22
**10:53** 41:23,24,25
42:1,2,3,4,5,6,7,8
42:9,10,11,12,13
42:14
**10:54** 42:15,16,17
42:18,19,20
**10:55** 42:21,22,23
42:24,25 43:1,2,3
43:4,5,6,7,8,9,10
43:11
**10:56** 43:12,13,14
43:15,16,17,18,19
43:20,21,22,23,24
43:25 44:1,2,3,4,5
44:6
**10:57** 44:7,8,9,10
44:11,12,13,14,15

44:16,17,18,19,20
44:21,22,23,24
**10:58** 44:25 45:1,2
45:3,4,5,6,7,8,9
45:10,11,12,13
**10:59** 45:14,15,16
45:17,18,19,20,21
45:22,23,24,25
46:1,2,3
**10003** 2:6
**102** 163:14,17
164:11
**103** 163:15,19
164:2
**104** 162:14
**106** 161:11
**11** 4:21 68:13,15
112:10,13,18,25
113:22 115:24
116:12
**11th** 2:13
**11:00** 46:4,5,6,7,8,9
46:10,11,12,13,14
46:15,16
**11:01** 46:17,18,19
46:20,21,22,23,24
46:25 47:1,2
**11:02** 47:3,4,5,6,7,8
47:9,10,11,12,13
47:14,15,16
**11:03** 47:17,18,19
47:20,21,22,23,24
47:25 48:1,2,3,4,5
48:6,7,8,9,10,11
48:12,13,14,15,16
48:17
**11:04** 48:18,19,20
48:21,22,23,24,25
**11:05** 49:1,2,3,4,5,6
49:7,8,9,10,11
**11:06** 49:12,13,14
49:15,16,17,18,19
49:20,21,22,23
**11:07** 49:24,25 50:1
50:2,3,4,5,6,7,8,9
50:10,11,12,13,14

**11:08** 50:15,16,17
50:18,19,20,21,22
50:23,24,25 51:1
51:2,3,4,5,6,7
**11:09** 51:8,9,10,11
51:12,13,14,15,16
51:17,18,19,20,21
**11:10** 51:22,23,24
51:25 52:1,2,3,4,5
52:6,7,8,9,10,11
52:12,13,14,15,16
**11:11** 52:17,18,19
52:20,21,22,23,24
52:25 53:1,2,3,4,5
53:6,7
**11:12** 53:8,9,10,11
53:12,13,14,15,16
53:17,18,19,20,21
53:22,23
**11:13** 53:24,25 54:1
54:2,3,4,5,6,7,8,9
54:10,11,12,13,14
**11:14** 54:15,16,17
54:18,19,20,21,22
54:23,24,25 55:1
55:2,3,4,5,6
**11:15** 55:3,4
**11:26** 55:5,7,8,8,9
55:10,11,12,13,14
55:15,16,17,18,19
55:20,21,22,23,24
**11:27** 55:25 56:1,2
56:3,4,5,6,7,8,9
56:10,11,12,13,14
**11:28** 56:15,16,17
56:18,19,20,21,22
56:23,24,25 57:1
57:2,3,4
**11:29** 57:5,6,7,8,9
57:10,11,12,13,14
57:15,16,17
**11:30** 57:18,19,20
57:21,22,23,24,25
58:1,2,3,4
**11:31** 58:5,6,7,8,9
58:10,11,12,13,14


MAGNA
LEGAL SERVICES

58:15,16,17,18
**11:32** 58:19,20,21
58:22,23,24,25
59:1,2,3,4,5
**11:33** 59:6,7,8,9,10
59:11,12,13,14,15
59:16,17,18,19,20
59:21,22,23,24,25
**11:34** 60:1,2,3,4,5,6
60:7,8,9,10,11,12
60:13,14,15,16,17
**11:35** 60:18,19,20
60:21,22,23,24,25
61:1,2,3,4,5,6,7,8
61:9,10,11,12,13
**11:36** 61:14,15,16
61:17,18,19,20,21
61:22,23,24,25
62:1,2,3,4
**11:37** 62:5,6,7,8,9
62:10,11,12,13,14
62:15,16,17
**11:38** 62:18,19,20
62:21,22,23,24,25
63:1,2,3,4
**11:39** 63:5,6,7,8,9
63:10,11
**11:40** 63:12,13,14
63:15,16,17,18,19
63:20,21,22
**11:41** 63:23,24,25
64:1,2,3,4,5,6,7,8
64:9,10,11,12
**11:42** 64:13,14,15
64:16,17,18,19,20
64:21,22,23,24
**11:43** 64:25 65:1,2
65:3,4,5,6,7,8,9
65:10,11,12
**11:44** 65:13,14,15
65:16,17,18,19,20
65:21,22,23,24,25
**11:45** 66:1,2,3,4,5,6
66:7,8,9,10,11,12
66:13,14,15
**11:46** 66:16,17,18

66:19,20,21,22,23
66:24,25 67:1,2,3
67:4,5,6
**11:47** 67:7,8,9,10
67:11,12,13,14,15
67:16,17,18,19,20
67:21
**11:48** 67:22,23,24
67:25 68:1,2,3,4,5
68:6,7,8,9,10,11
68:12,13,14
**11:49** 68:15,16,17
68:18,19,20,21,22
**11:50** 68:23,24,25
69:1,2,3,4,5,6,7,8
69:9
**11:51** 69:10,11,12
69:13,14,15,16,17
69:18,19,20,21,22
69:23,24
**11:52** 69:25 70:1,2
70:3,4,5,6,7,8,9
70:10,11,12,13,14
70:15 147:6
**11:53** 70:16,17,18
70:19,20,21,22,23
70:24,25 71:1,2,3
71:4,5,6,7,8,9
**11:54** 71:10,11,12
71:13,14,15,16,17
71:18,19,20,21,22
71:23,24,25 72:1
**11:55** 72:2,3,4,5,6,7
72:8,9,10,11,12
72:13,14,15,16,17
72:18,19,20,21,22
72:23,24
**11:56** 72:25 73:1,2
73:3,4,5,6,7,8,9
73:10,11
**11:57** 73:12,13,14
73:15,16,17,18,19
73:20,21,22,23,24
**11:58** 73:25 74:1,2
74:3,4,5,6,7,8,9
74:10,11,12,13,14

74:15,16,17
**11:59** 74:18,19,20
74:21,22,23,24,25
75:1,2,3,4,5,6,7,8
75:9,10
**113** 4:21
**11693** 14:1
**12** 4:23 33:7 34:3
42:21 77:13
119:19,23 143:18
**12:00** 75:11,12,13
75:14,15,16,17,18
75:19,20,21,22,23
75:24,25 76:1,2,3
76:4
**12:01** 76:5,6,7,8,9
76:10,11,12,13,14
76:15,16,17,18,19
76:20,21,22,23,24
76:25 77:1
**12:02** 77:2,3,4,5,6,7
77:8,9,10,11,12
77:13,14,15,16
**12:03** 77:17,18,19
77:20,21,22,23,24
77:25 78:1,2,3,4,5
78:6,7,8
**12:04** 78:9,10,11,12
78:13,14,15,16,17
78:18,19,20,21,22
78:23,24,25 79:1
79:2,3,4
**12:05** 79:5,6,7,8,9
79:10,11,12,13,14
79:15,16,17,18,19
79:20,21,22
**12:06** 79:23,24,25
80:1,2,3,4,5,6,7,8
80:9,10,11,12
**12:07** 80:13,14,15
80:16,17,18,19,20
80:21,22,23,24,25
81:1,2,3,4,5,6,7
**12:08** 81:8,9,10,11
81:12,13,14,15,16
81:17,18,19

**12:09** 81:20,21,22
81:23,24,25 82:1
82:2,3,4,5,6,7,8,9
**12:10** 82:10,11,12
82:13,14,15,16,17
82:18,19,20,21,22
82:23,24,25
**12:11** 83:1,2,3,4,5,6
83:7,8,9,10,11,12
83:13,14,15,16,17
**12:12** 83:18,19,20
83:21,22,23,24,25
84:1,2,3,4,5,6,7,8
84:9
**12:13** 84:10,11,12
84:13,14,15,16,17
84:18,19,20,21,22
**12:14** 84:23,24,25
85:1,2,3,4,5,6,7,8
85:9,10,11,12,13
85:14,15,16,17
**12:15** 85:18,19,20
85:21,22,23,24,25
86:1,2,3,4,5
**12:16** 86:6,7,8,9,10
86:11,12,13,14,15
86:16,17
**12:17** 86:18,19,20
86:21,22,23,24,25
87:1,2,3,4,5,6
**12:18** 87:7,8,9,10
87:11,12,13,14,15
87:16,17,18,19,20
87:21,22,23,24,25
88:1,2,3,4,5,6,7,8
88:9
**12:19** 88:10,11,12
88:13,14,15,16,17
88:18,19,20,21,22
88:23
**12:20** 88:24,25 89:1
89:2,3,4,5,6,7,8,9
**12:21** 89:9,10,11,12
89:13,14,15,16,17
89:18,19,20,21
**12:22** 89:22,23,24

89:25 90:1,2,3,4,5
90:6,7,8,9,10
**12:23** 90:11,12,13
90:14,15,16,17,18
90:19,20,21,22,23
90:24,25 91:1,2,3
91:4,5,6,7,8,9,10
91:11,12
**12:24** 91:13,14,15
91:16,17,18,19,20
91:21,22,23,24,25
**12:25** 92:5,6,7,8,9
92:10,11,12,13,14
92:15,16
**12:26** 92:17,18,19
92:20,21,22,23,24
92:25 93:1,2,3,4,5
93:6
**12:27** 93:7,8,9,10
93:11,12,13,14,15
**12:28** 93:16,17,18
93:19,20,21,22,23
93:24
**12:29** 93:25 94:1,2
94:3,4,5,6,7,8,9
94:10,11,12
**12:30** 94:13,14,15
94:16,17,18,19,20
94:21,22,23,24,25
95:1,2
**12:31** 95:3,4,5,6,7,8
95:9,10,11,12,13
**12:32** 95:14,15,16
95:17,18,19,20,21
95:22,23,24,25
96:1,2,3
**12:33** 96:4,5,6,7,8,9
96:10,11,12,13,14
96:15,16,17,18
**12:34** 96:19,20,21
96:22,23,24,25
97:1,2,3,4,5,6,7,8
97:9,10,11,12,13
97:14,15,16,17,18
97:19,20,21,22,23



| | | | | |
|---|---|---|---|---|
| 97:24 | **13:40** 104:7,8,9,10 | 111:4 | 116:25 117:1,2,3 | 124:14 |
| **12:35** 97:25 98:1,2 | 104:11,12,13,14 | **13:52** 111:5,6,7,8,9 | 117:4,5,6,7,8,9,10 | **14:13** 124:15,16,17 |
| 98:3,4,5,6,7,8,9 | 104:15,16,17,18 | 111:10,11,12,13 | 117:11,12,13,14 | 124:18,19,20,21 |
| 98:10,11,12,13,14 | 104:19 | 111:14,15,16,17 | **14:02** 117:15,16,17 | 124:22,23,24,25 |
| 98:15,16,17,18,19 | **13:41** 104:20,21,22 | 111:18,19,20,21 | 117:18,19,20,21 | 125:1,2,3,4,5 |
| 98:20,21,22,23,24 | 104:23,24,25 | 111:22,23 | 117:22,23,24,25 | **14:14** 125:6,7,8,9 |
| 98:25 99:1,2,3,4,5 | 105:1,2,3,4,5,6,7 | **13:53** 111:24,25 | 118:1,2,3,4,5,6,7 | 125:10,11,12,13 |
| 99:6,7,8,9,10 | **13:42** 105:8,9,10,11 | 112:1,2,3,4,5,6,7 | **14:03** 118:8,9,10,11 | 125:14,15,16,17 |
| **12:36** 99:11,12,13 | 105:12,13,14,15 | 112:8,9,10,11,12 | 118:12,13,14,15 | 125:18,19,20,21 |
| 99:14,15,16,17,18 | 105:16,17,18,19 | 112:13,14,15 | 118:16,17,18,19 | 125:22 |
| 99:19,20,21,22,23 | 105:20,21,22,23 | **13:54** 112:16,17,18 | 118:20,21,22,23 | **14:15** 125:23,24,25 |
| 99:24,25 100:1 | 105:24,25 | 112:19,20,21,22 | 118:24,25 119:1 | 126:1,2,3,4,5,6,7 |
| **12:37** 100:2,3,4,5,6 | **13:43** 106:1,2,3,4,5 | 112:23,24,25 | **14:04** 119:2,3,4,5,6 | 126:8,9,10,11,12 |
| 100:7,8 | 106:6,7,8,9,10,11 | 113:1,2,3,4,5 | 119:7,8,9,10,11 | 126:13,14,15,16 |
| **12:38** 100:9,10,11 | 106:12,13,14,15 | **13:55** 113:6,7,8,9 | 119:12,13,14,15 | 126:17,18,19 |
| 100:12,13,14,15 | **13:44** 106:16,17,18 | 113:10,11,12,13 | 119:16,17 | **14:16** 126:20,21,22 |
| 100:16,17,18,19 | 106:19,20,21,22 | 113:14,15,16,17 | **14:05** 119:18,19,20 | 126:23,24,25 |
| 100:20 | 106:23,24,25 | 113:18,19,20 | 119:21,22,23,24 | 127:1,2,3,4,5,6,7 |
| **12:39** 100:21,22,23 | 107:1,2,3,4,5,6,7 | **13:56** 113:21,22,23 | 119:25 120:1,2,3 | 127:8,9,10,11 |
| 100:24,25 101:1,2 | **13:45** 107:8,9,10,11 | 113:24,25 114:1,2 | 120:4,5,6,7,8 | **14:17** 127:12,13,14 |
| 101:3,4,5,6,7,8,9 | 107:12,13,14,15 | 114:3,4,5,6,7,8,9 | **14:06** 120:9,10,11 | 127:15,16,17,18 |
| 101:10,11,12 | 107:16,17 | 114:10,11,12,13 | 120:12,13,14,15 | 127:19,20,21,22 |
| **12:40** 101:13,14,15 | **13:46** 107:18,19,20 | 114:14,15 | 120:16,17,18,19 | 127:23,24,25 |
| 101:16,17,18,19 | 107:21,22,23,24 | **13:57** 114:16,17,18 | **14:07** 120:20,21,22 | **14:18** 128:1,2,3,4,5 |
| 101:20,21,22,23 | 107:25 108:1,2,3 | 114:19,20,21,22 | 120:23,24,25 | 128:6,7,8,9,10 |
| 101:24,25 102:1,2 | 108:4,5,6,7,8 | 114:23,24,25 | 121:1,2,3,4,5,6,7 | **14:19** 128:11,12,13 |
| 102:3,4,5,6,7 | **13:47** 108:9,10,11 | 115:1,2,3,4,5,6,7 | 121:8,9,10,11,12 | 128:14,15,16,17 |
| **12:41** 102:8,9,10,11 | 108:12,13,14,15 | 115:8 | 121:13,14,15,16 | 128:18,19,20,21 |
| 102:12,13,14,15 | 108:16,17,18,19 | **13:58** 115:9,10,11 | 121:17,18,19 | 128:22 |
| 102:16,17,18,19 | 108:20,21,22,23 | 115:12,13,14,15 | **14:08** 121:20,21,22 | **14:20** 128:23,24,25 |
| 102:20,21 | 108:24 | 115:16,17,18,19 | 121:23,24,25 | 129:1,2,3,4,5,6,7 |
| **12:45** 102:21,22 | **13:48** 108:25 109:1 | 115:20,21,22 | 122:1,2,3,4,5 | 129:8 |
| **120** 4:23 | 109:2,3,4,5,6,7,8 | **13:59** 115:23,24,25 | **14:09** 122:6,7,8,9 | **14:21** 129:9,10,11 |
| **122** 5:5 | 109:9,10 | 116:1,2,3,4,5,6,7 | 122:10,11,12,13 | 129:12,13,14,15 |
| **13** 5:5 81:21 103:19 | **13:49** 109:11,12,13 | 116:8 | 122:14,15,16,17 | 129:16,17,18,19 |
| 121:13,17,21,24 | 109:14,15,16,17 | **130** 2:12 | 122:18,19,20,21 | 129:20,21,22,23 |
| 139:10 | 109:18,19,20,21 | **138** 5:7,9 | **14:10** 122:22,23,24 | 129:24,25 |
| **13:37** 102:22,23,24 | 109:22,23,24,25 | **14** 5:7 43:3,10,14 | 122:25 123:1,2,3 | **14:22** 130:1,2,3,4,5 |
| 103:1,2 | 110:1 | 44:21,21 122:19 | 123:4,5,6,7,8,9,10 | 130:6,7,8,9,10,11 |
| **13:38** 103:3,4,5,6,7 | **13:50** 110:2,3,4,5,6 | 122:19 136:20,23 | 123:11,12,13,14 | 130:12,13,14,15 |
| 103:8,9,10,11,12 | 110:7,8,9,10,11 | 137:8,10 | **14:11** 123:15,16,17 | 130:16 |
| 103:13,14,15 | 110:12,13 | **14:00** 116:9,10,11 | 123:18,19,20,21 | **14:23** 130:17,18,19 |
| **13:39** 103:16,17,18 | **13:51** 110:14,15,16 | 116:12,13,14,15 | 123:22,23,24,25 | 130:20,21,22,23 |
| 103:19,20,21,22 | 110:17,18,19,20 | 116:16,17 | 124:1,2,3,4 | 130:24,25 131:1,2 |
| 103:23,24,25 | 110:21,22,23,24 | **14:01** 116:18,19,20 | **14:12** 124:5,6,7,8,9 | 131:3,4,5,6,7,8 |
| 104:1,2,3,4,5,6 | 110:25 111:1,2,3 | 116:21,22,23,24 | 124:10,11,12,13 | **14:24** 131:9,10,11 |



131:12,13,14,15
131:16,17,18,19
131:20,21,22,23
131:24,25
**14:25** 132:1,2,3,4,5
132:6,7,8,9,10,11
132:12,13,14,15
132:16,17,18,19
132:20
**14:26** 132:21,22,23
132:24,25 133:1,2
133:3,4,5,6,7,8
**14:27** 133:9,10,11
133:12,13,14,15
133:16,17,18,19
133:20,21,22,23
133:24,25 134:1
**14:28** 134:2,3,4,5,6
134:7,8,9,10,11
134:12,13,14,15
**14:29** 134:16,17,18
134:19,20,21,22
134:23,24,25
135:1,2
**14:30** 135:3,4,5,6,7
135:8,9,10,11,12
135:13,14,15,16
135:17,18
**14:31** 135:19,20,21
135:22,23,24,25
136:1
**14:32** 136:2,3,4,5,6
136:7,8,9,10,11
136:12,13,14,15
136:16,17,18,19
136:20,21,22,23
136:24,25 137:1,2
137:3,4
**14:33** 137:5,6,7,8,9
137:10
**14:34** 137:11,12,13
137:14,15,16,17
137:18,19,20,21
137:22,23,24,25
138:1,2
**14:35** 138:3,4,5,6,7

138:8,9,10,11,12
138:13,14,15,16
138:17,18,19,20
138:21,22,23,24
**14:36** 138:25 139:1
139:2,3,4,5,6,7,8
139:9,10,11,12,13
139:14,15
**14:37** 139:16,17,18
139:19,20,21,22
139:23,24,25
140:1,2,3,4,5,6,7
140:8,9
**14:38** 140:10,11,12
140:13,14,15,16
140:17,18,19,20
**14:39** 140:21,22,23
140:24,25 141:1,2
141:3,4,5,6,7,8,9
**14:40** 141:10,11,12
141:13,14,15,16
141:17,18,19,20
141:21,22,23,24
141:25 142:1,2,3
142:4,5
**14:41** 142:6,7,8,9
142:10,11,12,13
**14:42** 142:14,15,16
142:17,18,19,20
142:21,22,23,24
142:25 143:1,2
**14:43** 143:3,4,5,6,7
143:8,9,10,11,12
143:13,14,15
**14:44** 143:16,17,18
143:19,20,21,22
143:23,24,25
144:1,2,3,4,5,6
**14:45** 144:7,8,9,10
144:11,12,13,14
144:15,16,17,18
144:19,20,21,22
144:23
**14:46** 144:24,25
145:1,2,3,4,5,6,7
145:8,9,10,11,12

145:13,14,15,16
145:17,18
**14:47** 145:19,20,21
145:22,23,24,25
146:1,2,3,4,5,6,7
146:8,9
**14:48** 146:10,11,12
146:13,14,15,16
146:17,18,19,20
**14:49** 146:21,22,23
146:24,25 147:1,2
**14:50** 147:3,4,5,6,7
147:8,9,10,11,12
147:13
**14:51** 147:14,15,16
147:17,18,19,20
147:21,22,23,24
147:25 148:1,2,3
148:4,5,6,7,8
**14:52** 148:9,10,11
148:12,13,14,15
148:16,17,18,19
148:20,21,22,23
148:24,25 149:1,2
149:3,4,5,6,7,8
**14:53** 149:9,10,11
149:12,13,14,15
149:16,17,18,19
149:20,21,22,23
149:24,25 150:1,2
150:3,4,5
**14:54** 150:6,7,8,9
150:10,11,12,13
150:14,15,16,17
150:18,19,20,21
150:22
**14:55** 150:23,24,25
151:1,2,3,4,5,6,7
151:8,9,10,11,12
151:13,14,15
**14:56** 151:16,17,18
151:19,20,21,22
151:23,24,25
152:1,2,3,4,5,6,7
152:8,9,10,11
**14:57** 152:12,13,14

152:15,16,17,18
152:19,20,21,22
152:23,24,25
153:1,2,3,4,5
**14:58** 153:6,7,8,9
153:10,11,12,13
153:14,15,16,17
153:18,19,20,21
153:22,23,24,25
**14:59** 154:1,2,3,4,5
154:6,7,8,9,10,11
154:12,13,14,15
154:16,17,18,19
154:20,21
**141** 5:11
**143** 5:12
**15** 5:9 43:3,10,14
44:21,22 116:12
136:20 137:3,9,22
151:14,17
**15-CV-02917-K...**
1:2 7:7
**15-minute** 158:13
**15:16** 154:22,23,24
154:25
**15:17** 155:1,2,3,4,5
155:6,7,8,9,10,11
155:12,13
**15:18** 155:14,15,16
155:17,18,19,20
155:21,22,23,24
155:25 156:1,2,3
**15:19** 156:4,5,6,7,8
156:9,10,11,12,13
156:14,15
**15:20** 156:16,17,18
156:19,20,21,22
156:23,24,25
157:1
**15:21** 157:2,3,4,5,6
157:7,8,9,10
**15:22** 157:11,12,13
157:14,15,16,17
157:18,19,20,21
157:22,23,24,25
158:1,2,3,4,5

**15:23** 158:6,7,8,9
158:10,11,12,13
158:14,15,16
**15:24** 158:17,18,19
158:20,21,22,23
158:24,25 159:1,2
**15:25** 159:3,4,5,6,7
159:8,9,10,11,12
159:13,14,15,16
159:17
**15:26** 159:18,19,20
159:21,22,23,24
159:25 160:1,2,3
160:4,5,6,7,8,9,10
160:11,12,13
**15:27** 160:14,15,16
160:17,18,19,20
160:21,22
**15:28** 160:23,24,25
161:1,2,3,4,5,6,7
161:8
**15:29** 161:9,10,11
161:12,13,14,15
**15:30** 161:16,17,18
161:19,20,21,22
161:23,24,25
162:1,2,3,4,5,6,7
162:8,9,10,11,12
162:13
**15:31** 162:14,15,16
162:17,18,19,20
162:21,22,23
**15:32** 162:24,25
163:1,2,3,4,5,6,7
163:8,9
**15:33** 163:10,11,12
163:13,14,15,16
163:17,18,19,20
163:21,22,23
**15:34** 163:24,25
164:1,2,3,4,5,6,7
164:8,9,10,11
**15:35** 164:12,13,14
164:15,16,17,18
164:19,20,21,22
164:23,24,25



**15:36** 165:1,2,3,4
**15:37** 165:5,6,7,8,9
165:10,11,12,13
165:14
**15:38** 165:15,16,17
165:18,19,20,21
165:22,23,24,25
166:1,2,3,4,5,6,7
**15:39** 166:8,9,10,11
166:12,13,14,15
166:16,17,18,19
166:20,21,22,23
166:24,25
**15:40** 167:1,2,3,4,5
167:6,7,8,9,10,11
167:12,13,14,15
**15:41** 167:16,17,18
167:19,20,21,22
167:23,24,25
168:1,2,3,4,5,6,7
168:8,9,10
**15:42** 168:11,12,13
168:14,15,16,17
168:18,19,20,21
168:22,23,24,25
169:1,2,3,4,5
**15:43** 169:6,7,8,9
169:10,11,12,13
169:14,15,16,17
169:18,19,20,21
169:22
**15:44** 169:23,24,25
170:1,2,3,4,5,6,7
170:8,9,10,11,12
170:13
**15:45** 170:14,15,16
170:17,18,19,20
170:21,22,23
**15:46** 170:24,25
171:1,2,3
**15:47** 171:4,5,6,7,8
171:9,10,11,12,13
171:14
**15:48** 171:15,16,17
171:18,19,20,21
171:22,23,24,25

172:1,2,3,4,5,6
**15:49** 172:7,8,9,10
172:11,12,13,14
172:15,16,17,18
172:19,20,21,22
172:23,24,25
173:1,2
**15:50** 173:3,4,5,6,7
173:8,9,10,11,12
173:13,14,15,16
173:17,18,19,20
**15:51** 173:21,22,23
173:24,25 174:1,2
174:3,4,5,6,7,8,9
174:10,11,12,13
174:14,15,16
**15:52** 174:17,18,19
174:20,21,22,23
174:24,25 175:1,2
175:3,4,5,6,7,8,9
175:10
**15:53** 175:11,12,13
175:14,15,16,17
175:18,19,20,21
175:22,23,24,25
176:1,2,3
**15:54** 176:4,5,6,7,8
176:9,10,11,12,13
176:14,15,16,17
176:18,19,20
**15:55** 176:21,22,23
176:24,25 177:1,2
177:3,4,5,6,7
**15:56** 177:8,9,10,11
177:12
**15:57** 177:13,14,15
177:16,17,18,19
177:20,21,22,23
177:24,25 178:1,2
178:3,4,5,6,7,8,9
178:10,11,12
**15:58** 178:13,14,15
178:16,17,18,19
178:20,21,22,23
178:24,25 179:1,2
179:3,4

**15:59** 179:5,6,7,8,9
179:10,11,12,13
179:14,15,16,17
179:18,19,20,21
179:22
**156** 5:14
**159** 6:9
**16** 5:11 68:18 73:4
113:2 140:4,7
**16th** 100:3
**16:00** 179:23,24,25
180:1,2,3,4,5,6,7
180:8,9,10,11,12
180:13,14,15,16
180:17,18
**16:01** 180:19,20,21
180:22,23,24,25
181:1,2,3,4,5,6,7
181:8
**16:02** 181:9,10,11
181:12,13,14,15
181:16,17,18,19
181:20,21,22,23
181:24,25 182:1
**16:03** 182:2,3,4
**16:04** 182:5
**16:05** 182:6,7,8,9
182:10
**16:06** 182:11,12,13
182:14,15,16
**16:07** 182:17,18,19
182:20,21,22,23
182:24,25 183:1,2
183:3,4,5,6,7,8,9
183:10,11,12
**16:08** 183:13,14,15
183:16,17,18,19
183:20,21,22,23
**16:09** 183:24 184:1
184:2,3,4,5,6,7,8
184:9
**16:10** 184:10,11,12
184:13,14,15,16
184:17
**16:11** 184:18,19,20
184:21,22,23,24

184:25 185:1,2,3
185:4,5,6,7,8,9,10
**16:12** 185:11,12,13
185:14,15,16,17
185:18,19
**16:13** 185:20,21,22
185:23,24,25
186:1,2,3,4
**16:14** 186:5,6,7,8,9
186:10,11,12,13
186:14,15,16
**16:25** 186:17,18,19
186:20,21,22,23
**16:26** 186:24,25
187:1,2,3,4,5,6,7
187:8,9,10,11,12
187:13,14
**16:27** 187:15,16,17
187:18,19,20,21
187:22,23,24,25
188:1,2,3,4
**16:28** 188:5,6,7,8,9
188:10,11,12,13
188:14,15,16,17
188:18,19,20,21
188:22
**16:29** 188:23,24,25
189:1,2,3,4,5,6
**16:30** 189:7,8,9,10
189:11,12,13,14
189:15,16,17,18
189:19
**16:31** 189:20,21,22
189:23,24 190:1,2
190:3,4,5,6,7,8,9
190:10,11,12
**16:32** 190:13,14,15
190:16,17,18,19
190:20
**16:33** 190:21,22,23
190:24,25 191:1,2
191:3,4,5,6,7,8,9
191:10
**16:34** 191:11,12,13
191:14,15,16,17
191:18,19,20,21

**16:35** 191:22,23,24
191:25 192:1,2,3
192:4,5
**16:36** 192:6,7,8,9
192:10,11,12,13
192:14,15,16,17
192:18,19,20,21
192:22,23
**16:37** 192:24,25
193:1,2,3,4,5,6,7
193:8,9,10,11,12
193:13,14,15,16
193:17,18,19,20
193:21
**16:38** 193:22,23,24
193:25 194:1,2,3
194:4,5,6,7,8,9,10
194:11,12,13,14
194:15,16,17,18
**16:39** 194:19,20,21
194:22,23,24,25
195:1,2,3,4,5,6,7
195:8,9,10
**16:40** 195:11,12,13
195:14,15,16,17
195:18,19,20,21
195:22,23,24,25
196:1,2,3,4,5,6,7
196:8,9,10
**16:41** 196:11,12,13
196:14,15,16,17
196:18,19,20,21
196:22,23,24,25
197:1,2,3,4,5,6
**16:42** 197:7,8,9,10
197:11,12,13,14
197:15,16,17,18
197:19,20,21,22
197:23,24,25
198:1
**16:43** 198:2,3,4,5,6
198:7,8,9,10,11
198:12,13,14,15
198:16,17,18,19
198:20,21,22,23
**16:44** 198:24,25



199:1,2,3,4,5,6,7
199:8,9,10,11,12
199:13,14,15,16
199:17,18,19,20
199:21,22
**16:45** 199:23,24,25
200:1,2,3,4,5,6,7
200:8,9,10
**16:46** 200:11,12,13
200:14,15,16,17
200:18,19,20,21
200:22,23,24
**16:47** 200:25 201:1
201:2,3,4,5,6,7,8
201:9,10,11,12,13
201:14,15,16
**16:48** 201:17,18,19
201:20,21,22,23
201:24,25 202:1,2
202:3
**16:49** 202:4,5,6,7,8
202:9,10,11,12,13
202:14,15,16,17
202:18
**16:50** 202:19,20,21
202:22,23,24,25
203:1,2,3,4,5,6,7
203:8,9,10,11,12
203:13,14,15,16
203:17
**16:51** 203:18,19,20
203:21,22,23,24
203:25 204:1,2,3
204:4,5,6,7,8,9,10
204:11,12,13,14
204:15
**16:52** 204:16,17,18
204:19,20,21,22
204:23,24,25
205:1
**16:53** 205:2,3,4,5,6
205:7,8,9,10,11
**16:54** 205:12,13,14
205:15,16
**16:55** 205:17,18,19
205:20,21,22,23

205:24,25 206:1,2
206:3,4,5,6,7,8,9
206:10
**16:56** 206:11,12,13
206:14,15,16,17
206:18,19,20,21
206:22,23
**161** 5:15
**166** 5:19
**17** 1:16 3:21 5:12
7:8 68:18 109:11
113:2 141:24
142:3,8,18 171:6
**17th** 162:16 164:13
**17:00** 206:24,25
207:1,2,3,4,5,6,7
207:8,9,10,11,12
207:13,14,15,16
207:17,18,19,20
207:21 208:1,2,3
208:4,5,6,7,8,9,10
208:11,12,13,14
208:15,16,17,18
208:19,20,20,21
**171** 5:20
**18** 5:14 82:23
109:12 155:17,19
157:3
**18th** 2:12
**19** 5:15 40:4,16
86:13 109:12
159:25 160:6,14
**19103** 2:14
**1968** 15:21
**1989** 103:22

────────────
**2**
────────────
**2** 4:5 42:3,5,12
115:15,16 116:1
128:13 174:16
**2nd** 116:6
**2/18/2013** 5:11
140:6
**2:59** 154:17,18
**20** 5:19 6:9 108:5
109:12 165:7,10

165:15
**2000** 125:21
**2003** 104:12
**2008** 104:17
**2011** 82:3,3
**2012** 81:21 143:18
**2013** 63:19,22 64:2
65:1 140:12 141:9
**2015** 1:16 3:21 7:8
16:17 114:23
115:5 116:1
122:19,20 128:3
130:4,15 136:4
139:4 171:6
204:15 208:18
**2016** 113:10 115:15
115:16 116:6
**2017** 135:22
**21** 5:20 111:20
170:15,18 181:21
**221173** 1:19
**24** 2:5
**25** 15:21 111:20
169:14
**29** 128:3

────────────
**3**
────────────
**3** 4:6 33:7 34:3,7
40:1 43:2 45:21
45:23 46:2 173:14
**3rd** 21:10
**3:16** 154:19,22
**30** 4:4 74:24 108:5
130:15 136:4
139:4
**30th** 100:9 165:24
167:3 171:16,17
172:11 173:2
208:18
**30X100223700**
208:21
**300** 102:11
**301** 1:14 7:9
**330** 13:24
**37** 122:10
**38** 125:1

**39** 127:25
**39.41(b)(11)** 122:15
**391.41B-11** 125:8
128:8 129:2

────────────
**4**
────────────
**4** 4:7 6:8 40:2 47:18
47:21 48:5,7,23
49:16 171:17,25
182:5,10
**4th** 2:5
**4:15** 186:16,17
**4:25** 186:18,21
**4:56** 206:20,21
**4:59** 206:22,25
**40** 125:20
**41** 128:20
**42** 4:5
**43** 129:4
**46** 4:6
**48** 4:7,8,10
**49** 122:14 125:8
128:8 129:2

────────────
**5**
────────────
**5** 4:8 47:18 48:1,3,5
48:23 49:10,12
50:22 55:12
182:10,12,13
**5:00** 207:18,19
**5:36** 171:6
**500** 125:20

────────────
**6**
────────────
**6** 4:10 48:9,9,10,15
48:22 87:20 88:24
89:21 91:13 92:21
171:2 204:15
**6th** 100:3
**6/11/2013** 146:14
147:6
**60** 84:23
**624-6221** 1:21

────────────
**7**
────────────
**7** 4:12 40:4,16

42:21 63:10,11
64:11 87:20 88:1
89:2,11,12 155:25
**70** 84:23
**75** 107:9

────────────
**8**
────────────
**8** 4:14 88:7,11,11
88:19 90:2,5,21
90:22 93:24
112:20 122:1
165:25
**8A** 98:24
**85** 119:8
**866** 1:21
**88** 4:12,14

────────────
**9**
────────────
**9** 3:5 4:17 98:12,16
113:10 114:23
115:5
**9th** 116:5
**9/25/1968** 114:11
**9:53** 1:16 7:8
**90** 134:19
**90th** 13:24
**90-day** 61:12
122:14 130:21
131:18 171:5
173:5
**93** 103:19
**97** 6:8
**98** 4:17
**99** 4:19



**EXHIBIT 4**

Page 1

UNITED STATES DISTRICT COURT                         09:11

FOR THE DISTRICT OF NEW JERSEY                       09:11

CIV. NO. 15-CV-02917-KM-JBC                          09:11

                                                     09:11

- - - - - - - - - - - - - - - - - - - -x             09:11

KENNETH FRILANDO,                                    09:11

                Plaintiff,                           09:11

        - against -                                  09:11

BORDENTOWN DRIVER TRAINING SCHOOL, LLC,              09:11

                                                     09:11

                Defendant.                           09:11

- - - - - - - - - - - - - - - - - - - -x             09:11

                                                     09:11

                                                     09:11

    VIDEOTAPE DEPOSITION of JOSEPH FRILANDO, taken   09:11

pursuant to notice, was held at the Law Offices of   09:11

Blank Rome, LLP, 301 Carnegie Center, Princeton,     09:11

New Jersey 08540, commencing November 19, 2015,      09:11

10:05 a.m., on the above date, before Catherine M.   09:11

Donahue, a Certified Court Reporter and Notary       09:11

Public in the State of New Jersey.                   09:11

Job No. 221182                                       09:11

                                                     09:11

            MAGNA LEGAL SERVICES                     09:11

              (866) 624-6221                         09:11

            www.MagnaLS.com                          09:11

                                                     09:11



Page 2

| | |
|---|---|
| 1 | A P P E A R A N C E S : 09:11 |
| 2 | 09:11 |
| 3 | EISENBERG AND BAUM, LLP 09:11 |
| 4 | Attorneys for Plaintiff 09:11 |
| 5 | 24 Union Square East, 4th Floor 09:11 |
| 6 | New York, New York 10003 09:11 |
| 7 | BY: SETH A. NADLER, ESQ. 09:11 |
| 8 | 09:11 |
| 9 | BLANK ROME, LLP 09:11 |
| 10 | Attorneys for Defendant 09:11 |
| 11 | 130 North 18th Street 09:11 |
| 12 | One Logan Square, 11th Floor 09:11 |
| 13 | Philadelphia, Pennsylvania 19103 09:11 |
| 14 | BY: ANTHONY B. HALLER, ESQ. 09:11 |
| 15 | JOHN A. CONNELLY, ESQ. 09:11 |
| 16 | 09:11 |
| 17 | ALSO PRESENT: 09:11 |
| 18 | John Diab 09:11 |
| 19 | Matthew Donaghy, Videographer 09:11 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 4

| | |
|---|---|
| 1 | E X H I B I T S 09:11 |
| 2 | Exhibit Name Description Page No. 09:11 |
| | 09:11 |
| 3 | Defendant's 09:11 |
| 4 | 09:11 |
| 5 | 22 Subpoena 16 09:11 |
| | 09:11 |
| 6 | 23 E-mail from Barbara Friedman 16 09:11 |
| | dated November 16, 2015 09:11 |
| 7 | 09:11 |
| 8 | 24 Document bearing Bates stamp 107 09:11 |
| | Nos. BDTS-0002 through 09:11 |
| | BDTS-0010 09:11 |
| 9 | 09:11 |
| 10 | 09:11 |
| 11 | (Exhibits attached with transcript.) 09:11 |
| 12 | 09:11 |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 3

| | |
|---|---|
| 1 | I N D E X 09:11 |
| 2 | 09:11 |
| 3 | Witness: Page 09:11 |
| 4 | JOSEPH FRILANDO 09:11 |
| 5 | Examination by Ms. Haller................ 7 09:11 |
| 6 | 09:11 |
| 7 | 09:11 |
| 8 | 09:11 |
| 9 | 09:11 |
| 10 | 09:11 |
| 11 | 09:11 |
| 12 | 09:11 |
| 13 | 09:11 |
| 14 | 09:11 |
| 15 | 09:11 |
| 16 | 09:11 |
| 17 | 09:11 |
| 18 | 09:11 |
| 19 | 09:11 |
| 20 | 09:11 |
| 21 | November 19, 2015 09:11 |
| 22 | Princeton, New Jersey 09:11 |
| 23 | 09:11 |
| 24 | 09:11 |
| 25 | 09:11 |

Page 5

| | |
|---|---|
| 1 | DEPOSITION SUPPORT INDEX 09:11 |
| 2 | 09:11 |
| 3 | Instruction To Witness Not To Answer 09:11 |
| 4 | PAGE LINE 09:11 |
| 5 | None Marked 09:11 |
| 6 | Request for Production of Documents 09:11 |
| 7 | PAGE LINE 09:11 |
| 8 | None Marked 09:11 |
| | 09:11 |
| 9 | Marked Text 09:11 |
| 10 | PAGE LINE 09:11 |
| 11 | None Marked 09:11 |
| 12 | 09:11 |
| 13 | 09:11 |
| 14 | 09:11 |
| 15 | 09:11 |
| 16 | 09:11 |
| 17 | 09:11 |
| 18 | 09:11 |
| 19 | 09:11 |
| 20 | 09:11 |
| 21 | 09:11 |
| 22 | 09:11 |
| 23 | 09:11 |
| 24 | 09:12 |
| 25 | 09:29 |



2 (Pages 2 to 5)

Page 6

```
1          THE VIDEOGRAPHER:  We are now on     10:05
2    record.  This begins DVD No. 1, in the     10:05
3    deposition of Joseph Frilando, in the      10:05
4    matter of Kenneth Frilando versus          10:05
5    Bordentown Driver Training School d/b/a     10:05
6    Smith & Solomon, in the United States      10:05
7    District Court for the District of New     10:05
8    Jersey, No. 15-CV-02917-KM-JBC.  Today     10:05
9    is Thursday, November 19, 2015, and the    10:05
10   time is 10:05.  This deposition is being   10:05
11   taken at 301 Carnegie Center at the        10:05
12   request of Blank Rome, and the             10:06
13   videographer is Matt Donaghy of Magna      10:06
14   Legal Services and the court reporter is   10:06
15   Catherine Donahue of Magna Legal           10:06
16   Services.                                  10:06
17         Will counsel and all parties         10:06
18   present state their appearances and whom   10:06
19   they represent.                            10:06
20         MR. NADLER:  Seth Nadler of          10:06
21   Eisenberg and Baum, LLP appearing on       10:06
22   behalf of plaintiff, Kenneth Frilando.     10:06
23         MR. HALLER:  Anthony Haller of       10:06
24   the law firm of Blank Rome, along with     10:06
25   my colleague, John Connelly representing   10:06
```

Page 7

```
1    Bordentown Driver Training School,         10:06
2    sometimes referred to in the complaint     10:06
3    at least, as Smith & Solomon School of     10:06
4    Tractor-Trailer Driving.                   10:06
5          THE VIDEOGRAPHER:  Will the court    10:06
6    reporter please swear in the witness.      10:06
7    J O S E P H   F R I L A N D O,  called as a   10:06
8    witness by Defendant, having been first    10:06
9    duly sworn by Catherine M. Donahue, a      10:06
10   Notary Public within and for the State of  10:06
11   New Jersey, was examined and testified as  10:06
12   follows:                                   10:06
13   EXAMINATION BY MR. HALLER:                  10:06
14   Q.  Good morning, Mr. Frilando.            10:07
15   A.  Good morning.                          10:07
16   Q.  As you just heard, my name is          10:07
17   Anthony Haller.  I am an attorney with the law  10:07
18   firm of Blank Rome, and along with my colleague,  10:07
19   John Connelly, who is sitting to my right, we  10:07
20   represent the defendant in this case, which is  10:07
21   referred to properly as Bordentown Driver  10:07
22   Training School, and I may refer to it sometimes  10:07
23   just for shorthand, as Bordentown, just so you  10:07
24   know throughout the deposition.            10:07
25   A.  Sure.                                  10:07
```

Page 8

```
1    Q.  Do you understand that you are under   10:07
2    oath here today?                           10:07
3    A.  I do.                                  10:07
4    Q.  Okay.                                  10:07
5          Have you ever been through a process  10:07
6    like this, through a deposition before?    10:07
7    A.  I have.                                10:07
8    Q.  Okay.                                  10:07
9          On how many occasions?               10:07
10   A.  Once.                                  10:07
11   Q.  Okay.                                  10:07
12         And what was that occasion in        10:07
13   connection with what?                      10:07
14   A.  It was in regards, with connection     10:07
15   to my employer, basically just as a witness.  10:08
16   Q.  Do you know the type of case that      10:08
17   was involved?                              10:08
18   A.  Injury.                                10:08
19   Q.  Is that somebody got injured at        10:08
20   work?                                      10:08
21   A.  No, it was a customer.                 10:08
22   Q.  And were you a witness to the events   10:08
23   that led to the injury?                    10:08
24   A.  No, I work in customer service, so I   10:08
25   took a complaint.                          10:08
```

Page 9

```
1    Q.  Okay.                                  10:08
2    A.  That supposedly led to the injury.     10:08
3    Q.  And when was that approximately?       10:08
4    A.  When was what?                         10:08
5    Q.  When was the deposition that you       10:08
6    just mentioned?                            10:09
7    A.  This passed Tuesday.                   10:09
8    Q.  Do you know the name of the case?      10:09
9    A.  I do not.                              10:09
10   Q.  What is the name of your employer?     10:09
11   A.  Con Ed.                                10:09
12   Q.  Do you know where the lawsuit has      10:09
13   been filed that led to you're being asked to be  10:09
14   a witness and give testimony in a deposition?  10:09
15   A.  Well, the incident took place in the   10:09
16   Bronx.  Bronx, New York.                   10:09
17   Q.  Given that you have been through the   10:09
18   process perhaps this will be familiar to you,  10:09
19   but I would just like at the beginning of the  10:09
20   deposition to establish several ground rules for  10:09
21   how we proceed.                            10:09
22         So, first of all, I would ask that   10:10
23   you answer my questions fully and to the best of  10:10
24   your knowledge.                            10:10
25         Is that fair, agreed and understood?  10:10
```



3 (Pages 6 to 9)

Page 10

```
1        A. Understood.              10:10
2        Q. If you do not understand a question    10:10
3    that I ask you, please, will you tell me?    10:10
4        A. Sure.                  10:10
5        Q. If you do not say anything, I will    10:10
6    assume that you have understood the question.    10:10
7            Is that fair, agreed and understood?    10:10
8        A. Understood.              10:10
9        Q. As I think you know, because we have    10:10
10   a court reporter and she is taking down both my    10:10
11   questions and the answers, it is important for    10:10
12   you to wait until I finish my question before    10:10
13   you answer and I will endeavor to make sure that    10:10
14   I let you finish your answer before I go into my    10:10
15   next question.                10:10
16           Is that understood?          10:10
17       A. Understood.              10:10
18       Q. Okay.                  10:10
19           If at any point you feel, I won't do    10:10
20   it intentionally, but inadvertently interrupted    10:10
21   in terms of giving an answer, please, will you    10:10
22   tell me?                    10:10
23       A. I will.                10:10
24       Q. Is there any reason why you're not    10:11
25   fully mentally capable of giving deposition    10:11
```

Page 11

```
1    testimony here today?              10:11
2        A. I'm fully -- I'm capable.        10:11
3        Q. Okay.                  10:11
4           You're not taking any medication    10:11
5    that would impact your ability to mentally give    10:11
6    testimony here today, are you?          10:11
7        A. No.                  10:11
8        Q. Could you state your full name and    10:11
9    home address for the record, please?      10:11
10       A. Joseph Albert Frilando. 330 Beach    10:11
11   90th Street, Rockaway Beach, New York 11963.    10:11
12       Q. Would you please also state your    10:11
13   date of birth?                10:11
14       A. April 14, 1970.            10:11
15       Q. Are you single?            10:11
16       A. I am.                  10:11
17       Q. Do you live in the house, the      10:11
18   address that you just gave with your mother and    10:12
19   brother?                    10:12
20       A. I do.                  10:12
21       Q. Anyone else live at the house?      10:12
22       A. No.                  10:12
23       Q. Is that home owned or is it rented?    10:12
24       A. Owned.                  10:12
25       Q. And who owns the home?          10:12
```

Page 12

```
1        A. My mother.              10:12
2        Q. Does she have a mortgage on the    10:12
3    house?                      10:12
4        A. Yes.                  10:12
5        Q. Does she work?            10:12
6        A. Yes.                  10:12
7        Q. And where does she work?        10:12
8        A. Gouveneur Hospital.          10:12
9        Q. Could you spell that for me?      10:12
10       A. To the best of my knowledge,      10:12
11   G-o-u-v-e-n-e-a-r.              10:12
12       Q. And where is that hospital?        10:12
13       A. Downtown Manhattan, lower east side.    10:12
14       Q. Do you contribute to the mortgage or    10:13
15   pay rent to your mother?            10:13
16           MR. NADLER: Objection to form.    10:13
17   You can answer.                10:13
18           THE WITNESS: I have to answer,    10:13
19   right?                      10:13
20           MR. NADLER: You can answer.      10:13
21   BY MR. HALLER:                  10:13
22       Q. Right.                  10:13
23       A. Yes.                  10:13
24       Q. Which of those two? Do you support    10:13
25   the mortgage or do you pay her rent and then she    10:13
```

Page 13

```
1    pays it?                    10:13
2        A. I pay her rent.            10:13
3        Q. Okay.                  10:13
4           And approximately, what is the      10:13
5    monthly rent that you pay?            10:13
6        A. 500.                  10:13
7        Q. Does your brother pay any rent?    10:13
8        A. I don't recall.            10:13
9        Q. Now, are you represented here today    10:13
10   by the law firm of Eisenberg and Baum?      10:14
11       A. Yes.                  10:14
12       Q. Okay.                  10:14
13           And when did you first speak, as    10:14
14   best as you can recall, to anyone at the law    10:14
15   firm of Eisenberg and Baum in any way connected    10:14
16   to the events that have led to this lawsuit?    10:14
17       A. Within the last 48 hours.        10:14
18       Q. So is it your testimony that before    10:14
19   the last 48 hours you have not spoken with    10:14
20   anyone at Eisenberg and Baum --          10:14
21           MR. NADLER: Objection to form.    10:14
22   BY MR. HALLER:                  10:14
23       Q. -- at any point in time?        10:14
24       A. The conversation within the last 48    10:14
25   hours was solely with regards to this      10:14
```



4 (Pages 10 to 13)

Page 14

```
1    deposition.                           10:14
2         Q.  Okay.                        10:14
3         So what I was trying to understand    10:15
4    is whether you had had prior contact.    10:15
5         MR. NADLER:  Objection.  I would    10:15
6    just like to remind the witness on the    10:15
7    record that any discussions that he may    10:15
8    have had with his attorneys regarding    10:15
9    this matter previously are privileged    10:15
10   and you can testify as to the nature of    10:15
11   that discussion might have happened, but    10:15
12   any communications with your attorney is    10:15
13   privileged and should not be disclosed.    10:15
14        MR. HALLER:  Right.              10:15
15        Just for the record, I hadn't    10:15
16   finished my question when you interposed    10:15
17   the objection.  So I just want to be    10:15
18   clear at this point I'm not asking for    10:15
19   what you discussed.  I'm not asking the    10:15
20   content.  I'm just trying to get a    10:15
21   chronology of when things happened.    10:15
22   BY MR. HALLER:                        10:15
23        Q.  So I was trying to determine when    10:15
24   you first spoke with anyone from Eisenberg and    10:15
25   Baum.                                 10:15
```

Page 15

```
1         A.  I don't recall.             10:15
2         Q.  Do you recall the circumstances that    10:15
3    led you --                            10:16
4         A.  No.                         10:16
5         Q.  Okay.                       10:16
6         Did you personally have any       10:16
7    involvement in your brother retaining Eisenberg    10:16
8    and Baum to represent him in connection with    10:16
9    this matter and other legal claims that he has    10:16
10   against other driving schools?         10:16
11        A.  No.                         10:16
12        Q.  So, when did you first learn that    10:16
13   your brother had engaged counsel to assist him    10:16
14   in connection with his interests or professed    10:16
15   interests in having -- in getting a CDL license?    10:16
16        A.  I'm sorry.  Repeat the question.    10:16
17        Q.  When did you first learn that your    10:17
18   brother had engaged counsel in connection with    10:17
19   his professed interest in obtaining a CDL    10:17
20   license?                             10:17
21        A.  I don't recall.             10:17
22        Q.  I have put before you two piles of    10:17
23   documents.  The first pile, which is to your    10:17
24   left, are documents that were identified during    10:17
25   the deposition of your brother on Tuesday and    10:17
```

Page 16

```
1    they are Defendant's Exhibits 1 through 21.  And    10:17
2    then I have put to the right, two exhibits,    10:17
3    which I premarked as Defendant's Exhibits 22 and    10:18
4    23.                                  10:18
5         (Subpoena was marked as       10:18
6    Defendant's Exhibit 22 for             10:18
7    identification, as of this date.)      10:18
8         (E-mail from Barbara           10:18
9    Friedman dated November 16, 2015 was    10:18
10   marked as Defendant's Exhibit 23 for    10:18
11   identification, as of this date.)      10:18
12   BY MR. HALLER:                        10:18
13        Q.  So I will be referring to those    10:18
14   exhibits throughout the deposition, just so you    10:18
15   know.  I would like to start with what's before    10:18
16   you in the right-hand pile as Deposition    10:18
17   Exhibits 22 and 23.  So if you could pick those    10:18
18   up, please.                          10:18
19        Are you aware that your presence    10:18
20   here today was as a result of a subpoena that    10:18
21   was served on you through your counsel?    10:18
22        A.  Yes.                        10:18
23        Q.  And that subpoena, am I right, is    10:18
24   the document that we have marked as Exhibit 23,    10:18
25   Defendant's Exhibit 23?               10:18
```

Page 17

```
1         A.  Yes.                        10:19
2         Q.  And did you personally receive a    10:19
3    copy of the subpoena and the attachments at some    10:19
4    point in time prior to today?          10:19
5         A.  Yes.                        10:19
6         Q.  And did you review the subpoena and    10:19
7    the attached subpoena for documents?    10:19
8         A.  Yes.                        10:19
9         Q.  If you go to Exhibit 1 of this    10:19
10   document, which is, I believe, page, it begins    10:19
11   at page 13, do you have that in front of you?    10:20
12        A.  Yes.                        10:20
13        Q.  Okay.                       10:20
14        So if we can go to the next page, do    10:20
15   you see that, sir, Defendant's First Document    10:20
16   Request to Plaintiff, Kenneth Frilando?    10:20
17        Do you see that?                 10:20
18        A.  What, page 1?               10:20
19        Q.  Yes.                        10:20
20        Do you see on page 1 that there is    10:20
21   an Exhibit 1 which is marked Defendant's First    10:20
22   Document Requests to Plaintiff Kenneth Frilando?    10:20
23        A.  Yes.                        10:20
24        Q.  Okay.                       10:20
25        So were you aware that part of the    10:20
```



Page 18

```
 1    subpoena request for documents, that the detail    10:20
 2    request that had been served on your brother    10:20
 3    were attached to this document?    10:20
 4        A.  For documents?    10:21
 5        Q.  Yes.    10:21
 6        A.  Yes, I understood that documents    10:21
 7    needed to be provided.    10:21
 8        Q.  Okay.    10:21
 9        So if we can go back now, therefore,    10:21
10    to page 7, Exhibit B, do you see that on    10:21
11    Exhibit B is a subpoena for documents addressed    10:21
12    to you, that's on page 8 of this exhibit?    10:21
13        A.  Page 8?    10:21
14        Q.  Yes.    10:21
15        A.  Yes.    10:21
16        Q.  Okay.    10:21
17        So if we now can focus on the    10:21
18    specific request subject to the subpoena to you    10:21
19    which are on page 11, did you carefully review    10:21
20    the requests that are listed on pages 11 and 12,    10:22
21    requests 1 through 10?    10:22
22        A.  I read through it.    10:22
23        Q.  Okay.    10:22
24        And could you explain to me what you    10:22
25    personally did to search for the documents that    10:22
```

Page 19

```
 1    were covered by these document requests?    10:22
 2        A.  I just looked through my e-mail.    10:22
 3        Q.  Anything else?    10:22
 4        A.  That's it.    10:22
 5        Q.  And did you provide to your counsel    10:22
 6    any e-mails that you identified as being covered    10:22
 7    by these requests?    10:22
 8        A.  Yes, I provided what I was able to    10:22
 9    find.    10:22
10        Q.  Okay.    10:23
11        Is there anything that you are aware    10:23
12    of that you identified in your search that you    10:23
13    did not provide to your counsel?    10:23
14        A.  I don't recall.    10:23
15        Q.  Could you explain that?  You don't    10:23
16    recall?    10:23
17        A.  I don't recall.  I was looking -- he    10:23
18    asked me to provide documents pertaining to    10:23
19    requests from schools and I was able to provide    10:23
20    what I found.  If there was anything in    10:23
21    addition, I don't recall that.    10:23
22        Q.  Okay.    10:23
23        I'm just trying to make sure that to    10:23
24    the extent that a search was done that you    10:23
25    provided to your counsel everything that you    10:23
```

Page 20

```
 1    were able to find?    10:23
 2        A.  And that's exactly what I did.    10:23
 3        Q.  Okay.    10:23
 4        So you may not have understood my    10:23
 5    question.  I was asking if there was anything    10:23
 6    that you found, but decided not to provide to    10:23
 7    your counsel?    10:23
 8        A.  No.    10:23
 9        Q.  Okay.    10:23
10        Is there anything you found that you    10:24
11    decided to delete at the time?    10:24
12        A.  No.    10:24
13        Q.  Okay.    10:24
14        So, if we look at the document    10:24
15    that's before you as Defendant's Exhibit 23,    10:24
16    which is the next document here, this is an    10:24
17    e-mail response that we received from Barbara    10:24
18    Freeman, a litigation paralegal at Eisenberg and    10:24
19    Baum, in relation to the documents subpoena that    10:24
20    was served on you through your counsel in which    10:24
21    they have indicated that all of the documents    10:24
22    have been produced, to the extent that there are    10:24
23    any.    10:25
24        Do you see that?    10:25
25        A.  Okay.    10:25
```

Page 21

```
 1        Q.  So do you see that it says "Document    10:25
 2    Requests 1, 2 and 3, see documents attached as    10:25
 3    Exhibit A to Defendant's document requests Bates    10:25
 4    stamped PLA 1 through PLA 7?    10:25
 5        Do you see that?    10:25
 6        A.  Yes.    10:25
 7        Q.  Okay.    10:25
 8        So, did you review this response for    10:25
 9    accuracy before it was sent to the Defendant's    10:25
10    counsel?    10:25
11        A.  This particular document, no.    10:25
12        Q.  Okay.    10:25
13        You just handed over everything you    10:25
14    thought was covered by the requests that you    10:25
15    could find?    10:25
16        A.  Correct.    10:25
17        Q.  And then you let them handle it?    10:25
18        A.  Correct.    10:25
19        Q.  Okay.    10:25
20        So, therefore, I just want to make    10:26
21    sure I understand where things lie with the    10:26
22    documents you were able to find.    10:26
23        Is it your testimony that you    10:26
24    provided to your counsel all documents that    10:26
25    relate in any way to any communications that you    10:26
```



Page 22

```
 1    had on your brother's behalf with Bordentown or    10:26
 2    as you referred to it Smith & Solomon?             10:26
 3         A.  Solely in regards to Smith &              10:26
 4    Solomon?                                            10:26
 5         Q.  Yes.                                       10:26
 6         A.  Yes.                                        10:26
 7         Q.  Everything.  Okay.                          10:26
 8             Is it your testimony that you               10:26
 9    produced all documents that are related to any      10:26
10    communications you had on your brother's behalf     10:26
11    with any other driving school?                      10:26
12         A.  As far as I recall.                         10:26
13         Q.  Did you personally have any direct          10:27
14    involvement with your brother's application to       10:27
15    the Federal Motor Carrier Safety Administration      10:27
16    for a waiver?                                         10:27
17         A.  No.                                          10:27
18         Q.  Did you have any direct involvement         10:27
19    with respect to your brother's efforts to obtain    10:27
20    an appropriate medical certificate?                  10:27
21         A.  No.                                          10:27
22         Q.  Other than the e-mails, do you have        10:27
23    any other documents that you think might be          10:27
24    related to the issues in this case that in any       10:27
25    way reflect events that may have occurred in         10:27
```

Page 23

```
 1    connection with your brother's professed             10:27
 2    interests in getting a CDL license from               10:28
 3    Bordentown or any other driving school?               10:28
 4             MR. NADLER:  Objection to form.              10:28
 5             You can answer.                               10:28
 6         A.  Not that I recall.                             10:28
 7    BY MR. HALLER:                                          10:28
 8         Q.  You can put those two documents               10:28
 9    aside.  If you could pull from the bigger pile         10:28
10    Exhibits 8 and 10.  Let me help you.  If I could       10:28
11    assist you.                                             10:29
12         A.  Thank you.                                     10:29
13         Q.  I have put before you, am I right,            10:29
14    what has been marked as Exhibits 8 and 10, is          10:29
15    that right?                                             10:29
16         A.  Yes.                                           10:29
17         Q.  You have those in front of you.  So,          10:29
18    I'll represent to you that Exhibit 8 are your          10:29
19    brother's original answers to Bordentown's             10:29
20    request for documents.  And if we look at              10:29
21    Exhibit A, there are a series of e-mails, PLA 1        10:29
22    through PLA 7, that appear to be communications        10:29
23    that you had in connection with your brother's         10:29
24    professed interests in taking CDL driving              10:30
25    training through Bordentown.                           10:30
```

Page 24

```
 1             Do you see that?                              10:30
 2         A.  Yes.                                          10:30
 3         Q.  And can we agree on the record that          10:30
 4    this Attachment A represents all of the               10:30
 5    communications that you were able to find on          10:30
 6    your computer?                                         10:30
 7             MR. NADLER:  Objection to form.               10:30
 8             You can answer.                                10:30
 9         A.  Whatever was provided per the                10:30
10    request of Mr. Wessendorf, that's what we gave         10:30
11    them.                                                   10:30
12    BY MR. HALLER:                                          10:30
13         Q.  Right.                                         10:30
14             At this point -- I will get into             10:30
15    what actually happened, but I'm just trying to        10:30
16    make sure that we have everything we need.            10:30
17         A.  Right.                                        10:30
18         Q.  So I'm asking you since you didn't           10:31
19    apparently review your counsel's responses to         10:31
20    the subpoena, that you could confirm under oath in    10:31
21    the record that what is contained in Exhibit A        10:31
22    represents all communications that you had with Smith 10:31
23    & Solomon or Bordentown.  I'm just asking about       10:31
24    Exhibit A at this point.                               10:31
25         A.  There should be a few more pieces of         10:32
```

Page 25

```
 1    communication here.                                   10:32
 2         Q.  There should?                                 10:32
 3         A.  Right.                                         10:32
 4         Q.  What is it that you're identifying?          10:32
 5         A.  There should be a communication              10:32
 6    towards the end of this where Mr. Wessendorf is        10:32
 7    stating that they cannot assist Kenny, that I'm        10:32
 8    not seeing here.  And my response, my                  10:32
 9    disappointed response to him.  I'm not seeing          10:33
10    that.                                                   10:33
11         Q.  Well, if you look at Exhibit A, on           10:33
12    the first page, PLA 1, so the bottom of that           10:33
13    page, going over to the next page.                     10:33
14             Do you see that there is an e-mail           10:33
15    from Mr. Wessendorf on April 6th?                      10:33
16         A.  Okay.  All right.  Thank you.                 10:33
17         Q.  Is that what you were referring to?          10:33
18         A.  Yes, so then, yes, you do.                    10:33
19         Q.  So you're now saying we do have              10:33
20    everything?                                             10:33
21         A.  Yes.                                           10:33
22         Q.  Okay.                                          10:33
23             I guess based on your testimony, I           10:33
24    don't see a response from you to that?                 10:33
25         A.  Well, it was just me voicing my              10:33
```



Page 26

```
 1    disappointment and that was the end of our        10:33
 2    correspondence.                                   10:33
 3        Q.  Okay.                                     10:33
 4        But I don't see any e-mail to that            10:33
 5    effect?                                           10:33
 6        A.  Okay.                                     10:33
 7        Q.  Did you send an e-mail to that            10:33
 8    effect?                                           10:34
 9        A.  I don't recall, but there is that         10:34
10    part of it.                                       10:34
11        Q.  So, Mr. Frilando, this is important       10:34
12    in this lawsuit.  So I don't want there to be     10:34
13    any ambiguity on the record.  We sent you a       10:34
14    subpoena asking for you, for you to produce here  10:34
15    today all e-mails, correspondence you had with    10:34
16    the defendant in this case.                       10:34
17        Do you understand that?                       10:34
18        A.  Yes, and I produced to the best that      10:34
19    I could that what I found.                        10:34
20        Q.  Okay.                                     10:34
21        And your lawyers in an e-mail sent            10:34
22    in response to the subpoena have represented      10:34
23    that this set of documents, PLA 1 through 7,      10:34
24    represents everything that you were able through  10:34
25    a diligent search to be able to find that is      10:34
```

Page 27

```
 1    responsive to that request.                       10:35
 2        Do you understand that?                       10:35
 3        A.  And I gave what I found.                  10:35
 4        Q.  Okay.                                     10:35
 5        A.  What's not listed here was just me        10:35
 6    voicing my disappointment in the school.  That's  10:35
 7    it.                                               10:35
 8        Q.  Okay.                                     10:35
 9        Where is that e-mail?                          10:35
10        MR. NADLER:  Objection.                        10:35
11        A.  I must have not included it.  It          10:35
12    wasn't intentional.                               10:35
13    BY MR. HALLER:                                     10:35
14        Q.  Okay.                                     10:35
15        Well, I think it is very important            10:35
16    for us to know exactly what you said.             10:35
17        A.  Okay.                                     10:35
18        Q.  When you voiced your disagreement,        10:35
19    so is there some way that we can find that        10:35
20    e-mail?                                           10:35
21        MR. HALLER:  Let's go off the                  10:35
22    record.                                           10:35
23        THE VIDEOGRAPHER:  The time is                10:35
24    10:35.  We're off the record.                     10:35
25        (Whereupon, at 10:35 o'clock               10:35
```

Page 28

```
 1    a.m., a recess was taken until 10:47              10:35
 2    o'clock a.m.)                                     10:35
 3        THE VIDEOGRAPHER:  The time is                10:48
 4    10:48.                                            10:48
 5        We are back on the record.                    10:48
 6    BY MR. HALLER:                                     10:48
 7        Q.  Mr. Frilando, we're back on the           10:48
 8    record, and I believe after consultation with    10:48
 9    your attorneys, we have an understanding, which   10:48
10    I would like to confirm with your attorney, that  10:48
11    Exhibit A represents all the e-mails that you     10:48
12    have been able to identify in your possession     10:48
13    related to your brother's professed interest in   10:48
14    doing CDL training with Smith & Solomon, as we    10:48
15    referred to it Bordentown, is that correct?       10:48
16        MR. NADLER:  Yes, that is                      10:48
17    correct.                                          10:48
18        A.  That is correct.                          10:48
19    BY MR. HALLER:                                     10:48
20        Q.  Okay.  Thank you.                         10:48
21        Then, if we could go to Exhibit B.            10:48
22        MR. NADLER:  What Exhibit B?                   10:49
23        MR. HALLER:  Of Defendant's                    10:49
24    Deposition Exhibit 8.                             10:49
25        MR. NADLER:  So 8 B.                          10:49
```

Page 29

```
 1        MR. HALLER:  8 B, yes.                         10:49
 2        MR. NADLER:  Got it.  Thank you.              10:49
 3    BY MR. HALLER:                                     10:49
 4        Q.  So, Mr. Frilando, 8 B are e-mails         10:49
 5    that you had with the Dutchess School of Driving  10:49
 6    and they are under 8 B marked as PLA 8 through    10:49
 7    12, and I just ask you the same question, are     10:49
 8    these all of the e-mails that you were able to    10:49
 9    locate with respect to communications you had on  10:49
10    your brother's behalf with the Dutchess School    10:49
11    of Driving?                                       10:49
12        A.  That is correct.                          10:49
13        Q.  Okay.                                     10:49
14        And you're not aware of any that you          10:49
15    did not produce?                                  10:49
16        A.  There were no other.                      10:49
17        Q.  Okay.  Thank you.                         10:49
18        And then, if we look at what's                10:50
19    before you as Exhibit 10, this was a              10:50
20    supplemental response submitted on behalf of      10:50
21    your brother.  I would just like you to go to     10:50
22    Exhibit B to Defendant's Exhibit 10 where there   10:50
23    are e-mails marked PLA 99 through PLA 112         10:50
24    relating to correspondence that you had on your   10:50
25    brother's behalf with Jersey Tractor-Trailer     10:50
```



8 (Pages 26 to 29)

Page 30

```
 1   Training.                        10:50
 2        Do you see those e-mails?   10:50
 3   A.  Yes.                         10:50
 4   Q.  And I just, again, want to confirm   10:50
 5   that this group of documents represent all the   10:50
 6   communications that you were able to identify   10:50
 7   with respect to Jersey Tractor-Trailer Training?   10:50
 8   A.  That is correct.            10:51
 9   Q.  And you're not aware of any   10:51
10   correspondence with Jersey Tractor-Trailer   10:51
11   Training that you have not produced?   10:51
12   A.  No.                         10:51
13   Q.  Okay.  Thank you.           10:51
14        What did you do to prepare for   10:51
15   today's deposition?             10:51
16   A.  Nothing really.  I have a very busy   10:51
17   schedule myself.                10:51
18   Q.  Did you meet with your counsel at   10:51
19   any point?                     10:51
20   A.  No.                         10:51
21   Q.  Did you review any documents to   10:51
22   prepare for today's deposition?   10:51
23   A.  Just what was the attachments that   10:51
24   were sent to me.                10:51
25   Q.  You mean the subpoena?      10:52
```

Page 31

```
 1   A.  Right.                      10:52
 2   Q.  Okay.                       10:52
 3        We can put these two documents to   10:52
 4   the side for now.  Thank you.  I'm going to go   10:52
 5   to this pile that's to your right and go through   10:52
 6   those pretty much in order.      10:52
 7        So, what you have before you marked   10:52
 8   as Defendant's Deposition Exhibit 1 is the   10:52
 9   complaint that was filed by you and your   10:52
10   brother's attorneys on your brother's behalf   10:52
11   that began this litigation.      10:52
12        Have you seen this document before   10:52
13   today?                         10:53
14   A.  Yes.  As part of the attachments.   10:53
15   Q.  Okay.                       10:53
16        I want to go back in time and ask   10:53
17   you if you reviewed this document for accuracy   10:53
18   before it was filed on behalf of your brother?   10:53
19   A.  No.                         10:53
20   Q.  I don't want you to tell me what you   10:53
21   said, but I do want to know if you recall   10:53
22   providing information to your attorneys in   10:53
23   advance of this complaint being filed?   10:53
24        MR. NADLER:  Objection.     10:54
25        You can answer.            10:54
```

Page 32

```
 1   A.  Okay.  Prior to this being filed, if   10:54
 2   I had any dealings with them?   10:54
 3   BY MR. HALLER:                   10:54
 4   Q.  Yes.                        10:54
 5   A.  No.                         10:54
 6   Q.  Okay.                       10:54
 7        So to the extent that there's   10:54
 8   information stated in the complaint that refers   10:54
 9   to your correspondence with Bordentown and/or   10:54
10   Smith & Solomon on your brother's behalf, how is   10:54
11   it that the law firm had obtained that   10:54
12   information, if you know?        10:54
13        MR. NADLER:  Objection.     10:54
14        You can answer.            10:54
15   A.  My brother had other related matters   10:54
16   with them.  So I knew he had counsel on some   10:54
17   other issues.                   10:55
18   BY MR. HALLER:                   10:55
19   Q.  And do you know what those related   10:55
20   matters were generally?          10:55
21   A.  You would have to ask my brother and   10:55
22   his counsel.                    10:55
23   Q.  Okay.                       10:55
24        Do you have any information for me   10:55
25   about the nature of those related matters?   10:55
```

Page 33

```
 1        MR. NADLER:  Objection.     10:55
 2   A.  I don't recall.             10:55
 3   BY MR. HALLER:                   10:55
 4   Q.  Okay.                       10:55
 5        Do you know when your brother first   10:55
 6   sought out help from the firm of Eisenberg and   10:55
 7   Baum?                          10:55
 8   A.  I don't recall.             10:55
 9   Q.  Okay.                       10:55
10        So to the extent that the   10:55
11   information about your specific correspondence   10:55
12   was contained in the complaint, am I correct in   10:56
13   saying that's because you gave it to your   10:56
14   brother so that he could give it to the lawyers?   10:56
15   A.  Repeat that.                10:56
16   Q.  Okay.  I'll rephrase it.     10:56
17        I'm just trying to understand how it   10:56
18   is that your e-mails were provided to the law   10:56
19   firm of Eisenberg and Baum, do you know?   10:56
20        MR. NADLER:  Objection.     10:56
21   A.  It would have been through my   10:56
22   brother.                       10:56
23   BY MR. HALLER:                   10:56
24   Q.  Okay.                       10:56
25        Why don't we put Exhibit 1,    10:56
```



Page 34

1    Defendant's Exhibit 1 on that pile upside down.    10:56
2    Thank you.    10:56
3         I put before you what we have marked    10:56
4    previously as Defendant's Deposition Exhibit 2.    10:56
5         Do you have that in front of you?    10:56
6    A.   Yes.    10:56
7    Q.   I'll represent to you this is the    10:57
8    complaint that was filed by Eisenberg and Baum    10:57
9    against the Dutchess School of Driving on your    10:57
10   brother's behalf.    10:57
11        Have you seen this document before    10:57
12   today?    10:57
13   A.   Only the -- probably in the    10:57
14   attachment that was provided.    10:57
15   Q.   In fairness, I don't think this was    10:57
16   attached -- it was to the subpoena?    10:57
17        MR. CONNELLY:  Not to the    10:57
18        subpoena, no.  So I'm a little confused.    10:57
19        This document wasn't attached to the    10:57
20        subpoena.  So --    10:57
21   A.   I apologize.  What I saw in the    10:57
22   attachments that I got there was mention of    10:58
23   Dutchess School.  If it was this specific    10:58
24   document, I don't know.    10:58
25   Q.   Okay.    10:58

Page 35

1    A.   So, no, I did not see this document.    10:58
2    Q.   All right.    10:58
3         So, it was just a reference of    10:58
4    whether you saw it.  I guess the most important    10:58
5    thing is I would like to know whether or not you    10:58
6    reviewed this --    10:58
7    A.   No.    10:58
8    Q.   -- complaint for accuracy before it    10:58
9    was filed by Eisenberg and Baum on your    10:58
10   brother's behalf?    10:58
11   A.   No.    10:58
12   Q.   If you could go to the document    10:58
13   that's marked as Defendant's Exhibit, Deposition    10:58
14   Exhibit 5.  So the other ones you can put on the    10:59
15   pile upside down.  Thanks.    10:59
16        Do you have that in front of you?    10:59
17   A.   Yes.    10:59
18   Q.   So, if you could go, I guess, the    10:59
19   fourth page of the document, which is where the    10:59
20   substantive answers begin.  I have a few    10:59
21   questions for you.    10:59
22   A.   Okay.    10:59
23   Q.   So under the response to    10:59
24   Interrogatory No. 1, your brother had provided a    10:59
25   list of certain people that might have    10:59

Page 36

1    information relating to the facts and    10:59
2    circumstances of his lawsuit, which includes    10:59
3    yourself and your brother and Mr. Wessendorf.    10:59
4    But if we go to the next page, I'd like to know    11:00
5    if you had any direct involvement in    11:00
6    accompanying your brother to any of the medical    11:00
7    examinations that were performed by Dr. Lawrence    11:00
8    Marino?    11:00
9    A.   No.    11:00
10   Q.   You didn't?    11:00
11   A.   No.    11:00
12   Q.   None whatsoever?    11:00
13   A.   Not that I recall.    11:00
14   Q.   How about something that was    11:00
15   unrelated directly to his request for a CDL    11:00
16   medical certification, just regular normal    11:00
17   visits, would you accompany your brother to    11:00
18   something like that?    11:00
19        MR. NADLER:  Objection.    11:00
20        You can answer.    11:00
21   A.   No.    11:00
22   BY MR. HALLER:    11:00
23   Q.   No?    11:00
24   A.   Regular medical appointment?    11:00
25   Q.   Yes.    11:00

Page 37

1    A.   No.    11:00
2    Q.   Okay.    11:00
3         Did you have any involvement in your    11:00
4    brother's visit with Dr. Yu whose listed as    11:01
5    No. 6?    11:01
6    A.   No.    11:01
7    Q.   Did you have any involvement with    11:01
8    your brother's visits to either Dr. Jacobson or    11:01
9    Peter Fong who are listed seven and eight?    11:01
10   A.   No.    11:01
11   Q.   Did you have any direct dealings in    11:01
12   any way with the person listed in No. 9, Cindy    11:01
13   Gaines, who is apparently a nurse consultant for    11:01
14   the Federal Motor Carrier Safety Association?    11:01
15   A.   No.    11:01
16   Q.   Did you have any involvement in any    11:01
17   way with interaction between your brother and    11:01
18   Mr. Larry Minor listed on No. 10, who is    11:01
19   associate administrator for policy at the    11:01
20   Federal Motor Carrier Safety Association?    11:01
21   A.   I don't recall.    11:02
22   Q.   You don't recall or you did not?    11:02
23   A.   I don't recall.    11:02
24   Q.   Okay.    11:02
25        How about with Elaine Papp, Chief    11:02



## Page 38

```
1    Medical Programs Division Nurse, apparently at    11:02
2    the Federal Motor Carrier Administration, did      11:02
3    you have any communications or involvement with    11:02
4    her?                                              11:02
5        A. No.                                        11:02
6        Q. If you go to the next interrogatory,       11:02
7    your brother gave an interview with Josh Inicia    11:02
8    of Channel 7 ABC News.                            11:02
9            Do you remember that?                     11:02
10       A. I do.                                       11:02
11       Q. Were you involved in that in any           11:02
12   way?                                              11:02
13       A. I was not.                                 11:02
14       Q. So you were not involved in setting        11:02
15   that up?                                          11:02
16           MR. NADLER. Objection. You can            11:02
17       answer.                                       11:02
18       A. No, I was not.                             11:03
19   BY MR. HALLER:                                    11:03
20       Q. And you were not involved in any of        11:03
21   the Channel 7 ABC News interviews or              11:03
22   arrangement?                                      11:03
23           MR. NADLER. Objection.                    11:03
24           You can answer.                           11:03
25       A. No.                                        11:03
```

## Page 39

```
1    BY MR. HALLER:                                    11:03
2        Q. If you go forward to Interrogatory         11:03
3    No. 7, are you on that page?                      11:03
4        A. Yes.                                       11:03
5        Q. So before I get to interrogatory           11:03
6    No. 7, there is a name above Interrogatory        11:03
7    No. 7, Dr. Judy Shepherd-Kegl.                    11:03
8            Do you see that?                          11:03
9        A. Yes.                                       11:03
10       Q. Have you had any contact with her?         11:03
11       A. No.                                        11:03
12       Q. Under Interrogatory No. 7, there's a       11:03
13   hearing examination that is referenced there at   11:04
14   HearUSA. Did you have any involvement             11:04
15   accompanying your brother or participating in     11:04
16   that?                                            11:04
17       A. No.                                        11:04
18       Q. If you go to the next page, under          11:04
19   Interrogatory No. 10, did you participate in any  11:04
20   way in your brother's application for a learner   11:04
21   permit commercial driver with the State of New    11:04
22   York?                                            11:04
23       A. No.                                        11:04
24       Q. If you go to the next interrogatory,       11:04
25   No. 11, your brother indicates here and then      11:04
```

## Page 40

```
1    further testified about how he learned to drive   11:04
2    a car at Mill Neck Lutheran School for the Deaf.  11:04
3            Were you involved in any way in           11:05
4    teaching him to drive in order for him to get a   11:05
5    license?                                         11:05
6        A. Not at all.                                11:05
7        Q. If you go forward to Interrogatory         11:05
8    No. 18, in Interrogatory No. 18 your brother      11:05
9    listed two places where he believes that they     11:05
10   have training courses that are designed to help   11:05
11   people who are deaf.                              11:05
12           Do you see that? Action Career            11:05
13   Training and Peak Technical Institute?            11:05
14       A. Yes.                                       11:05
15       Q. Have you personally had any contact        11:05
16   with either Action Career Training or Peak        11:05
17   Technical Institute?                              11:05
18       A. No.                                        11:06
19       Q. Do you sitting here today have any         11:06
20   knowledge about their training courses?           11:06
21           MR. NADLER: Objection.                    11:06
22           You can answer.                           11:06
23       A. I do not.                                  11:06
24   BY MR. HALLER:                                    11:06
25       Q. Have you received from anyone at           11:06
```

## Page 41

```
1    Action Career Training or Peak Technical          11:06
2    Institute any information about their training    11:06
3    courses?                                         11:06
4        A. No.                                        11:06
5        Q. And you have not read anything about       11:06
6    what they do?                                     11:06
7        A. No.                                        11:06
8        Q. So you couldn't sitting here today         11:06
9    from your own knowledge say whether they are      11:06
10   able to assist people who are deaf or not,        11:06
11   right?                                           11:06
12           MR. NADLER: Objection.                    11:06
13           You can answer.                           11:06
14       A. No.                                        11:06
15   BY MR. HALLER:                                    11:06
16       Q. Okay.                                      11:06
17           It is fine to put that document           11:06
18   away. I'm next going to go to what has been       11:06
19   marked as Defendant's Deposition Exhibit 11. So   11:07
20   if you can fast forward. I put before you what    11:07
21   we have marked as Defendant's Deposition          11:07
22   Exhibit 11, which is a photocopy of your          11:07
23   brother's Class A license and Class D license.    11:07
24   And I just want to confirm. I think you said      11:08
25   this, but confirm that you had no involvement in  11:08
```



Page 42

```
 1   him obtaining this license?                11:08
 2        A.  The permit?                       11:08
 3        Q.  The permit, yes.                   11:08
 4        A.  No involvement.                     11:08
 5        Q.  Okay.                              11:08
 6             How about the driver's license?    11:08
 7        A.  No involvement.                     11:08
 8        Q.  There's a restriction on the permit 11:08
 9   related to a hearing aid and full-view mirror. 11:08
10   Do you have any knowledge about what that     11:08
11   restriction means?                           11:08
12        A.  No.                                11:08
13        Q.  Okay.                              11:08
14             If you go to the next document,    11:08
15   Exhibit 12, this is an abstract of driver     11:08
16   record.  It is deposition -- Defendant's      11:08
17   Deposition Exhibit 12.  An abstract driver    11:08
18   report.                                      11:08
19             Do you have that in front of you?  11:08
20        A.  Yes.                               11:08
21        Q.  Did you personally have any         11:09
22   involvement in the traffic violation that's   11:09
23   reflected here?                              11:09
24        A.  No.                                11:09
25        Q.  Okay.                              11:09
```

Page 43

```
 1             So you were not present when the    11:09
 2   incident occurred?                           11:09
 3             MR. NADLER:  Objection.            11:09
 4             You can answer.                    11:09
 5        A.  I don't recall.                     11:09
 6   BY MR. HALLER:                               11:09
 7        Q.  Do you recall anything about it?    11:09
 8        A.  I don't recall anything about it.   11:09
 9        Q.  Do you recall assisting your brother 11:09
10   in any way in dealing with this situation?    11:09
11             MR. NADLER:  Objection.            11:09
12             You can answer.                    11:09
13        A.  No.                                11:09
14   BY MR. HALLER:                               11:09
15        Q.  Mr. Frilando, I put before you what 11:09
16   we have marked as deposition -- Defendant's   11:09
17   Deposition Exhibit 13, which is everything,   11:09
18   according to your brother, that relates to    11:10
19   correspondence he had with the Federal Motor  11:10
20   Carrier Safety Administration.               11:10
21             Do you have that in front of you?   11:10
22        A.  I do.                               11:10
23        Q.  So, I believe that you have already  11:10
24   testified, but I would like to confirm, that you 11:10
25   personally had no involvement in any of the    11:10
```

Page 44

```
 1   communications between your brother and the    11:10
 2   Federal Motor Carrier Safety Association?      11:10
 3             MR. NADLER:  Objection.            11:10
 4             You can answer.                    11:10
 5        A.  None.                               11:10
 6   BY MR. HALLER:                               11:10
 7        Q.  So, if we look at the first          11:10
 8   document, I'll represent to you -- well, let me 11:10
 9   step back.  Have you seen, even though you had 11:10
10   no involvement in the communications, did you   11:10
11   read these documents after your brother received 11:10
12   them?                                        11:10
13        A.  I did not.                          11:10
14        Q.  Would it be fair to say that you're  11:10
15   not personally familiar with the specific terms 11:11
16   of whatever waiver your brother obtained?      11:11
17             MR. NADLER:  Objection.            11:11
18             You can answer.                    11:11
19        A.  It is fair to say.                  11:11
20   BY MR. HALLER:                               11:11
21        Q.  Okay.                              11:11
22             So, if I was to ask you about the   11:11
23   waiver applying to a specific provision of the  11:11
24   code that relates to what's called a Forced     11:11
25   Whisper test, you have no knowledge about that?  11:11
```

Page 45

```
 1        A.  I don't recall.                     11:11
 2        Q.  Okay.  Okay.  Let me ask it          11:11
 3   differently.                                  11:11
 4             Could you tell me sitting here today 11:11
 5   what you know about what the waiver is and what 11:11
 6   provisions of the code that it waives?         11:11
 7             MR. NADLER:  Objection.            11:11
 8             You can answer.                    11:11
 9        A.  I don't know.                       11:11
10   BY MR. HALLER:                               11:11
11        Q.  Okay.                              11:11
12             If you go forward to PLA 43, there's 11:11
13   correspondence from Elaine Papp, which relates  11:12
14   to obtaining a completed medical examination.   11:12
15             Do you see that?                    11:12
16        A.  Yes.                               11:12
17        Q.  Did you personally have any          11:12
18   involvement with the communications that your   11:12
19   brother had with the Federal Motor Carrier      11:12
20   Safety Administration about the need for him to  11:12
21   get a medical certification from a physician who 11:12
22   was certified by the government and on the      11:12
23   national registry?                            11:12
24        A.  No.                                11:12
25        Q.  Did you become aware at some point   11:12
```



Page 46

```
 1    that your brother didn't have a medical        11:12
 2    certificate from somebody that was certified and 11:12
 3    on the registry and then needed to get a new one 11:13
 4    done?                                          11:13
 5          MR. NADLER: Objection.                   11:13
 6          You can answer.                          11:13
 7       A. Yes.                                     11:13
 8    BY MR. HALLER:                                 11:13
 9       Q. Okay.                                    11:13
10          And when did you learn that?            11:13
11       A. It happened with my conversation        11:13
12    with the Dutchess School.                      11:13
13       Q. So it came to your attention in         11:13
14    connection with those discussions that he might 11:13
15    not have a valid medical certificate, right?   11:13
16       A. Right.                                   11:13
17       Q. And, therefore, he needed to do         11:13
18    something to get a valid medical certificate?  11:13
19       A. Correct.                                 11:13
20       Q. Okay.                                    11:13
21       A. And I apologize, I'm going to           11:13
22    correct, not the Dutchess School.  It was the  11:13
23    NTTF School.                                   11:13
24       Q. We'll come to that.  So other than      11:13
25    becoming aware of it, were you personally      11:13
```

Page 47

```
 1    involved then in helping him correct the       11:13
 2    problem?                                       11:14
 3       A. No.                                      11:14
 4       Q. Okay.                                    11:14
 5          You just told him that there was a      11:14
 6    problem?                                       11:14
 7       A. I told him what he needed to do and     11:14
 8    he pursued it himself.                          11:14
 9       Q. Okay.                                    11:14
10          And what did you tell him he needed     11:14
11    to do?                                         11:14
12       A. That he needed to get the waiver        11:14
13    through someone who was registered.            11:14
14       Q. Okay.  Thank you.                        11:14
15          You can put that down.  So, could       11:14
16    you just briefly please provide me with your   11:14
17    educational background and work history?       11:14
18          MR. NADLER: Objection.                   11:14
19          You can answer.                          11:15
20       A. I have a two-year associate's           11:15
21    degree.                                        11:15
22    BY MR. HALLER:                                 11:15
23       Q. In what and from where?                  11:15
24       A. Corporate communications from           11:15
25    Borough of Manhattan Community College.  For   11:15
```

Page 48

```
 1    about 16 years I worked in the video broadcast  11:15
 2    industry on the post production side, various   11:15
 3    companies.  The last 6-1/2 years, I moved to Con 11:15
 4    Edison in New York, which is New York City      11:15
 5    utility company.                                11:15
 6       Q. Okay.                                    11:15
 7          And what is the nature of your           11:15
 8    position there?                                 11:15
 9       A. Customer service.                         11:15
10       Q. Do you own a car?                         11:15
11       A. Yes.                                      11:15
12       Q. And what type of car?                     11:16
13       A. 2007 Dodge Caliber.                       11:16
14       Q. What color?                               11:16
15       A. Burgundy, red.                            11:16
16       Q. Do you own it or do you lease it?         11:16
17       A. I own it outright.                        11:16
18       Q. Okay.                                     11:16
19          And from whom did you buy it?            11:16
20       A. From Enterprise Car Division.            11:16
21       Q. Okay.                                     11:16
22          And do you have a key chain that has     11:16
23    Enterprise on it?                               11:16
24       A. I do.                                     11:16
25       Q. Okay.                                     11:16
```

Page 49

```
 1          Before you owned that vehicle, did      11:16
 2    you have a car?                                 11:16
 3       A. I do -- did.                              11:16
 4       Q. And what was that?                        11:16
 5       A. I don't recall.  It was, it was a        11:16
 6    Buick of some sort.                             11:16
 7       Q. Okay.                                     11:16
 8          And am I correct that your current       11:16
 9    car is an automatic transmission?              11:16
10       A. Automatic, right.                         11:16
11       Q. And the Buick was automatic also?        11:16
12       A. Correct.                                  11:17
13       Q. Does your brother from time to time      11:17
14    drive your car?                                 11:17
15       A. He drives it all the time.               11:17
16       Q. Well, do you commute to work or do       11:17
17    you drive to work?                              11:17
18       A. I drive to work.                          11:17
19       Q. When you say your brother drives it      11:17
20    all the time, that's not literally, correct,    11:17
21    right?                                          11:17
22       A. If you want to be literal, for his       11:17
23    appointments.                                   11:17
24       Q. Okay.                                     11:17
25          He drives it when he needs it and       11:17
```



Page 50

```
 1    when it is available?              11:17
 2       A.  Correct.                    11:17
 3       Q.  Is that fair?  Just out of interest,  11:17
 4    are you the older brother or younger?   11:17
 5       A.  Younger.                    11:17
 6       Q.  What's your understanding of any  11:18
 7    employment that your brother has had?   11:18
 8           MR. NADLER:  Objection.      11:18
 9           You can answer.             11:18
10       A.  He, he did -- filled prescriptions  11:18
11    for glasses for a little while.  He was trained  11:18
12    in that.  He's done some graphic stuff, graphic  11:18
13    design.  That's about it.         11:18
14    BY MR. HALLER:                     11:18
15       Q.  When were you first aware that he  11:18
16    had some interest in training to get a CDL  11:19
17    license?                          11:19
18           MR. NADLER:  Objection.  You can  11:19
19           answer.                     11:19
20       A.  I would say that interest started  11:19
21    about three years ago.            11:19
22    BY MR. HALLER:                     11:19
23       Q.  Okay.  Okay.                11:19
24           What do you recall about that?  11:19
25       A.  Just that he started discussing  11:19
```

Page 51

```
 1    going for the permit and we supported it.  We  11:19
 2    said, go for it.                  11:19
 3       Q.  So did you personally do any kind of  11:19
 4    research into whether there were any training  11:19
 5    schools that might have programs that were  11:19
 6    designed to train deaf drivers?   11:20
 7       A.  I did not research specifically.  I  11:20
 8    was just going for schools that taught CDL,  11:20
 9    whether it was, whether they were capable --  11:20
10    well, I wasn't -- without knowing what their  11:20
11    capabilities were.  I was just inquiring  11:20
12    basically.                        11:20
13       Q.  So, at some point, did he ask you to  11:20
14    start making inquiries on his behalf?  11:20
15           MR. NADLER:  Objection.      11:20
16           You can answer.             11:20
17       A.  I took that up on my own.  Simply  11:20
18    because I saw for the first couple of attempts  11:20
19    that he did, the frustration he was going  11:20
20    through.  So I told him let me start to inquire  11:20
21    on your behalf.                   11:20
22    BY MR. HALLER:                     11:20
23       Q.  Okay.                       11:20
24           So do you have any details of what  11:20
25    those first couple of attempts were?  11:21
```

Page 52

```
 1       A.  I don't.                     11:21
 2       Q.  You have no knowledge of what  11:21
 3    training schools were involved?   11:21
 4       A.  I don't recall.             11:21
 5       Q.  And was it in connection with that  11:21
 6    frustration that he first went to go get legal  11:21
 7    advice?                           11:21
 8           MR. NADLER:  Objection.      11:21
 9           You can answer.             11:21
10       A.  No.  Sorry.  No.            11:21
11    BY MR. HALLER:                     11:21
12       Q.  So when do you recall that he first  11:21
13    went to get legal advice?         11:21
14           MR. NADLER:  Objection.      11:21
15           You can answer.             11:21
16       A.  Again, he already had legal counsel  11:21
17    on some other matter.             11:21
18    BY MR. HALLER:                     11:21
19       Q.  Okay.                       11:21
20           So when you made your inquiries to  11:21
21    Smith & Solomon, Bordentown, he already had  11:21
22    legal counsel?                    11:21
23       A.  I don't recall at this particular  11:21
24    moment, I don't recall.           11:21
25       Q.  And you can't tell me what that in  11:22
```

Page 53

```
 1    quotes other matter was?          11:22
 2       A.  You would have to inquire of my  11:22
 3    brother and his counsel.          11:22
 4       Q.  Before you started making inquiries,  11:22
 5    did you get any direction from your brother  11:22
 6    based on conversations he had had with  11:22
 7    attorneys?                        11:22
 8           MR. NADLER:  Objection.      11:22
 9           You can answer.             11:22
10       A.  No.                         11:22
11    BY MR. HALLER:                     11:22
12       Q.  And it is your testimony you hadn't  11:22
13    spoken to any lawyers when you first made the  11:22
14    inquiries?                        11:22
15           MR. NADLER:  Objection.      11:22
16           You can answer.             11:22
17       A.  No, no.                     11:22
18    BY MR. HALLER:                     11:22
19       Q.  So given that you're the younger  11:22
20    brother, so once you became sort of conscious  11:23
21    and mature enough, you understood your brother  11:23
22    was deaf, right, obviously?       11:23
23       A.  Right.                      11:23
24       Q.  Right.                      11:23
25           And obviously you have been  11:23
```



Page 54

1  supporting that your whole life, which I think     11:23
2  is a great credit to you.                  11:23
3          Did you learn sign language?          11:23
4      A.  I'm not fluent.                11:23
5      Q.  Okay.                     11:23
6          You can use it a bit?            11:23
7      A.  I can use it a bit.  For the most      11:23
8  part, I have to spell out sentences to him, and    11:23
9  being that he is my brother, we have our own     11:23
10 sort of way of communicating.            11:23
11     Q.  Okay.                     11:23
12         Is there anything that your family     11:23
13 has at home that provides any special assistance  11:23
14 to him?  Anything in particular?          11:23
15     A.  Other than captioning for the TV.     11:24
16     Q.  Okay.                     11:24
17     A.  And he does have a device where he    11:24
18 can sort of speak to people video conference     11:24
19 like that, I guess.                11:24
20     Q.  I think he described that.         11:24
21         So that would be where there's a     11:24
22 connection to somebody who's a sign language    11:24
23 interpreter that participates in the call?      11:24
24     A.  Right.  Either that, you know,      11:24
25 through the third party, if he's speaking to     11:24

Page 55

1  someone who is hearing and does not sign or he    11:24
2  can speak to his friends, you know, through this  11:24
3  video outlet.                  11:24
4      Q.  Okay.                     11:24
5      A.  Yes.                      11:24
6      Q.  I'll come to it in a minute or a few   11:24
7  minutes, which is, is correspondence you had    11:24
8  with the Dutchess School in which you told them  11:24
9  that his hearing aids were of little use to him.  11:25
10         Do you recall saying that?          11:25
11     A.  I do.  I'm not medically trained,    11:25
12 though.                      11:25
13     Q.  Okay.                     11:25
14         From your perspective, living with    11:25
15 him, what is the basis of the statement that you  11:25
16 made to Dutchess that they're of little use?     11:25
17         MR. NADLER:  Objection.           11:25
18         You can answer.              11:25
19     A.  Just based -- I think saying that    11:25
20 was just letting them know if they do take him   11:25
21 on, he is going to need an interpreter.       11:25
22 BY MR. HALLER:                   11:25
23     Q.  So making sure they understood that   11:25
24 even with the hearing aids he's not going to be  11:25
25 able to hear people talking and many of the     11:25

Page 56

1  sounds associated with driving, right?       11:25
2      A.  That basically he'll need an       11:25
3  interpreter to understand what's being relayed   11:25
4  to him and the instruction.  That was my      11:25
5  purpose.                     11:25
6      Q.  In terms of everyday living, do you   11:26
7  know what sounds with the hearing aids on your   11:26
8  brother can hear or not?             11:26
9          MR. NADLER:  Objection.           11:26
10         You can answer.              11:26
11     A.  He can hear very loud sounds.  For   11:26
12 instance, if there is a fire alarm, you know,    11:26
13 due to cooking in the house goes off and he has  11:26
14 his hearing aids on, he can basically hear that  11:26
15 going off.                    11:26
16 BY MR. HALLER:                   11:26
17     Q.  Okay.                     11:26
18         And then, more subtle sounds he      11:26
19 would have difficulty hearing, is that right?    11:26
20     A.  I would have to say, yes.         11:26
21     Q.  Okay.                     11:27
22         So everyday things like a tea kettle  11:27
23 or alarm clock or things like that he would have 11:27
24 a problem hearing, right?            11:27
25         MR. NADLER:  Objection.           11:27

Page 57

1          You can answer.              11:27
2      A.  Yes.                      11:27
3  BY MR. HALLER:                   11:27
4      Q.  Fourth of July fireworks, do you    11:27
5  know if he hears anything?            11:27
6          MR. NADLER:  Objection.           11:27
7          You can answer.              11:27
8      A.  I don't know.              11:27
9  BY MR. HALLER:                   11:27
10     Q.  Okay.                     11:27
11         MR. HALLER:  Seth, you have made    11:27
12 a lot of objections.  I'm not sure what       11:27
13 the nature is to the form of the         11:27
14 question --                   11:27
15         MR. NADLER:  Just to the form.     11:27
16         MR. HALLER:  That's fine.  I just   11:27
17 want to make sure I'm not missing         11:27
18 something more substantive, but that's      11:27
19 fine.                      11:27
20         MR. NADLER:  No, no, just form.    11:27
21         MR. HALLER:  Okay.  Thanks.       11:27
22 BY MR. HALLER:                   11:27
23     Q.  Please, could you go now to       11:27
24 Exhibit 17.  I'll represent to you that this    11:28
25 exhibit contains a letter from our office, the   11:28



Page 58

```
 1   law firm of Blank Rome, subpoena, and then      11:28
 2   medical records from Dr. Marino and Dr. Marino's  11:28
 3   office.                                  11:28
 4        So I'd like to really draw your      11:28
 5   attention to primarily to the page that's -- I   11:28
 6   think it is the ninth page in.  Do you have that  11:28
 7   in front of you?  It is a notes from JMC Howard   11:29
 8   Beach for your brother, Kenneth Frilando, with    11:29
 9   it says "Review" -- down in the right-hand        11:29
10   bottom corner, "Review complete, Lawrence J.      11:29
11   Marino 12/12/12."                        11:29
12        Do you see that?                    11:29
13   A.  Yes.                               11:29
14   Q.  Okay.                              11:29
15        Now, this appears to be a visit that  11:29
16   your brother had to Dr. Marino around that date,  11:29
17   the 12th of December, 2012.              11:29
18        Do you recall accompanying him to    11:29
19   this visit?                             11:29
20   A.  I do not recall.                    11:29
21   Q.  Okay.                              11:29
22        You're saying you didn't or you just  11:29
23   don't remember?                         11:30
24   A.  I don't remember.                   11:30
25   Q.  Okay.                              11:30
```

Page 59

```
 1        On the page in the middle you'll see  11:30
 2   that there is a heading "Diagnosis".     11:30
 3        Do you see that?                    11:30
 4   A.  Yes.                               11:30
 5   Q.  And there are three.  A-Fib, sleep    11:30
 6   apnea and something called BRBPR?        11:30
 7   A.  Yes.                               11:30
 8   Q.  If you go forward two pages, not the  11:30
 9   next page, but the page after --         11:30
10   A.  Yes.                               11:30
11   Q.  -- do you have that, and it has      11:30
12   towards the top "Progress notes, Lawrence J.      11:30
13   Marino at 12/12/2012, 2:20 p.m."?        11:30
14   A.  Yes.                               11:30
15   Q.  Okay.                              11:30
16        And then if we go to the progress    11:31
17   notes, it says "Patient in for routine health    11:31
18   maintenance and recently went to the E.R.        11:31
19   because he was having difficulty breathing and   11:31
20   chest discomfort."                      11:31
21        Do you see that?                    11:31
22   A.  Yes.                               11:31
23   Q.  It says "He was diagnosed with       11:31
24   A-Fib.  No cause was found.  I will investigate  11:31
25   the thyroid."                           11:31
```

Page 60

```
 1        Do you see that?                    11:31
 2   A.  Uh-hum.                            11:31
 3   Q.  He goes on to say "Today, as well as  11:31
 4   other routine blood work since he's fasting."    11:31
 5        Do you see that?                    11:31
 6   A.  Uh-hum.                            11:31
 7   Q.  Then it says "The E.R. gave him no    11:31
 8   information."                           11:31
 9        Do you see that?                    11:31
10   A.  Uh-hum.                            11:31
11   Q.  "I explained through his            11:31
12   interpreter, his brother, as he is deaf, what    11:31
13   A-Fib is and what could cause it."       11:31
14        Do you see that?                    11:31
15   A.  I do.                               11:31
16   Q.  Does that help refresh your          11:31
17   recollection that you were there?        11:31
18   A.  I don't recall, but if this is       11:31
19   documented, then I must have been there.         11:31
20   Q.  Okay.                              11:31
21        Do you recall that your brother was   11:31
22   around this time diagnosed with A-Fib?   11:32
23   A.  I remember the A-Fib.               11:32
24   Q.  Okay.                              11:32
25        Then he goes on to say "Patient      11:32
```

Page 61

```
 1   describes three bouts of rectal bleeding with no  11:32
 2   pain."                                  11:32
 3        Do you see that?                    11:32
 4   A.  Yes.                               11:32
 5   Q.  "The last bout was two weeks ago.     11:32
 6   There was no pain.  The first and second bout     11:32
 7   occurred three months ago."             11:32
 8        Do you see that?                    11:32
 9   A.  Yes.                               11:32
10   Q.  Then it goes on to say "The third     11:32
11   problem is sleep apnea.  The brother says that   11:32
12   he snores all night and has periods where he     11:32
13   stops breathing for a few seconds."      11:32
14        Do you see that?                    11:32
15   A.  Yes.                               11:32
16   Q.  Okay.                              11:32
17        So, does that in any way help        11:32
18   refresh your recollection that you were present   11:32
19   for this doctor's examination?          11:32
20        MR. NADLER:  Objection.             11:32
21        You can answer.                     11:32
22   A.  Again, I don't remember being        11:32
23   present, but if it is documented here, I have no  11:32
24   doubt that I was there.                 11:32
25   BY MR. HALLER:                          11:32
```



Page 62

```
 1      Q.  Is that a true statement, at least    11:32
 2   as of that time, that your brother snores all   11:32
 3   night and he has periods where he stops       11:32
 4   breathing for a few seconds?              11:33
 5      A.  He snores.  I haven't really paid     11:33
 6   attention as much.  He snores, I'll give you   11:33
 7   that.                                  11:33
 8      Q.  Okay.                          11:33
 9      But do you see the doctor's note         11:33
10   clearly is saying "Brother says that he snores  11:33
11   all night and has periods where he stops       11:33
12   breathing for a few seconds," right?         11:33
13      Do you see that?                     11:33
14      A.  I see that I do.                    11:33
15      Q.  All right.                        11:33
16      A.  I don't recall making that            11:33
17   statement.                             11:33
18      Q.  I didn't get out my question, but      11:33
19   you don't recall making the statement?        11:33
20      A.  Right.                           11:33
21      Q.  You're not saying you didn't make     11:33
22   the statement, you just don't remember?       11:33
23      A.  I don't remember.                  11:33
24      Q.  Okay.                          11:33
25      And do you recall that as part of         11:33
```

Page 63

```
 1   this medical examination your brother was      11:33
 2   diagnosed with sleep apnea?              11:33
 3      A.  I did not recall that diagnosis.  I      11:34
 4   pretty much remember the A-Fib.            11:34
 5      Q.  Do you see, if you go back to the      11:34
 6   original page, go back two pages.  Dr. Marino   11:34
 7   says under sleep apnea towards the bottom of the 11:34
 8   page "Will refer to sleep apnea clinic."        11:34
 9      Do you see that?                     11:34
10      A.  Yes.                            11:34
11      Q.  Okay.                          11:34
12      Do you recall at any point your          11:34
13   brother going to a sleep apnea clinic?         11:34
14      A.  He did not.                       11:34
15      Q.  Okay.                          11:34
16      Do you know why he didn't do that?      11:34
17      A.  It was not followed through.         11:34
18      Q.  There's no follow through?           11:34
19      A.  Right.                           11:34
20      Q.  Okay.                          11:34
21      I have no further questions on that       11:34
22   document.  I'm assuming, though, that you don't 11:34
23   remember accompanying your brother to other   11:35
24   visits with Dr. Marino?                   11:35
25      A.  No.                            11:35
```

Page 64

```
 1      THE VIDEOGRAPHER:  We need to        11:35
 2   take a short break to switch tapes.           11:35
 3      MR. HALLER:  Yes, let's take a         11:35
 4   short break.  We need to switch the          11:35
 5   tape.                               11:35
 6      THE WITNESS:  All right.              11:35
 7      THE VIDEOGRAPHER:  The time is        11:35
 8   11:35.  We're off the record.             11:35
 9      (Whereupon, at 11:35 o'clock         11:35
10   a.m., a recess was taken until 11:48        11:35
11   o'clock a.m.)                          11:35
12      THE VIDEOGRAPHER:  The time is        11:48
13   11:49.  We are back on the record.          11:49
14   BY MR. HALLER:
15      Q.  Mr. Frilando, we're back on the      11:49
16   record, and what I would like to do next is to   11:49
17   ask you to look at Defendant's Deposition      11:49
18   Exhibit 18, which I think you have in front of   11:49
19   you.                               11:49
20      A.  Yes.                            11:49
21      Q.  Is this your car that's depicted --     11:49
22   that's in this photograph?                11:49
23      A.  This is my vehicle.                11:49
24      Q.  Okay.                          11:49
25      And I'll represent to you this is a       11:49
```

Page 65

```
 1   snapshot of some of the video that was shown on  11:50
 2   ABC 7 News in relation to the piece that they    11:50
 3   did about your brother.                   11:50
 4      A.  Yes.                            11:50
 5      Q.  I don't know if you could help us,      11:50
 6   but do you know where this photograph is taken,  11:50
 7   what streets are reflected here?            11:50
 8      A.  I do not.                         11:50
 9      Q.  You don't recognize it personally?     11:50
10      A.  No.                            11:50
11      Q.  Okay.                          11:50
12      If we could go to the next exhibit,       11:50
13   Defendant's Deposition Exhibit 19.  I put before 11:50
14   you what we have marked as Defendant's        11:50
15   Deposition Exhibit 19, which are the          11:50
16   communications that you had on your brother's    11:50
17   behalf with Jersey Tractor-Trailer Training.     11:50
18      Do you have those in front of you?        11:51
19      A.  Yes.                            11:51
20      Q.  I think that they are in reverse       11:51
21   chronological order.  So if we could go to the   11:51
22   back of this package and perhaps start on page  11:51
23   PLA 110, the third page from the back.  So it    11:51
24   looks like the first correspondence is an e-mail  11:51
25   that you received from Christina Loveall on      11:51
```



Page 66

```
 1    April 30th saying "Dear Potential Student, Thank    11:51
 2    you for inquiring with the National                 11:52
 3    Tractor-Trailer School."                            11:52
 4         Do you see that?                                11:52
 5    A.   Yes.                                            11:52
 6    Q.   Okay.                                           11:52
 7         So, what led you in the first                   11:52
 8    instance to make inquiries on your brother's        11:52
 9    behalf with the National Tractor-Trailer School,    11:52
10    which I think is also known as the Jersey           11:52
11    Tractor-Trailer Training School?                     11:52
12    A.   His interest in becoming a                      11:52
13    licensed -- as a CDL driver.                         11:52
14    Q.   Okay.                                           11:52
15         So how did you pick them out?                   11:52
16    A.   Just looked online.                             11:52
17    Q.   Did you tell your brother that you              11:52
18    were doing that?                                     11:52
19    A.   For this particular school, no.                 11:52
20    Q.   At any point did you tell your                  11:52
21    brother that you were speaking to this              11:52
22    particular school?                                   11:52
23    A.   Not that I recall.                              11:52
24    Q.   So then, on May 11th, some 11 days             11:53
25    or 12 days later, I guess 11 days later, you        11:53
```

Page 67

```
 1    respond saying "That's great to hear.  Let me       11:53
 2    give you some detail before we speak directly on    11:53
 3    the phone."                                          11:53
 4         Do you see that?                                11:53
 5    A.   Yes.                                            11:53
 6    Q.   And in that you say, "My brother               11:53
 7    Kenneth Frilando who is deaf from birth and has     11:53
 8    his New York State CDL permit is looking for a      11:53
 9    school that would be able to train him to obtain    11:53
10    his CDL license for driving tractor-trailers.       11:53
11    Please advice if this is something your school      11:53
12    can accommodate."                                    11:53
13         Do you see that?                                11:53
14    A.   Yes.                                            11:53
15    Q.   Okay.                                           11:53
16         Can you explain to me why given that           11:53
17    your brother had this video system capability       11:53
18    where he could be using an interpreter to speak     11:54
19    directly to people, why you were doing these        11:54
20    inquiries on his behalf rather than him?            11:54
21         MR. NADLER:  Objection.                         11:54
22         You can answer.                                 11:54
23    A.   Well, again, I wanted to prevent him           11:54
24    from potentially going through levels of            11:54
25    frustration if he was declined.  That's why I       11:54
```

Page 68

```
 1    took over the whole inquiry then to begin with.     11:54
 2    Q.   Okay.  That's fine.                             11:54
 3         So then, in response to that she               11:54
 4    says she checked with the president of the          11:54
 5    school.  We would love to have your brother         11:54
 6    attend, but all students must pass a DOT           11:54
 7    physical in order to get the CDL A license.  The    11:55
 8    hearing part of the DOT physical test requires      11:55
 9    students to hear a whisper from five paces.  Do    11:55
10    you think this is something he can do?  She asks    11:55
11    is he partially deaf?                                11:55
12         Do you see that?                                11:55
13    A.   Yes.                                            11:55
14    Q.   Okay.                                           11:55
15         So that was on the 11th she responds          11:55
16    almost immediately, right?                           11:55
17    A.   Correct.                                        11:55
18    Q.   And then you respond on the 13th              11:55
19    saying "Hi Christina, did you get my last e-mail    11:55
20    where I attached my brother's physical?  And        11:55
21    then she says she didn't get it.                     11:55
22         Do you see that?                                11:55
23    A.   Yes.                                            11:55
24    Q.   And when you're referring to that             11:55
25    physical, were you referring to a certificate       11:55
```

Page 69

```
 1    done by Dr. Marino at that time?                    11:55
 2    A.   I don't recall.                                11:55
 3    Q.   Okay.                                           11:55
 4         And then you respond saying "Seems            11:55
 5    like the file is too big.  I'm going to resend      11:55
 6    it or break it into several e-mails.  I do          11:56
 7    apologize about this and the multiple e-mails."     11:56
 8         Right?                                          11:56
 9         Do you see that?                                11:56
10    A.   Correct.                                        11:56
11    Q.   Okay.                                           11:56
12         And then she says "Please don't              11:56
13    apologize.  I would like to review to see if        11:56
14    there's anything we can do here," correct?          11:56
15    A.   Correct.                                        11:56
16    Q.   Okay.                                           11:56
17         So at least at that point she's been          11:56
18    very responsive to you, correct?                     11:56
19    A.   Yes.                                            11:56
20    Q.   Okay.                                           11:56
21         Now, the next e-mail that has been            11:56
22    produced is an e-mail from her and it is           11:56
23    Christina Loveall on May 14, 2015, in which she     11:56
24    is saying that she was able to check and then      11:56
25    she refers to Dr. Marino.                           11:56
```



Page 70

```
 1              Do you see that?          11:56
 2      A.  Yes.                          11:57
 3      Q.  Okay.                         11:57
 4          So, does that help refresh your    11:57
 5  recollection that what you sent her for a   11:57
 6  certificate or purported certificate from Dr.   11:57
 7  Marino?                               11:57
 8      A.  I was -- I sent what my brother gave   11:57
 9  me, gave to me.  So if that was Dr. Marino's   11:57
10  information, then, yes.               11:57
11      Q.  Okay.                         11:57
12          Now, there must have been some other   11:57
13  correspondence that's not in this set of   11:57
14  materials where you were forwarding the medical   11:57
15  information, but I don't see it here.   11:57
16          Is there some reason why it is not   11:57
17  part of what's been produced?         11:57
18      A.  I produced everything.        11:57
19      Q.  Okay.                         11:57
20          Did you delete some things at the   11:57
21  time?                                 11:57
22      A.  No.                           11:57
23      Q.  Can you explain why those e-mails   11:57
24  are missing?                          11:57
25      A.  I don't recall, but I produced all   11:57
```

Page 71

```
 1  of them.                              11:58
 2      Q.  Okay.  All right.             11:58
 3          So in her e-mail to you she says,   11:58
 4  I'm going to quote, "So I was able to check and   11:58
 5  Dr. Marino who performed your brother's physical   11:58
 6  is not a DOT certified physician.  In order for   11:58
 7  enrollment we would need to get a DOT certified   11:58
 8  doctor to do the physical then send us the   11:58
 9  results.  I have included the link you need to   11:58
10  locate a doctor in your area with the correct   11:58
11  qualifications we are looking for."  And there   11:58
12  is a link.  "Once I get the physical we can   11:58
13  review and see from there.  Would you be able to   11:58
14  get him in for another DOT physical?  Best   11:58
15  regards, Christina."                  11:58
16          Do you see that?              11:58
17      A.  Yes.                          11:58
18      Q.  So we talked about this earlier.   11:58
19  That's what first put you, according to your   11:58
20  testimony, on notice that there might be a   11:58
21  problem with Dr. Marino's certificate?   11:59
22      A.  Correct.                      11:59
23      Q.  And then there's additional    11:59
24  correspondence between you and her on that and   11:59
25  if we look at PLA 104 at May 15 -- May 14, 2015,   11:59
```

Page 72

```
 1  after you responded to her she writes, "Hi   11:59
 2  Joseph, all truck drivers MUST," and that's in   11:59
 3  all caps, the MUST, "have a DOT physical in   11:59
 4  order to obtain their license.  That is why it   11:59
 5  is a requirement to attend our school.  DOT   11:59
 6  regulations are that the physician has to be DOT   11:59
 7  certified to perform a physical.  The doctor   11:59
 8  that performed his physical is not on the DOT   11:59
 9  registry list.  This is a federal/state law that   11:59
10  the physician be DOT certified."       11:59
11          Do you see that?              11:59
12      A.  Yes.                          11:59
13      Q.  So she is again kind of confirming   11:59
14  this concern and that led you to recognize that   11:59
15  he needed to get another medical certificate,   11:59
16  right?                                12:00
17      A.  That is correct.              12:00
18      Q.  So then there's -- you respond by   12:00
19  saying that you will look into these doctors,   12:00
20  right?                                12:00
21          Do you see that on page PLA 104?   12:00
22      A.  PLA 104?                      12:00
23      Q.  Yes.                          12:00
24          Just above the e-mail from Christina   12:00
25  Loveall on May 14th, you respond May 15th at   12:00
```

Page 73

```
 1  12:11 a.m., saying "I will look into these   12:00
 2  doctors."                             12:00
 3      A.  Right.  What I meant from that, is   12:00
 4  that I will relay it to my brother.  I'll show   12:00
 5  him the link and from there -- he takes it from   12:00
 6  there.  That was my involvement.      12:00
 7      Q.  Okay.                         12:00
 8          So, following that, do you recall   12:00
 9  that your brother then looked into getting a   12:00
10  proper certificate from somebody on the   12:01
11  registry?                             12:01
12      A.  Correct.                      12:01
13      Q.  And I believe on Tuesday we looked   12:01
14  at documents and he testified that that was done   12:01
15  at the end of July of 2015, I think July 30th?   12:01
16      A.  I don't recall the exact time.   12:01
17      Q.  Okay.  All right.             12:01
18          And then, so you'll see from this   12:01
19  correspondence some time passes and then you   12:01
20  e-mail Christina Loveall on August 17th saying   12:01
21  that you had communicated in May and now you   12:01
22  attached the new DOT certified physical, isn't   12:01
23  that right?                           12:01
24      A.  Correct.                      12:01
25      Q.  Okay.                         12:01
```



Page 74

```
 1          And that was the new physical from      12:01
 2   Dr. Yu, correct?                               12:01
 3       A.  I don't know who the doctor was.       12:01
 4       Q.  Okay.                                  12:01
 5          It was -- whatever doctor that your     12:01
 6   brother had gone to that was on the registry,  12:01
 7   right?                                         12:01
 8       A.  Yes, whoever was certified.            12:01
 9       Q.  Okay.                                  12:01
10          So then, she on August 17th, the        12:02
11   same day responds to you saying, "It is nice to 12:02
12   hear from you again. Thank you for getting this 12:02
13   over to me. Now that we have a DOT physical     12:02
14   signed and ready, his next step, his next step  12:02
15   would be to complete an online application and  12:02
16   set up a phone interview."                      12:02
17          Do you see that?                         12:02
18       A.  Yes.                                    12:02
19       Q.  Okay.                                   12:02
20          And then she also says that she sees     12:02
21   by his DOT physical that he does have a hearing 12:02
22   aid. Does he have one for each ear and does     12:02
23   that mean he can understand the instructor      12:02
24   without the help of sign language. I just want 12:02
25   to check to see where we're at.                 12:02
```

Page 75

```
 1          Do you see that?                         12:02
 2       A.  That's on PLA 102?                       12:02
 3       Q.  103.                                     12:02
 4       A.  Yes, I see that.                          12:02
 5       Q.  Okay.                                     12:02
 6          So you have no problem with her            12:02
 7   asking those questions to try and understand     12:02
 8   what the situation is, right?                     12:03
 9       A.  No, no.                                    12:03
10       Q.  Okay.                                      12:03
11          And then, and then you respond that        12:03
12   same day saying "Thank you," and I'm going to     12:03
13   quote "No, he will need a sign language           12:03
14   interpreter at all times. Would rely on the      12:03
15   school to provide one for Kenneth."               12:03
16          Do you see that?                           12:03
17       A.  Yes.                                      12:03
18       Q.  Okay.                                     12:03
19          So does that statement that he would      12:03
20   need a sign language interpreter at all times    12:03
21   and that he would rely on the school to provide  12:03
22   one represent a statement of what you believed   12:03
23   on behalf of your brother was needed in order to 12:03
24   accommodate his disability?                        12:03
25       A.  An interpreter would be needed to be     12:03
```

Page 76

```
 1   provided, yes.                                   12:03
 2       Q.  Okay.                                     12:03
 3          And that's an interpreter at all          12:03
 4   times, right?                                    12:03
 5       A.  For instructional purposes, of           12:03
 6   course.                                          12:03
 7       Q.  Okay.                                     12:03
 8          And that you were looking for the         12:04
 9   school to provide the interpreter?               12:04
10       A.  That is correct.                         12:04
11       Q.  That means find it, pay for it, and      12:04
12   absorb the cost, right?                          12:04
13          MR. NADLER:  Objection.                   12:04
14          You can answer.                           12:04
15       A.  Obviously, not absorb the costs.         12:04
16   I'm sure no one does it for free. They would     12:04
17   tack it on to his bill.                          12:04
18       Q.  Do you know the price, you know,         12:04
19   what interpreters charge on a daily basis?       12:04
20       A.  I have no idea.                          12:04
21       Q.  So, Mr. Frilando, I'll represent to     12:05
22   you that in order to take the deposition to      12:05
23   occur on Tuesday with your brother and having    12:05
24   sign language interpreters, the cost was, I      12:05
25   believe, in the range of four to $5,000.         12:05
```

Page 77

```
 1          Are you aware that it costs that         12:05
 2   much?                                           12:05
 3       A.  I do not.                               12:05
 4       Q.  So, I mean, if we said it costs         12:06
 5   $3,000 a day and it is a six-week course, five  12:06
 6   days a week, you testifying your brother        12:06
 7   would be able to pay like $90,000?              12:06
 8          MR. NADLER:  Objection.                  12:06
 9          You can answer.                          12:06
10       A.  I'm saying that there should, should   12:06
11   have been some discussion about it.             12:06
12   BY MR. HALLER:                                  12:06
13       Q.  Okay.                                   12:06
14          And then, so in response to that,        12:06
15   she says, "Okay, just need him to do the        12:06
16   application and we can see from there."          12:06
17          Right?                                    12:06
18       A.  Yes. I see that.                        12:06
19       Q.  Okay.                                   12:06
20          And then you respond on the 17th         12:06
21   saying "Please excuse my frustrated term, but I 12:06
22   would like a definitive answer about whether or 12:06
23   not you can service my brother first before I   12:06
24   have him to take the time to fill out an        12:06
25   application and prepare for an interview. This  12:07
```



Page 78

```
 1    is not a job interview, correct?  This is an       12:07
 2    educational facility seeking out students, not     12:07
 3    employees, correct?  To be honest, 'we can see      12:07
 4    from there,' is just not an appropriate            12:07
 5    response.  You are now in possession of the DOT    12:07
 6    physical.  We just need to know if the school is   12:07
 7    capable of servicing a deaf student.  If not, we   12:07
 8    will continue our search."                          12:07
 9         Do you see that?                               12:07
10    A.  Yes.                                            12:07
11    Q.  Okay.                                           12:07
12         So I have a few questions on this.             12:07
13    But, up to this point, it appears that she has     12:07
14    been very responsive and willing to work with      12:07
15    you to see if this is a possibility, right?        12:07
16         MR. NADLER:  Objection.                        12:07
17         You can answer.                                12:07
18    A.  Yes.                                            12:07
19    Q.  So why do you respond in the tone              12:07
20    that's contained in this e-mail?                    12:07
21         MR. NADLER:  Objection.                        12:07
22         You can answer.                                12:07
23    A.  Because, there was no detail given             12:07
24    in terms of if they can really work with my        12:07
25    brother.  I've seen, again, my brother go          12:07
```

Page 79

```
 1    through frustration that is -- I don't feel the    12:08
 2    need to put him involved with if it is going to    12:08
 3    result in something not happening for him in       12:08
 4    terms of the educational part of it.               12:08
 5    Q.  Okay.                                           12:08
 6         So in this case, he didn't fill an            12:08
 7    application out?                                    12:08
 8    A.  No, he didn't.  He didn't, he did             12:08
 9    not know about the communication with the          12:08
10    school.                                             12:08
11    Q.  Actually, with respect to Dutchess,           12:08
12    he never actually filled an application out?       12:08
13    A.  Dutchess, no.                                   12:08
14    Q.  And with Smith & Solomon, he never            12:08
15    actually filled an application out, did he?        12:08
16    A.  No.                                             12:08
17    Q.  Essentially -- I'll withdraw that.             12:08
18         And then she responds, "Joseph, I            12:08
19    appreciate your concern for your brother,          12:09
20    however, this is the process all of our            12:09
21    candidates go through to determine enrollment.     12:09
22    I would need to see his application and set up a   12:09
23    30-minute interview to start."                      12:09
24         Do you see that?                               12:09
25    A.  Yes.                                            12:09
```

Page 80

```
 1    Q.  And then you say "We don't like your           12:09
 2    'process'. I'll have my brother take his CASH      12:09
 3    elsewhere since your company obviously doesn't     12:09
 4    want it."                                           12:09
 5    A.  Correct.                                        12:09
 6    Q.  Now, it is my understanding that              12:09
 7    your brother is in the process of considering or   12:09
 8    actually determining to sue Jersey                 12:09
 9    Tractor-Trailer, are you aware of that?             12:09
10         MR. NADLER:  Objection.                        12:09
11         You can answer.                                12:09
12    BY MR. HALLER:                                       12:09
13    Q.  If you know.                                     12:09
14    A.  I don't recall.  I have no                     12:09
15    knowledge.                                           12:09
16    Q.  So, maybe I misunderstood those               12:09
17    e-mails.  So the communications we have just       12:10
18    discussed were with Christina Loveall of           12:10
19    National Tractor-Trailer School is that            12:10
20    everything to this point is with National          12:10
21    Tractor-Trailer School?                             12:10
22    A.  It is with NTTS.                                12:10
23    Q.  NTTS, okay.                                      12:10
24         And then, there's two pages of               12:10
25    e-mails or documents that have also been           12:10
```

Page 81

```
 1    produced, PLA 99 and PLA 100, which seem to be     12:10
 2    communications with something called Jersey        12:10
 3    Tractor-Trailer Training.                           12:10
 4         Do you see that?                               12:10
 5    A.  Yes.                                            12:10
 6    Q.  Is that the same or is that               12:10
 7    something different?                                12:10
 8    A.  No, that's different.                           12:10
 9    Q.  Okay.                                            12:10
10         So what happened with Jersey               12:10
11    Tractor-Trailer Training?                           12:10
12    A.  It comes down to customer service.             12:10
13    Right.  My brother is the customer.  We're         12:10
14    trying to get as much information to see which     12:10
15    is the best situation for him.  They're just       12:10
16    simply -- and here I didn't even discuss his       12:11
17    deafness.  I'm like, you're in Jersey, can you     12:11
18    train a New York CDL permitted person.  You        12:11
19    know, these are very basic information that I'm    12:11
20    seeking.  If you can't relay that to me in an      12:11
21    e-mail, I feel that the service part of it isn't   12:11
22    going to be there.                                  12:11
23    Q.  So you didn't pursue it?                        12:11
24    A.  Right.                                          12:11
25    Q.  Okay.                                            12:11
```



Page 82

```
 1            Is there anything else that      12:11
 2     happened, to your recollection with NTTS, the    12:11
 3     National Tractor-Trailer School, that isn't    12:11
 4     contained in the e-mails that we just went    12:11
 5     through?                        12:11
 6        A.  No.                      12:12
 7        Q.  All right.                  12:12
 8            If we can now go to the next      12:12
 9     exhibit, Defendant's Deposition Exhibit 20.    12:12
10     I'll represent to you these are all the e-mails    12:12
11     that have been produced with respect to the    12:12
12     Dutchess School.                  12:12
13            Do you have those in front of you?    12:12
14        A.  Yes.                      12:12
15        Q.  Again, I would like to go in reverse    12:12
16     chronological order since that is how they were    12:12
17     produced.  So, the first e-mail in whats' been    12:12
18     produced is an e-mail from Daniele Dominijanni,    12:12
19     D-o-m-i-n-i-j-a-n-n-i, manager of the Dutchess    12:12
20     School of Driving.                12:12
21            Do you see that?            12:12
22        A.  Yes.                      12:12
23        Q.  It says "Thank you for your interest    12:12
24     on in our school.  We can definitely help your    12:12
25     brother."                        12:12
```

Page 83

```
 1            Do you see that?            12:12
 2        A.  Yes.                      12:13
 3        Q.  I assume that's in response to some    12:13
 4     inquiry that you made.  Did you make that    12:13
 5     inquiry by telephone or did you make it by    12:13
 6     e-mail?                        12:13
 7        A.  I don't recall.              12:13
 8        Q.  But if you made it by e-mail, we    12:13
 9     don't have a copy of that, right?        12:13
10        A.  I presented everything.        12:13
11        Q.  Okay.                      12:13
12            Then you respond saying "That's    12:13
13     great to hear.  Let me just give you some detail    12:13
14     before we speak directly on the phone.  Only    12:13
15     because I have a very busy schedule.  I want to    12:13
16     be sure your school will be capable before I    12:13
17     take time out for a phone conversation.  Not to    12:13
18     mention, finding a school is becoming pretty    12:13
19     laborious."                      12:13
20            Right?                    12:13
21        A.  Yes.                      12:13
22        Q.  And then you go on to say "My    12:13
23     brother Kenneth Frilando who is deaf from birth    12:13
24     and has his New York State CDL permit is looking    12:13
25     for a school that would be able to train him to    12:13
```

Page 84

```
 1     obtain his CDL A license for driver      12:13
 2     tractor-trailers.  Please advise if this is    12:14
 3     something your school can accommodate."    12:14
 4            Correct?                  12:14
 5        A.  Yes.                      12:14
 6        Q.  And from your perspective, this was    12:14
 7     around the time or shortly after the time that    12:14
 8     you had correspondence with Smith & Solomon?    12:14
 9        A.  That is correct.            12:14
10        Q.  That's only the second -- so      12:14
11     Dutchess is only the second place that you have    12:14
12     been directly involved in?            12:14
13        A.  Correct.                  12:14
14        Q.  And then, if we look at page PLA 10,    12:14
15     it looks like you received a response from the    12:14
16     Dutchess School asking is he completely deaf in    12:14
17     parens requiring a sign language interpreter or    12:14
18     does he have a type of hearing aid.      12:14
19            Do you see that?            12:15
20        A.  Yes.                      12:15
21        Q.  And then in response, you say, on    12:15
22     April 28th, "He is completely deaf, and yes,    12:15
23     would require a sign language interpreter.  His    12:15
24     hearing aids are of little use unfortunately."    12:15
25            Correct?                  12:15
```

Page 85

```
 1        A.  Yes.                      12:15
 2        Q.  And that statement is similar to the    12:15
 3     statement that you made to NTTS, National    12:15
 4     Tractor-Trailer School, in connection with the    12:15
 5     need for your brother if he was to do this    12:15
 6     training to have a sign language interpreter    12:15
 7     with him at all times, right?          12:15
 8        A.  For instructional purposes, correct.    12:15
 9        Q.  And then the Dutchess School says "I    12:15
10     need to speak with you personally."  Ask for    12:15
11     your telephone number and a good time to call.    12:15
12            Do you see that?            12:15
13        A.  Yes.                      12:16
14        Q.  And then you say, "Sure, you can    12:16
15     call me now," and you go on to explain that    12:16
16     there's a two-year waiver he was granted by the    12:16
17     DOT.                            12:16
18            Do you see that?            12:16
19        A.  Yes.                      12:16
20        Q.  You give your number, right?      12:16
21        A.  Correct.                  12:16
22        Q.  Did you actually speak to anyone    12:16
23     from the Dutchess School?            12:16
24        A.  Over the phone, no.            12:16
25        Q.  Okay.                      12:16
```



**22 (Pages 82 to 85)**

Page 86

1          So you then follow up and say "I        12:16
2   think you attempted to call me and chose not to   12:16
3   leave a voice mail.  If I don't pick up, you can   12:16
4   leave a voice mail or you can continue via   12:16
5   e-mail.  Please advise."          12:16
6          Do you see that?        12:16
7      A.  Yes.              12:16
8      Q.  Okay.            12:16
9          That was the same day that you had   12:16
10  given her your phone number, right?      12:16
11     A.  Correct.          12:16
12     Q.  And the next day you hadn't heard,   12:16
13  so you e-mailed, "I'm still waiting to hear from   12:16
14  you.  I just need to know if your school can   12:16
15  accommodate a deaf student.  If not, I can   12:16
16  continue my search."          12:16
17     A.  Correct.          12:16
18     Q.  You didn't hear anything, so the   12:16
19  next day you just sent an e-mail with five   12:16
20  question marks on it?        12:16
21     A.  That's correct.        12:17
22     Q.  Okay.            12:17
23          And then on the 30th, that same day   12:17
24  she responds saying, "Joseph, we've never had   12:17
25  any deaf students, therefore, we have no   12:17

Page 87

1   experience in teaching a deaf student how to   12:17
2   drive a tractor-trailer.  My suggestion would be   12:17
3   for you to continue your search for a school   12:17
4   that has such experience.  Best regards."   12:17
5          Is that right?        12:17
6      A.  Correct.          12:17
7      Q.  Okay.            12:17
8          And then you forward that to your   12:17
9   brother saying "Send to your lawyer"?      12:17
10     A.  Correct.          12:17
11     Q.  Okay.            12:17
12          Why did you do that?        12:17
13     A.  Because I thought he was being   12:17
14  discriminated against, so I figured let his   12:17
15  lawyer review the documentation.      12:17
16     Q.  Okay.            12:17
17          So, at least by April 30th, it is   12:17
18  clear that your brother was represented, right,   12:17
19  by a lawyer?          12:17
20     A.  On some other matter.      12:17
21     Q.  Okay.            12:17
22          Is there anything else other than   12:18
23  what we have now gone through with respect to   12:18
24  the Dutchess School that you were involved in by   12:18
25  way of communications with them?      12:18

Page 88

1      A.  No.              12:18
2      Q.  Is there anything else that happened   12:18
3   in connection with the Dutchess School that we   12:18
4   haven't now discussed in this deposition?      12:18
5      A.  No.              12:18
6      Q.  Can we agree that with respect to   12:18
7   both the National Tractor-Trailer School and   12:18
8   Dutchess that the requests that you made on   12:18
9   behalf of your brother for accommodation was to   12:18
10  have a sign language interpreter assigned at all   12:18
11  times?              12:18
12          MR. NADLER:  Objection.      12:18
13          You can answer.        12:18
14     A.  For instructional purposes.      12:18
15  BY MR. HALLER:            12:18
16     Q.  And when you say in quotes "for   12:18
17  instructional purposes," closed quotes, what do   12:19
18  you mean by that?          12:19
19     A.  For their course.        12:19
20     Q.  Okay.            12:19
21          And that's all facets of that   12:19
22  course, all parts of it?        12:19
23     A.  Of course.          12:19
24     Q.  Okay.            12:19
25          And in terms of what you were   12:19

Page 89

1   requesting, can we agree on the record that   12:19
2   there was nothing else that you communicated to   12:19
3   either of those two schools, the National   12:19
4   Tractor-Trailer School or Dutchess that you felt   12:19
5   would be needed to assist your brother other   12:19
6   than these assignment of a sign language   12:19
7   interpreter?          12:19
8          MR. NADLER:  Objection.      12:19
9          You can answer.        12:19
10     A.  Nothing else communicated.      12:19
11  BY MR. HALLER:            12:19
12     Q.  Okay.            12:19
13          Sitting here today, are you aware of   12:19
14  anything else that you believe would be an   12:20
15  accommodation to assist your brother in one of   12:20
16  these training schools?        12:20
17     A.  In addition to?        12:20
18     Q.  The sign language interpreter.   12:20
19     A.  That's all he needs.        12:20
20     Q.  Okay.            12:20
21          So let's go to what has been marked   12:20
22  as Defendant's Deposition Exhibit 21.  Now, I'll   12:20
23  represent to you that this exhibit is all   12:20
24  e-mails that have been produced by your counsel   12:20
25  on your brother's behalf and on your behalf that   12:20



Page 90

1    relate to communications with Smith.  So it is        12:20
2    exactly what is contained in Exhibit A of        12:21
3    Defendant's Deposition Exhibit 8, which we        12:21
4    looked at earlier.                        12:21
5        Okay?        12:21
6    A.  Yes.        12:21
7        Q.  So in terms of what you have        12:21
8    identified and produced, we have agreed on the        12:21
9    record and we have had representations that this        12:21
10   is everything you were able to find?        12:21
11   A.  Correct.        12:21
12   Q.  Okay.        12:21
13       So I would like to just, again, go        12:21
14   through this in reverse chronological order.        12:21
15   So, it looks like if we go to PLA 6, it looks        12:21
16   like on March 2nd, your brother forwarded to you        12:21
17   information related to his 90-day waiver,        12:22
18   correct?        12:22
19   A.  Yes.        12:22
20   Q.  Okay.        12:22
21       So a couple weeks later on March 17,        12:22
22   2015 in the evening, it looks like you e-mail        12:22
23   Dale Wessendorf at Smith & Solomon e-mail        12:22
24   address subject, forward 90-day waiver.        12:22
25       Do you see that?        12:22

Page 91

1    A.  Yes.        12:22
2    Q.  Okay.        12:22
3        So, how is it that you at that point        12:22
4    identified Smith & Solomon in order to send this        12:22
5    e-mail?        12:22
6    A.  It was through a former co-worker of        12:22
7    mine who attended the school.  So I became aware        12:22
8    of him obtaining his license through them.  So I        12:22
9    asked him for their information.        12:23
10   Q.  Okay.        12:23
11       Did he give you the e-mail address?        12:23
12   A.  No.        12:23
13   Q.  So how did you get Mr. Wessendorf's        12:23
14   e-mail address?        12:23
15   A.  Well, once I found out the name of        12:23
16   the school, I looked them up online and I        12:23
17   called.  Initially, I spoke to a woman there.  I        12:23
18   don't recall her name, but after a couple of        12:23
19   conversations then she put me in contact with        12:23
20   Mr. Wessendorf, where we had one conversation,        12:23
21   and from there, everything else was via e-mail        12:23
22   from my recollection.        12:23
23   Q.  Okay.        12:23
24       So let's just work through that.        12:23
25   So, you don't know the name of the woman you        12:23

Page 92

1    spoke to?        12:23
2    A.  No.        12:23
3    Q.  Okay.        12:23
4        Do you know her position?        12:23
5    A.  No.        12:23
6    Q.  Okay.        12:23
7        And what do you recall about those        12:23
8    conversations, if anything?        12:23
9    A.  Well, initially, she was going to        12:23
10   set up an appointment for us to come over, but        12:24
11   then, by the second conversation, I think that's        12:24
12   when Mr. Wessendorf got involved and we then        12:24
13   started communicating via e-mail.        12:24
14   Q.  Okay.        12:24
15       So tell me, you know, you obviously        12:24
16   initiated the phone call?        12:24
17   A.  Yes.        12:24
18   Q.  What did you say to her and then        12:24
19   what she did say to you, as best as you can        12:24
20   recall?        12:24
21   A.  That, basically, I was referred by a        12:24
22   friend who went to the school, had just recently        12:24
23   graduated.  That my brother is seeking a school        12:24
24   because he has his New York State permit and        12:24
25   we're interested in, you know, viewing your        12:24

Page 93

1    school and having a conversation with him        12:24
2    potentially becoming a student.        12:24
3    Q.  Okay.        12:24
4        Did you give any more description        12:24
5    about your brother, his medical condition in        12:24
6    that first conversation?        12:25
7    A.  Yes, over the phone I mentioned he        12:25
8    was deaf, yes.        12:25
9    Q.  Okay.        12:25
10       And then, what did she did say, as        12:25
11   best as you can recall?        12:25
12   A.  To the best of my recollection, is        12:25
13   that she, I believe, had to have someone get        12:25
14   back to me, and that's when Mr. Wessendorf came        12:25
15   into the picture.        12:25
16   Q.  Okay.        12:25
17       So then you had a conversation with        12:25
18   Mr. Wessendorf, correct?        12:25
19   A.  Correct.        12:25
20   Q.  And can you tell me, as best as you        12:25
21   can recall, what happened -- withdrawn.  I'll        12:25
22   start again.        12:25
23       Could you please tell me, to the        12:25
24   best of your recollection, what was said in that        12:25
25   conversation between the two of you in the order        12:25



Page 94

```
 1    that it was said?                    12:25
 2        A.  I don't, I don't really recall the    12:25
 3    conversation.                         12:25
 4        Q.  Okay.                         12:25
 5        So you don't remember what you said    12:26
 6    to him and what he said to you?        12:26
 7        A.  I know part of the -- from the best    12:26
 8    of my recollection, is that he had to run it up    12:26
 9    the chain of command through their safety    12:26
10    department to see how best to see if they can    12:26
11    accommodate my brother.               12:26
12        Q.  Okay.                         12:26
13        And then, following that           12:26
14    conversation, you sent him by e-mail the 90-day    12:26
15    waiver?                               12:26
16        A.  Correct.                      12:26
17        Q.  And you gave him your phone number?    12:26
18        A.  Yes.                          12:26
19        Q.  Okay.                         12:26
20        That was on March 17th, right?        12:26
21        A.  Correct.                      12:26
22        Q.  So then, on March 23rd, you sent him    12:26
23    a follow up e-mail, correct?           12:26
24        A.  Yes.                          12:26
25        Q.  Okay.                         12:26
```

Page 95

```
 1        Just give me one second, please.    12:26
 2    Okay.                                 12:27
 3        So, your e-mail to him on March 17th    12:27
 4    was in the evening, 5:30, 6:00 p.m.     12:27
 5        Do you see that?                  12:27
 6        A.  Yes.                          12:27
 7        Q.  And, as best as you can recall, he    12:27
 8    said he was going to talk to people in the    12:27
 9    safety department?                     12:27
10        A.  Right.  Yes.                   12:27
11        Q.  So, I'll represent to you, just    12:27
12    having looked it up, that March 17th was a    12:27
13    Tuesday.                               12:27
14        A.  Okay.                         12:27
15        Q.  So, Wednesday, Thursday, Friday go    12:27
16    by, and then on Monday in the morning you send    12:27
17    him an e-mail saying "Hi, still waiting to hear    12:27
18    from you."                            12:27
19        A.  Correct.                      12:27
20        Q.  Do you see that?              12:27
21        And then you say "Good day," two    12:27
22    exclamation marks.  What did you mean by that?    12:28
23        MR. NADLER:  Objection.          12:28
24        You can answer.                  12:28
25        A.  Have a good day.              12:28
```

Page 96

```
 1        Q.  It is not like good day sort of with    12:28
 2    --                                    12:28
 3        A.  Just have a good day.          12:28
 4        Q.  And then, on the 29th, you still    12:28
 5    have not heard from him, correct?      12:28
 6        A.  Correct.                      12:28
 7        Q.  And you follow up saying, "I'm still    12:28
 8    waiting to hear from you about setting up an    12:28
 9    appointment for my brother, Kenneth Frilando, to    12:28
10    come and learn about your school and to discuss    12:28
11    training at your facility.  If Smith Solomon    12:28
12    cannot accommodate a deaf student, please advise    12:28
13    and I will continue to seek out other schools.    12:28
14    Please advise.  Time is of the essence."    12:28
15        Do you see that?                  12:28
16        A.  Yes.                          12:28
17        Q.  What did you mean, "time is of the    12:28
18    essence"?                             12:28
19        A.  Well, my brother's waiver was coming    12:28
20    to an end at that point.  It was nearing its    12:29
21    end.  It is a 90-day waiver.           12:29
22        Q.  You weren't aware that he had the    12:29
23    two-year waiver at that time?          12:29
24        A.  No, he got it shortly, sometime, I    12:29
25    believe, after that.                  12:29
```

Page 97

```
 1        Q.  Okay.                         12:29
 2        So, the next day -- you sent your    12:29
 3    e-mail on a Sunday.  The next working day was a    12:29
 4    working day, you hear back from Mr. Wessendorf,    12:29
 5    is that right?                         12:29
 6        A.  Yes.                          12:29
 7        Q.  He says "We are seeking guidance    12:29
 8    from the federal DOT and the local MVC's    12:29
 9    regarding how to safely and effectively    12:29
10    accommodate the specific needs of this    12:29
11    community.  As of yet, we do not have a clear    12:29
12    direction in the matter.  As we receive    12:29
13    additional communication, we will keep you    12:30
14    advised.  Yours truly."                 12:30
15        Do you see that?                  12:30
16        A.  Yes.                          12:30
17        Q.  Okay.                         12:30
18        And then, you responded saying,    12:30
19    "Thank you for your response.  As I mentioned,    12:30
20    time is of the essence.  Kenneth's permit    12:30
21    expires January 16, 2016.  I look forward to a    12:30
22    reasonably timed response."             12:30
23        Do you see that?                  12:30
24        A.  Yes.                          12:30
25        Q.  Does that refresh your recollection    12:30
```



25 (Pages 94 to 97)

Page 98

```
1      that "time is of the essence," that it referred    12:30
2    to his permit and not to the waiver?              12:30
3           A.  No, it was to -- I meant to the        12:30
4    waiver.                                           12:30
5           Q.  So what you say on March 30th is not   12:30
6    accurate?                                         12:30
7           A.  I was referring to both, because       12:30
8    his -- it is March 30, 2015.  January 2nd, yes,   12:31
9    his permit expires, which he had to renew, and    12:31
10   also his 90-day waiver was expiring.  So I was    12:31
11   concerned about both.                             12:31
12          Q.  Then, on that same day he asks you     12:31
13   to forward a copy of exemptions.                  12:31
14          Do you see that?                           12:31
15          A.  Yes.                                   12:31
16          Q.  And at that time, certainly, you       12:31
17   know, that the two-year waiver is at least        12:31
18   approved and on its way, correct?                 12:31
19          A.  Correct.                               12:31
20          Q.  And then, that's your response, was    12:31
21   on Tuesday, March 2015 at 1:49 a.m.?              12:31
22          A.  Yes.                                   12:31
23          Q.  Do you see that?                       12:31
24          A.  Yes.                                   12:31
25          Q.  And then, it looks like on April       12:31
```

Page 99

```
1    14th, you've sent your brother an e-mail,         12:31
2    attaching this chain of e-mail correspondence     12:32
3    and you said "Forward to it your lawyer."         12:32
4           Do you see that?                           12:32
5           A.  Yes.                                   12:32
6           Q.  Okay.                                  12:32
7           So why did you do that?                    12:32
8           A.  Well, that was after I received the    12:32
9    e-mail from Mr. Wessendorf of April 6, 2015,      12:32
10   where he says "After considerable discussion on   12:32
11   both state and federal level and having received  12:32
12   little or no guidance on how to effectively       12:32
13   train and safely protect the motoring public,     12:32
14   the student and our personnel, we have            12:32
15   determined that Smith & Solomon is not capable    12:32
16   or qualified at this time to render the services  12:32
17   requested."  So that was based off of that.       12:32
18          Q.  Okay.                                  12:32
19          And so you sent it to the lawyers --       12:33
20   sorry.  Withdrawn.                                12:33
21          You sent it to your brother so he          12:33
22   could send it to the lawyers that he had already  12:33
23   engaged on these other matters, right?            12:33
24          MR. NADLER:  Objection.                    12:33
25          You can answer.                            12:33
```

Page 100

```
1           A.  Can you repeat the question?           12:33
2           MR. HALLER:  Can you please read           12:33
3    that back.                                        12:33
4           (Record read.)                             12:33
5           A.  I sent it for him to forward to his    12:33
6    lawyers to review.                                12:33
7    BY MR. HALLER:                                    12:33
8           Q.  Okay.                                  12:33
9           But you had previously explained to        12:33
10   me that he had, he had retained the lawyers for   12:33
11   some other matters, right?                        12:33
12          A.  Right.  We have already established     12:33
13   that.                                             12:33
14          Q.  Right.  Okay.                          12:33
15          And so, by saying "Forward to your         12:33
16   lawyer," you were saying send it to the lawyers   12:33
17   who are representing you in the other matters,    12:33
18   right?                                            12:33
19          MR. NADLER:  Objection.                    12:34
20          You can answer.                            12:34
21          A.  For review.                            12:34
22   BY MR. HALLER:                                    12:34
23          Q.  Okay.                                  12:34
24          A.  I felt it was discrimination.  I       12:34
25   wanted them to review.                            12:34
```

Page 101

```
1           Q.  No, I understand that.  I fully        12:34
2    appreciate what you're saying.  I'm trying to     12:34
3    understand the chronology of what these other     12:34
4    matters were.                                     12:34
5           A.  Again --                               12:34
6           Q.  As I understand your testimony --      12:34
7    let me please finish -- you knew that your        12:34
8    brother had lawyers as of April 14th related to   12:34
9    these other matters?                              12:34
10          A.  Correct.                               12:34
11          Q.  Okay.                                  12:34
12          And that's why you knew to say             12:34
13   "Forward to a lawyer," because you knew he        12:34
14   already had a lawyer?                             12:34
15          A.  Correct.                               12:34
16          Q.  Okay.                                  12:34
17          But you don't know what these other        12:34
18   matters are?                                      12:34
19          A.  You have to ask him and his counsel.   12:34
20          Q.  Do you know who contacted who first,   12:34
21   the law firm of Eisenberg and Baum versus your   12:34
22   brother, who initiated the first contact?        12:35
23          A.  I don't recall.                        12:35
24          Q.  You don't recall or you don't know?   12:35
25          A.  I don't recall.                        12:35
```



Page 102

```
 1        Q.  Did you personally have any        12:35
 2   conversations with anyone at the National   12:35
 3   Association for the Deaf in connection with your  12:35
 4   brother's interests in getting a CDL license and  12:35
 5   training?                                    12:35
 6        A.  I did not.                          12:35
 7        Q.  Okay.                               12:35
 8        So, if we go forward to PLA 2, on       12:35
 9   the 6th of April you forward to Mr. Wessendorf  12:35
10   the two-year waiver, correct?                12:35
11        A.  Correct.                            12:36
12        Q.  Can we agree on the record that at  12:36
13   no point up to April 6th had you provided to Mr.  12:36
14   Wessendorf the medical certificate?          12:36
15        A.  Agreed.                             12:36
16        Q.  Okay.                               12:36
17        And at no time as of April 6th had      12:36
18   your brother made a formal application to    12:36
19   participate?                                 12:36
20        A.  Agreed.                             12:36
21        Q.  Okay.                               12:36
22        And then on the 6th, is the e-mail      12:36
23   you just referred to, which is that Mr.      12:36
24   Wessendorf e-mailed you saying "Joseph, after  12:36
25   considerable discussion at both the state and  12:36
```

Page 104

```
 1        A.  Everything was sent to the lawyer.  12:38
 2        Q.  Okay.                               12:38
 3        A.  Everything you have here is the full  12:38
 4   e-mail correspondence between me and Mr.     12:38
 5   Wessendorf.                                  12:38
 6        Q.  So unlike the correspondence with   12:39
 7   the National Tractor Training School and     12:39
 8   Dutchess, there's nothing that I see in this  12:39
 9   package of communication which indicates what  12:39
10   specific accommodation you believe your brother  12:39
11   would need, is there?                        12:39
12        A.  It wasn't asked.                    12:39
13        Q.  Well, I'm not -- I think we went    12:39
14   through the conversations you had with them and  12:39
15   we have gone through e-mails?                12:39
16        A.  Right, the detail that was not --   12:39
17        Q.  I'm just sort of asking a specific  12:39
18   question --                                  12:39
19        A.  Right.                              12:39
20        Q.  -- which is can we agree that there  12:39
21   is nothing in your correspondence to them which  12:39
22   says this is what he would specifically need?  12:39
23        A.  Correct.                            12:40
24        Q.  Okay.                               12:40
25        And it is your testimony that you       12:40
```

Page 103

```
 1   federal level and having received little or no  12:36
 2   guidance on how to effectively train and safely  12:36
 3   protect the motoring public, the student and our  12:36
 4   personnel, we have determined that Smith &   12:37
 5   Solomon is not capable or qualified at this time  12:37
 6   to render the services requested.  Thank you  12:37
 7   very much for your interest in Smith & Solomon.  12:37
 8   Yours truly."                                12:37
 9        Do you see that?                        12:37
10        A.  Yes, I just read it.                12:37
11        Q.  Okay.                               12:37
12        And then, you, it looks like you        12:37
13   forwarded that to your brother, correct?     12:37
14        A.  Correct.                            12:37
15        Q.  Okay.                               12:37
16        So, I guess what I'm just trying to     12:37
17   understand is your testimony that you forwarded  12:37
18   the chain the way it has been produced ends on  12:37
19   March 31st saying "Forward to your lawyer,"   12:37
20   because of Mr. Wessendorf's April 6th response,  12:38
21   but you don't appear to forward his April 6th  12:38
22   correspondence suggesting that he should send it  12:38
23   to a lawyer.  I'm not sure I understand why you  12:38
24   thought one portion should be sent to the    12:38
25   lawyers and not another?                     12:38
```

Page 105

```
 1   didn't say that because it wasn't asked?     12:40
 2        A.  Correct.                            12:40
 3        Q.  Is it your testimony that had you   12:40
 4   been asked, you would have said the same thing  12:40
 5   you said to the National Tractor-Trailer     12:40
 6   Training School and to Dutchess, is that he  12:40
 7   would need a sign language interpreter at all  12:40
 8   times during the training?                   12:40
 9        A.  Correct.                            12:40
10        Q.  Okay.                               12:40
11        Are you aware of any guidance that      12:40
12   the Federal Motor Carrier Safety Administration  12:40
13   has given to driving schools to deal with safe  12:40
14   training for students who are hearing impaired?  12:41
15        A.  I'm unaware.                        12:41
16        Q.  So when Mr. Wessendorf said that    12:41
17   Smith & Solomon had received little or no    12:41
18   guidance from the Federal Administration, you  12:41
19   have no reason to dispute that, do you?      12:41
20        MR. NADLER:  Objection.                 12:41
21        You can answer.                         12:41
22        A.  I know my brother was allowed to    12:41
23   obtain his permit through the state and federal  12:41
24   level.  To me that speaks volumes right there.  12:41
25        Q.  But beyond that, you have no        12:41
```



27 (Pages 102 to 105)

Page 106

```
 1    information to suggest there was no guidance to    12:41
 2    the training schools?                              12:41
 3          A.  Beyond that, no.  But yet again,         12:41
 4    he's allowed to obtain his CDL permit.             12:41
 5          Q.  Have you ever discussed with him         12:41
 6    that the problem may be that when the Federal      12:42
 7    Motor Carrier Administration made the decision     12:42
 8    to publish a reg and ultimately issue a reg that   12:42
 9    waived a very specific provision of the code       12:42
10    that they didn't deal with other implications of   12:42
11    what that event meant?                             12:42
12                MR. NADLER:  Objection.                12:42
13          You can answer.                              12:42
14          A.  I'm not aware.  I've had no              12:42
15    conversation.                                      12:42
16    BY MR. HALLER:                                     12:42
17          Q.  Okay.                                    12:42
18          Other than what we have now been            12:42
19    through, are there any other discussions or        12:42
20    communications you believe you had with Smith &    12:42
21    Solomon?                                           12:42
22          A.  No.                                      12:42
23          Q.  I'm going to show you a document         12:42
24    that we'll mark as Deposition Exhibit 24.          12:42
25                (Document bearing Bates                12:43
```

Page 107

```
 1          stamp Nos. BDTS-0002 through                 12:43
 2          BDTS-0010 was marked as Defendant's          12:43
 3          Exhibit 24 for identification, as of         12:43
 4          this date.)                                  12:43
 5    BY MR. HALLER:                                     12:43
 6          Q.  Defendant's's Deposition Exhibit 24.     12:43
 7                MR. NADLER:  This is 24.  Okay.         12:43
 8                MR. CONNELLY:  Did you get two of       12:43
 9          them?                                        12:43
10                MR. NADLER:  Yes, I have two 24s.       12:43
11          Does someone need one?                       12:43
12    BY MR. HALLER:                                     12:43
13          Q.  Okay.                                    12:43
14          Mr. Frilando, I'll represent to you          12:43
15    that Defendant's Exhibit 24 represents the         12:43
16    communications which have been produced by         12:43
17    Bordentown Driving Training School in this case    12:43
18    related to your communications with them.  So it   12:43
19    is sort of the mirror image of what you have       12:43
20    produced to us.                                    12:43
21          A.  Okay.                                    12:43
22          Q.  And I would say for the most part        12:43
23    the correspondence is the same, except if you      12:44
24    would go to page 10, so you'll see on page 10, I   12:44
25    think this is what you may have been alluding to   12:44
```

Page 108

```
 1    earlier that it looks like there is an e-mail      12:44
 2    from you to Mr. Wessendorf after he sends you      12:44
 3    the e-mail that you have read and I have           12:44
 4    subsequently read into the record where he says    12:44
 5    that "Smith & Solomon have made a determination    12:44
 6    they were not capable or qualified at this time    12:45
 7    following the discussion with the state and        12:45
 8    federal authorities."                              12:45
 9          Do you see that there is a response          12:45
10    from you?                                          12:45
11          A.  Yes.                                     12:45
12          Q.  Okay.                                    12:45
13          So, I have some questions related to         12:45
14    that.  First of all, why is it that has not been   12:45
15    produced by you to us in this case?                12:45
16          A.  I presented everything I had.            12:45
17          Q.  Okay.                                    12:45
18          So did you just -- had you reviewed          12:45
19    this set of documents before the deposition        12:45
20    today or did you just remember that you felt       12:45
21    like you said something to him after he sent you   12:45
22    the April 6th e-mail?                              12:45
23          A.  No, I reviewed the documentation         12:45
24    quickly and I felt that I presented everything     12:45
25    that I had.  I'm the one who mentioned this part   12:45
```

Page 109

```
 1    of the correspondence if you don't recall.        12:46
 2          Q.  No, I do.  I'm just trying to           12:46
 3    understand how that happened, if you looked at     12:46
 4    anything to refresh your recollection?             12:46
 5          A.  I thought I presented everything I      12:46
 6    had.                                               12:46
 7          Q.  Okay.                                    12:46
 8          So, I just, can you explain why that        12:46
 9    e-mail is missing from what you have produced?     12:46
10                MR. NADLER:  Objection.                12:46
11          You can answer.                              12:46
12          A.  Maybe it got lost somewhere.  I         12:46
13    don't know.                                        12:46
14    BY MR. HALLER:                                     12:46
15          Q.  And then in this e-mail you say         12:46
16    shouldn't know -- I take issue with your           12:46
17    commentary since the federal government is         12:46
18    basically saying my brother has proved he is       12:46
19    capable and authorized to train for a CDL.  Have   12:46
20    a good day.                                        12:46
21          Do you see that?                             12:46
22          A.  Absolutely.                              12:46
23          Q.  Okay.                                    12:46
24          And that's exactly what you just            12:46
25    said on the record, right?                         12:46
```



Page 110

```
1        A.  Correct.                        12:46
2        Q.  Other than now what we have been    12:47
3   through, is there anything else that you can    12:47
4   recall may have occurred in the nature of    12:47
5   communications between you and Smith & Solomon    12:47
6   in any way connected to your brother's potential    12:47
7   interest in seeking training for his CDL    12:47
8   license?                              12:47
9        A.  No.                          12:47
10        Q.  Do you personally have any knowledge    12:47
11   of what your brother is trying to get the court    12:47
12   to do or say in this case?              12:47
13        A.  What do you mean?              12:47
14        Q.  If you don't understand the    12:47
15   question, just tell me.                 12:48
16        A.  I don't understand the question.    12:48
17        Q.  Do you know what your brother is    12:48
18   seeking by way of damages in this case?    12:48
19        A.  What he's seeking is to be treated    12:48
20   like everyone else.  What he's seeking is to go    12:48
21   to a tractor-trailer school and become a    12:48
22   licensed CDL driver.                   12:48
23        Q.  Anything else that you are aware of    12:48
24   that he's seeking through the litigation?    12:48
25        A.  No.                         12:48
```

Page 111

```
1        Q.  Okay.                         12:48
2        To your knowledge, has your brother    12:48
3   explored any other type of driving, commercial    12:48
4   driving options other than tractor-trailers?    12:48
5        A.  Not to my knowledge.            12:48
6        Q.  Why not?                      12:48
7        A.  I don't know.                  12:49
8        MR. HALLER:  Let's take a short    12:49
9   break.                               12:49
10        MR. NADLER:  Sure.                 12:49
11        MR. HALLER:  Let's go off the    12:49
12   record.                              12:49
13        THE VIDEOGRAPHER:  The time is    12:49
14   12:48.  We're off the record.           12:49
15        (Whereupon, at 12:48 o'clock    12:57
16   p.m., a recess was taken until 12:58    12:57
17   o'clock p.m.)                         12:57
18        THE VIDEOGRAPHER:  The time is    12:58
19   12:58.  We are back on the record.     12:58
20   BY MR. HALLER:                          12:58
21        Q.  Mr. Frilando, if you could pull out    12:58
22   exhibit, Deposition Exhibit 21, that's    12:58
23   Defendant's's Deposition Exhibit 21, which is    12:58
24   your production as to e-mails with respect to    12:58
25   Smith & Solomon.                       12:58
```

Page 112

```
1        Do you have that in front of you?    12:58
2        A.  Yes.                          12:58
3        Q.  So, can we agree on the record that    12:59
4   your first e-mail, at least appears on PLA 6,    12:59
5   which is the e-mail you sent to Mr. Wessendorf    12:59
6   on March 17th?                         12:59
7        A.  PLA 6?                        12:59
8        Q.  Yes.                          12:59
9        That's the first e-mail              12:59
10   correspondence with Mr. Wessendorf, right?    12:59
11        A.  Yes.                          12:59
12        Q.  Okay.                         12:59
13        Now, what -- if we go back before    12:59
14   that date, do you remember how long before then    12:59
15   had been the initial contact with Smith &    12:59
16   Solomon?                             12:59
17        A.  I don't recall.                12:59
18        Q.  Okay.                         12:59
19        Do you recall that it was perhaps    12:59
20   even as much as a month earlier that initial    12:59
21   inquiries had been made?               13:00
22        A.  No, it was less than that.      13:00
23        Q.  Are you sure?                  13:00
24        A.  To the best of my recollection.    13:00
25        Q.  Okay.                         13:00
```

Page 113

```
1        Were you aware that an interview had    13:00
2   been scheduled with your brother for February    13:00
3   18, 2015?                             13:00
4        A.  I do recall and I believe that was a    13:00
5   result of me speaking to the first person who I    13:00
6   contacted there, which was a woman.  Best of my    13:00
7   recollection, that was cancelled once, I    13:00
8   believe, it was mentioned that my brother was    13:00
9   deaf, and best of my recollection, that's when    13:00
10   Mr. Wessendorf got involved.            13:00
11        Q.  Well, let's go one by one.  So you    13:00
12   do now recollect that there was an interview    13:00
13   scheduled, right?                      13:01
14        A.  Excuse me.                     13:01
15        Q.  You recollect there was an interview    13:01
16   scheduled?                           13:01
17        A.  I do remember.                 13:01
18        Q.  And do you recall that it was    13:01
19   scheduled for the 20th of February at 10:00 to    13:01
20   10:30 a.m.?                           13:01
21        A.  I don't remember the exact date.    13:01
22        Q.  Okay.                         13:01
23        And can we agree on the record you    13:01
24   have no correspondence cancelling that    13:01
25   interview, do you?                     13:01
```



Page 114

```
1        A.  No.                        13:01
2        Q.  Okay.                      13:01
3           Can we agree that neither you nor    13:01
4   your brother showed up for that interview,    13:01
5   regardless of the reasons, you didn't appear for    13:01
6   the interview, right?                 13:01
7        A.  I called and cancelled.  I do    13:01
8   remember that.                      13:01
9        Q.  Okay.                      13:01
10          You called and cancelled?        13:01
11       A.  I called and cancelled.        13:01
12       Q.  And why was that?            13:01
13       A.  It was, it was because of the    13:01
14  weather.  It was bad weather, going to be that    13:01
15  day.                            13:01
16       Q.  Okay.                      13:01
17          MR. HALLER:  I have no further    13:02
18  questions at this time.              13:02
19          MR. NADLER:  All right.         13:02
20          MR. HALLER:  Thank you very much    13:02
21  for coming in.                     13:02
22          THE WITNESS:  Thank you.        13:02
23          MR. NADLER:  Thank you.         13:02
24          THE VIDEOGRAPHER:  The time is    13:02
25  1:02, and we are off the record.        13:02
```

Page 115

```
1           (Whereupon, at 1:02 o'clock      13:02
2           p.m., the deposition was concluded.)    13:02
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 116

```
1        C E R T I F I C A T E           13:02
2   STATE OF NEW JERSEY)                  13:02
3           )SS:                13:02
4   COUNTY OF MONMOUTH )                  13:02
5                           13:02
6       I, CATHERINE M. DONAHUE, a Certified Court    13:02
7   Reporter and Notary Public within and for the    13:02
8   State of New Jersey, do hereby certify:    13:02
9       That the witness whose deposition is    13:02
10  hereinbefore set forth was duly sworn by me and    13:02
11  that such deposition is a true record of the    13:02
12  testimony given by such witness.       13:02
13      I further certify that I am not related to    13:02
14  any of the parties to this action by blood or    13:02
15  marriage, and that I am in no way interested in    13:02
16  the outcome of this matter.           13:02
17      IN WITNESS WHEREOF, I have hereunto set my    13:02
18  hand this 1st day of December, 2015.    13:02
19                          13:02
20  _____            13:02
    CATHERINE M. DONAHUE, CCR           13:02
21  License No. 30X100223700            13:02
22
23
24
25
```



## A

**A-Fib** 59:5,24
  60:13,22,23 63:4
**a.m** 1:16 28:1,2
  64:10,11 73:1
  98:21 113:20
**ABC** 38:8,21 65:2
**ability** 11:5
**able** 19:8,19 20:1
  21:22 24:5 26:24
  26:25 28:12 29:8
  30:6 41:10 55:25
  67:9 69:24 71:4
  71:13 77:7 83:25
  90:10
**Absolutely** 109:22
**absorb** 76:12,15
**abstract** 42:15,17
**accommodate**
  67:12 75:24 84:3
  86:15 94:11 96:12
  97:10
**accommodation**
  88:9 89:15 104:10
**accompany** 36:17
**accompanying** 36:6
  39:15 58:18 63:23
**accuracy** 21:9
  31:17 35:8
**accurate** 98:6
**action** 40:12,16
  41:1 116:14
**addition** 19:21
  89:17
**additional** 71:23
  97:13
**address** 11:9,18
  90:24 91:11,14
**addressed** 18:11
**Administration**
  22:15 38:2 43:20
  45:20 105:12,18
  106:7
**administrator**
  37:19

**advance** 31:23
**advice** 52:7,13
  67:11
**advise** 84:2 86:5
  96:12,14
**advised** 97:14
**ago** 50:21 61:5,7
**agree** 24:3 88:6
  89:1 102:12
  104:20 112:3
  113:23 114:3
**agreed** 9:25 10:7
  90:8 102:15,20
**aid** 42:9 74:22
  84:18
**aids** 55:9,24 56:7
  56:14 84:24
**alarm** 56:12,23
**Albert** 11:10
**allow** 76:22
**allowed** 105:22
  106:4
**alluding** 107:25
**ambiguity** 26:13
**and/or** 32:9
**answer** 5:3 9:23
  10:13,14,21 12:17
  12:18,20 23:5
  24:8 31:25 32:14
  36:20 38:17,24
  40:22 41:13 43:4
  43:12 44:4,18
  45:8 46:6 47:19
  50:9,19 51:16
  52:9,15 53:9,16
  55:18 56:10 57:1
  57:7 61:21 67:22
  76:14 77:9,22
  78:17,22 80:11
  88:13 89:9 95:24
  99:25 100:20
  105:21 106:13
  109:11
**answers** 10:11
  23:19 35:20
**Anthony** 2:14 6:23

7:17
**apnea** 59:6 61:11
  63:2,7,8,13
**apologize** 34:21
  46:21 69:7,13
**apparently** 24:19
  37:13 38:1
**appear** 23:22
  103:21 114:5
**appearances** 6:18
**appearing** 6:21
**appears** 58:15
  78:13 112:4
**application** 22:14
  39:20 74:15 77:16
  77:25 79:7,12,15
  79:22 102:18
**applying** 44:23
**appointment** 36:24
  92:10 96:9
**appointments**
  49:23
**appreciate** 79:19
  101:2
**appropriate** 22:20
  78:4
**approved** 98:18
**approximately** 9:3
  13:4
**April** 11:14 25:15
  66:1 84:22 87:17
  98:25 99:9 101:8
  102:9,13,17
  103:20,21 108:22
**area** 71:10
**arrangement** 38:22
**aside** 23:9
**asked** 9:13 19:18
  91:9 104:12 105:1
  105:4
**asking** 14:18,19
  20:5 24:18,23
  26:14 75:7 84:16
  104:17
**asks** 68:10 98:12
**assigned** 88:10

**assignment** 89:6
**assist** 15:13 23:11
  25:7 41:10 89:5
  89:15
**assistance** 54:13
**assisting** 43:9
**associate** 37:19
**associate's** 47:20
**associated** 56:1
**Association** 37:14
  37:20 44:2 102:3
**assume** 10:6 83:3
**assuming** 63:22
**attached** 4:11 17:7
  18:3 21:2 34:16
  34:19 68:20 73:22
**attaching** 99:2
**attachment** 24:4
  34:14
**attachments** 17:3
  30:23 31:14 34:22
**attempted** 86:2
**attempts** 51:18,25
**attend** 68:6 72:5
**attended** 91:7
**attention** 46:13
  58:5 62:6
**attorney** 7:17 14:12
  28:10
**attorneys** 2:4,10
  14:8 28:9 31:10
  31:22 53:7
**August** 73:20 74:10
**authorities** 108:8
**authorized** 109:19
**automatic** 49:9,10
  49:11
**available** 50:1
**aware** 16:19 17:25
  19:11 29:14 30:9
  45:25 46:25 50:15
  77:1 80:9 89:13
  91:7 96:22 105:11
  106:14 110:23
  113:1

## B

**B** 2:14 4:1 18:10,11
  28:21,22,25 29:1
  29:4,6,22
**back** 18:9 28:5,7
  31:16 44:9 63:5,6
  64:13,15 65:22,23
  93:14 97:4 100:3
  111:19 112:13
**background** 47:17
**bad** 114:14
**Barbara** 4:6 16:8
  20:17
**based** 25:23 53:6
  55:19 99:17
**basic** 81:19
**basically** 8:15
  51:12 56:2,14
  92:21 109:18
**basis** 55:15 76:19
**Bates** 4:7 21:3
  106:25
**Baum** 2:3 6:21
  13:10,15,20 14:25
  15:8 20:19 33:7
  33:19 34:8 35:9
  101:21
**BDTS-0002** 4:8
  107:1
**BDTS-0010** 4:8
  107:2
**Beach** 11:10,11
  58:8
**bearing** 4:7 106:25
**becoming** 46:25
  66:12 83:18 93:2
**began** 31:11
**beginning** 9:19
**begins** 6:2 17:10
**behalf** 6:22 22:1,10
  29:10,20,25 31:10
  31:18 32:10 34:10
  35:10 51:14,21
  65:17 66:9 67:20
  75:23 88:9 89:25



89:25
**believe** 17:10 28:8
  43:23 73:13 76:25
  89:14 93:13 96:25
  104:10 106:20
  113:4,8
**believed** 75:22
**believes** 40:9
**best** 9:23 12:10
  13:14 26:18 71:14
  81:15 87:4 92:19
  93:11,12,20,24
  94:7,10 95:7
  112:24 113:6,9
**beyond** 105:25
  106:3
**big** 69:5
**bigger** 23:9
**bill** 76:17
**birth** 11:13 67:7
  83:23
**bit** 54:6,7
**Blank** 1:14 2:9 6:12
  6:24 7:18 58:1
**bleeding** 61:1
**blood** 60:4 116:14
**Bordentown** 1:7
  6:5 7:1,21,23 22:1
  23:3,25 24:23
  28:15 32:9 52:21
  107:17
**Bordentown's**
  23:19
**Borough** 47:25
**bottom** 25:12 58:10
  63:7
**bout** 61:5,6
**bouts** 61:1
**BRBPR** 59:6
**break** 64:2,4 69:6
  111:9
**breathing** 59:19
  61:13 62:4,12
**briefly** 47:16
**broadcast** 48:1
**Bronx** 9:16,16

**brother** 11:19 13:7
  15:7,13,18,25
  18:2 29:21 31:18
  32:15,21 33:5,14
  33:22 35:24 36:3
  36:6,17 37:17
  38:7 39:15,25
  40:8 43:9,18 44:1
  44:11,16 45:19
  46:1 49:13,19
  50:4,7 53:3,5,20
  53:21 54:9 56:8
  58:8,16 60:12,21
  61:11 62:2,10
  63:1,13,23 65:3
  66:17,21 67:6,17
  68:5 70:8 73:4,9
  74:6 75:23 76:23
  77:6,23 78:25,25
  79:19 80:2,7
  81:13 82:25 83:23
  85:5 87:9,18 88:9
  89:5,15 90:16
  92:23 93:5 94:11
  96:9 99:1,21
  101:8,22 102:18
  103:13 104:10
  105:22 109:18
  110:11,17 111:2
  113:2,8 114:4
**brother's** 22:1,10
  22:14,19 23:1,19
  23:23 28:13 29:10
  29:25 31:10,10
  32:10 34:10 35:10
  37:4,8 39:20
  41:23 65:16 66:8
  68:20 71:5 89:25
  96:19 102:4 110:6
**Buick** 49:6,11
**Burgundy** 48:15
**busy** 30:16 83:15
**buy** 48:19

----
**C**
----
**C** 2:1 116:1,1

**Caliber** 48:13
**call** 54:23 85:11,15
  86:2 92:16
**called** 7:7 44:24
  59:6 81:2 91:17
  114:7,10,11
**cancelled** 113:7
  114:7,10,11
**cancelling** 113:24
**candidates** 79:21
**capabilities** 51:11
**capability** 67:17
**capable** 10:25 11:2
  51:9 78:7 83:16
  99:15 103:5 108:6
  109:19
**caps** 72:3
**captioning** 54:15
**car** 40:2 48:10,12
  48:20 49:2,9,14
  64:21
**Career** 40:12,16
  41:1
**carefully** 18:19
**Carnegie** 1:14 6:11
**Carrier** 22:15
  37:14,20 38:2
  43:20 44:2 45:19
  105:12 106:7
**case** 7:20 8:16 9:8
  22:24 26:16 79:6
  107:17 108:15
  110:12,18
**CASH** 80:2
**Catherine** 1:16
  6:15 7:9 116:6,20
**cause** 59:24 60:13
**CCR** 116:20
**CDL** 15:15,19 23:2
  23:24 28:14 36:15
  50:16 51:8 66:13
  67:8,10 68:7
  81:18 83:24 84:1
  102:4 106:4
  109:19 110:7,22
**Center** 1:14 6:11

**certain** 35:25
**certainly** 98:16
**certificate** 22:20
  46:2,15,18 68:25
  70:6,6 71:21
  72:15 73:10
  102:14
**certification** 36:16
  45:21
**certified** 1:17 45:22
  46:2 71:6,7 72:7
  72:10 73:22 74:8
  116:6
**certify** 116:8,13
**chain** 48:22 94:9
  99:2 103:18
**Channel** 38:8,21
**charge** 76:19
**check** 69:24 71:4
  74:25
**checked** 68:4
**chest** 59:20
**Chief** 37:25
**chose** 86:2
**Christina** 65:25
  68:19 69:23 71:15
  72:24 73:20 80:18
**chronological**
  65:21 82:16 90:14
**chronology** 14:21
  101:3
**Cindy** 37:12
**circumstances** 15:2
  36:2
**City** 48:4
**CIV** 1:2
**claims** 15:9
**Class** 41:23,23
**clear** 14:18 87:18
  97:11
**clearly** 62:10
**clinic** 63:8,13
**clock** 56:23
**closed** 88:17
**co-worker** 91:6
**code** 44:24 45:6

106:9
**colleague** 6:25 7:18
**College** 47:25
**color** 48:14
**come** 46:24 55:6
  92:10 96:10
**comes** 81:12
**coming** 96:19
  114:21
**command** 94:9
**commencing** 1:15
**commentary**
  109:17
**commercial** 39:21
  111:3
**communicated**
  73:21 89:2,10
**communicating**
  54:10 92:13
**communication**
  25:1,5 79:9 97:13
  104:9
**communications**
  14:12 21:25 22:10
  23:22 24:5,22
  29:9 30:6 38:3
  44:1,10 45:18
  47:24 65:16 80:17
  81:2 87:25 90:1
  106:20 107:16,18
  110:5
**community** 47:25
  97:11
**commute** 49:16
**companies** 48:3
**company** 48:5 80:3
**complaint** 7:2 8:25
  31:9,23 32:8
  33:12 34:8 35:8
**complete** 58:10
  74:15
**completed** 45:14
**completely** 84:16
  84:22
**computer** 24:6
**Con** 9:11 48:3



**concern** 72:14
79:19
**concerned** 98:11
**concluded** 115:2
**condition** 93:5
**conference** 54:18
**confirm** 24:20
28:10 30:4 41:24
41:25 43:24
**confirming** 72:13
**confused** 34:18
**connected** 13:15
110:6
**connection** 8:13,14
15:8,14,18 23:1
23:23 46:14 52:5
54:22 85:4 88:3
102:3
**Connelly** 2:15 6:25
7:19 34:17 107:8
**conscious** 53:20
**considerable** 99:10
102:25
**considering** 80:7
**consultant** 37:13
**consultation** 28:8
**contact** 14:4 39:10
40:15 91:19
101:22 112:15
**contacted** 101:20
113:6
**contained** 24:21
33:12 78:20 82:4
90:2
**contains** 57:25
**content** 14:20
**continue** 78:8 86:4
86:16 87:3 96:13
**contribute** 12:14
**conversation** 13:24
46:11 83:17 91:20
92:11 93:1,6,17
93:25 94:3,14
106:15
**conversations** 53:6
91:19 92:8 102:2

104:14
**cooking** 56:13
**copy** 17:3 83:9
98:13
**corner** 58:10
**Corporate** 47:24
**correct** 21:16,18
28:15,17,18 29:12
30:8 33:12 46:19
46:22 47:1 49:8
49:12,20 50:2
68:17 69:10,14,15
69:18 71:10,22
72:17 73:12,24
74:2 76:10 78:1,3
80:5 84:4,9,13,25
85:8,21 86:11,17
86:21 87:6,10
90:11,18 93:18,19
94:16,21,23 95:19
96:5,6 98:18,19
101:10,15 102:10
102:11 103:13,14
104:23 105:2,9
110:1
**correspondence**
26:2,15 29:24
30:10 32:9 33:11
43:19 45:13 55:7
65:24 70:13 71:24
73:19 84:8 99:2
103:22 104:4,6,21
107:23 109:1
112:10 113:24
**cost** 76:12,24
**costs** 76:15 77:1,4
**counsel** 6:17 15:13
15:18 16:21 19:5
19:13,25 20:7,20
21:10,24 30:18
32:16,22 52:16,22
53:3 89:24 101:19
**counsel's** 24:19
**COUNTY** 116:4
**couple** 51:18,25
90:21 91:18

**course** 76:6 77:5
88:19,22,23
**courses** 40:10,20
41:3
**court** 1:1,17 6:7,14
7:5 10:10 110:11
116:6
**covered** 19:1,6
21:14
**credit** 54:2
**current** 49:8
**customer** 8:21,24
48:9 81:12,13

___

**D**

**D** 3:1 7:7 41:23
**D-o-m-i-n-i-j-a-n...**
82:19
**d/b/a** 6:5
**daily** 76:19
**Dale** 90:23
**damages** 110:18
**Daniele** 82:18
**date** 1:16 11:13
16:7,11 58:16
107:4 112:14
113:21
**dated** 4:6 16:9
**day** 74:11 75:12
77:5 86:9,12,19
86:23 95:21,25
96:1,3 97:2,3,4
98:12 109:20
114:15 116:18
**days** 66:24,25,25
77:6
**deaf** 40:2,11 41:10
51:6 53:22 60:12
67:7 68:11 78:7
83:23 84:16,22
86:15,25 87:1
93:8 96:12 102:3
113:9
**deafness** 81:17
**deal** 105:13 106:10
**dealing** 43:10

**dealings** 32:2 37:11
**Dear** 66:1
**December** 58:17
116:18
**decided** 20:6,11
**decision** 106:7
**declined** 67:25
**defendant** 1:9 2:10
7:8,20 26:16
**Defendant's** 4:3
16:1,3,6,10,25
17:15,21 20:15
21:3,9 28:23
29:22 31:8 34:1,4
35:13 41:19,21
42:16 43:16 64:17
65:13,14 82:9
89:22 90:3 107:2
107:15
**Defendant's's**
107:6 111:23
**definitely** 82:24
**definitive** 77:22
**degree** 47:21
**delete** 20:11 70:20
**department** 94:10
95:9
**depicted** 64:21
**deposition** 1:12 5:1
6:3,10 7:24 8:6
9:5,14,20 10:25
14:1 15:25 16:14
16:16 28:24 30:15
30:22 31:8 34:4
35:13 41:19,21
42:16,17 43:16,17
64:17 65:13,15
76:22 82:9 88:4
89:22 90:3 106:24
107:6 108:19
111:22,23 115:2
116:9,11
**described** 54:20
**describes** 61:1
**description** 4:2
93:4

**design** 50:13
**designed** 40:10
51:6
**detail** 18:1 67:2
78:23 83:13
104:16
**details** 51:24
**determination**
108:5
**determine** 14:23
79:21
**determined** 99:15
103:4
**determining** 80:8
**device** 54:17
**Diab** 2:18
**diagnosed** 59:23
60:22 63:2
**diagnosis** 59:2 63:3
**different** 81:7,8
**differently** 45:3
**difficulty** 56:19
59:19
**diligent** 26:25
**direct** 22:13,18
36:5 37:11
**direction** 53:5
97:12
**directly** 36:15 67:2
67:19 83:14 84:12
**disability** 75:24
**disagreement**
27:18
**disappointed** 25:9
**disappointment**
26:1 27:6
**disclosed** 14:13
**discomfort** 59:20
**discriminated**
87:14
**discrimination**
100:24
**discuss** 81:16 96:10
**discussed** 14:19
80:18 88:4 106:5
**discussing** 50:25



**discussion** 14:11
77:11 99:10
102:25 108:7
**discussions** 14:7
46:14 106:19
**dispute** 105:19
**District** 1:1,2 6:7,7
**Division** 38:1 48:20
**doctor** 71:8,10 72:7
74:3,5
**doctor's** 61:19 62:9
**doctors** 72:19 73:2
**document** 4:7
16:24 17:10,15,22
18:3 19:1 20:14
20:16 21:1,3,11
31:12,17 34:11,19
34:24 35:1,12,19
41:17 42:14 44:8
63:22 106:23,25
**documentation**
87:15 108:23
**documented** 60:19
61:23
**documents** 5:6
15:23,24 17:7
18:1,4,6,11,25
19:18 20:19,21
21:2,22,24 22:9
22:23 23:8,20
26:23 30:5,21
31:3 44:11 73:14
80:25 108:19
**Dodge** 48:13
**doing** 28:14 66:18
67:19
**Dominijanni** 82:18
**Donaghy** 2:19 6:13
**Donahue** 1:17 6:15
7:9 116:6,20
**DOT** 68:6,8 71:6,7
71:14 72:3,5,6,8
72:10 73:22 74:13
74:21 78:5 85:17
97:8
**doubt** 61:24

**Downtown** 12:13
**Dr** 36:7 37:4,8 39:7
58:2,2,16 63:6,24
69:1,25 70:6,9
71:5,21 74:2
**draw** 58:4
**drive** 40:1,4 49:14
49:17,18 87:2
**driver** 1:7 6:5 7:1
7:21 39:21 42:15
42:17 66:13 84:1
110:22
**driver's** 42:6
**drivers** 51:6 72:2
**drives** 49:15,19,25
**driving** 7:4 15:10
22:11 23:3,24
29:5,11 34:9 56:1
67:10 82:20
105:13 107:17
111:3,4
**due** 56:13
**duly** 7:9 116:10
**Dutchess** 29:5,10
34:9,23 46:12,22
55:8,16 79:11,13
82:12,19 84:11,16
85:9,23 87:24
88:3,8 89:4 104:8
105:6
**DVD** 6:2

**E**

**E** 2:1,1 3:1 4:1 7:7
116:1,1
**e-mail** 4:6 16:8
19:2 20:17 25:14
26:4,7,21 27:9,20
65:24 68:19 69:21
69:22 71:3 72:24
73:20 78:20 81:21
82:17,18 83:6,8
86:5,19 90:23
91:5,11,14,21
92:13 94:14,23
95:3,17 97:3 99:1

99:2,9 102:22
104:4 108:1,3,22
109:9,15 112:4,5
112:9
**e-mailed** 86:13
90:22 102:24
**e-mails** 19:6 22:22
23:21 26:15 28:11
29:4,8,23 30:2
33:18 69:6,7
70:23 80:17,25
82:4,10 89:24
104:15 111:24
**E.R** 59:18 60:7
**ear** 74:22
**earlier** 71:18 90:4
108:1 112:20
**east** 2:5 12:13
**Ed** 9:11
**Edison** 48:4
**educational** 47:17
78:2 79:4
**effect** 26:5,8
**effectively** 97:9
99:12 103:2
**efforts** 22:19
**eight** 37:9
**Eisenberg** 2:3 6:21
13:10,15,20 14:24
15:7 20:18 33:6
33:19 34:8 35:9
101:21
**either** 37:8 40:16
54:24 89:3
**Elaine** 37:25 45:13
**employees** 78:3
**employer** 8:15 9:10
**employment** 50:7
**endeavor** 10:13
**ends** 103:18
**engaged** 15:13,18
99:23
**enrollment** 71:7
79:21
**Enterprise** 48:20
48:23

**ESQ** 2:7,14,15
**essence** 96:14,18
97:20 98:1
**Essentially** 79:17
**establish** 9:20
**established** 100:12
**evening** 90:22 95:4
**event** 106:11
**events** 8:22 13:16
22:25
**everyday** 56:6,22
**exact** 73:16 113:21
**exactly** 20:2 27:16
90:2 109:24
**examination** 3:5
7:13 39:13 45:14
61:19 63:1
**examinations** 36:7
**examined** 7:11
**exclamation** 95:22
**excuse** 77:21
113:14
**exemptions** 98:13
**exhibit** 4:2 16:6,10
16:24,25 17:9,21
18:10,11,12 20:15
21:3 23:18,21
24:21,24 25:11
28:11,21,22,24
29:19,22,22 31:8
33:25 34:1,4
35:13,14 41:19,22
42:15,17 43:17
57:24,25 64:18
65:12,13,15 82:9
82:9 89:22,23
90:2,3 106:24
107:3,6,15 111:22
111:22,23
**exhibits** 4:11 16:1,2
16:3,14,17 23:10
23:14
**experience** 87:1,4
**expires** 97:21 98:9
**expiring** 98:10
**explain** 18:24 19:15

67:16 70:23 85:15
109:8
**explained** 60:11
100:9
**explored** 111:3
**extent** 19:24 20:22
32:7 33:10

**F**

**F** 7:7 116:1
**facets** 88:21
**facility** 78:2 96:11
**facts** 36:1
**fair** 9:25 10:7 44:14
44:19 50:3
**fairness** 34:15
**familiar** 9:18 44:15
**family** 54:12
**far** 22:12
**fast** 41:20
**fasting** 60:4
**February** 113:2,19
**federal** 22:15 37:14
37:20 38:2 43:19
44:2 45:19 97:8
99:11 103:1
105:12,18,23
106:6 108:8
109:17
**federal/state** 72:9
**feel** 10:19 79:1
81:21
**felt** 89:4 100:24
108:20,24
**figured** 87:14
**file** 69:5
**filed** 9:13 31:9,18
31:23 32:1 34:8
35:9
**fill** 77:24 79:6
**filled** 50:10 79:12
79:15
**find** 19:9 20:1
21:15,22 24:5
26:25 27:19 76:11
90:10



**finding** 83:18
**fine** 41:17 57:16,19
  68:2
**finish** 10:12,14
  101:7
**finished** 14:16
**fire** 56:12
**fireworks** 57:4
**firm** 6:24 7:18
  13:10,15 32:11
  33:6,19 58:1
  101:21
**first** 7:8 9:22 13:13
  14:24 15:12,17,23
  17:15,21 25:12
  33:5 44:7 50:15
  51:18,25 52:6,12
  53:13 61:6 65:24
  66:7 71:19 77:23
  82:17 93:6 101:20
  101:22 108:14
  112:4,9 113:5
**five** 68:9 77:5 86:19
**Floor** 2:5,12
**fluent** 54:4
**focus** 18:17
**follow** 63:18 86:1
  94:23 96:7
**followed** 63:17
**following** 73:8
  94:13 108:7
**follows** 7:12
**Fong** 37:9
**Forced** 44:24
**form** 12:16 13:21
  23:4 24:7 57:13
  57:15,20
**formal** 102:18
**former** 91:6
**forth** 116:10
**forward** 39:2 40:7
  41:20 45:12 59:8
  87:8 90:24 97:21
  98:13 99:3 100:5
  100:15 101:13
  102:8,9 103:19,21

**forwarded** 90:16
  103:13,17
**forwarding** 70:14
**found** 19:20 20:6
  20:10 26:19 27:3
  59:24 91:15
**four** 76:25
**fourth** 35:19 57:4
**free** 76:16
**Freeman** 20:18
**Friday** 95:15
**Friedman** 4:6 16:9
**friend** 92:22
**friends** 55:2
**Frilando** 1:4,12 3:4
  6:3,4,22 7:14
  11:10 17:16,22
  26:11 28:7 29:4
  43:15 58:8 64:15
  67:7 76:21 83:23
  96:9 107:14
  111:21
**front** 17:11 23:17
  34:5 35:16 42:19
  43:21 58:7 64:18
  65:18 82:13 112:1
**frustrated** 77:21
**frustration** 51:19
  52:6 67:25 79:1
**full** 11:8 104:3
**full-view** 42:9
**fully** 9:23 10:25
  11:2 101:1
**further** 40:1 63:21
  114:17 116:13

_____

**G**

**G-o-u-v-e-n-e-a-r**
  12:11
**Gaines** 37:13
**generally** 32:20
**getting** 15:15 23:2
  73:9 74:12 102:4
**give** 9:14 11:5
  33:14 62:6 67:2
  83:13 85:20 91:11

93:4 95:1
**given** 9:17 53:19
  67:16 78:23 86:10
  105:13 116:12
**giving** 10:21,25
**glasses** 50:11
**go** 10:14 17:9,14
  18:9 27:21 28:21
  29:21 31:4,5,16
  35:12,18 36:4
  38:6 39:2,18,24
  40:7 41:18 42:14
  45:12 51:2 52:6
  57:23 59:8,16
  63:5,6 65:12,21
  78:25 79:21 82:8
  82:15 83:22 85:15
  89:21 90:13,15
  95:15 102:8
  107:24 110:20
  111:11 112:13
  113:11
**goes** 56:13 60:3,25
  61:10
**going** 25:13 31:4
  41:18 46:21 51:1
  51:8,19 55:21,24
  56:15 63:13 67:24
  69:5 71:4 75:12
  79:2 81:22 92:9
  95:8 106:23
  114:14
**good** 7:14,15 85:11
  95:21,25 96:1,3
  109:20
**Gouveneur** 12:8
**government** 45:22
  109:17
**graduated** 92:23
**granted** 85:16
**graphic** 50:12,12
**great** 54:2 67:1
  83:13
**ground** 9:20
**group** 30:5
**guess** 25:23 35:4,18

54:19 66:25
  103:16
**guidance** 97:7
  99:12 103:2
  105:11,18 106:1

_____

**H**

**H** 4:1 7:7
**Haller** 2:14 3:5
  6:23,23 7:13,17
  12:21 13:22 14:14
  14:22 16:12 23:7
  24:12 27:13,21
  28:6,19,23 29:1,3
  32:3,18 33:3,23
  36:22 38:19 39:1
  40:24 41:15 43:6
  43:14 44:6,20
  45:10 46:8 47:22
  50:14,22 51:22
  52:11,18 53:11,18
  55:22 56:16 57:3
  57:9,11,16,21,22
  61:25 64:3,14
  77:12 80:12 88:15
  89:11 100:2,7,22
  106:16 107:5,12
  109:14 111:8,11
  111:20 114:17,20
**hand** 116:18
**handed** 21:13
**handle** 21:17
**happened** 14:11,21
  24:15 46:11 81:10
  82:2 88:2 93:21
  109:3
**happening** 79:3
**he'll** 56:2
**heading** 59:2
**health** 59:17
**hear** 55:25 56:8,11
  56:14 67:1 68:9
  74:12 83:13 86:13
  86:18 95:17 96:8
  97:4
**heard** 7:16 86:12

96:5
**hearing** 39:13 42:9
  55:1,9,24 56:7,14
  56:19,24 68:8
  74:21 84:18,24
  105:14
**hears** 57:5
**HearUSA** 39:14
**held** 1:13
**help** 23:10 33:6
  40:10 60:16 61:17
  65:5 70:4 74:24
  82:24
**helping** 47:1
**hereinbefore**
  116:10
**hereunto** 116:17
**Hi** 68:19 72:1 95:17
**history** 47:17
**home** 11:9,23,25
  54:13
**honest** 78:3
**hospital** 12:8,12
**hours** 13:17,19,25
**house** 11:17,21
  12:3 56:13
**Howard** 58:7

_____

**I**

**idea** 76:20
**identification** 16:7
  16:11 107:3
**identified** 15:24
  19:6,12 90:8 91:4
**identify** 28:12 30:6
**identifying** 25:4
**image** 107:19
**immediately** 68:16
**impact** 11:5
**impaired** 105:14
**implications**
  106:10
**important** 10:11
  26:11 27:15 35:4
**inadvertently**
  10:20



**incident** 9:15 43:2
**included** 27:11
  71:9
**includes** 36:2
**INDEX** 5:1
**indicated** 20:21
**indicates** 39:25
  104:9
**industry** 48:2
**information** 31:22
  32:8,12,24 33:11
  36:1 41:2 60:8
  70:10,15 81:14,19
  90:17 91:9 106:1
**Inicia** 38:7
**initial** 112:15,20
**initially** 91:17 92:9
**initiated** 92:16
  101:22
**injured** 8:19
**injury** 8:18,23 9:2
**inquire** 51:20 53:2
**inquiries** 51:14
  52:20 53:4,14
  66:8 67:20 112:21
**inquiring** 51:11
  66:2
**inquiry** 68:1 83:4,5
**instance** 56:12 66:8
**Institute** 40:13,17
  41:2
**instruction** 5:3
  56:4
**instructional** 76:5
  85:8 88:14,17
**instructor** 74:23
**intentional** 27:12
**intentionally** 10:20
**interaction** 37:17
**interest** 15:19
  28:13 50:3,16,20
  66:12 82:23 103:7
  110:7
**interested** 92:25
  116:15
**interests** 15:14,15

23:2,24 102:4
**interposed** 14:16
**interpreter** 54:23
  55:21 56:3 60:12
  67:18 75:14,20,25
  76:3,9 84:17,23
  85:6 88:10 89:7
  89:18 105:7
**interpreters** 76:19
  76:24
**interrogatory**
  35:24 38:6 39:2,5
  39:6,12,19,24
  40:7,8
**interrupted** 10:20
**interview** 38:7
  74:16 77:25 78:1
  79:23 113:1,12,15
  113:25 114:4,6
**interviews** 38:21
**investigate** 59:24
**involved** 8:17 38:11
  38:14,20 40:3
  47:1 52:3 79:2
  84:12 87:24 92:12
  113:10
**involvement** 15:7
  22:14,18 36:5
  37:3,7,16 38:3
  39:14 41:25 42:4
  42:7,22 43:25
  44:10 45:18 73:6
**issue** 106:8 109:16
**issues** 22:24 32:17

---

**J**

**J** 7:7 58:10 59:12
**Jacobson** 37:8
**January** 97:21 98:8
**Jersey** 1:2,15,18
  3:22 6:8 7:11
  29:25 30:7,10
  65:17 66:10 80:8
  81:2,10,17 116:2
  116:8
**JMC** 58:7

**job** 1:19 78:1
**John** 2:15,18 6:25
  7:19
**Joseph** 1:12 3:4 6:3
  11:10 72:2 79:18
  86:24 102:24
**Josh** 38:7
**Judy** 39:7
**July** 57:4 73:15,15

---

**K**

**keep** 97:13
**Kenneth** 1:4 6:4,22
  17:16,22 58:8
  67:7 75:15 83:23
  96:9
**Kenneth's** 97:20
**Kenny** 25:7
**kettle** 56:22
**key** 48:22
**kind** 51:3 72:13
**knew** 32:16 101:7
  101:12,13
**know** 7:24 8:16 9:8
  9:12 10:9 16:15
  27:16 31:21 32:12
  32:19 33:5,19
  34:24 35:5 36:4
  45:5,9 54:24 55:2
  55:20 56:7,12
  57:5,8 63:16 65:5
  65:6 74:3 76:18
  76:18 78:6 79:9
  80:13 81:19 86:14
  91:25 92:4,15,25
  94:7 98:17 101:17
  101:20,24 105:22
  109:13,16 110:17
  111:7
**knowing** 51:10
**knowledge** 9:24
  12:10 40:20 41:9
  42:10 44:25 52:2
  80:15 110:10
  111:2,5
**known** 66:10

---

**L**

**L** 7:7
**laborious** 83:19
**language** 54:3,22
  74:24 75:13,20
  76:24 84:17,23
  85:6 88:10 89:6
  89:18 105:7
**Larry** 37:18
**law** 1:13 6:24 7:17
  13:10,14 32:11
  33:18 58:1 72:9
  101:21
**Lawrence** 36:7
  58:10 59:12
**lawsuit** 9:12 13:16
  26:12 36:2
**lawyer** 87:9,15,19
  99:3 100:16
  101:13,14 103:19
  103:23 104:1
**lawyers** 26:21
  33:14 53:13 99:19
  99:22 100:6,10,16
  101:8 103:25
**learn** 15:12,17
  46:10 54:3 96:10
**learned** 40:1
**learner** 39:20
**lease** 48:16
**leave** 86:3,4
**led** 8:23 9:2,13
  13:16 15:3 66:7
  72:14
**left** 15:24
**legal** 1:21 6:14,15
  15:9 52:6,13,16
  52:22
**let's** 27:21 64:3
  89:21 91:24 111:8
  111:11 113:11
**letter** 57:25
**letting** 55:20
**level** 99:11 103:1
  105:24

**levels** 67:24
**license** 15:15,20
  23:2 40:5 41:23
  41:23 42:1,6
  50:17 67:10 68:7
  72:4 84:1 91:8
  102:4 110:8
  116:21
**licensed** 66:13
  110:22
**lie** 21:21
**life** 54:1
**LINE** 5:4,7,10
**link** 71:9,12 73:5
**list** 35:25 72:9
**listed** 18:20 27:5
  37:4,9,12,18 40:9
**literal** 49:22
**literally** 49:20
**litigation** 28:18
  31:11 110:24
**little** 34:18 50:11
  55:9,16 84:24
  99:12 103:1
  105:17
**live** 11:17,21
**living** 55:14 56:6
**LLC** 1:7
**LLP** 1:14 2:3,9
  6:21
**local** 97:8
**locate** 29:9 71:10
**Logan** 2:12
**long** 112:14
**look** 20:14 23:20
  25:11 29:18 44:7
  64:17 71:25 72:19
  73:1 84:14 97:21
**looked** 19:2 66:16
  73:9,13 90:4
  91:16 95:12 109:3
**looking** 19:17 67:8
  71:11 76:8 83:24
**looks** 65:24 84:15
  90:15,15,22 98:25
  103:12 108:1



**lost** 109:12
**lot** 57:12
**loud** 56:11
**love** 68:5
**Loveall** 65:25
  69:23 72:25 73:20
  80:18
**lower** 12:13
**Lutheran** 40:2

**M**

**M** 1:16 7:9 116:6
  116:20
**Magna** 1:21 6:13
  6:15
**mail** 86:3,4
**maintenance** 59:18
**making** 51:14 53:4
  55:23 62:16,19
**manager** 82:19
**Manhattan** 12:13
  47:25
**March** 90:16,21
  94:20,22 95:3,12
  98:5,8,21 103:19
  112:6
**Marino** 36:8 58:2
  58:11,16 59:13
  63:6,24 69:1,25
  70:7 71:5
**Marino's** 58:2 70:9
  71:21
**mark** 106:24
**marked** 5:5,8,9,11
  16:5,10,24 17:21
  23:14 29:6,23
  31:7 34:3 35:13
  41:19,21 43:16
  65:14 89:21 107:2
**marks** 86:20 95:22
**marriage** 116:15
**materials** 70:14
**Matt** 6:13
**matter** 6:4 14:9
  15:9 52:17 53:1
  87:20 97:12

116:16
**matters** 32:15,20
  32:25 99:23
  100:11,17 101:4,9
  101:18
**Matthew** 2:19
**mature** 53:21
**mean** 30:25 74:23
  77:4 88:18 95:22
  96:17 110:13
**means** 42:11 76:11
**meant** 73:3 98:3
  106:11
**medical** 22:20 36:6
  36:16,24 38:1
  45:14,21 46:1,15
  46:18 58:2 63:1
  70:14 72:15 93:5
  102:14
**medically** 55:11
**medication** 11:4
**meet** 30:18
**mentally** 10:25
  11:5
**mention** 34:22
  83:18
**mentioned** 9:6 93:7
  97:19 108:25
  113:8
**middle** 59:1
**Mill** 40:2
**mine** 91:7
**Minor** 37:18
**minute** 55:6
**minutes** 55:7
**mirror** 42:9 107:19
**missing** 57:17
  70:24 109:9
**misunderstood**
  80:16
**moment** 52:24
**Monday** 95:16
**MONMOUTH**
  116:4
**month** 112:20
**monthly** 13:5

**months** 61:7
**morning** 7:14,15
  95:16
**mortgage** 12:2,14
  12:25
**mother** 11:18 12:1
  12:15
**Motor** 22:15 37:14
  37:20 38:2 43:19
  44:2 45:19 105:12
  106:7
**motoring** 99:13
  103:3
**moved** 48:3
**multiple** 69:7
**MVC's** 97:8

**N**

**N** 2:1 3:1 7:7
**Nadler** 2:7 6:20,20
  12:16,20 13:21
  14:5 23:4 24:7
  27:10 28:16,22,25
  29:2 31:24 32:13
  33:1,20 36:19
  38:16,23 40:21
  41:12 43:3,11
  44:3,17 45:7 46:5
  47:18 50:8,18
  51:15 52:8,14
  53:8,15 55:17
  56:9,25 57:6,15
  57:20 61:20 67:21
  76:13 77:8 78:16
  78:21 80:10 88:12
  89:8 95:23 99:24
  100:19 105:20
  106:12 107:7,10
  109:10 111:10
  114:19,23
**name** 4:2 7:16 9:8
  9:10 11:8 39:6
  91:15,18,25
**national** 45:23 66:2
  66:9 80:19,20
  82:3 85:3 88:7

89:3 102:2 104:7
  105:5
**nature** 14:10 32:25
  48:7 57:13 110:4
**nearing** 96:20
**Neck** 40:2
**need** 24:16 45:20
  55:21 56:2 64:1,4
  71:7,9 75:13,20
  77:15 78:6 79:2
  79:22 85:5,10
  86:14 104:11,22
  105:7 107:11
**needed** 18:7 46:3
  46:17 47:7,10,12
  72:15 75:23,25
  89:5
**needs** 49:25 89:19
  97:10
**neither** 114:3
**never** 79:12,14
  86:24
**new** 1:2,15,18 2:6,6
  3:22 6:7 7:11 9:16
  11:11 39:21 46:3
  48:4,4 67:8 73:22
  74:1 81:18 83:24
  92:24 116:2,8
**News** 38:8,21 65:2
**nice** 74:11
**night** 61:12 62:3,11
**ninth** 58:6
**normal** 36:16
**North** 2:11
**Nos** 4:8 107:1
**Notary** 1:17 7:10
  116:7
**note** 62:9
**notes** 58:7 59:12,17
**notice** 1:13 71:20
**November** 1:15
  3:21 4:6 6:9 16:9
**NTTF** 46:23
**NTTS** 80:22,23
  82:2 85:3
**number** 85:11,20

86:10 94:17
**nurse** 37:13 38:1

**O**

**O** 7:7,7
**o'clock** 27:25 28:2
  64:9,11 111:15,17
  115:1
**oath** 8:2 24:20
**objection** 12:16
  13:21 14:5,17
  23:4 24:7 27:10
  31:24 32:13 33:1
  33:20 36:19 38:16
  38:23 40:21 41:12
  43:3,11 44:3,17
  45:7 46:5 47:18
  50:8,18 51:15
  52:8,14 53:8,15
  55:17 56:9,25
  57:6 61:20 67:21
  76:13 77:8 78:16
  78:21 80:10 88:12
  89:8 95:23 99:24
  100:19 105:20
  106:12 109:10
**objections** 57:12
**obtain** 22:19 67:9
  72:4 84:1 105:23
  106:4
**obtained** 32:11
  44:16
**obtaining** 15:19
  42:1 45:14 91:8
**obviously** 53:22,25
  76:15 80:3 92:15
**occasion** 8:12
**occasions** 8:9
**occur** 76:23
**occurred** 22:25
  43:2 61:7 110:4
**office** 57:25 58:3
**Offices** 1:13
**okay** 8:4,8,11 9:1
  10:18 11:3 13:3
  13:12 14:2 15:5



17:13,24 18:8,16
18:23 19:10,22
20:3,9,13,25 21:7
21:12,19 22:7
25:16,22 26:3,6
26:20 27:4,8,14
27:17 28:20 29:13
29:17 30:13 31:2
31:15 32:1,6,23
33:4,9,16,24
34:25 35:22 37:2
37:24 41:16 42:5
42:13,25 44:21
45:2,2,11 46:9,20
47:4,9,14 48:6,18
48:21,25 49:7,24
50:23,23 51:23
52:19 54:5,11,16
55:4,13 56:17,21
57:10,21 58:14,21
58:25 59:15 60:20
60:24 61:16 62:8
62:24 63:11,15,20
64:24 65:11 66:6
66:14 67:15 68:2
68:14 69:3,11,16
69:20 70:3,11,19
71:2 73:7,17,25
74:4,9,19 75:5,10
75:18 76:2,7
77:13,15,19 78:11
79:5 80:23 81:9
81:25 83:11 85:25
86:8,22 87:7,11
87:16,21 88:20,24
89:12,20 90:5,12
90:20 91:2,10,23
92:3,6,14 93:3,9
93:16 94:4,12,19
94:25 95:2,14
97:1,17 99:6,18
100:8,14,23
101:11,16 102:7
102:16,21 103:11
103:15 104:2,24
105:10 106:17

107:7,13,21
108:12,17 109:7
109:23 111:1
112:12,18,25
113:22 114:2,9,16
**older** 50:4
**once** 8:10 53:20
71:12 91:15 113:7
**ones** 35:14
**online** 66:16 74:15
91:16
**options** 111:4
**order** 31:6 40:4
65:21 68:7 71:6
72:4 75:23 76:22
82:16 90:14 91:4
93:25
**original** 23:19 63:6
**outcome** 116:16
**outlet** 55:3
**outright** 48:17
**owned** 11:23,24
49:1
**owns** 11:25

**P**

**P** 2:1,1 7:7
**p.m** 59:13 95:4
111:16,17 115:2
**paces** 68:9
**package** 65:22
104:9
**page** 3:3 4:2 5:4,7
5:10 17:10,11,14
17:18,20 18:10,12
18:13,19 25:12,13
25:13 35:19 36:4
39:3,18 58:5,6
59:1,9,9 63:6,8
65:22,23 72:21
84:14 107:24,24
**pages** 18:20 59:8
63:6 80:24
**paid** 62:5
**pain** 61:2,6
**Papp** 37:25 45:13

**paralegal** 20:18
**parens** 84:17
**part** 17:25 26:10
31:14 54:8 62:25
68:8 70:17 79:4
81:21 94:7 107:22
108:25
**partially** 68:11
**participate** 39:19
102:19
**participates** 54:23
**participating** 39:15
**particular** 21:11
52:23 54:14 66:19
66:22
**parties** 6:17 116:14
**parts** 88:22
**party** 54:25
**pass** 68:6
**passed** 9:7
**passes** 73:19
**Patient** 59:17 60:25
**pay** 12:15,25 13:2,5
13:7 76:11 77:7
**pays** 13:1
**Peak** 40:13,16 41:1
**Pennsylvania** 2:13
**people** 35:25 40:11
41:10 54:18 55:25
67:19 95:8
**perform** 72:7
**performed** 36:7
71:5 72:8
**periods** 61:12 62:3
62:11
**permit** 39:21 42:2,3
42:8 51:1 67:8
83:24 92:24 97:20
98:2,9 105:23
106:4
**permitted** 81:18
**person** 37:12 81:18
113:5
**personally** 15:6
17:2 18:25 22:13
40:15 42:21 43:25

44:15 45:17 46:25
51:3 65:9 85:10
102:1 110:10
**personnel** 99:14
103:4
**perspective** 55:14
84:6
**pertaining** 19:18
**Peter** 37:9
**Philadelphia** 2:13
**phone** 67:3 74:16
83:14,17 85:24
86:10 92:16 93:7
94:17
**photocopy** 41:22
**photograph** 64:22
65:6
**physical** 68:7,8,20
68:25 71:5,8,12
71:14 72:3,7,8
73:22 74:1,13,21
78:6
**physician** 45:21
71:6 72:6,10
**pick** 16:17 66:15
86:3
**picture** 93:15
**piece** 65:2
**pieces** 24:25
**pile** 15:23 16:16
23:9 31:5 34:1
35:15
**piles** 15:22
**PLA** 21:4,4 23:21
23:22 25:12 26:23
29:6,23,23 45:12
65:23 71:25 72:21
72:22 75:2 81:1,1
84:14 90:15 102:8
112:4,7
**place** 9:15 84:11
**places** 40:9
**plaintiff** 1:5 2:4
6:22 17:16,22
**please** 7:6 10:3,21
11:9,12 16:18

47:16 57:23 67:11
69:12 77:21 84:2
86:5 93:23 95:1
96:12,14 100:2
101:7
**point** 10:19 13:23
14:18 17:4 24:14
24:24 30:19 45:25
51:13 63:12 66:20
69:17 78:13 80:20
91:3 96:20 102:13
**policy** 37:19
**portion** 103:24
**position** 48:8 92:4
**possession** 28:12
78:5
**possibility** 78:15
**post** 48:2
**potential** 66:1
110:6
**potentially** 67:24
93:2
**premarked** 16:3
**prepare** 30:14,22
77:25
**prescriptions** 50:10
**presence** 16:19
**present** 2:17 6:18
43:1 61:18,23
**presented** 83:10
108:16,24 109:5
**president** 68:4
**pretty** 31:6 63:4
83:18
**prevent** 67:23
**previously** 14:9
34:4 100:9
**price** 76:18
**primarily** 58:5
**Princeton** 1:14
3:22
**prior** 14:4 17:4
32:1
**privileged** 14:9,13
**probably** 34:13
**problem** 47:2,6



56:24 61:11 71:21
75:6 106:6
**proceed** 9:21
**process** 8:5 9:18
79:20 80:7
**process'** 80:2
**produce** 26:14
29:15
**produced** 20:22
22:9 26:18 30:11
69:22 70:17,18,25
81:1 82:11,17,18
89:24 90:8 103:18
107:16,20 108:15
109:9
**production** 5:6
48:2 111:24
**professed** 15:14,19
23:1,24 28:13
**programs** 38:1
51:5
**progress** 59:12,16
**proper** 73:10
**properly** 7:21
**protect** 99:13 103:3
**proved** 109:18
**provide** 19:5,13,18
19:19 20:6 47:16
75:15,21 76:9
**provided** 18:7 19:8
19:25 21:24 24:9
33:18 34:14 35:24
76:1 102:13
**provides** 54:13
**providing** 31:22
**provision** 44:23
106:9
**provisions** 45:6
**public** 1:18 7:10
99:13 103:3 116:7
**publish** 106:8
**pull** 23:9 111:21
**purported** 70:6
**purpose** 56:5
**purposes** 76:5 85:8
88:14,17

**pursuant** 1:13
**pursue** 81:23
**pursued** 47:8
**put** 15:22 16:2 23:8
23:13 31:3 33:25
34:3 35:14 41:17
41:20 43:15 47:15
65:13 71:19 79:2
91:19

_____

**Q**

**qualifications**
71:11
**qualified** 99:16
103:5 108:6
**question** 10:2,6,12
10:15 14:16 15:16
20:5 29:7 57:14
62:18 86:20 100:1
104:18 110:15,16
**questions** 9:23
10:11 35:21 63:21
75:7 78:12 108:13
114:18
**quickly** 108:24
**quote** 71:4 75:13
**quotes** 53:1 88:16
88:17

_____

**R**

**R** 2:1 7:7 116:1
**range** 76:25
**read** 18:22 41:5
44:11 100:2,4
103:10 108:3,4
**ready** 74:14
**really** 30:16 58:4
62:5 78:24 94:2
**reason** 10:24 70:16
105:19
**reasonably** 97:22
**reasons** 114:5
**recall** 13:8,14 15:1
15:2,21 19:14,16
19:17,21 22:12
23:6 26:9 31:21

33:2,8 36:13
37:21,22,23 43:5
43:7,8,9 45:1 49:5
50:24 52:4,12,23
52:24 55:10 58:18
58:20 60:18,21
62:16,19,25 63:3
63:12 66:23 69:2
70:25 73:8,16
80:14 83:7 91:18
92:7,20 93:11,21
94:2 95:7 101:23
101:24,25 109:1
110:4 112:17,19
113:4,18
**receive** 17:2 97:12
**received** 20:17
40:25 44:11 65:25
84:15 99:8,11
103:1 105:17
**recess** 28:1 64:10
111:16
**recognize** 65:9
72:14
**recollect** 113:12,15
**recollection** 60:17
61:18 70:5 82:2
91:22 93:12,24
94:8 97:25 109:4
112:24 113:7,9
**record** 6:2 11:9
14:7,15 24:3,21
26:13 27:22,24
28:5,8 42:16 64:8
64:13,16 89:1
90:9 100:4 102:12
108:4 109:25
111:12,14,19
112:3 113:23
114:25 116:11
**records** 58:2
**rectal** 61:1
**red** 48:15
**refer** 7:22 63:8
**reference** 35:3
**referenced** 39:13

**referred** 7:2,21
22:2 28:15 92:21
98:1 102:23
**referring** 16:13
25:17 68:24,25
98:7
**refers** 32:8 69:25
**reflect** 22:25
**reflected** 42:23
65:7
**refresh** 60:16 61:18
70:4 97:25 109:4
**reg** 106:8,8
**regarding** 14:8
97:9
**regardless** 114:5
**regards** 8:14 13:25
22:3 71:15 87:4
**registered** 47:13
**registry** 45:23 46:3
72:9 73:11 74:6
**regular** 36:16,24
**regulations** 72:6
**relate** 21:25 90:1
**related** 22:9,24
28:13 32:15,19,25
42:9 90:17 101:8
107:18 108:13
116:13
**relates** 43:18 44:24
45:13
**relating** 29:24 36:1
**relation** 20:19 65:2
**relay** 73:4 81:20
**relayed** 56:3
**rely** 75:14,21
**remember** 38:9
58:23,24 60:23
61:22 62:22,23
63:4,23 94:5
108:20 112:14
113:17,21 114:8
**remind** 14:6
**render** 99:16 103:6
**renew** 98:9
**rent** 12:15,25 13:2

13:5,7
**rented** 11:23
**repeat** 15:16 33:15
100:1
**rephrase** 33:16
**report** 42:18
**reporter** 1:17 6:14
7:6 10:10 116:7
**represent** 6:19 7:20
15:8 23:18 30:5
34:7 44:8 57:24
64:25 75:22 76:21
82:10 89:23 95:11
107:14
**representations**
90:9
**represented** 13:9
26:22 87:18
**representing** 6:25
100:17
**represents** 24:4,22
26:24 28:11
107:15
**request** 5:6 6:12
17:16 18:1,2,18
23:20 24:10 27:1
36:15
**requested** 99:17
103:6
**requesting** 89:1
**requests** 17:22
18:20,21 19:1,7
19:19 21:2,3,14
88:8
**require** 84:23
**requirement** 72:5
**requires** 68:8
**requiring** 84:17
**research** 51:4,7
**resend** 69:5
**respect** 22:19 29:9
30:7 79:11 82:11
87:23 88:6 111:24
**respond** 67:1 68:18
69:4 72:18,25
75:11 77:20 78:19



83:12
**responded** 72:1
97:18
**responds** 68:15
74:11 79:18 86:24
**response** 20:17
21:8 25:8,9,24
26:22 29:20 35:23
68:3 77:14 78:5
83:3 84:15,21
97:19,22 98:20
103:20 108:9
**responses** 24:19
**responsive** 27:1
69:18 78:14
**restriction** 42:8,11
**result** 16:20 79:3
113:5
**results** 71:9
**retained** 100:10
**retaining** 15:7
**reverse** 65:20 82:15
90:14
**review** 17:6 18:19
21:8 24:19 30:21
58:9,10 69:13
71:13 87:15 100:6
100:21,25
**reviewed** 31:17
35:6 108:18,23
**right** 7:19 12:19,22
14:14 16:2,23
23:13,15 24:13,17
25:3,16 31:1,5
35:2 41:11 46:15
46:16 49:10,21
53:22,23,24 54:24
56:1,19,24 62:12
62:15,20 63:19
64:6 68:16 69:8
71:2 72:16,20
73:3,17,23 74:7
75:8 76:4,12
77:17 78:15 81:13
81:24 82:7 83:9
83:20 85:7,20

86:10 87:5,18
94:20 95:10 97:5
99:23 100:11,12
100:14,18 104:16
104:19 105:24
109:25 112:10
113:13 114:6,19
**right-hand** 16:16
58:9
**Rockaway** 11:11
**Rome** 1:14 2:9 6:12
6:24 7:18 58:1
**routine** 59:17 60:4
**rules** 9:20
**run** 94:8

---

**S**

**S** 2:1 4:1 7:7
**safe** 105:13
**safely** 97:9 99:13
103:2
**safety** 22:15 37:14
37:20 43:20 44:2
45:20 94:9 95:9
105:12
**saw** 34:21 35:4
51:18
**saying** 25:19 33:13
55:10,19 58:22
62:10,21 66:1
67:1 68:19 69:4
69:24 72:19 73:1
73:20 74:11 75:12
77:10,21 83:12
86:24 87:9 95:17
96:7 97:18 100:15
100:16 101:2
102:24 103:19
109:18
**says** 21:1 58:9
59:17,23 60:7
61:11 62:10 63:7
68:4,21 69:12
71:3 74:20 77:15
82:23 85:9 97:7
99:10 104:22

108:4
**schedule** 30:17
83:15
**scheduled** 113:2,13
113:16,19
**school** 1:7 6:5 7:1,3
7:22 22:11 23:3
27:6 29:5,10 34:9
34:23 40:2 46:12
46:22,23 55:8
66:3,9,11,19,22
67:9,11 68:5 72:5
75:15,21 76:9
78:6 79:10 80:19
80:21 82:3,12,20
82:24 83:16,18,25
84:3,16 85:4,9,23
86:14 87:3,24
88:3,7 89:4 91:7
91:16 92:22,23
93:1 96:10 104:7
105:6 107:17
110:21
**schools** 15:10 19:19
51:5,8 52:3 89:3
89:16 96:13
105:13 106:2
**search** 18:25 19:12
19:24 26:25 78:8
86:16 87:3
**second** 61:6 84:10
84:11 92:11 95:1
**seconds** 61:13 62:4
62:12
**see** 17:15,17,20
18:10 20:24 21:1
21:2,5 24:1 25:14
25:24 26:4 30:2
35:1 39:8 40:12
45:15 58:12 59:1
59:3,21 60:1,5,9
60:14 61:3,8,14
62:9,13,14 63:5,9
66:4 67:4,13
68:12,22 69:9,13
70:1,15 71:13,16

72:11,21 73:18
74:17,25 75:1,4
75:16 77:16,18
78:3,9,15 79:22
79:24 81:4,14
82:21 83:1 84:19
85:12,18 86:6
90:25 94:10,10
95:5,20 96:15
97:15,23 98:14,23
99:4 103:9 104:8
107:24 108:9
109:21
**seeing** 25:8,9
**seek** 96:13
**seeking** 78:2 81:20
92:23 97:7 110:7
110:18,19,20,24
**seen** 31:12 34:11
44:9 78:25
**sees** 74:20
**send** 26:7 71:8 87:9
91:4 95:16 99:22
100:16 103:22
**sends** 108:2
**sent** 21:9 26:13,21
30:24 70:5,8
86:19 94:14,22
97:2 99:1,19,21
100:5 103:24
104:1 108:21
112:5
**sentences** 54:8
**series** 23:21
**served** 16:21 18:2
20:20
**service** 8:24 48:9
77:23 81:12,21
**services** 1:21 6:14
6:16 99:16 103:6
**servicing** 78:7
**set** 26:23 70:13
74:16 79:22 92:10
108:19 116:10,17
**Seth** 2:7 6:20 57:11
**setting** 38:14 96:8

**seven** 37:9
**Shepherd-Kegl**
39:7
**short** 64:2,4 111:8
**shorthand** 7:23
**shortly** 84:7 96:24
**show** 73:4 106:23
**showed** 114:4
**shown** 65:1
**side** 12:13 31:4
48:2
**sign** 54:3,22 55:1
74:24 75:13,20
76:24 84:17,23
85:6 88:10 89:6
89:18 105:7
**signed** 74:14
**similar** 85:2
**simply** 51:17 81:16
**single** 11:15
**sir** 17:15
**sitting** 7:19 40:19
41:8 45:4 89:13
**situation** 43:10
75:8 81:15
**six-week** 77:5
**sleep** 59:5 61:11
63:2,7,8,13
**Smith** 6:6 7:3 22:2
22:3 24:22 28:14
32:10 52:21 79:14
84:8 90:1,23 91:4
96:11 99:15 103:4
103:7 105:17
106:20 108:5
110:5 111:25
112:15
**snapshot** 65:1
**snores** 61:12 62:2,5
62:6,10
**solely** 13:25 22:3
**Solomon** 6:6 7:3
22:2,4 24:23
28:14 32:10 52:21
79:14 84:8 90:23
91:4 96:11 99:15



103:5,7 105:17
106:21 108:5
110:5 111:25
112:16
**somebody** 8:19
46:2 54:22 73:10
**sorry** 15:16 52:10
99:20
**sort** 49:6 53:20
54:10,18 96:1
104:17 107:19
**sought** 33:6
**sounds** 56:1,7,11
56:18
**speak** 13:13 54:18
55:2 67:2,18
83:14 85:10,22
**speaking** 54:25
66:21 113:5
**speaks** 105:24
**special** 54:13
**specific** 18:18
33:11 34:23 44:15
44:23 97:10
104:10,17 106:9
**specifically** 51:7
104:22
**spell** 12:9 54:8
**spoke** 14:24 91:17
92:1
**spoken** 13:19 53:13
**Square** 2:5,12
**SS** 116:3
**stamp** 4:7 107:1
**stamped** 21:4
**start** 16:15 51:14
51:20 65:22 79:23
93:22
**started** 50:20,25
53:4 92:13
**state** 1:18 6:18 7:10
11:8,12 39:21
67:8 83:24 92:24
99:11 102:25
105:23 108:7
116:2,8

**stated** 32:8
**statement** 55:15
62:1,17,19,22
75:19,22 85:2,3
**States** 1:1 6:6
**stating** 25:7
**step** 44:9 74:14,14
**stops** 61:13 62:3,11
**Street** 2:11 11:11
**streets** 65:7
**student** 66:1 78:7
86:15 87:1 93:2
96:12 99:14 103:3
**students** 68:6,9
78:2 86:25 105:14
**stuff** 50:12
**subject** 18:18 90:24
**submitted** 29:20
**subpoena** 4:5 16:5
16:20,23 17:3,6,7
18:1,11,18 20:19
24:20 26:14,22
30:25 34:16,18,20
58:1
**subsequently** 108:4
**substantive** 35:20
57:18
**subtle** 56:18
**sue** 80:8
**suggest** 106:1
**suggesting** 103:22
**suggestion** 87:2
**Sunday** 97:3
**supplemental**
29:20
**support** 5:1 12:24
**supported** 51:1
**supporting** 54:1
**supposedly** 9:2
**sure** 7:25 10:4,13
19:23 21:21 24:16
55:23 57:12,17
76:16 83:16 85:14
103:23 111:10
112:23
**swear** 7:6

**switch** 64:2,4
**sworn** 7:9 116:10
**system** 67:17

---

**T**

**T** 4:1 116:1,1
**tack** 76:17
**take** 55:20 64:2,3
77:24 80:2 83:17
109:16 111:8
**taken** 1:12 6:11
28:1 64:10 65:6
111:16
**takes** 73:5
**talk** 95:8
**talked** 71:18
**talking** 55:25
**tape** 64:5
**tapes** 64:2
**taught** 51:8
**tea** 56:22
**teaching** 40:4 87:1
**Technical** 40:13,17
41:1
**telephone** 83:5
85:11
**tell** 10:3,22 31:20
45:4 47:10 52:25
66:17,20 92:15
93:20,23 110:15
**term** 77:21
**terms** 10:21 44:15
56:6 78:24 79:4
88:25 90:7
**test** 44:25 68:8
**testified** 7:11 40:1
43:24 73:14
**testify** 14:10
**testifying** 77:6
**testimony** 9:14
11:1,6 13:18
21:23 22:8 25:23
53:12 71:20 101:6
103:17 104:25
105:3 116:12
**Text** 5:9

**Thank** 23:12 25:16
28:20 29:2,17
30:13 31:4 34:2
47:14 66:1 74:12
75:12 82:23 97:19
103:6 114:20,22
114:23
**Thanks** 35:15
57:21
**there,'** 78:4
**thing** 35:5 105:4
**things** 14:21 21:21
56:22,23 70:20
**think** 10:9 22:23
27:15 34:15 41:24
54:1,20 55:19
58:6 64:18 65:20
66:10 68:10 73:15
86:2 92:11 104:13
107:25
**third** 54:25 61:10
65:23
**thought** 21:14
87:13 103:24
109:5
**three** 50:21 59:5
61:1,7
**Thursday** 6:9
95:15
**thyroid** 59:25
**time** 6:10 13:23
17:4 20:11 27:23
28:3 31:16 49:13
49:13,15,20 60:22
62:2 64:7,12 69:1
70:21 73:16,19
77:24 83:17 84:7
84:7 85:11 96:14
96:17,23 97:20
98:1,16 99:16
102:17 103:5
108:6 111:13,18
114:18,24
**timed** 97:22
**times** 75:14,20 76:4
85:7 88:11 105:8

**today** 6:8 8:2 11:1
11:6 13:9 16:20
17:4 26:15 31:13
34:12 40:19 41:8
45:4 60:3 89:13
108:20
**today's** 30:15,22
**told** 47:5,7 51:20
55:8
**tone** 78:19
**top** 59:12
**Tractor** 104:7
**tractor-trailer** 7:4
29:25 30:7,10
65:17 66:3,9,11
80:9,19,21 81:3
81:11 82:3 85:4
87:2 88:7 89:4
105:5 110:21
**tractor-trailers**
67:10 84:2 111:4
**traffic** 42:22
**train** 51:6 67:9
81:18 83:25 99:13
103:2 109:19
**trained** 50:11 55:11
**training** 1:7 6:5 7:1
7:22 23:25 28:14
30:1,7,11 40:10
40:13,16,20 41:1
41:2 50:16 51:4
52:3 65:17 66:11
81:3,11 85:6
89:16 96:11 102:5
104:7 105:6,8,14
106:2 107:17
110:7
**transcript** 4:11
**transmission** 49:9
**treated** 110:19
**truck** 72:2
**true** 62:1 116:11
**truly** 97:14 103:8
**try** 75:7
**trying** 14:3,20,23
19:23 24:15 33:17



81:14 101:2
103:16 109:2
110:11
**Tuesday** 9:7 15:25
73:13 76:23 95:13
98:21
**TV** 54:15
**two** 12:24 15:22
16:2 23:8 31:3
40:9 59:8 61:5
63:6 80:24 89:3
93:25 95:21 107:8
107:10
**two-year** 47:20
85:16 96:23 98:17
102:10
**type** 8:16 48:12
84:18 111:3

**U**

**Uh-hum** 60:2,6,10
**ultimately** 106:8
**unaware** 105:15
**understand** 8:1
10:2 14:3 21:21
26:17 27:2 33:17
56:3 74:23 75:7
101:1,3,6 103:17
103:23 109:3
110:14,16
**understanding**
28:9 50:6 80:6
**understood** 9:25
10:1,6,7,8,16,17
18:6 20:4 53:21
55:23
**unfortunately**
84:24
**Union** 2:5
**United** 1:1 6:6
**unrelated** 36:15
**upside** 34:1 35:15
**use** 54:6,7 55:9,16
84:24
**utility** 48:5

**V**

**valid** 46:15,18
**various** 48:2
**vehicle** 49:1 64:23
**versus** 6:4 101:21
**video** 48:1 54:18
55:3 65:1 67:17
**videographer** 2:19
6:1,13 7:5 27:23
28:3 64:1,7,12
111:13,18 114:24
**VIDEOTAPE** 1:12
**viewing** 92:25
**violation** 42:22
**visit** 37:4 58:15,19
**visits** 36:17 37:8
63:24
**voice** 86:3,4
**voiced** 27:18
**voicing** 25:25 27:6
**volumes** 105:24

**W**

**wait** 10:12
**waiting** 86:13
95:17 96:8
**waived** 106:9
**waiver** 22:16 44:16
44:23 45:5 47:12
85:16 90:17,24
94:15 96:19,21,23
98:2,4,10,17
102:10
**waives** 45:6
**want** 14:17 21:20
26:12 30:4 31:16
31:20,21 41:24
49:22 57:17 74:24
80:4 83:15
**wanted** 67:23
100:25
**wasn't** 27:12 34:19
51:10 104:12
105:1
**way** 13:15 21:25
22:25 27:19 37:12

37:17 38:12 39:20
40:3 43:10 54:10
61:17 87:25 98:18
103:18 110:6,18
116:15
**we'll** 46:24 106:24
**we're** 27:24 28:7
64:8,15 74:25
81:13 92:25
111:14
**we've** 86:24
**weather** 114:14,14
**Wednesday** 95:15
**week** 77:6
**weeks** 61:5 90:21
**went** 52:6,13 59:18
82:4 92:22 104:13
**weren't** 96:22
**Wessendorf** 24:10
25:6,15 36:3
90:23 91:20 92:12
93:14,18 97:4
99:9 102:9,14,24
104:5 105:16
108:2 112:5,10
113:10
**Wessendorf's**
91:13 103:20
**whats'** 82:17
**whatsoever** 36:12
**WHEREOF**
116:17
**whisper** 44:25 68:9
**willing** 78:14
**withdraw** 79:17
**withdrawn** 93:21
99:20
**witness** 3:3 5:3 7:6
7:8 8:15,22 9:14
12:18 14:6 64:6
114:22 116:9,12
116:17
**woman** 91:17,25
113:6
**work** 8:20,24 12:5
12:7 47:17 49:16

49:17,18 60:4
78:14,24 91:24
**worked** 48:1
**working** 97:3,4
**writes** 72:1
**www.MagnaLS.c...**
1:22

**X**

**x** 1:3,9 3:1 4:1

**Y**

**years** 48:1,3 50:21
**York** 2:6,6 9:16
11:11 39:22 48:4
48:4 67:8 81:18
83:24 92:24
**younger** 50:4,5
53:19
**Yu** 37:4 74:2

**Z**

**0**

**08540** 1:15
**09:11** 1:1,2,2,3,3,4
1:5,6,7,8,9,9,10
1:11,12,13,14,15
1:16,17,18,19,20
1:21,21,22,22 2:1
2:2,3,4,5,6,7,8,9
2:10,11,12,13,14
2:15,16,17,18,19
3:1,2,3,4,5,6,7,8,9
3:10,11,12,13,14
3:15,16,17,18,19
3:20,21,22,23,24
3:25 4:1,2,2,3,4,5
4:5,6,6,7,7,8,8,9
4:10,11,12 5:1,2,3
5:4,5,6,7,8,8,9,10
5:11,12,13,14,15
5:16,17,18,19,20
5:21,22,23
**09:12** 5:24
**09:29** 5:25

**1**

**1** 6:2 16:1 17:9,18
17:20,21 18:21
21:2,4 23:21
25:12 26:23 31:8
33:25 34:1 35:24
**1:02** 114:25 115:1
**1:49** 98:21
**10** 18:21 23:10,14
29:19,22 37:18
39:19 84:14
107:24,24
**10:00** 113:19
**10:05** 1:16 6:1,2,3,4
6:5,6,7,8,9,10,10
6:11
**10:06** 6:12,13,14,15
6:16,17,18,19,20
6:21,22,23,24,25
7:1,2,3,4,5,6,7,8,9
7:10,11,12,13
**10:07** 7:14,15,16,17
7:18,19,20,21,22
7:23,24,25 8:1,2,3
8:4,5,6,7,8,9,10
8:11,12,13,14
**10:08** 8:15,16,17,18
8:19,20,21,22,23
8:24,25 9:1,2,3,4
9:5
**10:09** 9:6,7,8,9,10
9:11,12,13,14,15
9:16,17,18,19,20
**10:10** 9:21,22,23,24
9:25 10:1,2,3,4,5
10:6,7,8,9,10,11
10:12,13,14,15,16
10:17,18,19,20,21
10:22,23
**10:11** 10:24,25 11:1
11:2,3,4,5,6,7,8,9
11:10,11,12,13,14
11:15,16,17
**10:12** 11:18,19,20
11:21,22,23,24,25



12:1,2,3,4,5,6,7,8 12:9,10,11,12,13
**10:13** 12:14,15,16 12:17,18,19,20,21 12:22,23,24,25 13:1,2,3,4,5,6,7,8 13:9
**10:14** 13:10,11,12 13:13,14,15,16,17 13:18,19,20,21,22 13:23,24,25 14:1 14:2
**10:15** 14:3,4,5,6,7,8 14:9,10,11,12,13 14:14,15,16,17,18 14:19,20,21,22,23 14:24,25 15:1,2
**10:16** 15:3,4,5,6,7,8 15:9,10,11,12,13 15:14,15,16
**10:17** 15:17,18,19 15:20,21,22,23,24 15:25 16:1,2
**10:18** 16:3,4,5,6,7,8 16:9,10,11,12,13 16:14,15,16,17,18 16:19,20,21,22,23 16:24,25
**10:19** 17:1,2,3,4,5,6 17:7,8,9,10
**10:20** 17:11,12,13 17:14,15,16,17,18 17:19,20,21,22,23 17:24,25 18:1,2,3
**10:21** 18:4,5,6,7,8,9 18:10,11,12,13,14 18:15,16,17,18,19
**10:22** 18:20,21,22 18:23,24,25 19:1 19:2,3,4,5,6,7,8,9
**10:23** 19:10,11,12 19:13,14,15,16,17 19:18,19,20,21,22 19:23,24,25 20:1 20:2,3,4,5,6,7,8,9
**10:24** 20:10,11,12 20:13,14,15,16,17 20:18,19,20,21,22
**10:25** 20:23,24,25 21:1,2,3,4,5,6,7,8 21:9,10,11,12,13 21:14,15,16,17,18 21:19
**10:26** 21:20,21,22 21:23,24,25 22:1 22:2,3,4,5,6,7,8,9 22:10,11,12
**10:27** 22:13,14,15 22:16,17,18,19,20 22:21,22,23,24,25 23:1
**10:28** 23:2,3,4,5,6,7 23:8,9,10
**10:29** 23:11,12,13 23:14,15,16,17,18 23:19,20,21,22,23
**10:30** 23:24,25 24:1 24:2,3,4,5,6,7,8,9 24:10,11,12,13,14 24:15,16,17 113:20
**10:31** 24:18,19,20 24:21,22,23,24
**10:32** 24:25 25:1,2 25:3,4,5,6,7,8
**10:33** 25:9,10,11,12 25:13,14,15,16,17 25:18,19,20,21,22 25:23,24,25 26:1 26:2,3,4,5,6,7
**10:34** 26:8,9,10,11 26:12,13,14,15,16 26:17,18,19,20,21 26:22,23,24,25
**10:35** 27:1,2,3,4,5,6 27:7,8,9,10,11,12 27:13,14,15,16,17 27:18,19,20,21,22 27:23,24,24,25,25 28:1,2
**10:47** 28:1
**10:48** 28:3,4,4,5,6,7 28:8,9,10,11,12 28:13,14,15,16,17 28:18,19,20,21
**10:49** 28:22,23,24 28:25 29:1,2,3,4,5 29:6,7,8,9,10,11 29:12,13,14,15,16 29:17
**10:50** 29:18,19,20 29:21,22,23,24,25 30:1,2,3,4,5,6,7
**10:51** 30:8,9,10,11 30:12,13,14,15,16 30:17,18,19,20,21 30:22,23,24
**10:52** 30:25 31:1,2 31:3,4,5,6,7,8,9 31:10,11,12
**10:53** 31:13,14,15 31:16,17,18,19,20 31:21,22,23
**10:54** 31:24,25 32:1 32:2,3,4,5,6,7,8,9 32:10,11,12,13,14 32:15,16
**10:55** 32:17,18,19 32:20,21,22,23,24 32:25 33:1,2,3,4,5 33:6,7,8,9,10,11
**10:56** 33:12,13,14 33:15,16,17,18,19 33:20,21,22,23,24 33:25 34:1,2,3,4,5 34:6
**10:57** 34:7,8,9,10 34:11,12,13,14,15 34:16,17,18,19,20 34:21
**10:58** 34:22,23,24 34:25 35:1,2,3,4,5 35:6,7,8,9,10,11 35:12,13
**10:59** 35:14,15,16 35:17,18,19,20,21 35:22,23,24,25 36:1,2,3
**100** 81:1
**10003** 2:6
**102** 75:2
**103** 75:3
**104** 71:25 72:21,22
**107** 4:7
**11** 18:19,20 39:25 41:19,22 66:24,25
**11:00** 36:4,5,6,7,8,9 36:10,11,12,13,14 36:15,16,17,18,19 36:20,21,22,23,24 36:25 37:1,2,3
**11:01** 37:4,5,6,7,8,9 37:10,11,12,13,14 37:15,16,17,18,19 37:20
**11:02** 37:21,22,23 37:24,25 38:1,2,3 38:4,5,6,7,8,9,10 38:11,12,13,14,15 38:16,17
**11:03** 38:18,19,20 38:21,22,23,24,25 39:1,2,3,4,5,6,7,8 39:9,10,11,12
**11:04** 39:13,14,15 39:16,17,18,19,20 39:21,22,23,24,25 40:1,2
**11:05** 40:3,4,5,6,7,8 40:9,10,11,12,13 40:14,15,16,17
**11:06** 40:18,19,20 40:21,22,23,24,25 41:1,2,3,4,5,6,7,8 41:9,10,11,12,13 41:14,15,16,17,18
**11:07** 41:19,20,21 41:22,23
**11:08** 41:24,25 42:1 42:2,3,4,5,6,7,8,9 42:10,11,12,13,14 42:15,16,17,18,19
**11:09** 42:20,21,22 42:23,24,25 43:1 43:2,3,4,5,6,7,8,9 43:10,11,12,13,14 43:15,16,17
**11:10** 43:18,19,20 43:21,22,23,24,25 44:1,2,3,4,5,6,7,8 44:9,10,11,12,13 44:14
**11:11** 44:15,16,17 44:18,19,20,21,22 44:23,24,25 45:1 45:2,3,4,5,6,7,8,9 45:10,11,12
**11:12** 45:13,14,15 45:16,17,18,19,20 45:21,22,23,24,25 46:1
**11:13** 46:2,3,4,5,6,7 46:8,9,10,11,12 46:13,14,15,16,17 46:18,19,20,21,22 46:23,24,25 47:1
**11:14** 47:2,3,4,5,6,7 47:8,9,10,11,12 47:13,14,15,16,17 47:18
**11:15** 47:19,20,21 47:22,23,24,25 48:1,2,3,4,5,6,7,8 48:9,10,11
**11:16** 48:12,13,14 48:15,16,17,18,19 48:20,21,22,23,24 48:25 49:1,2,3,4,5 49:6,7,8,9,10,11
**11:17** 49:12,13,14 49:15,16,17,18,19 49:20,21,22,23,24 49:25 50:1,2,3,4,5
**11:18** 50:6,7,8,9,10 50:11,12,13,14,15
**11:19** 50:16,17,18 50:19,20,21,22,23 50:24,25 51:1,2,3 51:4,5
**11:20** 51:6,7,8,9,10

51:11,12,13,14,15
51:16,17,18,19,20
51:21,22,23,24
**11:21** 51:25 52:1,2
52:3,4,5,6,7,8,9
52:10,11,12,13,14
52:15,16,17,18,19
52:20,21,22,23,24
**11:22** 52:25 53:1,2
53:3,4,5,6,7,8,9
53:10,11,12,13,14
53:15,16,17,18,19
**11:23** 53:20,21,22
53:23,24,25 54:1
54:2,3,4,5,6,7,8,9
54:10,11,12,13,14
**11:24** 54:15,16,17
54:18,19,20,21,22
54:23,24,25 55:1
55:2,3,4,5,6,7,8
**11:25** 55:9,10,11,12
55:13,14,15,16,17
55:18,19,20,21,22
55:23,24,25 56:1
56:2,3,4,5
**11:26** 56:6,7,8,9,10
56:11,12,13,14,15
56:16,17,18,19,20
**11:27** 56:21,22,23
56:24,25 57:1,2,3
57:4,5,6,7,8,9,10
57:11,12,13,14,15
57:16,17,18,19,20
57:21,22,23
**11:28** 57:24,25 58:1
58:2,3,4,5,6
**11:29** 58:7,8,9,10
58:11,12,13,14,15
58:16,17,18,19,20
58:21,22
**11:30** 58:23,24,25
59:1,2,3,4,5,6,7,8
59:9,10,11,12,13
59:14,15
**11:31** 59:16,17,18
59:19,20,21,22,23

59:24,25 60:1,2,3
60:4,5,6,7,8,9,10
60:11,12,13,14,15
60:16,17,18,19,20
60:21
**11:32** 60:22,23,24
60:25 61:1,2,3,4,5
61:6,7,8,9,10,11
61:12,13,14,15,16
61:17,18,19,20,21
61:22,23,24,25
62:1,2,3
**11:33** 62:4,5,6,7,8,9
62:10,11,12,13,14
62:15,16,17,18,19
62:20,21,22,23,24
62:25 63:1,2
**11:34** 63:3,4,5,6,7,8
63:9,10,11,12,13
63:14,15,16,17,18
63:19,20,21,22
**11:35** 63:23,24,25
64:1,2,3,4,5,6,7,8
64:8,9,9,10,11
**11:48** 64:10,12
**11:49** 64:13,13,14
64:15,16,17,18,19
64:20,21,22,23,24
64:25
**11:50** 65:1,2,3,4,5,6
65:7,8,9,10,11,12
65:13,14,15,16,17
**11:51** 65:18,19,20
65:21,22,23,24,25
66:1
**11:52** 66:2,3,4,5,6,7
66:8,9,10,11,12
66:13,14,15,16,17
66:18,19,20,21,22
66:23
**11:53** 66:24,25 67:1
67:2,3,4,5,6,7,8,9
67:10,11,12,13,14
67:15,16,17
**11:54** 67:18,19,20
67:21,22,23,24,25

68:1,2,3,4,5,6
**11:55** 68:7,8,9,10
68:11,12,13,14,15
68:16,17,18,19,20
68:21,22,23,24,25
69:1,2,3,4,5
**11:56** 69:6,7,8,9,10
69:11,12,13,14,15
69:16,17,18,19,20
69:21,22,23,24,25
70:1
**11:57** 70:2,3,4,5,6,7
70:8,9,10,11,12
70:13,14,15,16,17
70:18,19,20,21,22
70:23,24,25
**11:58** 71:1,2,3,4,5,6
71:7,8,9,10,11,12
71:13,14,15,16,17
71:18,19,20
**11:59** 71:21,22,23
71:24,25 72:1,2,3
72:4,5,6,7,8,9,10
72:11,12,13,14,15
**110** 65:23
**112** 29:23
**11963** 11:11
**11th** 2:12 66:24
68:15
**12** 18:20 29:7 42:15
42:17 66:25
**12/12** 58:11
**12/12/2012** 59:13
**12:00** 72:16,17,18
72:19,20,21,22,23
72:24,25 73:1,2,3
73:4,5,6,7,8,9
**12:01** 73:10,11,12
73:13,14,15,16,17
73:18,19,20,21,22
73:23,24,25 74:1
74:2,3,4,5,6,7,8,9
**12:02** 74:10,11,12
74:13,14,15,16,17
74:18,19,20,21,22
74:23,24,25 75:1

75:2,3,4,5,6,7
**12:03** 75:8,9,10,11
75:12,13,14,15,16
75:17,18,19,20,21
75:22,23,24,25
76:1,2,3,4,5,6,7
**12:04** 76:8,9,10,11
76:12,13,14,15,16
76:17,18,19,20
**12:05** 76:21,22,23
76:24,25 77:1,2,3
**12:06** 77:4,5,6,7,8,9
77:10,11,12,13,14
77:15,16,17,18,19
77:20,21,22,23,24
**12:07** 77:25 78:1,2
78:3,4,5,6,7,8,9
78:10,11,12,13,14
78:15,16,17,18,19
78:20,21,22,23,24
78:25
**12:08** 79:1,2,3,4,5,6
79:7,8,9,10,11,12
79:13,14,15,16,17
79:18
**12:09** 79:19,20,21
79:22,23,24,25
80:1,2,3,4,5,6,7,8
80:9,10,11,12,13
80:14,15,16
**12:10** 80:17,18,19
80:20,21,22,23,24
80:25 81:1,2,3,4,5
81:6,7,8,9,10,11
81:12,13,14
**12:11** 73:1 81:15,16
81:17,18,19,20,21
81:22,23,24,25
82:1,2,3,4,5
**12:12** 82:6,7,8,9,10
82:11,12,13,14,15
82:16,17,18,19,20
82:21,22,23,24,25
83:1
**12:13** 83:2,3,4,5,6,7
83:8,9,10,11,12

83:13,14,15,16,17
83:18,19,20,21,22
83:23,24,25 84:1
**12:14** 84:2,3,4,5,6,7
84:8,9,10,11,12
84:13,14,15,16,17
84:18
**12:15** 84:19,20,21
84:22,23,24,25
85:1,2,3,4,5,6,7,8
85:9,10,11,12
**12:16** 85:13,14,15
85:16,17,18,19,20
85:21,22,23,24,25
86:1,2,3,4,5,6,7,8
86:9,10,11,12,13
86:14,15,16,17,18
86:19
**12:17** 86:20,21,22
86:23,24,25 87:1
87:2,3,4,5,6,7,8,9
87:10,11,12,13,14
87:15,16,17,18,19
87:20,21
**12:18** 87:22,23,24
87:25 88:1,2,3,4,5
88:6,7,8,9,10,11
88:12,13,14,15,16
**12:19** 88:17,18,19
88:20,21,22,23,24
88:25 89:1,2,3,4,5
89:6,7,8,9,10,11
89:12,13
**12:20** 89:14,15,16
89:17,18,19,20,21
89:22,23,24,25
90:1
**12:21** 90:2,3,4,5,6,7
90:8,9,10,11,12
90:13,14,15,16
**12:22** 90:17,18,19
90:20,21,22,23,24
90:25 91:1,2,3,4,5
91:6,7,8
**12:23** 91:9,10,11,12
91:13,14,15,16,17



91:18,19,20,21,22
91:23,24,25 92:1
92:2,3,4,5,6,7,8,9
**12:24** 92:10,11,12
92:13,14,15,16,17
92:18,19,20,21,22
92:23,24,25 93:1
93:2,3,4,5
**12:25** 93:6,7,8,9,10
93:11,12,13,14,15
93:16,17,18,19,20
93:21,22,23,24,25
94:1,2,3,4
**12:26** 94:5,6,7,8,9
94:10,11,12,13,14
94:15,16,17,18,19
94:20,21,22,23,24
94:25 95:1
**12:27** 95:2,3,4,5,6,7
95:8,9,10,11,12
95:13,14,15,16,17
95:18,19,20,21
**12:28** 95:22,23,24
95:25 96:1,2,3,4,5
96:6,7,8,9,10,11
96:12,13,14,15,16
96:17,18,19
**12:29** 96:20,21,22
96:23,24,25 97:1
97:2,3,4,5,6,7,8,9
97:10,11,12
**12:30** 97:13,14,15
97:16,17,18,19,20
97:21,22,23,24,25
98:1,2,3,4,5,6,7
**12:31** 98:8,9,10,11
98:12,13,14,15,16
98:17,18,19,20,21
98:22,23,24,25
99:1
**12:32** 99:2,3,4,5,6,7
99:8,9,10,11,12
99:13,14,15,16,17
99:18
**12:33** 99:19,20,21
99:22,23,24,25

100:1,2,3,4,5,6,7
100:8,9,10,11,12
100:13,14,15,16
100:17,18
**12:34** 100:19,20,21
100:22,23,24,25
101:1,2,3,4,5,6,7
101:8,9,10,11,12
101:13,14,15,16
101:17,18,19,20
101:21
**12:35** 101:22,23,24
101:25 102:1,2,3
102:4,5,6,7,8,9,10
**12:36** 102:11,12,13
102:14,15,16,17
102:18,19,20,21
102:22,23,24,25
103:1,2,3
**12:37** 103:4,5,6,7,8
103:9,10,11,12,13
103:14,15,16,17
103:18,19
**12:38** 103:20,21,22
103:23,24,25
104:1,2,3,4,5
**12:39** 104:6,7,8,9
104:10,11,12,13
104:14,15,16,17
104:18,19,20,21
104:22
**12:40** 104:23,24,25
105:1,2,3,4,5,6,7
105:8,9,10,11,12
105:13
**12:41** 105:14,15,16
105:17,18,19,20
105:21,22,23,24
105:25 106:1,2,3
106:4,5
**12:42** 106:6,7,8,9
106:10,11,12,13
106:14,15,16,17
106:18,19,20,21
106:22,23,24
**12:43** 106:25 107:1

107:2,3,4,5,6,7,8
107:9,10,11,12,13
107:14,15,16,17
107:18,19,20,21
107:22
**12:44** 107:23,24,25
108:1,2,3,4,5
**12:45** 108:6,7,8,9
108:10,11,12,13
108:14,15,16,17
108:18,19,20,21
108:22,23,24,25
**12:46** 109:1,2,3,4,5
109:6,7,8,9,10,11
109:12,13,14,15
109:16,17,18,19
109:20,21,22,23
109:24,25 110:1
**12:47** 110:2,3,4,5,6
110:7,8,9,10,11
110:12,13,14
**12:48** 110:15,16,17
110:18,19,20,21
110:22,23,24,25
111:1,2,3,4,5,6,14
111:15
**12:49** 111:7,8,9,10
111:11,12,13,14
**12:57** 111:15,16,17
**12:58** 111:16,18,19
111:19,20,21,22
111:23,24,25
112:1,2
**12:59** 112:3,4,5,6,7
112:8,9,10,11,12
112:13,14,15,16
112:17,18,19,20
**12th** 58:17
**13** 17:11 43:17
**13:00** 112:21,22,23
112:24,25 113:1,2
113:3,4,5,6,7,8,9
113:10,11,12
**13:01** 113:13,14,15
113:16,17,18,19
113:20,21,22,23

113:24,25 114:1,2
114:3,4,5,6,7,8,9
114:10,11,12,13
114:14,15,16
**13:02** 114:17,18,19
114:20,21,22,23
114:24,25 115:1,2
116:1,2,3,4,5,6,7
116:8,9,10,11,12
116:13,14,15,16
116:17,18,19,20
116:20,21
**130** 2:11
**13th** 68:18
**14** 11:14 69:23
71:25
**14th** 72:25 99:1
101:8
**15** 71:25
**15-CV-02917-K...**
1:2 6:8
**15th** 72:25
**16** 4:5,6,6 16:9 48:1
97:21
**17** 57:24 90:21
**17th** 73:20 74:10
77:20 94:20 95:3
95:12 112:6
**18** 40:8,8 64:18
113:3
**18th** 2:11
**19** 1:15 3:21 6:9
65:13,15
**19103** 2:13
**1970** 11:14
**1st** 116:18

**2**

**2** 21:2 34:4 102:8
**2:20** 59:13
**20** 82:9
**2007** 48:13
**2012** 58:17
**2015** 1:15 3:21 4:6
6:9 16:9 69:23
71:25 73:15 90:22

98:8,21 99:9
113:3 116:18
**2016** 97:21
**20th** 113:19
**21** 16:1 89:22
111:22,23
**22** 4:5 16:3,6,17
**221182** 1:19
**23** 4:6 16:4,10,17
16:24,25 20:15
**23rd** 94:22
**24** 2:5 4:7 106:24
107:3,6,7,15
**24s** 107:10
**28th** 84:22
**29th** 96:4
**2nd** 90:16 98:8

**3**

**3** 21:2
**3,000** 77:5
**30** 98:8
**30-minute** 79:23
**301** 1:14 6:11
**30th** 66:1 73:15
86:23 87:17 98:5
**30X100223700**
116:21
**31st** 103:19
**330** 11:10

**4**

**43** 45:12
**48** 13:17,19,24
**4th** 2:5

**5**

**5** 35:14
**5,000** 76:25
**5:30** 95:4
**500** 13:6

**6**

**6** 37:5 90:15 99:9
112:4,7
**6-1/2** 48:3



**6:00** 95:4
**624-6221** 1:21
**6th** 25:15 102:9,13
   102:17,22 103:20
   103:21 108:22

---
**7**
---

**7** 3:5 18:10 21:4
   23:22 26:23 38:8
   38:21 39:3,6,7,12
   65:2

---
**8**
---

**8** 18:12,13 23:10,14
   23:18 28:24,25
   29:1,4,6,6 90:3
**866** 1:21

---
**9**
---

**9** 37:12
**90-day** 90:17,24
   94:14 96:21 98:10
**90,000** 77:7
**90th** 11:11
**99** 29:23 81:1



# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIV. NO. 15-CV-02917-KM-JBC

- - - - - - - - - - - - - - - - - - - - x

KENNETH FRILANDO,

        Plaintiff,

   -against-

BORDENTOWN DRIVER TRAINING SCHOOL, LLC

        Defendant.

- - - - - - - - - - - - - - - - - - - - x


        Deposition of YU KYI, taken
pursuant to notice, was held at the Law
Offices of BLANK ROME, LLP, 405
Lexington Avenue, New York, New York,
commencing February 3, 2016, 12:40
p.m., on the above date, before Leslie
Fagin, a Court Reporter and Notary
Public in the State of New York.

               - - -


        MAGNA LEGAL SERVICES
     1200 Avenue of the Americas
     New York, New York 10026
        (866) 624-6221



Page 2

```
1
2   APPEARANCES:
3
4   EISENBERG AND BAUM, LLP
    Attorneys for Plaintiff
5       24 Union Square East, 4th Floor
        New York, New York 10003
6   BY:    SETH A. NADLER, ESQUIRE
7
8   BLANK ROME, LLP
    Attorneys for Defendant
9       130 North 18th Street
        One Logan Square, 11th Floor
10      Philadelphia, Pennsylvania 19103
    BY:    ANTHONY B. HALLER, ESQUIRE
11         JOHN A. CONNELLY, ESQUIRE
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                   Y. Kyi
2   Y U   K Y I,  called as a witness, having
3       been duly sworn by a Notary Public, was
4       examined and testified as follows:
5   EXAMINATION BY
6   MR. HALLER:
7       Q.   Good afternoon, Doctor.  My name is
8   Anthony Haller.  I'm with the law firm of
9   Blank Rome and we represent Bordentown Track
10  Core Trailer Driving School, doing business
11  as Smith & Solomon in a case that's been
12  brought by Mr. Frilando in the United States
13  District Court of New Jersey.
14      I appreciate your coming today and
15  I'm sorry we had to take your time, but it is
16  necessary for the purposes of the litigation.
17      Could you please just state your
18  full name for the record?
19      A.   My full name is, last name, Y-U;
20  first name, K-Y-I; middle name, W-I-N.
21      Q.   Dr. Yu, have you ever been in a
22  position of having to give a deposition
23  before?
24      A.   One time.
25      Q.   So you have some understanding of
```

Page 4

```
1                   Y. Kyi
2   the process, is that correct?
3       A.   Yeah.
4       Q.   Just I would like to just go over
5   some ground rules to make sure you understand
6   how this will proceed.
7       First of all, I would ask you to
8   answer my questions fully and to the best of
9   your knowledge.
10      Is that agreed?
11      A.   Agreed.
12      Q.   If you don't understand something
13  that I'm asking or it doesn't make sense,
14  please let me know and I will restate the
15  question.
16      If you don't say anything, I will
17  assume you understood the question.
18      Is that fair and understanding?
19      A.   Yes.
20      Q.   And on that point, one of the
21  ground rules is that you must give an audible
22  and verbal answer so the court reporter can
23  take it down, just because there is a
24  transcript and it's very difficult for the
25  court reporter if it isn't a verbal answer.
```

Page 5

```
1                   Y. Kyi
2       A.   Okay.
3       Q.   Dr. Yu, I wanted to confirm on the
4   record that you are a licensed physician in
5   the State of New York, is that correct?
6       A.   Yes.
7       Q.   How long have you been practicing
8   medicine?
9       A.   1996 in America.
10      Q.   Before then?
11      A.   Before then, in Burma, from 1979 to
12  1988.
13      Q.   The events that are going to be the
14  subject of the deposition today occurred in
15  late July of 2015 when Mr. Frilando came to
16  you for a medical examination which we will
17  discuss in some detail.
18      Just to fix a timeframe, at that
19  time, could you just describe to me what your
20  practice was and where you were located?
21      A.   My practice is at 8704 Rockaway
22  Beach Boulevard, Rockaway Beach, New York,
23  zip code 11693.  I had office named Dr. Yu
24  Family Practice.  I started that practice in
25  2006 and we open every day, Monday through
```



Page 6

Y. Kyi

1
2  Saturday, 8:00 to 12:00 noon.
3      Q.  Am I correct in saying it's a
4  general family practice?
5      A.  General family practice.
6      Q.  In the specialty of internal
7  medicine?
8      A.  We say general practice.
9      Q.  Could you very briefly just provide
10  us with your educational background and
11  medical certifications, just a quick summary?
12      A.  I graduated from Institute of
13  Medicine, One Yangon Burma.  Now, they call
14  Yangon Myanmar, in 1977.
15          After graduation, I did internship
16  in medicine for general medicine and I did
17  one year fellowship in family facility
18  medicine.  I open an office in countryside
19  about 25 miles from capital city, Rangoon.
20  Over there, I practice about eight years.
21          In 1988, I stopped this and I came
22  to America.  I came to America '88.  I did
23  odd job '88 to '89, '90, and I took the exam
24  and I passed the exam and I did general
25  pathology residency at Long Island College

Page 7

Y. Kyi

1
2  Hospital in Brooklyn, I did general pathology
3  residency.
4          I finished 1994 and I not satisfied
5  because job is not available right away, so I
6  did family medicine in Wyckoff Height Medical
7  Center, 1994 to 1997.
8          1997, I finish, I got a job in
9  resident training for faculty at St. John
10  Hospital at Far Rockaway from 1997 to 2005.
11          In 2005, the program, they want to
12  close the office I work for, the family
13  practice office, they want to close the
14  office, so they close it, so I went my own
15  office then.
16      Q.  You've been practicing in your
17  family medical practice since 2006?
18      A.  Private practice 2006, but from
19  1997 up to this.
20      Q.  What official licensures or
21  certifications do you have?
22      A.  I have New York State license, I
23  have American Family Practice, American
24  Family Board of Family Medicine and American
25  Board of Pathology.

Page 8

Y. Kyi

1
2      Q.  Anything else?
3      A.  That's it.  Another certification
4  is this National Association, Certified
5  Medical Examiner For Private License.
6      Q.  You mentioned initially studied at
7  the institute of something in Rangoon, then
8  you gave the current name.
9          Can you spell that?
10      A.  University of Medicine, One Yangon,
11  Myanmar, Y-A-N-G-O-N, M-Y-A-N-M-A-R.
12      Q.  In your practice, family practice,
13  are there any other physicians that
14  support --
15      A.  Only me.
16      Q.  Do you have anyone assisting you,
17  such as nurses or office staff?
18      A.  No, only me.
19      Q.  We know from the medical records
20  that you saw Mr. Frilando in your office in
21  your capacity as an FMCSA medical examiner on
22  or about July 30th of 2015 and I'm going to
23  talk about that.
24          Other than that occasion when you
25  saw him for the medical examination, have you

Page 9

Y. Kyi

1
2  had any other contact with Mr. Frilando?
3      A.  No.
4      Q.  You haven't spoken to him before or
5  since?
6      A.  No.
7      Q.  Have you spoken at any time since
8  you examined him with any family member, such
9  as his mother or his brother?
10      A.  No.
11      Q.  Have you had any discussions with
12  his attorneys who are representing him in
13  this litigation in connection --
14      A.  I don't know who are they.
15          MR. NADLER:  My name is Seth Nadler
16      and I, along with Eisenberg Baum are
17      representing the plaintiff, Mr.
18      Frilando, in this matter.
19      Q.  Have you had any discussions with
20  any of them?
21      A.  No, this is the first time I see
22  him.
23      Q.  Could you state your home address
24  for the record?
25      A.  6403 213th Street, Bayside, New



3 (Pages 6 to 9)

Page 10

Y. Kyi

1    York 11364.
2        Q.  Dr. Yu, I'm going to show you what
3    has been previously identified in this
4    litigation as BDTS 1, Defendant's Deposition
5    Exhibit 1.
6        I will represent to you that this
7    is the complaint that Mr. Frilando filed
8    against our client, that I'm going to refer
9    to through this deposition as Bordentown,
10   that does business under the name of Smith &
11   Solomon.
12       Have you ever seen this document
13   before?
14       A.  No.
15       Q.  Do you, sitting here today, have
16   any understanding of what this case is about?
17       A.  I don't know.
18       Q.  I didn't expect you to, but I just
19   wanted to know.
20       So you can put that aside, I
21   suppose, just for clarity, before you would
22   turn away from this document.
23       Do you see that at the top of the
24   page, there is a designation line that has a
25

Page 11

Y. Kyi

1    number that says, Document 1?
2        A.  Where is that?
3        Q.  The very top of the page.
4        A.  Yeah.
5        Q.  It says, Filed 04/24/15.
6        Do you see that?
7        A.  Yeah.
8        Q.  So that is April 24th of 2015, so
9    we can agree on the record that you had not
10   met Mr. Frilando at that point in time?
11       A.  No.
12       Q.  I'm going to put before you three
13   documents which relate to our request to your
14   office to get documents and medical records
15   related to Mr. Frilando.
16       (BDTS Exhibit 25, subpoena served
17   on Dr. Yu on or about October 27, 2015,
18   marked for identification.)
19       Q.  Dr. Yu, I've put before you what we
20   marked as BDTS 25, which is a subpoena that
21   was served on you on or about October 27,
22   2015 asking for the medical files relating to
23   Mr. Frilando.
24       Do you see that?
25

Page 12

Y. Kyi

1        A.  Yeah.
2        Q.  Do you generally recall receiving a
3    subpoena around that time?
4        A.  Yeah.
5        Q.  Then I'm going to show you what we
6    will mark as BDTS 26.
7        (BDTS Exhibit 26, series of
8    documents, marked for identification.)
9        Q.  This is a set of materials that
10   includes the letter that we sent you, along
11   with the subpoena and then attached to it,
12   beginning on the fifth page of the document,
13   there is some medical records starting with a
14   summary view for Frilando, Kenneth.
15       Do you see that?
16       A.  Yeah.
17       Q.  Then for the rest of the document,
18   other than the very last page which is a fax
19   transmittal -- I will restate my question.
20       Do you see from that page that
21   starts from summary view for Frilando,
22   Kenneth, to the last, but one page in this
23   document are the medical records from your
24   office with respect to this individual, is
25

Page 13

Y. Kyi

1    that right?
2        A.  Yeah.
3        Q.  That was at least at the time
4    everything that you had in your possession?
5        A.  That's it.
6        Q.  If I can show you now what we will
7    mark as BDTS 27.
8        (BDTS Exhibit 27, letter dated
9    January 21, 2016 from Blank Rome, LLP
10   with attachments, marked for
11   identification.)
12       Q.  Dr. Yu, this is a letter dated
13   January 21, 2016 from our office at Blank
14   Rome, a subpoena to come testify here today
15   and also to produce documents in connection
16   with this deposition and we had put a
17   request, essentially, asked you to produce
18   anything, other than what had already been
19   produced.
20       You understood that?
21       A.  Yes.
22       Q.  And I just want to make sure, for
23   the record, that there is nothing else that
24   you had?
25

Page 14

```
 1              Y. Kyi
 2      A.  Nothing else.
 3      Q.  So what's in the exhibits BDTS 26
 4  and 27 represents all of the medical records
 5  that you have and ever had for Mr. Frilando?
 6      A.  Yes.
 7      Q.  So using the document BDTS 27, the
 8  one I just handed to you, if we can go to the
 9  page that begins summary view.  There is two
10  pages that appear to be related to this
11  summary, is that correct?
12      A.  Yeah.
13      Q.  Just for the record, what is this
14  summary?  What is it intended for?
15      A.  It is to check for medical license
16  examination -- CDL license.
17      Q.  These would be notes that you
18  completed on the date that Mr. Frilando came
19  to see you, which is July 30, 2015?
20      A.  Yes.
21      Q.  This would be a record of the
22  general examination you conducted that day,
23  is that right?
24      A.  Yes.
25      Q.  Then after that, there is a
```

Page 15

```
 1              Y. Kyi
 2  document marked medical examination report
 3  for Commercial Driver Fitness Determination.
 4      Do you see that?
 5      A.  Yes.
 6      Q.  This is a form that must be
 7  completed, is that correct?
 8      A.  Yes.
 9      Q.  And it must be signed by the
10  patient, is that correct?
11      A.  Yes.
12      Q.  And in normal circumstances, the
13  patient is responsible for completing this
14  form, is that correct?
15      A.  Yes.
16      Q.  And the patient is certifying that
17  the information is complete and true and that
18  inaccurate, false or missing information may
19  invalidate the examination?
20      A.  That's true.
21      Q.  And then the certificate, is that
22  correct?
23      A.  Yes.
24      Q.  I'm not asking for Mr. Frilando
25  now, but, in general terms, when you are
```

Page 16

```
 1              Y. Kyi
 2  doing this, you are relying on the patient to
 3  be --
 4      A.  Truthful.
 5      Q.  -- truthful with you?
 6      A.  Yes.
 7      Q.  And to tell if you there are
 8  conditions they have which may effect your
 9  examination?
10      A.  Yes.
11      Q.  Then the next document is a page
12  titled Testing.
13      Am I right, this is something that
14  is completed by the physician?
15      A.  Yeah.
16      Q.  Then the next page is entitled
17  Physical Examination.
18      Again, is this completed by the
19  physician?
20      A.  Yes.
21      Q.  Then there is a page that is
22  entitled 49 CFR 391.41 Physical
23  Qualifications For Drivers, is that correct?
24      A.  Yes.
25      Q.  That's a summary of the physical
```

Page 17

```
 1              Y. Kyi
 2  qualifications that are the subject of the
 3  examination, is that correct?
 4      A.  Yeah.
 5      Q.  Then the next page is Instructions
 6  to the Medical Examiner, is that correct?
 7      A.  Yeah.
 8      Q.  And that goes on for four pages, is
 9  that correct?
10      A.  Yes.
11      Q.  Then after that, there is something
12  called Medical Examiner's Certificate?
13      A.  Certificate.
14      Q.  Is that the certificate you give
15  once you complete the information?
16      A.  Yes.
17      Q.  And in order to give that, you have
18  to be satisfied that the person meets the
19  regulatory requirements, correct?
20      A.  Yes.
21      Q.  Can we agree on the record, this is
22  the certificate you completed on July 30,
23  2015, based upon the information given by Mr.
24  Frilando and your examination of him?
25      A.  Yeah.
```

Page 18

Y. Kyi

2    Q.   There is another page, which is
3 blank, so it's just a blank examiner's
4 certificate?
5    A.   Yes.
6    Q.   And then what we have now been
7 through represents the totality of the
8 medical records from your office?
9    A.   Yes.
10    Q.   Am I correct you never requested,
11 nor did you receive any other medical records
12 that relate to Mr. Frilando, including
13 records from his internist or any other
14 specialist he may have seen?
15    A.   No.
16    Q.   I'm going to put before you, Dr.
17 Yu, a document we will mark as BDTS 28.
18        (BDTS Exhibit 28, medical records
19        of Kenneth Frilando, marked for
20        identification.)
21    Q.   Dr. Yu, I've given you what's been
22 marked as BDTS 28 and I will represent to you
23 these are documents related to the
24 examination which you conducted that Mr.
25 Frilando, himself, produced in this

Page 19

Y. Kyi

2 litigation?
3    A.   Yes.
4    Q.   I'm going to use them because they
5 are more legible.  It's clearer the way they
6 are copied than those from your files, not
7 meant to be a criticism, but it just seems
8 easier to use them.  Is that okay?
9    A.   Yes.
10    Q.   The top page is the medical
11 examiner's certificate, correct?
12    A.   Yes.
13    Q.   Then and I will come back to the
14 details, but following that, there is the
15 medical examination report which has Mr.
16 Frilando's signature on it, is that right?
17    A.   Yes.
18    Q.   Before we get into the details of
19 the examination, I would like to ask you,
20 first of all, do you have any actual
21 recollection of seeing Mr. Frilando?
22    A.   No, not much.
23    Q.   So would his appointment have been
24 arranged through you, given you have no other
25 staff, do people call you?

Page 20

Y. Kyi

2    A.   I have a front desk, two at the
3 front desk, so when he call, the front desk,
4 say, okay, come in, because we are working,
5 general practice, so patient want to see me,
6 they just walk in.
7    Q.   I may have misunderstood what you
8 said earlier.  You don't have any other
9 medical staff, but you do have two
10 receptionists?
11    A.   Two front desk and one medical
12 student that is training with me.
13    Q.   Do you know if anyone, other than
14 yourself, was present when you examined Mr.
15 Frilando?
16    A.   No.
17    Q.   Do you recall if he had anyone
18 helping him as an interpreter, as a sign
19 language interpreter when he came to see you?
20    A.   He talk himself.
21    Q.   Tell me, as best you can recall,
22 what happened in this medical examination?
23    A.   Usually, I ask why you are here
24 for.  I have to have a CDL license exam, so
25 do you have any other medical problem?  They

Page 21

Y. Kyi

2 will say no or yes.  If they say yes, what is
3 the other problem, so I will write it down
4 and then, next, do you have any surgery, do
5 you have any allergy, he put down he has hip
6 replacement on the right side and after that
7 his allergy, no allergy and, next, any
8 hospitalization, he said no and after that, I
9 asked, do you smoke, drink, so yes or no, yes
10 or no, and after that, I check his height,
11 weight, I check the eye, I check the hearing
12 and then I check the blood pressure, that's a
13 major requirement, I check the heart sound,
14 the heart rate and I did the urine test and
15 then I checked how he walked and that's about
16 it.
17    Q.   So did he complete himself the form
18 that's on the second page of this document,
19 the health history form?
20    A.   No, I ask him.
21    Q.   You asked him the question and
22 then --
23    A.   I check off.
24    Q.   Again, just to emphasize the point,
25 you are relying on his truthfulness in his

MAGNA ▶
LEGAL SERVICES

Page 22

Y. Kyi

1  answers?
2  answers?
3      A.  That's true.
4      Q.  What I'm a little confused about,
5  given that he is deaf, how there could have
6  been conversation, unless you are able to use
7  sign language?
8      A.  I don't, I don't use sign language,
9  I just ask a little louder.
10      Q.  Did you conclude that he could
11  hear?
12      A.  Yes.
13      Q.  And to that degree, is that, in
14  part, why in your recommendation on the
15  certification --
16      A.  Hearing aids.
17      Q.  To use hearing aids?
18      A.  Yeah.
19      Q.  So from your vantage point, if he
20  used hearing aids, that he would be able to
21  hear normal speech?
22      A.  It looked like that.
23      Q.  If that was not the case, would
24  that have affected your analysis?
25      A.  Sure.

Page 23

Y. Kyi

1
2      Q.  In what way would have it affected
3  your analysis?
4      A.  Had to fail.
5      Q.  So I'm going to put BDTS 28 aside
6  for now.  I'm going to come back to it, but I
7  just want to go through and establish for the
8  record what the requirements are of an FMCSA
9  medical examiner, Federal Motor Carrier
10  Safety Administration.
11      By the way, which office did you
12  see him, do you recall?
13      A.  Rockaway Beach.
14      Q.  Back up.  When did you apply for
15  the ability to be certified as a medical
16  examiner and put on the national registry?
17      A.  2014.
18      Q.  Just could you generally describe
19  what the process involves?
20      A.  You have to have training.  After
21  training, you have to take the exam.  After
22  exam, they give you certificate for 10 years.
23      Q.  Where do you train?
24      A.  Training is just computer training.
25      Q.  I'm going to show you what we will

Page 24

Y. Kyi

1
2  mark as BDTS 29.
3          (BDTS Exhibit 29, document entitled
4      Complete Guide to Medical Examiner
5      Certification, marked for
6      identification.)
7      Q.  And I'm also going to show you a
8  document, because it's a companion to what I
9  presented, which we will mark as BDTS 30.
10          (BDTS Exhibit 30, Medical Examiner
11      Handbook, marked for identification.)
12      Q.  Dr. Yu, I put before you two
13  documents.  The first is BDTS 29, which is a
14  document entitled Complete Guide to Medical
15  Examiner Certification.
16      Are you generally familiar with
17  that document?
18      A.  Yes.
19      Q.  This was something you saw in the
20  process of getting your certificate, correct?
21      A.  Yes.
22      Q.  Then I also put before you BDTS 30,
23  which is the Medical Examiner Handbook.
24      A.  Yes.
25      Q.  Are you also familiar with that

Page 25

Y. Kyi

1
2  booklet?
3      A.  Yes.
4      Q.  That is a detailed set of
5  guidelines for medical examiners once they've
6  been certified, correct?
7      A.  Yes.
8      Q.  Both these documents are issued by
9  the Federal Motor Carrier Safety
10  Administration, which is part of the
11  Department of Transportation, is that
12  correct?
13      A.  Yeah.
14      Q.  Did you understand when you applied
15  that you had to have the certification in
16  order to do an examination of somebody who is
17  looking to become a CDL driver?
18      A.  Yeah.
19      Q.  Because at some point in 2014,
20  there is a legal requirement that it be done
21  by somebody on a national registry?
22      A.  Yes.
23      Q.  Had you, before that rule came out,
24  had you done the examinations?
25      A.  Yes.

Page 26

Y. Kyi

1
2     Q.   How did you learn that there was
3   this new requirement you had to be, if you
4   were going to do them on the national
5   registry?
6     A.   Because a driver come to me that
7   want CDL, so when I tried to, one of my
8   friends say, if you do CDL, you need national
9   registry certification.  I say, okay, let's
10  find out, so early 2014 or late 2014, so we
11  called website and we look at it and they
12  list a training site and we call that
13  training site and then I get the
14  certification training fee.  They let us go
15  through computer training, we log in every
16  day one hour, I watched their tape.
17    Q.   So I have a few questions on these
18  documents, Dr. Yu, just so I fully understand
19  what your role is and what you're trying to
20  do when you do an examination, so if you can
21  go to page 22 of BDTS 29, the smaller
22  document, which is the Guide to Medical
23  Examiner's Certification.
24      Do you have that?
25    A.   Yeah.

Page 27

Y. Kyi

1
2     Q.   There is a page that starts
3   Appendices and then it starts,
4   Familiarization with the responsibilities and
5   work environment of commercial motor vehicle
6   (CMV) operations.
7       Do you see that?
8     A.   Yes.
9     Q.   Am I correct, as part of the
10  training, the administration wants medical
11  examiners to have some familiarity with the
12  variety of tasks and the demands that are
13  placed upon people who might be driving these
14  very large trucks, is that right?
15    A.   Yeah.
16    Q.   Did you go through that process?
17    A.   Yeah.
18    Q.   And through that, you understood
19  sort of the complexity of the operations?
20    A.   Yes.
21    Q.   You understood the emotional
22  demands it places upon people?
23    A.   Yes.
24    Q.   You understood that, therefore, the
25  necessity to make sure there are no

Page 28

Y. Kyi

1
2   conditions that might effect somebody's
3   ability to drive safely and concentrate,
4   correct?
5     A.   Yes.
6     Q.   The next page, page 23, is a
7   summary of being able to identify the medical
8   history and things that might effect the
9   certification, is that correct?
10    A.   Yes.
11    Q.   There is a long list under the
12  second bullet of the things that are relevant
13  to the analysis of the medical ability of a
14  person to pass the certification, is that
15  right?
16    A.   Yes.
17    Q.   Many of these relate to conditions
18  that may be disqualified under the
19  regulations, is that correct?
20    A.   Yes.
21    Q.   And so in your training, you're
22  required to become familiar with those
23  things?
24    A.   Yes.
25    Q.   And through your training, are you

Page 29

Y. Kyi

1
2   taught what you need to do if you identified
3   there is a potential problem?
4     A.   Yes.
5     Q.   If you identify through the
6   information given by the patient or through
7   your examination that there is a potential
8   problem, what are you supposed to do from the
9   perspective of the medical examiner?
10    A.   If I identify, let's say, like
11  hearing loss, I check the ear, ear is good, I
12  give hearing test, hearing test is good, why
13  I have to send another guy, this is not for
14  disease, this is for whether he can drive or
15  not.
16    Q.   What if you learned there was a
17  history of perhaps neurological disorder,
18  what would you do if you found that out?
19    A.   Neurological, according to
20  examination, checkmark, if he has so much
21  spasm, he is in front of me, he is twisting
22  like this, I would not pass him, I would say,
23  go and see neurologist, bring paper from
24  neurology I want to see.
25    Q.   So if, in the course of the



Page 30

Y. Kyi

1  examination, through what he tells you or
2  what you observe, you identify a potential
3  problem that you can't resolve that day,
4  would you send him to a specialist?
5       A.  Yeah.
6       Q.  You wouldn't certify him until you
7  have confirmation from the specialist that
8  there is no issue, right, is that fair?
9       A.  Yes.
10      Q.  If we then go to page 25, just
11  picking up on what you just said.  This No. 5
12  on page 25, deals with performing, obtaining,
13  documenting diagnostic tests and obtaining
14  additional testing or medical opinion from a
15  medical specialist or treating physician.
16      Do you see that?
17      A.  Yes.
18      Q.  This seems to be part of the
19  training which is teaching medical examiners
20  of certain requirements if there are problems
21  identified, is that right?
22      A.  Yes.
23      Q.  So if I focus just for now on the
24  fifth bullet down, it says, Refer to a

Page 31

Y. Kyi

1  specialist.
2      Do you see that?
3      A.  Yes.
4      Q.  Am I correct, it says, Refer to a
5  specialist if driver who exhibits evidence of
6  any of the following disorders?
7      A.  Yeah.
8      Q.  And then it lists the disorders?
9      A.  Yes.
10      Q.  One is vision, right?
11      A.  Yeah.
12      Q.  One is cardiac?
13      A.  Yeah.
14      Q.  One is pulmonary?
15      A.  Yeah.
16      Q.  One is endocrine?
17      A.  Yes.
18      Q.  One is musculoskeletal?
19      A.  Yes.
20      Q.  One is neurological?
21      A.  Yes.
22      Q.  One is sleep, such as obstructive
23  sleep apnea?
24      A.  Yes.

Page 32

Y. Kyi

1       Q.  Mental and emotional health, such
2  as depression or schizophrenia?
3       A.  Yes.
4       Q.  Or other medical conditions that
5  may interfere with ability to safely operate
6  a CMV?
7       A.  Yes.
8       Q.  Am I right that if any of those
9  particular conditions are identified in the
10 medical examination, that you, as a medical
11 examiner, must take the extra step and refer
12 them and get clearance from the specialist?
13      A.  Sure.
14      Q.  That's right?
15      A.  Yeah.
16      Q.  And in the absence of getting
17 clearance from a specialist, the
18 certification would not be valid if those
19 conditions are identified?
20      A.  Yes, when you check physically, he
21 has no limp, like that, so skill performance
22 exam has to be there, but he doesn't show
23 this, he doesn't show limp, if wrist drop
24 like that.

Page 33

Y. Kyi

1       Q.  These are more subtle things that
2  have to be examined?
3       A.  Yes.
4       Q.  And considered?
5       A.  If a person walk into my office, he
6  walking good, why I have to send to
7  everybody?
8       Q.  I understand, but if, in the course
9  of the examination, you find out this person
10 has a cardiac condition.
11      A.  Yes, we will send.
12      Q.  And that's not a matter of
13 discretion, you have to do it?
14      A.  Yeah.
15      Q.  It's not valid until you've done
16 it, correct?
17      A.  Yes.
18      Q.  We talked about the medical
19 examiner guide referring to some of the
20 demands that are placed upon commercial
21 drivers and I just ask, if you go to the
22 second document, BDTS 30, and just go to page
23 17.
24      Do you see in the Medical Examiner



Page 34

Y. Kyi

1      Handbook, there is a general description of
2      the role of a CDL driver beginning on page
3      17.  It says, it begins, The driver and the
4      job of commercial driving.
5              Do you see that?
6          A.  Yeah.
7          Q.   Then if you go over to the next
8      page, page 18, it identifies stress factors
9      associated with commercial driving, correct?
10          A.  Yes.
11          Q.   Are these things you became
12     familiar with as part of your training?
13          A.  Yes.
14          Q.   Below that, there is sort of an
15     identification of driving and other tasks
16     that might effect safety issues?
17          A.  Yes.
18          Q.   You became familiar with those
19     kinds of things?
20          A.  Yes.
21          Q.   And then that goes through page 20,
22     do you see that?  There is a whole list of
23     things that are required, from staying alert
24     to using side mirrors to controlling steering

Page 35

Y. Kyi

1      wheel to manipulating dashboard, shifting
2      gears, entering and exiting vehicle, loading
3      and securing cargo and performing vehicle
4      checks, right?
5          A.  Yes.
6          Q.   If we go to page 21, you see that
7      there is information about crashes, injuries
8      and fatalities?
9          A.  Yes.
10          Q.   Am I correct, Dr. Yu, that you
11     understand and take seriously your role as a
12     medical examiner in doing the job to ensure
13     the safety of the general public, correct?
14          A.  Yes.
15          Q.   That's a large measure why there is
16     a requirement to have people trained,
17     certified and on a list?
18          A.  Yes.
19          Q.   Because accidents involving these
20     very large vehicles can be catastrophic?
21          A.  Yes.
22          Q.   In fact, if we look at page 21, it
23     says above the picture of what looks like a
24     terrible accident, When a fatal crash

Page 36

Y. Kyi

1      involves at least one large truck, regardless
2      of the cause, the occupants of the passenger
3      vehicles are more likely to sustain serious
4      injury or die than the occupants of the large
5      truck.
6              Do you see that?
7          A.  Yes.
8          Q.   Below the picture, why are the
9      death rates of occupants in passenger
10     vehicles so high, and it says, The answer is
11     found in basic physics, injury severity
12     equals relative velocity change, the greater
13     the mass, the less relative velocity change,
14     right?
15          A.  Yes.
16          Q.   It says, The crash of a vehicle
17     having twice the mass of a lighter vehicle
18     equals a six fold risk of death to persons in
19     the lighter vehicle.
20              Do you see that?
21          A.  Yes.
22          Q.   And I just look at it in lay terms,
23     these are really monstrously big vehicles and
24     they can do significant harm if they are not

Page 37

Y. Kyi

1      driven safely, right?
2          A.  Yes.
3          Q.   You know that in some
4      circumstances, it's not just one car, it can
5      be --
6          A.  Chain reaction.
7          Q.   Chain reaction to multiple
8      accidents?
9          A.  Yes.
10          Q.   So this is a really serious thing,
11     the medical examination and making sure
12     people that come to you are qualified to
13     operate one of these vehicles, is that right?
14          A.  Sure.
15          Q.   In order to do that assessment, the
16     truthfulness of the person in identifying
17     their medical history and conditions is
18     absolutely essential for you to do your job?
19          A.  Yes.
20          Q.   And you wouldn't want to certify
21     somebody who had misled you about their prior
22     history, right?
23          A.  Sure.
24          Q.   And if you found out that somebody



Page 38

```
 1              Y. Kyi
 2  had not provided you the information and
 3  actually misled you, what would you do?
 4       A.  I call and disqualify him.
 5       Q.  If you go to page 24 of this
 6  document, and I'm not going to go through
 7  them in detail, but you see that the top of
 8  the page, it looks at sort of this balancing
 9  between the right to work in public safety
10  and talks through all of the safety
11  implications, right?
12       A.  Yes.
13       Q.  These are things you covered in
14  your training, right?
15       A.  Yes.
16       Q.  If you go to page 27, there is an
17  identification of, at the very bottom of the
18  page, it says, Health history, driver's
19  signature and it says, Verify that the driver
20  signs the medical examination report form.
21          Do you see that?
22       A.  Yes.
23       Q.  That's the two sentences we
24  identified earlier, which say, I certify that
25  the above information is complete and true.
```

Page 39

```
 1              Y. Kyi
 2  I understand inaccurate, false or missing
 3  information may invalidate the examination
 4  and my medical examiner's certificate?
 5       A.  Yes.
 6       Q.  The critical importance of ensuring
 7  there is a signature is to ensure that you
 8  have received from the individual the
 9  certification that the information they're
10  giving you is correct?
11       A.  Yes.
12       Q.  And truthful?
13       A.  Truthful.
14       Q.  Then if you go to page 28, it
15  starts to describe the medical examiner's
16  responsibilities.
17          Do you see that?
18       A.  Yes.
19       Q.  It starts by saying, The purpose of
20  the health history is to obtain information
21  relevant to detecting the presence of
22  physical, mental or organic conditions of
23  such character and extent as to effect the
24  ability of the driver to operate a commercial
25  motor vehicle, in parens, CMV safely.
```

Page 40

```
 1              Y. Kyi
 2       Q.  Do you see that?
 3       A.  Yes.
 4       Q.  It goes on, under the regulations,
 5  The medical examiner must review and
 6  discussion with the driver, any yes answers
 7  on the medical form, is that right?
 8       A.  Yes.
 9       Q.  If the questions are asked about a
10  preexisting conditions or history and the
11  person says, yes, then you have to delve into
12  it?
13       A.  Yeah.
14       Q.  If they say no, you don't have to
15  delve into it?
16       A.  Yes.
17       Q.  And then it talks about what you
18  must do if the answer is yes, is that right?
19       A.  Yes.
20       Q.  If we go to page 29, I'm going --
21  I'm not going to go through all of these, I
22  will pick out some.
23          Seizures and epilepsy is something
24  you ask about and if there is a yes answer,
25  you need to delve into it?
```

Page 41

```
 1              Y. Kyi
 2       A.  If seizure disqualify
 3  automatically.
 4       Q.  Automatically disqualify?
 5       A.  Automatically.
 6       Q.  You need to make sure there a
 7  problem, but if there is a problem you can't
 8  certify?
 9       A.  No.
10       Q.  So that would be one thing you
11  learn of and say, I can't do it?
12       A.  Right.
13       Q.  If we go down the page, heart
14  disease or acute myocardial infarction, other
15  cardiovascular conditions.
16          Do you see that?
17       A.  Yes.
18       Q.  It says, If the driver reports
19  symptoms consistent with undiagnosed CVD, you
20  should refer the driver to a specialist for
21  further evaluation prior to certification?
22       A.  Yes.
23       Q.  If a driver reports current CVD,
24  consult with the driver's healthcare provider
25  and obtain documentation prior to
```

MAGNA
LEGAL SERVICES

Page 42

Y. Kyi

1        certification?
2            A.   Yes.
3            Q.   I want to make sure I understand.
4        If you learn, through what the person says,
5        that they have history or symptoms not been
6        diagnosed, then you have to refer them.  If
7        they say, I've been treated for it, you have
8        to go to the record?
9            A.   Yeah.
10           Q.   And then decide, is it clear, is it
11       not, do I need to do more?
12           A.   Yes.
13           Q.   But in either case, you can't
14       certify them?
15           A.   No.
16           Q.   If we picked out, next page, 30,
17       and I'm being fairly random at this point,
18       muscular disease.  If there is some
19       indication of muscular disease, would you
20       need to get additional assessment done?
21           A.   Yes, but he has hip replacement
22       surgery, but he walking fine.
23           Q.   I'm talking generally now, I'm not
24       talking about him.

Page 43

Y. Kyi

1            If you go to page 31, fainting,
2        dizziness, if you were told about that kind
3        of condition, what do you need to do?
4            A.   If fainting, if report of fainting
5        and depending on what type of fainting is
6        that, cardiovascular would be automatic
7        disqualification.
8            Q.   Then next thing, sleep disorders,
9        pausing or breathing while sleep, daytime
10       sleepiness and loud snoring, if you are told
11       about those kind of symptoms, what are you
12       supposed to do?
13           A.   You are to check the sleep apnea
14       test, sent to sleep study.  Usually, I don't
15       qualify them.  I have one or two patient come
16       like that, I said bye-bye, get out.
17           Q.   So, generally, you wouldn't certify
18       them?
19           A.   No.
20           Q.   At minimum, you would send them to
21       a sleep apnea clinic?
22           A.   Yeah.
23           Q.   But if somebody presented with that
24       condition, you would not certify them?

Page 44

Y. Kyi

1            A.   No.
2            Q.   How about chronic back pain, is
3        that an issue?
4            A.   You come to the office with chronic
5        low back pain, we check.  Every person we
6        check whether they can move up and down.  If
7        they can bend, we pass them because any
8        driver who sit in the car for six, seven
9        hours, they may get back pain, doesn't mean
10       they disqualified.
11           Q.   So is that a question of judgment?
12           A.   Judgment, yes.
13           Q.   Sometimes you might refer them?
14           A.   Yes, specialist.
15           Q.   What about high blood pressure, is
16       that an issue and, if so...
17           A.   If blood pressure is more than 160,
18       automatic disqualification.  We don't pass
19       them.
20           I have one young guy came to me,
21       blood pressure of 180.  He said, I cannot
22       pass you.  He said, only I have in front of
23       doctor, I said, no, I cannot pass you.
24           Q.   Dr. Yu, with that background, I

Page 45

Y. Kyi

1        would like to come back to what we marked as
2        BDTS 28, which is the most legible or more
3        legible version of the certificate and the
4        examination report.
5            If we go to the first page, this is
6        your certification and your signature on this
7        document, correct?
8            A.   Yes.
9            Q.   And it includes the requirement to
10       wear hearing aids based on what you said
11       earlier in the deposition, your perception he
12       could hear, but he needed help?
13           A.   Yeah.
14           Q.   And had you not reached that
15       conclusion, you wouldn't have certified him,
16       is that right?
17           A.   Yes.
18           Q.   If we go to the next page, this is
19       the form that is signed by the individual and
20       which you filled out for him by asking him
21       the questions, is that right?
22           A.   Yes.
23           Q.   So just to get sort of the process,
24       would you ask him if he has any illness or



Page 46

Y. Kyi

1   injury in the last five years?
2       A.  Yes.
3       Q.  He would say yes or no?
4       A.  Yes.
5       Q.  And if it's a yes, then you delve
6   into it, right?
7       A.  Yes.
8       Q.  And if it's a no, you accept it?
9       A.  Yes.
10      Q.  You are relying on the truthfulness
11  of what he is saying?
12      A.  Yes.
13      Q.  That would be true of all of the
14  answers on this page that are no?
15      A.  Yes.
16      Q.  And can we agree that in terms of
17  what you were told by Mr. Frilando that day
18  and what he then certified as complete and
19  true, is of all of the things listed, the
20  only thing he said yes on was he had hearing
21  disorders, loss of balance?
22      A.  Yes.
23      Q.  That was something you specifically
24  evaluated leading to the recommendation of

Page 47

Y. Kyi

1   wearing hearing aids?
2       A.  Yes.
3       Q.  But beyond that, there was nothing
4   that he identified that would have led you to
5   inquire further into the conditions, asked
6   for prior medical records or send him to a
7   specialist?
8       A.  No.
9       Q.  Have you ever seen any of his prior
10  medical records sitting here today?
11      A.  No.
12      Q.  So, Doctor, if I was to tell you
13  that Mr. Frilando had been diagnosed with
14  atrial fibrillation, would that have been
15  something you would have wanted to know when
16  you did your examination?
17      A.  Sure.
18      Q.  Would that have led you to then
19  say, well, I need to refer him to a
20  specialist or to get the records from whoever
21  he had seen?
22      A.  Yes.
23          MR. NADLER:  Objection to form.
24      Q.  Is it true, Mr. Frilando said this

Page 48

Y. Kyi

1   to us, that he never told you that he had
2   been diagnosed with atrial fibrillation?
3       A.  No.
4       Q.  Given what you've said about
5   needing to rely on the information, that
6   could well change your view of whether he was
7   qualified to be certified, right?
8       A.  Yes.
9       Q.  I'm looking at the medical record
10  from his doctor, Dr. Marino, that says,
11  Patient was diagnosed with atrial
12  fibrillation, would that concern you?
13      A.  Yes, but how diagnosed, is that
14  just one EKG, is that cardiac monitor?
15  Sometimes they will see atrial fibrillation.
16  Once in a while, atrial fibrillation doesn't
17  mean anything, but if persistent atrial
18  fibrillation, cardio may have to evaluate
19  that.
20      Q.  I will represent to you that his
21  internist having identified the diagnosis,
22  recommended and required him to follow-up
23  with a cardiologist for cardiac clearance?
24      A.  His internist require him for

Page 49

Y. Kyi

1   cardiac clearance, for what?
2       Q.  Because of the diagnosis of atrial
3   fibrillation.
4       A.  For what?
5       Q.  Mistakenly, Mr. Frilando went to
6   his internist to try to get the certification
7   and the doctor said, I can't certify you
8   because of this history, unless and until you
9   get a cardiologist to clear you.
10          Do you understand what I'm saying?
11      A.  Yes.
12      Q.  I know that you knew none of this
13  information.
14      A.  Yeah.
15      Q.  But my point to you is, we can
16  speculate on what the condition was and
17  serious or not, but you needed to know that
18  information from Mr. Frilando when you saw
19  him, correct?
20          MR. NADLER:  Objection.
21      A.  Yes.
22      Q.  The fact he didn't tell you is a
23  problem, is it not?
24      A.  Yes.



Page 50

Y. Kyi
1
2      Q.  Because if he had told you, you
3   would have looked into it to decide whether
4   it was serious or not and certainly would
5   have required there to be some follow-up?
6          MR. NADLER:  Objection.
7      A.  Yes.
8      Q.  Either through getting existing
9   records or having him cleared by a
10   cardiologist?
11     A.  Yes.
12     Q.  But in the absence of him telling
13  you, you didn't know, so the certification
14  isn't really valid, right?
15         MR. NADLER:  Objection.
16     A.  I cannot say that because when you
17  do examination, one part is saying you
18  palpate the pulse.  I checked the pulse.  The
19  pulse is regular for one minute.  If I
20  measure the pulse for another half hour,
21  maybe I find something, but pulse is only one
22  minute, two-minute job, pulse is regular.
23     Q.  But, Dr. Yu, I don't want to spar
24  with you.  One reason we went through these
25  regulations, you have testified that it is a

Page 51

Y. Kyi
1
2   requirement, if a cardiac issue is
3   identified, you can't pass him immediately,
4   you have to refer him to a specialist, you
5   understand that?
6      A.  Yeah, if he disclose.
7      Q.  If he disclosed and in this case,
8   he didn't disclose, right?
9      A.  Yes.
10     Q.  And that calls into question the
11  validity of the certificate, right?
12         MR. NADLER:  Objection.
13     A.  Yes.
14     Q.  The second thing I will now
15  disclose to you is that in the context of the
16  medical records from Dr. Marino, he has a
17  note from December 2012 in which he
18  identifies that the patient, Mr. Frilando,
19  had been to the ER because he was having
20  difficulty breathing and chest discomfort
21  where he was diagnosed with A fib.  He then
22  identifies an issue of rectal bleeding that
23  was also a concern at that point and then
24  there is a third problem that he identifies
25  and I'm going to read it to you.  The third

Page 52

Y. Kyi
1
2   problem is sleep apnea.  The brother says
3   that he snores all night and has periods
4   where he stops breathing for a few seconds.
5          Now, in the context of the medical
6   examination you performed, Mr. Frilando did
7   not say in any way that he had been diagnosed
8   with sleep apnea, right?
9      A.  No.
10     Q.  He didn't mention to you that his
11  treating physician had recommended and really
12  required him to go to a sleep apnea clinic?
13         MR. NADLER:  Objection.
14     Q.  Right, he didn't say any of that?
15     A.  He didn't say.
16     Q.  He didn't tell you he had chosen
17  not to his doctor's recommendation?
18         MR. NADLER:  Objection.
19     A.  He didn't say.
20     Q.  If he said to you in the
21  examination, my doctor has identified this
22  problem of sleep apnea and I was supposed to
23  go to a clinic, but I didn't, you would not
24  have certified him?
25     A.  Yes.

Page 53

Y. Kyi
1
2      Q.  You would have said, I can't do it,
3   you have to go to a sleep apnea clinic,
4   right?
5      A.  Yes.
6      Q.  As you said earlier, you might have
7   just said no, right?
8      A.  Yes.
9      Q.  So, again, the failure to disclose
10  that information calls into question the
11  validity of the certification, right?
12         MR. NADLER:  Objection.
13     A.  That's lawyer job, not my job.
14     Q.  You wouldn't have certified him
15  with that information?
16         MR. NADLER:  Objection.
17     A.  Yes.
18     Q.  You would agree?
19     A.  Yes.
20         MR. HALLER:  I want to take a break
21     off the record.
22         (Recess.)
23     Q.  If we could go to the second page
24  of BDTS 28.  I just want to confirm for the
25  record, on the question about whether there



14  (Pages 50 to 53)

Page 54

```
1               Y. Kyi
2  he has any illness or injury in the last five
3  years, he said no, right?
4       A.  Yes.
5       Q.  The question on whether he had any
6  history of heart disease or heart attack or
7  other cardiovascular condition, he said no?
8       A.  Yes.
9       Q.  And then on the question on the far
10 right, sleeping disorders, pauses in
11 breathing while sleep, daytime sleepiness and
12 loud snoring, he said no, correct?
13      A.  Yes.
14           MR. HALLER:  I have no further
15 questions.
16 EXAMINATION BY
17 MR. NADLER:
18      Q.  I have one follow-up question.
19           When somebody comes to you for a
20 medical certificate because they would like
21 to get their CDL and looking for that FMSCA,
22 everybody that comes to you, on this form,
23 they self-report, is that correct?
24      A.  Yes.
25      Q.  So everybody is telling you on this
```

Page 55

```
1               Y. Kyi
2  form that was presented earlier on BDTS 28
3  what their health history is?
4       A.  Yes, we ask them, we ask line by
5  line.
6           MR. NADLER:  I have no further
7  questions.
8           MR. HALLER:  Thank you very much.
9           (Time noted:  1:50 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 56

```
1
2                  - - -
3               I N D E X
4                  - - -
5
6  YU KYI                    PAGE
7    By Mr. Haller             3
8    By Mr. Nadler            54
9
10                 - - -
11             E X H I B I T S
12                 - - -
13 BDTS EXHIBIT               PAGE
14 Exhibit 25 Subpoena served on Dr. Yu   11
15   on or about October 27, 2015
16 Exhibit 26 Series of documents        12
17 Exhibit 27 Letter dated January 21,   13
18   2016 from Blank Rome, LLP with
19   attachments
20 Exhibit 28 Medical records of Kenneth  18
21   Frilando
22 Exhibit 29 Document entitled Complete  24
23   Guide to Medical Examiner
24   Certification
25 Exhibit 30 Medical Examiner Handbook   24
```

Page 57

```
1
2                 - - -
3        DEPOSITION SUPPORT INDEX
4                 - - -
5  Direction to Witness Not to Answer
   Page Line  Page Line   Page Line
6  None
7                 - - -
8  Request for Production of Documents
   Page Line  Page Line   Page Line
9  None
10                - - -
11 Stipulations
   Page Line  Page Line   Page Line
12 None
13                - - -
14 Questions Marked
   Page Line  Page Line   Page Line
   None
15                - - -
16
17
18
19
20
21
22
23
24
25
```



Page 58

```
1
2                  CERTIFICATE
3
         I HEREBY CERTIFY that the witness,
4    YU KYI, was duly sworn by me and that the
     deposition is a true record of the testimony
5    given by the witness.
6    _____
     Leslie Fagin,
7    Registered Professional Reporter
     Dated: February 3, 2016
8
9
10
         (The foregoing certification of
11   this transcript does not apply to any
12   reproduction of the same by any means, unless
13   under the direct control and/or supervision
14   of the certifying reporter.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 59

```
1
2            ACKNOWLEDGMENT OF DEPONENT
3
         I,                , do hereby
4    certify that I have read the foregoing pages,
     and that the same is a correct transcription
5    of the answers given by me to the questions
     therein propounded, except for the
6    corrections or changes in form or substance,
     if any, noted in the attached Errata Sheet.
7
8
9    YU KYI              DATE
10
11   Subscribed and sworn
     to before me this
12        day of           , 2016.
13   My commission expires:
14
     Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 60

```
1
2             - - - - - -
             E R R A T A
3             - - - - - -
     PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



16 (Pages 58 to 60)

**A**

**ability** 23:15 28:3
28:13 32:6 39:24
**able** 22:6,20 28:7
**absence** 32:17
50:12
**absolutely** 37:19
**accept** 46:9
**accident** 35:25
**accidents** 35:20
37:9
**acknowledgment**
59:2
**actual** 19:20
**acute** 41:14
**additional** 30:15
42:21
**address** 9:23
**administration**
23:10 25:10 27:10
**afternoon** 3:7
**agree** 11:10 17:21
46:17 53:18
**agreed** 4:10,11
**aids** 22:16,17,20
45:11 47:2
**alert** 34:24
**allergy** 21:5,7,7
**america** 5:9 6:22
6:22
**american** 7:23,23
7:24
**americas** 1:22
**analysis** 22:24 23:3
28:13
**answer** 4:8,22,25
36:11 40:18,24
57:5
**answers** 22:2 40:6
46:15 59:5
**anthony** 2:10 3:8
**apnea** 31:24 43:14
43:22 52:2,8,12
52:22 53:3
**appear** 14:10

**appearances** 2:2
**appendices** 27:3
**applied** 25:14
**apply** 23:14 58:11
**appointment** 19:23
**appreciate** 3:14
**april** 11:9
**arranged** 19:24
**aside** 10:21 23:5
**asked** 13:18 21:9
21:21 40:9 47:6
**asking** 4:13 11:23
15:24 45:21
**assessment** 37:16
42:21
**assisting** 8:16
**associated** 34:10
**association** 8:4
**assume** 4:17
**atrial** 47:15 48:3,12
48:16,17,18 49:3
**attached** 12:12
59:6
**attachments** 13:11
56:19
**attack** 54:6
**attorneys** 2:4,8
9:12
**audible** 4:21
**automatic** 43:7
44:19
**automatically** 41:3
41:4,5
**available** 7:5
**avenue** 1:15,22

**B**

**b** 2:10 56:11
**back** 19:13 23:6,14
44:3,6,10 45:2
**background** 6:10
44:25
**balance** 46:22
**balancing** 38:8
**based** 17:23 45:11
**basic** 36:12

**baum** 2:4 9:16
**bayside** 9:25
**bdts** 10:5 11:17,21
12:7,8 13:8,9 14:3
14:7 18:17,18,22
23:5 24:2,3,9,10
24:13,22 26:21
33:23 45:3 53:24
55:2 56:13
**beach** 5:22,22
23:13
**beginning** 12:13
34:3
**begins** 14:9 34:4
**bend** 44:8
**best** 4:8 20:21
**beyond** 47:4
**big** 36:24
**blank** 1:14 2:8 3:9
13:10,14 18:3,3
56:18
**bleeding** 51:22
**blood** 21:12 44:16
44:18,22
**board** 7:24,25
**booklet** 25:2
**bordentown** 1:9
3:9 10:10
**bottom** 38:17
**boulevard** 5:22
**break** 53:20
**breathing** 43:10
51:20 52:4 54:11
**briefly** 6:9
**bring** 29:23
**brooklyn** 7:2
**brother** 9:9 52:2
**brought** 3:12
**bullet** 28:12 30:25
**burma** 5:11 6:13
**business** 3:10 10:11
**byebye** 43:17

**C**

**call** 6:13 19:25 20:3
26:12 38:4

**called** 3:2 17:12
26:11
**calls** 51:10 53:10
**cant** 30:4 41:7,11
42:14 49:8 51:3
53:2
**capacity** 8:21
**capital** 6:19
**car** 37:5 44:9
**cardiac** 31:13
33:11 48:15,24
49:2 51:2
**cardio** 48:19
**cardiologist** 48:24
49:10 50:16
**cardiovascular**
41:15 43:7 54:7
**cargo** 35:4
**carrier** 23:9 25:9
**case** 3:11 10:17
22:23 42:14 51:7
**catastrophic** 35:21
**cause** 36:3
**cdl** 14:16 20:24
25:17 26:7,8 34:3
54:21
**center** 7:7
**certain** 30:21
**certainly** 50:4
**certificate** 15:21
17:12,13,14,22
18:4 19:11 23:22
24:20 39:4 45:4
51:11 54:20 58:2
**certification** 8:3
22:15 24:5,15
25:15 26:9,14,23
28:9,14 32:19
39:9 41:21 42:2
45:7 49:7 50:13
53:11 56:24 58:10
**certifications** 6:11
7:21
**certified** 8:4 23:15
25:6 35:18 45:16
46:19 48:8 52:24

53:14
**certify** 30:7 37:21
38:24 41:8 42:15
43:18,25 49:8
58:3 59:4
**certifying** 15:16
58:14
**cfr** 16:22
**chain** 37:7,8
**change** 36:13,14
48:7 60:3
**changes** 59:6
**character** 39:23
**check** 14:15 21:10
21:11,11,12,13,23
29:11 32:21 43:14
44:6,7
**checked** 21:15
50:18
**checkmark** 29:20
**checks** 35:5
**chest** 51:20
**chosen** 52:16
**chronic** 44:3,5
**circumstances**
15:12 37:5
**city** 6:19
**civ** 1:4
**clarity** 10:22
**clear** 42:11 49:10
**clearance** 32:13,18
48:24 49:2
**cleared** 50:9
**clearer** 19:5
**client** 10:9
**clinic** 43:22 52:12
52:23 53:3
**close** 7:12,13,14
**cmv** 27:6 32:7
39:25
**code** 5:23
**college** 6:25
**come** 13:15 19:13
20:4 23:6 26:6
37:13 43:16 44:5
45:2



**comes** 54:19,22
**coming** 3:14
**commencing** 1:15
**commercial** 15:3
  27:5 33:21 34:5
  34:10 39:24
**commission** 59:13
**companion** 24:8
**complaint** 10:8
**complete** 15:17
  17:15 21:17 24:4
  24:14 38:25 46:19
  56:22
**completed** 14:18
  15:7 16:14,18
  17:22
**completing** 15:13
**complexity** 27:19
**computer** 23:24
  26:15
**concentrate** 28:3
**concern** 48:13
  51:23
**conclude** 22:10
**conclusion** 45:16
**condition** 33:11
  43:4,25 49:17
  54:7
**conditions** 16:8
  28:2,17 32:5,10
  32:20 37:18 39:22
  40:10 41:15 47:6
**conducted** 14:22
  18:24
**confirm** 5:3 53:24
**confirmation** 30:8
**confused** 22:4
**connection** 9:13
  13:16
**connelly** 2:11
**considered** 33:5
**consistent** 41:19
**consult** 41:24
**contact** 9:2
**context** 51:15 52:5
**control** 58:13

**controlling** 34:25
**conversation** 22:6
**copied** 19:6
**core** 3:10
**correct** 4:2 5:5 6:3
  14:11 15:7,10,14
  15:22 16:23 17:3
  17:6,9,19 18:10
  19:11 24:20 25:6
  25:12 27:9 28:4,9
  28:19 31:5 33:17
  34:10 35:11,14
  39:10 45:8 49:20
  54:12,23 59:4
**corrections** 59:6
**countryside** 6:18
**course** 29:25 33:9
**court** 1:2,16 3:13
  4:22,25
**covered** 38:13
**crash** 35:25 36:17
**crashes** 35:8
**critical** 39:6
**criticism** 19:7
**current** 8:8 41:23
**cvd** 41:19,23

——————————
**D**

**d** 56:3
**dashboard** 35:2
**date** 1:16 14:18
  59:9
**dated** 13:9,13 56:17
  58:7
**day** 5:25 14:22
  26:16 30:4 46:18
  59:12
**daytime** 43:10
  54:11
**deaf** 22:5
**deals** 30:13
**death** 36:10,19
**december** 51:17
**decide** 42:11 50:3
**defendant** 1:10 2:8
**defendants** 10:5

**degree** 22:13
**delve** 40:11,15,25
  46:6
**demands** 27:12,22
  33:21
**department** 25:11
**depending** 43:6
**deponent** 59:2
**deposition** 1:13
  3:22 5:14 10:5,10
  13:17 45:12 57:3
  58:4
**depression** 32:3
**describe** 5:19 23:18
  39:15
**description** 34:2
**designation** 10:25
**desk** 20:2,3,3,11
**detail** 5:17 38:7
**detailed** 25:4
**details** 19:14,18
**detecting** 39:21
**determination** 15:3
**diagnosed** 42:7
  47:14 48:3,12,14
  51:21 52:7
**diagnosis** 48:22
  49:3
**diagnostic** 30:14
**didnt** 10:19 49:23
  50:13 51:8 52:10
  52:14,15,16,19,23
**die** 36:5
**difficult** 4:24
**difficulty** 51:20
**direct** 58:13
**direction** 57:5
**disclose** 51:6,8,15
  53:9
**disclosed** 51:7
**discomfort** 51:20
**discretion** 33:14
**discuss** 5:17
**discussion** 40:6
**discussions** 9:11,19
**disease** 29:14 41:14

  42:19,20 54:6
**disorder** 29:17
**disorders** 31:7,9
  43:9 46:22 54:10
**disqualification**
  43:8 44:19
**disqualified** 44:11
**disqualify** 38:4
  41:2,4
**disqualifying** 28:18
**district** 1:2,3 3:13
**dizziness** 43:3
**doctor** 3:7 44:24
  47:13 48:11 49:8
  52:21
**doctors** 52:17
**document** 10:13,23
  11:2 12:13,18,24
  14:7 15:2 16:11
  18:17 21:18 24:3
  24:8,14,17 26:22
  33:23 38:6 45:8
  56:22
**documentation**
  41:25
**documenting** 30:14
**documents** 11:14
  11:15 12:9 13:16
  18:23 24:13 25:8
  26:18 56:16 57:8
**doesnt** 4:13 32:23
  32:24 44:10 48:17
**doing** 3:10 16:2
  35:13
**dont** 4:12,16 9:14
  10:18 20:8 22:8,8
  40:14 43:15 44:19
  50:23
**dr** 3:21 5:3,23 10:3
  11:18,20 13:13
  18:16,21 24:12
  26:18 35:11 44:25
  48:11 50:23 51:16
  56:14
**drink** 21:9
**drive** 28:3 29:14

**driven** 37:2
**driver** 1:9 15:3
  25:17 26:6 31:6
  34:3,4 38:19
  39:24 40:6 41:18
  41:20,23 44:9
**drivers** 16:23 33:22
  38:18 41:24
**driving** 3:10 27:13
  34:5,10,16
**drop** 32:24
**duly** 3:3 58:4

——————————
**E**

**e** 56:3,11 60:2
**ear** 29:11,11
**earlier** 20:8 38:24
  45:12 53:6 55:2
**early** 26:10
**easier** 19:8
**east** 2:5
**educational** 6:10
**effect** 16:8 28:2,8
  34:17 39:23
**eight** 6:20
**eisenberg** 2:4 9:16
**either** 42:14 50:8
**ekg** 48:15
**emotional** 27:21
  32:2
**emphasize** 21:24
**endocrine** 31:17
**ensure** 35:13 39:7
**ensuring** 39:6
**entering** 35:3
**entitled** 16:16,22
  24:3,14 56:22
**environment** 27:5
**epilepsy** 40:23
**equals** 36:13,19
**er** 51:19
**errata** 59:6
**esquire** 2:6,10,11
**essential** 37:19
**essentially** 13:18
**establish** 23:7



evaluate 48:19
evaluated 46:25
evaluation 41:21
events 5:13
everybody 33:8
  54:22,25
evidence 31:6
exam 6:23,24 20:24
  23:21,22 32:23
examination 3:5
  5:16 8:25 14:16
  14:22 15:2,19
  16:9,17 17:3,24
  18:24 19:15,19
  20:22 25:16 26:20
  29:7,20 30:2
  32:11 33:10 37:17
  38:20 39:3 45:5
  47:17 50:17 52:6
  52:21 54:16
examinations 25:24
examined 3:4 9:8
  20:14 33:3
examiner 8:5,21
  17:6 23:9,16 24:4
  24:10,15,23 29:9
  32:12 33:20,25
  35:13 40:5 56:23
  56:25
examiners 17:12
  18:3 19:11 25:5
  26:23 27:11 30:20
  39:4,15
exhibit 10:6 11:17
  12:8 13:9 18:18
  24:3,10 56:13,14
  56:16,17,20,22,25
exhibits 14:3 31:6
existing 50:8
exiting 35:3
expect 10:19
expires 59:13
extent 39:23
extra 32:12
eye 21:11

**F**
facility 6:17
fact 35:23 49:23
factors 34:9
faculty 7:9
fagin 1:16 58:6
fail 23:4
failure 53:9
fainting 43:2,5,5,6
fair 4:18 30:9
fairly 42:18
false 15:18 39:2
familiar 24:16,25
  28:22 34:13,19
familiarity 27:11
familiarization
  27:4
family 5:24 6:4,5
  6:17 7:6,12,17,23
  7:24,24 8:12 9:8
far 7:10 54:9
fatal 35:25
fatalities 35:9
fax 12:19
february 1:15 58:7
federal 23:9 25:9
fee 26:14
fellowship 6:17
fib 51:21
fibrillation 47:15
  48:3,13,16,17,19
  49:4
fifth 12:13 30:25
filed 10:8 11:6
files 11:23 19:6
filled 45:21
find 26:10 33:10
  50:21
fine 42:23
finish 7:8
finished 7:4
firm 3:8
first 3:20 4:7 9:21
  19:20 24:13 45:6
fitness 15:3

five 46:2 54:2
fix 5:18
floor 2:5,9
fmcsa 8:21 23:8
fmsca 54:21
focus 30:24
fold 36:19
following 19:14
  31:7
follows 3:4
followup 48:23
  50:5 54:18
foregoing 58:10
  59:4
form 15:6,14 21:17
  21:19 38:20 40:7
  45:20 47:24 54:22
  55:2 59:6
found 29:18 36:12
  37:25
four 17:8
friends 26:8
frilando 1:6 3:12
  5:15 8:20 9:2,18
  10:8 11:11,16,24
  12:15,22 14:5,18
  18:19,25 19:21
  20:15 46:18 47:14
  47:25 49:6,19
  51:18 52:6 56:21
frilandos 19:19
front 20:2,3,3,11
  29:21 44:23
full 3:18,19
fully 4:8 26:18
further 41:21 47:6
  54:14 55:6

**G**
gears 35:3
general 6:4,5,8,16
  6:24 7:2 14:22
  15:25 20:5 34:2
  35:14
generally 12:3

23:18 24:16 42:24
  43:18
getting 24:20 32:17
  50:8
give 3:22 4:21
  17:14,17 23:22
  29:12
given 17:23 18:21
  19:24 22:5 29:6
  48:5 58:5 59:5
giving 39:10
go 4:4 14:8 23:7
  26:14,21 27:16
  29:23 30:11 33:22
  33:23 34:8 35:7
  38:5,6,16 39:14
  40:20,21 41:13
  42:9 43:2 45:6,19
  52:12,23 53:3,23
goes 17:8 34:22
  40:4
going 5:13 8:22
  10:3,9 11:13 12:6
  18:16 19:4 23:5,6
  23:25 24:7 26:4
  38:6 40:20,21
  51:25
good 3:7 29:11,12
  33:7
graduated 6:12
graduation 6:15
greater 36:13
ground 4:5,21
guide 24:4,14 26:22
  33:20 56:23
guidelines 25:5
guy 29:13 44:21

**H**
h 56:11
half 50:20
haller 2:10 3:6,8
  53:20 54:14 55:8
  56:7
handbook 24:11,23
  34:2 56:25

handed 14:8
happened 20:22
harm 36:25
havent 9:4
health 21:19 32:2
  38:18 39:20 55:3
healthcare 41:24
hear 22:11,21
  45:13
hearing 21:11
  22:16,17,20 29:11
  29:12,12 45:11
  46:21 47:2
heart 21:13,14
  41:13 54:6,6
height 7:6 21:10
held 1:14
help 45:13
helping 20:18
high 36:11 44:16
hip 21:5 42:22
history 21:19 28:8
  29:17 37:18,23
  38:18 39:20 40:10
  42:6 49:9 54:6
  55:3
home 9:23
hospital 7:2,10
hospitalization
  21:8
hour 26:16 50:20
hours 44:10

**I**
identification 11:19
  12:9 13:12 18:20
  24:6,11 34:16
  38:17
identified 10:4 29:2
  30:22 32:10,20
  38:24 47:5 48:22
  51:3 52:21
identifies 34:9
  51:18,22,24
identify 28:7 29:5
  29:10 30:3



**identifying** 37:17
**illness** 45:25 54:2
**im** 3:8,15 4:13 8:22
  10:3,9 11:13 12:6
  15:24 18:16 19:4
  22:4 23:5,6,25
  24:7 38:6 40:20
  40:21 42:18,24,24
  48:10 49:11 51:25
**immediately** 51:3
**implications** 38:11
**importance** 39:6
**inaccurate** 15:18
  39:2
**includes** 12:11
  45:10
**including** 18:12
**index** 57:3
**indication** 42:20
**individual** 12:25
  39:8 45:20
**infarction** 41:14
**information** 15:17
  15:18 17:15,23
  29:6 35:8 38:2,25
  39:3,9,20 48:6
  49:14,19 53:10,15
**initially** 8:6
**injuries** 35:8
**injury** 36:5,12 46:2
  54:2
**inquire** 47:6
**institute** 6:12 8:7
**instructions** 17:5
**intended** 14:14
**interfere** 32:6
**internal** 6:6
**internist** 18:13
  48:22,25 49:7
**internship** 6:15
**interpreter** 20:18
  20:19
**invalidate** 15:19
  39:3
**involves** 23:19 36:2
**involving** 35:20

**island** 6:25
**isnt** 4:25 50:14
**issue** 30:9 44:4,17
  51:2,22
**issued** 25:8
**issues** 34:17
**ive** 11:20 18:21
  42:8

**J**

**january** 13:10,14
  56:17
**jersey** 1:3 3:13
**job** 6:23 7:5,8 34:5
  35:13 37:19 50:22
  53:13,13
**john** 2:11 7:9
**judgment** 44:12,13
**july** 5:15 8:22
  14:19 17:22

**K**

**k** 3:2
**kenneth** 1:6 12:15
  12:23 18:19 56:20
**kind** 43:3,12
**kinds** 34:20
**knew** 49:13
**know** 4:14 8:19
  9:14 10:18,20
  20:13 37:4 47:16
  49:13,18 50:13
**knowledge** 4:9
**kyi** 1:13 3:1,20 4:1
  5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1

43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:6 58:4
  59:9

**L**

**language** 20:19
  22:7,8
**large** 27:14 35:16
  35:21 36:2,5
**late** 5:15 26:10
**law** 1:14 3:8
**lawyer** 53:13
**lay** 36:23
**leading** 46:25
**learn** 26:2 41:11
  42:5
**learned** 29:16
**led** 47:5,19
**legal** 1:21 25:20
**legible** 19:5 45:3,4
**leslie** 1:16 58:6
**letter** 12:11 13:9,13
  56:17
**lexington** 1:15
**license** 7:22 8:5
  14:15,16 20:24
**licensed** 5:4
**licensures** 7:20
**lighter** 36:18,20
**limp** 32:22,24
**line** 10:25 55:4,5
  57:5,5,8,8,8,11
  57:11,11,14,14,14
  60:3
**list** 26:12 28:11
  34:23 35:18
**listed** 46:20
**lists** 31:9
**litigation** 3:16 9:13
  10:5 19:2
**little** 22:4,9
**llc** 1:9
**llp** 1:14 2:4,8 13:10

56:18
**loading** 35:3
**located** 5:20
**log** 26:15
**logan** 2:9
**long** 5:7 6:25 28:11
**look** 26:11 35:23
  36:23
**looked** 22:22 50:3
**looking** 25:17
  48:10 54:21
**looks** 35:24 38:8
**loss** 29:11 46:22
**loud** 43:11 54:12
**louder** 22:9
**low** 44:6

**M**

**m** 1:16 55:9
**magna** 1:21
**major** 21:13
**making** 37:12
**manipulating** 35:2
**marino** 48:11 51:16
**mark** 12:7 13:8
  18:17 24:2,9
**marked** 11:19,21
  12:9 13:11 15:2
  18:19,22 24:5,11
  45:2 57:13
**mass** 36:14,18
**materials** 12:10
**matter** 9:18 33:13
**mean** 44:10 48:18
**means** 58:12
**meant** 19:7
**measure** 35:16
  50:20
**medical** 5:16 6:11
  7:6,17 8:5,19,21
  8:25 11:15,23
  12:14,24 14:4,15
  15:2 17:6,12 18:8
  18:11,18 19:10,15
  20:9,11,22,25
  23:9,15 24:4,10

24:14,23 25:5
  26:22 27:10 28:7
  28:13 29:9 30:15
  30:16,20 32:5,11
  32:11 33:19,25
  35:13 37:12,18
  38:20 39:4,15
  40:5,7 47:7,11
  48:10 51:16 52:5
  54:20 56:20,23,25
**medicine** 5:8 6:7,13
  6:16,16,18 7:6,24
  8:10
**meets** 17:18
**member** 9:8
**mental** 32:2 39:22
**mention** 52:10
**mentioned** 8:6
**met** 11:11
**middle** 3:20
**miles** 6:19
**minimum** 43:21
**minute** 50:19,22
**mirrors** 34:25
**misled** 37:22 38:3
**missing** 15:18 39:2
**mistakenly** 49:6
**misunderstood**
  20:7
**monday** 5:25
**monitor** 48:15
**monstrously** 36:24
**mother** 9:9
**motor** 23:9 25:9
  27:5 39:25
**move** 44:7
**multiple** 37:8
**muscular** 42:19,20
**musculoskeletal**
  31:19
**myanmar** 6:14
  8:11,11
**myocardial** 41:14

**N**

**n** 56:3



**nadler** 2:6 9:15,15
47:24 49:21 50:6
50:15 51:12 52:13
52:18 53:12,16
54:17 55:6 56:8
**name** 3:7,18,19,19
3:20,20 8:8 9:15
10:11
**named** 5:23
**national** 8:4 23:16
25:21 26:4,8
**necessary** 3:16
**necessity** 27:25
**need** 26:8 29:2
40:25 41:6 42:12
42:21 43:4 47:20
**needed** 45:13 49:18
**needing** 48:6
**neurological** 29:17
29:19 31:21
**neurologist** 29:23
**neurology** 29:24
**never** 18:10 48:2
**new** 1:3,15,15,17
1:22,22 2:5,5 3:13
5:5,22 7:22 9:25
26:3
**night** 52:3
**noon** 6:2
**normal** 15:12 22:21
**north** 2:9
**notary** 1:16 3:3
59:14
**note** 51:17
**noted** 55:9 59:6
**notes** 14:17
**notice** 1:14
**number** 11:2
**nurses** 8:17

**O**

**objection** 47:24
49:21 50:6,15
51:12 52:13,18
53:12,16
**observe** 30:3

**obstructive** 31:23
**obtain** 39:20 41:25
**obtaining** 30:13,14
**occasion** 8:24
**occupants** 36:3,5
36:10
**occurred** 5:14
**october** 11:18,22
56:15
**odd** 6:23
**office** 5:23 6:18
7:12,13,14,15
8:17,20 11:15
12:25 13:14 18:8
23:11 33:6 44:5
**offices** 1:14
**official** 7:20
**okay** 5:2 19:8 20:4
26:9
**once** 17:15 25:5
48:17
**open** 5:25 6:18
**operate** 32:6 37:14
39:24
**operations** 27:6,19
**opinion** 30:15
**order** 17:17 25:16
37:16
**organic** 39:22

**P**

**p** 1:16 55:9
**page** 10:25 11:4
12:13,19,21,23
14:9 16:11,16,21
17:5 18:2 19:10
21:18 26:21 27:2
28:6,6 30:11,13
33:23 34:3,9,9,22
35:7,23 38:5,8,16
38:18 39:14 40:20
41:13 42:17 43:2
45:6,19 46:15
53:23 56:6,13
57:5,5,5,8,8,8,11
57:11,11,14,14,14

60:3
**pages** 14:10 17:8
59:4
**pain** 44:3,6,10
**palpate** 50:18
**paper** 29:23
**parens** 39:25
**part** 22:14 25:10
27:9 30:19 34:13
50:17
**particular** 32:10
**pass** 28:14 29:22
44:8,19,23,24
51:3
**passed** 6:24
**passenger** 36:3,10
**pathology** 6:25 7:2
7:25
**patient** 15:10,13,16
16:2 20:5 29:6
43:16 48:12 51:18
**pauses** 54:10
**pausing** 43:10
**pennsylvania** 2:10
**people** 19:25 27:13
27:22 35:17 37:13
**perception** 45:12
**performance** 32:22
**performed** 52:6
**performing** 30:13
35:4
**periods** 52:3
**persistent** 48:18
**person** 17:18 28:14
33:6,10 37:17
40:11 42:5 44:6
**persons** 36:19
**perspective** 29:9
**philadelphia** 2:10
**physical** 16:17,22
16:25 39:22
**physically** 32:21
**physician** 5:4 16:14
16:19 30:16 52:11
**physicians** 8:13
**physics** 36:12

**pick** 40:22
**picked** 42:17
**picking** 30:12
**picture** 35:24 36:9
**placed** 27:13 33:21
**places** 27:22
**plaintiff** 1:7 2:4
9:17
**please** 3:17 4:14
**point** 4:20 11:11
21:24 22:19 25:19
42:18 49:16 51:23
**position** 3:22
**possession** 13:5
**potential** 29:3,7
30:3
**practice** 5:20,21,24
5:24 6:4,5,8,20
7:13,17,18,23
8:12,12 20:5
**practicing** 5:7 7:16
**preexisting** 40:10
**presence** 39:21
**present** 20:14
**presented** 24:9
43:24 55:2
**pressure** 21:12
44:16,18,22
**previously** 10:4
**prior** 37:22 41:21
41:25 47:7,10
**private** 7:18 8:5
**problem** 20:25 21:3
29:3,8 30:4 41:7,7
49:24 51:24 52:2
52:22
**problems** 30:21
**proceed** 4:6
**process** 4:2 23:19
24:20 27:16 45:24
**produce** 13:16,18
**produced** 13:20
18:25
**production** 57:8
**professional** 58:7
**program** 7:11

**propounded** 59:5
**provide** 6:9
**provided** 38:2
**provider** 41:24
**public** 1:17 3:3
35:14 38:9 59:14
**pulmonary** 31:15
**pulse** 50:18,18,19
50:20,21,22
**purpose** 39:19
**purposes** 3:16
**pursuant** 1:14
**put** 10:21 11:13,20
13:17 18:16 21:5
23:5,16 24:12,22

**Q**

**qualifications**
16:23 17:2
**qualified** 37:13
48:8
**qualify** 43:16
**question** 4:15,17
12:20 21:21 44:12
51:10 53:10,25
54:5,9,18
**questions** 4:8 26:17
40:9 45:22 54:15
55:7 57:13 59:5
**quick** 6:11

**R**

**r** 60:2,2
**random** 42:18
**rangoon** 6:19 8:7
**rate** 21:14
**rates** 36:10
**reached** 45:15
**reaction** 37:7,8
**read** 51:25 59:4
**really** 36:24 37:11
50:14 52:11
**reason** 50:24
**recall** 12:3 20:17,21
23:12
**receive** 18:11



received 39:8
receiving 12:3
receptionists 20:10
recess 53:22
recollection 19:21
recommendation
    22:14 46:25 52:17
recommended
    48:23 52:11
record 3:18 5:4
    9:24 11:10 13:24
    14:13,21 17:21
    23:8 42:9 48:10
    53:21,25 58:4
records 8:19 11:15
    12:14,24 14:4
    18:8,11,13,18
    47:7,11,21 50:9
    51:16 56:20
rectal 51:22
refer 10:9 30:25
    31:5 32:12 41:20
    42:7 44:14 47:20
    51:4
referring 33:20
regardless 36:2
registered 58:7
registry 23:16
    25:21 26:5,9
regular 50:19,22
regulations 28:19
    40:4 50:25
regulatory 17:19
relate 11:14 18:12
    28:17
related 11:16 14:10
    18:23
relating 11:23
relative 36:13,14
relevant 28:12
    39:21
rely 48:6
relying 16:2 21:25
    46:11
replacement 21:6
    42:22

report 15:2 19:15
    38:20 43:5 45:5
reporter 1:16 4:22
    4:25 58:7,14
reports 41:18,23
represent 3:9 10:7
    18:22 48:21
representing 9:12
    9:17
represents 14:4
    18:7
reproduction 58:12
request 11:14
    13:18 57:8
requested 18:10
require 48:25
required 28:22
    34:24 48:23 50:5
    52:12
requirement 21:13
    25:20 26:3 35:17
    45:10 51:2
requirements
    17:19 23:8 30:21
residency 6:25 7:3
resident 7:9
resolve 30:4
respect 12:25
responsibilities
    27:4 39:16
responsible 15:13
rest 12:18
restate 4:14 12:20
review 40:5
right 7:5 13:2 14:23
    16:13 19:16 21:6
    27:14 28:15 30:9
    30:22 31:11 32:9
    32:15 35:5 36:15
    37:2,14,23 38:9
    38:11,14 40:7,18
    41:12 45:17,22
    46:7 48:8 50:14
    51:8,11 52:8,14
    53:4,7,11 54:3,10
risk 36:19

rockaway 5:21,22
    7:10 23:13
role 26:19 34:3
    35:12
rome 1:14 2:8 3:9
    13:10,15 56:18
rule 25:23
rules 4:5,21

────── S ──────
s 56:11
safely 28:3 32:6
    37:2 39:25
safety 23:10 25:9
    34:17 35:14 38:9
    38:10
satisfied 7:4 17:18
saturday 6:2
saw 8:20,25 24:19
    49:19
saying 6:3 39:19
    46:12 49:11 50:17
says 11:2,6 30:25
    31:5 34:4 35:24
    36:11,17 38:18,19
    40:11 41:18 42:5
    48:11 52:2
schizophrenia 32:3
school 1:9 3:10
second 21:18 28:12
    33:23 51:14 53:23
seconds 52:4
securing 35:4
see 9:21 10:24 11:7
    11:25 12:16,21
    14:19 15:4 20:5
    20:19 23:12 27:7
    29:23,24 30:17
    31:3 33:25 34:6
    34:23 35:7 36:7
    36:21 38:7,21
    39:17 40:2 41:16
    48:16
seeing 19:21
seen 10:13 18:14
    47:10,22

seizure 41:2
seizures 40:23
selfreport 54:23
send 29:13 30:5
    33:7,12 43:21
    47:7
sense 4:13
sent 12:11 43:15
sentences 38:23
series 12:8 56:16
serious 36:4 37:11
    49:18 50:4
seriously 35:12
served 11:17,22
    56:14
services 1:21
set 12:10 25:4
seth 2:6 9:15
seven 44:9
severity 36:12
sheet 59:6
shifting 35:2
show 10:3 12:6
    13:7 23:25 24:7
    32:23,24
side 21:6 34:25
sign 20:18 22:7,8
signature 19:16
    38:19 39:7 45:7
signed 15:9 45:20
significant 36:25
signs 38:20
sit 44:9
site 26:12,13
sitting 10:16 47:11
six 36:19 44:9
skill 32:22
sleep 31:23,24 43:9
    43:10,14,15,22
    52:2,8,12,22 53:3
    54:11
sleepiness 43:11
    54:11
sleeping 54:10
smaller 26:21
smith 3:11 10:11

smoke 21:9
snores 52:3
snoring 43:11
    54:12
solomon 3:11 10:12
somebody 25:16,21
    37:22,25 43:24
    54:19
somebodys 28:2
sorry 3:15
sort 27:19 34:15
    38:8 45:24
sound 21:13
spar 50:23
spasm 29:21
specialist 18:14
    30:5,8,16 31:2,6
    32:13,18 41:20
    44:15 47:8,21
    51:4
specialty 6:6
specifically 46:24
speculate 49:17
speech 22:21
spell 8:9
spoken 9:4,7
square 2:5,9
st 7:9
staff 8:17 19:25
    20:9
started 5:24
starting 12:14
starts 12:22 27:2,3
    39:15,19
state 1:17 3:17 5:5
    7:22 9:23
states 1:2 3:12
staying 34:24
steering 34:25
step 32:12
stipulations 57:11
stopped 6:21
stops 52:4
street 2:9 9:25
stress 34:9
student 20:12



**studied** 8:6
**study** 43:15
**subject** 5:14 17:2
**subpoena** 11:17,21
  12:4,12 13:15
  56:14
**subscribed** 59:11
**substance** 59:6
**subtle** 33:2
**summary** 6:11
  12:15,22 14:9,11
  14:14 16:25 28:7
**supervision** 58:13
**support** 8:14 57:3
**suppose** 10:22
**supposed** 29:8
  43:13 52:22
**sure** 4:5 13:23
  22:25 27:25 32:14
  37:12,15,24 41:6
  42:4 47:18
**surgery** 21:4 42:23
**sustain** 36:4
**sworn** 3:3 58:4
  59:11
**symptoms** 41:19
  42:6 43:12

**T**

**t** 56:11 60:2
**take** 3:15 4:23
  23:21 32:12 35:12
  53:20
**taken** 1:13
**talk** 8:23 20:20
**talked** 33:19
**talking** 42:24,25
**talks** 38:10 40:17
**tape** 26:16
**tasks** 27:12 34:16
**taught** 29:2
**teaching** 30:20
**tell** 16:7 20:21
  47:13 49:23 52:16
**telling** 50:12 54:25
**tells** 30:2

**terms** 15:25 36:23
  46:17
**terrible** 35:25
**test** 21:14 29:12,12
  43:15
**testified** 3:4 50:25
**testify** 13:15
**testimony** 58:4
**testing** 16:12 30:15
**tests** 30:14
**thank** 55:8
**thats** 3:11 8:3 13:6
  15:20 16:25 21:12
  21:15,18 22:3
  32:15 33:13 35:16
  38:23 53:13
**theyre** 39:9
**theyve** 25:5
**thing** 37:11 41:10
  43:9 46:21 51:14
**things** 28:8,12,23
  33:2 34:12,20,24
  38:13 46:20
**third** 51:24,25
**three** 11:13
**time** 3:15,24 5:19
  9:7,21 11:11 12:4
  13:4 55:9
**timeframe** 5:18
**titled** 16:12
**today** 3:14 5:14
  10:16 13:15 47:11
**told** 43:3,11 46:18
  48:2 50:2
**top** 10:24 11:4
  19:10 38:7
**totality** 18:7
**track** 3:9
**trailer** 3:10
**train** 23:23
**trained** 35:17
**training** 1:9 7:9
  20:12 23:20,21,24
  23:24 26:12,13,14
  26:15 27:10 28:21
  28:25 30:20 34:13

38:14
**transcript** 4:24
  58:11
**transcription** 59:4
**transmittal** 12:20
**transportation**
  25:11
**treated** 42:8
**treating** 30:16
  52:11
**tried** 26:7
**truck** 36:2,6
**trucks** 27:14
**true** 15:17,20 22:3
  38:25 46:14,20
  47:25 58:4
**truthful** 16:4,5
  39:12,13
**truthfulness** 21:25
  37:17 46:11
**try** 49:7
**trying** 26:19
**turn** 10:23
**twice** 36:18
**twisting** 29:21
**two** 14:9 20:2,9,11
  24:12 38:23 43:16
**twominute** 50:22
**type** 43:6

**U**

**u** 3:2
**understand** 4:5,12
  25:14 26:18 33:9
  35:12 39:2 42:4
  49:11 51:5
**understanding**
  3:25 4:18 10:17
**understood** 4:17
  13:21 27:18,21,24
**undiagnosed** 41:19
**union** 2:5
**united** 1:2 3:12
**university** 8:10
**urine** 21:14
**use** 19:4,8 22:6,8,17

**usually** 20:23 43:15

**V**

**valid** 32:19 33:16
  50:14
**validity** 51:11
  53:11
**vantage** 22:19
**variety** 27:12
**vehicle** 27:5 35:3,4
  36:17,18,20 39:25
**vehicles** 35:21 36:4
  36:11,24 37:14
**velocity** 36:13,14
**verbal** 4:22,25
**verify** 38:19
**version** 45:4
**view** 12:15,22 14:9
  48:7
**vision** 31:11

**W**

**walk** 20:6 33:6
**walked** 21:15
**walking** 33:7 42:23
**want** 7:11,13 13:23
  20:5 23:7 26:7
  29:24 37:21 42:4
  50:23 53:20,24
**wanted** 5:3 10:20
  47:16
**wants** 27:10
**watched** 26:16
**way** 19:5 23:2,11
  52:7
**wear** 45:11
**wearing** 47:2
**website** 26:11
**weight** 21:11
**went** 7:14 49:6
  50:24
**whats** 14:3 18:21
**wheel** 35:2
**win** 3:20
**witness** 3:2 57:5
  58:3,5

**work** 7:12 27:5
  38:9
**working** 20:4
**wouldnt** 30:7 37:21
  43:18 45:16 53:14
**wrist** 32:24
**write** 21:3
**wyckoff** 7:6

**X**

**x** 1:5,11 56:3,11

**Y**

**y** 3:1,2,2 4:1 5:1 6:1
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
**yangon** 6:13,14
  8:10,11
**yeah** 4:3 11:5,8
  12:2,5,17 13:3
  14:12 16:15 17:4
  17:7,25 22:18
  25:13,18 26:25
  27:15,17 30:6
  31:8,12,14,16
  32:16 33:15 34:7
  40:13 42:10 43:23
  45:14 49:15 51:6
**year** 6:17
**years** 6:20 23:22
  46:2 54:3
**york** 1:15,15,17,22



1:22 2:5,5 5:5,22
7:22 10:2
**young** 44:21
**youre** 26:19 28:21
**youve** 7:16 33:16
48:5
**yu** 1:13 3:19,21 5:3
5:23 10:3 11:18
11:20 13:13 18:17
18:21 24:12 26:18
35:11 44:25 50:23
56:6,14 58:4 59:9

---

**Z**

**zip** 5:23

---

**0**

**00** 6:2,2
**04** 11:6

---

**1**

**1** 10:5,6 11:2 55:9
**10** 23:22
**10003** 2:5
**10026** 1:22
**11** 56:14
**11364** 10:2
**11693** 5:23
**11th** 2:9
**12** 1:15 6:2 56:16
**1200** 1:22
**13** 56:17
**130** 2:9
**15** 11:6
**15cv02917kmjbc**
1:4
**160** 44:18
**17** 33:24 34:4
**18** 34:9 56:20
**180** 44:22
**18th** 2:9
**19103** 2:10
**1977** 6:14
**1979** 5:11
**1988** 5:12 6:21
**1994** 7:4,7

**1996** 5:9
**1997** 7:7,8,10,19

---

**2**

**20** 34:22
**2005** 7:10,11
**2006** 5:25 7:17,18
**2012** 51:17
**2014** 23:17 25:19
26:10,10
**2015** 5:15 8:22 11:9
11:18,23 14:19
17:23 56:15
**2016** 1:15 13:10,14
56:18 58:7 59:12
**21** 13:10,14 35:7,23
56:17
**213th** 9:25
**22** 26:21
**23** 28:6
**24** 2:5 11:6 38:5
56:22,25
**24th** 11:9
**25** 6:19 11:17,21
30:11,13 56:14
**26** 12:7,8 14:3
56:16
**27** 11:18,22 13:8,9
14:4,7 38:16
56:15,17
**28** 18:17,18,22 23:5
39:14 45:3 53:24
55:2 56:20
**29** 24:2,3,13 26:21
40:20 56:22

---

**3**

**3** 1:15 56:7 58:7
**30** 14:19 17:22 24:9
24:10,22 33:23
42:17 56:25
**30th** 8:22
**31** 43:2
**391** 16:22

---

**4**

**40** 1:15
**405** 1:14
**41** 16:22
**49** 16:22
**4th** 2:5

---

**5**

**5** 30:12
**50** 55:9
**54** 56:8

---

**6**

**6246221** 1:23
**6403** 9:25

---

**7**

---

**8**

**8** 6:2
**866** 1:23
**8704** 5:21
**88** 6:22,23
**89** 6:23

---

**9**

**90** 6:23



# EXHIBIT 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIV. NO.  15-CV-02917-KM-JBC

------------------------------------------ x

KENNETH FRILANDO,

      Plaintiff,

  -against-

BORDENTOWN DRIVER TRAINING SCHOOL, LLC,

      Defendant.

------------------------------------------ x

     Blank Rome, LLP
     405 Lexington Ave., 24th Fl.
     New York, N.Y.  10174

     July 27, 2016

     10:35 a.m.


   EXAMINATION BEFORE TRIAL of DANIEL COX,

Expert Witness, by the Defendant in the

above-entitled action, held at the above time

and place, taken before Joi Rafkind, a

shorthand reporter and Notary Public within

and for the State of New York.


     MAGNA LEGAL SERVICES
      (866)624-6221
      www.MagnaLS.com



```
                                                    Page 2
1    A P P E A R A N C E S :
2
3         EISENBERG AND BAUM, LLP
               Attorneys for Plaintiff
4              24 Union Square East, 4th Fl.
               New York, N.Y.  10003
5
          BY:  ANDREW ROZYNSKI, ESQ.
6
7
8         BLANK ROME, LLP
               Attorneys for Defendant
9              130 North 18th Street
               One Logan Square, 11th Fl.
10             Philadelphia, P.A.  19103
11        BY:  ANTHONY B. HALLER, ESQ.
               JOHN A. CONNELLY, ESQ.
12
13
14   ALSO PRESENT:
15   Robert Steinkopf, Videographer
     Magna Legal Services
16
17
18
19
20
21
22
23
24        xxxxx
25
```

```
                                                    Page 3
1              I N D E X
2    WITNESS        EXAMINATION BY       PAGE
3    DANIEL COX       MR. HALLER          5
4
5              EXHIBITS
6    FOR IDENTIFICATION   DESCRIPTION      PAGE
7    Cox Exhibit 1      Subpoena          7
8    Cox Exhibit 2      Report            34
9    Cox Exhibit 3      Article           75
10   Cox Exhibit 4      Article           87
11   Cox Exhibits 5-11   Documents         91
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 4
1         THE VIDEOGRAPHER:  We're now on the
2    record.  This begins DVD number one in
3    the deposition of Daniel Cox in the
4    matter of Kenneth Frilando v.
5    Bordentown Driver Training School, LLC
6    in the United States District Court for
7    the District of New Jersey.  Today is
8    Wednesday, July 27, 2016.  The time is
9    10:35 am.  This deposition is being
10   taken at 405 Lexington Avenue, New
11   York, New York at the request of Blank
12   Rome, LLP.  The videographer is Robert
13   Steinkopf of Magna Legal Services.  The
14   court reporter is Joi Rafkind of Magna
15   Legal Services.  Will counsel and all
16   parties present state their appearances
17   and whom they represent.
18        MR. HALLER:  Yes.  On behalf of the
19   defendant, Anthony Haller and John
20   Connelly of Blank Rome.
21        MR. ROZYNSKI:  On behalf of the
22   plaintiff, Kenneth Frilando, Andrew
23   Rozynski from the firm of Eisenberg and
24   Baum.  I'm also doing a limited
25   appearance for Mr. Cox today.
```

```
                                                    Page 5
1         THE VIDEOGRAPHER:  Will the court
2    reporter please swear in the witness.
3            x x x x x
4    DANIEL COX, the witness herein, having been
5    first duly sworn before a Notary Public of the
6    State of New York, was examined and testified
7    as follows:
8    EXAMINATION
9    BY MR. HALLER:
10        Q.  Please state your name for the
11   record.
12        A.  Daniel Cox.
13        Q.  Please state your address for the
14   record.
15        A.  5241 Wilson Mills Road, Richmond
16   Heights, Ohio 44143.
17        Q.  Good morning, Mr. Cox.
18        A.  Good morning.
19        Q.  As you just heard, my name is
20   Anthony Haller.  I'm with the law firm of
21   Blank Rome and I'm here with my colleague,
22   John Connelly, and we represent Bordentown
23   Driver Training School, LLC doing business as
24   Smith and Solomon in an action brought by
25   Mr. Frilando in the United States District
```



Page 6

1   Court for the District of New Jersey.  Good
2   morning to you and thank you for coming in, I
3   believe, from Ohio today?
4       A.  That is correct.
5       Q.  Could you please state your full
6   name and either business or home address for
7   the record.
8       A.  That is correct.  My full name is
9   Daniel Patrick Cox.  My business address is
10  5241 Wilson Mills Road, Richmond Heights,
11  Ohio 44143.
12      Q.  What is your occupation?
13      A.  I'm a -- well, several things; a
14  driving instructor, I guess, but also I own
15  the business of Heights Driving School,
16  Incorporated.
17      Q.  Could you just, for the record, tell
18  us what Heights Driving School does?
19      A.  Well, we're a full-service school.
20  We operate -- we teach teens, adult,
21  disabilities, we do assessments, so anything
22  that has to do with the driving realm for
23  passenger vehicles.
24      Q.  I'm going to put before you a
25  document that we have marked as Cox

Page 7

1   Deposition Exhibit 1; do you recognize this,
2   Mr. Cox?
3       (Whereupon subpoena was marked
4       Cox Exhibit 1 for identification as
5       of this date.)
6       A.  Yes, I do.
7       Q.  This is a subpoena issued to you to
8   testify at today's deposition, a notice of
9   deposition, along with a request for
10  production of certain documents, is that
11  right?
12      A.  That is correct.
13      Q.  Did you review this some time
14  shortly after it was served on the
15  plaintiff's law firm?
16      A.  Yes, I did.
17      Q.  Did you make an effort to put
18  together and produce the documents that are
19  listed on attachment B?
20      A.  Yes, I did.
21      Q.  Did you provide, through counsel for
22  the plaintiff, any and all documents that you
23  relied on or considered at arriving at your
24  opinions or conclusions in this lawsuit?
25      A.  Yes, I did.

Page 8

1       Q.  For the record, you're here as an
2   expert, correct?
3       A.  That is correct.
4       Q.  What kind of expert are you?
5       A.  My expertise relies in training in
6   disabilities, I have a special certification
7   in that.  I'm a certified driver
8   rehabilitation specialist, which I took a
9   board exam to do.  I've had 34 years of
10  teaching in the vehicles and different
11  levels.  And I've also, in related
12  specifically to this case, I designed a
13  system to teach the deaf to drive in a
14  vehicle, which has been accepted in several
15  different states.
16      Q.  Can we agree for the record that all
17  of that relates to passenger cars?
18      A.  We can agree for the record that is
19  correct.
20      Q.  As we proceed today I'd just like to
21  make sure that you understand the process and
22  I'd like to establish certain ground rules
23  for the taking of the deposition.  First of
24  all, have you ever been through a process
25  like this before, had your deposition taken?

Page 9

1       A.  Yes, I have.
2       Q.  On how many occasions?
3       A.  Maybe three or four that I recall,
4   yes.
5       Q.  Let me go over the ground rules.
6   Please, would you answer my questions fully
7   and to the best of your knowledge?
8       A.  Okay.
9       Q.  Is that agreed?
10      A.  Agreed.
11      Q.  If I ask you a question that goes
12  outside your expertise as you defined it here
13  today, please will you tell me?
14      A.  I'll do so.
15      Q.  If you do not understand a question
16  that I ask you, please will you tell me?
17      A.  I'll do so, I'll ask you to repeat
18  the question.
19      Q.  Thank you.  If you do not say
20  anything, I'll assume that you've understood
21  the question; is that fair, understood, and
22  agreed?
23      A.  If I do not say anything, I'm
24  probably thinking about the answer.  Okay,
25  correct, we'll agree on that.



1     Q.  Just as you may recall from other
2  depositions that you've done, it's very
3  important to give a verbal answer so the
4  court reporter can take down --
5     A.  Yes, I agree with that totally.
6     Q.  Finally, I would ask you to wait
7  until I finish my question before you answer
8  and I will endeavor to make sure that I have
9  allowed you to fully complete your answer
10  before I go on to either follow-up or ask
11  another question.
12     A.  Okay, understandable, agreed.
13     Q.  If for any reason you think that I
14  have cut you off or interrupted you, please
15  will you tell me?
16     A.  Okay, agreed.
17     Q.  I assume that there's no reason
18  medically why you're not fully capable of
19  giving testimony under oath here today?
20     A.  You are correct.
21     Q.  With respect to the three or four
22  occasions on which you've given deposition
23  testimony, how many of those were in the
24  context of acting on behalf of a party as an
25  expert in a lawsuit?

1     A.  That would be one time.
2     Q.  What were the other occasions, the
3  other two or three occasions?
4     A.  Those would have been suits
5  involving the Driving School Association of
6  Ohio.
7     Q.  What kind of lawsuit?
8     A.  The Driving School Association was
9  suing the state.
10     Q.  Are these different cases or are
11  they all related?
12     A.  Those are totally different cases.
13     Q.  Very briefly, what was the context
14  or substance of each of those lawsuits?
15     A.  Which ones?
16     Q.  Well, you said that there were two
17  or three?
18     A.  You want to know the content of each
19  of the cases I was involved in?
20     Q.  Yes.
21     A.  The content of the Driving School
22  Association cases were that we felt that -- I
23  was president of the association at the time,
24  we felt that the state had gone beyond its
25  regulatory rights, and therefore, took the

1  state to court, to federal court, to stop
2  them from illegally searching and seizing
3  different driving schools for various
4  reasons.  The other case that I was involved
5  in was Bates versus UPS, I think it was in
6  1999, 2000, in which UPS refused to allow
7  deaf truck drivers -- or delivery drivers is
8  a better way to put that.
9     Q.  What role did you play in that case?
10     A.  Similar to this, I designed the
11  system around that time to teach the deaf to
12  drive in a vehicle.  And Disability
13  Advocates, I believe was the law firm, hired
14  me to come in and explain how I taught the
15  deaf to drive.
16     Q.  Could you just state again what date
17  that was?
18     A.  Which one?
19     Q.  The Bates versus UPS?
20     A.  I believe, it was maybe 1998, 1999,
21  I'm not really clear on the exact date, 15,
22  16 years ago.
23     Q.  Was it in connection with the box
24  trucks, when I think of the box trucks of
25  UPS?

1     A.  At that time my recollection of the
2  case was that the federal government did not
3  allow deaf to operate trucks over axle weight
4  of 10,000 pounds, give or take.  And this was
5  more of a small delivery vehicle, more
6  into -- they were talking about the box
7  trucks, I'm not sure, but they weren't
8  talking about the semi's, they were talking
9  about the smaller -- I'm not sure it was
10  anything under 10,000, I believe, if I recall
11  that correctly.  That was 16 years ago, so.
12     Q.  Did you actually testify in a
13  deposition in that case?
14     A.  I did do a deposition in that case,
15  that is correct.
16     Q.  Do you still have a transcript of
17  that deposition?
18     A.  I do not have a transcript of that
19  deposition, no.
20     Q.  Whom were the lawyers that retained
21  you as an expert in that case?
22     A.  Like I stated before, I believe
23  Disability Advocates, but.
24     Q.  I think you said it was in federal
25  court?



1    A.  It was in federal court.
2    Q.  Do you remember what district it
3  was?
4    A.  That would be the District of
5  Northern California.
6    Q.  Do you remember, I think you said
7  the name was?
8    A.  I did say the name.
9    Q.  Bates versus UPS?
10    A.  That is correct, that would be the
11  name of the case.
12    Q.  That's B-A-T-E-S?
13    A.  I believe so.
14    Q.  Did you prepare a report, an expert
15  report, in that case?
16    A.  In that case, I don't recall.  I
17  really don't recall.
18    Q.  Is that the -- is the Bates versus
19  UPS case the one instance in which you have
20  testified in a deposition as an expert?
21    A.  Correct, that would be the only one
22  that I had done.
23    Q.  I just want to make sure that I
24  fully understand your original answer.  I had
25  asked you if you had testified in a

1  deposition before, you said yes, in three or
2  four occasions; so based on what you just
3  said, I have two occasions, one is the search
4  and seizure case that you described and the
5  second one is Bates versus UPS, are there any
6  other cases?
7    A.  Like I said, the other two cases
8  involved the Driving School Association, so
9  it was another similar case we had gone.  The
10  original case for the Driving School
11  Association was in an Aldridge court in
12  Cleveland, Ohio.  That was the first part of
13  that case.  We had one part of that case, the
14  state did capitulate, work, with us.  Several
15  years later a new administration came in and
16  started doing the same thing, so we went back
17  to federal court once again to have an
18  Aldridge.  We assert new ruling on the state,
19  so that's why you're seeing when I said there
20  were two cases involved.  Does that make
21  sense to you?
22    Q.  It does.  Having now clarified that,
23  the case involving search and seizure had
24  really two stages to it?
25    A.  It did.  That would be a very good

1  way to put it.
2    Q.  Other than the Bates versus UPS, are
3  there any other cases in which you have
4  testified?
5    A.  Just testified?
6    Q.  Yes, in a deposition?
7    A.  In a deposition?
8    Q.  Yes.
9    A.  No, those are the ones that I
10  testified in a deposition.
11    Q.  Are there any cases where you have
12  testified at a hearing or a trial when you
13  didn't first testify in a deposition?
14    A.  Yes, there would be one that I
15  testified.
16    Q.  What is that?
17    A.  That would be the one I listed for
18  you, I believe that is Heights Driving School
19  versus Svaboda, correct, I think that's in
20  your list I gave you.
21    Q.  Yes.  I'm looking at your report
22  with the attachment of your resume and it
23  says legal cases involvement in last four
24  years, Svaboda versus Heights Driving School
25  2014.

1    A.  That's correct.
2    Q.  What court was that in?
3    A.  That was in Cuyahoga County Court.
4    Q.  In Ohio?
5    A.  That's in Cleveland, correct.
6    Q.  It looks like somebody was suing
7  your driving school, is that correct?
8    A.  That is correct.
9    Q.  What was the basis of the lawsuit?
10    A.  The basis of the lawsuit was that
11  there was a crash involved, the driving
12  school car came over a hill and hit a
13  washed-out part of the road, a student
14  skidded and unfortunately a semi was coming
15  the other way and immediately had crossed a
16  little of the center over the center line and
17  the semi struck the vehicle.
18    Q.  When you say a semi, what are you
19  referring to?
20    A.  It was a truck that had a cab and
21  then a piece, you know, a large tow -- I
22  don't know how you would describe that, a box
23  after it, that's what I would call a semi,
24  has a separate cab, then you have the area
25  that it was pulling, cargo area, whatever.



Page 18

```
 1       Q.  Were you the instructor?
 2       A.  No, I was not.
 3       Q.  So this was an accident involving
 4  one of your students and one of your
 5  instructors?
 6       A.  That is correct.
 7       Q.  Could you describe what the extent
 8  of the accident was, other than property
 9  damage, was there any actual personal injury?
10       A.  Yes, there was.
11       Q.  What was that?
12       A.  The driver of the car, the air bag
13  went off and broke her nose.  The instructor
14  took the brunt of the crash because it hit
15  his side and he was severely damaged and was
16  life-flighted.  He recovered completely and
17  she did also.
18       Q.  Who brought the lawsuit?
19       A.  The Svaboda family did.
20       Q.  That was the family of the student?
21       A.  That would be correct.
22       Q.  What did they allege in that lawsuit
23  that would provide a basis of liability for
24  the school?
25       A.  They alleged that we should have
```

Page 20

```
 1       Q.  So when the student driver was
 2  coming over the hill just before the
 3  accident, what was it that the plaintiff
 4  alleged in this lawsuit happened for which
 5  they claim the school should be responsible?
 6       A.  Again, it was that we were
 7  negligent, instructor was negligent, not the
 8  school, the instructor was negligent for
 9  placing her on that road at that time, that
10  was their lawsuit.
11       Q.  What is it that they claim she did
12  when she came over the hill and it was washed
13  out?
14       A.  They didn't claim she did anything.
15  They claimed that our instructor placed them
16  on the wrong road for the conditions at the
17  time.
18       Q.  I know you have described generally
19  what had occurred in the beginning of this
20  line of questioning, but I'd like to maybe
21  delve a little bit deeper into it.  So I
22  believe you said that she crossed over the
23  median in the road, is that right?
24       A.  That is correct, that is what caused
25  the eventual strike from the semi.
```

Page 19

```
 1  been aware of the condition of the road and
 2  not have taken her on that stretch of road.
 3       Q.  What was it about that stretch of
 4  road that they alleged created some kind of
 5  unusual -- let me finish --
 6       A.  I'm sorry, my apologies.
 7       Q.  -- some kind of unusual danger or
 8  challenge for a student driver?
 9       A.  They alleged, again, that we should
10  have known the road had washed out.  A huge
11  thunderstorm had occurred in that particular
12  area, not where they were driving, and they
13  were coming back to take her home, they had
14  passed that stretch of road in the beginning
15  of the lesson and they were coming home back
16  on that stretch of road because that's where
17  she lived, and they came over the hill and
18  the road had been washed out.
19       Q.  Just so it's clear for the record;
20  when you say the road had been washed out,
21  what do you mean by that?
22       A.  A part where the road sloped there
23  was another piece so the torrent of rain and
24  water came down there, it deposited stuff on
25  the road, and then collapsed a portion of it.
```

Page 21

```
 1       Q.  Was that because she was trying to
 2  avoid the deposits on the road, or the
 3  condition in which you say the road was
 4  washed out?
 5       A.  No.  What actually occurred,
 6  according to the experts that were brought
 7  into it on both sides, was that the car had
 8  come over the hill, it was sand -- it was a
 9  light sand and gravel causing the car to
10  start its rotation.  They said it was
11  equating to ice, being on ice.
12       Q.  Was there any evidence as to what
13  the instructor did as the car began to veer
14  towards the median?
15       A.  His statement was that he was
16  starting to react, but because of the
17  location of the semi and where the car came
18  over there was not enough time.
19       Q.  When you say starting to react,
20  react to do what?
21       A.  Well, an instructor in that case, if
22  the car is veering off, then his job is to --
23  or her -- would be then to immediately react
24  and bring the car back into the position.
25       Q.  Would that be by actually taking
```



1    hold of the steering wheel?
2        A.   In that case, in that particular
3    case, in an emergency, yes, that would be --
4    he was actually moving towards taking over
5    the vehicle.
6        Q.   Did that case go to trial?
7        A.   Yes, it did go to a trial.
8        Q.   You testified at trial?
9        A.   I did testify at trial.
10       Q.   What was the result in the case?
11       A.   The result in Ohio, they may split
12   liability, so that's exactly what the jury
13   did, they found fault with us and found fault
14   with the other party.
15       Q.   What was the claim as to fault by
16   the other party?  That is the student, I
17   assume?
18       A.   You have to explain that.
19       Q.   Let me withdraw the question --
20       A.   Sure.
21       Q.   -- because it may be an incorrect
22   assumption then.  So you said they split the
23   finding of liability as between --
24       A.   The instructor.
25       Q.   -- the instructor and the school?

1        A.   No.  The instructor and Svaboda.  So
2    the jury found that she was at fault and they
3    also found the instructor at fault.
4        Q.   What was the basis of the finding of
5    fault against the student?
6        A.   The jury.  I'm not aware of how they
7    deliberated and how they came up to those,
8    they just came back and gave their finding.
9        Q.   Did the attorneys representing the
10   instructor and your Heights Driving School
11   claim to the jury that the student was at
12   fault in some manner?
13       A.   Our claim was that there was no way
14   for the instructor, who was being charged
15   that he was on an inappropriate road -- our
16   claim was that he was, in fact, and took all
17   precautions, and that it was unforeseen, that
18   no one could have ever foreseen what had
19   happened to that road, and therefore it was
20   more of an act of God, and not trying to
21   charge her with the fault or us with the
22   fault, but that was something that no one --
23   no one could have ever discovered that.
24       Q.   So is it your testimony that there
25   wasn't an allegation in the case by the

1    Heights Driving School on behalf of the
2    instructor that in some manner the student
3    was at fault or also at fault?
4        A.   No.  Just as I described it, the
5    main part of the case was that there was no
6    one could have avoided that.
7        Q.   Understood.  You said the main part,
8    was there a subsidiary part of the case?
9        A.   No.  That was it, as I understand
10   it.
11       Q.   Did the jury award damages?
12       A.   Yes, in Ohio they may award damages
13   if the percentage is there.
14       Q.   What damages did they award against
15   the driving school?
16       A.   Let me think here.  They awarded
17   her, I think in the end she got around 35 or
18   40,000.  I think that was her net of what she
19   got.
20       Q.   Does the Heights Driving School have
21   to report in any way to any government
22   authority, federal or state, its accident
23   record as a driving school?
24       A.   No, we're not required.
25       Q.   Do you keep track of those

1    statistics of accidents?
2        A.   Personally do we keep track of any
3    crashes, we do.
4        Q.   So in the last 10 years could you
5    give me any sort of estimate of how many of
6    those kinds of events you would have logged
7    for your internal purposes?
8            MR. ROZYNSKI:  Objection to the
9        form.  You can answer.
10       A.   It would be a complete guess.  I
11   don't have that.  Probably in the last 10
12   years I would say we have under -- we have
13   around forty-some cars running, I'd say we
14   have not -- more than probably in each year,
15   how about year by year, we maybe have --
16   maybe -- maybe ten, maybe.  And those are
17   minor.  Anything is recorded.
18       Q.   Right, so maybe ten a year?
19       A.   No, no.  I said total for 10 years.
20       Q.   I see.  Total?
21       A.   I'm not saying ten a year.  No, that
22   would be unacceptable on our safety record.
23       Q.   So approximately --
24       A.   Maybe one a year.
25       Q.   Approximately one a year?



1      A.   That would mean that could be
2  someone touching a fender, that's to me is a
3  crash and shouldn't be happening.
4      Q.   Other than the case involving
5  Svaboda, has Heights Driving School
6  experienced any other serious accidents?
7      A.   In the last how many years?
8      Q.   At anytime?
9      A.   At anytime in the history since
10  1957?
11      Q.   How long have you been involved?
12      A.   Thirty-four years.
13      Q.   In your --
14      A.   My experience, yes, there would have
15  been one other incident that happened 2 years
16  ago, I believe 2 years ago.
17      Q.   Could you describe that incident,
18  please?
19      A.   Yes.  There was one of our cars was
20  proceeding through a large intersection when
21  another car proceeded through a red light and
22  struck it.
23      Q.   Was a student driving that time?
24      A.   You're correct, a student was
25  driving.

1      Q.   Was there any personal injury in
2  that?
3      A.   Yes, there was.
4      Q.   What was that?
5      A.   The instructor was personally
6  injured.
7      Q.   In what way?
8      A.   Again, the instructor took the brunt
9  of the crash on the door and so he had a head
10  injury and I believe he had a contusion to
11  his rib, broken, and then a problem with the
12  lung, if I recall that correctly.
13      Q.   Was the student injured in that
14  event?
15      A.   No.
16      Q.   Was there any kind of claim or
17  lawsuit brought in respect to that incident?
18      A.   No, there was no lawsuits brought in
19  that respect.
20      Q.   Were there -- was there a claim?
21      A.   There was a claim, of course.
22      Q.   A claim by the student?
23      A.   No.  The claim was of Heights
24  Driving School.  And also in Ohio with the
25  Workers Compensation they want us to file the

1  claim against the insurance so that they can
2  recoup, because the instructor is paid
3  through Workers Compensation, and the state
4  then recoups from the at-fault driver.
5      Q.   Let me break that down.  There was a
6  claim against the driver whose car struck
7  the --
8      A.   No.  This is an insurance claim, not
9  a legal claim.
10      Q.   Understand, an insurance claim --
11      A.   Okay, sure.
12      Q.   -- is that right?
13      A.   That is correct.
14      Q.   But the student did not seek to
15  recoup any money against the driving school?
16      A.   No, they did not.
17      Q.   Was there any investigation done
18  into the incident, after it had occurred, by
19  Heights Driving School?
20      A.   Yes.  Each -- any crash that we
21  have, we -- the facts all come to me, we look
22  at them, we want to see how that we can
23  improve safety, was there anything that the
24  instructor missed or did, so we do review any
25  type of crash.

1      Q.   In that case was there anything that
2  the instructor, after the investigation, you
3  believe could have done to avert that
4  accident?
5      A.   In that case I felt the instructor
6  proceeded correctly.  Had looked, as I
7  stated, and that this driver just came down
8  the street, clearly red light, all
9  documented, and just went right through it.
10      Q.   Did you examine whether or not the
11  instructor and student had taken appropriate
12  care in approaching the intersection before
13  traveling through it?
14      A.   Yes, I asked both of them what they
15  did prior and both said they did the
16  appropriate procedure as they went through.
17      Q.   What did you understand they did in
18  terms of the appropriate procedure?
19      A.   Well, remember, as an instructor and
20  a student, you have four eyes, so they are
21  all scanning -- so they all should be
22  scanning.  The student should be scanning and
23  the instructors are to scan also.  Both had
24  looked left and then they looked left, right
25  and left as they are going.  As they did



1   that, they did proceed through, they had the
2   green light.  The car was at a large
3   intersection, it was at more of a distance,
4   so they felt that that car was not a threat
5   as it was going through, because they clearly
6   had a green and they felt that it would
7   behave normally.  And once they are in the
8   intersection, that car obviously proceeded
9   through.  So my estimation, yes, they did
10  look and clear.
11      Q.   How did you determine that the
12  student had, in fact, taken the appropriate
13  precautions by the left, right, and left
14  again?
15      A.   I asked them.
16      Q.   You asked?
17      A.   It was an interview.  What did you
18  do as you are approaching, I asked the
19  instructor.  So they both, you know, it was
20  them telling me what they had done.  I was
21  not actually in the vehicle.
22      Q.   Understood.  In short, that's what
23  I'm asking, is what you concluded after the
24  investigation.  Did you determine that the
25  instructor had been helping the student as he

1   or she approached the intersection to make
2   sure that they were doing the right things?
3       A.   The student was more an advanced
4   student, so therefore it was -- I think it
5   was on their third lesson.  It was not a
6   beginning student, because they would not
7   have been in the larger intersections.  So
8   they, obviously, they would take a beginning
9   student, novice through a procession.  The
10  more complicated intersection they had toward
11  the end of the lessons.  So in that case the
12  instructor was looking and would be observing
13  the student, what they are doing.
14      Q.   In a case like that -- I'm going to
15  come back to this in more detail -- if the
16  instructor observes the student and doesn't
17  think they are doing the right thing, what
18  are they supposed to do?
19      A.   As far as too fast, too slow, what's
20  going on?
21      Q.   Not checking where they should be
22  checking?
23      A.   They wouldn't be checking?  So in
24  that case the instructor might ask the
25  student are you checking both, are you

1   checking the directions.
2       Q.   How would the student know -- how
3   would the instructor know if the student is
4   or is not doing that?
5       A.   By watching their head.  Also by an
6   eye check mirror, which is in the vehicle.
7   We call them eye check mirrors.  They are up
8   there so they reflect back to the student so
9   we can watch their eyes where they are
10  looking.
11      Q.   Are there any other serious
12  accidents, that you recall?
13      A.   Not that I recall.
14      Q.   You said that the instructor had a
15  head injury, I think a problem with his or
16  her lung?
17      A.   I believe the rib broke and, I mean,
18  I believe there was something that he had a
19  little problem with the -- he was an older
20  retired gentleman.
21      Q.   Do you know whether or not he is
22  still experiencing problems from that injury?
23      A.   No, he is fully recovered.
24      Q.   Do you know how long it took for him
25  to fully recover?

1       A.   No, I wouldn't know exactly.
2       Q.   What did you do to prepare for
3   today's deposition?
4       A.   Today's deposition?
5       Q.   Yes.
6       A.   I reread my report and that's about
7   it.
8       Q.   Other than your report, were there
9   any documents that you reviewed to prepare
10  for today's deposition?
11      A.   No.
12      Q.   The report you're referring to is a
13  report which is entitled Effective
14  Communication While Teaching The Deaf To
15  Drive, is that right?
16      A.   That is correct.
17      Q.   And that topic is something on which
18  you have written before, is that correct?
19      A.   Yes.
20      Q.   In fact, the report is a restatement
21  of materials which currently exist on your
22  website, right?
23      A.   Yes, and the state of Ohio's website
24  too -- some of it.
25      Q.   Well, in terms of the substance of



1    your report it's almost completely in line
2    with what's on the website?
3        A.   Yes, as it should be.
4        Q.   I'm going to show you a document,
5    which we'll mark as Cox Deposition Exhibit 2.
6            (Whereupon report was marked
7         Cox Exhibit 2 for identification as
8         of this date.)
9        A.   And this would be more detailed than
10   the website.
11       Q.   Mr. Cox, I've put before you what
12   we've marked as Cox Deposition 2.
13       A.   Sure.
14       Q.   I just ask you to confirm for the
15   record that is the report that you have
16   provided in this case based upon the
17   expertise that you described at the beginning
18   of this deposition and it's entitled
19   Effective Communication While Teaching The
20   Deaf To Drive?
21       A.   You're correct.
22       Q.   It says at the beginning that it's a
23   report commissioned by Eisenberg and Baum,
24   LLP in Kenneth Frilando versus Smith and
25   Solomon School of Tractor-Trailer Driving,

1    Inc., do you see that?
2        A.   I do.
3        Q.   What did you mean by the term
4    commissioned by?
5        A.   They asked me to do it.
6        Q.   What did they ask you to do?
7        A.   To make a report -- asked me to make
8    a report on how I would teach someone, I
9    guess if I recall correctly exact words, a
10   report on Effective Communication While
11   Teaching The Deaf To Drive.
12       Q.   So you were asked to provide a
13   report on the techniques that on which you've
14   written before on effective communication for
15   teaching somebody who is deaf to drive, is
16   that right?
17           MR. ROZYNSKI:  Objection to the
18        form.  You can answer.  Is that
19        correct?
20       A.   Correct.
21       Q.   The techniques that you describe in
22   this report are techniques that you have used
23   for passenger vehicles, is that correct?
24       A.   That would be correct.
25       Q.   Your entire experience in this

1    regard is with passenger vehicles, right?
2        A.   Teaching a deaf person --
3        Q.   Yes.
4        A.   -- to drive in a passenger vehicle,
5    that would be correct.
6        Q.   I just want to follow-up on
7    something you said earlier, vis-a-vis the
8    Bates versus UPS case, and ask you whether or
9    not there was any question about your
10   qualifications to testify in that case, that
11   you recall being the subject of motion
12   practice or litigation?
13           MR. ROZYNSKI:  Objection to the
14        form.  You can answer.
15       A.   I don't recall any.
16       Q.   You're not saying there wasn't, you
17   just don't remember?
18       A.   I testified.  I was allowed -- I
19   know the other side objected, but the judge
20   allowed it all, so.
21       Q.   You testified in a deposition,
22   right?
23       A.   Right, so.
24       Q.   But you didn't testify at trial?
25       A.   Yes, I did.

1        Q.   You did?
2        A.   Oh, yes.  You asked me if I did
3    deposition, not trial, correct.  I believe
4    your question was about depositions only.
5        Q.   No, I actually followed up, I
6    believe, with a question about --
7        A.   I apologize.
8        Q.   -- whether in addition to
9    depositions you had ever testified at a
10   trial.  And I understood you to say that you
11   had, but the only thing I heard was in the
12   Svaboda case.  So if you didn't understand,
13   that's fine.  So you did testify at trial?
14       A.   Yes, I did.
15           MR. ROZYNSKI:  Objection to the
16        form.
17       Q.   So it's your recollection that the
18   other side objected to your qualifications?
19           MR. ROZYNSKI:  Objection to the
20        form.
21       A.   Not my qualifications -- I'm not
22   sure what all the objections were, they just
23   told me they were objected.  What it was for,
24   I have no idea.
25       Q.   In that trial what was the subject



Page 38

```
 1    of your testimony in the trial proceeding
 2    itself?
 3        A.  At Bates versus UPS?
 4        Q.  Yes.
 5        A.  It was, again, going back to my
 6    system of teaching the deaf to drive a
 7    vehicle.
 8        Q.  Is it fair to say it would have
 9    been, without pinning you down on exactly
10    what you said it would have, that your
11    testimony would have been similar to the
12    principals that are in the report that's
13    marked as Cox Deposition 2?
14        A.  I think that would be a fair
15    summary, yes.
16        Q.  Did anyone assist you in drafting
17    the report that's before you as Cox
18    Deposition 2?
19        A.  No, they did not.
20        Q.  When were you retained in this case,
21    if you recall?
22        A.  The exact date, I don't recall.
23        Q.  Approximately when?
24        A.  Approximately had to be at least a
25    few months.
```

Page 39

```
 1        Q.  Have you ever previously performed
 2    services for the law firm of Eisenberg and
 3    Baum?
 4        A.  No, I have not.
 5        Q.  You are being compensated for your
 6    services, is that correct?
 7        A.  That would be correct.
 8        Q.  What's the basis of your
 9    compensation?
10        A.  The basis of my compensation, I
11    think it submitted so far what was for the
12    report and time would be 3,000, is that
13    right, do you have that?
14        Q.  I do understand that attached to the
15    back of Cox Deposition Exhibit 2 is an
16    invoice in the amount of $3,000.  But I'm
17    actually trying to understand what is behind
18    that invoice; so are you charging a fixed
19    fee, are you charging by the hour?
20        A.  Usually I charge a fixed fee, I did
21    tell you that too I charge $1,000 a day for
22    my time and any compensation for traveling
23    and so forth.
24        Q.  So you would have charged a fixed
25    fee of $3,000 for the report, is that right?
```

Page 40

```
 1        A.  For the time the report -- how long
 2    it took me, that's correct.
 3        Q.  And then any additional time you
 4    would charge $1,000 a day?
 5        A.  Correct.  If they needed me to come
 6    in for like today's deposition or anything
 7    else, that would be correct.
 8        Q.  If you, not today, but if you were
 9    required to only be involved for a partial
10    day, would you still charge a full $1,000?
11        A.  I do have a standard fee because I'm
12    pulled away from my business and therefore I
13    can't operate, so the answer is yes.
14        Q.  Thank you.
15        A.  Sorry.
16        Q.  There's nothing wrong, I'm just
17    trying to understand it.  That's all.
18        A.  I understand.
19        Q.  Thank you.  Did the Bates versus UPS
20    case result in a judgment by a court or jury
21    or was it resolved?
22        A.  It was a judgment.
23        Q.  It was a judgment?
24        A.  It was.
25        Q.  Was it by jury or by the judge?
```

Page 41

```
 1        A.  It was before a judge only.
 2        Q.  Mr. Cox, I'm going to refer you to,
 3    I think it's page 16 of your report, which is
 4    an attachment of three pages, 16, 17, and 18,
 5    it appears to be a Curriculum Vitae or
 6    biography, is that right?
 7        A.  That would be correct.
 8        Q.  I'd like to quickly kind of go
 9    through that, not necessarily dwell on it,
10    because I do have the document in front of
11    me; but you have a Bachelor's degree in
12    business education, is that right?
13        A.  In business and education, correct.
14        Q.  That was from Ohio State University?
15        A.  That is correct.
16        Q.  From which you graduated in 1983?
17        A.  Correct.
18        Q.  Then am I correct that you then
19    became a driving instructor following
20    graduation from Ohio State University?
21        A.  Actually, Ohio State University I
22    took their drivers education course, so I was
23    actually certified while I was at school.
24        Q.  What's the driver education course?
25        A.  Course I was put through is, it was
```



11 (Pages 38 to 41)

1    9 semester hours, so, you know, so they call
2    it, I think an equivalent of a 30-hour, I
3    can't remember exactly, but I remember it was
4    9 semester hours.
5        Q.   That's driver education with respect
6    to passenger vehicles?
7        A.   You are correct.  As well as
8    disability.
9        Q.   Then you began work in 1983 as a
10   driving instructor at the Heights Driving
11   School, is that correct?
12       A.   That is correct.
13       Q.   In that capacity you instructed
14   students on how to drive and develop training
15   courses?
16       A.   That is correct.  My primary duty
17   was to develop training courses and I did
18   work in the schools.
19       Q.   Under education you list three
20   certifications.  I'd just briefly like to
21   understand what they are.
22       A.   Sure.
23       Q.   Let's go in first order of
24   chronology; 1996 you received some
25   certification from Indiana University of

1    Pennsylvania?
2        A.   Yes, that's Indiana University of
3    Pennsylvania.  They came into the state of
4    Ohio, we were putting together when Ohio went
5    to the GDL, graduating license law, highly
6    selected certain trainers throughout the
7    state to educate the driving schools on the
8    new graduating license law, I was part of one
9    of the trainers, I was selected.  Indiana
10   University came into Columbus and we spent
11   time with them on training us because Ohio,
12   basically because their curriculum, I
13   believe, and then we were taught under their
14   curriculum by their professors.
15           MR. HALLER:  Could you please read
16       back the answer.
17           (Whereupon, the record was read
18       by the reporter.)
19       Q.   Just for my education, what is the
20   GDL license law?
21       A.   That's when the state made it so
22   that a student could not get a license in 2
23   weeks, so they have to have 50 hours with
24   their parent, they have to wait 6 months from
25   the date they purchase their temporary, they

1    can start the education in 15 and 5 months,
2    and they may take the test, like I said, 6
3    months after.  The idea of that is to give
4    them lots of practice before they actually
5    drive on the road.
6        Q.   That law doesn't require that they
7    go to a school of driving, does it?
8        A.   Yes, it did.  But that never
9    changed, the state law in 1968 in Ohio made
10   it mandatory to take drivers education.
11       Q.   What is that?
12       A.   They have to have 24 hours of class
13   and 8 hours behind the wheel and 50 hours of
14   instruction time with their parents and wait
15   6 months from the time they purchase their
16   temporary.
17       Q.   Make sure I understand; 24 hours in
18   class?
19       A.   That is correct.
20       Q.   How is that generally administered,
21   the 24 hours, is that formal or is it online?
22       A.   Okay.  Most of it is what we call
23   the traditional classroom, Ohio just recently
24   went to allowing online classroom probably 6,
25   8 months ago.

1        Q.   Then 8 hours with an instructor?
2        A.   That's correct.  In the vehicle.
3        Q.   That's in addition to the 50 hour
4    requirement?
5        A.   By the parents, you are correct.
6        Q.   Just so I understand it; on the
7    regulations in Ohio, is there a requirement
8    that the 8 hours -- let me rephrase that
9    question.  Is there a relationship between
10   the 50 hours with the parents and the 8
11   hours, I mean, is there some sequence that
12   has to occur?
13       A.   We provide a guide to the parents.
14   What they do is not -- all they have to do is
15   come to the state testing station with an
16   affidavit saying they gave 50 hours of
17   instruction, 10 of it at night, and they sign
18   that off and a notary has to sign it.  What
19   they do is not monitored or there's no
20   logbook, if that's what you're asking.
21       Q.   Then does the 8 hours of mandatory
22   instruction that you mentioned then occur
23   after that certification is occurred through
24   the affidavit?
25       A.   No, it does not.  It occurs, a lot

1 of times, prior.
2    Q.  So all I'm trying to understand is
3 does the student come to you as like brand
4 new, not ever having driven a car before, or
5 is it generally the case that they've had
6 some experience with their parents before
7 they come to the driving school?
8    A.  Total mixed bag, you get both.
9    Q.  Is the manner in which you instruct
10 somebody who has absolutely no experience in
11 the vehicle different from the manner in
12 which you instruct somebody who has 50 hours
13 of instruction from their parent by the time
14 they come to you?
15    A.  My apologies.  No, the instructor is
16 trained to treat everybody as a complete
17 novice.
18    Q.  Is it your experience that in the 8
19 hours that's required by Ohio state law that
20 it is possible to take somebody from the
21 position of being a complete novice to
22 somebody who is trained and equipped safely
23 to drive, provided they pass the test?
24    A.  Our job in 8 hours would be to get
25 them to proficiency part where they are safe

1 to be with their parent for the other 50
2 hours.  We never make a claim that they will
3 come out of us as the world best drivers.
4 They have the basics and they should be
5 able -- there's certain standards we have
6 that they would then pass.
7    Q.  Again, for my own education this is,
8 I love what I do because I learn a lot about
9 things I have no idea about.  Once the
10 student has gone through the 50 hours and 8
11 hours, 50 hours with their parent and 8 hours
12 of instruction, and done 24 hours of class,
13 in Ohio what must they do to pass whatever
14 the testing requirements are?
15    A.  Testing requirements for them, they
16 need to take those documents, along with our
17 certificate, to the testing station in which
18 the state of Ohio will administer a driving
19 exam.
20    Q.  Is the driving exam, is that
21 written?
22    A.  The written part would have been
23 when they got their temporary.  So the first
24 process, so you understand it, they would buy
25 the temporary packet, then they would go take

1 the test with the temporary knowing basic
2 laws, and then they would do the instruction.
3 And then the next step was once they
4 completed the instruction, they would go
5 ahead and make an appointment for their
6 driving exam.
7    Q.  The initial written test to get the
8 temporary license or permit involves
9 knowledge and understanding of the rules of
10 the road?
11    A.  You are correct.
12    Q.  That's what they are testing?
13    A.  That's what they are testing.
14    Q.  I know how it's done in
15 Pennsylvania, but in Ohio is that like an
16 online multiple-choice type of test?
17    A.  It's not done online.  It is done at
18 the testing station on a computer in which
19 they will see diagrams and different things
20 and they have to, if the car needs to go
21 here, whatever, then they put different
22 answers.
23    Q.  Is it multiple-choice?
24    A.  It's a multiple-choice.
25    Q.  Then the driving exam at the testing

1 station that you mentioned, what does that
2 involve?
3    A.  I mean, the actual road test is what
4 you want to know about?
5    Q.  Yes.
6    A.  Okay.  There are two parts.  There
7 is a driving exam in which the examiner will
8 go out and pick roads and go around and drive
9 on the road.  And they are looking at their
10 driving skills.  And then there's
11 maneuverability part, and so you understand
12 that part in one of my exhibits that we do
13 would be that maneuverability test I'm
14 talking about, I believe.  Let me make sure
15 I'm accurate about that.  But I believe that
16 was included in some of the drills we do.
17 Yes, that would be maneuverability.
18    Q.  That would be the diagrams?
19    A.  Diagram page 12, diagram 4 --
20 diagram 4, that is the actual test that
21 students do in the state of Ohio.
22    Q.  Are you aware that in some states
23 that the driving test is done in a confined
24 environment at the testing school?
25    A.  Yes.  Different states allow the



1  test different ways.
2      Q.  Do you know how New York tests for
3  passenger vehicles?
4      A.  I wouldn't know.  I would not be
5  aware of New York laws.
6      Q.  Do you know how New Jersey tests for
7  passenger vehicles?
8      A.  No, I do not.
9      Q.  Do you know how Pennsylvania tests?
10     A.  Pennsylvania I know a little bit
11 since some of our schools are kind of close
12 to the border there.  The last I knew was a
13 range-type deal where they go on and they
14 kind of just drive around, not on the
15 streets, but in an arranged area.  That was
16 my understanding.
17     Q.  We went off on a little bit of a
18 tangent.  I apologize.  We were going through
19 your curriculum vitae or bio and identifying
20 the certifications; could you tell me what
21 the next certification is 1997?
22     A.  Let me get there.  What page is
23 that?
24     Q.  That's page 17.
25     A.  Seventeen.  Thank you.  I've got it

1  here.  You're looking at 1997 certification
2  course.  Once again, in 1997 the state of
3  Ohio decided to make standardization
4  disability training for instructors and they
5  hired Louisiana Tech University to come in
6  and put on a program.  And once again the
7  state selected instructors to be taught by
8  Louisiana Tech University to then turn around
9  and instruct the people in the driving
10 schools or those that wanted to be certified
11 on disabilities to be certified.  So we
12 changed it in Ohio, we now have you have to
13 be certified to do disabilities.
14     Q.  Did the course, that in which you
15 were certified in 1997, did that involve
16 techniques to deal with a range of
17 disabilities?
18     A.  Oh, yes.
19     Q.  Then in 2006 you say you passed the
20 board exam to be a certified driving
21 rehabilitation specialist, what is that?
22     A.  That would be involved in an
23 organization called ADAD, the Association for
24 Driver Rehabilitation Specialist.  And under
25 those -- I don't know their criteria, but you

1  have to have -- they require so many hours of
2  disability training, at that time you had to
3  have a Bachelor's degree, you had to have
4  worked so many hours instruction.  I can't
5  remember all the criteria to actually sit for
6  the exam.  And then they had their exam and I
7  passed it and became certified.
8      Q.  Could you just tell me exactly what
9  ADAD stands for, that's A-D-A-D?
10     A.  Unfortunately, the acronym no longer
11 stands for the name, but it's the Association
12 of Driver Rehabilitation Specialist.
13         MR. ROZYNSKI:  Can we take a 2
14     minute break?
15         MR. HALLER:  I got two follow-up
16     questions.
17         MR. ROZYNSKI:  Sure.
18     Q.  Just with respect to both the
19 certification in 1997 and the board exam that
20 you've just described, that was all with
21 respect to passenger vehicles?
22     A.  You are correct.
23         MR. HALLER:  Thank you.  Let's take
24     a break.
25         THE VIDEOGRAPHER:  We're now off

1  the record.  The time is now 11:40 a.m.
2      (Brief recess taken.)
3         THE VIDEOGRAPHER:  We're now on the
4  record.  The time is 11:47 a.m.
5      Q.  Mr. Cox, we're back on the record.
6  And just before the break I had been asking
7  you some questions about the organization
8  that's known by the acronym of ADAD; does
9  that association deal with passenger
10 vehicles?
11     A.  They deal in passenger vehicles,
12 they deal in vans.  They deal in all -- and
13 they do motorcycles.  Any vehicles that would
14 be motorized, they could get involved with.
15     Q.  Do you know if they have been
16 involved in any way in commercial motor
17 vehicles, for which you would need a CDL
18 Class A license?
19     A.  I would not know that, whether or
20 not they were involved in that.
21     Q.  And you're not personally familiar
22 with anything that they have done in that
23 context?
24     A.  In that context?
25     Q.  If anything?



1      A.  I have not personally been involved.
2      Q.  You don't know if they have done
3  anything in that arena?
4      A.  I am not aware of it.
5      Q.  Just continuing through your CV or
6  bio; as I read this, in 1993 you became the
7  chief executive officer of Heights Driving
8  School, is that right?
9      A.  That is correct.
10     Q.  That's been your position ever
11 since?
12     A.  It has been.
13     Q.  Just could you generally describe
14 what your responsibilities have been as chief
15 executive of Heights Driving School?
16     A.  Well, I oversee all the employees
17 and running day-to-day operations of the
18 school.
19     Q.  Do you have schools throughout the
20 state of Ohio?
21     A.  It's in three counties across the
22 northern section of the state.
23     Q.  During the period that's reflected
24 on your CV or bio, when you have been chief
25 executive officer there's an entry related to

1  spending approximately 5 years in some
2  capacity in connection with the department of
3  public safety; do you see that on the resume?
4      A.  Yes.  What I did for the -- they
5  hired me to go around the state and teach.
6  As you recall, remember, I told you there are
7  two things, remember, in 1996 I told you
8  about we were changing the rules for GDL, in
9  that case again they hired instructors, that
10 was one I did, went around.  In 1997 again we
11 did the disability certification and I was
12 part of that team that went around the state
13 and did instruction for that.
14     Q.  Am I correct you were not an
15 employee of the department, you were retained
16 by them as a consultant to do the training?
17     A.  Consultant that would be -- I'm not
18 sure how they classified, but no, I was never
19 an employee of the state.
20     Q.  To the extent that you were involved
21 on behalf of the department of public safety
22 with respect to helping develop and train the
23 new driver education, teaching the trainer
24 course, and developing and teaching
25 continuing education courses for the

1  certification of disability, all of that was
2  with respect to passenger vehicles, am I
3  correct?
4      A.  You are correct.
5      Q.  You also have an entry that seems to
6  reflect that for approximately 3 years that
7  you were retained in some manner by the
8  Cleveland Clinic Health System to become
9  involved in some kind of assessment program
10 for persons with disabilities, is that
11 correct?
12     A.  You are correct.
13     Q.  Again, you weren't employed by the
14 Cleveland Clinic Health System, you were
15 retained as a consultant?
16     A.  In that case I know exactly what it
17 was.  It was a contractor.
18     Q.  What was the scope of the engagement
19 as a contractor for the Cleveland Clinic
20 Health System?
21     A.  That was in the scope of that was
22 Cleveland Clinic wanted to set up was called
23 an assessment program.  So this involved OT,
24 occupational therapists, what they would do
25 is that a physician would then refer them to

1  a driver rehabilitation, so that's why I came
2  in.  So I helped set up their driver
3  rehabilitation program at Cleveland Clinic at
4  Euclid Hospital.  I trained the OT, the
5  occupational therapists, in the procedures to
6  make assessments on drivers.  They would get
7  clients, such as someone have a stroke, maybe
8  would be paralyzed, or any nature of
9  disability, Parkinson's, there's just a whole
10 host of things.  The neurologists would then
11 send the script to them, the OT would then
12 have to do a clinical exam and then a driving
13 exam.  Those both were part of what I helped
14 set up with the clinic to get their program
15 off the ground and running.
16     Q.  Just so I understand; this would be
17 assistance with assessing whether somebody
18 who has experienced some kind of medical
19 condition that might cause a disability is
20 capable with that condition of safely
21 driving?
22     A.  You are correct.
23     Q.  Was that intended to help the
24 licensing authorities to make determinations
25 as to whether or not the person could



1  continue to drive under their license?
2      A.  It was designed because the
3  licensing authority doesn't have the skill to
4  figure that part out.  So our job in those
5  programs is to see -- our job is number one
6  to try to keep the person mobile.  We are in
7  New York City, not a problem.  Different
8  parts of the country, it's a problem.  So our
9  job is to assess is there a possibility, can
10  we do anything to keep this person driving.
11  If that answer is yes, then we have a whole
12  host of things we would design for them
13  depending on the disability.  If it's a no,
14  we give a no-drive, the physician then writes
15  that to the state of Ohio, and that person's
16  license is revoked.
17      Q.  In terms of that assessment, what
18  are the factors that might lead to the
19  conclusion that the person should not be
20  permitted to continue to drive?
21      A.  Well, that would vary on their
22  condition.  So maybe it's a physical
23  condition, that we don't have at this point a
24  piece of equipment that might be able to
25  whatever.  It could be cognitive, in which

1  the person isn't cognitive.  We give a bunch
2  of cognitive tests.  They are not cognitive,
3  able to work with the dynamics of the road,
4  and therefore, in our opinion, we would then
5  issue a no-drive.
6      Q.  And those assessments leading to the
7  issuing of what you refer to as a no-drive
8  would be based ultimately on a determination
9  of whether that person can safely operate a
10  passenger vehicle, correct?
11      A.  Right.
12      Q.  And all of this was related to
13  passenger vehicles that you did for the
14  Cleveland Clinic Health System?
15      A.  All of it was except for one.
16      Q.  What was the exception?
17      A.  The assessment was done with a truck
18  driver in a truck.
19      Q.  On one occasion?
20      A.  On one occasion.
21      Q.  What was the condition of the truck
22  driver, if you recall?
23      A.  As I recall with that case, he came
24  to us, he had a stroke, the company wanted to
25  know whether or not he was now capable of

1  reoperating the truck in a safe manner.
2  Based on the fact that he had a CVS,
3  cardiovascular accident on the left, which
4  affects the right, he was fully rehabbed, but
5  they wanted -- the company asked for it to
6  make sure that he was able to shift gears and
7  do so.
8      Q.  Okay.  What was the conclusion in
9  that particular case?
10      A.  The conclusion is that we rode, as I
11  did in the truck, to assess him and that he
12  was fully capable of reoperating the vehicle.
13      Q.  What kind of vehicle was he driving?
14      A.  The vehicle, it was his vehicle.  It
15  was a standard big cab piece, I don't know
16  what you call it, and had the attachment
17  where -- you know, sorry, the terminology, I
18  don't know what you call it.  How we refer to
19  box -- you want to call it the box of the
20  truck -- it was a major semi.
21      Q.  Do you know what the federal
22  regulations require with respect to heart
23  conditions of the nature you just described,
24  in terms of whether or not the person would
25  pass a DOT medical exam?

1          MR. ROZYNSKI:  Objection to the
2      form.  You can answer.
3      A.  You're referring to DOT, you're
4  talking about -- you're talking about a CDL
5  license?
6      Q.  Yes?
7      A.  Okay.  No, I do not know the
8  requirements of that.
9      Q.  Do you know whether this individual
10  then had to go and get a medical exam by
11  the -- administered by DOT?
12      A.  I am not aware of that.
13      Q.  Your resume, or bio, also refers to
14  being, I think, a member of the Association
15  of Driver Rehabilitation -- let me restate
16  that.  Your resume, or bio, refers to being a
17  rehabilitation specialist traffic safety
18  course instructor for approximately 3 years
19  from 2011 to 2014; do you see that?
20      A.  I do.
21      Q.  What did that involve?
22      A.  That involved teaching drivers
23  education to occupational therapists.
24      Q.  Again, that was with respect to
25  passenger vehicles?



1      A.  That was with respect to passenger
2  vehicles, you're correct.
3      Q.  Then you have generally described
4  your duties as chief executive officer on
5  this resume, or bio, and we can agree on the
6  record that all of that relates to passenger
7  vehicles?
8      A.  That would be correct.
9      Q.  Have we now fairly described your
10  education and educational background and work
11  history which would support your
12  qualifications as an expert?
13          MR. ROZYNSKI:  Objection to the
14      form.
15      A.  I would think it's fair.
16      Q.  Is there anything, putting aside
17  seminars and publications, is there anything
18  significant that you think we have not
19  touched on that would relate to your
20  qualification as an expert in the manner you
21  described it at the beginning of this
22  deposition?
23          MR. ROZYNSKI:  Objection to the
24      form.  You can answer.
25      A.  The only thing that I can't produce,

1  that I was -- I have been on public radio
2  several times for shows on doing disability
3  and describing how things work.  So I was
4  asked many times, I've published a lot of
5  things and articles in the newspapers, which
6  I don't have.  So the only real publication
7  that I can get a hold of that I knew was ADAD
8  still had that reference to the manual of the
9  one that I included with it.  Okay.
10      Q.  Mr. Cox, I'm going to come back to
11  your publications later towards the end of
12  the deposition.  But what I am interested in
13  knowing is what you actually relied on or
14  considered in order to do the report that's
15  before you as Cox Exhibit 2.  So if we could
16  just go to that subject, and I'm referring
17  you right now to the second paragraph of your
18  report in which you say, I've read the file
19  complaint and the depositions of John Diab
20  and Joseph Frilando; do you see that?
21      A.  I do.
22      Q.  Other than the complaint and the
23  depositions of John Diab and Joseph Frilando,
24  are there any other documents related to this
25  specific case that you reviewed in order to

1  develop your report, or that went into your
2  considerations in respect of the report?
3      A.  Excluding the reference sheet that I
4  included that I used to develop the report --
5      Q.  Okay.
6      A.  -- on page 8.
7      Q.  You're referring to page 8 of Cox
8  Deposition Exhibit 2, is that correct?
9      A.  Correct.
10      Q.  This is very important in terms of
11  sort of today's deposition to really
12  understand exactly what the basis of your
13  report is.
14      A.  Sure, I understand.
15      Q.  So is it your testimony that in
16  addition to reading the file complaint and
17  the depositions of John Diab and Joseph
18  Frilando, that you considered and may have
19  relied on the items that are listed on page 8
20  of your report under references?
21      A.  That is correct.
22      Q.  Other than reading the filed
23  complaint and the depositions of John Diab
24  and Joseph Frilando and relying or
25  considering the items listed on page 8 under

1  references, was there anything else
2  specifically that you considered or reviewed
3  in order to write the report that's before
4  you as Cox Deposition 2?
5          MR. ROZYNSKI:  Objection to the
6      form.  You can answer.
7      A.  No.  That was what -- that would be
8  a complete.
9      Q.  Have you -- let me withdraw that.
10  Were you provided by counsel for plaintiff
11  any materials, other than what we have just
12  identified as the complaint and the
13  depositions of John Diab and Joseph Frilando?
14      A.  No, I was not.
15      Q.  I believe you answered this, but I
16  just want to make sure it's clear on the
17  record.  What I've just asked you is anything
18  that you considered or relied on in writing
19  your report, you understand that?
20      A.  I understand that completely.
21          MR. ROZYNSKI:  Objection to the
22      form.
23      Q.  What I want to know next is after
24  you have -- after you issued your report,
25  which was dated May 24, 2016, were you



1   subsequently provided any additional
2   materials by counsel for the plaintiffs in
3   connection with this case?
4       A.   No, I have not.
5       Q.   Is it your testimony you have not
6   seen the expert reports of the defendant's
7   experts?
8       A.   I apologize.  Yes, I, in fact, did
9   see those reports, so.
10      Q.   When did you see those reports?
11      A.   I don't know the exact date, but it
12  probably was not too long after that they
13  were produced.  My apologies, I forgot about
14  that.
15      Q.   Does the term rebuttal expert mean
16  anything to you?
17      A.   Yes, it does.
18      Q.   You are not sitting here today as a
19  rebuttal expert?
20      A.   No, I'm not.
21      Q.   Do you know, who are members of the
22  Driving School Association of Ohio, what the
23  scope of the association is?
24      A.   Do I know what?
25      Q.   Yes.

1       A.   Rephrase the question, I'm not sure
2   what you're asking me.
3       Q.   I think that you say on your
4   resume --
5       A.   I was president.
6       Q.   -- that you're president of the
7   Driving School Association of Ohio?
8       A.   Okay.
9       Q.   I'm trying -- I just want to
10  understand, it's an association of what?
11      A.   Okay, I can answer that.  It's an
12  association of other driving schools, so
13  driving school owners.
14      Q.   Just for the record; those are
15  passenger driving schools?
16      A.   That would be correct.  Although, it
17  can include truck driving schools.  And we
18  did have one for a while.
19      Q.   What driving school?
20      A.   The name of the truck driving
21  school?
22      Q.   Yes.
23      A.   Hammrick.
24      Q.   Sorry?
25      A.   Hammrick.

1       Q.   Could you spell it, please?
2       A.   No.
3       Q.   H-A-M-M-R-I-C-K?
4       A.   I think that would be fair.
5       Q.   Am I correct, you personally do not
6   have a CDL license?
7       A.   You are correct.
8       Q.   You've never, throughout the course
9   of your education, experience, or association
10  with any government agencies or private
11  entities, ever trained individuals for CDL
12  licenses, right?
13      A.   You are correct.
14      Q.   You yourself have not been trained
15  to operate, aside whether you have a license
16  to operate, a CDL?
17      A.   No, I do not have a license to
18  operate a CDL.
19      Q.   My question was a little bit
20  different, I apologize.  Not only do you have
21  a license, but you haven't had any experience
22  driving a CDL?
23           MR. ROZYNSKI:  Objection to the
24      form.  You can answer.
25      A.   Well, a CDL is not a car.

1       Q.   Let me --
2       A.   You need to rephrase that.
3       Q.   You haven't any experience driving a
4   large tractor-trailer commercial motor
5   vehicle?
6           MR. ROZYNSKI:  Objection to the
7      form.
8       A.   I have.
9       Q.   You have driven one?
10      A.   I have driven a very large vehicle,
11  correct.
12      Q.   When was that?
13      A.   That was between my high school and
14  college days.
15      Q.   Just tell me what you did?
16      A.   I was hired by a school district
17  they had education mobile units they are the
18  size of a school bus or larger.  And since it
19  had no passengers, I was able to drive.  I
20  was transporting those from the school board
21  to the other Catholic schools in the school
22  districts, district, whatever you want to
23  say.
24      Q.   Exactly what kind of vehicle was
25  that?



Page 70

```
 1      A.  They were called educational mobile
 2  unit.  So think of a school bus or larger and
 3  inside the bus was a mobile classroom.
 4      Q.  So it's not a tractor-trailer?
 5      A.  It is not a tractor-trailer.
 6      Q.  So you haven't any experience at all
 7  whatsoever driving a tractor-trailer, have
 8  you?
 9      A.  That would be a correct statement.
10      Q.  You have not had any experience
11  dealing with the specifics of the federal
12  motor carriers safety administration and
13  regulations which govern the rules, licensing
14  requirements, and other obligations
15  associated with driving large tractor-trailer
16  vehicles, have you?
17      MR. ROZYNSKI:  Objection to the
18      form.  You can answer.
19      A.  The question, if I believe -- could
20  you rephrase it exactly.
21      Q.  I'll rephrase it.
22      A.  I appreciate that.
23      Q.  Are you aware that there is
24  something called the Commercial Motor Vehicle
25  Safety Act of 1986?
```

Page 71

```
 1      A.  That's federal.
 2      Q.  Yes.
 3      A.  Do I have any -- if I understand the
 4  question; do I have any knowledge or worked
 5  with that?
 6      Q.  First of all, are you aware that
 7  there is such a thing as the Commercial Motor
 8  Vehicle Safety Act of 1986?
 9      A.  That regulates trucks, I'm aware of
10  that.
11      Q.  My next question is whether you
12  personally ever had any experience dealing
13  with the code of federal regulations which
14  relate to the standard developed pursuant to
15  the Commercial Motor Vehicle Safety Act for
16  save driving of commercial drivers --
17      MR. ROZYNSKI:  Objection to the
18      form.
19      Q.  -- in interstate commercial?
20      MR. ROZYNSKI:  Objection to the
21      form.  You can answer.
22      A.  No.
23      Q.  Do you know how much the mobile
24  classroom vehicle that you described weighed?
25      A.  I'm sorry, I would not remember
```

Page 72

```
 1  that.
 2      Q.  Do you know whether it weighed more
 3  or less than 26,000 and 1 pounds?
 4      A.  Again, I would have no idea.
 5      Q.  Do you, sitting here today, do you
 6  know what the Commercial Motor Vehicle Safety
 7  Act of 1986 required in terms of minimum
 8  federal standards for the operation of
 9  commercial motor vehicles over certain
10  weights or with certain configurations?
11      MR. ROZYNSKI:  Objection to the
12      form.
13      A.  No.
14      MR. ROZYNSKI:  You can answer.
15      A.  No, I don't.
16      Q.  You don't?
17      A.  The federal law I'm dealing with CDL
18  trucking --
19      Q.  Yes.
20      A.  -- no, the answer is I'm aware of, I
21  wouldn't know the details.
22      Q.  You're not aware of even the basics
23  of the 1986 statutes --
24      MR. ROZYNSKI:  Objection to the
25      form.
```

Page 73

```
 1      Q.  -- sitting here today?
 2      A.  The entire statutes?
 3      Q.  No, just the basis?
 4      MR. ROZYNSKI:  Objection to the
 5      form.
 6      A.  No, I wouldn't know the exact basis
 7  of that.
 8      MR. HALLER:  Can we go off the
 9      record for a minute.
10      THE VIDEOGRAPHER:  We are now off
11  the record.  The time is now 12:17 p.m.
12      (Brief recess taken.)
13      THE VIDEOGRAPHER:  We are now on
14  the record.  The time is 12:20 p.m.
15      Q.  Do you know what the acronym AAMVA
16  stands for?
17      A.  I do not.
18      Q.  Have you had any dealings,
19  personally, with the American Association of
20  Motor Vehicle Administration?
21      A.  No, I have not.
22      Q.  Do you know what role the American
23  Association of Motor Vehicle Administrators,
24  referred to by the acronym of AAMVA, has with
25  respect to the Commercial Motor Vehicle
```



1   Safety Act of 1986?
2        MR. ROZYNSKI:  Objection to the
3   form.  You can answer.
4        A.  No.
5        Q.  Does the term The Essex Project mean
6   anything to you?
7        A.  Essex Project?
8        Q.  Yes, Essex Project?
9        A.  No.
10       Q.  Are you familiar in any way with the
11  standards that have been developed by the
12  American Association of Motor Vehicle
13  Administrators for the operation of those
14  vehicles covered by the Commercial Motor
15  Vehicle Safety Act of 1986?
16       MR. ROZYNSKI:  Objection to the
17   form.  You can answer.
18       A.  No.
19       Q.  So you have no familiarity with the
20  standards, which are often referred to as the
21  AAMVA standards, for the testing and
22  operation of vehicles for which a person
23  would need to get a CDL Class A license?
24       MR. ROZYNSKI:  Objection to the
25   form.

1        A.  That would be correct.
2        Q.  I take it from that that you also
3   are not familiar with the specifications and
4   requirements of the CDL examinations which
5   are administered by the various states in
6   conformity with the AAMVA standards?
7        MR. ROZYNSKI:  Objection to the
8    form.  You can answer.
9        A.  You are correct.
10       Q.  I'm going to show you a document
11  we'll mark as Cox Deposition 3.
12       (Whereupon article was marked
13   Cox Exhibit 3 for identification as
14   of this date.)
15       Q.  Mr. Cox, I've given you a document
16  we've marked as Cox Deposition Exhibit 3; do
17  you have that in front of you?
18       A.  I do.
19       Q.  Do you recognize it?
20       A.  Yes, I do.
21       Q.  Is this an article that you wrote
22  entitled Effective Communication With Deaf
23  During Assessment or Training?
24       A.  Correct.
25       Q.  Is that essentially the same topic

1   as covered in your report Effective
2   Communication While Teaching the Deaf to
3   Drive?
4        MR. ROZYNSKI:  Objection to the
5    form.
6        A.  It would be similar.
7        Q.  Pretty much the same, right?
8        A.  It would be pretty much around the
9   same.
10       Q.  What was the purpose of this
11  particular article?
12       A.  This came out of a need from as this
13  is from news break, I see from the article I
14  produced for ADAD, the Association for Driver
15  Rehabilitation Specialists, and that was
16  because the occupational therapists were
17  having trouble assessing the deaf in an
18  assessment in a vehicle.  And therefore, I
19  taught a course for them and also they asked
20  me to write an article.
21       Q.  Was this published on the ADAD
22  website?
23       A.  I don't believe.  Where you got this
24  is that they housed -- the news break is an
25  actual physical hard copy, I know there's not

1   many more around, but hard copy that goes out
2   to every ADAD member, and that's where this
3   was taken from.
4        Q.  Are you familiar with this article?
5        A.  It's been a little bit before I have
6   read it, but like I produced it in 2009.
7        Q.  Is there anything that's
8   significantly changed about your view on
9   effective communication about teaching the
10  deaf to drive between 2009 and when you wrote
11  your report issued on May 24, 2016 in this
12  case?
13       A.  In that case I would like time to
14  actually read it --
15       Q.  Yes, please do.
16       A.  -- before I make a statement.
17       Q.  Absolutely.
18       A.  Thank you.  Other than the hand
19  signals themselves are missing, I guess they
20  didn't put those or not in the electronic
21  version, but I believe those were part of the
22  article, and the actual diagrams of how to do
23  it.  But for the most part, I would say this
24  is pretty standard still, this would be the
25  basis for doing it.

1    Q.   Just a suggestion, I think if you
2  could talk a little bit more loudly that
3  would be helpful to the court reporter.
4    A.   Absolutely.
5    Q.   Sometimes you're just speaking very
6  softly.
7    A.   Okay, my apologies.
8    Q.   I do the same thing, so I
9  understand, but it's just a lot easier.
10    A.   Understand.
11    Q.   Among the things you say in this
12  article are that on the road -- you have a
13  section that says on the road; do you see
14  that?
15    A.   I do.
16    Q.   When you say on the road, does that
17  mean on the road?
18    A.   I mean just what it sounds, yes,
19  it's actually in a moving vehicle.
20    Q.   In a moving vehicle.  One of the
21  things you recommend is that in a moving
22  vehicle when you're working with the deaf on
23  the road, a note pad, pen, and selected route
24  should be organized before each lesson in the
25  vehicle; do you see that?

1    A.   Yes, I do.
2    Q.   Could you just elaborate for me on
3  how the note pad and pen are used when you're
4  on the road?
5    A.   Certainly.  Now, this would be only
6  in training.  So there's a distinction
7  between assessment and training, they are two
8  distinct things.
9    Q.   Understood.
10    A.   In training the note pad is used, it
11  would be to communicate with a deaf person.
12  Now, most driving is visual, so they may draw
13  a diagram of an intersection they want them
14  to go through and show them how they want to
15  proceed through it so the deaf person could
16  see exactly what they were looking at.  It
17  could also be what they were going to be
18  doing.  Also could be used if they have gone
19  through a section of road or something they
20  wanted to elaborate with them to show them
21  how they would prefer that to be done or they
22  had a little -- they want to adjust them,
23  they would then pull off, stop and they would
24  say okay, here we go, this is kind of how we
25  want to do this.  Again, let's go ahead and

1  try it or it could be used for actual
2  communication between the deaf student and
3  the assessor or trainer.
4    Q.   Is the concept of using a note pad
5  and pen one that many might, in some
6  circumstances, occur while the vehicle is
7  moving?
8    A.   No.
9    Q.   So the note pad and pen would only
10  be used if the vehicle is pulled over and
11  stopped?
12    A.   It is supposed to be in a static
13  situation.
14    Q.   In the sample that you gave when
15  perhaps somebody has gone through an
16  intersection and now the instructor wants to
17  go back over what happened and maybe what
18  should be pointed out to the student, is it
19  your testimony that the instructor needs to
20  tell the student to pull over at that point
21  in time?
22      MR. ROZYNSKI:  Objection to the
23    form.  You can answer.
24    A.   So what the planning route would be
25  so there's a plan that's also in that

1  paragraph talking about a plan there would be
2  a plan of what they are going over that day.
3  Let's just, for example, would be
4  intersections or they would go through an
5  intersection, if there was something that the
6  instructor wanted to point out, a nuisance,
7  something he wanted him to do, to tell them
8  about, they would then pull over and describe
9  that.  They could, if needed to, it was used
10  as a communication tool.
11    Q.   What I'm trying to understand is
12  simply whether the process involves pulling
13  over shortly after the event so that it's a
14  true teaching moment as opposed to waiting
15  until going through the rest of the hour and
16  then trying to do it at the end?
17    A.   It could be either.  It's totally up
18  to the instructor.
19    Q.   You say lower down, most deaf do
20  have some residual hearing and need hand
21  signals to act as an aid if needed.
22    A.   I see that.
23    Q.   What did you mean by that, in terms
24  of most deaf do have some residual hearing?
25    A.   Well, in my -- when I instruct, and



Page 82

1    at the time that I had worked with the deaf,
2    come across a few that are profoundly deaf,
3    but most had some residual hearing. And
4    therefore, in driving, we want to utilize any
5    asset that we have to communicate, especially
6    with someone who is deaf. So that's a piece
7    that I wanted OT to be aware of and make sure
8    they utilize, if they are capable now with
9    cochlear implants, there's a lot of things we
10   want them to be aware that that does occur.
11       Q. When you say utilize, you mean that
12   there can be some amount of speaking?
13       A. That totally depends on the level of
14   hearing from the deaf person. That's
15   supposed to be, like I said in my -- you have
16   an assessment period with a deaf person
17   first.
18       Q. Right, I'm reading what you say in
19   this article.
20       A. Sure.
21       Q. Which is essentially similar or
22   close to the exact same topic on which you
23   have issued this report, same topic, right.
24   You say most deaf do have some residual
25   hearing and the hand signals act as an aid if

Page 83

1    needed; that's what you said, right?
2        MR. ROZYNSKI: Objection to the
3    form.
4        A. Again, yes.
5        Q. So it's by implication, like as I
6    read this, it's -- there may be another way
7    of communication, communicating, other than
8    the hand signals, because the hand signals
9    are to be used if needed, right?
10       A. Again, it's totally based by client
11   by client. So we may have a deaf person who
12   has a lot of hearing, but we have one that
13   has very little or none, that the way you
14   would instruct them on the road is totally
15   different. So there's a whole sliding scale.
16       Q. You said you only had limited
17   experience of people who are, I think your
18   word was, profoundly deaf?
19       MR. ROZYNSKI: Objection to the
20   form.
21       A. In my career in teaching the deaf,
22   most that were -- anyone that was profoundly
23   deaf came with a cochlear implant before they
24   were there. I did have a few more, but there
25   was not as many.

Page 84

1        Q. At the beginning of the report you
2    say -- I'm looking at the second paragraph.
3        A. Second paragraph?
4        Q. Yes.
5        A. First column?
6        Q. First column.
7        A. Okay.
8        Q. Correct. Before I actually ask
9    this, can we confirm on the record that this
10   article is listed in your Curriculum Vitae,
11   or bio, on page 17 of Cox Deposition Exhibit
12   2?
13       A. Seventeen, yes, you asked for
14   publications I did and this would certainly
15   be a publication I wrote.
16       Q. It's significant enough to put on
17   your CV?
18       A. Well, you asked for all publications
19   I did, that was a publication I did.
20       Q. Going back to the exhibit Cox
21   Deposition Exhibit 3, in the first column,
22   second paragraph, you say some of you have
23   had experience with the deaf that would
24   require you to have an interpreter while in
25   the vehicle during your assessment or

Page 85

1    training; do you see that?
2        A. I do.
3        Q. When you say some of you, who are
4    you referring to?
5        A. Occupational therapists.
6        Q. Are the occupational therapists, in
7    this context, training, or assessing, or
8    both?
9        A. It would be both.
10       Q. It would be both, okay. You go on
11   to say this practice, aside from not being
12   required by the ADA, in parens Americans with
13   Disabilities Act, is also very dangerous; do
14   you see that?
15       A. I do see that.
16       Q. Why is it dangerous?
17       MR. ROZYNSKI: Objection to the
18   form.
19       A. In a moving vehicle the trainer, in
20   an assessment we don't -- we don't want the
21   deaf to look backwards and so most of the
22   training, the interpreters were put in the
23   back seat, as the article goes on to explain.
24   That's a problem. You can't have an
25   interpreter making hand signals or sign



Page 86

1  language from the back.  And that's my part
2  where I said to the OTs it's not a good
3  system for them to have.
4       Q.  Well, you actually said --
5       A.  That it's dangerous.
6       Q.  -- that it's dangerous?
7       A.  We don't want the deaf person
8  staring in the rear view mirror to the back
9  or turning their head to communicate
10 backwards, correct.
11      Q.  That was your opinion when you wrote
12 this article, correct?
13      A.  That is when I wrote the article.
14      Q.  It's your opinion as we sit here
15 today?
16      A.  My opinion is still the same, that
17 if you have someone in the back seat, they
18 shouldn't be communicating with them in the
19 back seat, actively communicating with them.
20      Q.  You go on to say, I once had a
21 meeting on the subject with bureaucratic from
22 Washington that insisted we needed an
23 interpreter in the vehicle while teaching the
24 deaf.  I solved this quickly by asking him
25 how many times have you turned around while

Page 87

1  driving to have a conversation with the
2  person in the back seat.  He, of course, said
3  never, that's dangerous.
4       A.  You are correct.  That's exactly
5  what happened.
6       Q.  Then you go on to say then why would
7  you want to put an interpreter in the back
8  seat of a vehicle while a deaf person is
9  driving; this is your conversation with him,
10 right?
11      A.  That is my demonstration with him,
12 that you can't have a conversation with an
13 interpreter in the back seat.
14      Q.  Then you actually say you could see
15 the light bulb go on with him?
16      A.  You are correct.  He was a little
17 bit surprised, but still stuck to his guns.
18          THE VIDEOGRAPHER:  You have about
19      five minutes.
20      Q.  I'm going to show you another
21 document, which we'll mark as Cox Deposition
22 Exhibit 4.
23          (Whereupon article was marked
24      Cox Exhibit 4 for identification as
25      of this date.)

Page 88

1       Q.  Mr. Cox, do you recognize this to be
2  another article that you wrote for a website
3  called Cleveland dot com?
4       A.  I never wrote an article for
5  Cleveland dot com.
6       Q.  Sorry, I apologize.  Let me restate
7  that.  Do you recognize this as an article
8  for a website called Cleveland dot com in
9  which you were quoted?
10      A.  I would have to read it to answer
11 that question.
12      Q.  Okay.  Just for your information,
13 the quote that I'm going to ask you about
14 appears at the very bottom of the page.
15      A.  I see the substance of this.
16      Q.  Go ahead, please take a minute to
17 review it.
18      A.  Thank you.  The date on there was
19 2015, so this is about cell phones.  Okay,
20 I'm familiar with this.  This is on the
21 online stuff.
22      Q.  What's the subject, generally?
23      A.  Generally what this is, is that the
24 state of Ohio is going to, I believe, taking
25 drivers classroom portion online.

Page 89

1       Q.  There's a quote in which on the
2  second page you say it's like telling someone
3  who wants to learn how to play the trumpet,
4  sign up for this online course, don't ever
5  touch the instrument, and go out and play it;
6  do you see that?
7       A.  Yes.
8       Q.  Is that your -- a correct quotation
9  of what you said?
10      A.  I don't remember exactly what I told
11 her, but I can tell you the content.
12      Q.  Okay.  What did you mean by that,
13 what was the content?
14      A.  The content is that under this what
15 was going on in the state, and they are
16 pushing forward, is the adults can take an
17 online course when they fail the driving
18 course.  So they take an online course, but
19 yet they failed the actual driving part, so
20 my quote to her is how can you learn
21 something if you don't even do it.  And I
22 believe I did make a reference to an
23 instrument.  If you take an online course to
24 learn an instrument, I don't think you'd have
25 to actually play the instrument to do it.



1    That's where this is coming from.
2        Q.  Are there any schools in Ohio, that
3    you're familiar with, that use simulators to
4    teach how to drive?
5        A.  Not that I'm -- you mean simulators?
6        Q.  Yes.
7        A.  Not that I'm aware of.
8        Q.  You would agree that even if there
9    was the ability to teach basics by using a
10   simulator, that ultimately, just as you said
11   here, you need to actually go do it on a road
12   with changing conditions?
13           MR. ROZYNSKI:  Objection to the
14       form.
15       A.  Well, the newest simulators which
16   are coming in from ADAD which will have our
17   convention here in Columbus coming up here in
18   two weeks, the simulators brought in are
19   getting much more sophisticated, the seat
20   actually moves, the pedals actually have
21   feeling, and the gear shifters are pretty
22   realistic, and then they have not just the
23   one screen that used to be, but they have a
24   surround, so at this point they are getting
25   much more sophisticated, so I would say that

1    you could learn more on those from what my
2    experience sitting in them doing it.
3        Q.  You'd still say you'd have to have
4    actual on road life experience?
5        A.  Absolutely.  It's the same thing in
6    the airline industry, they train them in the
7    simulator and they actually fly in
8    aircrafts.
9            MR. HALLER:  Let's go off the
10      record.
11          THE VIDEOGRAPHER:  Let's go off the
12      record.  The time is now 12:45 p.m.
13      This ended DVD number one.
14          (Whereupon, a luncheon
15            recess was taken.)
16          THE VIDEOGRAPHER:  We're now on the
17      record.  The time is 1:37 p.m.  This
18      begins DVD number two.
19          (Whereupon documents were
20      marked Cox Exhibits 5-11 for
21      identification as of this date.)
22   Q.  Good afternoon, Mr. Cox.
23   A.  Good afternoon.
24   Q.  We've just had a lunch break; just
25   to remind you, the same ground rules we

1    agreed still apply --
2        A.  Yes, I understand.
3        Q.  -- is that understood?  I put before
4    you a group of documents which we have marked
5    as Cox Deposition Exhibits 5 through 11, and
6    I would ask you to also take -- perhaps to
7    speed things up, Cox Deposition Exhibit 2,
8    which is your report, open it at page 8,
9    please feel free to use that as a reference,
10   because what I'm about to just identify and
11   make sure I understand the document on which
12   you relied external to anything to do with
13   this actual litigation and they offer the
14   most part are the things I put in front of
15   you, so, if you could just follow along with
16   me with both the documents in front of you
17   and that one page of Exhibit 2, then I think
18   that will speed things up.  Thank you.  Am I
19   correct that Cox Exhibit 5 is the article
20   that's referenced as the first entry under
21   references on page 8?
22       A.  Correct.
23       Q.  That has to do with deaf and hearing
24   children, a comparison, and peripheral vision
25   development, is that right?

1        A.  That would be correct.
2        Q.  We can agree on the record this
3    particular report has nothing to do with
4    driving commercial vehicles?
5        A.  I would agree.  I want to correct
6    that, may I do so?  The statement I just
7    said, you said it has nothing to do with
8    commercial vehicles, I would say peripheral
9    vision has something to do with driving
10   commercial vehicles.
11       Q.  The report itself doesn't mention
12   commercial vehicles?
13       A.  You are correct.
14       Q.  It's not intended to analyze
15   anything to do with safety using enhanced
16   peripheral vision that a deaf person might
17   have in a commercial vehicle?
18       A.  It does not.
19       Q.  The second document I put before you
20   in this batch, Cox Deposition Exhibit 6, am I
21   correct is the second document listed under
22   references?
23       A.  You are correct.
24       Q.  This also deals with the development
25   of additional sensory perception among deaf



1    people, is that right?
2        A.   Yes.
3        Q.   Now, you listed in your reference as
4    Deaf Adults See Better Than Hearing People
5    new study finds; do you see that?
6        A.   That's on the Daily Science, this is
7    Scientific America.  Yes, there were
8    several -- let's see.  That would be what you
9    have here --
10       Q.   I see.
11       A.   -- fifth down.
12       Q.   Let me restate the question, because
13   I think I have the order mixed up.  Am I
14   correct that what's before you is Cox
15   Deposition Exhibit 6 is an article that is
16   listed as the fifth item on your list of
17   references?
18       A.   That would be correct.
19       Q.   It's entitled Super Powers For The
20   Blind And Deaf?
21       A.   Correct.
22       Q.   What in this article, if anything,
23   did you consider in connection with your
24   report?
25       A.   This is, when I read through and it

1    was just you asked to have any references
2    that I used in and this is one article that
3    in conjunction with all of these reading
4    through on this one.  I don't know exactly
5    what I pulled from it, other than general
6    knowledge of it.
7        Q.   You agree that that article does not
8    address in any way safety issues related to
9    blind or deaf people driving commercial motor
10   vehicles?
11       A.   Correct.
12       Q.   If we go to the next document, Cox
13   Deposition Exhibit 7, am I correct that this
14   is the article that is listed third under
15   your list of references entitled Do Deaf
16   People Really Have Superhuman Vision?
17       A.   Correct it is.
18       Q.   What, if anything, did you consider
19   in connection with your report in conjunction
20   with this article?
21       A.   Again, it's the general article is
22   generally on what I read on peripheral vision
23   dealing with adult deaf.
24       Q.   Again, you would agree that this
25   article itself has nothing to do with driving

1    a commercial motor vehicle or any safety
2    issues in connection with driving a
3    commercial motor vehicle?
4        A.   I would say that it is in itself
5    correct, other than as I stated before, that
6    peripheral vision would be a safety issue.
7        Q.   I'm not asking currently what you
8    might derive from these articles, I'm asking
9    what the articles themselves address?
10       A.   You are correct.
11       Q.   We can agree on the record that this
12   article, as the other articles, they don't
13   even mention the words commercial motor
14   vehicle?
15           MR. ROZYNSKI:  Objection to the
16       form.
17       A.   They do not.
18       Q.   They don't for a minute purport to
19   address whether or not it is safe for a deaf
20   or a blind person to drive a commercial motor
21   vehicle?
22           MR. ROZYNSKI:  Objection to the
23       form.
24       A.   You are correct.
25       Q.   Then if we look at Cox Deposition

1    Exhibit 8, that is the article that appears
2    as the second entry under list of references,
3    am I correct?
4        A.   You are correct.
5        Q.   It's entitled Deaf Adults See Better
6    Than Hearing People new study finds, is that
7    correct?
8        A.   That is correct.
9        Q.   What, if anything, did you rely or
10   consider in connection with your report from
11   this particular article?
12       A.   Again, it's like the other ones, it
13   does go in and talk about as an adult deaf
14   person has better peripheral vision and
15   that's what I derived from it.
16       Q.   Again, we can agree on the record
17   that there's nothing in connection with this
18   article that has anything to do with
19   commercial motor vehicles or safety issues
20   related to operating a commercial motor
21   vehicle?
22           MR. ROZYNSKI:  Objection to the
23       form.
24       A.   We will agree on that again.
25       Q.   Am I correct that all of those



1   articles in the general sense support some
2   conclusion that you've generally derived with
3   respect to the peripheral vision of somebody
4   who is deaf?
5        MR. ROZYNSKI:  Objection to the
6     form.
7     A.  That is correct.
8     Q.  What is it that you derive from
9   those articles with respect to peripheral
10   vision of somebody who is deaf?
11     A.  My conclusion is based on my
12   experience with the deaf in the car, that
13   when peripheral vision in picking up the
14   signals and different things they tend to do
15   it quicker and faster than my hearing
16   students.  And these articles are the
17   scientific area showing that my observations
18   professionally on seeing that, that I am
19   seeing something that has now been documented
20   true.
21     Q.  But you have no -- personally no
22   professional qualification that would allow
23   you to testify under oath as to an opinion on
24   the actual extent of the development of
25   peripheral vision for deaf people from a

1   scientific perspective?
2        MR. ROZYNSKI:  Objection to the
3     form.
4     Q.  Do you?
5     A.  I could only tell you that my
6   experiences with the deaf versus the hearing
7   in my car, so my observations, over the
8   years, were that is the only basis that I
9   could personally attest to.  I'm not a
10   scientist or a doctor, you're correct.
11     Q.  What you're saying is that you have
12   this personal observation based on your own
13   experience, right?
14     A.  Correct.
15     Q.  And that the materials that you've
16   referenced in your view support that
17   conclusion?
18     A.  That would be a good summary of how
19   I feel, correct.
20     Q.  You're not aware and have not cited
21   to any specific study that looks at the
22   impact of peripheral vision for deaf driving
23   students with respect to passenger vehicles,
24   are you?
25        MR. ROZYNSKI:  Objection to the

1     form.
2     A.  Rephrase your question so I
3   understand completely, if you could.
4     Q.  You are not -- you haven't cited and
5   you're not relying on any specific scientific
6   study related to deaf students who are trying
7   to learn to drive and the impact of that
8   peripheral vision on their ability to learn?
9        MR. ROZYNSKI:  Objection to the
10     form.
11     A.  Not really clear on the question
12   you're asking me to say, so my best answer to
13   you would be that I, through my professional
14   experience of thirty-four years working with
15   the deaf and the hearing, noticing the
16   difference of when their peripheral vision
17   then seeing scientific, scientists actually
18   proving that they do have peripheral, so they
19   are confirming what I'm seeing in the field,
20   that's all I can rely on.
21     Q.  Right, that's my point, there's
22   nothing that you're citing to or know about
23   that deals with --
24     A.  Other than these.
25     Q.  -- a scientific study of people who

1   want to learn to drive and how peripheral
2   vision may affect their ability or not?
3        MR. ROZYNSKI:  Objection to the
4     form.
5     A.  Well, I'm relying on these studies
6   here.
7     Q.  I understand.  And those studies,
8   we've agreed on the record, they are not
9   connected with driving, they are not related
10   to driving, they are not studying people who
11   are driving, so I'm just trying to make
12   sure --
13     A.  But, okay.
14     Q.  -- if you could answer my question,
15   so all I'm asking is you're -- you have not
16   cited to or relied on anything that
17   specifically involves a scientific study of
18   deaf people and the peripheral vision as
19   applied to driving?
20        MR. ROZYNSKI:  Objection to the
21     form.
22     A.  Other than my own personal
23   experience?
24     Q.  Right.
25     A.  So even though that I would equate

Page 102

1    study of peripheral vision directly to what I
2    do, there is no study -- rephrase your
3    question so if this is exactly what you're
4    asking, because I'm a little confused.  Did I
5    rely on any specific study that took deaf
6    people and said here is how they drive better
7    than hearing people, and the answer to that
8    question would be no.
9        Q.   Not necessarily how they drive
10   better, but how the peripheral vision that
11   may or may not be enhanced because you're
12   deaf, how that impacts safety issues with
13   respect to driving.
14       A.   Okay.  So to rephrase, so I
15   understand, the question would be did I rely
16   on any study that specifically talked about
17   deaf driving and peripheral vision?
18       Q.   Right.
19       A.   And the answer to that question
20   would be no.
21       Q.   And you're not aware of any such
22   study, sitting here today?
23       A.   I'm not aware of any such study,
24   correct.
25       Q.   When you say you had these articles

Page 103

1    in some way confirm your observations, what
2    is it that you are specifically comparing as
3    between the deaf population and students who
4    are not hearing impaired?
5        A.   What I observed with the deaf while
6    driving or in a classroom setting is they are
7    very visually acute.  So if something happens
8    on the road or other, they would be able to
9    spot it and recognize it more so than my
10   hearing students.  Sometimes something we go
11   can just not even check it.  Remember, I have
12   the eye check mirror, so I know where they
13   are looking, so I saw that they would pick up
14   objects, that was what I saw professionally
15   in the field for many years.  Trying to
16   research to see is there a connection, I
17   don't remember what I did in the original --
18   I don't know where the original article there
19   was evidence of that, so going back, this is
20   where -- this confirms, supports, my field
21   observations, I would say.
22       Q.   Did you do any tests in the field,
23   so say testing with the population that does
24   not have a hearing impairment, their visual
25   acuity in terms of seeing the signs that you

Page 104

1    have suggested should be used for deaf people
2    in comparing to any analysis like that you've
3    done?
4        A.   If I understand the question, you're
5    asking did I do a signs with hearing
6    students?
7        Q.   Did you do any kind of study where
8    you did a comparison using the signs to get
9    some kind of empirical result as opposed to
10   just general observation?
11           MR. ROZYNSKI:  Objection to the
12       form.
13       A.   Did I actually conduct a study?
14       Q.   Yes.
15       A.   No, I did not conduct a study.
16       Q.   Is it your testimony that every
17   person who has a hearing impairment will have
18   some form of enhanced peripheral vision?
19           MR. ROZYNSKI:  Objection to the
20       form.
21       A.   No, I don't believe that's what it
22   stated.  I said, and the articles say, that
23   it's depending if they are profoundly deaf
24   from birth.  And like I've told you
25   throughout the deposition, that it's a

Page 105

1    sliding scale so depending on hearing you're
2    going to have the same thing with peripheral
3    vision.
4        Q.   Wouldn't you agree that to conclude
5    that in any particular case somebody presents
6    with perhaps more acute peripheral vision
7    you'd need to look at that on an
8    individualized basis?
9        A.   That would be yes, we would do that
10   in the assessment work.  We always have the
11   assessment.
12       Q.   I mean, these studies don't say
13   every person who is hard of hearing or
14   hearing impairment or is completely deaf will
15   necessarily have the --
16       A.   Well --
17       Q.   Let me finish.
18       A.   Sorry.
19       Q.   -- will have improved visual acuity?
20           MR. ROZYNSKI:  Objection to the
21       form.
22       A.   Yes, they do go through and show the
23   years of development the studies does and I
24   believe they empirically say that someone who
25   is profoundly deaf from birth does have, I

Page 106

1    believe that their percentage -- I guess if
2    you said every single one --
3        Q.   Right.
4        A.   -- I believe it does not state that.
5        Q.   Right.  They are extrapolating a
6    percentage so it's more likely that they
7    will, right?
8        A.   Correct, I can agree with that.
9        Q.   I mean, I'm not trying to argue.  At
10   the end of the day you do have to deal in
11   these kinds of context with each person on an
12   individual basis, you would agree with that?
13       A.   I will agree with that, absolutely.
14       Q.   Have you personally met Kenneth
15   Frilando?
16       A.   No.
17       Q.   Have you done any assessment of
18   Kenneth Frilando?
19       A.   I have not.
20       Q.   You have no knowledge of his visual
21   acuity, do you?
22       A.   I do not.
23       Q.   And you haven't read his deposition,
24   have you?
25       A.   His deposition?

Page 107

1        Q.   Kenneth Frilando's deposition?
2        A.   I believe I did read his deposition,
3    I believe that's stated in there.  Wait a
4    minute.  I'm trying to think.  What --
5        Q.   You said you read Joseph Frilando's
6    deposition, which is his brother's?
7        A.   His brother's.
8        Q.   Yes.
9        A.   I think that was provided to me, I
10   think that's what I read.
11       Q.   Just to finish up on this group of
12   questions.  We can agree, can we not, on the
13   record that whatever you extrapolate from
14   your personal observations, and these
15   references in connection with peripheral
16   vision, doesn't in any way affect your
17   conclusion that the use of sign language
18   interpreters in a vehicle that's moving would
19   be dangerous?
20       MR. ROZYNSKI:  Objection to the
21   form.
22       A.   Sign language interpreters in the
23   back seat would be dangerous, that's what I
24   would agree to.
25       Q.   Well, I'm having a little trouble

Page 108

1    understanding that testimony.  Where else
2    would a sign language interpreter be unless
3    they are actually the instructor?
4        A.   Well, you just answered your own
5    question.  It would be the instructor.
6        Q.   Do you have instructors in your
7    school that are proficient in sign language?
8        MR. ROZYNSKI:  Objection to the
9    form.
10       A.   At this time we do not.
11       Q.   Do you have any assessment of
12   whether it would be safe or not in a
13   passenger vehicle to try and use sign
14   language as opposed to the signs that you
15   suggested as the means of communication
16   between an instructor who is proficient at
17   sign language?
18       MR. ROZYNSKI:  Objection to the
19   form.
20       A.   It would be my -- our training that
21   we would prefer to have short hand signals
22   rather than trying to do long sentences which
23   would be someone who could sign and speak
24   with them.  Same correlation if I was
25   speaking to someone basically in the

Page 109

1    passenger compartment and turning my head,
2    that is what we try to avoid doing.
3        Q.   So you would have the same concerns
4    as to danger involved in that kind of process
5    of having active sign language in the vehicle
6    while it's moving with an instructor?
7        A.   Yes.
8        Q.   Even if the instructor is proficient
9    in sign language?
10       MR. ROZYNSKI:  Objection to the
11   form.
12       A.   Instructing the student as they go,
13   yes, I want just the hand signals, basic hand
14   signals.
15       Q.   I've put before you what we've
16   marked as Cox Deposition Exhibit 9, which
17   is --
18       A.   That would be --
19       MR. ROZYNSKI:  I don't have a copy
20   of 9.
21       Q.   I think it's the one right in front
22   of you on top of this pile.  Isn't that 9?
23       A.   No, that's 1 -- yes, I'm sorry.
24   Thanks.  I got it.
25       Q.   Do you know what is before you,

1   what's marked as Cox Exhibit 9?
2       A.   I do.
3       Q.   Am I correct that this is an article
4   that you wrote?
5       A.   It is.
6       Q.   And it's entitled Effective
7   Communication When Teaching The Deaf To
8   Drive?
9       A.   Correct.
10      Q.   That was published in 2001?
11      A.   Is it dated.  Let's see.  That could
12  have been --
13      Q.   Let me ask you a different -- is
14  this the article that is referenced as the
15  fourth entry on your list of referencing?
16      A.   No.  That one effective -- how to
17  drive for training.  It is not the exact one,
18  I don't believe.  This is not that -- for the
19  state -- this date -- I don't believe this is
20  it.  I believe this is pulled from my
21  website, not the state of Ohio's document
22  that I referenced.
23      Q.   Why don't we look at what's been
24  marked as Cox Deposition Exhibit 10.
25      A.   I'm looking at the page.  Sorry.  I

1   have Exhibit 10, yes.
2       Q.   I'll represent to you that Exhibit
3   10 is what we pulled from the website and
4   what's before you as Cox Exhibit 9 we pulled
5   from the Ohio --
6           MR. CONNELLY:  The Ohio driver
7       training website.
8       Q.   The Ohio driver training website.
9       A.   Okay.  It does have the questions,
10  the eleven questions on that Ohio drivers
11  website.
12          MR. HALLER:  Why don't we go off
13      the record.
14          THE VIDEOGRAPHER:  We're now off
15      the record.  The time is 2:03 p.m.
16          (Whereupon, a discussion was
17      held off the record.)
18          THE VIDEOGRAPHER:  We are now on
19      the record.  The time is now 2:03 p.m.
20      Q.   Mr. Cox, we just went off the record
21  to see if we could help refresh your
22  recollection on which is which; and so having
23  done that by reference to the Ohio --
24          MR. CONNELLY:  Driver training.
25      Q.   -- driver training website can we

1   agree on the record that Cox Deposition
2   Exhibit 9 is what's on that website and the
3   reference that is number 4 on the list of
4   referenced documents?
5       A.   Yes, we can.
6       Q.   Then can we agree that Cox Exhibit
7   10 is a similar kind of document with a
8   different title entitled Working With The
9   Deaf and What Are Your Legal Requirements and
10  what is the Heights' driving website?
11      A.   Yes, they are similar.
12      Q.   The title on Cox Exhibit 9 we can
13  agree is the exact same title as --
14      A.   Yes, it is.
15      Q.   -- as your report?
16      A.   I'll agree to that, yes.
17      Q.   And your report is really derivative
18  of that original article, correct?
19      A.   You mean this?
20      Q.   Yes, the report in this case, which
21  you have entitled Effective Communication
22  While Teaching Deaf To Drive is derivative of
23  the article that's on the Ohio --
24      A.   Yes, I used that, as I said, as a
25  reference to a published background.

1       Q.   In both these documents you have a
2   segment dealing with public accommodation
3   questions and answers under the Americans
4   with Disabilities Act; are you aware of that?
5       A.   Let me get to that.  What page is
6   that?
7       Q.   Well, it's the last, I'd say three
8   pages of Exhibit 9.  It begins on the third
9   to last page and it's page 2 of Exhibit 10.
10      A.   Yes, I have it, okay.  I got you.
11  It starts at US Equal Unemployment
12  Commission, okay.
13      Q.   Is this something that you had
14  somebody else prepare or did you prepare this
15  yourself?
16      A.   That was directly lifted right from
17  the US Equal Opportunity Commission.  It was
18  on their website.
19      Q.   So you're not sitting here today
20  purporting to be an expert on the legal
21  requirements with respect to public
22  accommodations under the Americans with
23  Disabilities Act?
24      A.   I am not.
25      Q.   Are you generally aware that the

Page 114

1    Americans with Disabilities Act expressly
2    provides that an entity that is deemed a
3    public entity may exclude individuals because
4    of their disability if the individual poses a
5    direct threat to the health or safety of
6    others?
7        MR. ROZYNSKI:  Objection to the
8     form.  You can answer.
9        A.  Am I aware that's in this ADA law?
10       Q.  Yes.
11       A.  Yes.
12       Q.  Are you aware that to the extent
13   that a public entity covered by the
14   statute -- sorry, let me withdraw that.  Are
15   you aware that an entity covered by the
16   statute is required to provide reasonable
17   accommodations, but not if they would have an
18   effect of endangering the health or safety of
19   others?
20       MR. ROZYNSKI:  Objection to the
21    form.  You can answer.
22       A.  Like I said, I'm not an attorney on
23   it, but I know that my understanding is that
24   they, like I said, this question before seems
25   very similar, I'm not sure the difference

Page 115

1    between the two questions that you just
2    asked.
3        Q.  Well, I mean do you understand what
4    a term reasonable accommodation means?
5        MR. ROZYNSKI:  Objection to the
6     form.
7        A.  That's open for interpretation.
8    What is reasonable to you may not be
9    reasonable to me.
10       Q.  You're not sure what it means
11   legally then?
12       A.  Legally, no, I'm not an attorney.
13       Q.  Are you aware that under the statute
14   the ADA does not require an entity to
15   accommodate if it would result in a
16   fundamental alteration in the manner in which
17   the services are provided?
18       MR. ROZYNSKI:  Objection to the
19    form.
20       A.  I believe that is in the ADA.
21       Q.  Your report in this case doesn't
22   specifically address any of the provisions
23   that you've summarized in these two articles
24   with respect to ADA, you will agree with
25   that?

Page 116

1        MR. ROZYNSKI:  Objection to the
2     form.
3        A.  I'll agree with that.
4        Q.  Finally, with respect to the items
5    that are listed on references, can we agree
6    that Cox Exhibit 11 is the final entry which
7    relates to the Federal Motor Carrier Safety
8    Administration Evidence report dated
9    August 26, 2008?
10       A.  Correct.
11       Q.  Was there anything in particular
12   from this evidence report that you considered
13   or relied on in terms of your report?
14       A.  The only one piece in here is the
15   study about drivers -- deaf drivers versus
16   hearing that there's no evidence that they
17   are involved in more motor vehicle crashes.
18       Q.  Anything else?
19       A.  No.
20       Q.  Perhaps we can go to page 3 then of
21   what's before you as Cox Deposition Exhibit
22   11.
23       A.  This is in this report?
24       Q.  Yes.  Page 3.
25       A.  Okay.

Page 117

1        Q.  Am I correct that what you're
2    generally referencing is what appears on the
3    second bullet point on page 3, evidence from
4    a private driver license holder population
5    does not support the contention that
6    individuals with hearing impairments are at
7    an increased risk for a crash?
8        MR. ROZYNSKI:  Objection to the
9     form.
10       A.  You are correct.
11       Q.  Beyond that general proposition did
12   you look into the underlying data or basis
13   for that conclusion in any way in terms of
14   developing your report in this case?
15       A.  In this case I relied on they have a
16   summary I think which shows do they feel this
17   is strong or the studies, this is kind of a
18   summation of the studies and then it says
19   whatever they feel they are reliable or not
20   reliable.
21       Q.  You didn't delve into the underlying
22   studies and look at what they said and how
23   they reached their conclusions and do any
24   kind of quantitative or qualitive analysis of
25   that data?

Page 118

1    A.  I did not.
2    Q.  You would agree with me that the
3  conclusion that it's referenced, and on which
4  you relied for your report, is identified
5  under strength of conclusion as minimally
6  acceptable, you would agree with that?
7       MR. ROZYNSKI:  Objection to the
8    form.
9    A.  I believe it goes on and it
10  references other ones that I believe they
11  said that it was in the moderate category.
12  If I'm not correct.  I see where you're
13  referencing this is page 3, correct?
14    Q.  Yes.  If you look underneath that it
15  says one retrospective study below.
16    A.  Right.  Then it said another one
17  moderate, that's the one I'm referencing
18  where it said it was moderate.
19    Q.  You would agree with me that in
20  terms of this report that the overall
21  conclusion was based on what is deemed to be
22  minimally acceptable data?
23       MR. ROZYNSKI:  Objection to the
24    form.
25    A.  You're asking me what I based on I

Page 119

1  felt that a quality rating of moderate was
2  acceptable to me to find that that conclusion
3  since I have no other data or other studies
4  showing opposite that that would be a
5  reasonable conclusion.
6    Q.  That wasn't my question though.  My
7  question was that the ultimate conclusion
8  that's stated in the bold bullet that we
9  referenced earlier is specifically referenced
10  in this report as being based on data that is
11  minimally acceptable, would you agree with
12  that?
13    A.  Yes, I see where you're pulling for.
14  I apologize.  I see what you're saying in the
15  bullet.  Yes, I would agree with that.
16    Q.  Did you take that into
17  consideration?
18    A.  I did.
19    Q.  Could you go to page 46?
20    A.  Of this report?
21    Q.  Yes.
22    A.  Sure.  Hold on.
23    Q.  I'm going to ask you some questions
24  about what appears in the very bottom of page
25  46; but before I do so, I want to just make

Page 120

1  sure we're on the same page.  You understood
2  that whatever data was being viewed as
3  minimally acceptable related to passenger
4  drivers private licensed holder population,
5  right?
6    A.  That -- yes, I believe that's what
7  it's referencing.
8    Q.  You would agree that none of the
9  studies on which that minimally acceptable
10  conclusion was reached involved populations
11  of CMV drivers?
12       MR. ROZYNSKI:  Objection to the
13    form.
14    A.  I would agree that is correct.
15    Q.  And therefore the generalized -- I
16  don't like that word, so I'll withdraw it.
17  The ability to generalize from the studies as
18  to commercial motor vehicles is unclear?
19    A.  Rephrase the question for me.
20    Q.  Since the studies involve private
21  motor vehicle license holders and did not
22  study populations of CMV drivers, the ability
23  to generalize from the data as to CMV drivers
24  is unclear?
25       MR. ROZYNSKI:  Objection to the

Page 121

1    form.
2    A.  Based on the study.  Since I'm not a
3  researcher, I'd have to agree.
4    Q.  That's what it actually says?
5    A.  Yes, I know what it says.
6    Q.  It says in quotes the generalized
7  ability of the findings of these studies to
8  CMV drivers is therefore unclear closed
9  quotes?
10    A.  Correct.
11    Q.  You're not disagreeing with that?
12       MR. ROZYNSKI:  Objection to the
13    form.
14    A.  I cannot disagree with it, it's
15  their study.
16    Q.  You understand, do you not, that
17  many of the population that was studied were
18  people who already had a license and were
19  able to drive, right?
20    A.  I agree that was my understanding of
21  the study.
22    Q.  So we can agree on the record that
23  there was no study done of CMV drivers
24  themselves, right?
25       MR. ROZYNSKI:  Objection to the

1       form.
2       A.  Correct.
3       Q.  That therefore the application of
4    the conclusion to that of the driving
5    population is unclear, right?
6          MR. ROZYNSKI:  Objection to the
7       form.
8       A.  They are not linking it, so it would
9    be.
10      Q.  And that vis-a-vis the population
11   that was studied, which are people that hold
12   private driving licenses and driver passenger
13   cars, those were all people that had got
14   licenses and knew how to drive, right?
15         MR. ROZYNSKI:  Objection to the
16      form.
17      A.  Okay.  You made a statement got
18   licenses and knew how to drive --
19      Q.  Yes?
20      A.  -- together in one sentence.  I need
21   that rephrased because that doesn't compute
22   to me.
23      Q.  The studies were done on the private
24   driver license holder population?
25      A.  Correct, people already held

1    driver's license.
2       Q.  So must have passed some state test,
3    do you understand?
4       A.  So they already knew how to drive,
5    you are correct.
6       Q.  So there's nothing in this entire
7    report that looks at the safety implications
8    of individuals who are learning how to
9    drive --
10         MR. ROZYNSKI:  Objection to the
11      form.
12      Q.  -- any kind of vehicle?
13      A.  Whether or not their crash history
14   would be more or less?
15      Q.  Yes.
16      A.  No, this study was just on licensed
17   drivers.
18      Q.  Right.
19      A.  That's only I referenced only thing.
20      Q.  So you'd agree that this study
21   simply does not enable you or anyone to
22   derive a conclusion about the relative safety
23   of training somebody who is completely deaf
24   on a tractor-trailer commercial motor vehicle
25   as opposed to somebody who has the ability to

1    hear?
2       A.  Yes, my report specifically was to a
3    motor vehicle, as I stated before, not
4    tractor-trailer, and this study is one that I
5    found that showed that they're licensed that
6    there were no noticeable crashes in this
7    particular study in a motor vehicle had
8    nothing to do with and I did not claim to
9    have to do with a commercial vehicle.
10      Q.  What I'm trying to drive at is
11   something much more specific though and you
12   may or may not be able to answer me, but I
13   think it's self-evident, the studies on which
14   the Federal Motor Carrier Safety
15   Administration relied for the minimally
16   acceptable conclusion that's stated in the
17   report did not involve in any way a
18   comparison of people who could hear and
19   people who were deaf in the context of
20   training on a tractor-trailer for which you
21   would need a Class A CDL license --
22         MR. ROZYNSKI:  Objection to the
23      form.
24      Q.  -- correct?
25      A.  No, it did not.

1       Q.  You can't extrapolate anything from
2    this report in terms of whether there are
3    safety issues involved in the training of
4    somebody who is deaf greater than somebody
5    who can fully hear in that context, is
6    that --
7       A.  The only thing I reported in this
8    report was the fact that a study in motor
9    vehicles would be between the ones that are
10   licensed and did not have shown a greater
11   propensity for crashes.
12      Q.  Did you do anything to consider
13   additional research that might lead you to
14   determine if there were any studies that
15   actually related to commercial motor vehicles
16   that might impact your conclusions in this
17   case?
18         MR. ROZYNSKI:  Objection to the
19      form.
20      A.  I did not find any.
21      Q.  Now, you have -- actually, we'll
22   come back to this -- given seminars on the
23   safety issues related to training or
24   continued driving of the older population, am
25   I right?

Page 126

1    A.  You are correct.
2    Q.  In the context of that kind of
3 presentation, did you ever look at whether
4 there were any studies related to commercial
5 motor vehicles that might inform your report
6 in this case?
7        MR. ROZYNSKI:  Objection to the
8    form.
9    A.  No.
10   Q.  Are you aware of a study that was
11 commissioned by the Federal Motor Carrier
12 Safety Administration and issued in and
13 around 2010 dealing with older commercial
14 drivers and whether they posed a safety risk?
15   A.  Older, no, I'm not aware of that
16 study.
17   Q.  So you're not aware that in the
18 context of that detailed research which
19 supported the study commissioned by the
20 Federal Motor Carrier Safety Administration
21 that there was a conclusion that the safety
22 records of hearing impaired with those of
23 non-impaired drivers in this older population
24 was roughly 1.8 times the number of accidents
25 as between the hearing impaired and the

Page 127

1 non-hearing impaired?
2        MR. ROZYNSKI:  Objection to the
3    form.  None of us have this document in
4    front of us.
5    A.  As he stated, I don't have that one
6 thing about a study.  Do you know whether or
7 not they tested how many miles each person
8 drove, is that part of that study?  You're
9 asking me a question of a study how they
10 looked at how they drove.  Is it by how many
11 miles they drove, that's my question to you?
12   Q.  Those may be fair questions.
13   A.  You're asking me to make an opinion
14 on a study that I don't know.  I'm asking a
15 question, does it say that?  You have the
16 study in front of you.
17   Q.  I understand, I'm sure you're astute
18 enough to know that I'm not here to testify.
19   A.  Correct.
20   Q.  So I get to ask the questions, and I
21 don't mean that in an impertinent way, my
22 question doesn't really go to the underlying
23 basis of the study, I'm trying to find out
24 whether you were generally aware that there
25 are studies that suggest that there is a

Page 128

1 significantly greater risk of accidents in
2 the older population for those individuals
3 who have hearing impairment versus those who
4 don't?
5        MR. ROZYNSKI:  Objection to the
6    form.
7    A.  I would answer that obviously I
8 haven't even seen it, but you've made me
9 aware, so I'd have to answer that question,
10 taking your word for it, that the answer
11 would be, I did not know.
12   Q.  It's true, is it not, that you did
13 not consider, review, or rely on in any way
14 the U.S. Department of Transportation Federal
15 Motor Carrier Safety Administration report of
16 September 2009 involving driver distraction
17 in commercial vehicle operations?
18   A.  No, I did not.
19   Q.  Were you even aware that that study
20 existed?
21   A.  I was not.
22   Q.  Have you any idea what its
23 conclusions were?
24   A.  No, I do not.
25   Q.  It wouldn't surprise you to learn

Page 129

1 that tasks in a cab of a commercial motor
2 vehicle that take even momentarily the
3 driver's attention off the road are likely to
4 create greater risk of accident?
5        MR. ROZYNSKI:  Objection to the
6    form.
7    A.  Anytime a driver has to scan and
8 take their eyes off the road then they may
9 miss information.
10   Q.  Would it surprise you to learn that
11 writing on a pad or note book was determined
12 to very significantly increase the risk of
13 accident?
14   A.  Of the driver doing it?
15   Q.  Yes.
16   A.  No, I would not object to that at
17 all.
18   Q.  Would it surprise you to learn that
19 just anything where the person has to take
20 their eyes off the road, such as looking at
21 like a monitor screen or a cell phone or
22 anything like that, significantly increases
23 the risk of accident?
24   A.  Are you saying looking or reading,
25 because those are two different things?

MAGNA
LEGAL SERVICES

Page 130

1    Q.  Well, let's start with reading?
2    A.  Reading would be, that would be a
3  significant.
4    Q.  So for instance, even on a
5  navigation system, focusing your attention
6  trying to read it as opposed to just
7  listening to the instructions?
8    A.  Reading would be more significant,
9  uses more brain activity.
10    Q.  It wouldn't surprise you to learn
11  that if you were looking behind you in the
12  cabs, which would be toward the sleeper
13  berth, which is behind in a cab, that that
14  would create a significant increased risk of
15  accident?
16    A.  I would agree with that.
17    Q.  That would be consistent even with
18  what you said in passenger vehicles looking
19  to the back seat to somebody to sign, am I
20  correct?
21    A.  You are correct.
22    Q.  Do you have any reason to dispute
23  that driver error is the predominant
24  contributing fact in crashes of commercial
25  motor vehicles?

Page 131

1    MR. ROZYNSKI:  Objection to the
2    form.
3    A.  I would not.
4    Q.  And that distracted driving is
5  frequently a cause of driver error
6  contributing to crashes in commercial motor
7  vehicles?
8    A.  In regular vehicles I can talk to it
9  does.  I can't attest to, because I don't
10  work in that realm, but in regular vehicles
11  you are correct, distracted driving does
12  account for more crashes.
13    Q.  In connection with your report, am I
14  correct, am I not, that you did not consider,
15  review, or rely on the CDL examiner's manual
16  that has been issued pursuant to the
17  Commercial Motor Vehicle Safety Act of 1986
18  reflecting the AAMVA standards that I asked
19  you about earlier today?
20    A.  I did not reference that, no.
21    Q.  And you haven't read it?
22    A.  The laws on governing a test, no.
23    Q.  You're not familiar with the
24  requirements in the CDL examiner's manual?
25    MR. ROZYNSKI:  Objection to the

Page 132

1    form.
2    A.  I am not familiar with that.
3    Q.  Sitting here today, do you know the
4  specific elements of the test which must be
5  applied, not the details of each test, but
6  what tests are even required under the AAMVA
7  standards?
8    MR. ROZYNSKI:  Objection to the
9    form.
10    A.  The only idea that is in your, I
11  believe, in your expert report he referred to
12  some of that, the gentleman.
13    Q.  But beyond that?
14    A.  Beyond that I would not.
15    Q.  You have no personal knowledge?
16    MR. ROZYNSKI:  Objection to the
17    form.
18    A.  No idea.
19    Q.  You're not here purporting to
20  provide any expertise in connection with the
21  application of what you have experienced
22  vis-a-vis passenger drivers to the actual
23  AAMVA standards, are you?
24    MR. ROZYNSKI:  Objection to the
25    form.

Page 133

1    A.  No.  My expert report is very clear,
2  it's in a passenger vehicle.
3    Q.  You have not made any effort to
4  extrapolate that specifically and apply it to
5  the AAMVA standards, have you?
6    MR. ROZYNSKI:  Objection to the
7    form.
8    A.  I have not applied it to the AAMVA
9  standards.
10    Q.  You have no testimony to offer in
11  that respect, sitting here today?
12    MR. ROZYNSKI:  Objection to the
13    form.
14    A.  To that, to those standards, no.
15    Q.  Do you know the definition of a
16  Class A combination vehicle?
17    A.  Do I know the definition?
18    Q.  Yes.
19    A.  I do not.
20    Q.  Do you have any familiarity with air
21  brakes?
22    A.  No.
23    Q.  I take it from that, that you don't
24  have any knowledge as to how a trainee for a
25  commercial driver license Class A must check

MAGNA
LEGAL SERVICES

Page 134

1    for air brake problems or issues as part of a
2    vehicle inspection?
3         MR. ROZYNSKI:  Objection to the
4    form.
5         A.  No, I would not.
6         Q.  Do you have any knowledge of the
7    importance of being able to recognize audible
8    discharge of air in that connection?
9         MR. ROZYNSKI:  Objection to the
10   form.
11        A.  Of an air brake?
12        Q.  Yes.
13        A.  No, I would not.
14        Q.  I take it generally you're not
15   familiar with the inspection requirements of
16   the AAMVA standards and the testing that goes
17   into getting a CDL license?
18        MR. ROZYNSKI:  Objection to the
19   form.
20        A.  That would be correct.
21        Q.  Am I also correct to conclude that
22   you also do not know any details concerning
23   the basic control skills testing, which must
24   be taught and tested in order to get a CDL
25   Class A license?

Page 135

1         MR. ROZYNSKI:  Objection to the
2    form.
3         A.  You are correct.
4         Q.  Could you even list for me the
5    different aspects involved in the basic
6    control skills test?
7         MR. ROZYNSKI:  Objection to the
8    form.
9         A.  Not with any accuracy, no.
10        Q.  Do you have any experience when
11   teaching passenger of either, whether you
12   were doing it or your instructor is doing it,
13   in the way they are not in the vehicle as to
14   the person who is doing the maneuvers?
15        A.  Are you asking questions on range?
16   Let me see if I understand your question
17   correctly.  This would be someone outside a
18   vehicle directing a person inside the
19   vehicle?
20        Q.  Yes.
21        A.  Okay.  In the state of Ohio for
22   passenger vehicles it is illegal to do that.
23   So the answer to your question was we don't
24   do it because the law forbids us to do so.
25        Q.  So you don't have any experience in

Page 136

1    how that would be done then for deaf people
2    if somebody was outside the vehicle?
3         A.  The only part of instruction that
4    we've done is in a skid control environment
5    in which they are in the vehicle and they are
6    instructed what to do and then perform it.
7    They are licensed drivers.
8         Q.  That's licensed drivers?
9         A.  They are licensed drivers.
10        Q.  With respect to trainees, though,
11   you have nothing you've done that would
12   enable you to be able to say how best to deal
13   with somebody who is deaf if you're not in
14   the car with them?
15        A.  That's right, I have not trained
16   them that way, correct.
17        Q.  Are you personally familiar with the
18   specific characteristics of a combination
19   vehicle as which might affect its safe
20   operations, such as the relationship of the
21   trailer to the tractor, braking distances,
22   blind spots, anything of that nature?
23        MR. ROZYNSKI:  Objection to the
24   form.
25        A.  That would be with -- I had a large

Page 137

1    trailer of a sailboat that I trailed, so it
2    was 1400 pounds, I'm not sure exact weight,
3    but it would be the same force on vehicle, so
4    I'm familiar with two different -- pulling a
5    large object behind.
6         Q.  Say that again.
7         A.  So you're asking if I'm familiar
8    with the dynamics of a vehicle on the road
9    which is two parts, correct, and has a lot
10   of, obviously, weight, and dynamics of what
11   happens to those, and the answer to that
12   question to you would be I do, correct.
13        Q.  That's from what?
14        A.  As I explained, I race sailboats and
15   I had large sailboats I would trailer to
16   different regattas and therefore it is the
17   same -- it has a lead keel, it's a very large
18   object behind my truck, and so therefore, I
19   had to -- it has a lot of swirliness dynamics
20   about turning, about braking and about
21   vision, so all that would be encompassed into
22   that.
23        Q.  Just from that personal experience,
24   right, you recognize that there are some
25   differences between that situation and

MAGNA
LEGAL SERVICES

1 driving just a passenger car or SUV?
2      A.   Yes, without anything attached to
3 it, there is, yes.
4      Q.   But you're not suggesting that you
5 have any expertise on the characteristics of
6 a combination vehicle as defined in the code
7 of federal regulations under the Commercial
8 Motor Vehicle Act of 1986?
9           MR. ROZYNSKI:  Objection to the
10 form.
11      A.   No, I would not say I have expertise
12 in that field, correct.
13      Q.   Do you have any knowledge of what's
14 involved in the road test portion of the
15 training and testing of somebody who wants to
16 get a CDL Class A license?
17           MR. ROZYNSKI:  Objection to the
18 form.
19      A.   No, I don't.
20      Q.   Are you aware that under the AAMVA
21 standards that there must be something called
22 a pretrip inspection done?
23      A.   I'm aware of that only from the
24 expert report that I read.
25      Q.   Are you aware that for a pretrip

1 inspection, the basic controls skills test
2 and the road test, under the AAMVA standards,
3 that the tests have to be administered in
4 English only and the use of interpreter is
5 prohibited?
6           MR. ROZYNSKI:  Objection to the
7 form.
8      A.   Again, I would not be familiar with
9 the specifics of those laws and rules.
10      Q.   You discussed earlier in connection
11 with the article that we discussed, which is
12 before you as Cox Deposition Exhibit 3, the
13 use of the white board or the note pad --
14      A.   This would be note pad in this
15 article.
16      Q.   The note pad?
17      A.   Sure.
18      Q.   I think what you said is that in
19 part, that would be used to essentially give
20 the trainee, the student, an idea of what the
21 instructor was going to do by way of the
22 route and things that would occur along the
23 route, is that right?
24      A.   No, that would be done in a
25 pre-driving all the route layout what was

1 going on that day.  Note pad essentially was
2 used to communicate during the lesson.
3      Q.   So just tell me what you're
4 suggesting occurred by way of the pre-route
5 planning?
6      A.   So in a pre-route that would be when
7 the student and the instructor would get
8 together and say, okay, today's lesson is,
9 let's say it would be country road driving,
10 so this is what we're going to do today,
11 we're going to go country roads, these are
12 the speed limits we're going to be
13 encountering, this is the environment we're
14 encountering, let's go over the different
15 possibilities we will encounter and how to
16 handle those different things.  That would
17 show the road in which they would be
18 traveling so both instructor and the student
19 would get a general idea of what terrain they
20 would be going and what lessons they would be
21 going on.  That would be the pre-drive.
22      Q.   How do you show the road?
23      A.   Basically they would have a map,
24 kind of say this is where we're going to go
25 on, we're going to go on 303 today and up and

1 around, that's basically what they would do.
2      Q.   In the context of somebody who is
3 deaf, how is that all communicated?
4      A.   Well, it totally depends on that
5 person.  We handle both lip or speech readers
6 and also someone who is a signer, so we have
7 a system who works with both, as we deal with
8 both.  Depending on what their disability,
9 however, that would change.
10      Q.   Let's take somebody who is
11 profoundly deaf.
12      A.   A profound individual who is deaf,
13 provided of course, so we would go over
14 obviously it's visual, we would show them the
15 route, we would explain the different things
16 that they are going to come about, that might
17 be writing, if that's what they can do,
18 writing, or the drawing of the pictures, so
19 if it was a curve on there, we wanted to warn
20 them about different things that are coming,
21 we would draw a curve.  Maybe there's some
22 areas that we want them to pay attention to
23 in that section.
24      Q.   Is that done with a sign language
25 interpreter present or is that just done

Page 142

1    through diagrams?
2        A.  It depends.  If they are requesting,
3    depending on how they are verbal, how their
4    verbal skills are, versus how their English
5    skills are, if those are poor, then an
6    interpreter may be used in a static
7    environment, yes.
8        Q.  Is the pre-route planning process
9    that you've just described, in your opinion,
10   an essential element of effectively teaching
11   a deaf person how to drive?
12       MR. ROZYNSKI:  Objection to the
13       form.
14       A.  I wouldn't say essential.  It's a
15   great tool and we consider part of the
16   program and it's an important part, I'll give
17   you that.  You know.  It's nice to have.  Is
18   it necessary, it's not necessary, but it's a
19   good element to add to it, absolutely.
20       Q.  If you don't have that, do you think
21   it's safe just to say get in the car and go?
22       MR. ROZYNSKI:  Objection to the
23       form.
24       A.  They do it in some fashion.  So if
25   they are going to pick up in an element where

Page 143

1    they are picking up a student they will go
2    over what they are doing that day.  So if you
3    want to call that the pre-driving thing, it
4    is.  What's the degree of complexity of that,
5    that may vary depending on the situation
6    we're placed in.
7        Q.  But you would say that to
8    effectively communicate while teaching the
9    deaf to drive it's necessary to have some
10   preplanning portion before starting on the
11   road?
12       MR. ROZYNSKI:  Objection to the
13       form.
14       A.  An outline of a class, sure.  I
15   mean, we're teaching a class basically on the
16   road.
17       Q.  Do you have any knowledge as to what
18   AAMVA standards say about pretrip
19   preplanning?
20       MR. ROZYNSKI:  Objection to the
21       form.
22       A.  Only in what I saw again in the
23   expert witness.
24       Q.  Did you discern from reading the
25   expert report that the standards do not

Page 144

1    permit any preplanning?
2        MR. ROZYNSKI:  Objection to the
3        form.
4        A.  I believe that's for the test.
5        Q.  Yes?
6        A.  Yes, for the test I understood that,
7    yes.
8        Q.  Do you have any knowledge as to how
9    instructions are given during the road
10   portion of the test by the examiner under the
11   AAMVA standards?
12       A.  No, I do not.
13       Q.  Do you know how instructions are to
14   be given under the AAMVA standards in context
15   of training?
16       A.  No, I do not.
17       Q.  Are you aware that the AAMVA
18   standards and state testing requirements
19   require students to use their senses to check
20   for problems, including looking, listening,
21   smelling, and feeling?
22       A.  No, I do not.
23       Q.  At your school do you train on both
24   automatic and manual vehicles?
25       A.  Yes.

Page 145

1        Q.  Do you know what the AAMVA standards
2    say about having both hands on the wheel?
3        A.  No, I do not.
4        Q.  Do you agree that distracted driving
5    can result when you perform any activity that
6    may shift your full attention from the
7    driving task?
8        MR. ROZYNSKI:  Objection to the
9        form.
10       A.  As a driving professional, when I
11   say driving task, that means scanning your
12   gauges, which would be taking your road off
13   the road, so in that context I would have to
14   say that that is part of the driving task so
15   no that's part of the driving task -- you're
16   asking -- your question, if I understand
17   correctly -- just repeat it so I have it
18   better.
19       Q.  That distracting driving can result
20   when you perform any activity that may shift
21   your full attention from the driving task?
22       MR. ROZYNSKI:  Objection to the
23       form.
24       A.  I guess depending -- the answer
25   would be depending on what that activity is.

Page 146

1      Q.  Are you aware that if drivers react
2  a half second slower because of distractions,
3  commercial motor vehicle crashes double?
4        MR. ROZYNSKI:  Objection to the
5     form.
6      A.  I'm not aware of that statistic.
7      Q.  Would you agree that you should not
8  attempt to read or write while driving?
9      A.  I would agree.
10      Q.  Do you agree that you should not
11  engage in complex or emotionally intense
12  conversations with other occupants?
13        MR. ROZYNSKI:  Objection to the
14     form.
15      A.  I would agree.
16      Q.  Do you agree that attempting to type
17  or read messages, including on a satellite
18  system increases the risk of distracted
19  driving?
20      A.  Could you repeat, because you're
21  holding --
22      Q.  I'm sorry.
23      A.  And I couldn't hear you.
24      Q.  Do you agree that attempting to type
25  or read messages, even on a satellite system,

Page 147

1  while driving can create distractions and
2  risk?
3        MR. ROZYNSKI:  Objection to the
4     form.
5      A.  Yes, I would agree.
6      Q.  Do you know anything about air leaks
7  on tractor-trailer vehicles?
8      A.  I believe we asked that and the
9  answer is no.
10      Q.  Do you have any personal familiarity
11  with the manual transmissions of large
12  trucks?
13      A.  Large trucks being?
14      Q.  Anything that's a combination
15  vehicle for Class A purposes under the
16  federal -- under the Federal Motor Carrier
17  Safety Act?
18      A.  The answer would be no.
19      Q.  Do you have any specific knowledge
20  as to the stopping distances for large
21  trucks, tractor-trailers, of the kind that
22  are covered by Class A licenses?
23        MR. ROZYNSKI:  Objection to the
24     form.
25      A.  I have a general knowledge of

Page 148

1  stopping distance of different vehicles in
2  different rates.
3      Q.  What's your general knowledge as to
4  a large truck that is more than 26,000 pounds
5  in weight and has a tractor-trailer
6  configuration?
7        MR. ROZYNSKI:  Objection to the
8     form.
9      A.  The general -- as I said, the
10  general as -- we teach as the vehicle gets
11  more weight its stopping distance is going to
12  be greater.  Depending on the reaction of the
13  perception time, the reaction time, braking
14  of the vehicle, and then the braking
15  distance, so that formula is the same for
16  vehicles as it relating to heavier vehicles
17  as you're describing.
18      Q.  Having said that, accepting that
19  general proposition, do you know how farther
20  braking distances are for a large truck,
21  tractor-trailer, over 26,000 pounds in a
22  tractor-trailer configuration?
23      A.  It would be part of a formula.  You
24  have to tell me the weather conditions, the
25  speed of the vehicle, the weight of the

Page 149

1  vehicle, and then that formula is entered in
2  to find out the stopping distance, the type
3  of brakes, all determine, so do I know the
4  exact -- just by your question do I know a
5  stopping distance of a tractor-trailer, the
6  answer to the question, it would depend on
7  what conditions you're putting the
8  tractor-trailer in.
9        THE VIDEOGRAPHER:  We're now off
10     the record.  The time is 2:58 p.m.
11        (Brief recess taken.)
12        THE VIDEOGRAPHER:  We're now on the
13     record the time is 3:07 p.m.
14      Q.  Mr. Cox, are you aware that when a
15  fatal crash involves at least one large
16  truck, regardless of the cause, the occupants
17  of a passenger vehicle are more likely to
18  sustain serious injury or die than the
19  occupants of the large truck?
20      A.  I would agree with that, yes.
21      Q.  Do you know why the death rate in
22  the passenger vehicles that are so effected
23  are higher?
24      A.  I'm sorry, the last word you said,
25  higher?

Page 150

1    Q.  Let me restate.  Do you know why the
2  death rates of the occupants in the passenger
3  vehicles, if they are struck by a large
4  truck, are so high?
5    A.  Basically they are a smaller
6  vehicle.
7    Q.  Would you agree that the answer is
8  found in basic physics injury severity equals
9  relative change?
10    MR. ROZYNSKI:  Objection to the
11    form.
12    A.  I probably agree related to the
13  smashing.
14    Q.  Would you agree that the crash of
15  the vehicle having twice the mass of a
16  lighter vehicle equals six-fold of death in
17  the persons in the lighter vehicle?
18    MR. ROZYNSKI:  Objection to the
19    form.
20    A.  I would attest to the fact that
21  anytime a larger vehicle strikes the smaller
22  one, the smaller car is going to be crushed,
23  the people in it are more apt to get injured.
24    Q.  Are you aware that a loaded truck is
25  twenty times the mass of an SUV?

Page 151

1    MR. ROZYNSKI:  Objection to the
2    form.
3    A.  I would guess that would be correct.
4    Q.  Do you understand that the risks
5  associated with large tractor-trailers on
6  roads and highways in the United States
7  creates significant increased risk to general
8  public or drivers in passenger cars and SUVs?
9    A.  I can say that statistically we know
10  that a mixed vehicle population on the
11  highways is more for -- wait -- is more
12  dangerous than having a single or uniform
13  rate.
14    Q.  You do recognize, do you not,
15  Mr. Cox, that there are significant enhanced
16  risks associated with driving a large truck,
17  tractor-trailer, that is over 26,000 pounds
18  in weight and is a combination vehicle?
19    MR. ROZYNSKI:  Objection to the
20    form.
21    A.  That there would be more risks
22  driving that vehicle than a passenger car,
23  correct.
24    Q.  Not just that would be more risk,
25  Mr. Cox, that there is significantly more

Page 152

1  risk?
2    MR. ROZYNSKI:  Objection to the
3    form.
4    A.  I guess I have trouble with the
5  significant, I don't know what that means.
6    Q.  Mr. Cox, you know I know you don't
7  know the details, you know, that there is a
8  federal statute that imposes specific safety
9  regulations on these kinds of vehicles,
10  right?
11    MR. ROZYNSKI:  Objection to the
12    form.
13    A.  Yes, the Federal Government does.
14    Q.  Do you understand that Congress
15  decided that there was such significant risks
16  to public safety that it needed to enact a
17  federal statute in order to protect the
18  public?
19    MR. ROZYNSKI:  Objection to the
20    form.
21    A.  They've also done that for passenger
22  vehicles.
23    Q.  What?
24    A.  Yes, they have enacted safety
25  standards for trucks and they have enacted

Page 153

1  safety standards for vehicles.  Again, you
2  asked me do I feel there's an increased risk
3  with a larger vehicle, I told you, yes, there
4  is an increased risk.
5    Q.  There's a significant increase?
6    A.  Again, significant to me, it would
7  be somebody doing a study and showing what
8  that is.  Significant, again, to me, may be
9  different than significant to you.  There is
10  an increased risk.
11    Q.  Do you have an explanation why we
12  have a whole large code of federal
13  regulations dealing with commercial motor
14  vehicles?
15    A.  In the state of Ohio?
16    Q.  On the federal level?
17    A.  In Ohio there are over 10,000 motor
18  vehicle laws dealing with a motor vehicle.
19  That's again, because, it's safety
20  regulations, sir, and federal law, again,
21  dealing with the trucks is definitely trying
22  to say here is what the safety standards of
23  these are.
24    Q.  And you have no reason to believe
25  that the requirements of the federal

MAGNA ►
LEGAL SERVICES

Page 154

```
 1   regulations, including the AAMVA standards,
 2   are anything other than to protect the safety
 3   of the general public who might be driving on
 4   the roads in passenger vehicles?
 5       A.  Yes, I would agree that that's what
 6   they are trying to attempt, absolutely.
 7       Q.  If you could, go to what's before
 8   you as Cox Deposition 2, which is your
 9   report.
10       A.  Okay, I have that.
11       Q.  I'm going to ask you some questions
12   about details of your report, so --
13       A.  Okay.
14       Q.  -- please feel free to refer to it.
15   I'm going to start with paragraph 1.  This
16   says I have been commissioned by Eisenberg
17   and Baum, LLP to evaluate whether a deaf
18   person can be trained safely in the driving
19   school environment; do you see that?
20       A.  Yes.
21       Q.  Then you go on to say what your
22   report will focus on, correct?
23       A.  Correct.
24       Q.  The driving school environment that
25   you're referring to here is in the context of
```

Page 155

```
 1   a passenger car, correct?
 2       A.  You are correct.
 3       Q.  That's the only thing that you're
 4   qualified as an expert to talk about here
 5   today?
 6       A.  You are correct.
 7       Q.  Am I correct that if I went through
 8   the entire report, I wouldn't see anything
 9   that specifically applies or adapts what you
10   say in this report to the specific
11   requirements involved in training somebody
12   for a Class A CDL license?
13           MR. ROZYNSKI:  Objection to the
14       form.
15       A.  There isn't anything specific in the
16   report stating other than, I guess, I did say
17   that a deaf person taught without danger
18   instructor could operate safely a vehicle
19   based on these facts and I would say I guess
20   talking to a vehicle would include a truck,
21   but, so this is based on a vehicle.
22       Q.  Well, let's break that down.  We can
23   agree on the record that nowhere in your
24   report do you apply these teaching methods
25   that you set out to the actual facts and
```

Page 156

```
 1   circumstances of what's required to train
 2   somebody on a Class A commercial motor
 3   vehicle, right?
 4           MR. ROZYNSKI:  Objection to the
 5       form.
 6       A.  I would agree with your statement.
 7       Q.  In fact, you do not in this report
 8   say in any way how these principles might
 9   apply specifically to somebody who is being
10   taught for Class A motor vehicle driver's
11   license in the context of the federal
12   requirements that apply, right, there's just
13   nothing here to that effect?
14           MR. ROZYNSKI:  Objection to the
15       form.
16       A.  Nothing specific, correct.
17       Q.  There's nothing here that applies
18   these principles to that context, is there?
19           MR. ROZYNSKI:  Objection to the
20       form.
21       A.  I would believe as my report says in
22   a vehicle that they can apply.
23       Q.  I understand, Mr. Cox, that what
24   your report is intended to do is extrapolate
25   these principles to a different context.  I
```

Page 157

```
 1   understand that, okay?
 2           MR. ROZYNSKI:  Objection to the
 3       form.
 4       Q.  What I'm asking you, and I need you
 5   to specifically answer on the record, is that
 6   you do not attempt in your report to apply
 7   them to that other context?
 8           MR. ROZYNSKI:  Objection to the
 9       form.
10       A.  To apply them to the other context?
11   Let me make sure so may I read to make sure
12   to answer your question absolutely correctly.
13       Q.  Well, it's your report, you should
14   know coming here today what you said.
15       A.  I want the quote out of the report.
16   May I have a minute to show what I'm speaking
17   of.  So we maybe semantics.
18       Q.  Let me withdraw the question then.
19   I'll break it down.  You have testified here
20   under oath you don't know the details of
21   what's required under the Commercial Motor
22   Carrier Act, you don't know the AAMVA
23   standards, you've never been trained in how
24   to train somebody under those standards in
25   one of these vehicles, and, Mr. Cox, it's a
```

MAGNA
LEGAL SERVICES

Page 158

1    pretty simple question, your report does not
2    even begin to try and apply these principles
3    to the actual facts and circumstances that
4    apply when a driving school has to meet the
5    federal requirements for a CDL A class
6    license, correct?
7          MR. ROZYNSKI:  Objection to the
8    form.
9      A.  So my answer is what I stated here,
10   that a deaf person can be taught to drive in
11   a dynamic driver of a vehicle in a manner
12   that is safe by which I have taught.  Do I
13   exactly point to a CDL, no.
14     Q.  And the vehicle you're referring to
15   here, because that's your experience, is a
16   passenger vehicle?
17         MR. ROZYNSKI:  Objection to the
18   form.
19     A.  No, I am not.  I am referring to a
20   vehicle, because we teach in different
21   vehicles besides that, could be SUV, so my
22   general reality is in a dynamic environment
23   of a vehicle.
24     Q.  Mr. Cox, is there -- just point me
25   to anything in your report that applies

Page 159

1    anything you're saying, anything you're
2    saying, put aside your conclusion to the
3    context of the cabin of a commercial motor
4    vehicle, the trailer, the circumstances under
5    which training must be done, the federal
6    regulations that you've just said, you have
7    no idea about, just point me to where I could
8    actually read something that says --
9      A.  No.
10     Q.  -- anything about a commercial motor
11   vehicle?
12     A.  Besides --
13         MR. ROZYNSKI:  Objection to the
14   form.
15     A.  -- my experience of training in
16   different vehicles, no, there's nothing in
17   that report that would point to what you're
18   asking.
19     Q.  All you're saying is I have this
20   experience with passenger cars, right, that's
21   what you're saying?
22         MR. ROZYNSKI:  Objection to the
23   form.
24     A.  What I'm saying is I have the
25   experience of developing training methods in

Page 160

1    various conditions in various vehicles and
2    stating that I feel in my opinion, which was
3    asked, could that be done in the environment
4    in which you're asking, my answer to that, in
5    this report, would be that I believe it could
6    be done.
7      Q.  You feel you believe, right?
8      A.  I believe --
9          MR. ROZYNSKI:  Objection to the
10   form.
11     A.  -- it can be done.
12     Q.  But that's an extrapolation from
13   your actual experience in passenger vehicles,
14   correct?
15     A.  That would be an extrapolation based
16   on my experience and 34 years of doing it,
17   correct.
18     Q.  Understanding it's an extrapolation,
19   and I respect your experience in the
20   passenger vehicle world, I'm not challenging
21   that --
22     A.  I understand.
23     Q.  -- but I do want a straight answer
24   to this question.  You, in your report, did
25   not consider, did not review, and did not

Page 161

1    apply any of the specifics of what must go
2    into training for a CMV, commercial motor
3    vehicle, where you are training for a CDL
4    Class A license, did you?
5          MR. ROZYNSKI:  Objection to the
6    form.
7      A.  You are correct.
8      Q.  Thank you.
9      A.  I would agree to that.
10     Q.  Okay.  We can agree on the record
11   that you have not visited the Bordentown
12   facility?
13     A.  I have not.
14     Q.  You have not even read the details
15   of the Bordentown training program?
16     A.  No, I have not.
17     Q.  Do you know how long it takes?
18     A.  Their training program?
19     Q.  Yes.
20     A.  No, I do not.
21     Q.  Do you know what's involved in the
22   training program?
23     A.  I have a basic understanding from
24   the -- from what I've read in the
25   correspondence.

Page 162

1      Q.   Putting aside the basics, do you
2   know specifically how much time is spent
3   doing what tasks during the training?
4          MR. ROZYNSKI:  Objection to the
5      form.
6      A.   I believe it was some of that was in
7   the expert report, I can't recall the exact
8   time on that, on the different things they
9   spent on it.  I know they go into the
10  range -- I know there's classroom and then
11  there's actual road, so I know a general
12  idea, but do I know specifics to answer your
13  question, you asked specifics, no, I would
14  not.
15     Q.   Those are things you gleaned from an
16  expert report after you issued your report?
17     A.   Well, also involvement with Hammrick
18  a while back when they were members of the
19  association.  Understanding just generally
20  what they do.
21     Q.   Do you have any knowledge or
22  awareness that the Bordentown training
23  program is designed to replicate test
24  conditions?
25         MR. ROZYNSKI:  Objection to the

Page 163

1      form.
2      A.   No.
3      Q.   Did you do any research on the
4   Bordentown Linden location?
5      A.   As far as where they were located
6   or --
7      Q.   Anything at all whatsoever?
8      A.   The only thing I was extrapolated is
9   in the deposition it was gone through stating
10  what different things were happening in it,
11  so that gave me, again, a general idea of
12  what was going on there.
13     Q.   Do you have any knowledge of the key
14  physical aspects of the Linden facility?
15     A.   I do not.
16     Q.   Do you know what kind of environment
17  in which that sits?
18     A.   No, I do not.
19     Q.   You're not aware that it's in a high
20  traffic area sandwiched between Route 9 and
21  the New Jersey Turnpike?
22     A.   I do not.
23     Q.   Do you have any knowledge of the
24  size of the yard?
25     A.   I believe it was mentioned in the

Page 164

1   deposition, but I can't recite what it is.
2      Q.   Do you have any knowledge as to the
3   maneuvers that are tested -- I mean trained
4   and then tested in the yard?
5      A.   Yes, they kind of went over some of
6   them, so I kind of knew some of it.  Again,
7   we're talking generalities, specifics, again,
8   I would not know exactly.
9      Q.   Are you aware that the program
10  involves simultaneous activities by a number
11  of students and trainers in the same yard
12  environment?
13     A.   Yes, I did read that.
14     Q.   But you didn't address that in your
15  report anywhere?
16     A.   Of their yard and their -- no, I
17  hadn't seen it firsthand see how it operated.
18     Q.   Are you personally aware of the
19  fleet of commercial motor vehicles that
20  Bordentown Linden facility has?
21     A.   No, I do not.
22     Q.   Are you familiar with the 48 foot
23  van trainer that exists at that facility?
24     A.   Only if it was mentioned in the
25  deposition.

Page 165

1      Q.   Were you aware that there are
2   generally four trainees in the back of the
3   cab when they are on the road, as well as the
4   person driving?
5      A.   No, I'm not aware of that.
6      Q.   Do you know anything about west
7   coast mirrors and the blind spots associated
8   with them?
9      A.   Talking about west coast mirrors on
10  the side of the truck?
11     Q.   Yes?
12     A.   Do I know about mirrors?  I know
13  about mirrors and I've used -- like I said, I
14  drove the education mobile units and used the
15  same mirrors that were in a truck, so I was
16  familiar with them and the blind spots that
17  are associated with them.
18     Q.   Are you aware that there's no
19  interior mirror in the cabs?
20     A.   Yes, there can't be, correct.
21     Q.   Do you have any knowledge of the
22  distance between the student and the
23  instructor in the conventional freight liners
24  that are used at the Bordentown Linden
25  facility?

MAGNA
LEGAL SERVICES

Page 166

1   A.  Not at Bordentown, no.
2   Q.  Do you know anything about the
3   configuration of the cab?
4   A.  Yes, I did an assessment of the cab
5   at Cleveland Clinic in a regular cab.
6   Q.  I'm talking about --
7   A.  At the Bordentown facility, no, I do
8   not.
9   Q.  Are you familiar with the dog house
10  containing engines, the engine which
11  separates the trainee from the instructor in
12  those cabs?
13  A.  No.
14  Q.  Do you know what I mean by dog
15  house?
16  A.  The dog house, I believe we're
17  talking about it sits high, kind of where the
18  engine is, so it's a compartment over the
19  top, am I correct?
20  Q.  It protrudes into the cabin?
21  A.  It protrudes into the cabin, you are
22  correct.
23  Q.  There's no windows in the rear of
24  the cab?
25  A.  Of their cabs?

Page 167

1   Q.  Yes.
2   A.  I guess not.  I wouldn't know.  I
3   was not there.
4   Q.  You didn't read the deposition of
5   Kenneth Frilando?
6      MR. ROZYNSKI:  Objection to the
7   form.
8   A.  This is -- I read depositions.
9   Q.  Looking at your report, the second
10  paragraph --
11  A.  I don't believe so.  This is -- just
12  to make clear, this is the --
13  Q.  To look at your report, second
14  paragraph.
15  A.  I know, I'm trying to recall.
16  Q.  John Diab is the president of
17  Bordentown and Joseph Frilando is the
18  plaintiff's brother?
19  A.  Correct.  The two depositions that
20  were provided to me were with the owner, is
21  that correct, I'm trying to recall?
22  Q.  Correct.
23  A.  And also the brother, those are the
24  two depositions.
25  Q.  Are you aware of what Mr. Frilando

Page 168

1   said he needed by way of accommodation?
2   A.  I believe it's in one of the
3   depositions, it said he wanted an
4   interpreter.
5   Q.  If I go back to your report, second
6   paragraph --
7   A.  Second paragraph, okay.
8   Q.  -- you say in the complaint
9   Mr. Wessendorf sent a message to Mr. Frilando
10  and John Diab in his deposition stating that
11  Smith and Solomon could not effectively train
12  and safely protect the public, student and
13  their personnel while training a deaf person
14  to operate a vehicle these statements have no
15  merit; do you see that?
16  A.  I do see that.
17  Q.  So where is it that you get the
18  conclusion that that's what Mr. Wessendorf
19  said?
20  A.  Mr. Wessendorf, if I believe I'm
21  correct, is the gentleman that passed away?
22  Q.  Yes.
23  A.  And I believe in the first part, I
24  know I had the deposition in front of me, but
25  I know in there he said that, I'm trying to

Page 169

1   summarize here, that he couldn't do it
2   because he had no guidance from anybody of
3   how to do it and therefore it would be a
4   safety hazard to the student, the instructor,
5   and the general motor public.  And that's
6   summarizing what I believe is what he said.
7   Q.  If I told you what he actually said,
8   would you have any reason to disbelieve it?
9   I can put it in front of you.
10  A.  If that's the only spot in the
11  deposition where that's mentioned, you know,
12  I couldn't pick it out exactly.  Go ahead and
13  read.
14  Q.  I'm looking at his actual
15  contemporaneous email to Joseph Frilando
16  saying in quotes, after considerable
17  discussion at both the state and federal
18  level and having received little or no
19  guidance on how to effectively train and
20  safely protect the motoring public, the
21  student, and our personnel, we have
22  determined that Smith and Solomon is not
23  capable or qualified at this time to render
24  the services requested.
25  A.  Yes, I would agree that's where I

MAGNA▶
LEGAL SERVICES

1  extrapolated out of there.
2      Q.  You understand that what you say is
3  an extrapolation, correct?
4      A.  Yes, I would agree.
5      Q.  Do you know what he was referring to
6  in relation to considerable discussion on
7  both the state and federal level?
8      A.  I think it was an email traffic,
9  he's saying about that, if I'm summarizing.
10  What my understanding of it is that he was
11  asked to do it, he was looking to find out if
12  he could do it, and felt that he couldn't
13  based on not getting the information and
14  therefore since he didn't, he stopped there
15  and said they wouldn't do it because they
16  couldn't, they weren't capable of doing it.
17      Q.  But do you have any idea of, sitting
18  here today, if the context when he says after
19  considerable discussion of both the state and
20  federal level?
21      A.  Well, I can only assume that he went
22  around and asked and found that at the state
23  and federal -- I believe it goes into the
24  owner's deposition talking about where he
25  talked to different people and was getting no

1  answer from them on how to do it.
2      Q.  Did you at least understand having
3  read Mr. Diab's deposition that part of the
4  issue was how the Bordentown driving school,
5  which is subject to the obligations of a
6  motor carrier, could go about the task of
7  accommodating without violating some of the
8  regulations under which it was obligated to
9  operate?
10      A.  It's my understanding that it was
11  the test that they were having the most
12  problem of having an interpreter in, and that
13  they couldn't find a state that would even
14  test their student, if they did even train
15  them, and therefore because they couldn't
16  take the test, they said there's no purpose
17  in training is my general of how they were
18  working with it.
19      Q.  That's your understanding of
20  Mr. Diab's deposition?
21      A.  No.  That's my interpretation of why
22  he said that.  He was not one of the main
23  reasons why they weren't going to train,
24  there was no test to give.  I believe it was
25  New Jersey, Pennsylvania, New York that they

1  searched and they couldn't do it, so
2  therefore -- maybe I'm mixing it between the
3  owner's testimony and that, I mean, there's a
4  lot of material.
5      Q.  Just moving forward then to the
6  third paragraph.
7      A.  In my report, correct --
8      Q.  Yes.
9      A.  -- or right?
10      Q.  Right.
11      A.  On which page are you, first page?
12      Q.  First page.
13      A.  Okay.
14      Q.  You said my expert opinion is based
15  on these facts and then you list one, two,
16  three, four, five, six, seven bullets,
17  correct?
18      A.  Yes, I do.
19      Q.  As we agreed in the deposition,
20  everything you list there is based upon
21  experience which relates to passenger cars?
22          MR. ROZYNSKI:  Objection to the
23      form.
24      A.  You are correct, correct.
25      Q.  If we go to the next page --

1      A.  Okay.
2      Q.  -- you cite from the effort report
3  that we looked at earlier this afternoon, is
4  that correct?
5      A.  That is correct.
6      Q.  And we've been through kind of what
7  that said or didn't say?
8      A.  You are correct.
9      Q.  Then on peripheral vision, we've
10  dealt with that because we've talked about it
11  earlier in the deposition?
12      A.  In the day we did talk about
13  peripheral vision.
14      Q.  I'm now going to go to the section
15  dealing with assessing the student.  In your
16  report you say that there are some questions
17  the student should be asked during an
18  assessment; do you see that?
19      A.  Yes, I do.
20      Q.  That includes does the student
21  speak, read, or sign, is that right?
22      A.  Does the student speech read or
23  sign.
24      Q.  Speech read or sign, I'm sorry.
25  Then whether they have some residual hearing?

1    A.  Correct.
2    Q.  If they do, do they have any devices
3  such as hearing aids which would help?
4    A.  Yes.
5    Q.  Then you go and start talking about
6  the vehicle environment, correct?
7    A.  I do.
8    Q.  Then the context of this report
9  you're referring to a passenger vehicle,
10  correct?
11    A.  I am.
12    Q.  Then you say prior to going on the
13  road it's essential to prepare the route
14  being taken, the hand signals being used,
15  also small white board or note book should be
16  available for use during instruction; do you
17  see that?
18    A.  I do.
19    Q.  We've talked through the elements
20  that you referred to that in today's
21  deposition?
22    A.  Yes, we have.
23    Q.  Is there anything that you think is
24  essential as part of the route preparation,
25  hand signals, or use of a notebook that we

1  haven't discussed today?
2    A.  In the preparation, no, I believe we
3  covered essentials, prepared route being
4  taken, hand signals being used, white board,
5  note book.
6    Q.  I had asked you earlier in the
7  context of some questions about whether or
8  not it was critical or essential to have
9  preplanning of the route, do you remember
10  those questions?
11    A.  I do.
12    Q.  And you didn't quite agree with me,
13  you sort of said it's important, but you
14  wouldn't agree it was essential, do you
15  remember that?
16    A.  I said it depended on the situation
17  that they were in.
18    Q.  But we agree that here in this
19  report you say it is essential to prepare the
20  route being taken?
21    A.  Of course, and by essential, prepare
22  the route, you are saying preplanning, I
23  would say that the instructor, as I agreed
24  to, would have a lesson plan and would know
25  the route they were taking.

1    Q.  And would communicate that in
2  advance to the student?
3    A.  They would tell them in general
4  terms where they are going to go, correct.
5    Q.  When you say the vehicle should be
6  free from as much noise as possible, what do
7  you mean by that?
8    A.  Well, when they have a cochlear
9  implant for hearing, if sometimes they have
10  air running or different things on, that that
11  can disrupt the hearing process.  So we try
12  to facilitate the hearing if they have
13  partial hearing.
14    Q.  Do you have any expert knowledge
15  about the noise levels in a cab of a large
16  CDL, large commercial motor vehicle?
17    A.  I do not.
18    Q.  We earlier, in relation to the
19  article that's identified as Cox Exhibit 3,
20  we talked about the lesson preparation, the
21  note pad and pen, and what you meant by that,
22  correct?
23    A.  We did.
24    Q.  Is there anything that you would
25  want to add that we haven't discussed in that

1  respect that you think is important to your
2  conclusion?
3    A.  Using the note book and pad and pen?
4    Q.  Yes.
5    A.  That was used in static environment,
6  I think that was clear, no, I don't believe
7  so.
8    Q.  Then you go on to describe the hand
9  signals that should be used to communicate
10  with the deaf student, am I correct?
11    A.  You are correct.
12    Q.  We can agree that the use of hand
13  signals is an essential component of your
14  conclusion that can be at least as to
15  passenger vehicles an effective way of
16  communicating while teaching the deaf to
17  drive?
18    A.  Yes, I think they would be an
19  effective use.
20    Q.  You've ruled out sign language
21  interpreters as a means of doing this, right?
22      MR. ROZYNSKI:  Objection to the
23      form.
24    A.  We have -- I guess you have to look
25  at the context that we used, as I stated

MAGNA ▶
LEGAL SERVICES

Page 178

1   earlier in the deposition, that we have used
2   them for communication, but not during the
3   instructional part of the moving vehicle.
4       Q.   Right, that's what I was getting at.
5   During the instructional part you said it's
6   dangerous and you're not recommending it,
7   right?
8       MR. ROZYNSKI:  Objection to the
9   form.
10      A.   I said it was not recommended to
11  have them in the back seat, you are correct.
12      Q.   And that it's dangerous to do so?
13      MR. ROZYNSKI:  Objection to the
14  form.
15      A.   If they are in the back seat, I
16  agree, I said that I would say that if they
17  were talking to them in the back seat, having
18  them sit in the back seat is not dangerous,
19  having them sit in the back seat and having
20  the student talk to them, that would be
21  dangerous.
22      Q.   Your conclusion, at least as to
23  passenger vehicles, is that deaf drivers can
24  be taught effectively to drive is based on a
25  system that relies on hand signals, do we

Page 179

1   agree on that?
2       A.   If they are profoundly deaf, yes,
3   that would be a consistent part of it.
4       THE VIDEOGRAPHER:  You have about
5   five minutes.
6       Q.   These would be the nine hand signals
7   that you have attached as Exhibit 1 to your
8   report?
9       A.   Right, those signals, correct.  And
10  they are used in combination.
11      MR. HALLER:  Why don't we change
12  tape now?
13      THE VIDEOGRAPHER:  We're now off
14  the record.  The time is 3:43 p.m.
15  This ends DVD number two.
16      (Brief recess taken.)
17      THE VIDEOGRAPHER:  We are now on
18  the record.  The time is 3:47 p.m.
19  This begins DVD number three.
20      Q.   Before we took a short break I was
21  asking you about page 3 of your report and
22  your statement with respect to hand signals,
23  so I just want to bring you back to that
24  context.
25      A.   Okay.

Page 180

1       Q.   In the paragraph under hand signals
2   used to communicate with the deaf student, at
3   the end you say the nine signs are proceed
4   ahead comma turn left comma turn right comma
5   slow down comma speed up comma stop comma
6   lane change comma reverse comma look; is that
7   right?
8       A.   That's correct.
9       Q.   Extrapolating to the context of a
10  CMV, which I know you don't specifically do
11  here, are those the nine signs that you would
12  recommend be used in the training of somebody
13  for a CDL Class A license?
14      A.   The way I would have to determine
15  what to use would be first to go into that
16  situation, learn the situation of what
17  exactly they all have to do, and then those
18  would be the starting point.  We may have
19  other ones developed out of it based on the
20  need of the training environment of the
21  truck.
22      Q.   Sitting here today, you don't have a
23  prescription for what signs would be
24  necessary?
25      A.   No.  I have a prescription saying

Page 181

1   that they would be the basic ones as a basic
2   starting point from this though until I
3   actually assessed that environment to know
4   what was needed exactly, then I would go
5   about designing the training program from
6   that.
7       Q.   So that's something that from your
8   report we don't know, right?
9       A.   You are correct, you don't know.
10      Q.   Sitting here today, you don't know
11  whether it would be twenty signals or thirty,
12  forty, fifty, you have no idea, do you?
13      A.   Or ten.  No, I do not.
14      Q.   You then go on to deal with
15  controlling the student and the vehicle; do
16  you see that?
17      A.   I do.
18      Q.   You say the vehicle control is
19  primarily done through physical control of
20  the vehicle?
21      A.   That would be under that section,
22  you are correct.
23      Q.   You start then by saying the first
24  thing is controlling the student, correct?
25      A.   The first one is controlling the

1  student.
2      Q.  That's not really physical, is it?
3      A.  No, that is not physical.
4      Q.  That's done by giving directions,
5  correct?
6      A.  You would be correct.
7      Q.  And you say a key component of the
8  direction is route planning; what do you --
9      A.  Yes, the route planning.  So again,
10 we go back to that of what the lesson is for
11 the day.  We would never, as an instructional
12 school, not have a lesson plan for the day.
13     Q.  You say that in order for the
14 directions to be understood and followed,
15 they must be short and concise?
16     A.  Correct.
17     Q.  That's with respect to passenger
18 vehicles, right?
19     A.  Any dynamic vehicle that I am
20 involved with we always give short and
21 concise directions.  So that would be
22 everything you're reading here is what my
23 experience in the passenger vehicle.
24     Q.  But you say they must be short and
25 concise, right?

1      A.  They must be for understanding in
2  the context of telling them what -- where to
3  go and what to do.
4      Q.  That's what I'm trying to
5  understand.  In your experience for passenger
6  vehicles if you're going to rely on hand
7  signals to give directions, they must be
8  short and concise?
9      A.  For good understanding, you're
10 correct.
11     Q.  When you start getting complexity,
12 the system gets undermined, right?
13     A.  When you start giving more than two
14 instructions at a time, things can go wrong.
15     Q.  You go on to say that they should
16 not be given more than two directions at a
17 time?
18     A.  Correct.
19     Q.  Why is that?
20     A.  If I was instructing you and I gave
21 you a whole line of things to do as going
22 down, you may remember the first two, after
23 that, things would get hazy.  We try not to
24 give more than two, maybe three, and then
25 allow that to go in and then we can then

1  provide others.
2      Q.  So I understand, give me an example
3  of the two things you might give at one time?
4      A.  So if you're driving a vehicle and
5  we're approaching an intersection, I would
6  then point to the light, say at the light
7  make a left.  Using hand signals, I verbally
8  do it and also signal to the driver, so that
9  is a look signal, and then I would do left.
10 That's two directions, you know, to look at
11 the light and we're going to make a left at
12 the light.
13     Q.  So now I'm in a commercial motor
14 vehicle tractor-trailer more than 26,000
15 pounds and I'm a novice driver and I'm coming
16 down a fairly steep ramp downhill which
17 enters a major federal highway, three lanes,
18 heavy traffic at all times including large
19 trucks, are you following my scenario?
20     A.  I hear what you're doing.
21     Q.  I'm trying to learn how to come onto
22 that kind of entrance to a highway
23 controlling this very large vehicle of which
24 I have no experience using the gears of which
25 there are at least twelve, and which require

1  double clutching, are you following me?
2      A.  I'm following you.
3      Q.  You haven't done any of that
4  yourself, have you?
5      A.  I have not done it in a
6  tractor-trailer, you are correct.
7      Q.  Because I'm coming down from -- I'm
8  on the right of the highway entering to my
9  left, I have to look closely through the
10 left-hand mirror in order to determine what
11 traffic is coming on the highway, do you
12 follow that?
13     A.  I'm following you.
14     Q.  At the same time I have traffic
15 behind me, right?
16     A.  Possibly, sure.
17     Q.  I have traffic actually ahead of me
18 trying to enter?
19     A.  Probably there, yes.
20     Q.  I'm having trouble actually changing
21 the gears, are you following me?
22     A.  Okay.
23     Q.  I'm now actually unexpectedly out of
24 gear and free-wheeling, are you following me?
25     A.  Okay.

1    Q.   There's a motorcyclist behind me in
2  one of the blind spots that happens to occur
3  in one of these large vehicles, are you
4  following me?
5    A.  I'm following you.
6    Q.   And now the student's vision is
7  either in front or to the left and there's
8  all these things going on, stuff behind,
9  stuff in front, traffic coming at high speeds
10  from the left, trouble with the gears, and
11  the vehicle is free-wheeling.  Now, give me
12  two instructions that would suffice to deal
13  with that situation?
14    A.   Well, let's look, since you put the
15  situation together and you made some
16  assumptions, I would assume that the driver
17  you claim is a novice has already his
18  driver's license for a regular car?  I'm
19  asking that question.  You gave me a
20  scenario, I want to clarify something.
21    Q.   Yes, they have, but they've never
22  driven manual.
23    A.   Now you're making the driver not
24  have ever driven manual?
25    Q.   Yes.

1    A.  I have to work with no manual.  We
2  have a driver who's driven an automatic car
3  only.  I'm assuming they had some instruction
4  to change gears before they got on the main
5  road?
6    Q.  Minimal, but some.
7    A.  This is your story.  Looked like the
8  training they had in what I read they did do
9  some gear shifting in the range, correct?
10    Q.  There's some gear shifting.
11    A.  Training and gear shifting?
12    Q.  I'm not saying they didn't, I'm
13  saying in my hypothetical --
14    A.  You want me to give an answer, I
15  have to know all the hypotheticals.  So I'm
16  just going through and clarifying, if that's
17  okay?
18    Q.  Right.
19    A.  I appreciate it.  Assuming this
20  driver already knows how to drive, because
21  they have a driver's license, so the other
22  element that you're throwing in, the driver
23  should know those elements, should know how
24  to merge normally on a freeway or on the
25  street, that you're saying they should know

1  the dynamics of the general laws, so all of
2  those factors that you're saying should be
3  covered in that, I'm assuming, that driver's
4  knowledge.  So they are going to operate --
5  they know how to steer generally and work
6  with a vehicle on a general basis.  True,
7  it's a new vehicle to them, a little more.
8  So the only thing I'm hearing that the
9  problem is really is that they are having
10  problems shifting gears, correct?
11    Q.  No, not correct.
12    A.  No.  Well, I'm assuming that you
13  made a hypothetical, I'm saying my driver
14  that you gave me, I'm saying they are a
15  driver of a vehicle, they understand the
16  basic concept that we should agree they know
17  the traffic laws, they are not the people I
18  teach which have no knowledge of traffic
19  laws, correct, they do have traffic
20  knowledge.
21    Q.  So, Mr. Cox, I understand that you
22  sort of want to play with a hypothetical.  If
23  you can't answer the question, just tell me,
24  because I'm not here to sort of engage in
25  answering your questions.  I think you know

1  that.
2    A.  I understand, but if you're going to
3  give me a hypothetical and say, Mr. Cox,
4  answer that, I'm going to say as a trainer --
5  I'm not trying to be difficult, please
6  understand that I am not, this is what I do
7  for a living, understand how to train someone
8  in a vehicle, and I had to understand what
9  they should be learning, and assuming, if
10  you're going to give me a hypothetical, a
11  person in a vehicle, that person should have
12  the basic understandings of traffic
13  formations and what they need to do.  So
14  you've asked the question how am I going to
15  handle giving commands to someone about
16  merging on the freeway, about looking in
17  their mirror, and you put all these things,
18  I'm assuming by seeing even eye check mirror,
19  which I use, that's the only thing I can tell
20  you that they are doing those things prior to
21  entering, that they have a basic knowledge to
22  do so, and then you throw in the hypothetical
23  saying he is having trouble with the gears,
24  well, at this point that is really -- and
25  he's free-wheeling, that really is the

1   problem, the free-wheeling, all the other
2   stuff that you've caked on really should
3   be -- is being handled by that student from
4   their basic knowledge of training and the
5   fact that they have a current driver's
6   license. So at that point then we should be
7   able to do just a simple command of how --
8   and again, I would need time to study what
9   they need, which may be another symbol for
10   pressing in a clutch and shifting to a
11   correct gear by using hand signals of what
12   gear they need to be in. So that's where my
13   answer to you would be in that hypothetical
14   you just gave me.
15       Q.  Do you not understand that the gears
16   control the speed?
17       A.  I'm very well aware that the gears
18   control --
19       Q.  If you're in the wrong speed, you
20   may be entering at much too high of a
21   velocity --
22       A.  Correct, so -- I'm sorry.
23       Q.  -- as a result you have to be
24   concerned about what's in front of you,
25   what's behind you, and what's coming on the

1   highway?
2       A.  Again, that is correct. And you
3   asked about the gear selection, so therefore
4   you would then put them in the correct gear
5   which would slow the vehicle down by
6   downshifting that would slow the truck in
7   that situation. It doesn't operate any
8   different than a stick shift car or manual
9   car, other than you have a higher rate, more
10   gears for the weight that's involved.
11       Q.  What's your assumption that you need
12   to put it in gear to slow it down as opposed
13   to do something to put it into gear to
14   accelerate, because if you slow it down,
15   you're going to go straight into some vehicle
16   that's coming, how do you know that?
17       A.  Again, we go back to the -- the
18   assumption is that you're giving the
19   hypothetical, I'm telling you that as a
20   driver there are some assumptions you're
21   going to have to take on that. You're asking
22   me specifics on how to operate inside a cab
23   and what to do on that. As I stated, if I
24   had an opportunity to train with the trucking
25   school to learn the different things that

1   they need to do, then I can go about
2   developing a program to train them.
3       Q.  But sitting here today --
4       A.  Sitting here today, which you're
5   giving me a truck for instance how to do it
6   in that I did give you that, I boiled it down
7   to you said free-wheeling with the gears,
8   that's all you said. My solution to that I
9   feel that the other stuff was taken care of
10   and that now I would gear them into a clutch
11   thing and then with my other hand they will
12   tell which gear they probably should be in.
13       Q.  You're assuming -- your answer
14   assumes that the student has taken into
15   account all of the other things, so -- just
16   let me finish please -- you're assuming that
17   they are doing everything right and there's
18   only one thing wrong, but my hypothetical is
19   the instructor doesn't know that, doesn't
20   know if they have observed the motorcyclist
21   in the blind spot, they don't know if they
22   observed the traffic behind, the traffic in
23   front, or they know what's coming on the
24   highway, and that the instructor wants to
25   relate all of that to get in the right gear,

1   you may need to accelerate, you may need to
2   decelerate, and do you know where stuff is
3   coming from, I need to understand that. How
4   do you do that in two signals?
5           MR. ROZYNSKI: Objection to the
6       form.
7       A.  My answer to you is I would say that
8   your instructor, if he didn't know all that
9   coming into that, he is a poor instructor.
10   The duty of an instructor is to know where
11   the student is looking and what they are
12   aware of at all times. That is why we have
13   an eye check mirror, we watch where they are
14   looking. I can tell you in a ride in my
15   vehicle with a student if they have checked
16   those things, I will know that. I know, I
17   have to be two steps as an instructor ahead
18   of that student. So if you're telling me
19   that at the last moment that instructor is
20   caught in that situation where all those
21   things are happening, that's a poor
22   instructor.
23       Q.  Where is the eye check mirror for
24   the left-hand mirror?
25       A.  No, no, it's inside the vehicle, it

MAGNA
LEGAL SERVICES

1    sits so the instructor can watch their eye
2    movement.
3         Q.  But, Mr. Cox, you're sitting in a
4    big cab and literally when you're going into
5    one of these -- one of these entrances to a
6    highway, the visual is completely to the
7    left?
8         A.  Again, what I do cue on as an
9    instructor, I cue on head position and eye
10   movement.  Those two things I can see.  Now
11   you're -- again, you're putting me back in a
12   cab.  I'm putting you back in a vehicle and
13   telling you how I would do it in that
14   vehicle.  That's how I would do it.
15        Q.  Right.
16        A.  Okay.  Now, will they flow freely
17   into a cab?  Well, that would be determined.
18        Q.  Okay.  That's my point.  Sitting
19   here today, you haven't determined any of
20   that, have you?
21        A.  I have not studied in that
22   environment.
23        Q.  And you would want -- you would need
24   to go through the kind of situation that I
25   just described to conclude whether or not

1    that could be dealt with through simple and
2    concise signals, no more than two directions
3    at one time, right?
4         A.  Based on your scenario that you gave
5    me, I did boil it down to what I felt is one
6    most critical element that we're dealing with
7    at that moment, and that would have been the
8    gear selection.  I could then tell the
9    student what they need to do with the gears
10   if that would be done when the student
11   finished that we're not seeing how -- I mean,
12   if they got that, if there was some other
13   element I needed to work with, then I could
14   command after that, that is exactly how I do
15   it in a vehicle.
16        Q.  How do you distill what's happening
17   with the gears to one direction, does the
18   person --
19        A.  Not direction.
20        Q.  Does the person know which gear they
21   should be in, are they having trouble double
22   clutching, I mean?
23        A.  Your hypothetical said they were
24   free-wheeling, which means there is no gear,
25   they are not in any gear.  The instructor

1    should know exactly what gear should be used
2    at that time, that's my assumption, correct.
3    I assume that the instructor should know what
4    gear that truck should be in at that given
5    moment.
6         Q.  I think you can assume that --
7         A.  Assuming that the instructor knows
8    exactly what gear that student should be in,
9    therefore, you're asking can I give, in that
10   situation, two signals taking the most
11   dangerous element right now that I need to
12   deal with would be gear selection, so off the
13   top of my head, just sitting in this room,
14   never going over this before or sitting --
15   I'm telling you that I can probably come up
16   with a signal for pushing the clutch in and
17   then giving a signal to tell him what gear,
18   and in that quickly the student should
19   understand oh, press the clutch in, I need
20   fifth gear.  That's just based -- you just
21   asked me a question hypothetical, I gave you
22   and answer off the top of my head.
23        Q.  Do you have any personal experience
24   with what it's like to maneuver the gears --
25        A.  I do.

1         Q.  -- on a tractor-trailer like the one
2    the Bordentown train on?
3         A.  I don't know what they train on.
4    But as you recall, I had to do an assessment
5    of an individual with a stroke at the
6    Cleveland Clinic in a cab situation where he
7    did, in my opinion, back to the doctor, was
8    can he operate all those gears correctly.  So
9    your answer to the question is yes, I did see
10   what they had to do.
11        Q.  Right, that was a trained driver,
12   somebody who had experience driving for a
13   long time, correct?
14        A.  You are correct, that was a trained
15   driver.
16        Q.  Not a novice driver?
17        A.  It was not a novice driver.
18        Q.  Big difference?
19            MR. ROZYNSKI:  Objection to the
20   form.
21        A.  There is a difference between a
22   novice and a seasoned driver, correct.
23        Q.  If I wanted to communicate that you
24   got to get into gear, then accelerate, get
25   into gear, got to double clutch, explain to



1   you how to do it, because you're having
2   trouble, make sure that you know that there's
3   this motorcyclist in your blind spot and
4   there's this truck coming on the highway, if
5   you don't accelerate as you enter, you might
6   actually hit because you can't stop because
7   there's something right behind you, how do I
8   do that in two signals?
9       A.  I believe I answered that question
10  for you.  I think I answered it in detail how
11  I broke it down and how the assumption is
12  for.
13      Q.  Your assumptions were that the
14  driver knew everything that was going on?
15      A.  Your assumption is that all these
16  things were happening, so if you're going to
17  put assumptions in, I can assume mine would
18  be more apropos because they take a licensed
19  driver, do they not, to do a truck driving
20  training school, I'm assuming that that
21  person has the basic knowledge of vehicle
22  control, of traffic laws, and the instructor
23  of that vehicle should be adapt in knowing
24  what that student is looking at, where they
25  are looking at, and if they have checked

1   those things prior.  Because if they have
2   not, then I would have brought the attention
3   to the student that they need to check those.
4       Q.  Mr. Cox, I don't want to continue
5   sparring with you, but in great -- with great
6   respect, I'm talking about some instructions
7   that deal with specific problems with
8   changing gears, which happens frequently -- I
9   know you haven't done this, but it happens
10  frequently with students in a situation
11  coming onto a highway with a motorcyclist in
12  a blind spot, are you following me, in a
13  blind spot.  So in that hypothetical, the
14  student, if they had driven, you know, a car
15  for many years, wouldn't necessarily have
16  seen the motorcyclist, are you following me?
17      A.  No disrespect to you and not trying
18  to avoid you, but I know what an instructor
19  should be doing and those things should be --
20  you're asking me can you give a ton of things
21  at once.  Those things should be taken care
22  of as they are going on.  If a regular
23  student -- let me finish -- was in that
24  situation too, I guarantee you that, and you
25  put all those things on a hearing student in

1   a truck, assuming again, I'm not been in
2   there, that that hearing student may not get
3   through that unscathed.
4       Q.  Understood, but I think you're
5   reverting --
6       A.  No, I don't believe I am.
7       Q.  Let me finish.  You're reverting the
8   onset to the question.  My question isn't
9   about whether or not that's a difficult
10  situation which would challenge even somebody
11  who has hearing, my question is when all of
12  those things are going on, and they are going
13  on in an unanticipated manner, because coming
14  down this ramp the student is having problems
15  with the gears and they are free-wheeling,
16  how can you communicate all of the things
17  necessary with two simple and concise
18  signals, that's all I'm asking?
19      A.  And I believe I gave you a very
20  detailed answer on how that would work.
21      Q.  You haven't studied any of this,
22  right?
23      A.  You are correct.
24          MR. ROZYNSKI:  Objection to the
25      form.

1       Q.  And that goes to the question I
2   asked earlier, you didn't take the nine
3   signals and then apply it to this context to
4   provide what you recommend are the hand
5   signals that would be necessary to train a
6   CDL Class A student in order to be trained
7   and tested under the AAMVA standards, right?
8           MR. ROZYNSKI:  Objection to the
9       form.
10      A.  These are the signals I use in a
11  moving vehicle, correct, and -- let me
12  finish -- and therefore they would be, as I
13  stated, the basis that I would start if asked
14  to develop a system for under a trucking.
15      Q.  Is there a line of demarcation over
16  which if you have more than let's say twelve
17  signals that it becomes unmanageable?
18          MR. ROZYNSKI:  Objection to the
19      form.
20      A.  It's all up to the capacity of the
21  brain to remember which signals.
22      Q.  What's the signal for there's a
23  child ahead crossing the road, if you don't
24  stop now you're going to kill her?
25          MR. ROZYNSKI:  Objection to the



1      form.
2        A.  All right, that's very easy.  Again,
3    we are assuming that there's a licensed
4    driver who understands that if they go
5    through and keep going at that pedestrian,
6    that they will kill them.  So one signal is
7    to bring their attention to look right at the
8    object, then, I'm assuming, I take the
9    assumption that they are not crazed and they
10   understand that if they continue they will
11   kill somebody, and therefore they will take
12   the appropriate action.
13       Q.  What's the signal for there's a
14   child crossing the road ahead of you and if
15   you attempt to do what you would naturally
16   do, which is try and stop this vehicle,
17   because it's so large, you won't have time,
18   and you'll kill the child, therefore you need
19   to do something else, what's that signal?
20       MR. ROZYNSKI:  Objection to the
21       form.
22       A.  So what is something else?  So if
23   you don't have the something else, then I
24   will add that and complete your scenario and
25   explain how I do that or how I would go about

1    training somebody to do that.  If someone has
2    entered the road and there is no way we don't
3    want to hit them, therefore, we're going to
4    have to move in a different direction,
5    meaning, away from them, then the symbol
6    would be to get their attention, and then as
7    a lane change or a moving laterally, a
8    movement that way, and that student would
9    then move away from the hazard that they
10   can't react, so attention and then direction.
11       Q.  Now, I just want to make sure I
12   understand this; you're sitting there as an
13   instructor in one of these cabs, right?
14       A.  Well, all I can tell you what I'm
15   doing in the vehicle.
16       Q.  I'm just going through what you just
17   said.  You observe there's a child ahead and
18   you're concerned that there's immediate
19   danger, right?
20       A.  You are correct.
21       Q.  You just gave me two signals in
22   which the instructor was indicating to move
23   the cab in a certain way, right?
24       A.  Yes.  Your scenario was here we are,
25   we have to do that, and they can't just stop

1    the vehicle, they have to do something else.
2    So I added the something else.  Well, then,
3    the most remarkable one thing that we would
4    do is move the cab or the vehicle, since it's
5    a force in a direction of safety, so then as
6    an instructor, I would pick that avenue of
7    safety and direct the student towards that.
8        Q.  How would you make that decision,
9    why would you pick --
10       A.  How would I pick it as an
11   instructor?  As I stated, they should always
12   be two steps ahead of the student.  In the
13   vehicle I'm always in the position of what-if
14   I should see that in advance, that student,
15   the person shouldn't, I should be making the
16   student aware of that pedestrian before they
17   walk out, that they could.  If the situation
18   develops where there's a hazard, then just as
19   I pointed out, I should know where to leave
20   ourselves an out to move the vehicle.
21       Q.  How did you make that assessment?
22       A.  That's an assessment based on as an
23   instructor I have many miles on the road, I'm
24   always looking for a way out, as I would
25   imagine the people in trucks, instructors,

1    should do the same thing, shouldn't be any
2    different than instructors in our car where
3    they are always looking for an avenue to
4    place the car safely in the traffic no matter
5    what happens, car coming over, pedestrian
6    coming out, that is part of our job.
7        Q.  You said you would imagine an
8    instructor in a --
9        A.  Sorry?
10       Q.  -- would do the same thing?
11       A.  I would say that an instructor
12   teaching a truck, I'm not sure why that would
13   be so radically different than our
14   instructors teaching a student in a car.
15   Know to maintain the car properly and if the
16   student doesn't, it's the instructor's job to
17   make sure it's going that direction.
18       Q.  So you don't really -- you're not
19   aware of the limitations on the vision of the
20   road available to an instructor in one of
21   these cabs, are you?
22       A.  Again, no, I haven't sat in a cab to
23   analyze exactly what he is looking at.
24       Q.  Do you understand that if you tell
25   somebody to go one direction or the other,

MAGNA
LEGAL SERVICES

Page 206

1   that there's a huge difference between
2   maneuvering a tractor-trailer and a passenger
3   car in those circumstances?
4       A.  Dynamics of a truck would be, it
5   would exponentially be different than a
6   vehicle, that is correct.
7       Q.  Do you understand that if you make a
8   sudden change in direction, that that doesn't
9   necessarily avert the danger when you're in a
10  tractor-trailer?
11      A.  Depending on the angle of obviously
12  that you're directing that the truck you're
13  telling it, but again, as an instructor
14  making up a hypothetical here, that if in
15  fact they know the dynamics, they are going
16  to direct them in a way that the truck isn't
17  placed into those dangerous situations.
18      Q.  So you would agree that you're not
19  aware that in fact in circumstances like that
20  the instructor may not know which is the
21  safest direction to go because it doesn't
22  have the ability to see properly through the
23  mirrors that are designed to allow the driver
24  to have the vision behind?
25      A.  Then I would say, and I haven't been

Page 207

1   in a cab, but under our -- we make sure that
2   the instructor has that ability.  Now, in a
3   cab if they use training regular students and
4   they are blind to different things, I would
5   say that the industry is not taking that --
6   it needs to take that into consideration so
7   that they can see those things.
8       Q.  So let's then ducktail into your
9   report, because as I read your report, once
10  you've dealt with the directions, which we've
11  now talked about --
12      A.  Okay.
13      Q.  -- a central premise of your report
14  that is, is that in necessary circumstances
15  you have the ability as the instructor to
16  take control of the vehicle?
17      A.  You're correct.
18      Q.  And the premise of your report is
19  that you can affect the handling of the
20  vehicle by actually taking control of the
21  steering wheel and if necessary actually
22  putting your foot on the accelerator or the
23  brake if necessary?
24      A.  Yes, we're talking about a passenger
25  vehicle, correct, and how we train

Page 208

1   instructors, that is correct.
2       Q.  Sitting here today, though, you
3   don't have any concept of the actual
4   configuration of the cabs that Bordentown has
5   in which this instruction is given, right?
6       A.  Not what Bordentown has, no, I do
7   not.
8       Q.  You can offer no opinion as to
9   whether it's feasible to even accomplish that
10  kind of essential safety control requirement
11  that you have described in your report in the
12  context of a cab, can you?
13      A.  I have -- the assessment I was in a
14  cab, so I do have some concept of a cab and
15  so I have an idea that I could effectively
16  develop a training method for a deaf person
17  in a cab.
18      Q.  That is not my question, Mr. Cox.
19      A.  I'm sorry.  Go ahead and ask that
20  again for me.
21      Q.  So in the cabs that Bordentown has,
22  you don't know the distance between the
23  instructor and the driver, do you?
24      A.  I do not.
25      Q.  You don't know what an impediment

Page 209

1   the dog house is to trying to affect anything
2   that the driver is doing, including in
3   particular the use of the pedals?
4       A.  No, I'll agree.
5       Q.  You don't even know if it's possible
6   to affect the use of the pedals without
7   getting out of the -- the instructor getting
8   out of their seat, right?
9       A.  No.
10      Q.  If the instructor needs to get out
11  of their seat to affect the pedals it could
12  be way too late, right?
13      A.  It would be too late, correct.
14      Q.  Thank you.  You have no idea as to
15  whether it is safe in the context of a
16  tractor-trailer for somebody who is sitting
17  at some distance away, whatever that exact
18  distance may be, leaning over a dog house
19  trying to grab the steering wheel when they
20  have no vision as to what's going on because
21  of the physical dynamics of what's occurring,
22  right?
23      A.  So if I can paraphrase, you're
24  giving me dynamics.  I would assume that
25  their cab is similar to a regular semi's that



Page 210

1   are out there that I was in.  I can assume
2   it's somewhat similar.  All I can do is make
3   an assumption of that what I have experience
4   in.  I had to make an assessment of this
5   driver and therefore didn't know whether they
6   could actually work and they were licensed.
7   The cab -- and I was ready to take control of
8   it if he failed to do so, if necessary.  It
9   wasn't necessary.  So I do have only a
10  general, not specific, idea of how that
11  might -- might be done.
12      Q.  Sitting here today, you can't say
13  under oath that it would be safe to do in a
14  tractor-trailer cab what you're suggesting
15  for a passenger car, in terms of controlling
16  the steering wheel, putting your foot on the
17  accelerator or on the brake, can you?
18      A.  I cannot, you're correct.
19      Q.  I think somewhere in your report you
20  suggest that one thing you can do is put the
21  gear in neutral?
22      A.  The gear in neutral is when a
23  student would then slam on the gas and so a
24  technique to counter that is you don't ride
25  the brake or try to stop them that way, you

Page 211

1   put the car into neutral, you're correct,
2   that would be an explanation of what I mean
3   by put the car in neutral.
4       Q.  On page 4 --
5       A.  Page 4.
6       Q.  -- you say towards the bottom, if
7   the student panics and is pressing down the
8   accelerator excessively, then you need to put
9   the car in neutral by slapping the selector
10  with the open palm of your hand.
11      A.  Is that a question?
12      Q.  What do you mean by that?
13      A.  What do I mean by that.  In an
14  automatic car the selector, when you have
15  open palm, you need the open palm because if
16  you strike the selector, it will never go
17  into reverse.  You have to grab it and push
18  it in an automatic car and make it go in
19  reverse, the same with the column or on the
20  floor, so that's why it's called an open palm
21  technique to put the car into neutral.
22      Q.  What effect does that have?
23      A.  Puts the car into neutral.
24      Q.  Right; why does that help?
25      A.  The situation, as I explained, the

Page 212

1   student is flooring the car and therefore the
2   instructor then once they take it out, that
3   disables that particular problem, which is
4   the excessive speed, then they can actually
5   get control back of the vehicle and the
6   student.
7       Q.  Would you need to brake as well at
8   the same time?
9       A.  It depends on the situation.
10      Q.  So now can we agree that in a
11  12-speed, 15-speed, 20-speed gear system of a
12  tractor-trailer that what you're suggesting
13  here wouldn't be possible?
14      A.  I wouldn't know if it's possible or
15  not.  No, it would take study.
16      Q.  If we go back to the hypothetical,
17  that I think we had a lot of problem with, of
18  coming down and if you change that so the not
19  free-wheeling, but the student is actually
20  accelerating excessively into this highway
21  with traffic coming, what measures do you, in
22  your opinion, believe should be taken by the
23  instructor at that point in time in the
24  context of a commercial motor vehicle,
25  tractor-trailer?

Page 213

1       A.  Again, as I stated to the last
2   question, that I wouldn't know exactly how
3   the gears -- that would need study,
4   therefore, your hypothetical, I would have to
5   know exactly how the gears work, and so
6   forth, before putting forth -- giving you a
7   correct answer of what that instructor would
8   do.
9       Q.  Well, yes, but my earlier questions
10  went to what hand signals you would need, but
11  I'm now asking you as to what measures can
12  or -- can be taken if the student is pressing
13  down excessively on the accelerator coming
14  down this ramp into a major highway.
15      A.  I can tell you exactly what would
16  happen in a passenger vehicle, but I cannot
17  give you, as I stated, an answer for that one
18  because I need to know exactly that -- the
19  way the gears are working in the truck.
20      Q.  As the student is coming in to merge
21  and got their attention on the left-hand
22  mirror to look at what's coming on the
23  highway, how can they even see a hand signal
24  at that point?
25      A.  Well, again, they should be checking

Page 214

1  in advance so we know that, and then if there
2  happens to be something that needs to be
3  done, as in has happened in a vehicle once
4  the hand comes in peripheral vision, it takes
5  very little time and their attention to see,
6  and again, only two to get exactly what I'm
7  trying to get at.
8      Q.  Right, you're talking about a
9  passenger vehicle and sitting close to the
10  person?
11      A.  I'm talking about that, that's
12  what -- your hypothetical you keep throwing
13  me back into a truck.
14      Q.  In a truck -- let me finish my
15  question -- in a truck you're not sure when
16  somebody is looking in the mirror to enter a
17  highway whether or not from where the
18  instructor is seated that a hand signal would
19  be in peripheral vision, are you?
20      A.  I would need to study that, you are
21  correct.
22      Q.  You say taking control of the wheel
23  is the most important aspect of vehicle
24  control?
25      A.  I do.

Page 215

1      Q.  You mean that in a number of
2  different ways which is you have the
3  invisible hand technique and then you have
4  actually grabbing the wheel at different
5  positions, correct?
6      A.  I do.
7      Q.  You haven't studied in any way the
8  particular safety concerns in a
9  tractor-trailer motor vehicle or instructed
10  to do that given the limited vision that the
11  instructor has of the road?
12      A.  I would say not applied these ever
13  to a tractor-trailer teaching situation.
14      Q.  Are you aware that the parking
15  recommendations that you make with the
16  diagrams that you have attached to your
17  report do not in any way relate to the
18  specific backing movements that are required
19  to be trained under the AAMVA standards?
20          MR. ROZYNSKI:  Objection to the
21      form.
22      A.  Those are what -- those are part of
23  how we would train or things we would do.
24      Q.  Right?
25      A.  I did not apply them to the

Page 216

1  standards -- the AAMVA standards.
2      Q.  As we discussed, everything that
3  you've listed here would be done with a
4  student and the instructor in the car at all
5  times?
6      A.  It's state law, so yes.
7      Q.  At the end of your report you state
8  your opinion with reference to the dynamic
9  environment of a moving vehicle, correct, we
10  can agree that all of your experiences are
11  with respect to passenger vehicles?
12      A.  We can agree.
13      Q.  As we now discussed through these
14  various hypotheticals, you haven't studied
15  how to apply the principles stated in the
16  report to a tractor-trailer commercial motor
17  vehicle?
18      A.  I have not studied, you are correct.
19      Q.  And you also go on to say that it's
20  your expert opinion that if the only factor
21  is the person is deaf, they are not at risk
22  for increased risk for crash involvement; do
23  you see that?
24      A.  I do.
25      Q.  That's not based on any scientific

Page 217

1  study, is it?
2      A.  Yes, it was based on the report on
3  here that there is no evidence that I've ever
4  found or studies showing that deaf, except
5  for yours in a tractor in a motor vehicle,
6  that they are more dangerous.
7      Q.  Your confusion there relates to the
8  data that's referenced in the report that's
9  before you as Exhibit 11?
10      A.  Yes, correct.
11      Q.  Which is for passenger vehicles?
12      A.  That's correct.
13      Q.  Now, do you recall that earlier
14  today you mentioned your involvement in the
15  Bates versus United Parcel Service?
16      A.  Yes.
17      Q.  As I've listened to your testimony,
18  there are at least two, there may be more,
19  essential components to the system that you
20  have laid out here to support your conclusion
21  as it applies to passenger vehicles, and they
22  are the use of hand signals and the ability
23  to control the vehicle as we've just
24  discussed, correct?
25      A.  In instructing the deaf in a regular

Page  218

1    car?
2    Q.  Yes.
3        A.  Two main things would be the hand
4    signals and also the ability to control the
5    car.
6        Q.  Do you recall that in the Bates
7    versus United Parcel case that the court
8    specifically found that notwithstanding your
9    testimony, and this related not to these big
10   trucks that I'm talking about, but to, you
11   know, these much smaller box vans, that
12   relying on the trainer to communicate by hand
13   signals in the trainee's peripheral vision
14   would be unworkable?
15       MR. ROZYNSKI:  Objection to the
16   form.
17       A.  Not offhand.  I know that it goes on
18   to say that since -- I think the judge also
19   said, because it was ruled in favor of
20   disability advocates, that while he didn't,
21   or wasn't sure the hand signals to be
22   applicably used, he wasn't sure it could
23   be -- he said that based on the fact that I
24   had taught the deaf to drive, that he felt
25   that it could be done and ruled in favor of

Page  219

1    against UPS based on my saying that based on
2    my history of teaching many deaf.  I believe
3    you'll see that the ruling from the judge was
4    against UPS.
5        Q.  Well, I'm trying to break this down.
6        A.  Okay.  You are correct then, I mean,
7    based on what you said you're reading it.
8        Q.  I'm going to quote the court says by
9    contrast having the trainer and trainee
10   communicate by lip reading or passing notes
11   back and forth while the vehicle is moving
12   would present obvious safety concerns, doing
13   either would take the trainee's eyes away
14   from the road for long periods of time and
15   the trainee could not use his or her hands to
16   write notes and steer at the same time.
17       A.  And that was never part of my
18   testimony.
19       Q.  The court then goes on to say
20   similarly the court finds that relying on the
21   trainer to communicate by hand signals in the
22   trainee's peripheral vision would be
23   unworkable; do you recall that?
24       A.  I'm listening to you reading the
25   transcript, so.

Page  220

1        Q.  I'm asking whether you recall that?
2    You can say yes or no.
3        A.  That was part of the decision by the
4    court.
5        Q.  The court goes on to say plaintiff
6    presented testimony from Daniel Cox, a driver
7    trainer from the Heights Driving School in
8    Ohio, Mr. Cox uses a combination of hand
9    signals and written notes, the latter only
10   when the vehicle is stopped, to communicate
11   with deaf driver trainees.  These hand
12   signals, which were distributed to driving
13   schools throughout the state of Ohio,
14   included following instructions straight
15   ahead, turn right, turn left, slow down,
16   stop, look ahead, change lanes, and reverse;
17   do you recall the judge saying that?
18       A.  I don't recall verbatim, but you're
19   reading, so we'll assume it has.
20       Q.  The court goes on to say another
21   hand sign is used to indicate to the trainee
22   that he or she has performed the task well;
23   do you recall the judge saying that?
24       A.  I don't recall that.  He never spoke
25   from the bench.  You're reading the decision.

Page  221

1        Q.  Right.  The court goes on to say
2    Mr. Cox has successfully used these hand
3    signals to train deaf passenger car drivers,
4    but he has never tried to train a deaf
5    individual how to drive a commercial vehicle.
6        A.  I think we established that today
7    also.
8        Q.  We agree with that?
9        MR. ROZYNSKI:  Let the record
10   reflect that neither I nor Mr. Cox has
11   a copy of this decision, nor has the
12   decision been cited to on the record as
13   to what this decision is.
14       Q.  The court goes on to say this
15   distinction is relevant because the trainer
16   is much closer to the trainee in a passenger
17   car than in a commercial vehicle such as a
18   UPS P5 package car and a commercial driving
19   trainee might not therefore be able to see
20   the same hand signals in his or her
21   peripheral vision; do you recall the court
22   saying that?
23       A.  Again, you're reading it to me so
24   I'll assume that the court said that.
25       Q.  In addition, the communication

MAGNA ›
LEGAL SERVICES

Page 222

1    between a UPS trainer and trainee is more
2    complex than the nine hand signals developed
3    by Mr. Cox and there is no evidence to
4    support the finding that it would be possible
5    to develop signals that could be seen in a
6    trainee's peripheral vision for all of the
7    necessary communication.
8        A.  While the judge stated all that, he
9    still ruled against them, stating that I
10   did -- I demonstrated that it could be done
11   and therefore he felt it could also be done
12   or else he would not have ruled in Disability
13   Advocates favor, correct?
14       Q.  Well --
15       A.  He stated all that, but he ruled
16   against them.
17       Q.  Mr. Cox, I think we discussed in the
18   beginning of the deposition process is
19   that I ask a question, you answer it fully
20   and to the best of your knowledge.
21       A.  I apologize.
22       Q.  Now you're arguing with me.
23       A.  I don't want to do that.  I
24   apologize.
25       Q.  I'm not asking about what the court

Page 223

1    ultimately found and how it got to its
2    opinion and whether there were some other
3    aspects of what you said that it considered
4    in reaching a conclusion as to certain types
5    of vehicles that are not CDL Class A
6    vehicles, right?  I'm not asking you that.
7    What I'm focused on is that the court
8    rejected as -- the court rejected, as you may
9    recall, the concept that in a much smaller
10   type of commercial motor vehicle that the
11   hand signal system you proposed could be used
12   effectively or safely; do you recall that?
13       MR. ROZYNSKI:  Objection to the
14    form.
15       A.  Yes, a judge made an opinion on
16   that, correct.
17       Q.  I'm citing, the cite is Bates versus
18   United Parcel Service, Inc. 16 capital A,
19   Capital D in case is 205 it's 2004.  I
20   believe you said the case was in the late
21   '90s?
22       A.  I thought so.  When was it?
23       Q.  The decision was 2004.
24       A.  It went on for quite a while.  I
25   think my involvement was in the late '90s.

Page 224

1        Q.  Do you have any knowledge of the
2    medical requirement for CDL licenses?
3        A.  Firsthand knowledge, no.
4        Q.  Are you aware that all CDL
5    applicants are required to pass a medical
6    exam and to be approved by a doctor on the
7    national registry?
8        A.  Through the depositions, I have
9    general knowledge.
10       Q.  Are you aware that the medical
11   examination tests for various conditions
12   covers thirteen areas related to driving
13   functions?
14       A.  Like I said, only generally.
15       Q.  Are you generally aware that there
16   are nine areas that are discretionary to the
17   medical examiner, such as loss of limb,
18   cardiovascular system, respiratory
19   dysfunction?
20       A.  Again, not in the specifics.
21       Q.  Are you aware that there are four
22   areas of no discretion that if the applicant
23   can't pass they can't obtain a medical
24   certificate without a specific waiver and
25   exemption from DOL?

Page 225

1        MR. ROZYNSKI:  Objection to the
2     form.
3        A.  Again, the specifics, I wouldn't be
4    aware of all the specifics.
5        Q.  I want to take a couple of examples
6    if you were presented with a student who
7    suffered from sleep apnea, would you take
8    them into the school, your school, and train
9    them?
10       A.  You're talking about a novice
11   driver?
12       Q.  Yes.
13       A.  If they have physician's approval.
14       Q.  Do you ask those kinds of questions?
15       A.  Yes, if they are disability,
16   depending on the disability, we will ask for
17   a physician's approval.
18       Q.  With approval you would train them?
19       A.  If the physician said they could go,
20   yes, we would start the training.  We do an
21   assessment first and then we do the training.
22       Q.  If somebody presents with a history
23   of epilepsy, would you train them?
24       A.  We would, again, based on a
25   physician's recommendation.

Page 226

1      MR. HALLER:  I'm going to take a
2   short break.
3      A.  Okay.
4      MR. HALLER:  Sort of review where
5   we are.
6      THE VIDEOGRAPHER:  Off the record.
7   The time is now 4:44 p.m.
8      (Brief recess taken.)
9      THE VIDEOGRAPHER:  We are now on
10   the record.  The time is 4:54 p.m.
11      Q.  Just a couple of questions to finish
12   up the deposition, Mr. Cox.  In your report
13   in connection with parking lots or range work
14   on page 5 you say with any student his need
15   to vehicle it's important to start them out
16   in large empty parking lot or range; do you
17   see that?
18      A.  I do.
19      Q.  You have no way of relating that to
20   the yard in which Bordentown does its backing
21   maneuvers, correct?
22      A.  No, I've never seen them.
23      Q.  Do you have any knowledge as to what
24   it would mean in terms of the alteration of
25   the way the program is delivered to students

Page 227

1   by Bordentown if they were to do backing
2   maneuvers at some other facility which is a
3   big parking empty lot, if there were one
4   around?
5      A.  What would the Bordentown people do?
6      Q.  How would it affect the way they
7   actually managed the yard operations?
8      A.  Well, I would have to see how they
9   manage in the first place to figure out any
10   of those particulars.
11      Q.  You can't comment here today?
12      A.  I really can't comment on that
13   today, correct.
14      Q.  In your report you say that the
15   instructor should try and anticipate problems
16   and give directions well in advance?
17      A.  I do.
18      Q.  But you do recognize that traffic
19   conditions, particularly in urban areas, are
20   constantly changing?
21      A.  I would agree with that.
22      Q.  So unanticipated things happen when
23   you're on the road?
24      A.  Unanticipated things can happen.
25      Q.  In your report you say that the

Page 228

1   instructor should avoid giving directions
2   while a student is performing a maneuver?
3      A.  Meaning if they are in the middle of
4   a turn to direct them again to something
5   else, another maneuver would be inappropriate
6   because they are focusing on this maneuver.
7      Q.  What about giving them directions if
8   they are not performing the maneuver that
9   you've asked them to perform properly?
10      A.  Well, in that situation it kind of
11   goes back, we answered earlier, in which if I
12   don't feel that the student has performed the
13   maneuver properly, I would want to take aside
14   and go over it to show them what I would
15   consider proper in that maneuver.
16      Q.  That would be after the fact?
17      A.  The maneuver happened, you said, so
18   obviously if they didn't perform it properly,
19   it would have to have been after the fact.  I
20   guess just adding to that like in my take if
21   they are not performing to the extent where
22   it's so egregious that I have to intervene in
23   the hand controls, that would be another
24   piece to the not properly doing one.
25      Q.  In your in the context of the

Page 229

1   program that you've described the passenger
2   vehicle training in your report are there any
3   occasions where you would want the student to
4   describe techniques for specific situations
5   that might occur as part of the training?
6      A.  So I understand exactly what you're
7   asking; you're asking if at any point the
8   student would describe a piece of the
9   training back to the instructor?
10      Q.  Yes.
11      A.  Would that be useful so
12   understanding -- the instructor would then
13   have an understanding that they understood
14   that piece of the training?
15      Q.  Yes.
16      A.  Yes, that would be useful.
17      Q.  Do you do that?
18      A.  If it's necessary, sure, they use
19   all methods to make sure understanding.
20      Q.  When the student -- how do you do
21   that?
22      A.  Again, it would be, remember the
23   white board we talked about or the pad?
24      Q.  If you're actually driving, that
25   would not be an appropriate way of

Page 230

1    proceeding, right?
2        MR. ROZYNSKI:  Objection to the
3    form.
4        A.  That's correct, that would not be an
5    appropriate way of proceeding.
6        Q.  How would you accomplish the
7    following, that if you're driving a
8    tractor-trailer of the size we've been
9    talking about, and the instructor asks the
10   student to imagine that a point of reference
11   ahead is a railroad crossing on a four-lane
12   road and for the student to describe and
13   demonstrate the procedures that they would
14   use to cross the railroad tracks on a
15   four-lane road, how would you accomplish that
16   through your sign process?
17       MR. ROZYNSKI:  Objection to the
18   form.
19       A.  Well, I would -- so you're asking
20   how would they -- I want to see as the
21   instructor, do they understand how to proceed
22   through over a rail track -- excuse me --
23   railroad crossing on a four-lane highway,
24   correct, if I understand the question
25   correctly, that's my objective as instructor,

Page 231

1    I want to know if that student understands
2    how to do that?
3        Q.  No.
4        A.  No, okay.  Please rephrase.
5        Q.  You want to know as an instructor
6    that the student can describe while driving a
7    vehicle by reference to a point of reference
8    ahead what they would do and demonstrate what
9    they would do to cross railroad tracks on the
10   four-lane road?
11       MR. ROZYNSKI:  Objection to the
12   form.
13       A.  So if I'm in a cab of that way and
14   again I would have to study, but how I would
15   go about it as just in motor vehicle, I would
16   then assume that I have trained them prior on
17   those proper techniques and then see how they
18   did it.  And if they did it properly, then I
19   would assume that they understand the
20   procedures.  If we had an improper piece in
21   there, I would then have them pull over and
22   we would then communicate different things
23   they would do, or I could do it prior, that
24   we are going to encounter this, how are you
25   going to handle that, and prior to the moving

Page 232

1    of the truck they would then describe --
2    that's how, off the top of my head right
3    here, how I would handle it.
4        Q.  I'm not sure you answered my
5    question because first of all, I asked you
6    specifically they are driving, actually
7    driving, and they are being asked to
8    communicate by using a point of reference,
9    what they would do?
10       A.  I guess I'm not clear on what you
11   mean by point of reference.
12       Q.  So the instructor would say there's
13   an intersection ahead and I want you to
14   imagine that's a railroad crossing somewhere
15   and it's a four-lane road and tell me exactly
16   what the procedure is?
17       A.  You said they would imagine or there
18   are railroads?
19       Q.  No, it's like simulated location.
20       A.  Okay, so it's an imaginary --
21       Q.  Yes.
22       A.  In any imaginary situation working
23   in a vehicle with the deaf I wouldn't be
24   wanting to communicate that.  I would want to
25   do that, like I said, either go into an

Page 233

1    actual situation like that, see if they
2    understand the instruction of what I've given
3    or ask them when the vehicle is parked about
4    that imaginary situation.
5        Q.  Do you know anything about the
6    importance of hearing as it relates to tire
7    failure in a commercial motor vehicle?
8        A.  Could you repeat the question
9    because I didn't catch it all.
10       MR. HALLER:  Could you read it
11   back.
12       (Whereupon, the record was read
13   by the reporter.)
14       Q.  I'll rephrase the question.  What I
15   said was, do you know anything about the
16   importance of hearing as it relates to tire
17   failure in a commercial motor vehicle of the
18   kind of size that we've been talking about, a
19   tractor-trailer?
20       A.  So if you could speak up, that would
21   be -- because you're over here --
22       MR. HALLER:  Read it back.
23       (Whereupon, the record was read
24   by the reporter.)
25       MR. ROZYNSKI:  Objection to the

Page 234

```
 1        form.
 2        A.  You're asking my opinion whether
 3   that's important to know that?
 4        Q.  No.  If you know anything about it?
 5        MR. ROZYNSKI:  Objection to the
 6   form.
 7        A.  In a general sense, as I believe it
 8   was answered in the deposition.
 9        Q.  What do you know in a general sense?
10        A.  Just that they should be aware of a
11   blow out, blow out of a tire on a commercial
12   vehicle.
13        Q.  Do you know anything about the
14   influence of combination type on rearward
15   amplification?
16        A.  I'm sorry, I'm not familiar with the
17   term rearward or what's that referring to.
18        Q.  Rearward is backwards amplification
19   from behind, you're not familiar with that?
20        A.  Amplification in cab are you
21   referring to the -- I guess I'm not
22   understanding the question clearly.
23        Q.  Well, I'm not sure how I can help
24   you, I'm just simply asking if you have any
25   familiarity with what is termed influence
```

Page 235

```
 1   combination type on rearward amplification
 2   with respect to tractor-trailer motor
 3   vehicles?
 4        A.  Based on the information provided in
 5   the question, I would say no.
 6        Q.  I'm assuming that you don't have any
 7   specific familiarity with the speed at which
 8   large combination vehicles -- let me withdraw
 9   that question.  I assume you don't have any
10   specific familiarity with the way in which
11   large combination vehicles stop when you
12   apply the brakes?
13        A.  Only in the concept of the
14   generalities we talked about earlier today
15   about stopping distance for larger vehicles.
16        Q.  Is it your assumption that a fully
17   loaded vehicle would, because of the weight,
18   would take longer to stop than one that is
19   lightly loaded?
20        A.  That would be correct, law of
21   physics.
22        Q.  What's the basis of what you said
23   when you say the law of physics, what do you
24   mean?
25        A.  Well, a larger object put into
```

Page 236

```
 1   motion that's heavy takes more friction and
 2   force to slow it down in generalities.
 3        Q.  Would it surprise you to learn that,
 4   in fact, large combination vehicles take
 5   longer to stop when they are empty than when
 6   they are fully loaded?
 7        MR. ROZYNSKI:  Objection to the
 8   form.
 9        A.  I would be, I would, yes, I probably
10   would be surprised at that.
11        Q.  Are you aware that when lightly
12   loaded, the very stiff suspension, springs
13   and strong brakes, give poor traction and
14   make it very easy to lock up the wheels?
15        A.  Again, as I stated many times in
16   this deposition, I am not familiar with all
17   the aspects of a tractor-trailer.
18        Q.  Are you aware if you do that the
19   trailer can swing out and can strike other
20   vehicles and can jackknife very quickly?
21        MR. ROZYNSKI:  Objection to the
22   form.
23        A.  Again, if you say that they can, I'm
24   not familiar with all the things of the
25   tractor-trailer.
```

Page 237

```
 1        Q.  Does the term off-tracking or
 2   cheating, as applied to a combination
 3   vehicle, mean anything to you?
 4        A.  Off-tracking, cheating?  No.
 5        Q.  Do you have any knowledge as to how
 6   to train a novice driver to make turns
 7   without off-tracking or cheating?
 8        A.  Since I don't know the term
 9   off-tracking or cheating, what it means, I
10   couldn't answer that question.
11        Q.  Do you know how many hand signals it
12   might take to do that maneuver safely?
13        A.  Again, it would take study as to
14   know what it is and then I can ascertain from
15   that.
16        Q.  Do you have any knowledge as to what
17   problems arise from the articulation of a
18   combination vehicle when you're making
19   backing maneuvers?
20        A.  Can you repeat that question.
21        Q.  Do you have any knowledge as to the
22   problems with articulation that may occur
23   with a combination vehicle when you're doing
24   backing maneuvers?
25        A.  If you're talking about articulation
```

MAGNA
LEGAL SERVICES

Page 238

1    of the swinging of a cab, the back, yes, it
2    would be based on trailering my big boat, it
3    would be the same.
4        Q.  Well, it wouldn't be the same, would
5    it?
6        A.  I believe it would.
7        Q.  It might have some similar --
8        A.  Similarities, I'll give you that,
9    yes, there could be some differences.
10       Q.  Thank you.  Do you understand that,
11   depending on which way you swing the wheel,
12   that the trailer might drift in an opposite
13   direction?
14       A.  Oh, yeah I'm very aware of that.
15   That would be identical.
16       Q.  I have no further questions.  I
17   really appreciate your coming here all the
18   way from Ohio today, Mr. Cox.  Thank you very
19   much.
20       A.  Thank you.
21       THE VIDEOGRAPHER:  Nothing further?
22       MR. HALLER:  No.
23       THE VIDEOGRAPHER:  We're now off
24   the record.  The time is 5:16 p.m.
25   This ends today's deposition and DVD

Page 239

1        number three.
2        (Time noted:  5:16 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 240

1            A C K N O W L E D G E M E N T
2        I, DANIEL COX, hereby certify that I
3    have read the transcript of my testimony taken
4    under oath on July 27, 2016, that the
5    transcript is a true, complete and correct
6    record of what was asked, answered and said
7    during my testimony under oath, and that the
8    answers on the record as given by me are true
9    and correct.
10
11   _____
12   DANIEL COX
13
14
15   Signed and subscribed to
16   before me, this _____ day
17   of _____, _____.
18
19   _____
20   Notary Public
21
22
23
24
25

Page 241

1            C E R T I F I C A T E
2        I, JOI RAFKIND, a shorthand reporter
3    and Notary Public within and for the State of
4    New York, do hereby certify:
5        That the witness whose testimony is
6    hereinbefore set forth was duly sworn by me,
7    and the foregoing transcript is a true record
8    of the testimony given by such witness.
9        I further certify that I am not
10   related to any of the parties to this action
11   by blood or marriage, and that I am in no way
12   interested in the outcome of this matter.
13
14
15   _____
16        JOI RAFKIND
17
18
19
20
21
22
23
24
25



61 (Pages 238 to 241)

Page 242

```
 1        ERRATA SHEET
        PAGE/LINE        CORRECTION
 2
 3      _____
 4      _____
 5      _____
 6      _____
 7      _____
 8      _____
 9      _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      _____
21      _____
22      _____
23      _____
24      _____
25      _____
```

Page 243

```
 1      _____
 2      _____
 3      _____
 4      _____
 5      _____
 6      _____
 7      _____
 8      _____
 9      _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20
21
22
23
24
25
```

**A**

**aamva** 73:15,24
74:21 75:6 131:18
132:6,23 133:5,8
134:16 138:20
139:2 143:18
144:11,14,17
145:1 154:1
157:22 201:7
215:19 216:1
**ability** 90:9 100:8
101:2 120:17,22
121:7 123:25
206:22 207:2,15
217:22 218:4
**able** 47:5 58:24
59:3 60:6 69:19
103:8 121:19
124:12 134:7
136:12 190:7
221:19
**aboveentitled** 1:18
**absolutely** 46:10
77:17 78:4 91:5
106:13 142:19
154:6 157:12
**accelerate** 191:14
193:1 197:24
198:5
**accelerating** 212:20
**accelerator** 207:22
210:17 211:8
213:13
**acceptable** 118:6
118:22 119:2,11
120:3,9 124:16
**accepted** 8:14
**accepting** 148:18
**accident** 18:3,8
20:3 24:22 29:4
60:3 129:4,13,23
130:15
**accidents** 25:1 26:6
32:12 126:24
128:1

**accommodate**
115:15
**accommodating**
171:7
**accommodation**
113:2 115:4 168:1
**accommodations**
113:22 114:17
**accomplish** 208:9
230:6,15
**account** 131:12
192:15
**accuracy** 135:9
**accurate** 49:15
**acronym** 52:10
53:8 73:15,24
**act** 23:20 70:25
71:8,15 72:7 74:1
74:15 81:21 82:25
85:13 113:4,23
114:1 131:17
138:8 147:17
157:22
**acting** 10:24
**action** 1:18 5:24
202:12 241:10
**active** 109:5
**actively** 86:19
**activities** 164:10
**activity** 130:9
145:5,20,25
**actual** 18:9 49:3,20
76:25 77:22 80:1
89:19 91:4 92:13
98:24 132:22
155:25 158:3
160:13 162:11
169:14 208:3
233:1
**acuity** 103:25
105:19 106:21
**acute** 103:7 105:6
**ada** 85:12 114:9
115:14,20,24
**adad** 51:23 52:9,9
53:8 63:7 76:14

76:21 77:2 90:16
**adapt** 198:23
**adapts** 155:9
**add** 142:19 176:25
202:24
**added** 204:2
**adding** 228:20
**addition** 37:8 45:3
64:16 221:25
**additional** 40:3
66:1 93:25 125:13
**address** 5:13 6:6,9
95:8 96:9,19
115:22 164:14
**adjust** 79:22
**administer** 47:18
**administered** 44:20
61:11 75:5 139:3
**administration**
15:15 70:12 73:20
116:8 124:15
126:12,20 128:15
**administrators**
73:23 74:13
**adult** 6:20 95:23
97:13
**adults** 89:16 94:4
97:5
**advance** 176:2
204:14 214:1
227:16
**advanced** 31:3
**advocates** 12:13
13:23 218:20
222:13
**affect** 101:2 107:16
136:19 207:19
209:1,6,11 227:6
**affidavit** 45:16,24
**afternoon** 91:22,23
173:3
**agencies** 68:10
**ago** 12:22 13:11
26:16,16 44:25
**agree** 8:16,18 9:25
10:5 62:5 90:8

93:2,5 95:7,24
96:11 97:16,24
105:4 106:8,12,13
107:12,24 112:1,6
112:13,16 115:24
116:3,5 118:2,6
118:19 119:11,15
120:8,14 121:3,20
121:22 123:20
130:16 145:4
146:7,9,10,15,16
146:24 147:5
149:20 150:7,12
150:14 154:5
155:23 156:6
161:9,10 169:25
170:4 175:12,14
175:18 177:12
178:16 179:1
188:16 206:18
209:4 212:10
216:10,12 221:8
227:21
**agreed** 9:9,10,22
10:12,16 92:1
101:8 172:19
175:23
**ahead** 48:5 79:25
88:16 169:12
180:4 185:17
193:17 201:23
202:14 203:17
204:12 208:19
220:15,16 230:11
231:8 232:13
**aid** 81:21 82:25
**aids** 174:3
**air** 18:12 133:20
134:1,8,11 147:6
176:10
**aircrafts** 91:8
**airline** 91:6
**aldridge** 15:11,18
**allegation** 23:25
**allege** 18:22
**alleged** 18:25 19:4

19:9 20:4
**allow** 12:6 13:3
49:25 98:22
183:25 206:23
**allowed** 10:9 36:18
36:20
**allowing** 44:24
**alteration** 115:16
226:24
**america** 94:7
**american** 73:19,22
74:12
**americans** 85:12
113:3,22 114:1
**amount** 39:16
82:12
**amplification**
234:15,18,20
235:1
**analysis** 104:2
117:24
**analyze** 93:14
205:23
**andrew** 2:5 4:22
**angle** 206:11
**answer** 9:6,24 10:3
10:7,9 14:24 25:9
35:18 36:14 40:13
43:16 58:11 61:2
62:24 65:6 67:11
68:24 70:18 71:21
72:14,20 74:3,17
75:8 80:23 88:10
100:12 101:14
102:7,19 114:8,21
124:12 128:7,9,10
135:23 137:11
145:24 147:9,18
149:6 150:7 157:5
157:12 158:9
160:4,23 162:12
171:1 187:14
188:23 189:4
190:13 192:13
193:7 196:22
197:9 200:20



213:7,17 222:19
237:10
**answered** 65:15
108:4 198:9,10
228:11 232:4
234:8 240:6
**answering** 188:25
**answers** 48:22
113:3 240:8
**anthony** 2:11 4:19
5:20
**anticipate** 227:15
**anybody** 169:2
**anytime** 26:8,9
129:7 150:21
**apnea** 225:7
**apologies** 19:6
46:15 66:13 78:7
**apologize** 37:7
50:18 66:8 68:20
88:6 119:14
222:21,24
**appearance** 4:25
**appearances** 4:16
**appears** 41:5 88:14
97:1 117:2 119:24
**applicably** 218:22
**applicant** 224:22
**applicants** 224:5
**application** 122:3
132:21
**applied** 101:19
132:5 133:8
215:12 237:2
**applies** 155:9
156:17 158:25
217:21
**apply** 92:1 133:4
155:24 156:9,12
156:22 157:6,10
158:2,4 161:1
201:3 215:25
216:15 235:12
**appointment** 48:5
**appreciate** 70:22
187:19 238:17

**approached** 31:1
**approaching** 29:12
30:18 184:5
**appropriate** 29:11
29:16,18 30:12
202:12 229:25
230:5
**approval** 225:13,17
225:18
**approved** 224:6
**approximately**
25:23,25 38:23,24
55:1 56:6 61:18
**apropos** 198:18
**apt** 150:23
**area** 17:24,25 19:12
50:15 98:17
163:20
**areas** 141:22
224:12,16,22
227:19
**arena** 54:3
**argue** 106:9
**arguing** 222:22
**arranged** 50:15
**arriving** 7:23
**article** 3:9,10 75:12
75:21 76:11,13,20
77:4,22 78:12
82:19 84:10 85:23
86:12,13 87:23
88:2,4,7 92:19
94:15,22 95:2,7
95:14,20,21,25
96:12 97:1,11,18
103:18 110:3,14
112:18,23 139:11
139:15 176:19
**articles** 63:5 96:8,9
96:12 98:1,9,16
102:25 104:22
115:23
**articulation** 237:17
237:22,25
**ascertain** 237:14
**aside** 62:16 68:15

85:11 159:2 162:1
228:13
**asked** 14:25 29:14
30:15,16,18 35:5
35:7,12 37:2 60:5
63:4 65:17 76:19
84:13,18 95:1
115:2 131:18
147:8 153:2 160:3
162:13 170:11,22
173:17 175:6
189:14 191:3
196:21 201:2,13
228:9 232:5,7
240:6
**asking** 30:23 45:20
53:6 67:2 86:24
96:7,8 100:12
101:15 102:4
104:5 118:25
127:9,13,14
135:15 137:7
145:16 157:4
159:18 160:4
179:21 186:19
191:21 196:9
199:20 200:18
213:11 220:1
222:25 223:6
229:7,7 230:19
234:2,24
**asks** 230:9
**aspect** 214:23
**aspects** 135:5
163:14 223:3
236:17
**assert** 15:18
**assess** 58:9 60:11
**assessed** 181:3
**assessing** 57:17
76:17 85:7 173:15
**assessment** 56:9,23
58:17 59:17 75:23
76:18 79:7 82:16
84:25 85:20
105:10,11 106:17

108:11 166:4
173:18 197:4
204:21,22 208:13
210:4 225:21
**assessments** 6:21
57:6 59:6
**assessor** 80:3
**asset** 82:5
**assist** 38:16
**assistance** 57:17
**associated** 70:15
151:5,16 165:7,17
**association** 11:5,8
11:22,23 15:8,11
51:23 52:11 53:9
61:14 66:22,23
67:7,10,12 68:9
73:19,23 74:12
76:14 162:19
**assume** 9:20 10:17
22:17 170:21
186:16 196:3,6
198:17 209:24
210:1 220:19
221:24 231:16,19
235:9
**assumes** 192:14
**assuming** 187:3,19
188:3,12 189:9,18
192:13,16 196:7
198:20 200:1
202:3,8 235:6
**assumption** 22:22
191:11,18 196:2
198:11,15 202:9
210:3 235:16
**assumptions**
186:16 191:20
198:13,17
**astute** 127:17
**atfault** 28:4
**attached** 39:14
138:2 179:7
215:16
**attachment** 7:19
16:22 41:4 60:16

**attempt** 146:8
154:6 157:6
202:15
**attempting** 146:16
146:24
**attention** 129:3
130:5 141:22
145:6,21 199:2
202:7 203:6,10
213:21 214:5
**attest** 99:9 131:9
150:20
**attorney** 114:22
115:12
**attorneys** 2:3,8
23:9
**audible** 134:7
**august** 116:9
**authorities** 57:24
**authority** 24:22
58:3
**automatic** 144:24
187:2 211:14,18
**available** 174:16
205:20
**ave** 1:11
**avenue** 4:10 204:6
205:3
**avert** 29:3 206:9
**avoid** 21:2 109:2
199:18 228:1
**avoided** 24:6
**award** 24:11,12,14
**awarded** 24:16
**aware** 19:1 23:6
49:22 50:5 54:4
61:12 70:23 71:6
71:9 72:20,22
82:7,10 90:7
99:20 102:21,23
113:4,25 114:9,12
114:15 115:13
126:10,15,17
127:24 128:9,19
138:20,23,25
144:17 146:1,6



149:14 150:24
163:19 164:9,18
165:1,5,18 167:25
190:17 193:12
204:16 205:19
206:19 215:14
224:4,10,15,21
225:4 234:10
236:11,18 238:14
**awareness** 162:22
**axle** 13:3

**B**

**b** 2:11 7:19
**bachelors** 41:11
52:3
**back** 15:16 19:13
19:15 21:24 23:8
31:15 32:8 38:5
39:15 43:16 53:5
63:10 80:17 84:20
85:23 86:1,8,17
86:19 87:2,7,13
103:19 107:23
125:22 130:19
162:18 165:2
168:5 178:11,15
178:17,18,19
179:23 182:10
191:17 194:11,12
197:7 212:5,16
214:13 219:11
228:11 229:9
233:11,22 238:1
**background** 62:10
112:25
**backing** 215:18
226:20 227:1
237:19,24
**backwards** 85:21
86:10 234:18
**bag** 18:12 46:8
**based** 15:2 34:16
59:8 60:2 83:10
98:11 99:12
118:21,25 119:10

121:2 155:19,21
160:15 170:13
172:14,20 178:24
180:19 195:4
196:20 204:22
216:25 217:2
218:23 219:1,1,7
225:24 235:4
238:2
**basic** 48:1 109:13
134:23 135:5
139:1 150:8
161:23 181:1,1
188:16 189:12,21
190:4 198:21
**basically** 43:12
108:25 140:23
141:1 143:15
150:5
**basics** 47:4 72:22
90:9 162:1
**basis** 17:9,10 18:23
23:4 39:8,10
64:12 73:3,6
77:25 99:8 105:8
106:12 117:12
127:23 188:6
201:13 235:22
**batch** 93:20
**bates** 12:5,19 14:9
14:12,18 15:5
16:2 36:8 38:3
40:19 217:15
218:6 223:17
**baum** 2:3 4:24
34:23 39:3 154:17
**began** 21:13 42:9
**beginning** 19:14
20:19 31:6,8
34:17,22 62:21
84:1 222:18
**begins** 4:2 91:18
113:8 179:19
**behalf** 4:18,21
10:24 24:1 55:21
**behave** 30:7

**believe** 6:3 12:13
12:20 13:10,22
14:13 16:18 20:22
26:16 27:10 29:3
32:17,18 37:3,6
43:13 49:14,15
65:15 70:19 76:23
77:21 88:24 89:22
104:21 105:24
106:1,4 107:2,3
110:18,19,20
115:20 118:9,10
120:6 132:11
144:4 147:8
153:24 156:21
160:5,7,8 162:6
163:25 166:16
167:11 168:2,20
168:23 169:6
170:23 171:24
175:2 177:6 198:9
200:6,19 212:22
219:2 223:20
234:7 238:6
**bench** 220:25
**berth** 130:13
**best** 9:7 47:3
100:12 136:12
222:20
**better** 12:8 94:4
97:5,14 102:6,10
145:18
**beyond** 11:24
117:11 132:13,14
**big** 60:15 194:4
197:18 218:9
227:3 238:2
**bio** 50:19 54:6,24
61:13,16 62:5
84:11
**biography** 41:6
**birth** 104:24
105:25
**bit** 20:21 50:10,17
68:19 77:5 78:2
87:17

**blank** 1:11 2:8 4:11
4:20 5:21
**blind** 94:20 95:9
96:20 136:22
165:7,16 186:2
192:21 198:3
199:12,13 207:4
**blood** 241:11
**blow** 234:11,11
**board** 8:9 51:20
52:19 69:20
139:13 174:15
175:4 229:23
**boat** 238:2
**boil** 195:5
**boiled** 192:6
**bold** 119:8
**book** 129:11 174:15
175:5 177:3
**bordentown** 1:8
4:5 5:22 161:11
161:15 162:22
163:4 164:20
165:24 166:1,7
167:17 171:4
197:2 208:4,6,21
226:20 227:1,5
**border** 50:12
**bottom** 88:14
119:24 211:6
**box** 12:23,24 13:6
17:22 60:19,19
218:11
**brain** 130:9 201:21
**brake** 134:1,11
207:23 210:17,25
212:7
**brakes** 133:21
149:3 235:12
236:13
**braking** 136:21
137:20 148:13,14
148:20
**brand** 46:3
**break** 28:5 52:14
52:24 53:6 76:13

76:24 91:24
155:22 157:19
179:20 219:5
226:2
**brief** 53:2 73:12
149:11 179:16
226:8
**briefly** 11:13 42:20
**bring** 21:24 179:23
202:7
**broke** 18:13 32:17
198:11
**broken** 27:11
**brother** 167:18,23
**brothers** 107:6,7
**brought** 5:24 18:18
21:6 27:17,18
90:18 199:2
**brunt** 18:14 27:8
**bulb** 87:15
**bullet** 117:3 119:8
119:15
**bullets** 172:16
**bunch** 59:1
**bureaucratic** 86:21
**bus** 69:18 70:2,3
**business** 5:23 6:6,9
6:15 40:12 41:12
41:13
**buy** 47:24

**C**

**c** 2:1 240:1 241:1,1
**cab** 17:20,24 60:15
129:1 130:13
165:3 166:3,4,5
166:24 176:15
191:22 194:4,12
194:17 197:6
203:23 204:4
205:22 207:1,3
208:12,14,14,17
209:25 210:7,14
231:13 234:20
238:1
**cabin** 159:3 166:20



166:21
**cabs** 130:12 165:19
166:12,25 203:13
205:21 208:4,21
**caked** 190:2
**california** 14:5
**call** 17:23 32:7 42:1
44:22 60:16,18,19
143:3
**called** 51:23 56:22
70:1,24 88:3,8
138:21 211:20
**cant** 40:13 42:3
52:4 62:25 85:24
87:12 125:1 131:9
162:7 164:1
165:20 188:23
198:6 203:10,25
210:12 224:23,23
227:11,12
**capable** 10:18
57:20 59:25 60:12
82:8 169:23
170:16
**capacity** 42:13 55:2
201:20
**capital** 223:18,19
**capitulate** 15:14
**car** 17:12 18:12
21:7,9,13,17,22
21:24 26:21 28:6
30:2,4,8 46:4
48:20 68:25 98:12
99:7 136:14 138:1
142:21 150:22
151:22 155:1
186:18 187:2
191:8,9 199:14
205:2,4,5,14,15
206:3 210:15
211:1,3,9,14,18
211:21,23 212:1
216:4 218:1,5
221:3,17,18
**cardiovascular**
60:3 224:18

**care** 29:12 192:9
199:21
**career** 83:21
**cargo** 17:25
**carrier** 116:7
124:14 126:11,20
128:15 147:16
157:22 171:6
**carriers** 70:12
**cars** 8:17 25:13
26:19 122:13
151:8 159:20
172:21
**case** 8:12 12:4,9
13:2,13,14,21
14:11,15,16,19
15:4,9,10,13,13
15:23 21:21 22:2
22:3,6,10 23:25
24:5,8 26:4 29:1,5
31:11,14,24 34:16
36:8,10 37:12
38:20 40:20 46:5
55:9 56:16 59:23
60:9 63:25 66:3
77:12,13 105:5
112:20 115:21
117:14,15 125:17
126:6 218:7
223:19,20
**cases** 11:10,12,19
11:22 15:6,7,20
16:3,11,23
**catch** 233:9
**category** 118:11
**catholic** 69:21
**caught** 193:20
**cause** 57:19 131:5
149:16
**caused** 20:24
**causing** 21:9
**cdl** 53:17 61:4 68:6
68:11,16,18,22,25
72:17 74:23 75:4
124:21 131:15,24
134:17,24 138:16

155:12 158:5,13
161:3 176:16
180:13 201:6
223:5 224:2,4
**cell** 88:19 129:21
**center** 17:16,16
**central** 207:13
**certain** 7:10 8:22
43:6 47:5 72:9,10
203:23 223:4
**certainly** 79:5
84:14
**certificate** 47:17
224:24
**certification** 8:6
42:25 45:23 50:21
51:1 52:19 55:11
56:1
**certifications** 42:20
50:20
**certified** 8:7 41:23
51:10,11,13,15,20
52:7
**certify** 240:2 241:4
241:9
**challenge** 19:8
200:10
**challenging** 160:20
**change** 141:9 150:9
179:11 180:6
187:4 203:7 206:8
212:18 220:16
**changed** 44:9 51:12
77:8
**changing** 55:8
90:12 185:20
199:8 227:20
**characteristics**
136:18 138:5
**charge** 23:21 39:20
39:21 40:4,10
**charged** 23:14
39:24
**charging** 39:18,19
**cheating** 237:2,4,7
237:9

**check** 32:6,7
103:11,12 133:25
144:19 189:18
193:13,23 199:3
**checked** 193:15
198:25
**checking** 31:21,22
31:23,25 32:1
213:25
**chief** 54:7,14,24
62:4
**child** 201:23 202:14
202:18 203:17
**children** 92:24
**chronology** 42:24
**circumstances** 80:6
156:1 158:3 159:4
206:3,19 207:14
**cite** 173:2 223:17
**cited** 99:20 100:4
101:16 221:12
**citing** 100:22
223:17
**city** 58:7
**civ** 1:3
**claim** 20:5,11,14
22:15 23:11,13,16
27:16,20,21,22,23
28:1,6,8,9,10 47:2
124:8 186:17
**claimed** 20:15
**clarified** 15:22
**clarify** 186:20
**clarifying** 187:16
**class** 44:12,18
47:12 53:18 74:23
124:21 133:16,25
134:25 138:16
143:14,15 147:15
147:22 155:12
156:2,10 158:5
161:4 180:13
201:6 223:5
**classified** 55:18
**classroom** 44:23,24
70:3 71:24 88:25

103:6 162:10
**clear** 12:21 19:19
30:10 65:16
100:11 133:1
167:12 177:6
232:10
**clearly** 29:8 30:5
234:22
**cleveland** 15:12
17:5 56:8,14,19
56:22 57:3 59:14
88:3,5,8 166:5
197:6
**client** 83:10,11
**clients** 57:7
**clinic** 56:8,14,19,22
57:3,14 59:14
166:5 197:6
**clinical** 57:12
**close** 50:11 82:22
214:9
**closed** 121:8
**closely** 185:9
**closer** 221:16
**clutch** 190:10
192:10 196:16,19
197:25
**clutching** 185:1
195:22
**cmv** 120:11,22,23
121:8,23 161:2
180:10
**coast** 165:7,9
**cochlear** 82:9 83:23
176:8
**code** 71:13 138:6
153:12
**cognitive** 58:25
59:1,2,2
**collapsed** 19:25
**colleague** 5:21
**college** 69:14
**columbus** 43:10
90:17
**column** 84:5,6,21
211:19



com 1:25 88:3,5,8
combination
133:16 136:18
138:6 147:14
151:18 179:10
220:8 234:14
235:1,8,11 236:4
237:2,18,23
come 12:14 21:8
28:21 31:15 40:5
45:15 46:3,7,14
47:3 51:5 63:10
82:2 125:22
141:16 184:21
196:15
comes 214:4
coming 6:2 17:14
19:13,15 20:2
90:1,16,17 141:20
157:14 184:15
185:7,11 186:9
190:25 191:16
192:23 193:3,9
198:4 199:11
200:13 205:5,6
212:18,21 213:13
213:20,22 238:17
comma 180:4,4,4,5
180:5,5,6,6
command 190:7
195:14
commands 189:15
comment 227:11
227:12
commercial 53:16
69:4 70:24 71:7
71:15,16,19 72:6
72:9 73:25 74:14
93:4,8,10,12,17
95:9 96:1,3,13,20
97:19,20 120:18
123:24 124:9
125:15 126:4,13
128:17 129:1
130:24 131:6,17
133:25 138:7

146:3 153:13
156:2 157:21
159:3,10 161:2
164:19 176:16
184:13 212:24
216:16 221:5,17
221:18 223:10
233:7,17 234:11
commission 113:12
113:17
commissioned
34:23 35:4 126:11
126:19 154:16
communicate
79:11 82:5 86:9
140:2 143:8 176:1
177:9 180:2
197:23 200:16
218:12 219:10,21
220:10 231:22
232:8,24
communicated
141:3
communicating
83:7 86:18,19
177:16
communication
33:14 34:19 35:10
35:14 75:22 76:2
77:9 80:2 81:10
83:7 108:15 110:7
112:21 178:2
221:25 222:7
company 59:24
60:5
comparing 103:2
104:2
comparison 92:24
104:8 124:18
compartment
109:1 166:18
compensated 39:5
compensation
27:25 28:3 39:9
39:10,22
complaint 63:19,22

64:16,23 65:12
168:8
complete 10:9
25:10 46:16,21
65:8 202:24 240:5
completed 48:4
completely 18:16
34:1 65:20 100:3
105:14 123:23
194:6
complex 146:11
222:2
complexity 143:4
183:11
complicated 31:10
component 177:13
182:7
components 217:19
compute 122:21
computer 48:18
concept 80:4
188:16 208:3,14
223:9 235:13
concerned 190:24
203:18
concerning 134:22
concerns 109:3
215:8 219:12
concise 182:15,21
182:25 183:8
195:2 200:17
conclude 105:4
134:21 194:25
concluded 30:23
conclusion 58:19
60:8,10 98:2,11
99:17 107:17
117:13 118:3,5,21
119:2,5,7 120:10
122:4 123:22
124:16 126:21
159:2 168:18
177:2,14 178:22
217:20 223:4
conclusions 7:24
117:23 125:16

128:23
condition 19:1 21:3
57:19,20 58:22,23
59:21
conditions 20:16
60:23 90:12
148:24 149:7
160:1 162:24
224:11 227:19
conduct 104:13,15
configuration
148:6,22 166:3
208:4
configurations
72:10
confined 49:23
confirm 34:14 84:9
103:1
confirming 100:19
confirms 103:20
conformity 75:6
confused 102:4
confusion 217:7
congress 152:14
conjunction 95:3
95:19
connected 101:9
connection 12:23
55:2 66:3 94:23
95:19 96:2 97:10
97:17 103:16
107:15 131:13
132:20 134:8
139:10 226:13
connelly 2:11 4:20
5:22 111:6,24
consider 94:23
95:18 97:10
125:12 128:13
131:14 142:15
160:25 228:15
considerable
169:16 170:6,19
consideration
119:17 207:6
considerations 64:2

considered 7:23
63:14 64:18 65:2
65:18 116:12
223:3
considering 64:25
consistent 130:17
179:3
constantly 227:20
consultant 55:16
55:17 56:15
containing 166:10
contemporaneous
169:15
content 11:18,21
89:11,13,14
contention 117:5
context 10:24 11:13
53:23,24 85:7
106:11 124:19
125:5 126:2,18
141:2 144:14
145:13 154:25
156:11,18,25
157:7,10 159:3
170:18 174:8
175:7 177:25
179:24 180:9
183:2 201:3
208:12 209:15
212:24 228:25
continue 58:1,20
199:4 202:10
continued 125:24
continuing 54:5
55:25
contractor 56:17
56:19
contrast 219:9
contributing
130:24 131:6
control 134:23
135:6 136:4
181:18,19 190:16
190:18 198:22
207:16,20 208:10
210:7 212:5



214:22,24 217:23
218:4
**controlling** 181:15
181:24,25 184:23
210:15
**controls** 139:1
228:23
**contusion** 27:10
**convention** 90:17
**conventional**
165:23
**conversation** 87:1
87:9,12
**conversations**
146:12
**copy** 76:25 77:1
109:19 221:11
**correct** 6:4,8 7:12
8:2,3,19 9:25
10:20 13:15 14:10
14:21 16:19 17:1
17:5,7,8 18:6,21
20:24 26:24 28:13
33:16,18 34:21
35:19,20,23,24
36:5 37:3 39:6,7
40:2,5,7 41:7,13
41:15,17,18 42:7
42:11,12,16 44:19
45:2,5 48:11
52:22 54:9 55:14
56:3,4,11,12
57:22 59:10 62:2
62:8 64:8,9,21
67:16 68:5,7,13
69:11 70:9 75:1,9
75:24 84:8 86:10
86:12 87:4,16
89:8 92:19,22
93:1,5,13,21,23
94:14,18,21 95:11
95:13,17 96:5,10
96:24 97:3,4,7,8
97:25 98:7 99:10
99:14,19 102:24
106:8 110:3,9

112:18 116:10
117:1,10 118:12
118:13 120:14
121:10 122:2,25
123:5 124:24
126:1 127:19
130:20,21 131:11
131:14 134:20,21
135:3 136:16
137:9,12 138:12
151:3,23 154:22
154:23 155:1,2,6
155:7 156:16
158:6 160:14,17
161:7 165:20
166:19,22 167:19
167:21,22 168:21
170:3 172:7,17,24
172:24 173:4,5,8
174:1,6,10 176:4
176:22 177:10,11
178:11 179:9
180:8 181:9,22,24
182:5,6,16 183:10
183:18 185:6
187:9 188:10,11
188:19 190:11,22
191:2,4 196:2
197:13,14,22
200:23 201:11
203:20 206:6
207:17,25 208:1
209:13 210:18
211:1 213:7
214:21 215:5
216:9,18 217:10
217:12,24 219:6
222:13 223:16
226:21 227:13
230:4,24 235:20
240:5,9
**correction** 242:1
**correctly** 13:11
27:12 29:6 35:9
135:17 145:17
157:12 197:8

230:25
**correlation** 108:24
**correspondence**
161:25
**couldnt** 146:23
169:1,12 170:12
170:16 171:13,15
172:1 237:10
**counsel** 4:15 7:21
65:10 66:2
**counter** 210:24
**counties** 54:21
**country** 58:8 140:9
140:11
**county** 17:3
**couple** 225:5
226:11
**course** 27:21 41:22
41:24,25 51:2,14
55:24 61:18 68:8
76:19 87:2 89:4
89:17,18,18,23
141:13 175:21
**courses** 42:15,17
55:25
**court** 1:1 4:6,14 5:1
6:1 10:4 12:1,1
13:25 14:1 15:11
15:17 17:2,3
40:20 78:3 218:7
219:8,19,20 220:4
220:5,20 221:1,14
221:21,24 222:25
223:7,8
**covered** 74:14 76:1
114:13,15 147:22
175:3 188:3
**covers** 224:12
**cox** 1:16 3:3,7,8,9
3:10,11 4:3,25 5:4
5:12,17 6:9,25 7:2
7:4 34:5,7,11,12
38:13,17 39:15
41:2 53:15 63:10
63:15 64:7 65:4
75:11,13,15,16

84:11,20 87:21,24
88:1 91:20,22
92:5,7,19 93:20
94:14 95:12 96:25
109:16 110:1,24
111:4,20 112:1,6
112:12 116:6,21
139:12 149:14
151:15,25 152:6
154:8 156:23
157:25 158:24
176:19 188:21
189:3 194:3 199:4
208:18 220:6,8
221:2,10 222:3,17
226:12 238:18
240:2,12
**crash** 17:11 18:14
26:3 27:9 28:20
28:25 117:7
123:13 149:15
150:14 216:22
**crashes** 25:3
116:17 124:6
125:11 130:24
131:6,12 146:3
**crazed** 202:9
**create** 129:4 130:14
147:1
**created** 19:4
**creates** 151:7
**criteria** 51:25 52:5
**critical** 175:8 195:6
**cross** 230:14 231:9
**crossed** 17:15
20:22
**crossing** 201:23
202:14 230:11,23
232:14
**crushed** 150:22
**cue** 194:8,9
**current** 190:5
**currently** 33:21
96:7
**curriculum** 41:5
43:12,14 50:19

84:10
**curve** 141:19,21
**cut** 10:14
**cuyahoga** 17:3
**cv** 54:5,24 84:17
**cvs** 60:2

---
**D**
---
**d** 3:1 223:19 240:1
**daily** 94:6
**damage** 18:9
**damaged** 18:15
**damages** 24:11,12
24:14
**danger** 19:7 109:4
155:17 203:19
206:9
**dangerous** 85:13
85:16 86:5,6 87:3
107:19,23 151:12
178:6,12,18,21
196:11 206:17
217:6
**daniel** 1:16 3:3 4:3
5:4,12 6:9 220:6
240:2,12
**data** 117:12,25
118:22 119:3,10
120:2,23 217:8
**date** 7:5 12:16,21
34:8 38:22 43:25
66:11 75:14 87:25
88:18 91:21
110:19
**dated** 65:25 110:11
116:8
**day** 39:21 40:4,10
81:2 106:10 140:1
143:2 173:12
182:11,12 240:16
**days** 69:14
**daytoday** 54:17
**deaf** 8:13 12:7,11
12:15 13:3 33:14
34:20 35:11,15
36:2 38:6 75:22



76:2,17 77:10
78:22 79:11,15
80:2 81:19,24
82:1,2,6,14,16,24
83:11,18,21,23
84:23 85:21 86:7
86:24 87:8 92:23
93:16,25 94:4,20
95:9,15,23 96:19
97:5,13 98:4,10
98:12,25 99:6,22
100:6,15 101:18
102:5,12,17 103:3
103:5 104:1,23
105:14,25 110:7
112:9,22 116:15
123:23 124:19
125:4 136:1,13
141:3,11,12
142:11 143:9
154:17 155:17
158:10 168:13
177:10,16 178:23
179:2 180:2
208:16 216:21
217:4,25 218:24
219:2 220:11
221:3,4 232:23
**deal** 50:13 51:16
53:9,11,12,12
106:10 136:12
141:7 181:14
186:12 196:12
199:7
**dealing** 70:11 71:12
72:17 95:23 113:2
126:13 153:13,18
153:21 173:15
195:6
**dealings** 73:18
**deals** 93:24 100:23
**dealt** 173:10 195:1
207:10
**death** 149:21 150:2
150:16
**decelerate** 193:2

**decided** 51:3
152:15
**decision** 204:8
220:3,25 221:11
221:12,13 223:23
**deemed** 114:2
118:21
**deeper** 20:21
**defendant** 1:9,17
2:8 4:19
**defendants** 66:6
**defined** 9:12 138:6
**definitely** 153:21
**definition** 133:15
133:17
**degree** 41:11 52:3
143:4
**deliberated** 23:7
**delivered** 226:25
**delivery** 12:7 13:5
**delve** 20:21 117:21
**demarcation**
201:15
**demonstrate**
230:13 231:8
**demonstrated**
222:10
**demonstration**
87:11
**department** 55:2
55:15,21 128:14
**depend** 149:6
**depended** 175:16
**depending** 58:13
104:23 105:1
141:8 142:3 143:5
145:24,25 148:12
206:11 225:16
238:11
**depends** 82:13
141:4 142:2 212:9
**deposited** 19:24
**deposition** 4:3,9 7:1
7:8,9 8:23,25
10:22 13:13,14,17
13:19 14:20 15:1

16:6,7,10,13 33:3
33:4,10 34:5,12
34:18 36:21 37:3
38:13,18 39:15
40:6 62:22 63:12
64:8,11 65:4
75:11,16 84:11,21
87:21 92:5,7
93:20 94:15 95:13
96:25 104:25
106:23,25 107:1,2
107:6 109:16
110:24 112:1
116:21 139:12
154:8 163:9 164:1
164:25 167:4
168:10,24 169:11
170:24 171:3,20
172:19 173:11
174:21 178:1
222:18 226:12
234:8 236:16
238:25
**depositions** 10:2
37:4,9 63:19,23
64:17,23 65:13
167:8,19,24 168:3
224:8
**deposits** 21:2
**derivative** 112:17
112:22
**derive** 96:8 98:8
123:22
**derived** 97:15 98:2
**describe** 17:22 18:7
26:17 35:21 54:13
81:8 177:8 229:4
229:8 230:12
231:6 232:1
**described** 15:4
20:18 24:4 34:17
52:20 60:23 62:3
62:9,21 71:24
142:9 194:25
208:11 229:1
**describing** 63:3

148:17
**description** 3:6
**design** 58:12
**designed** 8:12
12:10 58:2 162:23
206:23
**designing** 181:5
**detail** 31:15 198:10
**detailed** 34:9
126:18 200:20
**details** 72:21 132:5
134:22 152:7
154:12 157:20
161:14
**determination** 59:8
**determinations**
57:24
**determine** 30:11,24
125:14 149:3
180:14 185:10
**determined** 129:11
169:22 194:17,19
**develop** 42:14,17
55:22 64:1,4
201:14 208:16
222:5
**developed** 71:14
74:11 180:19
222:2
**developing** 55:24
117:14 159:25
192:2
**development** 92:25
93:24 98:24
105:23
**develops** 204:18
**devices** 174:2
**diab** 63:19,23 64:17
64:23 65:13
167:16 168:10
**diabs** 171:3,20
**diagram** 49:19,19
49:20 79:13
**diagrams** 48:19
49:18 77:22 142:1
215:16

**didnt** 16:13 20:14
36:24 37:12 77:20
117:21 164:14
167:4 170:14
173:7 175:12
187:12 193:8
201:2 210:5
218:20 228:18
233:9
**die** 149:18
**difference** 100:16
114:25 197:18,21
206:1
**differences** 137:25
238:9
**different** 8:10,15
11:10,12 12:3
46:11 48:19,21
49:25 50:1 58:7
68:20 83:15 98:14
110:13 112:8
129:25 135:5
137:4,16 140:14
140:16 141:15,20
148:1,2 153:9
156:25 158:20
159:16 162:8
163:10 170:25
176:10 191:8,25
203:4 205:2,13
206:5 207:4 215:2
215:4 231:22
**difficult** 189:5
200:9
**direct** 114:5 204:7
206:16 228:4
**directing** 135:18
206:12
**direction** 182:8
195:17,19 203:4
203:10 204:5
205:17,25 206:8
206:21 238:13
**directions** 32:1
182:4,14,21 183:7
183:16 184:10



195:2 207:10
227:16 228:1,7
**directly** 102:1
113:16
**disabilities** 6:21 8:6
51:11,13,17 56:10
85:13 113:4,23
114:1
**disability** 12:12
13:23 42:8 51:4
52:2 55:11 56:1
57:9,19 58:13
63:2 114:4 141:8
218:20 222:12
225:15,16
**disables** 212:3
**disagree** 121:14
**disagreeing** 121:11
**disbelieve** 169:8
**discern** 143:24
**discharge** 134:8
**discovered** 23:23
**discretion** 224:22
**discretionary**
224:16
**discussed** 139:10
139:11 175:1
176:25 216:2,13
217:24 222:17
**discussion** 111:16
169:17 170:6,19
**dispute** 130:22
**disrespect** 199:17
**disrupt** 176:11
**distance** 30:3 148:1
148:11,15 149:2,5
165:22 208:22
209:17,18 235:15
**distances** 136:21
147:20 148:20
**distill** 195:16
**distinct** 79:8
**distinction** 79:6
221:15
**distracted** 131:4,11
145:4 146:18

**distracting** 145:19
**distraction** 128:16
**distractions** 146:2
147:1
**distributed** 220:12
**district** 1:1,2 4:6,7
5:25 6:1 14:2,4
69:16,22
**districts** 69:22
**doctor** 99:10 197:7
224:6
**document** 6:25
34:4 41:10 75:10
75:15 87:21 92:11
93:19,21 95:12
110:21 112:7
127:3
**documented** 29:9
98:19
**documents** 3:11
7:10,18,22 33:9
47:16 63:24 91:19
92:4,16 112:4
113:1
**doesnt** 31:16 44:6
58:3 93:11 107:16
115:21 122:21
127:22 191:7
192:19,19 205:16
206:8,21
**dog** 166:9,14,16
209:1,18
**doing** 4:24 5:23
15:16 31:2,13,17
32:4 63:2 77:25
79:18 91:2 109:2
129:14 135:12,12
135:14 143:2
153:7 160:16
162:3 170:16
177:21 184:20
189:20 192:17
199:19 203:15
209:2 219:12
228:24 237:23
**dol** 224:25

**dont** 14:16,17
17:22 25:11 36:15
36:17 38:22 51:25
54:2 58:23 60:15
60:18 63:6 66:11
72:15,16 76:23
85:20,20 86:7
89:4,10,21,24
95:4 96:12,18
103:17,18 104:21
105:12 109:19
110:18,19,23
111:12 120:16
127:5,14,21 128:4
131:9 133:23
135:23,25 138:19
142:20 152:5,6
157:20,22 167:11
177:6 179:11
180:10,22 181:8,9
181:10 192:21
197:3 198:5 199:4
200:6 201:23
202:23 203:2
205:18 208:3,22
208:25 209:5
210:24 220:18,24
222:23 228:12
235:6,9 237:8
**door** 27:9
**dot** 60:25 61:3,11
88:3,5,8
**double** 146:3 185:1
195:21 197:25
**downhill** 184:16
**downshifting** 191:6
**drafting** 38:16
**draw** 79:12 141:21
**drawing** 141:18
**drift** 238:12
**drills** 49:16
**drive** 8:13 12:12,15
33:15 34:20 35:11
35:15 36:4 38:6
42:14 44:5 46:23
49:8 50:14 58:1

58:20 69:19 76:3
77:10 90:4 96:20
100:7 101:1 102:6
102:9 110:8,17
112:22 121:19
122:14,18 123:4,9
124:10 142:11
143:9 158:10
177:17 178:24
187:20 218:24
221:5
**driven** 46:4 69:9,10
186:22,24 187:2
199:14
**driver** 1:8 4:5 5:23
8:7 18:12 19:8
20:1 28:4,6 29:7
41:24 42:5 51:24
52:12 55:23 57:1
57:2 59:18,22
61:15 76:14 111:6
111:8,24,25 117:4
122:12,24 128:16
129:7,14 130:23
131:5 133:25
158:11 184:8,15
186:16,23 187:2
187:20,22 188:13
188:15 191:20
197:11,15,16,17
197:22 198:14,19
202:4 206:23
208:23 209:2
210:5 220:6,11
225:11 237:6
**drivers** 12:7,7
41:22 44:10 47:3
57:6 61:22 71:16
88:25 111:10
116:15,15 120:4
120:11,22,23
121:8,23 123:1,17
126:14,23 129:3
132:22 136:7,8,9
146:1 151:8
156:10 178:23

186:18 187:21
188:3 190:5 221:3
**driving** 6:14,15,18
6:22 11:5,8,21
12:3 15:8,10
16:18,24 17:7,11
19:12 23:10 24:1
24:15,20,23 26:5
26:23,25 27:24
28:15,19 34:25
41:19 42:10,10
43:7 44:7 46:7
47:18,20 48:6,25
49:7,10,23 51:9
51:20 54:7,15
57:12,21 58:10
60:13 66:22 67:7
67:12,13,15,17,19
67:20 68:22 69:3
70:7,15 71:16
79:12 82:4 87:1,9
89:17,19 93:4,9
95:9,25 96:2
99:22 101:9,10,11
101:19 102:13,17
103:6 112:10
122:4,12 125:24
131:4,11 138:1
140:9 145:4,7,10
145:11,14,15,19
145:21 146:8,19
147:1 151:16,22
154:3,18,24 158:4
165:4 171:4 184:4
197:12 198:19
220:7,12 221:18
224:12 229:24
230:7 231:6 232:6
232:7
**drove** 127:8,10,11
165:14
**ducktail** 207:8
**duly** 5:5 241:6
**duties** 62:4
**duty** 42:16 193:10
**dvd** 4:2 91:13,18



179:15,19 238:25
**dwell** 41:9
**dynamic** 158:11,22
182:19 216:8
**dynamics** 59:3
137:8,10,19 188:1
206:4,15 209:21
209:24
**dysfunction** 224:19

**E**
**e** 2:1,1 3:1 240:1,1
240:1 241:1,1
**earlier** 36:7 119:9
131:19 139:10
173:3,11 175:6
176:18 178:1
201:2 213:9
217:13 228:11
235:14
**easier** 78:9
**east** 2:4
**easy** 202:2 236:14
**educate** 43:7
**education** 41:12,13
41:22,24 42:5,19
43:19 44:1,10
47:7 55:23,25
61:23 62:10 68:9
69:17 165:14
**educational** 62:10
70:1
**effect** 114:18
156:13 211:22
**effected** 149:22
**effective** 33:13
34:19 35:10,14
75:22 76:1 77:9
110:6,16 112:21
177:15,19
**effectively** 142:10
143:8 168:11
169:19 178:24
208:15 223:12
**effort** 7:17 133:3
173:2

**egregious** 228:22
**eisenberg** 2:3 4:23
34:23 39:2 154:16
**either** 6:6 10:10
81:17 135:11
186:7 219:13
232:25
**elaborate** 79:2,20
**electronic** 77:20
**element** 142:10,19
142:25 187:22
195:6,13 196:11
**elements** 132:4
174:19 187:23
**eleven** 111:10
**email** 169:15 170:8
**emergency** 22:3
**emotionally** 146:11
**empirical** 104:9
**empirically** 105:24
**employed** 56:13
**employee** 55:15,19
**employees** 54:16
**empty** 226:16
227:3 236:5
**enable** 123:21
136:12
**enact** 152:16
**enacted** 152:24,25
**encompassed**
137:21
**encounter** 140:15
231:24
**encountering**
140:13,14
**endangering**
114:18
**endeavor** 10:8
**ended** 91:13
**ends** 179:15 238:25
**engage** 146:11
188:24
**engagement** 56:18
**engine** 166:10,18
**engines** 166:10
**english** 139:4 142:4

**enhanced** 93:15
102:11 104:18
151:15
**enter** 185:18 198:5
214:16
**entered** 149:1
203:2
**entering** 185:8
189:21 190:20
**enters** 184:17
**entire** 35:25 73:2
123:6 155:8
**entities** 68:11
**entitled** 33:13
34:18 75:22 94:19
95:15 97:5 110:6
112:8,21
**entity** 114:2,3,13
114:15 115:14
**entrance** 184:22
**entrances** 194:5
**entry** 54:25 56:5
92:20 97:2 110:15
116:6
**environment** 49:24
136:4 140:13
142:7 154:19,24
158:22 160:3
163:16 164:12
174:6 177:5
180:20 181:3
194:22 216:9
**epilepsy** 225:23
**equal** 113:11,17
**equals** 150:8,16
**equate** 101:25
**equating** 21:11
**equipment** 58:24
**equipped** 46:22
**equivalent** 42:2
**errata** 242:1
**error** 130:23 131:5
**especially** 82:5
**esq** 2:5,11,11
**essential** 142:10,14
174:13,24 175:8

175:14,19,21
177:13 208:10
217:19
**essentially** 75:25
82:21 139:19
140:1
**essentials** 175:3
**essex** 74:5,7,8
**establish** 8:22
**established** 221:6
**estimate** 25:5
**estimation** 30:9
**euclid** 57:4
**evaluate** 154:17
**event** 27:14 81:13
**events** 25:6
**eventual** 20:25
**everybody** 46:16
**evidence** 21:12
103:19 116:8,12
116:16 117:3
217:3 222:3
**exact** 12:21 35:9
38:22 66:11 73:6
82:22 110:17
112:13 137:2
149:4 162:7
209:17
**exactly** 22:12 33:1
38:9 42:3 52:8
56:16 64:12 69:24
70:20 79:16 87:4
89:10 95:4 102:3
158:13 164:8
169:12 180:17
181:4 195:14
196:1,8 205:23
213:2,5,15,18
214:6 229:6
232:15
**exam** 8:9 47:19,20
48:6,25 49:7
51:20 52:6,6,19
57:12,13 60:25
61:10 224:6
**examination** 1:16

3:2 5:8 224:11
**examinations** 75:4
**examine** 29:10
**examined** 5:6
**examiner** 49:7
144:10 224:17
**examiners** 131:15
131:24
**example** 81:3 184:2
**examples** 225:5
**exception** 59:16
**excessive** 212:4
**excessively** 211:8
212:20 213:13
**exclude** 114:3
**excluding** 64:3
**excuse** 230:22
**executive** 54:7,15
54:25 62:4
**exemption** 224:25
**exhibit** 3:7,8,9,10
7:1,4 34:5,7 39:15
63:15 64:8 75:13
75:16 84:11,20,21
87:22,24 92:7,17
92:19 93:20 94:15
95:13 97:1 109:16
110:1,24 111:1,2
111:4 112:2,6,12
113:8,9 116:6,21
139:12 176:19
179:7 217:9
**exhibits** 3:5,11
49:12 91:20 92:5
**exist** 33:21
**existed** 128:20
**exists** 164:23
**experience** 26:14
35:25 46:6,10,18
68:9,21 69:3 70:6
70:10 71:12 83:17
84:23 91:2,4
98:12 99:13
100:14 101:23
135:10,25 137:23
158:15 159:15,20



159:25 160:13,16
160:19 172:21
182:23 183:5
184:24 196:23
197:12 210:3
**experienced** 26:6
57:18 132:21
**experiences** 99:6
216:10
**experiencing** 32:22
**expert** 1:17 8:2,4
10:25 13:21 14:14
14:20 62:12,20
66:6,15,19 113:20
132:11 133:1
138:24 143:23,25
155:4 162:7,16
172:14 176:14
216:20
**expertise** 8:5 9:12
34:17 132:20
138:5,11
**experts** 21:6 66:7
**explain** 12:14 22:18
85:23 141:15
197:25 202:25
**explained** 137:14
211:25
**explanation** 153:11
211:2
**exponentially**
206:5
**expressly** 114:1
**extent** 18:7 55:20
98:24 114:12
228:21
**external** 92:12
**extrapolate** 107:13
125:1 133:4
156:24
**extrapolated** 163:8
170:1
**extrapolating**
106:5 180:9
**extrapolation**
160:12,15,18

170:3
**eye** 32:6,7 103:12
189:18 193:13,23
194:1,9
**eyes** 29:20 32:9
129:8,20 219:13

---
**F**
**f** 241:1
**facilitate** 176:12
**facility** 161:12
163:14 164:20,23
165:25 166:7
227:2
**fact** 23:16 30:12
33:20 60:2 66:8
125:8 130:24
150:20 156:7
190:5 206:15,19
218:23 228:16,19
236:4
**factor** 216:20
**factors** 58:18 188:2
**facts** 28:21 155:19
155:25 158:3
172:15
**fail** 89:17
**failed** 89:19 210:8
**failure** 233:7,17
**fair** 9:21 38:8,14
62:15 68:4 127:12
**fairly** 62:9 184:16
**familiar** 53:21
74:10 75:3 77:4
88:20 90:3 131:23
132:2 134:15
136:17 137:4,7
139:8 164:22
165:16 166:9
234:16,19 236:16
236:24
**familiarity** 74:19
133:20 147:10
234:25 235:7,10
**family** 18:19,20
**far** 31:19 39:11

163:5
**farther** 148:19
**fashion** 142:24
**fast** 31:19
**faster** 98:15
**fatal** 149:15
**fault** 22:13,13,15
23:2,3,5,12,21,22
24:3,3
**favor** 218:19,25
222:13
**feasible** 208:9
**federal** 12:1 13:2
13:24 14:1 15:17
24:22 60:21 70:11
71:1,13 72:8,17
116:7 124:14
126:11,20 128:14
138:7 147:16,16
152:8,13,17
153:12,16,20,25
156:11 158:5
159:5 169:17
170:7,20,23
184:17
**fee** 39:19,20,25
40:11
**feel** 92:9 99:19
117:16,19 153:2
154:14 160:2,7
192:9 228:12
**feeling** 90:21
144:21
**felt** 11:22,24 29:5
30:4,6 119:1
170:12 195:5
218:24 222:11
**fender** 26:2
**field** 100:19 103:15
103:20,22 138:12
**fifth** 94:11,16
196:20
**fifty** 181:12
**figure** 58:4 227:9
**file** 27:25 63:18
64:16

**filed** 64:22
**final** 116:6
**finally** 10:6 116:4
**find** 119:2 125:20
127:23 149:2
170:11 171:13
**finding** 22:23 23:4
23:8 222:4
**findings** 121:7
**finds** 94:5 97:6
219:20
**fine** 37:13
**finish** 10:7 19:5
105:17 107:11
192:16 199:23
200:7 201:12
214:14 226:11
**finished** 195:11
**firm** 4:23 5:20 7:15
12:13 39:2
**first** 5:5 8:23 15:12
16:13 42:23 47:23
71:6 82:17 84:5,6
84:21 92:20
168:23 172:11,12
180:15 181:23,25
183:22 225:21
227:9 232:5
**firsthand** 164:17
224:3
**five** 87:19 172:16
179:5
**fixed** 39:18,20,24
**fl** 1:11 2:4,9
**fleet** 164:19
**floor** 211:20
**flooring** 212:1
**flow** 194:16
**fly** 91:7
**focus** 154:22
**focused** 223:7
**focusing** 130:5
228:6
**follow** 92:15 185:12
**followed** 37:5
182:14

**following** 41:19
184:19 185:1,2,13
185:21,24 186:4,5
199:12,16 220:14
230:7
**follows** 5:7
**followup** 10:10
36:6 52:15
**foot** 164:22 207:22
210:16
**forbids** 135:24
**force** 137:3 204:5
236:2
**foregoing** 241:7
**foreseen** 23:18
**forgot** 66:13
**form** 25:9 35:18
36:14 37:16,20
61:2 62:14,24
65:6,22 68:24
69:7 70:18 71:18
71:21 72:12,25
73:5 74:3,17,25
75:8 76:5 80:23
83:3,20 85:18
90:14 96:16,23
97:23 98:6 99:3
100:1,10 101:4,21
104:12,18,20
105:21 107:21
108:9,19 109:11
114:8,21 115:6,19
116:2 117:9 118:8
118:24 120:13
121:1,13 122:1,7
122:16 123:11
124:23 125:19
126:8 127:3 128:6
129:6 131:2 132:1
132:9,17,25 133:7
133:13 134:4,10
134:19 135:2,8
136:24 138:10,18
139:7 142:13,23
143:13,21 144:3
145:9,23 146:5,14



147:4,24 148:8
150:11,19 151:2
151:20 152:3,12
152:20 155:14
156:5,15,20 157:3
157:9 158:8,18
159:14,23 160:10
161:6 162:5 163:1
167:7 172:23
177:23 178:9,14
193:6 197:20
200:25 201:9,19
202:1,21 215:21
218:16 223:14
225:2 230:3,18
231:12 234:1,6
236:8,22
**formal** 44:21
**formations** 189:13
**formula** 148:15,23
149:1
**forth** 39:23 213:6,6
219:11 241:6
**forty** 181:12
**fortysome** 25:13
**forward** 89:16
172:5
**found** 22:13,13
23:2,3 124:5
150:8 170:22
217:4 218:8 223:1
**four** 9:3 10:21 15:2
16:23 29:20 165:2
172:16 224:21
**fourlane** 230:11,15
230:23 231:10
232:15
**fourth** 110:15
**free** 92:9 154:14
176:6
**freely** 194:16
**freeway** 187:24
189:16
**freewheeling**
185:24 186:11
189:25 190:1

192:7 195:24
200:15 212:19
**freight** 165:23
**frequently** 131:5
199:8,10
**friction** 236:1
**frilando** 1:5 4:4,22
5:25 34:24 63:20
63:23 64:18,24
65:13 106:15,18
167:5,17,25 168:9
169:15
**frilandos** 107:1,5
**front** 41:10 75:17
92:14,16 109:21
127:4,16 168:24
169:9 186:7,9
190:24 192:23
**full** 6:5,8 40:10
145:6,21
**fullservice** 6:19
**fully** 9:6 10:9,18
14:24 32:23,25
60:4,12 125:5
222:19 235:16
236:6
**functions** 224:13
**fundamental**
115:16
**further** 238:16,21
241:9

---
**G**
**g** 240:1
**gas** 210:23
**gauges** 145:12
**gdl** 43:5,20 55:8
**gear** 90:21 185:24
187:9,10,11
190:11,12 191:3,4
191:12,13 192:10
192:12,25 195:8
195:20,24,25
196:1,4,8,12,17
196:20 197:24,25
210:21,22 212:11

**gears** 60:6 184:24
185:21 186:10
187:4 188:10
189:23 190:15,17
191:10 192:7
195:9,17 196:24
197:8 199:8
200:15 213:3,5,19
**general** 95:5,21
98:1 104:10
117:11 140:19
147:25 148:3,9,10
148:19 151:7
154:3 158:22
162:11 163:11
169:5 171:17
176:3 188:1,6
210:10 224:9
234:7,9
**generalities** 164:7
235:14 236:2
**generalize** 120:17
120:23
**generalized** 120:15
121:6
**generally** 20:18
44:20 46:5 54:13
62:3 88:22,23
95:22 98:2 113:25
117:2 127:24
134:14 162:19
165:2 188:5
224:14,15
**gentleman** 32:20
132:12 168:21
**getting** 90:19,24
134:17 170:13,25
178:4 183:11
209:7,7
**give** 10:3 13:4 25:5
44:3 58:14 59:1
139:19 142:16
171:24 182:20
183:7,24 184:2,3
186:11 187:14
189:3,10 192:6

196:9 199:20
213:17 227:16
236:13 238:8
**given** 10:22 75:15
125:22 144:9,14
183:16 196:4
208:5 215:10
233:2 240:8 241:8
**giving** 10:19 182:4
183:13 189:15
191:18 192:5
196:17 209:24
213:6 228:1,7
**gleaned** 162:15
**go** 9:5 10:10 22:6,7
41:8 42:23 44:7
47:25 48:4,20
49:8,8 50:13 55:5
61:10 63:16 73:8
79:14,24,25 80:17
81:4 85:10 86:20
87:6,15 88:16
89:5 90:11 91:9
91:11 95:12 97:13
103:10 105:22
109:12 111:12
116:20 119:19
127:22 140:11,14
140:24,25 141:13
142:21 143:1
154:7,21 161:1
162:9 168:5
169:12 171:6
172:25 173:14
174:5 176:4 177:8
180:15 181:4,14
182:10 183:3,14
183:15,25 191:15
191:17 192:1
194:24 202:4,25
205:25 206:21
208:19 211:16,18
212:16 216:19
225:19 228:14
231:15 232:25
**god** 23:20

**goes** 9:11 77:1
85:23 118:9
134:16 170:23
201:1 218:17
219:19 220:5,20
221:1,14 228:11
**going** 6:24 29:25
30:5 31:14,20
34:4 38:5 41:2
50:18 63:10 75:10
79:17 81:2,15
84:20 87:20 88:13
88:24 89:15
103:19 105:2
119:23 139:21
140:1,10,11,12,20
140:21,24,25
141:16 142:25
148:11 150:22
154:11,15 163:12
171:23 173:14
174:12 176:4
183:6,21 184:11
186:8 187:16
188:4 189:2,4,10
189:14 191:15,21
194:4 196:14
198:14,16 199:22
200:12,12 201:24
202:5 203:3,16
205:17 206:15
209:20 219:8
226:1 231:24,25
**good** 5:17,18 6:1
15:25 86:2 91:22
91:23 99:18
142:19 183:9
**govern** 70:13
**governing** 131:22
**government** 13:2
24:21 68:10
152:13
**grab** 209:19 211:17
**grabbing** 215:4
**graduated** 41:16
**graduating** 43:5,8



**graduation** 41:20
**gravel** 21:9
**great** 142:15 199:5
   199:5
**greater** 125:4,10
   128:1 129:4
   148:12
**green** 30:2,6
**ground** 8:22 9:5
   57:15 91:25
**group** 92:4 107:11
**guarantee** 199:24
**guess** 6:14 25:10
   35:9 77:19 106:1
   145:24 151:3
   152:4 155:16,19
   167:2 177:24
   228:20 232:10
   234:21
**guidance** 169:2,19
**guide** 45:13
**guns** 87:17

———————
**H**

**hadnt** 164:17
**half** 146:2
**haller** 2:11 3:3 4:18
   4:19 5:9,20 43:15
   52:15,23 73:8
   91:9 111:12
   179:11 226:1,4
   233:10,22 238:22
**hammrick** 67:23
   67:25 68:3 162:17
**hand** 77:18 81:20
   82:25 83:8,8
   85:25 108:21
   109:13,13 174:14
   174:25 175:4
   177:8,12 178:25
   179:6,22 180:1
   183:6 184:7
   190:11 192:11
   201:4 211:10
   213:10,23 214:4
   214:18 215:3

217:22 218:3,12
218:21 219:21
220:8,11,21 221:2
221:20 222:2
223:11 228:23
237:11
**handle** 140:16
   141:5 189:15
   231:25 232:3
**handled** 190:3
**handling** 207:19
**hands** 145:2 219:15
**happen** 213:16
   227:22,24
**happened** 20:4
   23:19 26:15 80:17
   87:5 214:3 228:17
**happening** 26:3
   163:10 193:21
   195:16 198:16
**happens** 103:7
   137:11 186:2
   199:8,9 205:5
   214:2
**hard** 76:25 77:1
   105:13
**havent** 68:21 69:3
   70:6 100:4 106:23
   128:8 131:21
   175:1 176:25
   185:3 194:19
   199:9 200:21
   205:22 206:25
   215:7 216:14
**hazard** 169:4 203:9
   204:18
**hazy** 183:23
**head** 27:9 32:5,15
   86:9 109:1 194:9
   196:13,22 232:2
**health** 56:8,14,20
   59:14 114:5,18
**hear** 124:1,18
   125:5 146:23
   184:20
**heard** 5:19 37:11

**hearing** 16:12
   81:20,24 82:3,14
   82:25 83:12 92:23
   94:4 97:6 98:15
   99:6 100:15 102:7
   103:4,10,24 104:5
   104:17 105:1,13
   105:14 116:16
   117:6 126:22,25
   128:3 173:25
   174:3 176:9,11,12
   176:13 188:8
   199:25 200:2,11
   233:6,16
**heart** 60:22
**heavier** 148:16
**heavy** 184:18 236:1
**heights** 5:16 6:10
   6:15,18 16:18,24
   23:10 24:1,20
   26:5 27:23 28:19
   42:10 54:7,15
   112:10 220:7
**held** 1:18 111:17
   122:25
**help** 57:23 111:21
   174:3 211:24
   234:23
**helped** 57:2,13
**helpful** 78:3
**helping** 30:5
   55:22
**hereinbefore** 241:6
**hes** 170:9 189:25
**high** 69:13 150:4
   163:19 166:17
   186:9 190:20
**higher** 149:23,25
   191:9
**highly** 43:5
**highway** 184:17,22
   185:8,11 191:1
   192:24 194:6
   198:4 199:11
   212:20 213:14,23
   214:17 230:23

**highways** 151:6,11
**hill** 17:12 19:17
   20:2,12 21:8
**hired** 12:13 51:5
   55:5,9 69:16
**history** 26:9 62:11
   123:13 219:2
   225:22
**hit** 17:12 18:14
   198:6 203:3
**hold** 22:1 63:7
   119:22 122:11
**holder** 117:4 120:4
   122:24
**holders** 120:21
**holding** 146:21
**home** 6:6 19:13,15
**hospital** 57:4
**host** 57:10 58:12
**hour** 39:19 45:3
   81:15
**hours** 42:1,4 43:23
   44:12,13,13,17,21
   45:1,8,10,11,16
   45:21 46:12,19,24
   47:2,10,11,11,11
   47:12 52:1,4
**house** 166:9,15,16
   209:1,18
**housed** 76:24
**huge** 19:10 206:1
**hypothetical**
   187:13 188:13,22
   189:3,10,22
   190:13 191:19
   192:18 195:23
   196:21 199:13
   206:14 212:16
   213:4 214:12
**hypotheticals**
   187:15 216:14

———————
**I**

**ice** 21:11,11
**id** 8:20,22 20:20
   25:13 41:8 42:20

113:7 121:3 128:9
**idea** 37:24 44:3
   47:9 72:4 128:22
   132:10,18 139:20
   140:19 159:7
   162:12 163:11
   170:17 181:12
   208:15 209:14
   210:10
**identical** 238:15
**identification** 3:6
   7:4 34:7 75:13
   87:24 91:21
**identified** 65:12
   118:4 176:19
**identify** 92:10
**identifying** 50:19
**ill** 9:14,17,17,20
   70:21 111:2
   112:16 116:3
   120:16 142:16
   157:19 209:4
   221:24 233:14
   238:8
**illegal** 135:22
**illegally** 12:2
**im** 4:24 5:20,21
   6:13,24 8:7 9:23
   12:21 13:7,9
   16:21 19:6 23:6
   25:21 30:23 31:14
   34:4 37:21 39:16
   40:11,16 41:2
   46:2 49:13,15
   55:17 63:10,16
   66:20 67:1,9 71:9
   71:25 72:17,20
   75:10 81:11 82:18
   84:2 87:20 88:13
   88:20 90:5,7
   92:10 96:7,8 99:9
   100:19 101:5,11
   101:15 102:4,23
   106:9 107:4,25
   109:23 110:25
   114:22,25 115:12



118:12,17 119:23
121:2 124:10
126:15 127:14,17
127:18,23 137:2,4
137:7 138:23
146:6,22 149:24
154:11,15 157:4
157:16 159:24
160:20 165:5
166:6 167:15,21
168:20,25 169:14
170:9 172:2
173:14,24 183:4
184:13,15,15,21
185:2,7,7,13,20
185:23 186:5,18
187:3,12,12,15
188:3,8,12,13,14
188:24 189:4,5,18
190:17,22 191:19
194:12 196:15
198:20 199:6
200:1,18 202:8
203:14,16 204:13
204:23 205:12
208:19 213:11
214:6,11 218:10
219:5,8,24 220:1
222:25 223:6,7,17
226:1 231:13
232:4,10 234:16
234:16,21,23,24
235:6 236:23
238:14
**imaginary** 232:20
232:22 233:4
**imagine** 204:25
205:7 230:10
232:14,17
**immediate** 203:18
**immediately** 17:15
21:23
**impact** 99:22 100:7
125:16
**impacts** 102:12
**impaired** 103:4

126:22,25 127:1
**impairment** 103:24
104:17 105:14
128:3
**impairments** 117:6
**impediment** 208:25
**impertinent** 127:21
**implant** 83:23
176:9
**implants** 82:9
**implication** 83:5
**implications** 123:7
**importance** 134:7
233:6,16
**important** 10:3
64:10 142:16
175:13 177:1
214:23 226:15
234:3
**imposes** 152:8
**improper** 231:20
**improve** 28:23
**improved** 105:19
**inappropriate**
23:15 228:5
**incident** 26:15,17
27:17 28:18
**include** 67:17
155:20
**included** 49:16
63:9 64:4 220:14
**includes** 173:20
**including** 144:20
146:17 154:1
184:18 209:2
**incorporated** 6:16
**incorrect** 22:21
**increase** 129:12
153:5
**increased** 117:7
130:14 151:7
153:2,4,10 216:22
**increases** 129:22
146:18
**indiana** 42:25 43:2
43:9

**indicate** 220:21
**indicating** 203:22
**individual** 61:9
106:12 114:4
141:12 197:5
221:5
**individualized**
105:8
**individuals** 68:11
114:3 117:6 123:8
128:2
**industry** 91:6 207:5
**influence** 234:14,25
**inform** 126:5
**information** 88:12
129:9 170:13
235:4
**initial** 48:7
**injured** 27:6,13
150:23
**injury** 18:9 27:1,10
32:15,22 149:18
150:8
**inside** 70:3 135:18
191:22 193:25
**insisted** 86:22
**inspection** 134:2,15
138:22 139:1
**instance** 14:19
130:4 192:5
**instruct** 46:9,12
51:9 81:25 83:14
**instructed** 42:13
136:6 215:9
**instructing** 109:12
183:20 217:25
**instruction** 44:14
45:17,22 46:13
47:12 48:2,4 52:4
55:13 136:3
174:16 187:3
208:5 233:2
**instructional** 178:3
178:5 182:11
**instructions** 130:7
144:9,13 183:14

186:12 199:6
220:14
**instructor** 6:14
18:1,13 20:7,8,15
21:13,21 22:24,25
23:1,3,10,14 24:2
27:5,8 28:2,24
29:2,5,11,19
30:19,25 31:12,16
31:24 32:3,14
41:19 42:10 45:1
46:15 61:18 80:16
80:19 81:6,18
108:3,5,16 109:6
109:8 135:12
139:21 140:7,18
155:18 165:23
166:11 169:4
175:23 192:19,24
193:8,9,10,17,19
193:22 194:1,9
195:25 196:3,7
198:22 199:18
203:13,22 204:6
204:11,23 205:8
205:11,20 206:13
206:20 207:2,15
208:23 209:7,10
212:2,23 213:7
214:18 215:11
216:4 227:15
228:1 229:9,12
230:9,21,25 231:5
232:12
**instructors** 18:5
29:23 51:4,7 55:9
108:6 204:25
205:2,14,16 208:1
**instrument** 89:5,23
89:24,25
**insurance** 28:1,8,10
**intended** 57:23
93:14 156:24
**intense** 146:11
**interested** 63:12
241:12

**interior** 165:19
**internal** 25:7
**interpretation**
115:7 171:21
**interpreter** 84:24
85:25 86:23 87:7
87:13 108:2 139:4
141:25 142:6
168:4 171:12
**interpreters** 85:22
107:18,22 177:21
**interrupted** 10:14
**intersection** 26:20
29:12 30:3,8 31:1
31:10 79:13 80:16
81:5 184:5 232:13
**intersections** 31:7
81:4
**interstate** 71:19
**intervene** 228:22
**interview** 30:17
**investigation** 28:17
29:2 30:24
**invisible** 215:3
**invoice** 39:16,18
**involve** 49:2 51:15
61:21 120:20
124:17
**involved** 11:19 12:4
15:8,20 17:11
26:11 40:9 51:22
53:14,16,20 54:1
55:20 56:9,23
61:22 109:4
116:17 120:10
125:3 135:5
138:14 155:11
161:21 182:20
191:10
**involvement** 16:23
162:17 216:22
217:14 223:25
**involves** 48:8 81:12
101:17 149:15
164:10
**involving** 11:5



15:23 18:3 26:4
128:16
**isnt** 59:1 109:22
155:15 200:8
206:16
**issue** 59:5 96:6
171:4
**issued** 7:7 65:24
77:11 82:23
126:12 131:16
162:16
**issues** 95:8 96:2
97:19 102:12
125:3,23 134:1
**issuing** 59:7
**item** 94:16
**items** 64:19,25
116:4
**ive** 8:9,11 34:11
50:25 63:4,18
65:17 75:15
104:24 109:15
161:24 165:13
217:3,17 226:22
233:2

———————
**J**

**jackknife** 236:20
**jersey** 1:2 4:7 6:1
50:6 163:21
171:25
**job** 21:22 46:24
58:4,5,9 205:6,16
**john** 2:11 4:19 5:22
63:19,23 64:17,23
65:13 167:16
168:10
**joi** 1:19 4:14 241:2
241:16
**joseph** 63:20,23
64:17,24 65:13
107:5 167:17
169:15
**judge** 36:19 40:25
41:1 218:18 219:3
220:17,23 222:8

223:15
**judgment** 40:20,22
40:23
**july** 1:13 4:8 240:4
**jury** 22:12 23:2,6
23:11 24:11 40:20
40:25

———————
**K**

**k** 240:1
**keel** 137:17
**keep** 24:25 25:2
58:6,10 202:5
214:12
**kenneth** 1:5 4:4,22
34:24 106:14,18
107:1 167:5
**key** 163:13 182:7
**kill** 201:24 202:6,11
202:18
**kind** 8:4 11:7 19:4
19:7 27:16 41:8
50:11,14 56:9
57:18 60:13 69:24
79:24 104:7,9
109:4 112:7
117:17,24 123:12
126:2 140:24
147:21 163:16
164:5,6 166:17
173:6 184:22
194:24 208:10
228:10 233:18
**kinds** 25:6 106:11
152:9 225:14
**knew** 50:12 63:7
122:14,18 123:4
164:6 198:14
**know** 11:18 17:21
17:22 20:18 30:19
32:2,3,21,24 33:1
36:19 42:1 48:14
49:4 50:2,4,6,9,10
51:25 53:15,19
54:2 56:16 59:25
60:15,17,18,21

61:7,9 65:23
66:11,21,24 71:23
72:2,6,21 73:6,15
73:22 76:25 95:4
100:22 103:12,18
109:25 114:23
121:5 127:6,14,18
128:11 132:3
133:15,17 134:22
142:17 144:13
145:1 147:6
148:19 149:3,4,21
150:1 151:9 152:5
152:6,6,7,7
157:14,20,22
161:17,21 162:2,9
162:10,11,12
163:16 164:8
165:6,12,12 166:2
166:14 167:2,15
168:24,25 169:11
170:5 175:24
180:10 181:3,8,9
181:10 184:10
187:15,23,23,25
188:5,16,25
191:16 192:19,20
192:21,23 193:2,8
193:10,16,16
195:20 196:1,3
197:3 198:2 199:9
199:14,18 204:19
205:15 206:15,20
208:22,25 209:5
210:5 212:14
213:2,5,18 214:1
218:11,17 231:1,5
233:5,15 234:3,4
234:9,13 237:8,11
237:14
**knowing** 48:1
63:13 198:23
**knowledge** 9:7 48:9
71:4 95:6 106:20
132:15 133:24
134:6 138:13

143:17 144:8
147:19,25 148:3
162:21 163:13,23
164:2 165:21
176:14 188:4,18
188:20 189:21
190:4 198:21
222:20 224:1,3,9
226:23 237:5,16
237:21
**known** 19:10 53:8
**knows** 187:20
196:7

———————
**L**

**l** 240:1
**laid** 217:20
**lane** 180:6 203:7
**lanes** 184:17
220:16
**language** 86:1
107:17,22 108:2,7
108:14,17 109:5,9
141:24 177:20
**large** 17:21 26:20
30:2 69:4,10
70:15 136:25
137:5,15,17
147:11,13,20
148:4,20 149:15
149:19 150:3
151:5,16 153:12
176:15,16 184:18
184:23 186:3
202:17 226:16
235:8,11 236:4
**larger** 31:7 69:18
70:2 150:21 153:3
235:15,25
**late** 209:12,13
223:20,25
**laterally** 203:7
**law** 5:20 7:15 12:13
39:2 43:5,8,20
44:6,9 46:19
72:17 114:9

135:24 153:20
216:6 235:20,23
**laws** 48:2 50:5
131:22 139:9
153:18 188:1,17
188:19 198:22
**lawsuit** 7:24 10:25
11:7 17:9,10
18:18,22 20:4,10
27:17
**lawsuits** 11:14
27:18
**lawyers** 13:20
**layout** 139:25
**lead** 58:18 125:13
137:17
**leading** 59:6
**leaks** 147:6
**leaning** 209:18
**learn** 47:8 89:3,20
89:24 91:1 100:7
100:8 101:1
128:25 129:10,18
130:10 180:16
184:21 191:25
236:3
**learning** 123:8
189:9
**leave** 204:19
**left** 29:24,24,25
30:13,13 60:3
180:4 184:7,9,11
185:9 186:7,10
194:7 220:15
**lefthand** 185:10
193:24 213:21
**legal** 1:24 2:15 4:13
4:15 16:23 28:9
112:9 113:20
**legally** 115:11,12
**lesson** 19:15 31:5
78:24 140:2,8
175:24 176:20
182:10,12
**lessons** 31:11
140:20



MAGNA ▶
LEGAL SERVICES

**level** 82:13 153:16
169:18 170:7,20
**levels** 8:11 176:15
**lexington** 1:11 4:10
**liability** 18:23
22:12,23
**license** 43:5,8,20,22
48:8 53:18 58:1
58:16 61:5 68:6
68:15,17,21 74:23
117:4 120:21
121:18 122:24
123:1 124:21
133:25 134:17,25
138:16 155:12
156:11 158:6
161:4 180:13
186:18 187:21
190:6
**licensed** 120:4
123:16 124:5
125:10 136:7,8,9
198:18 202:3
210:6
**licenses** 68:12
122:12,14,18
147:22 224:2
**licensing** 57:24
58:3 70:13
**life** 91:4
**lifeflighted** 18:16
**lifted** 113:16
**light** 21:9 26:21
29:8 30:2 87:15
184:6,6,11,12
**lighter** 150:16,17
**lightly** 235:19
236:11
**limb** 224:17
**limitations** 205:19
**limited** 4:24 83:16
215:10
**limits** 140:12
**linden** 163:4,14
164:20 165:24
**line** 17:16 20:20

34:1 183:21
201:15 242:1
**liners** 165:23
**linking** 122:8
**lip** 141:5 219:10
**list** 16:20 42:19
94:16 95:15 97:2
110:15 112:3
135:4 172:15,20
**listed** 7:19 16:17
64:19,25 84:10
93:21 94:3,16
95:14 116:5 216:3
**listened** 217:17
**listening** 130:7
144:20 219:24
**literally** 194:4
**litigation** 36:12
92:13
**little** 17:16 20:21
32:19 50:10,17
68:19 77:5 78:2
79:22 83:13 87:16
102:4 107:25
169:18 188:7
214:5
**lived** 19:17
**living** 189:7
**llc** 1:8 4:5 5:23
**llp** 1:11 2:3,8 4:12
34:24 154:17
**loaded** 150:24
235:17,19 236:6
236:12
**located** 163:5
**location** 21:17
163:4 232:19
**lock** 236:14
**logan** 2:9
**logbook** 45:20
**logged** 25:6
**long** 26:11 32:24
40:1 66:12 108:22
161:17 197:13
219:14
**longer** 52:10

235:18 236:5
**look** 28:21 30:10
85:21 96:25 105:7
110:23 117:12,22
118:14 126:3
167:13 177:24
180:6 184:9,10
185:9 186:14
202:7 213:22
220:16
**looked** 29:6,24,24
127:10 173:3
187:7
**looking** 16:21
31:12 32:10 49:9
51:1 79:16 84:2
103:13 110:25
129:20,24 130:11
130:18 144:20
167:9 169:14
170:11 189:16
193:11,14 198:24
198:25 204:24
205:3,23 214:16
**looks** 17:6 99:21
123:7
**loss** 224:17
**lot** 45:25 47:8 63:4
78:9 82:9 83:12
137:9,19 172:4
212:17 226:16
227:3
**lots** 44:4 226:13
**loudly** 78:2
**louisiana** 51:5,8
**love** 47:8
**lower** 81:19
**lunch** 91:24
**luncheon** 91:14
**lung** 27:12 32:16

— M —
**m** 1:14 53:1,4 73:11
73:14 91:12,17
111:15,19 149:10
149:13 179:14,18

226:7,10 238:24
239:2 240:1
**magna** 1:24 2:15
4:13,14
**magnals** 1:25
**main** 24:5,7 171:22
187:4 218:3
**maintain** 205:15
**major** 60:20 184:17
213:14
**making** 85:25
186:23 204:15
206:14 237:18
**manage** 227:9
**managed** 227:7
**mandatory** 44:10
45:21
**maneuver** 196:24
228:2,5,6,8,13,15
228:17 237:12
**maneuverability**
49:11,13,17
**maneuvering** 206:2
**maneuvers** 135:14
164:3 226:21
227:2 237:19,24
**manner** 23:12 24:2
46:9,11 56:7 60:1
62:20 115:16
158:11 200:13
**manual** 63:8
131:15,24 144:24
147:11 186:22,24
187:1 191:8
**map** 140:23
**mark** 34:5 75:11
87:21
**marked** 6:25 7:3
34:6,12 38:13
75:12,16 87:23
91:20 92:4 109:16
110:1,24
**marriage** 241:11
**mass** 150:15,25
**material** 172:4
**materials** 33:21

65:11 66:2 99:15
**matter** 4:4 205:4
241:12
**mean** 19:21 26:1
32:17 35:3 45:11
49:3 66:15 74:5
78:17,18 81:23
82:11 89:12 90:5
105:12 106:9
112:19 115:3
127:21 143:15
164:3 166:14
172:3 176:7
195:11,22 211:2
211:12,13 215:1
219:6 226:24
232:11 235:24
237:3
**meaning** 203:5
228:3
**means** 108:15
115:4,10 145:11
152:5 177:21
195:24 237:9
**meant** 176:21
**measures** 212:21
213:11
**median** 20:23
21:14
**medical** 57:18
60:25 61:10 224:2
224:5,10,17,23
**medically** 10:18
**meet** 158:4
**meeting** 86:21
**member** 61:14 77:2
**members** 66:21
162:18
**mention** 93:11
96:13
**mentioned** 45:22
49:1 163:25
164:24 169:11
217:14
**merge** 187:24
213:20



**merging** 189:16
**merit** 168:15
**message** 168:9
**messages** 146:17,25
**met** 106:14
**method** 208:16
**methods** 155:24
  159:25 229:19
**middle** 228:3
**miles** 127:7,11
  204:23
**mills** 5:15 6:10
**mine** 198:17
**minimal** 187:6
**minimally** 118:5,22
  119:11 120:3,9
  124:15
**minimum** 72:7
**minor** 25:17
**minute** 52:14 73:9
  88:16 96:18 107:4
  157:16
**minutes** 87:19
  179:5
**mirror** 32:6 86:8
  103:12 165:19
  185:10 189:17,18
  193:13,23,24
  213:22 214:16
**mirrors** 32:7 165:7
  165:9,12,13,15
  206:23
**missed** 28:24
**missing** 77:19
**mixed** 46:8 94:13
  151:10
**mixing** 172:2
**mobile** 58:6 69:17
  70:1,3 71:23
  165:14
**moderate** 118:11
  118:17,18 119:1
**moment** 81:14
  193:19 195:7
  196:5
**momentarily** 129:2

**money** 28:15
**monitor** 129:21
**monitored** 45:19
**months** 38:25
  43:24 44:1,3,15
  44:25
**morning** 5:17,18
  6:2
**motion** 36:11 236:1
**motor** 53:16 69:4
  70:12,24 71:7,15
  72:6,9 73:20,23
  73:25 74:12,14
  95:9 96:1,3,13,20
  97:19,20 116:7,17
  120:18,21 123:24
  124:3,7,14 125:8
  125:15 126:5,11
  126:20 128:15
  129:1 130:25
  131:6,17 138:8
  146:3 147:16
  153:13,17,18
  156:2,10 157:21
  159:3,10 161:2
  164:19 169:5
  171:6 176:16
  184:13 212:24
  215:9 216:16
  217:5 223:10
  231:15 233:7,17
  235:2
**motorcycles** 53:13
**motorcyclist** 186:1
  192:20 198:3
  199:11,16
**motoring** 169:20
**motorized** 53:14
**move** 203:4,9,22
  204:4,20
**movement** 194:2
  194:10 203:8
**movements** 215:18
**moves** 90:20
**moving** 22:4 78:19
  78:20,21 80:7

85:19 107:18
  109:6 172:5 178:3
  201:11 203:7
  216:9 219:11
  231:25
**multiplechoice**
  48:16,23,24

———————————

**N**

**n** 1:12 2:1,4 3:1
  240:1,1
**name** 5:10,19 6:6,8
  14:7,8,11 52:11
  67:20
**national** 224:7
**naturally** 202:15
**nature** 57:8 60:23
  136:22
**navigation** 130:5
**necessarily** 41:9
  102:9 105:15
  199:15 206:9
**necessary** 142:18
  142:18 143:9
  180:24 200:17
  201:5 207:14,21
  207:23 210:8,9
  222:7 229:18
**need** 47:16 53:17
  69:2 74:23 76:12
  81:20 90:11 105:7
  122:20 124:21
  157:4 180:20
  189:13 190:8,9,12
  191:11 192:1
  193:1,1,3 194:23
  195:9 196:11,19
  199:3 202:18
  211:8,15 212:7
  213:3,10,18
  214:20 226:14
**needed** 40:5 81:9
  81:21 83:1,9
  86:22 152:16
  168:1 181:4
  195:13

**needs** 48:20 80:19
  207:6 209:10
  214:2
**negligent** 20:7,7,8
**neither** 221:10
**net** 24:18
**neurologists** 57:10
**neutral** 210:21,22
  211:1,3,9,21,23
**never** 44:8 47:2
  55:18 68:8 87:3
  88:4 157:23
  182:11 186:21
  196:14 211:16
  219:17 220:24
  221:4 226:22
**new** 1:2,12,21 2:4
  4:7,10,11 5:6 6:1
  15:15,18 43:8
  46:4 50:2,5,6
  55:23 58:7 94:5
  97:6 163:21
  171:25,25 188:7
  241:4
**newest** 90:15
**news** 76:13,24
**newspapers** 63:5
**nice** 142:17
**night** 45:17
**nine** 179:6 180:3,11
  201:2 222:2
  224:16
**nodrive** 58:14 59:5
  59:7
**noise** 176:6,15
**nonhearing** 127:1
**nonimpaired**
  126:23
**normally** 30:7
  187:24
**north** 2:9
**northern** 14:5
  54:22
**nose** 18:13
**notary** 1:20 5:5
  45:18 240:20

241:3
**note** 78:23 79:3,10
  80:4,9 129:11
  139:13,14,16
  140:1 174:15
  175:5 176:21
  177:3
**notebook** 174:25
**noted** 239:2
**notes** 219:10,16
  220:9
**notice** 7:8
**noticeable** 124:6
**noticing** 100:15
**notwithstanding**
  218:8
**novice** 31:9 46:17
  46:21 184:15
  186:17 197:16,17
  197:22 225:10
  237:6
**nuisance** 81:6
**number** 4:2 58:5
  91:13,18 112:3
  126:24 164:10
  179:15,19 215:1
  239:1

———————————

**O**

**o** 240:1
**oath** 10:19 98:23
  157:20 210:13
  240:4,7
**object** 129:16 137:5
  137:18 202:8
  235:25
**objected** 36:19
  37:18,23
**objection** 25:8
  35:17 36:13 37:15
  37:19 61:1 62:13
  62:23 65:5,21
  68:23 69:6 70:17
  71:17,20 72:11,24
  73:4 74:2,16,24
  75:7 76:4 80:22



83:2,19 85:17
90:13 96:15,22
97:22 98:5 99:2
99:25 100:9 101:3
101:20 104:11,19
105:20 107:20
108:8,18 109:10
114:7,20 115:5,18
116:1 117:8 118:7
118:23 120:12,25
121:12,25 122:6
122:15 123:10
124:22 125:18
126:7 127:2 128:5
129:5 131:1,25
132:8,16,24 133:6
133:12 134:3,9,18
135:1,7 136:23
138:9,17 139:6
142:12,22 143:12
143:20 144:2
145:8,22 146:4,13
147:3,23 148:7
150:10,18 151:1
151:19 152:2,11
152:19 155:13
156:4,14,19 157:2
157:8 158:7,17
159:13,22 160:9
161:5 162:4,25
167:6 172:22
177:22 178:8,13
193:5 197:19
200:24 201:8,18
201:25 202:20
215:20 218:15
223:13 225:1
230:2,17 231:11
233:25 234:5
236:7,21
**objections** 37:22
**objective** 230:25
**objects** 103:14
**obligated** 171:8
**obligations** 70:14
171:5

**observation** 99:12
104:10
**observations** 98:17
99:7 103:1,21
107:14
**observe** 203:17
**observed** 103:5
192:20,22
**observes** 31:16
**observing** 31:12
**obtain** 224:23
**obvious** 219:12
**obviously** 30:8 31:8
128:7 137:10
141:14 206:11
228:18
**occasion** 59:19,20
**occasions** 9:2 10:22
11:2,3 15:2,3
229:3
**occupants** 146:12
149:16,19 150:2
**occupation** 6:12
**occupational** 56:24
57:5 61:23 76:16
85:5,6
**occur** 45:12,22 80:6
82:10 139:22
186:2 229:5
237:22
**occurred** 19:11
20:19 21:5 28:18
45:23 140:4
**occurring** 209:21
**occurs** 45:25
**offer** 92:13 133:10
208:8
**offhand** 218:17
**officer** 54:7,25 62:4
**offtracking** 237:1,4
237:7,9
**oh** 37:2 51:18
196:19 238:14
**ohio** 5:16 6:3,11
11:6 15:12 17:4
22:11 24:12 27:24

41:14,20,21 43:4
43:4,11 44:9,23
45:7 46:19 47:13
47:18 48:15 49:21
51:3,12 54:20
58:15 66:22 67:7
88:24 90:2 111:5
111:6,8,10,23
112:23 135:21
153:15,17 220:8
220:13 238:18
**ohios** 33:23 110:21
**okay** 9:8,24 10:12
10:16 28:11 44:22
49:6 60:8 61:7
63:9 64:5 67:8,11
78:7 79:24 84:7
85:10 88:12,19
89:12 101:13
102:14 111:9
113:10,12 116:25
122:17 135:21
140:8 154:10,13
157:1 161:10
168:7 172:13
173:1 179:25
185:22,25 187:17
194:16,18 207:12
219:6 226:3 231:4
232:20
**older** 32:19 125:24
126:13,15,23
128:2
**once** 15:17 30:7
47:9 48:3 51:2,6
86:20 199:21
207:9 212:2 214:3
**ones** 11:15 16:9
97:12 118:10
125:9 180:19
181:1
**online** 44:21,24
48:16,17 88:21,25
89:4,17,18,23
**onset** 200:8
**open** 92:8 115:7

211:10,15,15,20
**operate** 6:20 13:3
40:13 59:9 68:15
68:16,18 155:18
168:14 171:9
188:4 191:7,22
197:8
**operated** 164:17
**operating** 97:20
**operation** 72:8
74:13,22
**operations** 54:17
128:17 136:20
227:7
**opinion** 59:4 86:11
86:14,16 98:23
127:13 142:9
160:2 172:14
197:7 208:8
212:22 216:8,20
223:2,15 234:2
**opinions** 7:24
**opportunity** 113:17
191:24
**opposed** 81:14
104:9 108:14
123:25 130:6
191:12
**opposite** 119:4
238:12
**order** 42:23 63:14
63:25 65:3 94:13
134:24 152:17
182:13 185:10
201:6
**organization** 51:23
53:7
**organized** 78:24
**original** 14:24
15:10 103:17,18
112:18
**ot** 56:23 57:4,11
82:7
**ots** 86:2
**outcome** 241:12
**outline** 143:14

**outside** 9:12 135:17
136:2
**overall** 118:20
**oversee** 54:16
**owner** 167:20
**owners** 67:13
170:24 172:3

**P**

**p** 2:1,1,10 73:11,14
91:12,17 111:15
111:19 149:10,13
179:14,18 226:7
226:10 238:24
239:2
**p5** 221:18
**package** 221:18
**packet** 47:25
**pad** 78:23 79:3,10
80:4,9 129:11
139:13,14,16
140:1 176:21
177:3 229:23
**page** 3:2,6 41:3
49:19 50:22,24
64:6,7,19,25
84:11 88:14 89:2
92:8,17,21 110:25
113:5,9,9 116:20
116:24 117:3
118:13 119:19,24
120:1 172:11,11
172:12,25 179:21
211:4,5 226:14
242:1
**pages** 41:4 113:8
**paid** 28:2
**palm** 211:10,15,15
211:20
**panics** 211:7
**paragraph** 63:17
81:1 84:2,3,22
154:15 167:10,14
168:6,7 172:6
180:1
**paralyzed** 57:8



paraphrase 209:23
parcel 217:15
  218:7 223:18
parens 85:12
parent 43:24 46:13
  47:1,11
parents 44:14 45:5
  45:10,13 46:6
parked 233:3
parking 215:14
  226:13,16 227:3
parkinsons 57:9
part 15:12,13 17:13
  19:22 24:5,7,8
  43:8 46:25 47:22
  49:11,12 55:12
  57:13 58:4 77:21
  77:23 86:1 89:19
  92:14 127:8 134:1
  136:3 139:19
  142:15,16 145:14
  145:15 148:23
  168:23 171:3
  174:24 178:3,5
  179:3 205:6
  215:22 219:17
  220:3 229:5
partial 40:9 176:13
particular 19:11
  22:2 60:9 76:11
  93:3 97:11 105:5
  116:11 124:7
  209:3 212:3 215:8
particularly 227:19
particulars 227:10
parties 4:16 241:10
parts 49:6 58:8
  137:9
party 10:24 22:14
  22:16
pass 46:23 47:6,13
  60:25 224:5,23
passed 19:14 51:19
  52:7 123:2 168:21
passenger 6:23
  8:17 35:23 36:1,4

42:6 50:3,7 52:21
  53:9,11 56:2
  59:10,13 61:25
  62:1,6 67:15
  99:23 108:13
  109:1 120:3
  122:12 130:18
  132:22 133:2
  135:11,22 138:1
  149:17,22 150:2
  151:8,22 152:21
  154:4 155:1
  158:16 159:20
  160:13,20 172:21
  174:9 177:15
  178:23 182:17,23
  183:5 206:2
  207:24 210:15
  213:16 214:9
  216:11 217:11,21
  221:3,16 229:1
passengers 69:19
passing 219:10
patrick 6:9
pay 141:22
pedals 90:20 209:3
  209:6,11
pedestrian 202:5
  204:16 205:5
pen 78:23 79:3 80:5
  80:9 176:21 177:3
pennsylvania 43:1
  43:3 48:15 50:9
  50:10 171:25
people 51:9 83:17
  94:1,4 95:9,16
  97:6 98:25 100:25
  101:10,18 102:6,7
  104:1 121:18
  122:11,13,25
  124:18,19 136:1
  150:23 170:25
  188:17 204:25
  227:5
percentage 24:13
  106:1,6

perception 93:25
  148:13
perform 136:6
  145:5,20 228:9,18
performed 39:1
  220:22 228:12
performing 228:2,8
  228:21
period 54:23 82:16
periods 219:14
peripheral 92:24
  93:8,16 95:22
  96:6 97:14 98:3,9
  98:13,25 99:22
  100:8,16,18 101:1
  101:18 102:1,10
  102:17 104:18
  105:2,6 107:15
  173:9,13 214:4,19
  218:13 219:22
  221:21 222:6
permit 48:8 144:1
permitted 58:20
person 36:2 57:25
  58:6,10,19 59:1,9
  60:24 74:22 79:11
  79:15 82:14,16
  83:11 86:7 87:2,8
  93:16 96:20 97:14
  104:17 105:13
  106:11 127:7
  129:19 135:14,18
  141:5 142:11
  154:18 155:17
  158:10 165:4
  168:13 189:11,11
  195:18,20 198:21
  204:15 208:16
  214:10 216:21
personal 18:9 27:1
  99:12 101:22
  107:14 132:15
  137:23 147:10
  196:23
personally 25:2
  27:5 53:21 54:1

68:5 71:12 73:19
  98:21 99:9 106:14
  136:17 164:18
personnel 168:13
  169:21
persons 56:10
  58:15 150:17
perspective 99:1
philadelphia 2:10
phone 129:21
phones 88:19
physical 58:22
  76:25 163:14
  181:19 182:2,3
  209:21
physician 56:25
  58:14 225:19
physicians 225:13
  225:17,25
physics 150:8
  235:21,23
pick 49:8 103:13
  142:25 169:12
  204:6,9,10
picking 98:13
  143:1
pictures 141:18
piece 17:21 19:23
  58:24 60:15 82:6
  116:14 228:24
  229:8,14 231:20
pile 109:22
pinning 38:9
place 1:19 205:4
  227:9
placed 20:15 143:6
  206:17
placing 20:9
plaintiff 1:6 2:3
  4:22 7:22 20:3
  65:10 220:5
plaintiffs 7:15 66:2
  167:18
plan 80:25 81:1,2
  175:24 182:12
planning 80:24

140:5 142:8 182:8
  182:9
play 12:9 89:3,5,25
  188:22
please 5:2,10,13 6:5
  9:6,13,16 10:14
  26:18 43:15 68:1
  77:15 88:16 92:9
  154:14 189:5
  192:16 231:4
point 58:23 80:20
  81:6 90:24 100:21
  117:3 158:13,24
  159:7,17 180:18
  181:2 184:6
  189:24 190:6
  194:18 212:23
  213:24 229:7
  230:10 231:7
  232:8,11
pointed 80:18
  204:19
poor 142:5 193:9
  193:21 236:13
population 103:3
  103:23 117:4
  120:4 121:17
  122:5,10,24
  125:24 126:23
  128:2 151:10
populations 120:10
  120:22
portion 19:25
  88:25 138:14
  143:10 144:10
posed 126:14
poses 114:4
position 21:24
  46:21 54:10 194:9
  204:13
positions 215:5
possibilities 140:15
possibility 58:9
possible 46:20
  176:6 209:5
  212:13,14 222:4



possibly 185:16
pounds 13:4 72:3
  137:2 148:4,21
  151:17 184:15
powers 94:19
practice 36:12 44:4
  85:11
precautions 23:17
  30:13
predominant
  130:23
predrive 140:21
predriving 139:25
  143:3
prefer 79:21
  108:21
premise 207:13,18
preparation 174:24
  175:2 176:20
prepare 14:14 33:2
  33:9 113:14,14
  174:13 175:19,21
prepared 175:3
preplanning
  143:10,19 144:1
  175:9,22
preroute 140:4,6
  142:8
prescription
  180:23,25
present 2:14 4:16
  141:25 219:12
presentation 126:3
presented 220:6
  225:6
presents 105:5
  225:22
president 11:23
  67:5,6 167:16
press 196:19
pressing 190:10
  211:7 213:12
pretrip 138:22,25
  143:18
pretty 76:7,8 77:24
  90:21 158:1

previously 39:1
primarily 181:19
primary 42:16
principals 38:12
principles 156:8,18
  156:25 158:2
  216:15
prior 29:15 46:1
  174:12 189:20
  199:1 231:16,23
  231:25
private 68:10 117:4
  120:4,20 122:12
  122:23
probably 9:24
  25:11,14 44:24
  66:12 150:12
  185:19 192:12
  196:15 236:9
problem 27:11
  32:15,19 58:7,8
  85:24 171:12
  188:9 190:1 212:3
  212:17
problems 32:22
  134:1 144:20
  188:10 199:7
  200:14 227:15
  237:17,22
procedure 29:16,18
  232:16
procedures 57:5
  230:13 231:20
proceed 8:20 30:1
  79:15 180:3
  230:21
proceeded 26:21
  29:6 30:8
proceeding 26:20
  38:1 230:1,5
process 8:21,24
  47:24 81:12 109:4
  142:8 176:11
  222:18 230:16
procession 31:9
produce 7:18 62:25

produced 66:13
  76:14 77:6
production 7:10
professional 98:22
  100:13 145:10
professionally
  98:18 103:14
professors 43:14
proficiency 46:25
proficient 108:7,16
  109:8
profound 141:12
profoundly 82:2
  83:18,22 104:23
  105:25 141:11
  179:2
program 51:6 56:9
  56:23 57:3,14
  142:16 161:15,18
  161:22 162:23
  164:9 181:5 192:2
  226:25 229:1
programs 58:5
prohibited 139:5
project 74:5,7,8
propensity 125:11
proper 228:15
  231:17
properly 205:15
  206:22 228:9,13
  228:18,24 231:18
property 18:8
proposed 223:11
proposition 117:11
  148:19
protect 152:17
  154:2 168:12
  169:20
protrudes 166:20
  166:21
provide 7:21 18:23
  35:12 45:13
  114:16 132:20
  184:1 201:4
provided 34:16
  46:23 65:10 66:1

107:9 115:17
  141:13 167:20
  235:4
provides 114:2
proving 100:18
provisions 115:22
public 1:20 5:5
  55:3,21 63:1
  113:2,21 114:3,13
  151:8 152:16,18
  154:3 168:12
  169:5,20 240:20
  241:3
publication 63:6
  84:15,19
publications 62:17
  63:11 84:14,18
published 63:4
  76:21 110:10
  112:25
pull 79:23 80:20
  81:8 231:21
pulled 40:12 80:10
  95:5 110:20 111:3
  111:4
pulling 17:25 81:12
  119:13 137:4
purchase 43:25
  44:15
purport 96:18
purporting 113:20
  132:19
purpose 76:10
  171:16
purposes 25:7
  147:15
pursuant 71:14
  131:16
push 211:17
pushing 89:16
  196:16
put 6:24 7:17 12:8
  16:1 34:11 41:25
  48:21 51:6 77:20
  84:16 85:22 87:7
  92:3,14 93:19

109:15 159:2
  169:9 186:14
  189:17 191:4,12
  191:13 198:17
  199:25 210:20
  211:1,3,8,21
  235:25
puts 211:23
putting 43:4 62:16
  149:7 162:1
  194:11,12 207:22
  210:16 213:6

---

### Q

qualification 62:20
  98:22
qualifications
  36:10 37:18,21
  62:12
qualified 155:4
  169:23
qualitive 117:24
quality 119:1
quantitative 117:24
question 9:11,15,18
  9:21 10:7,11
  22:19 36:9 37:4,6
  45:9 67:1 68:19
  70:19 71:4,11
  88:11 94:12 100:2
  100:11 101:14
  102:3,8,15,19
  104:4 108:5
  114:24 119:6,7
  120:19 127:9,11
  127:15,22 128:9
  135:16,23 137:12
  145:16 149:4,6
  157:12,18 158:1
  160:24 162:13
  186:19 188:23
  189:14 196:21
  197:9 198:9 200:8
  200:8,11 201:1
  208:18 211:11
  213:2 214:15



222:19 230:24
232:5 233:8,14
234:22 235:5,9
237:10,20
**questioning** 20:20
**questions** 9:6 52:16
53:7 107:12 111:9
111:10 113:3
115:1 119:23
127:12,20 135:15
154:11 173:16
175:7,10 188:25
213:9 225:14
226:11 238:16
**quicker** 98:15
**quickly** 41:8 86:24
196:18 236:20
**quite** 175:12
223:24
**quotation** 89:8
**quote** 88:13 89:1,20
157:15 219:8
**quoted** 88:9
**quotes** 121:6,9
169:16

**R**

**r** 2:1 241:1
**race** 137:14
**radically** 205:13
**radio** 63:1
**rafkind** 1:19 4:14
241:2,16
**rail** 230:22
**railroad** 230:11,14
230:23 231:9
232:14
**railroads** 232:18
**rain** 19:23
**ramp** 184:16
200:14 213:14
**range** 51:16 135:15
162:10 187:9
226:13,16
**rangetype** 50:13
**rate** 149:21 151:13

191:9
**rates** 148:2 150:2
**rating** 119:1
**reached** 117:23
120:10
**reaching** 223:4
**react** 21:16,19,20
21:23 146:1
203:10
**reaction** 148:12,13
**read** 43:15,17 54:6
63:18 77:6,14
83:6 88:10 94:25
95:22 106:23
107:2,5,10 130:6
131:21 138:24
146:8,17,25
157:11 159:8
161:14,24 164:13
167:4,8 169:13
171:3 173:21,22
173:24 187:8
207:9 233:10,12
233:22,23 240:3
**readers** 141:5
**reading** 64:16,22
82:18 95:3 129:24
130:1,2,8 143:24
182:22 219:7,10
219:24 220:19,25
221:23
**ready** 210:7
**real** 63:6
**realistic** 90:22
**reality** 158:22
**really** 12:21 14:17
15:24 64:11 95:16
100:11 112:17
127:22 182:2
188:9 189:24,25
190:2 205:18
227:12 238:17
**realm** 6:22 131:10
**rear** 86:8 166:23
**rearward** 234:14
234:17,18 235:1

**reason** 10:13,17
130:22 153:24
169:8
**reasonable** 114:16
115:4,8,9 119:5
**reasons** 12:4
171:23
**rebuttal** 66:15,19
**recall** 9:3 10:1
13:10 14:16,17
27:12 32:12,13
35:9 36:11,15
38:21,22 55:6
59:22,23 162:7
167:15,21 197:4
217:13 218:6
219:23 220:1,17
220:18,23,24
221:21 223:9,12
**received** 42:24
169:18
**recess** 53:2 73:12
91:15 149:11
179:16 226:8
**recite** 164:1
**recognize** 7:1 75:19
88:1,7 103:9
134:7 137:24
151:14 227:18
**recollection** 13:1
37:17 111:22
**recommend** 78:21
180:12 201:4
**recommendation**
225:25
**recommendations**
215:15
**recommended**
178:10
**recommending**
178:6
**record** 4:2 5:11,14
6:7,17 8:1,16,18
19:19 24:23 25:22
34:15 43:17 53:1
53:4,5 62:6 65:17

67:14 73:9,11,14
84:9 91:10,12,17
93:2 96:11 97:16
101:8 107:13
111:13,15,17,19
111:20 112:1
121:22 149:10,13
155:23 157:5
161:10 179:14,18
221:9,12 226:6,10
233:12,23 238:24
240:6,8 241:7
**recorded** 25:17
**records** 126:22
**recoup** 28:2,15
**recoups** 28:4
**recover** 32:25
**recovered** 18:16
32:23
**red** 26:21 29:8
**refer** 41:2 56:25
59:7 60:18 154:14
**reference** 63:8 64:3
89:22 92:9 94:3
111:23 112:3,25
131:20 216:8
230:10 231:7,7
232:8,11
**referenced** 92:20
99:16 110:14,22
112:4 118:3 119:9
119:9 123:19
217:8
**references** 64:20
65:1 92:21 93:22
94:17 95:1,15
97:2 107:15 116:5
118:10
**referencing** 110:15
117:2 118:13,17
120:7
**referred** 73:24
74:20 132:11
174:20
**referring** 17:19
33:12 61:3 63:16

64:7 85:4 154:25
158:14,19 170:5
174:9 234:17,21
**refers** 61:13,16
**reflect** 32:8 56:6
221:10
**reflected** 54:23
**reflecting** 131:18
**refresh** 111:21
**refused** 12:6
**regard** 36:1
**regardless** 149:16
**regattas** 137:16
**registry** 224:7
**regular** 131:8,10
166:5 186:18
199:22 207:3
209:25 217:25
**regulates** 71:9
**regulations** 45:7
60:22 70:13 71:13
138:7 152:9
153:13,20 154:1
159:6 171:8
**regulatory** 11:25
**rehabbed** 60:4
**rehabilitation** 8:8
51:21,24 52:12
57:1,3 61:15,17
76:15
**rejected** 223:8,8
**relate** 62:19 71:14
192:25 215:17
**related** 8:11 11:11
54:25 59:12 63:24
95:8 97:20 100:6
101:9 120:3
125:15,23 126:4
150:12 218:9
224:12 241:10
**relates** 8:17 62:6
116:7 172:21
217:7 233:6,16
**relating** 148:16
226:19
**relation** 170:6



176:18
**relationship** 45:9
 136:20
**relative** 123:22
 150:9
**relevant** 221:15
**reliable** 117:19,20
**relied** 7:23 63:13
 64:19 65:18 92:12
 101:16 116:13
 117:15 118:4
 124:15
**relies** 8:5 178:25
**rely** 97:9 100:20
 102:5,15 128:13
 131:15 183:6
**relying** 64:24 100:5
 101:5 218:12
 219:20
**remarkable** 204:3
**remember** 14:2,6
 29:19 36:17 42:3
 42:3 52:5 55:6,7
 71:25 89:10
 103:11,17 175:9
 175:15 183:22
 201:21 229:22
**remind** 91:25
**render** 169:23
**reoperating** 60:1
 60:12
**repeat** 9:17 145:17
 146:20 233:8
 237:20
**rephrase** 45:8 67:1
 69:2 70:20,21
 100:2 102:2,14
 120:19 231:4
 233:14
**rephrased** 122:21
**replicate** 162:23
**report** 3:8 14:14,15
 16:21 24:21 33:6
 33:8,12,13,20
 34:1,6,15,23 35:7
 35:8,10,13,22

38:12,17 39:12,25
 40:1 41:3 63:14
 63:18 64:1,2,4,13
 64:20 65:3,19,24
 76:1 77:11 82:23
 84:1 92:8 93:3,11
 94:24 95:19 97:10
 112:15,17,20
 115:21 116:8,12
 116:13,23 117:14
 118:4,20 119:10
 119:20 123:7
 124:2,17 125:2,8
 126:5 128:15
 131:13 132:11
 133:1 138:24
 143:25 154:9,12
 154:22 155:8,10
 155:16,24 156:7
 156:21,24 157:6
 157:13,15 158:1
 158:25 159:17
 160:5,24 162:7,16
 162:16 164:15
 167:9,13 168:5
 172:7 173:2,16
 174:8 175:19
 179:8,21 181:8
 207:9,9,13,18
 208:11 210:19
 215:17 216:7,16
 217:2,8 226:12
 227:14,25 229:2
**reported** 125:7
**reporter** 1:20 4:14
 5:2 10:4 43:18
 78:3 233:13,24
 241:2
**reports** 66:6,9,10
**represent** 4:17 5:22
 111:2
**representing** 23:9
**request** 4:11 7:9
**requested** 169:24
**requesting** 142:2
**require** 44:6 52:1

60:22 84:24
 115:14 144:19
 184:25
**required** 24:24
 40:9 46:19 72:7
 85:12 114:16
 132:6 156:1
 157:21 215:18
 224:5
**requirement** 45:4,7
 208:10 224:2
**requirements**
 47:14,15 61:8
 70:14 75:4 112:9
 113:21 131:24
 134:15 144:18
 153:25 155:11
 156:12 158:5
**reread** 33:6
**research** 103:16
 125:13 126:18
 163:3
**researcher** 121:3
**residual** 81:20,24
 82:3,24 173:25
**resolved** 40:21
**respect** 10:21 27:17
 27:19 42:5 52:18
 52:21 55:22 56:2
 60:22 61:24 62:1
 64:2 73:25 98:3,9
 99:23 102:13
 113:21 115:24
 116:4 133:11
 136:10 160:19
 177:1 179:22
 182:17 199:6
 216:11 235:2
**respiratory** 224:18
**responsibilities**
 54:14
**responsible** 20:5
**rest** 81:15
**restate** 61:15 88:6
 94:12 150:1
**restatement** 33:20

**result** 22:10,11
 40:20 104:9
 115:15 145:5,19
 190:23
**resume** 16:22 55:3
 61:13,16 62:5
 67:4
**retained** 13:20
 38:20 55:15 56:7
 56:15
**retired** 32:20
**retrospective**
 118:15
**reverse** 180:6
 211:17,19 220:16
**reverting** 200:5,7
**review** 7:13 28:24
 88:17 128:13
 131:15 160:25
 226:4
**reviewed** 33:9
 63:25 65:2
**revoked** 58:16
**rib** 27:11 32:17
**richmond** 5:15
 6:10
**ride** 193:14 210:24
**right** 7:11 20:23
 25:18 28:12 29:9
 29:24 30:13 31:2
 31:17 33:15,22
 35:16 36:1,22,23
 39:13,25 41:6,12
 54:8 59:11 60:4
 63:17 68:12 76:7
 82:18,23 83:1,9
 87:10 92:25 94:1
 99:13 100:21
 101:24 102:18
 106:3,5,7 109:21
 113:16 118:16
 120:5 121:19,24
 122:5,14 123:18
 125:25 136:15
 137:24 139:23
 152:10 156:3,12

159:20 160:7
 172:9,10 173:21
 177:21 178:4,7
 179:9 180:4,7
 181:8 182:18,25
 183:12 185:8,15
 187:18 192:17,25
 194:15 195:3
 196:11 197:11
 198:7 200:22
 201:7 202:2,7
 203:13,19,23
 208:5 209:8,12,22
 211:24 214:8
 215:24 220:15
 221:1 223:6 230:1
 232:2
**rights** 11:25
**risk** 117:7 126:14
 128:1 129:4,12,23
 130:14 146:18
 147:2 151:7,24
 152:1 153:2,4,10
 216:21,22
**risks** 151:4,16,21
 152:15
**road** 5:15 6:10
 17:13 19:1,2,4,10
 19:14,16,18,20,22
 19:25 20:9,16,23
 21:2,3 23:15,19
 44:5 48:10 49:3,9
 59:3 78:12,13,16
 78:17,23 79:4,19
 83:14 90:11 91:4
 103:8 129:3,8,20
 137:8 138:14
 139:2 140:9,17,22
 143:11,16 144:9
 145:12,13 162:11
 165:3 174:13
 187:5 201:23
 202:14 203:2
 204:23 205:20
 215:11 219:14
 227:23 230:12,15



231:10 232:15
**roads** 49:8 140:11
151:6 154:4
**robert** 2:15 4:12
**rode** 60:10
**role** 12:9 73:22
**rome** 1:11 2:8 4:12
4:20 5:21
**room** 196:13
**rotation** 21:10
**roughly** 126:24
**route** 78:23 80:24
139:22,23,25
141:15 163:20
174:13,24 175:3,9
175:20,22,25
182:8,9
**rozynski** 2:5 4:21
4:23 25:8 35:17
36:13 37:15,19
52:13,17 61:1
62:13,23 65:5,21
68:23 69:6 70:17
71:17,20 72:11,14
72:24 73:4 74:2
74:16,24 75:7
76:4 80:22 83:2
83:19 85:17 90:13
96:15,22 97:22
98:5 99:2,25
100:9 101:3,20
104:11,19 105:20
107:20 108:8,18
109:10,19 114:7
114:20 115:5,18
116:1 117:8 118:7
118:23 120:12,25
121:12,25 122:6
122:15 123:10
124:22 125:18
126:7 127:2 128:5
129:5 131:1,25
132:8,16,24 133:6
133:12 134:3,9,18
135:1,7 136:23
138:9,17 139:6

142:12,22 143:12
143:20 144:2
145:8,22 146:4,13
147:3,23 148:7
150:10,18 151:1
151:19 152:2,11
152:19 155:13
156:4,14,19 157:2
157:8 158:7,17
159:13,22 160:9
161:5 162:4,25
167:6 172:22
177:22 178:8,13
193:5 197:19
200:24 201:8,18
201:25 202:20
215:20 218:15
221:9 223:13
225:1 230:2,17
231:11 233:25
234:5 236:7,21
**ruled** 177:20
218:19,25 222:9
222:12,15
**rules** 8:22 9:5 48:9
55:8 70:13 91:25
139:9
**ruling** 15:18 219:3
**running** 25:13
54:17 57:15
176:10

_____
**S**
**s** 2:1 128:14
**safe** 46:25 60:1
96:19 108:12
136:19 142:21
158:12 209:15
210:13
**safely** 46:22 57:20
59:9 154:18
155:18 168:12
169:20 205:4
223:12 237:12
**safest** 206:21
**safety** 25:22 28:23

55:3,21 61:17
70:12,25 71:8,15
72:6 74:1,15
93:15 95:8 96:1,6
97:19 102:12
114:5,18 116:7
123:7,22 124:14
125:3,23 126:12
126:14,20,21
128:15 131:17
147:17 152:8,16
152:24 153:1,19
153:22 154:2
169:4 204:5,7
208:10 215:8
219:12
**sailboat** 137:1
**sailboats** 137:14,15
**sample** 80:14
**sand** 21:8,9
**sandwiched** 163:20
**sat** 205:22
**satellite** 146:17,25
**save** 71:16
**saw** 103:13,14
143:22
**saying** 25:21 36:16
45:16 99:11
119:14 129:24
159:1,2,19,21,24
169:16 170:9
175:22 180:25
181:23 187:12,13
187:25 188:2,13
188:14 189:23
219:1 220:17,23
221:22
**says** 16:23 34:22
78:13 117:18
118:15 121:4,5,6
154:16 156:21
159:8 170:18
219:8
**scale** 83:15 105:1
**scan** 29:23 129:7
**scanning** 29:21,22

29:22 145:11
**scenario** 184:19
186:20 195:4
202:24 203:24
**school** 1:8 4:5 5:23
6:15,18,19 11:5,8
11:21 15:8,10
16:18,24 17:7,12
18:24 20:5,8
22:25 23:10 24:1
24:15,20,23 26:5
27:24 28:15,19
34:25 41:23 42:11
44:7 46:7 49:24
54:8,15,18 66:22
67:7,13,19,21
69:13,16,18,20,21
70:2 108:7 144:23
154:19,24 158:4
171:4 182:12
191:25 198:20
220:7 225:8,8
**schools** 12:3 42:18
43:7 50:11 51:10
54:19 67:12,15,17
69:21 90:2 220:13
**science** 94:6
**scientific** 94:7
98:17 99:1 100:5
100:17,25 101:17
216:25
**scientist** 99:10
**scientists** 100:17
**scope** 56:18,21
66:23
**screen** 90:23
129:21
**script** 57:11
**search** 15:3,23
**searched** 172:1
**searching** 12:2
**seasoned** 197:22
**seat** 85:23 86:17,19
87:2,8,13 90:19
107:23 130:19
178:11,15,17,18

178:19 209:8,11
**seated** 214:18
**second** 15:5 63:17
84:2,3,22 89:2
93:19,21 97:2
117:3 146:2 167:9
167:13 168:5,7
**section** 54:22 78:13
79:19 141:23
173:14 181:21
**see** 25:20 28:22
35:1 48:19 55:3
58:5 61:19 63:20
66:9,10 76:13
78:13,25 79:16
81:22 85:1,14,15
87:14 88:15 89:6
94:4,5,8,10 97:5
103:16 110:11
111:21 118:12
119:13,14 135:16
154:19 155:8
164:17 168:15,16
173:18 174:17
181:16 194:10
197:9 204:14
206:22 207:7
213:23 214:5
216:23 219:3
221:19 226:17
227:8 230:20
231:17 233:1
**seeing** 15:19 98:18
98:19 100:17,19
103:25 189:18
195:11
**seek** 28:14
**seen** 66:6 128:8
164:17 199:16
222:5 226:22
**segment** 113:2
**seizing** 12:2
**seizure** 15:4,23
**selected** 43:6,9 51:7
78:23
**selection** 191:3



195:8 196:12
**selector** 211:9,14
  211:16
**selfevident** 124:13
**semantics** 157:17
**semester** 42:1,4
**semi** 17:14,17,18
  17:23 20:25 21:17
  60:20
**seminars** 62:17
  125:22
**semis** 13:8 209:25
**send** 57:11
**sense** 15:21 98:1
  234:7,9
**senses** 144:19
**sensory** 93:25
**sent** 168:9
**sentence** 122:20
**sentences** 108:22
**separate** 17:24
**separates** 166:11
**september** 128:16
**sequence** 45:11
**serious** 26:6 32:11
  149:18
**served** 7:14
**service** 217:15
  223:18
**services** 1:24 2:15
  4:13,15 39:2,6
  115:17 169:24
**set** 56:22 57:2,14
  155:25 241:6
**setting** 103:6
**seven** 172:16
**seventeen** 50:25
  84:13
**severely** 18:15
**severity** 150:8
**sheet** 64:3 242:1
**shift** 60:6 145:6,20
  191:8
**shifters** 90:21
**shifting** 187:9,10
  187:11 188:10

190:10
**short** 30:22 108:21
  179:20 182:15,20
  182:24 183:8
  226:2
**shorthand** 1:20
  241:2
**shortly** 7:14 81:13
**shouldnt** 26:3
  86:18 204:15
  205:1
**show** 34:4 75:10
  79:14,20 87:20
  105:22 140:17,22
  141:14 157:16
  228:14
**showed** 124:5
**showing** 98:17
  119:4 153:7 217:4
**shown** 125:10
**shows** 63:2 117:16
**side** 18:15 36:19
  37:18 165:10
**sides** 21:7
**sign** 45:17,18 85:25
  89:4 107:17,22
  108:2,7,13,17,23
  109:5,9 130:19
  141:24 173:21,23
  173:24 177:20
  220:21 230:16
**signal** 184:8,9
  196:16,17 201:22
  202:6,13,19
  213:23 214:18
  223:11
**signals** 77:19 81:21
  82:25 83:8,8
  85:25 98:14
  108:21 109:13,14
  174:14,25 175:4
  177:9,13 178:25
  179:6,9,22 180:1
  181:11 183:7
  184:7 190:11
  193:4 195:2

196:10 198:8
  200:18 201:3,5,10
  201:17,21 203:21
  213:10 217:22
  218:4,13,21
  219:21 220:9,12
  221:3,20 222:2,5
  237:11
**signed** 240:15
**signer** 141:6
**significant** 62:18
  84:16 130:3,8,14
  151:7,15 152:5,15
  153:5,6,8,9
**significantly** 77:8
  128:1 129:12,22
  151:25
**signs** 103:25 104:5
  104:8 108:14
  180:3,11,23
**similar** 12:10 15:9
  38:11 76:6 82:21
  112:7,11 114:25
  209:25 210:2
  238:7
**similarities** 238:8
**similarly** 219:20
**simple** 158:1 190:7
  195:1 200:17
**simply** 81:12
  123:21 234:24
**simulated** 232:19
**simulator** 90:10
  91:7
**simulators** 90:3,5
  90:15,18
**simultaneous**
  164:10
**single** 106:2 151:12
**sir** 153:20
**sit** 52:5 86:14
  178:18,19
**sits** 163:17 166:17
  194:1
**sitting** 66:18 72:5
  73:1 91:2 102:22

113:19 132:3
  133:11 170:17
  180:22 181:10
  192:3,4 194:3,18
  196:13,14 203:12
  208:2 209:16
  210:12 214:9
**situation** 80:13
  137:25 143:5
  175:16 180:16,16
  186:13,15 191:7
  193:20 194:24
  196:10 197:6
  199:10,24 200:10
  204:17 211:25
  212:9 215:13
  228:10 232:22
  233:1,4
**situations** 206:17
  229:4
**six** 172:16
**sixfold** 150:16
**size** 69:18 163:24
  230:8 233:18
**skid** 136:4
**skidded** 17:14
**skill** 58:3
**skills** 49:10 134:23
  135:6 139:1 142:4
  142:5
**slam** 210:23
**slapping** 211:9
**sleep** 225:7
**sleeper** 130:12
**sliding** 83:15 105:1
**sloped** 19:22
**slow** 31:19 180:5
  191:5,6,12,14
  220:15 236:2
**slower** 146:2
**small** 13:5 174:15
**smaller** 13:9 150:5
  150:21,22 218:11
  223:9
**smashing** 150:13
**smelling** 144:21

**smith** 5:24 34:24
  168:11 169:22
**softly** 78:6
**solomon** 5:24 34:25
  168:11 169:22
**solution** 192:8
**solved** 86:24
**somebody** 17:6
  35:15 46:10,12,20
  46:22 57:17 80:15
  98:3,10 105:5
  113:14 123:23,25
  125:4,4 130:19
  136:2,13 138:15
  141:2,10 153:7
  155:11 156:2,9
  157:24 180:12
  197:12 200:10
  202:11 203:1
  205:25 209:16
  214:16 225:22
**somewhat** 210:2
**sophisticated** 90:19
  90:25
**sorry** 19:6 40:15
  60:17 67:24 71:25
  88:6 105:18
  109:23 110:25
  114:14 146:22
  149:24 173:24
  190:22 205:9
  208:19 234:16
**sort** 25:5 64:11
  175:13 188:22,24
  226:4
**sounds** 78:18
**sparring** 199:5
**speak** 108:23
  173:21 233:20
**speaking** 78:5
  82:12 108:25
  157:16
**special** 8:6
**specialist** 8:8 51:21
  51:24 52:12 61:17
**specialists** 76:15



**specific** 63:25
  99:21 100:5 102:5
  124:11 132:4
  136:18 147:19
  152:8 155:10,15
  156:16 199:7
  210:10 215:18
  224:24 229:4
  235:7,10
**specifically** 8:12
  65:2 101:17
  102:16 103:2
  115:22 119:9
  124:2 133:4 155:9
  156:9 157:5 162:2
  180:10 218:8
  232:6
**specifications** 75:3
**specifics** 70:11
  139:9 161:1
  162:12,13 164:7
  191:22 224:20
  225:3,4
**speech** 141:5
  173:22,24
**speed** 92:7,18
  140:12 148:25
  180:5 190:16,19
  212:4 235:7
**speeds** 186:9
**spell** 68:1
**spending** 55:1
**spent** 43:10 162:2,9
**split** 22:11,22
**spoke** 220:24
**spot** 103:9 169:10
  192:21 198:3
  199:12,13
**spots** 136:22 165:7
  165:16 186:2
**springs** 236:12
**square** 2:4,9
**stages** 15:24
**standard** 40:11
  60:15 71:14 77:24
**standardization**

51:3
**standards** 47:5
  72:8 74:11,20,21
  75:6 131:18 132:7
  132:23 133:5,9,14
  134:16 138:21
  139:2 143:18,25
  144:11,14,18
  145:1 152:25
  153:1,22 154:1
  157:23,24 201:7
  215:19 216:1,1
**stands** 52:9,11
  73:16
**staring** 86:8
**start** 21:10 44:1
  130:1 154:15
  174:5 181:23
  183:11,13 201:13
  225:20 226:15
**started** 15:16
**starting** 21:16,19
  143:10 180:18
  181:2
**starts** 113:11
**state** 1:21 4:16 5:6
  5:10,13 6:5 11:9
  11:24 12:1,16
  15:14,18 24:22
  28:3 33:23 41:14
  41:20,21 43:3,7
  43:21 44:9 45:15
  46:19 47:18 49:21
  51:2,7 54:20,22
  55:5,12,19 58:15
  88:24 89:15 106:4
  110:19,21 123:2
  135:21 144:18
  153:15 169:17
  170:7,19,22
  171:13 216:6,7
  220:13 241:3
**stated** 13:22 29:7
  96:5 104:22 107:3
  119:8 124:3,16
  127:5 158:9

177:25 191:23
  201:13 204:11
  213:1,17 216:15
  222:8,15 236:15
**statement** 21:15
  70:9 77:16 93:6
  122:17 156:6
  179:22
**statements** 168:14
**states** 1:1 4:6 5:25
  8:15 49:22,25
  75:5 151:6
**static** 80:12 142:6
  177:5
**stating** 155:16
  160:2 163:9
  168:10 222:9
**station** 45:15 47:17
  48:18 49:1
**statistic** 146:6
**statistically** 151:9
**statistics** 25:1
**statute** 114:14,16
  115:13 152:8,17
**statutes** 72:23 73:2
**steep** 184:16
**steer** 188:5 219:16
**steering** 22:1
  207:21 209:19
  210:16
**steinkopf** 2:15 4:13
**step** 48:3
**steps** 193:17 204:12
**stick** 191:8
**stiff** 236:12
**stop** 12:1 79:23
  180:5 198:6
  201:24 202:16
  203:25 210:25
  220:16 235:11,18
  236:5
**stopped** 80:11
  170:14 220:10
**stopping** 147:20
  148:1,11 149:2,5
  235:15

**story** 187:7
**straight** 160:23
  191:15 220:14
**street** 2:9 29:8
  187:25
**streets** 50:15
**strength** 118:5
**stretch** 19:2,3,14
  19:16
**strike** 20:25 211:16
  236:19
**strikes** 150:21
**stroke** 57:7 59:24
  197:5
**strong** 117:17
  236:13
**struck** 17:17 26:22
  28:6 150:3
**stuck** 87:17
**student** 17:13
  18:20 19:8 20:1
  22:16 23:5,11
  24:2 26:23,24
  27:13,22 28:14
  29:11,20,22 30:12
  30:25 31:3,4,6,9
  31:13,16,25 32:2
  32:3,8 43:22 46:3
  47:10 80:2,18,20
  109:12 139:20
  140:7,18 143:1
  165:22 168:12
  169:4,21 171:14
  173:15,17,20,22
  176:2 177:10
  178:20 180:2
  181:15,24 182:1
  190:3 192:14
  193:11,15,18
  195:9,10 196:8,18
  198:24 199:3,14
  199:23,25 200:2
  200:14 201:6
  203:8 204:7,12,14
  204:16 205:14,16
  210:23 211:7

212:1,6,19 213:12
  213:20 216:4
  225:6 226:14
  228:2,12 229:3,8
  229:20 230:10,12
  231:1,6
**students** 18:4 42:14
  49:21 98:16 99:23
  100:6 103:3,10
  104:6 144:19
  164:11 186:6
  199:10 207:3
  226:25
**studied** 121:17
  122:11 194:21
  200:21 215:7
  216:14,18
**studies** 101:5,7
  105:12,23 117:17
  117:18,22 119:3
  120:9,17,20 121:7
  122:23 124:13
  125:14 126:4
  127:25 217:4
**study** 94:5 97:6
  99:21 100:6,25
  101:17 102:1,2,5
  102:16,22,23
  104:7,13,15
  116:15 118:15
  120:22 121:2,15
  121:21,23 123:16
  123:20 124:4,7
  125:8 126:10,16
  126:19 127:6,8,9
  127:14,16,23
  128:19 153:7
  190:8 212:15
  213:3 214:20
  217:1 231:14
  237:13
**studying** 101:10
**stuff** 19:24 88:21
  186:8,9 190:2
  192:9 193:2
**subject** 36:11 37:25



63:16 86:21 88:22
171:5
**submitted** 39:11
**subpoena** 3:7 7:3,7
**subscribed** 240:15
**subsequently** 66:1
**subsidiary** 24:8
**substance** 11:14
33:25 88:15
**successfully** 221:2
**sudden** 206:8
**suffered** 225:7
**suffice** 186:12
**suggest** 127:25
210:20
**suggested** 104:1
108:15
**suggesting** 138:4
140:4 210:14
212:12
**suggestion** 78:1
**suing** 11:9 17:6
**suits** 11:4
**summarize** 169:1
**summarized**
115:23
**summarizing** 169:6
170:9
**summary** 38:15
99:18 117:16
**summation** 117:18
**super** 94:19
**superhuman** 95:16
**support** 62:11 98:1
99:16 117:5
217:20 222:4
**supported** 126:19
**supports** 103:20
**supposed** 31:18
80:12 82:15
**sure** 8:21 10:8 13:7
13:9 14:23 22:20
28:11 31:2 34:13
37:22 42:22 44:17
49:14 52:17 55:18
60:6 64:14 65:16

67:1 82:7,20
92:11 101:12
114:25 115:10
119:22 120:1
127:17 137:2
139:17 143:14
157:11,11 185:16
198:2 203:11
205:12,17 207:1
214:15 218:21,22
229:18,19 232:4
234:23
**surprise** 128:25
129:10,18 130:10
236:3
**surprised** 87:17
236:10
**surround** 90:24
**suspension** 236:12
**sustain** 149:18
**suv** 138:1 150:25
158:21
**suvs** 151:8
**svaboda** 16:19,24
18:19 23:1 26:5
37:12
**swear** 5:2
**swing** 236:19
238:11
**swinging** 238:1
**swirliness** 137:19
**sworn** 5:5 241:6
**symbol** 190:9 203:5
**system** 8:13 12:11
38:6 56:8,14,20
59:14 86:3 130:5
141:7 146:18,25
178:25 183:12
201:14 212:11
217:19 223:11
224:18

---

**T**

**t** 240:1 241:1,1
**take** 10:4 13:4
19:13 31:8 44:2

44:10 46:20 47:16
47:25 52:13,23
75:2 88:16 89:16
89:18,23 92:6
119:16 129:2,8,19
133:23 134:14
141:10 171:16
191:21 198:18
201:2 202:8,11
207:6,16 210:7
212:2,15 219:13
225:5,7 226:1
228:13,20 235:18
236:4 237:12,13
**taken** 1:19 4:10
8:25 19:2 29:11
30:12 53:2 73:12
77:3 91:15 149:11
174:14 175:4,20
179:16 192:9,14
199:21 212:22
213:12 226:8
240:3
**takes** 161:17 214:4
236:1
**talk** 78:2 97:13
131:8 155:4
173:12 178:20
**talked** 102:16
170:25 173:10
174:19 176:20
207:11 229:23
235:14
**talking** 13:6,8,8
49:14 61:4,4 81:1
155:20 164:7
165:9 166:6,17
170:24 174:5
178:17 199:6
207:24 214:8,11
218:10 225:10
230:9 233:18
237:25
**tangent** 50:18
**tape** 179:12
**task** 145:7,11,14,15

145:21 171:6
220:22
**tasks** 129:1 162:3
**taught** 12:14 43:13
51:7 76:19 134:24
155:17 156:10
158:10,12 178:24
218:24
**teach** 6:20 8:13
12:11 35:8 55:5
90:4,9 148:10
158:20 188:18
**teaching** 8:10 33:14
34:19 35:11,15
36:2 38:6 55:23
55:24 61:22 76:2
77:9 81:14 83:21
86:23 110:7
112:22 135:11
142:10 143:8,15
155:24 177:16
205:12,14 215:13
219:2
**team** 55:12
**tech** 51:5,8
**technique** 210:24
211:21 215:3
**techniques** 35:13
35:21,22 51:16
229:4 231:17
**teens** 6:20
**tell** 6:17 9:13,16
10:15 39:21 50:20
52:8 69:15 80:20
81:7 89:11 99:5
140:3 148:24
176:3 188:23
189:19 192:12
193:14 195:8
196:17 203:14
205:24 213:15
232:15
**telling** 30:20 89:2
183:2 191:19
193:18 194:13
196:15 206:13

**temporary** 43:25
44:16 47:23,25
48:1,8
**ten** 25:16,18,21
181:13
**tend** 98:14
**term** 35:3 66:15
74:5 115:4 234:17
237:1,8
**termed** 234:25
**terminology** 60:17
**terms** 29:18 33:25
58:17 60:24 64:10
72:7 81:23 103:25
116:13 117:13
118:20 125:2
176:4 210:15
226:24
**terrain** 140:19
**test** 44:2 46:23 48:1
48:7,16 49:3,13
49:20,23 50:1
123:2 131:22
132:4,5 135:6
138:14 139:1,2
144:4,6,10 162:23
171:11,14,16,24
**tested** 127:7 134:24
164:3,4 201:7
**testified** 5:6 14:20
14:25 16:4,5,10
16:12,15 22:8
36:18,21 37:9
157:19
**testify** 7:8 13:12
16:13 22:9 36:10
36:24 37:13 98:23
127:18
**testimony** 10:19,23
23:24 38:1,11
64:15 66:5 80:19
104:16 108:1
133:10 172:3
217:17 218:9
219:18 220:6
240:3,7 241:5,8



**testing** 45:15 47:14
  47:15,17 48:12,13
  48:18,25 49:24
  74:21 103:23
  134:16,23 138:15
  144:18
**tests** 50:2,6,9 59:2
  103:22 132:6
  139:3 224:11
**thank** 6:2 9:19
  40:14,19 50:25
  52:23 77:18 88:18
  92:18 161:8
  209:14 238:10,18
  238:20
**thanks** 109:24
**thats** 14:12 15:19
  16:19 17:1,5,23
  19:16 22:12 26:2
  30:22 33:6 37:13
  38:12,17 40:2,17
  42:5 43:2,21 45:2
  45:3,20 46:19
  48:12,13 50:24
  52:9 53:8 54:10
  54:23 57:1 63:14
  65:3 71:1 77:2,7
  80:25 82:6,14
  83:1 85:24 86:1
  87:3,4 90:1 92:20
  94:6 97:15 100:20
  100:21 104:21
  107:3,10,18,23
  109:23 112:23
  114:9 115:7
  118:17 119:8
  120:6 121:4
  123:19 124:16
  127:11 136:8,15
  137:13 141:1,17
  144:4 145:15
  147:14 153:19
  154:5 155:3
  158:15 159:20
  160:12 168:18
  169:5,10,11,25

171:19,21 176:19
  178:4 180:8 181:7
  182:2,4,17 183:4
  184:10 187:16
  189:19 190:12
  191:10,16 192:8
  193:21 194:14,18
  196:2,20 200:9,18
  202:2 204:22
  211:20 214:11
  216:25 217:8,8,12
  230:4,25 232:2,14
  234:3 236:1
**therapists** 56:24
  57:5 61:23 76:16
  85:5,6
**theres** 10:17 40:16
  45:19 47:5 49:10
  54:25 57:9 76:25
  79:6 80:25 82:9
  83:15 89:1 97:17
  100:21 116:16
  123:6 141:21
  153:2,5 156:12,17
  159:16 162:10,11
  165:18 166:23
  171:16 172:3
  186:1,7 187:10
  192:17 198:2,4,7
  201:22 202:3,13
  203:17,18 204:18
  206:1 232:12
**theyre** 124:5
**theyve** 46:5 152:21
  186:21
**thing** 15:16 31:17
  37:11 62:25 71:7
  78:8 91:5 105:2
  123:19 125:7
  127:6 143:3 155:3
  163:8 181:24
  188:8 189:19
  192:11,18 204:3
  205:1,10 210:20
**things** 6:13 31:2
  47:9 48:19 55:7

57:10 58:12 63:3
  63:5 78:11,21
  79:8 82:9 92:7,14
  92:18 98:14
  129:25 139:22
  140:16 141:15,20
  162:8,15 163:10
  176:10 183:14,21
  183:23 184:3
  186:8 189:17,20
  191:25 192:15
  193:16,21 194:10
  198:16 199:1,19
  199:20,21,25
  200:12,16 207:4,7
  215:23 218:3
  227:22,24 231:22
  236:24
**think** 10:13 12:5,24
  13:24 14:6 16:19
  24:16,17,18 31:4
  31:17 32:15 38:14
  39:11 41:3 42:2
  61:14 62:15,18
  67:3 68:4 70:2
  78:1 83:17 89:24
  92:17 94:13 107:4
  107:9,10 109:21
  117:16 124:13
  139:18 142:20
  170:8 174:23
  177:1,6,18 188:25
  196:6 198:10
  200:4 210:19
  212:17 218:18
  221:6 222:17
  223:25
**thinking** 9:24
**third** 31:5 95:14
  113:8 172:6
**thirteen** 224:12
**thirty** 181:11
**thirtyfour** 26:12
  100:14
**thought** 223:22
**threat** 30:4 114:5

**three** 9:3 10:21
  11:3,17 15:1 41:4
  42:19 54:21 113:7
  172:16 179:19
  183:24 184:17
  239:1
**throw** 189:22
**throwing** 187:22
  214:12
**thunderstorm**
  19:11
**time** 1:18 4:8 7:13
  11:1,23 12:11
  13:1 20:9,17
  21:18 26:23 39:12
  39:22 40:1,3
  43:11 44:14,15
  46:13 52:2 53:1,4
  73:11,14 77:13
  80:21 82:1 91:12
  91:17 108:10
  111:15,19 148:13
  148:13 149:10,13
  162:2,8 169:23
  179:14,18 183:14
  183:17 184:3
  185:14 190:8
  195:3 196:2
  197:13 202:17
  212:8,23 214:5
  219:14,16 226:7
  226:10 238:24
  239:2
**times** 46:1 63:2,4
  86:25 126:24
  150:25 184:18
  193:12 216:5
  236:15
**tire** 233:6,16
  234:11
**title** 112:8,12,13
**today** 4:7,25 6:3
  8:20 9:13 10:19
  40:8 66:18 72:5
  73:1 86:15 102:22
  113:19 131:19

132:3 133:11
  140:10,25 155:5
  157:14 170:18
  175:1 180:22
  181:10 192:3,4
  194:19 208:2
  210:12 217:14
  221:6 227:11,13
  235:14 238:18
**todays** 7:8 33:3,4
  33:10 40:6 64:11
  140:8 174:20
  238:25
**told** 37:23 55:6,7
  89:10 104:24
  153:3 169:7
**ton** 199:20
**tool** 81:10 142:15
**top** 109:22 166:19
  196:13,22 232:2
**topic** 33:17 75:25
  82:22,23
**torrent** 19:23
**total** 25:19,20 46:8
**totally** 10:5 11:12
  81:17 82:13 83:10
  83:14 141:4
**touch** 89:5
**touched** 62:19
**touching** 26:2
**tow** 17:21
**track** 24:25 25:2
  230:22
**tracks** 230:14
  231:9
**traction** 236:13
**tractor** 136:21
  217:5
**tractortrailer**
  34:25 69:4 70:4,5
  70:7,15 123:24
  124:4,20 147:7
  148:5,21,22 149:5
  149:8 151:17
  184:14 185:6
  197:1 206:2,10



209:16 210:14
212:12,25 215:9
215:13 216:16
230:8 233:19
235:2 236:17,25
**tractortrailers**
147:21 151:5
**traditional** 44:23
**traffic** 61:17
163:20 170:8
184:18 185:11,14
185:17 186:9
188:17,18,19
189:12 192:22,22
198:22 205:4
212:21 227:18
**trailed** 137:1
**trailer** 136:21
137:1,15 159:4
236:19 238:12
**trailering** 238:2
**train** 55:22 91:6
144:23 156:1
157:24 168:11
169:19 171:14,23
189:7 191:24
192:2 197:2,3
201:5 207:25
215:23 221:3,4
225:8,18,23 237:6
**trained** 46:16,22
57:4 68:11,14
136:15 154:18
157:23 164:3
197:11,14 201:6
215:19 231:16
**trainee** 133:24
139:20 166:11
219:9,15 220:21
221:16,19 222:1
**trainees** 136:10
165:2 218:13
219:13,22 220:11
222:6
**trainer** 55:23 80:3
85:19 164:23

189:4 218:12
219:9,21 220:7
221:15 222:1
**trainers** 43:6,9
164:11
**training** 1:8 4:5
5:23 8:5 42:14,17
43:11 51:4 52:2
55:16 75:23 79:6
79:7,10 85:1,7,22
108:20 110:17
111:7,8,24,25
123:23 124:20
125:3,23 138:15
144:15 155:11
159:5,15,25 161:2
161:3,15,18,22
162:3,22 168:13
171:17 180:12,20
181:5 187:8,11
190:4 198:20
203:1 207:3
208:16 225:20,21
229:2,5,9,14
**transcript** 13:16,18
219:25 240:3,5
241:7
**transmissions**
147:11
**transportation**
128:14
**transporting** 69:20
**traveling** 29:13
39:22 140:18
**treat** 46:16
**trial** 1:16 16:12
22:6,7,8,9 36:24
37:3,10,13,25
38:1
**tried** 221:4
**trouble** 76:17
107:25 152:4
185:20 186:10
189:23 195:21
198:2
**truck** 12:7 17:20

59:17,18,21 60:1
60:11,20 67:17,20
137:18 148:4,20
149:16,19 150:4
150:24 151:16
155:20 165:10,15
180:21 191:6
192:5 196:4 198:4
198:19 200:1
205:12 206:4,12
206:16 213:19
214:13,14,15
232:1
**trucking** 72:18
191:24 201:14
**trucks** 12:24,24
13:3,7 71:9
147:12,13,21
152:25 153:21
184:19 204:25
218:10
**true** 81:14 98:20
128:12 188:6
240:5,8 241:7
**trumpet** 89:3
**try** 58:6 80:1
108:13 109:2
158:2 176:11
183:23 202:16
210:25 227:15
**trying** 21:1 23:20
39:17 40:17 46:2
67:9 81:11,16
100:6 101:11
103:15 106:9
107:4 108:22
124:10 127:23
130:6 153:21
154:6 167:15,21
168:25 183:4
184:21 185:18
189:5 199:17
209:1,19 214:7
219:5
**turn** 51:8 180:4,4
220:15,15 228:4

**turned** 86:25
**turning** 86:9 109:1
137:20
**turnpike** 163:21
**turns** 237:6
**twelve** 184:25
201:16
**twenty** 150:25
181:11
**twice** 150:15
**two** 11:3,16 15:3,7
15:20,24 49:6
52:15 55:7 79:7
90:18 91:18 115:1
115:23 129:25
137:4,9 167:19,24
172:15 179:15
183:13,16,22,24
184:3,10 186:12
193:4,17 194:10
195:2 196:10
198:8 200:17
203:21 204:12
214:6 217:18
218:3
**type** 28:25 48:16
146:16,24 149:2
223:10 234:14
235:1
**types** 223:4

————————
U
————————
**u** 128:14
**ultimate** 119:7
**ultimately** 59:8
90:10 223:1
**unacceptable** 25:22
**unanticipated**
200:13 227:22,24
**unclear** 120:18,24
121:8 122:5
**underlying** 117:12
117:21 127:22
**undermined**
183:12
**underneath** 118:14

**understand** 8:21
9:15 14:24 24:9
28:10 29:17 37:12
39:14,17 40:17,18
42:21 44:17 45:6
46:2 47:24 49:11
57:16 64:12,14
65:19,20 67:10
71:3 78:9,10
81:11 92:2,11
100:3 101:7
102:15 104:4
115:3 121:16
123:3 127:17
135:16 145:16
151:4 152:14
156:23 157:1
160:22 170:2
171:2 183:5 184:2
188:15,21 189:2,6
189:7,8 190:15
193:3 196:19
202:10 203:12
205:24 206:7
229:6 230:21,24
231:19 233:2
238:10
**understandable**
10:12
**understanding**
48:9 50:16 108:1
114:23 121:20
160:18 161:23
162:19 170:10
171:10,19 183:1,9
229:12,13,19
234:22
**understandings**
189:12
**understands** 202:4
231:1
**understood** 9:20,21
24:7 30:22 37:10
79:9 92:3 120:1
144:6 182:14
200:4 229:13



**unemployment** 113:11
**unexpectedly** 185:23
**unforeseen** 23:17
**unfortunately** 17:14 52:10
**uniform** 151:12
**union** 2:4
**unit** 70:2
**united** 1:1 4:6 5:25 151:6 217:15 218:7 223:18
**units** 69:17 165:14
**university** 41:14,20 41:21 42:25 43:2 43:10 51:5,8
**unmanageable** 201:17
**unscathed** 200:3
**unusual** 19:5,7
**unworkable** 218:14 219:23
**ups** 12:5,6,19,25 14:9,19 15:5 16:2 36:8 38:3 40:19 219:1,4 221:18 222:1
**urban** 227:19
**use** 90:3 92:9 107:17 108:13 139:4,13 144:19 174:16,25 177:12 177:19 180:15 189:19 201:10 209:3,6 217:22 219:15 229:18 230:14
**useful** 229:11,16
**uses** 130:9 220:8
**usually** 39:20
**utilize** 82:4,8,11

---
**V**
---

**v** 4:4
**van** 164:23

**vans** 53:12 218:11
**various** 12:3 75:5 160:1,1 216:14 224:11
**vary** 58:21 143:5
**veer** 21:13
**veering** 21:22
**vehicle** 8:14 12:12 13:5 17:17 22:5 30:21 32:6 36:4 38:7 45:2 46:11 59:10 60:12,13,14 60:14 69:5,10,24 70:24 71:8,15,24 72:6 73:20,23,25 74:12,15 76:18 78:19,20,22,25 80:6,10 84:25 85:19 86:23 87:8 93:17 96:1,3,14 96:21 97:21 107:18 108:13 109:5 116:17 120:21 123:12,24 124:3,7,9 128:17 129:2 131:17 133:2,16 134:2 135:13,18,19 136:2,5,19 137:3 137:8 138:6,8 146:3 147:15 148:10,14,25 149:1,17 150:6,15 150:16,17,21 151:10,18,22 153:3,18,18 155:18,20,21 156:3,10,22 158:11,14,16,20 158:23 159:4,11 160:20 161:3 168:14 174:6,9 176:5,16 178:3 181:15,18,20 182:19,23 184:4 184:14,23 186:11

188:6,7,15 189:8
189:11 191:5,15
193:15,25 194:12
194:14 195:15
198:21,23 201:11
202:16 203:15
204:1,4,13,20
206:6 207:16,20
207:25 212:5,24
213:16 214:3,9,23
215:9 216:9,17
217:5,23 219:11
220:10 221:5,17
223:10 226:15
229:2 231:7,15
232:23 233:3,7,17
234:12 235:17
237:3,18,23
**vehicles** 6:23 8:10 35:23 36:1 42:6 50:3,7 52:21 53:10,11,13,17 56:2 59:13 61:25 62:2,7 70:16 72:9 74:14,22 93:4,8 93:10,12 95:10 97:19 99:23 120:18 125:9,15 126:5 130:18,25 131:7,8,10 135:22 144:24 147:7 148:1,16,16 149:22 150:3 152:9,22 153:1,14 154:4 157:25 158:21 159:16 160:1,13 164:19 177:15 178:23 182:18 183:6 186:3 216:11 217:11,21 223:5,6 235:3,8,11,15 236:4,20
**velocity** 190:21
**verbal** 10:3 142:3,4
**verbally** 184:7

**verbatim** 220:18
**version** 77:21
**versus** 12:5,19 14:9 14:18 15:5 16:2 16:19,24 34:24 36:8 38:3 40:19 99:6 116:15 128:3 142:4 217:15 218:7 223:17
**videographer** 2:15 4:1,12 5:1 52:25 53:3 73:10,13 87:18 91:11,16 111:14,18 149:9 149:12 179:4,13 179:17 226:6,9 238:21,23
**view** 77:8 86:8 99:16
**viewed** 120:2
**violating** 171:7
**visavis** 36:7 122:10 132:22
**vision** 92:24 93:9 93:16 95:16,22 96:6 97:14 98:3 98:10,13,25 99:22 100:8,16 101:2,18 102:1,10,17 104:18 105:3,6 107:16 137:21 173:9,13 186:6 205:19 206:24 209:20 214:4,19 215:10 218:13 219:22 221:21 222:6
**visited** 161:11
**visual** 79:12 103:24 105:19 106:20 141:14 194:6
**visually** 103:7
**vitae** 41:5 50:19 84:10

---
**W**
---

**w** 240:1
**wait** 10:6 43:24 44:14 107:3 151:11
**waiting** 81:14
**waiver** 224:24
**walk** 204:17
**want** 11:18 14:23 27:25 28:22 36:6 49:4 60:19 65:16 65:23 67:9 69:22 79:13,14,22,25 82:4,10 85:20 86:7 87:7 93:5 101:1 109:13 119:25 141:22 143:3 157:15 160:23 176:25 179:23 186:20 187:14 188:22 194:23 199:4 203:3,11 222:23 225:5 228:13 229:3 230:20 231:1,5 232:13,24
**wanted** 51:10 56:22 59:24 60:5 79:20 81:6,7 82:7 141:19 168:3 197:23
**wanting** 232:24
**wants** 80:16 89:3 138:15 192:24
**warn** 141:19
**washed** 19:10,18,20 20:12 21:4
**washedout** 17:13
**washington** 86:22
**wasnt** 23:25 36:16 119:6 210:9 218:21,22
**watch** 32:9 193:13 194:1
**watching** 32:5
**water** 19:24
**way** 12:8 16:1



17:15 23:13 24:21
27:7 53:16 74:10
83:6,13 95:8
103:1 107:16
117:13 124:17
127:21 128:13
135:13 136:16
139:21 140:4
156:8 168:1
177:15 180:14
203:2,8,23 204:24
206:16 209:12
210:25 213:19
215:7,17 226:19
226:25 227:6
229:25 230:5
231:13 235:10
238:11,18 241:11
**ways** 50:1 215:2
**weather** 148:24
**website** 33:22,23
34:2,10 76:22
88:2,8 110:21
111:3,7,8,11,25
112:2,10 113:18
**wednesday** 4:8
**weeks** 43:23 90:18
**weighed** 71:24 72:2
**weight** 13:3 137:2
137:10 148:5,11
148:25 151:18
191:10 235:17
**weights** 72:10
**went** 15:16 18:13
29:9,16 43:4
44:24 50:17 55:10
55:12 64:1 111:20
155:7 164:5
170:21 213:10
223:24
**wessendorf** 168:9
168:18,20
**west** 165:6,9
**weve** 34:12 75:16
91:24 101:8
109:15 136:4

173:6,9,10 174:19
207:10 217:23
230:8 233:18
**whatif** 204:13
**whats** 31:19 34:2
39:8 41:24 88:22
94:14 110:1,23
111:4 112:2
116:21 138:13
143:4 148:3 154:7
156:1 157:21
161:21 190:24,25
190:25 191:11
192:23 195:16
201:22 202:13,19
209:20,21 213:22
234:17 235:22
**whatsoever** 70:7
163:7
**wheel** 22:1 44:13
145:2 207:21
209:19 210:16
214:22 215:4
238:11
**wheels** 236:14
**white** 139:13
174:15 175:4
**whos** 187:2
**wilson** 5:15 6:10
**windows** 166:23
**withdraw** 22:19
65:9 114:14
120:16 157:18
235:8
**witness** 1:17 3:2 5:2
5:4 143:23 241:5
241:8
**wont** 202:17
**word** 83:18 120:16
128:10 149:24
**words** 35:9 96:13
**work** 15:14 42:9,18
59:3 62:10 63:3
105:10 131:10
187:1 188:5

195:13 200:20
210:6 213:5
226:13
**worked** 52:4 71:4
82:1
**workers** 27:25 28:3
**working** 78:22
100:14 112:8
171:18 213:19
232:22
**works** 141:7
**world** 47:3 160:20
**wouldnt** 31:23 33:1
50:4 72:21 73:6
105:4 128:25
130:10 142:14
155:8 167:2
170:15 175:14
199:15 212:13,14
213:2 225:3
232:23 238:4
**write** 65:3 76:20
146:8 219:16
**writes** 58:14
**writing** 65:18
129:11 141:17,18
**written** 33:18 35:14
47:21,22 48:7
220:9
**wrong** 20:16 40:16
183:14 190:19
192:18
**wrote** 75:21 77:10
84:15 86:11,13
88:2,4 110:4
**www** 1:25

## X

**x** 1:4,10 3:1 5:3,3,3
5:3,3
**xxxxx** 2:24

## Y

**y** 1:12 2:4
**yard** 163:24 164:4
164:11,16 226:20

227:7
**yeah** 238:14
**year** 25:14,15,15,18
25:21,24,25
**years** 8:9 12:22
13:11 15:15 16:24
25:4,12,19 26:7
26:12,15,16 55:1
56:6 61:18 99:8
100:14 103:15
105:23 160:16
199:15
**york** 1:12,21 2:4
4:11,11 5:6 50:2,5
58:7 171:25 241:4
**youd** 89:24 91:3,3
105:7 123:20
**youll** 202:18 219:3
**youre** 8:1 10:18
15:19 26:24 33:12
34:21 36:16 45:20
51:1 53:21 61:3,3
61:4 62:2 64:7
67:2,6 72:22 78:5
78:22 79:3 90:3
99:9,10,11,20 100:5
100:12,22 101:15
102:3,11,21 104:4
105:1 113:19
115:10 117:1
118:12,25 119:13
119:14 121:11
126:17 127:8,13
127:17 131:23
132:19 134:14
136:13 137:7
138:4 140:3
145:15 146:20
148:17 149:7
154:25 155:3
158:14 159:1,1,17
159:19,21 160:4
163:19 174:9
178:6 182:22
183:6,9 184:4,20
186:23 187:22,25

188:2 189:2,10
190:19 191:15,18
191:20,21 192:4
192:13,16 193:18
194:3,4,11,11
196:9 198:1,16
199:20 200:4,7
201:24 203:12,18
205:18 206:9,12
206:12,18 207:17
209:23 210:14,18
211:1 212:12
214:8,15 219:7
220:18,25 221:23
222:22 225:10
227:23 229:6,7,24
230:7,19 233:21
234:2,19 237:18
237:23,25
**youve** 9:20 10:2,22
35:13 52:20 68:8
98:2 99:15 104:2
115:23 128:8
136:11 142:9
157:23 159:6
177:20 189:14
190:2 207:10
216:3 228:9 229:1

## Z

## 0

**000** 13:4,10 24:18
39:12,16,21,25
40:4,10 72:3
148:4,21 151:17
153:17 184:14
**03** 111:15,19
**07** 149:13

## 1

**1** 3:7 7:1,4 39:21
40:4,10 72:3
91:17 109:23
126:24 154:15
179:7



**10** 1:14 4:9 13:4,10
  25:4,11,19 45:17
  110:24 111:1,3
  112:7 113:9
  153:17
**10003** 2:4
**10174** 1:12
**11** 53:1,4 92:5
  116:6,22 217:9
**11th** 2:9
**12** 49:19 73:11,14
  91:12
**12speed** 212:11
**130** 2:9
**1400** 137:2
**15** 12:21 44:1
**15cv02917kmjbc**
  1:3
**15speed** 212:11
**16** 12:22 13:11 41:3
  41:4 223:18
  238:24 239:2
**17** 41:4 50:24 73:11
  84:11
**18** 41:4
**18th** 2:9
**19103** 2:10
**1957** 26:10
**1968** 44:9
**1983** 41:16 42:9
**1986** 70:25 71:8
  72:7,23 74:1,15
  131:17 138:8
**1993** 54:6
**1996** 42:24 55:7
**1997** 50:21 51:1,2
  51:15 52:19 55:10
**1998** 12:20
**1999** 12:6,20

─────────
**2**

**2** 3:8 26:15,16 34:5
  34:7,12 38:13,18
  39:15 43:22 52:13
  63:15 64:8 65:4
  84:12 92:7,17

111:15,19 113:9
  149:10 154:8
**20** 73:14
**2000** 12:6
**2001** 110:10
**2004** 223:19,23
**2006** 51:19
**2008** 116:9
**2009** 77:6,10
  128:16
**2010** 126:13
**2011** 61:19
**2014** 16:25 61:19
**2015** 88:19
**2016** 1:13 4:8 65:25
  77:11 240:4
**205** 223:19
**20speed** 212:11
**24** 2:4 44:12,17,21
  47:12 65:25 77:11
**24th** 1:11
**26** 72:3 116:9 148:4
  148:21 151:17
  184:14
**27** 1:13 4:8 240:4

─────────
**3**

**3** 3:9 39:12,16,25
  56:6 61:18 75:11
  75:13,16 84:21
  116:20,24 117:3
  118:13 139:12
  149:13 176:19
  179:14,18,21
**303** 140:25
**30hour** 42:2
**34** 3:8 8:9 160:16
**35** 1:14 4:9 24:17
**37** 91:17

─────────
**4**

**4** 3:10 49:19,20
  87:22,24 112:3
  211:4,5 226:7,10
**40** 24:18 53:1
**405** 1:11 4:10

**43** 179:14
**44** 226:7
**44143** 5:16 6:11
**45** 91:12
**46** 119:19,25
**47** 53:4 179:18
**48** 164:22
**4th** 2:4

─────────
**5**

**5** 3:3 44:1 55:1 92:5
  92:19 226:14
  238:24 239:2
**50** 43:23 44:13 45:3
  45:10,16 46:12
  47:1,10,11
**511** 3:11 91:20
**5241** 5:15 6:10
**54** 226:10
**58** 149:10

─────────
**6**

**6** 43:24 44:2,15,24
  93:20 94:15
**6246221** 1:24

─────────
**7**

**7** 3:7 95:13
**75** 3:9

─────────
**8**

**8** 44:13,25 45:1,8
  45:10,21 46:18,24
  47:10,11 64:6,7
  64:19,25 92:8,21
  97:1 126:24
**866** 1:24
**87** 3:10

─────────
**9**

**9** 42:1,4 109:16,20
  109:22 110:1
  111:4 112:2,12
  113:8 163:20
**90s** 223:21,25
**91** 3:11



# EXHIBIT 7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIV. NO.  15-CV-02917-KM-JBC

------------------------------------------ x

KENNETH FRILANDO,

                    Plaintiff,

     -against-

BORDENTOWN DRIVER TRAINING SCHOOL, LLC,

                    Defendant.

------------------------------------------ x

              Blank Rome, LLP
              405 Lexington Ave., 24th Fl.
              New York, N.Y.  10174

              September 29, 2016

              10:27 a.m.


     EXAMINATION BEFORE TRIAL of JOHN

LUEGENE HUEY, JR., Video Expert, by the

Defendant in the above-entitled action, held

at the above time and place, taken before Joi

Rafkind, a shorthand reporter and Notary

Public within and for the State of New York.


            MAGNA LEGAL SERVICES
              (866)624-6221
             www.MagnaLS.com



Page 2

1  A P P E A R A N C E S:
2
3     EISENBERG AND BAUM, LLP
          Attorneys for Plaintiff
4         24 Union Square East, 4th Fl.
          New York, N.Y. 10003
5
      BY: ANDREW ROZYNSKI, ESQ.
6
7
8     BLANK ROME, LLP
          Attorneys for Defendant
9         130 North 18th Street
          One Logan Square, 11th Fl.
10        Philadelphia, P.A. 19103
11    BY: ANTHONY B. HALLER, ESQ.
          JOHN A. CONNELLY, ESQ.
12
13
14  ALSO PRESENT:
15  John Diab, Sr.
16  John Diab, Jr.
17  Kymme Val Caleef
    Craig Ridgway
18  Sign Language Interpreters
    Magna Legal Services
19
    John Edmunds, Videographer
20  Magna Legal Services
21
22
23
24
          xxxxx
25

Page 3

1        I N D E X
2  WITNESS         EXAMINATION BY    PAGE
3  J. LUEGENE HUEY, JR.  MR. HALLER     6
4
5        EXHIBITS
6  PLAINTIFF'S DESCRIPTION          PAGE
7  Huey 1     Subpoena         12
8  Huey 2     Letter            12
9  Huey 3     Stack of documents    32
10 Huey 4     Copy of license, and  34
            other documents
11
   Huey 5     Texas Dept. of Public   35
12            Safety 3 year History
              Record 09/26/2016
13
14    INFORMATION/DOCUMENT PRODUCTION
15 DESCRIPTION              PAGE
16 All documents regarding witness'    94
   experience
17
18
19
20
21
22
23
24
25

Page 4

1        S T I P U L A T I O N S
2
3      IT IS HEREBY STIPULATED AND AGREED by and
4  between the attorneys for the respective
5  parties herein, that filing, sealing and
6  certification, and the same are, hereby
7  waived.
8
9      IT IS FURTHER STIPULATED AND AGREED
10 that all objections except as to the form of
11 the question, shall be reserved to the time of
12 the trial.
13
14      IT IS FURTHER STIPULATED AND AGREED
15 that the within deposition may be signed and
16 sworn to by an officer authorized to
17 administer an oath, with the same force and
18 effect as if signed and sworn to before the
19 Court.
20
21
22
23
24        xxxxx
25

Page 5

1      THE VIDEOGRAPHER: We are now on
2  the record. This begins videotape
3  number one in the deposition of John
4  Eugene Huey, Junior in the matter of
5  Kenneth Frilando versus Bordentown
6  Driver Training School in the United
7  States District Court in the District
8  of New Jersey, Civil Number
9  15-CV-02917-KM-JBC.
10     Today is Thursday, September 29,
11 2016 and the time is 10:27 a.m. This
12 deposition is being taken at Blank
13 Rome, LLP in the Chrysler Building, New
14 York, New York, at the request of Blank
15 Rome, LLP.
16     The videographer is John Edmunds of
17 Magna Legal Services, and the court
18 reporter is Joi Rafkind of Magna Legal
19 Services. Counsel will be noted on the
20 record.
21     Will the court reporter please
22 swear in the witness.
23 KYMME VAL CALEEF and CRAIG RIDGWAY, called as
24 the interpreters in this matter, were duly
25 sworn by a Notary Public of the State of New



2 (Pages 2 to 5)

Page 6

1    York to accurately and faithfully translate
2    the questions propounded to the witness from
3    English into Sign Language and the answers
4    given by the witness from Sign Language into
5    English.
6              oOo
7    JOHN LUEGENE HUEY, JR., the witness herein,
8    having been first duly sworn by a Notary
9    Public of the State of New York, was examined
10   and testified through the interpreters as
11   follows:
12   EXAMINATION
13   BY MR. HALLER:
14       Q.  State your name for the record,
15   please.
16       A.  John Luegene Huey, Jr.
17       Q.  State your address for the record,
18   please.
19       A.  7820 Duber Lane, Austin, Texas
20   78747.
21       Q.  Good morning, Mr. Huey.
22       A.  Good morning, everyone.
23       Q.  My name is Anthony Haller, along
24   with my colleague here, John Connelly, is to
25   my right.  We're at the law firm of Blank

Page 7

1    Rome and we represent the defendant,
2    Bordentown Driver Training School, LLC doing
3    business as Smith and Solomon in this case,
4    which is being brought by Mr. Kenneth
5    Frilando.  Do you understand that you're
6    under oath here today?
7        A.  Yes, I do.
8        Q.  Do you understand what your role
9    here today is as a witness?
10       A.  Well, to help the defense people
11   become expert truck drivers.
12       Q.  So that's your role?
13       A.  Yes.
14       Q.  Is that something you feel strongly
15   and passionately about?
16       A.  Yes, I've always have.
17       Q.  Have you been somebody who has
18   supported the efforts of the deaf community
19   to allow what became the hearing exemption?
20           MR. ROZYNSKI:  Objection to the
21       form.  You can answer.
22       A.  Yes, that's right.  I always support
23   the deaf community and advise them in how to,
24   you know, become successful and to get
25   involved with the process, yes, I have been

Page 8

1    an advocate for the deaf community.
2        Q.  As an advocate for the deaf
3    community, have you been an advocate in
4    connection with the question of deaf
5    individuals being able to drive
6    tractor-trailers?
7        A.  That's right, yes, all trucks,
8    buses, all types of vehicles, whatever they
9    want to do to improve their future, because
10   it's a similar system.
11       Q.  Other than being here today, could
12   you just describe generally for me the things
13   you've done as an advocate on behalf of the
14   deaf community in connection with deaf
15   individuals potentially driving
16   tractor-trailers and the other vehicles you
17   just mentioned?
18           MR. ROZYNSKI:  Objection to the
19       form.
20       A.  Well, I've shown that we can, deaf
21   people can, drive tractor-trailers, and
22   anyone really can, so I support that idea.
23       Q.  My question goes more to what have
24   you done to voice that opinion in the
25   community, such as supporting the waiver

Page 9

1    itself and other advocacy that you may have
2    done?
3            MR. ROZYNSKI:  Objection to the
4        form.  You can answer.
5        A.  Well, I explain the truck system,
6    the air pressure gauge and how that is hooked
7    up, and how to take care of trucks, you know,
8    I help explain.  But I'm not sure exactly
9    what specifics you're asking for me.  Can you
10   give me an example of what type?  It's really
11   not clear what your question is, what you're
12   asking me.
13       Q.  Let me just back up a second and go
14   through some instructions and I'll come back
15   to my question.  So have you ever had a
16   deposition taken before like today?
17       A.  This is my first time.
18       Q.  Do you understand that the questions
19   that you are asked and the answers that you
20   give may be used in further proceedings in
21   this case?
22       A.  Yes, yes.  And I will always have
23   the same answers to the questions.
24       Q.  As part of the ground rules for
25   taking the deposition, I would just ask that



1    you answer my questions fully and to the best
2    of your knowledge.  Is that fair and
3    understood?
4        A.  Yes, I understand.  And I'll try my
5    best to do that, as long as I understand the
6    question clearly.
7        Q.  You understand that the interpreters
8    are here acting as an extension of the court?
9        A.  Yes.
10       Q.  And that job is to insure that they
11   are accurately relaying information as
12   between me, the questioner, and you, the
13   witness?
14       A.  Yes.
15       Q.  You understand that it's not their
16   role to clarify anything, they have to give
17   me your answer as you relay it to them?
18       A.  Right, that's correct.  That's how
19   it's supposed to be.
20       Q.  To your point; if at any point you
21   do not understand the question that I've
22   asked, or something about the question,
23   please, will you tell me, and the interpreter
24   will advise us of that?
25       A.  Yes, I will do that.  I definitely

1    will.
2        Q.  Sir, I want to come back to the
3    question, because I think you said you hadn't
4    fully understood what I was asking.  Let me
5    try and clarify.  You said on the record
6    today that you are an advocate for the deaf
7    community, and in particular with respect to
8    deaf individuals being allowed to drive
9    tractor-trailers, correct?
10       A.  That's right, that is correct.
11       Q.  So my follow-up question, which I
12   don't think you understood, so I'll try to
13   make it clearer, was to try and find out what
14   specific things you have done, in terms of
15   being an advocate for the deaf community,
16   with respect to the driving of
17   tractor-trailers.  So by way of example, I
18   know, because we have a copy of it, that you
19   wrote a letter to the Federal Motor Carrier
20   Association as part of the petition of the
21   National Association of the Deaf when they
22   were considering whether or not to give an
23   exception to the forced whisper hearing test
24   of the medical examination; do you recall
25   doing that?

1        A.  You're saying I wrote the letter to
2    NAD.
3        Q.  I believe so?
4        A.  No, I'm not sure about that.  Can I
5    see the letter, please, that you're referring
6    to?
7        Q.  I'll show you.
8            MR. HALLER:  Let's mark this.
9            (Whereupon Subpoena was marked
10       Defendant's Exhibit Huey 1 for
11       identification as of this date.)
12           (Whereupon Letter was marked
13       Defendant's Exhibit Huey 2 for
14       identification as of this date.)
15       Q.  Mr. Huey, through the course of the
16   deposition I'm going to be giving you some
17   documents to look at, about which I'll ask
18   questions.  We have a system whereby we mark
19   them as exhibits, so I'm going to give you
20   two exhibits now, the first one is
21   Defendant's deposition Exhibit Huey 1 and the
22   second is Defendant's deposition Exhibit Huey
23   2.
24       A.  Oh, yeah, I remember someone sent me
25   this.  Yes, this looks familiar.

1        Q.  Let's start with --
2        A.  Yes.
3        Q.  -- Exhibit 1, Huey 1, do you have
4    that in front of you?
5        A.  Yes.
6        Q.  Do you recognize it to be a subpoena
7    for today's deposition, along with a notice,
8    and then a subpoena for documents to be
9    produced?
10       A.  Yes, that's correct.  Yes, sir.
11       Q.  I'm going to come back to that in a
12   minute, because it came out in the initial
13   conversation a minute or so ago.  I put
14   before you what we've marked as deposition
15   Exhibit Huey 2, do you have that in front of
16   you?
17       A.  Yes.
18       Q.  Am I correct that this appears to be
19   a comment with respect to a petition of the
20   National Association of the Deaf for
21   exception with your name associated with it?
22       A.  Let me read it.  So you're asking me
23   did I write this and send it to FMCSA, is
24   that your question, if I wrote this, the
25   petition of NAD for exemption?



1      Q.  Let me break it down.  Let me start
2   with --
3      A.  With a hearing waiver.
4      Q.  Let me start with asking the
5   question whether now you recall that your
6   name was used in connection with comments to
7   the Federal Motor Carrier Safety
8   Administration when they were considering
9   whether or not to grant exception to deaf
10  individuals, or hearing-impaired individuals,
11  from the medical requirements that existed?
12     A.  Yes, I believe so.  I believe so,
13  yes.
14     Q.  Do you agree on --
15     A.  I don't see anything wrong with
16  these comments.
17     Q.  Do you agree, sitting here today,
18  that the comment that appears that is drawn
19  from the notice of comment website of the
20  Federal Motor Carrier Safety Administration
21  is a letter that was written under your name?
22     A.  Yes, I see my name there.  I do see
23  John Huey.
24     Q.  Did you authorize your name to be
25  used in association with the letter that

1   appears under this comment?
2      A.  I think NAD and I had a
3   conversation, so I believe I did give
4   permission to NAD, yes, I believe I did.
5      Q.  My next question then is in your
6   discussions with NAD about giving this
7   letter, did you personally write it or did
8   they write it on your behalf?
9      A.  I wrote it and gave it to NAD.  And
10  they may have made some revisions and used
11  the specific wording of the Federal Motor
12  Carrier Safety Administration, but I wrote it
13  and they may have tweaked it a bit.  And
14  also -- and I'm also related with NAD and
15  that FMCSA as well related with them.
16     Q.  Could you explain to me what you
17  mean by I'm also related to NAD?
18     A.  As an advocate for deaf people and
19  hard-of-hearing and for deaf people's rights,
20  I'm involved with collaboration with NAD and
21  the Federal Motor Carrier Safety
22  Administration.
23     Q.  So that then gets to my question,
24  which is sort of very specific as to what you
25  have done in the capacity as an advocate in

1   collaboration with the National Association
2   for the Deaf, other than the letter that
3   we've now identified, what other specific
4   things have you done to try and advance the
5   cause that you feel so passionately about
6   with respect to deaf drivers and
7   tractor-trailers?
8         MR. ROZYNSKI:  Objection to the
9      form.  You can answer.
10     A.  I need more specifics again of what
11  advocacy, can you be more specific?
12     Q.  Well, I can't, because I'm asking
13  the questions and I don't know the answers to
14  all the questions I ask.  So I was trying to
15  find out from you what the advocacy and
16  collaboration with the National Association
17  for the Deaf that you've been involved in
18  does.  So what sort of things have you done
19  in that connection with that, who have you
20  spoken to, have you written other letters or
21  articles, have you been on social media,
22  anything that you've done as an advocate is
23  what I'd like to generally know about.
24     A.  There's some videos that I've done
25  and explaining to people how to, you know,

1   work in that field with the tractor-trailers,
2   so that they can understand what's written in
3   English and I put it into sign language on
4   videos some of the information that's written
5   in English, then I translate it into sign
6   language and have it on videos.
7      Q.  Anything else that you can think of?
8      A.  Well, let me explain.  What I do is
9   like a teacher does, instructor in school,
10  I'm just trying to teach that people about
11  driving and the tractor-trailer system and
12  things like that.  I basically teach deaf
13  people.
14     Q.  What does your collaboration with
15  the National Association of the Deaf involve?
16     A.  Well, I collaborate with them to
17  protect deaf people's rights in order to get
18  a CDL.
19     Q.  When you say collaborate, what does
20  that mean?
21     A.  He needs clarification --
22        MR. ROZYNSKI:  I can't talk to you
23     in the middle of a question, so, you
24     know, answer the question the best you
25     can and if you need clarification then.



1      A.  I'm still not understanding about
2  NAD, you know, it's a National Association of
3  the Deaf and I support the same things that
4  they support.  You know, whatever law they
5  are supporting, I advocate for deaf people
6  and deaf people's rights.  As far as, you
7  know, the Federal Motor Carrier Safety
8  Administration and NAD, they know each other
9  well and they've been communicating back and
10  forth with each other and I've been
11  advocating with NAD on that matter.
12      Q.  Who at NAD do you deal with?
13      A.  There's a Howard, I'm not sure of
14  his last name, I would have to look in my
15  files, I'm not sure of his last name.  His
16  first name is Howard.
17      Q.  Do you know what position he holds
18  with NAD?
19      A.  He is the CEO.
20      Q.  Have you attended any meetings with
21  him and either the Federal Motor Carrier
22  Safety Administration or other interested
23  organizations in connection with the advocacy
24  that you do on behalf of deaf individuals who
25  want to drive tractor-trailer?

1      MR. ROZYNSKI:  Objection to the
2   form.
3      A.  Yes, I have.
4      Q.  Could you give me examples of the
5  kinds of meetings that you've attended?
6      A.  Things related to DMV, school
7  programs, how to provide interpreting
8  services for these situations, meetings in
9  that vein.
10      Q.  Who are these meetings with?  I want
11  to get a sense of who the participants are.
12      A.  I can't say.
13      Q.  Are the meetings that you've
14  described with FMSCA, or are there other
15  organizations?
16      A.  NAD and FMSCA, like the heads of
17  DMV, for example, the head of Department of
18  Transportation.  I'm not sure who else.
19  There was a few people in those
20  meetings, typically heads of departments,
21  transportation.  DMV head.
22      THE INTERPRETER:  We're going to
23   have an interpreter switch.
24      Q.  Approximately how many of those
25  meetings have you been involved in?

1      A.  One time.
2      Q.  Do you remember when that was?
3      A.  I'm trying to think.  That was --
4  that was in 2014.
5      Q.  Do you recall whether it was before
6  or after the effective date of the exemption
7  from the hearing component of the medical
8  examination?
9      A.  That was before.
10      Q.  Was that a meeting in which you were
11  participating in advocacy to persuade the
12  Federal Motor Carrier Safety Administration
13  to grant exceptions to the first forty-five
14  individuals who were seeking waivers from the
15  hearing component?
16      A.  That was after.  That wasn't for the
17  forty-five, that had been in 2012, the
18  forty-five individuals that asked for the
19  exemption, and this meeting took place two
20  years later.  Now, this was more related to
21  deaf people that wanted to get a CDL, that
22  was that particular meeting with the DMV,
23  yes, I remember that was a long meeting.
24      Q.  You were there to advocate on behalf
25  of the deaf community in support of the

1  exemption?
2      A.  Yes.
3      Q.  Do you have any --
4      A.  Also, I want to add, also it relates
5  to the DMV had to test individuals for the
6  CDL.
7      Q.  Where was this meeting?
8      A.  At the Department of Transportation,
9  DOT.
10      Q.  In Washington, D.C.?
11      A.  Yes.
12      Q.  Were there any representatives of
13  state agencies present, if you know?
14      A.  Only the NAD.  And then the FMCSA
15  were there and the Department of
16  Transportation, the DMV.
17      Q.  I want to just follow-up, because
18  you said DMV, which to me suggests a state
19  agency, because I'm not aware of a federal
20  DMV, but --
21      A.  This is the head, they are under the
22  Department of Transportation, DMV.  They
23  oversee all the states to provide programs
24  and services.  Say, for instance, a state, if
25  there's a deaf person, they'll contact the



Page 22

```
 1    DMV at the headquarters and explain how to
 2    handle this situation.  If they could provide
 3    interpreting services, for instance, so they
 4    would get some guidance.
 5        Q.  I may come back to this later.  So
 6    we've identified this meeting.  Are there any
 7    other things that you specifically recall
 8    that you did in connection with your role as
 9    an advocate for deaf individuals in
10    collaboration with the National Association
11    for the Deaf, particularly as it relates to
12    driving tractor-trailers?
13        A.  I advise people that you can become
14    drivers, you can.
15        Q.  Are these individuals referred by
16    NAD to you?
17        A.  There's several of us, I wasn't the
18    only person that you were referred to.
19        Q.  But you're one of the people that
20    the National Association for the Deaf refers
21    individuals who might be interested in
22    driving tractor-trailers who may be
23    hearing-impaired?
24        A.  Okay, I'm a little bit confused.
25    When you're saying referred by NAD, there's
```

Page 23

```
 1    always an open discussion with NAD, there's
 2    not a referral.  There will be a group of us
 3    that get together, and I would join this
 4    group discussion.
 5        Q.  That's helpful, because it gets to
 6    answer my question.  So who is in the group?
 7        A.  There's deaf people there.
 8        Q.  Specifically by name, I'm asking?
 9        A.  There's myself, John, Randal, Morie,
10    M-O-R-I-E.  I'm trying to think of other
11    names.  Dean, he is not a truck driver, he is
12    an advocate for deaf to become drivers,
13    that's Dean.  Who else.  Randal, Morie, Dan.
14    The last names I can't remember.  I do have
15    them saved in my contacts, but I would have
16    to search through that to provide you full
17    names.
18        Q.  I'm going to request that during a
19    break, perhaps, we can get the last names of
20    these individuals --
21        A.  Okay.
22        Q.  -- is that agreeable?
23        A.  Yes.
24        Q.  Would we be able to also get some
25    identification of what position they hold and
```

Page 24

```
 1    with what organization they are associated?
 2        A.  No, I'm not too -- I'm not close
 3    friends with them, so I'm not too sure what
 4    their positions are.
 5        Q.  How does this group get together, is
 6    it by telephone, by video, or is it in
 7    person?
 8        A.  We set it up through Facebook on a
 9    video and we're signing in the video and we
10    just share it.
11        Q.  Do you have a Facebook page open to
12    the public, not private?
13        A.  No.
14        Q.  Do you participate in any kind of
15    social media in connection with the advocacy
16    that you do on behalf of the deaf community?
17        A.  I do have another group, but nobody
18    comments on that, there's a slow response
19    time.  I set that up about four years ago,
20    three or four years ago, this as called RDT,
21    the Rights of the Deaf Truck Drivers and
22    Equalities.  There was about three hundred
23    members in that.  I don't know who they are,
24    they just join.  And I provided some comments
25    and instructions, and the basic thing is you
```

Page 25

```
 1    can do it.  And I didn't get any responses,
 2    no comments.
 3        Q.  Is there a group on Facebook or is
 4    it some other form of social media?
 5        A.  On Facebook.
 6        Q.  Is it something that if I wanted to
 7    go to today, or somebody wanted to go to
 8    today, it would be accessible?
 9        A.  Might be set to private, you would
10    have to ask me for permission and then I
11    would have to approve you.  I believe there's
12    three of us there, administrators, and so we
13    could approve it.  You know, we're trying to
14    avoid any scam or we want to verify people's
15    identities.
16        Q.  Can I assume that given you're here
17    today testifying in this case that you would
18    give the defendants permission to look at
19    that group site on Facebook?
20        A.  Yes.
21        Q.  What would a person need to get the
22    ability to view that site, is it a password
23    or is it something else that they need to do?
24        A.  Once you became a member you can
25    gain access and view it.
```



Page 26

1    Q.  So you have to make a request to
2  become a member?
3    A.  Yes, that's right.
4    Q.  Is that kind of like adding a
5  friend, is that basically it?
6    A.  Yes.
7    Q.  Would it be possible that before the
8  end of today that we have the ability to get
9  friended on this site so that we can look at
10 it so we can ask any questions that might
11 arise from it?
12   A.  Sure.
13   Q.  I'm going to leave that to my --
14   A.  I have no objections to that.  I'm
15 not opposed to that.
16   Q.  I'm going to leave that tentacle
17 part of the deposition to Mr. Connelly.
18   A.  Okay.  Just don't take us down,
19 don't say that we can't do it.  I want you to
20 stand with the deaf people and encourage us.
21   Q.  We will purely go and view it, we're
22 not going to say anything or do anything with
23 it.
24   A.  Okay, right, right.  We're very
25 protective, us and other advocates, for our

Page 27

1  rights that basically we can do it, we can
2  become truck drivers, as well as bus drivers
3  too.  I'm sorry, my chair just went down.
4    Q.  That happens with these chairs, and
5  I apologize.  It happened to me.
6    A.  Is there an air problem?
7    Q.  I just want to finish up on this
8  line of questioning.  Are there any other
9  social media sites that you participate in
10 that one could, with permission, get access
11 to?
12   A.  Just Facebook.  Sometimes I might go
13 to a deaf event, and it's a very small world,
14 and then people will approach me and say, oh,
15 I recognize you, you're the truck driver.
16 And then I will explain to them in person
17 one-on-one or in a group, so that's basically
18 what I do.
19   Q.  I just want to be clear.  When you
20 talked about the Facebook group, RDT and
21 Equalities, or whatever that exact name is,
22 but that's what I wrote down?
23   A.  Yes, I can search it for you.
24   Q.  That's fine.  Just wait.  When you
25 referred to that, you said that that was

Page 28

1  another group that you had; so my specific
2  question is the group that you described with
3  John and Randal, Morie, Dean and Dan, does
4  that have a name, and can you also, if you're
5  allowed, get access to that?
6    A.  Yes, that is a separate one.
7    Q.  What's its name?
8    A.  I'm not a member of that one, but
9  they do have their own group, it's called
10 Deaf Truckers United.  Deaf Truckers United,
11 DTU.  And then mine is RDT.  And this -- mine
12 is more focused on advocacy and rights.
13 Their's is more general to the general deaf
14 community.
15   Q.  You said you're not a member, but
16 you do participate on Deaf --
17       THE INTERPRETER:  DTU.
18   Q.  On DTU?  Yes?
19   A.  No, I don't participate.
20   Q.  I thought you said that you
21 participate in videos with --
22   A.  No.  This is in RDT I make videos,
23 but I'm not involved in DTU.  Before I was,
24 but not anymore.  I don't agree with them.
25   Q.  In the past you've been involved

Page 29

1  with DTU?
2    A.  Yes, I was.
3    Q.  You were a member, but you're not
4  currently now a member?
5    A.  Yes, that's correct.
6    Q.  When you were a member you would
7  participate in some of the discussions that
8  you described with John, Randal, Morie, Dean,
9  Dan, and maybe some others?
10   A.  Yes.
11   Q.  What is it about DTU with which you
12 have disagreement?
13   A.  We don't -- we have a different
14 philosophy on how we approach things.  I
15 don't agree with them, I'm more focused on
16 advocacy, implying interpreter services and
17 communication, how it relates to programs.
18 They said you don't need an interpreter.  I
19 believe strongly that you need an interpreter
20 present.
21   Q.  When they say you don't need an
22 interpreter present, what are you referring
23 to?
24   A.  They believe that you can do it
25 without an interpreter, everyone should have



8 (Pages 26 to 29)

1    the right to take the program with or without
2    an interpreter, and I disagree with them. We
3    had several arguments and I left that group
4    and I set up my own. And I encourage people
5    that you can do it, and you can advocate for
6    an interpreter as well.
7        Q. Is there anything else that you've
8    done that is specific, in terms of advocacy
9    on behalf of the deaf community with respect
10   to driving tractor-trailers that we haven't
11   now mentioned in today's deposition?
12       MR. ROZYNSKI: Objection to the
13       form.
14       A. Basically I encourage people that
15   you can do it, and if you have any questions,
16   just contact me directly.
17       Q. Is it fair to say, Mr. Huey, that
18   you're a constant advocate for the cause of
19   deaf individuals with respect to driving
20   tractor-trailers and other large vehicles
21   such as buses?
22       MR. ROZYNSKI: Objection to the
23       form.
24       A. Yes, that's right.
25       Q. Absolutely no question about it,

1    right?
2        MR. ROZYNSKI: Objection to the
3        form.
4        A. Yes, I always do.
5        Q. You understand I assume that you're
6    being put forward here as an expert witness
7    in this case?
8        A. Yes.
9        Q. Do you understand that as an expert
10   witness that the federal rules of civil
11   procedure which govern the conduct of
12   litigation in federal court such as the
13   United States District Court for the District
14   in New Jersey require that you provide to the
15   other side, that happens to be the defendant
16   here, all documents that you relied upon or
17   considered in arriving at any of your
18   opinions or conclusions in the lawsuit?
19       MR. ROZYNSKI: Objection to the
20       form.
21       A. I'm not too sure what you mean by
22   the tail end of your question.
23       Q. Do you understand that you, as an
24   expert, are required to provide to the other
25   side of the lawsuit, since you're an expert

1    on behalf of Mr. Frilando, all documents that
2    you relied upon, or considered, in arriving
3    at any of your opinions or conclusions?
4        A. Yes.
5        Q. If you look at what we put before
6    you as Huey Exhibit 1 and go to attachment B,
7    which is document to be produced page 1, do
8    you have attachment B in front of you?
9        A. Yes.
10       Q. Do you see that the first request is
11   for all documents that you relied upon and/or
12   considered in arriving at any of your
13   opinions or conclusions in this lawsuit, and
14   then it goes on to say including, without
15   limitation, lists, some things; do you see
16   that?
17       A. Yes.
18       Q. I'm going to mark as Huey Exhibit 3,
19   I don't have copies of this yet because we've
20   just received them at the beginning of the
21   deposition, a stack of documents that was
22   provided by counsel for the plaintiff on your
23   behalf.
24       (Whereupon Stack of Documents
25       was marked Defendant's Exhibit Huey

1        3 for identification as of this
2        date.)
3        Q. And I just ask you to just identify
4    what these documents are? I mean, in general
5    terms, are these all the documents that you
6    have produced?
7        MR. CONNELLY: The binder on the
8        bottom is not part of that.
9        MR. HALLER: I'm sorry, I
10       apologize.
11       A. Yes, I was perplexed, that's not
12   mine.
13       Q. Are these all of the documents you
14   produced in response to the subpoena?
15       THE INTERPRETER: Interpreter
16       switch.
17       Q. Specifically in response to
18   attachment B number 1?
19       MR. ROZYNSKI: I just want to note
20       for the record that there are other
21       documents that were produced prior to
22       this deposition that are not included
23       in that pile.
24       A. That's right, correct.
25       MR. HALLER: I'd like to go off the



1    record for a minute.
2         THE VIDEOGRAPHER:  The time is
3    11:13 a.m.  Off the record.
4         (Whereupon, a discussion was
5    held off the record.)
6         THE VIDEOGRAPHER:  The time is
7    11:23 a.m., back on the record.
8         Q.   Mr. Huey, we're back on the record.
9    Before we broke I was in the middle of asking
10   you questions about the documents that you
11   reviewed and considered in forming the basis
12   of any opinion and conclusions of this
13   lawsuit, and I had presented to you Huey
14   deposition 3, which are the documents that
15   were handed to me by counsel for the
16   plaintiff around 10:00 beginning of today's
17   deposition.  Do you recall that's what we
18   were discussing?
19        A.   Yes.
20        Q.   There was an objection interposed,
21   so to try to deal with that objection I'm
22   going to also give you two additional
23   exhibits, which we'll mark as Huey 4 and 5,
24   respectively.
25        (Whereupon Copy of license and

1    other documents were marked
2    Defendant's Exhibit Huey 4 for
3    identification as of this date.)
4         (Whereupon Texas Dept. of
5    Public Safety 3 year History Record
6    09/26/2016 was marked Defendant's
7    Exhibit Huey 5 for identification
8    as of this date.)
9         Q.   Mr. Huey, I'll represent to you that
10   Exhibits 4 and 5 are the documents that were
11   provided to us by counsel for the plaintiff
12   in advance of the deposition.  So if we put
13   together Exhibits 3, 4, and 5, I'd just like
14   to establish on the record that this set of
15   documents represents all the documents that
16   you relied on or considered in connection
17   with any opinion or conclusion you may have
18   reached in this case?
19        MR. ROZYNSKI:  Objection to the
20   form.
21        A.   Yes, and it's part of my opinion, my
22   experience as working as a truck driver,
23   that's what's in these documents.
24        Q.   That's the basis for your opinion?
25        MR. ROZYNSKI:  Objection.

1         Q.   Like I said --
2         MR. ROZYNSKI:  Objection to the
3    form.
4         A.   Yes, that's the documents that I
5    provided and that I used for my opinion as an
6    advocate for deaf people.
7         Q.   Just briefly, to go off on a
8    tangent, what did you do to prepare for
9    today's deposition, if anything?
10        A.   Nothing.  I brought the documents
11   that I had, and I have my past experience,
12   but that's all.
13        Q.   Did you meet with Mr. Rozynski or
14   anyone at the law firm Eisenberg and Baum in
15   advance of today's deposition?
16        A.   No.  I was never at his office, no,
17   I never did.
18        Q.   Can we agree on the record that
19   other than the documents we now have before
20   you as Huey deposition 3, 4, and 5, you did
21   not review any other documents in connection
22   with this case?
23        MR. ROZYNSKI:  Objection to the
24   form.
25        A.   No, this is all I have right here

1    that you see here today.
2         Q.   So normally I will come to questions
3    about why there may not be a normal expert
4    situation, but normally when an expert is
5    identified in a case they provide a report,
6    and one of the requirements of the report is
7    listing of all documents reviewed and
8    considered in order to give the opinion.  So
9    can we agree on the record that if we make a
10   list of everything that's before you as
11   Exhibits 3, 4, and 5, that that would form
12   the basis and substitute for having in
13   advance of this deposition a written list of
14   everything that you reviewed and considered?
15        MR. ROZYNSKI:  Objection to the
16   form.
17        A.   Yes, yes, this is how I form my
18   opinion.
19        Q.   There's nothing else that's missing
20   from that set of documents which supports, in
21   a documentary sense, the formation of your
22   opinion?
23        MR. ROZYNSKI:  Objection to the
24   form.
25        A.   Everything is there, yes.  Plus I



1    have experience and work as a truck driver,
2    as well.
3        Q.   It's fair to say that your opinion
4    is based upon your own personal experience?
5        A.   Correct.
6        Q.   Are you being paid or compensated in
7    any way for your participation as an
8    identified expert in this case?
9        A.   Yes.
10       Q.   What compensation are you receiving?
11       A.   I haven't really gotten an exact
12   amount.  Andrew is taking care of that.  I
13   have the information and email in my iPad for
14   the ticket and my confirmation for the
15   ticket, but, you know, I was being reimbursed
16   for my ticket, for the airplane ticket.
17       Q.   Other than reimbursement for your
18   expenses, are you being paid, compensated in
19   any way, for giving testimony here today or
20   in this case?
21       A.   Can I check in this if you want to
22   know exact amount?
23       Q.   Yes.
24       A.   I can check in here?
25       Q.   Please do.

1        A.   One moment.  571.20, and that
2    includes tax, that's for the airline, that's
3    the airplane ticket amount.
4        Q.   Perhaps you did not understand my
5    question.  My question was other than
6    reimbursement for out-of-pocket expenses such
7    as airline tickets and hotel and taxis and
8    those kinds of things, are you being paid any
9    other form of compensation to participate as
10   an expert witness or a witness in this case?
11       A.   I'm not sure.  We didn't discuss
12   whether I'm being paid.  I was told I would
13   be given reimbursement for expenses, but we
14   didn't speak about an amount of money other
15   than that.
16       Q.   Do you have an expectation that you
17   would be paid for your time?
18       A.   Yes, I do expect to be paid to be
19   involved with the case, yes.
20       Q.   Do you have a rate that you would
21   charge to be an expert, which is an hourly or
22   daily rate?
23       A.   No, I don't.  Possibly equal to what
24   I would have earned if I was working, you
25   know, my weekly salary which I earn for work.

1        Q.   Do you recall when you were first
2    retained as an expert in this case?
3        A.   I'm trying to think.  Let's see,
4    where are we now, October -- well, September.
5    I'm thinking it was in around April, May
6    timeframe, I believe.  I don't remember the
7    specific date, but I'm feeling it was between
8    April and May.
9        Q.   Who first contacted you in
10   connection to perhaps becoming involved in
11   this matter?
12       A.   Andrew.
13       Q.   Other than having discussions with
14   Mr. Rozynski, have you spoken to anyone else
15   connected with this case, such as
16   Mr. Frilando himself, or his brother?
17       A.   No, I don't even know them.  I don't
18   know who they are and I've never met them in
19   person, no.
20       Q.   In this case we don't have a written
21   report from you, you understand that?
22       A.   Right, there's no written report,
23   right.
24       Q.   Based on the letter that we
25   identified that you wrote as an advocate to

1    the Federal Motor Carriers Association that
2    we marked as Huey Exhibit 2, am I correct in
3    saying that you are fully capable of drafting
4    a written report in this case?
5            MR. ROZYNSKI:  Objection to the
6        form.
7        A.   Yes, I could write a report.  But at
8    that time when I got in contact I was very
9    busy driving the truck and I'm all around,
10   you know, I have to load the truck, and I
11   didn't have time to sit down and write a
12   report.  I don't have a laptop with me on the
13   road, you know.  If I were to write a report,
14   I would need a laptop, you know, to write in
15   English.  You can't do anything like that on
16   this little thing.  I need a laptop, which I
17   have at home.  But I would work as a truck
18   driver, and I'm rarely home, so I asked
19   Andrew and he said okay, that was fine, and I
20   provided him with various documents, as you
21   see here, so that's all.
22       Q.   I'm trying to understand this,
23   Mr. Huey.  You're here purporting to be an
24   expert in this case.  You're fully capable of
25   writing a report, but it's your testimony you



Page 42

1  didn't have time to do it?
2       MR. ROZYNSKI:  Objection to the
3    form.
4    A.  Right.
5    Q.  And --
6    A.  I drive eleven hours, I'm tired.
7    Q.  It's your testimony --
8    A.  I work quite a lot, eleven hours.
9    Q.  It's your testimony that
10 Mr. Rozynski said that's fine, you don't need
11 to write a written report?
12      MR. ROZYNSKI:  Objection to the
13    form.  Mr. Huey, any conversations that
14    we had is privileged and you don't have
15    to answer that.
16      MR. HALLER:  He's already said it
17    on the record.
18      MR. ROZYNSKI:  Well, if he's
19    already said it, then you don't have to
20    ask him again.
21      MR. HALLER:  I don't think that a
22    direction that he doesn't need to write
23    a report is privileged.  That's not
24    privileged at all.  And I'll reserve
25    comment on what we just heard.

Page 43

1    Q.  Mr. Huey, in fairness to the
2  defendants, I'm sure you can understand that
3  when somebody purports to be an expert, that
4  it's important that the other side knows what
5  the opinions of the expert are likely to be
6  in advance of a deposition, because
7  otherwise, it's very hard to do a deposition
8  because you don't know what you're going to
9  be asking about.  You understand that, don't
10 you?
11    A.  Yes, yes.
12    Q.  What opinion were you asked to
13 provide in this case?
14    A.  That deaf people can drive trucks
15 and I can train them.
16    Q.  Is that your opinion that you're
17 here to state on this record?
18    A.  Yes.
19      MR. ROZYNSKI:  Objection to the
20    form.
21      THE INTERPRETER:  Interpreter
22    switch.
23    Q.  Before you were contacted by counsel
24 for the plaintiff, had you had any
25 involvement in this case whatsoever, such as

Page 44

1  being a consultant or giving advice in
2  connection with the case?
3    A.  No.
4    Q.  Did you know anything about the case
5  when you were contacted by Mr. Rozynski on
6  behalf of Mr. Frilando?
7    A.  Yes, he did explain it to me.
8    Q.  Is your understanding of the case,
9  and the opinion that you are being sought to
10 provide, based upon conversations you had
11 with Mr. Rozynski?
12      THE INTERPRETER:  Could you repeat
13    that again.
14      MR. ROZYNSKI:  Objection to the
15    form.  And I just advise you to not
16    reveal any conversations that we have
17    had.  To the extent you can answer that
18    without revealing any communications
19    that we had, you can answer.  But
20    otherwise, don't answer.
21    Q.  I'm waiting for the answer.
22    A.  I decline.
23    Q.  I'm not asking what the two of you
24 discussed.  I want to be clear on that.  I'm
25 just asking whether your understanding of the

Page 45

1  case, and the opinion you're being asked to
2  provide, is based on a conversation you had
3  with Mr. Rozynski?
4      MR. ROZYNSKI:  Again, I'm going to
5    tell you, Mr. Huey, that to the extent
6    that it involves any of the subject
7    matter that we talked about, or any of
8    the discussions that we had, I'll
9    instruct you not to answer.  But to the
10    extent that you can answer that
11    question without revealing any
12    conversations we had, then you can
13    answer it.  But I'm just advising you
14    that's privileged.
15    Q.  Are you declining to answer again?
16    A.  Can you repeat the question.
17    Q.  I'm going to restate the question,
18 see if I can approach it differently.  I'm
19 not seeking to -- I want you and counsel to
20 be clear.  I'm not seeking to invade any
21 privilege that may attach -- let me be very
22 clear.  True, is it not, that you and
23 Mr. Rozynski had conversations in which the
24 subject matter of those conversations related
25 to the details of the case and the opinion



1    that he was seeking that you provided, just
2    the subject matter?
3         MR. ROZYNSKI:  Objection.  That
4    necessarily involves the content of
5    conversations, which is protected by
6    the privilege.
7         MR. HALLER:  No, it doesn't.  I'm
8    asking the subject matter, I'm entitled
9    to ask the subject matter.
10        MR. ROZYNSKI:  Of our
11   conversations?
12        MR. HALLER:  Yes, the subject
13   matter.  I'm not asking what you told
14   him, what you told him to do, I'm just
15   asking him the subject matter.
16        MR. ROZYNSKI:  You're asking for
17   particular communications.
18        MR. HALLER:  No, I'm not.
19        MR. ROZYNSKI:  Yes.
20        MR. HALLER:  I think you need to
21   read up on privilege.  I'm entitled to
22   know what the subject matter of a
23   discussion was, even if I don't
24   inquire -- I'm not inquiring what was
25   said.

1         MR. ROZYNSKI:  I disagree.  What do
2    we do.
3         MR. HALLER:  There's a question
4    pending.
5         MR. ROZYNSKI:  I'm asserting
6    privileged.
7         MR. HALLER:  You're instructing him
8    not to answer?
9         MR. ROZYNSKI:  Yes, because you're
10   asking about the contents of
11   communications, asking about
12   communications you're asking about.
13        Q.  Let me try it this way, Mr. Huey.
14   Other than conversations you may have had
15   with Mr. Rozynski, who else, if anyone, did
16   you receive information about the details of
17   the case and the opinion that --
18        A.  No one.  No one.
19        Q.  -- that you were being asked to
20   provide?
21        A.  No one.
22        Q.  Do you understand that you're here
23   today as a designated rebuttal expert?
24        A.  Rebuttal expert, what exactly does
25   that mean?

1         Q.  Do you not know what that means?
2         A.  No.  This is the first time I
3    encounter this word.  Can you explain the
4    meaning?
5         Q.  It means an expert who is identified
6    to respond specifically to something that
7    another expert has said in this instance.
8    That's the meaning of rebuttal as an expert.
9         A.  Yes.
10        Q.  You understand that?
11        A.  Yes.
12        Q.  What specifically, with respect to
13   what was said by the defendant's experts, are
14   you rebutting here today?
15        MR. ROZYNSKI:  Objection to the
16   form.
17        A.  I'm not familiar with the
18   defendant's experts, so I don't know if I can
19   answer that question.
20        Q.  So you can't give me a specific
21   statement in the reports of the defendant's
22   experts that you're here to rebut?
23        MR. ROZYNSKI:  Objection to the
24   form.
25        A.  Unless the person wants to take the

1    driving school program, they have the right
2    to take it.  They could apply for the
3    training program.  You cannot reject them,
4    that's what I disagree with, that's my
5    opinion.
6         Q.  Understood that's your opinion and
7    understood that that's the position for which
8    you have been advocating for some time; but
9    my question is very specific, and I want to
10   know, and if you can't tell me, that's fine
11   too, I want to know what specifically,
12   sitting here today, in the reports of the
13   defendant's experts you are rebutting?
14        MR. ROZYNSKI:  Objection to the
15   form.
16        A.  They believe that a deaf person
17   can't learn.  I believe that is incorrect, a
18   deaf person can learn the training.
19        Q.  When you say they believe the deaf
20   person can't learn, what's the basis for that
21   statement if you haven't even read the
22   reports?
23        A.  What I know is that they said a deaf
24   person can't learn and become a driver.  So
25   that makes a big deal.  I believe a deaf



Page 50

1  person can.
2      Q.  As I understood it, based on
3  representations by your counsel to the court,
4  you were being offered to refute, in other
5  words, dispute might be easier to understand,
6  an alleged statement by the defendant's
7  experts that it's not possible safely to
8  train a deaf individual to drive a
9  tractor-trailer?
10      A.  Right, correct.
11      Q.  Is that what you're here today to
12  address?
13      A.  Yes.
14      Q.  Is it your opinion that it is
15  possible safely to train a deaf individual to
16  drive a tractor-trailer?
17      A.  Yes.
18      Q.  So just remember my comments that
19  normally you have a report and it says this
20  is my opinion, and what I really feel is
21  important, Mr. Huey, in fairness to the
22  defendants, that we identify what your
23  opinion is; so is it your opinion -- so if we
24  had a written report, it would say it's my
25  opinion that it is possible to safely train a

Page 51

1  deaf individual to drive a tractor-trailer,
2  is that what we're here to discuss today?
3      A.  Yes, I could -- right now if you
4  want, I can write this down and provide it.
5      Q.  I'm not asking -- we're here today,
6  we don't have a written report, we're in a
7  deposition and I'm trying to make sure that
8  we have a specific understanding of what your
9  opinion is, and then I will ask you questions
10  about that opinion.  So what we have now
11  identified is the opinion that you will give
12  in this case if it goes to trial, right?
13      A.  Yes, that's correct.
14      Q.  Obviously there's some reasons why
15  you have formed that opinion, but that's the
16  totality of the opinion that you're going to
17  give, that it is possible to safely train
18  deaf individuals to drive a tractor-trailer?
19          MR. ROZYNSKI:  Objection to the
20      form.
21      A.  Yes.
22      Q.  And that opinion is to rebut or
23  dispute, you're alleging is, a statement in
24  the defendant's reports, that you haven't
25  read, where they say it's not possible safely

Page 52

1  to train a deaf individual to drive a
2  tractor-trailer, is that right?
3      A.  Yes.  I have read this.  I haven't
4  written my own report.
5      Q.  So have we now fairly identified the
6  four corners of the opinion that you intend
7  to give on the record here today?
8          MR. ROZYNSKI:  Objection to the
9      form.
10      A.  Yes.
11      Q.  A few minutes ago you said that the
12  opinion that you're giving here today is
13  based on your personal experience, do you
14  recall that?
15          MR. ROZYNSKI:  Objection to the
16      form.
17      A.  Yes.
18      Q.  In a disclosure statement that we
19  were provided by Mr. Rozynski, or his firm on
20  your behalf, there was identified that you
21  had trained one student to drive a
22  tractor-trailer who was deaf?
23      A.  Two.
24      Q.  Two.  I'll come back to that.
25      A.  And four hearing students in

Page 53

1  addition to that.
2      Q.  I just want to identify -- so your
3  personal experience is what you yourself went
4  through in terms of learning how to drive a
5  tractor-trailer, the experience you've had
6  driving a tractor-trailer since, and the fact
7  that you have trained two students who were
8  deaf, is that right?
9      A.  Yes.
10      Q.  So we've now fairly stated the four
11  corners of your personal experience, not all
12  the details, but four corners of your
13  personal experience --
14          MR. ROZYNSKI:  Objection to the
15      form.
16      Q.  -- is that right?
17          MR. ROZYNSKI:  Objection to the
18      form.
19      A.  Yes.
20      Q.  Am I correct that you are not
21  suggesting in any way here today that you are
22  an expert on the legal issues that are
23  involved in this case --
24          MR. ROZYNSKI:  Objection to the
25      form.



1    A.  Right.
2    Q.  -- is it fair?
3    A.  But I'm familiar with the legal
4  paperwork, I'm not an expert, I'm aware of
5  it. I'm aware of my rights.
6    Q.  I understand, Mr. Huey, that you may
7  have some general awareness, but my question
8  goes to your expertise, and I just want it to
9  be clear on the record; you're not suggesting
10  in any way that you're an expert in the legal
11  issues that relate to this case?
12    A.  Legal expert, can you clarify
13  exactly?
14    Q.  You have no legal training, do you,
15  Mr. Huey?
16      MR. ROZYNSKI:  Objection to the
17    form.
18    A.  No.
19    Q.  You have --
20    A.  I understand now.
21    Q.  You have no basis here today to
22  express an opinion on the legal issues
23  involved in this case?
24      MR. ROZYNSKI:  Objection to the
25    form.

1    A.  Right.
2    Q.  You're not suggesting --
3    A.  I understand now.  Thank you.
4    Q.  You're not suggesting here today
5  that you are in a position to provide any
6  expert testimony with respect to the
7  regulatory framework that governs the issues
8  that are subject to this litigation?
9      MR. ROZYNSKI:  Objection to the
10    form.
11    A.  Wait, wait.  Yes, it depends what
12  exactly you're asking me.  Are we talking
13  about deaf rights and their ability to get a
14  CDL?
15    Q.  No, I'm not talking any substance at
16  this point.  I'm asking questions related to
17  what kind of expert you are and what
18  expertise you have.
19    A.  Okay.
20    Q.  Let me try and explain it to you by
21  way of example, and perhaps it will make this
22  line of questioning easier, because I think
23  most of this is pretty self-evident, but I
24  just need to establish it for the record.  If
25  a person in a lawsuit is an accountant and

1  they are asked to provide expert testimony in
2  connection with the books and records of a
3  company, it would be clear that they are not
4  in a position, because they are not qualified
5  as a lawyer, to talk about the legal issues
6  in the case.  Do you understand the
7  distinction?
8      MR. ROZYNSKI:  Objection to the
9    form.
10    A.  Right, I understand.
11    Q.  In order for them to talk about the
12  legal issues, they would have to be qualified
13  in a lawyer and have experience in those
14  issues and probably a lot of
15  qualifications --
16    A.  That's not me.
17      MR. ROZYNSKI:  Objection to the
18    form.
19    Q.  I'm not trying to do anything other
20  than just make clear on the record what type
21  of expert you are, just so you understand.
22    A.  Okay.  Well, anything that's related
23  to truck issues, I'm an expert on, but not
24  legal.
25    Q.  Let me just go one by one.  In terms

1  of being an expert on the regulations, that
2  is the legal principles that govern through
3  regulations, you're not an expert, are you?
4      MR. ROZYNSKI:  Objection to the
5    form.
6    A.  Right.
7    Q.  You might know some things, but
8  you're not sitting here today pretending to
9  be an expert on the regulations of the
10  Federal Motor Carriers, right?
11      MR. ROZYNSKI:  Objection to the
12    form.
13    A.  Correct.
14      THE INTERPRETER:  Interpreter
15    switch.
16    Q.  Your experience, in terms of the two
17  students you taught, was that in Texas?
18    A.  Yes, Texas and Georgia, two
19  different states.
20    Q.  Then you did some training in
21  Arizona, as I understand?
22      MR. ROZYNSKI:  Objection to the
23    form.
24    A.  Not Arizona, no.
25    Q.  You personally were trained in



1    Arizona at one point, weren't you?
2        A.   No.  Hold on one minute.  Give me
3    example, talking about training, school, what
4    training?
5        Q.   I thought you went to Glendale
6    Community College in Arizona?
7        A.   I went to college and took some
8    courses, yes.
9        Q.   Let me try and approach this
10   differently.  You have not got any experience
11   teaching students to drive in the states of
12   New Jersey or New York, have you?
13       MR. ROZYNSKI:  Objection to the
14       form.
15       A.   No, I have not.
16       Q.   Sitting here today?
17       A.   Not yet.  If anyone would want me
18   to, I'd be willing to.
19       Q.   Right.  Sitting here today, you have
20   no personal knowledge of the specific
21   requirements of the testing agencies in New
22   Jersey or New York, do you?
23       MR. ROZYNSKI:  Objection to the
24       form.
25       A.   Like testing, what specific testing?

1        Q.   CDL license testing?
2        A.   I think it's pretty common all
3    around the United States.
4        Q.   I'm not interested in what you think
5    and what you suppose.  What I'm getting at is
6    you personally, sitting here today, have no
7    specific information about the requirements,
8    the rules, and the limitations, that are
9    imposed by New Jersey or New York testing
10   agencies on people doing CDL license tests?
11       MR. ROZYNSKI:  Objection to the
12       form.
13       A.   Well, if I were to move here, I
14   would get the information and review it, you
15   know, of course I would look up on that and
16   get the rules if I were to move and live
17   here.
18       Q.   Right.  I understand.  But in terms
19   of the testimony that you're here to give,
20   it's not based on any knowledge you have
21   sitting here today about the details of the
22   New Jersey or New York testing requirements
23   and limitations on tests?
24       MR. ROZYNSKI:  Objection to the
25       form.

1        A.   Yes, that's right.  But --
2        Q.   It's based upon your experience in
3    Texas and Georgia.
4        MR. ROZYNSKI:  Objection to the
5        form.
6        A.   Well, I actually drive in
7    forty-eight states, so I've experienced
8    driving in forty-eight states.  But I'm not
9    really sure the point of that question about
10   the CDL requirements in New York and New
11   Jersey, I'm still not clear on the question.
12       Q.   It doesn't really matter whether
13   you're clear or not; the issue is whether you
14   have today any specific knowledge, and can we
15   agree on the record you don't?
16       MR. ROZYNSKI:  Objection to the
17       form.
18       A.   That's right.  Right as far as
19   taking the CDL test?
20       Q.   Correct.
21       A.   Yes, I do not have that yet.
22       Q.   Sitting here today, you couldn't
23   tell me if there are any differences between
24   the CDL examiners manual in the state of
25   Texas as compared with the CDL examiners

1    manual in the states of New Jersey or New
2    York?
3        MR. ROZYNSKI:  Objection to the
4        form.
5        A.   They should be except there's that
6    one rule for the CDL there's certain rules
7    New Jersey and New York have their own rules
8    and Texas and Georgia have their own rules.
9    So most of the commercial and air brakes,
10   it's standard, it's quite standard in every
11   state in the manuals, except for there's some
12   specific laws and rules in New Jersey that
13   are different, but a lot of it is standard
14   information.
15       Q.   That's fine.  My point is, you're
16   not able to, sitting here today, to identify
17   what the differences are between the New
18   Jersey rules or New York rules and the Texas
19   or Georgia rules?
20       MR. ROZYNSKI:  Objection to the
21       form.
22       A.   Well, you know, in some places
23   there's a specific thing where the Amish are
24   and you have to go a certain mile per hour, I
25   believe, and the amber color there's a



Page 62

```
 1   specific rule like that, there are some, but
 2   you know, like I'm saying, the states vary
 3   and I haven't really looked at the ones in
 4   New Jersey or New York, but I know there's a
 5   variation.
 6        Q.  You've not visited the Bordentown
 7   facility, correct?
 8        A.  No, I have not.
 9        Q.  Sitting here today, you have -- you
10   do not know specifically the details of the
11   training program and the methods that are
12   used by the Bordentown at that facility to
13   train students?
14        A.  Well, there's no one there, so yes,
15   I do not know.  That's correct, I do not
16   know.
17        Q.  When you say there's no one there,
18   I'm not sure I understood what that comment
19   meant?
20        A.  Well, there's no one deaf there.  If
21   there were, I might have had an opportunity,
22   but no -- there's no one deaf at that
23   program.
24        Q.  Right.  My question really was that
25   you don't know any of the details of that
```

Page 63

```
 1   program or the specific methods by which the
 2   training is done?
 3        A.  Right, I've never been there.
 4        Q.  Right.  Do you have any knowledge of
 5   the environment around the school where
 6   people drive?
 7             MR. ROZYNSKI:  Objection to the
 8        form.
 9        A.  Well, I don't know, you mean in New
10   Jersey, I've never been there, so no.  I've
11   been to New Jersey, but I do not know the
12   environment specifically around that school,
13   because I have driven in New York and New
14   Jersey, but I have not been to that school.
15   No.
16        Q.  You haven't read any of the papers
17   in this case, the depositions, the complaint,
18   the answer, or any of the expert reports,
19   right?
20             MR. ROZYNSKI:  Objection to the
21        form.
22        A.  Yes.
23        Q.  In terms of what you bring to the
24   table here today as an expert, it's really
25   that you're just someone talking about your
```

Page 64

```
 1   own personal experience, right?
 2             MR. ROZYNSKI:  Objection to the
 3        form.
 4        A.  Right, yes.
 5        Q.  Do you know what it means to be an
 6   expert in a case?
 7             MR. ROZYNSKI:  Objection to the
 8        form.
 9        A.  Yes.
10        Q.  What?
11        A.  Means that I'm an expert to truck
12   driving.
13        Q.  Yes.  But in order to be an expert,
14   do you have any understanding of the kind of
15   characteristics that are necessary for the
16   court to accept an opinion?
17             MR. ROZYNSKI:  Objection to the
18        form.
19        A.  Yes.
20        Q.  What are those characteristics, if
21   you know?
22        A.  Well, I am meant to answer all the
23   questions that are asked of me regarding deaf
24   people driving trucks is my role as an
25   expert.
```

Page 65

```
 1        Q.  Would you agree that in order to
 2   testify reliably in a case, an expert needs
 3   to come to the case with a completely
 4   objective view as to the facts and
 5   circumstances?
 6             MR. ROZYNSKI:  Objection to the
 7        form.
 8        A.  Yes.
 9        Q.  An expert needs to be dispassionate
10   about the issues in the case?
11             MR. ROZYNSKI:  Objection to the
12        form.
13        A.  Yes, I understand.
14        Q.  And the expert needs to be somebody
15   without a personal stake or interest in the
16   outcome of the case?
17             MR. ROZYNSKI:  Objection to the
18        form.
19        A.  Right.
20        Q.  And do you agree, do you know that
21   someone's who is vested as the outcome for
22   the cause would not be a suitable expert on
23   which the court could rely on?
24             MR. ROZYNSKI:  Objection to the
25        form.
```



1      A.  Yes.
2      Q.  Have you ever testified as an expert
3  in any setting before here today?
4          MR. ROZYNSKI:  Objection to the
5      form.
6      A.  No, never.
7      Q.  Have you ever testified in any
8  context in a legal proceeding?
9      A.  No.
10      Q.  Given that we've identified
11  everything that you relied on, or considered,
12  can we agree on the record that you did not
13  read, review, or consider any scholarly
14  articles about safety issues related to
15  driving tractor-trailers, including with
16  respect to people who may have physical
17  impairments such as hearing limitations?
18          MR. ROZYNSKI:  Objection to the
19      form.
20      A.  Let me make sure I understand.  Have
21  I read articles regarding safety issues, is
22  that the question?
23      Q.  No.
24      A.  I do read articles.
25      Q.  No, that's not the question.

1      A.  Okay.
2      Q.  The question is with respect to the
3  opinion that we've now identified clear on
4  the record, what it is that you're giving
5  today and have given, and everything
6  identified, everything you reviewed and
7  considered to support that opinion, I just
8  want to establish clearly on the record that
9  you did not, in giving your opinion, refer to
10  or rely on in any way any scholarly articles
11  or analysis of data related to safety of
12  driving tractor-trailers, including with
13  respect to people that have physical
14  impairments?
15          MR. ROZYNSKI:  Objection to the
16      form.
17      A.  No, I did not.  My opinion is based
18  on my personal experience and these
19  documentations here.
20      Q.  Have you -- are you familiar with or
21  have you ever read a report of the Federal
22  Motor Carrier Safety Administration or -- let
23  me withdraw that question.  Have you ever
24  reviewed or read a report sponsored by the
25  Federal Motor Carrier Safety Administration

1  called Older Commercial Drivers Do They Pose
2  a Safety Risk?
3          THE INTERPRETER:  What's it is
4      called?
5      A.  Older Commercial Drivers Do They
6  Pose a Safety Risk.
7          MR. ROZYNSKI:  Objection.
8      A.  No, I did not.
9      Q.  Are you familiar at all with the
10  research done in 1997 by an individual named
11  Robinson, which was an extensive analysis of
12  commercial driving, maybe the most extensive
13  ever undertaken?
14          MR. ROZYNSKI:  Objection to the
15      form.
16      A.  No, I don't know about that.
17      Q.  So you have no knowledge as to the
18  conclusion of that study with respect to the
19  safety records of hearing-impaired versus
20  non-hearing-impaired drivers?
21          MR. ROZYNSKI:  Objection to the
22      form.
23      A.  No, I'm not familiar with it.  Now,
24  there's an issue as far as visual acuity that
25  deaf people have, is that what that's

1  referring to, the acuity that deaf people
2  have, the sharpness of vision?
3      Q.  No, no.
4      A.  Oh, okay.  Because on Facebook
5  there's a lot of information on that in my
6  Facebook page, so I'm not sure if that's
7  applying related to your research you're
8  referring to.  They just say sharpness of,
9  you know, vision, that deaf people have that
10  ability.
11      Q.  Are you aware of any court decisions
12  that conclude as a matter of law that relying
13  on a trainer to communicate by hand signals
14  for somebody who is learning to drive a
15  tractor-trailer in the trainee's peripheral
16  vision is unworkable?
17          MR. ROZYNSKI:  Objection to the
18      form.
19      A.  Is that the court or is that what
20  the Federal -- FMC decided?  You're saying
21  it's a court decision?
22      Q.  I'm just asking if he's familiar
23  with any court decision that makes that
24  finding?
25      A.  No, I believe that's what the FMCSA



1  has said and established, but I'm not
2  familiar with any court decisions.
3      Q.  In furtherance from your earlier
4  testimony, but I'd like to be clear on the
5  record, you disagree with people who are
6  advocating on behalf of deaf individuals with
7  respect to CDL licenses with the concept that
8  you should not have a sign language
9  interpreter present?
10      MR. ROZYNSKI:  Objection to the
11   form.
12      A.  Yes, I disagree with that.
13      Q.  We established you hadn't ever gone
14  to the Bordentown facility.  I didn't ask you
15  do you have any specific familiarity with the
16  kind of tractor-trailers that are used for
17  the training at that facility and the
18  specifications of the cabins that --
19      THE INTERPRETER:  The cabins?
20      Q.  The cab that exists?
21      MR. ROZYNSKI:  Objection to the
22   form.
23      A.  Yes, I am familiar.
24      Q.  You're familiar with the specific
25  trucks that are used at the Bordentown

1  facility?
2      A.  I'm assuming they are standard,
3  standards trucks.  I'm not sure exactly what
4  they provide and what they use, but my
5  understanding is it's quite standard.  Tend
6  to -- the training programs tend to get older
7  trucks and they have to follow certain
8  insurance policy.  But specifically what they
9  have in Bordentown, no, I'm not familiar.
10      Q.  Do you know how many gears the
11  trucks that they use have?
12      A.  Ten or thirteen.  Ten or thirteen.
13      Q.  Do you know, not guessing, do you
14  know what the configuration of the inside of
15  the cab looks like?
16      A.  I know it's quite standard.  I
17  haven't seen them specifically, but I believe
18  it's quite standard, because how could people
19  learn if they were using different trucks in
20  different facilities, it's got to be
21  standardized.
22      Q.  But these are assumptions you're
23  making, right?
24      A.  I never saw it, right.
25      Q.  You have no specific knowledge of

1  like the distance between the instructor and
2  the trainee, as it relates to the interior of
3  the cabins that they use?
4      MR. ROZYNSKI:  Objection to the
5   form.
6      A.  As I said, it should be standard.
7      Q.  Do you have any knowledge of any
8  specific safety mechanisms that the
9  instructors have in the trucks that
10  Bordentown uses?
11      A.  Seatbelt.  I'm not sure safety
12  features, can you give me examples of
13  specifically what you're --
14      Q.  The point of my question is not to
15  give the information, it's to find out if you
16  know the information.  So if you don't know,
17  it's fine.
18      A.  No, I would have to go and look at
19  them.  If I saw them, then I could tell you,
20  but I have not seen them.
21      THE INTERPRETER:  Interpreter
22   switch.
23      Q.  I'm not asking what you were told by
24  counsel, but I think I am entitled to ask
25  whether it's your understanding, sitting here

1  today, that the specific requests that
2  Mr. Frilando made of Bordentown was that he
3  should have a sign language interpreter
4  present in the truck at all times?
5      MR. ROZYNSKI:  Objection to the
6   form.
7      A.  Yes, yes, I'm aware of this.
8      Q.  That's an understanding that you
9  reached based upon your discussions with
10  counsel, correct?
11      MR. ROZYNSKI:  Objection to the
12   form.  Don't answer that.  That's
13   privileged information.
14      Q.  Let me ask it differently.  Other
15  than your discussions with counsel, was there
16  any other basis for you to reach that
17  understanding?
18      A.  No.
19      Q.  I'd like to just, before we take a
20  break for lunch, understand some of the
21  chronology of your own personal experience.
22      A.  I'm hungry too.
23      Q.  You're hungry too.  I'll be very
24  short, then we'll take a break.  That okay?
25      A.  No problem, that's fine.



1      Q.   Based on the information we've been
2  provided in the documents, through the
3  documents that were produced today and
4  produced earlier, we understand that you
5  attended Glendale Community College and
6  completed courses around May 13, 2011?
7      A.   2011, 2010, 2011, I got to refer
8  back to the paperwork.
9      Q.   That's fine.  I think if we look at
10 Huey Exhibit 4 --
11     A.   2011, yes.
12     Q.   -- it seems to have been -- let me
13 just get to the right page.  A letter halfway
14 through the package from Glendale Community
15 College, could you go to that.  Are you
16 familiar with that?
17     A.   I'm familiar with that, yes.
18     Q.   I'm not sure I understand it.  Did
19 you go to Glendale to do general studies or
20 was it specifically in respect of a
21 tractor-trailer driving program?
22     A.   For the CDL, to obtain one I took a
23 training program.
24     Q.   Did you get a permit in order to
25 drive a tractor-trailer as part of that

1  training that you did sometime in 2009, '10
2  or '11?
3      A.   Yes.
4      Q.   Did you get a permit from the
5  Federal Motor Carrier Administration?
6      A.   No.  This was through the DMV.  I
7  took the written test, had nothing to do with
8  the FMCSA.  Remember, in 2011 they had the
9  waiver applied, the next year in 2012.
10     Q.   Well, that's why I'm asking the
11 question, because I'm completely lost and
12 don't understand sort of how some of these
13 things happen.  But the effective date of the
14 waiver was actually --
15         MR. CONNELLY:  February 1st, 2013.
16     Q.   February 1st, 2013?
17     A.   No.  This is 2012.
18     Q.   Well, we can show you the
19 documentation when the waivers became
20 effective, the exemptions became effective,
21 but regardless, we're talking about whether
22 it was '12 or '13, we're talking in
23 connection with what you did at Glendale
24 Community College about you driving when the
25 exemption was not in place, right?

1      A.   Yes.
2      Q.   But nonetheless, you have to get a
3  permit in order to go into these, the
4  tractor-trailers, to learn to drive, right?
5      A.   Yes.
6      Q.   Who specifically -- from whom
7  specifically did you get a permit?
8      A.   I did it myself.  I went to an
9  audiologist.  I had a hearing aid, I was
10 tested.  I had to be under 40 decibels and I
11 was at 20.  And then I was qualified to get
12 one.  This is through the DOL, they approved
13 it, the report, and then I provided it to the
14 DMV and I took the written test, I was able
15 to get my permit.  And then I also went to
16 the Glendale program and they were to require
17 an interpreter because I was deaf, so they
18 were connected.
19     Q.   I want to stick with the first part,
20 which is the permit and your visit to the
21 audiologist.  So to get the permit from DOT
22 you had to agree, do you not, that you needed
23 to have a medical exam?
24     A.   Yes, the audiologist, correct.
25     Q.   And that you needed to pass the

1  medical exam, correct?
2      A.   Yes.
3      Q.   At that time you had to pass the
4  forced whisper test that was in place by
5  regulations as part of the medical
6  examination, correct?
7          MR. ROZYNSKI:  Objection to the
8      form.
9      A.   Yes.  And then it was supposed to be
10 at 40 decibels at the audiologist test.
11     Q.   Then you were tested by an
12 audiologist, correct?
13     A.   Yes.
14     Q.   The audiologist said that with a
15 hearing aid --
16     A.   And then they made the report and I
17 provided that to the DOT.
18         THE INTERPRETER:  I didn't catch
19      your question.
20     Q.   Your original permit back in 2010 or
21 '11 was based on you passing the forced
22 whisper test of the medical examination,
23 correct?
24     A.   Right.
25         MR. HALLER:  Why don't we take a

Page 78

```
 1   break.  I'd like to keep it relatively
 2   short, forty-five minutes.
 3        MR. ROZYNSKI:  We'll try for
 4   forty-five minutes.
 5        THE VIDEOGRAPHER:  The time is
 6   12:30 p.m.  Off the record.
 7          (Whereupon, a luncheon
 8          recess was taken.)
 9        THE VIDEOGRAPHER:  The time is 1:28
10   p.m.  This begins DVD number two.  Back
11   on the record.
12        MR. ROZYNSKI:  Mr. Huey would like
13   to correct testimony that was
14   inaccurate and just wants to make sure
15   the record is complete and accurate and
16   clear, if that's okay.
17        MR. HALLER:  Before he says
18   anything, I have some preliminary
19   questions.
20   Q.  Mr. Huey, we're back on the record.
21   Over the lunch break have you been discussing
22   your testimony with counsel for the
23   plaintiff, Mr. Rozynski?
24        MR. ROZYNSKI:  Objection.
25   Privileged.
```

Page 79

```
 1        MR. HALLER:  It's not privileged in
 2   the middle of a deposition, absolutely
 3   not privileged.
 4        MR. ROZYNSKI:  Can you show me any
 5   authority on that?
 6        MR. HALLER:  Yes, there's a case,
 7   it's in the Eastern District.
 8        MR. ROZYNSKI:  Eastern District of
 9   what?
10        MR. HALLER:  Pennsylvania.  Adopted
11   by most.
12        MR. ROZYNSKI:  We're in New Jersey,
13   correct?
14        MR. HALLER:  Southern District of
15   New York or New Jersey.  I don't have
16   specific citations, but you can't talk
17   to a witness about his testimony during
18   a deposition and then come in and say
19   he wants to change his testimony.  I
20   have an absolute right to know what you
21   discussed that would lead to him
22   changing his testimony.
23        MR. ROZYNSKI:  He wants to correct
24   an inaccuracy in the record, there's no
25   changing of testimony.
```

Page 80

```
 1        MR. HALLER:  Just tell me the
 2   subject matter of the inaccuracy and
 3   we'll figure out where to go.
 4        MR. ROZYNSKI:  Mr. Huey brought
 5   something to my attention and he wants
 6   to correct an inaccuracy.  As an
 7   officer of the court, I have to insure
 8   that any inaccuracies are corrected.
 9        MR. HALLER:  Well, you said he
10   wanted to change.
11   Q.  I don't understand, there must have
12   been discussion, so could we identify what
13   the claimed inaccuracy is, Mr. Huey?
14        MR. ROZYNSKI:  You can tell him.
15   A.  Part of the report and then I had
16   read it, it was emailed to me and I had read
17   and seen the reports from the defendant.  I
18   did read the reports, all of them.
19        MR. ROZYNSKI:  That's all.
20   Q.  Well, they are not in the documents
21   that you produced, right?
22   A.  Right.  I didn't print it out.  It
23   was an email, you know, so I'm in the truck,
24   I don't really have any way to print it and
25   do that, so it was an email I read.
```

Page 81

```
 1   Q.  Right.  I'm very sorry, but there
 2   was a subpoena, that was a requirement to
 3   produce documents, Mr. Huey.  This is not a
 4   game we're playing and you can't be here as
 5   an expert and say you don't have time to do
 6   things because you're driving a truck.  So
 7   can we agree on the record that you didn't
 8   produce the document, right?
 9   A.  Right.
10   Q.  My question to you though, does
11   that, what you have just said, change any of
12   your testimony, other than what you've now
13   corrected on the record?
14        MR. ROZYNSKI:  Objection to the
15   form.
16   A.  Everything is the same except that
17   one -- that one thing.
18   Q.  So your opinion is the same, and
19   what you're rebutting is the same, and your
20   ability to address anything that was said by
21   the defendant's experts is the same, correct?
22        MR. ROZYNSKI:  Objection to the
23   form.
24   A.  Yes.
25   Q.  When we broke at lunchtime I was
```



Page 82

```
 1   asking you about a document in Huey Exhibit 4
 2   related to Glendale Community College. If
 3   you could go back to that, I'd appreciate it.
 4   How long did you attend Glendale Community
 5   College?
 6        A.  I think it was six months -- well,
 7   it was one hundred eighty hours to complete
 8   the training program, so one hundred eighty
 9   hours.
10        Q.  I understand one hundred eighty
11   hours related to the tractor-trailer driving
12   program.  My question was how long you
13   attended Glendale Community College, can we
14   agree it was for about six months?
15        A.  Yes, six months, yes.
16        Q.  Did you pay for the community
17   college yourself or was there some kind of
18   funding that was provided?
19        A.  So this actually is wrong, it says
20   one hundred sixty.  I'm refreshing my memory.
21   I'm looking at this, it's one hundred sixty.
22   Eighty hours in the classroom, eighty hours
23   in the field training, so eighty and eighty,
24   the total would be one hundred sixty to meet
25   the requirements.
```

Page 83

```
 1        Q.  That took place over a six month
 2   period, correct?
 3        A.  I'm not sure, might have been four
 4   months, four or six months.  I can't remember
 5   the exact start and finish date, and it
 6   doesn't say it on here.
 7        Q.  I think my.  So -- my question was
 8   whether you received any kind of funding for
 9   this program or whether you paid for it
10   yourself?
11        A.  It was through the Division of
12   Vocational Rehabilitation.
13        Q.  That's a Texas state-sponsored
14   organization?
15            MR. ROZYNSKI:  Objection to the
16        form.
17        A.  Vocational rehabilitation and I've
18   got -- it's some tutoring, a form for
19   tutoring in the state of Texas as well.
20            MR. ROZYNSKI:  Objection.
21        Objection.  Can I ask the interpreters
22        to reinterpret that, please.
23            THE INTERPRETER:  Can you read back
24        the question.
25        Q.  Well, the question was whether or
```

Page 84

```
 1   not the Division of Vocational Rehabilitation
 2   was part of the Texas state government?
 3        A.  Yes.
 4        Q.  And they paid for --
 5        A.  Actually, just to clarify, Glendale
 6   Community College is in Arizona.
 7        Q.  Sorry, my mistake.  So it's funded
 8   by the Division of Vocational Rehabilitation
 9   for the state of Arizona?
10        A.  Yes.  Thank you, yes.  That's why I
11   was confused how Texas got in there.
12        Q.  So did they -- were you living in
13   Arizona at the time?
14        A.  Yes.
15        Q.  And they paid for the tuition to
16   Glendale Community College?
17        A.  Yes, they did.
18        Q.  Do you know how much that was?
19        A.  I really wasn't responsible for the
20   payment in tuition, so DVR took care of it.
21   They didn't tell me.  So no, I don't know.
22   They just paid them directly, so I never saw
23   any kind of bill or anything.
24        Q.  Did the Division of Vocational
25   Rehabilitation pay for the tutoring that you
```

Page 85

```
 1   mentioned, special tutoring?
 2        A.  Yes.
 3        Q.  What was the nature of the special
 4   tutoring?
 5            THE INTERPRETER:  Hold on,
 6        interpreter clarification.
 7        A.  Maybe that was an interpreter error.
 8   He may have not mentioned tutoring.  Can we
 9   go back to that question that brought that
10   up.
11        Q.  It was sort of a response to my
12   question about Division of Vocational
13   Rehabilitation being part of the state
14   government, but he said something about
15   tutoring in the state.
16        A.  I was confused by the question
17   because I was thinking, you know, the college
18   was in Arizona and Texas was mentioned.
19        Q.  So let's just go back and clean up
20   the record, go over it again.  So you
21   received funding from the Division of
22   Vocational Rehabilitation the state of
23   Arizona to attend Glendale Community College,
24   correct?
25        A.  Yes.
```



1      Q.  And that covered tuition, as well as
2  any other special needs that you had
3  associated with the program, correct?
4      MR. ROZYNSKI:  Objection to the
5  form.
6      A.  Interpreters.
7      Q.  Did you have speech language
8  interpreters -- sorry.  Did you have sign
9  language interpreters throughout the six
10  months -- four to six months that you were
11  there?
12      A.  Yes, the entire time, yes.  Always
13  had an interpreter with me from the classroom
14  as well as the field training.  The entire
15  training had sign language interpreters, yes.
16      Q.  As here today, was there more than
17  one so that they could be sort of continual
18  interpretation?
19      A.  Two, always had two.
20      Q.  At what point in connection with
21  that program did you get the driving permit
22  that you described before the lunch break?
23      MR. ROZYNSKI:  Objection to the
24  form.
25      MR. HALLER:  Could you explain the

1  nature of the objection to form.
2      MR. ROZYNSKI:  Your question was
3  very vague and it wasn't clear at all.
4      MR. HALLER:  What's not clear about
5  it?
6      MR. ROZYNSKI:  The court reporter
7  can read it back.  See for yourself.
8      MR. HALLER:  You made an objection
9  to the form.  The purpose of making an
10  objection to the form is to put me on
11  notice so that I can correct what the
12  problem is.
13      MR. ROZYNSKI:  Vague.
14      MR. HALLER:  It's vague?
15      MR. ROZYNSKI:  Yes.
16      MR. HALLER:  What's vague about it?
17      MR. ROZYNSKI:  You don't specify
18  what you're talking about when you
19  posed the question.  If you want to
20  read it back, we can talk about it.
21  It's vague.  I don't have to go farther
22  than --
23      MR. HALLER:  Yes, you do actually,
24  but I'm not going to argue with you.
25      MR. ROZYNSKI:  -- simply stating

1  what my basis is.
2      MR. HALLER:  Maybe you know
3  something that I don't know.  If you
4  do, you need to say it on the record.
5      Q.  Let me break this down.  Before the
6  lunch break you told me that you had got some
7  kind of permit, which you said was from DMV
8  or DOL, in order to be able to drive a
9  tractor-trailer to participate in the
10  program, is that correct?
11      MR. ROZYNSKI:  Objection to the
12  form.  It misstates earlier testimony.
13      MR. HALLER:  What's the problem
14  with it?
15      MR. ROZYNSKI:  Misstates earlier
16  testimony.
17      MR. HALLER:  In what way?  So I can
18  understand it and then be accurate.
19      MR. ROZYNSKI:  Department of Labor,
20  DOL, what are you talking about?
21      MR. HALLER:  DOT, I'm sorry.  Is
22  that the only issue?
23      MR. ROZYNSKI:  Yes, misstated what
24  he said.
25      MR. HALLER:  Okay.

1      MR. ROZYNSKI:  We can go back and
2  forth with every objection.
3      MR. HALLER:  No.  On this it's
4  important, because to be very blunt,
5  Mr. Rozynski, I've never been put in a
6  position, and it is absolutely, I
7  think, outrageous conduct that I'm
8  taking the deposition of an expert
9  without documents that should have been
10  produced, I don't have a copy of this
11  so-called permit, I don't have any
12  documentation of what we're talking
13  about, and this witness is here
14  claiming to be an expert based on his
15  personal experience, and I shouldn't be
16  guessing at it.  I shouldn't.  All
17  right.  So if you know what it is we're
18  talking about, or if you have the
19  documents, or he has the documents, we
20  should have it.  In the absence of
21  that, I'm going to do my best.  And if
22  you think I'm wrong, then I'm asking
23  you to be specific, because I am not
24  normally, and shouldn't be, in this
25  position.  So let's go back.



1    Q.  Mr. Huey, you said before the lunch
2  break that you had received some kind of
3  permit in order to be able to drive a
4  tractor-trailer as part of the Glendale
5  Community College program, is that correct?
6    A.  Yes.
7    Q.  Was that from DMV or DOL?
8      MR. ROZYNSKI:  Objection to the
9  form.  You said DOL again.
10      MR. HALLER:  Sorry.  I'll withdraw
11  it.
12    Q.  Was that from DMV or DOT?
13    A.  Really, I think you're confused,
14  DOL, DOT, DMV.
15    Q.  Why don't you just tell me --
16  withdraw the question.  Why don't you just
17  tell me exactly what permit you had to enable
18  you to participate in the Glendale Community
19  College program, specifically please?
20    A.  Two things, physical from DOT first,
21  the audiology, the results of that, then I
22  gave that, you know, and I passed the medical
23  and gave that to DMV, and I explained that to
24  you before when I was being interrupted, the
25  three things, so let me explain how it

1  worked.  I went to the audiologist, I got the
2  results of that.  And you have to be under
3  the 40 decibel level.  I actually am 20
4  decibels.  I gave that to the doctor to sign
5  for clearance.  And then that was given to
6  DMV, and then I was accepted and approved to
7  take the written test.  And that was the
8  process of how I got the permit after I
9  passed the written test and then I was able
10  to go to the Glendale program.
11    Q.  Who issued the permit to you?
12    A.  DMV of Arizona.
13    Q.  Was that for interstate or
14  intrastate driving?
15    A.  I thought I already made that clear
16  that DMV gave me the permit, DMV my permit.
17    Q.  That wasn't my question.  My
18  question was that for intrastate, within the
19  state only driving, or did it cover
20  interstate driving?
21    A.  Okay.  In the training program you
22  were only allowed to drive in the state of
23  Arizona, so intrastate, until you complete
24  and get the CDL license, then it's interstate
25  after you have your full license.

1    Q.  My question is whether the permit
2  that you received only allowed you to drive
3  intrastate or whether it covered both
4  intrastate and interstate driving?
5    A.  Well, there's two different markings
6  on it depending on the state.  I had this
7  form for the physical part that the doctor
8  had to check, check off, to permit me to go
9  out of state, so interstate it actually
10  depended on the SPE, Skill Performance
11  Evaluation, and that was based on the
12  doctor's decision and between the doctor and
13  the DMV, but it didn't depends on me.  The
14  SPE -- suppose you have an amputation, that's
15  considered, the SPE, the Skill Performance
16  Evaluation, and that does not apply to me as
17  a deaf person, that's more applied to someone
18  of physical limitation as an amputation.  Is
19  that clear?
20    Q.  Not really.  I'm just trying to find
21  out whether the permit that you received from
22  the DMV was limited to interstate, intrastate
23  driving that is within the state of Arizona
24  at that time?
25    A.  Now I'm a little bit confused.  Hold

1  on.  Not blaming the interpreter, but I'm a
2  little bit confused on the question.  The
3  SPE, Skill Performance Evaluation, that
4  depends on the doctor, and if he checks off
5  intrastate or interstate, that means you
6  cannot go out of state if it's intrastate,
7  but that did not apply to me and that was
8  something that the doctor's designation --
9    Q.  Do you have a copy of this permit
10  that you're referencing?
11    A.  At home.
12    Q.  Is there some reason you didn't
13  produce it as part of your documents?
14    A.  Well, today, here we are today, I
15  was just producing things that are current,
16  you know, for the legal proceeding.  I was
17  producing the current documentation.  If you
18  wanted to go back, back into time from
19  Arizona I could have made copies of all those
20  things in Arizona, but, you know, I wasn't in
21  Arizona at the time.
22    Q.  Well, Mr. Huey, we did ask for all
23  of these documents in the subpoena, so I'm
24  not -- I don't think it's appropriate to say
25  that you weren't aware that we weren't



Page 94

```
 1    looking for them and you produced things
 2    going back in time I'm looking at a document
 3    from Glendale Community College --
 4        A.  You just asked me about the permit
 5    today.  I didn't know, I didn't know about
 6    it, that it would be necessary.
 7        Q.  It wasn't for you to determine.  We
 8    asked for all the documents related to your
 9    experience, so you should have produced them.
10    I'll ask for them, and we'll follow-up with
11    Mr. Rozynski.  Right now we're dealing with
12    what's before us, so.
13    REQUEST NOTED:
14        A.  Okay, I understand.
15          THE INTERPRETER:  Interpreter
16        switch.
17        Q.  Following the four to six months you
18    spent at Glendale Community College, did you
19    take the test to get a Class A CDL license?
20        A.  Yes.
21        Q.  Did you pass the test?
22        A.  Yes, I did.
23        Q.  Did you then get --
24        A.  I passed all of them.
25        Q.  Did you then get a commercial driver
```

Page 95

```
 1    license?
 2        A.  The double tractor, the
 3    tractor-trailer, the double tractor-trailer,
 4    the tankers, and the hazmat.  I believe that
 5    covers them all.  I have passed all of the
 6    tests.
 7        Q.  Because I'm looking at the documents
 8    you produced and the first commercial
 9    driver's license that we see in what you've
10    given to us is dated 10/31/2014 in the
11    package that's marked as Huey Exhibit 4.
12        A.  Yes, I got this one first.
13        Q.  Well, this is dated issue
14    10/31/2014, do you see that?
15        A.  Yes.
16        Q.  Is that the first commercial
17    driver's license that you got?
18        A.  Yes, it is.
19        Q.  So now I'm confused.  You finished
20    Glendale Community College in 2011, around,
21    and this license you don't get until October
22    of 2014, there's over two year delay; do you
23    understand my confusion?
24        A.  Okay.  I had some struggles with the
25    DMV.  They didn't provide an exam test for
```

Page 96

```
 1    me.  They wouldn't provide an interpreter
 2    during the test for the road test, so we went
 3    back and forth, I had to negotiate with them.
 4    So then I moved to Texas and I quickly was
 5    able to take the test and get my license
 6    within two weeks, so I had a better
 7    interaction there in Texas as opposed to
 8    Arizona.
 9        Q.  So let me just then try and piece
10    this together.  So, you finished at Glendale
11    and then you wanted to take the CDL Class A
12    license, right, test?
13        A.  Yes, I did want to take it.  And I
14    had all these discussions with the DMV and
15    then the instructor didn't want to get
16    involved either.  They encouraged me to get
17    in touch with them and they required me to
18    speak and I said no, I want an interpreter to
19    be provided.  I had wanted things to be
20    signed to me.  So then I moved to Texas and
21    they allowed some gesturing, not an
22    interpreter, but gesturing to be provided
23    with the instruction.  So it's basic hand
24    signs, left, right, straight.
25        Q.  So let me just finish with the
```

Page 97

```
 1    document on Glendale.  This says, it looks
 2    like, do you see the date at the top,
 3    10/01/2010, do you see it says at the
 4    completion of the one hundred sixty hours of
 5    training the student successfully obtained a
 6    Class A CDL, do you see that?
 7        A.  Yes, I see that.
 8        Q.  Then if you would look at the second
 9    to last document in the package that's marked
10    as Huey Exhibit 4, there's a letter from
11    Turning Point Assistance and Development LLC,
12    vocational counselor to OSD coordinator dated
13    March 13, 2014, do you see that?
14        A.  What was the date again?  Did you
15    say June 24th?
16        Q.  No, I said the letter is dated
17    March --
18        A.  I'm looking at the wrong thing
19    maybe.
20        Q.  The letter itself is dated March 13,
21    2014.  There's a fax marking that's June 24,
22    2016.  It's not that.  I'll find the page for
23    you.  Give it to me, let me find the page for
24    you, then I'll show it to you.  It's the last
25    but one page in this package of documents.
```

MAGNA >
LEGAL SERVICES

1    Do you now have that in front of you?
2        A.  Yes.
3        Q.  So do you see that there's a letter
4    dated March 13, 2014 front of you, Virginia
5    Thompson, T-H-O-M-P-S-O-N, vocational
6    counselor to OSD coordinator Austin Community
7    College, do you see that?
8        A.  Yes.
9        Q.  She says I've been working with
10   Mr. Huey Junior since 2009, do you see that?
11       A.  Yes.  I'm aware of what this
12   pertains to.
13       Q.  I want to find out.  So Virginia
14   Thompson was a vocational counselor who had
15   been working with you since 2009, that's
16   correct?
17       A.  Correct.
18       Q.  She was employed by an entity called
19   Turning Point Assistance and Development LLC,
20   is that correct?
21       A.  Yes.
22       Q.  Am I correct in believing that these
23   vocational counseling services were paid for
24   by a state government?
25       A.  Yes, that's correct.

1        Q.  So was Ms. Thompson in Texas or in
2    Arizona, if you recall?
3            THE INTERPRETER:  Virginia, Texas
4        is that your question?
5        Q.  Was Virginia Thompson in Texas or
6    Arizona, if you recall?
7        A.  Arizona.
8        Q.  In addition to the government
9    support you had to go to Glendale Community
10   College, you also got funding to have a vocal
11   counselor working with you throughout this
12   period of time 2009 through 2014?
13       A.  Yes.
14       Q.  She goes on to say that during that
15   time Mr. Huey has been working hard to become
16   a CDL truck driver, do you see that?
17       A.  Yes, yes.
18       Q.  Is that statement --
19       A.  Yes, they believed that I can become
20   a truck driver, they believed in me.
21       Q.  Understood.  But that statement
22   implies to me that as of March 13, 2014 you
23   had not yet got a CDL license, that's
24   correct, isn't it?
25       A.  Can I explain something?

1        Q.  No.  I just want an answer to my
2    question right now.  We'll go back and cover
3    it and I'll give you an opportunity to
4    explain.
5        A.  This is pertaining to going to
6    Austin Community College and then it's
7    required to fill out an application and then
8    I can take courses that are required, so this
9    is an introduction to approve me to start the
10   process.
11       Q.  I understand.  But the statement
12   that Mr. Huey has been working hard toward
13   becoming a CDL truck driver certainly implies
14   that you do not yet have the license to be a
15   CDL truck driver.  I just want to establish
16   that as of the date of this letter, March 13,
17   2014, you didn't yet have a CDL license and
18   hadn't yet passed a CDL test?
19       A.  Right, I didn't get the full license
20   I got a permit and I was working towards
21   getting a license, but I had struggles with
22   DMV.
23       Q.  That then explains the gap in time
24   between the Glendale Community College and
25   the obtaining in October of 2014 of a

1    commercial driver license; because until you
2    took the test in Texas, you really hadn't
3    been able to get a license, right?
4        A.  I did struggle with that for them to
5    issue me a license, yes.
6        Q.  So we can just agree on the record
7    that immediately after you left Glendale
8    Community College, although you may have
9    attempted to take the test, you weren't
10   permitted, and that you didn't actually take
11   a test and get a license until sometime in
12   the middle to the later part of 2014?
13       A.  Yes, that's right.
14       Q.  Then am I correct that after
15   Glendale Community College you then did some
16   training with Pima County Community College
17   District?
18           THE INTERPRETER:  I just need a
19       spelling on that.
20           MR. HALLER:  P-I-M-A County
21       Community College.
22       A.  Yes.
23       Q.  That was also in Arizona, correct?
24       A.  Yes, that's correct.  It's a
25   different city, this is in Tucson because I



Page 102

1   was the last person to finish in Glendale and
2   then the community college shut down the
3   program and it transferred over to here.
4       Q.  When you say they shut down the
5   program, what was the program they shut down?
6       A.  The CDL trucking program.  They
7   weren't going to be offering that program no
8   more.  Along with the diesel mechanic
9   training, that expired too, that wasn't being
10  offered anymore.
11      Q.  What is Glendale Community College,
12  is it a general community college or is it
13  dedicated to assist people with disabilities?
14      A.  It's open to the general.  There's
15  hearing students there.  It's a community
16  college.
17      Q.  Was there a particular individual
18  that you trained with at Glendale Community
19  College or was it more than one person?
20      A.  There was many teachers.
21      Q.  Where initially did they go on road
22  driving with you?
23      A.  In Phoenix, in the area of Phoenix.
24      Q.  Did they have sort of a private area
25  where they started out students?

Page 103

1       A.  Could you ask that again.  Could you
2   clarify.
3       Q.  Yes.  I'm trying to get an
4   understanding of whether they had a private
5   area, was not main roads, and sort of in
6   urban areas where they started people out?
7       A.  To practice?
8       Q.  Yes.
9       A.  It was a private area that was
10  connected with the school in the beginning.
11  And the teacher would observe, and then if
12  you were ready, then you would go out.
13      Q.  Can you give me sort of a sense of
14  how big the private area was, and how much
15  opportunity it gave to test out basic skills?
16      A.  About ten acres.
17          THE INTERPRETER:  Interpreter
18      switch.
19      Q.  When you were initially starting to
20  learn in that context in the private area,
21  was there a trainer in the cab with you?
22      A.  No.
23      Q.  So am I correct in understanding
24  they had somebody observing, but they let you
25  sort of try on your own?

Page 104

1       A.  You're talking about the private
2   field area, correct.  They let us on our own,
3   but not when we were out in the public, they
4   would let us drive on our own and they would
5   observe us in that private field area.  There
6   were only maybe two or three students at a
7   time.  Ten acres, that's a lot of room,
8   that's very roomy, but you could only go a
9   limited speed and third gear.  Third gear,
10  that was all, you couldn't get up to fourth,
11  fifth gear, you could only go up to third
12  gear.
13      Q.  Was there an interpreter in the
14  vehicle with you during that initial training
15  in the private area?
16      A.  Sometimes there was an interpreter
17  there.  Really depended on the interpreter,
18  if they wanted to sit in the truck or sit out
19  with the instructor.  Sometimes the
20  interpreter wouldn't really understand the
21  technology and the terminology, so the
22  interpreter would sometimes talk to the
23  instructor off to the side to get more better
24  understanding of, you know, the different
25  things regarding the truck.

Page 105

1       Q.  You said there were only two or
2   three students at a time; explain what you
3   mean by that, is that individually in
4   separate trucks?
5       A.  Yes.
6       Q.  And they could be -- were they all
7   hearing-impaired or was it a combination of
8   people who could hear and people that had
9   hearing impairments?
10      A.  Well, I was the only one that was
11  deaf, the others could hear.  Yes, everybody
12  else could hear.
13      Q.  So what you're describing is the way
14  this Glendale Community College trained for
15  all of its students by starting them out in
16  this private area?
17      A.  Yes.
18      Q.  Then I assume at some point --
19      A.  You know, after you had a little bit
20  of experience, then the instructor would sit
21  in the cab with you and you'd go out of the
22  private area, you know, usually two or three
23  students, maybe just up to three at a time.
24      Q.  Where is Glendale Community College
25  in terms of the town of Phoenix, is it in the



27 (Pages 102 to 105)

Page 106

1    city itself or is it on the outskirts in sort
2    of a more rural area?
3        A.   The college is in the town, yes, the
4    college is in the town, like a suburb, I
5    would say, a suburb. I think it was out to
6    the west of Phoenix, the western part of
7    Phoenix, but there's a lot of houses there,
8    it's not out in the country, no.
9        Q.   Am I correct that the instructors
10   would make an assessment of how well you and
11   others were handling the vehicle before they
12   let you out on the road?
13       A.   Yes, they would do that in that
14   field area.  And that was in, you know, you
15   practice backing up, you practice going
16   forward, you know, various different skills
17   that were required.  And when you were
18   competent in the field test, the field area
19   of practice, then we would go out of that
20   private area.
21       Q.   So I just want to make sure I
22   understand.  So there was sort of a
23   requirement that you reach a certain level of
24   proficiency before you went out on any kind
25   of public road?

Page 107

1        A.   Yes, of course.  Yes, I believe
2    probably I would say for everybody, people
3    who could hear, people who were deaf, I think
4    we all had the same requirement, because even
5    some of the hearing people were struggling
6    maneuvering the truck and stuff, I'd try to
7    help them.
8        Q.   So as I understand it, after that
9    program you had difficulty with the state of
10   Arizona administering a test because they
11   wouldn't allow an interpreter, is that right?
12       A.   That's right.
13       Q.   Then you went to Pima County
14   Community College and essentially did another
15   course in learning how to drive a
16   tractor-trailer?
17       A.   It was a refresher course.  I
18   believe it was forty hours in one week,
19   because I already had the diploma of one
20   sixty hours that I had passed, so this was a
21   refresher course that I took at the Pima
22   County College.
23       Q.   Was the driving -- were you driving
24   in a private area again or was this on the
25   road?

Page 108

1        A.   Well, it was some reading that
2    reviewed, you know, I had to do some reading,
3    and then they let me go out, the first day,
4    because I already had experience.  So after I
5    did some reading and reviewing up on that, I
6    went out on the road and the instructor is
7    like how is it you don't have your CDL.  And
8    I had to, you know, explain about the
9    struggle with DMV and all that.
10       Q.   Did you have a sign language
11   interpreter in the vehicle during that
12   experience when you were on the road at Pima
13   County Community College?
14       A.   Yes.
15       Q.   Was Pima County Community College
16   funded again by the state?
17          MR. ROZYNSKI:  Objection to the
18       form.
19       A.   Yes.
20       Q.   The state program also paid for the
21   interpreters?
22       A.   Well, it was separate.  The tuition
23   was paid and then they would also provide for
24   interpreters as well.  I don't really know
25   how the system works with the interpreters

Page 109

1    specifically, but I'm not really an expert in
2    that department on how that all gets set up.
3        Q.   As far as you knew, it was all being
4    paid for by the state?
5        A.   Well, not always.  It would depend,
6    you know, sometime the state would provide,
7    sometimes the college would provide.  It
8    really depends.
9        Q.   I'm talking about this experience at
10   Pima County Community College?
11       A.   Well, they have their own
12   interpreter office there at the campus, so I
13   believe that was separate, the VR state paid
14   for the tuition and then the college had
15   interpreters on staff that they provided.  It
16   may still be state funding, but I don't know,
17   I don't think it specifically was VR funding,
18   but it could have been another agency of the
19   state, but they were on the campus there.
20       Q.   So you did that, and then, as I
21   understand it, you continue to have
22   difficulties being able to take the test in
23   Arizona which lead you to go to Texas, is
24   that right?
25       A.   That's right.

MAGNA ▶
LEGAL SERVICES

Page 110

1     Q.  Then you enrolled in the Austin
2   Community College, is that right?
3     A.  Yes.
4     Q.  You did another course at Austin in
5   tractor-trailer driving?
6     A.  Yes.
7     Q.  Was that also funded by the state?
8     A.  Okay.  This is a separate issue
9   here.  Tuition.
10        THE INTERPRETER:  Interpreter
11     clarify.  I was misunderstanding his
12     sign for tuition.  When I said
13     tutoring, tuition, so that's clarifying
14     that.
15     A.  I applied to the State of Texas as
16   for the tuition because I'm deaf and then I
17   went into the community college, you know, so
18   I had actually the tuition was waived because
19   I was deaf, and I went in and took the
20   courses at Austin Community College.  VR did
21   not help me there.  You know, they helped me
22   with other things, you know, but not with the
23   tuition, they didn't pay for the school, no.
24   The state had a waiver, tuition waiver, for
25   deaf students.

Page 111

1     Q.  Then who provided or who paid for
2   the interpreters, if you had them?
3        THE INTERPRETER:  At Austin?
4     Q.  At Austin?
5     A.  Again, Austin Community College had
6   an office of interpreters and Texas, I
7   believe, the state of Texas funds that
8   interpreter office, but it's there on the
9   campus of the college.
10     Q.  At Austin Community College did you
11   have an interpreter with you most -- either
12   all the time or most of the time?
13     A.  All the time.
14     Q.  Again, was it one or was it two
15   because of the needs to rotate?
16     A.  Yes.
17     Q.  So it was two?
18     A.  Yes, yes.
19     Q.  Was that also true at Pima County?
20     A.  Yes.  All the schools were the same,
21   always had two interpreters.
22     Q.  Then when exactly did you take the
23   CDL Class A license test in Texas, when?
24     A.  October 31, 2014, as you can see on
25   the license.

Page 112

1     Q.  Do you recall who the person was who
2   administered the test?
3     A.  No.  I never asked the name.  My
4   instructor was with me and that was Jason, my
5   instructor's name was Jason.  And he helped
6   me, you know, contact DMV and the woman who
7   gave me the test, the person who gave me the
8   test at DMV was a female, and she was very
9   strict.
10     Q.  So were you allowed a sign language
11   interpreter at any point in the test?
12     A.  One part.
13     Q.  What part was that?
14     A.  Well, the part that had the
15   discussion of the air brakes system.  They
16   were asking me questions regarding, you know,
17   the four PSI, the air pressure, if there's
18   four PSI lost in one minute and just
19   questions like that, 60, 40, there's a
20   warning light that comes on.  And yes -- and
21   they asked me about TUG.  TUG, the TUG test,
22   when you put it in first shift there's a
23   little tugging to make sure the brakes
24   worked.  And I passed all that with the
25   interpreter.  Then the interpreter left and

Page 113

1   then I had the tester in the car, in the cab
2   with me gesturing the remainder of the test
3   to me.  He learned some sign, like can't and
4   on, and two hands on the wheel.  He said you
5   couldn't to that.  You had to have both hands
6   on the wheel, you couldn't have one on the
7   shift.  You know, like arrows, he would
8   gesture like this for each of the streets and
9   things like that.  So we had a gesture system
10   made up that we could communicate via
11   gestures, so then at the same time, you know,
12   grading me and making sure that I was doing
13   the right thing following the signs, so
14   that's how she graded me.  We went out on the
15   highway and then parked and I passed.  I
16   think I got 83, a score of 83, I believe.
17     Q.  I'd like to break it down.  My
18   question really went to whether you had sign
19   language interpreter assisting, and I think
20   you said you did with respect to a specific
21   part, and I think you described --
22     A.  Yes.
23     Q.  -- the air brake system
24   demonstration?
25     A.  Yes, yes, that's air brake system

MAGNA
LEGAL SERVICES

Page 114

1  testing the interpreter was there.
2      Q.  Was there any other part or aspect
3  that a sign language interpreter was present
4  and involved?
5      A.  Just that one part.
6      Q.  So then in terms of the road portion
7  of the test, I understand you to be saying
8  that there was some kind of system of signals
9  or gestures that was used, is that generally
10  correct?  I don't want the specifics yet.
11      A.  Yes, that's correct.  Yeah, we had
12  set up a gesture system, that was
13  established.
14      Q.  I want to understand that better.
15  You say we set up a gesture system; who set
16  up a gesture system?
17      A.  The examiner told me, you know, this
18  means this and this means that, and showed me
19  the various gestures, and so the examiner set
20  up the system.
21      Q.  When that -- was that discussion
22  occurring before anything got started or at
23  some point in the test before the road
24  portion?
25      A.  While we were in the cab.  Though we

Page 115

1  would be in the cab and right before we would
2  leave, you know, the gestures were explained.
3      Q.  I'm having a hard -- trouble
4  understanding this.  I apologize.  But in
5  order for the examiner to explain the
6  gestures, wasn't it necessary to have a sign
7  language interpreter involved in the
8  discussion?
9      A.  No, there was no interpreter, no.
10      Q.  I'm having difficulty understanding
11  how the medical examiner communicated what
12  the signs meant so that you would comprehend
13  them unless you were wearing a hearing aid
14  and could hear at least some of what you were
15  saying?
16      MR. ROZYNSKI:  Objection to the
17  form.
18      A.  Well, she would do this gesture, and
19  then she'd do this gesture, and then she'd do
20  this gesture.  It was pretty
21  self-explanatory.  And then would put this
22  gesture, and it was, you know, this gesture,
23  thumbs up.  And then other gestures, just
24  really gestures that were pretty obvious that
25  anyone would really understand.

Page 116

1      Q.  Again, I'm not sure I understand.
2  Were these worked out before you started
3  driving or were they just sort of things you
4  did as you went along and that you believe
5  were self-evident?
6      A.  While we were going along.  Now, the
7  same thing when I'm teaching someone who
8  doesn't know sign language, I typically have
9  a similar type of gesture system.  There
10  might be an interpreter in the back, but I
11  don't need the interpreter back there, the
12  two of us who are in the front communicate
13  through obvious gestures, hand gestures.
14      Q.  Right.  I appreciate it and I am
15  going to come and talk about that experience.
16  Right now I'm focused only on what happened
17  during this test.  As I understand your
18  testimony, there was no explanation in
19  advance, that it was just gestures while you
20  were driving?
21      A.  Yes, that's correct.
22      Q.  Am I right in understanding there
23  was no sign language interpreter in the cab
24  during this test?
25      A.  That's right.

Page 117

1      Q.  Is that because Texas wouldn't allow
2  it or just because that was the choice of the
3  particular examiner that day?
4      A.  It's a federal law.  It's not Texas
5  or Austin, it's federal said it's not
6  permitted for the interpreter to be there.
7  It's federal.
8      THE INTERPRETER:  Interpreter
9  switch.
10      Q.  I understand that this examiner made
11  up these gestures and you did the test and
12  she passed you; but do you personally have
13  any knowledge as to whether what occurred is
14  consistent with and conforms to AAMVA
15  standards, which are the standards that
16  should be followed by CDL examiners?
17      MR. ROZYNSKI:  Objection to the
18  form.
19      THE INTERPRETER:  Can I get a
20  spelling on AAMVA.
21      MR. HALLER:  You don't know what
22  AAMVA is?
23      THE INTERPRETER:  I'm asking the
24  interpreter for clarification.
25      MR. HALLER:  It's A-A-M-V-A, the

MAGNA ▶
LEGAL SERVICES

Page 118

1   acronym.
2        THE INTERPRETER:  A-A-M-V-A,
3   correct?
4        MR. HALLER:  Yes.
5   A.  I'm not sure what that is.
6   Q.  So you wouldn't be able to say
7   whether it conforms to those standards or
8   not, or whether this test was a deviation
9   from those standards?
10       MR. ROZYNSKI:  Objection to the
11  form.
12  A.  I'm not sure what that is.
13       MR. ROZYNSKI:  Can you tell him
14  what the acronym means.
15       MR. HALLER:  Is that an objection
16  or a request?
17       MR. ROZYNSKI:  Request, because how
18  could someone know what the acronym is
19  without explaining what the acronym is
20  is not a proper --
21       MR. HALLER:  I would have thought
22  somebody who is an expert --
23  Q.  American Association of Motor
24  Vehicle Administrators, does that mean
25  anything to you?

Page 120

1   you or have an argument, I'm just trying to
2   establish certain things on the record in
3   terms of your knowledge as an expert, or
4   purported expert, in this case, so I do need
5   an answer to my question.  Given that you do
6   not know what AAMVA is, that you do not know
7   anything about their standards, can we agree
8   that you're not in a position here to testify
9   whether the test you were given conforms to
10  or deviates from the AAMVA standards?
11  A.  No.
12  Q.  No, you can't, right?
13  A.  Am I aware of it, no.  I don't know.
14  Q.  Don't know and you can't say whether
15  it conforms or deviates from those standards?
16  A.  I'm not familiar with the standards,
17  I've never seen it before, so.
18  Q.  You said earlier in your deposition
19  that you had trained, I think, two students?
20       MR. ROZYNSKI:  Objection to the
21  form.
22  A.  Yes, two students.
23  Q.  Two deaf students?
24  A.  Yes.
25  Q.  I just want to make clear, was this

Page 119

1   A.  No, I'm not familiar with this.
2   What is that exactly?
3        MR. ROZYNSKI:  It's fine.  You've
4   answered my question so don't worry
5   about it.
6   A.  Okay.
7   Q.  I just want to establish on the
8   record that since you don't know what AAMVA
9   is, and you don't know what their standards
10  are, that you have no knowledge as to whether
11  the test that you were given conforms or
12  deviates from their standards?
13  A.  I am not familiar with the
14  standards.  I've gone to different places for
15  testing, so to provide proper accommodations
16  for a deaf person I'm not really familiar if
17  they are compliant with the standards or not.
18  Now, they'll make accommodations for other
19  people that speak different languages, they
20  might have Chinese available or Mandarin,
21  Spanish, but they don't have anything
22  provided for a deaf person.  There's no ASL
23  accommodation, so maybe that's why I'm not
24  familiar with this standard.
25  Q.  I'm really not trying to spar with

Page 121

1   people who didn't yet know how to drive in
2   order for them to take the commercial driver
3   license, or was this as part of a program
4   with your employer to provide additional
5   training to people who had passed their CDL
6   license?
7   A.  They had gotten the CDL themselves,
8   and then under the U.S. Express, that's where
9   I was working at, they had joined under me
10  and I had trained them, so I trained them on
11  the policy and procedure of the particular
12  company.
13  Q.  I wanted to be clear.  Just so the
14  record is clear, whatever training you gave
15  those two individuals was after they had
16  passed their CDL license?
17  A.  Yes.
18  Q.  They were not novice drivers when
19  they came to you?
20  A.  Okay, I'm a little bit confused.
21  Let me backtrack.  They both had their
22  license, yes.  Now, how to load or how to
23  back up, they weren't familiar with that.  I
24  had to teach them these things, these skills.
25  How to load, how to read the orders, and also

MAGNA ▶
LEGAL SERVICES

Page 122

1  with my fleet manager, so I had to teach them
2  these certain skills.
3      Q.  And that was based on a program that
4  U.S. Express had developed?
5      A.  I'm not really sure on your
6  question, could you explain that.
7      Q.  Yes.  I think it's self-evident, but
8  these were individuals who came to work for
9  U.S. Express after they had got their
10 license, correct?
11     A.  Yes, that's right.
12     Q.  Then U.S. Express had a program to
13 provide additional training to all its new
14 drivers?
15     A.  For entry level, yes.
16     Q.  For entry level.  And you
17 participated in that supplemental training
18 for new entries and in that --
19     A.  Yes, I did train them.
20     Q.  And in that context you trained
21 these two individuals who had a hearing
22 impairment?
23     A.  Yes.  They were both deaf.
24     Q.  Were they both completely deaf or
25 were they hearing-impaired?

Page 123

1      A.  They were deaf, profoundly deaf.
2  And we used sign language to communicate.
3      Q.  That was my next question.  You
4  communicated exclusively in sign language
5  during that additional training?
6      A.  Yes.
7      Q.  Was some of the training in a
8  yard-like area and some on the road, or was
9  it all in a yard?
10     A.  I would teach them how to back up
11 and to observe everything and how to turn
12 based on a forty-five degree angle or ninety
13 degree angle, I would explain these things,
14 how to turn, and then we would do a road
15 test, and then whatever they need, I would
16 help them out.  We can switch, they could
17 observe me, I could show them the inner
18 workings of what needs to be done and then
19 they can develop their skills and then --
20     Q.  Was all this done at U.S. Express'
21 facility?
22     A.  Yes, at first initially it was on
23 their property on their yard, it's considered
24 a base, maybe fifteen acres, I would say that
25 would be the size of it.  They had a big lot.

Page 124

1  I would introduce myself at first, we would
2  explain different things, give maybe a tour,
3  do a post-inspection, just explain
4  everything.  And then we'd get inside the cab
5  and I would explain the inner workings and
6  explain how to back up, then how to drive.  I
7  would observe them for about two weeks this
8  took place, just to make sure everything was
9  running smooth.  Also observe your mirrors.
10 So they were knowledgeable of everything.
11     Q.  Again, most of this was taking place
12 in the fifteen acre facility?
13     A.  Yes.
14     Q.  Was there any portion that was on a
15 public road or was it all confined to the
16 facility?
17     A.  We did go out, first we started in
18 the private lot and then we would go out
19 maybe after two or three or four days or the
20 Travel of America, it's a truck stop, they
21 have a huge lot, we would visit that space as
22 well, and we'd practice with parking, backing
23 up, and then we'd move on from there.  And I
24 encouraged them to watch other drivers as
25 well, see how they are handling going in

Page 125

1  reverse and just observe them, and I
2  encourage that as well.
3      Q.  Was there a length of time for this
4  program or would it depend on the individual,
5  the new entry?
6      A.  In the beginning it was pretty
7  flexible, you needed to get one hundred
8  seventy-five hours for training under this
9  program.
10     Q.  Are you able to say of the one
11 hundred seventy-five hours how many hours
12 were in the facility, in the fifteen acre
13 facility, versus on the road?
14     A.  About two hours there, two to four
15 hours at U.S. Express, and then we would go
16 out and then the rest would be out in public
17 space.
18     Q.  So have we now covered sort of what
19 you did in training new entrants, that covers
20 everything, yes.  Can we agree on the record
21 that you have not personally taken somebody
22 who has had no experience whatsoever and
23 trained them through a program to get them to
24 take and pass the CDL license?
25     A.  Right, no.

MAGNA
LEGAL SERVICES

Page 126

```
 1          MR. HALLER:  I'd like to take a
 2     break.
 3          MR. ROZYNSKI:  Okay.
 4          THE VIDEOGRAPHER:  The time is 2:46
 5     p.m.  Off the record.
 6          (Whereupon, a discussion was
 7     held off the record.)
 8          MR. HALLER:  I have no further
 9     questions.  I'm closing the deposition
10     for today, thank you.  There may be
11     some documents that we will get, so I'm
12     reserving my rights, but I don't
13     anticipate calling this witness back
14     unless something really unusual is
15     disclosed.
16          MR. ROZYNSKI:  Mr. Huey would ask
17     that the U.S. Express documents which
18     are business records be kept strictly
19     confidential and not be disclosed to
20     the public.
21          MR. HALLER:  We agree to that, and
22     we'll treat them accordingly.
23          (Time noted:  2:55 p.m.)
24
25
```

Page 128

```
 1            C E R T I F I C A T E
 2          I, JOI RAFKIND, a shorthand reporter
 3     and Notary Public within and for the State of
 4     New York, do hereby certify:
 5          That the witness whose testimony is
 6     hereinbefore set forth was duly sworn by me,
 7     and the foregoing transcript is a true record
 8     of the testimony given by such witness.
 9          I further certify that I am not
10     related to any of the parties to this action
11     by blood or marriage, and that I am in no way
12     interested in the outcome of this matter.
13
14
15          _____
16            JOI RAFKIND
17
18
19
20
21
22
23
24
25
```

Page 127

```
 1        A C K N O W L E D G E M E N T
 2          I, JOHN LUEGENE HUEY, JR., hereby certify
 3     that I have read the transcript of my
 4     testimony taken under oath on September 29,
 5     2016, that the transcript is a true, complete
 6     and correct record of what was asked, answered
 7     and said during my testimony under oath, and
 8     that the answers on the record as given by me
 9     are true and correct.
10
11     _____
12     JOHN LUEGENE HUEY, JR.
13
14
15     Signed and subscribed to
16     before me, this _____ day
17     of _____, _____.
18
19     _____
20     Notary Public
21
22
23
24
25
```

Page 129

```
 1                 ERRATA SHEET
       PAGE/LINE        CORRECTION
 2     _____
 3     _____
 4     _____
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____
```



Page 130

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**A**

**aamva** 117:14,20
117:22,25 118:2
119:8 120:6,10
**ability** 25:22 26:8
55:13 69:10 81:20
**able** 8:5 23:24
61:16 76:14 88:8
90:3 91:9 96:5
101:3 109:22
118:6 125:10
**aboveentitled** 1:18
**absence** 89:20
**absolute** 79:20
**absolutely** 30:25
79:2 89:6
**accept** 64:16
**accepted** 91:6
**access** 25:25 27:10
28:5
**accessible** 25:8
**accommodation**
119:23
**accommodations**
119:15,18
**accountant** 55:25
**accurate** 78:15
88:18
**accurately** 6:1
10:11
**acre** 124:12 125:12
**acres** 103:16 104:7
123:24
**acronym** 118:1,14
118:18,19
**acting** 10:8
**action** 1:18 128:10
**acuity** 68:24 69:1
**add** 21:4
**adding** 26:4
**addition** 53:1 99:8
**additional** 34:22
121:4 122:13
123:5
**address** 6:17 50:12

81:20
**administer** 4:17
**administered** 112:2
**administering**
107:10
**administration**
14:8,20 15:12,22
18:8,22 20:12
67:22,25 75:5
**administrators**
25:12 118:24
**adopted** 79:10
**advance** 16:4 35:12
36:15 37:13 43:6
116:19
**advice** 44:1
**advise** 7:23 10:24
22:13 44:15
**advising** 45:13
**advocacy** 9:1 16:11
16:15 18:23 20:11
24:15 28:12 29:16
30:8
**advocate** 8:1,2,3,13
11:6,15 15:18,25
16:22 18:5 20:24
22:9 23:12 30:5
30:18 36:6 40:25
**advocates** 26:25
**advocating** 18:11
49:8 70:6
**agencies** 21:13
58:21 59:10
**agency** 21:19
109:18
**ago** 13:13 24:19,20
52:11
**agree** 14:14,17
28:24 29:15 36:18
37:9 60:15 65:1
65:20 66:12 76:22
81:7 82:14 101:6
120:7 125:20
126:21
**agreeable** 23:22
**agreed** 4:3,9,14

**aid** 76:9 77:15
115:13
**air** 9:6 27:6 61:9
112:15,17 113:23
113:25
**airline** 39:2,7
**airplane** 38:16 39:3
**alleged** 50:6
**alleging** 51:23
**allow** 7:19 107:11
117:1
**allowed** 11:8 28:5
91:22 92:2 96:21
112:10
**amber** 61:25
**america** 124:20
**american** 118:23
**amish** 61:23
**amount** 38:12,22
39:3,14
**amputation** 92:14
92:18
**analysis** 67:11
68:11
**andrew** 2:5 38:12
40:12 41:19
**angle** 123:12,13
**answer** 7:21 9:4
10:1,17 16:9
17:24 23:6 42:15
44:17,19,20,21
45:9,10,13,15
47:8 48:19 63:18
64:22 73:12 100:1
120:5
**answered** 119:4
127:6
**answers** 6:3 9:19
9:23 16:13 127:8
**anthony** 2:11 6:23
**anticipate** 126:13
**anymore** 28:24
102:10
**apologize** 27:5
33:10 115:4
**appears** 13:18

14:18 15:1
**application** 100:7
**applied** 75:9 92:17
110:15
**apply** 49:2 92:16
93:7
**applying** 69:7
**appreciate** 82:3
116:14
**approach** 27:14
29:14 45:18 58:9
**appropriate** 93:24
**approve** 25:11,13
100:9
**approved** 76:12
91:6
**approximately**
19:24
**april** 40:5,8
**area** 102:23,24
103:5,9,14,20
104:2,5,15 105:16
105:22 106:2,14
106:18,20 107:24
123:8
**areas** 103:6
**argue** 87:24
**argument** 120:1
**arguments** 30:3
**arizona** 57:21,24
58:1,6 84:6,9,13
85:18,23 91:12,23
92:23 93:19,20,21
96:8 99:2,6,7
101:23 107:10
109:23
**arriving** 31:17 32:2
32:12
**arrows** 113:7
**articles** 16:21 66:14
66:21,24 67:10
**asked** 9:19 10:22
20:18 41:18 43:12
45:1 47:19 56:1
64:23 94:4,8
112:3,21 127:6

**asking** 9:9,12 11:4
13:22 14:4 16:12
23:8 34:9 43:9
44:23,25 46:8,13
46:15,16 47:10,11
47:12 51:5 55:12
55:16 69:22 72:23
75:10 82:1 89:22
112:16 117:23
**asl** 119:22
**aspect** 114:2
**asserting** 47:5
**assessment** 106:10
**assist** 102:13
**assistance** 97:11
98:19
**assisting** 113:19
**associated** 13:21
24:1 86:3
**association** 11:20
11:21 13:20 14:25
16:1,16 17:15
18:2 22:10,20
41:1 118:23
**assume** 25:16 31:5
105:18
**assuming** 71:2
**assumptions** 71:22
**attach** 45:21
**attachment** 32:6,8
33:18
**attempted** 101:9
**attend** 82:4 85:23
**attended** 18:20
19:5 74:5 82:13
**attention** 80:5
**attorneys** 2:3,8 4:4
**audiologist** 76:9,21
76:24 77:10,12,14
91:1
**audiology** 90:21
**austin** 6:19 98:6
100:6 110:1,4,20
111:3,4,5,10
117:5
**authority** 79:5



**authorize** 14:24
**authorized** 4:16
**available** 119:20
**ave** 1:11
**avoid** 25:14
**aware** 21:19 54:4,5
  69:11 73:7 93:25
  98:11 120:13
**awareness** 54:7

**B**
**b** 2:11 32:6,8 33:18
**back** 9:13,14 11:2
  13:11 18:9 22:5
  34:7,8 52:24 74:8
  77:20 78:10,20
  82:3 83:23 85:9
  85:19 87:7,20
  89:1,25 93:18,18
  94:2 96:3 100:2
  116:10,11 121:23
  123:10 124:6
  126:13
**backing** 106:15
  124:22
**backtrack** 121:21
**base** 123:24
**based** 38:4 40:24
  44:10 45:2 50:2
  52:13 59:20 60:2
  67:17 73:9 74:1
  77:21 89:14 92:11
  122:3 123:12
**basic** 24:25 96:23
  103:15
**basically** 17:12
  26:5 27:1,17
  30:14
**basis** 34:11 35:24
  37:12 49:20 54:21
  73:16 88:1
**baum** 2:3 36:14
**becoming** 40:10
  100:13
**beginning** 32:20
  34:16 103:10

125:6
**begins** 5:2 78:10
**behalf** 8:13 15:8
  18:24 20:24 24:16
  30:9 32:1,23 44:6
  52:20 70:6
**believe** 12:3 14:12
  14:12 15:3,4
  25:11 29:19,24
  40:6 49:16,17,19
  49:25 61:25 69:25
  71:17 95:4 107:1
  107:18 109:13
  111:7 113:16
  116:4
**believed** 99:19,20
**believing** 98:22
**best** 10:1,5 17:24
  89:21
**better** 96:6 104:23
  114:14
**big** 49:25 103:14
  123:25
**bill** 84:23
**binder** 33:7
**bit** 15:13 22:24
  92:25 93:2 105:19
  121:20
**blaming** 93:1
**blank** 1:11 2:8 5:12
  5:14 6:25
**blood** 128:11
**blunt** 89:4
**books** 56:2
**bordentown** 1:8
  5:5 7:2 62:6,12
  70:14,25 71:9
  72:10 73:2
**bottom** 33:8
**brake** 113:23,25
**brakes** 61:9 112:15
  112:23
**break** 14:1 23:19
  73:20,24 78:1,21
  86:22 88:5,6 90:2
  113:17 126:2

**briefly** 36:7
**bring** 63:23
**broke** 34:9 81:25
**brother** 40:16
**brought** 7:4 36:10
  80:4 85:9
**building** 5:13
**bus** 27:2
**buses** 8:8 30:21
**business** 7:3 126:18
**busy** 41:9

**C**
**c** 2:1 21:10 127:1
  128:1,1
**cab** 70:20 71:15
  103:21 105:21
  113:1 114:25
  115:1 116:23
  124:4
**cabins** 70:18,19
  72:3
**caleef** 2:17 5:23
**called** 5:23 24:20
  28:9 68:1,4 98:18
**calling** 126:13
**campus** 109:12,19
  111:9
**cant** 16:12 17:22
  19:12 23:14 26:19
  41:15 48:20 49:10
  49:17,20,24 79:16
  81:4 83:4 113:3
  120:12,14
**capable** 41:3,24
**capacity** 15:25
**car** 113:1
**care** 9:7 38:12
  84:20
**carrier** 11:19 14:7
  14:20 15:12,21
  18:7,21 20:12
  67:22,25 75:5
**carriers** 41:1 57:10
**case** 7:3 9:21 25:17
  31:7 35:18 36:22

37:5 38:8,20
  39:10,19 40:2,15
  40:20 41:4,24
  43:13,25 44:2,4,8
  45:1,25 47:17
  51:12 53:23 54:11
  54:23 56:6 63:17
  64:6 65:2,3,10,16
  79:6 120:4
**catch** 77:18
**cause** 16:5 30:18
  65:22
**cdl** 17:18 20:21
  21:6 55:14 59:1
  59:10 60:10,19,24
  60:25 61:6 70:7
  74:22 91:24 94:19
  96:11 97:6 99:16
  99:23 100:13,15
  100:17,18 102:6
  108:7 111:23
  117:16 121:5,7,16
  125:24
**ceo** 18:19
**certain** 61:6,24
  71:7 106:23 120:2
  122:2
**certainly** 100:13
**certification** 4:6
**certify** 127:2 128:4
  128:9
**chair** 27:3
**chairs** 27:4
**change** 79:19 80:10
  81:11
**changing** 79:22,25
**characteristics**
  64:15,20
**charge** 39:21
**check** 38:21,24
  92:8,8
**checks** 93:4
**chinese** 119:20
**choice** 117:2
**chronology** 73:21
**chrysler** 5:13

**circumstances** 65:5
**citations** 79:16
**city** 101:25 106:1
**civ** 1:3
**civil** 5:8 31:10
**claimed** 80:13
**claiming** 89:14
**clarification** 17:21
  17:25 85:6 117:24
**clarify** 10:16 11:5
  54:12 84:5 103:2
  110:11
**clarifying** 110:13
**class** 94:19 96:11
  97:6 111:23
**classroom** 82:22
  86:13
**clean** 85:19
**clear** 9:11 27:19
  44:24 45:20,22
  54:9 56:3,20
  60:11,13 67:3
  70:4 78:16 87:3,4
  91:15 92:19
  120:25 121:13,14
**clearance** 91:5
**clearer** 11:13
**clearly** 10:6 67:8
**close** 24:2
**closing** 126:9
**collaborate** 17:16
  17:19
**collaboration** 15:20
  16:1,16 17:14
  22:10
**colleague** 6:24
**college** 58:6,7 74:5
  74:15 75:24 82:2
  82:5,13,17 84:6
  84:16 85:17,23
  90:5,19 94:3,18
  95:20 98:7 99:10
  100:6,24 101:8,15
  101:16,21 102:2
  102:11,12,16,19
  105:14,24 106:3,4



107:14,22 108:13
108:15 109:7,10
109:14 110:2,17
110:20 111:5,9,10
**color** 61:25
**com** 1:25
**combination** 105:7
**come** 9:14 11:2
13:11 22:5 37:2
52:24 65:3 79:18
116:15
**comes** 112:20
**comment** 13:19
14:18,19 15:1
42:25 62:18
**comments** 14:6,16
24:18,24 25:2
50:18
**commercial** 61:9
68:1,5,12 94:25
95:8,16 101:1
121:2
**common** 59:2
**communicate**
69:13 113:10
116:12 123:2
**communicated**
115:11 123:4
**communicating**
18:9
**communication**
29:17
**communications**
44:18 46:17 47:11
47:12
**community** 7:18,23
8:1,3,14,25 11:7
11:15 20:25 24:16
28:14 30:9 58:6
74:5,14 75:24
82:2,4,13,16 84:6
84:16 85:23 90:5
90:18 94:3,18
95:20 98:6 99:9
100:6,24 101:8,15
101:16,21 102:2

102:11,12,15,18
105:14,24 107:14
108:13,15 109:10
110:2,17,20 111:5
111:10
**company** 56:3
121:12
**compared** 60:25
**compensated** 38:6
38:18
**compensation**
38:10 39:9
**competent** 106:18
**complaint** 63:17
**complete** 78:15
82:7 91:23 127:5
**completed** 74:6
**completely** 65:3
75:11 122:24
**completion** 97:4
**compliant** 119:17
**component** 20:7,15
**comprehend**
115:12
**concept** 70:7
**conclude** 69:12
**conclusion** 35:17
68:18
**conclusions** 31:18
32:3,13 34:12
**conduct** 31:11 89:7
**confidential** 126:19
**configuration**
71:14
**confined** 124:15
**confirmation** 38:14
**conforms** 117:14
118:7 119:11
120:9,15
**confused** 22:24
84:11 85:16 90:13
92:25 93:2 95:19
121:20
**confusion** 95:23
**connected** 40:15
76:18 103:10

**connection** 8:4,14
14:6 16:19 18:23
22:8 24:15 35:16
36:21 40:10 44:2
56:2 75:23 86:20
**connelly** 2:11 6:24
26:17 33:7 75:15
**consider** 66:13
**considered** 31:17
32:2,12 34:11
35:16 37:8,14
66:11 67:7 92:15
123:23
**considering** 11:22
14:8
**consistent** 117:14
**constant** 30:18
**consultant** 44:1
**contact** 21:25 30:16
41:8 112:6
**contacted** 40:9
43:23 44:5
**contacts** 23:15
**content** 46:4
**contents** 47:10
**context** 66:8 103:20
122:20
**continual** 86:17
**continue** 109:21
**conversation** 13:13
15:3 45:2
**conversations**
42:13 44:10,16
45:12,23,24 46:5
46:11 47:14
**coordinator** 97:12
98:6
**copies** 32:19 93:19
**copy** 3:10 11:18
34:25 89:10 93:9
**corners** 52:6 53:11
53:12
**correct** 10:18 11:9
11:10 13:10,18
29:5 33:24 38:5
41:2 50:10 51:13

53:20 57:13 60:20
62:7,15 73:10
76:24 77:1,6,12
77:23 78:13 79:13
79:23 80:6 81:21
83:2 85:24 86:3
87:11 88:10 90:5
98:16,17,20,22,25
99:24 101:14,23
101:24 103:23
104:2 106:9
114:10,11 116:21
118:3 122:10
127:6,9
**corrected** 80:8
81:13
**correction** 129:1
**couldnt** 60:22
104:10 113:5,6
**counsel** 5:19 32:22
34:15 35:11 43:23
45:19 50:3 72:24
73:10,15 78:22
**counseling** 98:23
**counselor** 97:12
98:6,14 99:11
**country** 106:8
**county** 101:16,20
107:13,22 108:13
108:15 109:10
111:19
**course** 12:15 59:15
107:1,15,17,21
110:4
**courses** 58:8 74:6
100:8 110:20
**court** 1:1 4:19 5:7
5:17,21 10:8
31:12,13 50:3
64:16 65:23 69:11
69:19,21,23 70:2
80:7 87:6
**cover** 91:19 100:2
**covered** 86:1 92:3
125:18
**covers** 95:5 125:19

**craig** 2:17 5:23
**current** 93:15,17
**currently** 29:4

_____

**D**

**d** 3:1 21:10 127:1
**daily** 39:22
**dan** 23:13 28:3 29:9
**data** 67:11
**date** 12:11,14 20:6
33:2 35:3,8 40:7
75:13 83:5 97:2
97:14 100:16
**dated** 95:10,13
97:12,16,20 98:4
**day** 108:3 117:3
127:16
**days** 124:19
**deaf** 7:18,23 8:1,2,4
8:14,14,20 11:6,8
11:15,21 13:20
14:9 15:18,19
16:2,6,17 17:12
17:15,17 18:3,5,6
18:24 20:21,25
21:25 22:9,11,20
23:7,12 24:16,21
26:20 27:13 28:10
28:10,13,16 30:9
30:19 36:6 43:14
49:16,18,19,23,25
50:8,15 51:1,18
52:1,22 53:8
55:13 62:20,22
64:23 68:25 69:1
69:9 70:6 76:17
92:17 105:11
107:3 110:16,19
110:25 119:16,22
120:23 122:23,24
123:1,1
**deal** 18:12 34:21
49:25
**dealing** 94:11
**dean** 23:11,13 28:3
29:8



**decibel** 91:3
**decibels** 76:10
  77:10 91:4
**decided** 69:20
**decision** 69:21,23
  92:12
**decisions** 69:11
  70:2
**decline** 44:22
**declining** 45:15
**dedicated** 102:13
**defendant** 1:9,18
  2:8 7:1 31:15
  80:17
**defendants** 12:10
  12:13,21,22 25:18
  32:25 35:2,6 43:2
  48:13,18,21 49:13
  50:6,22 51:24
  81:21
**defense** 7:10
**definitely** 10:25
**degree** 123:12,13
**delay** 95:22
**demonstration**
  113:24
**department** 19:17
  21:8,15,22 88:19
  109:2
**departments** 19:20
**depend** 109:5 125:4
**depended** 92:10
  104:17
**depending** 92:6
**depends** 55:11
  92:13 93:4 109:8
**deposition** 4:15 5:3
  5:12 9:16,25
  12:16,21,22 13:7
  13:14 26:17 30:11
  32:21 33:22 34:14
  34:17 35:12 36:9
  36:15,20 37:13
  43:6,7 51:7 79:2
  79:18 89:8 120:18
  126:9

**depositions** 63:17
**dept** 3:11 35:4
**describe** 8:12
**described** 19:14
  28:2 29:8 86:22
  113:21
**describing** 105:13
**description** 3:6,15
**designated** 47:23
**designation** 93:8
**details** 45:25 47:16
  53:12 59:21 62:10
  62:25
**determine** 94:7
**develop** 123:19
**developed** 122:4
**development** 97:11
  98:19
**deviates** 119:12
  120:10,15
**deviation** 118:8
**diab** 2:15,16
**didnt** 25:1 39:11,14
  41:11 42:1 70:14
  77:18 80:22 81:7
  84:21 92:13 93:12
  94:5,5 95:25
  96:15 100:17,19
  101:10 110:23
  121:1
**diesel** 102:8
**differences** 60:23
  61:17
**different** 29:13
  57:19 61:13 71:19
  71:20 92:5 101:25
  104:24 106:16
  119:14,19 124:2
**differently** 45:18
  58:10 73:14
**difficulties** 109:22
**difficulty** 107:9
  115:10
**diploma** 107:19
**direction** 42:22
**directly** 30:16

84:22
**disabilities** 102:13
**disagree** 30:2 47:1
  49:4 70:5,12
**disagreement**
  29:12
**disclosed** 126:15,19
**disclosure** 52:18
**discuss** 39:11 51:2
**discussed** 44:24
  79:21
**discussing** 34:18
  78:21
**discussion** 23:1,4
  34:4 46:23 80:12
  112:15 114:21
  115:8 126:6
**discussions** 15:6
  29:7 40:13 45:8
  73:9,15 96:14
**dispassionate** 65:9
**dispute** 50:5 51:23
**distance** 72:1
**distinction** 56:7
**district** 1:1,2 5:7,7
  31:13,13 79:7,8
  79:14 101:17
**division** 83:11 84:1
  84:8,24 85:12,21
**dmv** 19:6,17,21
  20:22 21:5,16,18
  21:20,22 22:1
  75:6 76:14 88:7
  90:7,12,14,23
  91:6,12,16,16
  92:13,22 95:25
  96:14 100:22
  108:9 112:6,8
**doctor** 91:4 92:7,12
  93:4
**doctors** 92:12 93:8
**document** 3:14
  32:7 81:8 82:1
  94:2 97:1,9
**documentary** 37:21
**documentation**

75:19 89:12 93:17
**documentations**
  67:19
**documents** 3:9,10
  3:16 12:17 13:8
  31:16 32:1,11,21
  32:24 33:4,5,13
  33:21 34:10,14
  35:1,10,15,15,23
  36:4,10,19,21
  37:7,20 41:20
  74:2,3 80:20 81:3
  89:9,19,19 93:13
  93:23 94:8 95:7
  97:25 126:11,17
**doesnt** 42:22 46:7
  60:12 83:6 116:8
**doing** 7:2 11:25
  59:10 113:12
**dol** 76:12 88:8,20
  90:7,9,14
**dont** 11:12 14:15
  16:13 24:23 26:18
  26:19 28:19,24
  29:13,15,18,21
  32:19 39:23 40:6
  40:17,17,20 41:12
  42:10,14,19,21
  43:8,9 44:20
  46:23 48:18 51:6
  60:15 62:25 63:9
  68:16 72:16 73:12
  75:12 77:25 79:15
  80:11,24 81:5
  84:21 87:17,21
  88:3 89:10,11
  90:15,16 93:24
  95:21 108:7,24
  109:16,17 114:10
  116:11 117:21
  119:4,8,9,21
  120:13,14 126:12
**dot** 21:9 76:21
  77:17 88:21 90:12
  90:14,20
**double** 95:2,3

**drafting** 41:3
**drawn** 14:18
**drive** 8:5,21 11:8
  18:25 42:6 43:14
  50:8,16 51:1,18
  52:1,21 53:4
  58:11 60:6 63:6
  69:14 74:25 76:4
  88:8 90:3 91:22
  92:2 104:4 107:15
  121:1 124:6
**driven** 63:13
**driver** 1:8 5:6 7:2
  23:11 27:15 35:22
  38:1 41:18 49:24
  94:25 99:16,20
  100:13,15 101:1
  121:2
**drivers** 7:11 16:6
  22:14 23:12 24:21
  27:2,2 68:1,5,20
  95:9,17 121:18
  122:14 124:24
**driving** 8:15 11:16
  17:11 22:12,22
  30:10,19 41:9
  49:1 53:6 60:8
  64:12,24 66:15
  67:12 68:12 74:21
  75:24 81:6 82:11
  86:21 91:14,19,20
  92:4,23 102:22
  107:23,23 110:5
  116:3,20
**dtu** 28:11,17,18,23
  29:1,11
**duber** 6:19
**duly** 5:24 6:8 128:6
**dvd** 78:10
**dvr** 84:20

———— **E** ————
**e** 2:1,1 3:1 127:1,1
  127:1 128:1,1
**earlier** 70:3 74:4
  88:12,15 120:18



**earn** 39:25
**earned** 39:24
**easier** 50:5 55:22
**east** 2:4
**eastern** 79:7,8
**edmunds** 2:19 5:16
**effect** 4:18
**effective** 20:6 75:13
  75:20,20
**efforts** 7:18
**eighty** 82:7,8,10,22
  82:22,23,23
**eisenberg** 2:3 36:14
**either** 18:21 96:16
  111:11
**eleven** 42:6,8
**email** 38:13 80:23
  80:25
**emailed** 80:16
**employed** 98:18
**employer** 121:4
**enable** 90:17
**encounter** 48:3
**encourage** 26:20
  30:4,14 125:2
**encouraged** 96:16
  124:24
**english** 6:3,5 17:3,5
  41:15
**enrolled** 110:1
**entire** 86:12,14
**entitled** 46:8,21
  72:24
**entity** 98:18
**entrants** 125:19
**entries** 122:18
**entry** 122:15,16
  125:5
**environment** 63:5
  63:12
**equal** 39:23
**equalities** 24:22
  27:21
**errata** 129:1
**error** 85:7
**esq** 2:5,11,11

**essentially** 107:14
**establish** 35:14
  55:24 67:8 100:15
  119:7 120:2
**established** 70:1,13
  114:13
**eugene** 5:4
**evaluation** 92:11
  92:16 93:3
**event** 27:13
**everybody** 105:11
  107:2
**exact** 27:21 38:11
  38:22 83:5
**exactly** 9:8 47:24
  54:13 55:12 71:3
  90:17 111:22
  119:2
**exam** 76:23 77:1
  95:25
**examination** 1:16
  3:2 6:12 11:24
  20:8 77:6,22
**examined** 6:9
**examiner** 114:17
  114:19 115:5,11
  117:3,10
**examiners** 60:24,25
  117:16
**example** 9:10 11:17
  19:17 55:21 58:3
**examples** 19:4
  72:12
**exception** 11:23
  13:21 14:9
**exceptions** 20:13
**exclusively** 123:4
**exemption** 7:19
  13:25 20:6,19
  21:1 75:25
**exemptions** 75:20
**exhibit** 12:10,13,21
  12:22 13:3,15
  32:6,18,25 35:2,7
  41:2 74:10 82:1
  95:11 97:10

**exhibits** 3:5 12:19
  12:20 34:23 35:10
  35:13 37:11
**existed** 14:11
**exists** 70:20
**expect** 39:18
**expectation** 39:16
**expenses** 38:18
  39:6,13
**experience** 3:16
  35:22 36:11 38:1
  38:4 52:13 53:3,5
  53:11,13 56:13
  57:16 58:10 60:2
  64:1 67:18 73:21
  89:15 94:9 105:20
  108:4,12 109:9
  116:15 125:22
**experienced** 60:7
**expert** 1:17 7:11
  31:6,9,24,25 37:3
  37:4 38:8 39:10
  39:21 40:2 41:24
  43:3,5 47:23,24
  48:5,7,8 53:22
  54:4,10,12 55:6
  55:17 56:1,21,23
  57:1,3,9 63:18,24
  64:6,11,13,25
  65:2,9,14,22 66:2
  81:5 89:8,14
  109:1 118:22
  120:3,4
**expertise** 54:8
  55:18
**experts** 48:13,18,22
  49:13 50:7 81:21
**expired** 102:9
**explain** 9:5,8 15:16
  17:8 22:1 27:16
  44:7 48:3 55:20
  86:25 90:25 99:25
  100:4 105:2 108:8
  115:5 122:6
  123:13 124:2,3,5
  124:6

**explained** 90:23
  115:2
**explaining** 16:25
  118:19
**explains** 100:23
**explanation** 116:18
**express** 54:22
  121:8 122:4,9,12
  123:20 125:15
  126:17
**extension** 10:8
**extensive** 68:11,12
**extent** 44:17 45:5
  45:10

---

**F**

**f** 128:1
**facebook** 24:8,11
  25:3,5,19 27:12
  27:20 69:4,6
**facilities** 71:20
**facility** 62:7,12
  70:14,17 71:1
  123:21 124:12,16
  125:12,13
**fact** 53:6
**facts** 65:4
**fair** 10:2 30:17 38:3
  54:2
**fairly** 52:5 53:10
**fairness** 43:1 50:21
**faithfully** 6:1
**familiar** 12:25
  48:17 54:3 67:20
  68:9,23 69:22
  70:2,23,24 71:9
  74:16,17 119:1,13
  119:16,24 120:16
  121:23
**familiarity** 70:15
**far** 18:6 60:18
  68:24 109:3
**farther** 87:21
**fax** 97:21
**features** 72:12
**february** 75:15,16

**federal** 11:19 14:7
  14:20 15:11,21
  18:7,21 20:12
  21:19 31:10,12
  41:1 57:10 67:21
  67:25 69:20 75:5
  117:4,5,7
**feel** 7:14 16:5 50:20
**feeling** 40:7
**female** 112:8
**field** 17:1 82:23
  86:14 104:2,5
  106:14,18,18
**fifteen** 123:24
  124:12 125:12
**fifth** 104:11
**figure** 80:3
**files** 18:15
**filing** 4:5
**fill** 100:7
**find** 11:13 16:15
  72:15 92:20 97:22
  97:23 98:13
**finding** 69:24
**fine** 27:24 41:19
  42:10 49:10 61:15
  72:17 73:25 74:9
  119:3
**finish** 27:7 83:5
  96:25 102:1
**finished** 95:19
  96:10
**firm** 6:25 36:14
  52:19
**first** 6:8 9:17 12:20
  18:16 20:13 32:10
  40:1,9 48:2 76:19
  90:20 95:8,12,16
  108:3 112:22
  123:22 124:1,17
**fl** 1:11 2:4,9
**fleet** 122:1
**flexible** 125:7
**fmc** 69:20
**fmcsa** 13:23 15:15
  21:14 69:25 75:8



**fmsca** 19:14,16
**focused** 28:12
  29:15 116:16
**follow** 71:7
**followed** 117:16
**following** 94:17
  113:13
**follows** 6:11
**followup** 11:11
  21:17 94:10
**force** 4:17
**forced** 11:23 77:4
  77:21
**foregoing** 128:7
**form** 4:10 7:21 8:19
  9:4 16:9 19:2 25:4
  30:13,23 31:3,20
  35:20 36:3,24
  37:11,16,17,24
  39:9 41:6 42:3,13
  43:20 44:15 48:16
  48:24 49:15 51:20
  52:9,16 53:15,18
  53:25 54:17,25
  55:10 56:9,18
  57:5,12,23 58:14
  58:24 59:12,25
  60:5,17 61:4,21
  63:8,21 64:3,8,18
  65:7,12,18,25
  66:5,19 67:16
  68:15,22 69:18
  70:11,22 72:5
  73:6,12 77:8
  81:15,23 83:16,18
  86:5,24 87:1,9,10
  88:12 90:9 92:7
  108:18 115:17
  117:18 118:11
  120:21
**formation** 37:21
**formed** 51:15
**forming** 34:11
**forth** 18:10 89:2
  96:3 128:6
**forty** 107:18

**fortyeight** 60:7,8
**fortyfive** 20:13,17
  20:18 78:2,4
  123:12
**forward** 31:6
  106:16
**four** 24:19,20 52:6
  52:25 53:10,12
  83:3,4 86:10
  94:17 112:17,18
  124:19 125:14
**fourth** 104:10
**framework** 55:7
**friend** 26:5
**friended** 26:9
**friends** 24:3
**frilando** 1:5 5:5 7:5
  32:1 40:16 44:6
  73:2
**front** 13:4,15 32:8
  98:1,4 116:12
**full** 23:16 91:25
  100:19
**fully** 10:1 11:4 41:3
  41:24
**funded** 84:7 108:16
  110:7
**funding** 82:18 83:8
  85:21 99:10
  109:16,17
**funds** 111:7
**further** 4:9,14 9:20
  126:8 128:9
**furtherance** 70:3
**future** 8:9

———
**G**
———
**g** 127:1
**gain** 25:25
**game** 81:4
**gap** 100:23
**gauge** 9:6
**gear** 104:9,9,11,12
**gears** 71:10
**general** 28:13,13
  33:4 54:7 74:19

  102:12,14
**generally** 8:12
  16:23 114:9
**georgia** 57:18 60:3
  61:8,19
**gesture** 113:8,9
  114:12,15,16
  115:18,19,20,22
  115:22 116:9
**gestures** 113:11
  114:9,19 115:2,6
  115:23,24 116:13
  116:13,19 117:11
**gesturing** 96:21,22
  113:2
**getting** 59:5 100:21
**give** 9:10,20 10:16
  11:22 12:19 15:3
  19:4 25:18 34:22
  37:8 48:20 51:11
  51:17 52:7 58:2
  59:19 72:12,15
  97:23 100:3
  103:13 124:2
**given** 6:4 25:16
  39:13 66:10 67:5
  91:5 95:10 119:11
  120:5,9 127:8
  128:8
**giving** 12:16 15:6
  38:19 44:1 52:12
  67:4,9
**glendale** 58:5 74:5
  74:14,19 75:23
  76:16 82:2,4,13
  84:5,16 85:23
  90:4,18 91:10
  94:3,18 95:20
  96:10 97:1 99:9
  100:24 101:7,15
  102:1,11,18
  105:14,24
**go** 9:13 25:7,7
  26:21 27:12 32:6
  33:25 36:7 56:25
  61:24 72:18 74:15

  74:19 76:3 80:3
  82:3 85:9,19,20
  87:21 89:1,25
  91:10 92:8 93:6
  93:18 99:9 100:2
  102:21 103:12
  104:8,11 105:21
  106:19 108:3
  109:23 124:17,18
  125:15
**goes** 8:23 32:14
  51:12 54:8 99:14
**going** 12:16,19
  13:11 19:22 23:18
  26:13,16,22 32:18
  34:22 43:8 45:4
  45:17 51:16 87:24
  89:21 94:2 100:5
  102:7 106:15
  116:6,15 124:25
**good** 6:21,22
**gotten** 38:11 121:7
**govern** 31:11 57:2
**government** 84:2
  85:14 98:24 99:8
**governs** 55:7
**graded** 113:14
**grading** 113:12
**grant** 14:9 20:13
**ground** 9:24
**group** 23:2,4,6 24:5
  24:17 25:3,19
  27:17,20 28:1,2,9
  30:3
**guessing** 71:13
  89:16
**guidance** 22:4

———
**H**
———
**hadnt** 11:3 70:13
  100:18 101:2
**halfway** 74:13
**haller** 2:11 3:3 6:13
  6:23 12:8 33:9,25
  42:16,21 46:7,12
  46:18,20 47:3,7

  77:25 78:17 79:1
  79:6,10,14 80:1,9
  86:25 87:4,8,14
  87:16,23 88:2,13
  88:17,21,25 89:3
  90:10 101:20
  117:21,25 118:4
  118:15,21 126:1,8
  126:21
**hand** 69:13 96:23
  116:13
**handed** 34:15
**handle** 22:2
**handling** 106:11
  124:25
**hands** 113:4,5
**happen** 75:13
**happened** 27:5
  116:16
**happens** 27:4 31:15
**hard** 43:7 99:15
  100:12 115:3
**hardofhearing**
  15:19
**havent** 30:10 38:11
  49:21 51:24 52:3
  62:3 63:16 71:17
**hazmat** 95:4
**head** 19:17,21
  21:21
**headquarters** 22:1
**heads** 19:16,20
**hear** 105:8,11,20
  107:3 115:14
**heard** 42:25
**hearing** 7:19 11:23
  14:3 20:7,15
  52:25 66:17 76:9
  77:15 102:15
  105:9 107:5
  115:13 122:21
**hearingimpaired**
  14:10 22:23 68:19
  105:7 122:25
**held** 1:18 34:5
  126:7



**help** 7:10 9:8 107:7 110:21 123:16
**helped** 110:21 112:5
**helpful** 23:5
**hereinbefore** 128:6
**hes** 42:16,18 69:22
**highway** 113:15
**history** 3:12 35:5
**hold** 23:25 58:2 85:5 92:25
**holds** 18:17
**home** 41:17,18 93:11
**hooked** 9:6
**hotel** 39:7
**hour** 61:24
**hourly** 39:21
**hours** 42:6,8 82:7,9 82:11,22,22 97:4 107:18,20 125:8 125:11,11,14,15
**houses** 106:7
**howard** 18:13,16
**huey** 1:17 3:3,7,8,9 3:10,11 5:4 6:7,16 6:21 12:10,13,15 12:21,22 13:3,15 14:23 30:17 32:6 32:18,25 34:8,13 34:23 35:2,7,9 36:20 41:2,23 42:13 43:1 45:5 47:13 50:21 54:6 54:15 74:10 78:12 78:20 80:4,13 81:3 82:1 90:1 93:22 95:11 97:10 98:10 99:15 100:12 126:16 127:2,12
**huge** 124:21
**hundred** 24:22 82:7,8,10,20,21 82:24 97:4 125:7 125:11

**hungry** 73:22,23

**I**

**id** 16:23 33:25 35:13 58:18 70:4 73:19 78:1 82:3 107:6 113:17 126:1
**idea** 8:22
**identification** 12:11 12:14 23:25 33:1 35:3,7
**identified** 16:3 22:6 37:5 38:8 40:25 48:5 51:11 52:5 52:20 66:10 67:3 67:6
**identify** 33:3 50:22 53:2 61:16 80:12
**identities** 25:15
**ill** 9:14 10:4 11:12 12:7,17 35:9 42:24 45:8 52:24 73:23 90:10 94:10 97:22,24 100:3
**im** 9:8 12:4,16,19 13:11 15:14,17,20 16:12 17:10 18:1 18:13,15 19:18 20:3 21:19 22:24 23:8,10,18 24:2,2 24:3 26:13,14,16 27:3 28:8,23 29:15 31:21 32:18 33:9 34:21 39:11 39:12 40:3,5,7 41:9,18,22 42:6 43:2 44:21,23,24 45:4,13,17,18,20 46:7,8,13,14,18 46:21,24 47:5 48:17 51:5,7 54:3 54:4,4,5 55:15,16 56:19,23 59:4,5 60:8,11 62:2,18 64:11 68:23 69:6

69:22 70:1 71:2,3 71:9 72:11,23 73:7,22 74:17,18 75:10,11 80:23 81:1 82:20,21 83:3 87:24 88:21 89:7,21,22,22 92:20,25 93:1,23 94:2 95:7,19 97:18 98:11 103:3 109:1,9 110:16 115:3,10 116:1,7 116:16 117:23 118:5,12 119:1,16 119:23,25 120:1 120:16 121:20 122:5 126:9,11
**immediately** 101:7
**impairment** 122:22
**impairments** 66:17 67:14 105:9
**implies** 99:22 100:13
**implying** 29:16
**important** 43:4 50:21 89:4
**imposed** 59:9
**improve** 8:9
**inaccuracies** 80:8
**inaccuracy** 79:24 80:2,6,13
**inaccurate** 78:14
**included** 33:22
**includes** 39:2
**including** 32:14 66:15 67:12
**incorrect** 49:17
**individual** 50:8,15 51:1 52:1 68:10 102:17 125:4
**individually** 105:3
**individuals** 8:5,15 11:8 14:10,10 18:24 20:14,18 21:5 22:9,15,21 23:20 30:19 51:18

70:6 121:15 122:8 122:21
**information** 3:14 10:11 17:4 38:13 47:16 59:7,14 61:14 69:5 72:15 72:16 73:13 74:1
**initial** 13:12 104:14
**initially** 102:21 103:19 123:22
**inner** 123:17 124:5
**inquire** 46:24
**inquiring** 46:24
**inside** 71:14 124:4
**instance** 21:24 22:3 48:7
**instruct** 45:9
**instructing** 47:7
**instruction** 96:23
**instructions** 9:14 24:25
**instructor** 17:9 72:1 96:15 104:19 104:23 105:20 108:6 112:4
**instructors** 72:9 106:9 112:5
**insurance** 71:8
**insure** 10:10 80:7
**intend** 52:6
**interaction** 96:7
**interest** 65:15
**interested** 18:22 22:21 59:4 128:12
**interior** 72:2
**interposed** 34:20
**interpretation** 86:18
**interpreter** 10:23 19:22,23 28:17 29:16,18,19,22,25 30:2,6 33:15,15 43:21,21 44:12 57:14,14 68:3 70:9,19 72:21,21 73:3 76:17 77:18

83:23 85:5,6,7 86:13 93:1 94:15 94:15 96:1,18,22 99:3 101:18 103:17,17 104:13 104:16,17,20,22 107:11 108:11 109:12 110:10,10 111:3,8,11 112:11 112:25,25 113:19 114:1,3 115:7,9 116:10,11,23 117:6,8,8,19,23 117:24 118:2
**interpreters** 2:18 5:24 6:10 10:7 83:21 86:6,8,9,15 108:21,24,25 109:15 111:2,6,21
**interpreting** 19:7 22:3
**interrupted** 90:24
**interstate** 91:13,20 91:24 92:4,9,22 93:5
**intrastate** 91:14,18 91:23 92:3,4,22 93:5,6
**introduce** 124:1
**introduction** 100:9
**invade** 45:20
**involve** 17:15
**involved** 7:25 15:20 16:17 19:25 28:23 28:25 39:19 40:10 53:23 54:23 96:16 114:4 115:7
**involvement** 43:25
**involves** 45:6 46:4
**ipad** 38:13
**isnt** 99:24
**issue** 60:13 68:24 88:22 95:13 101:5 110:8
**issued** 91:11
**issues** 53:22 54:11



54:22 55:7 56:5
56:12,14,23 65:10
66:14,21
**ive** 7:16 8:20 10:21
16:24 18:10 40:18
60:7 63:3,10,10
83:17 89:5 98:9
119:14 120:17

**J**

**j** 3:3
**jason** 112:4,5
**jersey** 1:2 5:8 31:14
58:12,22 59:9,22
60:11 61:1,7,12
61:18 62:4 63:10
63:11,14 79:12,15
**job** 10:10
**john** 1:16 2:11,15
2:16,19 5:3,16 6:7
6:16,24 14:23
23:9 28:3 29:8
127:2,12
**joi** 1:19 5:18 128:2
128:16
**join** 23:3 24:24
**joined** 121:9
**jr** 1:17 2:16 3:3 6:7
6:16 127:2,12
**june** 97:15,21
**junior** 5:4 98:10

**K**

**k** 127:1
**keep** 78:1
**kenneth** 1:5 5:5 7:4
**kept** 126:18
**kind** 24:14 26:4
55:17 64:14 70:16
82:17 83:8 84:23
88:7 90:2 106:24
114:8
**kinds** 19:5 39:8
**knew** 109:3
**know** 7:24 9:7
11:18 16:13,23,25

17:24 18:2,4,7,8
18:17 21:13 24:23
25:13 38:15,22
39:25 40:17,18
41:10,13,14 43:8
44:4 46:22 48:1
48:18 49:10,11,23
57:7 59:15 61:22
62:2,4,10,15,16
62:25 63:9,11
64:5,21 65:20
68:16 69:9 71:10
71:13,14,16 72:16
72:16 79:20 80:23
84:18,21 85:17
88:2,3 89:17
90:22 93:16,20
94:5,5 104:24
105:19,22 106:14
106:16 108:2,8,24
109:6,16 110:17
110:21,22 112:6
112:16 113:7,11
114:17 115:2,22
116:8 117:21
118:18 119:8,9
120:6,6,13,14
121:1
**knowledge** 10:2
58:20 59:20 60:14
63:4 68:17 71:25
72:7 117:13
119:10 120:3
**knowledgeable**
124:10
**knows** 43:4
**kymme** 2:17 5:23

**L**

**l** 4:1 127:1
**labor** 88:19
**lane** 6:19
**language** 2:18 6:3,4
17:3,6 70:8 73:3
86:7,9,15 108:10
112:10 113:19

114:3 115:7 116:8
116:23 123:2,4
**languages** 119:19
**laptop** 41:12,14,16
**large** 30:20
**law** 6:25 18:4 36:14
69:12 117:4
**laws** 61:12
**lawsuit** 31:18,25
32:13 34:13 55:25
**lawyer** 56:5,13
**lead** 79:21 109:23
**learn** 49:17,18,20
49:24 71:19 76:4
103:20
**learned** 113:3
**learning** 53:4 69:14
107:15
**leave** 26:13,16
115:2
**left** 30:3 96:24
101:7 112:25
**legal** 1:24 2:18,20
5:17,18 53:22
54:3,10,12,14,22
56:5,12,24 57:2
66:8 93:16
**length** 125:3
**letter** 3:8 11:19
12:1,5,12 14:21
14:25 15:7 16:2
40:24 74:13 97:10
97:16,20 98:3
100:16
**letters** 16:20
**level** 91:3 106:23
122:15,16
**lexington** 1:11
**license** 3:10 34:25
59:1,10 91:24,25
94:19 95:1,9,17
95:21 96:5,12
99:23 100:14,17
100:19,21 101:1,3
101:5,11 111:23
111:25 121:3,6,16

121:22 122:10
125:24
**licenses** 70:7
**light** 112:20
**limitation** 32:15
92:18
**limitations** 59:8,23
66:17
**limited** 92:22 104:9
**line** 27:8 55:22
129:1
**list** 37:10,13
**listing** 37:7
**lists** 32:15
**litigation** 31:12
55:8
**little** 22:24 41:16
92:25 93:2 105:19
112:23 121:20
**live** 59:16
**living** 84:12
**llc** 1:8 7:2 97:11
98:19
**llp** 1:11 2:3,8 5:13
5:15
**load** 41:10 121:22
121:25
**logan** 2:9
**long** 10:5 20:23
82:4,12
**look** 12:17 18:14
25:18 26:9 32:5
59:15 72:18 74:9
97:8
**looked** 62:3
**looking** 82:21 94:1
94:2 95:7 97:18
**looks** 12:25 71:15
97:1
**lost** 75:11 112:18
**lot** 42:8 56:14 61:13
69:5 104:7 106:7
123:25 124:18,21
**luegene** 1:17 3:3
6:7,16 127:2,12
**lunch** 73:20 78:21

86:22 88:6 90:1
**luncheon** 78:7
**lunchtime** 81:25

**M**

**m** 1:14 5:11 34:3,7
78:6,10 126:5,23
127:1
**magna** 1:24 2:18,20
5:17,18
**magnals** 1:25
**main** 103:5
**making** 71:23 87:9
113:12
**manager** 122:1
**mandarin** 119:20
**maneuvering** 107:6
**manual** 60:24 61:1
**manuals** 61:11
**march** 97:13,17,20
98:4 99:22 100:16
**mark** 12:8,18 32:18
34:23
**marked** 12:9,12
13:14 32:25 35:1
35:6 41:2 95:11
97:9
**marking** 97:21
**markings** 92:5
**marriage** 128:11
**matter** 5:4,24 18:11
40:11 45:7,24
46:2,8,9,13,15,22
60:12 69:12 80:2
128:12
**mean** 15:17 17:20
31:21 33:4 47:25
63:9 105:3 118:24
**meaning** 48:4,8
**means** 48:1,5 64:5
64:11 93:5 114:18
114:18 118:14
**meant** 62:19 64:22
115:12
**mechanic** 102:8
**mechanisms** 72:8


**media** 16:21 24:15
25:4 27:9
**medical** 11:24
14:11 20:7 76:23
77:1,5,22 90:22
115:11
**meet** 36:13 82:24
**meeting** 20:10,19
20:22,23 21:7
22:6
**meetings** 18:20
19:5,8,10,13,20
19:25
**member** 25:24 26:2
28:8,15 29:3,4,6
**members** 24:23
**memory** 82:20
**mentioned** 8:17
30:11 85:1,8,18
**met** 40:18
**methods** 62:11 63:1
**middle** 17:23 34:9
79:2 101:12
**mile** 61:24
**mine** 28:11,11
33:12
**minute** 13:12,13
34:1 58:2 112:18
**minutes** 52:11 78:2
78:4
**mirrors** 124:9
**missing** 37:19
**misstated** 88:23
**misstates** 88:12,15
**mistake** 84:7
**misunderstanding**
110:11
**moment** 39:1
**money** 39:14
**month** 83:1
**months** 82:6,14,15
83:4,4 86:10,10
94:17
**morie** 23:9,10,13
28:3 29:8
**morning** 6:21,22

**motor** 11:19 14:7
14:20 15:11,21
18:7,21 20:12
41:1 57:10 67:22
67:25 75:5 118:23
**move** 59:13,16
124:23
**moved** 96:4,20

---
### N

**n** 1:12 2:1,4 3:1 4:1
127:1,1
**nad** 12:2 13:25 15:2
15:4,6,9,14,17,20
18:2,8,11,12,18
19:16 21:14 22:16
22:25 23:1
**name** 6:14,23 13:21
14:6,21,22,24
18:14,15,16 23:8
27:21 28:4,7
112:3,5
**named** 68:10
**names** 23:11,14,17
23:19
**national** 11:21
13:20 16:1,16
17:15 18:2 22:10
22:20
**nature** 85:3 87:1
**necessarily** 46:4
**necessary** 64:15
94:6 115:6
**need** 16:10 17:25
25:21,23 29:18,19
29:21 41:14,16
42:10,22 46:20
55:24 88:4 101:18
116:11 120:4
123:15
**needed** 76:22,25
125:7
**needs** 17:21 65:2,9
65:14 86:2 111:15
123:18
**negotiate** 96:3

**never** 36:16,17
40:18 63:3,10
66:6 71:24 84:22
89:5 112:3 120:17
**new** 1:2,12,21 2:4
5:8,13,14,25 6:9
31:14 58:12,12,21
58:22 59:9,9,22
59:22 60:10,10
61:1,1,7,7,12,17
61:18 62:4,4 63:9
63:11,13,13 79:12
79:15,15 122:13
122:18 125:5,19
128:4
**ninety** 123:12
**nonhearingimpai...**
68:20
**normal** 37:3
**normally** 37:2,4
50:19 89:24
**north** 2:9
**notary** 1:20 5:25
6:8 127:20 128:3
**note** 33:19
**noted** 5:19 94:13
126:23
**notice** 13:7 14:19
87:11
**novice** 121:18
**number** 5:3,8 33:18
78:10

---
### O

**o** 4:1 127:1
**oath** 4:17 7:6 127:4
127:7
**objection** 7:20 8:18
9:3 16:8 19:1
30:12,22 31:2,19
34:20,21 35:19,25
36:2,23 37:15,23
41:5 42:2,12
43:19 44:14 46:3
48:15,23 49:14
51:19 52:8,15

53:14,17,24 54:16
54:24 55:9 56:8
56:17 57:4,11,22
58:13,23 59:11,24
60:4,16 61:3,20
63:7,20 64:2,7,17
65:6,11,17,24
66:4,18 67:15
68:7,14,21 69:17
70:10,21 72:4
73:5,11 77:7
78:24 81:14,22
83:15,20,21 86:4
86:23 87:1,8,10
88:11 89:2 90:8
108:17 115:16
117:17 118:10,15
120:20
**objections** 4:10
26:14
**objective** 65:4
**observe** 103:11
104:5 123:11,17
124:7,9 125:1
**observing** 103:24
**obtain** 74:22
**obtained** 97:5
**obtaining** 100:25
**obvious** 115:24
116:13
**obviously** 51:14
**occurred** 117:13
**occurring** 114:22
**october** 40:4 95:21
100:25 111:24
**offered** 50:4 102:10
**offering** 102:7
**office** 36:16 109:12
111:6,8
**officer** 4:16 80:7
**oh** 12:24 27:14 69:4
**okay** 22:24 23:21
26:18,24 41:19
55:19 56:22 67:1
69:4 73:24 78:16
88:25 91:21 94:14

95:24 110:8 119:6
121:20 126:3
**older** 68:1,5 71:6
**once** 25:24
**oneonone** 27:17
**ones** 62:3
**ooo** 6:6
**open** 23:1 24:11
102:14
**opinion** 8:24 34:12
35:17,21,24 36:5
37:8,18,22 38:3
43:12,16 44:9
45:1,25 47:17
49:5,6 50:14,20
50:23,23,25 51:9
51:10,11,15,16,22
52:6,12 54:22
64:16 67:3,7,9,17
81:18
**opinions** 31:18 32:3
32:13 43:5
**opportunity** 62:21
100:3 103:15
**opposed** 26:15 96:7
**order** 17:17 37:8
56:11 64:13 65:1
74:24 76:3 88:8
90:3 115:5 121:2
**orders** 121:25
**organization** 24:1
83:14
**organizations**
18:23 19:15
**original** 77:20
**osd** 97:12 98:6
**outcome** 65:16,21
128:12
**outofpocket** 39:6
**outrageous** 89:7
**outskirts** 106:1
**oversee** 21:23

---
### P

**p** 2:1,1,10 4:1 78:6
78:10 126:5,23



**package** 74:14
95:11 97:9,25
**page** 3:2,6,15 24:11
32:7 69:6 74:13
97:22,23,25 129:1
**paid** 38:6,18 39:8
39:12,17,18 83:9
84:4,15,22 98:23
108:20,23 109:4
109:13 111:1
**papers** 63:16
**paperwork** 54:4
74:8
**parked** 113:15
**parking** 124:22
**part** 9:24 11:20
26:17 33:8 35:21
74:25 76:19 77:5
80:15 84:2 85:13
90:4 92:7 93:13
101:12 106:6
112:12,13,14
113:21 114:2,5
121:3
**participants** 19:11
**participate** 24:14
27:9 28:16,19,21
29:7 39:9 88:9
90:18
**participated**
122:17
**participating** 20:11
**participation** 38:7
**particular** 11:7
20:22 46:17
102:17 117:3
121:11
**particularly** 22:11
**parties** 4:5 128:10
**pass** 76:25 77:3
94:21 125:24
**passed** 90:22 91:9
94:24 95:5 100:18
107:20 112:24
113:15 117:12
121:5,16

**passing** 77:21
**passionately** 7:15
16:5
**password** 25:22
**pay** 82:16 84:25
110:23
**payment** 84:20
**pending** 47:4
**pennsylvania** 79:10
**people** 7:10 8:21
15:18 16:25 17:10
17:13 18:5 19:19
20:21 22:13,19
23:7 26:20 27:14
30:4,14 36:6
43:14 59:10 63:6
64:24 66:16 67:13
68:25 69:1,9 70:5
71:18 102:13
103:6 105:8,8
107:2,3,5 119:19
121:1,5
**peoples** 15:19
17:17 18:6 25:14
**performance** 92:10
92:15 93:3
**period** 83:2 99:12
**peripheral** 69:15
**permission** 15:4
25:10,18 27:10
**permit** 74:24 75:4
76:3,7,15,20,21
77:20 86:21 88:7
89:11 90:3,17
91:8,11,16,16
92:1,8,21 93:9
94:4 100:20
**permitted** 101:10
117:6
**perplexed** 33:11
**person** 21:25 22:18
24:7 25:21 27:16
40:19 48:25 49:16
49:18,20,24 50:1
55:25 92:17 102:1
102:19 112:1,7

119:16,22
124:14
**personal** 38:4
52:13 53:3,11,13
58:20 64:1 65:15
67:18 73:21 89:15
**personally** 15:7
57:25 59:6 117:12
125:21
**persuade** 20:11
**pertaining** 100:5
**pertains** 98:12
**petition** 11:20
13:19,25
**philadelphia** 2:10
**philosophy** 29:14
**phoenix** 102:23,23
105:25 106:6,7
**physical** 66:16
67:13 90:20 92:7
92:18
**piece** 96:9
**pile** 33:23
**pima** 101:16,20
107:13,21 108:12
108:15 109:10
111:19
**place** 1:19 20:19
75:25 77:4 83:1
124:8,11
**places** 61:22 119:14
**plaintiff** 1:6 2:3
32:22 34:16 35:11
43:24 78:23
**plaintiffs** 3:6
**playing** 81:4
**please** 5:21 6:15,18
10:23 12:5 38:25
83:22 90:19
**plus** 37:25
**point** 10:20,20
55:16 58:1 60:9
61:15 72:14 86:20
97:11 98:19
105:18 112:11
114:23
**policy** 71:8 121:11

**portion** 114:6,24
124:14
**pose** 68:1,6
**posed** 87:19
**position** 18:17
23:25 49:7 55:5
56:4 89:6,25
120:8
**positions** 24:4
**possible** 26:7 50:7
50:15,25 51:17,25
**possibly** 39:23
**postinspection**
124:3
**potentially** 8:15
**practice** 103:7
106:15,15,19
124:22
**preliminary** 78:18
**prepare** 36:8
**present** 2:14 21:13
29:20,22 70:9
73:4 114:3
**presented** 34:13
**pressure** 9:6
112:17
**pretending** 57:8
**pretty** 55:23 59:2
115:20,24 125:6
**principles** 57:2
**print** 80:22,24
**prior** 33:21
**private** 24:12 25:9
102:24 103:4,9,14
103:20 104:1,5,15
105:16,22 106:20
107:24 124:18
**privilege** 45:21
46:6,21
**privileged** 42:14,23
42:24 45:14 47:6
73:13 78:25 79:1
79:3
**probably** 56:14
107:2
**problem** 27:6 73:25

87:12 88:13
**procedure** 31:11
121:11
**proceeding** 66:8
93:16
**proceedings** 9:20
**process** 7:25 91:8
100:10
**produce** 81:3,8
93:13
**produced** 13:9 32:7
33:6,14,21 74:3,4
80:21 89:10 94:1
94:9 95:8
**producing** 93:15,17
**production** 3:14
**proficiency** 106:24
**profoundly** 123:1
**program** 30:1 49:1
49:3 62:11,23
63:1 74:21,23
76:16 82:8,12
83:9 86:3,21
88:10 90:5,19
91:10,21 102:3,5
102:5,6,7 107:9
108:20 121:3
122:3,12 125:4,9
125:23
**programs** 19:7
21:23 29:17 71:6
**proper** 118:20
119:15
**property** 123:23
**propounded** 6:2
**protect** 17:17
**protected** 46:5
**protective** 26:25
**provide** 19:7 21:23
22:2 23:16 31:14
31:24 37:5 43:13
44:10 45:2 47:20
51:4 55:5 56:1
71:4 95:25 96:1
108:23 109:6,7
119:15 121:4



122:13
**provided** 24:24
  32:22 35:11 36:5
  41:20 46:1 52:19
  74:2 76:13 77:17
  82:18 96:19,22
  109:15 111:1
  119:22
**psi** 112:17,18
**public** 1:21 3:11
  5:25 6:9 24:12
  35:5 104:3 106:25
  124:15 125:16
  126:20 127:20
  128:3
**purely** 26:21
**purported** 120:4
**purporting** 41:23
**purports** 43:3
**purpose** 87:9
**put** 13:13 17:3 31:6
  32:5 35:12 87:10
  89:5 112:22
  115:21

**Q**

**qualifications**
  56:15
**qualified** 56:4,12
  76:11
**question** 4:11 8:4
  8:23 9:11,15 10:6
  10:21,22 11:3,11
  13:24 14:5 15:5
  15:23 17:23,24
  23:6 28:2 30:25
  31:22 39:5,5
  45:11,16,17 47:3
  48:19 49:9 54:7
  60:9,11 62:24
  66:22,25 67:2,23
  72:14 75:11 77:19
  81:10 82:12 83:7
  83:24,25 85:9,12
  85:16 87:2,19
  90:16 91:17,18

92:1 93:2 99:4
  100:2 113:18
  119:4 120:5 122:6
  123:3
**questioner** 10:12
**questioning** 27:8
  55:22
**questions** 6:2 9:18
  9:23 10:1 12:18
  16:13,14 26:10
  30:15 34:10 37:2
  51:9 55:16 64:23
  78:19 112:16,19
  126:9
**quickly** 96:4
**quite** 42:8 61:10
  71:5,16,18

**R**

**r** 2:1 128:1
**rafkind** 1:20 5:18
  128:2,16
**randal** 23:9,13 28:3
  29:8
**rarely** 41:18
**rate** 39:20,22
**rdt** 24:20 27:20
  28:11,22
**reach** 73:16 106:23
**reached** 35:18 73:9
**read** 13:22 46:21
  49:21 51:25 52:3
  63:16 66:13,21,24
  67:21,24 80:16,16
  80:18,25 83:23
  87:7,20 121:25
  127:3
**reading** 108:1,2,5
**ready** 103:12
**really** 8:22 9:10
  38:11 50:20 60:9
  60:12 62:3,24
  63:24 80:24 84:19
  90:13 92:20 101:2
  104:17,20 108:24
  109:1,8 113:18

115:24,25 119:16
  119:25 122:5
  126:14
**reason** 93:12
**reasons** 51:14
**rebut** 48:22 51:22
**rebuttal** 47:23,24
  48:8
**rebutting** 48:14
  49:13 81:19
**recall** 11:24 14:5
  20:5 22:7 34:17
  40:1 52:14 99:2,6
  112:1
**receive** 47:16
**received** 32:20 83:8
  85:21 90:2 92:2
  92:21
**receiving** 38:10
**recess** 78:8
**recognize** 13:6
  27:15
**record** 3:12 5:2,20
  6:14,17 11:5
  33:20 34:1,3,5,7,8
  35:5,14 36:18
  37:9 42:17 43:17
  52:7 54:9 55:24
  56:20 60:15 66:12
  67:4,8 70:5 78:6
  78:11,15,20 79:24
  81:7,13 85:20
  88:4 101:6 119:8
  120:2 121:14
  125:20 126:5,7
  127:6,8 128:7
**records** 56:2 68:19
  126:18
**refer** 67:9 74:7
**referencing** 93:10
**referral** 23:2
**referred** 22:15,18
  22:25 27:25
**referring** 12:5
  29:22 69:1,8
**refers** 22:20

**refresher** 107:17
  107:21
**refreshing** 82:20
**refute** 50:4
**regarding** 3:16
  64:23 66:21
  104:25 112:16
**regardless** 75:21
**regulations** 57:1,3
  57:9 77:5
**regulatory** 55:7
**rehabilitation**
  83:12,17 84:1,8
  84:25 85:13,22
**reimbursed** 38:15
**reimbursement**
  38:17 39:6,13
**reinterpret** 83:22
**reject** 49:3
**relate** 54:11
**related** 15:14,15,17
  19:6 20:20 45:24
  55:16 56:22 66:14
  67:11 69:7 82:2
  82:11 94:8 128:10
**relates** 21:4 22:11
  29:17 72:2
**relatively** 78:1
**relay** 10:17
**relaying** 10:11
**reliably** 65:2
**relied** 31:16 32:2
  32:11 35:16 66:11
**rely** 65:23 67:10
**relying** 69:12
**remainder** 113:2
**remember** 12:24
  20:2,23 23:14
  40:6 50:18 75:8
  83:4
**repeat** 44:12 45:16
**report** 37:5,6 40:21
  40:22 41:4,7,12
  41:13,25 42:11,23
  50:19,24 51:6
  52:4 67:21,24

76:13 77:16 80:15
**reporter** 1:20 5:18
  5:21 87:6 128:2
**reports** 48:21 49:12
  49:22 51:24 63:18
  80:17,18
**represent** 7:1 35:9
**representations**
  50:3
**representatives**
  21:12
**represents** 35:15
**request** 5:14 23:18
  26:1 32:10 94:13
  118:16,17
**requests** 73:1
**require** 31:14
  76:16
**required** 31:24
  96:17 100:7,8
  106:17
**requirement** 81:2
  106:23 107:4
**requirements**
  14:11 37:6 58:21
  59:7,22 60:10
  82:25
**research** 68:10
  69:7
**reserve** 42:24
**reserved** 4:11
**reserving** 126:12
**respect** 11:7,16
  13:19 16:6 30:9
  30:19 48:12 55:6
  66:16 67:2,13
  68:18 70:7 74:20
  113:20
**respective** 4:4
**respectively** 34:24
**respond** 48:6
**response** 24:18
  33:14,17 85:11
**responses** 25:1
**responsible** 84:19
**rest** 125:16



**restate** 45:17
**results** 90:21 91:2
**retained** 40:2
**reveal** 44:16
**revealing** 44:18
  45:11
**reverse** 125:1
**review** 36:21 59:14
  66:13
**reviewed** 34:11
  37:7,14 67:6,24
  108:2
**reviewing** 108:5
**revisions** 15:10
**ridgway** 2:17 5:23
**right** 6:25 7:22 8:7
  10:18 11:10 26:3
  26:24,24 30:1,24
  31:1 33:24 36:25
  40:22,23 42:4
  49:1 50:10 51:3
  51:12 52:2 53:8
  53:16 54:1 55:1
  56:10 57:6,10
  58:19 59:18 60:1
  60:18,18 62:24
  63:3,4,19 64:1,4
  65:19 71:23,24
  74:13 75:25 76:4
  77:24 79:20 80:21
  80:22 81:1,8,9
  89:17 94:11 96:12
  96:24 100:2,19
  101:3,13 107:11
  107:12 109:24,25
  110:2 113:13
  115:1 116:14,16
  116:22,25 120:12
  122:11 125:25
**rights** 15:19 17:17
  18:6 24:21 27:1
  28:12 54:5 55:13
  126:12
**risk** 68:2,6
**road** 41:13 96:2
  102:21 106:12,25

107:25 108:6,12
  114:6,23 123:8,14
  124:15 125:13
**roads** 103:5
**robinson** 68:11
**role** 7:8,12 10:16
  22:8 64:24
**rome** 1:11 2:8 5:13
  5:15 7:1
**room** 104:7
**roomy** 104:8
**rotate** 111:15
**rozynski** 2:5 7:20
  8:18 9:3 16:8
  17:22 19:1 30:12
  30:22 31:2,19
  33:19 35:19,25
  36:2,13,23 37:15
  37:23 40:14 41:5
  42:2,10,12,18
  43:19 44:5,11,14
  45:3,4,23 46:3,10
  46:16,19 47:1,5,9
  47:15 48:15,23
  49:14 51:19 52:8
  52:15,19 53:14,17
  53:24 54:16,24
  55:9 56:8,17 57:4
  57:11,22 58:13,23
  59:11,24 60:4,16
  61:3,20 63:7,20
  64:2,7,17 65:6,11
  65:17,24 66:4,18
  67:15 68:7,14,21
  69:17 70:10,21
  72:4 73:5,11 77:7
  78:3,12,23,24
  79:4,8,12,23 80:4
  80:14,19 81:14,22
  83:15,20 86:4,23
  87:2,6,13,15,17
  87:25 88:11,15,19
  88:23 89:1,5 90:8
  94:11 108:17
  115:16 117:17
  118:10,13,17

119:3 120:20
  126:3,16
**rule** 61:6 62:1
**rules** 9:24 31:10
  59:8,16 61:6,7,8
  61:12,18,18,19
**running** 124:9
**rural** 106:2

---

## S

**s** 2:1 4:1,1 121:8
  122:4,9,12 123:20
  125:15 126:17
**safely** 50:7,15,25
  51:17,25
**safety** 3:12 14:7,20
  15:12,21 18:7,22
  20:12 35:5 66:14
  66:21 67:11,22,25
  68:2,6,19 72:8,11
**salary** 39:25
**saved** 23:15
**saw** 71:24 72:19
  84:22
**saying** 12:1 22:25
  41:3 62:2 69:20
  114:7 115:15
**says** 50:19 78:17
  82:19 97:1,3 98:9
**scam** 25:14
**scholarly** 66:13
  67:10
**school** 1:8 5:6 7:2
  17:9 19:6 49:1
  58:3 63:5,12,14
  103:10 110:23
**schools** 111:20
**score** 113:16
**sealing** 4:5
**search** 23:16 27:23
**seatbelt** 72:11
**second** 9:13 12:22
  97:8
**see** 12:5 14:15,22
  14:22 32:10,15
  37:1 40:3 41:21

45:18 87:7 95:9
  95:14 97:2,3,6,7
  97:13 98:3,7,10
  99:16 111:24
  124:25
**seeking** 20:14
  45:19,20 46:1
**seen** 71:17 72:20
  80:17 120:17
**selfevident** 55:23
  116:5 122:7
**selfexplanatory**
  115:21
**send** 13:23
**sense** 19:11 37:21
  103:13
**sent** 12:24
**separate** 28:6 105:4
  108:22 109:13
  110:8
**september** 1:13
  5:10 40:4 127:4
**services** 1:24 2:18
  2:20 5:17,19 19:8
  21:24 22:3 29:16
  98:23
**set** 24:8,19 25:9
  30:4 35:14 37:20
  109:2 114:12,15
  114:15,19 128:6
**setting** 66:3
**seventyfive** 125:8
  125:11
**share** 24:10
**sharpness** 69:2,8
**shed** 115:19,19
**sheet** 129:1
**shift** 112:22 113:7
**short** 73:24 78:2
**shorthand** 1:20
  128:2
**shouldnt** 89:15,16
  89:24
**show** 12:7 75:18
  79:4 97:24 123:17
**showed** 114:18

**shown** 8:20
**shut** 102:2,4,5
**side** 31:15,25 43:4
  104:23
**sign** 2:18 6:3,4 17:3
  17:5 70:8 73:3
  86:8,15 91:4
  108:10 110:12
  112:10 113:3,18
  114:3 115:6 116:8
  116:23 123:2,4
**signals** 69:13 114:8
**signed** 4:15,18
  96:20 127:15
**signing** 24:9
**signs** 96:24 113:13
  115:12
**similar** 8:10 116:9
**simply** 87:25
**sir** 1:12 13:10
**sit** 41:11 104:18,18
  105:20
**site** 25:19,22 26:9
**sites** 27:9
**sitting** 14:17 49:12
  57:8 58:16,19
  59:6,21 60:22
  61:16 62:9 72:25
**situation** 22:2 37:4
**situations** 19:8
**six** 82:6,14,15 83:1
  83:4 86:9,10
  94:17
**sixty** 82:20,21,24
  97:4 107:20
**size** 123:25
**skill** 92:10,15 93:3
**skills** 103:15
  106:16 121:24
  122:2 123:19
**slow** 24:18
**small** 27:13
**smith** 7:3
**smooth** 124:9
**socalled** 89:11
**social** 16:21 24:15



25:4 27:9
**solomon** 7:3
**somebody** 7:17
 25:7 43:3 65:14
 69:14 103:24
 118:22 125:21
**someones** 65:21
**sorry** 27:3 33:9
 81:1 84:7 86:8
 88:21 90:10
**sort** 15:24 16:18
 75:12 85:11 86:17
 102:24 103:5,13
 103:25 106:1,22
 116:3 125:18
**sought** 44:9
**southern** 79:14
**space** 124:21
 125:17
**spanish** 119:21
**spar** 119:25
**spe** 92:10,14,15
 93:3
**speak** 39:14 96:18
 119:19
**special** 85:1,3 86:2
**specific** 11:14
 15:11,24 16:3,11
 28:1 30:8 40:7
 48:20 49:9 51:8
 58:20,25 59:7
 60:14 61:12,23
 62:1 63:1 70:15
 70:24 71:25 72:8
 73:1 79:16 89:23
 113:20
**specifically** 22:7
 23:8 33:17 48:6
 48:12 49:11 62:10
 63:12 71:8,17
 72:13 74:20 76:6
 76:7 90:19 109:1
 109:17
**specifications**
 70:18
**specifics** 9:9 16:10

114:10
**specify** 87:17
**speech** 86:7
**speed** 104:9
**spelling** 101:19
 117:20
**spent** 94:18
**spoken** 16:20 40:14
**sponsored** 67:24
**square** 2:4,9
**sr** 2:15
**stack** 3:9 32:21,24
**staff** 109:15
**stake** 65:15
**stand** 26:20
**standard** 61:10,10
 61:13 71:2,5,16
 71:18 72:6 119:24
**standardized** 71:21
**standards** 71:3
 117:15,15 118:7,9
 119:9,12,14,17
 120:7,10,15,16
**start** 13:1 14:1,4
 83:5 100:9
**started** 102:25
 103:6 114:22
 116:2 124:17
**starting** 103:19
 105:15
**state** 1:21 5:25 6:9
 6:14,17 21:13,18
 21:24 43:17 60:24
 61:11 83:19 84:2
 84:9 85:13,15,22
 91:19,22 92:6,9
 92:23 93:6 98:24
 107:9 108:16,20
 109:4,6,13,16,19
 110:7,15,24 111:7
 128:3
**stated** 53:10
**statement** 48:21
 49:21 50:6 51:23
 52:18 99:18,21
 100:11

**states** 1:1 5:7 21:23
 31:13 57:19 58:11
 59:3 60:7,8 61:1
 62:2
**statesponsored**
 83:13
**stating** 87:25
**stick** 76:19
**stipulated** 4:3,9,14
**stop** 124:20
**straight** 96:24
**street** 2:9
**streets** 113:8
**strict** 112:9
**strictly** 126:18
**strongly** 7:14 29:19
**struggle** 101:4
 108:9
**struggles** 95:24
 100:21
**struggling** 107:5
**student** 52:21 97:5
**students** 52:25 53:7
 57:17 58:11 62:13
 102:15,25 104:6
 105:2,15,23
 110:25 120:19,22
 120:23
**studies** 74:19
**study** 68:18
**stuff** 107:6
**subject** 45:6,24
 46:2,8,9,12,15,22
 55:8 80:2
**subpoena** 3:7 12:9
 13:6,8 33:14 81:2
 93:23
**subscribed** 127:15
**substance** 55:15
**substitute** 37:12
**suburb** 106:4,5
**successful** 7:24
**successfully** 97:5
**suggesting** 53:21
 54:9 55:2,4
**suggests** 21:18

**suitable** 65:22
**supplemental**
 122:17
**support** 7:22 8:22
 18:3,4 20:25 67:7
 99:9
**supported** 7:18
**supporting** 8:25
 18:5
**supports** 37:20
**suppose** 59:5 92:14
**supposed** 10:19
 77:9
**sure** 9:8 12:4 18:13
 18:15 19:18 24:3
 26:12 31:21 39:11
 43:2 51:7 60:9
 62:18 66:20 69:6
 71:3 72:11 74:18
 78:14 83:3 106:21
 112:23 113:12
 116:1 118:5,12
 122:5 124:8
**swear** 5:22
**switch** 19:23 33:16
 43:22 57:15 72:22
 94:16 103:18
 117:9 123:16
**sworn** 4:16,18 5:25
 6:8 128:6
**system** 8:10 9:5
 12:18 17:11
 108:25 112:15
 113:9,23,25 114:8
 114:12,15,16,20
 116:9

---
**T**
---
**t** 4:1,1 127:1 128:1
 128:1
**table** 63:24
**tail** 31:22
**take** 9:7 26:18 30:1
 48:25 49:2 73:19
 73:24 77:25 91:7
 94:19 96:5,11,13

100:8 101:9,10
 109:22 111:22
 121:2 125:24
 126:1
**taken** 1:19 5:12
 9:16 78:8 125:21
 127:4
**talk** 17:22 56:5,11
 79:16 87:20
 104:22 116:15
**talked** 27:20 45:7
**talking** 55:12,15
 58:3 63:25 75:21
 75:22 87:18 88:20
 89:12,18 104:1
 109:9
**tangent** 36:8
**tankers** 95:4
**taught** 57:17
**tax** 39:2
**taxis** 39:7
**teach** 17:10,12
 121:24 122:1
 123:10
**teacher** 17:9
 103:11
**teachers** 102:20
**teaching** 58:11
 116:7
**technology** 104:21
**telephone** 24:6
**tell** 10:23 45:5
 49:10 60:23 72:19
 80:1,14 84:21
 90:15,17 118:13
**ten** 71:12,12 103:16
 104:7
**tend** 71:5,6
**tentacle** 26:16
**terminology** 104:21
**terms** 11:14 30:8
 33:5 53:4 56:25
 57:16 59:18 63:23
 105:25 114:6
 120:3
**test** 11:23 21:5



60:19 75:7 76:14
77:4,10,22 91:7,9
94:19,21 95:25
96:2,2,5,12
100:18 101:2,9,11
103:15 106:18
107:10 109:22
111:23 112:2,7,8
112:11,21 113:2
114:7,23 116:17
116:24 117:11
118:8 119:11
120:9 123:15
**tested** 76:10 77:11
**tester** 113:1
**testified** 6:10 66:2,7
**testify** 65:2 120:8
**testifying** 25:17
**testimony** 38:19
41:25 42:7,9 55:6
56:1 59:19 70:4
78:13,22 79:17,19
79:22,25 81:12
88:12,16 116:18
127:4,7 128:5,8
**testing** 58:21,25,25
59:1,9,22 114:1
119:15
**tests** 59:10,23 95:6
**texas** 3:11 6:19
35:4 57:17,18
60:3,25 61:8,18
83:13,19 84:2,11
85:18 96:4,7,20
99:1,3,5 101:2
109:23 110:15
111:6,7,23 117:1
117:4
**thank** 55:3 84:10
126:10
**thats** 7:12,22 8:7
10:18,18 11:10
13:10 17:4 23:5
23:13 26:3 27:17
27:22,24 29:5
30:24 33:11,24

34:17 35:23,24
36:4,12 37:10,19
39:2,2 41:21
42:10,23 45:14
48:8 49:4,4,6,7,10
51:13,15 56:16,22
60:1,18 61:15
62:15 66:25 68:25
69:6,25 73:8,12
73:25 74:9 75:10
78:16 80:19 83:13
84:10 92:14,17
95:11 97:9,21
98:15,25 99:23
101:13,24 104:7,8
107:12 109:25
110:13 113:14,25
114:11 116:21,25
119:23 121:8
122:11
**theirs** 28:13
**theres** 16:24 18:13
21:25 22:17,25
23:1,7,9 24:18
25:11 37:19 40:22
47:3 51:14 61:5,6
61:11,23,25 62:4
62:14,17,20,22
68:24 69:5 79:6
79:24 92:5 95:22
97:10,21 98:3
102:14 106:7
112:17,19,22
119:22
**theyll** 21:25 119:18
**theyve** 18:9
**thing** 24:25 41:16
61:23 81:17 97:18
113:13 116:7
**things** 8:12 11:14
16:4,18 17:12
18:3 19:6 22:7
29:14 32:15 39:8
57:7 75:13 81:6
90:20,25 93:15,20
94:1 96:19 104:25

110:22 113:9
116:3 120:2
121:24 123:13
124:2
**think** 11:3,12 15:2
17:7 20:3 23:10
40:3 42:21 46:20
55:22 59:2,4
72:24 74:9 82:6
83:7 89:7,22
90:13 93:24 106:5
107:3 109:17
113:16,19,21
120:19 122:7
**thinking** 40:5 85:17
**third** 104:9,9,11
**thirteen** 71:12,12
**thompson** 98:5,5
98:14 99:1,5
**thought** 28:20 58:5
91:15 118:21
**three** 24:20,22
25:12 90:25 104:6
105:2,22,23
124:19
**thumbs** 115:23
**thursday** 5:10
**ticket** 38:14,15,16
38:16 39:3
**tickets** 39:7
**time** 1:19 4:11 5:11
9:17 20:1 24:19
34:2,6 39:17 41:8
41:11 42:1 48:2
49:8 77:3 78:5,9
81:5 84:13 86:12
92:24 93:18,21
94:2 99:12,15
100:23 104:7
105:2,23 111:12
111:12,13 113:11
125:3 126:4,23
**timeframe** 40:6
**times** 73:4
**tired** 42:6
**today** 5:10 7:6,9

8:11 9:16 11:6
14:17 25:7,8,17
26:8 37:1 38:19
47:23 48:14 49:12
50:11 51:2,5 52:7
52:12 53:21 54:21
55:4 57:8 58:16
58:19 59:6,21
60:14,22 61:16
62:9 63:24 66:3
67:5 73:1 74:3
86:16 93:14,14
94:5 126:10
**todays** 13:7 30:11
34:16 36:9,15
**told** 39:12 46:13,14
72:23 88:6 114:17
**top** 97:2
**total** 82:24
**totality** 51:16
**touch** 96:17
**tour** 124:2
**town** 105:25 106:3
106:4
**tractor** 95:2
**tractortrailer**
17:11 18:25 50:9
50:16 51:1,18
52:2,22 53:5,6
69:15 74:21,25
82:11 88:9 90:4
95:3,3 107:16
110:5
**tractortrailers** 8:6
8:16,21 11:9,17
16:7 17:1 22:12
22:22 30:10,20
66:15 67:12 70:16
76:4
**train** 43:15 50:8,15
50:25 51:17 52:1
62:13 122:19
**trained** 52:21 53:7
57:25 102:18
105:14 120:19
121:10,10 122:20

125:23
**trainee** 72:2
**trainees** 69:15
**trainer** 69:13
103:21
**training** 1:8 5:6 7:2
49:3,18 54:14
57:20 58:3,4
62:11 63:2 70:17
71:6 74:23 75:1
82:8,23 86:14,15
91:21 97:5 101:16
102:9 104:14
121:5,14 122:13
122:17 123:5,7
125:8,19
**transcript** 127:3,5
128:7
**transferred** 102:3
**translate** 6:1 17:5
**transportation**
19:18,21 21:8,16
21:22
**travel** 124:20
**treat** 126:22
**trial** 1:16 4:12
51:12
**trouble** 115:3
**truck** 7:11 9:5
23:11 24:21 27:2
27:15 35:22 38:1
41:9,10,17 56:23
64:11 73:4 80:23
81:6 99:16,20
100:13,15 104:18
104:25 107:6
124:20
**truckers** 28:10,10
**trucking** 102:6
**trucks** 8:7 9:7
43:14 64:24 70:25
71:3,7,11,19 72:9
105:4
**true** 45:22 111:19
127:5,9 128:7
**try** 10:4 11:5,12,13



16:4 34:21 47:13
55:20 58:9 78:3
96:9 103:25 107:6
**trying** 16:14 17:10
20:3 23:10 25:13
40:3 41:22 51:7
56:19 92:20 103:3
119:25 120:1
**tucson** 101:25
**tug** 112:21,21,21
**tugging** 112:23
**tuition** 84:15,20
86:1 108:22
109:14 110:9,12
110:13,16,18,23
110:24
**turn** 123:11,14
**turning** 97:11
98:19
**tutoring** 83:18,19
84:25 85:1,4,8,15
110:13
**tweaked** 15:13
**two** 12:20 20:19
34:22 44:23 52:23
52:24 53:7 57:16
57:18 78:10 86:19
86:19 90:20 92:5
95:22 96:6 104:6
105:1,22 111:14
111:17,21 113:4
116:12 120:19,22
120:23 121:15
122:21 124:7,19
125:14,14
**type** 9:10 56:20
116:9
**types** 8:8
**typically** 19:20
116:8

---
**U**
---
**u** 4:1 121:8 122:4,9
122:12 123:20
125:15 126:17
**understand** 7:5,8

9:18 10:4,5,7,15
10:21 17:2 31:5,9
31:23 39:4 40:21
41:22 43:2,9
47:22 48:10 50:5
54:6,20 55:3 56:6
56:10,21 57:21
59:18 65:13 66:20
73:20 74:4,18
75:12 80:11 82:10
88:18 94:14 95:23
100:11 104:20
106:22 107:8
109:21 114:7,14
115:25 116:1,17
117:10
**understanding**
18:1 44:8,25 51:8
64:14 71:5 72:25
73:8,17 103:4,23
104:24 115:4,10
116:22
**understood** 10:3
11:4,12 49:6,7
50:2 62:18 99:21
**undertaken** 68:13
**union** 2:4
**united** 1:1 5:6
28:10,10 31:13
59:3
**unusual** 126:14
**unworkable** 69:16
**urban** 103:6
**use** 71:4,11 72:3
**uses** 72:10
**usually** 105:22

---
**V**
---
**vague** 87:3,13,14
87:16,21
**val** 2:17 5:23
**variation** 62:5
**various** 41:20
106:16 114:19
**vary** 62:2
**vehicle** 104:14

106:11 108:11
118:24
**vehicles** 8:8,16
30:20
**vein** 19:9
**verify** 25:14
**versus** 5:5 68:19
125:13
**vested** 65:21
**video** 1:17 24:6,9,9
**videographer** 2:19
5:1,16 34:2,6 78:5
78:9 126:4
**videos** 16:24 17:4,6
28:21,22
**videotape** 5:2
**view** 25:22,25
26:21 65:4
**virginia** 98:4,13
99:3,5
**vision** 69:2,9,16
**visit** 76:20 124:21
**visited** 62:6
**visual** 68:24
**vocal** 99:10
**vocational** 83:12,17
84:1,8,24 85:12
85:22 97:12 98:5
98:14,23
**voice** 8:24
**vr** 109:13,17
110:20

---
**W**
---
**w** 127:1
**wait** 27:24 55:11,11
**waiting** 44:21
**waived** 4:7 110:18
**waiver** 8:25 14:3
75:9,14 110:24,24
**waivers** 20:14
75:19
**want** 8:9 11:2 18:25
19:10 21:4,17
25:14 26:19 27:7
27:19 33:19 38:21

44:24 45:19 49:9
49:11 51:4 53:2
54:8 58:17 67:8
76:19 87:19 96:13
96:15,18 98:13
100:1,15 106:21
114:10,14 119:7
120:25
**wanted** 20:21 25:6
25:7 80:10 93:18
96:11,19 104:18
121:13
**wants** 48:25 78:14
79:19,23 80:5
**warning** 112:20
**washington** 21:10
**wasnt** 20:16 22:17
84:19 87:3 91:17
93:20 94:7 102:9
115:6
**watch** 124:24
**way** 11:17 38:7,19
47:13 53:21 54:10
55:21 67:10 80:24
88:17 105:13
128:11
**wearing** 115:13
**website** 14:19
**wed** 124:4,22,23
**week** 107:18
**weekly** 39:25
**weeks** 96:6 124:7
**went** 27:3 53:3 58:5
58:7 76:8,15 91:1
96:2 106:24
107:13 108:6
110:17,19 113:14
113:18 116:4
**west** 106:6
**western** 106:6
**weve** 13:14 16:3
22:6 32:19 53:10
66:10 67:3 74:1
**whats** 17:2 28:7
35:23 49:20 68:3
87:4,16 88:13

94:12
**whatsoever** 43:25
125:22
**wheel** 113:4,6
**whisper** 11:23 77:4
77:22
**willing** 58:18
**withdraw** 67:23
90:10,16
**witness** 3:2,16 5:22
6:2,4,7 7:9 10:13
31:6,10 39:10,10
79:17 89:13
126:13 128:5,8
**woman** 112:6
**word** 48:3
**wording** 15:11
**words** 50:5
**work** 17:1 38:1
39:25 41:17 42:8
122:8
**worked** 91:1
112:24 116:2
**working** 35:22
39:24 98:9,15
99:11,15 100:12
100:20 121:9
**workings** 123:18
124:5
**works** 108:25
**world** 27:13
**worry** 119:4
**wouldnt** 96:1
104:20 107:11
117:1 118:6
**write** 13:23 15:7,8
41:7,11,13,14
42:11,22 51:4
**writing** 41:25
**written** 14:21 16:20
17:2,4 37:13
40:20,22 41:4
42:11 50:24 51:6
52:4 75:7 76:14
91:7,9
**wrong** 14:15 82:19



89:22 97:18
**wrote** 11:19 12:1
  13:24 15:9,12
  27:22 40:25
**www** 1:25

---

**X**

**x** 1:4,10 3:1
**xxxxx** 2:24 4:24

---

**Y**

**y** 1:12 2:4
**yard** 123:9,23
**yardlike** 123:8
**yeah** 12:24 114:11
**year** 3:12 35:5 75:9
  95:22
**years** 20:20 24:19
  24:20
**york** 1:12,21 2:4
  5:14,14 6:1,9
  58:12,22 59:9,22
  60:10 61:2,7,18
  62:4 63:13 79:15
  128:4
**youd** 105:21
**youre** 7:5 9:9,11
  12:1,5 13:22
  22:19,25 25:16
  27:15 28:4,15
  29:3 30:18 31:5
  31:25 41:23,24
  43:8,16 45:1
  46:16 47:7,9,12
  47:22 48:22 50:11
  51:16,23 52:12
  54:9,10 55:2,4,12
  57:3,8 59:19
  60:13 61:15 63:25
  67:4 69:7,20
  70:24 71:22 72:13
  73:23 81:6,19
  87:18 90:13 93:10
  104:1 105:13
  120:8
**youve** 8:13 16:17

16:22 19:5,13
  28:25 30:7 53:5
  62:6 81:12 95:9
  119:3

---

**Z**

---

**0**

**00** 34:16
**01** 97:3
**09** 3:12 35:6

---

**1**

**1** 3:7 12:10,21 13:3
  13:3 32:6,7 33:18
  78:9
**10** 1:14 5:11 34:16
  75:1 95:10,14
  97:3
**10003** 2:4
**10174** 1:12
**11** 34:3,7 75:2
  77:21
**11th** 2:9
**12** 3:7,8 75:22 78:6
**13** 34:3 74:6 75:22
  97:13,20 98:4
  99:22 100:16
**130** 2:9
**15cv02917kmjbc**
  1:3 5:9
**18th** 2:9
**19103** 2:10
**1997** 68:10
**1st** 75:15,16

---

**2**

**2** 3:8 12:13,23
  13:15 41:2 126:4
  126:23
**20** 39:1 76:11 91:3
**2009** 75:1 98:10,15
  99:12
**2010** 74:7 77:20
  97:3
**2011** 74:6,7,7,11

75:8 95:20
**2012** 20:17 75:9,17
**2013** 75:15,16
**2014** 20:4 95:10,14
  95:22 97:13,21
  98:4 99:12,22
  100:17,25 101:12
  111:24
**2016** 1:13 3:12 5:11
  35:6 97:22 127:5
**23** 34:7
**24** 2:4 97:21
**24th** 1:11 97:15
**26** 3:12 35:6
**27** 1:14 5:11
**28** 78:9
**29** 1:13 5:10 127:4

---

**3**

**3** 3:9,12 32:18 33:1
  34:14 35:5,13
  36:20 37:11
**30** 78:6
**31** 95:10,14 111:24
**32** 3:9
**34** 3:10
**35** 3:11

---

**4**

**4** 3:10 34:23 35:2
  35:10,13 36:20
  37:11 74:10 82:1
  95:11 97:10
**40** 76:10 77:10 91:3
  112:19
**405** 1:11
**46** 126:4
**4th** 2:4

---

**5**

**5** 3:11 34:23 35:7
  35:10,13 36:20
  37:11
**55** 126:23
**571** 39:1

---

**6**

**6** 3:3
**60** 112:19
**6246221** 1:24

---

**7**

**7820** 6:19
**78747** 6:20

---

**8**

**83** 113:16,16
**866** 1:24

---

**9**

**94** 3:16



# EXHIBIT 8

Model

# Commercial Driver License Manual



## 2005 CDL Testing Model
### (July 2010)

CDL Driver's Manual
COPYRIGHT AAMVA
All Rights Reserved

This material is based upon work supported by the Federal Motor Carrier Safety Administration under Cooperative Agreement No. DTFH61-97-X-00017.  Any opinions, findings, conclusions or recommendations expressed in this publication are those of the Author(s) and do not necessarily reflect the view of the Federal Motor Carrier Safety Administration.

# Table Of Contents

Introduction...................................................................................1-1

Driving Safely..............................................................................2-1

Transporting Cargo Safely ..........................................................3-1

Transporting Passengers Safely ..................................................4-1

Air Brakes...................................................................................5-1

Combination Vehicles..................................................................6-1

Doubles and Triples.....................................................................7-1

Tank Vehicles..............................................................................8-1

Hazardous Materials....................................................................9-1

School Bus.................................................................................10-1

Pre-Trip Vehicle Inspection .......................................................11-1

Basic Vehicle Control Skills Test................................................12-1

On-Road Driving...........................................................................1

# Section 1
# INTRODUCTION

## This Section Covers

- **Commercial Driver License Tests**
- **Driver Disqualifications**
- **Other Safety Rules**

There is a federal requirement that each state have minimum standards for the licensing of commercial drivers.

This manual provides driver license testing information for drivers who wish to have a commercial driver license (CDL). This manual does NOT provide information on all the federal and state requirements needed before you can drive a commercial motor vehicle (CMV). You may have to contact your state driver licensing authority for additional information.

You must have a CDL to operate:

   Any single vehicle with a gross vehicle weight rating (GVWR) of 26,001 pounds or more.

   A combination vehicle with a gross combination weight rating of 26,001 or more pounds, if the trailer(s) has a GVWR of 10,001 or more pounds.

   A vehicle designed to transport 16 or more passengers (including the driver).

   Any size vehicle which requires hazardous material placards or is carrying material listed as a select agent or toxin in 42 CFR part 73. Federal regulations through the Department of Homeland Security require a background check and fingerprinting for the Hazardous Materials endorsement. Contact your local department of driver licensing for more information.

(Your state may have additional definitions of CMVs.)

To get a CDL, you must pass knowledge and skills tests. This manual will help you pass the tests. This manual is not a substitute for a truck driver training class or program. Formal training is the most reliable way to learn the many special skills required for safely driving a large commercial vehicle and becoming a professional driver in the trucking industry.  Figure 1.1 helps you determine if you need a CDL

**Do You Need a CDL?**



**NOTE:** A bus may be Class A, B, or C depending on whether the GVWR is over 26,001 pounds or is a combination vehicle.

**Figure 1.1**

## 1.1 – Commercial Driver License Tests

### 1.1.1 – Knowledge Tests

You will have to take one or more knowledge tests, depending on what class of license and what endorsements you need. The CDL knowledge tests include:

The general knowledge test, taken by all applicants.

The passenger transport test, taken by all bus driver applicants.

The air brakes test, which you must take if your vehicle has air brakes, including air over hydraulic brakes.

The combination vehicles test, which is required if you want to drive combination vehicles.

The hazardous materials test, required if you want to haul hazardous materials as defined in 49 CFR 383.5. In order to obtain this endorsement you are also required to pass a Transportation Security Administration (TSA) background check.

The tanker test, required if you want to haul a liquid or liquid gas in a permanently mounted cargo tank rated at 119 gallons or more or a portable tank rated at 1,000 gallons or more.

The doubles/triples test, required if you want to pull double or triple trailers.

The School Bust test, required if you want to drive a school bus.

### 1.1.2 – Skills Tests

If you pass the required knowledge test(s), you can take the CDL skills tests. There are three types of general skills that will be tested: pre-trip inspection, basic vehicle control, and on-road driving. You must take these tests in the type of vehicle for which you wish to be licensed. Any vehicle that has components marked or labeled cannot be used for the Pre-Trip Inspection Test.

**Pre-trip Vehicle Inspection.** You will be tested to see if you know whether your vehicle is safe to drive. You will be asked to do a pre-trip inspection of your vehicle and explain to the examiner what you would inspect and why.

**Basic Vehicle Control.** You will be tested on your skill to control the vehicle. You will be asked to move your vehicle forward, backward, and turn it within a defined area. These areas may be marked with traffic lanes, cones, barriers, or something similar. The examiner will tell you how each control test is to be done.

**On-road Test.** You will be tested on your skill to safely drive your vehicle in a variety of traffic situations. The situations may include left and right turns, intersections, railroad crossings, curves, up and down grades, single or multi-lane roads, streets, or highways. The examiner will tell you where to drive.

Figure 1.2 details which sections of this manual you should study for each particular class of license and for each endorsement.

| What Sections Should You Study? | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | LICENSE TYPE | | | ENDORSEMENT | | | | |
| | | Class A | Class B | Class C | Hazardous Materials | Double / Triple | Tank Vehicles | Passenger | School Bus |
| Sections to Study | 1 | X | X | X | | | | | |
| | 2 | X | X | X | | X | X | X | |
| | 3 | X | X | X | | | | | |
| | 4 | | | | | | | X | |
| | 5* | X | X | X | | X | | | |
| | 6 | X | | | | X | X | | |
| | 7 | | | | | X | | | |
| | 8 | | | | | | X | | |
| | 9 | | | | X | | X | | |
| | 10 | | | | | | | | X |
| | 11 | X | X | X | | | | X | X |
| | 12 | X | X | X | | | | X | X |
| | 13 | X | X | X | | | | X | X |
| *Study section 5 if you plan to operate vehicles equipped with air brakes. | | | | | | | | | |

**Figure 1.2 – What to Study**

## 1.2 – CDL Disqualifications

### 1.2.1 – General

You may not drive a commercial motor vehicle if you are disqualified for any reason.

### 1.2.2 – Alcohol, Leaving the Scene of an Accident, and Commission of a Felony

It is illegal to operate a CMV if your blood alcohol concentration (BAC) is .04% or more. If you operate a CMV, you shall be deemed to have given your consent to alcohol testing.

You will lose your CDL for at least one year for a first offense for:

Driving a CMV if your blood alcohol concentration is .04% or higher.

Driving a CMV under the influence of alcohol.

Refusing to undergo blood alcohol testing.

Driving a CMV while under the influence of a controlled substance.

Leaving the scene of an accident involving a CMV.

Committing a felony involving the use of a CMV.

Driving a CMV when  the CDL is suspended.

Causing a fatality through negligent operation of a CMV.

You will lose your CDL for at least three years if the offense occurs while you are operating a CMV that is placarded for hazardous materials.

You will lose your CDL for life for a second offense.

You will lose your CDL for life if you use a CMV to commit a felony involving controlled substances.

You will be put out-of-service for 24 hours if you have any detectable amount of alcohol under .04%.

### 1.2.3 – Serious Traffic Violations

Serious traffic violations are excessive speeding (15 mph or more above the posted limit), reckless driving, improper or erratic lane changes, following a vehicle too closely, traffic offenses committed in a CMV in connection with fatal traffic accidents, driving a CMV without obtaining a CDL or having a CDL in the driver's possession, and driving a CMV without the proper class of CDL and/or endorsements.

You will lose your CDL:

For at least 60 days if you have committed two serious traffic violations within a three-year period involving a CMV.

For at least 120 days for three or more serious traffic violations within a three-year period involving a CMV.

### 1.2.4 – Violation of Out-of-Service Orders

You will lose your CDL:

[For at least 90 days if you have committed your first violation of an out-of-service order.

For at least one year if you have committed two violations of an out-of-service order in a ten-year period.

For at least three years if you have committed three or more violations of an out-of-service order in a ten-year period].

### 1.2.5 – Railroad-highway Grade Crossing Violations

You will lose your CDL:

For at least 60 days for your first violation.

For at least 120 days for your second violation within a three-year period.

For at least one year for your third violation within a three-year period.

These violations include violation of a federal, state or local law or regulation pertaining to one of the following six offenses at a railroad-highway grade crossing:

For drivers who are not required to always stop, failing to stop before reaching the crossing if the tracks are not clear.

For drivers who are not required to always stop, failing to slow down and check that the tracks are clear of an approaching train.

For drivers who are always required to stop, failing to stop before driving onto the crossing.

For all drivers failing to have sufficient space to drive completely through the crossing without stopping.

For all drivers failing to obey a traffic control device or the directions of an enforcement official at the crossing.

For all drivers failing to negotiate a crossing because of insufficient undercarriage clearance.

### 1.2.6 – Hazardous Materials Endorsement Background Check and Disqualifications

If you require a hazardous materials endorsement you will be required to submit your fingerprints and be subject to a background check.

You will be denied or you will lose your hazardous materials endorsement if you:

Are not a lawful permanent resident of the United States.

Renounce your United States citizenship.

Are wanted or under indictment for certain felonies.

Have a conviction in military or civilian court for certain felonies.

Have been adjudicated as a mental defective or committed to a mental institution.

Are considered to pose a security threat as determined by the Transportation Security Administration.

The background check procedures vary from jurisdiction to jurisdiction.  Your licensing agency will provide you with all the information you need to complete the required TSA background check procedures.

### 1.2.7 – Traffic Violations in Your Personal Vehicle

The Motor Carrier Safety Improvement Act (MCSIA) of 1999 requires a CDL holder to be disqualified from operating a commercial motor vehicle if the CDL holder has been convicted of certain types of moving violations in their personal vehicle.

If your privilege to operate your personal vehicle is revoked, cancelled, or suspended due to violations of traffic control laws (other than parking violations) you will also lose your CDL driving privileges.

If your privilege to operate your personal vehicle is revoked, cancelled, or suspended due to alcohol, controlled substance or felony  violations, you will lose your CDL for 1 year.  If you are convicted of a second violation in your personal vehicle or CMV you will lose your CDL for life.

If your license to operate your personal vehicle is revoked, cancelled, or suspended you may not obtain a "hardship" license to operate a CMV.

## 1.3 – Other CDL Rules

There are other federal and state rules that affect drivers operating CMVs in all states. Among them are:

You cannot have more than one license. If you break this rule, a court may fine you up to $5,000 or put you in jail and keep your home state license and return any others.

You must notify your employer within 30 days of conviction for any traffic violations (except parking). This is true no matter what type of vehicle you were driving.

You must notify your motor vehicle licensing agency within 30 days if you are convicted in any other jurisdiction of any traffic violation (except parking). This is true no matter what type of vehicle you were driving.

You must notify your employer within two business days if your license is suspended, revoked, or canceled, or if you are disqualified from driving.

You must give your employer information on all driving jobs you have held for the past 10 years. You must do this when you apply for a commercial driving job.

No one can drive a commercial motor vehicle without a CDL. A court may fine you up to $5,000 or put you in jail for breaking this rule.

If you have a hazardous materials endorsement you must notify and surrender your hazardous materials endorsement to the state that issued your CDL within 24 hours of any conviction or indictment in any jurisdiction, civilian or military, for, or found not guilty by reason of insanity of a disqualifying crime listed in 49 CFR 1572.103; who is adjudicated as a mental defective or committed to a mental institution as specified in 49 CFR 1572.109; or who renounces his or her U. S. citizenship;

Your employer may not let you drive a commercial motor vehicle if you have more than one license or if you're CDL is suspended or revoked. A court may fine the employer up to $5,000 or put him/her in jail for breaking this rule.

All states are connected to one computerized system to share information about CDL drivers. The states will check on drivers' accident records to be sure that drivers do not have more than one CDL.

You must be properly restrained by a safety belt at all times while operating a commercial motor

vehicle. The safety belt design holds the driver securely behind the wheel during a crash, helping the driver to control the vehicle and reduces the chance of serious injury or death. If you do not wear a safety belt, you are four times more likely to be fatally injured if you are thrown from the vehicle.

Your state may have additional rules that you must also obey.

## 1.4 – International Registration Plan International Fuel Tax Agreement

If you operate a CDL required vehicle in interstate commerce, the vehicle, with few exceptions, is required to be registered under the International Registration Plan (IRP) and the International Fuel Tax Agreement (IFTA). These federally mandated programs provide for the equitable collection and distribution of vehicle license fees and motor fuels taxes for vehicles traveling throughout the 48 contiguous United States and 10 Canadian provinces.

Under the IRP, jurisdictions must register apportioned vehicles which includes issuing license plates and cab cards or proper credentials, calculate, collect and distribute IRP fees, audit carriers for accuracy of reported distance and fees and enforce IRP requirements.

Registrant responsibilities under the Plan include applying for IRP registration with base jurisdiction, providing proper documentation for registration, paying appropriate IRP registration fees, properly displaying registration credentials, maintaining accurate distance records, and making records available for jurisdiction review.

The basic concept behind IFTA is to allow a licensee (motor carrier) to license in a base jurisdiction for the reporting and payment of motor fuel use taxes.

Under the IFTA, a licensee is issued one set of credentials which will authorize operations through all IFTA member jurisdictions. The fuel use taxes collected pursuant to the IFTA are calculated based on the number of miles (kilometers) traveled and the number of gallons (liters) consumed in the member jurisdictions. The licensee files one quarterly tax return with the base jurisdiction by which the licensee will report all operations through all IFTA member jurisdictions.

It is the base jurisdiction's responsibility to remit the taxes collected to other member jurisdictions and to represent the other member jurisdictions in the tax collection process, including the performance of audits.

An IFTA licensee must retain records to support the information reported on the IFTA quarterly tax return

***The IRP registrant and the IFTA licensee may be the vehicle owner or the vehicle operator.***

The requirement for acquiring IRP plates for a vehicle and IFTA license for a motor carrier is determined by the definitions from the IRP Plan and the IFTA for Qualified Vehicle and Qualified Motor Vehicle:

**For purposes of IRP:**

**A Qualified Vehicle is (except as provided below) any Power Unit that is used or intended for use in two or more Member Jurisdictions and that is used for the transportation of persons for hire or designed, used, or maintained primarily for the transportation of property, and:**

**(i) has two Axles and a gross Vehicle weight or registered gross Vehicle weight in excess of 26,000 pounds (11,793.401 kilograms), or**

**(ii) has three or more Axles, regardless of weight, or**

**(iii) is used in combination, when the gross Vehicle weight of such combination exceeds 26,000 pounds (11,793.401 kilograms).**

**While similar, the Qualified Motor Vehicle in IFTA means a motor vehicle used, designed, or maintained for transportation of persons or property and:**

1) **Having two axles and a gross vehicle weight or registered gross vehicle weight exceeding 26,000 pounds or 11,797 kilograms; or**

2) **Having three or more axles regardless of weight; or**

3) **Is used in combination, when the weight of such combination exceeds 26,000 punds or 11,797 kilograms gross vehicle or registered gross vehicle weight. Qualified Motor Vehicle does not include recreational vehicles.**

If the vehicle you operate is registered under IRP and you are a motor carrier licensed under IFTA, then you are required to comply with the mandatory record keeping requirements for operating the vehicle. A universally accepted method of capturing this information is through the completion of an Individual Vehicle Distance Record (IVDR), sometimes times referred to as a Driver Trip Report. This document reflects the distance traveled and fuel purchased for a vehicle that operates interstate under apportioned (IRP) registration and IFTA fuel tax credentials.

**Although the actual format of the IVDR may vary, the information that is required for proper record keeping does not.**

In order to satisfy the requirements for Individual Vehicle Distance Records, these documents must include the following information:

<u>Distance</u>

***Per Article IV of the IRP Plan***
**(i) Date of trip (starting and ending)**
**(ii) Trip origin and destination – City and State or Province**
**(iii) Route(s) of travel**
**(iv) Beginning and ending odometer or hubodometer reading of the trip**
**(v) Total distance traveled**
**(vi) In-Jurisdiction distance**
**(vii) Power unit number or vehicle identification number.**

<u>Fuel</u>

***Per Section P560 of the IFTA Procedures Manual***
**.300 An acceptable receipt or invoice must include, but shall not be limited to, the following:**
**.005 Date of purchase**
**.010 Seller's name and address**
**.015 Number of gallons or liters purchased;**
**.020 Fuel type**
**.025 Price per gallon or liter or total amount of sale**
**.030 Unit number or other unique vehicle identifier**
**.035 Purchaser's name**

An example of an IVDR that must be completed in its entirety for each trip can be found in **Figure 1** below.  Each individual IVDR should be filled out for only one vehicle.  The rules to follow when trying to determine how and when to log an odometer reading are the following:

- At the beginning of the day
- When leaving the state or province
- At the end of the trip/day

Not only do the trips need to be logged, but the fuel purchases need to be documented as well.  You must obtain a receipt for all fueling and include it with your completed IVDR.

*Make sure that any trips that you enter are always filled out in descending order and that your trips include all state/provinces that you traveled through on your route.*

There are different routes that a driver may take, and most of the miles may be within one state or province.  Whether or not the distance you travel is primarily in one jurisdiction or spread among several jurisdictions, all information for the trip must be recorded. This includes the dates, the routes, odometer readings and fuel purchases.

By completing this document in full and keeping all records required by both the IRP and the IFTA, you will have ensured that you and your company are in compliance with all State and Provincial laws surrounding fuel and distance record keeping requirements.

The IVDR serves as the source document for the calculation of fees and taxes that are payable to the jurisdictions in which the vehicle is operated, so these original records must be maintained for a minimum of four years.

In addition, these records are subject to audit by the taxing jurisdictions. Failure to maintain complete and accurate records could result in fines, penalties and suspension or revocation of IRP registrations and IFTA  licenses.

 For additional information on the IRP and the requirements related to the IRP, contact your base jurisdiction motor vehicle department or IRP, Inc. the official repository for the IRP.  Additional information can be found on the IRP, Inc. website at www.irponline.org.  There is a training video on the website home page available in English, Spanish and French

For additional information on IFTA and the requirements related to IFTA, contact the appropriate agency in your base jurisdiction.  You will also find useful information about the Agreement at the official repository of IFTA at http://www.iftach.org/index.php.

**Individual Vehicle Mileage And Fuel Record**



Figure 1 – Individual Vehicle Mileage & Fuel Record (Example)

**This page intentionally left blank.**

# Section 2
# DRIVING SAFELY

## This Section Covers

- **Vehicle Inspection**
- **Basic Control of Your Vehicle**
- **Shifting Gears**
- **Seeing**
- **Communicating**
- **Space Management**
- **Controlling Your Speed**
- **Seeing Hazards**
- **Distracted Driving**
- **Aggressive Drivers/Road Rage**
- **Night Driving**
- **Driving in Fog**
- **Winter Driving**
- **Hot Weather Driving**
- **Railroad-highway Crossings**
- **Mountain Driving**
- **Driving Emergencies**
- **Antilock Braking Systems**
- **Skid Control and Recovery**
- **Accident Procedures**
- **Fires**
- **Alcohol, Other Drugs, and Driving**
- **Staying Alert and Fit to Drive**
- **Hazardous Materials Rules**

This section contains knowledge and safe driving information that all commercial drivers should know. You must pass a test on this information to get a CDL. This section does not have specific information on air brakes, combination vehicles, doubles, or passenger vehicles. When preparing for the Pre-trip Inspection Test, you must review the material in Section 11 in addition to the information in this section. This section does have basic information on hazardous materials (HazMat) that all drivers should know. If you need a HazMat endorsement, you should study Section 9.

## 2.1 – Vehicle Inspection

### 2.1.1 – Why Inspect

Safety is the most important reason you inspect your vehicle, safety for yourself and for other road users.

A vehicle defect found during an inspection could save you problems later. You could have a breakdown on the road that will cost time and dollars, or even worse, a crash caused by the defect.

Federal and state laws require that drivers inspect their vehicles. Federal and state inspectors also may inspect your vehicles. If they judge the vehicle to be unsafe, they will put it "out of service" until it is fixed.

### 2.1.2 – Types of Vehicle Inspection

**Pre-trip Inspection.** A pre-trip inspection will help you find problems that could cause a crash or breakdown.

**During a Trip.** For safety you should:

Watch gauges for signs of trouble.

Use your senses to check for problems (look, listen, smell, feel).

Check critical items when you stop:
- Tires, wheels and rims.
- Brakes.
- Lights and reflectors.
- Brake and electrical connections to trailer.
- Trailer coupling devices.
- Cargo securement devices.

**After-trip Inspection and Report.** You should do an after-trip inspection at the end of the trip, day, or tour of duty on each vehicle you operated. It may include filling out a vehicle condition report listing any problems you find. The inspection report helps a motor carrier know when the vehicle needs repairs.

### 2.1.3 – What to Look For

**Tire Problems**

Too much or too little air pressure.

Bad wear. You need at least 4/32-inch tread depth in every major groove on front tires. You need 2/32 inch on other tires. No fabric should show through the tread or sidewall.

Cuts or other damage.

Tread separation.

Dual tires that come in contact with each other or parts of the vehicle.

Mismatched sizes.

Radial and bias-ply tires used together.

Cut or cracked valve stems.

Regrooved, recapped, or retreaded tires on the front wheels of a bus. These are prohibited.

**Wheel and Rim Problems**

Damaged rims.

Rust around wheel nuts may mean the nuts are loose--check tightness. After a tire has been changed, stop a short while later and re-check tightness of nuts.

Missing clamps, spacers, studs, or lugs means danger.

Mismatched, bent, or cracked lock rings are dangerous.

Wheels or rims that have had welding repairs are not safe.

**Bad Brake Drums or Shoes**

Cracked drums.

Shoes or pads with oil, grease, or brake fluid on them.

Shoes worn dangerously thin, missing, or broken.

**Steering System Defects**

Missing nuts, bolts, cotter keys, or other parts.

Bent, loose, or broken parts, such as steering column, steering gear box, or tie rods.

If power steering equipped, check hoses, pumps, and fluid level; check for leaks.

Steering wheel play of more than 10 degrees (approximately 2 inches movement at the rim of a 20-inch steering wheel) can make it hard to steer.

**Suspension System Defects.** The suspension system holds up the vehicle and its load. It keeps the axles in place. Therefore, broken suspension parts can be extremely dangerous. Look for:

Spring hangers that allow movement of axle from proper position. See Figure 2.2.

Cracked or broken spring hangers.

Missing or broken leaves in any leaf spring. If one-fourth or more are missing, it will put the vehicle "out of service", but any defect could be dangerous. See Figure 2.3.

Broken leaves in a multi-leaf spring or leaves that have shifted so they might hit a tire or other part.

Leaking shock absorbers.

Torque rod or arm, u-bolts, spring hangers, or other axle positioning parts that are cracked, damaged, or missing.

Air suspension systems that are damaged and/or leaking. See Figure 2.4.

Any loose, cracked, broken, or missing frame members.



**Figure 2.1**



**Figure 2.2**



**Figure 2.3**



**Figure 2.4**

**Exhaust System Defects.** A broken exhaust system can let poison fumes into the cab or sleeper berth. Look for:

Loose, broken, or missing exhaust pipes, mufflers, tailpipes, or vertical stacks.

Loose, broken, or missing mounting brackets, clamps, bolts, or nuts.

Exhaust system parts rubbing against fuel system parts, tires, or other moving parts of vehicle.

Exhaust system parts that are leaking.

**Emergency Equipment.** Vehicles must be equipped with emergency equipment. Look for:

Fire extinguisher(s).

Spare electrical fuses (unless equipped with circuit breakers).

Warning devices for parked vehicles (for example, three reflective warning triangles or 6 fusees or 3 liquid burning flares).

**Cargo (Trucks).** You must make sure the truck is not overloaded and the cargo is balanced and secured before each trip. If the cargo contains hazardous materials, you must inspect for proper papers and placarding.

### 2.1.4 – CDL Pre-trip Vehicle Inspection Test

In order to obtain a CDL you will be required to pass a pre-trip vehicle inspection test. You will be tested to see if you know whether your vehicle is safe to drive. You will be asked to do a pre-trip inspection of your vehicle and explain to the examiner what you would inspect and why. The following seven-step inspection method should be useful.

### 2.1.5 – Seven-step Inspection Method

**Method of Inspection.** You should do a pre-trip inspection the same way each time so you will learn all the steps and be less likely to forget something.

**Approaching the Vehicle.** Notice general condition. Look for damage or vehicle leaning to one side. Look under the vehicle for fresh oil, coolant, grease, or fuel leaks. Check the area around the vehicle for hazards to vehicle movement (people, other vehicles, objects, low-hanging wires, limbs, etc.).

**Vehicle Inspection Guide**

**Step 1: Vehicle Overview**

**Review Last Vehicle Inspection Report.** Drivers may have to make a vehicle inspection report in writing each day. The motor carrier must repair any items in the report that affect safety and certify on the report that repairs were made or were unnecessary. You must sign the report only if defects were noted and certified to be repaired or not needed to be repaired.

**Step 2: Check Engine Compartment**

**Check That the Parking Brakes Are On and/or Wheels Chocked.**

You may have to raise the hood, tilt the cab (secure loose things so they don't fall and break something), or open the engine compartment door. Check the following:

Engine oil level.

Coolant level in radiator; condition of hoses.

Power steering fluid level; hose condition (if so equipped).

Windshield washer fluid level.

Battery fluid level, connections, and tie downs (battery may be located elsewhere).

Automatic transmission fluid level (may require engine to be running).

Check belts for tightness and excessive wear (alternator, water pump, air compressor)--learn how much "give" the belts should have when adjusted right, and check each one.

Leaks in the engine compartment (fuel, coolant, oil, power steering fluid, hydraulic fluid, battery fluid).

Cracked, worn electrical wiring insulation.

Lower and secure hood, cab, or engine compartment door.

### Step 3: Start Engine and Inspect Inside the Cab

### Get In and Start Engine

Make sure parking brake is on.

Put gearshift in neutral (or "park" if automatic).

Start engine; listen for unusual noises.

If equipped, check the Anti-lock Braking System (ABS) indicator lights.  Light on dash should come on and then turn off.  If it stays on the ABS is not working properly.  For trailers only, if the yellow light on the left rear of the trailer stays on, the ABS is not working properly.

### Look at the Gauges

Oil pressure. Should come up to normal within seconds after engine is started. See Figure 2.5

Air pressure. Pressure should build from 50 to 90 psi within 3 minutes.  Build air pressure to governor cut-out (usually around 120 – 140 psi. Know your vehicles requirements.

Ammeter and/or voltmeter. Should be in normal range(s).

Coolant temperature. Should begin gradual rise to normal operating range.

Engine oil temperature. Should begin gradual rise to normal operating range.

Warning lights and buzzers. Oil, coolant, charging circuit warning, and antilock brake system lights should go out right away.

**Check Condition of Controls.** Check all of the following for looseness, sticking, damage, or improper setting:

Steering wheel.

Clutch.

Accelerator ("gas pedal").

Brake controls.
- Foot brake.
- Trailer brake (if vehicle has one).
- Parking brake.
- Retarder controls (if vehicle has them).

Transmission controls.

Interaxle differential lock (if vehicle has one).

Horn(s).

Windshield wiper/washer.

Lights.
- Headlights.
- Dimmer switch.
- Turn signal.
- Four-way flashers.
- Parking, clearance, identification, marker switch(es).



**Figure 2.5**

**Check Mirrors and Windshield.** Inspect mirrors and windshield for cracks, dirt, illegal stickers, or other obstructions to seeing clearly. Clean and adjust as necessary.

**Check Emergency Equipment**

Check for safety equipment:
- Spare electrical fuses (unless vehicle has circuit breakers).
- Three red reflective triangles, 6 fusees or 3 liquid burning flares.
- Properly charged and rated fire extinguisher.

Check for optional items such as:
- Chains (where winter conditions require).
- Tire changing equipment.
- List of emergency phone numbers
- Accident reporting kit (packet).

**Check Safety Belt.** Check that the safety belt is securely mounted, adjusts, latches properly and is not ripped or frayed.

**Step 4: Turn Off Engine and Check Lights**

Make sure the parking brake is set, turn off the engine, and take the key with you. Turn on headlights (low beams) and four-way emergency flashers, and get out of the vehicle.

**Step 5: Do Walkaround Inspection**

Go to front of vehicle and check that low beams are on and both of the four-way flashers are working.

Push dimmer switch and check that high beams work.

Turn off headlights and four-way emergency flashers.

Turn on parking, clearance, side-marker, and identification lights.

Turn on right turn signal, and start walk-around inspection.

**General**

Walkaround and inspect.

Clean all lights, reflectors, and glass as you go along.

**Left Front Side**

Driver's door glass should be clean.

Door latches or locks should work properly.

Left front wheel.

- Condition of wheel and rim--missing, bent, broken studs, clamps, lugs, or any signs of misalignment.
- Condition of tires--properly inflated, valve stem and cap OK, no serious cuts, bulges, or tread wear.
- Use wrench to test rust-streaked lug nuts, indicating looseness.
- Hub oil level OK, no leaks.

Left front suspension.
- Condition of spring, spring hangers, shackles, u-bolts.
- Shock absorber condition.

Left front brake.
- Condition of brake drum or disc.
- Condition of hoses.

**Front**

Condition of front axle.

Condition of steering system.

- No loose, worn, bent, damaged or missing parts.
- Must grab steering mechanism to test for looseness.

Condition of windshield.

- Check for damage and clean if dirty.
- Check windshield wiper arms for proper spring tension.
- Check wiper blades for damage, "stiff" rubber, and securement.

Lights and reflectors.

- Parking, clearance, and identification lights clean, operating, and proper color (amber at front).
- Reflectors clean and proper color (amber at front).
- Right front turn signal light clean, operating, and proper color (amber or white on signals facing forward).

**Right Side**

Right front: check all items as done on left front.

Primary and secondary safety cab locks engaged (if cab-over-engine design).

Right fuel tank(s).

- Securely mounted, not damaged, or leaking.
- Fuel crossover line secure.
- Tank(s) contain enough fuel.
- Cap(s) on and secure.

Condition of visible parts.

- Rear of engine--not leaking.
- Transmission--not leaking.
- Exhaust system--secure, not leaking, not touching wires, fuel, or air lines.
- Frame and cross members--no bends or cracks.
- Air lines and electrical wiring--secured against snagging, rubbing, wearing.
- Spare tire carrier or rack not damaged (if so equipped).
- Spare tire and/or wheel securely mounted in rack.
- Spare tire and wheel adequate (proper size, properly inflated).

Cargo securement (trucks).

- Cargo properly blocked, braced, tied, chained, etc.
- Header board adequate, secure (if required).
- Side boards, stakes strong enough, free of damage, properly set in place (if so equipped).
- Canvas or tarp (if required) properly secured to prevent tearing, billowing, or blocking of mirrors.
- If oversize, all required signs (flags, lamps, and reflectors) safely and properly mounted and all required permits in driver's possession.
- Curbside cargo compartment doors in good condition, securely closed, latched/locked and required security seals in place.

**Right Rear**

Condition of wheels and rims--no missing, bent, or broken spacers, studs, clamps, or lugs.

Condition of tires--properly inflated, valve stems and caps OK, no serious cuts, bulges, tread wear, tires not rubbing each other, and nothing stuck between them.

Tires same type, e.g., not mixed radial and bias types.

Tires evenly matched (same sizes).

Wheel bearing/seals not leaking.

Suspension.

- Condition of spring(s), spring hangers, shackles, and u-bolts.
- Axle secure.
- Powered axle(s) not leaking lube (gear oil).
- Condition of torque rod arms, bushings.
- Condition of shock absorber(s).

- If retractable axle equipped, check condition of lift mechanism. If air powered, check for leaks.
- Condition of air ride components.

Brakes.

- Brake adjustment.
- Condition of brake drum(s) or discs.
- Condition of hoses--look for any wear due to rubbing.

Lights and reflectors.

- Side-marker lights clean, operating, and proper color (red at rear, others amber).
- Side-marker reflectors clean and proper color (red at rear, others amber).

**Rear**

Lights and reflectors.

- Rear clearance and identification lights clean, operating, and proper color (red at rear).
- Reflectors clean and proper color (red at rear).
- Taillights clean, operating, and proper color (red at rear).
- Right rear turn signal operating, and proper color (red, yellow, or amber at rear).

License plate(s) present, clean, and secured.

Splash guards present, not damaged, properly fastened, not dragging on ground, or rubbing tires.

Cargo secure (trucks).

Cargo properly blocked, braced, tied, chained, etc.

Tailboards up and properly secured.

End gates free of damage, properly secured in stake sockets.

Canvas or tarp (if required) properly secured to prevent tearing, billowing, or blocking of either the rearview mirrors or rear lights.

If over-length, or over-width, make sure all signs and/or additional lights/flags are safely and properly mounted and all required permits are in driver's possession.

Rear doors securely closed, latched/locked.

**Left Side**

Check all items as done on right side, plus:

- Battery(ies) (if not mounted in engine compartment).
- Battery box(es) securely mounted to vehicle.

- Box has secure cover.
- Battery(ies) secured against movement.
- Battery(ies) not broken or leaking.
- Fluid in battery(ies) at proper level (except maintenance-free type).
- Cell caps present and securely tightened (except maintenance-free type).
- Vents in cell caps free of foreign material (except maintenance-free type).

### Step 6: Check Signal Lights

### Get In and Turn Off Lights

Turn off all lights.

Turn on stop lights (apply trailer hand brake or have a helper put on the brake pedal).

Turn on left turn signal lights.

### Get Out and Check Lights

Left front turn signal light clean, operating and proper color (amber or white on signals facing the front).

Left rear turn signal light and both stop lights clean, operating, and proper color (red, yellow, or amber).

### Get In Vehicle

Turn off lights not needed for driving.

Check for all required papers, trip manifests, permits, etc.

Secure all loose articles in cab (they might interfere with operation of the controls or hit you in a crash).

Start the engine.

### Step 7: Start the Engine and Check

**Test for Hydraulic Leaks.** If the vehicle has hydraulic brakes, pump the brake pedal three times. Then apply firm pressure to the pedal and hold for five seconds. The pedal should not move. If it does, there may be a leak or other problem. Get it fixed before driving. If the vehicle has air brakes, do the checks described in Sections 5 and 6 of this manual.

### Brake System

### Test Parking Brake(s)

Fasten safety belt

Set parking brake (power unit only).

Release trailer parking brake (if applicable).

Place vehicle into a low gear.

Gently pull forward against parking brake to make sure the parking brake holds.

Repeat the same steps for the trailer with trailer parking brake set and power unit parking brakes released (if applicable).

If it doesn't hold vehicle, it is faulty; get it fixed.

### Test Service Brake Stopping Action

Go about five miles per hour.

Push brake pedal firmly

"Pulling" to one side or the other can mean brake trouble.

Any unusual brake pedal "feel" or delayed stopping action can mean trouble.

If you find anything unsafe during the pre-trip inspection, get it fixed. Federal and state laws forbid operating an unsafe vehicle.

## *2.1.6 – Inspection During a Trip*

### Check Vehicle Operation Regularly

You should check:

Instruments.

Air pressure gauge (if you have air brakes).

Temperature gauges.

Pressure gauges.

Ammeter/voltmeter.

Mirrors.

Tires.

Cargo, cargo covers.

Lights.

Etc.

If you see, hear, smell, or feel anything that might mean trouble, check it out.

**Safety Inspection.** Drivers of trucks and truck tractors when transporting cargo must inspect the securement of the cargo within the first 50 miles of a trip and every 150 miles or every three hours (whichever comes first) after.

## *2.1.7 – After-trip Inspection and Report*

You may have to make a written report each day on the condition of the vehicle(s) you drove. Report anything affecting safety or possibly leading to mechanical breakdown.

## Subsection 2.1
## Test Your Knowledge

The vehicle inspection report tells the motor carrier about problems that may need fixing. Keep a copy of your report in the vehicle for one day. That way, the next driver can learn about any problems you have found.

1.   What is the most important reason for doing a vehicle inspection?
2.   What things should you check during a trip?
3.   Name some key steering system parts.
4.   Name some suspension system defects.
5.   What three kinds of emergency equipment must you have?
6.   What is the minimum tread depth for front tires? For other tires?
7.   Name some things you should check on the front of your vehicle during the walk around inspection.
8.   What should wheel bearing seals be checked for?
9.   How many red reflective triangles should you carry?
10.  How do you test hydraulic brakes for leaks?
11.  Why put the starter switch key in your pocket during the pre-trip inspection?

These questions may be on your test. If you can't answer them all, re-read subsection 2.1.

# 2.2 – Basic Control of Your Vehicle

To drive a vehicle safely, you must be able to control its speed and direction. Safe operation of a commercial vehicle requires skill in:

  Accelerating.

  Steering.

  Stopping.

  Backing safely.

Fasten your seatbelt when on the road. Apply the parking brake when you leave your vehicle.

## 2.2.1 – Accelerating

Don't roll back when you start. You may hit someone behind you. If you have a manual transmission vehicle, partly engage the clutch before you take your right foot off the brake. Put on the parking brake whenever necessary to keep from rolling back. Release the parking brake only when you have applied enough engine power to keep from rolling back. On a tractor-trailer equipped with a trailer brake hand valve, the hand valve can be applied to keep from rolling back.

Speed up smoothly and gradually so the vehicle does not jerk. Rough acceleration can cause mechanical damage. When pulling a trailer, rough acceleration can damage the coupling.

Speed up very gradually when traction is poor, as in rain or snow. If you use too much power, the drive wheels may spin. You could lose control. If the drive wheels begin to spin, take your foot off the accelerator.

## 2.2.2 – Steering

Hold the steering wheel firmly with both hands. Your hands should be on opposite sides of the wheel. If you hit a curb or a pothole (chuckhole), the wheel could pull away from your hands unless you have a firm hold.

## 2.2.3 – Stopping

Push the brake pedal down gradually. The amount of brake pressure you need to stop the vehicle will depend on the speed of the vehicle and how quickly you need to stop. Control the pressure so the vehicle comes to a smooth, safe stop. If you have a manual transmission, push the clutch in when the engine is close to idle.

## 2.2.4 – Backing Safely

Because you cannot see everything behind your vehicle, backing is always dangerous. Avoid backing whenever you can. When you park, try to park so you will be able to pull forward when you leave. When you have to back, here are a few simple safety rules:

  Start in the proper position.

  Look at your path.

  Use mirrors on both sides.

  Back slowly.

  Back and turn toward the driver's side whenever possible.

  Use a helper whenever possible.

  These rules are discussed in turn below.

**Start in the Proper Position.** Put the vehicle in the best position to allow you to back safely. This

position will depend on the type of backing to be done.

**Look at Your Path.** Look at your line of travel before you begin. Get out and walk around the vehicle. Check your clearance to the sides and overhead, in and near the path your vehicle will take.

**Use Mirrors on Both Sides.** Check the outside mirrors on both sides frequently. Get out of the vehicle and check your path if you are unsure.

**Back Slowly.** Always back as slowly as possible. Use the lowest reverse gear. That way you can more easily correct any steering errors. You also can stop quickly if necessary.

**Back and Turn Toward the Driver's Side.** Back to the driver's side so you can see better. Backing toward the right side is very dangerous because you can't see as well. If you back and turn toward the driver's side, you can watch the rear of your vehicle by looking out the side window. Use driver-side backing--even if it means going around the block to put your vehicle in this position. The added safety is worth it.

**Use a Helper.** Use a helper when you can. There are blind spots you can't see. That's why a helper is important. The helper should stand near the back of your vehicle where you can see the helper. Before you begin backing, work out a set of hand signals that you both understand. Agree on a signal for "stop."

## 2.3 – Shifting Gears

Correct shifting of gears is important. If you can't get your vehicle into the right gear while driving, you will have less control.

### 2.3.1 – Manual Transmissions

**Basic Method for Shifting Up.** Most heavy vehicles with manual transmissions require double clutching to change gears. This is the basic method:

Release accelerator, push in clutch and shift to neutral at the same time.

Release clutch.

Let engine and gears slow down to the rpm required for the next gear (this takes practice).

Push in clutch and shift to the higher gear at the same time.

Release clutch and press accelerator at the same time.

Shifting gears using double clutching requires practice. If you remain too long in neutral, you may have difficulty putting the vehicle into the next gear. If so, don't try to force it. Return to neutral, release clutch, increase engine speed to match road speed, and try again.

**Knowing When to Shift Up.** There are two ways of knowing when to shift:

**Use Engine Speed (rpm).** Study the driver's manual for your vehicle and learn the operating rpm range. Watch your tachometer, and shift up when your engine reaches the top of the range. (Some newer vehicles use "progressive" shifting: the rpm at which you shift becomes higher as you move up in the gears. Find out what's right for the vehicle you will operate.)

**Use Road Speed (mph).** Learn what speeds each gear is good for. Then, by using the speedometer, you'll know when to shift up.

With either method, you may learn to use engine sounds to know when to shift.

**Basic Procedures for Shifting Down**

Release accelerator, push in clutch, and shift to neutral at the same time.

Release clutch.

Press accelerator, increase engine and gear speed to the rpm required in the lower gear.

Push in clutch and shift to lower gear at the same time.

Release clutch and press accelerator at the same time.

Downshifting, like upshifting, requires knowing when to shift. Use either the tachometer or the speedometer and downshift at the right rpm or road speed.

Special conditions where you should downshift are:

**Before Starting Down a Hill.** Slow down and shift down to a speed that you can control without using the brakes hard. Otherwise the brakes can overheat and lose their braking power.

Downshift before starting down the hill. Make sure you are in a low enough gear, usually lower than the gear required to climb the same hill.

**Before Entering a Curve.** Slow down to a safe speed, and downshift to the right gear before entering the curve. This lets you use some power through the curve to help the vehicle be more stable while turning. It also allows you to speed up as soon as you are out of the curve.

### 2.3.2 – Multi-speed Rear Axles and Auxiliary Transmissions

Multi-speed rear axles and auxiliary transmissions are used on many vehicles to provide extra gears. You usually control them by a selector knob or switch on the gearshift lever of the main transmission. There are many different shift patterns. Learn the right way to shift gears in the vehicle you will drive.

### 2.3.3 – Automatic Transmissions

Some vehicles have automatic transmissions. You can select a low range to get greater engine braking when going down grades. The lower ranges prevent the transmission from shifting up beyond the selected gear (unless the governor rpm is exceeded). It is very important to use this braking effect when going down grades.

### 2.3.4 – Retarders

Some vehicles have "retarders." Retarders help slow a vehicle, reducing the need for using your brakes. They reduce brake wear and give you another way to slow down. There are four basic types of retarders (exhaust, engine, hydraulic, and electric). All retarders can be turned on or off by the driver. On some vehicles the retarding power can be adjusted. When turned "on," retarders apply their braking power (to the drive wheels only) whenever you let up on the accelerator pedal all the way.

Because these devices can be noisy, be sure you know where their use is permitted.

**Caution.** When your drive wheels have poor traction, the retarder may cause them to skid. Therefore, you should turn the retarder off whenever the road is wet, icy, or snow covered.

---

### Subsections 2.2 and 2.3 Test Your Knowledge

1.  Why should you back toward the driver's side?
2.  If stopped on a hill, how can you start moving without rolling back?
3.  When backing, why is it important to use a helper?
4.  What's the most important hand signal that you and the helper should agree on?
5.  What are the two special conditions where you should downshift?
6.  When should you downshift automatic transmissions?
7.  Retarders keep you from skidding when the road is slippery. True or False?
8.  What are the two ways to know when to shift?

These questions may be on the test. If you can't answer them all, re-read subsections 2.2 and 2.3.

---

## 2.4 – Seeing

To be a safe driver you need to know what's going on all around your vehicle. Not looking properly is a major cause of accidents.

### 2.4.1 – Seeing Ahead

All drivers look ahead; but many don't look far enough ahead.

**Importance of Looking Far Enough Ahead.** Because stopping or changing lanes can take a lot of distance, knowing what the traffic is doing on all sides of you is very important. You need to look well ahead to make sure you have room to make these moves safely.

**How Far Ahead to Look.** Most good drivers look at least 12 to 15 seconds ahead. That means looking ahead the distance you will travel in 12 to 15 seconds. At lower speeds, that's about one block. At highway speeds it's about a quarter of a mile. If you're not looking that far ahead, you may have to stop too quickly or make quick lane changes. Looking 12 to 15 seconds ahead doesn't mean not paying attention to things that are closer. Good drivers shift their attention back and forth, near and far. Figure 2.6 illustrates how far to look ahead.



**Figure 2.6**

**Look for Traffic.** Look for vehicles coming onto the highway, into your lane, or turning. Watch for brake lights from slowing vehicles. By seeing these things far enough ahead, you can change your speed, or change lanes if necessary to avoid a problem.  If a traffic light has been green for a long time it will probably change before you get there. Start slowing down and be ready to stop.

### 2.4.2 – Seeing to the Sides and Rear
It's important to know what's going on behind and to the sides. Check your mirrors regularly. Check more often in special situations.

**Mirror Adjustment.** Mirror adjustment should be checked prior to the start of any trip and can only be checked accurately when the trailer(s) are straight. You should check and adjust each mirror to show some part of the vehicle. This will give you a reference point for judging the position of the other images.

**Regular Checks.** You need to make regular checks of your mirrors to be aware of traffic and to check your vehicle.

**Traffic.** Check your mirrors for vehicles on either side and in back of you. In an emergency, you may need to know whether you can make a quick lane change. Use your mirrors to spot overtaking vehicles. There are "blind spots" that your mirrors cannot show you. Check your mirrors regularly to know where other vehicles are around you, and to see if they move into your blind spots.

**Check Your Vehicle.** Use the mirrors to keep an eye on your tires. It's one way to spot a tire fire. If you're carrying open cargo, you can use the mirrors to check it. Look for loose straps, ropes, or chains. Watch for a flapping or ballooning tarp.

**Special Situations.** Special situations require more than regular mirror checks. These are lane changes, turns, merges, and tight maneuvers.

**Lane Changes.** You need to check your mirrors to make sure no one is alongside you or about to pass you. Check your mirrors:

> Before you change lanes to make sure there is enough room.

> After you have signaled, to check that no one has moved into your blind spot.

> Right after you start the lane change, to double-check that your path is clear.

> After you complete the lane change.

**Turns.** In turns, check your mirrors to make sure the rear of your vehicle will not hit anything.

**Merges.** When merging, use your mirrors to make sure the gap in traffic is large enough for you to enter safely.

**Tight Maneuvers.** Any time you are driving in close quarters, check your mirrors often. Make sure you have enough clearance.

**How to Use Mirrors.** Use mirrors correctly by checking them quickly and understanding what you see.

> When you use your mirrors while driving on the road, check quickly. Look back and forth between the mirrors and the road ahead. Don't focus on the mirrors for too long. Otherwise, you will travel quite a distance without knowing what's happening ahead.

> Many large vehicles have curved (convex, "fisheye," "spot," "bugeye") mirrors that show a wider area than flat mirrors. This is often helpful. But everything appears smaller in a convex mirror than it would if you were looking at it directly. Things also seem farther away than they really are. It's important to realize this and to allow for it. Figure 2.7 shows the field of vision using a convex mirror.

*2005 Commercial Driver's License Manual*



**Figure 2.7**

## 2.5 – Communicating

### 2.5.1 – Signal Your Intentions

Other drivers can't know what you are going to do until you tell them.

Signaling what you intend to do is important for safety. Here are some general rules for signaling. **Turns.** There are three good rules for using turn signals:

Signal early. Signal well before you turn. It is the best way to keep others from trying to pass you.

Signal continuously. You need both hands on the wheel to turn safely. Don't cancel the signal until you have completed the turn.

Cancel your signal. Don't forget to turn off your turn signal after you've turned (if you don't have self-canceling signals).

**Lane Changes.** Put your turn signal on before changing lanes. Change lanes slowly and smoothly. That way a driver you didn't see may have a chance to honk his/her horn, or avoid your vehicle.

**Slowing Down.** Warn drivers behind you when you see you'll need to slow down. A few light taps

on the brake pedal -- enough to flash the brake lights -- should warn following drivers. Use the four-way emergency flashers for times when you are driving very slowly or are stopped. Warn other drivers in any of the following situations:

Trouble Ahead. The size of your vehicle may make it hard for drivers behind you to see hazards ahead. If you see a hazard that will require slowing down, warn the drivers behind by flashing your brake lights.

Tight Turns. Most car drivers don't know how slowly you have to go to make a tight turn in a large vehicle. Give drivers behind you warning by braking early and slowing gradually.

Stopping on the Road. Truck and bus drivers sometimes stop in the roadway to unload cargo or passengers, or to stop at a railroad crossing. Warn following drivers by flashing your brake lights. Don't stop suddenly.

Driving Slowly. Drivers often do not realize how fast they are catching up to a slow vehicle until they are very close. If you must drive slowly, alert following drivers by turning on your emergency flashers if it is legal. (Laws regarding the use of flashers differ from one state to another. Check the laws of the states where you will drive.)

**Don't Direct Traffic.** Some drivers try to help out others by signaling when it is safe to pass. You should not do this. You could cause an accident. You could be blamed and it could cost you many thousands of dollars.

### 2.5.2 – Communicating Your Presence

Other drivers may not notice your vehicle even when it's in plain sight. To help prevent accidents, let them know you're there.

**When Passing.** Whenever you are about to pass a vehicle, pedestrian, or bicyclist, assume they don't see you. They could suddenly move in front of you. When it is legal, tap the horn lightly or, at night, flash your lights from low to high beam and back. And, drive carefully enough to avoid a crash even if they don't see or hear you.

**When It's Hard to See.** At dawn, dusk, in rain, or snow, you need to make yourself easier to see. If you are having trouble seeing other vehicles, other drivers will have trouble seeing you. Turn on your lights. Use the headlights, not just the identification or clearance lights. Use the low beams; high beams can bother people in the daytime as well as at night.

**When Parked at the Side of the Road.** When you pull off the road and stop, be sure to turn on the four-way emergency flashers. This is important at night. Don't trust the taillights to give warning. Drivers have crashed into the rear of a parked vehicle because they thought it was moving normally.

If you must stop on a road or the shoulder of any road, you must put out your emergency warning devices within ten minutes. Place your warning devices at the following locations:

> If you must stop on or by a one-way or divided highway, place warning devices 10 feet, 100 feet, and 200 feet toward the approaching traffic. See Figure 2.8.

> If you stop on a two-lane road carrying traffic in both directions or on an undivided highway, place warning devices within 10 feet of the front or rear corners to mark the location of the vehicle and 100 feet behind and ahead of the vehicle, on the shoulder or in the lane you stopped in. See Figure 2.9.



**Figure 2.8**



**Figure 2.9**

Back beyond any hill, curve, or other obstruction that prevents other drivers from seeing the vehicle within 500 feet. If line of sight view is obstructed due to hill or curve, move the rear-most triangle to a point back down the road so warning is provided. See Figure 2.10.



**Figure 2.10**

When putting out the triangles, hold them between yourself and the oncoming traffic for your own safety. (So other drivers can see you.)

**Use Your Horn When Needed.** Your horn can let others know you're there. It can help to avoid a crash. Use your horn when needed. However, it can startle others and could be dangerous when used unnecessarily.

## 2.6 – Controlling Speed

Driving too fast is a major cause of fatal crashes. You must adjust your speed depending on driving conditions. These include traction, curves, visibility, traffic and hills.

### 2.6.1 – Stopping Distance

Perception Distance + Reaction Distance + Braking Distance = Total Stopping Distance

**Perception distance.** The distance your vehicle travels, in ideal conditions; from the time your eyes see a hazard until your brain recognizes it. Keep in mind certain mental and physical conditions can affect your perception distance. It can be affected greatly depending on visibility and the hazard itself. The average perception time for an alert driver is 1¾ seconds. At 55 mph this accounts for 142 feet traveled.

**Reaction distance.** The distance you will continue to travel, in ideal conditions; before you physically hit the brakes, in response to a hazard seen ahead. The average driver has a reaction time of ¾ second to 1 second. At 55 mph this accounts for 61 feet traveled.

**Braking distance.** The distance your vehicle will travel, in ideal conditions; while you are braking. At 55 mph on dry pavement with good brakes, it can take about 216 feet.

**Total stopping distance.** The total minimum distance your vehicle has traveled, in ideal conditions; with everything considered, including perception distance, reaction distance and braking distance, until you can bring your vehicle to a complete stop. At 55 mph, your vehicle will travel a minimum of 419 feet. See Figure 2.11.



**Figure 2.11**

**The Effect of Speed on Stopping Distance.**

The faster you drive, the greater the impact or striking power of your vehicle. When you double your speed from 20 to 40 mph the impact is 4 times greater. The braking distance is also 4 times longer. Triple the speed from 20 to 60 mph and the impact and braking distance is 9 times greater. At 60 mph, your stopping distance is greater than the length of a football field. Increase the speed to 80 mph and the impact and braking distance are 16 times greater than at 20 mph. High speeds greatly increase the severity of crashes and stopping distances. By slowing down, you can reduce braking distance.

**The Effect of Vehicle Weight on Stopping Distance.** The heavier the vehicle, the more work the brakes must do to stop it, and the more heat they absorb. But the brakes, tires, springs, and shock absorbers on heavy vehicles are designed to work best when the vehicle is fully loaded. Empty trucks require greater stopping distances because an empty vehicle has less traction.

### 2.6.2 – Matching Speed to the Road Surface

You can't steer or brake a vehicle unless you have traction. Traction is friction between the tires and the road. There are some road conditions that reduce traction and call for lower speeds.

**Slippery Surfaces.** It will take longer to stop, and it will be harder to turn without skidding, when the road is slippery. Wet roads can double stopping distance. You must drive slower to be able to stop in the same distance as on a dry road. Reduce speed by about one-third (e.g., slow from 55 to

about 35 mph) on a wet road. On packed snow, reduce speed by a half, or more. If the surface is icy, reduce speed to a crawl and stop driving as soon as you can safely do so.

**Identifying Slippery Surfaces.** Sometimes it's hard to know if the road is slippery. Here are some signs of slippery roads:

**Shaded Areas**. Shady parts of the road will remain icy and slippery long after open areas have melted.

**Bridges.** When the temperature drops, bridges will freeze before the road will. Be especially careful when the temperature is close to 32 degrees Fahrenheit.

**Melting Ice**. Slight melting will make ice wet. Wet ice is much more slippery than ice that is not wet.

**Black Ice**. Black ice is a thin layer that is clear enough that you can see the road underneath it. It makes the road look wet. Any time the temperature is below freezing and the road looks wet, watch out for black ice.

**Vehicle Icing**. An easy way to check for ice is to open the window and feel the front of the mirror, mirror support, or antenna. If there's ice on these, the road surface is probably starting to ice up.

**Just After Rain Begins**. Right after it starts to rain, the water mixes with oil left on the road by vehicles. This makes the road very slippery. If the rain continues, it will wash the oil away.

**Hydroplaning**. In some weather, water or slush collects on the road. When this happens, your vehicle can hydroplane. It's like water skiing--the tires lose their contact with the road and have little or no traction. You may not be able to steer or brake. You can regain control by releasing the accelerator and pushing in the clutch. This will slow your vehicle and let the wheels turn freely. If the vehicle is hydroplaning, do not use the brakes to slow down. If the drive wheels start to skid, push in the clutch to let them turn freely.

It does not take a lot of water to cause hydroplaning. Hydroplaning can occur at speeds as low as 30 mph if there is a lot of water. Hydroplaning is more likely if tire pressure is low, or the tread is worn. (The grooves in a tire carry away the water; if they aren't deep, they don't work well.)

Road surfaces where water can collect can create conditions that cause a vehicle to hydroplane. Watch for clear reflections, tire splashes, and raindrops on the road. These are indications of standing water.

### 2.6.3 – Speed and Curves

Drivers must adjust their speed for curves in the road. If you take a curve too fast, two things can happen. The tires can lose their traction and continue straight ahead, so you skid off the road. Or, the tires may keep their traction and the vehicle rolls over. Tests have shown that trucks with a high center of gravity can roll over at the posted speed limit for a curve.

Slow to a safe speed before you enter a curve. Braking in a curve is dangerous because it is easier to lock the wheels and cause a skid. Slow down as needed. Don't ever exceed the posted speed limit for the curve. Be in a gear that will let you accelerate slightly in the curve. This will help you keep control.

### 2.6.4 – Speed and Distance Ahead

You should always be able to stop within the distance you can see ahead. Fog, rain, or other conditions may require that you slow down to be able to stop in the distance you can see. At night, you can't see as far with low beams as you can with high beams. When you must use low beams, slow down.

### 2.6.5 – Speed and Traffic Flow

When you're driving in heavy traffic, the safest speed is the speed of other vehicles. Vehicles going the same direction at the same speed are not likely to run into one another. In many states, speed limits are lower for trucks and buses than for cars. It can vary as much as 15 mph. Use extra caution when you change lanes or pass on these roadways. Drive at the speed of the traffic, if you can without going at an illegal or unsafe speed. Keep a safe following distance.

The main reason drivers exceed speed limits is to save time. But, anyone trying to drive faster than the speed of traffic will not be able to save much time. The risks involved are not worth it. If you go faster than the speed of other traffic, you'll have to keep passing other vehicles. This increases the chance of a crash, and it is more tiring. Fatigue increases the chance of a crash. Going with the flow of traffic is safer and easier.

### 2.6.6 – Speed on Downgrades

Your vehicle's speed will increase on downgrades because of gravity. Your most important objective is to select and maintain a speed that is not too fast for the:

Total weight of the vehicle and cargo.

Length of the grade.

Steepness of the grade.

Road conditions.

Weather.

If a speed limit is posted, or there is a sign indicating "Maximum Safe Speed," never exceed the speed shown. Also, look for and heed warning signs indicating the length and steepness of the grade. You must use the braking effect of the engine as the principal way of controlling your speed on downgrades. The braking effect of the engine is greatest when it is near the governed rpms and the transmission is in the lower gears. Save your brakes so you will be able to slow or stop as required by road and traffic conditions. Shift your transmission to a low gear before starting down the grade and use the proper braking techniques. Please read carefully the section on going down long, steep downgrades safely in "Mountain Driving."

### 2.6.7 – Roadway Work Zones

Speeding traffic is the number one cause of injury and death in roadway work zones. Observe the posted speed limits at all times when approaching and driving through a work zone. Watch your speedometer, and don't allow your speed to creep up as you drive through long sections of road construction. Decrease your speed for adverse weather or road conditions. Decrease your speed even further when a worker is close to the roadway.

---

### Subsections 2.4, 2.5, and 2.6
### Test Your Knowledge

1.  How far ahead does the manual say you should look?
2.  What are two main things to look for ahead?
3.  What's your most important way to see the sides and rear of your vehicle?
4.  What does "communicating" mean in safe driving?

5.  Where should your reflectors be placed when stopped on a divided highway?
6.  What three things add up to total stopping distance?
7.  If you go twice as fast, will your stopping distance increase by two or four times?
8.  Empty trucks have the best braking. True or False?
9.  What is hydroplaning?
10. What is "black ice"?

These questions may be on the test. If you can't answer them all, re-read subsections 2.4, 2.5, and 2.6.

---

## 2.7 – Managing Space

To be a safe driver, you need space all around your vehicle. When things go wrong, space gives you time to think and to take action.

To have space available when something goes wrong, you need to manage space. While this is true for all drivers, it is very important for large vehicles. They take up more space and they require more space for stopping and turning.

### 2.7.1 – Space Ahead

Of all the space around your vehicle, it is the area ahead of the vehicle--the space you're driving into --that is most important.

**The Need for Space Ahead.** You need space ahead in case you must suddenly stop. According to accident reports, the vehicle that trucks and buses most often run into is the one in front of them. The most frequent cause is following too closely. Remember, if the vehicle ahead of you is smaller than yours, it can probably stop faster than you can. You may crash if you are following too closely.

**How Much Space?** How much space should you keep in front of you? One good rule says you need at least one second for each 10 feet of vehicle length at speeds below 40 mph. At greater speeds, you must add 1 second for safety. For example, if you are driving a 40-foot vehicle, you should leave 4 seconds between you and the vehicle ahead. In a 60-foot rig, you'll need 6 seconds. Over 40 mph, you'd need 5 seconds for a 40-foot vehicle and 7 seconds for a 60-foot vehicle. See Figure 2.12.

---

*2005 Commercial Driver's License Manual*

To know how much space you have, wait until the vehicle ahead passes a shadow on the road, a pavement marking, or some other clear landmark. Then count off the seconds like this: "one thousand- and-one, one thousand-and-two" and so on, until you reach the same spot. Compare your count with the rule of one second for every ten feet of length.

If you are driving a 40-foot truck and only counted up to 2 seconds, you're too close. Drop back a little and count again until you have 4 seconds of following distance (or 5 seconds, if you're going over 40 mph). After a little practice, you will know how far back you should be. Remember to add 1 second for speeds above 40 mph. Also remember that when the road is slippery, you need much more space to stop.



## HEAVY VEHICLE FORMULA
### For timed interval following distance

- 1 second required for each 10 feet of vehicle length at speeds under 40 MPH
- Above 40 MPH use same formula, then add 1 second for the additional speed

40 foot truck (under 40 MPH) = 4 seconds

50 foot truck (above 40 MPH) = 6 seconds

60 foot truck (under 40 MPH) = 6 seconds

**Figure 2.12**

## 2.7.2 – Space Behind

You can't stop others from following you too closely. But there are things you can do to make it safer.

**Stay to the Right.** Heavy vehicles are often tailgated when they can't keep up with the speed of traffic. This often happens when you're going uphill. If a heavy load is slowing you down, stay in the right lane if you can. Going uphill, you should not pass another slow vehicle unless you can get around quickly and safely.

**Dealing with Tailgaters Safely.** In a large vehicle, it's often hard to see whether a vehicle is close behind you. You may be tailgated:

When you are traveling slowly. Drivers trapped behind slow vehicles often follow closely.

In bad weather. Many car drivers follow large vehicles closely during bad weather, especially when it is hard to see the road ahead.

If you find yourself being tailgated, here are some things you can do to reduce the chances of a crash.

Avoid quick changes. If you have to slow down or turn, signal early, and reduce speed very gradually.

Increase your following distance. Opening up room in front of you will help you to avoid having to make sudden speed or direction changes. It also makes it easier for the tailgater to get around you.

Don't speed up. It's safer to be tailgated at a low speed than a high speed.

Avoid tricks. Don't turn on your taillights or flash your brake lights. Follow the suggestions above.

## 2.7.3 – Space to the Sides

Commercial vehicles are often wide and take up most of a lane. Safe drivers will manage what little space they have. You can do this by keeping your vehicle centered in your lane, and avoid driving alongside others.

**Staying Centered in a Lane.** You need to keep your vehicle centered in the lane to keep safe clearance on either side. If your vehicle is wide, you have little room to spare.

**Traveling Next to Others.** There are two dangers in traveling alongside other vehicles:

Another driver may change lanes suddenly and turn into you.

You may be trapped when you need to change lanes.

Find an open spot where you aren't near other traffic. When traffic is heavy, it may be hard to find an open spot. If you must travel near other vehicles, try to keep as much space as possible between you and them. Also, drop back or pull forward so that you are sure the other driver can see you.

**Strong Winds.** Strong winds make it difficult to stay in your lane. The problem is usually worse for lighter vehicles. This problem can be especially bad coming out of tunnels. Don't drive alongside others if you can avoid it.

### 2.7.4 – Space Overhead

Hitting overhead objects is a danger. Make sure you always have overhead clearance.

Don't assume that the heights posted at bridges and overpasses are correct. Re-paving or packed snow may have reduced the clearances since the heights were posted.

The weight of a cargo van changes its height. An empty van is higher than a loaded one. That you got under a bridge when you were loaded does not mean that you can do it when you are empty.

If you doubt you have safe space to pass under an object, go slowly. If you aren't sure you can make it, take another route. Warnings are often posted on low bridges or underpasses, but sometimes they are not.

Some roads can cause a vehicle to tilt. There can be a problem clearing objects along the edge of the road, such as signs, trees, or bridge supports. Where this is a problem, drive a little closer to the center of the road.

Before you back into an area, get out and check for overhanging objects such as trees, branches, or electric wires. It's easy to miss seeing them while you are backing. (Also check for other hazards at the same time.)

### 2.7.5 – Space Below

Many drivers forget about the space under their vehicles. That space can be very small when a vehicle is heavily loaded. This is often a problem on dirt roads and in unpaved yards. Don't take a chance on getting hung up. Drainage channels across roads can cause the ends of some vehicles to drag. Cross such depressions carefully.

Railroad tracks can also cause problems, particularly when pulling trailers with a low

underneath clearance. Don't take a chance on getting hung up halfway across.

### 2.7.6 – Space for Turns

The space around a truck or bus is important in turns. Because of wide turning and offtracking, large vehicles can hit other vehicles or objects during turns.

**Right Turns.** Here are some rules to help prevent right-turn crashes:

Turn slowly to give yourself and others more time to avoid problems.

If you are driving a truck or bus that cannot make the right turn without swinging into another lane, turn wide as you complete the turn. Keep the rear of your vehicle close to the curb. This will stop other drivers from passing you on the right.

Don't turn wide to the left as you start the turn. A following driver may think you are turning left and try to pass you on the right. You may crash into the other vehicle as you complete your turn.

If you must cross into the oncoming lane to make a turn, watch out for vehicles coming toward you. Give them room to go by or to stop. However, don't back up for them, because you might hit someone behind you. See Figure 2.13.



**Figure 2.13**

**Left Turns.** On a left turn, make sure you have reached the center of the intersection before you start the left turn. If you turn too soon, the left side of your vehicle may hit another vehicle because of offtracking.

If there are two turning lanes, always take the right turn lane. Don't start in the inside lane because you may have to swing right to make the turn.

Drivers on your left can be more readily seen. See Figure 2.14.



**Figure 2.14**

### 2.7.7 – Space Needed to Cross or Enter Traffic

Be aware of the size and weight of your vehicle when you cross or enter traffic. Here are some important things to keep in mind.

Because of slow acceleration and the space large vehicles require, you may need a much larger gap to enter traffic than you would in a car.

Acceleration varies with the load. Allow more room if your vehicle is heavily loaded.

Before you start across a road, make sure you can get all the way across before traffic reaches you.

## 2.8 – Seeing Hazards

### 2.8.1 – Importance of Seeing Hazards

**What Is a Hazard?** A hazard is any road condition or other road user (driver, bicyclist, pedestrian) that is a possible danger. For example, a car in front of you is headed toward the freeway exit, but his brake lights come on and he begins braking hard. This could mean that the driver is uncertain about taking the off ramp. He might suddenly return to the highway. This car is a hazard. If the driver of the car cuts in front of you, it is no longer just a hazard; it is an emergency.

**Seeing Hazards Lets You Be Prepared.** You will have more time to act if you see hazards before they become emergencies. In the example above, you might make a lane change or slow down to prevent a crash if the car suddenly cuts in front of you. Seeing this hazard gives you time to check your mirrors and signal a lane change. Being prepared reduces the danger. A driver who did not see the hazard until the slow car pulled back on the highway in front of him would have to do something very suddenly. Sudden braking or a quick lane change is much more likely to lead to a crash.

**Learning to See Hazards.** There are often clues that will help you see hazards. The more you drive, the better you can learn to see hazards. This section will talk about hazards that you should be aware of.

### 2.8.2 – Hazardous Roads

Slow down and be very careful if you see any of the following road hazards.

**Work Zones.** When people are working on the road, it is a hazard. There may be narrower lanes, sharp turns, or uneven surfaces. Other drivers are often distracted and drive unsafely. Workers and construction vehicles may get in the way. Drive slowly and carefully near work zones. Use your four-way flashers or brake lights to warn drivers behind you.

**Drop Off.** Sometimes the pavement drops off sharply near the edge of the road. Driving too near the edge can tilt your vehicle toward the side of the road. This can cause the top of your vehicle to hit roadside objects (signs, tree limbs). Also, it can be hard to steer as you cross the drop off, going off the road, or coming back on.

**Foreign Objects.** Things that have fallen on the road can be hazards. They can be a danger to your tires and wheel rims. They can damage electrical and brake lines. They can be caught between dual tires and cause severe damage. Some obstacles that appear to be harmless can be very dangerous. For example, cardboard boxes may be empty, but they may also contain some solid or heavy material capable of causing damage. The same is true of paper and cloth sacks. It is important to remain alert for objects of all sorts, so you can see them early enough to avoid them without making sudden, unsafe moves.

**Off Ramps/On Ramps.** Freeway and turnpike exits can be particularly dangerous for commercial

vehicles. Off ramps and on ramps often have speed limit signs posted. Remember, these speeds may be safe for automobiles, but may not be safe for larger vehicles or heavily loaded vehicles. Exits that go downhill and turn at the same time can be especially dangerous. The downgrade makes it difficult to reduce speed. Braking and turning at the same time can be a dangerous practice. Make sure you are going slowly enough before you get on the curved part of an off ramp or on ramp.

### 2.8.3 – Drivers Who Are Hazards

In order to protect yourself and others, you must know when other drivers may do something hazardous. Some clues to this type of hazard are discussed below.

**Blocked Vision.** People who can't see others are a very dangerous hazard. Be alert for drivers whose vision is blocked. Vans, loaded station wagons, and cars with the rear window blocked are examples. Rental trucks should be watched carefully. Their drivers are often not used to the limited vision they have to the sides and rear of the truck. In winter, vehicles with frosted, ice-covered, or snow-covered windows are hazards.

Vehicles may be partly hidden by blind intersections or alleys. If you only can see the rear or front end of a vehicle but not the driver, then he or she can't see you. Be alert because he/she may back out or enter into your lane. Always be prepared to stop.

**Delivery Trucks Can Present a Hazard.** Packages or vehicle doors often block the driver's vision. Drivers of step vans, postal vehicles, and local delivery vehicles often are in a hurry and may suddenly step out of their vehicle or drive their vehicle into the traffic lane.

**Parked Vehicles Can Be Hazards,** especially when people start to get out of them. Or, they may suddenly start up and drive into your way. Watch for movement inside the vehicle or movement of the vehicle itself that shows people are inside. Watch for brake lights or backup lights, exhaust, and other clues that a driver is about to move.

Be careful of a stopped bus. Passengers may cross in front of or behind the bus, and they often can't see you.

**Pedestrians and Bicyclists Can Also Be Hazards.** Walkers, joggers, and bicyclists may be on the road with their back to the traffic, so they can't see you. Sometimes they wear portable stereos with headsets, so they can't hear you either. This can be dangerous. On rainy days, pedestrians may not see you because of hats or umbrellas. They may be hurrying to get out of the rain and may not pay attention to the traffic.

**Distractions.** People who are distracted are hazards. Watch for where they are looking. If they are looking elsewhere, they can't see you. But be alert even when they are looking at you. They may believe that they have the right of way.

**Children.** Children tend to act quickly without checking traffic. Children playing with one another may not look for traffic and are a serious hazard.

**Talkers.** Drivers or pedestrians talking to one another may not be paying close attention to the traffic.

**Workers.** People working on or near the roadway are a hazard clue. The work creates a distraction for other drivers and the workers themselves may not see you.

**Ice Cream Trucks.** Someone selling ice cream is a hazard clue. Children may be nearby and may not see you.

**Disabled Vehicles.** Drivers changing a tire or fixing an engine often do not pay attention to the danger that roadway traffic is to them. They are often careless. Jacked up wheels or raised hoods are hazard clues.

**Accidents.** Accidents are particularly hazardous. People involved in the accident may not look for traffic. Passing drivers tend to look at the accident. People often run across the road without looking. Vehicles may slow or stop suddenly.

**Shoppers.** People in and around shopping areas are often not watching traffic because they are looking for stores or looking into store windows.

**Confused Drivers.** Confused drivers often change direction suddenly or stop without warning. Confusion is common near freeway or turnpike interchanges and major intersections. Tourists unfamiliar with the area can be very hazardous. Clues to tourists include car-top luggage and out-of-state license plates. Unexpected actions (stopping in the middle of a block, changing lanes for no apparent reason, backup lights suddenly going on) are clues to confusion. Hesitation is another clue, including driving very slowly, using brakes often, or stopping in the middle of an intersection. You may also see drivers who are

looking at street signs, maps, and house numbers. These drivers may not be paying attention to you.

**Slow Drivers.** Motorists who fail to maintain normal speed are hazards. Seeing slow moving vehicles early can prevent a crash. Some vehicles, by their nature, are slow and seeing them is a hazard clue (mopeds, farm machinery, construction machinery, tractors, etc.). Some of these will have the "slow moving vehicle" symbol to warn you. This is a red triangle with an orange center. Watch for it.

**Drivers Signaling a Turn May Be a Hazard.** Drivers signaling a turn may slow more than expected or stop. If they are making a tight turn into an alley or driveway, they may go very slowly. If pedestrians or other vehicles block them, they may have to stop on the roadway. Vehicles turning left may have to stop for oncoming vehicles.

**Drivers in a Hurry.** Drivers may feel your commercial vehicle is preventing them from getting where they want to go on time. Such drivers may pass you without a safe gap in the oncoming traffic, cutting too close in front of you. Drivers entering the road may pull in front of you in order to avoid being stuck behind you, causing you to brake. Be aware of this and watch for drivers who are in a hurry.

**Impaired Drivers.** Drivers who are sleepy, have had too much to drink, are on drugs, or who are ill are hazards. Some clues to these drivers are:

  Weaving across the road or drifting from one side to another.

  Leaving the road (dropping right wheels onto the shoulder, or bumping across a curb in a turn).

  Stopping at the wrong time (stopping at a green light, or waiting for too long at a stop).

  Open window in cold weather.

  Speeding up or slowing down suddenly, driving too fast or too slow.

Be alert for drunk drivers and sleepy drivers late at night.

**Driver Body Movement as a Clue.** Drivers look in the direction they are going to turn. You may sometimes get a clue from a driver's head and body movements that a driver may be going to make a turn, even though the turn signals aren't on. Drivers making over-the-shoulder checks may be going to change lanes. These clues are most easily seen in motorcyclists and bicyclists. Watch other road users and try to tell whether they might do something hazardous.

**Conflicts.** You are in conflict when you have to change speed and/or direction to avoid hitting someone. Conflicts occur at intersections where vehicles meet, at merges (such as turnpike on ramps) and where there are needed lane changes (such as the end of a lane, forcing a move to another lane of traffic). Other situations include slow moving or stalled traffic in a traffic lane, and accident scenes. Watch for other drivers who are in conflict because they are a hazard to you. When they react to this conflict, they may do something that will put them in conflict with you.

### 2.8.4 – Always Have a Plan

You should always be looking for hazards. Continue to learn to see hazards on the road. However, don't forget why you are looking for the hazards--they may turn into emergencies. You look for the hazards in order to have time to plan a way out of any emergency. When you see a hazard, think about the emergencies that could develop and figure out what you would do. Always be prepared to take action based on your plans. In this way, you will be a prepared, defensive driver who will improve your own safety as well as the safety of all road users.

---

**Subsections 2.7 and 2.8
Test Your Knowledge**

1.   How do you find out how many seconds of following distance space you have?
2.   If you are driving a 30-foot vehicle at 55 mph, how many seconds of following distance should you allow?
3.   You should decrease your following distance if somebody is following you too closely. True or False?
4.   If you swing wide to the left before turning right, another driver may try to pass you on the right. True or False?
5.   What is a hazard?
6.   Why make emergency plans when you see a hazard?

These questions may be on the test. If you can't answer them all, re-read subsections 2.7 and 2.8

---

## 2.9 – Distracted Driving

Whenever you are driving a vehicle and your attention is not on the road, you're putting yourself, your passengers, other vehicles, and pedestrians in danger. Distracted driving can result when you perform any activity that may shift your full attention from the driving task. Taking your eyes off the road or hands off the steering wheel presents obvious driving risks. Mental activities that take your mind away from driving are just as dangerous. Your eyes can gaze at objects in the driving scene but fail to see them because your attention is distracted elsewhere.

Activities that can distract your attention include: talking to passengers; adjusting the radio, CD player or climate controls; eating, drinking or smoking; reading maps or other literature; picking up something that fell; reading billboards and other road advertisements; watching other people and vehicles including aggressive drivers; talking on a cell phone or CB radio; using telematic devices (such as navigation systems, pagers, etc.); daydreaming or being occupied with other mental distractions.

### 2.9.1 – Don't Drive Distracted

If drivers react a half-second slower because of distractions, crashes double. Some tips to follow so you won't become distracted:

Review and be totally familiar with all safety and usage features on any in-vehicle electronics, including your wireless or cell phone, before you drive.

Pre-program radio stations.

Pre-load you favorite CDs or cassette tapes.

Clear the vehicle of any unnecessary objects.

Review maps and plan your route before you begin driving.

Adjust all mirrors for best all-round visibility before you start your trip.

Don't attempt to read or write while you drive.

Avoid smoking, eating and drinking while you drive.

Don't engage in complex or emotionally intense conversations with other occupants.

### 2.9.2 – Use In-vehicle Communication Equipment Cautiously

When possible, pull off the road in a safe, legal place when making/receiving a call on communication equipment.

If possible, turn the cell phone off until your destination is reached.

Position the cell phone within easy reach.

Pre-program cell phones with commonly called numbers.

If you have to place a call, find a safe place to pull off the road. Do not place a call while driving.

Some jurisdictions require that only hands-free devices can be used while driving. Even these devices are unsafe to use when you are moving down the road.

If you must use your cell phone, keep conversations short. Develop ways to get free of long-winded friends and associates while on the road. Never use the cell phone for social visiting.

Hang up in tricky traffic situations.

Do not use the equipment when approaching locations with heavy traffic, road construction, heavy pedestrian traffic, or severe weather conditions.

Do not attempt to type or read messages on your satellite system while driving.

### 2.9.3 – Watch Out for Other Distracted Drivers

You need to be able to recognize other drivers who are engaged in any form of driving distraction. Not recognizing other distracted drivers can prevent you from perceiving or reacting correctly in time to prevent a crash. Watch for:

Vehicles that may drift over the lane divider lines or within their own lane.

Vehicles traveling at inconsistent speeds.

Drivers who are preoccupied with maps, food, cigarettes, cell phones, or other objects.

Drivers who appear to be involved in conversations with their passengers.

Give a distracted driver plenty of room and maintain your safe following distance.

Be very careful when passing a driver who seems to be distracted. The other driver may not be aware of your presence, and they may drift in front of you.

## 2.10 – Aggressive Drivers/Road Rage

### 2.10.1 – What Is It?

Aggressive driving and road rage is not a new problem. However, in today's world, where heavy and slow-moving traffic and tight schedules are the norm, more and more drivers are taking out their anger and frustration in their vehicles.

Crowded roads leave little room for error, leading to suspicion and hostility among drivers and encouraging them to take personally the mistakes of other drivers.

Aggressive driving is the act of operating a motor vehicle in a selfish, bold, or pushy manner, without regard for the rights or safety of others.

Road rage is operating a motor vehicle with the intent of doing harm to others or physically assaulting a driver or their vehicle.

### 2.10.2 – Don't Be an Aggressive Driver

How you feel before you even start your vehicle has a lot to do with how stress will affect you while driving.

Reduce your stress before and while you drive. Listen to "easy listening" music.

Give the drive your full attention. Don't allow yourself to become distracted by talking on your cell phone, eating, etc.

Be realistic about your travel time. Expect delays because of traffic, construction, or bad weather and make allowances.

If you're going to be later than you expected – deal with it. Take a deep breath and accept the delay.

Give other drivers the benefit of the doubt. Try to imagine why he or she is driving that way. Whatever their reason, it has nothing to do with you.

Slow down and keep your following distance reasonable.

Don't drive slowly in the left lane of traffic.

Avoid gestures. Keep you hands on the wheel. Avoid making any gestures that might anger another driver, even seemingly harmless expressions of irritation like shaking your head.

Be a cautious and courteous driver. If another driver seems eager to get in front of you, say, "Be my guest." This response will soon become a habit and you won't be as offended by other drivers' actions.

### 2.10.3 – What You Should Do When Confronted by an Aggressive Driver

First and foremost, make every attempt to get out of their way.

Put your pride in the back seat. Do not challenge them by speeding up or attempting to hold-your-own in your travel lane.

Avoid eye contact.

Ignore gestures and refuse to react to them.

Report aggressive drivers to the appropriate authorities by providing a vehicle description, license number, location and, if possible, direction of travel.

If you have a cell phone, and can do it safely, call the police.

If an aggressive driver is involved in a crash farther down the road, stop a safe distance from the crash scene, wait for the police to arrive, and report the driving behavior that you witnessed.

---

### Subsections 2.9 and 2.10
### Test Your Knowledge

1.  What are some tips to follow so you won't become a distracted driver?
2.  How do you use in-vehicle communications equipment cautiously?
3.  How do you recognize a distracted driver?
4.  What is the difference between aggressive driving and road rage?
5.  What should you do when confronted with an aggressive driver?
6.  What are some things you can do to reduce your stress before and while you drive?

These questions may be on the test. If you can't answer them all, re-read subsections 2.9 and 2.10.

---

## 2.11 – Driving at Night

### 2.11.1 – It's More Dangerous

You are at greater risk when you drive at night. Drivers can't see hazards as quickly as in daylight,