## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

KENNETH FRILANDO,

      Plaintiff,

      v.

BORDENTOWN DRIVER TRAINING
SCHOOL, LLC d/b/a SMITH & SOLOMON,

      Defendant.

Civ. No. 2:15-cv-02917-KM-JBC

**OPINION**

**MCNULTY, U.S.D.J.:**

Before the Court is a motion for summary judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 39) brought by the defendant, Bordentown Driver Training School, LLC d/b/a Smith & Solomon ("Bordentown"). Bordentown runs training classes for people who seek commercial driver's licenses ("CDLs"). In his Complaint (ECF No. 1), the plaintiff, Kenneth Frilando, alleges that Bordentown has violated Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12181, *et seq.*, as well as the New Jersey Law Against Discrimination (the "NJLAD"), N.J. Stat. Ann. § 10:5-1, *et seq.*, by refusing to accommodate his disability in a CDL training course in which he attempted to enroll. Frilando asks for declaratory, injunctive, and monetary relief, including an order that Bordentown implement policies and accommodations for serving deaf and hard-of-hearing students.[1]

---

[1]    For purposes of this opinion, citations to the record will be abbreviated as follows:

    Complaint (ECF No. 1) = Compl.

    Answer (ECF. No. 6) = Answer

    Memorandum of Law in Support of Defendant's Motion for Summary Judgment (ECF No. 39-1) = Br.

Bordentown asks this Court for summary judgment and a dismissal of Frilando's Complaint on four grounds. Bordentown says it cannot reasonably accommodate Frilando's disability without (1) fundamentally altering its training course; (2) threatening the health and safety of the public; and (3) incurring an undue financial burden. Bordentown also argues (4) that even setting aside Frilando's hearing disability, he was not medically qualified to participate in the training course.

This case presents knotty legal, not to say social, issues. Mr. Frilando admirably seeks to overcome a hearing disability. He believes that his disability should not limit his employment options, an aspiration that finds considerable support in federal law. Federal regulations do, however, place limitations, based on safety concerns, on a deaf person's obtaining a CDL. Mr. Frilando insists that those limitations can be accommodated by certain means, including the use of an American Sign Language interpreter, and that he will be entitled to an ongoing waiver of the hearing requirement. And of course Mr. Frilando is not yet applying for the CDL itself; he only seeks an accommodation sufficient to permit him to complete the Class A training course at Bordentown.

---

Defendant's Statement of Undisputed Material Facts (ECF No. 39-2) = Def. SUF

Exhibits to Defendant's Motion for Summary Judgment (ECF No. 39-3 through 6) = Def. Ex.

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF No. 40) = Opp.

Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts (ECF No. 40-1, pp. 2–79) = Pl. Resp.

Plaintiff's Supplemental Local Rule 56.1 Statement of Material Facts (ECF No. 40-1, pp. 80–87) = Pl. Supp.

Exhibits to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF Nos. 40-2–40-5) = Pl. Ex.

Reply in Support of Defendant's Motion for Summary Judgment (ECF No. 41) = Reply

Defendant's Response to Plaintiff's Supplemental Statement of Material Facts (ECF No. 41-1) = Def. Resp.

On the other hand, no one disputes that Bordentown is a highly reputable driver training school, with an interest in graduating students who will qualify for a CDL. Of course a person need not meet CDL licensing standards before being trained. The training process itself, however, involves the operation of heavy machinery in the yard and on public roads, raising immediate safety concerns that cannot simply be bucked to the licensing phase. There is evidence in the record that Bordentown behaved responsibly and even sought regulatory guidance as to how it might practically accommodate Mr. Frilando's disability. But Bordentown fears that it will have to impair its educational mission with respect to other students, as well as incur a potentially ruinous expense, in order to accommodate a single student who may not ever be eligible for a license.

Having reviewed the record, I conclude that these issues are just that—issues, which will need to be submitted to a fact finder for decision. These difficult questions, requiring a sensitive balance of competing policies, should be aired with the benefit of a full factual record. Because there are disputed issues of material fact, Bordentown's motion for summary judgment will be denied.

## I. BACKGROUND

### A. The Parties

Bordentown is a New Jersey-licensed organization that operates Commercial Driver's License ("CDL") training schools throughout Delaware, New Jersey, and Pennsylvania. According to Bordentown, because its training programs involve the use of commercial motor vehicles ("CMVs"), it is classified as an interstate motor carrier and must adhere to the Federal Motor Carrier Safety Regulations ("FMCSRs"), which are issued by the Federal Motor Carrier Safety Administration (the "FMCSA"). (Def. SUF ¶¶ 2–3; Def. Ex. 1, ¶ 4)[2] The FMCSRs define a CMV to include "any self-propelled or towed motor vehicle

---

[2]     Frilando disputes that the FMCSA has jurisdiction over driving schools. (*See, e.g.,* Pl. SUF ¶ 31)

3

used on a highway in interstate commerce" that "[h]as a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,0001 pounds) or more." (*Id.* ¶ 4 (quoting 49 C.F.R. § 390.5)) A state-issued CDL is generally required before a person is permitted to drive a CMV alone.[3]

Frilando has been deaf since birth. With hearing aids, he can detect loud noises such as sirens, gunshots, explosions, fire alarms, car horns, doorbells, and ringing phones, but he cannot identify their source or direction. (Def. SUF ¶¶ 116–117; Pl. SUF ¶ 1) He communicates primarily by using American Sign Language ("ASL") (Pl. SUG ¶ 1), but also by written English and gestures. (Pl. SUF ¶ 3) Frilando learned to drive a car with an instructor in the front seat and an ASL interpreter in the back seat. During full stops, the interpreter would convey to Frilando the directions spoken by the instructor. (Pl. Resp. ¶¶ 7–8; Pl. SUF ¶ 6–8) Frilando has held a non-commercial driver's license for over thirty years, but now wants to drive a CMV. (Pl. SUF ¶ 6)

### B. Requirements for Obtaining a CDL

#### 1. *Eligibility and the Hearing Test Waiver*

An individual who wishes to obtain a CDL must pass an FMCSR-prescribed medical fitness examination and obtain a medical certificate from a medical examiner who is certified and listed on the FMCSA's national registry. (Def. SUF ¶ 22) To obtain and maintain a CDL, an individual also must be capable of passing an FMCSR-prescribed hearing test:

> A person is physically qualified to drive a commercial motor vehicle if that person . . . [f]irst perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 50 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric

---

[3]    FMCSA, Commercial Driver's License Program, https://www.fmcsa.dot.gov/registration/commercial-drivers-license (last visited July 24, 2017).

> device is calibrated to American National Standard
> (formerly ASA Standard) Z24.5 — 1951.

(Def. SUF ¶ 28 (quoting 49 C.F.R. § 391.41(b)(11)) Since 2013, however, the FMCSA has waived the hearing test requirement for certain individuals. (*Id.* ¶ 29–31)

Requirements for CDL training courses—as opposed to requirements for the CDL itself—are less clear. The FMCSA has not regulated or offered guidance as to how CDL trainers should accommodate individuals who have received FMCSA hearing-test waivers. (Def. SUF ¶ 33) Bordentown's Chief Operating Officer, John Diab, testified that in 2014 he asked the FMCSA for guidance on that issue. FMCSA allegedly replied that there is no test or acceptable training program for deaf CDL applicants. (*Id.* ¶ 39–41) Diab says he was told that hearing-test waivers were intended to allow individuals who had lost their hearing *since* receiving a CDL to continue to drive; the FMCSA had not considered how unlicensed, hearing-impaired individuals could be granted waivers in order to be trained. (*Id.* ¶ 40) Diab testified that he also asked administrators from the American Association of Motor Vehicle Administrators (the "AAMVA") for guidance; they told him that the FMCSA had asked the AAMVA to create a test for deaf CDL applicants, but that the AAMVA had declined to do so, citing safety concerns.[4] (*Id.* ¶ 41)

Frilando twice sought to obtain an FMCSR-compliant medical certificate. (*Id.* ¶ 120) First, he obtained a medical certificate from Dr. Lawrence Marino. Dr. Marino, however, was not listed on the FMCSA's national registry. (Def. SUF ¶¶ 121–126) When Frilando realized this, he sought a second certificate from Dr. Kwi Y. Yu, who is FMCSR-certified. Dr. Yu issued Frilando a medical certificate, dated July 30, 2015 (Def. Ex. 20). Dr. Yu now says, however, that he did not know that Frilando had previously been diagnosed with sleep apnea and atrial fibrillation ("A-fib"). Bordentown implies that Frilando purposely

