**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

KENNETH FRILANDO,

　　　　　　　　　　　　　Plaintiff,

v.

BORDENTOWN DRIVER TRAINING
SCHOOL, LLC d/b/a SMITH & SOLOMON,

　　　　　　　　　　　　　Defendants.

Hon. Kevin McNulty

Civil Action No. 2:15-cv-02917

FINAL PRETRIAL ORDER

　　　　This matter having come before the Court for a pretrial conference pursuant to Fed.R.Civ.P

16; Eisenberg & Baum, LLP having appeared for Plaintiff Kenneth Frilando and Blank Rome LLP

having appeared for Defendant Bordentown Driver Training School, LLC ("Bordentown"); and

counsel all having been notified that:

　　　　(1)　　a **jury** trial in this matter has been scheduled before Hon. Kevin McNulty on

[TBD];

　　　　(2)　　the pretrial submissions detailed in ¶¶ 2, 18 and 19 below are to be submitted no

later than two (2) weeks prior to trial or they will be deemed waived; and

　　　　(3)　　a pretrial housekeeping conference is scheduled before Hon. Kevin McNulty on

[TBD];

the following Final Pretrial Order is hereby entered:

1.　　**JURISDICTION (Set forth specifically):**  The court has subject matter jurisdiction

pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under the Americans

145806.00601/106584671v.1
145806.00601/106651278v.4

with Disabilities Act, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

Plaintiff's claims arising under the New Jersey Law Against Discrimination

2.      **PENDING/CONTEMPLATED MOTIONS/TRIAL BRIEFS (Set forth all pleading or contemplated motions, whether dispositive or addressed to discovery or the calendar.  Also set forth the nature of the motion and the return date.  If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position.  NOTE:  ALL REMAINING PRE-TRIAL MOTIONS INCLUDING DAUBERT AND IN LIMINE MOTIONS SHALL BE FULLY BRIEFED AND FILED NO LATER THAN TWO WEEKS PRIOR TO TRIAL.  Only those motions listed herein will be entertained prior to trial.)**

A.      **PLAINTIFF'S CONTEMPLATED MOTIONS**

Plaintiff intends to file motions *in limine* to exclude mention of the Federal Motor Carrier Safety Regulations ("FMCSR"); to exclude evidence of the cost of American Sign Language interpreters; to exclude mention of any Federal Motor Carrier Safety Administration ("FMCSA") medical certificate from the liability phase of trial; to exclude the testimony of Dr. Yu Kyi in its entirety; to preclude Defendant from reading into evidence statements made by counsel concerning the conduct of the deposition; and to exclude any after acquired evidence, including but not limited to Plaintiff's sleep apnea and other medical conditions from the liability phase of the trail.

Plaintiff also intends to file motions to exclude the testimony of Defendants' expert witnesses (Adams and McGee), as further explained herein.  Plaintiff further intends to file a motion for bifurcation of the liability and damages phases of the trial.  Plaintiff reserves the right to file any other pre-trial motions necessitated by Defendant's proposed witnesses, testimony, or evidentiary submissions, to the extent the Court determines that manifest injustice would result if such motions were disallowed.

B.      **DEFENDANT'S CONTEMPLATED MOTIONS**

Defendant intends to file <u>Daubert</u> motions to exclude the testimony of Plaintiff's expert witnesses, John Luegene Huey, Jr. and Daniel Cox.  Defendant will file those motions sufficiently in advance of the trial date (once set by the Court) so that the motions will be fully briefed no later than two weeks prior to trial.

Defendant intends to file motions <u>in limine</u> to exclude (a) matters proposed by Plaintiff for judicial notice that are not properly the subject of such notice (and that are not otherwise admissible), including, without limitation, newspaper articles and news stories, (b) Plaintiff's proposed evidence and exhibits regarding proposals or theories for accommodation of deaf CDL applicants that do not reflect the actual law, (c) Plaintiff's proposed evidence and exhibits regarding matters arising only after Defendant's alleged decision to deny accommodation, and (d) any other proposed evidence or exhibits (including the proposed exhibits objected to in Section 13 of this Order) that is not permitted under the Federal Rules of Evidence, including, without limitation, Fed. R. Evid. 403.  Defendant also intends to file, if necessary, motions <u>in limine</u> to exclude the testimony of any fact or expert witness not identified by Plaintiff's Rule 26 disclosures in this litigation and to exclude any evidence not previously disclosed or produced by Plaintiff in this litigation.

Defendant reserves the right to timely file any other pre-trial motions necessitated by Plaintiff's proposed witnesses, testimony, or evidentiary submissions, to the extent the Court determines that manifest injustice would result if such motions were disallowed.

3.      **STIPULATION OF FACTS (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties,)**

The parties stipulate as follows:

1.      Plaintiff Kenneth Frilando is a deaf individual who communicates primarily using American Sign Language ("ASL").

145806.00601/106584671v.1
145806.00601/106651278v.4

2.      Defendant Bordentown is an organization licensed and doing business in New Jersey that operates Commercial Driver's License ("CDL") training schools at nine locations in Delaware, New Jersey, and Pennsylvania.

3.      Since 2013, the FMCSA has granted exemptions from the hearing test requirement set forth in the Federal Motor Carrier Safety Regulations ("FMCSR") for some persons with hearing loss.

4.      Bordentown operates CDL training schools at locations in Delaware (New Castle), New Jersey (Bellmawr, Bordentown, Hammonton, Lakewood, and Linden), and Pennsylvania (Dupont, Norristown, and Philadelphia).

5.      Bordentown offers a Class A CDL training program at each of its nine locations. At each location, the training program is specifically designed for students without any prior experience operating a CMV.

6.      The training program has three sequential phases that follow the steps of the CDL knowledge and skills tests – classroom training, yard training, and road training.

7.      The first phase of Bordentown's training program is classroom training. The classroom training is a weeklong advanced program designed to prepare students to take and pass the written CDL knowledge test examination.

8.      The second phase of Bordentown's training program is yard training.

9.      For the yard training (as well as the subsequent road training), Bordentown maintains a fleet of conventional tractor-trailers that have been modified for training. Each cab contains three additional seats in back of the driver and front passenger seats, thereby permitting the vehicle to carry up to five people.

4

10.     During the yard training, vehicle control skills are taught at skill stations set up in the yard, where students work on specific continuous motion skills. Instructors are stationed in safe positions outside of the vehicles and give instructions to the students operating the vehicles.  Instructors rotate through the yard and the skill stations, observing, instructing, and moving between their assigned vehicles and students.

11.     The third phase of Bordentown's training program is road training.

12.     During road training at Bordentown, the instructor provides instruction to a student as he or she operates the tractor trailer.

13.     Plaintiff applied for a waiver from the FMCSR hearing standard and received a 90-day waiver from Larry Minor at FMCSA on January 13, 2015.

14.     Plaintiff later received a two-year waiver from the FMCSR hearing standard on March 29, 2015.

15.     The parties reserve the right to further review each other's lists of contested facts in advance of trial to reach agreement, where possible, on additional stipulated facts.  If the parties agree to additional stipulated facts they will submit an amended Pretrial Order in advance of trial.  The fact that an issue of fact is presently listed as contested but later is stipulated to shall not be prejudicial to either party.

4.     **JUDICIAL NOTICE**

A.     **Plaintiff requests that the Court take judicial notice of the following facts:**

1.     According to the FMCSA, a 2016 Analysis Brief, "Safety Performance of Drivers with Medical Exemptions," analyzed the records of 218 CDL holders with hearing exemptions. Drivers with hearing exemptions had a lower crash rate than the national average, had a lower violation rate than the control group, and had fewer driver out-of-

5

service violations. (https://www.federalregister.gov/documents/2017/12/29/2017-28128/qualifications-of-drivers-applications-for-exemptions-hearing)

2.      The FMCSA issued guidance in 2014 indicating that a driver who fails to meet the hearing standard under 49 CFR 391.41(b)(11) but has obtained an exemption from that requirement, would not be considered unqualified under the English language proficiency requirement in 49 CFR 391.11(b)(2) if the driver cannot communicate orally in English if the hearing impaired driver with an exemption is capable of reading and writing in the English language. In that circumstance, the hearing impaired driver satisfies the English language requirement. The absence of an ability to speak in English is not an indication that the individual cannot read and write in English sufficiently to communicate with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records. (https://www.federalregister.gov/documents/2014/10/01/2014-23435/driver-qualifications-regulatory-guidance-concerning-the-applicability-of-language-requirement-to).

3.      82 FR 61809

4.      79 FR 59139

5.      https://www.gpo.gov/fdsys/pkg/CFR-2017-title49-vol5/xml/CFR-2017-title49-vol5-sec391-11.xml

**B.      Defendant objects to the taking of judicial notice for the following reasons:**

Defendant objects to Plaintiff's first request for judicial notice because it relates to matters arising after Defendant's alleged denial of reasonable accommodation and concerns evidence that would otherwise be excluded under the Federal Rules of Evidence, including Rule 403.

6

Defendant objects to Plaintiff's second request for judicial notice because it concerns evidence that would otherwise be excluded under the Federal Rules of Evidence, including Rule 403.

Defendant objects to Plaintiff's remaining requests for judicial notice as they appear to be only citations supporting the first two requests. Defendant therefore incorporates its objections to those requests, as applicable, to Plaintiff's remaining requests.

5.    **JUDICIAL NOTICE**

A.    **Defendant requests that the Court take judicial notice of the following facts:**

1.    According to the Model Commercial Driver License Manual published by the American Association of Motor Vehicle Administrators ("AAMVA"), it will take at least seven seconds for a 60-foot tractor-trailer traveling at greater than 40 miles per hour to come to a complete stop. (AAMVA Model Commercial Driver License Manual 2005 CDL Testing Model (July 2010 Version) at § 2.7.1.

2.    According to the Large Truck Causation Study, a multi-year study of Commercial Motor Vehicle ("CMV") crashes performed by the Federal Motor Carrier Safety Administration ("FMCSA") and the National Highway Traffic Safety Administration, 23% of CMV crashes during the study period resulted in at least one fatality and more than 28% of CMV crashes resulted in an incapacitating injury. (FMCSA Report to Congress on the Large Truck Causation Study, *available at* https://www.fmcsa.dot.gov/safety/researchand-analysis/report-congress-large-truck-crash-causation-study).

3.    The Large Truck Crash Causation Study found that brake and other mechanical failures were an associated factor in more than 29% of CMV crashes during the study period, "inadequate surveillance" by a CMV driver was an associated factor in more than 13% of CMV crashes, CMV driver "inattention" was an associated factor in 8.5% of CMV

7

crashes, and "external distraction factors" affecting the CMV driver was an associated factor in 8% of CMV crashes. (FMCSA Report to Congress on the Large Truck Crash Causation, cited *supra*).

4.      In 2014, 3,179 people were killed and 431,000 people were injured in motor vehicle crashes involving distracted drivers.  (Distracted Driving Facts & Statistics, *available at* http://www.distraction.gov/statsresearch-laws/facts-and-statistics.html).

5.      Under the Federal Motor Carrier Safety Regulations ("FMCSR"), a CMV includes "any self-propelled or towed motor vehicle used on a highway in interstate commerce" that "[h]as a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more."  (49 C.F.R. § 390.5).

6.      Under the FMCSR, a "Class A" CDL is required to operate any vehicle weighing more than 26,001 pounds or any combination of vehicles weighing more than 26,001 aggregate pounds when the trailer weights more than 10,000 pounds. *See* 49 C.F.R. § 383.