---

[4]     The AAMVA develops standard CDL examination questions and protocols. The FMCSRs require that questions and protocols used for the states' actual CDL tests be comparable to or in conformity with AAMVA standards. (Def. SUF ¶¶ 8, 52–54)

withheld this information; Frilando says that Dr. Yu never elicited it. Dr. Yu apparently attempted, with limited success, to communicate with Frilando by speaking loudly. (Def. SUF ¶¶132–33; Pl. Resp. ¶¶ 132–33) Dr. Yu has since testified that he would not have issued Frilando a medical certificate had he known about Frilando's other medical conditions; sleep apnea, he said, might prevent Frilando from ever being medically cleared under the FMCSRs. (*Id.* 128–135) Frilando, however, has adduced evidence that the sleep problem was minor, easily remedied by using a new pillow, and there is nothing further in the record indicating the extent to which the A-fib condition would pose a danger. (*See* Def. Ex. 3 at 144–51)

On January 13, 2015, between the time he received an invalid medical certificate from Dr. Marino and a facially valid, but now questioned, medical certificate from Dr. Yu, Frilando applied for and received a 90-day hearing test waiver from the FMCSA. It states that the FMCSA "is granting this waiver . . . so [Frilando] may complete driver training school." (Def. Ex. 21) The FMCSA issued Frilando a second, two-year waiver on March 29, 2015. (Def. SUF ¶¶ 138–139) Bordentown claims that neither hearing-test waiver is effective because the FMCSRs require an applicant seeking a waiver to provide a medical certificate that is valid. (*Id.* ¶ 140)

### 2. CDL Testing

The FMCSRs require that all state-level CDL examinations include a knowledge test and a skills test, covering specific, defined subject areas. (Def. SUF ¶ 42) The knowledge test contains FMCSA-approved questions. The skills test comprises three phases, covering pre-trip vehicle inspection skills, basic vehicle control skills, and safe on-road driving skills. An applicant must complete all four test components to pass the CDL examination. (*Id.* ¶ 44–45)

FMCSR standards prohibit the use of interpreters (including ASL interpreters) during any portion of the CDL examination. As of the time Frilando sought to enroll at Bordentown, neither New York's nor New Jersey's CDL examination permitted the use of ASL interpreters or otherwise

6

accommodated hearing-impaired individuals. (*Id.* ¶ 57). The FMCSRs also state that "[n]either the applicant nor the examiner may communicate in a language other than English during the skills test." (Def. SUF ¶¶ 46–48 (citing 49 C.F.R. § 383.133(b)(3) and quoting 49 C.F.R. § 383.133(c)(5); *see also id.* ¶ 82). Another FMCSR provision requires CMV drivers to be able to speak English well enough to converse with the general public, to understand highway signs and signals, to respond to inquiries by officials, and to make entries on reports and records. (*Id.* ¶ ¶ 49 (quoting 49 C.F.R. § 391.11(b)(2))

As noted above, however, the FMCSRs do not specifically regulate CDL training courses, so the particulars of such a course would not literally violate the FMCSRs. Indeed, a CDL training program, however helpful, is not a prerequisite to a CDL application. (*Id.* ¶ 32) Diab stresses, however, that the entire point of the course is to prepare individuals for the CDL test, the contents of which are prescribed by the FMCSRs. At any rate, says Diab, accommodating a deaf individual would put Bordentown at risk of losing its operating license; breaching the terms of its insurance policies (which independently require compliance with FMCSR standards); and being held liable for any motor vehicle accidents that occur during training. (Def. SUF ¶¶ 36–37; Def. Ex. 1, ¶ 4)

### C. Bordentown's CDL Training Course

At each of its nine locations, Bordentown offers a 160-hour "Class A" CDL training program for students who have no prior experience operating a CMV. (Def. SUF ¶¶ 62–64) To enroll, prospective students must, *inter alia*, sign an acknowledgement that they "must acquire and maintain a Federal DOT Medical Card and must have it in [their] possession at all times." (*Id.* ¶ 65–66 (quoting Def. Ex. 18 at BDTS-0139)) (I gather from the record that the "Federal DOT Medical Card" refers to, or at least includes, the FMCSR certificate. (*See* Def. Ex. 2 at 34:13–35:2.))

Bordentown's Class A has three phases: classroom training, yard training, and road training. (Def. SUF ¶ 68) These phases roughly correlate to the sections of the CDL examination.

Phase one, the classroom training, prepares students for the written knowledge component of the CDL examination. (*Id.*¶ 72) At Bordentown's largest location, in Linden, New Jersey,[5] classroom training uses videos, computer presentations, and lectures. (*Id.* ¶ 73) At the end of classroom training, students take the written CDL knowledge test at their state department of motor vehicles ("DMV"). If they pass, they obtain a Commercial Learner's Permit (a "CLP"), which is required to operate a CMV (along with an instructor). (*Id.* ¶¶ 50, 75; Def. Ex. 1, ¶ 12)

Once a Class A student has obtained a CLP, he or she progresses to phase two: "yard training." Yard training prepares students for the pre-trip vehicle inspection and basic vehicle control portions of the CDL skills examination. (Def. SUF ¶¶ 76–79) At Bordentown's Linden facility, yard training occurs in a private lot, or "yard." At a given time, the yard may contain 20 trucks and 150 students, with each instructor overseeing up to three vehicles and fifteen students. (*Id.* ¶¶ 85–86) Bordentown describes the safety of yard training as being contingent on students' remaining focused on their vehicles. (*Id.* ¶¶ 87–89) That is just one reason, Bordentown says, that accommodating a deaf student by allowing an ASL interpreter on-site during yard training would be dangerous unless Bordentown dramatically changes the way it operates in some yet-unspecified way. (*Id.* ¶ 90–93)

The third Class A phase, road training, involves an instructor's taking up to four students on the road. (Def SUF ¶101) At Bordentown's Linden location, this third phase takes place exclusively on public roads. (*Id.* ¶ 102) Therefore, Bordentown says, the safety of the training depends on verbal communication

---

[5]     Bordentown describes only the practices at its Linden location, and certain communications between Diab and Wessendorf refer to Frilando as a "potential Linden student." (*See, e.g.,* Def. Ex. 23) Frilando does not dispute that he sought to enroll at the Linden location specifically, so that location is my focus.

between students and instructors, students' ability to recognize audible alerts, and students' ability to respond immediately to verbal instruction. (*Id.* ¶¶ 95–106) Again, Bordentown submits that allowing an ASL interpreter to participate in road training would threaten the safety of students, instructors, and the public. It would also require significant changes to the way Bordentown operates, because CMV seats normally occupied by students would have to be allocated to ASL interpreters. (*Id.* ¶¶ 107–111)

### D. Bordentown's Efforts to Accommodate Frilando

Frilando first made known his interest in enrolling in Class A through his brother. The brother contacted Bordentown and made an appointment for Frilando to meet with Bordentown representatives on February 20, 2015. (Def. SUF ¶ 143) Neither Frilando nor his brother showed up for that February 20th meeting. (*Id.* ¶ 144) On March 17, 2015, Frilando's brother called Bordentown and spoke with Bordentown's Director of Safety and Program Training, Dale Wessendorf. He also e-mailed Wessendorf copies of Frilando's 90-day and two-year hearing test waivers. (*Id.* ¶ 145) On March 23th and 29th of 2015, Frilando's brother followed up by e-mail. (Def. SUF ¶¶ 141–45; Pl. Resp. ¶¶ 141–45) On March 30, 2015, Bordentown responded that it was seeking guidance from the Federal Department of Transportation ("DOT") and local authorities as to how it could "safely and effectively accommodate the specific needs" of the deaf community. (Def. SUF ¶¶ 141–149) Frilando's brother responded that time was of the essence because Frilando's permit would be expiring on January 2, 2016. (*Id.* ¶ 149)[6]

Once Bordentown learned of Frilando's interest in Class A, it again sought guidance from FMCSA administrators. The administrators told Bordentown that there was still no CDL test or acceptable training program for

---

[6]      In the Complaint, Frilando averred that he "possesses a Class A Commercial Driver License (CDL) from the State of New York, which is valid and expires on January 2, 2016." (Compl. ¶ 8) The reference is confusing, but a reference in Frilando's deposition seems to suggest that this was a commercial learner's permit. (*See* Def. Ex. 3 at 113:21–116:6)

deaf individuals and that the AAMVA, citing safety concerns, had refused to develop such a test to accommodate deaf individuals. (Def. SUF ¶¶ 157–158) Bordentown also contacted New Jersey's CDL examiner, Pennsylvania's DMV, and New York's DMV. New York's DMV never provided an answer; New Jersey and Pennsylvania said they would not test a deaf person because it would not be safe to do so. (*Id.* ¶¶ 160–162)

Bordentown also conducted its own analysis to determine the feasibility of accommodating Frilando, but concluded that deaf students could not safely participate in Class A. (*Id.* ¶ 163) Bordentown communicated this conclusion to Frilando's brother on April 6, 2015.