7.      Under the FMCSR, the use of interpreters is prohibited during the administration of the CDL knowledge and skills tests.   (49 C.F.R. §§ 383.133(b)(3) & (c)(5).)

8.      Under the FMCSR, when the operator of a CMV holds a Commercial Learner's Permit ("CLP"), the CLP holder must be "at all times accompanied by the holder of a valid CDL" and the "CDL holder must at all times be physically present in the front seat of the vehicle next to the CLP holder."  (49 C.F.R. § 383.25(a)).

B.      **Plaintiff objects to the taking of judicial notice for the following reasons:**

Plaintiff objects that Defendant's requests for judicial notice 2-4 are irrelevant and would only serve to confuse the jury.  These studies relate to hearing CMV drivers and nothing in any of

these studies relates to the ability of a deaf individual to drive a CMV as opposed to a hearing individual.

6. **PLAINTIFF'S CONTESTED FACTS (Stated separately for each defendant.  Proof shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof.)**

     A. **Plaintiff intends to prove the following contested facts with regard to liability:**

       1. A deaf individual can be safely trained to drive a CMV with the provision of auxiliary aids and services.

       2. Plaintiff's proposed accommodation, involving a combination of ASL interpreters and gestures, to be utilized as needed during the different phases of Defendant's driver training program, would be a reasonable and effective accommodation for Plaintiff's disability.

       3. Defendant failed to engage in the interactive process with Plaintiff to determine how it could accommodate his disability.

       4. Defendant denied Plaintiff admission to its CDL training program because Plaintiff is deaf.

       5. Other driving schools have successfully and safely trained deaf individuals to drive CDLs.

       6. Accommodating Plaintiff's disability would not have resulted in an undue financial hardship for Defendant.

       7. Accommodating Plaintiff's disability would not have resulted in an undue administrative burden for Defendant.

       8. Accommodating Plaintiff's disability would not have resulted in a fundamental alteration to Defendant's program.

145806.00601/106584671v.1
145806.00601/106651278v.4

9. Accommodating Plaintiff's disability would not have resulted in risk to public safety or health.

10. Plaintiff was otherwise qualified to participate in Defendant's CDL program.

**B. Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages.)**

1. Defendant's refusal to admit Plaintiff on the basis of Plaintiff's disability caused Plaintiff to suffer emotional distress. Damages for emotional distress are not easily quantifiable and should be determined by the trier of fact based on Plaintiff's testimony and the objective circumstances of the civil rights violation to be proven.

2. Defendant's refusal to admit Plaintiff on the basis of Plaintiff's disability caused economic damage because it delayed Plaintiff's ability to obtain a CDL and gainful employment in his desired field.

**7. DEFENDANT'S CONTESTED FACTS (Stated separately for each defendant. Proof shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof.)**

**A. Defendant intends to prove the following contested facts with regard to liability:**

1. Bordentown is classified as an interstate motor carrier and is subject to the requirements set forth in the Federal Motor Carrier Safety Regulations ("FMCSR") issued by the Federal Motor Carrier Safety Administration ("FMCSA"). Bordentown's CDL training program must therefore adhere to the requirements of the FMCSR.

2. The FMCSR define a commercial motor vehicle ("CMV") to include "any self-propelled towed motor vehicle used on a highway in interstate commerce" that "[h]as a

10

gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more." 49 C.F.R. § 390.5.

3.      Commercial Motor Vehicles ("CMV") present significantly greater safety risks than regular passenger vehicles.

4.      A CMV is substantially heavier than a standard passenger vehicle – a semi-loaded tractor trailer can weigh up to 80,000 pounds, while a passenger vehicle typically weighs around 4,000 pounds. This added weight requires a substantially longer stopping distance and stopping time for a CMV and presents a much greater risk of harm to the travelling public if an operator loses control of a CMV.

5.      CMVs are also typically much longer than the average passenger vehicle and have much more powerful engines than the average passenger vehicle.

6.      From a safety perspective, the characteristics of driving a truck are entirely different than a car.

7.      Other significant dangers presented by a CMV include the risk of the tractor-trailer jackknifing (which may be caused by a brake failure or the driver downshifting and turning too quickly) or rolling over (which may be caused by the driver turning too sharply at speed).

8.      According to the Federal Motor Carrier Safety Administration ("FMCSA"), the crash of a vehicle having twice the mass with a lighter vehicle equals a six-fold risk of death to persons in the lighter vehicle. A sport utility vehicle (SUV) weighs approximately 4,000 pounds. A loaded semi-truck weights roughly 80,000 pounds. The truck has 20 times the mass of the SUV."

145806.00601/106584671v.1
145806.00601/106651278v.4

9.      The FMCSA has explained further that crashes involving CMVs create a grievous toll in human life and survivor suffering and that the economic cost of these crashes is exceedingly high.

10.     AAMVA's Model Commercial Driver's License Manual warns that "[i]f drivers react a half-second slower because of distractions, crashes double." The manual also warns that "[d]istracted driving can result when you perform any activity that may shift your full attention from the driving task. Taking your eyes off the road or hands off the steering wheel presents obvious driving risks."

11.     According to statistics compiled by the federal government, in 2014, 3,179 people were killed and 431,000 people were injured in motor vehicle crashes involving distracted drivers.

12.     The FMCSR impose strict safety and physical fitness requirements that are intended to reduce the risk of commercial motor vehicle accidents and the impact of injuries sustained therefrom.

13.     The FMCSR contain physical qualification requirements that must be satisfied in order for a person to be eligible to obtain and maintain a CDL.

14.     To be eligible to obtain and maintain a CDL, a person must pass a medical fitness examination prescribed by the FMCSR and obtain a medical certificate from a medical examiner certified by the FMCSA and listed on the FMCSA's National Registry of Certified Medical Examiners.

15.     As stated by the FMCSR, the "National Registry of Certified Medical Examiners Program is designed to improve highway safety and operator health by requiring that

145806.00601/106584671v.1
145806.00601/106651278v.4

medical examiners be trained and certified to determine effectively whether an operator meets FMCSA physical qualification standards." (49 C.F.R. § 390.101.)

16.     The Medical Examiner Handbook published by the FMCSA states that the "fundamental obligation" of a medical examiner "is to establish whether a driver has a disease, disorder, or injury resulting in a higher than acceptable likelihood for gradual or sudden incapacitation or sudden death, thus endangering public safety."

17.     The medical fitness examination covers thirteen distinct areas defined by the FMCSR.

18.     One of the areas covered by the medical fitness examination is the ability to hear.

19.     The FMCSR and their predecessor regulations have contained a hearing standard since 1970.

20.     In an October 1992 publication entitled "Hearing Disorders and Commercial Motor Vehicle Drivers," the Federal Highway Administration (the predecessor agency to the FMCSA) explained: "Under the current Federal guidelines, persons who are deaf or suffer from moderate to extreme hearing loss cannot be licensed to operate commercial motor vehicles in interstate commerce. . . . The Federal Highway Administration concluded that hearing is important when a driver must act on emergency sounds or improper mechanical sounds and when a driver needs to communicate."

21.     With respect to the hearing requirement, the FMCSR currently provide: "A person is physically qualified to drive a commercial motor vehicle if that person . . . [f]irst perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and

145806.00601/106584671v.1
145806.00601/106651278v.4

2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5 – 1951." 49 C.F.R. § 391.41(b)(11).

22.     Between the 1970 and 2013, the FMCSA and its predecessor agencies did not grant any individual exemptions from the hearing requirement of the medical fitness examination. Until 2013, an individual who failed the hearing test was categorically ineligible to obtain a medical certificate and therefore also categorically ineligible to obtain a CDL.

23.     As explained in the Federal Register, the exemptions granted by the FMCSA were expressly limited to the hearing test requirement for the medical fitness examination, as set forth in 49 C.F.R. § 391.41(b)(11). The FMCSA did not exempt the individuals receiving a hearing test exemption – or other individuals who subsequently received hearing test exemptions – from any of the other requirements of the FMCSR.

24.     Applicants for a CDL are not required to attend a CDL training program prior to applying for a CDL and taking the CDL examination. Enrollment in a CDL training program is voluntary and is not a prerequisite to obtaining a CDL.

25.     In deciding to grant exemptions from the hearing test requirement, the FMCSA did not consider, did not address, and did not provide any guidance regarding how the CDL training industry could (or would be able to) accommodate persons unable to hear.

26.     The FMCSA has not published any guidance regarding how (if at all) the CDL training industry may safely train an individual who is completely deaf or how such an individual may take the CDL examination.

145806.00601/106584671v.1
145806.00601/106651278v.4

27.     Studies involving non-commercial vehicles have found that hearing-impaired drivers have roughly 1.8 times the number of accidents as non-hearing impaired drivers.

28.     Bordentown is an interstate motor carrier subject to the FMCSR and would risk losing its operating license if it failed to comply with the requirements of the FMCSR in training its CDL students.

29.     If a crash occurred during Bordentown's training program and Bordentown was found not to be in compliance with the requirements of the FMCSR, Bordentown could be held legally liable for the crash.

30.     The terms of Bordentown's insurance policies for its CDL training program require Bordentown to comply with the requirements of the FMCSR.  Accordingly, Bordentown could compromise its insurance if it does not comply fully with the requirements of the FMCSR.

31.     After learning that the FMCSA was granting waivers of the hearing test requirement for the medical certificate, Bordentown preemptively contacted FMCSA and the American Association of Motor Vehicle Administrators ("AAMVA") for guidance on the potential training and testing of deaf CDL applicants.

32.     When Bordentown contacted state and federal agencies and administrators upon first learning that FMCSA was granting waivers of the hearing test requirement for a FMCSA medical certificate, those agencies and administrators uniformly informed Bordentown that there was no test and there is no acceptable training program for deaf CDL applicants.

33.     John Diab met with a number of FCMSA administrators, including Larry Minor, Chuck Horan, and Shannon Watson, who indicated that they never considered how

15

somebody would be trained after receiving a hearing test waiver.  These administrators informed Mr. Diab that the original thought in granting a waiver was to take someone who already had a CDL, lost their hearing and by giving them a waiver, would be able to continue to drive, but they never considered how somebody would be trained."

34.     Diab also spoke with Kevin Lewis, AAMVA's Director of Driver Programs, and asked Mr. Lewis if there was specifically a test that can be administered to the hearing impaired.  Mr. Lewis informed Mr. Diab that AAMVA had been asked by FMCSA to create a test and refused to do so because it is not safe to test hearing impaired CDL applicants.

35.     Operating a CMV without a CDL driver in the front passenger seat next to the CPL holder is such an unsafe condition that the driver could be placed "out of service" by the FMCSA and the motor carrier (i.e. Bordentown) could receive an unfavorable safety rating and face civil penalties.

36.     The AAMVA 2005 CDL Test System (July 2010 Version) Model Commercial Driver Manual contains, without limitation, the following elements for the "skills test" portion of the CDL examination:

    a.   On road driving

    b.   No pre-planning

    c.   Examiner gives directions during the on road test

    d.   Examiner requires clarification from the student

    e.   Interpreters are not permitted during the road test

    f.   The student must describe and demonstrate techniques for simulated activities, such as railroad crossings

g.  During the pre-trip vehicle inspection portion of the skills test, the student must explain to the examiner what is being inspected on the CMV and why

h.  The examiner must be able to communicate instructions and corrective actions to avoid emergencies

i.  The examiner must be able to communicate in emergencies and unsafe conditions

j.  During the pre-trip vehicle inspection, the student must use senses (look, listen, smell, feel) and, among other things, check buzzers and air brake connection leaks.

k.  The student must be able to recognize tire failure, such as the sound of a loud bang.