### E. Bordentown's Cost Analysis

John Diab testified that Bordentown "looked at [the inquiry] strictly from a safety standpoint" when it rebuffed Frilando in March of 2015. At the time, issues of cost did not come up; Bordentown became concerned about cost only when Diab sat in on Frilando's deposition and learned that the cost of two ASL interpreters for a day would be $2500. (Def. Ex. 2 at 210:10-211:23)

Diab estimates that it would cost between $60,000 and $150,000 to provide a student with two ASL interpreters for the average duration of Class A. (Def. SUF ¶ 112) That cost would offset most or all of Bordentown's $140,000 in annual profits from the Linden facility, and a significant portion of the $400,000 in annual profits company-wide. (*Id.* ¶¶ 114–15)

### F. Procedural History

No prior motion practice has occurred in this case. Frilando filed the Complaint against Bordentown on April 24, 2015, and on June 26, 2015, Bordentown answered the Complaint, alleging as affirmative defenses, *inter alia*, the arguments it now makes in support of its motion for summary judgment. (Answer pp. 8–9)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S Ct. 2505, 91 L.Ed.2d 202 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily

11

renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). That "evidentiary burden" is discussed in the following sections.

## III.   DISCUSSION

### A. ADA Title III

Title III of the ADA prohibits discrimination against individuals "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). *See also Bowers v. Nat'l Collegiate Athletic Ass'n,* 118 F. Supp. 2d 494, 514 (D.N.J. 2000), *opinion amended on reargument*, 130 F. Supp. 2d 610 (D.N.J. 2001). Bordentown does not dispute that Bordentown is a place of public accommodation under the ADA and that Frilando is disabled. This motion concerns only the element of discrimination, which, under Title III, includes

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless the entity can demonstrate that making such modifications would*

> *fundamentally alter the nature of such goods, services,*
> *facilities, privileges, advantages, or accommodations;*

42 U.S.C.A. § 12182(b)(2)(A)(ii) (emphasis added). Title III discrimination may also consist of

> a failure to take such steps as may be necessary to
> ensure that no individual with a disability is excluded,
> denied services, segregated or otherwise treated
> differently than other individuals because of the
> absence of auxiliary aids and services, *unless the entity*
> *can demonstrate that taking such steps would*
> *fundamentally alter the nature of the good, service,*
> *facility, privilege, advantage, or accommodation being*
> *offered or would result in an undue burden;*

42 U.S.C.A. § 12182(b)(2)(A)(iii) (emphasis added).[7]

Regulations implementing Title III state the following about the means of accommodating a disability:[8]

> A public accommodation *shall* take those steps that
> may be necessary to ensure that no individual with a

---

[7]     The Third Circuit has held, under the "specific governs the general" canon, that 42 U.S.C. § 12189 (Section 309) rather than 42 U.S.C. § 12182 (Section 302) governs in the context of "examinations . . . related to applications, licensing, certification, or credentialing . . . ." 42 U.S.C. § 12189. *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 155 (3d Cir. 1999). Arguably, 42 U.S.C. § 12189, which is also directed to "persons that offer[] . . . *courses* related to applications, licensing, certification, or credentialing," *id.* (emphasis added), might govern over 42 U.S.C. § 12182 in this case. On the other hand, Judge Hochberg has reasoned that "Sec[t]ion 309 [*i.e.*, 42 U.S.C. § 12189] . . . only applies to courses that directly lead to applications, licensing, certification, or credentialing rather than optional courses that provide preparation for a test required for applications, licensing, certification, or credentialing." *Malik v. Kaplan Inc.*, No. CIV. 13-5948 FSH, 2014 WL 631933, at *2 (D.N.J. Feb. 18, 2014). I tend to agree and, at any rate, the parties argue exclusively under § 12182 on this motion. Therefore, I apply 42 U.S.C. § 12182.

[8]     Congress has charged the Attorney General with issuing regulations for all non-transportation provisions of Title III. 42 U.S.C. § 12186(b). *See Rawdin v. Am. Bd. of Pediatrics*, 582 F. App'x 114, 118 (3d Cir. 2014); *Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront*, 193 F.3d 730, 731 (3d Cir. 1999). The regulations, *see generally* 28 C.F.R. §§ 36.101–36.608, "are 'entitled to substantial deference,' and 'given controlling weight unless [they are] arbitrary, capricious, or manifestly contrary to the statute.'" *Rawdin v. Am. Bd. of Pediatrics*, 582 F. App'x 114, 118 (3d Cir. 2014) (quoting *Helen L. v. Di Dario*, 46 F.3d 325, 331–32 (3d Cir.1995) and *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

> disability is excluded, denied services, segregated or
> otherwise treated differently than other individuals
> *because of the absence of auxiliary aids and services*,
> unless the public accommodation can demonstrate that
> taking those steps would fundamentally alter the
> nature of the goods, services, facilities, privileges,
> advantages, or accommodations being offered or would
> result in an *undue burden, i.e., significant difficulty or
> expense*.

28 C.F.R. § 36.303(a) (emphases added). Under the regulations, "auxiliary aids
and services" includes "[q]ualified interpreters on-site or through video remote
interpreting (VRI) services," 28 C.F.R. § 36.303(a)–(b)(1), and "qualified
interpreters" include "sign language interpreters." 28 C.F.R. § 36.104.

The regulations further provide that when determining whether an action
would result in an undue burden, factors to be considered include:

> (1) The nature and cost of the action . . . ;
>
> (2) The overall financial resources of the site or sites
> involved in the action; the number of persons employed
> at the site; the effect on expenses and resources;
> legitimate safety requirements that are necessary for
> safe operation, including crime prevention measures; or
> the impact otherwise of the action upon the operation
> of the site;
>
> (3) The geographic separateness, and the
> administrative or fiscal relationship of the site or sites
> in question to any parent corporation or entity;
>
> (4) If applicable, the overall financial resources of any
> parent corporation or entity; the overall size of the
> parent corporation or entity with respect to the number
> of its employees; the number, type, and location of its
> facilities; and
>
> (5) If applicable, the type of operation or operations of
> any parent corporation or entity, including the
> composition, structure, and functions of the workforce
> of the parent corporation or entity.

28 C.F.R. § 36.104.

Title III also permits an entity to turn away an individual "where such
individual poses a direct threat to the health or safety of others . . . . The term

14

'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3).

> In determining whether an individual poses a *direct threat* to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 36.208(b) (emphasis added).

Accordingly, the broad question on the motion before me is whether Title III excuses Bordentown's failure to accommodate Frilando's disability because accommodating him would have been unreasonable—that is, because it would have fundamentally altered the nature of Class A or resulted in an undue burden to Bordentown, by virtue of safety or cost. *Cf. Schneider v. Shah*, 507 F. App'x 132, 137 (3d Cir. 2012) (non-precedential); *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 121–22 (3d Cir. 1998) ("[B]ecause the appellant in this case alleges that the hospital failed to 'accommodate' his disability, the hospital is free to show that the relief requested would 'fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.' Similarly, in no way would a hospital be forced to accommodate an unqualified physician if he 'poses a direct threat to the health and safety of others.'" (citations omitted)).

Finally, a person who seeks accommodation of a disability must demonstrate that he or she is otherwise qualified to participate. *See Schneider*, 507 F. App'x at 137 (non-precedential) ("When a plaintiff alleges a failure to accommodate under Title III of the ADA, []he must establish '(1) that the plaintiff is disabled and otherwise qualified academically, . . .'" (quoting *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir.2006)); *Sapp v. Premier Educ. Grp., LP*, No. CV 15-8591 (RMB/AMD), 2016 WL 6434137, at *6

(D.N.J. Oct. 28, 2016) ("In order to state a claim under the ADA in the educational context, a plaintiff must allege that "(1) [s]he has a disability, or was regarded as having a disability; (2) [s]he was 'otherwise qualified' to participate in school activities; and (3) [s]he was 'denied the benefits of the program or was otherwise subject to discrimination because of [her] disability.'"); *cf. Menkowitz*, 154 F.3d 113, 121 (3d Cir. 1998) (explaining that "the absence of the phrase 'qualified individual' from Title III, which appears in Title I, Title II, and the Rehabilitation Act . . . make[s] little difference in a case . . . where the plaintiff seeks reasonable accommodation[, because] . . . if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." (quoting *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 154 (1st Cir. 1998)). Embedded in the accommodation issue, then, is the question of whether Frilando's potentially invalid medical certification renders him otherwise unqualified to participate in Class A.