37.    Each state administers its own CDL examination, based on the questions and protocols developed by AAMVA.

38.    The New Jersey and New York state motor vehicle administrators use CDL manuals that follow the AAMVA model manuals referenced in the FMCSR. As of the time Plaintiff Frilando presented himself to Bordentown, neither state had amended its CDL manuals to permit the use of ASL interpreters during CDL testing or to otherwise permit the accommodation of deaf CDL applicants during the testing process.

39.    Bordentown's largest facility is in Linden, New Jersey. The Linden facility is located on a tract of land in an urban, densely populated area bordered by U.S. Route 1 and Interstate 95.

17

40.     The Linden facility does not have an on-site road training course or an on-site road training simulator. All of the on-the-road training at the Linden facility is performed on adjacent public roads and highways.

41.     Bordentown's 160-hour Class A CDL training program is structured to teach the knowledge and skills to prepare students to pass each phase of the state Class A CDL examination.

42.     Prior to enrolling in the training program, a prospective student must obtain (among other requirements) a valid FMCSA medical certificate.

43.     All students must sign a "Student Acknowledgement for Drug/Alcohol Screening, Random Testing and DOT Medical Cards," which acknowledges (among other things) that the student "must acquire and maintain a Federal DOT Medical Card and must have it in [his or her] possession at all times."

44.     Although the curriculum for the training program is based on 160 hours of course instruction, students typically require more than 160 hours of instruction to complete the program and be fully prepared for the CDL examination. At the Linden facility, the average student requires at least ten weeks (or 50 days) and up to 125 days of instruction to complete the program.

45.     During each phase of the training program, Bordentown teaches and trains its students using "test conditions" – *i.e.* using the same steps, standards, and procedures prescribed by the FMCSR and AAMVA for use in each phase of the actual CDL examination.

18

46.     The use of "test conditions" is a fundamental and essential element of Bordentown's training program because it ensures that students are best prepared to take and pass each phase of the CDL examination.

47.     In each phase of the training program, Bordentown places a primary emphasis on the safety of its students, instructors, and the travelling public.

48.     At the Linden facility, the classroom training uses a combination of videos, computer presentations, and lectures that focus on the subjects covered by the written CDL knowledge test.

49.     The specific subjects taught during the classroom training include, without limitation: general knowledge (accident control, backing, braking, cargo, emergencies, fires, inspections, mirror use, night driving, parking, shifting, and skid control); the fundamentals of the air brake test; stopping distance, how to avoid rollovers, using trailer brakes, fifth wheel, coupling, air leakage rates, hose couplers, and trailer air supply; rules related to hazardous materials and waste; and tanker analysis.

50.     At the end of the classroom training, students take the written CDL knowledge test at their state department of motor vehicles and, assuming they pass, obtain their Commercial Learner's Permit ("CLP").

51.     Because a CLP is required to operate a CMV (with an instructor), Bordentown requires a student to obtain a CLP before progressing to yard training and road training.

52.     Yard training is designed to prepare students for the "pre-trip vehicle inspection" test and the "basic vehicle control" portions of the CDL skills test.

145806.00601/106584671v.1
145806.00601/106651278v.4

53.     For yard training, the vehicle can carry up to five people (*i.e.* an instructor and four students).  The cabs do not have interior ("rear view") mirrors. The trailers are standard forty-eight foot van trailers.

54.     The "pre-trip vehicle inspection" part of the practical road test requires students to perform a complete CMV inspection and verbally identify and describe the inspection. The "in-cab inspection" part of the practical road test requires students to identify and check the interior components of a CMV, such as the anti-lock brakes, air brake check, air compressor, electric lines, doors and mirrors, brake hoses, horn, lights, and warning signals.

55.     According to the AAMVA 2005 CDL Test System (July 2010 Version), the specific requirements of the "pre-trip vehicle inspection" and "in-cab inspection" parts of the practical road test include that (a) students must describe and demonstrate techniques for simulated activities, such as railroad crossings, (b) students must explain to the instructor what is being inspected on the CMV and why, and (c) students must use the senses (look, listen, smell, feel) to, among other things, check buzzers and air brake connection leaks.

56.     Bordentown does not permit the use of an interpreter when training students for the "pre-trip inspection" test.

57.     During the yard training, Bordentown also instructs students on how to operate a CMV's double clutch manual transmission (which is significantly more complex than a passenger vehicle's manual transmission) and teaches students basic vehicle control skills, including backing, docking, parallel parking, and turning skills.

58.     The yard training at the Linden facility takes place in the facility's private lot, with each instructor overseeing up to three vehicles and an average of fifteen students.

145806.00601/106584671v.1
145806.00601/106651278v.4

59.     Because students from multiple classes may be simultaneously engaged in yard training, there are as many as 20 trucks and 150 students participating in yard training at any time at the Linden facility.

60.     It is essential to the safety of Bordentown's students and instructors that students operating CMVs during yard training keep their vision on their vehicle at all times during the yard training.

61.     The road training is designed to prepare students for the "safe on-road driving" part of the CDL skills test.

62.     During road training at Bordentown, the instructor provides constant verbal instruction.  The types of instructions the instructor provides relate to topics including the use of the transmission, what to do if a gear is missed, using the mirrors, speed, braking, location, heights, intersections, lane changes, merging, signaling, reacting to changing road conditions, and other maneuvers.

63.     Bordentown does not permit the use of an interpreter when training students for the "safe on-road driving" test.

64.     During the yard training, Bordentown instructs its students using test conditions consistent with the FMCSR and the AAMVA examination requirements for the "pre-trip vehicle inspection" and "in-cab inspection" tests.

65.     During the road training, Bordentown instructs its students using test conditions.

66.     Bordentown does not have access a private roads or any large private estate near the Linden facility where a student could develop proficiency before proceeding to public roads. Students must start their road training on side streets and then proceed to major streets and highways as they become more familiar with driving a CMV in road conditions.

21

67.     The student tuition for Bordentown's 160-hour CDL training program is $4,000.

68.     At the Linden facility, Bordentown's annual profit is approximately $140,000 on approximately $3.5 million in revenue. Approximately 700 students attend CDL training programs at the Linden facility each year; thus, the profit per student is only approximately $200 (or $140,000 / 700).

69.     Company-wide, Bordentown's annual profit is only about $400,000 on approximately $10 million in revenue.

70.     Bordentown cannot safely train a deaf student through an ASL interpreter during the yard training without dramatically changing its training program. Bordentown would need to clear the yard of other students and instructors due to the safety risks presented by the use an ASL interpreter.

71.     On-road training involves constant verbal instructions by the instructor to the student including travel directions, how to shift the manual transmission, instructions if a gear is missed; use of mirrors; speed; location; distance; heights; clearances; negotiating intersections; lane changes; traffic conditions; pedestrian awareness; crossing railroad tracks; avoiding obstructions such as construction; tree limbs; or curbs; parked cars; signaling; reacting to horns, sirens, or other audible warnings; merging traffic; merging into traffic; controlling gears, speed, distance, and location during turns; merging and other maneuvers; and reacting to unforeseen circumstances.

72.     During road training, the instructor also relies on receiving communication from the trainee verifying his or her understanding of the instructions and throughout the road training, the trainee must have control of the unit with her or her hands on the steering wheel and/or the transmission shifter at all times and must without distraction be keeping

145806.00601/106584671v.1
145806.00601/106651278v.4

his or her eyes on the road, traffic, and surroundings constantly to monitor the ever changing conditions with appropriate use of mirrors."

73.     During the road training, an instructor will typically take up to four students out on the road.  Each student (including the driver and the students sitting behind the instructor) must be able to hear and understand the instructor's verbal commands.

74.     Because students are operating for the first time a CMV on public roads, the road training presents significant safety risks to students, instructors, and the travelling public if a student is unable to immediately receive and react to information provided to the instructor (and/or is unable to immediately communicate questions or concerns to the instructor).

75.     A catastrophic accident could occur if a student is unable to immediately respond to verbal instruction during road training.

76.     Students must be able recognize audible alerts to identify potential safety problems during the road training.

77.     Bordentown cannot provide an ASL interpreter for the road training without fundamentally altering its training program.

78.     There is no safe or feasible way to perform road training using ASL interpreters.

79.     Even if Bordentown could train a student using ASL interpreters, the interpreters would need to occupy seats in the cab that would otherwise be occupied by paying students, thereby reducing the number of students that could be trained from four students to two.

80.     As is the case across the CDL training industry, Bordentown's training programs have profitability margins and, correspondingly, Bordentown realizes only a very small profit (both at the Linden facility and company-wide) from its operating income.

23

81.     Based on the daily cost of ASL interpreters for Bordentown's forklift training program, it would cost Bordentown between $60,000 and $150,000 to provide a student with ASL interpreters for the average duration of the CDL training program.

82.     Plaintiff is deaf and unable to read lips.

83.     While Plaintiff can sometimes identify certain low frequency noises, he is not able to detect the source or direction of those sounds.

84.     Plaintiff has never driven a CMV and does not have any significant experience driving a gear-shift vehicle.

85.     Plaintiff requires ASL interpreters to effectively communicate with hearing individuals. If Plaintiff does not have interpreters, typically all communication is misunderstood and unsatisfactory.

86.     Prior to contacting Bordentown, Plaintiff twice sought to obtain the medical certificate required by the FMCSR. However, Plaintiff never obtained a valid medical certificate

87.     In December 2012, Dr. Lawrence Marino, Plaintiff's primary physician, diagnosed Plaintiff with atrial fibrillation ("A-Fib") and sleep apnea.

88.     Dr. Marino referred Plaintiff to a sleep apnea clinic, but Plaintiff never went for further treatment or diagnosis of his sleep apnea.

89.     In June 2013, Plaintiff asked his primary care physician, Dr. Lawrence Marino for a FMCSA medical certificate, but Dr. Marino advised that he could not provide a medical certificate until Plaintiff visited an audiologist and was cleared by a cardiologist.

90.     Plaintiff recalls subsequently visiting a cardiologist but he cannot recall the name or location of the alleged cardiologist or the date of his alleged appointment.

24

91.     Plaintiff visited Dr. Marino again in September 2013 and once again requested a FMCSA medical certificate. Dr. Marino provided Plaintiff with a medical certificate without addressing Plaintiff's previously diagnosed sleep apnea or A-Fib.

92.     Dr. Marino was not listed on the FMCSA's National Registry of Certified Medical Examiners at the time he issued the medical certificate.

93.     A representative of the FMCSA informed Plaintiff that his medical certificate was not valid because it had not been issued by a doctor listed on FMCSA's national registry of certified medical examiners.

94.     The medical certificate issued by Dr. Marino was not valid because Dr. Marino was not listed on the FMCSA's National Registry of Certified Medical Examiners at the time he issued the medical certificate.

95.     Plaintiff did not have a valid medical certificate (and knew that he did not have a valid medical certificate) when he presented himself to Bordentown in early 2015.

96.     In July 2015, Plaintiff visited another doctor, Dr. Kwi Y. Yu, in a further effort to obtain a valid medical certificate.