### B. The NJLAD

Like Title III, the NJLAD prohibits discrimination in a place of public accommodation. N.J. Stat. Ann. § 10:5–12. The NJLAD, like Title III, provides a defense where making an accommodation would impose an undue burden (in terms of cost or "fundamental alteration" of operations) or serious harm.[9]

---

[9]     Under regulations implementing the NJLAD,

> (a) An owner ... or employee of any place of public accommodation shall make such reasonable modifications in policies, practices, or procedures, as may be required to afford goods, services, facilities, privileges, advantages, or accommodations to a person with a disability, unless the owner ... or employee of the place of public accommodation demonstrates that *making the modifications would impose an undue burden on its operation.*
>
> (b) In determining whether an accommodation is unreasonable because it will impose an *undue burden* on the operation of a place of public accommodation, factors to be considered include:
>
> 1. The overall size of the business which runs the place of

16

Therefore, courts consistently look to federal law to analyze disability discrimination claims under the NJLAD, including "reasonable accommodation" disputes. *See Bowers v. National Collegiate Athletic Ass'n*, 475 F.3d 524, 535 n.12 (3d Cir. 2007) ("[T]he NJLAD relies on the same analytical framework as the ADA."); *Costow v. Live Nation Entm't, Inc.*, No. 15-CV-664, 2017 WL 1134382, at *3 n.2 (D.N.J. Mar. 27, 2017) ("[A]n analysis under the NJLAD mirrors the analysis under Title III of the ADA."); *Chin v. Rutgers*, No. CV 14-1332 (JLL), 2016 WL 2653908, at *5 (D.N.J. May 9, 2016) ("The standards for determining a violation of the . . . NJLAD are the same as those under the ADA."), *aff'd* No. 16-2737, 2017 WL 2703587 (3d Cir. June 22, 2017); *Masci v. Six Flags Theme Park, Inc.*, No. CIV.A. 12-6585, 2014 WL 7409952, at *8 (D.N.J. Dec. 31, 2014) ("Because the protections provided to disabled persons under the NJLAD are analogous to the protections offered under the ADA, New Jersey courts therefore apply the standards developed under the ADA when analyzing NJLAD claims." (internal quotation marks omitted)); *Ellison v. Creative Learning Ctr.*, 383 N.J. Super. 581, 594, 893 A.2d 12, 20 (App. Div. 2006) ("[W]e disagree with the motion judge's conclusion that federal precedent construing the ADA cannot be utilized in this context because reasonable accommodation is statutorily required under federal law, whereas it is not specified by New Jersey law in this context.").

Accordingly, I analyze Bordentown's motion primarily under Title III, but that analysis bears directly on Frilando's parallel NJLAD claim.

---

public accommodation with respect to the number of employees, number and type of facilities, and size of the budget;

2. The nature and cost of accommodation sought; [and]

3. *Whether the accommodation sought will result in a fundamental alteration* to the goods, services, program or activity offered. . . .

*N.J.A.C.* 13:13–4.11 (emphases added); *see also Ellison v. Creative Learning Ctr.*, 383 N.J. Super. 581, 593-95, 893 A.2d 12, 19 (App. Div. 2006) (noting the "defense of *N.J.A.C.* 13:13–4.8, governing conduct toward the handicapped when there is a reasonable probability of serious harm").

## C. Analysis

Bordentown makes the overlapping arguments that accommodating Frilando in Class A would fundamentally alter the program, result in an undue financial burden, and directly threaten the health and safety of others. Therefore, Bordentown contends, it has not violated Title III of the ADA. Bordentown also argues that Frilando has no basis for bringing an unreasonable accommodation claim because, even setting aside his hearing disability, he was not medically qualified to participate in Class A in the first place.

Frilando offers five counterarguments as to why his claims should go forward:

### 1. Fundamental alteration: the individualized inquiry requirement

First, Frilando argues that Bordentown's fundamental-alteration defense fails because Bordentown never conducted an individualized inquiry into Frilando's request for ASL interpreters. (Opp. 11) Specifically, Frilando avers he was "never able to have a collaborative discussion with Bordentown about his disability because Bordentown turned him away due to his deafness." (Pl. SUF ¶ 10)

It is true that a public accommodation cannot rest on generalities, but must make an individualized inquiry when determining whether it can accommodate a customer's disability. The Supreme Court explained in *PGA Tour, Inc. v. Martin*:

> [T]he ADA was enacted to eliminate discrimination against "individuals" with disabilities, 42 U.S.C. § 12101(b)(1), and to that end Title III of the Act requires without exception that any "policies, practices, or procedures" of a public accommodation be reasonably modified for disabled "individuals" as necessary to afford access unless doing so would fundamentally alter what is offered, § 12182(b)(2)(A)(ii). *To comply with this command, an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person,*

18

> *and yet at the same time not work a fundamental
> alteration.*

532 U.S. 661, 663, 688, 121 S. Ct. 1879, 1883 (2001) (emphasis added).

Of course Bordentown could consider Frilando's personal circumstances only to the extent that he revealed them. "A defendant is not liable for failure to provide reasonable accommodations under the ADA if the plaintiff does not provide information needed to assess the request for an accommodation." *Mucci v. Rutgers*, No. CIV. 08-4806 RBK, 2011 WL 831967, at *21 (D.N.J. Mar. 3, 2011); *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 467 (S.D.N.Y. 2012) ("Title III's requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing (1) what accommodations the examinee was seeking, and (2) whether those accommodations were reasonable in light of the disability and the test.").

Bordentown argues that it did its best to make an individualized inquiry into the feasibility of accommodating Frilando's disability; it says that Frilando was not very specific about his needs. (Reply 2; Def. Ex. 1, ¶ 36) Frilando claims that Bordentown never asked. (Opp. 11) Neither party's argument is very compelling in light of the somewhat vague factual record before me. True, the email exchanges between Frilando's brother and Bordentown did not specifically address the degree of Frilando's deafness or discuss any specific proposed accommodations. (*See* Def. Exs. 22–23) There were also telephone conversations, however, and neither party offers a detailed account of them. Following those conversations, Bordentown took actions that tend to suggest it must have learned at least something about the nature and extent of Frilando's disability from his brother. For example, it made some telephone inquiries into the feasibility of accommodating a deaf student in Class A. It also appears that Bordentown had in mind the necessity of ASL interpreters or other auxiliary measures when it made its decision, suggesting that it must have learned something about Frilando's disability. (*See, e.g.*, Opp. 9–10).

I conclude that issues of material fact remain as to whether Bordentown sufficiently discharged its duty of individual inquiry.

## 2. Fundamental alteration: essential or peripheral features

Second, Frilando argues that Bordentown's "fundamental alteration" defense fails. An accommodation, he says, would not have altered "essential" elements of Class A, but only "peripheral" features. (Opp. 12)

The U.S. Supreme Court discussed the distinction between essential and peripheral features in *PGA Tour, Inc. v. Martin, supra,* where an issue before the Court was whether a disabled contestant in PGA Tour golf tournaments could be denied the use of a golf cart under Title III of the ADA. 532 U.S. at 664. The Court explained that permitting a contestant to use a golf cart might cause a fundamental alteration where (1) it "alter[s] such an essential aspect of the game of golf that it would be unacceptable even if it affected all competitors equally" or (2) it "has only a peripheral impact on the game itself [but] might nevertheless give a disabled player . . . an advantage over others . . . ." *Id.* at 682.

*Martin* reasoned that walking the course is not an essential rule of golf but rather a peripheral one; several other tournaments in fact allowed players to use golf carts. *Id.* 689. The Court reasoned that Martin's physical disability made it unlikely that he would enjoy any competitive advantage over his opponents by virtue of riding rather than walking the course. *Id.* at 690. The Court therefore affirmed a preliminary injunction permitting him to use a cart in PGA Tour and qualifying events. *Id.* at 672–74. *Martin* is anything but on point—there, the potential downside was an uneven playing field, not a deadly highway accident—but *Martin* nevertheless sets forth a framework for analysis.