97.     During this visit, Plaintiff did not disclose to Dr. Yu his prior diagnoses of sleep apnea and A-Fib.

98.     The medical self-report part of Plaintiff's certification form for his FMCSA medical certificate attested that Plaintiff had "no" history of "heart disease [or] other cardiovascular condition" or any "sleep disorders [or] pauses in breathing while sleeping."

99.     Plaintiff signed the medical self-report and thereby certified that the report was "complete and accurate" and acknowledged that any "inaccurate, false, or missing information" on the medical examination report "may invalidate the examination and my Medical Examiner's Certificate."

145806.00601/106584671v.1
145806.00601/106651278v.4

100.    Dr. Yu provided Plaintiff with a FMCSA medical certificate.

101.    Dr. Yu would not have issued the medical certificate if he had known of Plaintiff's prior diagnoses of sleep apnea and A-Fib.

102.    According to the FMCSA, people with untreated sleep apnea have an increased risk of being involved in a fatigue-related motor vehicle crash.

103.    In one recent high-profile transportation accident, a New Jersey Transit train engineer with undiagnosed sleep apnea lost control of his train at a station in Hoboken, New Jersey, resulting in one death and more than one hundred injuries.

104.    In another recent high-profile transportation accident, the National Transportation Safety Board concluded that sleep apnea was the cause of a December 2013 Metro North Railroad crash that resulted in four deaths and sixty-one injuries.

105.    Plaintiff applied for a waiver from the FMCSR hearing standard after receiving the medical certificate from Dr. Marino, but prior to learning that Dr. Marino was not listed on the FMCSA's National Registry of Certified Medical Examiners.

106.    Plaintiff never communicated directly with Bordentown regarding his alleged interest in the CDL training program. Instead, Plaintiff's brother, Joseph Frilando was the one who had contact with Bordentown.

107.    Plaintiff's brother's inquiry was the first one Bordentown had ever received from a deaf person wanting to enroll in the CDL program.

108.    Joseph Frilando called Bordentown in February 2015, spoke with Bordentown's Admissions Manager, Mariela Rousey, and made an appointment for an interview on February 20, 2015.

145806.00601/106584671v.1
145806.00601/106651278v.4

109.    Neither Joseph Frilando nor his brother appeared for the February 20, 2015 appointment.

110.    Joseph Frilando next communicated with Bordentown on March 17, 2015. He spoke by phone with Dale Wessendorf, Bordentown's Director of Safety and Program Training, and also sent an e-mail to Wessendorf attaching Plaintiff's 90-day hearing test waiver.

111.    Joseph Frilando e-mailed Wessendorf on March 23, 2015 and wrote: "Hi . . . Still waiting to hear from you. Good day!!"

112.    Joseph Frilando e-mailed Wessendorf on March 29, 2015 and wrote, in part: "I'm still waiting to hear from you about setting up and [sic] appointment for my brother Kenneth Frilando who is deaf to come in and learn about your school and discuss training at your facility. If Smith Solomon [sic] can not [sic] accommodate a deaf student please advise and I will continue to seek out other schools. Please advised [sic] time is of the essence."

113.    Wessendorf responded to Joseph Frilando on March 30, 2015 and explained that Bordentown was "seeking guidance from the Federal DOT and the local MVC's regarding how to safely and effectively accommodate the specific needs of this community. As of yet we do not have a clear direction in the matter. As we receive additional communication we will keep you advised."

114.    Joseph Frilando responded to Wessendorf's e-mail on March 30 and wrote: "Thank you for your response. As I mentioned time is of the essence, Kenneth's permit expires Januaray [sic] 2, 2016. I look forward to a reasonably timed response. Thanks again!!"

27

115.    Bordentown's policy is to address disability accommodation issues on a case-by-case basis. Bordentown instructs its employees to contact senior management when any request for accommodation is made; Bordentown will then review, analyze, and determine whether and how the it can reasonably accommodate the disability.

116.    Bordentown has previously accommodated deaf students with ASL interpreters in the one-day, eight-hour forklift training program that it offers at certain locations. Some of these students have provided their own ASL interpreters; for other students, Bordentown has provided the interpreters.

117.    Unlike the CDL training program, the forklift training is done on a closed, private course.

118.    Forklift training is only a one-day program.

119.    The waiver Plaintiff received from the FMCSR hearing standard was not effective until and unless Plaintiff obtained a valid medical certificate.

120.    Unlike the CDL training program, Bordentown's forklift training is not regulated by FMCSA or any other agency, and does not require a license or any other specific certifications.

121.    Unlike CMVs, forklifts are small vehicles with a maximum speed of only a few miles per hour. Because forklifts are much smaller and slower than CMVs, Bordentown has determined that an ASL interpreter may safely stand on the ground with an instructor and translate while a student is operating a forklift.

122.    Because the forklift training is only a one-day program, Bordentown has determined that it is not an undue financial burden to provide ASL interpreters.

28

123. Bordentown took significant efforts to obtain guidance regarding the potential training and testing of deaf CDL applicants when the FMCSA first began to issue hearing test waivers.

124. After receiving Joseph Frilando's correspondence, John Diab again contacted Larry Minor at FMCSA and Kevin Lewis at AAMVA and asked if there an acceptable training program and is there a test for deaf CDL applicants. Mr. Minor and Mr. Lewis informed Mr. Diab that there is no test and there is no acceptable training program."

125. According to Diab, Kevin Lewis also reiterated that AAMVA had been requested by FMCSA to produce a test for the hearing impaired but had refused to produce a test because it is not safe to do so.

126. In March 2015, Blain Stein, the head CDL examiner for the State of New Jersey, told John Diab that New Jersey would not test deaf CDL applicants because it is not safe.

127. Henry Elmy from the Pennsylvania DMV told John Diab's son, John Diab Jr., that Pennsylvania would not test deaf CDL applicants because it is not safe.

128. The New York DMV never responded to John Diab's inquiries regarding testing deaf CDL applicants.

129. After receiving Joseph Frilando's correspondence, Bordentown contacted representatives from the CDL divisions of the New Jersey, New York, and Pennsylvania Departments of Motor Vehicles to determine whether they would allow a deaf applicant to take the state CDL examination.

130. In March 2015, John Diab spoke with Blain Stein, the head CDL examiner for the State of New Jersey, and inquired about New Jersey's position on testing a deaf CDL student.

29

131.    In March 2015, John Diab's son, John Diab Jr., spoke with Henry Elmy from the Pennsylvania DMV and inquired about Pennsylvania's position on testing a deaf CDL student.

132.    In March 2015, John Diab also called the New York DMV and inquired about New York's position on testing a deaf CDL student.

133.    Bordentown also conducted its own analysis to determine whether Plaintiff's disability could be reasonably accommodated.

134.    Based on the information that it received and its own assessment, Bordentown determined that it was not "qualified or capable at this time" to accommodate Plaintiff in its training program.

135.    On April 6, 2015, Wessendorf e-mailed Joseph Frilando and stated: "After considerable discussion at both the State and Federal level and having received little or no guidance on how to effectively train and safely protect the motoring public, the student and our personnel, we have determined that Smith & Solomon is not capable or qualified at this time to render the services requested."

136.    Plaintiff filed his complaint in this litigation 18 days later, on April 24, 2016.

137.    Plaintiff's communications are typically misunderstood and unsatisfactory if he does not have an ASL interpreter.

138.    When Plaintiff learned to operate a passenger vehicle, safety factors foreclosed the use of ASL interpretation while he was driving.

139.    It is more dangerous and unsafe to communicate through an ASL interpreter while operating a CMV than it is to do so while operating a passenger vehicle.

140.    To be effective, an ASL interpreter must be in Plaintiff's line of sight.

30

141.    An ASL interpreter would not be effective if sitting to Plaintiff's right, out of his line of sight.

142.    Plaintiff does not know the cost that Bordentown would incur to hire ASL interpreters.

143.    Plaintiff never applied to Bordentown's CDL training program.

144.    Plaintiff never accepted Bordentown's efforts to engage in an interactive process regarding accommodation.

145.    Plaintiff made no effort to engage in an interactive process with Bordentown regarding accommodation.

146.    Accommodating plaintiff, if even possible, would require Bordentown to incur significant costs, including the costs of providing ASL interpreters, displacing other students, taking safety measures, and modifying its program, facilities, and vehicles.

147.    Accommodating plaintiff, if even possible, would require Bordentown to make significant alterations and changes to its CDL training program

148.    Accommodating plaintiff, if even possible, would require Bordentown to put at risk the safety of its instructors, other students, and the travelling public

149.    Plaintiff has not sought admission in any other CDL training program since April or May of 2015

150.    Plaintiff has not sought admission in any CDL training program has indicated that it can accommodate deaf applicants.

151.    Plaintiff has never been accepted to, enrolled in, or completed any CDL training program.

31

152.     Prior to filing this litigation, Plaintiff did not provide any suggestions as to how Bordentown might be able to accommodate a deaf student in training.

153.     Bordentown determined that it was not capable or qualified to render the services requested by Plaintiff or Plaintiff's brother.

154.     Bordentown determined that no safe or reasonable accommodation existed to train Mr. Frilando using sign language interpreters.

155.     According to his own testimony, the specific accommodation that Plaintiff would need to be trained at Bordentown is a sign language interpreter, including inside the vehicle during road and yard training

156.     The only place that an ASL interpreter could sit if Plaintiff was driving a CMV during training is the front passenger seat.

157.     ASL interpreters need to work as a team because of fatigue and need to switch every 20 to 30 minutes.

158.     ASL interpretation is consecutive, not simultaneous, interpretation.

159.     To the extent also relevant to liability, Defendant reserves the right to prove at trial any contested facts relating to damages.

B.     **Defendant intends to prove the following contested facts with regard to damages:  (This statement must include the factual basis for each defense against plaintiff's claims for damages.)**

1.     Plaintiff has not suffered any financial damages as a result of Bordentown's decision that it could not reasonably accommodate his disability.

2.     Plaintiff has not sought any kind of treatment or counseling for mental or emotional issues and has not suffered any illnesses as a result of Bordentown's decision that it could not reasonably accommodate his disability.

32

3.      Bordentown determined in good faith that it could not reasonably accommodate Plaintiff's disability.

4.      Bordentown determined in good faith that any accommodation would impose an undue financial burden.

5.      Bordentown determined in good faith that any accommodation would require fundamental alteration to its CDL training program.

6.      Bordentown determined in good faith that any accommodation would present a significant risk to public safety.

7.      Plaintiff has not sought admission in any other CDL training program since April or May of 2015.

8.      Plaintiff has not sought admission in any CDL training program has indicated that it can accommodate deaf applicants.

9.      Plaintiff has never been accepted to, enrolled in, or completed any CDL training program.

10.     To the extent that Plaintiff has held other employment (or received other income) since Defendant's alleged denial of accommodation, Plaintiff has mitigated his damages and may not have any damages.

11.     To the extent that Plaintiff has not properly sought other employment, or has been under-employed, Plaintiff has failed to mitigate his damages and may not have any damages.

12.     Plaintiff has not suffered any emotional distress as a result of Defendant's alleged denial of accommodation.

33

13.    To the extent also relevant to damages, Defendant reserves the right to prove at trial

any contested facts relating to liability.