Here, Bordentown argues that accommodating Frilando would fundamentally alter Class A because (1) use of an ASL interpreter would prevent Bordentown from operating under conditions corresponding to the CDL test; (2) Bordentown could not teach Frilando to respond to audible alerts,

such as "leaking tires, squealing belts, brake pressure indications, emergency sirens, and warnings from other drivers"; and (3) Bordentown could not provide real-time verbal instruction on public roads. (Br. 22)

In portraying these as "essential" features of Class A, Bordentown analogizes to *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S. Ct. 2361 (1979). There, the U.S. Supreme Court held that a nursing school did not illegally discriminate against a hearing-impaired applicant when it refused to modify its curriculum to dispense with the requirement of "effective oral communication" with a nursing instructor. *Id.* at 407, 99 S. Ct. at 2368. Although the applicant could read lips and use sign language, the Court remained unpersuaded that an accommodation would not compromise essential features of the program. The training program's clinical phase required students to "instantly follow" instructions, and the Rehabilitation Act[10] "imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards" to accommodate a disabled student. *Id.* at 413, 99 S. Ct. at 2370.

The applicant in *Davis* argued that the nursing school's requirements should not be constrained by the requirements for a state nursing license. 442 U.S. at 413 n.12. The *Davis* Court thought that the applicant was missing the larger point.

> [A nursing program] structured to train persons who will be able to perform all normal roles of a registered nurse, represents a legitimate academic policy, . . . . In effect, it seeks to ensure that no graduate will pose a

[10]    Courts generally analyze the Rehabilitation Act under the same framework as the ADA. *See Ridley Sch. Dist. v. M.R.,* 680 F.3d 260, 282–83 (3d Cir. 2012) ("[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same . . . ."); *Hollinger v. Reading Health Sys.,* No. CV 15-5249, 2017 WL 429804, at *9 (E.D. Pa. Jan. 31, 2017) ("[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same. To make out a *prima facie* case under the [Rehabilitation Act], a plaintiff must show: (1) he or she is handicapped or disabled as defined under the statute; (2) he or she is otherwise qualified to participate in the program at issue; and (3) he or she was precluded from participating in a program or receiving a service or benefit because of his or her disability." (internal quotation marks and citations omitted)).

> danger to the public in any professional role in which
> he or she might be cast. . . .

*Id.*

Frilando makes an argument that resembles the one rejected in *Davis.* That is, he distinguishes between driving *school* requirements and commercial *licensing* requirements. The latter, he says, do not constrain the former. In essence, he argues that the Court should focus on whether, with appropriate accommodations, he can obtain the necessary training; whether he ultimately can obtain a CDL is an issue for another day. The holding of *Davis* casts that argument in a dubious light, but I think that under some versions of the facts, it could be distinguished.[11] Like Bordentown, the nursing school in *Davis* cited

---

[11]    Frilando makes a legal argument that *Davis*'s Rehabilitation Act standards are critically different from those of Title III; whereas Title III imposes affirmative obligations on public accommodations to provide auxiliary aids and services and/or make modifications, *see* 28 C.F.R. § 36.303(a), *supra* pp. 12–13, Frilando says, the Court specifically determined in *Davis* that Section 504 of the Rehabilitation Act does not require a school to take "affirmative action" to accommodate a disabled applicant. 442 U.S. at 407–408. But Frilando misses the portion of *Davis* in which Justice Powell recognizes that Rehabilitation Act regulations *do* "require[] covered institutions to make 'modifications' in their programs to accommodate handicapped persons, and to provide 'auxiliary aids' such as sign-language interpreters." *Id.* at 408. The Supreme Court's discussion of *Davis* in *Alexander v. Choate*, 469 U.S. 287, 300, 105 S. Ct. 712, 720 (1985) further supports the conclusion that the *Davis* standard has application to Frilando's case:

> Regardless of the aptness of our choice of words in *Davis,* it
> is clear from the context of *Davis* that the term "affirmative
> action" referred to those "changes," "adjustments," or
> "modifications" to existing programs that would be
> "substantial," 442 U.S., at 410, 411, n. 10, 413, 99 S.Ct., at
> 2369, 2369-2370, n. 10, 2370, or that would constitute
> "fundamental alteration[s] in the nature of a program ...,"
> *id.,* at 410, 99 S.Ct., at 2369, rather than to those changes
> that would be reasonable accommodations.

*Id.* at 300; *see also Helen L. v. DiDario*, 46 F.3d 325, 337 (3d Cir. 1995) ("In *Choate,* the Court explained that 'affirmative action' as used in *Davis* "[r]eferred to those 'changes,' 'adjustments,' or 'modifications' . . . that would constitute 'fundamental alteration[s]' in the nature of a program . . . .'" (quoting *Davis*, 469 U.S. at 300 n. 20)); *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) ("We recognize that the Rehabilitation Act and the ADA generally are interpreted consistently. *See* 28 C.F.R. § 36.103 (incorporating the standards applied under the Rehabilitation Act into Title III).").

safety concerns and the need for instantaneous verbal understanding. But Davis asked for more than Frilando is seeking here. She requested that the nursing school offer her individual faculty supervision any time she attended to patients directly, and that she be excused from taking required clinical courses altogether. 442 U.S. at 407–408. The Court reasoned that "[w]hatever benefits respondent might realize from such a course of study, she would not receive even a rough equivalent of the training a nursing program normally gives." *Davis*, 442 U.S. at 410.

Frilando, in contrast, would participate in all phases of Class A. He requests that ASL interpreters be present to communicate with him when he is not actively driving, and suggests that his Bordentown instructor use a set of predetermined hand signals for instantaneous communication while driving. (*See* Opp. 6–7, 17) These suggested modifications have the support of Frilando's experts, who have used the same or similar modifications to train deaf driving students (albeit not in the use of CMVs). (*See, e.g.*, Opp. 6–7; Pl. Resp. ¶¶ 14, 16; Def. Ex. 13) In short, factual issues—and a potential battle of the experts—remain in play; *Davis* falls short of actually dictating an outcome under the circumstances of this case.

Bordentown also relies on *Breece v. All. Tractor-Trailer Training II, Inc.*, 824 F. Supp. 576 (E.D. Va. 1993). There, a judge determined that the defendant, a tractor-trailer driving school, could not reasonably accommodate the plaintiff (Breece), a deaf applicant. The *Breece* facts are in some respects similar to, but in others critically different from, those before me. For example, Breece "suggested that the truck cab could be modified so that the instructor could stand behind him and plaintiff could continually 'glance around' at the interpreter in order to understand the instructor's instructions, questions, comments, and warnings." *Id.* at 577. Frilando, in contrast, proposes the use of hand signals that he would comprehend instantly. Breece (like Davis in the Supreme Court case) also requested more than Frilando is requesting here. Breece proposed expanded classroom training and asked that the school

23

substitute simulated training for on-road instruction. The court concluded that such simulated training would have little pedagogical value. *Id.* at 577–579. Frilando does not ask Bordentown for such major curricular alterations.[12]

Most importantly, *Breece* was a bench verdict by the judge as fact finder, not a summary judgment decision. *Id.* Given the fact-specific nature of the fundamental alteration defense in this case, a reasonable factfinder[13] could diverge from *Breece*.

Whether it is an essential condition that training at all times mimic CDL test conditions poses a factual issue. It is also uncertain whether it is essential to Bordentown's program that it adhere to FMCSR and AAMVA requirements. (*Compare, e.g.*, Def. Ex. 1 ¶ 4 (Diab stating Bordentown must comply with all FMCSRs), *with* Def. Ex. 2 at 83:19–84:4 (Diab testifying in deposition, "[FMCSA] has no jurisdiction over schools. They have jurisdiction over us as an Interstate Commerce Carrier. . . . So the motor vehicle or [FMCSA] cannot dictate to a school what you can or cannot do.")) Bordentown does not cite any FMCSRs that apply of their own force to CMV driver training courses or facilities, and it cites no regulations that say training schools must adhere to

---

[12]    It was the classroom and simulator training that the court found would fundamentally alter the defendant's program. The court rejected the use of an interpreter, as proposed, under Title III's "direct threat" safety exception. *Id.* at 579–80; *see* 42 U.S.C. § 12182(b)(3).

[13]    Frilando has demanded a jury. (*See* Compl. ¶ 1) The NJLAD has been interpreted as giving a right to a jury trial because it creates legal rights and provides for legal remedies, *see Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 472 (D.N.J. 1998); *McMillan v. Lincoln Fed. Sav. & Loan Ass'n*, 678 F. Supp. 89, 92 (D.N.J. 1988), but courts have determined that Title III, which permits only injunctive (i.e., equitable) relief to a private plaintiff, does not grant a right to a jury trial, *see, e.g.*, *Hobleman v. Kentucky Fried Chicken*, 260 F. Supp. 2d 801, 805 (D. Neb. 2003) ("I find no authority which would permit an award of damages to the plaintiff, or require that a jury trial be held, under Title III of the ADA."); *Dorsey v. City of Detroit*, 157 F. Supp. 2d 729, 733 (E.D. Mich. 2001) ("Title III of the ADA does not provide for monetary damages or, concomitantly, a jury trial, when the action is brought by a 'person who is being subjected to discrimination.'").