8.    **PLAINTIFF'S WITNESSES (Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial.)**

A.    **On liability plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:**

| WITNESS | SUMMARY |
|---|---|
| Kenneth Frilando<br>c/o Eisenberg & Baum, LLP<br>24 Union Square East<br>4th Floor<br>New York, NY 10003 | Plaintiff will testify about his communication abilities and needs, his driving abilities, and his interest in obtaining a Commercial Driver's License. |
| Joseph Frilando<br>c/o Eisenberg & Baum, LLP<br>24 Union Square East<br>4th Floor<br>New York, NY 10003 | Joseph Frilando will testify about his communications with Defendant regarding Plaintiff. |
| Daniel Cox<br>c/o Eisenberg & Baum, LLP<br>24 Union Square East<br>4th Floor<br>New York, NY 10003 | Daniel Cox will provide expert testimony regarding safely training deaf individuals to drive motor vehicles. |
| John Luegene Huey, Jr.<br>c/o Eisenberg & Baum, LLP<br>24 Union Square East<br>4th Floor<br>New York, NY 10003 | John Luegene Huey, Jr. will provide expert testimony regarding safely training deaf individuals to drive motor vehicles. |
| John Diab, Sr.<br>c/o Blank Rome LLP<br>130 N. 18th Street<br>Philadelphia, PA  19103 | John Diab will testify as Defendant's designated corporate representative regarding Defendant's policies and procedures for accommodating deaf students (including prospective deaf students) in its programs, and Defendant's investigation into a feasible accommodation for Plaintiff. |

34

B. **On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:**

| WITNESS | SUMMARY |
|---|---|
| Kenneth Frilando<br>c/o Eisenberg & Baum, LLP<br>24 Union Square East<br>4th Floor<br>New York, NY 10003 | Plaintiff will testify about the emotional distress he suffered due to Defendant's refusal to admit him. |
| Joseph Frilando<br>c/o Eisenberg & Baum, LLP<br>24 Union Square East<br>4th Floor<br>New York, NY 10003 | Joseph Frilando will testify about his observation of Kenneth Frilando's damages |

C. **Defendant objects to the following witnesses for the reasons states:**

Defendant objects to the proposed testimony Daniel Cox and John Luegene Huey, Jr. because, for the reasons set forth in Section 10.D below, they are not qualified to testify as expert witnesses and are not otherwise offered to present admissible fact testimony. Defendant also objects to the extent that Plaintiff seeks to require a specific person to testify as its "designated corporate representative." Defendant further objects to the proposed testimony of Joseph Frilando on damages, as his "observation" of Plaintiff's asserted damages is not admissible under Fed. R. Civ. P. 403 (and other Federal Rules of Evidence).

9. **DEFENDANT'S WITNESSES (Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial.)**

A. **On liability defendant intends to call the following witnesses who will testify in accordance with the following summaries:**

1. John Diab, Sr.
   c/o Blank Rome LLP
   130 N. 18th Street
   Philadelphia, PA  19103

John Diab, Sr. will testify regarding Bordentown's CDL training program, regulation, application procedures, and safety standards. He will also testify regarding Bordentown's correspondence with Plaintiff and efforts to determine whether Plaintiff's disability could be reasonably accommodate. He will further testify regarding the cost to Bordentown of potentially accommodating Plaintiff, the fundamental alterations to Bordentown's training program that would be required to accommodate Plaintiff, and the threats to health and safety that would be caused by any potential accommodation.

2. John Diab, Jr.
c/o Blank Rome LLP
130 N. 18th Street
Philadelphia, PA  19103

John Diab, Sr. will testify regarding Bordentown's CDL training program, regulation, application procedures, and safety standards. He will also testify regarding Bordentown's correspondence with Plaintiff and efforts to determine whether Plaintiff's disability could be reasonably accommodated. He will further testify regarding the cost to Bordentown of potentially accommodating Plaintiff, the fundamental alterations to Bordentown's training program that would be required to accommodate Plaintiff, and the threats to health and safety that would be caused by any potential accommodation.

3. Bill Applegate
c/o Blank Rome LLP
130 N. 18th Street
Philadelphia, PA  19103

Bill Applegate will testify regarding Bordentown's CDL training program.

4. Todd Hyland
c/o Blank Rome LLP
130 N. 18th Street
Philadelphia, PA  19103

Todd Hyland will testify regarding Bordentown's CDL training program

145806.00601/106584671v.1
145806.00601/106651278v.4

5.  Dr. Yu Kyi
    c/o Blank Rome LLP
    130 N. 18th Street
    Philadelphia, PA  19103

Dr. Kyi will testify regarding the procedures and requirements for granting a FMCSA medical certificate and his interactions with and examination of the Plaintiff in connection Plaintiff's attempt to obtain a medical certificate.

6.  Dennis M. McGee
    c/o Blank Rome LLP
    130 N. 18th Street
    Philadelphia, PA  19103

Mr. McGee will provide expert testimony, as summarized in his expert reports and as further summarized in Section 10.C below.

7.  William C. Adams
    c/o Blank Rome LLP
    130 N. 18th Street
    Philadelphia, PA  19103

Mr. Adams will provide expert testimony, as summarized in his expert reports and as further summarized in Section 10.C below.

B.  **On damages defendant intends to call the following witnesses who will testify in accordance with the following summaries:**

1.  John Diab, Sr.
    c/o Blank Rome LLP
    130 N. 18th Street
    Philadelphia, PA  19103

In addition to the topics of testimony discussed above, John Diab, Sr. will also testify regarding Bordentown's basis for determining that it could not reasonably accommodate Plaintiff in its CDL training program, the cost of attending Bordentown's training program, and, based on his personal knowledge, the cost of attending other CDL training programs.

2.  John Diab, Jr.
    c/o Blank Rome LLP

145806.00601/106584671v.1
145806.00601/106651278v.4

130 N. 18th Street
Philadelphia, PA  19103

In addition to the topics of testimony discussed above, John Diab, Sr. will also testify regarding Bordentown's basis for determining that it could not reasonably accommodate Plaintiff in its CDL training program, the cost of attending Bordentown's training program, and, based on his personal knowledge, the cost of attending other CDL training programs.

C.    Plaintiff objects to the following witnesses for the reasons stated:

Plaintiff objects to the testimony of both John Diab, Jr. and John Diab, Sr. concerning the issue of damages as summarized by Defendant.  The basis for Bordentown's failure to accommodate Plaintiff, the cost of attending Bordentown's training program, and the cost of attending other CDL training programs are not relevant to the issue of damages.

Plaintiff objects to any testimony by Bill Applegate who was never identified by Defendant in Defendant's Rule 26 disclosures.

Plaintiff objects to any testimony by Dr. Yu Kyi at the liability phase of the trial as irrelevant.  Information concerning Mr. Frilando's eligibility for a medical certificate is after acquired evidence, which is not admissible at the liability phase of the trial. The information Defendant had at the time of Mr. Frilando's inquiry is that he had a valid medical certificate.  As such, any concerns about the basis for which that medical certificate was obtained are not relevant in determining whether or not Defendant discriminated against Plaintiff and as such, Dr. Yu Kyi's testimony should be excluded.  It is well-settled that "the determination of whether a person was a 'qualified individual with a disability' for the purposes of a[ disability discrimination] claim is not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made." *Bowers v. NCAA*, 475 F.3d 425, 535-36 (3d Cir. 2007) (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006); *Gault v. Lucent*

145806.00601/106584671v.1
145806.00601/106651278v.4

*Techs.*, 134 F.3d 576, 580; *see also Bates v. Long Island R.R. Co.*, 997 F 2d 1028, 1035 (2d Cir. 1993)).  After-acquired evidence concerning a person's qualifications for admission is not relevant to the issue of liability because "Defendant[] 'could not have been motivated by knowledge [it] did not have.'" *Bowers*, 475 F.3d at 535 (quoting *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995)).

Plaintiff objects to the testimony of both defense experts as both Adams and McGee have admitted that they did no research on, and have no experience with, deafness or American Sign Language. Additionally, neither of them met or analyzed the Plaintiff. Furthermore, neither McGee nor Adams considered the visual capabilities of a deaf driver in arriving at their conclusion that the use of sign language would be distracting and/or unsafe. Neither investigated how other driver training schools were able to train deaf individuals. Accordingly, their testimony is not based on sufficient facts or data, and will not be helpful to the trier of fact to understand the evidence or to determine a fact in issue. Alternatively, the probative value of their testimony is substantially outweighed by the danger of misleading the jury.

10. **EXPERT AND SPECIALIZED LAY OPINION WITNESSES (No expert or specialized lay opinion witness offering scientific, technical or other specialized knowledge will be permitted to testify at trial unless listed below. A summary of the expert's qualifications and a copy of his/her report must be provided for the Court's review at the pretrial conference. Said summary shall be read into the record at the time he/she takes the stand, and no opposing counsel shall be permitted to question his/her qualifications unless the basis of the objection is set forth herein.**

A. **Plaintiff's expert and specialized lay opinion witnesses are:**

1. <u>Daniel Cox</u>

Mr. Cox is the CEO of Heights Driving School in Ohio. He has 34 years of experience and has taught over 200 deaf individuals to drive. Mr. Cox developed the road assessment program for persons with disabilities. He has given seminars and been published in the area of teaching deaf individuals to drive. His methods have been accepted by the State of Ohio and national

145806.00601/106584671v.1
145806.00601/106651278v.4

associations such as DSSA and ADED and have been used in train the trainer courses by those organizations. Additionally. Mr. Cox's method is the preferred method in the State of Ohio for teaching the deaf to drive

Attached is a copy of Mr. Cox's CV and expert report.

    2.  <u>John Luegene Huey, Jr.</u>

Mr. Huey is himself a deaf tractor trailer driver who was trained at no less than three different driving schools utilizing sign language interpreters. Mr. Huey has been working as a tractor trailer driver for U.S Xpress based in Chattanooga, Tennessee since February 2015. Mr. Huey is based out of Irving, Texas. Mr. Huey has been employed as a tractor trailer driver and has not been involved in any accidents. Mr. Huey has also been involved in the training of another deaf tractor trailer driver

Attached is a copy of the expert disclosure for Mr. Huey.

**B.**    **Defendant's objections to the qualifications of plaintiffs experts and specialized lay opinion witnesses are:**

    1.  <u>Daniel Cox</u>

Plaintiff's proposed expert Mr. Cox is a passenger vehicle (i.e. car) driving instructor whose only experience is with passenger vehicles and who, by his own admission, is not qualified to provide any opinion regarding CMVs or CDL training programs. Mr. Cox has never driven a tractor-trailer and has never trained any student (hearing or deaf) to drive a tractor-trailer. He has no experience with the Federal Motor Carrier Safety Regulations, has no familiarity with the AAMVA standards for CDL testing, and has no familiarity with the specifications and requirements of the CDL examinations that are administered by New Jersey and other states in conformity with the AAMVA standards. Mr. Cox has no familiarity with Bordentown's CDL training program and has never visited any of Bordentown's facilities.

40

    2.  <u>John Huey</u>

Plaintiff's proposed expert Mr. Huey did not provide an expert report or any of the disclosures required by Fed. R. Civ. P. 26(a)(2). Unlike Bordentown, Mr. Huey trained to operate a CMV at community colleges with large suburban campuses and private driving courses, through programs that provided ASL interpreters paid for with public funding. Unlike Bordentown, these community colleges were not FMCSA-regulated interstate motor carriers and were not subject to the legal requirements of the FMCSR. Unlike Bordentown, these community colleges also did not have training programs based on test conditions and adherence to the AAMVA standards. Mr. Huey has never trained a deaf student with no prior CMV driving experience to obtain a CDL. He has no familiarity with Bordentown's CDL training program and has never visited any of Bordentown's facilities.