CDL test conditions.[14] But even so, Bordentown maintains, if it fails to adhere to FMCSRs, then it risks losing its operating license.

Safety is surely essential to Bordentown's operations, and teaching students to react to certain events and to drive on-road are essential features of Class A. But whether audible alerts and on-road verbal instruction are essential may depend on Frilando's precise abilities. Whether a certain level of hearing and verbal abilities are essential to those training functions is unresolved. To some degree, this is a matter of conflicting expert testimony. For example, Frilando submits that he has significant residual hearing for loud noises, and his experts imply he may have visual or other physical advantages relative to non-hearing impaired individuals that allow him to react to certain events. (*See, e.g.*, Def. Ex. 13 (Cox report, explaining that the deaf react more quickly to objects in their peripheral vision than the hearing population); Pl. Supp. ¶ 1) Meanwhile, Bordentown's experts suggest that Frilando's senses fall short of what is required to participate properly in the training program. (*See, e.g.*, Def. SUF ¶ 81). Frilando's experts Daniel Cox and John Huey opine that the use of hand signals and intermittent signing during driving instruction can safely communicate all necessary information. (*See, e.g.*, Def. Ex. 13 (Cox Report); Pl. Supp. ¶¶ 17–21 (summarizing Huey testimony)) Bordentown's experts disagree. (*See, e.g.*, Def. SUF ¶¶ 93, 96–98, 108 (summarizing William

---

[14]     Presumably, general interstate commerce regulations would apply during on-road training. *See, e.g.*, Def. SUF ¶ 49 (citing 49 C.F.R. § 39.11(b)(2) (requiring a person to, *inter alia*, read and speak English to drive a CMV)). But the fact that the FMCSA granted Frilando his 90-day waiver specifically to "complete driver training school" (Def. Ex. 21 at p. PLA38) strongly suggests that Frilando's participation in on-road training would not run afoul of the FMCSRs. AAMVA commentary suggest this is indeed the case, although whether this commentary was available by the time Bordentown declined to accommodate Frilando is unclear. (*See, e.g.*, Pl. SUF Resp. ¶ 34 (citing Pl. Ex. D (AAMVA presentation titled Medical Exemption from Hearing Requirements, Administering CDL Skills Tests to Deaf or Hard of Hearing Applicants (2015), *available at* https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/2015%20CDL%20Coord%20-%20Hearing%20impaired%20drivers%20(rev)%202%209%202015.pptx) (at p.9, "If a driver fails to meet the medical hearing standard but has obtained an exemption from that requirement from FMCSA and is capable of reading and writing in English, that driver satisfies the English language requirement."))).

Adams and Dennis McGee testimony that ASL interpreters *cannot* be used safely during training))[15]

So would the suggested accommodations constitute a sufficient work-around, permitting Bordentown to perform its essential training functions safely? Suffice it to say that Frilando has raised sufficient (albeit disputed) evidence "from which a jury may infer that the [proposed] accommodation is 'reasonable on its face, *i.e.,* ordinarily or in the run of cases . . . .'" *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (quoting *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401–02, 122 S.Ct. 1516 (2002)). Accordingly, I decline to find on summary judgment that accommodating Frilando—for example, by incorporating an ASL interpreter into Bordentown's Class A—would work a fundamental alteration to Bordentown's operations and mission.

### 3. *Threat to safety*

Third, Frilando attacks Bordentown's invocation of Title III's "direct threat" safety defense. *See* 42 U.S.C. § 12182(b)(3); 28 C.F.R. § 36.208. Where, as here, the entity's mission is a safety-related one, this factor will overlap with the "fundamental alteration" analysis. *See supra.*

When making an individualized assessment of a threat to safety, a public entity must consider "[t]he nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 36.208(b) (quoted in full at p. 15, *supra*); *see also Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000) ("In disability discrimination cases, courts must evaluate the

---

[15]     Bordentown's experts reject the feasibility and safety of the accommodations Frilando proposes and Bordentown attacks the qualifications and methodology of Frilando's experts. (*See, e.g.,* Pl. Resp. ¶¶ 11–21) As Frilando observes, however, Bordentown has not sought to exclude Frilando's expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*See* Opp. 6) The testimony is not facially defective, and at least for now, I will assume that some version of it can be admitted.

significance of the risk that an employee would pose by considering four interrelated factors: the nature of the risk, the duration of the risk, the severity of the risk, and the probability that the potential harm will occur. If the threatened harm is grievous, of course, even a small risk may be 'significant.'" (citations omitted)); *Masci v. Six Flags Theme Park, Inc.*, No. CIV.A. 12-6585, 2014 WL 7409952, at *9–10 (D.N.J. Dec. 31, 2014) (applying 28 C.F.R. § 36.208(b)). Such a multifactor determination does not lend itself easily to resolution on summary judgment.[16]

Bordentown asserts that Frilando's participation in Class A cannot be accommodated because it would present a direct threat to the health and safety of himself and others. Frilando, it says, "cannot hear or respond [to] verbal commands," and "would not be able to respond to the instructions necessary to avoid a serious accident during yard training or while driving on a public road." (Br. 24) Bordentown further argues it "would have to clear the yard" of other students during Frilando's yard training. (It does not specifically describe the periods of time involved, or explain why it thinks this measure is unreasonable or would not mitigate risk.) Communicating with an ASL interpreter while driving on public roads, says Bordentown, would entail delayed reaction times and create distracting conditions. (*Id.* 25)

---

[16]    The facts known to Bordentown have a particular application under this factor. In deciding whether a defendant is entitled to the "direct threat" safety defense, the question is whether the defendant acted with objective reasonableness. "In making a determination of objective reasonableness, the fact-finder's responsibility does not involve independently assessing whether it believes that Plaintiff himself posed a direct threat. Rather, the fact-finder determines the reasonableness of Defendants' actions based upon [objective evidence]." *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 346 (S.D.N.Y. 2010) (citations, internal quotation marks, and original alterations omitted). "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the [] accommodation, and the risk assessment must be based on medical or other objective evidence" available at the time the defendant made the decision. *Bragdon v. Abbott*, 524 U.S. 624, 649–53, 118 S. Ct. 2196, 2210 (1998); *see also Doe*, 682 F. Supp. 2d at 346. Still, for the reasons expressed in the discussion of "after-acquired evidence," *infra*, the full panoply of facts may come into play with respect to forward-looking relief.

In support of these arguments, Bordentown cites (1) the testimony of John Diab and Bordentown's experts William Adams and Dennis McGee; (2) Frilando's own admission that it is unsafe to communicate with an ASL interpreter *while* driving;[17] (3) the FMCSR that forbids the use of interpreters during the CDL road test, *see* 49 C.F.R. § 383.133(c)(5); (4) AAMVA and FMCSA publications on CMV dangers and causes of crashes generally; and (5) a December 2013 report by the AAMVA that cautions: "The inability of the driver to respond to audible commands may result in injury to the examiner or other persons/vehicles in the immediate area."[18] (*See* Br. 23–26; Reply 10–11; Def. SUF ¶¶ 4–16, 77–109, 116–18)

I first consider items (1) and (2). Of these items of evidence, Diab's communications with the various licensing authorities seem most relevant to Bordentown's decision. Setting aside issues of admissibility,[19] the gist of Diab's testimony is that representatives from the FMCSA, AAMVA, and state licensing departments told him that no clear guidance on testing or training deaf

---

[17]     The accommodation Frilando requests is the presence of an ASL interpreter in the CMV, with whom he will communicate only while *not* actively driving. (*See* Opp. 17)

[18]     AAMVA, CDL Testing for Hearing Impaired Applicants, A Report to the Federal Motor Carrier Safety Administration (Dec. 2013), *available at* https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/CDL%20Testing%20for%20Hearing%20Impaired%20Applicants%20-%20FINAL.pdf, at p. 6.

[19]     Frilando argues Diab's testimony concerning what the authorities told him is inadmissible hearsay. Bordentown says it is not hearsay because it is not being offered to prove the truth of the statement. (*See* Reply p.1 n.1).

> [T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only explain the admissible form that is anticipated.