    C.    **Defendant's expert and specialized law opinion witnesses are:**

    1.  <u>Dennis M. McGee</u>

Mr. McGee is a consultant with National Transportation Consultants, Inc. ("NTCI"). NTCI is one of the country's leading consultancy firms for the motor carrier industry, providing services which include FMCSA/DOT compliance, safety programs and safety training, accident investigation, and other related programs.

Mr. McGee served as a member of the Pennsylvania State Police, patrol division. During his employment with the State Police, Mr. McGee worked with FMCSA conducting commercial motor vehicle ("CMV") inspections, and assisting in Compliance Reviews. And further, in this role, he trained Justices of the Peace and District Magistrates concerning CMV and driver violations as they related to the Federal Motor Carrier Safety Regulations.

Mr. McGee then served as a Special Agent I Safety Investigator with the FMCSA for over twenty-nine years. He began as a Special Agent of the FMC SA, Pennsylvania Division Office,

41

spending more than nine years as a Safety Investigator, conducting criminal and civil case investigations of motor carriers and drivers. Next, he served as the Pennsylvania Federal Program Specialist, managing the Pennsylvania FMCSA motor carrier enforcement program. After this, he served as the Pennsylvania State Program Specialist. His responsibility encompassed the Motor Carrier Safety Assistance Program ("MCSAP"), which involved over 150 municipal police officers and three Pennsylvania state agencies (PENNDOT, PAPUC and the Pennsylvania State Police), the Commercial Driver's License ("CDL") program, and the training of these officers in the FMCSA programs.

During his employment with the FMCSA as a Special Agent, Mr. McGee had significant exposure to and experience with FMCSA's waiver and exemption programs. From 1998 until his retirement in 2008, Mr. McGee was a Handicap Waiver Specialist. He conducted over two hundred (200) handicap waiver evaluations in the States of Pennsylvania, Maryland, Ohio, Delaware, New Jersey, Virginia, and West Virginia.

Additionally, Mr. McGee served as an instructor for the FMCSA National Training Center on truck and bus inspections and Automatic On-Board Recording Devices.

A copy of Mr. McGee's expert report is attached.

2.  <u>William C. Adams</u>

Mr. Adams is an expert in the area of safety issues involved with the training and on-road driving of Class A CDL drivers. He has 33 years of experience as a professional truck driver, 28 years of professional experience training drivers for trucking companies, and 10 years of experience as a Class A CDL safety expert dealing with accidents and accident prevention. Mr. Adams has logged 5 million miles of driving without a chargeable accident.

A copy of Mr. Adams's expert report is attached.

145806.00601/106584671v.1
145806.00601/106651278v.4

D. **Plaintiff's objections to the qualifications of defendant's experts and specialized lay opinion witnesses are:**

Both Adams and McGee have admitted that they did no research on, and have no experience with, deafness or American Sign Language. Additionally, neither of them met or analyzed the Plaintiff. Furthermore, neither McGee nor Adams considered the visual capabilities of a deaf driver in arriving at their conclusion that the use of sign language would be distracting and/or unsafe. Neither investigated how other driver training schools were able to train deaf individuals. Accordingly, their testimony is not based on sufficient facts or data, and will not be helpful to the trier of fact to understand the evidence or to determine a fact in issue. Alternatively, the probative value of their testimony is substantially outweighed by the danger of misleading the jury.

11. **PLAINTIFF' S DEPOSITIONS (List, by page and line, all depositions testimony to be offered into evidence. All irrelevant and redundant matters and al colloquy between counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.)**

A. **On liability plaintiff intends to read into evidence the following:**

Plaintiff reserves the right, in the event that any witness is unexpectedly unavailable to testify at trial, to designate testimony relating to that witness.

B. **On damages plaintiff intends to read into evidence the following:**

Plaintiff reserves the right, in the event that any witness is unexpectedly unavailable to testify at trial, to designate testimony relating to that witness.

C. **Defendant object to the deposition testimony set forth above for the reasons stated:**

12. **DEFENDANT'S DEPOSITIONS (List, by page and line, all depositions testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy between counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.)**

A. **On liability defendant intends to read into evidence the following:**

43

| KENNETH FRILANDO<br>November 17, 2015 | |
| --- | --- |
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 9:12-14 | This is a statement made by counsel concerning the nature of how the deposition will be conducted. It is not testimony. Mr. Rozynski is not a witness and has not been placed on any party's witness list.  Defendant certainly has not established that this statement is a permissible use of a deposition pursuant to Fed. R. Civ. P. 32.<br><br>Relevance; hearsay. |
| 10:19-11: 17 | Relevance |
| 12:22-13:13 | Relevance<br><br>Additionally, this contains another statement by Mr. Rozynski (which is cut off and continues to line 18 – rule of completeness dictates the entire sentence be included) concerning the nature of how the deposition will be conducted. It is not testimony. Mr. Rozynski is not a witness and has not been placed on any party's witness list.  Defendant certainly has not established that this statement is a permissible use of a deposition pursuant to Fed. R. Civ. P. 32 |
| 28:4-25 | Relevance;  improper  character  evidence;  more  prejudicial  than probative. |
| 32:11-33:3 | Relevance |
| 36:6-16 | Question calls for improper legal conclusion |
| 36:21-38:23 | |
| 38:25-39:24 | |
| 40:1-41:9 | Hearsay; rule of completeness |
| 42:14-43:1 | Object to 42:14-20 as irrelevant, improper character evidence, more prejudicial than probative |

44

| KENNETH FRILANDO<br>November 17, 2015 | |
| --- | --- |
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 43:24-45:17 | Object 44:20-45:17 to the mention of Duchess (irrelevant, improper character evidence & more prejudicial than probative); hearsay; speculation |
| 53:21-54:22 | |
| 59:8-61:6 | Calls for improper opinion |
| 61:21-63:4 | |
| 70:13-73:18 | |
| 74:1-17 | |
| 75:6-22 | |
| 76:5-12 | Vague – lacks context |
| 77:12-79:10 | Object to lines77:24-78:9 which are a colloquy between defense counsel and the interpreter on how to phrase the question |
| 79:17-80:9 | |
| 82:6-20 | |
| 85:17-25 | Relevance |
| 86:22-87:16 | Relevance, improper character evidence, more prejudicial than probative (Duchess) |
| 109:4-112:8 | |
| 113:21-114:25 | Relevance |
| 115:2-116:6 | |
| 116:13-117:8 | Relevance |
| 118:5-21 | Relevance |

145806.00601/106584671v.1<br>145806.00601/106651278v.4

| KENNETH FRILANDO<br>November 17, 2015 | |
|---|---|
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 122:9-126:13 | Objection to lines 126:2-13 – Mr. Rozynski lodged an objection to the interpretation of Mr. Frilando's response. After a colloquy between counsel and the interpreter (who indicated that the interpretation may not have been clear), the question was not reasked or answered, rather counsel decided to move on. As the record stands, these lines were not Mr. Frilando's testimony and as such should not be read to the jury. |
| 127:1-132:14 | 127:1-7 is a colloquy by counsel that is not testimony and should not be read to the jury; |
| 133:1-136:17 | |
| 137:7-24 | |
| 138:1-139:25 | |
| 143:14-25 | Relevance;  more prejudicial than probative; after-acquired evidence is not admissible at liability phase of trial |
| 144:2-145:13 | Relevance; more prejudicial than probative;  after-acquired evidence is not admissible at liability phase of trial |
| 145:24-146:3 | Relevance; more prejudicial than probative; after-acquired evidence is not admissible at liability phase of trial |
| 146:12-147:19 | Relevance; more prejudicial than probative; after-acquired evidence is not admissible at liability phase of trial |
| 148:17-149:14 | Relevance; more prejudicial than probative; after-acquired evidence is not admissible at liability phase of trial |
| 150:4-154:11 | Relevance; more prejudicial than probative; after-acquired evidence is not admissible at liability phase of trial |
| 155:22-159:19 | Relevance |
| 161:10-16425 | Hearsay; relevance; lacks personal knowledge |
| 165:14-168:7 | Relevance; improper character evidence; more prejudicial than probative; rule of completeness |

145806.00601/106584671v.1
145806.00601/106651278v.4

| KENNETH FRILANDO<br>November 17, 2015 | |
| --- | --- |
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 168:14-170: 12 | Counsel is testifying; argumentative |
| 170:21-179:2 | Hearsay within hearsay; argumentative; relevance; improper character evidence; more prejudicial than probative |
| 179:5-23 | |
| 180:20-181:1 | Improper question to lay witness |
| 181:7-18 | Seeks improper opinion |
| 181:21-183:24 | Argumentative; speculation; hearsay |
| 184:2-185:2 | |
| 185:13-186:9 | Relevance; counsel is testifying |
| 186:25-187:9 | |
| 186:11-188:16 | |
| 188:19-189:11 | |
| 189:13-24 | |
| 190:5-191:4 | Argumentative |
| 191:6-198:14 | Object to 197:25-198:5 as argumentative and counsel testifying |
| 199:17-203:5 | Objection to the mention of Duchess as improper character evidence; irrelevant; more prejudicial than probative |
| 203:15-204:6 | Counsel is testifying and attempting to explain the law |
| 204:14-20 | Goes to damages, not liability |
| 204:23-205:1 | Goes to damages |
| 205:14-206:14 | Counsel is testifying |

145806.00601/106584671v.1
145806.00601/106651278v.4

| KENNETH FRILANDO (DUTCHESS) August 8, 2016 | |
|---|---|
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 18:21-19:9 | Designations from a deposition taken in another case are not proper |
| 50:15-21 | Designations from a deposition taken in another case are not proper |

Plaintiff generally objects to deposition designations for Mr. Frilando as he will be present and testifying at the trial and it would be more efficient for counsel to simply ask Mr. Frilando these questions at the trial and elicit testimony.

| JOSEPH FRILANDO November 19, 2015 | |
|---|---|
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 28:7-18 | * |
| 29:4-30:12 | * |
| 37:3-6 | * |
| 37:11-38:5 | * |
| 43:15-47:14 | * |
| 50:15-53:17 | * |
| 55:6-57:8 | * |
| 58:15-24 | * |
| 59:1-63:25 | * |
| 64:15-65:3 | * |
| 65:12-19 | * |

48

| JOSEPH FRILANDO November 19, 2015 | |
| --- | --- |
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 28:7-18 | * |
| 29:4-30:12 | * |
| 37:3-6 | * |
| 66:7-80:15 | * |
| 80:24-81:24 | * |
| 82:1-106:22 | * |
| 107:14-110:9 | * |
| 111:2-7 | * |
| 111:21-114:16 | * |

\* Plaintiff objects to any deposition designations of Joseph Frilando.  Joseph Frilando is not a party to this case and as such, Defendant is not permitted unfettered use of his deposition testimony at trial aside from for impeachment purposes.  Defendant has not established that Joseph Frilando is unavailable to testify at the trial.  In fact, it is anticipated that Mr. Frilando will be testifying at the trial on behalf of Plaintiff.  As such, Defendant has not met the requirements of Federal Rule of Civil Procedure 32 to allow Defendant to utilize Joseph Frilando's deposition other than for impeachment purposes.