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (internal quotation marks, citations, and footnotes omitted, emphasis in original)). I accept Bordentown's explanation and therefore consider Diab's testimony on this motion.

individuals existed because of safety concerns and because deaf applicants may not use ASL interpreters during the CDL test. (Def. Ex. 1 ¶¶ 31–33; Def. SUF ¶¶ 39–41, 157–63) However persuasive, this evidence is not unopposed in the record.

Frilando cites the FMCSA's February 1, 2013 notice of its decision to grant hearing test exemptions (the "Notice") (see Opp. 4, 17). Even standing alone, certain language in this Notice raises an issue of fact as to the objective reasonableness of rejecting Frilando—who sent Bordentown copies of his hearing test waivers—on the basis of safety:

> The Agency's decision on these exemption applications is based on the current medical literature and information and the "Executive Summary on Hearing, Vestibular Function and Commercial Motor Driving Safety," (the 2008 Evidence Report) presented to FMCSA on August 26, 2008. The evidence report reached two conclusions regarding the matter of hearing loss and CMV driver safety: (1) No studies that examined the relationship between hearing loss and crash risk exclusively among CMV drivers were identified; and (2) evidence from studies of the private driver license holder population does not support the contention that individuals with hearing impairment are at an increased risk for a crash.
>
> . . . .
>
> [T]here is no specific scientific data to show that hearing impaired drivers are a higher safety risk than other drivers. Also, several States already allow hearing impaired individuals to operate commercial vehicles in intrastate commerce and most, if not all States allow such individuals to operate passenger cars.

Qualification of Drivers; Application for Exemptions; National Association of the Deaf, 78 FR 7479-01.

Bordentown proffers expert testimony. Again, it conflicts with Frilando's expert testimony (compare, e.g., Def. SUF ¶¶ 166–69, with id. ¶¶ 170–94; Pl. SUF ¶¶ 11–21, and thus does no more than create a disputed issue.

As for (3), the FMCSRs do forbid the use of interpreters during the CDL test. *See* 49 C.F.R. § 383.133(c)(5). I am not convinced, however, that this is strong evidence of the risks posed by an accommodation requiring the intermittent use of an ASL interpreter during CDL *training*. Likewise, a risk assessment based on (4) AAMVA and FMCSA publications that discuss the dangers inherent in driving a CMV and the causes of CMV crashes—which, by the way, do not specifically focus on deafness or the subject of training—is too speculative.

I accept (5), the AAMVA's December 2013 report, as objective evidence that Bordentown properly may have considered in making its decision. Again, however, the FMCSA's February 1, 2013 Notice of waiver undercuts the AAMVA's caution, at least insofar as successful applicants for hearing test waivers are concerned. *See* Qualification of Drivers; Application for Exemptions; National Association of the Deaf, 78 FR 7479-01, p. 29, *supra*.[20]

Frilando also argues that Bordentown's safety concerns ring hollow given Bordentown's lack of individualized inquiry into Frilando's disability and needs. (Opp. 17) There is incomplete evidence of the extent to which Bordentown failed to specifically assess the risk of admitting Frilando, and whether Frilando's reticence is partly to blame. *Cf. Masci v. Six Flags Theme Park, Inc.*, No. CIV.A. 12-6585, 2014 WL 7409952, at *12 (D.N.J. Dec. 31, 2014) (finding "too many factual deficiencies regarding the [defendant's] decision to exclude [the plaintiff]" but agreeing defendant must make an individualized assessment of whether a plaintiff meets safety requirements, and noting, "[i]f [amusement

---

[20]     *See also, e.g.*, Qualification of Drivers; Application for Exemptions; National Association of the Deaf, 78 FR 7479-01 (Feb. 1, 2013) ("Under 49 U.S.C. 31136(e) and 31315, FMCSA may grant an exemption from the safety regulations for a 2-year period *if it finds 'such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption.*" (emphasis added)). *But see* AAMVA, CDL Testing for Hearing Impaired Applicants, A Report to the Federal Motor Carrier Safety Administration (Dec. 2013), *available at* https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/CDL%20Testing%20for%20Hearing%20Impaired%20Applicants%20-%20FINAL.pdf, at p. 13 (AAMVA subcommittee "recommending that hearing impaired/deaf individuals **not** be exempted from the hearing standards in § 391.41(b)(11)" (emphasis in original)).

park] was discriminating against [Title III plaintiff] based on the appearance of his disability rather than any legitimate safety concerns, Defendant's safety defenses would appear to be irrelevant."). *See* Section C.1, *supra*.

For all of these reasons, Bordentown's entitlement to the safety defense remains an issue for trial.

### 4. *Undue financial burden*

Fourth, Frilando urges me to disregard Bordentown's argument that employing an ASL interpreter would be unduly burdensome financially. That undue burden defense requires consideration of, *inter alia*, the cost of the accommodations requested, the entity's finances, and the effect the accommodation would have on expenses, resources, and overall operation.[21]

Bordentown says these factors favor a complete defense in this case. John Diab estimates that the cost of implementing two ASL interpreters would run between $60,000 and $150,000—figures "approximately fifteen to thirty-seven times greater than the $4,000 tuition" for a Class A student. (Def. Ex. 1, ¶ 37) He says that in reality, the costs would be even higher because ASL interpreters would take up seats in training vehicles normally occupied by paying students. Other safety measures, such as clearing the yard of other students while Frilando was being trained, would also cost time and money. (Br. 20; Def. SUF ¶¶ 91, 111)

Diab places these figures in the perspective of Bordentown's annual revenue of approximately $10 million company-wide, with $3 million coming from the Linden location. (*Id.* ¶ 39) He further attests that Bordentown operates in a "low margin industry" and realizes a company-wide annual net profit of "only $400,000 (prior to taxes and capital expenditures, such as the cost of

---

[21]     *See* 42 U.S.C. § 12182(b)(2)(A)(iii) and 28 C.F.R. § 36.303(a), quoted in full at pp. 13–14, *supra*; *see also* N.J.A.C. 12:13-14.11 (NJLAD provision requiring public accommodations to make reasonable accommodations to the limitations of a person without a disability unless it "demonstrates that making the accommodations would impose an undue burden on its operation.").

purchasing a new cab or trailer for training), which is reinvested into the company." (*Id.* ¶ 40) Bordentown argues that it should not be forced to implement an accommodation that would "consume between 40% and 107% of the Linden facility's operating profit, 15% to 37.5% of Bordentown's company-wide operating profit, and [that] would cost between 300 and 750 times Bordentown's average $200 per student profit from the CDL training program." (Br. 19)

Bordentown's cost evidence is by no means unpersuasive. Other courts, however, have indicated that demonstrating undue burden is a "high bar". *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 823 F. Supp. 2d 995, 1014 (N.D. Cal. 2011) (where cost of accommodating exam applicant would be roughly $5,000 but could be spread among or passed on to other parties, accommodation was not an undue burden); *cf., e.g., Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 656 (E.D. Pa. 2013) (cost of developing new board exam to accommodate plaintiff's disability would impose undue burden where trial evidence showed each question took two years to develop and cost $3,500, with entire exam costing $1.2 million), *aff'd*, 582 F. App'x 114 (3d Cir. 2014); *Roberts v. KinderCare Learning Centers, Inc.*, 896 F. Supp. 921 (D. Minn. 1995) (net loss of $95 per week to accommodate disabled child at a daycare operating "on a shoestring budget" and whose parent company had recently emerged from bankruptcy would impose an undue financial burden).

Frilando makes two arguments as to why Bordentown has not met this high bar.

### a. There are disputed issues of fact

Bordentown's estimates, says Frilando, rely on back-of-the-envelope calculations and outdated data. (Opp. 14–15) Specifically, Frilando points to testimony in which Diab admitted that he based his calculations on the cost of hiring one ASL interpreter for one day (for Bordentown's forklift training program) in 2014. (*Id.* 14 (quoting Def. Ex. 2 at 209–211)) Bordentown responds that Frilando has failed to put forth any contrary evidence that the

accommodation would *not* result in "significant difficulty or expense." 28 C.F.R. 36.303. (Opp. 6–7) And of course it is true that courts will grant summary judgment on the issue of undue burden where the facts are undisputed. *See, e.g., Schlecht v. Lockheed Martin Corp.*, No. 11-CV-03072-RM-BNB, 2014 WL 4819006, at *5 (D. Colo. Sept. 29, 2014) ("Defendant is entitled to summary judgment because it is undisputed with any competent evidence that accommodating Plaintiff's requests would have posed an undue hardship."). Still, I am not required to ignore the quality of Bordentown's estimates, particularly on an issue as to which it carries the burden.[22]

---

[22]    The U.S. Court of Appeals for the Third Circuit has not addressed what the burden of production and persuasion is for the undue burden defense in the context of a Title III claim, but in the Title I context, which is informative, the court has adopted the U.S. Court of Appeals for the Second Circuit's middle-of-the-road approach:

> First, the plaintiff bears the burden of proving that she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified. On the issue of reasonable accommodation, *the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits.* These two requirements placed on the plaintiff will permit district courts to grant summary judgments for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly.

*Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 670 (3d Cir. 1999) (emphasis added) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995) (assessing a Rehabilitation Act employment discrimination claim)). The Third Circuit continued:

> Following a prima facie showing by the plaintiff that a reasonable accommodation exists which would make her qualified, *the burden shifts to the defendant to prove either that the accommodation is unreasonable or that it creates an undue hardship for the defendant.*

*Walton*, 168 F.3d at 670 (emphasis added); *see also Borkowski*, 63 F.3d at 138 ("[T]he defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship."); *J.T. v. Dumont Pub. Sch.*, 438 N.J. Super. 241, 264, 103 A.3d 269, 282 (App. Div. 2014) (looking to the Rehabilitation Act and ADA to interpret the

At any rate, Frilando does raise specific objections to Bordentown's assumptions and calculations. For example, Bordentown assumes that Frilando has demanded two ASL interpreters at all times. (*See* Br. 17, 19; Def. SUF ¶ 199) But Bordentown bases this on Frilando's testimony that ASL interpreters "need to work as a team because of fatigue." (Def. ¶ 199 (quoting Def. Ex. 24 at 18:21-19:9)) This testimony, says Frilando, concerned only "his impression of why two interpreters are needed <u>at a deposition</u>." (Pl. Resp. ¶ 199 (emphasis in original)) The implication is that a single ASL interpreter might suffice to accommodate him in Class A, cutting Bordentown's estimated costs in half.

Bordentown's calculation also assumes that Frilando needs an ASL interpreter throughout all three phases of Class A. (*See* Def. Ex. 2 at 209–211) The record shows that this is not necessarily the case. Bordentown describes the "phase one" classroom portion of its CDL course as using "a combination of videos, computer presentations, and lectures that focus on the subjects covered by the written CDL knowledge test." (Def. SUF ¶ 73) "Phase one" strikes me as being amenable to "auxiliary aids" less costly than an on-duty

---

NJLAD and explaining that once a plaintiff establishes a prima facie case under any of those statutes, "[t]he defendant may argue as an affirmative defense that the requested accommodation created an undue burden on the defendant.").

Here, where Title III's regulations specifically impose a duty on public accommodations to "take those steps that may be necessary" to provide auxiliary aids such as ASL interpreters to disabled patrons, 28 C.F.R. § 36.303(a), I do not think the costs of the accommodation Frilando has requested—the provision of one or two ASL interpreters—*facially*, can be said to exceed the benefits. *Cf. Borkowski*, 63 F.3d at 139 ("[W]hile the plaintiff could meet her burden of production by identifying an accommodation that facially achieves a rough proportionality between costs and benefits, an employer seeking to meet its burden of persuasion on reasonable accommodation and undue hardship must undertake a more refined analysis. And it must analyze the hardship sought to be imposed through the lens of the factors listed in the regulations, . . . ."); *id.* at 142 ("The proposed accommodation plainly falls within the range of accommodations that may, in a general sense, be considered reasonable in light of their costs and benefits. . . . there is nothing inherently unreasonable or undue in the burden that an employer would assume by providing an assistant to an employee with disabilities."). Therefore, under the reasoning of *Walton* and *Borkowski*, Bordentown must prove undue burden as an affirmative defense.

ASL interpreter.[23] Frilando himself testified that to get through Class A, he would need films and videos to be closed-captioned, not simultaneously translated, and that an ASL interpreter would be required only "as we're going on the road . . . ." (Def. Ex. 3 at 200:20-201:10)

Moreover, as Frilando points out, Bordentown bases its estimate on the cost of an ASL interpreter it hired for one day in 2014. (*See* Def. Ex. 2 at 209–211) There is no evidence of current rates for a longer-term job (or, I suppose, for a staff interpreter, if justified by the amount of work). And, as stated above, the interpreter's hours could perhaps be limited to certain critical phases of the training. In short, I am not satisfied that the evidence of undue burden is so clear and one-sided as to require summary judgment for Bordentown. *See US E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1059 (E.D. Cal. 2015) (declining to find undue burden on summary judgment where "the costs associated with an interpreter [we]re purely speculative because the extent of interpretation and written communications . . . required for reasonable accommodation are disputed.").

### b. The after-acquired evidence doctrine

That being the case, I devote less attention to Frilando's alternative argument that Bordentown's cost-based argument is based on "after-acquired evidence," which I should not consider. John Diab admitted that Bordentown

---

[23]   The regulations require Bordentown to consider alternative auxiliary aids to the extent it believes a full-time ASL interpreter would result in undue expense:

> If provision of a particular auxiliary aid or service by a public accommodation would result in a fundamental alteration in the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or in an undue burden, i.e., significant difficulty or expense, *the public accommodation shall provide an alternative auxiliary aid or service, if one exists, that would not result in an alteration or such burden* but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the goods, services, facilities, privileges, advantages, or accommodations offered by the public accommodation.

28 C.F.R. § 36.303(h).

never considered cost until after it made the decision to decline to accommodate Frilando. (Opp. 14 (citing Pl. Resp. ¶ 112))[24]

The rule against using after-acquired evidence is based on the commonsense principle that discriminatory intent cannot be rebutted by facts of which the alleged discriminator was unaware. *See generally Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F. Supp. 2d 508, 527 (D.N.J. 2008); *see also Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 537 (3d Cir. 2007) (defendants alleged to have unlawfully discriminated against plaintiff could not have been motivated by evidence of plaintiff's drug abuse unknown to them at the time the discrimination occurred), *amended on reh'g* (Mar. 8, 2007)).

Still, most of the relief requested here is prospective, and Bordentown makes a compelling logical point: "Because an accommodation that creates an undue burden is never a reasonable accommodation, the ADA and LAD would not require Bordentown to provide any unduly burdensome accommodation irrespective of the outcome of this litigation." (Reply 8 n.7) I agree that, practically speaking, the court may decline to order a defendant to make an unduly burdensome accommodation, even if its original refusal to make it was unjustified based on the facts then in its possession. *Cf. McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360–61, 115 S. Ct. 879 (1995) (although after-acquired evidence will not shield defendant from liability for age discrimination under ADEA, it *may* "bear[] on the specific remedy to be ordered."); *Cicchetti v. Morris County Sheriff's Office,* 194 N.J. 563, 589, 947 A.2d 626 (2008) (recognizing that after-acquired evidence is not relevant to the question of liability under NJLAD but permitting such evidence to limit economic damages, although not non-economic damages that "cannot in fairness be limited or barred" given the Legislative purposes of the NJLAD).

So it goes too far to say that after-acquired evidence is out of the case. For present purposes, I need not go farther than that.

---

[24]     Diab's testimony makes it clear that Bordentown never considered issues of cost prior to refusing to accommodate Frilando in March of 2015. (*See* Ex. 2 at 210:10-211:23)

### 5. Frilando's medical qualification to participate

Finally, Bordentown contends that, even apart from his hearing disability, Frilando was medically unqualified to enroll in Class A. At the time Bordentown made its allegedly discriminatory decision, Frilando had been medically cleared only by Dr. Marino, who was not a certified FMCSA examiner. (Br. 28) Frilando did not obtain his second medical certificate from Dr. Yu, who was FMCSA-certified, until July 30, 2015—three months *after* Frilando filed this action. (*Id.*; *see* Def. SUF ¶¶ 124–128)

Even setting aside the after-acquired evidence doctrine, I would still find that disputed issues of material fact preclude summary judgment on this issue. Bordentown's Class A lesson plan and Diab's testimony both demonstrate that Bordentown permits students to enroll first and undergo a physical examination with a FMCSA-certified examiner thereafter. (See Def. Ex. 2 at 34:17–35:24; Def. Ex. 17 p.3) Thus, a medical certificate has historically been a condition, but not a *pre*-condition, of enrollment. And for the reasons expressed above, Bordentown's challenges to the adequacy of Dr. Yu's second medical certificate raise factual issues of their own. *See* pp. 5–6, *supra*.

## VI. CONCLUSION

For the foregoing reasons, Bordentown's motion for summary judgment is **DENIED**.

**KEVIN MCNULTY**
**United States District Judge**

DATED: July 27, 2017