145806.00601/106584671v.1
145806.00601/106651278v.4

| DR. YU KYI, MD February 3, 2016 | |
| --- | --- |
| BORDENTOWN'S DESIGNATIONS | FRILANDO'S OBJECTIONS |
| 5:3-55:5 | ** |

** Plaintiff objects to any deposition designations of Dr. Yu Kyi. Dr. Yu Kyi is not a party to this case and as such, Defendant is not permitted unfettered use of his deposition testimony at trial aside from for impeachment purposes. Defendant has not established that Dr, Yu Kyi is unavailable to testify at the trial. As such, Defendant has not met the requirements of Federal Rule of Civil Procedure 32 to allow Defendant to utilize Dr. Yu Kyi's deposition other than for impeachment purposes. Furthermore, Plaintiff objects to any testimony by Dr. Yu Kyi at the trial as irrelevant. Information concerning Mr. Frilando's eligibility for a medical certificate is after acquired evidence, which is not admissible at the liability phase of the trial. The information Defendant had at the time of Mr. Frilando's inquiry is that he had a valid medical certificate. As such, any concerns about the basis for which that medical certificate was obtained are not relevant in determining whether or not Defendant discriminated against Plaintiff and as such, Dr. Yu Kyi's testimony should be excluded. It is well-settled that "the determination of whether a person was a 'qualified individual with a disability' for the purposes of a[ disability discrimination] claim is not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made." *Bowers v. NCAA*, 475 F.3d 425, 535-36 (3d Cir. 2007) (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006); *Gault v. Lucent Techs.*, 134 F.3d 576, 580; *see also Bates v. Long Island R.R. Co.*, 997 F 2d 1028, 1035 (2d Cir. 1993)). After-acquired evidence concerning a person's qualifications for admission is not relevant

50

to the issue of liability because "Defendant[] 'could not have been motivated by knowledge [it] did not have.'" *Bowers*, 475 F.3d at 535 (quoting *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995)).

Defendant reserves the right to designate additional deposition testimony for these witnesses or, in the event that another witness is unexpectedly unavailable to testify at trial, to designate testimony relating to that witness.

B.    **On damages defendant intends to read into evidence the following:**

| KENNETH FRILANDO<br>November 17, 2015 | |
|---|---|
| **BORDENTOWN'S DESIGNATIONS** | **FRILANDO'S OBJECTIONS** |
| 200:20-201:10 | Objection to the mention of Duchess as improper character evidence; irrelevant; more prejudicial than probative |
| 204:14-20 | |
| 204:23-205:1 | Counsel is testifying |

C.

To the extent also relevant to damages, Defendant reserves the right to read into evidence any deposition testimony designated with regard to liability.

C.    **Plaintiff object to the deposition testimony set forth above for the reasons stated:** Included in Chart above.

13.   **PLAINTIFF'S EXHIBITS (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibits as to which no such objection is made.)**

145806.00601/106584671v.1
145806.00601/106651278v.4

A.   **Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit):**

| P TRIAL EXHIBIT # | DESCRIPTION | OBJECTIONS |
|---|---|---|
| 1 | Email Correspondence (BDTS 2–10, 104–107) | No objection |
| 2 | CDL Lesson Plan (BDTS 21–99) | No objection |
| 3 | Internal emails (BDTS 108–111) | No objection |
| 4 | Sign language interpreter list (BDTS 110–125) | No objection |
| 5 | November 21, 2016 letter from FMCSA to Mr. Helton of Florida Department of Highway Safety & Motor Vehicles | Hearsay; relevance; no authentication or foundation; FRE 403 |
| 6 | December 29, 2017 Notice from FMCSA re Qualifications of Drivers; Applications for Exemptions; Hearing (https://www.federalregister.gov/documents/2017/12/29/2017-28128/qualifications-of-drivers-applications-for-exemptions-hearing) | Relevance; FRE 403 |
| 7 | October 1, 2014 Notice of Regulatory Guidance from FMCSA re Driver Qualifications; Regulatory Guidance Concerning the Applicability of Language Requirement to Drivers Who Do Not Meet the Hearing Standard (https://www.federalregister.gov/documents/2014/10/01/2014-23435/driver-qualifications-regulatory-guidance-concerning-the-applicability-of-language-requirement-to) | No objection |
| 8 | *Executive Summary: Hearing, Vestibular Function and Commercial Motor Vehicle Driver Safety*, August 26, 2008, (https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/Hearing-Evidence-Report-Final-Executive-Summary-prot.pdf) | Relevance; FRE 403 |

52

145806.00601/106584671v.1
145806.00601/106651278v.4

| 9 | Deaf COD Student Earns Perfect Score on CDL Tests (http://www.chicagotribune.com/suburbs/glen-ellyn/community/chi-ugc-article-deaf-cod-student-earns-perfect-score-on-cdl-t-2017-08-09-story.html) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 10 | Get the Hell out of my Weight Station! (http://www.fleetowner.com/driver-management-resource-center/get-hell-out-my-weigh-station) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 11 | Deaf woman fights for chance to drive a truck — and wins (http://jacksonville.com/news/2017-04-03/deaf-woman-fights-chance-drive-truck-and-wins) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 12 | Deaf woman becomes first in Wisconsin with a CDL (http://fox11online.com/news/local/fox-cities/deaf-woman-becomes-first-in-wisconsin-with-a-cdl) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 13 | New Mexico man first deaf truck driver to receive CDL in the state (http://www.livetrucking.com/new-mexico-man-first-deaf-truck-driver-receive-cdl-state/) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |

145806.00601/106584671v.1
145806.00601/106651278v.4

| 14 | Deaf Amarillo College student answers call of the road (http://amarillo.com/news/local-news/2016-08-08-1) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
|---|---|---|
| 15 | The People's Voice: Have drive, will travel: Rochelle man rides help from Tri-County to CDL license (http://www.saukvalley.com/2016/05/24/the-peoples-voice-have-drive-will-travel/aibeka6/) | Hearsay; double hearsay; relevance: no authentication or foundation; best evidence rule; FRE 403 |
| 16 | Sandy Sloat Becomes 1st Deaf Female to Graduate in Truck Driving (https://www.actx.edu/sandy-sloat-becomes-1st-deaf-female-to-graduate-in-truck-driving) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 17 | Deaf female trucker from Aurora ready to hit the road (http://www.chicagotribune.com/suburbs/aurora-beacon-news/opinion/ct-abn-crosby-deaf-trucker-st-1017-20161017-column.html) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 18 | Winston-Salem truck driver pursues career despite his lack of hearing (http://www.journalnow.com/business/business_news/local/winston-salem-truck-driver-pursues-career-despite-his-lack-of/article_6e587a75-5539-5573-a15c-47d4c1c97ed8.html?mode=story) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |

54

| | | |
|---|---|---|
| 19 | New Mexico First: Deaf man gets his Commercial Drivers Licence (http://krqe.com/2017/10/12/new-mexico-first-deaf-man-gets-his-commercial-drivers-licence/) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 20 | FMCSA response to public comments regarding the granting of exemptions from the hearing requirement in the Federal Motor Carrier Safety Regulations (https://www.gpo.gov/fdsys/pkg/FR-2017-12-29/pdf/2017-28128.pdf) | No objection |
| 21 | https://www.aamva.org/uploadedFiles/MainSite/Content/EventsEducation/Event_Materials/2017/2017_Region_I_Conference/FMCSA_Lewis_3.pdf | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 22 | http://www.publicsafety.ohio.gov/links/bmv-CDLTestingHearingExemptionGuidelines.pdf | Hearsay; relevance; no authentication or foundation |
| 23 | http://www.dispatch.com/content/stories/business/2016/07/07/hearing-impaired-now-can-get-commercial-drivers-license.html | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 24 | Email correspondence between Cindy Maugeri (FMCSA) and Defendant entitled "deaf drivers" (BDTS-0011) | No objection |
| 25 | John Huey Documents attached to 8.15.16 Amended Expert Disclosure Documents | Hearsay; double hearsay; no authentication or foundation; relevance; FRE 403 |

145806.00601/106584671v.1
145806.00601/106651278v.4

| 26 | Kenneth Frilando Current and Valid CDL Permit | Relevance; FRE 403 |
| 27 | Kenneth Frilando Current and Valid DOT Medical Certificate | Relevance; FRE 403 |
| 28 | Kenneth Frilando Current and Valid Hearing Exemption Waiver | Relevance; FRE 403 |
| 29 | State of Ohio – How to Obtain a CDL with Hearing Exemption Waiver Video – Published May 31, 2017 (https://www.youtube.com/watch?v=E3lNLbHyC8I) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 30 | New Mexico First: Deaf man gets his Commercial Drivers Licence – KRQE News 13 – Published October 12, 2017 (https://www.youtube.com/watch?v=M26Zbk9vPMQ) | Hearsay; double hearsay; relevance; no authentication or foundation; best evidence rule; FRE 403 |
| 31 | Any document listed on Defendant's exhibit list | No objection |

Plaintiff reserves the right to designate additional exhibits in advance of trial based on documents disclosed or produced by the parties or witnesses, or marked at any deposition in this case to the extent the Court determines that manifest injustice would result if such designation was disallowed.[1]

    B.    **Defendant objects to the introduction of plaintiff's exhibits (set forth number of exhibit and grounds for objection):** Included in Chart above.

14.    **DEFENDANT'S EXHIBITS (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be**

---

[1] Per the parties' conversation with the Court at the pretrial conference, the parties agree that demonstrative exhibits used at trial for illustrative purposes, and not admitted into evidence, will be addressed by the parties and the Court as they arise.

145806.00601/106584671v.1
145806.00601/106651278v.4

necessary to bring in the custodian of any exhibits as to which no such objection is made.)

A.      **Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit):**

| D TRIAL EXHIBIT # | DESCRIPTION | OBJECTIONS |
|---|---|---|
| 1 | Complaint (Dkt. 1), K. Frilando (KF) Dep. Ex. 1 | Pleadings are not evidence; Relevance; hearsay; invades the purview of the judge in explaining the law to the jury |
| 2 | Dutchess Complaint, KF Dep. Ex. 2 | Pleadings are not evidence; Relevance; hearsay; invades the purview of the judge in explaining the law to the jury; improper character evidence and more prejudicial than probative |
| 3 | Admissions of Plaintiff Contained Within Interrogatory Responses, KF Dep. Ex. 5 | Plaintiff reserves the right to renew objections previously made to the various requests; Plaintiff further reserves the right to make appropriate relevance and hearsay objections |
| 4 | Admissions of Plaintiff Contained Within Amended Interrogatory Responses, KF Dep. Ex. 9 | Plaintiff reserves the right to renew objections previously made to the various requests; Plaintiff further reserves the right to make appropriate relevance and hearsay objections |

57

| | | |
|---|---|---|
| 5 | Admissions of Plaintiff Contained Within Amended Interrogatory Responses, KF Dep. Ex. 10 | Plaintiff reserves the right to renew objections previously made to the various requests; Plaintiff further reserves the right to make appropriate relevance and hearsay objections |
| 6 | KF Driver's License, KF Dep. Ex. 11 | No objection |
| 7 | KF Abstract of Driver Record, KF Dep. Ex. 12 | No objection |
| 8 | KF FMCSA Waiver, KF Dep. Ex. 13, PLA37 | No objection |
| 9 | FMCSA "Terms of the Waiver," KF Dep. Ex. 13, PLA38 | No objection |
| 10 | FMCSA Correspondence, KF Dep. Ex. 13, PLA39-40 | No objection |
| 11 | FMCSA Exemption, KF Dep. Ex. 13, PLA41-42 | No objection |
| 12 | FMCSA Medical Examination Letter, KF Dep. Ex. 13, PLA43 | No objection |
| 13 | FMCSA Release, KF Dep. Ex. 13, PLA44-45 | No objection |
| 14 | Medical Examination Certificate, KF Dep. Ex. 14 | Relevance |
| 15 | Medical Examination Certificate, KF Dep. Ex. 15 | Relevance |
| 16 | HearUSA Report, KF Dep. Ex. 16 | No objection |
| 17 | Kenneth Frilando Medical Records, KF Dep. Ex. 17 | Relevance |

145806.00601/106584671v.1
145806.00601/106651278v.4

| 18 | Joseph Frilando-Jersey Tractor Trailer Training Correspondence re Kenneth Frilando, KF Dep. Ex. 19 | Relevance; hearsay, improper character evidence and more prejudicial than probative |
|---|---|---|
| 19 | Joseph Frilando-Dutchess School Correspondence re Kenneth Frilando, KF Dep. Ex. 20 | Relevance; hearsay, improper character evidence and more prejudicial than probative |
| 20 | E-mail chain re "my two years earhing [sic] exemption letter," KF Dep. Ex. 21, PLA1-2 | No objection |
| 21 | E-mail chain re "90 Day waiver," KF Dep. Ex. 21, PLA3-7 | No objection |
| 22 | E-mail chain re "90 Day waiver," BDTS-0002-10 | No objection |
| 23 | E-mail chain re "90 Day waiver," BDTS-0104-06 | No objection |
| 24 | John Diab e-mail re "Response," BDTS-0107 | No objection |
| 25 | John Diab e-mail chain re "Hearing Impaired Interview," BDTS-0108 | No objection |
| 26 | E-mail chain re "90 Day waiver," BDTS-0109-111 | No objection |
| 27 | John Diab e-mail chain re "ADA and the list of interpreters," BDTS-0112-13 | No objection |
| 28 | John Diab e-mail chain re "ADA and the list of interpreters," with attachments BDTS-0112-25 | No objection |
| 29 | E-mail chain re "Forklift training," BDTS-0126 | No objection |
| 30 | E-mail chain re "May 30," BDTS-0127-28 | Relevance |
| 31 | John Diab e-mail re "Your payment to Donald Rubel," BDTS-0129-30 | Relevance |
| 32 | E-mail re "Hearing Impaired," BDTS-0131 | Hearsay within hearsay |
| 33 | E-mail chain re "Hearing Issues," BDTS-0132-33 | Relevance; hearsay within hearsay |

145806.00601/106584671v.1
145806.00601/106651278v.4

| 34 | E-mail re "deaf drivers," BDTS-0134-35 | No objection |
| 35 | Bordentown CDL Training Enrollment Materials, D SJ Ex. 18, BDTS-0136-54 | No objection |
| 36 | Bordentown Course Syllabus, BDTS-0013-20 | No objection |
| 37 | Bordentown CDL Training Lesson Plan, D SJ Ex. 17, BDTS-0021-99 | No objection |
| 38 | Bordentown Comments Submitted to FMCSA Docket No. 2014-0383, BDTS-0100 | Hearsay; improper opinion |
| 39 | AAMVA Model Commercial Driver License Manual – 2005 CDL Testing Manual (July 2010) (D SJ Ex. 8) | No objection |
| 40 | FMCSA Medical Examiner Handbook, Yu Kyi Dep. Ex. 30 | Relevance; completeness – this appears to be an excerpt from the handbook, not the handbook itself |
| 41 | New Jersey CDL Manual (D SJ Ex. 15) | Relevance |
| 42 | New York CDL Manual (D SJ Ex. 16) | Relevance |
| 43 | CVTA Comments on FMCSA Docket No. 2014-0387, BDTS-0155-62 | Hearsay; improper opinion |
| 44 | Montana Motor Vehicle Division Comments on FMCSA Docket No. 2013-0126, BDTS-0163-64 | Hearsay; improper opinion |
| 45 | KF FMCSA Medical Examination Report, Yu Kyi Dep. Ex. 28, PLA27-35 | Relevance |
| 46 | Yu Kyi Medical Examination Summary for KF, Yu Kyi Dep. Ex. 26 at 5-6 | Relevance |
| 47 | ABC7 report on Kenneth Frilando (available at, among other sources, http://abc7ny.com/news/deaf-queens-man- | Relevance; hearsay within hearsay |

145806.00601/106584671v.1
145806.00601/106651278v.4

|  | fights-back-against-truck-driving-school-that-refuses-to-teach-him/879531/) |  |
|---|---|---|
| 48 | Any document listed on Plaintiff's exhibit list | No objection |

Defendant reserves the right to designate additional exhibits in advance of trial based on documents disclosed or produced by the parties or witnesses, or marked at any deposition in this case, to the extent the Court determines that manifest injustice would result if such designation was disallowed.[2]

**B.      Plaintiff objects to the introduction of Defendant's exhibits (set forth number of exhibit and grounds for objection):**  Included in Chart above.

**(COPIES OF EXHIBITS ARE TO BE MADE FOR OPPOSING COUNSEL, AND A BENCH BOOK OF EXHIBITS IS TO BE DELIVERED TO THE JUDGE AT THE START OF TRIAL.    IF COUNSEL DESIRES TO DISPLAY EXHIBITS TO THE JURY, SUFFICIENT COPIES SHOULD BE AVAILABLE TO PROVIDE EACH JUROR WITH A COPY; ALTERNATIVELY, ENLARGED PHOTOGRAPHIC OR PROJECTED COPIES MAY BE USED.)**

15.    **PLAINTIFF'S LEGAL ISSUES**

1.      Plaintiff is otherwise qualified to participate in Defendant's driver training program

2.      Defendant failed to make reasonable modifications that would accommodate the Plaintiff's disability.

3.      Whether Plaintiff is entitled to injunctive relief.

16.    **DEFENDANT'S LEGAL ISSUES**

1.      There is no reasonable accommodation under the ADA and the NJLAD for Plaintiff's disability that would permit Plaintiff to participate in Bordentown's CDL training program.

---

[2] Per the parties' conversation with the Court at the pretrial conference, the parties agree that demonstrative exhibits used at trial for illustrative purposes, and not admitted into evidence, will be addressed by the parties and the Court as they arise.

145806.00601/106584671v.1
145806.00601/106651278v.4

2.      Bordentown cannot accommodate Plaintiff's disability in its CDL training program with incurring an undue financial burden.

3.      Bordentown cannot accommodate Plaintiff's disability without fundamentally altering its CDL training program.

4.      Bordentown cannot accommodate Plaintiff's disability without directly threatening the health and safety of others.

5.      Bordentown was not required to accommodate Plaintiff because he never applied or sought admission to Bordentown's CDL training program.

6.      Plaintiff was not qualified to participate in Bordentown's CDL training program because, among other reasons, he did not obtain a valid FMCSA medical certificate prior to inquiring about admission to Bordentown's CDL training program.

7.      Bordentown was not required to accommodate Plaintiff because he never proposed any accommodation when he inquired about admission to Bordentown's CDL training program, or at any other time prior to filing this lawsuit.

17.   **MISCELLANEOUS**

   **Set forth any other matters which require action by, or should be brought to the attention of, the Court.**

   None.

18.   **JURY TRIALS – <u>the following should be submitted to the Court no later than two (2) weeks prior to trial:</u>**

   A.      Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2, with citations to authorities and arguments in support of its position on all disputed issues of law.

   B.      The parties shall confer and agree upon jury instructions and submit them to the Court with supporting authorizes on two separate computer discs in Microsoft Word format.  The first disc will contain the agreed-upon instructions, and the second disc will contain disputed instructions with the parties' alternative proposals.

145806.00601/106584671v.1
145806.00601/106651278v.4

C.      If any hypothetical questions are to be put to an expert witness on direct examination, these shall be submitted to the Judge and to opposing counsel.

D.      Counsel shall jointly submit to the Court a single set of proposed voir dire questions as to which the parties are in agreement, not to exceed 30 questions.

E.      Counsel shall jointly submit to the Court a single proposed special verdict sheet on a computer disc in Microsoft Word format.

F.      The parties shall prepare a joint trial exhibit list containing a description of all exhibits that is divided into two sections. The first section will identify the exhibits for which no objection has been raised, and the second section shall list those exhibits for which one of the parties has made an objection. The exhibits themselves are to be premarked and must include exhibit stickers. The parties must prepare a copy of all exhibits that they expect to use at trial for the Judge, Court Reporter, and opposing counsel.

19.    **TRIAL COUNSEL (List the names of trial counsel for all parties.)**

    A.    **Counsel for Plaintiff**

        Andrew Rozynski
        Brittany Shrader
        **EISENBERG & BAUM, LLP**
        24 Union Square East, Fourth Floor
        New York, NY 10003
        *Attorneys for Plaintiff*

    B.    **Counsel for Defendant**

        Anthony B. Haller
        Frederick G. Sandstrom
        Asima J. Ahmad
        **BLANK ROME LLP**
        130 N. 18th Street
        Philadelphia, PA  19103

        David C. Kistler
        **BLANK ROME LLP**
        300 Carnegie Center
        Suite 220
        Princeton, NJ  08540

20.    **BIFURCATION**

145806.00601/106584671v.1
145806.00601/106651278v.4

Bordentown's position is that the trial should not be bifurcated and, accordingly, issues of liability and damages should not be tried separately. If Plaintiff files a motion to bifurcate, Bordentown intends to oppose the motion and will set forth the legal and factual basis for its position in its opposition filing.

Plaintiff contends that liability and damages should be tried separately. Defendant seeks to admit after-acquired evidence concerning Plaintiff's medical condition in an attempt to urge the jury that Plaintiff was not otherwise qualified to attend Defendant's driving school. It is well-settled that "the determination of whether a person was a 'qualified individual with a disability' for the purposes of a[ disability discrimination] claim is not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made." *Bowers v. NCAA*, 475 F.3d 425, 535-36 (3d Cir. 2007) (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006); *Gault v. Lucent Techs.*, 134 F.3d 576, 580; *see also Bates v. Long Island R.R. Co.*, 997 F 2d 1028, 1035 (2d Cir. 1993)). After-acquired evidence concerning a person's qualifications for admission is not relevant to the issue of liability because "Defendant[] 'could not have been motivated by knowledge [it] did not have.'" *Bowers*, 475 F.3d at 535 (quoting *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995)). As such, this evidence should not be before the jury during the liability stage. If the Court rules that such evidence is admissible regarding damages, the trial must be bifurcated; otherwise, Plaintiff will be unduly prejudiced.

21. **ESTIMATE LENGTH OF TRIAL**

3-4 days.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE

145806.00601/106584671v.1
145806.00601/106651278v.4

CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

/s/
Eric M. Baum
Andrew Rozynski
**EISENBERG & BAUM, LLP**
24 Union Square East, Fourth Floor
New York, NY 10003
*Attorneys for Plaintiff*

/s/
David C. Kistler
Anthony B. Haller (*admitted pro hac vice*)
Frederick G. Sandstrom (*admitted pro hac vice*)
Asima J. Ahmad
**BLANK ROME LLP**
*A Pennsylvania LLP*
300 Carnegie Center, Suite 220
Princeton, NJ 08540
*Attorneys for Defendant*
*Bordentown Driver Training School, LLC*
*d/b/a Smith & Solomon*

65

Dated: 3/23/18

_____
**JAMES B. CLARK, III**
**United States Magistrate Judge**

145806.00601/106584671v.1
145806.00601/106651278v.4